UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

UNITED STATES OF AMERICA,

-versus- 08-CR-77

LINDA O'CONNOR and DEAN SACCO.

---------------------------------------------------------

TRANSCRIPT OF PROCEEDINGS

held in and for the United States District Court, Northern District of New York, at the Federal Building and Courthouse, 15 Henry Street, Binghamton, New York, on FRIDAY, April 25, 2008, before the HON. THOMAS J. McAVOY, Senior United States District Court Judge, PRESIDING.

APPEARANCES:

FOR THE GOVERNMENT:

UNITED STATES ATTORNEY'S OFFICE
BY: MIROSLAV LOVRIC, AUSA
Bighamton, New York

FOR THE DEFENDANT O'CONNOR:

FEDERAL PUBLIC DEFENDER'S OFFICE
BY: LISA PEEBLES, AFPD
Syracuse, New York

FOR THE DEFENDANT SACCO:

KELLY FISCHER, ESQ.
Binghamton, New York

THE COURT: This is in the matter of the application of defense counsel of Kelly Fischer to withdraw from the case defending defendant Mr. Sacco. Mr. Fischer is here, state your appearance, please.

MR. FISCHER: Your Honor, Kelly Fischer for defendant Sacco.

THE COURT: Mr. Sacco is also here. Good morning, Mr. Sacco.

DEFENDANT SACCO: Good morning.

THE COURT: And I think we have Mr. Lovric here from the government.

MR. LOVRIC: Morning, Judge.

THE COURT: The Court has received an application from Mr. Fischer, which the Court is going to order sealed, and is also going to order appended to the record. Responses have come from the public defender. I guess you should note your appearance too, Lisa.

MISS PEEBLES: Lisa Peebles on behalf of Linda O'Connor.

THE COURT: CO-defendant. And the Court has received correspondence from Miss Peebles on behalf of Miss O'Connor taking no position on behalf of Miss O'Connor on the application and the government has responded to the application asking that it be denied.

Mr. Sacco, from your perspective, how have you

been getting along with Mr. Fischer?

DEFENDANT SACCO: Well, I found Mr. Fischer to be sincere, genuine, intelligent, articulate. Almost Ivy-league type of attorney. However, I've been disappointed that our communication has not been continual in the last eight weeks.

THE COURT: Okay. Mr. Fischer, what would you like to say without going into any details regarding the application you've made about the situation this morning?

MR. FISCHER: Basically, your Honor, I would cite the ethical consideration under the Professional Code of Professional Responsibility EC2-30 which basically says that if the intensity of an attorney's personal feelings might affect -- may affect that attorney's ability to effectively represent his client, then the attorney should seek to withdraw. Based on the paperwork that I submitted which basically sets out my position personally, that raises a real concern for me in this case.

THE COURT: All right.

MR. FISCHER: Particularly with respect to the primary witness, almost the exclusive witness against Mr. Sacco, Shannon O'Connor.

THE COURT: I don't know about the exclusivity but I think you're right about the primacy.

Mr. Lovric, did you wish to be heard on this?

He cites to the canon of ethics that he says mandates under ethical considerations the ability to withdraw when a person -- an attorney's personal considerations would make it difficult for him to defend his client in this case, or impossible.

MR. LOVRIC: Judge, I don't think I'm in any position to offer any useful analysis of that not knowing the factual basis as to what exactly is the request here.

THE COURT: Let me just say, without going into any great detail, that Mr. Fischer has expressed to me a sincere problem that he has about continuing in this and it has nothing to do with logistics. It has to do with his own personal convictions and the Court believes that what he said was totally sincere and the Court accepts that. The Court has doubts, however, as to whether or not that's an appropriate legal consideration for granting that relief. The Court has done considerable research on that issue, has not researched the canon that just was brought up by Mr. Fischer, but will do so shortly and will issue a brief decision. But I just wondered -- I know the government has considerations. You're ready for trial. You've got your witnesses. I take it they're coming from all over. It's the eleventh hour for this application. The Court notes, Mr. Fischer, that you've been representing Mr. Sacco for some weeks now. Nothing really has changed in the charges against

Mr. Sacco. There may have been some slight change in the quantum or quality of proof against him and the Court doesn't believe that that warrants this kind of a consideration. Looking at the whole picture, nothing as the Court iterated is really different about the nature and circumstances of the charge against Mr. Sacco. You have indicated to me, and I've accepted that, you have carefully reviewed all of the discovery that the government has provided to you, that you spent a great deal of time reviewing that discovery because it was voluminous and you have a good knowledge of what's involved in this case and the Court accepts that to be true.

So, Miss Peebles, did you want to say anything now?

MR. LOVRIC: Judge, could I just add something to get my two cents on the record?

THE COURT: I thought you had your two cents. Go ahead and put in three or four cents.

MR. LOVRIC: Yeah, Judge. I guess to address what I can address which is the government's ready to go to trial. We're ready to go to trial on both defendants. You know, without knowing all the other things I really can't intelligently offer any opinion on it. What I can offer is, and I do mean this in a very respectful way to Mr. Fischer and to everyone involved, my primary concern is with my victim. I have a 14-year-old girl that's ready to testify.

We have been preparing her to testify now for the last month, in addition to preparing all the other witnesses. In this kind of a case versus -- if this was some RICO drug case or something like that, I probably wouldn't really care if there were some issues and we needed several more weeks to try the case.

THE COURT: I'll make a note of that and remember that for future reference.

MR. LOVRIC: Well, I think we have in the past where things come up in the last minute and we do accommodate issues but in this particular case it's very different. This victim has waited a long time to testify and she is ready to walk into this Court and testify about everything that happened to her. So my primary concern is with we're ready to go. She is ready to go and we would like to try this case.

THE COURT: Well, the Court -- I'll hear from you, Mr. Fischer, in just a moment. The Court is concerned, of course, and must ensure that Mr. Sacco has adequate counsel that can fairly represent him in an unconflicted situation and that he'll get a good defense on trial.

Mr. Fischer.

MR. FISCHER: I'm glad Mr. Lovric raised what he raised about the trial preparation involved. Given that I'm still retained or still representing Mr. Sacco in this

case, I need to raise at this point a problem that Mr. Sacco has with the recent receipt in literally a box containing about 50 pounds of documents, some information indicating that there was a condom found in a storage shed that apparently we have been told within the last about two weeks that contains DNA from this young woman and also apparently contains DNA from some unnamed male. The prosecutor has requested that Mr. Sacco provide a DNA swab and having spoken with Mr. Sacco, he's not willing to do that. But that also now presents to Mr. Sacco the problem that he probably, not probably, he must have that DNA that was just recently found tested to see what it shows because it will be important to his defense in this case to have that result privately tested and that is going to take time. That also effects the scheduling of the going forward with the trial on Monday. I have sought out DNA experts but I have not found anybody who can do this on such short notice now, and that presents a scheduling difficulty that I raise to the Court at this point on Mr. Sacco's behalf.

I also have to tell the Court that in speaking with Mr. Sacco yesterday, Mr. Sacco, and we discussed the possibility some time ago and we never revisited the issue, expressed a consideration in reconsideration of trying this case non-jury. Given the volume of the evidence that's now accumulated against him that I'm aware of, it may be in his

best interest to try this in front of the Court rather than in front of a jury. And I raise that because --

THE COURT: Well, we've got two separate concerns here.

Miss Peebles.

MISS PEEBLES: We're not willing to waive our right to a trial by jury for obvious reasons. And if, in fact, Mr. Fischer feels that way about representing Mr. Sacco, in light of the Court's decision with regard to my application for severance, I have very serious concerns that if he cannot effectively represent Mr. Sacco, it will definitely spill over into my case with regard to Miss O'Connor. So I would ask the Court to grant Mr. Fischer's application based on that ground on behalf of my client.

Judge, we have been preparing for trial. I've been working 24/7. I cancelled a trip to South Carolina and I've subpoenaed my witnesses, but this case is important to my client because it will effect the rest of her life obviously and I think every precaution has to be made in order to ensure that both defendants receive a fair trial.

Our position would be at this point, knowing what I know now, that I would ask the Court to grant Mr. Fischer's request to be relieved as Mr. Sacco's attorney and get somebody on board that will, in fact, be able to effectively represent him.

THE COURT: Don't you have cross purposes there? You've done all this work, ready to go to trial now, you want me to delay the trial by granting Mr. Fischer's application?

MISS PEEBLES: Well, your Honor, I do have cross purposes but my primary purpose is to make sure Miss O'Connor has a fair trial and I didn't know that that was Mr. Fischer's reason when the Court asked us to respond to his original application. If he is telling the Court that he is conflicted and he cannot effectively represent Mr. Sacco and the key witness is testifying against both defendants in this case, I have a real concern that something he may or may not be able to do or does will, in fact, have a detrimental impact on Miss O'Connor. I think it's only fair for both defendants that they have attorneys that can be zealous advocates on their behalf and I think that's what the law requires, your Honor. It doesn't appear Mr. Fischer's going to be able to do that.

THE COURT: I disagree with you. I don't think the law requires zealousness on part of the attorney. I think it requires adequacy on part of the attorney. I know Mr. Fischer is more than adequate.

MISS PEEBLES: I don't disagree with that, your Honor. I have a concerned based on what I just heard in the courtroom.

THE COURT: I appreciate your concern.

Mr. Lovric, what do you say in response to Mr. Fischer's claim that he only recently received the evidence concerning the DNA and that he is not, even though he's tried, had time to secure an expert that will be able to analyze, on Mr. Sacco's behalf, whether or not that DNA is, in fact, from the victim or who it is from. What do you say about that?

MR. LOVRIC: Judge, what I say is, we're learning of this one day before trial. We have given the defense notice of things that we have found and things that we have recovered as we recovered them. Back when the search warrant of that storage unit was done, which was a search warrant done recently.

THE COURT: Give me a date.

MR. LOVRIC: I'd have to look, Judge. I believe it was in March sometime that that storage unit was searched.

THE COURT: March of 2008?

MR. LOVRIC: Yes.

THE COURT: First part of March, middle March, end of March?

MR. FISCHER: March 31, your Honor.

THE COURT: March 31.

MR. LOVRIC: No, no, that's not correct.

March 31 is when I sent to both counsel the results of the condom test that I got back from the DNA lab.

THE COURT: When did you get that back?

MR. LOVRIC: I got it faxed to me I believe two days -- one day before then. It was faxed to me by the lab, I sent it out to defense.

THE COURT: March 29 or 30?

MR. LOVRIC: I believe so.

THE COURT: Okay.

MR. LOVRIC: The search warrant of that storage unit was done in March and we didn't know about that storage unit. We came upon it when we found a witness, a person that was a handyman for the defendant, and that handyman informed the police that there was a storage unit, and I do want to get this on the record because this is relevant. We disclosed to the defense when that search warrant was done. I think in a couple days I sent out copies of the search warrant, affidavit and the inventory and on that inventory it indicated packaged condoms and a used -- it didn't say used but it said a condom found in the storage unit. Mr. Sacco's investigators in the state case had found this same witness, this handyman, when Mr. Sacco was preparing to go to trial on the state because this witness has told us that an investigator from the state defense counsel came to see him and this witness said that he told

this investigator that there was a storage unit that he had rented from Mr. Sacco and put all of Mr. Sacco's belongings of the house into. His dresser, his materials, all the things that he had gathered. This witness asked the investigator did he want the key to the storage unit? And the investigator said no, I don't want that key and I don't want to look what's inside that storage unit.

THE COURT: When did that occur?

MR. LOVRIC: That occurred prior to -- I know it occurred prior to February of this year. I would have to go back. I believe it was some time in the fall of 2007. So, Mr. Sacco knew about this storage unit and Mr. Sacco's defense counsel in the state proceeding knew about this storage unit well before law enforcement. We learned of it when we interviewed this witness which was after the indictment in this case was brought out. It's after February 12 or 13 of 2008 when we indicted Mr. Sacco. Shortly after we learned of this storage unit, a search warrant was obtained. The unit was searched and in it was found, among many things, a used condom. It was in Mr. Sacco's dresser -- one of his drawers. That used condom then was sent to the DNA lab in -- New York State Police lab in Albany. The lab did an analysis and it found on the outside of the condom a female DNA, a full -- full allele spectrum DNA of a female. On the inside they found a

mixture. The mixture was a male/female mixture and a predominate allele with the female. We got that result back. We gave it to the defense. We gave both defense counsel copies of those reports. We then went out and got a buccal swab from the victim. We then sent that buccal swab to the DNA lab. The DNA lab analyzed the victim's DNA compared to the DNA found on the condom. The outside condom matches perfectly the victim's DNA. There's a one in three hundred billion chance it's someone other than the victim. The inside mixture, male to female, the female portions of the DNA are consistent with the victims. The male portion of the DNA -- there is only three alleles present and the only thing that any lab could say is whether a person is excluded as a possible contributor. They could not make a match even if you sent them the person who you believe is the person that left that. We provided those results to the defense at the same time that I got them. Within a day of getting them I provided that result. The first result we gave them when we received it from the lab.

Couple things, Judge. First, this is the first I'm hearing from defense on Mr. Sacco's behalf that they have something they need to do as far as testing. I had even offered -- if Mr. Sacco wanted to submit a buccal swab, we would have the lab run his buccal swab to that three allele mixture portion to see if he could be excluded or not

excluded. That's all they would be able to say. That would take one or two days according to the lab. I never heard anything back from the defense. In my letter, if I don't hear back, I assume Mr. Sacco is not interested.

THE COURT: When did that letter go out?

MR. LOVRIC: Judge, I'd have to look.

THE COURT: Give me a couple of days.

MR. LOVRIC: What's today, 25? I don't know. Maybe ten days ago. I don't know if Mr. Fischer has the letter with him. I don't. So, first of all, Judge, I'm a little troubled that the defense tells me this here on Friday. I mean, when we sent out all these results, I gave them the Jencks material as to the -- I gave him the reports as I got them. I never got any calls from anybody, except Miss Peebles in kind of a joking way asking for something but it was -- the defense never indicated anything that they wanted any more time or anything more from us as far as this DNA test is concerned. The point being though, this was done as we were uncovering evidence. It's not as though we did or found these things many, many months ago and the most critical point that I point to is Mr. Sacco, the defendant, knew about this storage unit and this condom in that storage unit and his investigator on the state side and I have to assume his lawyer on the state side knew that, as well. They chose not to touch it and not to do anything with it. That's

their prerogative. He certainly can't say that he is surprised by things that we have uncovered in the last several weeks. So that's my point as far as the DNA is concerned.

The non-jury trial, again, I'm hearing all of this right now Friday, day before trial. First of all, it's very interesting. Second of all, I think it's completely -- should not effect what we're doing here. If Mr. Sacco wants a jury trial, I will think about whether the government wants to consent to a jury -- to a non-jury trial with Mr. Sacco as I don't know if he knows it, but we have to agree to a non-jury trial in the federal system. And if we do, in fact, we can still have one trial starting Monday. The try will go on. Your Honor will decide Mr. Sacco's fate, the jury will decide Miss O'Connor and we go on with the trial. I don't really think that's an issue. If the government decides that we want a jury trial as to both, then that would take place as to both but I am a little perplexed as to why we're discussing this DNA issue today. I'm wondering whether it's simply another argument that really goes to the first application to be relieved and, again, not knowing what the substance of that is I can't throw my two cents in whether I think that's valid or not.

THE COURT: The Court can separate out the application on the basis upon which it was made from the DNA

problem that the Court now must wrestle with because just -- it would seem to me that ordinarily if there had been a lot of time, Mr. Fischer certainly would have the opportunity to submit that condom to a lab for independent analysis that might be different than what your lab said.

MR. LOVRIC: Sure.

THE COURT: But I'm going to have to think about it in relationship to how this came up as far as the time is concerned.

MR. FISCHER: With respect to those times the report is dated March 31 from the State Police lab. It came in a box of discovery to me sometime thereafter and I don't have the date. Mr. Lovric's letter to me is dated April 17 and was mailed over to me, so I received it sometime thereafter.

THE COURT: Okay. That helps.

MR. LOVRIC: But I want to point out, though, I don't want to get into a mini war with Mr. Fischer here. In addition to this box of things, I do this little thing called a discovery notice and in there very conspicuously is please note the condom has been analyzed and it summarizes -- so this letter goes back in ECF, so I don't think I'm hearing that Mr. Fischer is saying it took him 14 days to read the whole box, only then did he realize there's a DNA report. In my ECF notice letter which comes to him on his computer, like

it does to me, I articulate in there, there has been a DNA test done on a condom. The report is included in discovery and when I got the results in my letter I indicate the results of that DNA analysis and when I got the match I indicate that in the letter. So I hope I'm not hearing from counsel that he just -- it got lost in the shuffle of many, many papers in a box because I don't believe that's accurate.

DEFENDANT SACCO: Your Honor, if I may say one thing. I'm interested in going to trial as quickly as possible as Miss Peebles is. I want to get it behind me but I have no indication whatsoever that Mr. Fischer is actually ready at this time. I haven't discussed anything. I haven't seen any motions that he's put forth. I haven't received any replies from any of the letters that I sent him in the last eight weeks. When I read in the newspaper that a trial was taking place on the 28 of April, I was -- it couldn't be true. I hadn't spoken to Mr. Fischer so I think there is a little bit of an issue that he may not be ready, although I'd like to go, you know.

THE COURT: Okay. All right. The Court understands. All right.

Well, the Court needs at least a few minutes to think over these things it's been presented with for the first time in this context today, this morning on this bench, so I'll try to get an order out sometime this afternoon.

Beyond that, I cannot do anything.

Court stands adjourned.

(Court stands adjourned)

C E R T I F I C A T I O N

I, VICKY A. THELEMAN, RPR, CRR, United States Court Reporter in and for the United States District Court, Northern District of New York, do hereby certify that I attended at the time and place set forth in the heading hereof; that I did make a stenographic record of the proceedings had in this matter and cause the same to be transcribed; that the foregoing is a true and correct copy of the same and the whole thereof.

___________________________

VICKY A. THELEMAN, RPR, CRR
United States Court Reporter
US District Court - NDNY

Dated: April 28, 2008.