1

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                    -versus-                    08-CR-77

6   LINDA O'CONNOR and DEAN SACCO.

7   ----------------------------------------------------------

8                    TRANSCRIPT OF JURY TRIAL

9   held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  MONDAY and TUESDAY, May 5 and 6, 2008, before the HON.

13  THOMAS J. McAVOY, Senior United States District Court Judge,

14  PRESIDING.

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Bighamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

USA vs Sacco and O'Connor                    2

1         (In Chambers)

2              THE COURT:  We have been having a discussion

3    off the record here.  In fact, I guess maybe it's better if

4    you all state your appearances for the record.

5              MR. LOVRIC:  Miroslav Lovric for the

6    government.  Good morning, everybody.

7              MISS PEEBLES:  Lisa Peebles appearing on

8    behalf of Linda O'Connor and also James Egan from the Office

9    of the Federal Public Defender for Linda O'Connor.

10             MR. FISCHER:  Kelley Fischer for Dean Sacco.

11             THE COURT:  We have been having an informal

12   off the record discussion about the nature and content of the

13   trial and how it would affect jurors and we all agree that

14   material that will be the subject matter of this trial is

15   difficult material and may be very difficult for some jurors,

16   because I don't think that sexual abuse of children is

17   something that is unfamiliar to most people in this place or

18   any other community.

19             Lisa Peebles from the public defender's office

20   has submitted a list of questions in writing that she

21   proposes to give to the jurors on the theory that it would be

22   less embarrassing for them and they may be more forthcoming

23   if they didn't answer any of these questions, even in open

24   court, even in front of the Judge alone or the Judge and

25   lawyers, let alone standing up in the jury box and giving up

1    this kind of information.  If they answered this

2    questionnaire which will be appended to the record and I

3    think the government agrees, although the government has

4    expressed some reservations about doing it that way, it seems

5    to me this is the least offensive way of doing it and we're

6    more likely to get information that we can use in making a

7    decision of who goes and who stays and I'm talking about the

8    lawyer's decision, not the Court's decision.   We want to

9    give them to the jurors to have them fill them out and have

10   them collected.  Okay.  It's going to hold the process up.

11           How about other issues that we have to --

12   peremptory issue was we're going to go with what the statute

13   says.  The Court realizes there's two defendants and has

14   discretion to allow more peremptories to both the government

15   and defense but the Court doesn't really see the need for

16   that in this case.  I think by using this questionnaire and

17   by using other discreet questions we can weed out those

18   jurors who may be prejudiced one way or another and the

19   ordinary cause challenge and peremptory statutory challenge

20   numbers are enough I think in this case.

21           Did you want to take an exception?

22           MISS PEEBLES:  Yes, we would take an

23   exception.  We'd ask the Court to grant us a couple extra

24   based on the nature of the case and the fact that there's two

25   defendants.

USA vs Sacco and O'Connor

4

1           THE COURT:  Yes, sir, Mr. Lovric.

2           MR. LOVRIC:  It's ten and six, then I got the

3   numbers, right?

4           THE COURT:  Ten and six.

5           MR. FISCHER:  I just want to echo Miss

6   Peebles' request.  I'd like to echo Miss Peebles' request for

7   additional peremptories.

8           THE COURT:  We're going to have four alternate

9   jurors.  Does everybody think that's enough?  Everybody's

10  nodding in agreement.

11          MR. FISCHER:  Yes.

12          MISS PEEBLES:  Yes.

13          THE COURT:  Let me address an issue that we

14  did address a few moments ago off the record and that's the

15  issue of the sanctity of these medical records, hospital

16  records, inpatient records and social worker records that the

17  Court has already viewed to some extent, and the Court

18  recognizes that there's a privilege between the person who's

19  treated and the treating entities or the conferring entities

20  in the case of the social workers and that this privilege

21  ordinarily is not something that can be penetrated for

22  purposes of cross-examination, our cross-examination.  Here

23  we have two defendants that are accused of very serious

24  criminal conduct and the Court believes that one of the main

25  components of the government's case and the Court believes

USA vs Sacco and O'Connor                    5

 1  this based upon working with the case and working with

 2  everybody involved in reviewing the records over a long

 3  period of time, that if the -- if the victim, Shannon

 4  O'Connor, takes the stand and testifies about the involvement

 5  of either defendant, that the defendant's right to construct

 6  a defense to defend themselves, to adequately present their

 7  defense, should be able to penetrate the privilege and ask

 8  questions about events that occurred with the young lady

 9  while she was in treatment or consulting that would affect

10  her credibility as to matters she testifies to in Court.

11          Now, the Court has gone through almost all of

12  the records and has carefully held out and restricted matters

13  that the Court believes certainly are necessary for her care

14  and treatment but have no bearing, in the Court's view, on

15  the issues that are presented in this case.  However, all

16  other matters where there were discussions about the people

17  involved in this case or events where she knew about certain

18  things and discussed them, those records are going to be

19  given to both sides and they're not to be used until we hear

20  the direct examination and the Court can discern whether or

21  not cross on those matters are appropriate.

22          MR. FISCHER:  If I may, your Honor.

23          THE COURT:  Certainly.

24          MR. FISCHER:  I understand from reviewing of

25  the records that the government has provided that there may

1   have been statements by medical providers that Shannon

2   O'Connor suffered from a -- I don't know whether it was

3   serious or severe, I don't recall the word -- mental illness.

4   There were also intimations in the documents that I was

5   provided that she suffered at one time -- from while she was

6   recently in care at the Robinson Street facility, that she

7   suffered from some auditory hallucinations.

8                   THE COURT:  If there is anything of that

9   nature --

10                  MISS PEEBLES:  I have that.

11                  THE COURT:  It's very sparse.  There are, and

12  I'm prepared to give to you, whatever diagnoses were made.

13                  MR. FISCHER:  Yes.

14                  THE COURT:  I think that's important for the

15  defense to have.  I understand it's a direct breach of the

16  privilege.  The Court's fully aware of that.  Some appellate

17  court might be thinking I didn't understand the privilege.  I

18  do.  I just think in this case it has to give way.  The

19  impression I got from reading the medical records, she

20  certainly was not normal, she was disturbed and it appears

21  that arose out of -- in the opinion of her care providers of

22  abuse that she received and that -- and that she needed to be

23  medicated and she was medicated and she needed to be observed

24  and that's the theme in the Robinson Street records is that

25  she was under strict observation to prevent suicide or

USA vs Sacco and O'Connor                    7

1   self-injurious behavior and there's things in the record that

2   indicated that those dangers were real and present.  The

3   other matters basically were feelings that she had about her

4   mother and the relationship with her mother and maybe some

5   minors things about Mr. Sacco, but that's what's there.

6              I've reproduced everything I sent to you.

7   This stuff I haven't read over the weekend, we'll do that

8   today.  There may still be some more.  I don't think there's

9   going to be anything new in these records that you guys

10  haven't seen.  So I'll give everybody an exception, even

11  though you haven't taken one.  If I'm wrong and I shouldn't

12  do this and then I'll pay the penalty.  The circuit will send

13  it back and some other Judge will try the case next time

14  because I'm a senior.

15             MISS PEEBLES:  That's assuming there's a

16  guilty verdict.

17             THE COURT:  Assuming.  I don't assume that at

18  all.  I don't know what the verdict is going to be.

19             Off the record.

20             (Discussion held off the record).

21             MISS PEEBLES:  Judge, we made a pretrial

22  motion concerning some indication by the government in the

23  discovery letter that we received that they were going to

24  attempt to offer as 404(b) evidence that Mrs. O'Connor had

25  been sexually abused by her father and that she was

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs Sacco and O'Connor                    8

1   prostituted, past tense, and was convicted or charged with

2   prostitution and we made a motion to request the Court to

3   preclude the government from eliciting any type of

4   information concerning that and we've put in our papers the

5   basis for our request.

6                    THE COURT:  The Court has that.  Yes, you did.

7   What's the government's position on the fact that she may

8   have been abused or prostituted by her father when she was a

9   young child?

10                   MR. LOVRIC:  Judge, maybe I can clarify the

11  issue.  We are not going to seek to introduce in our direct

12  case any of those matters.

13                   THE COURT:  Oh.

14                   MR. LOVRIC:  But we do and we will utilize

15  those if defendant O'Connor testifies because they are very

16  relevant at that point in terms, if she testifies, about

17  conduct and actions.  So to clarify we're not going to seek

18  to introduce it on the direct case.

19                   THE COURT:  Okay.  I appreciate that.  That

20  probably helps someone.

21                   MISS PEEBLES:  Yeah.

22                   THE COURT:  Let me ask you this:  Assuming she

23  does take the stand for a moment, I don't know what she's

24  going to up do, it's up to her and her attorney at the final

25  decision making process, she takes the stand and denies any

USA vs Sacco and O'Connor

1   allegations of wrongdoing.  Now you begin to cross-examine

2   her.  I've looked at the list of misdemeanors, some of them

3   may possibly be relevant on credibility and some of them

4   aren't because of the rules.  We all know about 409 and case

5   law we can go into those individually when we have to.  What

6   would be the government's idea of relevancy or not even yet

7   getting to 403 of the fact she was abused by her father or

8   prostituted by her father when she was young?

9               MR. LOVRIC:  Well, it's relevant as to the

10  fact that she's charged in this case with prostituting her

11  child, pimping her out to other men which is exactly what she

12  underwent and what was done to her.  I think it's relevant to

13  determine whether or not she has the ability to know what it

14  is that's being done, how it's being done.  It goes towards

15  the fact that she went through this experience when she was a

16  teenage girl.  She has some idea of how this is done, what

17  happens, and it's like -- like the same thing when you are

18  trying to prove that someone is producing child pornography

19  on a specific event.  The fact that they have put together

20  things on different occasions or in past occasions.

21              THE COURT:  That's different, isn't it?

22              MR. LOVRIC:  No physical.

23              THE COURT:  She's the victim, wasn't she?

24              MR. LOVRIC:  No.  Well, she's the victim but,

25  you know, at the age of 18 she's -- under some state law

1    she's an adult.  If she's out prostituting herself and being

2    prostituted by her father, it's relevant as to whether or not

3    she can then turn around and do that to her child in terms of

4    knowledge, what it takes, what happens, what she's going to

5    do and what she isn't.

6              THE COURT:  First of all, I don't accept that

7    premise.  I disagree what you're saying.  Number one, if I

8    did agree with it and it's remotely possible it is relevant,

9    I'd say under 403 the prejudicial effect of that far

10   outweighs any probative value.  That's my preliminary ruling.

11   As the trial develops things may happen and I may have to

12   look at it differently but right now that's the way I'm

13   looking at it.

14              So what else we got?

15              MR. FISCHER:  Well, no, no, your Honor.  You

16   know, cross-examination of and really introduction of

17   evidence -- apparently Shannon has stated that George Lang

18   abused her before Dean Sacco was in the picture.

19              THE COURT:  So there's evidence that Linda

20   O'Connor had had her daughter associate with George Lang in

21   an improper purpose?

22              MR. FISCHER:  Yes, including photographs.

23              THE COURT:  Yes.

24              MR. FISCHER:  The government has indicated

25   they intend to offer -- withdrawn.  I'm sorry.  Confusing

USA vs Sacco and O'Connor                                    11

1    issues.  My position basically is that brings Rule 412 of

2    Federal Rules of Evidence into play.  Part of what we're

3    talking about is the injury to the girl as a result of her

4    abuse, her symptoms, her medical treatment and as I read it,

5    412 (B)(1)(a) allows examination concerning her prior conduct

6    if it relates to an injury and, therefore, I do believe that

7    that prior conduct and beyond that basically my defense, I'll

8    put it right on the table, that she's transposing

9    psychologically events from George Lang to what occurred

10   here.

11                 THE COURT:  So you want that in the record.

12                 MR. FISCHER:  I do.

13                 THE COURT:  You're offering it, right?

14                 MR. LOVRIC:  I'll be honest with you, Judge, I

15   don't understand this issue at all.  What's the objection?

16                 THE COURT:  He's not making an objection.

17                 MR. LOVRIC:  I'm asking what's on the table?

18                 MR. FISCHER:  Basically Rule 412, as I

19   understand the premise of the rule is you can't use prior

20   sexual conduct of the victim.

21                 MR. LOVRIC:  Okay.

22                 MR. FISCHER:  But I think that there are some

23   exceptions one of which applies here and I do believe the

24   prior sexual conduct of the victim, although all be it

25   involuntary, relates to what she's going through here.

1           THE COURT:  Well, I think the government --

2           MR. LOVRIC:  I can simplify that.  We're

3     introducing that because O'Connor's charged with --

4     O'Connor's charged with trafficking the minor to several men,

5     not just Sacco, to George Lang and to two other men who are

6     unidentified.  That's going to come in.

7           THE COURT:  You're going to try to get it in.

8           MR. LOVRIC:  Right.

9           MISS PEEBLES:  Because I don't see anywhere in

10    the indictment where George Lang is even brought up.  I don't

11    think that's in there.  It's all intertwined with Dean Sacco.

12          MR. LOVRIC:  Count three.

13          THE COURT:  That's where 412, 413 may come

14    into play as prior misconduct on the part of your client,

15    Lisa, with respect to the daughter.  And I've looked through

16    those rules.  I think these are what they're designed to do.

17          MISS PEEBLES:  To be honest with you, it

18    doesn't cut against our theory of the case that it comes in

19    any way.  I don't know that it's going to be an issue.

20          THE COURT:  That leads to me to one last

21    question.  Supposing this evidence starts coming in, you're

22    going to use it, Lisa's going to use it and the government's

23    going to use it, all draw different conclusions, do you or do

24    you not want me, Mr. Fischer, to instruct the jury that this

25    evidence against Linda O'Connor cannot be considered against

USA vs Sacco and O'Connor

13

1    your defendant in terms of any of the charges against him

2    because it can't be?

3                    MR. FISCHER:  I would ask that you instruct

4    the jury it cannot be used against Mr. Sacco.

5                    THE COURT:  Even on the face of the theory

6    you're going to use this transposition.

7                    MR. FISCHER:  Because basically I'm saying

8    it's not evidence against him.  It's confabulation.  That's

9    consistent I think with my position here.

10                   THE COURT:  Okay.  You'll get it.

11                   MR. FISCHER:  Thank you.

12                   THE COURT:  Let's go through this stuff.

13                   (Discussion held off the record).

14                   MISS PEEBLES:  One thing, Judge.  I didn't

15   know if this was an issue or not but I would ask the Court

16   that they not require Linda to have leg braces on or the

17   chains on.

18                   THE COURT:  I was asked that before.  I didn't

19   think that was necessary.  Do you want me to convey that to

20   the Marshals service?

21                   MISS PEEBLES:  Yes.  The way they were going

22   to set them up, I didn't want my client to be sat next to Mr.

23   Sacco.  We're crunched at that table for jury selection.  If

24   I can have put her on the end between Dean Sacco, it would be

25   better.

USA vs Sacco and O'Connor                              14

 1              THE COURT:  Let's see what Kelley says about

 2    that.

 3              MR. FISCHER:  You always have the concern that

 4    somebody's going to see the defendant in shackles but if it's

 5    just the legs and Mr. Sacco's in the middle, that's not a

 6    problem.  He does wear a -- I think it's a jail wrist band

 7    that we should get off him before he goes in.

 8              THE COURT:  All right.

 9              MR. FISCHER:  And --

10              THE COURT:  We've arranged it with Colleen

11    that the defendants will be in the courtroom before the jury

12    comes in and seated, so they'll be no chance but I'll try to

13    address your concern with them.

14              MISS PEEBLES:  Thank you.

15              THE COURT:  Anything else.

16              MISS PEEBLES:  I think that's it.

17              (Reviewing of Questionnaires).

18              THE COURT:  We are here in chambers just about

19    to begin jury selection and Mr. Fischer has raised a question

20    about the arrangements for his client and how severe the

21    restriction should be on his liberty and we all know he's got

22    a past history.  We may have to flesh all that out but the

23    marshal is here and I'd ask you to tell me what plans do you

24    have to secure that defendant in the courtroom.

25              THE MARSHAL:  We're going to use leg irons,

1   they're going to be duct taped so they don't make any kind of

2   clicking noise.  And also since the courtroom lacks any kind

3   of bolt in the ground that we can attach the leg irons to

4   limit his movements, if he decides to jump up and maybe go

5   after his co-defendant or whatever, I'm going to use the

6   table -- is an old table.  It has a pretty thick beam going

7   across it on the beam.  I'm going to use a chain to attach

8   his leg irons to the table physically.  I was going to give

9   him enough movement, he's going to be comfortable and be able

10  to adjust himself.  It will limit him from jumping up and

11  moving away from the table.

12              THE COURT:  What will the jurors be able to

13  see?

14              THE MARSHAL:  Nothing.

15              THE COURT:  Is the chain wrapped around that

16  cross member?

17              THE MARSHAL:  That's correct, your Honor.

18              THE COURT:  How do you keep that from making

19  noise?

20              THE MARSHAL:  Also duct tape.

21              THE COURT:  Do you think his background merits

22  that additional security?  I've tried all kinds of cases with

23  all kinds of people, including violent murderers, that ended

24  up serving life sentences and I don't recall anybody being

25  chained down.  Leg irons always but that additional step

USA vs Sacco and O'Connor

1  which may be necessary in this case is something above and

2  beyond what's been done before.  Now I appreciate that we

3  have to be concerned, very concerned about security in this

4  courtroom for the defendant's benefit, as well as everybody

5  else but I think the paramount thing is that the jury doesn't

6  get the idea that this gentleman is any more dangerous than

7  anybody else in the courtroom.

8              THE MARSHAL:  Marshal service has done -- we

9  have attached people's leg irons.  There have been cases that

10 the Marshal service actually has installed bolts into the

11 concrete, into the courtroom and that was utilized to attach

12 the leg irons through.  Here we don't have this, therefore,

13 it's that we're using the beam.  It's the defendant's past

14 history, unstable pretty much, mental status, comments he has

15 made to myself and other deputies while in our custody in the

16 beginning of this case before we even went to trial.  He has

17 made statements to me, said in regards, you just want to

18 punch me, don't you?  Let's bring it on.  That kind of

19 comments.  I'm worried that if there's less restraint he

20 might get enough momentum going where he could either hurt

21 Linda O'Connor, her lawyer, or even his lawyer or even

22 Mr. Lovric.

23              We're also we're also going to have an

24 electronic devise, taser available.  In order to minimize the

25 chances of us using that, I think a physical restraint would

USA vs Sacco and O'Connor

1    keep him more grounded than using a taser if he does get --

2                THE COURT:  We certainly want to avoid that if

3    it's possible.

4                THE MARSHAL:  His demeanor, attitude towards

5    any kind of law enforcement authority that I observed.

6    Personally, if it's ourselves or even Broome County

7    Sheriff's, makes me believe that he would probably be a good

8    candidate for this.

9                THE COURT:  Mr. Fischer.

10               MR. FISCHER:  Your Honor, I'm not aware of any

11   incidents while Mr. Sacco's been incarcerated at the Broome

12   County Correctional Facility where he's been isolated for any

13   reason.  He did a number of years in New Jersey state prison.

14   We have parole records, no indication there of any violent

15   conduct during his incarceration there.  In my experience, in

16   meeting with him, he's frustrated and angry but there's no

17   indication to me that he poses any physical risk in this

18   setting of escape or attacking anybody at all.

19               THE COURT:  When put in the equation of it's

20   less likely that he'd have to be tasered if he has that chain

21   wrapped around that cross member, do you still think that's a

22   thing that, if he doesn't object to that, he hasn't objected

23   to that, has he?  He doesn't know about it, right?

24               MR. FISCHER:  He has not been made aware of

25   this yet, no.  And, again, if there's a risk -- jury's going

USA vs Sacco and O'Connor                    18

1   to know he's incarcerated, that's just one more straw on the

2   camel's back.  It's not a risk that's justified under these

3   circumstances at all in my opinion.

4              THE COURT:  Does he know how he's going to be

5   restrained in the courtroom?

6              THE MARSHAL:  Not yet.  I wasn't sure if this

7   was going to go through, therefore, he wasn't notified yet.

8   If, your Honor, this does pose a problem, we can avoid it but

9   just so you know, the taser will be utilized if Mr. Sacco

10  steps out of line with anybody.

11             THE COURT:  I understand that.  I'd like to

12  avoid that.  I know it's a necessary device and I'm aware of

13  Mr. Sacco's background to a certain extent.  The New Jersey

14  incident where he pulled the weapon in a crowded bus station

15  and all kinds of physical action.  I observed him myself in

16  the courtroom, in my opinion, all of the defendants, except

17  for two that I've observed over 22 years doing this kind of

18  work, he seems to be -- have the least amount of stability,

19  except for those other couple that I mentioned and so I think

20  I'm going to allow him to be wrapped around the table, leg,

21  chain, cross member, because I think although it might upset

22  him to some degree, in the long run balance it all out.  It's

23  not going to give the jury any information that he's anymore

24  dangerous than if he were not wrapped around because they're

25  not going to know about it.  That's what we're going to do.

USA vs Sacco and O'Connor                    19

1   I'll give you an exception.

2                    MR. FISCHER:  Thank you.

3                    THE COURT:  What else do we got to do?

4                    MR. LOVRIC:  Just for the record, I was going

5   to add there's a considerable information about Mr. Sacco's

6   background i think to support that.  I think from the

7   government's standpoint, I don't think there's any -- there's

8   really no detriment to Mr. Sacco in terms of the security

9   procedure.  There's going to be nothing the jury's going to

10  know.  Most importantly it's a minor inconvenience for the

11  defendant which I don't think is an inconvenience.  I've read

12  Mr. Sacco's autobiography where he talks about a lot of

13  different activities and conduct and even about his own

14  personality disorders, his criminal history.  I think he is

15  and I hope counsel can recognize, I think he is a very

16  disturbed individual in the sense of his personality.  By way

17  of example, after -- after the controlled telephone calls

18  were made to him by the victim in this case and on the day

19  that the New Jersey State Police or New Jersey Police

20  Department went to find him, he actually tried to commit

21  suicide and kill himself.  That's, I think, to the extreme

22  that he has gone in terms of his thinking.  Now I don't know

23  where he is today in terms of that but it certainly indicates

24  that he has some very extreme thinking in terms of how to

25  deal with this issue.

USA vs Sacco and O'Connor

1          THE COURT:  Okay.  I want the government and

2    the defendant each to secure and make available for

3    attachment to the record any information they have about this

4    gentleman's background and proclivity toward irrational acts

5    or rational acts, how ever you want to characterize it, so

6    the Second Circuit can see what decision was made by the

7    Court.  The Court's aware of a lot of that stuff and hasn't

8    articulated it for the record because we're very pressed for

9    time.  I've made my decision but I want the circuit to see

10   what the background is.

11          MISS PEEBLES:  Judge, so we're clear on who

12   we're calling back, are we going to have a list of who we're

13   going to talk to individually, do you want to do that now?

14          THE COURT:  I've got a list of people I'm

15   going to ask.  That's one thing.  I may miss something so

16   when you're questioning the jurors, is there something about

17   the answer you gave on your questionnaire that you'd like to

18   address prior with the Judge or do you want to answer my

19   questions here or you just want to say I'd like you to step

20   up to the bench, there's a couple things I'd like to ask you.

21          MISS PEEBLES:  Can I do that?

22          THE COURT:  Sure.

23          MISS PEEBLES:  I'll do that.

24          THE COURT:  Because I'll probably miss

25   something here.

USA vs Sacco and O'Connor                    21

1              (Discussion held off the record)

2              (Whereupon Jury Selection taken place)

3              (Court stands adjourned)

4          (Tuesday, May 6, Continuation of Jury Selection)

5              (Whereupon a Jury was duly selected and sworn)

6          THE COURT:  I was gone so long you forgot your

7    seating arrangement.  I apologize for the delay and my doctor

8    apologizes, the whole medical community apologizes, but when

9    you get over there you just can't hurry them.  You've just

10   got to go through the procedure.

11         All right.  I'm going to give you a charge

12   here.  I'm going to tell you it's going to be your duty to

13   find from the evidence what the facts are.  You and you alone

14   are the judges of the facts.  You'll then have to apply to

15   those facts the law as the Court gives it to you and you must

16   follow the law whether or not you agree with it.

17         Nothing that I do or say during the course of

18   the trial is intended to indicate or should be taken by you

19   as indicating what your verdict should be.  That's a matter

20   that's entirely up to you.

21         Now, the evidence from which you'll find the

22   facts will consist of the testimony of the witnesses and

23   documents and exhibits received in the record, and any facts

24   that the lawyers might agree to or stipulate or something the

25   Court may instruct you to find.  Certain things are not

1   evidence and must not be considered by you as evidence and I

2   will list some of those for you now.  The statements, the

3   arguments and the questions by the attorneys are not

4   evidence.  Objections to questions are not evidence.  The

5   attorneys have an obligation to their clients to make

6   objections when they feel some item of evidence being offered

7   is contrary to the rules.  You should not be influenced by

8   the objection or by the Court's ruling on it.  If an

9   objection is sustained, just ignore the question.  If it's

10  overruled, treat the answer like any other.  If you're

11  instructed that some item of evidence is received for a

12  limited purpose only, you most follow that instruction.

13              Testimony the Court has excluded or told you

14  to disregard is not evidence and must not be considered.

15  Anything you've seen or heard outside the courtroom about

16  this case is not evidence and must be disregarded.  You're to

17  decide the case solely on the evidence presented here in the

18  courtroom.

19              Now there are two kinds of evidence that can

20  properly be considered by you, direct evidence and

21  circumstantial evidence.  Direct evidence is proof of a fact

22  such as testimony by an eyewitness.  Circumstantial evidence

23  is proof of facts from which you may infer or conclude that

24  other facts exist.  I'll give you further instructions on

25  these as well as other matters at the end of the trial but

USA vs Sacco and O'Connor                           23

1    just keep in mind that you may consider both direct and

2    circumstantial evidence.

3                    Now, it's going to be up to you to decide

4    which witnesss to believe, which witnesses not to believe and

5    how much of any witness' testimony to accept or reject.

6    Again, at the end of the case I'll give you some instructions

7    that hopefully will be helpful to you in determining the

8    credibility or believability of witnesses that you will have

9    seen.

10                   As you know, this is a criminal case and there

11   are three basic rules about a criminal case that you must

12   keep in mind.  First, that the defendants are presumed

13   innocent until proven guilty.  The indictment against the

14   defendants brought by the government is only an accusation,

15   nothing more.  It is not proof of guilt or anything else.

16   The defendants, therefore, start out the trial with a clean

17   slate.  Second, the burden of proof is on the government

18   until the very end of the case.  The defendants have no

19   burden to prove their innocence or to present any evidence or

20   to testify.  Since the defendants have the right to remain

21   silent the law prohibits you in arriving at your verdict from

22   considering the defendants may not have testified.  Third,

23   the government must prove each defendant's guilt beyond a

24   reasonable doubt.  I'll give you further instructions on this

25   point later, but bear in mind that this is very different in

USA vs Sacco and O'Connor                    24

1    that respect from a civil case or grand jury.

2              Now, I instruct you during the trial you're

3    not to discuss the case with anyone or permit anyone to

4    discuss it with you.  Until you retire to the jury room at

5    the end of the case, you're simply not to talk about it.

6    Next, if there's anything in the media, just ignore it once

7    you've identified it.  Don't try to do any research on your

8    own.  No computers, no Googles, no whatever search engines

9    there are out there.  DogPile, don't go to DogPile, for

10   example.  Also, don't form any opinion or conclusion until

11   the end of the case.  Keep an open mind until you've heard

12   all the evidence before you and make any conclusions or firm

13   opinions.

14             Now, if you want to take notes you can.  I see

15   you've been given the where with all to do that.  Some people

16   learn better hearing things, other people learn better by

17   writing them down and maybe looking at them later and you're

18   certainly permitted to write down anything you wish.  Just

19   remember, though, that's personal to you.  You can't be

20   showing that to the other jurors.  You can look at it to

21   refresh your recollection and say, oh, this witness said thus

22   and so but you just can't pass your writing around.  Maybe

23   you made a mistake in it, who knows, that's the reason we

24   don't do that.

25             Now, there's going to be in minute or two --

1    even actually a minute or two a while you're going to hear

2    the opening statements from the attorneys and each side will

3    present to you what they believe the proof in the case is

4    going to be.  And, of course, they're going to present it in

5    such a fashion as it helps their own side.  That's my belief.

6    They may tell you something different.  What they say in that

7    opening statement is not facts.  I just told you what the

8    lawyers say are not facts but it may be helpful to you.  I

9    like to think of it as a big puzzle box with the picture on

10   the front.  If you dump that out on a table and you turn the

11   picture face down, it's a lot harder to put the pieces

12   together.  If you turn the face up and look at it, you can

13   kind of feel where the pieces may go.  That's what an opening

14   statement seems like to me.  Painting a picture for you and

15   the pieces that will be presented to you.  Some people like

16   to think of it as a road map and there's all kinds of other

17   analogies you can imagine for the opening statement.

18                Now, I'm going to give you a preliminary

19   charge on the law that you're going to be dealing with at the

20   end of this case.  This will not be a complete charge.  I'll

21   give you a complete charge at the end of the case.  Your

22   deliberations and verdict must be based on the charge that I

23   give you at the end of this case and not on this preliminary

24   charge.  This is simply an over view so you will recognize

25   and appreciate the significance of the evidence or the lack

1   of evidence presented in this case.

2            The defendants in this case are Dean Sacco and

3   Linda O'Connor.  Although these two defendants are being

4   tried together, you remember its your duty to consider each

5   charge separately as to each defendant.  In count one

6   defendant O'Connor is charged with selling a child for

7   purpose of producing child pornography.  In count two

8   defendant Sacco is charged with buying of a child for the

9   purpose of producing child pornography.  Count three charges

10  both defendants.  Count four charges both defendants with the

11  production of child pornography.  Count five charges

12  defendant O'Connor with the production of child pornography.

13  Count six charges defendant Sacco traveled in interstate

14  commerce with the intent to engage in illicit sexual conduct

15  with a minor.  Count seven charges both defendants with the

16  possession of child pornography.  So there are seven counts

17  total.  Six counts Miss O'Connor is a defendant and Mr. Sacco

18  is charged in the rest of the counts.

19           Now, count one charges defendant O'Connor with

20  violating Title 18 United States Code -- don't worry about

21  these numbers -- Title 18 United States Code Section

22  2251(A)(a), which provides in part it's a crime for any

23  parent, legal guardian, or other person having custody or

24  control of a minor who sells or otherwise transfers custody

25  or control of such minor, or offers to sell or otherwise

1    transfer custody of such minor either with knowledge that as

2    a consequence of the sale or transfer, the minor will be

3    portrayed in a visual depiction engaging in or assisting

4    another person to engage in sexually explicit conduct or with

5    intent to promote either the engaging in of sexually explicit

6    conduct by such minor for the purpose of producing any visual

7    depiction of such conduct or the rendering of assistance by

8    the minor to any other person to engage in sexually explicit

9    conduct for the purpose of producing any visual depiction of

10   such conduct.

11           To convict defendant O'Connor on this count

12   the government must prove each of the following elements

13   beyond a reasonable doubt:  First, that defendant O'Connor

14   was a parent, legal guardian or a person having custody or

15   control over Shannon.  Second, that the defendant O'Connor

16   sold or otherwise transferred custody or control over to

17   defendant Dean Sacco.  Third, that the defendant O'Connor

18   either knew that as a consequence of the sale or transfer

19   Shannon O'Connor would be portrayed in a visual depiction

20   engaging in or assisting Dean Sacco to engage in sexually

21   explicit conduct or intended to promote either the engaging

22   in of sexually explicit conduct by Shannon O'Connor for the

23   purpose of producing any visual depiction of such conduct or

24   the rendering of assistance by Shannon O'Connor to Dean Sacco

25   to engage in sexually explicit conduct for the purpose of

USA vs Sacco and O'Connor

1   producing any visual depiction of such conduct.  Fourth, at

2   the time Shannon O'Connor was under 18 years of age and

3   fifth, that Dean Sacco crossed state lines in connection with

4   the charged conduct.

5             Now, the third element that I read to you uses

6   the phrase visual depiction of sexually explicit conduct.  A

7   visual depiction includes any photograph, film, video or

8   picture, including undeveloped film and videotape and data

9   stored on computer disk or by electronic means which is

10  capable of conversion into a visual image.  In deciding

11  whether the government has proven this element, you may

12  consider all of the evidence concerning the defendant's

13  conduct.  While the government must prove the defendant acted

14  with knowledge that the minor would be portrayed in a visual

15  depiction of the child engaging in sexually explicit conduct,

16  or with the intent to promote the engaging in of sexually

17  explicit conduct by the minor for purposes of producing any

18  visual depiction of such conduct, or the rendering of

19  assistance by the minor to Dean Sacco to engage in sexually

20  explicit conduct for the purpose of producing a visual

21  depiction of such conduct, it is not required that the

22  government prove visual depiction of that conduct was

23  actually produced.  The term produce means producing,

24  directing, manufacturing, issuing, publishing or advertising.

25  The phrase sexually explicit conduct as used in this element

USA vs Sacco and O'Connor                    29

1   means actual or simulated sexual intercourse, including

2   genital to genital, oral to genital, anal to genital, or

3   oral-anal, whether between persons of the same or opposite

4   sex, masturbation, sadistic or masochistic abuse or

5   lascivious exhibition of the genitals or pubic area of any

6   person.  The term lascivious exhibition means a depiction

7   which displays or brings to view to attract notice to the

8   genitals or pubic area of children in order to excite

9   lustfulness or sexual stimulation in the viewer.  Not every

10  exposure of genitals or pubic area constitutes lascivious

11  exhibition.  In deciding whether the government has proven

12  that a particular visual depiction constitutes a lascivious

13  exhibition you should consider the following question:

14  Whether the focal point of visual depiction is on the child's

15  genitals or pubic area or whether there is some other focal

16  area; whether the setting of the visual depiction makes it

17  appear to be sexually suggestive, for example, in a place or

18  pose generally associated with sexual activity; whether the

19  child is displayed in an unnatural pose or in inappropriate

20  attire, considering the age of the child; whether the child

21  is fully or partially clothed or nude, although nudity is not

22  in and of itself lascivious; whether the visual depiction

23  suggests sexual coyness or willingness to engage in sexual

24  activity and whether the visual depiction is intended or

25  designed to elicit a sexual response in the viewer.  It is

USA vs Sacco and O'Connor                    30

1   not required that the particular visual depiction involve all

2   of these factors to be a lascivious exhibition.   The

3   importance which you give to any one factor is up to you to

4   decide.

5          The fourth element which the government must

6   prove beyond a reasonable doubt is that Shannon O'Connor was

7   less than 18 years old at the time of the acts alleged in the

8   indictment.   The government does not have to prove that the

9   defendant knew Shannon O'Connor was less than 18 years old.

10          Now, count two charges defendant Sacco with

11  buying a child for the purpose of producing child pornography

12  in violation of Section 2251A(b) of Title 18, United States

13  Code.   Section 2251A(b) provides in relevant part that

14  whoever purchases or otherwise obtains custody or control of

15  a minor or offers to purchase or otherwise obtain custody or

16  control over a minor, either with knowledge that as a

17  consequence of the purchase or obtaining of custody, the

18  minor will be portrayed in a visual depiction engaging in, or

19  assisting another person to engage in, sexually explicit

20  conduct; or with intent to promote either the engaging in of

21  sexually explicit conduct by such minor for the purpose of

22  producing any visual depiction of such conduct; or the

23  rendering of assistance by the minor to any other person to

24  engage in sexually explicit conduct for the purpose of

25  producing any visual depiction of such conduct shall be

1    guilty of a crime.

2                  To convict defendant Sacco on this count the

3    government must prove each of the following elements beyond a

4    reasonable doubt:  First, that defendant Sacco purchased or

5    obtained custody or control over the minor or offered to

6    purchase or otherwise obtain custody or control of a minor.

7    Second, that the defendant Sacco either knew or as a

8    consequence of purchase or obtaining of custody, the minor

9    would be portrayed in a visual depiction engaging in or

10   assisting Sacco to engage in sexually explicit conduct or

11   intended to promote either the engaging in of sexually

12   explicit conduct by the minor person having custody or

13   control of for the purpose of producing any visual depiction

14   of such conduct, or the rendering of assistance by the minor

15   to defendant Sacco to engage in sexually explicit conduct for

16   the purpose of producing any visual depiction of such

17   conduct.  Third, that at the time the minor was under 18

18   years of age; and fourth, that defendant Sacco crossed state

19   lines in connection with the charged conduct.

20                  In addressing this count you should use the

21   definitions I previously provided you in connection with

22   count one.

23                  Count three, both defendant Sacco and O'Connor

24   are charged in count three of the indictment.  Count three

25   charges a violation of Section 1591 (a) and (b) of Title 18

USA vs Sacco and O'Connor

1   of the United States Code which provides in relevant part

2   that:  Whoever knowingly in or affecting interstate or

3   foreign commerce, or within the special maritime and

4   territorial jurisdiction of the United States recruits,

5   entices, harbors, transports, provides or obtains by any

6   means a person or benefits financially or by receiving

7   anything of value from participation in a venture which has

8   engaged in an act described in violation of paragraph one

9   knowing that force, fraud or coercion will be used to cause

10  the person to engage in a commercial sex act or that the

11  person is not attained the age of 18 years and will be caused

12  to engage in a commercial sex act shall be guilty of a crime.

13          To convict the defendants on this count the

14  government -- excuse me.  To convict the defendants on this

15  crime the government has to prove the following elements

16  beyond a reasonable doubt:  First, that the defendant

17  recruited, enticed harbored, transported, provided, or

18  obtained the minor by any means.  Second, that Shannon

19  O'Connor had not obtained the age of 18 years.  Third, that

20  the defendant knew that Shannon O'Connor would be caused to

21  engage in a commercial sex act; and fourth, that the

22  defendant's conduct affected interstate or foreign commerce.

23          With respect to the third element referring to

24  a commercial sex act, a commercial sex act means any sex act

25  on account of which anything of value is given to or received

USA vs Sacco and O'Connor                          33

1    by any person.  When considering this count three remember

2    that each defendant is charged in this count and you must

3    evaluate this charge as to each defendant individually.  In

4    count three, both defendants are also charged with violating

5    18 United States Code, Section 2, aiding and abetting.

6    Section 2 of Title 18 United States Code provides that

7    whoever commits an offense against the United States, or aids

8    or abets or counsels, commands, induces to procure its

9    commission is punishable as a principal.  Under the aiding

10   and abetting statute it's not necessary for the government to

11   show that a particular individual himself or herself

12   physically committed the crime with which he or she is

13   charged in order for you to find that individual guilty.  The

14   guilt of an individual may be established without proof that

15   the accused personally did every act constituting the offense

16   charged.  A person who aids or abets another to commit an

17   offense is just as guilty of that offense as if he or she

18   committed it himself.  Accordingly, you may find an

19   individual guilty of an offense charged if you find beyond a

20   reasonable doubt that the government has proven that another

21   person actually committed the offense with which the

22   individual is charged and that the individual aided or

23   abetted that person in the commission of the offense.

24            As you can see, the first requirement is that

25   you find that another person committed the crime charged.

1    Obviously no one can be convicted of aiding and abetting the
2    criminal acts of another if no crime was committed by the
3    other person in the first place.  But if you do find that a
4    crime was committed, then you must consider whether the
5    particular individual under consideration aided or abetted
6    the commission of that crime.  In order to aid or abet
7    another to commit a crime it is necessary that the individual
8    willingly and knowingly associated himself or herself in some
9    way with the crime or that he or she willfully and
10   unknowingly seeks by some act to help make the crime succeed.
11   Participation in a crime is willful if action is taken
12   voluntary and intentionally or in the case of a failure to
13   act with a specific intent to fail to do something the law
14   requires to be done; that is to say with a bad purpose either
15   to disobey or disregard the law.

16              In other words, if an individual is fully
17   aware that what he or she is doing plays a significant role
18   and intentionally participates in facilitating a transaction
19   prohibited by law, he or she is equally guilty as a person
20   who directly performs the illegal acts even though the other
21   played a greater or much larger role in the perpetration of
22   the crime.  Whether one aided or abetted or caused another to
23   commit a crime must be determined based on the alleged aider
24   and abettor's overt conduct, acts and statements.  You are
25   entitled to consider circumstantial evidence as proof that

1  one or more of these individual defendants aided and abetted

2  the crime.  It is not necessary that the acts alleged to have

3  constituted aiding and abetting be criminal in and of

4  themselves.  Under the law, acts which might otherwise be

5  legal can constitute the basis for the finding of aiding and

6  abetting.  The mere presence of an individual where a crime

7  is being committed even coupled with knowledge by the

8  individual that a crime is being committed or the mere

9  acquiescence by the individual in the criminal conduct of

10  others, even with guilty knowledge, is not sufficient to

11  establish aiding and abetting.  An aider and abettor must

12  have some interest in the criminal venture.  To determine

13  whether an individual aided and abetted the commission of a

14  crime which he or she is charged, ask yourself these

15  questions:  Did he or she participate in the crime charged as

16  something he or she wished to bring about?  Did he or she

17  associate him or herself with a criminal venture knowingly

18  and willfully?  Did he or she seek by his or her actions make

19  the criminal venture succeed?  If he or she did then the

20  individual is an aider and abettor and, therefore, guilty of

21  the offense.  If on the other hand your answer to the series

22  of questions are no, then the individual is not an aider and

23  abettor and cannot be found to have committed the charged

24  crime.

25              Court four.  Count four of the indictment

1   charges both defendants with violating Title 18 United States

2   Code Section 2251A which provides in pertinent part that any

3   person who employs, uses, persuades, induces, entices or

4   coerces any minor to engage in any sexually explicit conduct

5   for the purpose of producing any visual depiction of such

6   conduct shall be guilty of a crime if such person knows or

7   has reason to know that such visual depiction will be

8   transported in interstate or foreign commerce or mailed if

9   that visual depiction was produced using materials that have

10  been mailed, shipped, or transported in interstate or foreign

11  commerce by any means, including by computer, or if such

12  visual depiction has been actually transported in interstate

13  or foreign commerce or mailed.

14          To prove a defendant guilty of using a minor

15  to produce child pornography the government must prove each

16  of the following elements beyond a reasonable doubt:  First,

17  that Shannon was under the age of 18.  Second, the defendant

18  used, employed, persuaded, induced, enticed or coerced

19  Shannon to take part in sexually explicit conduct for the

20  purpose of producing a visual depiction of that conduct.  And

21  third, the visual depiction was produced using materials that

22  had been mailed, shipped or transported in interstate or

23  foreign commerce.  The second element the government must

24  prove beyond a reasonable doubt is that the defendants used,

25  employed, persuaded, induced, enticed, coerced Shannon

37

1    O'Connor to take part in explicit conduct for purpose of

2    producing visual depiction of that conduct.  A visual

3    depiction, as I've said before, includes any photograph,

4    film, video or picture, including undeveloped film, and

5    videotape and data stored on computer disk or by electronic

6    means which is capable of conversion into a visual image.

7              In deciding whether the government has proven

8    that the defendant acted for the purpose of producing a

9    visual depiction of the sexually explicit conduct, you may

10   consider all the evidence concerning the defendants' conduct.

11   While the government must prove that defendant acted with the

12   purpose of producing a visual depiction of the child engaging

13   in sexually explicit conduct, it is not required that the

14   government prove that the visual depiction of that conduct

15   was actually produced.  The phrase sexually explicit conduct

16   is defined as I previously explained it to you.

17             The third element which the government must

18   prove beyond a reasonable doubt is that the visual depiction

19   was produced using materials that have been mailed or

20   transported in interstate or foreign commerce.  Simply

21   stated, the phrase transported in interstate or foreign

22   commerce means that the materials used to produce the visual

23   depiction had previously moved from one state to another or

24   between the United States and another country.  Here the

25   government alleges that the camera used to take the

1    photographs in question was manufactured in another state.  I

2    instruct you that if you find that the camera was

3    manufactured outside of New York State, that is sufficient to

4    satisfy this element.  The government does not have to prove

5    that the defendant personally transported the camera across

6    the state line or the defendant knew the camera previously

7    crossed the state line.

8              Count five of the indictment charges defendant

9    O'Connor with violating 18 United States Code Section 2251B

10   which provides in pertinent part, any parent, legal guardian

11   or person having custody or control of a minor who knowingly

12   permits such minor to engage in or assist another person to

13   engage in sexually explicit conduct for the purpose of

14   producing any visual depiction of such conduct shall be

15   guilty of a crime if such parent, legal guardian or person

16   knows or has reason to know that such visual depiction will

17   be transported in interstate or foreign commerce or mailed.

18   That visual depiction was produced using materials that have

19   been mailed, shipped in interstate or foreign commerce by any

20   means, including by computer, or if such visual depiction has

21   actually been transported in interstate or foreign commerce

22   or mailed.

23             To prove a defendant guilty of this charge the

24   government must prove each of the following elements beyond a

25   reasonable doubt:  First, that Shannon O'Connor was under the

age of 18.  Second, that the defendant was a parent or legal guardian or person having custody or control over Shannon O'Connor.  Third, that the defendant knowingly permitted the minor to engage in, or assist any other person in, sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and fourth, the visual depiction was produced using materials that had been mailed or transported in interstate or foreign commerce.  Again in analyzing this charge you should use the definitions I previously gave you.

Count six charges defendant Sacco with violating Section 2423(b) of Title 18 of the United States Code which provides in relevant part that:  A person who travels in interstate commerce or travels into the United States or a United States citizen or alien admitted for permanent residency in United States who travels in foreign commerce for purposes of engaging in any illicit sexual act with another person shall be found guilty of a crime.  To convict defendant Sacco of this count the government must prove the following elements beyond a reasonable doubt: First, that the defendant traveled in interstate commerce. Second, one of the purposes of defendant's travels across state lines was to engage in illicit sexual conduct with another person; and third, that Shannon O'Connor was under 18 years of age at the time of the charged conduct.  For

40

purposes of this count the term illicit sexual conduct means
a sexual act with a person under the age of 18 or any
commercial sex act.  The phrase sexual act means contact
between penis and vulva or penis and the anus.  The phrase
sexual act means contact between the mouth and the penis, the
mouth and the vulva, or the mouth and the anus involving
penetration, however slight.  The phrase sexual also means
contact between the mouth and the penis, the mouth and vulva,
the mouth and the anus, the penetration; however slight, of
the anal or genital opening of another by a hand or finger or
by any object with the intent to abuse, humiliate, harass,
degrade or arouse or gratify the sexual desire of any person
or the intentional touching, not through the clothing, of the
genitalia of another person who has not attained the age of
16 years with intent to abuse, humiliate, harass, degrade or
arouse or gratify the sexual desire of any person.  The
phrase commercial sex act means any sex act on account of
which anything of value is given to or received by any
person.

Count seven.  Count seven charges both
defendants with violating Section 2252A(a)(5)(B) of Title 18,
United States Code, which provides in relevant part that:
Any person who knowingly possesses any book, magazine,
periodical, film, videotape, computer disk or any other
material that contains an image of child pornography that has

been mailed or shipped or transported in interstate or

foreign commerce by any means, including by computer, or that

was produced using materials that had been mailed or shipped

or transported in interstate or foreign commerce by any

means, including computer, shall be guilty of a crime.  To

convict the defendants on this count the government must

prove each of the following elements beyond a reasonable

doubt:  First, that the defendant knowingly possessed a

visual depiction as I'll explain that term to you.  Second,

the visual depiction was produced using materials that had

been transported in interstate or foreign commerce.  Third,

that the visual depiction was child pornography as I will

define that term; and fourth, that the defendant knew of the

sexually explicit nature of the material and that the visual

depictions were of an actual minor engaged in that sexually

explicit conduct.

The first element which the government must

prove beyond a reasonable doubt is that defendant knowingly

possessed a visual depiction.  A visual depiction includes

any photograph, film, video or picture, including undeveloped

film and videotapes and data storage on computer disk or by

electronic means which is capable of conversion into a visual

image.  To possess something means to have it within a

person's control.  This does not necessarily mean that the

person must hold it physically; that is, have actual

1   possession of it.  As long as the visual depiction is within

2   the defendant's control he or she has possession of it.  If

3   you find that the defendant either had actual possession of

4   the depiction or that he or she had the power and intention

5   to exercise control over it, even though it was not in his or

6   her physical possession, you may find that the government has

7   proven possession.

8           The law also recognizes that if one person

9   alone possesses it, that is sole possession; however, it is

10  possible that more than one person may have power and

11  intention to exercise control over a visual depiction, this

12  is called joint possession.  If you find the defendant had --

13  such a defendant had such power and intention then he or she

14  possessed the depiction even though he or she possessed it

15  jointly with another person.  The government must prove the

16  defendant knowingly when it's done voluntary and

17  intentionally and not because of accident, mistake or some

18  other innocent reason.

19          The second element which the government must

20  prove beyond a reasonable doubt is that the child pornography

21  was produced using materials that had been transported in

22  interstate or foreign commerce.  I have previously explained

23  this phrase to you and you may apply that same definition

24  here.  Essentially, it must be shown that the materials used

25  to produce the child pornography had previously moved from

1    one state to another or between the United States and any

2    other country.

3              The third element which the government must

4    prove beyond a reasonable doubt is that the visual depiction

5    was child pornography.  Child pornography means any visual

6    depiction the production of which involved the use of a minor

7    engaging in sexually explicit conduct which portrays that

8    minor in engaging in that conduct.  The visual depiction must

9    be of a real person under the age of 18 engaging in sexual

10   explicit conduct.  The government does not have to prove the

11   identity of the minor or the exact age of the minor.  You may

12   consider all of the evidence, including your viewing of the

13   depiction, in determining whether the depiction portrayed an

14   actual person under the age of 18 engaging in sexually

15   explicit conduct.  I have previously defined the term

16   sexually explicit conduct for you and you should apply that

17   same definition to this count.

18             The fourth element which the government must

19   prove beyond a reasonable doubt is that the defendant knew

20   that the material he or she possessed was child pornography.

21   As I stated before, an act is done knowingly when it's done

22   voluntarily and intentionally and not because of accident,

23   mistake or some other innocent reason.  In this case the

24   government must show that the defendant had knowledge of the

25   general nature of the content of the material.  The defendant

1    need not have specific knowledge as to identity or actual age

2    of the underage performer.  The defendant must have knowledge

3    or an awareness that the material contained a visual

4    depiction of a minor engaging in explicit conduct.  Such

5    knowledge may be shown by direct or circumstantial evidence

6    or both.  Eyewitness testimony of the defendant's viewing of

7    the material is not necessary to prove his or her awareness

8    of its contents.  The circumstances may warrant an inference

9    that he or she was aware of what the material depicts.

10   Further, the defendants belief as to the legality or

11   illegality of material is irrelevant.

12             Now, this has been a brief -- probably you

13   don't think this has been a brief -- overview of the charges

14   in the indictment.  It is important to bear in mind that

15   there are several different charges with two separate

16   defendants.  You must consider each charge as to each

17   defendant separately, that is to say you'll be required to

18   evaluate each element of the offense as applies to each count

19   and as to each defendant.  As I told you at the end of the

20   trial, I'll give you a more thorough charge on the legal

21   issues that are encompassed in this indictment.

22             All right.  Are you guys ready for opening

23   statement or do you want a break?  Hearing no cries for

24   breaks, Mr. Lovric.

25             MR. LOVRIC:  Thank you, Judge.  Good afternoon

1    everyone.  I'll try to speak into the mike a little bit.  I

2    think it's a little bit easier for everyone to hear.  I'm

3    going to talk with you and what the Judge mentioned to you is

4    called the opening statement and I want to take a little bit

5    of time to talk to you at this point and here's the reason:

6    What I'd like to do over the course of, I don't know if it

7    will be an hour or little bit more than an hour, is to go

8    through the things that I submit you will be seeing and

9    hearing in evidence during this trial.  This trial is going

10   to take, depending on a lot of different things and hopefully

11   one of them is not going to be snow, but depending on a lot

12   of different things on schedules, anywhere from six to seven

13   days to maybe a little bit longer, maybe eight or nine, ten

14   days.

15             During the course of the trial I anticipate

16   calling a number of witnesses.  You're going to hear actually

17   many witnesses testifying here and I think what I'm going to

18   do right now I think will help you, and I hope it helps you.

19   That's what it's designed to do from my perspective.  What

20   I'd like to do is walk you through what I submit you will be

21   seeing and hearing through the evidence.

22             Now, as you can imagine, the evidence in this

23   case comes in one witness at a time, one exhibit at a time.

24   It's not as though we can just bring everybody into the

25   courtroom and have everybody just start talking to you and

1    jumping in and saying but here's where this fits in, here's

2    where this fits in, here's where you may want to think about

3    this piece.  So, because it's going to come in one witness at

4    a time, one piece of paper at a time, one exhibit at a time,

5    I like to think that the opening statement will be helpful to

6    you, kind of like what the Judge said.  You know, it's kind

7    of like when you get one of those puzzles and maybe work on

8    with your family.  When you take all the pieces out you'll do

9    what I do, which is leave the room and let the rest of the

10   family work on the puzzle.  You look at it, wow, this is

11   going to take a while to put together and then somebody says,

12   hey, look at the back of the box, there's the picture.

13   They're like, well, it's not that bad.  The sky's here, the

14   barn's over here, cow's here.  You have an easier time when

15   you look at the end product.  I'm here to deliver to you what

16   I submit will be the end product.

17           So, after it's all said and done, six, seven,

18   eight days from now, what I want to do now is tell you this

19   is what I believe you will find.  This is what I believe the

20   evidence will show you so that when you hear, like, for

21   example, the first witness I'm going to call is Sergeant Pat

22   Blenis and Pat Blenis will tell you he works for the Norwich

23   Police Department and he was one of the first and the first

24   investigator to work on this case.  And he will tell you

25   about the things that he did and what he discovered and what

Government - Opening Statement                    47

1    he found and so on.  Well, after Pat Blenis they'll be

2    another witness, Investigator Terry Shultz from the New York

3    State Police, and so on and so on and at some point FBI Jim

4    Lyons will testify and he will tell you when he became

5    involved and what happened after he became involved.  So,

6    this will all kind of develop and unfold but the key is, I

7    want to take the opportunity in the forefront now to tell you

8    what I believe and what I submit you will be seeing so that

9    when these pieces come in you can kind of put them on your

10   pads if you want or in your mind so you kind of know where it

11   fits.  So that's kind of a long way of saying -- I do

12   apologize that I'm going to spend a little bit of time in

13   front of you and, you know, a lot of people will probably

14   like me to sit down after five minutes but I do think it's

15   important and I do think that it will help you and I hope it

16   does.

17          I want to start off by saying to you the

18   evidence you're going to hear and the information that is

19   going to be provided to you and things that you will hear

20   about, the testimony, the exhibits, the overall nature of

21   what you're going to hear is going to be horrific.  There is

22   no other way to put it.  It will be horrific.  You will hear

23   from Shannon O'Connor.  She will testify and she will testify

24   about excruciating, horrific things that were done to her.

25   She will tell you about how she was repeatedly raped by Dean

Government - Opening Statement                    48

1    Sacco.  She will tell you about the sexual abuse administered

2    to her for years by Linda O'Connor.  She will tell you about

3    the torture that she lived with for three plus years and she

4    will go into details about how it happened, where it

5    happened, who did what to her, what Linda O'Connor did to

6    her, what Dean Sacco did to her, what a man named George Lang

7    did to her, what two men at the Best Western motel did to

8    her.  And there's no other way to put it, it's going to be

9    horrific.  Shannon O'Connor will testify and she will tell

10   you at this point in time in her life she's 14 years old.

11   She will talk to you and tell you about things that Linda

12   O'Connor started to do to her when she was a little over ten

13   years old.  She will tell you about things that Linda

14   O'Connor began to do to her from about 2004 and going through

15   up to about March of 2007.  And through this testimony she

16   will describe for you how Linda O'Connor, and there is no

17   other word that I can use but to describe for you what she

18   will tell you, but she pimped her out.  Linda O'Connor pimped

19   out her own daughter to other men to have sex with her, to

20   sexually abuse her.  You will learn and hear that Linda

21   O'Connor herself began by sexually abusing Shannon O'Connor.

22   You will hear how it first started in the shower.  You will

23   hear how it first started with touching.  You will hear how

24   then Linda O'Connor moved this activity into her bedroom.

25   You will hear how she caused Shannon to engage in oral sex

Government - Opening Statement                              49

1   with Linda O'Connor.  You will hear how then it became

2   somewhat routine for Linda O'Connor to sexually assault and

3   sexually abuse Shannon.  You will hear from Shannon O'Connor

4   when she describes for you how this sexual abuse by George

5   Lang started.  You will hear Shannon O'Connor describe for

6   you in great detail the three-way sex that occurred between

7   Linda, George and Shannon and she will describe for you what

8   Linda did to her, what George did to her, and what they

9   caused her to do to each of them during these sexual trysts

10  the three of them had.

11            You will then learn also from the evidence

12  that in August of 2006, Linda O'Connor moved herself and

13  Shannon to Norwich.  You will hear about, as many of you may

14  recall, the flood of one of several that we had in this year,

15  but in June of 2006 there was dramatic flooding that happened

16  in the Deposit area and even in our communities here.  Linda

17  O'Connor and Shannon were one of the people flooded out.

18  They lived on River Street in Deposit and thereafter some

19  time they moved to Norwich and you will hear how Shannon will

20  describe for you how happy she was they were moving to

21  Norwich.  And you will learn that when they moved to Norwich,

22  they moved into Mr. Dean Sacco's residence that he had

23  purchased.  Mr. Dean Sacco, landlord from New Jersey, lived

24  and worked in New Jersey.  And I submit to you you will find

25  and you will conclude that when Linda O'Connor and Shannon

Government - Opening Statement

50

1    met Dean Sacco, the evidence will show you Dean Sacco was a

2    full blown pedophile.  You will find from all the evidence

3    that you hear that he was nothing short -- and we will prove

4    it, he was nothing short of a sexual feen, a sexual predator,

5    and you will find from the evidence and we will prove to you

6    that he prayed on Shannon and he raped her repeatedly.

7              You will also learn and we will prove to you

8    that Dean Sacco traveled from New Jersey.  He traveled on the

9    weekends fixing up his 45 Fair Street home.  He traveled to

10   be in the presence of Shannon and Linda and it was during

11   these travels when he came up from New Jersey to Norwich that

12   he raped Shannon.  And then you will also hear Shannon

13   describe for you on two separate occasions Linda O'Connor

14   took her to the Best Western hotel right here in Johnson

15   City, near the Oakdale Mall, and on two separate occasions

16   Linda O'Connor pimped out Shannon to two separate men on two

17   separate occasions.  And these men came to that hotel for one

18   purpose, to sexually rape Shannon.  She will tell you about

19   how when she was raped, Linda O'Connor sat there.  She'll

20   tell you about how Linda got paid by these men.

21             And I submit to you when this case is over and

22   when the evidence is all presented, we will have proven that

23   both of these defendants are guilty.  We will prove that

24   they're both guilty of charges that the Judge has read to you

25   and that he will instruct you on and I'm going to stand back

Government - Opening Statement            51

1   up in front of you again and after I make my concluding

2   remarks in the summation, I'm going to ask each and every one

3   of you to go back to the jury room, look at all the evidence,

4   and to find them guilty.  I'm going to ask you to stand up in

5   front of them and tell them they're guilty of what they did.

6             Now, I'd like to take a little bit of time and

7   talk about the charges.  The Judge has read you the charges

8   and the Judge is going to give you the law and I'm not going

9   to touch on the law or try to tell you what the law is.

10  That's not my place.  But I do want to talk briefly about

11  these charges and to tell you what I submit the evidence will

12  be as to those charges.  So as this evidence comes in,

13  hopefully it will help you to say to yourself, oh, okay, I

14  think that pertains to count one or I think that piece

15  pertains to count five.  That's the purpose in going through

16  this indictment.

17            Count one, now count one as the Judge has read

18  to you charges Linda O'Connor with selling a child for the

19  purpose of producing child pornography.  The evidence will

20  show and we will prove to you that as to count one, between

21  August of 2006 and March of 2007, Linda O'Connor allowed Dean

22  Sacco access and control of Shannon.  Now, the Judge will

23  tell you what it means to have -- to give custody or control

24  or to sell.  He will define those things but what I submit to

25  you the evidence will show is that during this time frame as

1    to count one, Linda O'Connor repeatedly, and Shannon will

2    testify repeatedly, gave Dean Sacco access to Shannon.  There

3    were times when she told Shannon to go upstairs with Dean

4    when she, Shannon O'Connor, told Linda that Dean was doing

5    things to me.  Linda nevertheless told her to go with him.

6    And we will prove to you that Linda O'Connor not only knew

7    what Dean Sacco was doing to Shannon, she was present during

8    a number of those rapes and, therefore, when she told Shannon

9    to go, the evidence will convince you that she not only knew

10   about the rapes and was involved in them, but thereby giving

11   this access to Shannon, she was violating this count one

12   statute.

13              The count also the Judge read to you requires

14   that there have been an interstate commerce travel.  We will

15   prove to you that Dean Sacco traveled from New Jersey to

16   Norwich and it was once he was in Norwich that he raped

17   Shannon.  We will prove to you that there was a visual

18   depiction that was produced as the Judge described for you.

19   What was that that occurred?  You will learn and hear that

20   during some of these rapes that Dean Sacco raped Shannon, he

21   photographed and he also videotaped these rapes.  You'll also

22   learn from Shannon that on certain occasions of these rapes,

23   Linda O'Connor was not only present during the rapes, she

24   helped and assisted Dean Sacco to take pictures of Shannon

25   being raped.  And it is these visual depictions that I submit

Government - Opening Statement                    53

1   to you make both count one and count two, but as to count one

2   make Linda O'Connor not only guilty but accountable for count

3   one.

4              Count two I submit to you is kind of like a

5   mirror image of count one but it refers to Dean Sacco.  Count

6   one charged Linda with selling or giving custody or giving

7   control of Shannon to Dean.  Count two charges Dean with

8   obtaining custody of Shannon from Linda O'Connor.  So in

9   count two, the evidence will show from Shannon and from

10  certain other exhibits that Dean Sacco took custody, albeit

11  for 15 minutes, whatever it was that it took for him to rape

12  her, but he took custody of Shannon and he took custody after

13  having traveled from New Jersey to Norwich and he took

14  custody of her to either take her upstairs and rape her or as

15  on one occasion he actually raped her downstairs in Linda's

16  apartment while Linda stood by and took pictures.

17             Count three, the sex trafficking count.  Count

18  three.  Count three charges both Linda and Dean Sacco.  The

19  sex trafficking that's charged in count one we intend to

20  prove that with respect to Linda O'Connor, she violated this

21  statute when she not only allowed but at times engaged in sex

22  acts with Shannon, with George Lang, with Shannon and Dean

23  Sacco, and with the two men at the Best Western motel, along

24  with Shannon being raped.  And the commercial aspect or the

25  commercial transaction that the Judge will instruct you the

1    law on, well we will prove that as to the Best Western, both

2    of those men paid Linda O'Connor in cash.  As to Dean Sacco

3    you will hear evidence that Linda O'Connor was consistently

4    late on her rent to Dean Sacco and had difficulties paying

5    the rent and we will prove to you that you will find that the

6    evidence shows that that was the quid pro quo.  Linda

7    O'Connor was allowed to stay in that apartment.  Linda

8    O'Connor was allowed to skate by either not paying on time or

9    not paying her full share in exchange for Dean Sacco having

10    access to Shannon.

11              Count four and five, the evidence I submit

12    that we will produce will show as to count four, production

13    of child pornography.  Count four deals with the times that

14    both Linda O'Connor and Dean Sacco took pictures of Shannon

15    being raped or sexually abused by Dean Sacco.  It also

16    includes occasions where George Lang and Linda O'Connor

17    performed sex acts on Shannon and caused Shannon to perform

18    sex acts on them and pictures being taken by George or by

19    Linda O'Connor.

20              Count five charges Linda and there -- the

21    count five conduct we intend to prove to you is very similar

22    to count four but count five is a separate way that Linda

23    O'Connor committed these acts in that she's a parent and as a

24    parent she allowed her daughter to engage in sex acts while

25    either someone else or while she took photographs of that

1   conduct.

2            Count six we will prove that Dean Sacco

3   repeatedly traveled from New Jersey up to Norwich, New York

4   and that one of the purposes in his traveling was to engage

5   in sexual acts with Shannon O'Connor.

6            And count seven is the count that charges the

7   possession of child pornography.  The child pornography in

8   this case that you will hear talked about is the child

9   pornography, that was photos and videotapes that were taken

10  by Dean Sacco and Linda O'Connor and George Lang.

11           We're going to start the timeline, if I can

12  put it that way, with witnesss that will eventually talk to

13  you about where it was that Shannon grew up and Linda

14  O'Connor were situated and what you're going to find from a

15  number of witnesses is it will take you back to Deposit,

16  New York.  And you're going to find that Linda O'Connor was

17  living in Deposit at a couple different addresses throughout

18  the time frame.  You're going to hear talk about a house at

19  Pine Street and Shannon will talk to you about Pine Street as

20  one of the places that she remembers more vividly living at.

21  She'll talk a little bit about that prior to that they lived

22  in Deposit at a trailer but she doesn't really remember a lot

23  about that.  Pine Street is where all the things start to --

24  not only start to happen but where she talks about most of

25  the time that she has a memory of the details about what

1    started to happen.  And then you'll hear talk about and

2    testimony about 11 River Street which is a place they went to

3    live after Pine Street.  And the evidence will show and

4    Shannon will go through and tell you about how the things

5    that Linda O'Connor started to do to her started at Pine

6    Street and then they continued to 11 River Street when they

7    moved to River Street where they stayed until they were

8    flooded out in June of 2006.

9            And you will hear evidence from Shannon and

10   Renee Lang.  Renee Lang is the wife of George Lang and you

11   will hear evidence from Renee and Shannon and a couple other

12   witnesses about the living -- the living style that was

13   occurring in Deposit when Linda O'Connor and Shannon were

14   living there.  Renee will tell you she's known Linda O'Connor

15   since Linda O'Connor was a teenager, since she was a young

16   kid.  And Linda will describe for you how on and off they had

17   contact with Linda O'Connor -- Renee will talk about that.

18   I'm sorry, I misspoke.  And they kind of got reacquainted at

19   the time when Linda O'Connor and Shannon were living at Pine

20   Street and you will learn that Linda O'Connor gets her first

21   computer and you will learn that George was very much into

22   computers and he had his computer and Renee will describe for

23   you how it was kind of his thing.  Nobody touched his

24   computer.  Renee never touched his computer and Renee will

25   describe for you how George would go over to Linda O'Connor's

Government - Opening Statement

1   apartment at Pine Street and then it continued at 11 River

2   Street, and it was all computers.  They were both into

3   getting computers.  They started to send things to each

4   other, e-mails, and you will learn that for some time Linda

5   O'Connor was sexually abusing Shannon and then when Linda

6   O'Connor developed this close relationship with George, and

7   Linda O'Connor and Shannon would actually go to George and

8   Renee's house and they would spend weekends there sometimes

9   and you will learn that Shannon O'Connor one evening walked

10  in on them and they were engaged in sexual acts and you will

11  then learn that at some point Linda O'Connor brings Shannon

12  into their sexual conduct.  And while they're at the Lang

13  residence Linda O'Connor engages Shannon to be involved in

14  the sex that she is having with George.  You will learn that

15  George -- certain things that he liked Shannon to do.  She'll

16  describe those things for you.  She'll describe the fact that

17  George would on occasion show her on the computer things that

18  he liked.  You will learn that George and Linda traded

19  pornography, adult pornography, back and forth.  You will

20  learn that Shannon on occasion saw that at her mom's computer

21  on River Street.  You will learn that while Linda O'Connor

22  lived at 11 River Street, she actually had two computers.

23  She brought the one she had over from Pine Street and then

24  Renee, George, and Linda O'Connor went to a computer store

25  where she purchased a second computer, computer that George

Government - Opening Statement                 58

1    helped her pick out.

2              Now, these activities where Shannon is

3    involved with sexual acts being performed on her by George

4    and by Linda O'Connor, she's about 11 years old.  I'm going

5    to introduce a couple of pictures that Renee had, excuse me,

6    of Shannon and George and you'll see those pictures.  You'll

7    see those pictures of how old Shannon was at the time.

8    Shannon will describe for you how the sexual abuse at the

9    hand of Linda O'Connor continues throughout the time they

10   lived at 11 River Street.  Renee will tell you and talk to

11   you about the times Linda O'Connor and Shannon were at their

12   house.  They would spend the weekend at the house.  Renee

13   will tell you she's not in the best of health.  She was

14   diabetic and had a number of medications she was on and her

15   routine was quite often she would doze and nod off due to the

16   medications and really was not even, not only not awake, but

17   was not able to be awake when a lot of the things that

18   Shannon describes occurred.  You'll also learn from Shannon

19   that it was at George Lang's residence that Linda O'Connor

20   and George Lang began to feed Shannon alcohol.  She'd be

21   given alcoholic drinks to drink and you'll also hear about

22   that again and I'll talk a little bit about it later when

23   Shannon is at 45 Fair Street.  That becomes a recuring thing

24   that is done for Shannon at times when Shannon complains to

25   Linda O'Connor that she -- she doesn't like what's being done

Government - Opening Statement

59

1    to her.  She's getting headaches.  And you will find and I

2    submit to you will find from the evidence that Shannon was

3    given alcoholic drinks in order to basically sedate her.

4    Sedate her in times when she is being either asked to perform

5    some sexual acts or is trying to deal with what has occurred

6    recently in terms of these sexual acts.

7             You'll also find from the evidence and you

8    will hear testimony from Shannon O'Connor that at 45 Fair

9    Street, when she complains to Linda O'Connor about things

10   that are happening to her and that she is getting really bad

11   headaches from everything that's going on with her, Linda

12   O'Connor starts to give her Vicodin.  Vicodin which is a

13   prescription pain killer.  And you will learn from Agent

14   Lyons that when he did a search warrant at 45 Fair Street, in

15   the basement, he found a Vicodin bottle with Linda O'Connor's

16   name on it, address, and prescription bottle was filled out.

17   You're also going to hear evidence from Renee Lang and also

18   from Shannon about how Linda O'Connor and this is, I'm

19   summarizing for you what I believe the evidence will show,

20   but how she latched on to George Lang.  Linda O'Connor

21   latches on to him and you'll even hear testimony about this

22   plan that's hatched by Linda O'Connor and George Lang to

23   adopt Linda O'Connor and Shannon.  He was going to and he

24   started paperwork to adopt them and actually make them a part

25   of his family.  And you'll hear about this plan and Renee

1    will describe for you this very bizarre, for lack of a better

2    word, plan that kind of got hatched.

3              Now, during the time that this is occurring,

4    during the time that Linda O'Connor is sexually abusing and

5    molesting Shannon, and I submit to you during the time that

6    you're hearing about the sexual abuse between George and

7    Linda O'Connor to Shannon, they'll be evidence that will be

8    brought in that you will hear about and I submit to you what

9    you're going to learn, what you're going to find is Linda

10   O'Connor is financially irresponsible.  They'll be repeated

11   things that you will find and hear in the evidence that shows

12   she just has an absolute lack of ability to conduct any kind

13   of responsible finances.  They'll be times when you're going

14   to hear she is not able to not only pay their rent, she's not

15   able to buy food.  They'll be events where you're going to

16   hear where she's incapable of paying utility bills and you're

17   going to see and hear evidence that she has income coming in

18   from different places but as quickly as it comes in, it just

19   disappears.  You're going to hear evidence that her financial

20   irresponsibility is directly linked to what she does and

21   allows these other men to do to Shannon.  And basically the

22   evidence will show you that Linda is always on her last

23   nickel, regardless of what amount the check was that came in.

24   Whether it was a flood check from being flooded out, whether

25   it was her public assistance, whatever it was it's gone

1   almost as soon as she cashes it.  And you're going to hear

2   evidence about how when she can't pay for basics, she's

3   buying things like an 800-dollar dog, and I submit to you the

4   evidence will show you that it is financial irresponsibility

5   and financial incapability that drives her to allow other men

6   to do to Shannon what they did.  This is the quid pro quo.

7   She is getting something back and in this case the evidence

8   will show you that from Dean Sacco it is a roof over her

9   head.  From the men at the Best Western, it is cash.  From

10  George Lang, it is this taking anything that George will give

11  her, whether it's spending the weekend at his place, whether

12  it's mooching off rides that he gives her, whether it's

13  taking computer knowledge and getting him to come over and do

14  stuff for her.

15          Now, in June of 2006, Linda O'Connor and

16  Shannon are flooded out and you'll hear that for a short

17  period they spent and were boarded by some friends in the

18  area.  Friends that they knew from the local church.  And

19  you'll then hear, Shannon will describe for you how they

20  found and Linda found this apartment and you will hear

21  evidence that they moved to this apartment right on or about

22  August 1 of 2006.  Shannon will tell you at this point in

23  time she has been molested in the ways that I described for

24  you by that point in time for over two years and Shannon will

25  describe for you how when she, Shannon and Linda O'Connor,

1    moved to Norwich, New York, Linda O'Connor told Shannon

2    things will be different.  And Shannon will describe for you,

3    tell you what she thought by that, what Shannon thought by

4    that and you'll find that Shannon for a glimpse of a moment

5    thought that the things that had been done to her were over.

6    And instead of being over, Shannon will go on and describe

7    for you what happens almost immediately when they move in to

8    45 Fair Street.  Dean Sacco brutally rapes her almost within

9    the first couple of days that they move in to 45 Fair Street.

10                   And I submit what you will find from the

11   evidence that comes in from this point of time, that instead

12   of things being different, Shannon, I submit to you the

13   evidence will show, simply enters another chamber of horrors

14   and this time that's Mr. Sacco's chambers of horrors.  You

15   will find from the time they moved to 45 Fair Street until

16   Dean Sacco is arrested, Dean Sacco rapes Shannon at least

17   seven separate times from August 1 of 2006 through up until

18   November of 2007.  And I'm going to walk through these events

19   for you right now, Shannon's life, if you find from the

20   evidence that it's been horrific and if you can imagine

21   begins to spiral downwards from August of 2006 through

22   November of 2007, all the things that you will find from the

23   evidence that happened to her.  I submit to you the evidence

24   will show that the even more horrific things occur once they

25   move into 45 Fair Street.  Shannon and Linda O'Connor move in

Government - Opening Statement

63

1    the beginning of August.  Shannon is raped by Dean Sacco

2    almost the first -- within the first few days.  The rape

3    occurs in the downstairs apartment.  You will hear that

4    within a week, Shannon tries to commit suicide.  Shannon

5    takes an overdose of Linda O'Connor's medications.  She

6    spends several days at a Syracuse Hospital.  You'll also hear

7    that at this point in time is the first time that the

8    Department of Social Services becomes involved in Shannon and

9    Linda O'Connor's life.  You will hear testimony from Naomi

10   Panus.  Naomi was the first social worker that worked the

11   case involving Linda O'Connor and Shannon.  And you will hear

12   how after Shannon had tried to commit suicide, after she got

13   out of the hospital, she was put back in the custody of Linda

14   O'Connor and you will hear shortly thereafter Linda O'Connor

15   leaves Shannon alone at home, unsupervised, very little food.

16   Linda O'Connor you'll learn went to the hospital for some

17   procedure and just kind of left Shannon at the apartment by

18   herself.  Social services, as a result of that you will

19   learn, returns and comes back into the picture and they

20   remove Shannon from the house.  You will learn that at that

21   point, social services removes her from the house and Shannon

22   goes to live with Renee Lang.

23          Now, at this point in time, you're going to

24   learn George Lang is dead.  He's deceased and died shortly

25   after the flood.  The flood of 2006.  So Shannon ends up

 1  going to live with Renee Lang and for the first few weeks you

 2  will learn things worked out okay.  Shannon seemed to be

 3  happier staying there than at home.  You're going to learn

 4  the Department of Social Services initiates a petition in

 5  Family Court allowing Renee Lang to have temporary custody of

 6  Shannon.  You'll learn Shannon stays at Renee Lang's from

 7  about August 21 to about October 11 of 2006 and you will

 8  learn that and Renee will describe this for you.  At some

 9  point towards the latter part of September, Renee Lang's

10  daughter finds Shannon on a porn site and she also finds her

11  on the computer looking into pregnancy sites, teen pregnancy

12  sites and Renee will describe this event and tell you that it

13  caused her to reevaluate whether she could have Shannon and

14  really handle the issues that Shannon was presenting for her.

15  You will learn the Department of Social Services -- Renee

16  Lang says she really doesn't believe she can keep Shannon in

17  temporary custody, doesn't feel that she really can or wants

18  to be involved with a lot of issues that Shannon seems to be

19  presenting.  DSS will tell you, Naomi Panus will tell you

20  they go back to Family Court and the Judge orders that

21  Shannon go back to Linda O'Connor's custody and you will

22  learn that one of the things that Shannon does raise is she

23  tells the folks that Dean Sacco is creepy and creeps her out

24  and you will learn that the Family Court Judge orders Linda

25  O'Connor not to allow Dean Sacco unsupervised access or

Government - Opening Statement

1   unsupervised contact with Shannon O'Connor.  And you will

2   learn from the evidence that as of October 11, 2006, Shannon

3   O'Connor is back with Linda O'Connor at 45 Fair Street.  And

4   one of the things that you will find from the evidence is

5   that Linda O'Connor showers Shannon with gifts right around

6   the time that this thing happens at Renee Lang's.  She sends

7   her gifts telling her about all the things she's buying for

8   her in her room when she comes back and you'll also hear that

9   this is the same thing that Linda O'Connor did when they

10  moved to Norwich back in August of 2006.  And I submit to you

11  the evidence will show you that this becomes a recuring theme

12  on Linda O'Connor.  That every time things with Shannon are

13  not working, she does this spending on her.  Buys her things

14  that might be extravagant or not really appropriate in order

15  to win her favor.

16        When Shannon comes back October 11, she's

17  happy to be back.  You'll find that Shannon appears to be

18  happy to come back to Linda O'Connor.  From October 11, 2006

19  until February 25, 2007, Dean Sacco rapes Shannon six

20  additional times.  And from October 11 of 2006 up until

21  February 25, 2006, or 7, excuse me, Linda O'Connor takes

22  Shannon to the Best Western on those two occasions where she

23  pimps her out.  You will find and hear that around the middle

24  of November of 2006, a new social worker comes in, Elizabeth

25  Chesebro.  You'll learn that Naomi who had been working in

1   Chenango County and was now transferring to Broome County and

2   Elizabeth Chesebro was just assigned to take over the social

3   work case.  And you will learn that one of the first things

4   that occurs or one of the more significant things that

5   occurred when Elizabeth Chesebro becomes the social worker is

6   there's two events in December, December 6 and December 19,

7   where Dean Sacco calls DSS and is complaining that Linda

8   O'Connor's not paying in rent and that her rent is over due.

9   And then he calls back that he's going to evict Linda

10  O'Connor because of lack of payment of rent.  Liz Chesebro

11  will testify and tell you she confronts Linda O'Connor and

12  talks to her about this and says what's the problem here,

13  what's going on?  Liz Chesebro will also tell you about the

14  financial irresponsibility of Linda O'Connor.  She's unable

15  to do the basic things as far as money that she has, pay

16  basic utilities and put basic food on the table.  Linda

17  Chesebro will tell you after she has this discussion with

18  Linda O'Connor that Linda calls her back at some point soon

19  thereafter, I talked to the landlord after and everything is

20  all set.  Everything is all squared away.

21          The rapes of Shannon, after the August rape by

22  Dean Sacco, the next time that Dean Sacco rapes Shannon is --

23  and Shannon will tell you about this -- is toward the end of

24  October, early November 2006.  She'll describe how Dean and

25  Linda have a conversation.  She can't hear what they're

1    talking about and then Linda instructs Shannon to go upstairs

2    at 45 Fair Street.  Now you're going to learn at that point

3    in time the upstairs tenants had moved out.  Prior to that,

4    you may hear mention of the Pipers, elderly couple, Mr. and

5    Mrs. Piper, who lived there.  They moved out at some point

6    and Dean Sacco was coming up on the weekends and was

7    preparing the apartment and kind of fixing it up to rent it

8    out.  Shannon will describe for you there was a mattress

9    upstairs.  She'll describe for you on that occasion, end of

10   October, early November, Dean brought her upstairs after

11   Linda O'Connor instructed her to go with him upstairs; that

12   he had a camera and it was set up on a tripod and she'll

13   describe a small camera.  She says that she started to resist

14   and that Dean slapped her and threatened her to do what he

15   said.  She will tell you about the rape and then she will

16   tell you when he was done with her she came downstairs and

17   Linda O'Connor was downstairs and Shannon walked up to Linda

18   O'Connor and said to her, he is doing things to me.  And

19   Shannon will describe those words that are -- that she will

20   tell you that are burned in her memory.  Linda O'Connor said

21   to her it is better than being homeless.

22            The next rape occurs on Thanksgiving 2006.

23   That rape of Shannon occurs downstairs in Linda O'Connor's

24   apartment.  Linda O'Connor participates in that rape with

25   Shannon.  You will hear mention of a dog Buddy.  Shannon will

Government - Opening Statement                    68

1   tell you about her dog.  This is the dog that Linda O'Connor

2   bought Shannon when they moved from Norwich to 45 Fair Street

3   in August of '06.  Linda O'Connor spends, you'll see the

4   receipt, it's about $600 for this dog.  She buys it for

5   Shannon, not that Shannon didn't love and appreciate it.

6   She'll tell you Buddy was her best friend but Linda O'Connor

7   spends this money, $600 dog, and then a few months later is

8   not able to pay rent or put food on the table.  They locked

9   up Buddy in a bedroom downstairs Thanksgiving of 2006.  In

10  the bedroom was Linda O'Connor and Dean Sacco.  Dean Sacco

11  began to have Linda O'Connor perform oral sex on him.

12  Shannon was told to perform oral sex on Dean and during this

13  time in the bedroom Shannon watches as her mother takes

14  pictures while she's performing sex on Dean Sacco.  Shannon

15  tells you that the camera, it didn't belong to them.  She

16  never saw it before.  She says it wasn't hers or her

17  mother's.

18          The next event she'll talk to you about

19  happens on December 1.  This is where Linda O'Connor takes

20  her to the Best Western motel.  You will see the receipts

21  from the Best Western where Linda O'Connor checks in from

22  December 1 and stays until December 3.  Shannon will tell you

23  that in preparation for going to that hotel, Buddy, the dog,

24  Linda O'Connor calls up the Pet Station Veterinarian in

25  Norwich and Shannon will describe for you how she makes up

Government - Opening Statement

1   this story that the dog has hiccups and she drops the dog off

2   and you'll see the records where the dog is left with this

3   veterinarian from November 30 through December 4.  And it was

4   on this weekend that Linda O'Connor brings Shannon to the

5   Best Western.  Shannon will describe for you, once they were

6   staying and at the Best Western hotel, a man showed up at the

7   room.  Shannon was instructed to do what he wants.  And

8   Shannon will describe for you how based on what she had to do

9   at that hotel, Linda O'Connor was given money by this man.

10  She will then describe for you the rape that happens just

11  before Christmas of 2006.  Dean Sacco is again visiting up

12  from New Jersey.  Linda directs Shannon to go upstairs with

13  Dean and she's again raped on that mattress.  Shannon tells

14  you -- will tell you that Dean didn't take pictures on this

15  occasion.  Raped her, had her do different things to him, and

16  in the middle of being raped, Shannon will describe for you

17  how a friend and her father stopped in to check on her, the

18  Parmalees.  Jim Parmalee and Lisa Parmalee will testify,

19  their daughter Brooke was a classmate of Shannon's and

20  Shannon had not been in school that whole week and we're

21  going to introduce school record attendance to show that week

22  she was out and Brooke and her dad just stopped by to kind of

23  checkup on her, make sure she was okay.  Shannon will tell

24  you Linda O'Connor came running up the stairs while Dean

25  Sacco is raping Shannon and she comes into the apartment,

Government - Opening Statement

70

1    tells Shannon to get her clothes on, go downstairs because

2    Brooke and her father are downstairs, came by to say hello.

3    And Shannon will tell you how she had to hurry up, gets her

4    clothes on and goes downstairs.  Shannon will tell you after

5    Brooke and her father leave, she goes back upstairs.  Dean is

6    mad at her and Dean Sacco is mad at her because she's not

7    cooperating and doing what he wants her to do.

8              Shannon will describe for you the next time

9    that Dean Sacco raped her.  It was actually on her birthday.

10   Two days after Christmas Dean Sacco comes up from New Jersey.

11   She's again told to go upstairs with him.  She goes upstairs,

12   and Linda comes upstairs.  Dean Sacco rapes her.  Dean Sacco

13   then orders Shannon to perform sex while she's on top of him

14   and at one point in time she says Dean Sacco is wearing

15   nothing but this cowboy hat.  Agent Lyons will testify and

16   tell you that when he executed a search warrant at 45 Fair

17   Street in the basement, and you'll see it, was this cowboy

18   hat and Shannon will identify that cowboy hat as the hat that

19   he was wearing on the date that he raped her on her birthday.

20             Some time in January she'll describe a second

21   trip to the Best Western motel.  Shannon is taken by Linda

22   O'Connor.  She'll tell you and testify that it was some time

23   after New Year's she knows that and believes it was before

24   Valentine's Day, and she says a different man showed up and,

25   in fact, she'll tell you he was already there.  He was in the

Government - Opening Statement                            71

1   room when they got there.  And she will testify and tell you

2   that this was a different man and this man had a tattoo, a

3   tattoo on his lower back.  Some kind -- she'll describe it

4   for you.  She describes and she'll describe for you it was

5   like a Chinese script.  She couldn't tell what it was or read

6   it.  And she'll tell you that when this man was raping her,

7   Linda O'Connor had gone -- Shannon will testify and tell you

8   she doesn't know if it was over to Dunkin Donuts or

9   downstairs but she comes back and she's eating a donut while

10  this man is raping her in the room.

11              She'll testify about the next time Dean Sacco

12  rapes her January of 2007.  Dean takes her upstairs again,

13  rapes her on the mattress upstairs.  She will tell you and

14  testify about how Linda O'Connor was downstairs watching TV

15  and how when Shannon complained to her after the rape, Linda

16  O'Connor's solution was she gives Shannon some Vicodin.

17  Tells her to take them, it will make her feel better.

18  Shannon will also describe for you how at this time in

19  January she, being Linda O'Connor and Dean Sacco, when he's

20  there, start to give Shannon O'Connor alcoholic drinks, wine

21  coolers.

22              Shannon will describe the final time that Dean

23  Sacco raped her, that being February of 2007.  Dean Sacco

24  takes her upstairs to that empty apartment, rapes her on the

25  mattress and she says when he brings her upstairs on this

1   occasion, Dean Sacco has these candles lit up in this room

2   where he's raping her and when she came upstairs she said

3   this was the first time she noticed this camera that was used

4   on that occasion.  It was set up on some boxes.  And she will

5   tell you how this camera was different than the previous

6   camera that Dean Sacco and Linda O'Connor had used.  And

7   Shannon will identify for you a video camera that will be

8   introduced into evidence here and you will learn from

9   Investigator Terry Shultz that this video camera that she

10  identified was taken out of a storage unit pursuant to this

11  warrant.  A storage unit that had a large amount of

12  belongings of Mr. Dean Sacco.  A storage unit was -- Storage

13  Center in Norwich, New York and Investigator Shultz will

14  describe to you how during the search warrant they recovered

15  two cameras, but one of them was this video camera and

16  Shannon will identify that video camera as being the camera

17  that Dean Sacco used on this February 2007 rape.

18              Shannon will describe for you how in January

19  of 2007 she hears Linda O'Connor and Dean Sacco arguing about

20  rent, rent money, and she will also tell you about the fact

21  that that same month she overhears this, Linda O'Connor ends

22  up buying another dog and a dog for $800 from the Pet Depot

23  in January of 2007.  And you'll see the receipt for that.

24  It's not just Shannon that's going to tell you that.  Linda

25  O'Connor buys this dog at a time when she's arguing over

Government - Opening Statement          73

1   rent, when Dean is calling DSS that she can't pay rent and

2   soon, thereafter, the next month, you'll hear testimony about

3   how Linda O'Connor doesn't have enough money to buy food and

4   she and Shannon actually leave a Pizza Hut without paying and

5   Liz Chesebro will testify about talking to Linda O'Connor

6   when this event happens and Linda O'Connor fully admitting

7   she just doesn't have money to buy Shannon a meal.

8                    February 25, 2007, Linda O'Connor and Shannon

9   walk out of Pizza Hut without paying and this causes DSS, and

10  at that point Liz Chesebro was the social worker, to again

11  come in and take Shannon out of Linda O'Connor's custody.

12  And from this point on Shannon O'Connor never goes back to

13  Linda O'Connor's custody.

14                   As you'll recall the evidence will show you

15  that before when she went to Renee Lang's she came back and

16  Liz Chesebro will testify that after February 25, 2007

17  Shannon O'Connor never goes to Linda O'Connor's custody to

18  this day.  From February 26, 2007, you will hear testimony

19  from Shannon O'Connor, from Liz Chesebro, that Shannon

20  remains in a family, foster care family from February 26,

21  2007 until September 19 of 2007.  Liz Chesebro will testify

22  that following Shannon being removed from Linda O'Connor's

23  custody, she talks to Linda O'Connor.  Linda admits to her

24  she doesn't have the money, the money's not around.  She's

25  not paying things.  She's having trouble putting food on the

Government - Opening Statement

1    table.   There's a Family Court appearance where the judge

2    orders Shannon to go into foster care at least through

3    October of 2007.   You will hear from Liz Chesebro how on

4    March 2 of 2007 is the first time that Shannon begins to

5    disclose what has been happening to her.   March 2, 2007 Liz

6    Chesebro will tell you she got a call from one of Shannon's

7    school teachers.   Liz Chesebro will tell you based upon this

8    call, Shannon had disclosed some things to the school

9    teacher.   She then rushes over to the foster care family

10   where Shannon is and when Shannon is back -- when they bring

11   her back from school, she sits down with Shannon for the

12   first time.   Liz will tell you, Shannon will tell you --

13   discloses what Dean Sacco had been doing to Shannon O'Connor.

14   Pat Blenis, Norwich Police Department, is notified March 2.

15   He will describe for you that is when he becomes involved in

16   the investigation in the case.   Liz Chesebro interviews

17   Shannon at the foster care family home.   She then immediately

18   calls the Norwich Police Department.   Pat Blenis will tell

19   you he immediately asks them to come down.   They come to his

20   office.   He then sits down and interviews Shannon about the

21   things that she discloses that Dean Sacco had been doing to

22   her.   And Shannon will tell you -- she described the rapes

23   and the conduct that Dean Sacco had been involved in between

24   August of '06 through February of '07.

25            And you'll also learn, Shannon will tell you

1  and she'll tell you why she said absolutely nothing about

2  Linda O'Connor's sexual abuse and Shannon O'Connor will tell

3  you she disclosed nothing about George Lang and Linda

4  O'Connor.  You will learn then based upon the interview now

5  by Sergeant Blenis that on March 12, 2007, Liz took Shannon

6  to the Chenango Memorial Hospital.  Dr. Waters will testify

7  and Dr. Waters will testify that he did a physical

8  examination of Shannon and Dr. Waters will tell you that

9  based upon his physical examination, Shannon O'Connor had

10 sexual intercourse.  He will tell you her hymen was

11 completely ripped and torn, non-existent.  He will tell you

12 based upon her examination, the sexual intercourse was not

13 like it just happened hours ago but he could tell by the

14 examination that it's something that had been -- that had

15 occurred at least some time in the past.

16            DSS files a petition in Family Court based

17 upon what they call neglect by Linda O'Connor failing to

18 provide basic needs for Shannon.  On March 13 of 2007, in

19 Family Court, Linda O'Connor admits to the petition.  The

20 judge finds neglect occurred and he orders Shannon into

21 foster care.  Liz Chesebro will describe for you Shannon's

22 reaction.  Shannon will tell you she was ecstatic.  She'll

23 tell you about her experience in the foster family where

24 there were a number of other children that she was with and

25 she'll describe for you what it felt like to be in a family.

1          Sergeant Blenis starts his criminal

2    investigation at this point.  March 2 he learns of

3    information provided by Shannon regarding Dean Sacco.  One of

4    the things that Investigator Blenis does early on is he sits

5    down with Shannon and he asks Shannon if she'd be willing to

6    put telephone calls into Dean Sacco and Shannon agrees.  And

7    you will hear the telephone conversations between Mr. Dean

8    Sacco and Shannon O'Connor on March 14 and March 15 of 2007

9    from the Norwich Police Department.  Shannon O'Connor, she

10   doesn't place the calls but the police place calls to Dean

11   Sacco and they tape record these calls and you will hear it

12   and it's about a total of about 45, 50 minutes of telephone

13   conversation and it's recorded and you will hear on this tape

14   Dean Sacco talking to Shannon and Sergeant Blenis will

15   testify and tell us that when he sat down with Shannon, he

16   asked her to talk to Dean Sacco and asked her because she had

17   disclosed rape and condoms, to talk to him about the sex that

18   they were having and the condoms and that she was concerned

19   that she might get pregnant.  And Sergeant Blenis will tell

20   you the whole point of these calls was to get Dean Sacco to

21   talk about this so Sergeant Blenis could accumulate evidence

22   and arrest Dean Sacco.  That was the purpose.  And you will

23   hear on these conversations that will be played for you Dean

24   Sacco, and I submit to you when you listen to these phone

25   conversations, Dean Sacco all but admits everything Shannon

Government - Opening Statement

77

 1    is saying.  You will hear on these phone conversations how he

 2    manipulates her on the telephone.  You will hear Dean Sacco,

 3    how he is trying to make her feel it's her fault and her

 4    responsibility.  You will hear Dean Sacco as he lays this

 5    guilt trip on Shannon.  You will hear how at one point on

 6    March 15 he suspects that she's gone to the police and even

 7    asks her directly on the phone, are you at the police

 8    station?  Have you gone to the police about this?  These

 9    phone conversations between Shannon and Dean Sacco happen

10    March 14 and March 15.  Liz Chesebro will tell you that on

11    March 13 she has a conversation with Linda O'Connor, and she

12    will testify for you what's on Linda O'Connor mind.  At this

13    point in time Shannon has been removed to foster care.  You

14    will hear evidence that she is ordered to be in foster care

15    through at least October of '07 and Liz Chesebro will testify

16    and tell you Linda O'Connor says to her what's on her mind is

17    I'm not going to get as much money because Shannon is not in

18    my household now, am I?  And Liz Chesebro will testify for

19    you that Linda O'Connor tells Liz Chesebro that she allowed

20    Sacco to have complete access to Shannon O'Connor, after the

21    judge in Family Court had ordered her not to, and Liz

22    Chesebro will tell you that, Liz, excuse me, Linda O'Connor

23    told Liz Chesebro that she didn't think there was any reason

24    to not allow him to have access to her.

25              Pat Blenis will testify that he interviewed

Government - Opening Statement                    78

1    Linda O'Connor or March 22, 2007, about a week after these

2    calls are placed and recorded to Dean Sacco and during the

3    course of this interview of Linda O'Connor, Sergeant Blenis

4    will tell you Linda O'Connor admitted, yeah, I let Dean Sacco

5    have access to her.  She even let him take her with this

6    other guy named Steve somewhere.  She didn't think there was

7    any problem.  She didn't think there was anything wrong with

8    it.  And Sergeant Blenis will tell you, this is after she was

9    ordered not to allow Sacco access to Shannon O'Connor

10   unsupervised.  Sergeant Blenis will also testify during this

11   interview on March 22, Linda O'Connor admits to him that she

12   was behind on her rent; that she was having difficulty,

13   trouble paying her rent; that she had financial difficulties

14   and that there were times when the rent was not getting to

15   Dean Sacco.

16            Sergeant Blenis will also testify that

17   subsequent to the phone calls placed to Dean Sacco that were

18   recorded and the information that he had gathered, including

19   an interview of Shannon, that he obtains and files charges

20   against Dean Sacco.  He will testify that Dean Sacco was

21   arrested on March 19, 2007 in New Jersey and then

22   approximately the first week of April he is brought back to

23   New York State from the State of New Jersey.  Liz Chesebro

24   will testify and tell you that Shannon starts to disclose the

25   alcohol that she was being provided by Linda O'Connor.

Government - Opening Statement            79

1              From March 15, 2006 through September 19,

2     excuse me, March 15 of 2007 through September 19 of 2007,

3     Shannon remains in a foster care family.  You will hear Liz

4     Chesebro and Shannon describe for you what starts to happen

5     to Shannon towards August of 2007 and September of 2007.

6     Shannon and Liz Chesebro will both describe Shannon begins to

7     spiral downward.  She starts to think about suicide again.

8     She starts to talk about it and the family that she's living

9     with in foster care believes it's serious enough where they

10    not only inform DSS, but believe they need to have more

11    supervision of Shannon.

12             As of September 19, 2007, you're going to

13    learn Shannon goes to the Binghamton Health Center, used to

14    be called the Psychiatric Center.  I believe now they call it

15    the Greater Binghamton Health Center, and she is under

16    supervision, under guard because of the suicide notions that

17    she is not only talking about but seriously talking about.

18    Once she's admitted to the Binghamton Crisis Center, Health

19    Center, you will hear testimony from Liz Chesebro that in

20    October, starting October of 2007, and then continuing into

21    December of 2007, Shannon O'Connor begins to disclose the

22    other things that she had never told anybody about.  She --

23    you will hear her testifying and you will hear Liz Chesebro

24    testify that she begins to disclose what Linda O'Connor did

25    to her, what George Lang did to her, what these men in the

Government - Opening Statement                    80

1    hotels did to her and she begins to tell the people that are

2    working at the crisis center and then she's interviewed by

3    Pat Blenis after he's informed.  You will also learn from

4    Shannon and from Liz Chesebro that once she -- Shannon has

5    disclosed things that Linda O'Connor had been doing to her,

6    Shannon is told at some point that it's possible the police

7    will have to confront and talk to Linda O'Connor about these

8    things.  And you will learn very shortly after Shannon learns

9    that, and that being on or about November 6, she, Shannon,

10   tries to commit suicide.  You will learn that Shannon tries

11   to hang herself.

12              Starting in November of 2007, Pat Blenis

13   starts to investigate and starts to look at Linda O'Connor as

14   being involved in sexual abuse of Shannon.  You will hear

15   that in January of 2008, the FBI is informed and for the

16   first time the FBI learns of the activities that have

17   occurred to Shannon.  You will learn that at that point in

18   time in January, once the case is referred and federal

19   authorities are involved, you will learn that there are a

20   number of investigative things that are done.  You will learn

21   that among the many things that were done at that point in

22   time, search warrants were conducted.  A search warrant was

23   obtained for 14 Miller Street.  You will learn at 14 Miller

24   Street is where Linda O'Connor was living in February of

25   2008.  You're also going to learn from the evidence Linda

1  O'Connor remained and continued to live in Dean Sacco's house

2  at 45 Fair Street up until about November of 2007 and then

3  moved to 14 Miller Street.  The search warrant at 14 Miller

4  Street, among the things that were recovered there were

5  photos showing Linda and Shannon at the Best Western hotel.

6  They're not pornographic photos but what you will find in

7  these photos -- and Michael Cashman from the Johnson City

8  Police Department will testify -- you'll find these photos

9  definitely are photos taken at the Best Western in Johnson

10  City.  You will learn about photos recovered from 14 Miller

11  Street showing the 11 River Street home I should say.  You'll

12  see a picture where there are two computers pictured in it.

13  Those are the two computers that Linda O'Connor had while

14  living at River Street.  You will learn that search warrant

15  was conducted at a storage center on or about March 11 of

16  2008.  This is a storage center belonging to Dean Sacco.

17  Found in the storage center of Dean Sacco -- you're going to

18  learn how the property got in there.  Clesson Lockwood, a

19  handyman, was directed by Mr. Sacco to gather up all his

20  belongings at 45 Fair Street and put them into this storage

21  unit.  In the storage unit, itself, you're going to see a big

22  foot locker with Dean Sacco's name on it.  There were items

23  recovered in there that have his name and address on them.

24  You will also learn that storage center that Dean Sacco's

25  materials were found in was being paid for in the last five

1    months by his mother.  Her name is Elizabeth Dinunzio.

2    You'll see checks where she is paying for that storage unit.

3    Among many things found in the storage unit you'll find a

4    video camera Shannon describes used to videotape the rape in

5    February 2007.  That video camera is found in that unit.  In

6    that unit there were unwrapped condoms that were found and

7    you will hear investigators tell you how they found in that

8    storage unit a used condom, and this used condom was found in

9    a dresser, Mr. Sacco's dresser, and it was in a box that

10   contained various envelopes and what you will learn is that

11   condom was sent to the Albany New York State Police DNA lab

12   and you will learn from the DNA expert that will testify that

13   on the outside of the condom is a perfect match of Shannon

14   O'Connor's DNA.  You will also learn that on the inside of

15   the condom is DNA that is very consistent with Shannon

16   O'Connor.  You will also learn male DNA, there was not enough

17   in order for any kind of a match to be made but you will

18   learn that this condom, which Shannon's was found in, was

19   Mr. Sacco's dresser in that storage center.

20            You will also learn that a search was

21   conducted at 45 Fair Street by the FBI.  In that house, which

22   is the house where Linda O'Connor and Shannon lived and where

23   Dean Sacco raped Shannon.  You will learn in the basement

24   they found that cowboy hat, the cowboy hat Shannon had

25   described prior to the search warrant being conducted.  You

1    will learn in that house the FBI found a prescription bottle

2    of Vicodin in Linda O'Connor's name.  You will also learn in

3    that house there was a Bartel and James wine cooler, empty

4    bottle found.  FBI Special Agent Jim Lyons will testify that

5    in the course of conducting the investigation, once they

6    became involved, he went down to New Jersey to interview a

7    number of people, including Bill Sorvino.  Bill Sorvino will

8    testify.  Bill Sorvino is Dean Sacco's employer.  He will

9    tell you about how Dean Sacco complained to him about his

10   tenants in Norwich not paying rent.  The FBI recovered in New

11   Jersey from Bill Sorvino a number of different items.  Agent

12   Lyons will testify that among the many items that were found,

13   there were 8-millimeter tapes and on these tapes, Jim Lyons

14   will describe for you how when he viewed these tapes, hours

15   and hours of tapes, that Dean Sacco was a prolific

16   videographer.  He videotaped everything.  Agent Lyons will

17   describe for you how Dean Sacco would set up the video camera

18   and videotape himself for hours at the workplace answering

19   the phone, interacting with the camera as if he's on some

20   live TV show.  Agent Lyons will describe for you how on

21   these -- on video there's hours where Dean Sacco is sitting

22   there reading Italian.  Agent Lyons will describe for you how

23   on one of these tapes in the middle of the Italian reading

24   session there is a clip where Dean Sacco is videotaping a

25   woman.  She has her clothes on but he's talking to her why it

Government - Opening Statement                    84

1    is she wants to star in a pornographic movie.  You will watch

2    a videotape where Dean Sacco is videotaping himself at work

3    and he answers a phone call from a person calling in about an

4    ad that Dean Sacco put in the paper looking for girls to star

5    in porn movies.  You will see videos where Dean Sacco and a

6    bunch of buddies -- Dean Sacco is describing for his buddies

7    why he bought this video camera, same camera Terry Shultz

8    found in that storage center.  You will hear from Dean Sacco

9    in his own words why he bought this video camera.  He had

10   this great idea, you will hear it and see it, to hire girls

11   for $150 to star in porn flicks to sell to make money.  You

12   will hear Agent Lyons reading from diaries from Dean Sacco

13   where he describes sexual attraction to minors, where he

14   describes urges to do and have sex with minors.  You will

15   hear from Dean Sacco's diaries where he is talking about

16   producing pornography with young girls.  You will see a

17   brochure that was recovered at the storage center where Dean

18   Sacco gets information to travel to Thailand, to Philippines

19   to have sex with young girls.  You will look at his passport

20   where he traveled to the Dominican Republic.  You will hear

21   an individual by the name of Amanda Rising from New Jersey

22   who was a landlord of his where he told him he traveled to

23   the Dominican Republic to have sex with young girls.  You

24   will hear things that Dean Sacco wrote in a book, an

25   autobiography, that has his picture on the front cover where

Government - Opening Statement

1  he describes his sexual attraction to young girls and

2  describes where he actually had committed sexual acts on

3  young girls.

4           I'm going to sit down now.  I've tried to give

5  you an overview, an overview of what these two people did to

6  Shannon O'Connor.  I tried to give you those pieces so you

7  can have them out there so as things come into evidence you

8  have an idea what they belong to, what we're talking about.

9  You will hear from Shannon.  She will describe all the things

10  I said she would.  All these pieces of information and

11  evidence you will see it.  And when this is all said and

12  done, I'm going to stand in front of you and I'm going to ask

13  you to find Dean Sacco and Linda O'Connor guilty.  I'm going

14  to ask you to convict them because this is what they did and

15  what they're charged with that they should be held

16  accountable for.

17           Thank you for your attention, especially for

18  the last hour and a half.

19           THE COURT:  All right, ladies and gentlemen.

20  We're going to take a short recess now.  See counsel at

21  side-bar, please.

22           (Short break taken).

23           (Jury present).

24           THE COURT:  All right, ladies and gentlemen.

25  What's going to happen now is Mr. Fischer is going to address

Mr. Fischer - Opening Statement

1    you on behalf of Mr. Sacco with his opening statement and

2    then we're going to recess for the evening and tomorrow

3    morning we're going to hear the last opening statement by

4    Miss Peebles on behalf of Miss O'Connor.

5              So, Mr. Fischer, are you prepared?

6              MR. FISCHER:  Thank you, your Honor.  May it

7    please the Court, counsel, members of the jury, good

8    afternoon.  I hate to do this at 4:45, it's a hard to time to

9    do it, but I think it's a good time to do it now.  I can

10   guarantee I'm not going to be as, how can I say it nicely, as

11   long as Mr. Lovric was in describing what I expect this proof

12   may say.  It's important though that you understand that we

13   are advocates.  We advocate our respective positions.  Mr.

14   Lovric is a very good lawyer.  He did a heck of a job in

15   explaining the aspect or those aspects of evidence that he

16   expects will support his case.  You know, as I watched from

17   behind and listened more than anything, I recognized a tone

18   to he used in telling you that story in sounding familiar

19   because it's a tone I use I when it's monotonous and it helps

20   send disbelief.  For every fact you just heard about there

21   are five or six other related facts and sometimes those

22   related facts, those five or six related facts are in fact

23   contradictory of the one facts that you just heard and I'm

24   not going to go through the ten thousand bits of evidence

25   that you're going to hear during the course of this trial

Mr. Fischer - Opening Statement                    87

1   right now and say this is why you should not convict.  There
2   will come a time to do that.  I'm not going to do it now.
3               What I'm going to ask of you is keep an open
4   mind because at the end of that opening statement by the
5   government you close up shop, walk out the door, this is a
6   done deal, we don't have to worry about anything else but
7   that is not how this works.  It's that darn evidence and that
8   law that complicates everything and it is complicated.  It is
9   complicated.  I've been a lawyer for 20 years.  I've
10  researched the law set out in this indictment.  I listened to
11  Judge McAvoy explain the law here.  It is a very long way
12  from simple, but that's where the Judge started.  It's
13  basically where the prosecutor started.  I think it's
14  important I address the law issue first.
15              Part of your obligation here, you all stood
16  up, raised your hand, took your solemn oath.  I hope
17  everybody understands just how serious that is.  There's a
18  lot involved with that.  These a huge undertaken.  That's a
19  responsibility you all accepted that is huge.  It goes to the
20  heart of our government, heart of our citizens of who we are,
21  how we decide things civilly.  It's a real important
22  obligation and part of the obligation is to make sure before
23  you render a verdict in this case that you understand the
24  law.  And that is not easy.  But it's important because the
25  only way there can be a fair judgment, whether it's

Mr. Fischer - Opening Statement                88

1    conviction or acquittal, is understanding first what the law

2    is.  So at the end of the day you've gotten the preface what

3    the law is, what the rules are, so when you hear the evidence

4    you get a generalized context but you haven't gotten a full

5    understanding yet so with respect to that aspect of it, I ask

6    you to keep an open mind.  Don't decide that guilt or

7    innocence at this point based on the opening and little bit

8    of law that you've heard.  With respect to the application of

9    that law to the facts, Mr. Lovric said to you, as I

10   understood it, I wrote it down, find them guilty of what they

11   did.  I'm not sure what that means.  It doesn't mean anything

12   to me because, first of all, you've got to find out what they

13   did and if you find what they did, well, of course, they're

14   guilty of it because they did it.  What you need to do is

15   something different than find them guilty of what they did

16   though.  In this case your job is find out whether what they

17   did, what they're guilty of doing physically requires that

18   you find them guilty under the rules.  Entirely different

19   concepts.  Okay.  So you can't just find them guilty of what

20   they did and render a guilty verdict on that basis.  It's not

21   how it works.  What they did in finding out what they did is

22   really hard.  That's probably the primary difficult job that

23   you all have here.  Listening to this evidence and the

24   evidence is complicated, it's contradictory on many points.

25   The primary witness in this case, I don't care how you cut it

Mr. Fischer - Opening Statement          89

1   and I don't care how many other police officers, DSS people,

2   investigators, or other people you put up here and I'm not

3   joking when I say the documentation stands this high

4   (indicating), okay, it all comes down to primarily and almost

5   exclusively to one person.  A young kid now 14 I guess.  An

6   ordinary kid, no.  To the extent that any upbringing can be

7   ordinary, her upbringing is not ordinary.  Her upbringing was

8   truly tragic, terrible.  All the things that happened to her

9   before August of 2006 when Mr. Sacco's life and Shannon

10  O'Connor's life coincided.  All of the things that happened

11  to her prior to that time but some really tragic, terrible,

12  awful things occurred to her.  Since that time medical

13  professionals have worked with her and as I read some of the

14  notes that I expect you will see, one of the diagnoses that

15  I've seen was that this girl is severely mentally ill.  All

16  right.  So understand that when she testifies and when the

17  prosecution rests their case upon her credibility.  They're

18  resting their case upon the credibility of somebody who has a

19  legitimate severe mental illness to the extent where it is

20  documented that she has -- she hallucinates.  She's had

21  auditory hallucinations.  Crying babies.  That's the

22  foundation for the prosecutor's case here.  The factual basis

23  for it.

24              There are extraneous facts that surround her

25  testimony that help you determine some aspects of the factual

Mr. Fischer - Opening Statement

90

1    events here at issue, but there's no way around it.  Their

2    primary case is based upon this girl, Shannon O'Connor.  And

3    you feel bad, I feel badly for her, I really do.  All of the

4    things that happened to her is truly a tragedy.  What

5    happened to this girl is tragic.  But you cannot say that

6    because you feel badly for her you can ignore the truth.  And

7    I think that what you'll hear in that regard is that as to

8    any given version of events that she provides, there are

9    couple, one, two, three, four other versions of the same set

10   of facts.  One example that leads to mind, Mr. Lovric said

11   that according to Shannon she had first contact with

12   Mr. O'Connor, I'm sorry, with Mr. Sacco shortly after

13   August 1 thereabouts and that soon after that, she

14   committed -- she tried to commit suicide.  Because of that

15   event, he attributes that.  If you go to the records, let's

16   go to the records, her own words, her own words elicited by

17   some people who are trying to help her.  You get two

18   different versions really I guess.  You got Chenango County

19   Mental Health person, client says the day before mom asked

20   Shannon why she didn't take the dog out, this new puppy

21   Buddy, they are trying to house train the dog, mom started

22   yelling and hitting her.  Also later on 9/27/06 -- I'm sorry.

23   8/11/06, couple days later, a record that mother is

24   physically abusive to Shannon on regular basis and that's why

25   she's hospitalized.  That is one example of contradictory

```
 1    versions as to the facts in this case coming from the mouth
 2    of the primary and nearly exclusive witness as to events that
 3    occurred here.  The record is replete with that and the
 4    cross-examination, it's my job to cross-examine.  It's going
 5    to be the job of Miss Peebles and myself, it's our job to
 6    cross-examine and try to figure out what part she's telling
 7    the truth and what part she's telling is not the truth.  And
 8    you know so much of this case is based on her testimony and
 9    you'll have to figure out whether she's actually
10    affirmatively lying or she's just fantasizing, confabulating,
11    confused or reasons for the clearly contradictory versions
12    she's giving of what occurred here.  But you can't avoid the
13    fact that she is giving contradictory versions of the same
14    events and you're going to have to figure out why that is.
15    Shannon O'Connor.
16              I'm not going to spend a long time talking
17    about this because we don't even know really all of the
18    evidence and what it's going to be.  We haven't heard an iota
19    of evidence at this point.  I've gone through what we do
20    have, this stack of documentation and you know a lot of the
21    indictment in this case, a lot of the charges against the
22    defendants are based on claims that the defendants took
23    pornographic pictures of Shannon O'Connor.  That's a good
24    part of the claim in this case.  But other than Shannon
25    O'Connor, there's absolutely not a single bit of evidence
```

Mr. Fischer - Opening Statement

1    that I'm aware of any picture of Shannon O'Connor taken in

2    this setting, pornographic images.  There's nothing there.

3    It ain't so.  I submit to you there were -- Mr. Sacco was

4    arrested down in New Jersey where he worked.  He didn't know,

5    you know, that he was going to get arrested that day.  He

6    didn't see this coming.  He didn't have any notice that the

7    police were on this.  There was a phone call but I'll talk

8    about that in a minute.  There's no evidence that he came

9    back up here and secreted away evidence.  And Miss O'Connor,

10   same thing.  You know, there were computers with images of

11   other pornography on it but there's just -- there's just

12   nothing about, there's no picture of Shannon on there.  If it

13   was taken then where the heck is it, if it ever existed?

14   They went through hard drives apparently and didn't find it.

15   It's not there.

16              You know, Mr. Sacco I believe at some point

17   was up there taking pictures of the house and that may be

18   where Shannon saw a camera that he had.  And I guess that

19   leads me to another point.  Oh, the phone calls.  Detective

20   Blenis was really the guy who stepped in first, the police

21   officer who stepped in first and lead the investigation and

22   in part of what he did was to get Shannon, I guess at that

23   time a 13-year-old girl on the phone to dial up Mr. Sacco and

24   see if she could persuade him to inculpate himself.  And that

25   was unsuccessful.  And characterized, as I've heard some

Mr. Fischer - Opening Statement

1    people characterize the evidence, that he admitted to certain

2    facts on those audio conversations.  But he did not.  You

3    listen to them, he did not.  I'm told -- I've heard the

4    prosecutor say in essence he almost did or he nearly did but

5    I've heard those and I can say to you clearly he did not.

6             Now, part of the equation that's missing is

7    Detective Blenis, he tried to record the first audiotape.

8    There were three phone calls.  The first phone call was and

9    it's gone.  They couldn't record it.  I don't know where it

10   is.  That's a big mistake.  That's the kind of mistake we

11   were talking about on voir dire.  That's, in my opinion, is

12   pretty darn huge.  No reference of what was said during that

13   conversation that I'm aware of.  That's a big blunder right

14   there and it concerns me.  So when Detective Blenis testifies

15   tomorrow you'll be able to watch him and understand what he

16   did and how he did it.  It's a big mistake.

17            I really don't know what happened back in

18   Deposit between Shannon, George Lang, and Mrs. Lang.  I

19   understand Mrs. Lang wasn't involved.  That's her claim.  I

20   don't know what happened with Linda O'Connor and I don't know

21   what happened with Shannon.  It was all long before Dean

22   Sacco even knew about Norwich apparently or was in Norwich

23   before Shannon had any contact when that occurred.  There's

24   an indication, though, there's a similarity in what occurred

25   in at least what the allegations are of what occurred there

1   as to the allegations that have been made against Mr. Sacco.

2   They're eventually through a couple different versions or a

3   reference to elicit information from Shannon where the

4   officer is sitting there nodding along, is this what

5   happened?  Oh, yes, that's exactly what happened.  Did it

6   have a tripod?  Oh, yes, it did have a tripod.  I just

7   thought that type of encouragement, suggestion, if you will,

8   that the facts, the allegations, not the facts, the claims

9   that Shannon makes against Mr. Sacco eventually take form

10  that are almost identical to the claims that she made about

11  George Lang and her mother concerning events that occurred

12  years before and I suggest to you consider the concept of

13  transference.  George Lang apparently died and had never got

14  opened up, exposed, addressed, resolved, to the extent it

15  could get resolved.  There's a lot of psychology here.  I'm

16  not a psychologist but there's a lot of stuff going on here

17  psychologically from the perspective, not just of Shannon,

18  but frankly Dean, of Linda O'Connor, the police officer

19  involved, police officers involved here, the DSS workers.

20  There are emotional aspects to each of their involvement with

21  this girl as they bring her out through the system that I'll

22  try to reveal and bring out and understand myself as to why

23  they did what they did and how they did what they did and

24  it's your job to become a psychologist and kind of understand

25  that.  And that's very difficult.  But I think it's important

Case 3:08-cr-00077-TJM  Document 160  Filed 12/24/08  Page 95 of 99

1    for you to understand it.  Some of you have more experience

2    with it than others and can bring those tools to the table in

3    evaluating the credibility of the witnesses who testify here

4    and I really strongly ask that you do that and when it comes

5    to the testimony, not just from Shannon, but from other

6    people about what Shannon said and other people in reliance

7    upon what Shannon said, I ask that you look at it credibly,

8    analyze it and consider it critically.  The biggest problem

9    frankly with my position at this point is, one, I don't know

10   what the evidence is but I know that there have been things

11   said by the witnesses you'll hear that have already been

12   recorded, documented, that are either self-contradictory,

13   contradicted by other evidence.  And the problem is that when

14   you get a package of information buying a child some of it's

15   true and some of it's untrue.  It's really hard to sort out.

16   If you know bits of it are true, it makes it very difficult

17   to say I don't believe the person because the little bits of

18   truth verify, substantiate that yes, I can believe this

19   person because they're telling me the truth.  But I submit to

20   you in listening to the witnesses in this case, those little

21   bits of truth do not rise to the level of beyond a reasonable

22   doubt and that's really what it comes down to in the case.

23   The law that's standard in this criminal case that it must be

24   proved to you beyond a reasonable doubt each and every

25   allegation in each and every count against each of these two

Mr. Fischer - Opening Statement

96

1    defendants must be proved beyond a reasonable doubt.  And I

2    submit to you what I know about the evidence at this point,

3    when we stand up here at the end of this trial in a week or

4    so, that the evidence will not rise to that level.

5                    There's a legal point about interstate

6    commerce.  I think it's mentioned eight or nine times in the

7    indictment.  It's an integral part of the claims in this

8    case.  You know the claim apparently is that Mr. Sacco came

9    up here for the purpose of engaging in a relationship with

10   this girl.  I submit to you he was up here from at least May

11   of '05 and then they moved in August of '06 and he continued

12   to work on this place whenever he could on the weekends.

13   He'd get up from his -- from his job in Glenwood Furniture in

14   New Jersey, he was coming up here working on this place

15   regularly before he was ever aware of Shannon O'Connor, Linda

16   O'Connor and that he continued to do that throughout.  So if

17   there was a purpose, his dominant purpose, his primary

18   purpose in coming up here, if there was a coincidental

19   meeting between the two of them, that's exactly what it was.

20   It was coincidence to him coming up to work on the house that

21   he used to make a living in part.  That I believe at the end

22   of the day is not going to suffice.  It's not going to rise

23   to the level of beyond a reasonable doubt to sustain the

24   allegations in this indictment.

25                    The interstate commerce aspect of this case is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mr. Fischer - Opening Statement

1    a technical aspect, frankly, that I look to and rely upon in

2    saying that in this federal case and the federal case has

3    unique requirements.  It's different than a state case.  The

4    interstate commerce aspect of this case is lacking proof --

5    regarding interstate commerce in this case is lacking and the

6    proof will not support a conviction on that and it's a

7    technical basis.  It is a technical basis, it's a technical

8    requirement but it's a rule of law and it's important and

9    we'll see what the proof brings but I submit to you that you

10   need to consider, as you listen to the evidence, whether that

11   basis is going to be supported.

12                 I've gone on long enough.  I'm not going to

13   address all the proof at this point.  Keep an open mind.

14   That's an awful hard thing to do at this point.  I won't

15   speak to you directly for another seven or eight days.

16   You're going to hear proof that goes this way and proof that

17   goes that way and you're going to feel terrible and wonderful

18   in the meantime about things occurring.  You're going to

19   laugh and cry seriously, that's not a joke, you will.  But

20   don't decide this case yet.  You know the prosecutor's urging

21   you to find these people guilty of what they did.  You can't

22   take that as the rule and you can't take what he said here as

23   fact, as evidence, it's not.  It's his position on particular

24   bits of evidence that you may hear.  Listen to the remainder

25   of the evidence, if you will, please.  Consider it in the

Mr. Fischer - Opening Statement                98

1   context and put the prosecution's case in context as you

2   listen to the remaining evidence.  I'm going to let everybody

3   go home now.  I appreciate your attention and I'll see you in

4   the morning and I'll speak with you in about a week or so.

5   Thank you.

6              THE COURT:  Thank you, Mr. Fischer.  All

7   right, ladies and gentlemen.  As I indicated to you we're

8   going to have the last opening statement tomorrow.  I think

9   we have been here long enough today and gotten a little ways

10  but we've got a lot farther to go.

11             Let me once again instruct you not to discuss

12  the case among yourselves, with anybody else or permit anyone

13  to discuss it with you.  If there's anything in the media,

14  just ignore it.  We want the case decided not upon about what

15  somebody else thinks they heard in the courtroom but what you

16  know you heard in the courtroom from the witness stand and

17  the law the Court gives to you.  Beyond that I guess I can

18  tell you have a nice evening.  We'll see you at 10:00

19  tomorrow morning because I have a 9:30 matter I've got to

20  take care of first and then we'll get you guys going.

21             (Court stands adjourned)

22

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1                    C E R T I F I C A T I O N

2

3

4          I, VICKY A. THELEMAN, RPR, CRR, United

5    States Court Reporter in and for the United States

6    District Court, Northern District of New York, do

7    hereby certify that I attended at the time and place

8    set forth in the heading hereof; that I did make a

9    stenographic record of the proceedings had in this

10   matter and cause the same to be transcribed; that

11   the foregoing is a true and correct copy of the same

12   and the whole thereof.

13

14

15                              _____

16                              VICKY A. THELEMAN, RPR, CRR

17                              United States Court Reporter

18                              US District Court - NDNY

19

20

21   Dated:  August 8, 2008.

22

23

24

25