1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF NEW YORK

3  ----------------------------------------------------------

4  UNITED STATES OF AMERICA,

5              -versus-                    08-CR-77

6  LINDA O'CONNOR and DEAN SACCO.

7  ----------------------------------------------------------

8              TRANSCRIPT OF JURY TRIAL

9  held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  WEDNESDAY, May 7, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Bighamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Miss Peebles - Opening Statement

101

1          MR. LOVRIC:  Just to mention, after Miss

2    Peebles does her opening, I'm going to need a break to

3    connect my laptop because we're doing a lot of things

4    through -- but she'll have to disconnect hers, I'll have to

5    connect mine, that will take -- I have to log on, it will

6    take me maybe five or ten minutes to do that.  I don't know

7    if you want the jury to step out.

8          THE COURT:  Right.  We'll let them step out.

9          (Jury present).

10          THE COURT:  Morning, ladies and gentlemen.  I

11   have been told that there was some further media attention

12   given to the case and, as you'll recall my instructions last

13   night before you left, were to avoid any of that.  Did

14   anybody happen to see any of that media attention?  Nobody.

15   You're all going to take the Fifth, huh?

16          All right.  At this time Miss Peebles is going

17   to address you with her opening statement on behalf of her

18   client, Miss O'Connor.

19          Miss Peebles, are you set?

20          MISS PEEBLES:  I am, your Honor.

21          THE COURT:  You may address the jury.

22          MISS PEEBLES:  May it please the Court,

23   counsel, members of the jury:  This case is about a mother

24   who was ill equipped to care and provide for her emotionally

25   disturbed 14-year-old daughter.  Shannon O'Connor was

Miss Peebles - Opening Statement

1   desperate in her quest to find a traditional family

2   lifestyle free from poverty.  While Shannon O'Connor loves

3   and cares about her mother, she knew that she could never be

4   the mother that she so desired.  Shannon knew in her heart

5   that Linda's mental and emotional limitations would never be

6   enough to provide her with the stability that she so craved.

7   Shannon O'Connor's beliefs about her mother's limitations

8   were confirmed and reinforced by the Department of Social

9   Services when she was introduced to two case workers, Naomi

10  Panus and eventually Elizabeth Chesebro.  Shannon has said in

11  desperation what she thought those around her wanted to hear

12  in order to give her the attention that she was seeking, in

13  order to get her place permanently in a home where she would

14  never have to worry about finances and stability again.

15           Now, Linda -- Shannon grew up essentially as

16  an only child being raised principally by Linda as a single

17  parent.  Linda O'Connor married a gentleman by the name of

18  Raymond O'Connor while he was in state prison.  He's never

19  lived as a father for Shannon.  They've never lived together

20  as a family.  He's not the biological father to Shannon.

21  Linda had hoped that one day they would live together but at

22  this point that had never happened.  Linda herself grew up in

23  extreme poverty and had a very difficult upbringing.  She

24  herself grew up in foster, barely had any contact with her

25  parents.  Her mother was a raging alcoholic.  She gave birth

Miss Peebles - Opening Statement

103

1   to her first child Walter Burkett, Junior when she was only

2   19 years old.  She has a ninth grade education and she lacked

3   parenting skills.  She had nothing to go on.  She had no

4   money, no finances.  As a result of her inability to parent,

5   Walter Burkett, Junior wound up spending the majority of his

6   life in foster care despite Linda's periodic attempt to try

7   to take care of him.

8               Shannon or Linda had hoped that would not be

9   the case with her daughter Shannon.  Linda O'Connor suffers

10  from some serious physical disabilities, severe diabetes, and

11  severe epilepsy which required her to have brain surgery when

12  Shannon was just a small child.  Those limitations have

13  always interfered with her ability on a day-to-day basis.

14  She along with the suffering from seizures could not drive

15  because of her condition so she's had to walk every where and

16  she couldn't really keep employment because of her seizures.

17  So she collects Social Security disability which again

18  doesn't provide for a large amount of income.  But what

19  you're going to hear through the witnesss in this case is

20  that despite her meager financial means she always tried to

21  buy Shannon everything she wanted, even though she didn't

22  have the money and she was often criticized for spending

23  money on her that she simply did not have.  Linda wanted to

24  provide Shannon with these things because she never had them

25  when she was a kid.

Miss Peebles - Opening Statement

1          Throughout most of her life Shannon grew up in

2    Deposit, New York.  It was in June of 2006 when the home that

3    they had been renting for several years was ravaged by flood

4    water and most of their personal belongings were destroyed as

5    a result of the flood.  Because of their living situation

6    they had to move out and moved in with a friend, a woman by

7    the name Delores Tomins.  You're going to hear from both

8    Shannon and Linda moved in with her while Linda tried to find

9    affordable housing.  She searched the paper and couldn't find

10   affordable housing in Hancock, Sidney and Deposit.  So she

11   did, as a result of the flood, receive a check for over five

12   thousand four hundred dollars to reimburse her for damage to

13   her property that was destroyed.  It was disaster relief

14   money that was provided from FEMA.  She's at a diner eating

15   with Delores Tomins when they're looking through the paper

16   and find an ad, there's a house in Norwich at 45 Fair Street.

17   So at that point she calls the number and she speaks to Dean

18   Sacco for the very first time and he tells her if you're

19   interested in the apartment you can go there now and the

20   upstairs tenants will show you the apartment.  If you're

21   interested in this, give me a call back.  So Miss Tomins

22   takes her over to 45 Fair Street in Norwich.  The upstairs

23   tenants, Larry Piper, shows her the apartment and immediately

24   Linda falls in love with the apartment.  Two bedrooms, big

25   kitchen, sun room.  It was nicer than any place she rented

Miss Peebles - Opening Statement

1    before.  She did not want the opportunity to pass by and she

2    had over $5,400 of disaster relief money.  She looks at the

3    property on July 23.  On July 24 she gets a hold of Dean

4    Sacco and she tells him she's interested and he says, well,

5    there's already been several individuals that are interested

6    in the property.  Linda tells him I've recovered money from

7    the disaster relief, I was a victim of the flood, I'll wire

8    transfer you three months worth of rent, August, September

9    and a deposit.  She wire transfers him on July 24 over

10   $1,800.  It cost her extra hundred dollars to wire transfer

11   to him.  So she paid for August, September and had $600 as a

12   deposit.  Linda had hoped that this would be a new beginning

13   for her and Shannon and it would provide more opportunities

14   for Shannon.  There was more to do for her in the Norwich

15   area than in Deposit.

16            Now, they move in and she meets Mr. Sacco for

17   the very first time on August 2 of 2006.  What you're going

18   to hear is Mr. Piper watching as Dean Sacco ingratiates

19   himself into the O'Connor family.  Clearly Shannon O'Connor

20   is starving for attention.  She lobs on to him and Linda

21   O'Connor with her limitations is taken.  He's a smooth

22   talker.  He's helping move all of their belongings into the

23   house and then he suggests to Linda, well, you should sign

24   Shannon up for the YMCA Day Camp down in Norwich because he

25   works out there so Linda does but before she moves in, she

Miss Peebles - Opening Statement

1 gets the approval of the landlord to buy Shannon a puppy.  So

2 she spends $800 on a puppy named Buddy and she thought, well,

3 this would be a perfect puppy for her to adjust to her new

4 environment.  Shannon wanted it so Shannon got it, $800 dog.

5 She moves in and he suggests the YMCA.  She signs her up for

6 the YMCA in Norwich at the suggestion of Dean Sacco.

7             Now, within the first week of living at 45

8 Fair Street, things aren't going so well because, first of

9 all, Linda doesn't have the patience or the ability to care

10 for a puppy and Shannon wasn't really ready to take on that

11 kind of responsibility on her own.  The puppy had to be

12 trained, fighting and arguing over the puppy.  You're going

13 to hear about that because what happens is that first week

14 when they're in Norwich, August 11, she shows up at day camp

15 and Shannon and says I took my mother's medication because it

16 was an act she said of trying to kill herself.  So, as a

17 precautionary measure, they call an ambulance.  They take her

18 to the Chenango County Memorial Hospital and do all this

19 blood work.  This is where the first time the Department of

20 Social Services enters into the O'Connor life.  Naomi Panus.

21 Shannon says to the case workers, to the doctors, you're

22 going to hear this, my mother is physically and verbally

23 abusive to me.  And when Linda goes to the hospital she's

24 shoots back, do you see any bruises on her?  And they said,

25 well, that doesn't matter.  They send her for five days to

1    psychiatric -- for psychiatric evaluation in Syracuse.

2    That's why she was in the hospital.  What you're going to

3    find in her blood work, she didn't have elevated levels of

4    medication in her system.  She says she took three shots of

5    her insulin medication.  We have those medical records.

6    You're going to get a chance to look at those.  Was it a

7    suicidal gesture or an act for attention?  Well, that's

8    August 11.

9              August 19, Shannon's home not more than three

10   days.  Linda is doubled over in pain vomiting.  The upstairs

11   tenant, Mr. Piper, has to take her to the hospital.  Linda

12   tells Shannon to check in with the Pipers and the Pipers are

13   going to watch her.  She has no idea how long she's going to

14   be in the hospital.  She's doubled over in pain with kidney

15   stones.  Her stay at the hospital turned out to be a lot

16   longer than she anticipated.  She wound up developing a blood

17   infection and required ten days at the hospital but the very

18   next day, August 20, Shannon shows up at the Y camp and

19   promptly tells the director at Y camp, my mother left me home

20   alone and there's no food in the house.  So immediately the

21   case workers show up and they see there's some superficial

22   cuts on her wrist where she said she was trying to cut

23   herself.

24             Now, as a result of her obvious need for

25   supervision and the fact she has some serious mental health

Miss Peebles - Opening Statement

1   issues, the Pipers were clearly not equipped to care for

2   Shannon.  What they do, they call a family friend, Renee

3   Lang.  Renee Lang, you heard the government discuss Renee

4   Lang.  She was a friend of the family, of Linda and Shannon,

5   and she steps in and agrees to take custody of Shannon and in

6   the meantime a neglect petition is filed.  September 14 it's

7   filed by Naomi Panus and it alleges that she was left home

8   alone with no food in the house and no appropriate

9   supervision, so she's going to be placed temporarily in the

10  custody of Renee Lang where she stayed until she returns back

11  to Linda.

12          Now, Linda doesn't return home from the

13  hospital right away because she's in the hospital for a

14  period of ten days but when she gets home she has a check

15  waiting for her for over $3,000, $3,300.  Again, disaster

16  relief money that she was given by the state.  You're going

17  to see the bank records and the money that comes in and out

18  of her checking account.  September 27, she's still with

19  Renee Lang.  Linda's having phone contact, limited phone

20  contact.  You're going to learn there was rift between Renee

21  and Linda that had been ongoing for years and in the meantime

22  Shannon is confronted about looking at pornography, not just

23  pregnancy sites, she was looking at X-rated videos and gay

24  men, seeing gay men on the internet which was not -- it

25  didn't have anything to do with being worried about being

Miss Peebles - Opening Statement

1   pregnant.  She's confronted about that by her case worker and

2   she denies it.  She lies.  She was on the Walt Disney site

3   and I was looking at Bo Bice sites.  It's not until she is

4   further pressed that she finally breaks down and admits it.

5   And on top of that she says please don't tell my mother.  Do

6   not tell my mother.  That's exactly what she instructs the

7   case worker to do.  By the end of September, Renee Lang has

8   had it up to her eye balls and cannot control Shannon.  She

9   had enough so she had to go back and live with Linda.

10              When Shannon returns home to her mother in

11   October of 2006, the Department of Social Services is heavily

12   involved in their day-to-day lives.  They have -- each have

13   their own counselor.  Linda has her counselor, Shannon has

14   her counselor.  They are seeking services.  They have a

15   parent aid.  Linda is learning how to manage her money.

16   They're constantly monitoring school attendance.  They're

17   heavily involved in their lives.  October 25 the Pipers move

18   out of the upstairs apartment and Mr. Sacco moves in.  Mr.

19   Sacco talked about revamping the back garage to make a living

20   space because he worked at some organic farm on the weekends

21   in Norwich.  He was always putt-sing around the property,

22   fixing it.  The neighbors all saw him there and saw Shannon

23   around him all the time.

24              So he moves in on October 25.  Now, again,

25   taking advantage of Shannon's vulnerability, she's never had

1    a father figure.  The only person she knows as a father has

2    been in custody since she was born.  So she's never had a

3    biological father.  She's never had closeness to anybody and,

4    of course, Linda is limited.  Now what happens on

5    November 21.  Naomi Panus transfers out of Chenango County

6    Department of Social Services and in walks the new case

7    worker, Elizabeth Chesebro.  Now, the day after that there is

8    a Family Court order that says Linda is not to allow Dean

9    Sacco around Shannon O'Connor unsupervised.  Why is that?

10   There were absolutely no allegations of sexual abuse at that

11   point.  None.  And if there were, the Department of Social

12   Services would have been heavily involved.  They were already

13   involved in their lives.  What was the basis for the Court

14   order?  The neglect petition that was filed in September when

15   Linda was in the hospital because Shannon made some comment

16   to one of the directors at the YMCA that her landlord creeped

17   her out.  She made that comment, which she made many comments

18   about many people, but she made that comment and as a result,

19   they issued this Family Court order.  No allegation

20   whatsoever that there was any type of sexual abuse.

21            Now, December rolls around and there's all

22   kinds of controversy going on with Linda and Shannon and

23   they're trying to adjust to this new living arrangement and

24   you're going to hear testimony from people in Deposit, Linda

25   would take Shannon to the Best Western across the street from

Miss Peebles - Opening Statement

1  the Oakdale Mall in the heart of the shopping hub, in the

2  shopping district down in Johnson City because that was the

3  mall that they would go to go shopping which is something

4  that they did and the pictures you're going to see are older

5  pictures when she was younger jumping on the bed and having a

6  good time in the hotel.  That is something that they knew

7  that Linda did.  That was a way of taking her on vacation.

8  She had limited means and Shannon loved it and enjoyed it and

9  talked about it with other people.  So Linda on December 1 of

10 2006 which was a weekend, by the way, which is a Friday, she

11 takes Shannon to the Best Western at Johnson City.  And Linda

12 registers in her own name and they shop for two days and

13 you're going to hear they go to Chuckie Cheese and she gets

14 her hair straightened and they go out to dinner.  What you're

15 not going to hear is that there is any other trip or any

16 other registration at the Best Western in 2006.  That's the

17 only time she took Shannon when they moved to Norwich is

18 December 1.  And that's what the proof is going to show.

19             December 6 rolls around.  Linda spends a lot

20 of money at the Best Western taking her shopping, getting her

21 hair done.  By December 6 Dean Sacco is calling the

22 Department of Social Services complaining that Linda hasn't

23 paid the rent.  Immediately he's calling and complaining.  So

24 Linda on December 14, confronted by Elizabeth Chesebro and

25 asked about this situation, and she says I'm in the process

Miss Peebles - Opening Statement

112

1   of applying for HUD.  She had received HUD when she was in

2   Deposit.  She didn't have to do that because she had received

3   all that flood recovery money, she dragged her feet and in

4   December she got the ball rolling and you're going to hear

5   from Delaware Opportunities that she was applying for HUD.

6   On December 16 Dean Sacco calls DSS and says if Linda doesn't

7   pay the rent I'm evicting her and Shannon.  Now, ask yourself

8   this, does it make any sense whatsoever that he would be

9   calling the Department of Social Services complaining if he

10  had some arrangement going on with Linda?  And the only time

11  she struggles to pay the rent is in December of 2006.  After

12  that in January HUD takes over.

13          She begins receiving HUD assistance and on

14  January 26 they give her a check for over $2,000 to reimburse

15  her because she was victim of a flood so again she has money.

16  January 30 they're in the Pet Depot and Shannon sees a dog,

17  another dog, and Linda buys it for her because she had the

18  check for over $2,000.  So she spends more money on her for

19  the puppy.  If Shannon wanted something Linda tried to buy it

20  for her and she never thought into the future.

21          February 25, Linda's obviously running low on

22  money.  She takes Shannon to the Pizza Hut.  They eat and

23  they leave.  Now Linda doesn't have a car so she can't hop in

24  the car and peel out of the parking area.  She eats, leaves

25  and she's immediately arrested.  She's arrested for leaving

Miss Peebles - Opening Statement

113

1   the restaurant without paying and she had Shannon with her.

2   On February 26, Shannon is whisked out of the home and put

3   into foster care and on February 26 it is the first time

4   Shannon O'Connor sees what it is like to live in a stable

5   family environment when she was placed to live with Kim and

6   Dick Hamilton.

7          Now, what you're going to hear is Elizabeth

8   Chesebro comes very actively involved with Shannon when she

9   gets placed.  She was before, she had a lot of contact with

10  her.  You're going to hear she takes her on car rides, to and

11  from doctor appointments, to and from school extra-curricular

12  activities.  They have discussions about use of condoms and

13  it's not long into her placement at the Hamiltons she's in a

14  science class at school and she -- they're talking about

15  puberty and Shannon approaches her teacher after the lecture,

16  and this is on March 2 of 2007.  Shannon tells her teacher, I

17  was sexually abused by the landlord.  She doesn't give his

18  name.  She says she was sexually abused.  As you can imagine,

19  there's a full-fledge investigation that takes place.

20  Elizabeth Chesebro's notified.  She goes over to the

21  Hamiltons and does a full interview of Shannon and Shannon

22  tells her about everything that happened and she says when it

23  happened.  It happened when we first moved in.  That's in

24  August of 2006.  She talks about the color of the condom,

25  where her mother was because her mother wasn't where she was

Miss Peebles - Opening Statement

1    and didn't have any idea.  What you're going to hear her also

2    say specifically is that at one point we were upstairs and

3    Dean told me not to make any noise or my mother was going to

4    hear.  She specifically tells her that.  You're also going to

5    hear that a friend of hers came over at one point, the

6    parents were in the driveway.  Mr. Lovric, what he told you

7    in his opening is what the evidence is going to say that

8    Linda bounded up the stairs and yelled for her to come down.

9    Well, we've done some of our own investigation and I think

10   what Lisa Parmalee is going to stay, Linda wouldn't get off

11   the couch.  Now ask yourself this:  Does it make any sense

12   that Linda would just sit there and try to yell up for

13   Shannon if she had any idea what was going on when her friend

14   and parents are in the driveway?  Listen carefully to what

15   Shannon says during that first interview.  She's telling

16   everything like it is.  Now what's key and critical is on

17   March 14 Shannon's taken down to the police department in

18   Norwich by Detective Blenis, by Elizabeth Chesebro.  She

19   takes her down there, she's part of all this, there with her.

20   They set Shannon up and what they touched on is the original

21   phone call wasn't recorded, so you don't hear what took place

22   but it sounds like what happened is they got cut off because

23   it sounds like Dean Sacco tried to call Shannon back and

24   didn't know she was in foster care so he actually called

25   Linda at home about Shannon and Linda had to say, well, she's

Miss Peebles - Opening Statement                    115

1    in foster care.  So what happens is, he learns at that point

2    when he tries to call her back when she's in foster care so

3    then Shannon gets a hold of him and calls him again and then

4    the phone call takes place and you're going to hear exactly

5    what takes place.  She starts launching into I just want to

6    know whether you used a condom last time we Had sex?  And

7    then he goes on to say, you know, well, Shannon you sounded

8    depressed, I called your mom, found out you were in foster

9    care, is everything okay and he says you sound depressed.

10   What are you are you talking about?  And then it goes into

11   didn't you tell me your grandfather had sexually touched you

12   in the past?  You're going to hear that in the phone

13   conversation.  You're going to hear I never said that, I

14   never said that.  He's old, he's sick, he was undergoing

15   chemotherapy.  I never told you that.  Isn't the guy you call

16   Grandpa, didn't he sexually touch you and she denies it and

17   she's trying to get him to stop the conversation and she

18   says -- everything she says is correct.  He had cancer, he

19   died.  He was undergoing chemo.  He was sick.  You're going

20   to hear from Renee Lang, his wife.  What do you hear on

21   March 14?  March 15 she makes another controlled call and

22   what Mr. Lovric said is absolutely correct.  You're going to

23   hear Mr. Sacco pleading with her, basically trying to pull at

24   her heart strings to not say anything about this relationship

25   that they had and you can tell there was something going on

Miss Peebles - Opening Statement

1   where she was confiding in him, well, isn't there somebody

2   you can talk to.  Would your mother help you if you were

3   pregnant.  How about some adult social worker, could they

4   help you?  He's going on people that get accused of this, get

5   their teeth kicked in, beat up.  You're going to hear all of

6   this, not once, not once during that phone conversation is

7   Linda's name mentioned as having any knowledge about what

8   took place.  Not once.  It's him pleading my mother's going

9   to be devastated, his mother.  I'm going to lose my cats. I'm

10  going to go to prison for life.  That's what you're going to

11  hear on those phone calls.  Don't get me wrong, to hear a

12  young child on the phone using those types of terms and

13  knowing what happened to her and it's very difficult to

14  listen to but it's critical to pay close attention to because

15  I submit that that is exactly the truth.  That is what

16  happened.

17          Linda is questioned on March 22.  She's taken

18  down to the police station.  Elizabeth Chesebro's present and

19  she's confronted and she's asked did you violate a court

20  order and she admits it?  She says yes, I didn't see any

21  reason to follow it.  I trusted him.  I trusted Dean.  He

22  took her horseback riding, ice skating and she trusted him.

23  And she says yes, I left Pizza Hut without paying.

24          April through June she has -- Shannon has very

25  limited contact with her mother and everything is supervised.

Miss Peebles - Opening Statement

1   Everything.  Her money, conversations are supervised, her

2   letters, any correspondence, face-to-face contact is

3   supervised.  Parent aid always listening to what is being

4   said.  They were not allowed to discuss anything having to do

5   with Dean Sacco.  She couldn't offer comfort to her daughter.

6   She wasn't even allowed to discuss it around her so Shannon

7   couldn't get the comfort from her mother because she wasn't

8   allowed.  She was getting her comfort from Elizabeth

9   Chesebro, from the Department of Social Service.  That's

10  where she was getting her comfort from.  Everything is going

11  to be fine and you're going to hear she testifies in front of

12  the grand jury.  Why didn't you tell your mother she's in

13  front of the state grand jury, not the federal grand jury,

14  the state grand jury and she says because I was embarrassed

15  and I was scared.  May 21 she gives a victim impact statement

16  and again she's upset because her mom didn't protect her.

17  She violated the court order and she says that Dean should be

18  punished, not her mother, for what Dean did to me.  July 2,

19  now this is where the contact really comes to an end between

20  Shannon and her mother.  Linda is incarcerated for 90 days

21  for leaving Pizza Hut without paying and for violating a

22  court order so, as a result, she's sent to the local county

23  lock up and she can only have letter correspondence with

24  Shannon and a little bit of phone contact but, again,

25  everything is supervised.  You're going to hear Shannon wants

Miss Peebles - Opening Statement

1  her mom to change and she really is hoping that she will and

2  she'll learn a lesson from all of this and she'll get her act

3  together, learn to manage her money and all of those things

4  and the parenting skills, but you will hear repeated

5  throughout that the case worker, Elizabeth Chesebro's, going

6  to tell her, well, you can lead a horse to water, but you

7  can't make her drink.  Don't count on it.  Some people, as

8  much as they want to change, probably not.  That's what

9  you're going to hear was said to her and you're going to hear

10  that early on Elizabeth Chesebro, back in March, has a

11  suspicion.  She says she has a suspicion that Linda was

12  prostituting Shannon for rent.  That's why this was going on

13  with the landlord.

14          Now, Shannon knows her mom is going to be

15  getting out of jail October 11 of 2007.  Shannon writes a

16  letter to her mother on September 13.  She writes a letter

17  and she's very angry in the tone of the letter saying you're

18  going to choose Raymond over me.  You're going to get out of

19  jail and you're going to take off with Raymond O'Connor and

20  you're going to leave me.  You're going to see the letter

21  it's going to be offered into evidence.  And she's very angry

22  that she's going to make a choice.  September 20 Shannon is

23  removed from the Hamilton home and placed in a psychiatric

24  hospital because she makes suicidal statements.  She has

25  superficial cuts, scratches on her wrist and she's put into a

Miss Peebles - Opening Statement

119

1  psychiatric center and the main advocate for Shannon and the

2  whole case coordinator is Elizabeth Chesebro and she becomes

3  actively involved, giving information to the counselors and

4  psychiatrists at this psychiatric hospital.  On September 24

5  Shannon is running through the facility out of control,

6  alarms are going off and they have to give her STAT

7  medication in order to get her to calm down.  Now, right

8  before Linda is released from jail you're going to hear that

9  Shannon is repeatedly asking about her mother.  She's getting

10  out.  She's concerned who's going to take care of her, how

11  she's going to feed her and where she's going to live.  It

12  was interesting, and Linda O'Connor stayed in the house until

13  November of 2007, despite the fact the landlord was having

14  sex with her and all this stuff.  Well, the bottom line is

15  she was in jail and she couldn't move out until she got out

16  of jail and she moves out in November and she finds a new

17  place and that's 14 Miller Street.  That's where the search

18  warrant was executed in this case.

19           October 24 Shannon is asking what's my mother

20  been doing since she's been home from jail?  Since

21  September 20 when she's put in the psychiatric hospital she

22  has no contact with her mother.  Shannon has no idea what's

23  going on with her mother.  Totally alienated from her mother

24  by this point.  Completely.  Any cards Linda tried to send,

25  any letters, and you'll see some of what she tried to send,

1   it says refused to give and you'll see those.  They're going

2   to come into evidence.  She didn't know what her mother was

3   doing.  She didn't have any idea.  What she asked Elizabeth

4   Chesebro is what has my mother been doing since she's been

5   home from jail?  Elizabeth Chesebro says not much.  Not much.

6   And Shannon says, well, I didn't think she would anyway.

7                On October 25 she starts saying I have more to

8   tell.  I have more to tell about my mother, it's going to get

9   her in trouble.  What does she say?  During this October 25

10  interview that she has with Elizabeth Chesebro, she says my

11  mom would give me alcohol.  My mom gave me five Vicodin.  I

12  was home for school from two weeks.  I was home from school

13  for two weeks and I was very sick.  She's 87 pounds.  She's

14  saying her mother gave her five Vicodin.  She missed a week

15  of school in December and she was at the YMCA that Friday.

16  Case workers were going to the house regularly.  She was

17  never put in the hospital.  They were under the belief that

18  she had the stomach flu.

19               October 29, Shannon gives a taped interview

20  with the -- she gets taken out of the psychiatric facility.

21  She gets brought over.  You're going to see this.  This is a

22  video that you're going to get to see.  She's brought over to

23  the interview room.  She's on center stage like she was when

24  she did recorded the phone call.  She's got Detective Blenis,

25  Elizabeth Chesebro.  She goes through, well, I'm really mad

Miss Peebles - Opening Statement

1   at my mom.   My mother took pictures of me.   She came into my

2   bedroom.   Listen to what she says.   My mother let Dean come

3   into my bedroom, she came in and put something over the

4   window.   She was having sex with me.   She was taking

5   pictures.   I was really mad.   I wanted to punch her in the

6   face.   Later on in the interview you've got to hear -- you've

7   got to watch the nature of the questions and how they lead.

8   Some of the questions that they're asking when they're trying

9   to elicit information later on in the interview.   You're

10   going to hear detective asks her, so when did your mom put

11   the sheet up?   She came in, she put the sheet up, sun was

12   bothering me -- in my eyes.   I'm sorry.   What you're going to

13   hear when you hear the tape is that she probably forgot what

14   she had said and the basis for the sheet was because the sun

15   was in her eyes and it bothered her.   That's what I'm saying,

16   if you listen closely to this detail, it's important.   It's

17   important because lies are difficult to remember where the

18   truth isn't.   It's at this point in time where she brings up

19   this notion that her mom was taking photographs of her while

20   she's having sex with Dean but later on -- that's the second

21   statement I'm going to offer, that statement as well because

22   I think you should see everything and in that statement

23   you'll hear it's October of '06.   Now she doesn't even get

24   back with Linda until October 11, I believe, of 2006.   She's

25   going to say, and in her first statement that she gives in

Miss Peebles - Opening Statement

122

1  March, she says she doesn't see Dean Sacco after August until

2  November of 2006.  This is entirely different.  Now, you're

3  going to hear in the tape, at the end of the tape when she

4  invites Elizabeth Chesebro to a Halloween party they're going

5  to have at Binghamton Psych, at the hospital.  Elizabeth

6  Chesebro doesn't kind of answer her about whether she's going

7  to go and she stares at her but then you're going to learn

8  after the Halloween party, when Elizabeth Chesebro doesn't

9  show up, she becomes out of control, banging her head against

10  the wall.  She has to be given stat medications.

11          November 6 is key.  She wanted to know whether

12  or not Detective Blenis had talked to her mother about

13  allegations.  They basically don't tell her anything.  She

14  says when it's appropriate for you to know.  Well, on the

15  phone she asked her will you come here and see me tomorrow?

16  Elizabeth Chesebro say I can't, I have obligations.  I've

17  been out of the office.  What you're going to learn is that

18  within two hours after that phone call she makes another

19  suicidal gesture.  She takes a shoe lace and puts it around

20  her neck which shocks everybody.  They can't figure out how

21  this could happen.

22          November 30 Shannon still has no contact with

23  her mother.  She has no idea what's going on.  She's claiming

24  now, she's running around I have more to more tell.  I have

25  more to tell about my mom.  Shannon O'Connor is interviewed

Miss Peebles - Opening Statement                123

1    for a third time and again she's brought down.  There's a

2    woman named Denise Oliver, forensic interviewer, and have

3    Elizabeth Chesebro who does all the questioning and Detective

4    Blenis is in another room wearing a earpiece so he can hear

5    what's being said and chime in if he has any questions.  And

6    during that interview Shannon says my grandfather sexually

7    abused me.  My mother sexually abused me.  She would come

8    into the bathroom when I was 11 and kiss me in my vagina,

9    fondle me and this started happening then and then just out

10   of the blue you're going to hear them say, did she say

11   anything when she would do this?  No, she never said

12   anything.  Again, listen to what she says and how she says

13   things happened.  Out of the blue her mother starts sexually

14   molesting her in the bathtub and fondling her and by the way

15   my grandfather started sexually touching me and abusing me,

16   we never had sex, fondled me and abused me.  Took pictures of

17   me giving my grandfather a blow job or they're on his hard

18   drive.  It's one of those cameras where you can put the

19   camera to the hard drive and transfer it which would -- it

20   would have seemed to be a digital camera.

21            She says that her mother took her to the Best

22   Western on two separate occasions since they moved to

23   Norwich, two separate occasions and had two different men on

24   two different occasions rape her, sexually molest her and

25   then paid her money mother money.  The problem with that is,

Miss Peebles - Opening Statement

1   they went and got hotel registrations and the hotel

2   registrations suggest that Linda O'Connor was there once.

3   That was a weekend, Shannon said it was during the week, she

4   took me out of school.   It was the weekend, December 1

5   through the 3 in 2006.   There were no other registrations.

6   What I heard from Mr. Lovric in his opening is that, oh,

7   well, there was another time they went you're going to hear

8   that the guy was sitting in the bedroom when they got up

9   there.   Well, that is not what she says during the videotaped

10  interview.   She specifically says two separate occasions, two

11  separate men, they were all in -- December, it was right

12  around her birthday, and then earlier in the fall and both

13  times my mom registered under her name, under her name and we

14  got two cards, two keys and we checked in and my mom was

15  making calls.   Well, there aren't any phone calls from the

16  Best Western to anybody and there aren't any phone calls from

17  Linda's cellphone that suggests that she had tried to find

18  some men to meet up with them at the Best Western because

19  there is no proof.   There's absolutely no proof that you're

20  going to hear apparently now in order to, I guess, figure out

21  a way to get around the fact that there was no registration

22  with Linda twice.   They're going to say there was a guy up in

23  the bedroom waiting.   That's not what she said when she was

24  interviewed on December 3.

25              So after all of Shannon's interviews, what

Miss Peebles - Opening Statement

125

1    will the evidence show?  Well, Liz Chesebro files on

2    December 5 a child protective in that report which we'll

3    introduce that says Linda and boyfriend George who had

4    regular and consistent contact with Shannon sexually abused

5    her on a regular basis.  Linda and George together both

6    performed oral sex on Shannon and made her perform oral sex

7    on them.  Linda and George also fondled Shannon sexually at

8    the same time.  Linda, with the landlord, also sexually

9    abused Shannon by performing oral sex on them.  Linda also

10   videotaped the landlord having sexual intercourse with

11   Shannon.  Linda had taken many pictures of Shannon while

12   performing sexual acts.  Linda then posted video of Shannon

13   of various sex acts on the internet.  Linda also prostituted

14   Shannon out to at least two different men.  That's what

15   Elizabeth Chesebro files as an abuse petition.

16           Summary of the evidence regarding George Lang.

17   There are no pictures of Shannon on George Lang's hard drive.

18   What was on George Lang's hard drive?  Well, the government's

19   going to say, well, it was corrupted.  What were they able to

20   pull off the hard drive?  They pulled up e-mails between

21   Linda and George and Renee and Linda and George.  There's

22   obviously a rift going on between them and they're fighting

23   over whatever and the bottom line is, there are no

24   photographs of Shannon and there's nothing that suggests that

25   there was any kind of illicit activity going on with any kind

Miss Peebles - Opening Statement

1   of pornography.  There was adult pornography that George Lang

2   had on his computer that Renee Lang knew he looked at and

3   they're able to pull those pictures off the hard drive.

4   There's absolutely no proof that George Lang ever owned a

5   digital camera.  Ever.  There's no proof that Linda O'Connor

6   ever owned a digital camera.  George Lang was diagnosed with

7   terminal cancer.  He had lung cancer.  He was diagnosed in

8   2004 and his wife is going to testify that basically he was

9   undergoing chemotherapy.  He was very sick in December of

10  2005.  He was very sick and by February it metastasized into

11  his brain.  Part of the fighting that was going on you're

12  going to learn was because he was out of his mind by the

13  spring and he dies in July of 2006.  He was a very difficult

14  man to be around because of his brain cancer.  What Shannon

15  O'Connor spoke in this phone conversation about him being

16  old, sick and undergoing chemo, that was true.  And again he

17  died in July of 2006.

18          Summary of the evidence regarding Dean Sacco.

19  Make no mistake, I do not represent Dean Sacco.  Far from it.

20  My client is sitting in a courtroom next to a table with a

21  man she cannot stand.  The phone calls of March 14 and 15.  A

22  condom that they find in a storage area miles from 45 Fair

23  Street.  Why will that be significant?  When you hear the

24  evidence you're going to hear that he had videos and journals

25  and pictures, none of Shannon but he has a condom with her

Miss Peebles - Opening Statement

1    DNA.  So clearly there's proof that he had sexually abused

2    Shannon O'Connor.  They didn't find any child pornography in

3    Dean Sacco's storage shed.  They found pornography and things

4    but they didn't find child pornography.

5           Summary of the evidence against Linda

6    O'Connor.  She took her daughter to the Best Western and she

7    took her daughter there one time in 2006 and we're not

8    disputing that.  There were no phone calls made from the

9    hotel room or anybody or from cellphone records.  There's no

10   men that have been identified that she had to meet up with at

11   the Best Western.  What is the summary of the evidence

12   further regarding the rent?  Well, we know she wire

13   transferred Dean Sacco, we have the proof of that, $1,800.

14   We know she had cash funds for October and November, ATM

15   withdrawals in the amount of $600, November 1.  Two $400

16   withdrawals right next to each on November 1.  We know she

17   got reimbursed for the flood in January for December and we

18   know she started getting HUD assistance in January and we

19   know Dean Sacco called and complained he was going to evict

20   them because they hadn't paid the rent.  They didn't find

21   child pornography.  Linda didn't even have a computer hooked

22   up when she moved to Norwich.  She had two computers when she

23   lived in Deposit.  What she had in Norwich was a computer

24   someone donated to her that they hadn't hooked up that they

25   confiscated pursuant to search warrant.  There was nothing on

Miss Peebles - Opening Statement

128

1    it and they know she never hooked it up.   No digital camera.

2    They seized a couple of disposable cameras.   What pictures do

3    they find on this?   Pictures of Shannon at her graduation for

4    sixth grade that Linda had to go to without being her

5    custodial parent because at the time she was in foster care

6    and Linda attended her sixth grade graduation and took

7    pictures.

8             So, really what does the government's case

9    against Linda O'Connor consist of?   She purchased two pure

10   bred dogs for her daughter.   That she did.   She mismanaged

11   her money.   She went to eat at a restaurant and she didn't

12   pay.   She violated a court order and as a result she had

13   spent 90 days in jail.   She's written bad checks before in

14   the past.   She married a man who was serving a sentence in

15   state prison.   She was a terrible mother to Walter, Burkett

16   Junior.   She was neglectful when it came to Shannon.   If

17   these were the things that she was charged with in this case,

18   you wouldn't be here because she would have pled guilty.

19   That's not what she's charged with here in this case.   I

20   heard, you know, pieces of a puzzle being put together and

21   this is what you're going to see.   Well, I would submit to

22   you that the puzzle pieces in this case are from several

23   different boxes and they're trying to jam them together and

24   they just don't fit.   What you're really going to hear is

25   excuse after excuse why we don't have this or why this

Miss Peebles - Opening Statement

1   doesn't make sense.  We didn't find this but this is why.  We

2   don't have this and this is why.  That's what this case is

3   going to consist of and she didn't tell about her mother

4   because she wanted to protect her.  Well, it didn't sound

5   like she wanted to protect her on August 11.  My mom is

6   verbally abusive, physically abusive.  She beats me.  She

7   tells everybody she can't stand her mother.  It doesn't sound

8   like she's protecting her mother at that point.  She knows

9   her mother is not a protective mother to begin with.  That's

10  part of Shannon's problem.  The government's case can be

11  summed up in five words.  Sex, lies, and no videotape.

12                  Thank you.

13                  THE COURT:  Thank you, Miss Peebles.  All

14  right, ladies and gentlemen.  We're going to take a short

15  break while we do some equipment adjusting and we'll get you

16  back in and start the proof.

17                  (Short break taken).

18                  (Jury present).

19                  THE COURT:  All right.  Mr. Lovric, are you

20  prepared to call your first witness?

21                  MR. LOVRIC:  Yes, Judge.

22                  THE COURT:  You may do that now.

23                  MR. LOVRIC:  First witness we call is Sergeant

24  Patrick Blenis.

25                  THE COURT:  Okay.

Patrick Blenis - Direct                    130

         THE CLERK:  Sir, please state your full name

for the record.

         THE WITNESS:  My name is Patrick M. Blenis.

B, as in boy, L-E-N-I-S.

P A T R I C K    B L E N I S, having been called as a witness,

being duly sworn, testified as follows:

         THE COURT:  Okay.  Mr. Lovric.

DIRECT EXAMINATION

BY MR. LOVRIC:

     Q    Good morning, Sergeant Blenis.

     A    Good morning.

     Q    Sergeant, could you just for the members of the

jury again tell us your full name, where you work and what

your title is?

     A    My name is Patrick M. Blenis.  I work for the

Norwich City Police Department.  I currently hold the

position of sergeant.

     Q    How long have you been with the Norwich PD?

     A    I've worked for the Norwich Police Department for

13 years.  I've been a police officer for approximately 15.

     Q    Okay.  So total number of years with the department

is how many?

     A    Thirteen.

     Q    And your current duties as a sergeant, what does

that basically include, what kind of work do you do?

Patrick Blenis - Direct

1    A    Currently my main function is patrol with enforcing

2 the state laws of New York.

3    Q    And prior to becoming a sergeant, were you an

4 investigator with the police department?

5    A    Yes, I was.  Between October 2005 and December 31

6 of 2007.

7    Q    And what kind of work did you perform as an

8 investigator?

9    A    I investigated crimes against persons, property.

10 Mostly state laws involving crimes involving larcenies, sex

11 crimes, assaults, murder.

12    Q    Okay.  About how large is the Norwich Police

13 Department at its current level?

14    A    Approximately 19 officers.

15    Q    Sergeant Blenis, I would like to talk with you this

16 morning about a case that involves a person by the name of

17 Dean Sacco as well as Linda O'Connor and a person by the name

18 of Shannon O'Connor.  Are you familiar with this case that

19 we're referring to?

20    A    Yes, I am.

21    Q    And when was it approximately that you first had

22 become aware of information that got you involved in this

23 investigation?

24    A    March 2 of 2007.

25    Q    And the persons that I mentioned, Mr. Dean Sacco

Patrick Blenis - Direct

1    and Linda O'Connor, do you see those persons in Court today?

2    A    Yes, I do.

3    Q    For the record, can you indicate where they are?

4    A    They're to my right sitting at the defense table.

5    Q    And which one is Mr. Dean Sacco?

6    A    Mr. Sacco is wearing a blue shirt and Miss O'Connor

7    is wearing some sort of paisley top.

8        MR. LOVRIC:  Just for the record indicating

9    the defendants that are on trial here.

10        THE COURT:  The record will so reflect the

11   identification.

12   Q    Sergeant Blenis, what was it that you first

13   received that initiated your involvement in this

14   investigation?

15   A    I received information from Chenango County

16   Department of Social Services that there was a child who was

17   victimized, specifically raped by her landlord.

18   Q    And who was it that you spoke with that provided

19   you this initial information?

20   A    It would be Elizabeth Chesebro from Chenango

21   County.

22   Q    Okay.  And Elizabeth Chesebro was working where?

23   A    With child protective.

24   Q    In Chenango County?

25   A    Yes.  Department of Social Services.

Patrick Blenis - Direct                          133

1      Q     And as a result did you receive this information in

2   person or was it telephonically led to you?

3      A     Both.

4      Q     On March 2 of 2007, did you on that date actually

5   speak with a person named Shannon O'Connor?

6      A     Yes, I did.

7      Q     Where was it that you spoke with and interviewed

8   Shannon O'Connor?

9      A     That was at the Norwich police station in the

10  upstairs interview office.

11     Q     And how did Shannon arrive there, if you know?

12     A     She arrived in the company of Elizabeth Chesebro.

13     Q     And did you at some point then sit down with

14  Shannon O'Connor and interview her?

15     A     Yes, I did.

16     Q     Who was present during that interview?

17     A     Elizabeth Chesebro.

18     Q     And yourself?

19     A     And myself, yes.

20     Q     And besides yourself and Liz Chesebro, anybody

21  else?

22     A     Shannon.

23     Q     Besides the three of you?

24     A     No, just the three of us.

25     Q     And about when was it approximately, what time of

Patrick Blenis - Direct

1  day, I don't mean by time, just approximately was it morning,

2  afternoon, evening that this interview occurred?

3      A     Afternoon, early evening.

4      Q     In speaking with Shannon O'Connor, did she relay

5  information to you about things that occurred to her?

6      A     Yes, she did.

7      Q     Now, at that time on that interview, March 2 of

8  2007, during your interview with Shannon O'Connor, did she at

9  all disclose or say anything about any acts committed upon

10  her by her mother Linda O'Connor?

11      A     No.

12      Q     The interview that she disclosed things to you, who

13  was the person that she was saying had done things to her?

14      A     Her landlord, Dean Sacco.

15      Q     Now, prior to this date, prior to March 2 of 2007,

16  had you personally had any involvement or had you personally

17  ever known or met Shannon O'Connor prior to this date?

18      A     No.

19      Q     How about Linda O'Connor?

20      A     No.

21      Q     And how about Dean Sacco?

22      A     No.

23      Q     How would you describe Shannon's demeanor, how did

24  she appear to you while she is telling you the things that

25  she told you about?

Patrick Blenis - Direct

1    A    She was very scared.  She was a little bit

2  apprehensive and she was very, I would say, clingy to

3  Elizabeth Chesebro.

4    Q    About how long would you approximate that the

5  interview of Shannon O'Connor took place, for about how long,

6  just an approximation?

7    A    I'd say more than, more than two hours.

8    Q    And following the interview of Shannon O'Connor,

9  did you type up a summary in your report of the basic things

10 that she had told you that had occurred between her and Dean

11 Sacco?

12   A    Yes, I did.

13   Q    And I take it, again, the report that you prepared

14 from this interview she had not and you did not have any

15 information in there about anything dealing with Linda

16 O'Connor doing anything to her, to Shannon?

17   A    That's correct.

18   Q    In March of 2007, did you then open an

19 investigation in connection with Shannon?

20   A    Yes, I did.

21   Q    And what she had disclosed to you?

22   A    Yes.

23   Q    And your investigation in March of 2007 focused on

24 whom?

25   A    Dean Sacco.

Patrick Blenis - Direct

1    Q    And following that interview of Shannon on March 2

2  of 2007, did you become aware or were you aware of any

3  medical examination performed on Shannon at some point after

4  that?

5    A    I learned that she had a medical exam on March 12

6  at the Chenango Memorial Hospital.

7    Q    And at some point did you learn or did somebody

8  inform you as to the results of that medical exam?

9    A    Yes.

10    Q    Now, following the interview of Shannon on March 2,

11  did you then commence to do any type of background

12  investigation in trying to find out a little bit more about

13  Mr. Dean Sacco?

14    A    Yes, I did.

15    Q    And did you at some point get information as to

16  where you could find him, where he would be located?

17    A    Yes.  I learned that I could locate him in New

18  Jersey.

19    Q    Okay.  Do you remember what city or town in New

20  Jersey?

21    A    Jersey City.

22    Q    Did you at some point learn whether or not he had

23  any employment in the Jersey City, New Jersey area?

24    A    Yes.

25    Q    What did you know as far as what was the employment

Patrick Blenis - Direct                                          137

1    about or what was he doing down there as far as employment?

2         A    I had a work phone number and that was all I had at

3    the time.

4         Q    Okay.  Now, at some point after the interview of

5    Shannon, and after trying to learn where Mr. Sacco was, did

6    you develop a plan where you were going to try to have

7    Shannon make phone calls to Dean Sacco?

8         A    Yes.

9         Q    What was the -- what was the plan that you wanted

10   to have her make the calls about?  What was it that you

11   wanted her to do?

12        A    Shannon was instructed to call Mr. Sacco on his

13   cellphone and engage him in conversation about possibly being

14   pregnant and that she was late for her period, and ask if he

15   used a condom the last time they had intercourse or the last

16   time there was a rape.

17        Q    Now, at this point in time in your investigation

18   you are investigating what possible charges or offenses?

19        A    Under the state statutes it would have been rape

20   first degree, rape second degree, criminal sexual act, and

21   criminal course of sexual conduct against a child.

22        Q    So that's the focus of your investigation at this

23   point in time?

24        A    Yes.

25        Q    And why was it that you were going to ask or seek

Patrick Blenis - Direct                                138

1    for Shannon to discuss with Mr. Sacco anything dealing with a

2    condom?

3        A    To show that the rape occurred.

4        Q    Had she disclosed anything to you about a condom?

5        A    She said that during some of the rapes that Mr.

6    Sacco used a condom.

7        Q    And what was the purpose for asking her also to

8    incorporate into these conversations the issue of her

9    possibly being pregnant or not pregnant?

10       A    To get Mr. Sacco to talk to her about the rape.

11       Q    Now, did there come a point in time that these

12   telephone calls were actually placed to Mr. Dean Sacco?

13       A    Yes.

14       Q    Directing your attention to two different dates

15   that I'd like to talk about, March 14 of 2007 and then

16   March 15 of 2007.  On both of those dates, did you record

17   telephone calls made to Dean Sacco?

18       A    Yes, I did.

19       Q    Now, where did the March 14 and March 15 calls take

20   place from?  Where were they made from?

21       A    They were made from the police station on the

22   second floor actually in the chief of police's office.

23       Q    And if I can talk first about the March 14, 2007.

24   On March 14, who was present when these calls were made to

25   Dean Sacco?

Patrick Blenis - Direct                           139

1    A    Shannon O'Connor, Elizabeth Chesebro, Deputy Chief
2  Van Miles and myself.
3    Q    I take it the deputy chief is one of your bosses?
4    A    He's since retired.  He was at the time, yes.
5    Q    At the time?
6    A    Yes.
7    Q    On March 14, prior to these calls or conversations
8  being made, the calls being made to Dean Sacco, did you
9  actually have discussion with Shannon about placing these
10  calls and what you wanted her to do or try to talk about?
11    A    Yes.
12    Q    And did you summarize somewhat what we just talked
13  about what you wanted her to talk about?
14    A    Yes.
15    Q    And on that date, was it your intention to tape
16  record these calls?
17    A    Yes.
18    Q    Now, during the calls that were going to be placed,
19  the conversations, did you or any other person in the room
20  have any communication with Shannon while she's on the phone
21  as to maybe where to take the conversation, what to talk
22  about?
23    A    Yes.  We actually passed notes to her.
24    Q    Okay.  And what was the purpose for that?
25    A    As she was having a problem trying to engage him in

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                    140

1    conversation to bring up another topic relating to the rapes.

2        Q    I take it the notes that were passed to Shannon,

3    who would pass her a note of the three people that were in

4    the room?

5        A    Myself, Miss Chesebro, and actually I believe

6    deputy chief also did on occasion.

7        Q    Now, on March 14, the first date that we're talking

8    about, what phone was used in this room at the police

9    department that all of you are seated, what phone was used to

10   make the outgoing call?

11       A    The chief's phone.  It was a blocked line.

12       Q    What does that mean, it was blocked line?

13       A    That means when you call out the numbers do not

14   come up, the actual phone number.

15       Q    So is it fair to say it had a blocked caller ID?

16       A    Yes.

17       Q    So is it fair to say that the person on the other

18   line could not see what number is calling, it would appear as

19   either blocked or subscriber unknown, something to that

20   effect?

21       A    Yes.

22       Q    What was the purpose for making the call from a

23   blocked phone?

24       A    So Mr. Sacco wouldn't know where the call was

25   coming from.

Patrick Blenis - Direct

141

1    Q    Okay.  So it wouldn't say Norwich Police
2  Department?

3    A    Correct.

4    Q    And what phone was it on March 14 that was dialed
5  to reach Mr. Sacco?

6    A    Mr. Sacco's cellphone.

7    Q    Okay.  Do you have that number, do you have
8  anything with you to give us the number that you dialed or
9  that was dialed on that date?

10    A    If I could just refer to my notes.  The cellphone
11  number that she called was (908)906-7917.

12    Q    And that phone number that you were calling was a
13  cellphone number for Mr. Sacco?

14    A    Yes.

15    Q    And how had you obtained that phone number or
16  determined that it belongs to Mr. Sacco?

17    A    I learned of that number through records, through
18  city government.

19    Q    And on that date, March 14, was a call actually
20  placed to Mr. Sacco?

21    A    Yes.

22    Q    Okay.  The first call placed to Mr. Sacco, about
23  how long approximately do you believe it lasted?

24    A    Approximately a little bit more than ten minutes.

25    Q    Okay.  And on that date had you prepared recording

Patrick Blenis - Direct                                142

1    equipment to record the calls that were going to be made to

2    Mr. Sacco?

3          A    Yes.

4          Q    And that first call that was made to Mr. Sacco,

5    after the call was made, what did you do after the call was

6    made to Mr. Sacco?

7          A    After the call was terminated with Mr. Sacco we

8    went back and checked the recording and found that it didn't

9    record.

10         Q    So, the first call placed to Mr. Sacco, the

11   machine, for whatever reason, it did not record it?

12         A    That's correct.

13         Q    So when you went to play it back the recording was

14   not there?

15         A    That's correct.

16         Q    Now, were you present during that first call to

17   Dean Sacco and while Shannon spoke to him on the phone?

18         A    Yes.

19         Q    Could you hear what she was saying in the room that

20   you were present in?

21         A    Yes.

22         Q    Based upon what you heard, heard her talking to him

23   on that first call, what were the topics or topics that were

24   being discussed with Mr. Sacco?

25                   MISS PEEBLES:   Objection, Judge.

Patrick Blenis - Direct

1    THE COURT:  Hearsay?

2    MISS PEEBLES:  Yes.  And if there are notes --

3 your Honor, can we have a side-bar?

4    THE COURT:  Sure.

5    (At the Bench).

6    MISS PEEBLES:  Judge, it appears that there's

7 some notes up there and we made a request for anything

8 related to that first call that did not get recorded.  I

9 haven't seen any notes that Mr. Blenis took regarding that

10 first call and we specifically asked them for that.  He sent

11 back that there was nothing from the detective himself.

12    MR. LOVRIC:  I don't think there are any

13 notes.

14    MISS PEEBLES:  Well, he just referred --

15    MR. LOVRIC:  He has his reports up there which

16 you have copies of but I'm not asking for him to tell us what

17 Shannon said.  I'm asking just for topics discussed.

18    THE COURT:  Well, the topics come from what

19 she said, don't they?  How else could he know?

20    MR. LOVRIC:  I think there's a difference

21 between hearsay verbatim saying this is what she said or he

22 overheard what Dean said, that would be hearsay.  I'm simply

23 trying to establish through him of the things discussed,

24 general topics, and then going onto the next call because the

25 same topics are discussed in the second and third or second

Patrick Blenis - Direct

144

1   and third and fourth calls.

2              THE COURT:  Are you offering that to prove the

3   truth of what was being said or you offering it just to say

4   this topic was brought up?

5              MR. LOVRIC:  Just that these topics were

6   brought up.

7              THE COURT:  Not hearsay.

8              MR. LOVRIC:  I'm not getting into what did she

9   say.

10             THE COURT:  That distinction doesn't impress

11  me.

12             MISS PEEBLES:  I understand that but I have a

13  real concern if he took notes about the first conversation, I

14  think we're entitled to them.

15             MR. LOVRIC:  I'm not aware of any notes, Lisa.

16             THE COURT:  We'll take a look at that issue.

17  I will ask him to turn over whatever he has in front of him,

18  I will look at that and we'll discuss it further.  Would you

19  like me to excuse the jury when we do that?

20             MISS PEEBLES:  I guess I can do it on

21  cross-examination, I suppose.

22             MR. FISCHER:  I was going to, before we began,

23  I was going to look at whatever notes he brought with him.

24             THE COURT:  I'm going to ask him to disclose

25  those, so you want to wait until cross?

Patrick Blenis - Direct

1          MISS PEEBLES:  I suppose so because we're

2    probably going to break for lunch anyways.

3          MR. LOVRIC:  For the record, I gave you

4    everything I have of his.

5          THE COURT:  That remains to be seen.  There's

6    a dispute about that.

7          (In open Court).

8          THE COURT:  Just by way of explanation, we saw

9    the lawyers and myself go over to side-bar.  None of us are

10   trying to hide anything from the jury, that's not the

11   purpose.  We're discussing technical matters involving the

12   admissibility of evidence and there's no purpose at all for

13   you guys to have to listen to that.  It's strictly technical

14   based on the Rules of Evidence and you'll see that happen

15   from time to time and hopefully this won't turn into OJ

16   Simpson.  So we will not spend a lot of time at side-bar but

17   you may see us go over there from time to time.

18          Mr. Lovric.

19          MR. LOVRIC:  Thank you, Judge.

20   BY MR. LOVRIC:

21     Q    Sergeant Blenis, if I can clarify my last question

22   and ask you this:  The first call did not record for whatever

23   reason, right?

24     A    That's correct.

25     Q    And my question I guess is -- the mike's are off --

Patrick Blenis - Direct

1   okay.  I guess my question to you is:  The topics that we're

2   going to hear talked about on the recorded calls that we're

3   going to play in a few minutes, my question to you is, the

4   topics on the recorded call that we're going to listen to

5   from your sitting in that room during the call that did not

6   record, were the same or different topics discussed during

7   the first non-recorded call compared to the second recorded

8   call?

9        A    They were the same.

10       Q    Same things discussed?

11       A    Yes.

12       Q    Okay.

13            MR. LOVRIC:  Judge, at this time I've marked

14   as Government's Exhibit number 1 for identification.  It is a

15   recording that I provided defense copies of the

16   communications on March 14, 2007 between Shannon O'Connor and

17   Dean Sacco during the time that Sergeant Blenis just

18   described.  I would offer those calls into evidence and I'd

19   like to play those for the jury.

20            MR. FISCHER:  Judge, I do have a hearsay

21   objection to those in particular.  Those are hearsay.

22            THE COURT:  Your hearsay objection is to what?

23            MR. FISCHER:  To the statements by Miss

24   O'Connor in those recorded conversations.

25            THE COURT:  Are you offering that matter for

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                    147

1  the truth of what Miss O'Connor said or are you offering it

2  to show the jury what the responses were by Mr. Sacco?

3                  MR. LOVRIC:  The calls are admissions by the

4  defendant being offered into evidence.

5                  THE COURT:  And the questions?

6                  MR. LOVRIC:  The questions by Shannon are

7  related to his responses and, therefore, admissible because

8  he adopts what she says and is responding to what she's

9  asking him.  I don't believe it's hearsay because it's

10 admissions by the defendant.

11                 THE COURT:  I understand the admissions by the

12 defendant and in order to make those intelligible to the

13 jury, you have to also put in what Shannon O'Connor was

14 saying and I agree with that so we'll have that introduced

15 and accepted into evidence, that's Government's 1 subject to

16 connection.

17                 MR. LOVRIC:  At this point, Judge, I'm going

18 to play the entire recordings of March 14, 2007 which is

19 Exhibit 1.

20                 (Playing Government's Exhibit 1).

21     Q     Sergeant Blenis, was that the second phone call

22 placed to Mr. Sacco?

23     A     That was the second phone call placed on the

24 14th.

25     Q     Now, if I could ask you a couple of things about

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct
148

1  this conversation and then subsequent discussions on

2  March 14.  After that call was placed to Mr. Sacco, do you

3  recall whether or not at some point after that call you asked

4  Shannon anything about this Grandpa George?

5      A    I asked who he was and she didn't offer anything

6  else up about him.

7      Q    Okay.  I take it at that time on March 14, after

8  this call was placed, she did not tell you anything about

9  George having sexually abused her or anything like that?

10     A    No, she did not.

11     Q    Now, at the end of the conversation Shannon says I

12  have to go, something to the effect, my friend is here.  Is

13  that something you or somebody else in the room was telling

14  her to at least get off the conversation at this point?

15     A    Yes.  That's correct.

16     Q    Okay.  And the reason for that was that you were

17  trying to get her to do what?

18     A    Well, we were trying to get her off the phone,

19  phone call had gone a certain amount of time and they were

20  actually at the end of the conversation from what I could --

21  from what she was saying.  We were going to make plans to set

22  up a second phone call or third phone call, I'm sorry.

23     Q    Okay.  And after this phone call was made on

24  March 14, did you actually have Shannon place other calls to

25  Dean Sacco?

Patrick Blenis - Direct

1    A    Yes.  On the 15.

2    Q    What was the purpose for making the calls to Dean

3  Sacco on March 15?

4    A    To engage him in conversation about the rapes that

5  occurred with her.

6    Q    Okay.  Primarily to talk more and try to elicit

7  more information from Mr. Sacco?

8    A    That's correct.

9    Q    Now, the March 15 phone calls, where were they made

10 from?

11   A    They were, again, they were made at the police

12 station in the upstairs office, the chief's office.

13   Q    And from what phone were the March 15 phone calls

14 placed?

15   A    That phone call was made from Shannon's personal

16 cell.

17   Q    Why was that decided to use her personal cellphone

18 on March 15?

19   A    So Mr. Sacco would feel more comfortable, that's a

20 familiar number to him, something he could look at and see

21 what the actual number was that was coming to him.

22   Q    Okay.  And I take it by March 15 you had listened

23 to this recorded call that we just listened to?

24   A    Yes.

25   Q    And I take it you heard what Mr. Sacco said to

Patrick Blenis - Direct                                    150

1   Shannon during that call, about not being able to tell where

2   she's calling from?

3        A    Yes.

4        Q    And so the calls that are placed to him on the 15th

5   are from Shannon's cellphone?

6        A    Her personal cellphone, yes.

7        Q    Do you have anywhere indicated what that phone

8   number was to make the phone calls to Dean Sacco?

9        A    Shannon's cellphone was (607)226-6539.

10       Q    Who was present on March 15 when these calls were

11  made to Mr. Sacco?

12       A    Elizabeth Cheseboro, Deputy Chief Van Miles and

13  myself and Shannon.

14       Q    Okay.  And at the Norwich Police Department?

15       A    At the Norwich police station.

16       Q    On March 15, did the same process occur in terms of

17  if somebody had something they wanted her to talk about,

18  they'd write it down or hand it to her?

19       A    That's correct.

20       Q    I take it, Sergeant Blenis, that at this point in

21  time that we're discussing which is the middle of March of

22  2007, you've been provided no information from Shannon

23  O'Connor regarding sex abuse by anybody but Dean Sacco?

24       A    That's correct.

25            MR. LOVRIC:  At this time, Judge, I've marked

Patrick Blenis - Direct                      151

1   as Government's Exhibit number 2, which is tape recorded

2   conversations made on March 15, 2007 between Shannon O'Connor

3   and Dean Sacco from the Norwich PD on her cellphone.  There

4   are several calls because one or two of the calls are dropped

5   and then are made again and then at one point Mr. Sacco also

6   calls back.  So there's a series of conversations of calls.

7   I provided counsel with copies of those and I'm offering

8   Exhibit 2 into evidence.

9                MR. FISCHER:  I have the same hearsay

10  objections, Judge.

11               THE COURT:  All right.  Well, overruled, but

12  we'll admit G-2 subject to connection.

13  BY MR. LOVRIC:

14      Q    Sergeant Blenis, before I play the conversations

15  we're going to hear, I just wanted to ask you a couple of

16  questions about some things that occurred on the calls.  At

17  some point there is what appears to be a news report or a

18  television reporter reporting some news.  Do you recall that

19  part of the calls?

20      A    Yes, I do.

21      Q    Okay.  On whose end is that coming from?

22      A    Mr. Sacco's end.

23      Q    Okay.  So it's something when he puts Shannon on

24  hold that this news kind of report just kind of clicks in and

25  is talking about some event that happened?

Patrick Blenis - Direct

152

1    A    Yes.

2    Q    So it's not on your end on the Norwich side that

3    this is broadcasting?

4    A    No.

5    Q    Okay.

6                MR. LOVRIC:  At this point, Judge, I'll play

7    the Government's Exhibit 2 conversations.

8                THE COURT:  Okay.

9                (Playing Government's Exhibit 2).

10   BY MR. LOVRIC:

11   Q    Sergeant Blenis, were those all of the calls and

12   communications between Shannon and Dean Sacco on March 15?

13   A    Yes.

14   Q    And subsequent to those phone calls, both on

15   March 14 and March 15, did you at some point then obtain an

16   arrest warrant for Mr. Sacco?

17   A    Yes, we did.

18   Q    Approximately when was that?

19   A    If I could refer to my notes.  That was March 16.

20   Q    And was Mr. Sacco arrested on charges that were

21   filed?

22   A    On the 19 he was arrested in Jersey City.

23   Q    Okay.  That was my next question:  Where was he

24   arrested?

25   A    Jersey City, New Jersey.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    Q     I'm sorry?

2    A     Jersey City, New Jersey.

3    Q     The charges that you filed, what were the general

4    nature of the charges filed?

5    A     Under the state statutes there were charges of rape

6    one, two counts.  There was criminal sexual act first degree.

7    There were two informations filed for rape two and also

8    criminal sexual act second, and course of sexual conduct

9    against a child.

10    Q     And now at the time that you obtained the arrest

11    warrant for Mr. Sacco, at that point in time, that being

12    March 16 of 2007, was the FBI involved in this investigation

13    in any way to your knowledge?

14    A     No.

15    Q     To the best of your knowledge when approximately is

16    it that the FBI becomes involved in this investigation?

17    A     Not until January of 2008.

18    Q     So some at least eight or nine months after this

19    time frame that we're still talking about right now?

20    A     Correct.

21    Q     When Mr. Sacco was arrested, did he at some point

22    appear then in New York State, was he brought to New York

23    State?

24    A     Yes.

25    Q     Approximately when?

Patrick Blenis - Direct                          154

1      A     Beginning of March.

2      Q     Beginning of March or the warrant was issued

3    March 16?

4      A     No.  That would have been -- oh, I'm sorry.  April.

5    That's my mistake.  That would be April.

6      Q     Okay.  Approximately beginning of April of 2007?

7      A     Yes.

8      Q     And did you then at some point appear before a

9    state grand jury?

10     A     Yes, I did.

11     Q     Did you testify there?

12     A     Yes, I did.

13     Q     And on the date that you testified, did you see

14   whether or not Shannon was present?

15     A     Shannon O'Connor was present for grand jury that

16   day.

17     Q     Now, as of that time when you testified in the

18   grand jury in the state and Shannon appeared before the grand

19   jury, had Shannon disclosed to you or any other investigator,

20   to your knowledge, anything regarding George Lang or Linda

21   O'Connor as far as any kind of sexual abuse?

22     A     No.

23     Q     So up until that point, the disclosures that she

24   had made dealt with the things that we have discussed here

25   today?

Patrick Blenis - Direct

1    A    That's correct.

2    Q    Now, did there come a point in time approximately

3  in October of 2007, let me withdraw that.  Let me first ask

4  you, Sergeant Blenis, in March of 2007, where is and by where

5  I mean in whose custody is Shannon O'Connor in March of 2007?

6    A    She was in the custody of social services.  She was

7  in foster care.

8    Q    And from the time period that I'd like to talk

9  about next which would be March of 2007, through and up to

10 approximately the end of September of 2007, did she remain in

11 the foster care family that she was in custody of?

12   A    As far as I knew, yes.

13   Q    Now, after March of 2007 and after the charges that

14 you indicated were filed, did there come a point in time

15 after that that you were notified about additional

16 disclosures that Shannon had made which she had not

17 previously made either to you or anyone else?

18   A    Yes.

19   Q    How did you get notified?  Who did you first hear

20 from?

21   A    I heard from Elizabeth Chesebro from Chenango

22 County Child Protective.

23   Q    And at some point after hearing about that, did you

24 participate in an interview of Shannon O'Connor?

25   A    Yes, I did.

Patrick Blenis - Direct

1      Q      Where did that interview occur that we're talking

2  about now?

3      A      That interview happened at the Child Advocacy

4  Center on Robinson Street in the City of Binghamton.

5      Q      Is it also sometimes called the Crisis Center or

6  the Binghamton Health Center?

7      A      I believe so, yes.

8      Q      Now, this interview that occurred, who was present

9  during the course of this first interview we're talking about

10 now?

11     A      For that interview, it was myself, Elizabeth

12 Chesebro, and Shannon O'Connor.

13     Q      And was this interview in any way to your knowledge

14 recorded?

15     A      Yes, it was.

16     Q      How was it recorded?

17     A      By video.

18     Q      Okay.  Was the video an audio?

19     A      Yes, it was audio and video.

20     Q      And this interview that we're going to discuss at

21 this point, did this occur on or about October 29 of 2007?

22     A      Yes, it did.

23     Q      And just approximately how long would you say this

24 interview with Shannon occurred?

25     A      More than an hour.

Patrick Blenis - Direct

1     Q     And during that interview, let me withdraw that.

2     What was the purpose for you going to that location to

3     interview Shannon at that point in time?

4     A     I had learned that Shannon had made further

5     disclosures and I was asked to come down and do the

6     interview.

7     Q     Okay.  Prior to going to interview Shannon at that

8     location, had you been provided with any information or any

9     notes about at least the general disclosures that Shannon had

10    made?

11    A     The information that I had was that her mother was

12    involved.

13    Q     Okay.  And in going to that interview then I take

14    it you were going to ask her questions about that topic and

15    these more recent disclosures by her?

16    A     That's correct.

17              MR. LOVRIC:  Judge, the next item that I'm

18    going to go to is -- I'm going to mark and identify a

19    videotape of that interview that I'll be offering into

20    evidence.  I've discussed with counsel, I don't think there's

21    any objection, but it will take a few minutes to set it up

22    and then the interview runs for about an hour, so I don't

23    know if this is good time to break.

24              THE COURT:  I think that's probably right.

25    All right, ladies and gentlemen.  It's about 12:30, we'll see

Patrick Blenis - Direct                               158

1   you back at 1:30.

2                     (Jury excused).

3                THE COURT:  All right.  Where are we with the

4   question of the witness' notes?  Are you interested in this

5   Miss Peebles or not?

6                MISS PEEBLES:  Yes.

7                THE COURT:  You interested in seeing his notes

8   that he has here?

9                MISS PEEBLES:  Yes, Judge.

10                THE COURT:  You are referring to some notes,

11   Sergeant.  Were they personal notes that you took or you

12   talking about reports that were filed?

13                THE WITNESS:  Both.  I'm not sure if you're

14   talking about the notes that had to do with the taped

15   conversations.

16                THE COURT:  No.  Just the notes you were

17   referring to as you testified that you would say --

18                THE WITNESS:  I have some personal notes and

19   some reports.

20                THE COURT:  Could you let Mr. Lovric have

21   those for a few minutes and then we can do what we have to do

22   with them.  We promise we'll give them back to you.

23                THE WITNESS:  Yes, sir.

24                THE COURT:  Mr. Lovric, you want to come up

25   here and take these notes and then we can do what we have to

Patrick Blenis - Direct

1   do.

2              MR. LOVRIC:  Yes, Judge.

3              THE COURT:  Okay.  All right.  We're all set

4   until 1:30 then.  You may step down.

5              (Lunch break taken).

6              THE COURT:  Mr. Lovric, you want to put

7   something on the record.

8              (At the Bench)

9              MR. LOVRIC:  Yes, Judge.  This case has a lot

10  of twists and turns so I think this will probably be apropos

11  of a lot of things.  During the lunch break I got a call from

12  Adam Lurie.  He's an Assistant US Attorney in New Jersey.

13  Adam called me from his cellphone.  Adam asked me if I'm

14  prosecuting the case against Dean Sacco and I said yes.  He

15  then described the Dean Sacco that he knows and it appears to

16  be the defendant, Dean Sacco.

17             THE COURT:  Okay.

18             MR. LOVRIC:  Adam informed me that in the

19  spring and fall of 2006 Adam would spar in a boxing ring with

20  Dean Sacco; they went to the same gym and he was sometimes

21  sparring with Dean Sacco.  Adam informed me that at times in

22  addition to sparring he would sometimes go on a run and Dean

23  would come by and ride his bike and kind of ride with him on

24  the run.  He said they kind of developed, not a friendship,

25  just kind of knowing each other from the gym.  The way Adam

Patrick Blenis - Direct

1    got to call me was this morning on -- in New Jersey, wherever

2    he works or resides, he saw an article in the paper about a

3    prosecution of a case in Binghamton, New York dealing with

4    Dean Sacco.  So that's how he then made the inquiry saying I

5    wonder if it's the same Dean Sacco I know.  You know, he has

6    access to our DOJ's sites for cases and assignments and

7    that's how he tracked me down.  The relevant part that he

8    provided to me was that he says that the Dean Sacco that he

9    knew at one point told him that he owned a house near

10   Binghamton and Dean Sacco told Adam that he was having

11   trouble with the tenants in collecting rent from the tenants

12   and that she wasn't paying up in rent.  Adam also told me

13   that at some point Dean Sacco inquired of what kind of work

14   he does.  The AUSA -- he told him he's a federal prosecutor,

15   then Dean inquired of what kind of cases he works on.  Adam

16   told him he works like on securities fraud and some other

17   white collar but he also told him he also picks up and

18   prosecutes child pornography cases.  Adam says that Dean took

19   a great interest in Adam's case work on child pornography and

20   started to inquire of him how it was that those kind of cases

21   are put together, prosecuted, and how it is that evidence is

22   collected and information collected as to people that engage

23   in child pornography matters.  And he said he generally

24   talked to Dean about how that occurs.  They had some other

25   discussions about Dean's work and things like that and, you

Patrick Blenis - Direct

1   know, other stuff that was kind of just non pertinent.

2          As I said, I learned of this when I went for

3   lunch, that's how the AUSA got ahold of me.  I'm going to be

4   putting Mr. Lurie tomorrow on the stand tomorrow to testify

5   about the two relevant things and I'm asking to amend my

6   witness list to that effect.

7          THE COURT:  Let's hear what the defense has to

8   say about that.

9          MR. FISCHER:  To put him on the stand

10  concerning the two relevant things, if I had heard two things

11  that I thought were relevant I would know what Mr. Lovric was

12  speaking of, but that they had some conversations about the

13  AUSA's work I don't think tends to prove in this case that

14  Mr. Sacco committed or did not commit the crimes that he's

15  charged with here.  I don't think it tends to make those

16  facts -- those final facts more or less probable than they

17  would be without the evidence and, frankly, given the

18  witnesses' position as an Assistant US Attorney, the risk of

19  any prejudice here is tremendous.  I also inquire of Mr.

20  Lovric whether the witness has access to the inhouse

21  information of the US Attorney's Office concerning this

22  matter, and if that's so, I think that opens some doors that

23  if the witness does testify that we should go into and find

24  out about but, frankly, your Honor, I think that the

25  balancing on it clearly weighs -- that's not to mention the

Patrick Blenis - Direct

1    late notice and the prejudice that accrues from that late

2    notice of such a real fundamental witness.  Something like

3    that that's going to have a lot of sway with this jury just

4    because of his position as an Assistant US Attorney working

5    for the government and I would in the strongest terms object

6    to it.

7              THE COURT:  Well, there's a lot of

8    conversations.  Number one, did you want to say something

9    else Miro?

10             MR. LOVRIC:  Yeah, Judge, I don't know if Miss

11   Peebles had anything to add.

12             MISS PEEBLES:  It just sounds really desperate

13   to me.  This is going to be another way to -- desperate

14   excuse to introduce evidence, so I object.  It's totally late

15   notice.  The case has had a lot of publicity not only here

16   locally, but also in Jersey City, now we're just going to be

17   told about it.  Frankly, I don't know it would hurt my case

18   because, again, it's just going to be another desperate

19   excuse as to why they don't have what they have.  That's

20   fine, your Honor.

21             MR. FISCHER:  We have not had a chance to

22   speak with prospective jurors or jurors about any potential

23   prejudice.  All the other witnesses were discussed with the

24   jurors.  We explored many of the witnesses' roles in law

25   enforcement.  What effect it might have.  Some of them

Patrick Blenis - Direct

163

1  actually had problems with an enforcement officer being more

2  credible from the outset than law enforcement.  Geez, you put

3  a Federal Assistant US Attorney up there and --

4                MR. LOVRIC:  Somebody might believe him.

5                MR. FISCHER:  In the same position that the

6  prosecutor in this case is.

7                THE COURT:  There's some things I have to

8  think about.  I think there's merit.

9                MR. LOVRIC:  I'm sorry.

10               THE COURT:  Let me make a decision, then you

11  can appeal it.  I'm not going to make a decision this minute.

12  I'm going to look into some things, I'm going to tell you

13  what I'm going to look into.  Anybody wants to help me out,

14  they can if they don't want to, I'll decide it on my own.

15  First of all, you've got a US Attorney in one office and

16  you've got another US Attorney in another office, both

17  Department of Justice employees.  There's a canon of ethics

18  that says a lawyer can't testify in his own case and this is

19  what that sounds like to me.  He's a part of your

20  organization.  It's just like a partner in a firm.  I

21  couldn't be trying a case and then call Phil Kramer to

22  testify on the stand as to some fact he may have seen.

23               MR. LOVRIC:  Can I respond to that issue?

24               THE COURT:  Yeah.

25               MR. LOVRIC:  This -- this was not in any way

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct

1    done in his official capacity.  This is not something that

2    he, through his job, had a relationship with Mr. Sacco.  He

3    as a private citizen ran into Mr. Sacco.  This is like an

4    AUSA becoming a witness to a homicide, then he can't testify

5    in the homicide case?

6                THE COURT:  I don't know.  I'm going to have

7    to look into it.

8                MR. LOVRIC:  I'm saying, Judge, I don't think

9    that's an issue because it would be different if it was in an

10   official capacity that he was engaged in this observation or

11   hearing of things that Mr. Sacco said.  He is merely another

12   witness.  The fact that he's an AUSA is simply a factor.

13   That's not how to he came to be in contact with Mr. Sacco or

14   had gained this information.

15               THE COURT:  Okay.

16               MR. LOVRIC:  But in responding to

17   Mr. Fischer's objections, you know, first of all, both

18   counsel are saying notice.  There is no notice obligation

19   other than the Court-ordered witness questionnaire which is

20   for the Court's convenience to run by the witnesses -- the

21   jurors if they know them.  There is no notice requirement

22   that I tell the defense who I'm going to call or what they're

23   going to say for that matter.  The only notice requirement I

24   have is Jencks and there is no Jencks.  I asked the AUSA if

25   he wrote anything down and there is no other notes or files

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                    165

1    or things of that sort.  So there is no notice violation here

2    because there's none that was required.

3                    Secondly, I learned of it 25 minutes ago and

4    the way it was -- by the happenstance that I described.  The

5    relevancy part, I find the defense objection really, I think

6    borders on it's relevant.  They don't like it but it's

7    relevant.  The defense would like to say that the rent issue

8    is not relevant.  It's at the heart of our case.  We're

9    proving that Dean Sacco had sex with Shannon and that Linda

10   O'Connor not only allowed him but knew about it because he

11   was either letting her slide on rent or in consideration for

12   rent money back and forth.  The quid pro quo.  This witness

13   has direct knowledge from Dean Sacco, an admission.

14                   THE COURT:  Is there going to be a derth of

15   evidence of the fact that she was back on her rent and wasn't

16   able to pay the rent?  Don't you have other witnesses who can

17   testify to that?

18                   MR. LOVRIC:  That she was back on her rent?

19                   THE COURT:  That she didn't pay her rent on

20   time.

21                   MR. LOVRIC:  No, there isn't a derth.  We have

22   the DSS.

23                   THE COURT:  Right.

24                   MR. LOVRIC:  We have DSS.  We have Mr. Sacco's

25   statement to --

Patrick Blenis - Direct                    166

1          THE COURT:  Right.

2          MR. LOVRIC:  -- excuse me, to Linda O'Connor's

3   statement to Sergeant Blenis.

4          THE COURT:  Sure.

5          MR. LOVRIC:  We have Bill Sorvino who he made

6   a statement to.

7          THE COURT:  Lots of evidence, right?

8          MR. LOVRIC:  I don't think so.

9          THE COURT:  You just said it was.

10         MR. LOVRIC:  Well, Judge, with all due respect

11  the jury may not think it's lot of evidence.  They may say we

12  don't think that's a lot of evidence of the quid pro quo of

13  the government.

14         THE COURT:  Maybe the defense -- somebody's

15  going to raise 403 and say it's cumulative.  You were just

16  about going to do that.

17         MR. FISCHER:  That's the first word I was

18  going to say.

19         MR. LOVRIC:  With all due respect to the

20  defense, I think is this is an attempt to keep very relevant

21  evidence out.

22         THE COURT:  Sometimes it works.  I'm going to

23  have to think about it.

24         MR. LOVRIC:  You know, with all due respect,

25  Judge, I think it's relevant and especially on the issue, not

Patrick Blenis - Direct

1  just the rent part, but when you take a look at the other

2  conversation Dean Sacco.  He is charged with producing child

3  pornography and taking videotapes and photographs and we have

4  said to the defense and we will argue that Dean Sacco got rid

5  of those things from the time that Shannon called him to the

6  time that he was arrested.  I don't know how anyone can say

7  it's not relevant.  Again, to say it's harmful to their

8  case --

9           THE COURT:  That's different.

10          MR. LOVRIC:  It's true.  But to say Dean

11  Sacco's inquiry into someone who has knowledge of

12  investigations dealing with child porn and video and

13  photographs and how investigators go around collecting and

14  prosecuting people who do that, at the very time that he's

15  doing this to Shannon.  These conversation occurred in the

16  fall of 2006.

17          MR. FISCHER:  He also mentioned, as I recall,

18  spring of 2006.

19          MR. LOVRIC:  Fall of 2006 Dean Sacco is

20  photographing Shannon and him engaged in sex and at the same

21  time having conversations with a federal prosecutor who

22  prosecutes child porn cases, I believe I'm entitled to put

23  that in front of the jury because our argument is he

24  destroyed these things and how, well, he had some idea of how

25  damaging these materials are.

Patrick Blenis - Direct                    168

1              THE COURT:  He wouldn't without talking to a

2      federal prosecutor.  Give me a break.

3              MR. LOVRIC:  That's not the question.

4              THE COURT:  Okay.  I'll think about it.

5              (In open Court).

6              (Jury present).

7              THE COURT:  All right.  Do we have Sergeant

8      Blenis, would you come back up on the stand, sir?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Mr. Lovric.

11             MR. LOVRIC:  Can I just have a moment, Judge?

12     BY MR. LOVRIC:

13         Q     Good afternoon, Sergeant Blenis.

14         A     Afternoon.

15         Q     Mike's not on again.  Sergeant Blenis, when we --

16     when we left this morning, I was discussing with you an

17     interview that occurred on October 29 of 2007.  Do you recall

18     that?

19         A     Yes, I do.

20         Q     And you indicated that that interview of Shannon

21     was video and audiotape, is that correct?

22         A     That's correct.

23         Q     And were you present for the entire time of that

24     interview?

25         A     Yes, I was.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                                        169

1      Q     And you went to interview Shannon regarding what?

2      A     Further disclosures made about acts committed

3   against her.

4              MR. LOVRIC:  Your Honor, I've marked as

5   Government's Exhibit number 87.  I've talked with both

6   counsel and we will offer Government's 87 which is a video

7   and audiotape of this interview conducted on October 29, 2007

8   of Shannon O'Connor.

9              THE COURT:  I take it there's no objection

10  from defense?

11             MR. FISCHER:  No objection.

12             MISS PEEBLES:  No.

13             THE COURT:  All right.  We'll receive

14  Government's 87 in evidence and permit it to be shown to the

15  jury at this time.

16             MR. LOVRIC:  Judge, I'll play that now.  It

17  runs for approximately a little over an hour.

18             THE COURT:  Thanks for the warning.

19             MR. LOVRIC:  Just a correction on that.  It is

20  88.  I'm sorry.  I misnumbered my exhibits.

21             THE COURT:  That's all right.  Eighty-eight's

22  in evidence.

23             (Playing Government Exhibit 88).

24  BY MR. LOVRIC:

25      Q     Sergeant Blenis, the video we just finished

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct

170

1  watching, was that the entire video of that entire interview

2  that you spoke of earlier?

3      A    Yes.

4      Q    Now, as of that date being October 29 of 2007, as

5  of that date had Shannon yet disclosed anything regarding

6  George Lang or sexual abuse occurring in the Deposit area?

7      A    No.

8      Q    Okay.  On the October 29 interview that we just

9  saw, I take it Shannon, during the course of that interview,

10 described and disclosed certain things about the camera by

11 Dean Sacco and her mother?

12     A    Yes.

13     Q    I take it that was the first time that you heard

14 that from her about the camera use by Mr. Sacco and Miss

15 O'Connor?

16     A    That's correct.

17     Q    She had not disclosed that to you in that previous

18 March 2 interview?

19     A    No, she did not.

20     Q    Sergeant Blenis, I apologize.  Before the lunch

21 break there was an event that I had forgotten to cover that

22 I'd like to go back to that occurred on March 22 of 2007

23 which is prior to the interview we just saw.  I apologize.  I

24 forgot to cover that.

25          Do you recall on March 22, 2007 interviewing Linda

Patrick Blenis - Direct

1   O'Connor?

2       A    Yes, I did.

3       Q    Where did that interview take place?

4       A    That interview took place at the city police

5   station.

6       Q    And how did Miss Linda O'Connor come to be or come

7   to the police station?

8       A    I picked her up at her residence at 45 Fair Street

9   and asked her to come back for an interview.

10      Q    Did she do so voluntarily come back with you?

11      A    Yes.

12      Q    And did you actually sit down and speak with her on

13  that date and interview her?

14      A    Yes, I did.

15      Q    And during the course of that interview, did Miss

16  O'Connor provide information to you about certain things that

17  you were asking about?

18      A    Yes, she did.

19      Q    Did you at some point ask her or speak to her about

20  her living arrangement or how she came to live at 45 Fair

21  Street?

22      A    Yes, I did.

23      Q    What did she say to you about that?

24      A    She told me she moved to 45 Fair Street August 2 of

25  2006.  That she moved there because that's where she

Patrick Blenis - Direct                172

1    relocated.  They were flood victims, her and her daughter.

2         Q    And did she indicate whose property it was that she

3    had moved to, who owned that property?

4         A    She advised that Dean Sacco owned the property.  He

5    was the landlord and that he lived in New Jersey, Jersey

6    City, New Jersey and that he would come up on weekends and

7    stay in the upstairs apartment and also do work on the

8    property when he came up on weekends.

9         Q    Did Linda O'Connor indicate to you how much she was

10   paying in rent for her apartment?

11        A    She told me she was paying $600 a month in rent and

12   at some point she had gotten HUD assistance and that was a

13   little bit later.

14        Q    Did she indicate in what month it was HUD

15   assistance commenced?

16        A    I believe February.

17        Q    You believe so or you're not sure?

18        A    If I could look at my notes, I could tell you.

19        Q    I take it you prepared a report after that

20   interview?

21        A    Yes.

22        Q    If you could take a look at that and see if that

23   refreshes your recollection.

24        A    I'm sorry.  I stand corrected.  That would be

25   January of 2008 or, I'm sorry, 2007.  January 2008.

Patrick Blenis - Direct

1    Q    Okay.  So she indicated that's when HUD assistance

2    began to pay for some of her rent?

3    A    Yes.

4    Q    Did Linda O'Connor on that date tell you whether or

5    not there were occasions when she would get into any

6    arguments with Dean Sacco about rent?

7    A    Yes, she did.  She said that they would have

8    arguments about her being behind in the rent and Dean had

9    threatened to kick her and Shannon out and that Shannon was

10   present for some of those conversations.

11   Q    And did she indicate to you during that course of

12   that interview whether or not she was having any kind of

13   financial difficulties?

14   A    She said that she had financial difficulty and fell

15   behind in her rent.

16   Q    Did she indicate whether or not there were any --

17   there was any social services involvement with her and

18   Shannon at the time of your interviewing her?

19   A    She did.  She said about that time she had problems

20   with Family Court with Shannon and that social services got

21   involved.

22   Q    Did Linda O'Connor speak to you about any Family

23   Court order that had been issued by a Family Court Judge?

24   A    Yes.

25   Q    What did she tell you?

Patrick Blenis - Direct

1    A    That there was a family court order that was issued

2  in November of 2007 and the order specified that she not have

3  her daughter around Dean Sacco unsupervised.

4    Q    What year was it she said this order was issued?

5    A    If I can look at my notes.  2006, November 2006.

6    Q    Okay.  And she indicated that this order told her

7  to do what?

8    A    That she couldn't have her daughter around Dean

9  Sacco unsupervised.

10   Q    Did you ask her or did she tell you whether or not

11  she followed this Family Court order?

12   A    She told me that she didn't.  She stated that she

13  trusted Dean and let her daughter go with Dean to different

14  locations on several occasions.  And also that she allowed

15  Shannon to go to the upstairs apartment with him unsupervised

16  on several occasions after the order.

17   Q    Did she indicate in any way how many times it was

18  that she allowed her daughter to be alone with Dean Sacco?

19   A    Several.

20   Q    I don't know if I asked this but did she offer an

21  explanation as to why it was she violated this order by the

22  Family Court Judge?

23   A    Again, she said that she trusted Dean and that was

24  why she violated the Family Court order.

25   Q    Now, if I could, Sergeant Blenis, I'd like to turn

Patrick Blenis - Direct                    175

1    back to the time frame forward from this October 29 interview

2    that we just watched.  So, following the October 29, 2007

3    interview, did you take part in another videotaped interview

4    of Shannon O'Connor?

5         A    Yes.

6         Q    I'm sorry.

7         A    On December 5.

8         Q    Of what year?

9         A    2007.

10         Q    Okay.  So, between October 29 of 2007 and

11    December 5 of 2007, are there any other interviews of Shannon

12    between that time frame by yourself?

13         A    No.

14         Q    And how were you informed of any disclosures by

15    Shannon prior to interviewing her on December 5 of 2007?

16         A    I was made aware by Liz Chesebro that there was

17    further disclosure by Shannon.

18         Q    What was your purpose then in participating with --

19    being present when this interviewed happen on December 5,

20    2007?

21         A    To gather information about those disclosures.

22         Q    Where did this interview on December 5 take place?

23         A    At the child Advocacy Center on Upper Front Street

24    in Binghamton.

25         Q    Same place we just saw on October 29 in the video?

Patrick Blenis - Direct

1    A    Yes.

2    Q    And on December 5 of 2007, who actually conducted

3  the interview in the interview room?

4    A    That would be Denise Oliver.  She's a forensic

5  interviewer with Child Advocacy Center.

6    Q    Who else was with Denise Oliver?

7    A    Elizabeth Chesebro from Chenango County Child

8  Protective.

9    Q    Where were you during the December 5 interview?

10   A    I was in the control room where you could observe

11 the interview and also have interaction through an earpiece

12 and a mike.

13   Q    Okay.  During the December 5 interview did you

14 communicate with anybody through this earpiece mechanism

15 during the course of the interview?

16   A    Yes.  I was able to speak with Denise Oliver

17 through the microphone with her using the ear mike.

18   Q    Okay.  So I take it when you spoke, only Denise

19 would hear you in her earpiece?

20   A    Yes.

21   Q    What was the purpose or logic, if I can call it

22 that, of having Denise Oliver and Elizabeth Chesebro conduct

23 this December 5 interview?

24   A    If there was further disclosure, I thought it would

25 be better if Denise and Elizabeth made the interview.  I

Patrick Blenis - Direct                           177

1    thought they'd be more comfortable or Shannon would be more

2    comfortable with Denise and Elizabeth.

3         Q    Okay.  Was the entire interview video and audio

4    recorded?

5         A    Yes, it was.

6              MR. LOVRIC:  Judge, I mark as Government's

7    Exhibit number 89 the video interview of December 5, 2007.

8    I'm offering it into evidence.  I don't believe there's any

9    objection but --

10             MR. FISCHER:  No objection.

11             MISS PEEBLES:  No objection.

12             THE COURT:  All right.  Receive Government's

13   89 in evidence.

14             MR. LOVRIC:  We can go ahead and play that if

15   that's okay.

16             THE COURT:  How long is this?

17             MR. LOVRIC:  I believe it's approximately one

18   hour.

19             THE COURT:  Okay.  Maybe we'll watch half of

20   it and take a break.  One of the jurors would like a break?

21             A JUROR:  Yes, please.

22             THE COURT:  Would you like a break?

23             A JUROR:  Yes, please.

24             THE COURT:  You got it.

25             (Short break taken).

Patrick Blenis - Direct

178

1          THE COURT:  Mr. Lovric, do you have

2  transcripts of these interviews?

3          MISS PEEBLES:  I do, Judge.  As I'm following

4  it, there's a few slight mistakes but I can make copies and

5  have them provided.

6          THE COURT:  Well, if you give them to me we'll

7  make the copies and that way you guys don't have to pay for

8  it, or if you'd rather make them that's fine.

9          MISS PEEBLES:  No, Judge.  The one now, if you

10  want to have it so they have to follow along for this one.

11          THE COURT:  Great.  Let me come down here.

12          (Discussion held off the record)

13          (At the Bench).

14          THE COURT:  After the videotape was played and

15  the juror asked for a break, I had three different people

16  tell me they couldn't hear a thing on that tape.  I could

17  hear bits and pieces but very few and far between of what she

18  was saying, Shannon.  I could hear the officer on most

19  occasions and I could hear Miss Chesebro all the time but I

20  couldn't hear the answers so I'm going to put that to the

21  jury to see if they could hear it and if they can't hear it,

22  then I think we're going to have to present it to them in

23  another form.

24          MISS PEEBLES:  I do have the transcript and if

25  the government agrees with what's in it we could and

Patrick Blenis - Direct

1    Mr. Kelly -- Mr. Fischer, then we could, you know, agree and

2    let them have the transcript.

3                MR. LOVRIC:  Let me take a look at it.  Yeah,

4    I mean, the problem is, Judge, no offense to the Court but

5    the system doesn't work well.  You can hear it a lot better

6    at a personal computer when it's playing on speakers.

7                MR. FISCHER:  I tried it on a PC.  I had

8    trouble with it even with ear buds.

9                MISS PEEBLES:  We had those enhanced, the ones

10   that Miro played, we actually had them enhanced as best we

11   could better than what we originally received.

12               THE COURT:  It's always been customary in my

13   recollection when you've got a tape like, especially when

14   you've got drug dealing conversations, that a transcript is

15   given to the jury to follow.  I realize it's all in English,

16   three English speed people all sitting in a room nice and

17   quiet, that thinking would not apply but after listening to

18   that I really couldn't hear a lot of it and other people that

19   were not jurors spoke to me directly and said they couldn't

20   hear it.  Colleen said the jurors told her they couldn't hear

21   it.  Marlene, you want to give me that stuff.  I think we

22   better make that inquiry and then take some time -- I'm not

23   sure if we want to go through the same process again and have

24   the same defect.  You haven't reviewed the transcript so you

25   don't know if they're accurate.  How do we get out of this

Patrick Blenis - Direct

1    dilemma?

2                    MR. LOVRIC:  Judge, put it this way, until

3    this morning I wasn't really expecting to be able to put

4    those things in and then it occurred to me after the defense

5    openings --

6                    THE COURT:  They wanted it.

7                    MR. LOVRIC:  -- they were going to put it in.

8    I had no objection to them going in but to be perfectly

9    honest, if the defense didn't want them in I don't think I

10   could have put them in so that's why I wasn't, you know,

11   preparing a transcript because I really didn't think but

12   after the openings I knew that the defense wanted them and

13   was going to be putting them in and so on.  I don't have any

14   objection to the transcript being provided to them as an aid.

15   I have no objection.

16                    THE COURT:  That's the way we do it.

17                    MR. LOVRIC:  I have no objection to video/

18   audio tapes going to the jury.  If I could just maybe look at

19   these things overnight and the jury can be told if the

20   defense wants that, they will have these as an aid, if they

21   want to utilize them in the jury room and if they want to

22   come back and see the tapes as well.  I don't have any

23   objection to that if that's what the defense wants.

24                    THE COURT:  So right this minute it would be

25   futile to call the jury in and play the second videotape

Patrick Blenis - Direct

1  unless they say they could all hear it fine.

2              MR. LOVRIC:  The second one.

3              MISS PEEBLES:  It's about as hard as the first

4  one I think.  I mean, as far as her voice, it doesn't carry

5  very well.

6              THE COURT:  She's very soft spoken.

7              MISS PEEBLES:  My assessment, they were both

8  hard to hear.  Maybe the first one was slightly harder.

9              MR. LOVRIC:  I think the first one is harder

10  to hear than the second one but the second one is easier than

11  the first one.

12              THE COURT:  I'd rather not have them play the

13  second one twice.  We may have to play the first one over

14  again.

15              MR. LOVRIC:  That's up to you, Judge.

16              THE COURT:  We can have an audibility hearing.

17  I'm going to say they're not audible.  Maybe, maybe.  All

18  right.  I'm going to ask the jury to come back.  Do you have

19  other evidence to present this afternoon?

20              MR. LOVRIC:  Through this witness I have about

21  half hour's worth of additional through this witness?

22              THE COURT:  Do you have another witness ready.

23              MR. LOVRIC:  No.  I didn't think we'd get

24  through him today.

25              THE COURT:  Not with the tapes you wouldn't.

Patrick Blenis - Direct                    182

1    You're right.

2                    MR. LOVRIC:  Plus we then have to put him on,

3    come back to go on for the second tape.

4                    THE COURT:  What we can do, we can -- if you

5    can look through this quickly, we can reproduce this and give

6    it to the jury to follow the audio -- to take it and follow,

7    be seeing and listening to it.  That way we'll have it in

8    evidence and fill up the rest of the day.  Do you want to

9    look at this quickly?

10                   MR. LOVRIC:  This is which tape?

11                   THE COURT:  This is the one that's coming up.

12   Second one.

13                   MR. LOVRIC:  Go through it real quick.

14                   (Discussion held off the record).

15                   THE COURT:  I want to get the jury in.

16                   (Jury present).

17                   THE COURT:  Ladies and gentlemen, after you

18   went on your break, a couple of people approached me and said

19   they couldn't hear anything as being said on those tapes.

20   Did anybody have any trouble hearing any parts of the tape?

21   If you did -- everybody.  So it's not that I'm totally deaf

22   because I couldn't hear anything.

23                   All right.  So we're going to try to remedy

24   that with a second tape.  What we're going to do is pass out

25   a transcript of what was said and we'll play the tape and

Patrick Blenis - Direct

183

1  watch how it is that the people are saying what they're

2  saying and you can fellow it along and you'll know what they

3  said and that might even be of help to you.  Go back out and

4  we'll get that all ready and get you all in here.  Another

5  break.

6                    (Jury excused).

7                    THE COURT:  Mark it as probably 89-T, that all

8  right, Miro?  Kelly, is that okay with you?  Lisa, is that

9  okay with you?

10                   MISS PEEBLES:  Mark it 89-T and I'll let them

11  use it to help as a guide.  It won't get into evidence.

12                   MR. LOVRIC:  We copied the wrong one, Judge.

13                   THE COURT:  I already asked her about that.

14  It says first, I fell into that trap.  I think Lisa was

15  trying to catch it.

16                   MISS PEEBLES:  Actually it's this one and it's

17  marked first.

18                   MR. LOVRIC:  I said this before.  This is a

19  transcript of the first video we just heard.

20                   MISS PEEBLES:  He's right.  It says first.  My

21  secretary put first with Shannon, Pat Blenis and Elizabeth

22  Chesebro.  She put first video with Shannon, Denise Oliver,

23  Liz Chesebro.  So, when you took both copies it did say first

24  and that was her thinking apparently and she labeled them and

25  I didn't catch it but it appears that Colleen just made

Patrick Blenis - Direct                    184

1    copies of the first one.

2              THE COURT:  All right.  Let's make copies of

3    the second one.

4              MISS PEEBLES:  But we needed copies of the

5    first one anyway.

6              THE COURT:  Yes, we did ultimately.

7              (Jury present).

8              THE COURT:  All right.  Ladies and gentlemen,

9    you found on your chairs as you came in a copy of the

10   transcript of the tape we're about to see which is the second

11   tape to be viewed here this afternoon involving Shannon

12   O'Connor and other folks.

13             So, are you ready to roll that, Mr. Lovric?

14             MR. LOVRIC:  Yes, Judge.

15             THE COURT:  And the transcript is not

16   evidence, I want to tell you that right off.  It's to allow

17   you to hear and view the evidence which is on the tape but

18   the transcript -- it will make it easier for you to follow

19   what's being said, hopefully hear it this time.  So we'll go

20   ahead and play it.  Follow right along with the transcript.

21             (Playing Government's Exhibit 89)

22             THE COURT:  All right.  I think that's enough

23   for today, ladies and gentlemen.  We can watch the rest of

24   this tomorrow morning.  Once again, we're going to start at

25   10:00 because I have a 9:30 procedure and let me once again

Patrick Blenis - Direct                                    185

1    tell you not to talk about the case among yourselves or with

2    anybody else or permit anyone to speak to you about this

3    case.  If that happens, please inform the clerk or myself,

4    and also try to avoid the media.  There's stuff in the media

5    this morning they said.  We want you to decide the case based

6    on what you hear in the courtroom not what somebody else

7    heard how things were happening.  Have a nice evening, we'll

8    see you tomorrow at 10:00.

9                    (Jury excused)

10                   (At the Bench)

11                   THE COURT:  The Court has done some research

12   without help from any of the parties with respect to the

13   testimony of the AUSA from New Jersey and my preliminary

14   ruling is that I will allow him to testify but only as to the

15   topic of what Mr. Sacco was quizzing him on with respect to

16   preparing, trying evidence involved in a case where you have

17   child pornography and I won't permit him to testify about any

18   conversations that Mrs. O'Connor may have had with him about

19   being late on the rent because I think that would be

20   cumulative under 403.

21                   Yes, sir, Mr. Fischer.

22                   MR. FISCHER:  Your Honor, I stated my

23   positions earlier on the record.  I take an exception to that

24   ruling.  I also, as I indicated earlier, feel that, you know,

25   it opens a door with respect to communication among the US

Patrick Blenis - Direct

186

1   Attorney's Offices concerning these matters, preparation of

2   these matters and how they do it.  If there are any

3   communications between these offices concerning these

4   subjects, I would like to and I believe I should know about

5   them before hand so there can be an appropriate

6   cross-examination.

7              THE COURT:  Jencks material?

8              MR. FISCHER:  Basically, yes.

9              MR. LOVRIC:  There is no communication between

10  New Jersey and ours.  The Department of Justice is enormous

11  and New Jersey doesn't have any direct access to our cases

12  and I think I indicated how this AUSA learned of this matter.

13  He read about it in the paper and that's what triggered his

14  mind and he actually had to go through different steps to

15  find out and he first called the FBI and then left a message

16  for the FBI agent to get a message to me and that's how he

17  found where it was.  But he doesn't have any access to our

18  files.  There has been no file sharing.  You know there is

19  nothing there in terms of Jencks because he knew Mr. Sacco

20  and his personal life, not professional.  And there is no

21  professional interaction or connection.

22             THE COURT:  Are there any communications

23  between you and this gentleman by e-mail or in writing?

24             MR. LOVRIC:  I first spoke to him like at one

25  today when I learned he reached out to the agent that was

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                              187

1    trying to find me.  That's when I first spoke to him.  Prior

2    to that, I didn't know he existed, he didn't know I existed

3    so --

4                    THE COURT:  Between one today and now are

5    there any e-mails or any other communications that are in

6    writing form?

7                    MR. LOVRIC:  Yes.  I called him and spoke to

8    him on the phone.  I did e-mail him, because he asked me for

9    a photo of our defendant because he says he knows Dean Sacco

10   and he described in my phone conversation the Dean Sacco he

11   knew and in my mind I knew he was talking about the same

12   person because he described him.  He also talked about the

13   boxing thing which I know Mr. Sacco boxed because I have

14   tapes of him boxing at the gym that the AUSA talked about so

15   I did e-mail him a photo, confirmed that's the Dean Sacco he

16   knows.

17                   THE COURT:  Okay.

18                   MR. LOVRIC:  I'll give Kelly Fischer the photo

19   I have.

20                   MR. FISCHER:  Okay.

21                   THE COURT:  Thank you.

22                   MR. LOVRIC:  That is the only e-mail

23   communication I've had with the AUSA.

24                   THE COURT:  Miss Peebles?

25                   MISS PEEBLES:  Your Honor, I suppose when it

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                    188

1    comes to instruct the jury, we're going to have a list of

2    limiting instructions that we would ask the Court to read.

3                    THE COURT:  If you want me to give one

4    contemporaneous with the testimony of the witness, I'll be

5    glad to consider anything you offer in that regard.

6                    MISS PEEBLES:  Okay.

7                    THE COURT:  You can think about it between now

8    and tomorrow morning.  Perhaps there's something you want me

9    to say in limine, if it's appropriate, I'll consider that

10   instruction.

11                   Thank you.

12                   (Court stands adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

189

1                  C E R T I F I C A T I O N

2

3

4          I, VICKY A. THELEMAN, RPR, CRR, United

5    States Court Reporter in and for the United States

6    District Court, Northern District of New York, do

7    hereby certify that I attended at the time and place

8    set forth in the heading hereof; that I did make a

9    stenographic record of the proceedings had in this

10   matter and cause the same to be transcribed; that

11   the foregoing is a true and correct copy of the same

12   and the whole thereof.

13

14

15                       _____

16                       VICKY A. THELEMAN, RPR, CRR

17                       United States Court Reporter

18                       US District Court - NDNY

19

20

21   Dated:  August 8, 2008.

22

23

24

25