190

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                   -versus-                    08-CR-77

6   LINDA O'CONNOR and DEAN SACCO.

7   ----------------------------------------------------------

8                   TRANSCRIPT OF JURY TRIAL

9   held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  THURSDAY, May 8, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Bighamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

Patrick Blenis - Direct                              191

1              (Jury present).

2              THE COURT:  Morning, ladies and gentlemen.  I

3   think we're going to hear a little bit more from Sergeant

4   Blenis this morning.  You don't have to be resworn, you're

5   still under oath, Sergeant.  Do we have anymore technical

6   difficulties?  Those of you who are laughing must have read

7   the newspaper.  No?

8              A JUROR:  I don't get it.

9              THE COURT:  I apologize for a mistake.  All

10  right.  Where are you, Mr. Lovric?

11             MR. LOVRIC:  I believe, Judge, we're going to

12  continue playing Government Exhibit 89, the videotape.

13             THE COURT:  We cut that off, that's right.

14             MR. LOVRIC:  We stopped at page 20.

15             THE COURT:  Okay.  We'll count on the clerk to

16  find the right spot.

17             MR. LOVRIC:  Okay, Judge.  We're at the bottom

18  of page 19 right now.

19             THE COURT:  Okay.

20             MR. LOVRIC:  That last sentence was bottom of

21  page 19 so that should now start with where we left off

22  yesterday approximately.

23             THE COURT:  Okay.

24             (Continuation of Government Exhibit 89)

25

Patrick Blenis - Direct                          192

1    BY MR. LOVRIC:

2        Q    Sergeant Blenis, at the very end of that interview,

3    although it wasn't reflected on that transcript, does Shannon

4    describe at the very end of that interview how she came about

5    to first tell a teacher?

6        A    In the first interview she said that she made a

7    disclosure to a teacher at Perry Brown school.

8        Q    Okay.  The first time you spoke to her?

9        A    Yes.

10       Q    I was referring to this tape that we were just

11   watching, at the very end she's talking about a teacher and a

12   class.  Is that where she's describing how she told her

13   teacher?

14       A    Yes.

15       Q    The interview we just watched on video, that

16   occurred on December 5 of 2007?

17       A    Yes.

18       Q    And at that time Shannon was in whose custody?

19       A    She was in the custody of the Binghamton

20   Psychiatric Center.

21       Q    The Crisis Center that you identified yesterday?

22       A    Yes.

23       Q    And at this point in time, in connection with your

24   investigation, have you at this point in time December of

25   2007 commenced to conduct an additional investigation, in

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                          193

1    addition to the Dean Sacco matter that you were

2    investigating?

3         A    Yes.  It was the second interview I had.

4         Q    I'm sorry?

5         A    As of the second interview, the October interview.

6         Q    Okay.  And who was it that you were then going to

7    commence investigating and looking into in terms of

8    allegations made by Shannon O'Connor?

9         A    Linda O'Connor.

10        Q    Now, shortly after this December 7 interview, did

11   the FBI become involved in this investigation?

12        A    No.

13        Q    December 2007.  Well, at some point after this

14   interview did the FBI get involved?

15        A    Yes.

16        Q    When was that approximately?

17        A    It wasn't until February, beginning of January.

18        Q    What year?

19        A    2008.

20        Q    Okay.  So sometime in the early part of 2008?

21        A    Yes.

22        Q    Now, did you become aware, at some point after the

23   FBI became involved, of the arrest of Linda O'Connor and Dean

24   Sacco by the FBI?

25        A    Yes.

Patrick Blenis - Direct

194

1      Q      Approximately when were they arrested?

2      A      February 10.

3      Q      Of 2008?

4      A      2008.

5      Q      Okay.  Now, in connection with -- let me rephrase

6  that.  In terms of, once the FBI became involved in the

7  investigation, were you still a part of the investigative

8  team that was working and gathering information?

9      A      Yes.

10     Q      Okay.  And subsequent to the FBI becoming involved,

11 did you actually conduct and participate in a search warrant

12 at 14 Miller Street?

13     A      Yes, I did.

14     Q      Now, whose residence was 14 Miller Street --

15     A      Fourteen.

16     Q      -- on the date that you did the search warrant?

17     A      That would be the apartment of Linda O'Connor.

18     Q      And approximately when was it that the search

19 warrant was conducted?

20     A      February 12 in the afternoon.

21     Q      And I take it you were present?

22     A      Yes, I was.

23     Q      Now, Sergeant Blenis, in connection with that

24 search warrant, did you take with you, pursuant to the

25 warrant, materials and items that you found in that

Patrick Blenis - Direct

195

1    apartment?

2        A    Yes, I did.

3        Q    What I'd like to do at this point, Sergeant Blenis,

4    I'd like to show you Exhibits 3 through 9 in one batch and

5    then 10 through 12 in another batch and I'll talk about each

6    exhibit individually but I just want to identify them first.

7                MR. LOVRIC:  I'll just let counsel look at

8    them first if that's okay.

9                THE COURT:  All right.

10                MR. FISCHER:  Your Honor, are they being

11    offered at this time?

12                THE COURT:  I think he's going to try to

13    identify them through the witness and then maybe he's going

14    to try to offer them.  I don't know.

15                MR. LOVRIC:  That's correct, Judge.

16    BY MR. LOVRIC:

17        Q    Sergeant Blenis, I'm going to hand you two stacks.

18    If you can keep them in the two stacks that I give to you and

19    then we're going to talk about them.  Sergeant Blenis, if you

20    could first look at the stack numbered 3 through 9, if you

21    take a look at those.  Okay.  Three through 9, you recognize

22    those items?

23        A    Yes.

24        Q    What are they generally speaking?

25        A    They are photographs of Shannon O'Connor and those

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                    196

1   were secured as evidence from 14 Miller Street.

2        Q    Okay.  Exhibits 3 through 9, where do they come

3   from, where were they found?

4        A    They were in a packet of photographs.

5        Q    At which house?

6        A    At 14 Miller Street.

7        Q    So during the search warrant?

8        A    Yes.

9        Q    Okay.  And are those photographs 3 through 9, they

10  appear the same way when you recovered them from 14 Miller

11  Street?

12       A    Yes.

13            MR. LOVRIC:  Judge, I can have him identify

14  each photo or I can do them after I offer them into evidence.

15            THE COURT:  Why don't you offer them and see

16  if there's an objection, then we can go back and go one

17  through one.

18            MR. LOVRIC:  I'll offer Exhibits 3 through 9

19  in evidence.

20            MISS PEEBLES:  No objection.

21            MR. FISCHER:  No.

22            THE COURT:  Receive Government's 3 through 9

23  in evidence.

24   BY MR. LOVRIC:

25       Q    Sergeant Blenis, I think the easiest way is --

Patrick Blenis - Direct                            197

1    Sergeant Blenis, if I could retrieve Exhibits 3 through 9.

2    The photos I'm going to put on the monitor, I'll start with

3    Exhibit 3 and then we'll identify what it is or what it shows

4    for the record and again indicate these all came out of 14

5    Miller Street, correct?

6         A    Correct.

7         Q    Okay.  I'll put on the screen Exhibit number 3.

8    Okay.  Exhibit 3, Sergeant Blenis, just for the record, it

9    shows what in that picture?

10        A    Shannon O'Connor.

11        Q    I'll put up Exhibit 4.  It shows what in that

12   picture, Exhibit 4?

13        A    Shannon O'Connor.

14        Q    Okay.  And then she's holding up two fingers just

15   to identify it differently than Exhibit 3?

16        A    Right.

17        Q    Exhibit 5 I'm putting on the screen now.  It shows

18   what generally in the picture?

19        A    Shannon O'Connor jumping on the bed.

20        Q    Exhibit 6 I'm putting on the screen, it shows

21   generally what?

22        A    Shannon O'Connor laying on the bed.

23        Q    Exhibit 7 I'm putting on the screen now.

24        A    That would be Linda O'Connor.

25        Q    Exhibit 8 on the screen now.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct                    198

1     A     Linda O'Connor.

2     Q     Sitting in much dimmer lighting than picture 7?

3     A     Yes.

4     Q     Exhibit 9 on the screen?

5     A     Linda O'Connor.

6     Q     Now, in front of you you have Exhibits 10 through

7  12.  Where were those recovered from?

8     A     Those were also recovered from 14 Miller Street.

9     Q     Are those the actual photos that you found at that

10  apartment?

11     A     Yes.

12            MR. LOVRIC:  I would offer Exhibits 10 through

13  12 in evidence.

14            MR. FISCHER:  No objection.

15            MISS PEEBLES:  No objection.

16            THE COURT:  Receive Government's 10 through 12

17  in evidence.

18            MR. LOVRIC:  If I, can just take those from

19  you, Sergeant.

20   BY MR. LOVRIC:

21     Q     Putting on the screen now Exhibit 10 in evidence

22  and that shows a picture of what, what's pictured in that?

23     A     Two different types of computers, bed frame.

24     Q     Putting on the screen now Exhibit number 11, and it

25  shows, generally speaking, what's shown in that photograph?

Patrick Blenis - Direct

1    A    Front porch of the residence with people.

2    Q    And Exhibit number 12 I'm putting on the screen

3  now, what does that show generally?

4    A    Curbing with refuse.

5    Q    And in the back of this photograph where I'm

6  pointing to right now, actually a river right there by the --

7  near the road side?

8    A    Yes.

9    Q    Sergeant Blenis, in connection with this

10  investigation, did you also obtain records from the Norwich

11  Family YMCA?

12    A    Yes, I did.

13    Q    Okay.  I'd like to show you what's marked as

14  Government's Exhibit number 13 for identification.

15          MR. FISCHER:  No objection, your Honor.  Thank

16  you.

17          THE COURT:  Okay.  We'll receive Government's

18  13 in evidence.

19    Q    I'll show these to you, Sergeant Blenis.  You've

20  seen these before, right?

21    A    Yes.

22    Q    These -- Exhibit 13 are the records you obtained

23  from the YMCA?

24    A    Yes.

25    Q    I'm going to put it up on the camera.  The first

Patrick Blenis - Direct

1  page of Exhibit 13 shows what, Sergeant Blenis, on those

2  records?

3      A    It shows the name of Dean Sacco, his address, phone

4  number, work phone, date of birth.

5      Q    Okay.  Does that read membership application?

6      A    Yes.

7      Q    Then just briefly page 2, some information there

8  about a contact person or contact information?

9      A    Yes.  Marcus Monroe.

10     Q    And page 3 of Exhibit 13, does it indicate further

11 payment information regarding this application?

12     A    Yes, it does.

13     Q    And at the middle of that page, is there -- bears a

14 signature and a date?

15     A    Yes.

16     Q    What I'm pointing to right now?

17     A    Yes, it does.

18     Q    Does that appear to be at least a name Dean Michael

19 Sacco?

20     A    Yes.

21     Q    And the date is 01 September of 2006?

22     A    Yes.

23     Q    Now, page -- I'm sorry, I lost count.  Page 4 of

24 Exhibit 13, I just want to zoom a little bit in on that,

25 Sergeant Blenis.  Okay.  Now, page 4 and then the next page

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct

1   which we'll look at page 5 in a second.  What does that

2   contain on that document?

3       A    That would be the dates and times that there was

4   use at the YMCA by Dean Sacco.

5       Q    Okay.  Now, are you familiar with the Y that we're

6   referring to here, the YMCA in Norwich?

7       A    Yes, I am.

8       Q    And members that become members there, how do they

9   gain access to the Y coming in and out?

10      A    Members are issued a card and what they do upon

11  entry is they make contact at the desk and they swipe the

12  card at a card swipe at the desk and then go in.

13      Q    With some type of electronic card?

14      A    Yes.

15      Q    Okay.  And then I take it this record shows the

16  swiping of the card the date and times?

17      A    Yes.

18      Q    And on the very top it indicates dates from and can

19  you read that?

20      A    Dates from September 1, 2006, 5:30 AM to March 17,

21  2007, 9:00 PM.

22      Q    Okay.  Just briefly flipping back to the third

23  page.  This membership started as of September 1, 2006?

24      A    That's correct.

25      Q    And then on this fifth page that we're looking at

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Direct

1    right now, it indicates the first swipe being September 13 of

2    2006?

3        A    That's correct.

4        Q    I'm just going to roll the page down and then on

5    that -- the last entry on the -- the last entry on the fourth

6    page of this document has a date of what that you're looking

7    at right now, the last entry on this page?

8        A    February 25, 2007.

9        Q    Okay.  And then I'm going to flip to the last page

10   of Exhibit 13 which is page 5, and it has a final entry of

11   what date?

12       A    March 5, 2007.

13       Q    And then there are no further entries after that?

14       A    No.

15       Q    Is that correct?

16       A    That's correct.

17       Q    Sergeant Blenis, in the course of your

18   participation in the investigation, did you also acquire a

19   phone number for Linda O'Connor, a TracFone number?

20       A    Yes, I did.

21       Q    Do you know that number or do you have anything

22   that you can use to refresh your recollection as to that

23   phone number?

24       A    The TracFone number that we had a record of for

25   Linda O'Connor was 372-9820.

Patrick Blenis - Cross                              203

1      Q    That's what area code?

2      A    607.

3           MR. LOVRIC:  Those are all the questions I

4    have at this time, your Honor.

5           THE COURT:  Okay.  Mr. Fischer.

6           MR. FISCHER:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. FISCHER:

9      Q    Good morning.  My name is Kelly Fischer.  I

10   represent Dean Sacco.

11     A    Good morning.

12     Q    You brought with you a folder of documents, you

13   brought that same folder with you yesterday?

14     A    Yes.

15     Q    Did you review those documents that are in that

16   folder before testifying?

17     A    Yes.

18     Q    All right.  And did you review any other documents

19   other than what is in that folder in preparation for your

20   testimony?

21     A    Yes.

22     Q    What else did you review?

23     A    Case files.

24     Q    Where did you review those?

25     A    Between my office, my home and here.

Patrick Blenis - Cross

1      Q    Can you identify, please, what case files, other

2  than your folder, you reviewed in coming -- before coming to

3  testify?

4      A    I reviewed case file 987 and 5687.

5      Q    What's in those files?

6      A    That would be the first arrest of Dean Sacco, the

7  first investigation I did and then the second case file would

8  be the investigation dealing with Linda O'Connor that started

9  on October 29.

10     Q    When you say the first case file concerning the

11 arrest of Dean Sacco, what's in that file?

12     A    In that case file there would be notes for the

13 investigation.  There would be a chronology of what steps I

14 took.  There would be the arrest information.  There would be

15 warrant information from the arrest warrants.

16     Q    I have photocopies of documents that I believe came

17 from your file, five pages it appears of typed documents with

18 some handwriting.

19              MR. FISCHER:  And I'll mark those if I may,

20 please.

21              THE CLERK:  Court marks Defendant Sacco's

22 Exhibit S-1.

23     Q    Sir, I'll show you Exhibit S-1.  Can you identify

24 that?

25     A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

1    Q    What is that?

2    A    Those are notes I made to outline the case.

3    Q    Now, those are notes that are in this file that you

4  brought with you, am I correct?

5    A    Yes.

6    Q    They're actually photocopies of your original

7  notes?

8    A    Yes.

9    Q    All right.  The notes that are in the folders that

10  you reviewed before coming here to testify are different than

11  those notes, S-1?

12    A    It's a breakdown of the case file to this.

13    Q    Can you explain to me what that means, please.

14    A    Basically summarized two case files and put key

15  points down on it.

16    Q    So Exhibit S-1 is your summary based upon your

17  review of other files?

18    A    Yes.

19    Q    I understand.  I understand.  May I take that back,

20  please?  Thank you.  When did you prepare Exhibit S-1?

21    A    I believe last weekend.

22    Q    Before preparing S-1, you were made aware that you

23  were going to come and testify?

24    A    Yes.

25    Q    Who spoke with you about that, if anybody?

Patrick Blenis - Cross

206

1    A    The US Attorney.

2    Q    Mr. Lovric?

3    A    Yes.

4    Q    Did you and Mr. Lovric sit down and have

5    conversations about this case in preparation for your coming

6    here to testify?

7    A    Yes, we had trial preparation.

8    Q    When was that?

9    A    It's been over the course of the last couple of

10   weeks.

11   Q    How many times have you met with Mr. Lovric

12   personally in preparing for your testimony?

13   A    More than three.

14   Q    Where?

15   A    Here.

16   Q    How much time have you spent in doing that?

17   A    More than a few hours.

18   Q    Other than the materials in your case file that you

19   have at home and your office, did you review any other

20   documents during those occasions to prepare yourself to come

21   and testify here?

22   A    No.  These are the only documents I've looked at.

23   Q    Let me go to the first occasion when you were made

24   aware of any allegations by Shannon O'Connor against Mr.

25   Sacco.  Was that on March 2 of 2007?

Patrick Blenis - Cross

1    A    Could you repeat the question.

2    Q    Was March 2 of 2007 the first time you became aware

3  of any allegations made by Shannon O'Connor against Dean

4  Sacco?

5    A    Yes.

6    Q    Who made those known to you?

7    A    Elizabeth Chesebro from DSS.

8    Q    How did she do that?

9    A    She made a phone call to me and then there was

10  arrangements made for her to come to the office with Shannon

11  so I could interview her.

12    Q    So she brought Shannon to your office?

13    A    Yes.

14    Q    When Shannon and Miss Chesebro arrived at your

15  office, what's the first thing you did?

16    A    I met them at the door and then I brought them

17  upstairs.

18    Q    There's an office upstairs or a room where you met

19  with them?

20    A    Yes.

21    Q    Do you have video recording equipment at the

22  Norwich Police Department that you could have used to record

23  that interview?

24    A    No.

25    Q    Do you have audio recording devices that you could

Patrick Blenis - Cross

1    have used available at the Norwich Police Department at that

2    time to record your first interview with Shannon O'Connor

3    concerning these allegations?

4         A    Yes.

5         Q    Did you use those?

6         A    No, I did not.

7         Q    How long did that first interview last before --

8    withdraw that.  How long did that first interview last?

9         A    It was more than an hour.

10        Q    Did you create any writings as a result of that

11   interview?

12        A    Yes, I did.  I took a written statement from her.

13        Q    Okay.  Did you spend an hour speaking with her

14   before preparing the written statement?

15        A    Yes.

16        Q    All right.  Did you make any notes, handwritten

17   notes or typewritten notes concerning the conversations you

18   were having while you were having them during that first hour

19   of the interview?

20        A    I believe I took notes, yes.

21        Q    Okay.  Where are those?

22        A    They should be part of the case file.

23        Q    Back in your house or at your office?

24        A    Probably at the office.

25        Q    How big is that case file for Mr. Sacco?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

1       A    It's -- there's size to it.  I couldn't give you an

2    exact size to it.

3       Q    Bigger than a banker's box?

4       A    No.

5       Q    But you didn't bring that with you here?

6       A    I do have it, yes.

7       Q    You do have it here?

8       A    Yes.

9       Q    May I look at it, please?

10      A    It's not with me in person.  It's upstairs where I

11   can get it.

12      Q    In the US Attorney's Office?

13      A    Yes.

14           MR. FISCHER:  Your Honor, I'll make a request,

15   reserve the right at the right time later on to review those

16   documents.

17           THE COURT:  Certainly.  The Court will reserve

18   your right to review those documents when we take a break in

19   a short period of time.

20      Q    The written statement that you prepared as a result

21   of your interview with Miss O'Connor the first time you met

22   with her, was that a written statement that you typed up or

23   was that a written statement that Miss O'Connor wrote out in

24   her own handwriting?

25      A    No.  That was her words reduced to summary and put

Patrick Blenis - Cross

1  in writing.

2      Q    It's the selection of words that you chose and you

3  typed those in, am I correct?

4      A    No.  Again, it's a reduction of what she said

5  reduced to summary which was put in writing.

6      Q    She didn't type those up, did she?

7      A    I typed those.

8      Q    You typed them?

9      A    Yes.

10     Q    Just you and Miss Chesebro and Shannon O'Connor

11 were present during the interview, am I correct?

12     A    That's correct.

13     Q    Did she sign the statement?

14     A    Yes, she did.

15     Q    Did she make any changes to it?

16     A    I don't believe she did.

17     Q    What did you do next?

18     A    I set up a time for her or I tried to set up a time

19 for her so she could have an exam done.

20     Q    Okay.  And when you did that she was still present?

21     A    No.

22     Q    What did you do next with respect to investigating

23 this matter?

24     A    I started looking into Dean Sacco's background.

25     Q    How did you do that, what did you do?

Patrick Blenis - Cross

1    A    What did I do?

2    Q    What did you do.

3    A    I ran a criminal history on him.

4    Q    What else did you do?

5    A    I looked for records at city government.

6    Q    What records did you look for at city government?

7    A    The information having to do with 45 Fair Street.

8    Q    And what did you discover in that connection?

9    A    That he was the landlord at 45 Fair Street.

10   Q    Were you able to determine that he purchased that

11   45 Fair Street property in approximately August of 2005?

12   A    I'd have to look at those notes.

13   Q    Is that consistent with your recollection?

14   A    I'm not sure.

15   Q    What did you do next?

16   A    I actually went on the web site for New Jersey

17   DOC.

18   Q    When did you do these things?

19   A    Within the short time after speaking with Shannon.

20   Q    On the same day, March 2, 2007?

21   A    No, within that week.

22   Q    What was the next thing you did?

23   A    The next thing I believe we waited for, for her to

24   have her exam which happened around March 12 and then we were

25   trying to decide how we were going to get ahold of Mr. Sacco

Patrick Blenis - Cross

1    and after conferring with the DA, it was decided that we

2    would try some phone calls to Mr. Sacco.

3         Q    This was based upon conversations with Mr. Joseph

4    McBride, the Chenango County District Attorney, am I correct?

5         A    I believe it was ADA Dunshee, D-U-N-S-H-E-E.

6         Q    Did you make arrangements to make those phone

7    calls?

8         A    Yes.

9         Q    What arrangements did you make?

10        A    I contacted Miss Chesebro and asked her to bring

11   Shannon in so we could make some phone calls.

12        Q    And she came in when, on March 14?

13        A    Yes.

14        Q    Did you perform any other investigation prior to

15   March 14?

16        A    Other than doing the background on Mr. Sacco.

17        Q    The things that we've discussed?

18        A    Yes.

19        Q    On March 14 you have the recording equipment at the

20   Norwich Police Department?

21        A    Yes.

22        Q    What equipment did you have?

23        A    I had to borrow a micro -- it was called a pearl

24   recorder.  I borrowed it from the State Police in Norwich.

25        Q    How does a pearl recorder work?

Patrick Blenis - Cross

1      A     What you do is you set it up for recording.  It's a

2  small cassette type.  You wear an earpiece in the ear and

3  while you're talking on the telephone, that will record the

4  conversation that you have.

5      Q     So you set this up before Miss O'Connor arrived at

6  your offices?

7      A     Yes.

8      Q     And did you test it?

9      A     Yes.

10     Q     Did it work?

11     A     At the time, yes.

12     Q     What did you do to test it?

13     A     Spoke into it.  Played it back.

14     Q     When -- what time did Miss O'Connor arrive at your

15  office to conduct these phone calls?

16     A     Around 5 PM.

17     Q     Did you have any conversation with her or Miss

18  Chesebro when they arrived and before placing the phone

19  calls?

20     A     Yes.

21     Q     What conversation did you have?

22     A     Explained to Shannon what we wanted to do.  We told

23  her we wanted to make controlled calls to Dean.  We gave her

24  a little bit of a script to follow and told her that, you

25  know, to follow the script and also to engage Mr. Sacco

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

214

1    freely in conversation.

2        Q    Did you tell her what you meant by controlled phone

3    calls?

4        A    Yes.  Recorded phone call.

5        Q    Is that what you meant when you said controlled

6    phone calls, just that they were recorded?

7        A    Recorded, the purpose I believe we told her was to

8    get Mr. Sacco to make some type of admission.

9        Q    So your objective was to have Mr. Sacco admit to

10   sexual relationship with Shannon during that phone call?

11       A    Yes.

12       Q    Now, up to this point then, it was clear to you

13   that Shannon was telling the truth, am I correct?

14       A    Yes he.

15       Q    You believed at that point that Shannon was telling

16   the truth, am I correct?

17       A    Absolutely.

18       Q    When you -- before you made those phone calls with

19   Shannon did you ever undertake any investigation to determine

20   Shannon's background?

21       A    I guess I don't understand the question.

22       Q    Did you ever undertake any investigation of people

23   in the neighborhood to determine whether or not Shannon was

24   truthful or not truthful?

25       A    No.  She came to me as a victim.  That's how I

Patrick Blenis - Cross
215

1    investigate it.

2         Q    So, if a victim comes to you, you assume the truth

3    of those allegations?

4         A    What she told me was the truth.

5         Q    You assumed what she told you was true?

6         A    What she told me was true.

7         Q    And you still assumed that, am I correct?

8         A    What she told me is true and that's what I believe.

9         Q    You weren't there, were you, sir?

10        A    I don't --

11        Q    When these events occurred, sir, you weren't

12   present to observe anything that did or did not happen?

13        A    No.

14        Q    All right.  So your belief is based upon what Miss

15   O'Connor, let's say, as of March 14 when you're making these

16   phone calls, your belief in the truth of her allegations is

17   based upon what she tells you at that time, am I correct?

18        A    That's correct.

19        Q    You gave her a script?

20        A    (Nods head).

21        Q    Do you have that script with you?

22        A    I actually do.

23        Q    May I look at it, please?

24             THE COURT:  It's a good time to take a break,

25   ladies and gentlemen.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

216

1          (Jury excused).

2          (Jury present).

3          THE COURT:  Okay.  Mr. Fischer.

4          MR. FISCHER:  Thank you, your Honor, counsel.

5     BY MR. FISCHER:

6      Q     Sergeant Blenis, I had an opportunity to go through

7     the documents and I pulled from that a document and if you'll

8     look through your folder I think you'll find it entitled

9     Norwich City Police Department Consent Waiver to Intercept

10    Audio Communications.  Do you see that document?

11     A     Yes.

12     Q     All right.  And it consists of eight pages, am I

13    correct?

14     A     The consent to waiver is by itself but it is

15    attached to other documents so it would be eight pages.

16     Q     Eight pages total in that paper clip group of

17    documents that you have in front of you now?

18     A     Yes.

19     Q     And I'm going to show you so we're clear, we're

20    talking about the same thing, Exhibit S-2.  Can you identify

21    S-2 and compare it against the original record in your

22    folder, please.

23     A     With exception to some of the notes on the back of

24    the pages, it's accurate.

25     Q     There are some handwritten notes on the back of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross                                    217

1  your pages of your original that do not appear on Exhibit

2  S-1?

3       A    That's correct.

4       Q    That's what you're saying, with that exception?

5       A    Yes.

6       Q    Exhibit S-2 is a true copy of your original notes?

7       A    With that exception.

8       Q    Okay.  Thank you.  Pages 2 through 8 of Exhibit S-2

9  are your original.  Exhibit S-2 contains typewritten, some

10  typewritten, some handwritten notes, am I correct?

11       A    Yes.

12       Q    The typewritten notes appear to be in two different

13  fonts, are they from two different calls?

14       A    Two different calls.  I don't understand the

15  question.

16       Q    There were -- withdraw that.  Pages 2 through 7 of

17  exhibit S-2, are these the scripts that you gave Shannon

18  O'Connor to make the phone calls?

19       A    Yes.

20       Q    Page 2 of that exhibit has some -- a number up top,

21  2007-987.  Do you see that?

22       A    Yes.

23       Q    That typewritten portion of that exhibit, who

24  prepared that?

25       A    I did.

Patrick Blenis - Cross

218

1    Q    When did you prepare it?

2    A    Prior to Shannon coming to the police station.

3    Q    So before she got there, you were all set to give

4    her this script?

5    A    Yes.

6    Q    Once she got there, did she go over the script

7    before she made the first phone call?

8    A    Yes.

9    Q    Did she make suggestions and changes to that script

10   at that time before she made the phone call?

11   A    No.

12   Q    There are some writings, let's say, on the second

13   page of Exhibit S-2 that starts dash, I have a problem in

14   typed letters.  Do you see the handwritten portions?

15   A    Yes.

16   Q    Say, for example, it says about center of the page

17   on the right, I thought you might be able to help.  Shannon

18   O'Connor wrote that?

19   A    No.

20   Q    Who wrote that?

21   A    I believe Elizabeth Chesebro wrote that.

22   Q    So, Liz both Chesebro at that time was also

23   suggesting ways for Mr. Sacco to admit on the telephone the

24   things that Shannon was saying he did?

25   A    Yes.

Patrick Blenis - Cross

1    Q    So the rest --

2              THE COURT:  Is that document in evidence?

3              MR. FISCHER:  I'm sorry.  No, your Honor.  I

4    can offer it into evidence at this time.

5              THE COURT:  If you wish, I offer Exhibit S-2.

6              MR. LOVRIC:  No objection.

7              THE COURT:  Receive Defendant's S-2 in

8    evidence.

9    BY MR. FISCHER:

10   Q    So on that second page where it says I'm just

11   scared, whose writing is that?

12   A    I believe that's Elizabeth Chesebro's.

13   Q    That's not Shannon O'Connor's writing, am I

14   correct?

15   A    I don't believe it is.  I believe it's Elizabeth

16   Chesebro's.

17   Q    If you go to the next page at the bottom where it

18   says I haven't had sex with anyone else.  That appears to be

19   the same handwriting, does it also appear that way to you?

20   A    Yes.

21   Q    So, Elizabeth Chesebro is saying I haven't had sex

22   with anyone else, am I correct?

23   A    That's the guidelines and the script that we

24   provided, yes.

25   Q    Going to the next page 3/15/07 in handwriting, the

Patrick Blenis - Cross

220

1   whole page is handwritten out, whose writing is that?

2       A    That's mine.

3       Q    Now, the pages that we just covered for the first

4   telephone call?

5       A    Yes.

6       Q    Did they also cover the second telephone call?

7       A    Yes.

8       Q    Were they also used during the third telephone

9   call?

10      A    No.

11      Q    The first telephone call, we've heard tapes here.

12  You sat through basically two sessions of recorded phone

13  calls, correct?

14      A    Yes.

15      Q    There was another phone call, the first phone call

16  that we did not hear, am I correct?

17      A    That's correct.

18      Q    That's the phone call that something happened to

19  the recording device that it didn't work, am I correct?

20      A    Yes.

21      Q    What happened to the recording device that it

22  didn't record that conversation?

23      A    The only thing I can explain is I hooked it up

24  wrong.

25      Q    Did you double check it after the first time and

Patrick Blenis - Cross

1   before the second time?

2       A    I don't remember.

3       Q    You would remember if there was a problem with that

4   first phone call having to fix the machine before you made

5   the second phone call, wouldn't you?

6       A    Again, I must have hooked it up wrong because it

7   didn't record.

8       Q    That's not my question.  My question is this, if

9   after the first phone call you had said it didn't record, I

10  better fix this machine, you'd remember that, wouldn't you?

11      A    I believe so.

12      Q    I'm going to page, it appears to be just

13  handwriting, upper right-hand corner, it appears to be

14  3/15/07 in your handwriting, am I correct?

15      A    Yes.

16      Q    It says at the top, I don't get you in trouble.

17  What should I tell her.  This is also Elizabeth Chesebro's

18  handwriting, am I correct?

19      A    You're going to have to show me which one you're

20  looking at.

21      Q    I'll show you that page.

22      A    I don't have that one in here.  Oh, I do.  It's

23  right here.  Yes.

24      Q    That's Miss Chesebro's handwriting?

25      A    Yes.

Patrick Blenis - Cross

222

1   Q    In fact, everything on that page with the exception

2   of the date is Miss Chesebro's handwriting, am I correct?

3   A    That's correct.

4   Q    Let's go to another page also in your handwriting,

5   3/15/07, I'll show it to you.  Can you see it?

6   A    Yes.

7   Q    Do you have that in front of you?

8   A    Yes.

9   Q    Whose handwriting appears on that page?

10   A    That would be Deputy Chief Van Miles.

11   Q    And Deputy Chief Van Miles wrote here, I don't want

12   you to hate me, what can I do, is that correct?

13   A    Correct.

14   Q    And he wrote maybe we'll get lucky and I'm not

15   pregnant, exclamation mark, right?

16   A    Yes.

17   Q    I'll go to page also 3/15/07, your writing.  I'll

18   show you the page so we're looking literally at the same

19   page.  See it?

20   A    Yes.

21   Q    Whose writing is on that page?

22   A    That would be Deputy Chief Van Miles.

23   Q    So nothing on this Exhibit S-2 is written by

24   Shannon O'Connor, am I correct?

25   A    That's correct.

Patrick Blenis - Cross

223

1      Q    Do you remember, and I think we're done for the

2  moment with these if you want to set them aside.  You were

3  present and could hear these conversations between Shannon

4  O'Connor and Dean Sacco on the phone when they were occurring

5  or no?

6      A    No.

7      Q    Well, you've been a police officer how long?

8      A    Approximately 15 years.

9      Q    You've had a lot of experience in interviewing

10 suspects, correct?

11     A    I've had some experience, yes.

12     Q    How much experience have you had in interviewing

13 suspects?

14     A    Over the span of the last 15 years, anybody that

15 I've talked to that has been a suspect I've applied different

16 techniques that I've learned in school.

17     Q    Thousand times?

18     A    I couldn't tell you.  I couldn't give you an exact

19 number.

20     Q    As I heard these conversations, there are

21 recorded -- that are in evidence, Mr. Sacco tells Shannon

22 O'Connor to tell her mother about these events, about the sex

23 with Dean and about the potential for pregnancy.  Did I hear

24 that right?  Is that consistent with what you heard?

25     A    Yes.

Patrick Blenis - Cross

1    Q    During these conversations Mr. Sacco, again correct

2  me if you heard this differently, says I would -- I'm sorry.

3  Miss O'Connor asks what if they ask and Mr. Sacco says I

4  would tell them the truth.  Did you hear that as well?

5    A    Yes.

6    Q    In your opinion, is that consistent with evidence

7  of guilt?

8              MR. LOVRIC:  Objection.

9              THE COURT:  Sustained.

10    Q    Who's Clesson Lockwood?

11    A    Clesson Lockwood?

12    Q    Yes, sir.

13    A    He's a resident of the City of Norwich.

14    Q    Where does he live?

15    A    He lives at -- he lives on Silver Street.  I can't

16  tell you the exact address.

17    Q    Where is Silver Street in relation to 45 Fair

18  Street?

19    A    It's quite a few city blocks away.

20    Q    Less than a mile?

21    A    I'd say, yes, less than a mile.

22    Q    Did you know Mr. Lockwood before March of 2007 or

23  know of him?

24    A    Yes.

25    Q    How did you know of Mr. Lockwood before March of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

1  2007?

2      A    We interviewed him during a murder investigation.

3  It would be the Pairard (phonetic) homicide that happened

4  after September 26.

5      Q    After September 26 of what year?

6      A    2007.

7      Q    Did you know Mr. Lockwood before then?  You

8  interviewed him before March 2, 2007, am I correct.

9      A    Yes.

10     Q    Mr. Lockwood has a son Tom, am I correct?

11     A    Yes.

12     Q    He has a disability of some sort?

13     A    I don't know if it's a disability.  I guess I'd

14  have to have you clarify that.

15     Q    Did it appear to you in your observations of

16  Mr. Lockwood's son Tom, prior to March 2 of 2007, if you ever

17  saw him before that time, that he had a disability?

18     A    There's Tom and Clesson Junior and occasionally I

19  get the two confused.  I think one has a reading and writing

20  problem.

21     Q    They look similar?

22     A    To a point.  It's just a matter of remembering

23  who's who.

24     Q    What kind of work does Mr. Lockwood do?

25     A    I believe he's self-employed.

Patrick Blenis - Cross

226

1    Q    Doing what?

2    A    He does yard work.  He does waste removal.  That

3    kind of thing.

4    Q    Do his sons help him?

5    A    I'm not sure about that.

6    Q    Mr. Lockwood worked for Mr. Sacco at 45 Fair

7    Street, correct?

8    A    Yes.

9    Q    You interviewed Mr. Lockwood, am I correct?

10   A    Yes.

11   Q    When did you interview Mr. Lockwood first?

12   A    First time that I interviewed Mr. Lockwood in

13   reference to this case was either January, February of this

14   year.

15   Q    Of 2008?

16   A    Yes.

17   Q    Did you draft or participate in drafting the arrest

18   warrant for Mr. Sacco?

19   A    The arrest warrant?

20   Q    Yes.

21   A    Yes.

22   Q    Before you did that, did you go to 45 Fair Street

23   and look around at all?

24   A    Before the warrant, no.

25   Q    Did you go to the area around 45 Fair Street and

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

227

1   interview anybody, any residents who lived around the area?

2        A    No.

3        Q    Before you drafted that arrest warrant, did you

4   reach out to Mr. and Mrs. Piper who had lived at one time at

5   45 Fair Street?

6        A    No.

7        Q    The arrest warrant, you listed out the charges that

8   Mr. Sacco is charged with, am I correct, during your direct

9   testimony?

10       A    Yes.

11       Q    Are those charges still pending?

12       A    The state trial was supposed to start February 10.

13  The FBI adopted the case and I believe it's waiting in lieu

14  of what's happening here.  So I guess you'd have to talk with

15  the district attorney in Chenango County.  I'm not sure if he

16  totally, you know, turned the case over or not.

17       Q    To the best of your knowledge, those state charges

18  have not been withdrawn, have they?

19       A    To the best of my knowledge.

20       Q    Did you ever speak with Miss Chesebro privately

21  concerning Shannon O'Connor?

22       A    We've had conversations about her, yes.

23       Q    Let's go back to March of 2007.  On or before

24  March 19, the date when Mr. Sacco I understand was arrested

25  down in New Jersey, okay, did you have private conversations

Patrick Blenis - Cross

1   with Miss Chesebro concerning Shannon O'Connor other than

2   getting Shannon to the police station?

3       A    I don't remember.

4       Q    Do you have any recollection that Miss Chesebro or

5   anybody else brought to your attention prior to March 19 of

6   2007 any concerns concerning Shannon O'Connor's emotional

7   condition?

8       A    No.  I don't remember.

9       Q    Well as of, let's say, December 5 of 2007, you were

10  aware that Shannon O'Connor was being administered medication

11  for a psychiatric condition, am I correct?

12      A    In the tapes she says she is under some type of

13  medication.

14      Q    She says Trazodone, am I correct?

15      A    Yes.

16      Q    She said she had her dosage increased

17  50 milligrams, is that your recollection?

18      A    We'd have to either look at the transcript or play.

19  I know there's a five in there.

20      Q    At the time of the December 5, 2007 videotaped

21  interview, had you undertaken any investigation at that point

22  to determine what the status of Shannon O'Connor's mental

23  health was?

24      A    October 29 is when I went down and interviewed her

25  at the CAC the first time and that was when I found out she

Patrick Blenis - Cross

1  was in the psychiatric center.

2       Q    Were you aware on or before December 5 of 2007 that

3  she was being prescribed medications other than the Trazodone

4  that she mentions in the tape recorded interview?

5       A    No.

6       Q    When you take a statement from a witness, isn't it

7  important to understand whether they've been taking any

8  psychotropic medication?

9       A    Do you mean if they're impaired?

10      Q    No.  Whether they're under the influence of any

11 drugs.

12      A    So you're saying impaired?

13      Q    I can rephrase my question.

14      A    Please.

15      Q    Is it important to you to know what drugs, if any,

16 a witness took before you interviewed the witness?

17      A    If they appear to be impaired, yes.

18      Q    So if they don't appear to be impaired, you may

19 safely assume that there are no psychotropic meds being

20 administered, is that fair to say?

21      A    No, you don't.

22      Q    You don't as a matter of course inquire about that

23 issue before you take an interview from a witness, am I

24 correct?

25      A    That's correct.

Patrick Blenis - Cross

1    Q    Of course, you had access through Miss Cheseboro to

2  some information about Shannon's background, am I correct?

3    A    You'll have to repeat that.

4    Q    On or before December 5 of 2007, let's say, could

5  you have gone to Miss Cheseboro and said, tell me about --

6  you knew she was in the psych center, you could have said to

7  her, tell me what the heck's going on, give me some

8  background so I'm interviewing or you're interviewing and I'm

9  speaking to you through the ear bud so I know what's going

10  on, I know what's coming, am I correct?

11    A    Yes.

12    Q    You didn't do that?

13    A    No, I didn't.

14    Q    October 29 of 2007, Shannon O'Connor makes

15  allegations concerning her mother and Dean and photographs,

16  correct?

17    A    Yes.

18    Q    Linda was not arrested, am I correct, until

19  February 10 of 2008, am I correct?

20    A    That's correct.

21    Q    Sergeant, you have not seen any photographic or

22  video images of Shannon O'Connor that are of a pornographic

23  nature discovered in connection with your investigation of

24  this matter, have you?

25    A    That's correct.

Patrick Blenis - Cross                                231

1          MR. FISCHER:  All right.  Thank you.  Thank

2   you.

3          THE COURT:  Miss Peebles.

4          MISS PEEBLES:  Thank you.  May I have

5   assistance, your Honor, if there's no objection, to using

6   some of the equipment?

7          THE COURT:  No.  Use it.

8          MISS PEEBLES:  Thank you.

9          THE COURT:  Sure.

10  DIRECT EXAMINATION

11  BY MISS PEEBLES:

12      Q    Morning, Sergeant.

13      A    Good morning.

14      Q    I'm going to start first with March 2, the

15  interview that you conducted with Miss Cheseboro and Shannon

16  O'Connor.  Do you understand?

17      A    Yes.

18      Q    All right.  You indicated that you did type up a

19  statement of what was told to you on that evening, correct?

20      A    Yes.

21      Q    And that information was as a result of speaking

22  with Shannon with her case worker present, correct?

23      A    Yes.

24      Q    And Shannon appeared to be bright, correct?

25      A    Yes.

Patrick Blenis - Cross

1    Q    And articulate, correct?

2    A    Yes.

3    Q    In fact, you noted that in your report, correct?

4    A    Yes.

5    Q    Now, she provided you with a lot of detail

6 concerning her relationship with Mr. Sacco, correct?

7    A    Yes.

8    Q    And I'm going -- did you sign the statement that

9 you typed up?

10    A    Yes.

11    Q    And you and Liz Chesebro signed that statement?

12    A    Yes.

13    Q    And Shannon O'Connor signed that statement?

14    A    Yes.

15    Q    I'm going to hand you, Sergeant, what's going to be

16 marked as Defense Exhibit number 1.

17              MISS PEEBLES:  And I apologize, Colleen, do

18 you have a sticker?

19              THE COURT:  I think we have Defendant S-1 you

20 want to designate that as.

21              MISS PEEBLES:  O-1.

22              THE COURT:  That's fine.

23              MISS PEEBLES:  O-1.

24    Q    Sergeant, I want to ask if you can identify what's

25 now been marked as Defense Exhibit O-1?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

233

1    A    With the exception of what's highlighted, this is

2  the statement that I took -- let me rephrase that.  With the

3  exception of the marker on the statement, it's the statement

4  I took on the 2nd.

5    Q    That's the statement that you prepared that you

6  typed and signed, along with Shannon O'Connor and Liz

7  Cheseboro?

8    A    Yes.

9         MISS PEEBLES:  Your Honor, I'd like to offer

10  into evidence Defense Exhibit O-1.

11         MR. LOVRIC:  No objection.

12         THE COURT:  Receive Defendant's O-1 in

13  evidence.

14    Q    Now, I'm going to -- showing you the first page of

15  what's been marked as Defense Exhibit O-1 and toward the

16  bottom of that page which is page 1, it states, Dean told me

17  to ask my mom to come up to his apartment and to bring a

18  board game and I asked my mom and she told me it was okay.  I

19  brought the game Sorry up with me.  That's what she said,

20  correct?

21    A    Yes.

22    Q    Looking at the second page of Exhibit 1, she states

23  on there, Dean told me that I could not make any noise

24  because my mom would hear us.  Dean said this in a mean

25  voice.  That's what she said, correct?

Patrick Blenis - Cross

1        A     Yes.

2        Q     Further down on that page she also stated her mom

3    didn't come in but she yelled that her friend Brooke Parmalee

4    was at the house with her dad.  Dean made me get dressed.  He

5    was very nervous.  That's what she said, correct?

6        A     Yes.

7        Q     And then in the last page she stated or last

8    paragraph, excuse me, on that page she states Dean told me to

9    ask my mom if I could come up and play cards and mom said it

10   was okay.  That's what she said, correct?

11       A     Yes.

12       Q     And then she says I heard my mom yelling for me, I

13   got dressed and went downstairs?

14       A     Yes.

15       Q     That's what she said?

16       A     Correct.

17       Q     And the last page is Shannon O'Connor's signature,

18   Elizabeth Chesebro's signature and I assume that is your

19   signature?

20       A     That is my signature.

21       Q     Correct.  And you believed her when she was talking

22   to you that night, correct?

23       A     Yes.

24       Q     And she wasn't under the influence of any kind of

25   drugs at that point, correct?

Patrick Blenis - Cross

1    A    That's correct.

2    Q    In fact, she was rather happy because she was in

3  foster care, correct?

4    A    When she came in she was nervous.  She was clinging

5  to Miss Chesebro.

6    Q    Did you make any notations about the fact that she

7  was in foster care?

8    A    Is it on the statement?

9    Q    I'm not referring to the statement.

10   A    I was told she was in foster care, yes.

11   Q    So you knew she was in foster care at that point,

12  correct?

13   A    Yes.

14   Q    And according to your notes, after speaking with

15  Miss Chesebro, you noted that she seemed to be adjusting

16  well, correct?

17   A    I don't remember that.

18   Q    Now, when she gave that statement in Defense

19  Exhibit O-1, she gave you quite a bit of detail, correct?

20   A    Yes.

21   Q    In fact, she was talking about condoms and condom

22  packaging, correct?

23   A    Yes.

24   Q    Now you played the -- now, Sergeant, let me ask you

25  this:  After she gave you that statement, Miss O'Connor was

Patrick Blenis - Cross

1   not notified, is that fair to say?

2        A    That's correct.

3        Q    In fact, you weren't going to tell Mrs. O'Connor

4   about that, correct?

5        A    Correct.

6        Q    And you didn't want to tell Mrs. O'Connor about

7   that because you didn't want to screw up the investigation,

8   correct?

9        A    Correct.

10       Q    And you didn't feel it was necessary at that point

11  in time to tell Mrs. O'Connor, correct?

12       A    That's correct.

13       Q    Now, with regard to the recorded telephone

14  conversation, you used the script with Shannon so she knew

15  how to initiate the conversation, correct?

16       A    Yes.

17       Q    But the script obviously couldn't control what Mr.

18  Sacco was saying back to her, fair to say?

19       A    Correct.

20       Q    And some of the information that Mr. Sacco was

21  stating, you didn't prepare her to answer, correct?

22       A    Correct.

23       Q    And, in fact, when he starts asking her about the

24  grandfather, she's telling him on her own about her

25  grandfather, correct?

Patrick Blenis - Cross

237

1    A    Could you repeat that, please.

2    Q    She's responding to the questions about her

3  grandfather just based on what she knows, correct?

4    A    Correct.

5    Q    And she says that her grandfather was sick,

6  correct?

7    A    Yes.

8    Q    He had cancer, correct?

9    A    Yes.

10   Q    He was undergoing chemotherapy, correct?

11   A    Yes.

12   Q    And he was in the hospital, correct?

13   A    I don't remember that part.

14   Q    Did she say he was old?

15   A    Yes.

16   Q    And she said ewww?

17   A    Yes.

18   Q    Now, after those controlled phone calls to Mr.

19  Sacco -- let me step back a moment.  When Mr. Lovric asked

20  you did you ask any questions with regard to things that were

21  said about her grandfather, do you remember that when he

22  asked you that?

23   A    Yes.

24   Q    And your response was, she didn't say anything

25  after I asked her, correct?

Patrick Blenis - Cross

238

1     A     Yes.

2     Q     Now, there comes a time when you talk to Linda

3  O'Connor after those phone calls, correct?

4     A     Yes.

5     Q     Now, in between that, Mr. Sacco's arrested on

6  March 16 or the warrant's issued for Mr. Sacco?

7     A     Warrant's issued on the 16th.

8     Q     So March 22 is when you first talk to Miss O'Connor

9  about what Shannon has told you, correct?

10    A     Yes.

11    Q     And Miss O'Connor goes down to the police station

12 or she gets a ride to the police station, correct?

13    A     Yes.

14    Q     You know she doesn't drive?

15    A     Correct.

16    Q     And she's cooperative?

17    A     Yes.

18    Q     She goes down and she doesn't know why you're

19 taking her down there, correct?

20    A     At that point I believe I told her that I needed to

21 talk to her about this.

22    Q     About Shannon or about the entire situation?

23    A     The situation.

24    Q     All right.  And she was quite upset when you told

25 her that, correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross                    239

1        A    At the office I believe she was upset.

2        Q    Yes.  And she wanted to know why she wasn't told,

3   correct?

4        A    Correct.

5        Q    And you asked her why she allowed Shannon around

6   Mr. Sacco after there was a court order, correct?

7        A    Yes.

8        Q    And she said she trusted him, correct?

9        A    That's what she said, yes.

10       Q    And she admitted that she ignored the Court order,

11   correct?

12       A    Yes.

13       Q    Now, you knew Shannon testified as well.  She

14   testified in front of the state grand jury, you mentioned

15   that on your direct when Mr. Lovric was asking you questions?

16       A    Yes.

17       Q    And you knew that she was asked a variety of

18   questions about what happened with Mr. Sacco?

19       A    Yes.

20       Q    And she was asked a question about why didn't she

21   tell her mother, correct?

22       A    We'd have to look at the grand jury minutes for

23   that.

24       Q    Did you look at her grand jury minutes before you

25   came in here today?

Patrick Blenis - Cross

240

1       A    Not today, no.

2       Q    Had you ever looked at them?

3       A    At one point I did, yes.

4       Q    Did you look at them before you interviewed her a

5   second time in October?

6       A    No.

7       Q    Would that have been a prudent investigative

8   endeavor before you interviewed her on October 29?

9       A    I don't think so.

10      Q    It didn't matter what she said when she was under

11  oath in front of the state grand jury?

12      A    It does matter, yes.

13      Q    I want to talk to you briefly about the YMCA

14  records that you retrieved for Dean Sacco.  Do you

15  understand?

16      A    Yes.

17      Q    All right.  In connection with that you also

18  retrieved Shannon O'Connor's YMCA records?

19      A    Yes.

20      Q    And you made notes that they were there together on

21  certain dates at the exact same time?

22      A    Yes.

23      Q    Do you know approximately how many times they were

24  there together at the YMCA?

25      A    Per the records, more than four.

Patrick Blenis - Cross

1          MISS PEEBLES:  I'm going to mark, if I can,

2    Defense Exhibit O-2, please.

3      Q    Sergeant, I'm going to ask you to see if you can

4    identify what's been marked as Defense Exhibit O-2.

5      A    This would be the records from the YMCA on Shannon

6    O'Connor.

7      Q    Thank you.

8          MISS PEEBLES:  Your Honor, at this time I'd

9    like to offer what's been marked as Defendant's Exhibit O-2.

10         MR. LOVRIC:  No objection.

11         THE COURT:  Receive Defendant's O-2 in

12   evidence.

13   BY MISS PEEBLES:

14     Q    Now, when you were listening to the phone

15   conversation or when you heard the phone conversation and Mr.

16   Sacco's response to Shannon's questions, fair to say it

17   sounded as though Mr. Sacco thought they had some type of

18   close relationship, is that a fair --

19     A    Yes.

20     Q    And, in fact, he went on to talk about how they had

21   conversations together, correct?

22     A    Yes.

23     Q    And he thought they had this friendship together,

24   correct?

25     A    Yes.

Patrick Blenis - Cross                              242

1      Q      And you got the YMCA records and you compared them,

2   correct?

3      A      Yes.

4      Q      And you saw that they would go to the YMCA together

5   on at least four or five occasions, correct?

6      A      Yes.

7      Q      And you knew they had done various other

8   activities, horseback riding, correct?

9      A      Yes.

10     Q      They went ice skating together?

11     A      I'm not sure if it was ice skating or roller

12   skating but they went skating, yes.

13     Q      Now, then there comes a time in October,

14   October 29, where you're contacted again by Liz Chesebro,

15   correct?

16     A      Yes.

17     Q      And she makes you aware that Shannon has more to

18   say and some of it has to do with her mother, correct?

19     A      Yes.

20     Q      And you make arrangements to have this videotaped

21   interview that we saw yesterday, correct?

22     A      The arrangements were made, it wasn't by me.

23     Q      But arrangements were made and you were aware of

24   that?

25     A      Yes.

Patrick Blenis - Cross                              243

1       Q    Now, after the interview you went out of the room

2    and typed up a statement, correct?

3       A    Yes.

4       Q    I'm going to hand you what's been marked as

5    Defendant's Exhibit O-3 and see if you can identify this

6    document for the jury.  Can you identify that document

7    Sergeant?

8       A    Yes.

9       Q    Would you tell the jury what O-3 is?

10      A    That was the statement I took from Shannon from the

11   CAC, Child Advocacy Center, on the 29th.

12           MISS PEEBLES:  At this point, your Honor, I'd

13   like to offer Defendant's Exhibit O-3 into evidence.

14           MR. LOVRIC:  No objection.

15           MR. FISCHER:  No objection.

16           THE COURT:  Receive Defendant's O-3 in

17   evidence.

18    BY MISS PEEBLES:

19      Q    Now, looking at page 2, I'm going to ask you to

20   look where it says, I told Dean that I did not want to and

21   that I might tell somebody about what was going on.  Dean

22   threatened me.  Dean told me he was going to stab me and that

23   while I was dying he was going to slowly rape me.  I was

24   scared.  I got undressed.  Is that what she told you on

25   October 29?

Patrick Blenis - Cross

244

1      A     Point that out again, please.

2      Q     Pointer.

3      A     I see where you're talking about though.

4      Q     Okay.  Right here.  So, you see where I'm talking

5   about then --

6              MISS PEEBLES:  I'm not good with the

7   technology.  I have to undo that.

8      Q     Okay.  That's what she told you on October 29?

9      A     Yes.

10     Q     Now, you listened to that phone conversation

11  between her and Mr. Sacco, correct?

12     A     Yes.

13     Q     And he didn't appear to be at all very threatening

14  toward her when she indicated she was going to tell somebody,

15  is that fair to say?

16     A     That's correct.

17     Q     In fact, he at one point offers to tell the teacher

18  on her behalf, you heard that, right?

19     A     Yes.

20     Q     And he tells her, well, there must be someone that

21  can help you.  He says your mother, then he goes on to say --

22  when she tells him I'm -- not even my mother, some adult

23  social worker can certainly help you, correct, he states

24  that?

25     A     Correct.

Patrick Blenis - Cross                    245

1    Q    That statement's to fly in the face of everything

2    you knew before that date, doesn't it?

3              MR. LOVRIC:  Objection.

4              THE COURT:  Sustained.

5    Q    Now, during the phone conversation, the second one

6    in particular where Mr. Sacco was pleading with Shannon

7    trying to pull at her heart strings not to say anything, is

8    that a fair assessment of what was going on?

9    A    Yes.

10   Q    He says I'm going to get beat up in jail, correct?

11   A    Yes.

12             MR. FISCHER:  I object.

13             MR. LOVRIC:  He objected.

14             MR. FISCHER:  I object.

15             THE COURT:  Let's go to side-bar for a second.

16             (At the Bench)

17             THE COURT:  What's the basis for that

18   objection?  We heard that testimony that Miss Peebles is

19   quoting.

20             MR. FISCHER:  As I hear it, he says if

21   somebody did this, this is what's going to happen to him.  He

22   doesn't say I'm going to be there.  That's what she said and

23   there's a little bit of a difference.

24             THE COURT:  So you're saying -- well, you mind

25   changing your question to include that nuance?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

246

1          MISS PEEBLES:  Yeah, but I also think he made

2    specific reference to his own cats, to his mother.  He does

3    make specific reference to himself.

4          MR. LOVRIC:  That's true.

5          MR. FISCHER:  If you made these allegations

6    against me, it would hurt my family is what he said but he

7    didn't say if I go to jail this is what's going to happen to

8    me.  There were two different instances.

9          THE COURT:  I think he said it both ways,

10   Kelly.  That's just my recollection, of course.  The record's

11   going to control as to what it is.  I think I'll permit the

12   question and you can go back on cross if you want to do

13   something with it.

14          (In open Court).

15   BY MR. LOVRIC:

16        Q    Sergeant, you can answer the question.

17        A    Could you repeat the question, please.

18        Q    You heard on the phone conversation Mr. Sacco

19   pleading about if he goes to jail, he's going to get beat up,

20   correct?

21        A    Yes.

22        Q    And he talked about if these accusations are made

23   against him, his mother's going to be devastated, correct?

24        A    Yes.

25        Q    He'll never pick a flower again, correct?

Patrick Blenis - Cross                                    247

1     A    Yes.

2     Q    He will lose his cats, correct?

3     A    Yes.

4     Q    So, would it be fair to say that he's pulling out

5  all the stops at this point trying to get her not to say

6  anything?

7     A    Yes.

8     Q    Not once during that phone conversation does Mr.

9  Sacco say you better think twice because your mother's going

10 to get in trouble, does he?

11    A    No.

12    Q    Now, there came a time after that interview with

13 Shannon on October 29 that you called Linda O'Connor again,

14 correct, after October 29.  At some point on November 14 you

15 got in touch with Miss O'Connor?

16    A    Yes.

17    Q    That was to bring her in and ask her about these

18 pictures that Shannon said she took, correct?

19    A    Could you repeat the question.

20    Q    You wanted to question Miss O'Connor about the

21 things that Shannon said regarding the photographs on

22 October 29, during that interview?

23    A    Yes.

24    Q    So, Miss O'Connor was cooperative, correct?

25    A    On which date are you talking?

Patrick Blenis - Cross

1    Q    November 14.

2    A    Okay.

3    Q    All right.  She was cooperative?

4    A    Yes.

5    Q    And so this would be the second interview that you

6    did with Miss O'Connor on November 14, correct?

7    A    Yes.

8    Q    And, in fact, you tell her some of what Shannon

9    said, correct?

10   A    Yes.

11   Q    And you say did you ever see Mr. Sacco with a

12   camera, correct?

13   A    Yes.

14   Q    And she said she thinks she saw him taking pictures

15   of the property once, correct?

16   A    Yes.

17   Q    And you asked her where would the camera be,

18   correct?

19   A    I don't remember that.

20   Q    If I showed you your notes, would it refresh your

21   recollection?

22   A    Yes.  You said it's from November 14?

23   Q    Yes.  Actually, let me rephrase the question.  You

24   asked her after she asked about the -- after you asked her

25   whether she saw Mr. Sacco with a camera, she tells you that

Patrick Blenis - Cross

1    you could probably find the pictures.  He probably got them

2    developed at Rite Aid, correct?

3        A    Yes.

4        Q    That's what she told you, right?

5        A    Yes.

6        Q    And you told her that it's unlikely that Rite Aid

7    would be developing naked pictures of her daughter, correct?

8        A    Yes.

9        Q    Now, you had plenty of interaction with Miss

10   O'Connor, you've interviewed her twice, correct?

11       A    Yes.

12       Q    And you've talked to Elizabeth Cheseboro about

13   Linda, correct?

14       A    Yes.

15       Q    And you're aware that she has a very limited

16   education, correct?

17       A    Yes.

18       Q    And you knew she had some disabilities, correct?

19       A    I'm not sure about disabilities.  Maybe medical

20   condition I think that would be accurate.

21       Q    Okay.  You knew she couldn't drive, correct?

22       A    I didn't know she couldn't drive -- could not or

23   did not.  You'd have to ask her that.

24       Q    All right.  Well you didn't -- apparently you're

25   saying you didn't know how severe her medical condition was,

Patrick Blenis - Cross

1    is that fair?

2        A    That's fair, yes.

3                THE COURT:  Okay.  Ladies and gentlemen, we're

4    going to break for lunch.  We'll see you back at 1:30.

5                (Lunch break taken).

6                MR. LOVRIC:  It's about the cross-examination.

7    I don't know if you want me to do that in front of the

8    witness because he's on the stand.

9                THE COURT:  We'll go over on the side.

10               (At the Bench).

11               MR. LOVRIC:  Judge, I don't know if the

12   defense O'Connor cross is getting into this, but I may -- it

13   may be so I thought it would be easier for me to make the

14   objection here before we get into it.  There's questioning

15   right now about November 14, 2007 interview of Linda O'Connor

16   by Detective Sergeant Pat Blenis.  I didn't offer those

17   statements of the defendants into evidence but I will object

18   to any elicitation of this witness by the defense about Linda

19   O'Connor requesting or saying that she wanted to take a

20   polygraph exam or that she would take a polygraph or anything

21   of that sort.

22               THE COURT:  I don't think --

23               MR. LOVRIC:  I don't know if that's going to

24   come up but the topic is being discussed now, that interview

25   of her, so I figure I'd just raise it.

Patrick Blenis - Cross

1              MISS PEEBLES:  It is going to come up, I am

2    going to ask the question.  I think it goes to her state of

3    mind.  I'm not going to ask if he did or didn't administer a

4    polygraph.  The fact that she was willing to I think is

5    indicative what her state is during the interview.  I think

6    if I remember correctly Elizabeth Cheseboro is going to talk

7    about how agitated she was, the fact she wanted something to

8    eat.  She was claiming her blood sugar had spiked.  I think

9    it's relevant.  I think I should be able to ask that.  It's

10   something she said to them in connection with being

11   confronted with regard to the photographs.

12              THE COURT:  Why is it not hearsay?

13              MISS PEEBLES:  Well, I mean, Judge, it's state

14   of mind so I just think that it's her frame of mind at the

15   time.

16              THE COURT:  So it's not being offered for the

17   truth?

18              MISS PEEBLES:  Not just how she was feeling.

19              THE COURT:  Innocent?

20              MISS PEEBLES:  Exactly.

21              MR. LOVRIC:  Well, I guess my objection has to

22   do with two reasonings for it:  One, I haven't offered

23   anything about November 14 interview of Linda nor did I

24   intend to nor do I intend to.  So, technically, anything that

25   Linda O'Connor wants to introduce about November 14, 2007

Patrick Blenis - Cross

1    interview it's hearsay but if it is being offered for

2    something other than the truth, then I still submit her

3    saying whatever about polygraph isn't really a state of mind,

4    as opposed to I'm not guilty, I'm innocent, and, therefore,

5    her communicating that which is really to tell the jury that

6    she was telling Pat Blenis I'm not guilty of anything, I'm

7    innocent, which is being offered for the truth.

8             MISS PEEBLES:  No, it's not, it's her state of

9    mind at the time and I'm not suggesting that she underwent a

10   polygraph examination nor am I suggesting that she was

11   claiming she was innocent.  She offered that up as an

12   investigative tool for him, period.  It would simply be like

13   her responding to questions, you know, where Dean Sacco's

14   camera is.  And her and him trying to get information about

15   where the camera might be.  It's the same type of tool as I

16   think the prosecutor would indicate.  Polygraph exams are

17   used as investigative tools.  He said it before and I think

18   that that's something that's relevant.

19            MR. LOVRIC:  That was in connection with

20   detention hearings I made those arguments.  I don't think

21   it's relevant in front of this jury what polygraph exams are

22   or aren't or if they're of any value.  Then we get into -- we

23   get into the whole issue why polygraphs are not routinely

24   admitted into trials.

25            MISS PEEBLES:  I'm not going to go there, is

Patrick Blenis - Cross

253

1    it even admissible, if you want to follow-up on it.

2                    MR. LOVRIC:  I don't want to mention the word

3    polygraph.

4                    MISS PEEBLES:  I'm not saying polygraph.  She

5    said I want to take a lie detector test.  That's what she

6    said to him.

7                    MR. LOVRIC:  That's my objection.

8                    THE COURT:  I'm going to sustain the objection

9    because even though it's being offered for her state of mind,

10   I don't think her state of mind at that point in time is

11   something this jury is going to have to decide.  They're

12   going to have to decide whether she did or didn't do things

13   she's accused of, maybe her state of mind in connection with

14   those things.  This is some time afterwards that they

15   interviewed her.  I don't think it's relevant.

16                   MISS PEEBLES:  Well, I object.

17                   THE COURT:  Okay.

18                   (In open Court).

19                   (Jury present).

20                   THE COURT:  All right.  Miss Peebles.

21   BY MISS PEEBLES:

22       Q    Sergeant Blenis, I think we left off when I was

23   talking to you about the November 14 interview you were

24   having with Miss O'Connor, do you remember?

25       A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

254

1    Q    During that discussion with her, you never talked
2   to her about Grandpa or George Lang, is that true?

3    A    That's correct.

4    Q    So, you heard the phone conversation and you've
5   talked to Miss O'Connor twice but you never asked her any
6   information concerning that, correct?

7    A    That's correct.

8    Q    Did you ever inquire about who George Lang was
9   after you heard that phone conversation between Mr. Sacco?

10   A    I asked Shannon that day and she advised it was
11  somebody she stayed with in Nineveh.

12   Q    Did you follow-up and talk to Renee Lang after that
13  conversation you had had with Shannon?

14   A    No.

15   Q    So you never bothered to find out whether he did
16  have cancer during the time period she was discussing?

17   A    No.

18   Q    Now, you felt or you actually believed that Mr.
19  Sacco would feel comfortable knowing it was Shannon's
20  cellphone that was calling him for the second call, correct?

21   A    Yes.

22   Q    And, in fact, he answered the phone because he
23  recognized the number, correct?

24   A    Are you talking about the second call or the third
25  call?

Patrick Blenis - Cross                                    255

1     Q     The second call that was recorded or the third
2  call.
3     A     It would be the third call, yes.
4     Q     Now, did you get Shannon's cellphone records?
5     A     No.
6     Q     So you weren't aware of how frequently Shannon
7  would call Mr. Sacco, is that fair to say?
8     A     That's correct.
9     Q     Did you ever make an attempt to investigate that
10 after?
11    A     No.
12    Q     Did you investigate that after, you never looked
13 into that?
14    A     I never looked into the cellphone records.
15    Q     During one of the interviews, had you spoken to
16 Miss Chesebro on October 29 to arrange for that videotaped
17 interview?
18    A     Yes.
19    Q     Now, during the course of that interview you heard
20 Shannon mention something that her mother gave her Vicodin,
21 do you remember that?
22    A     Yes.
23    Q     Now, were you aware that Shannon had told Miss
24 Chesebro that her mother gave her five Vicodin, do you
25 remember that?

Patrick Blenis - Cross

1    A    I don't remember that.

2    Q    Did Mrs. Chesebro ever tell you the number of pills

3  she told Miss Chesebro she took?

4    A    No, not the number of pills.

5    Q    She tells you during the interview she was out of

6  school sick for two weeks, do you remember that?

7    A    Yes.

8    Q    In fact, what she says is that she was out of

9  school for a total of four because it happened right before

10  her Christmas break, do you remember that?

11    A    Yes.

12    Q    Did you get her school records to see whether or

13  not she was out of school for two weeks?

14    A    I did not get her school records.

15    Q    Did you ever look at her school records?

16    A    At some point there was some school records that

17  Elizabeth Chesebro gave to me.

18    Q    Did you review those records?

19    A    I think it was the amount of absences.

20    Q    I'm going to hand you what's been marked as

21  Defendant's Exhibit O-4 and ask if you can identify this

22  document.

23    A    Yes.

24    Q    Is that the absentee record that you observed --

25  that you viewed previously?

Patrick Blenis - Cross                              257

1      A    I believe it is, yes.

2           MISS PEEBLES:  Your Honor, I'd like at this

3   time to offer Defendant's Exhibit O-4.

4           MR. LOVRIC:  Can I see which it is?  I have no

5   objection, Judge.

6           MR. FISCHER:  No objection.

7           THE COURT:  Receive Defendant's O-4 in

8   evidence.

9      Q    I'm going to ask you to look at Defendant's Exhibit

10  O-4 and direct you to December 18 of '06.  Do you see that?

11     A    Yes.

12     Q    She's absent a total of five days, correct, the

13  12th through the 22nd?

14     A    Is that six days including the 12th?

15     Q    Well six, if you look at the 18th, consecutive

16  days?

17     A    Starting the 18th.

18     Q    The 12th wouldn't have been the Friday before,

19  correct?

20     A    I'd have to look at a calendar.

21     Q    Well, there's three days -- well, Friday, Saturday,

22  Sunday, so Monday, that wouldn't have been consecutive,

23  correct?

24     A    Okay.  Yes.

25     Q    Now there's no two weeks' worth of absences on that

Patrick Blenis - Cross

1  attendance sheet, is there?

2      A    I don't see it that way, no.

3      Q    Now the YMCA records that I showed you that are in

4  evidence as Defendant's Exhibit --

5              MISS PEEBLES:  Colleen, did you keep those?

6              THE CLERK:  YMCA is O-2.

7              MISS PEEBLES:  Do you have them up there?

8              THE CLERK:  Yes.

9  BY MISS PEEBLES:

10     Q    Now, looking at Defendant's Exhibit O-2 which has

11 already been received in evidence, do you see there it says

12 12/22/06 she went to the YMCA?

13     A    Yes.

14     Q    But she also stayed home from school that day if

15 you look at the attendance records which indicate that she

16 was absent on 12/22?

17     A    Yes.

18     Q    Now, I'm going to ask you about the statements

19 regarding the Best Western that Shannon gave you on

20 December 5, do you understand?

21     A    Yes.

22     Q    This would be the third interview that you were

23 involved in regarding Shannon O'Connor, is that fair to say?

24     A    Yes.

25     Q    Now, you had conversation with Elizabeth Chesebro

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

259

1    before you interviewed her on December 5, correct?

2        A    Yes.

3        Q    And then she advised you of what was going on with

4    Shannon in the psychiatric hospital?

5        A    She advised there were further disclosures, yes.

6        Q    Well, did she tell you anything else about her?

7        A    Well, there was a suicide attempt.

8        Q    Did she elaborate on what this suicide gesture

9    involved?

10       A    I guess I don't understand your question.

11       Q    Well, let me ask you this:  Did she talk to you

12   about the number of times that she either said she was going

13   to kill herself, or actually acted in a suicidal gesture?

14       A    I don't remember that.

15       Q    Did you think that that information would be

16   important to you in your investigation?

17       A    No.

18       Q    So, you weren't concerned really with her state of

19   mind at that point in time during the course of any of these

20   interviews, is that fair to say?

21       A    No, I was always concerned.

22       Q    But you never bothered to ask about it?

23       A    No.

24       Q    Now, during the interview Shannon states that when

25   she moved to Norwich with her mother in August of '06, after

Patrick Blenis - Cross

1   that her mom took her to the Best Western on three occasions,

2   is that fair to say?

3       A    Yes.

4       Q    All right.  And she says her mom took her to the

5   Best Western one time just to shop and go to movies and do

6   whatever, is that fair to say?

7       A    Yes.

8       Q    And then she says there are two additional times

9   that her mom took her to the Best Western and two men showed

10  up and raped her, is that fair to say?

11      A    Yes.

12      Q    All right.  Now, with regard to her first statement

13  suggesting that somebody met up with her in their room, she

14  tells you that Miss O'Connor registered under her own name,

15  correct?

16      A    Yes.

17      Q    All right.  And she tells you that she got two keys

18  for the room, correct?

19      A    Yes.

20      Q    And she goes through and tells you that they check

21  in and -- correct?

22      A    Yes.

23      Q    Now, she says that there's a second time and again

24  they go to the room, they go to the hotel, her mom checks in

25  under her name, correct?

Patrick Blenis - Cross

1       A    I'm not sure if that was the first time or the

2   second time.

3       Q    The second time.  Well, twice she says that they

4   went, her mom checked in, she used her name and got room

5   keys, correct?

6       A    If I remember correctly, one of the times she

7   didn't use her name.

8       Q    Really.  And you heard that on the videotape?

9       A    That's what, if that's the tape, if that's what I'm

10  remembering.

11      Q    Well, how about if I show you a transcript of that

12  interview, would that help refresh your recollection?

13      A    It would.

14           MISS PEEBLES:  Judge, I'm going to need like

15  two minutes if the Court, please.

16           THE COURT:  Just a couple of minutes?

17           MISS PEEBLES:  Yeah.  Like five minutes.

18           THE COURT:  Okay.  We'll ask the jury to step

19  aside.

20           (Jury excused).

21           (Jury present).

22           THE COURT:  Okay.  Miss Peebles.

23  BY MISS PEEBLES:

24      Q    Okay, Sergeant, I asked you about the taped

25  interview concerning the Best Western comment Shannon made

Patrick Blenis - Cross

1    about that.  I'm going to hand you now what's been marked as

2    Defendant's Exhibit O-5 and ask you if you could take a look

3    at that and identify that document for me, please?

4        A    That would be the transcript that was provided on

5    the second interview.

6                MISS PEEBLES:  Your Honor, at this time I'd

7    like to offer Defendant's Exhibit 5 into evidence.  I know

8    that the tape is in and it's strictly used as an aid,

9    however, I need to use it in order to cross-examine this

10   witness.

11               THE COURT:  I don't think -- let's see.

12   That's already been played for the jury, right, that tape?

13               MISS PEEBLES:  Yes.

14               THE COURT:  They followed along using that

15   transcript?

16               MISS PEEBLES:  Yes.

17               THE COURT:  I don't think you need to put it

18   in to ask him questions from it.

19               MISS PEEBLES:  Okay.  Thank you.

20   BY MISS PEEBLES:

21       Q    Now, Sergeant, we're going to look at page 13 of

22   the transcript.

23               MR. LOVRIC:  Judge, I object to a couple of

24   things about this.  I don't know if you want me to say it out

25   in front of the jury or not.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

263

1              THE COURT:  No, I prefer you didn't.  Let's go

2    to side-bar.

3              (At the Bench).

4              THE COURT:  What's the problem?

5              MR. LOVRIC:  Here's -- let me succinctly put

6    it.  The transcripts are pretty good but just going through

7    them when they were listening I found many places where there

8    was either error on what is there.  Like at one point there

9    is upstairs, it really said downstairs in my view.  There's

10   other places where words were not in -- were not in the

11   transcript where you could hear them.  So, I don't have a

12   problem with the transcript being an aid but do I have a

13   problem with the witness being cross-examined about the

14   transcript as if they are exactly accurate because the tape

15   is really what he needs to refer to if he's going to say I do

16   remember or don't remember her saying those exact words.

17   Because I though for an exact, that the transcripts are not

18   accurate, they're very good but they're not one hundred

19   percent exact and, therefore, I do object to him being asked

20   is this exactly what she said because what it may say in the

21   transcript, that doesn't mean it's on the tape.  I know there

22   are inaccuracies and I think we saw say them as the tape

23   played.

24             MISS PEEBLES:  I don't think there's anything

25   inaccurate about the parts I was going to ask him.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

1          THE COURT:  That was my question.

2          MISS PEEBLES:  None.  Simply, I can say

3   approximately what was said if he wants, you know.

4          MR. LOVRIC:  But --

5          THE COURT:  Okay.

6          MR. LOVRIC:  But I do object being put as

7   though that's an exhibit that is in evidence as exact.

8          THE COURT:  If you want me to give a limiting

9   instruction.  The transcript is not word for word what was

10  said.  It's a close approximation.

11         MR. LOVRIC:  That's fine.

12         THE COURT:  Is that all right with everybody?

13         MISS PEEBLES:  Fine.

14         (In open Court).

15         THE COURT:  All right.  Ladies and gentlemen,

16  Miss Peebles is going to ask the sergeant some questions

17  about the tape and you folks had the transcript remember the

18  other day when we watched the tape being played.  The

19  transcript is not an exact, true copy of what was said.  It's

20  a close approximation.  It's hard to get from something

21  that's very difficult to hear exactly what was said.  This

22  was done in an attempt to get as near as possible to what was

23  said.  I want you to keep that in mind as these questions are

24  asked.  Okay.

25         MISS PEEBLES:  Thank you.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

1    BY MISS PEEBLES:

2        Q    Now, I'm going to refer you now to the highlighted

3    portions of page 13 of the transcript where Elizabeth

4    Chesebro states:  So you were going shopping -- and that was

5    the first time we're talking about -- and you were going to

6    the Best Western by the mall and did your mom check into the

7    room and she states she checked in before we went shopping.

8    Okay.  You get to Binghamton, you check into the hotel and

9    whose name did she use?  She states her name, and she states

10   her name.  Do you see that?

11       A    Yes.

12       Q    Now, do you recall that during the course of the

13   videotaped interview?

14       A    Yes.

15       Q    And then she also states further down she talked to

16   the desk person and then when we got up to the room she made

17   some phone calls, we went out and we came back about ten

18   minutes later and the guy showed up, do you recall that?

19       A    Yes.

20       Q    Now, next question on page 16 of the transcript.

21   Miss Chesebro talks about did you do the same thing, take a

22   bus from Norwich to Binghamton and she says yeah.  Did she

23   use her name for the hotel again?  She says yes.  Okay.  This

24   time did you hear her making any phone calls, is that what

25   was said?

Patrick Blenis - Cross                     266

1      A    I don't remember.

2      Q    You don't remember.  All right.  Let's talk about

3  what you found when you went to the Best Western.  You went

4  and retrieved some hotel registrations from the Best Western

5  after you had this conversation with Shannon, is that

6  correct?

7      A    That would be approximately on the 22nd, yes.

8      Q    I'm going to hand you what's been marked as

9  Defendant's Exhibit O-6 and ask if you can identify those

10 documents.

11     A    With the exception of this page, I don't remember

12 the second page.

13     Q    Okay.

14          MISS PEEBLES:  I'd like to offer Defendant's

15 Exhibit O-6.

16          THE COURT:  What is it?

17     Q    Could you identify O-6?

18     A    Those would be records from Best Western in Johnson

19 City.

20          MISS PEEBLES:  I'd like to offer these at this

21 time, your Honor.

22          MR. LOVRIC:  Take a quick look.  I have no

23 objection, Judge.

24          MR. FISCHER:  No objection.

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross                                    267

1    BY MISS PEEBLES:

2        Q    Now, I'm going to show you the first page of O-6.

3             THE COURT:  Was there an objection?  I was

4    busy talking to Marlene.

5             MR. LOVRIC:  No objection.

6             MR. FISCHER:  No objection.

7             THE COURT:  Okay.  We'll receive Defendant's

8    O-6 in evidence.

9    BY MISS PEEBLES:

10       Q    Now, I'm going to show you the first page of

11   Defendant's O-6.  On that document can you indicate where it

12   says the date of arrival?

13       A    Are you referring to where it says arrive?

14       Q    Correct?

15       A    2/11/2005.

16       Q    And then there's departure date on there that says

17   February 14 of '05, correct?

18       A    Yes.

19       Q    And that is under the name of Linda O'Connor, 11

20   River Street in Deposit, New York, correct?

21       A    Yes.

22       Q    I'm going to show you the next page from the Best

23   Western hotel which indicates that they arrived -- Linda

24   O'Connor's registered, correct?

25       A    Yes.

Patrick Blenis - Cross

1    Q    Eleven River Street, correct?

2    A    With a spelling error.  It's 11 Ricer Street but 11

3  River Street in Deposit.

4    Q    It states there they arrived on August 1 of '05,

5  correct?

6    A    Yes.

7    Q    And the next page shows that Linda O'Connor

8  registered on February 17 of '06 correct?

9    A    Yes.

10    Q    And she departed on February 20, '06 correct?

11    A    Yes.

12    Q    And there's another receipt from the Best Western

13  where it shows that Shannon or Linda O'Connor registered and

14  they arrived on March 31 of '06, is that correct?

15    A    Yes.

16    Q    And they departed on April 1 of '06, correct?

17    A    Yes.

18    Q    And the last exhibit shows that Linda O'Connor

19  registered at the Best Western on 12/1/06, correct?

20    A    Yes.

21    Q    And she departed on 12/3/06, correct?

22    A    Yes.

23    Q    And there's a paid receipt which indicates that she

24  lived at that point at 45 Fair Street in Norwich, correct?

25    A    Yes.

Patrick Blenis - Cross                              269

1     Q     So from these receipts, it's clear that Linda

2  O'Connor registered at the Best Western one time after August

3  '06, is that correct?

4     A     Yes.

5     Q     Now, I want to talk to you about phone records.

6  You, throughout your investigation, you retrieved Miss

7  O'Connor's home phone records, correct?

8     A     No.

9     Q     You did not?

10    A     No.

11    Q     Okay.  How about her cellphone records?

12    A     No.

13    Q     You have no knowledge about any phone calls is

14  that --

15    A     There are cellphone records that were worked on by

16  the State Police.

17    Q     But you had no involvement in any of that?

18    A     I provided cellphone numbers.

19    Q     Did you examine the cellphone numbers?

20    A     No.

21    Q     You were involved in the execution of a search

22  warrant at Miss O'Connor's home at 14 Miller Street --

23    A     Yes.

24    Q     -- correct?  And during the course of that search

25  you took a disposable camera?

Patrick Blenis - Cross

1    A    Yes.  Two disposable cameras.

2    Q    Correct.  And did you take any type of computer?

3    A    Yes.

4    Q    And the computer that you took was on the floor?

5    A    Yes.

6    Q    It hadn't been hooked up?

7    A    That's correct.

8    Q    And you did an examination on the computer?

9    A    I brought the computer to -- actually, when I

10   seized the computer, I turned it over to Agent Lyons from the

11   FBI.

12   Q    And did you learn what was on the computer?

13   A    At that time, no.

14   Q    Did you ever learn what was on the computer?

15   A    Later it was told to me that there was some

16   business records on the computer.

17   Q    That didn't belong to Miss O'Connor, is that

18   correct?

19   A    I'm not sure about that.  I was just told there was

20   business records on the computer.

21   Q    Now, as far as the disposable cameras go, you

22   developed those photographs, correct?

23   A    No, I did not.

24   Q    Did you ever see what was on the disposable

25   cameras?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Cross

271

1    A    No.

2    Q    Now, after Mr. Sacco is arrested in Jersey City,

3  after the phone calls are made, does Linda O'Connor contact

4  you about Mr. Sacco sending her letters from jail?

5    A    Yes.  I can't remember the date.  She came in to

6  see me though.

7    Q    And she provided you correspondence that she had

8  received from Mr. Sacco?

9    A    She provided me with a letter, yes.

10    Q    And did you bring copies of those letters?

11    A    Actually, I think I have the letter in the case

12  file upstairs.  It was one letter.

13    Q    With regard to your investigation concerning rent

14  money, did you know how Linda paid the rent in August of

15  2006?

16    A    No.

17    Q    Did you ever investigate to see how she paid the

18  rent?

19    A    No.

20    Q    Didn't Shannon O'Connor state in her original

21  statement that she had sex with Mr. Sacco in August of 2006?

22    A    Yes.

23    Q    During the second interview on October 29, Shannon

24  O'Connor had a sling on her arm across her shoulder, do you

25  remember that?

Patrick Blenis - Cross                                   272

1        A     Yes.

2        Q     Did you ever inquire about the number of times

3   Shannon O'Connor had been taken to the hospital for various

4   ailments?

5        A     I didn't inquire to the number of times, no.

6        Q     Did Miss Chesebro ever share with you that

7   information?

8        A     I don't remember.

9        Q     The charges here against Mr. Sacco do not negate

10  the rape charges that are pending in state court, isn't that

11  true?

12       A     I'm not really familiar with the federal system.

13  Like I said, I'm sure that they're still active in Chenango

14  County Court.

15       Q     That's something he still has to deal with,

16  correct?

17       A     I believe so.  Yes.

18             MISS PEEBLES:  Nothing further.

19             THE COURT:  Mr. Lovric.  Redirect?

20             MR. LOVRIC:  Just a couple questions, Judge.

21             THE COURT:  Okay.

22  REDIRECT EXAMINATION

23  BY MR. LOVRIC:

24       Q     Sergeant Blenis, my first follow-up question is Mr.

25  Fischer was asking you about the questions that were prepared

1    and handed to Shannon as she was making the phone calls on

2    March 14 and March 15 of 2007.  Do you remember those

3    questions that Mr. Fischer talked to you about?

4        A    Yes.

5        Q    My question is:  When you drafted those suggested

6    topics and had Shannon or gave them to her before she made

7    the phone call, the questions that you drafted, were those

8    questions based upon things that she had told you on March 2,

9    two weeks before those calls were made?

10       A    Yes.

11       Q    So in your questions that you drafted, like some of

12   them have something to the effect -- to talk about a condom,

13   something to the effect of talking about where the sex took

14   place.  I take it those were based upon information she had

15   given to you on March 2?

16       A    Yes.

17       Q    So, it wasn't like you just kind of dreamed these

18   things up on your own, these topics?

19       A    No.

20       Q    Now, I wanted to clarify something Mr. Fischer

21   asked you about, the first call that was made which the

22   equipment did not record.  Okay.  Do you remember that

23   question?

24       A    Yes.

25       Q    When did you realize or learn that the equipment

1  did not record that call?

2      A    Actually, we tried to play the call back to listen

3  to it to see what there was and that was when we found out it

4  didn't record.

5      Q    So, how soon after the actual call between Shannon

6  and Dean Sacco ended did you go back to see if the equipment

7  had recorded the call, just about?

8      A    Within minutes.

9      Q    So you knew within minutes it didn't work?

10     A    Yes.

11     Q    Okay.  And then the second call that was placed

12  from Shannon to Dean Sacco, how long was it after you

13  discovered that the first call had not recorded?

14     A    Within a span of ten minutes or so.

15     Q    Okay.  So, all of this happens like within 20

16  minutes of each other?

17     A    Yes.

18     Q    Okay.  So that second call which we heard the

19  recorded call, is it fair to say that conversation between

20  Shannon and Dean Sacco takes place within approximately 20 or

21  so minutes after the first conversation?

22     A    Yes.

23     Q    Same day?

24     A    Yes.

25     Q    Okay.  Now, during the first conversation that did

1    not record, were you present when Shannon was speaking to

2    Dean Sacco during the course of that first conversation?

3        A    Yes.

4        Q    Okay.  So you could hear what she was saying,

5    Shannon, is that correct?

6        A    That's correct.

7        Q    Could you hear what Dean Sacco was saying?

8        A    No.

9        Q    Okay.  Who had that earpiece in their ear in order

10   to effectuate the recording?

11       A    Shannon had the earpiece in.

12       Q    And what's the purpose for having that earpiece in

13   the ear?  What does it do, that earpiece?

14       A    It records the conversation that is being had.

15       Q    So, the earpiece is actually recording what's

16   coming from the phone she has up to her ear?

17       A    Yes.

18       Q    And it's also recording what's going through her

19   canal as she's talking?

20       A    Yes.

21       Q    Through her ear canal, so it's recording both sides

22   of the conversation?

23       A    Yes, it is.

24       Q    Okay.  And that's a piece of equipment the State

25   Police had that you had to borrow?

276

1      A    Yes.

2      Q    And when you're sitting in listening to what

3  Shannon is saying, were you able to hear clearly what she is

4  saying on her end?

5      A    Yes.

6      Q    And comparing it to the second call she makes, the

7  one that's recorded, does what she says to Dean Sacco compare

8  to that what she says on the first one, was it the same or

9  different?

10     A    It was the same.

11          MR. FISCHER:  Your Honor, I have an objection.

12  I wasn't privy to it.  It's hearsay.

13          THE COURT:  I think it's hearsay.  Sustained.

14     Q    I take it you could hear everything Shannon said

15  during all the calls made to Dean Sacco?

16     A    Yes.

17     Q    I believe Miss Peebles asked you whether you shared

18  with Linda O'Connor shortly after March 2 of 2007 information

19  that Shannon had provided to you about Dean Sacco having

20  raped her.  Do you remember that question?

21     A    Yes.

22     Q    Did you tell Linda O'Connor shortly after March 2

23  about the things that Shannon had said Dean had done to her?

24     A    No.

25     Q    Why didn't you?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

277

1        A    I wasn't sure what was going to get back to Mr.

2    Sacco.  I didn't know if Miss O'Connor would say something

3    and actually tip off Dean that the police had talked to

4    Shannon.

5        Q    Okay.  So at that point it was a need-to-know

6    basis?

7        A    Yes.

8               MR. LOVRIC:  That's all I have, Judge.

9               THE COURT:  Okay.

10              MR. FISCHER:  Your Honor, may I have just a

11   few follow ups concerning Miss Pebbles' questions?

12              THE COURT:  Sure.

13   RECROSS-EXAMINATION

14   BY MR. FISCHER:

15       Q    Sergeant Blenis, I want to make sure we're clear

16   about some things.  The claims that Shannon O'Connor made

17   concerning George Lang, the claim is that the events

18   concerning George Lang, that is George Lang having sexual

19   contact with Shannon and her mother and that the mother was

20   taking pictures.  The claim is that all of those events

21   occurred before August of 2006, am I correct?

22       A    Yes.

23       Q    Before Dean Sacco had any contact whatsoever with

24   Shannon or Linda O'Connor?

25       A    Yes.

Patrick Blenis - Recross

1    Q    At any time did Shannon refer to George Lang, to

2    your knowledge, as Grandpa?

3    A    I don't remember.

4    Q    The claims that Shannon O'Connor made concerning

5    her mother taking her to the Best Western and her mother and

6    these two men and taking pictures during that -- those

7    events, those allegations were not -- did not claim that Dean

8    Sacco had anything to do with the events at the Best Western,

9    did they?

10   A    Could you rephrase that, please.

11   Q    Sure.  Shannon never claimed that Dean Sacco had

12   anything to do with the events involving Linda O'Connor and

13   these two men and pictures at the Best Western?

14   A    That's correct.

15   Q    There were computers found at Linda O'Connor's

16   residence, correct?

17   A    There was one computer tower, yes.

18   Q    And there were computers found at the Lang

19   residence, am I correct?

20   A    I was told there was, yes.  It wasn't -- actually,

21   I should restate that.  It wasn't at the Lang residence.  I

22   believe it was at another residence.

23   Q    Okay.  There's no claim that you're aware of that

24   Mr. Sacco ever had a computer at 45 Fair Street or any other

25   place, am I correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Patrick Blenis - Recross

279

1    A    That's correct.

2                MR. FISCHER:  Thank you, Judge.

3                THE COURT:  Miss Peebles, anything further?

4                MISS PEEBLES:  Just a couple things, Judge.

5                THE COURT:  Okay.

6  RECROSS-EXAMINATION

7  BY MISS PEEBLES:

8    Q    Sergeant Blenis, it would be a natural reaction for

9  a mother to want to rip the persons head off if she found

10 they were sexually abusing their child, correct?

11   A    Correct.

12   Q    You were afraid that might happen if you told that

13 to Linda, correct?

14   A    No.

15   Q    No concern about that whatsoever?

16   A    No.

17   Q    I want to talk about those pictures at the Best

18 Western.  You testified about these pictures on direct.  In

19 fact, we entered some of those into evidence, didn't we?

20   A    Yes.

21   Q    And weren't those taken off the disposable camera

22 from Linda O'Connor?

23   A    No.

24   Q    Were there other pictures that you found at Miss

25 O'Connor's residence?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1      A    There's a photo album that I didn't take if I

2  remember correctly.

3      Q    Well, I'm going to hand you what has been marked

4  and I'll label them -- I'm going to hand you what's been

5  marked as Defendant's Exhibit 7.  I'm going to ask if you've

6  ever seen this photograph?

7      A    Yes.

8      Q    Was that with the same photographs that we've

9  already introduced into evidence?

10     A    They're the same -- they're with the photographs

11 that the people introduced, yes.

12              MISS PEEBLES:  Your Honor, at this time I'd

13 like to offer Defense Exhibit, I've labeled it O-7.

14              MR. LOVRIC:  No objection.

15              THE COURT:  Mr. Fischer?

16              MR. FISCHER:  No objection.  Thank you.

17              THE COURT:  Receive Defendant's O-7 in

18 evidence.

19 BY MISS PEEBLES:

20     Q    And with regard to the receipts from the Best

21 Western, the various dates, the various dates that they were

22 at the Best Western in Defendant's Exhibit O-6, February was

23 one month, right?

24     A    I'd have to look at the receipts again.

25     Q    February?

Patrick Blenis - Recross                              281

1      A    Yes.

2      Q    August?

3      A    Yes.

4      Q    There's February?

5      A    Yes.

6      Q    March?

7      A    Yes.

8      Q    And December?

9      A    Yes.

10     Q    Given the photographs that are in evidence, and the

11   clothing that's being worn, is it fair to say that those

12   photographs at the Best Western were probably on August 1 of

13   2005?

14     A    I'd say they'd be in August, yes.

15             MISS PEEBLES:  Nothing further.

16             THE COURT:  Mr. Lovric?

17             MR. LOVRIC:  No other questions, Judge.

18             THE COURT:  Mr. Fischer?

19             MR. FISCHER:  No thank you, your Honor.

20             THE COURT:  Okay.  Thank you, Sergeant Blenis.

21   You may step down, sir.

22             THE WITNESS:  Thank you, your Honor.

23             (Witness excused).

24             MR. LOVRIC:  Next witness?

25             THE COURT:  Please.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

282

1                    MR. LOVRIC:  Judge, next witness is Adam

2    Lurie.

3                    THE COURT:  Okay.

4                    THE CLERK:  Sir, please state your name for

5    the record.

6                    THE WITNESS:  It's Adam L-U-R-I-E.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   A D A M    L U R I E, having been called as a witness, being

2   duly sworn, testified as follows:

3                    THE COURT:  Okay.

4   DIRECT EXAMINATION

5   BY MR. LOVRIC:

6        Q    Good afternoon, Mr. Lurie.

7        A    Good afternoon.

8        Q    Am I pronouncing that correctly?

9        A    You are.

10       Q    Close.  Mr. Lurie, just for the members of the

11  jury, again, could you please tell them your name and if you

12  could tell them where you work and what kind of work you do.

13       A    Sure.  My name's Adam, last name, L-U-R-I-E.  I'm

14  an Assistant United States Attorney in New Jersey, and that

15  just means I'm a federal prosecutor in the State of New

16  Jersey.

17       Q    Mr. Lurie, I'd like to talk with you about a person

18  by the name of Dean Sacco.  But before we do that if you

19  could just indicate to the members of the jury when did you

20  learn or in any way know anything about this federal matter

21  that we're dealing with here in court today?

22       A    Short answer to your question is yesterday.  I, I

23  work in Newark, New Jersey and I live in Jersey City, New

24  Jersey and to get from Jersey City to Newark I take a subway.

25  And outside the subway station near my house there's a bin

Adam Lurie - Direct

1  where a person can pick up commuter papers that are free and

2  so like I often do I picked up a commuter paper and I was

3  flipping through it and reading it while I was on the subway

4  on my way to work and on the second page of the commuter

5  paper there was a two sentence blurb about evidently this

6  case, and it mentioned Mr. Sacco's name.  It mentioned that

7  he was from Jersey City and I realized that I know a

8  Mr. Sacco from Jersey City.  And so I learned yesterday.

9      Q    Okay.  And just for the record, Mr. Lurie, I'm

10  going to mark as Government's Exhibit 94 an item that is a

11  newspaper of some sort.  Is that the newspaper that you're

12  referring to that you picked up on the way to work?

13      A    It is.

14      Q    Now, after you read what you read, I don't want to

15  get into what it is you read in the paper, but I take it you

16  recognized the name Dean Sacco?

17      A    I did.

18      Q    And did you then at some point say something to

19  somebody and start to find out, try to find out where this

20  matter was pending and where it was being tried?

21      A    I did.  I am, like I mentioned, I'm a prosecutor

22  and I work very closely with several FBI agents on a case

23  that I'm working on right now and I was at lunch yesterday

24  and was explaining to my -- the FBI agent I work with, you're

25  not going to believe what happened to me this morning and I

Adam Lurie - Direct

285

1  was curious whether the Mr. Sacco mentioned in the press

2  article was the same Mr. Sacco that I knew from Jersey City.

3  And so in my presence the FBI agent who I'm working with on a

4  case appeared to me to call the FBI, her colleagues in Newark

5  and asked -- I mean I heard her ask on the telephone if she

6  could find any information about your matter and through her

7  inquiry, I was able to or I was led to Agent Lyons.  She I

8  guess -- it appeared to me that she asked somebody, whoever

9  she was talking to on the telephone, to find the case agent

10  assigned to this matter and she got two telephone numbers.

11  One was an office phone number and one was a cellphone number

12  and I reached out to Agent Lyons on both phone numbers to try

13  and determine whether the agent -- excuse me, Mr. Sacco was

14  the same person who I knew.

15       Q    And did you then at some point have a brief

16  conversation with Agent Jim Lyons?

17       A    I did yesterday.

18       Q    And I take it you met Agent Lyons who's sitting

19  here right in front of me?

20       A    I did.  Met him in person for the first time today.

21       Q    Yesterday at some point did you and I have a

22  conversation?

23       A    We did.  Yesterday afternoon at some point.

24       Q    And then in connection to that conversation, did I

25  e-mail you something?

Adam Lurie - Direct

1    A    You did.  You e-mailed me a photograph.

2    Q    Who was the photograph that you received?  Did you

3  recognize that photograph?

4    A    I did.  I recognized the photograph that you

5  e-mailed me as the Mr. Sacco that I had met in Jersey City,

6  New Jersey.

7    Q    Okay.  Just for the record, do you see Mr. Dean

8  Sacco that you know of here in court today?

9    A    I do.  I saw him as I walked in the courtroom and I

10  can see him now.

11   Q    Okay.  He's sitting where just for the record?

12   A    Sitting in -- I think he's the second person in on

13  the right.  He has a blue shirt on.

14        MR. LOVRIC:  Just for the record I believe

15  identifying the defendant Sacco.

16        THE COURT:  Record will so reflect.

17   Q    Mr. Lurie, just very briefly, you indicated you

18  work at the US Attorney's Office and generally speaking just

19  what kind of work do you do?  What kind of matters do you

20  work on, not specifically?

21   A    At this point I specialize in prosecuting political

22  corruption cases, so that involves the prosecution of --

23  investigation/prosecution of elected officials, government

24  officials, appointed officials or those people who do

25  business with government or government entities.

Adam Lurie - Direct

1    Q    And in the course of your -- actually I should ask

2    you how many years have you been in the US Attorney's Office?

3    A    I've been with US Attorney's Office since September

4    of 2005.  Before that I was a criminal defense lawyer for

5    about three years and had worked on all sorts of criminal

6    defense matters and I had also done a fair amount of pro bono

7    work with my law firm before I joined the US Attorney's

8    Office and that pro bono work included the representation of

9    incarcerated people who are claiming civil rights violations.

10   Before that I had the pleasure for clerking for a United

11   States District court Judge for two years.

12   Q    That must have been the best experience --

13   A    It was terrific.

14   Q    In the course of being a federal prosecutor have

15   you, prior to your what seems to be now primary work in

16   political corruption, did you also at some point prosecute

17   cases dealing with child pornography and those kind of

18   offenses?

19   A    Yes, I did.

20   Q    Now, how do you remember first meeting Mr. Sacco?

21   A    I work out -- at the time, anyway, I was working

22   out at a boxing gym in Jersey City and it's not too far from

23   my house and this was in 2006 and I would go there three or

24   four times in the morning, early, and I met Mr. Sacco at the

25   gym and we sparred together in the boxing ring couple times a

Adam Lurie - Direct

288

1    week, both in the spring of 2006 and then again briefly in

2    the fall of 2006.

3        Q    And your, if I could put it, your time span that

4    you knew of or knew Mr. Sacco and from time to time you had

5    occasion to either see or speak to him, what would you

6    approximate from about when to about when was that?

7        A    I would say just approximately, approximately

8    February or March of 2006 until approximately April or May of

9    2006.  I remember that because in April of 2006 I had a trial

10   that the defendant in that case decided to plead guilty on

11   the morning of jury selection.  It's a case that sticks out

12   in my mind and I remember initially meeting and working out

13   with Mr. Sacco during that period of time and then I also

14   remember in the fall, we had been sparring together in the

15   boxing ring until around April or May and then I recall

16   wanting to train for a marathon.  So I basically explained to

17   Mr. Sacco I'm not going to be training in the boxing ring for

18   a little while.  I wanted to get ready to run a marathon in

19   the fall, so I took a couple months off and then after the

20   marathon, which was in Rhode Island sometime in October of

21   2006, I came back to the gym and ran into Mr. Sacco again and

22   I remember that we began to spar briefly again.  My best

23   guess is for about a month period or so.  The other times I

24   would run into him on days I wouldn't be in the gym.  I would

25   often times go running, say, early in the morning and

Adam Lurie - Direct                                289

1    sometimes I'd run into Mr. Sacco who would be riding his bike

2    in -- Jersey City has a big park and there's a five mile loop

3    or so in the park and so when I would be running early in the

4    morning sometimes I would see him riding his bike, also

5    exercising.  And if he saw me he might ride his bike up to me

6    and ride next to me for about a mile or so or two miles while

7    I was running.

8            The only other way I know Mr. Sacco, from time

9    to time in the morning at the boxing gym he would ask me and

10   invite me to come to a wine tasting at a place that he worked

11   at in Jersey City, New Jersey which was -- I can't remember

12   the name of it at this point.  Something like make wine with

13   us.  In any event, he would ask me to come there to taste

14   wine and he said bring your wife and I remember saying no, a

15   few times and when he asked again, at some point I agreed to

16   go and so my wife and I went to this, to taste wine at

17   this -- at the place where he apparently worked and I

18   interacted with him a little bit that evening as well.  So

19   those are the ways in which I've known him.

20   Q    In addition to the wine place, did he ever indicate

21   to you any other place or any other type of employment that

22   he had in the New Jersey area?

23   A    He -- yes, he did.  What would happen is when we

24   would finish our work -- before we start our work out we

25   would take just make small talk.  Certainly when we were --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Adam Lurie - Direct

1   when I was running we would make small talk and when I saw

2   him at the wine place we would make small talk.  I can't

3   remember in which setting he told me other things that he had

4   done but it was certainly one of those settings.  He

5   explained that he was moving furniture for a furniture store.

6   I also remember him explaining to me that he was looking for

7   work.  He was considering becoming a tour guide is my best

8   recollection in Manhattan for Manhattan tourists.

9       Q    Now, at any point during the time that you

10   interacted with Mr. Sacco, at any point did he ever ask or

11   inquire of what you do for a living and how you do your job.

12   Anything about that?

13       A    He did.  Again, I can't tell you exactly which

14   setting it happened in but I'm certain it was either at the

15   gym or while I was running.  He asked me what I did for a

16   living and I explained to him that I'm a federal prosecutor

17   in New Jersey.  And he asked me what do I do, what kind of

18   cases do I prosecute and at the time, again, this was in

19   2006, at that time I was prosecuting a variety of different

20   types of federal crimes, one of which was child exploitation

21   cases.  I was also prosecuting violent crime cases.  I was

22   prosecuting financial fraud cases.  And in response to his

23   general question about what I did, I explained to him what I

24   just explained to you all.  This is what I do for a living,

25   these are the kinds of cases I prosecute and he asked me

Adam Lurie - Direct

1    follow-up questions.  He asked me to tell him a little bit

2    about types of cases in more detail that I prosecute.  The

3    types of defendants that I've prosecuted.  He asked me, in

4    general, he asked me how we develop cases?  In other words,

5    how do we learn about potential suspects and I do recall in

6    the area of child exploitation in particular.  He did ask me,

7    in general, how do you learn about suspects who are engaging

8    in that sort of activity?  And he asked me about the nature

9    of just generally -- he didn't use the words I'm using but

10   I'm doing the best I can to sort of summarize what he said

11   just, in general, the nature of evidence that we acquire in

12   those sorts of cases and I remember explaining to him that we

13   can learn about these cases in all sorts of different ways.

14          I remember explaining just generally that sometimes

15   the victim will complain to the FBI or complain to the US

16   Attorney's Office which will result in an investigation.  I

17   also remember explaining to him that sometimes a credit card

18   company might make a report to the FBI about suspicious

19   activity that they're seeing.  And when it came to evidence I

20   remember just again, just generally, talking about a lot of

21   times some of the most incriminating evidence can be found in

22   computers, can be found in photographs.  I remember again

23   just generally conveying how difficult I found those cases to

24   prosecute because of the nature of the evidence and how much

25   I just didn't enjoy looking at it.

Adam Lurie - Direct

1    Q    And my final question, Mr. Lurie is, during these

2  conversations did Mr. Sacco, when he's talking to you about

3  your work, did he seem very interested in knowing what it is

4  you do and how you do your job?

5    A    He did.  My experience with Mr. Sacco is that

6  he's -- he's an inquisitive person, and that was particularly

7  true in this area.  He was very inquisitive about my work and

8  inquisitive about the child exploitation work.  He did ask me

9  questions about some of the other areas, as well.  But it

10  was -- it occupied equal, if not larger, portions of our

11  conversations or the types of conversations like you would

12  instigate with me or start with me would concern my work and

13  would concern those areas that I worked on and the types of

14  evidence and the types of cases I worked on.

15    Q    I could say that was my final question but I do

16  have a final one.  Mr. Lurie, prior to yesterday is it

17  correct you and I didn't know each other until you reached

18  out to Agent Lyons?

19    A    I didn't know who you were and I've never spoken --

20  I didn't know who Agent Lyons was and I never spoke to either

21  of you before yesterday.

22         MR. LOVRIC:  That's all I have, Judge.

23         THE COURT:  Mr. Fischer.

24         MR. FISCHER:  Thank you, your Honor.

25

1    CROSS-EXAMINATION

2    BY MR. FISCHER:

3        Q    Mr. Lurie, my name is Kelly Fischer.  I represent

4    Dean Sacco.

5        A    Good afternoon.

6        Q    Good afternoon.  You are here voluntarily, no

7    subpoena, am I correct?

8        A    That's correct.

9        Q    Have you discussed this matter with Mr. Lovric

10   before testifying here today?

11       A    Yes.

12       Q    When?

13       A    I spoke with him yesterday on the telephone and I

14   spoke with him this afternoon, as well.  I presume it was

15   during lunch break.

16       Q    How long did you spend speaking with Mr. Lovric

17   yesterday on the telephone?

18       A    This is an estimate but I would say 15, maybe 15

19   minutes yesterday.

20       Q    How long did you spend speaking with Mr. Lovric

21   today here?

22       A    Again, just an estimate, but 10 or 15 minutes

23   today.

24       Q    How long did you spend speaking with Mr. Lyons?

25       A    Yesterday, maybe five or ten minutes by telephone.

Adam Lurie - Cross

294

And today, about the case, maybe five minutes about the case
today.

Q    I'm led to understand you have a trial commencing
tomorrow?

A    No.  I don't have a trial commencing tomorrow.  My
trial starts June 2.

Q    Okay.  So you do not have trial tomorrow?

A    No.

Q    You've been an Assistant United States Attorney for
how long now?

A    Since September of 2005.

Q    Since that time, actually before that time did you
receive any training to prepare you specifically to become a
US Attorney or an Assistant US Attorney?

A    My life experience and my -- but nothing
specifically to become an Assistant US Attorney.  Like I
mentioned, I was a criminal defense lawyer.  I find that
experience very helpful.

Q    I should rephrase my question then.

A    Okay.

Q    Did you receive any specific training by the United
States government to prepare you to become an Assistant
United States Attorney?

A    Not before I became an assistant, no.

Q    Since then you have, I assume?

Adam Lurie - Cross

295

1    A    Yes.

2    Q    How much.

3    A    I spent two weeks at the Department of Justice's

4    Training Center in South Carolina.  My best guess is maybe a

5    month or two after I started at the office.

6    Q    What other training have you received to -- from

7    the US Government in connection with educating you concerning

8    your duties as an Assistant United States Attorney?

9    A    On-the-job training.  My office on most Monday

10   nights, not every Monday night, most Monday nights, there's a

11   lecture by a Senior Assistant United States Attorney

12   concerning a particular area of law or a particular

13   investigative technique and I have attended on a fairly

14   regular basis those Monday night meetings.

15   Q    Anything else?

16   A    Again, other than conversations I have every day

17   with my colleagues and on-the-job training, nothing official.

18   Q    You have presented, tried a number of jury trials,

19   am I correct?

20   A    Since my time at the United States Attorney's

21   Office I have tried two jury trials.  I'm about to try my

22   third on June 2.

23   Q    In connection with jury trials in your work with

24   the United States Attorney's Office, have you received any

25   training about how to work with juries?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Adam Lurie - Cross                                    296

1     A     I think I know where you're going.  I wouldn't say

2  yes to that question.  I would say I have received training

3  on presenting cases to juries.

4     Q     What trainings have you received?

5     A     During my two weeks at Department of Justice

6  Training Center I received training concerning what makes an

7  effective opening statement, what makes an effective closing

8  statement, effective ways to present evidence to juries.  I

9  received training on the various things that people like me

10  think that juries care about.  For example, the way we may

11  present ourselves to a jury, the way we may appear to a jury.

12  So I received training along those lines.

13     Q     How big is the office in which you work, how many

14  attorneys?

15     A     My estimate would be about 145 Assistant United

16  States Attorneys in New Jersey.

17     Q     Your office of the United States Attorney's Office

18  for the District of New Jersey has its own office of public

19  affairs, am I correct?

20     A     Yes.

21     Q     Is it the practice of your office that when a case

22  is resolved favorably to the United States, a criminal case,

23  that it is published via the internet with the name of the

24  United States Attorney listed?

25     A     I can't tell you whether it's the practice in every

Adam Lurie - Cross                                    297

1    case.  I can certainly tell you it's the practice for many

2    cases.

3        Q    Are there promotions to be had in your role as an

4    Assistant US Attorney or once you become an Assistant US

5    Attorney you stay where you are pretty much?

6        A    There are promotions.

7        Q    How do you get promotions?

8        A    I'm a line assistant.  I don't actually know what

9    goes into awarding promotions.  I can -- generally speaking,

10   I know people in my office who are been promoted.  They're

11   usually very well regarded for various reasons.  But actually

12   what goes into making a promotion, I'm not privy to that

13   information.

14       Q    Have you spoken with your boss about what you are

15   going to do today?

16       A    Yes.

17       Q    You told him you're going to come up here to help

18   another United States -- Assistant United States Attorney

19   prosecute a case?

20       A    I didn't put it that way but I did explain that I'd

21   be coming up here to testify in a federal criminal case.  I

22   actually asked whether he had any objection or the office had

23   any objection to that.

24       Q    Do you believe coming up here to help Mr. Lovric

25   present this case is going to hurt you in your job?

Adam Lurie - Cross                                298

1      A     I don't know.

2                  MR. FISCHER:  Thank you.  Those are all the

3  questions.

4                  THE COURT:  Miss Peebles?

5                  MISS PEEBLES:  I have no questions.

6                  THE COURT:  Mr. Lovric?

7                  MR. LOVRIC:  That's all the questions I have,

8  Judge.

9                  THE COURT:  Okay.  Thank you, Mr. Lurie.

10                  THE WITNESS:  Thank you, your Honor.

11                  (Witness excused).

12                  MR. LOVRIC:  Judge, the next witness I would

13  call is Investigator Terry Shultz from the New York State

14  Police.

15                  THE CLERK:  Sir, please state your name for

16  the record.

17                  THE WITNESS:  Terry Shultz.

18

19

20

21

22

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct

1    T E R R Y   S H U L T Z, having been called as a witness,

2    being duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. LOVRIC:

5        Q    Good afternoon, Investigator Shultz.

6        A    Good afternoon.

7        Q    Just for the members of the jury could you please

8    state your full name and tell us where you work and what do

9    you do.

10       A    Terry Shultz.  I'm employed by the New York State

11   Police as an investigator.  I'm currently assigned to the

12   Troop C Major Crimes unit in Sidney.

13       Q    Investigator Shultz, how long have you been with

14   the New York State Police?

15       A    A little over 20 years.  Twelve and a half years as

16   an investigator.

17       Q    And during your tenure with the State Police, let's

18   start most currently, you're an investigator with the State

19   Police?

20       A    Yes, sir.

21       Q    What generally do you do as an investigator with

22   the State Police?

23       A    Right now my assignment is major crimes unit is

24   basically to assist other departments, other police agencies,

25   other State Police units with investigating crimes that they

Terry Shultz - Direct

1     may not have enough man powers or resources to do by

2     themselves.  So myself and other people in my unit assist by

3     conducting interviews, running what's called lead desks,

4     things of that nature.

5          Q    And do you work and assist either other agencies or

6     on State Police cases, do you work on one particular kind of

7     case or does it vary from topic or the type of criminal

8     investigation?

9          A    It's pretty much whatever any department needs

10    assistance with.  We've handled anything from larcenies to

11    bank robberies, armed robberies, assaults, homicides, child

12    pornography cases, burglary rings, whatever is needed.

13         Q    Okay.  And prior to becoming an investigator, what

14    kind of work did you do with the State Police?

15         A    As a trooper.

16         Q    Okay.  Folks that we see on 88?

17         A    Yes, sir.

18         Q    Okay.

19         A    I was a uniformed trooper, yes.

20         Q    Now, in the course of your working as an

21    investigator with the State Police, have you from time to

22    time been involved in things such as obtaining search

23    warrants and executing or searching places in connection with

24    search warrants?

25         A    Yes, sir.  Numerous times.

Terry Shultz - Direct

301

1    Q    Now, Investigator Shultz, I'd like to talk about

2  your participation and assistance in the case at hand dealing

3  with a Mr. Dean Sacco and Linda O'Connor.  Did you at some

4  point become involved in this matter in participating as an

5  investigator?

6    A    Yes.  My first involvement was on January 9 of

7  2008.

8    Q    And when you first became involved, what other

9  police agencies, if you recall, were already involved in this

10  investigation?

11    A    At that point it was the Norwich Police Department

12  and the Johnson City Police Department.

13    Q    And then at some point, subsequent to your becoming

14  involved, did the FBI become involved in the investigation as

15  well?

16    A    Yes.  I was advised on, I believe it was

17  January 17, that Agent Lyons was opening a case on the

18  investigation.

19    Q    Now, when you -- when you started your

20  participation in this investigation, in this matter, do you

21  recall one of the first things that you were involved in

22  obtaining or trying to search out to find if it could be

23  located?

24    A    Yes, I did.

25    Q    What was that?

Terry Shultz - Direct                                       302

1          A     On January 9 myself and Investigator MacNirmey,

2    Investigator Hall, all with the State Police, responded to

3    Renee Lang's residence in the Deposit area in an attempt to

4    locate a computer that was previously owned by George Lang,

5    her husband, her deceased husband at that time.

6          Q     Okay.  So by -- at that point in time you were

7    aware that George Lang had been deceased?

8          A     Yes.

9          Q     And I take it that you went to speak to Renee Lang

10   to try to find out where this computer was, if it was still

11   around and whether you could gain access to it?

12         A     Yes.

13         Q     And did you actually meet and speak to Renee Lang

14   on or about January 9 of 2008?

15         A     Yes, I did.

16         Q     Now, without telling us what she told you, did

17   there come a point in time when you then went to another

18   location in search of this computer?

19         A     Yes.

20         Q     Okay.  Let me just ask you:  When you were at Renee

21   Lang's residence were you -- were you able to or did you find

22   George Lang's computer at her residence?

23         A     No, we did not.

24         Q     It wasn't there anymore?

25         A     Correct.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct                                303

1    Q    What was the next residence that you went to then?

2    A    The residence of Christie Lang who is Renee's

3  daughter in law who lives on Lumber Road in the Town of

4  Sanford which is in Broome County, I believe.

5    Q    Okay.  And did you have conversations with her?

6    A    Yes, I did.

7    Q    And were you able to locate the computer at her

8  residence?

9    A    Yes, I was.

10   Q    And when you first saw the computer, where was it?

11   A    It was on an enclosed porch attached to her

12 residence.

13   Q    Okay.

14   A    Just setting on the floor.

15   Q    Okay.  Was it hooked up in any way?

16   A    No, it was not.

17   Q    And that computer that you identified, did you at

18 some point obtain permission to take it?

19   A    Yes, we did from Christie Lang.

20   Q    Okay.  So she voluntarily allowed you to remove the

21 computer?

22   A    Yes.

23   Q    When we're talking about the computer, generally

24 speaking, what were the components that you took with you?

25   A    The only component that we took was the actual

Terry Shultz - Direct

304

1  computer itself, the tower which contains -- not the monitor,

2  keyboard, not the mouse -- just the tower which contains the

3  hard drive and processor and the items that actually run the

4  computer.  The storage area.

5      Q   Okay.  Now, did you have any information whether or

6  not that computer had been anywhere else other than those two

7  locations that we just indicated?

8      A   No.  I learned that the computer had gone from

9  Renee Lang directly to Christie Lang and nobody else in

10  between.

11     Q   Okay.  Did you learn whether or not there were any

12  other persons that did anything with the computer or tried to

13  work on it?

14     A   Yes.  I learned that Christie's nephew had

15  attempted to repair the computer because it operated very

16  slowly.  She had a hard time using it and learned that he had

17  attempted to repair the computer with no luck and she

18  basically just played some games on it and then it was in

19  such poor working condition that she placed it on the porch

20  and just left it sitting there.  Didn't use it after that.

21     Q   Okay.  Now, when you recovered or took custody of

22  that computer, where did you eventually take that computer

23  to?

24     A   The next day the computer was taken to the Broome

25  County CATS lab is a unit that does computer analysis and

Terry Shultz - Direct                        305

1    technical services unit.  They basically do forensic

2    examinations of computers, cellphones, and electronic items,

3    videos, things of that nature.

4        Q    Okay.  And once you left it or gave it to the

5    Broome County Security, CATS unit, did the computer remain

6    there?

7        A    I myself didn't take it there.  Investigator Hall

8    had taken it on January 10 to the CATS lab and then it did

9    remain there.  I had no further contact with it.

10       Q    Okay.  And is it fair to say that it was taken

11   there to see if the CATS unit could do some type of forensic

12   examination of it?

13       A    Exactly, yes.

14       Q    Now, in connection with this matter, did you also

15   at some point obtain any records or documents from a Pet

16   Street Station Animal Hospital in Norwich, New York?

17       A    Yes, I did.

18       Q    I'd like to show you what I marked as Government's

19   Exhibit number 15.

20            MR. FISCHER:  No objection.

21       Q    Investigator Shultz, I'll just ask you to take a

22   look at it.  I don't want to presume but do you recognize

23   that?

24       A    Yes, I do.

25       Q    What is that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct

306

1     A     This is the records that I obtained from the Pet

2  Street Station Animal Hospital on County Route 32 in the Town

3  of Norwich.  It looks like the original handwritten notes and

4  then I printed out a copy of the records kept at the Pet

5  Street Station in reference to Linda O'Connor's dog named

6  Buddy.

7             MR. LOVRIC:  Judge, I would offer Government's

8  Exhibit number 15 into evidence.

9             MISS PEEBLES:  No objection.

10            MR. FISCHER:  No objection.

11            THE COURT:  Receive Government's 15 in

12 evidence.

13    Q     Investigator Shultz, I'm going to put on the

14 document camera Exhibit 15 and on the very top left-hand

15 corner is a business card of some sort?

16    A     Yes.

17    Q     Is that the business card of the person that you

18 obtained these records from?

19    A     Yes.  Doctor King, yes.

20    Q     And I know it sounds self-explanatory, what is Pet

21 Street Station Animal Hospital?

22    A     It's a veterinary clinic, basically for animals and

23 they also board animals there.

24    Q     Okay.  These specific records, I'll just flip up

25 the card out of the way, these specific records pertain to

1    whom?

2         A    To Linda O'Connor -- well, to her dog Buddy owned

3    by Linda O'Connor.

4         Q    And I'm looking and putting on the document camera

5    the first page and about a third of the way down, as I'm

6    pointing the way down, there's an entry of November 30, 2006

7    and then it reads what appears to be -- I'm not going to

8    attempt -- it appears to be a word 11/30/06 to 12/4/06 and

9    then there's some discussion about check hick-ups and it

10   reads on and on.  Have you had a chance to take a look at

11   those entries in that place?

12        A    Yes, I have.

13        Q    Is there an indication that Buddy, the dog, spent

14   from November 30, 2006 to 12/4/06 at the animal hospital?

15        A    Yes.

16        Q    And then there's other notations in there about

17   Buddy's veterinarian exposure, I take it?

18        A    Correct.

19        Q    And then on the second page of those records about

20   three-quarters of the way down, actually I'm sorry, more like

21   the very bottom.  There's notation under 11/30/2006.  It says

22   logged in 11/30/2006 and it has a time and then under

23   12/1/06 it indicates some tests are being conducted on Buddy,

24   is that correct?

25        A    That's correct.

Terry Shultz - Direct

1    Q    And then on the third page again, the top third I'm

2   pointing to, there's an indication that Buddy spent from

3   11/30/06 to 12/4/06 at the animal hospital?

4    A    Yes.

5    Q    From these records, does it also indicate that

6   there at some point became a new owner for the dog?

7    A    Yes.

8    Q    And is that this entry right here on this third

9   page for 1/4 of '08?

10    A    Yes.

11    Q    Investigator Shultz, in the course of participating

12   in this investigation, let me withdraw that for a second.

13   Investigator Shultz, I take it yourself you didn't do

14   everything in this case?  Like you didn't investigate every

15   aspect of it?

16    A    No, I did not.

17    Q    So the things we're going to talk about are things

18   you participated in?

19    A    Correct.

20    Q    Are you aware of other investigators doing other

21   parts and pieces of the investigation?

22    A    Yes, I am.

23    Q    Do you know, for example, Investigator Rich Berry?

24    A    Yes, I do.

25    Q    Which department does Rich Berry work with?

Terry Shultz - Direct                          309

1      A     The same unit as I do.  Troop C Major Crimes unit.

2      Q     And in this particular case are you aware of some

3  participation by Investigator Berry?

4      A     Yes, I am.

5      Q     What area in this case are you aware that Rich

6  Berry focused on and worked on?

7      A     Doing the phone records.

8      Q     Okay.  Telephone records, things of that sort?

9      A     Yes.

10     Q     Okay.  I just want to make sure, for example, we're

11 going to talk about a search warrant that you participated

12 in.  Do you recall participating in a search warrant at a

13 storage center in Norwich, New York?

14     A     Yes, I do.

15     Q     Are you aware that there were other search warrants

16 that were done in connection with this case?

17     A     Yes, I am.

18     Q     Now, did you participate in all the search warrants

19 that were executed?

20     A     No, not all of them.

21     Q     Okay.  Investigator Shultz, the search warrant at

22 the storage center in Norwich, New York, do you recall

23 participating in that warrant somewhere on or about March 11

24 of 2008?

25     A     Yes, I do.

Terry Shultz - Direct

1    Q    And you and other investigators went there with a

2   warrant in hand?

3    A    Yes, I did.

4    Q    And what unit was it that you were going to be

5   searching?

6    A    Number 129.

7    Q    And in connection with searching unit 129, did you

8   also at some point obtain from the Storage Center the

9   business records or the records dealing with unit 129?

10   A    Yes, I did.  On the same day, March 11.

11   Q    Okay.  Again, I know it's self-explanatory, what is

12  the Storage Center, just describe for us?

13   A    It's basically buildings in which storage units are

14  contained.  There are separate buildings, three or four

15  buildings at least, and in each of those buildings are 30, 40

16  little storage units varying in sizes.

17   Q    And in searching unit number 129, to your

18  knowledge, what was it that lead investigators to unit 129?

19   A    It was an interview conducted by Sergeant Blenis of

20  the Norwich Police Department, an interview of Clesson

21  Lockwood who is a resident of the City of Norwich and he

22  provided information that some of Mr. Sacco's belongings from

23  45 Fair Street in the City of Norwich were stored at storage

24  unit number 129 of the Storage Center.

25   Q    And in connection with the search warrant, March 11

Terry Shultz - Direct

1    about, approximately, not an exact, but approximately how

2    much prior had this information been obtained from

3    Mr. Clesson Lockwood about this storage unit, 129?

4        A    The night before, so March 10.

5        Q    And did you actually participate in drafting the

6    warrant?

7        A    Yes, I did.

8        Q    Now, what I'd like to do, Investigator, I'd like to

9    show you, if I could, exhibit marked for identification 16

10   through 33 and if I can show it to counsel, Judge?

11            THE COURT:  Okay.

12       Q    Investigator Shultz, let me first show you Exhibits

13   16 through 33 and if you could look at those, just look

14   through them generally and then let me know if you can

15   identify what they are generally speaking.

16       A    Yes, I can.

17       Q    Generally, 16 through 33 are what?

18       A    Photographs of the Storage Center individual

19   storage units and items located within storage unit number

20   129.

21       Q    And I ask asked you before you were present at that

22   unit when it was searched for the entire time?

23       A    Yes, I was.

24       Q    Sixteen through 33, do they accurately depict what

25   was found when that unit was open and what was found inside

Terry Shultz - Direct

312

1   and some of which was also taken pursuant to the search

2   warrant?

3       A    Correct.

4             MR. LOVRIC:  Judge, I would offer 16 through

5   33 and then I would ask to go through each one and have him

6   explain what they are specifically.

7             MISS PEEBLES:  I have no objection, your

8   Honor.

9             MR. FISCHER:  Your Honor, I wonder if I could

10  conduct a voir dire of the witness concerning those?

11            THE COURT:  Yes, you can.

12  VOIR DIRE EXAMINATION

13  BY MR. FISCHER:

14      Q    Good afternoon, sir, I'm Kelly Fischer.  I

15  represent Dean Sacco.  Am I correct in understanding that the

16  stuff that was in this locker 129 or storage unit 129 was

17  brought there by, not by Mr. Sacco, but by somebody else?

18      A    That's correct.

19      Q    And that Mr. Sacco never put anything in -- based

20  on your understanding, Mr. Sacco never put anything into that

21  storage unit 129?

22      A    To my knowledge, no, he has not.

23      Q    It was, in fact, Clesson Lockwood who put the

24  things in that storage shed, is that correct?

25      A    Yes, sir.

Terry Shultz - Direct

1    Q    And it was, in fact, Clesson Lockwood that

2  originally rented that storage shed in June, was it, of '07?

3    A    Yes, sir.

4    Q    Do you know when the items were placed in that

5  storage unit?

6    A    No, I don't.  Not the exact date, no.

7    Q    Do you know whether any of the items that are in

8  that storage shed belong to Clesson Lockwood?

9    A    To my knowledge, nothing in there belongs to him.

10    Q    And your knowledge is based upon statements from

11  Mr. Lockwood?

12    A    Based upon his statement to Detective Blenis and

13  based upon statements to me.

14    Q    But it all comes directly from Mr. Lockwood, am I

15  correct?

16    A    What comes from?

17    Q    The information.

18    A    Yes, sir.

19    Q    Upon which you base the belief that the items are

20  not Mr. Lockwood's come from Mr. Lockwood?

21    A    That, and along with that are the records from the

22  storage unit, from the Storage Center.  At one point the

23  storage unit was being paid for by Clesson Lockwood in, I

24  believe, it's October of 2007.  Payment for that storage unit

25  changes to being paid for by Elizabeth Dinunzio, who we know

Terry Shultz - Direct

1    is Mr. Sacco's mother.

2        Q    Correct.  Originally, when Mr. Lockwood opened up

3    this storage unit, Mr. Sacco did not have access to this, is

4    that correct?

5        A    That's correct.  Yes.

6        Q    And, in fact, has never had access to storage unit

7    number 129, am I correct --

8        A    That's correct.

9        Q    -- except through Mr. Lockwood?

10       A    Correct.

11            MR. FISCHER:  Your Honor, I do have an

12   objection to the items.

13            THE COURT:  Well, I think that there may have

14   to be some connection, so let's go to side-bar for a minute.

15            (At the Bench).

16            THE COURT:  Okay.  There's some question in

17   the Court's mind at this point as to whose materials were in

18   that storage unit, even though they were paid for by Mr.

19   Sacco's mother.  And my question would be, are you going to

20   be able to connect that up?  If you can, then if you can tell

21   us how you're going to connect it up and I'll admit that

22   subject to connection.  If you can't do it, I probably won't

23   admit it.

24            MR. LOVRIC:  Mr. Lockwood will be called as a

25   witness.  He will testify in the summer of 2007 -- well,

Terry Shultz - Direct

1    first of all -- back up.  Mr. Lockwood will testify that he

2    knew Mr. Sacco well before Mr. Sacco was arrested and

3    charged.  He was a handyman for Mr. Sacco, Mr. Lockwood was.

4    He would do odd-end jobs for him.  Clear brush for him, haul

5    garbage away for him, and Mr. Sacco would pay him for these

6    things.  He's a handyman in Norwich and works for a lot of

7    different landlords and people.  And he said that after Mr.

8    Sacco was arrested, he didn't know for what, Mr. Sacco

9    reached out to him and asked him to come see him at the jail.

10   Mr. Lockwood went and Mr. Sacco asked that Mr. Lockwood rent

11   a storage unit for him, Mr. Sacco, that he rent it and that

12   he go to his property and from the shed at the 45 Fair Street

13   property, that he remove all the property from there which is

14   Mr. Sacco's and put it into the storage unit.  Mr. Lockwood

15   will testify that he did that.  And he will testify that Mr.

16   Sacco paid him for the storage unit for a number of months

17   from his commissary account at Chenango County.  And then Mr.

18   Sacco also asked him on one occasion to go to the unit and

19   bring some magazines to him at the jail, which he did but

20   other than that he put all of Mr. Sacco's things, belongings

21   in there and that then at some point Mr. Sacco's mother took

22   over payments of the property in the unit and he no longer

23   then had anything to do with the payment of the stuff.

24            THE COURT:  Can Mr. Lockwood identify the

25   items in the pictures?

Terry Shultz - Direct

1          MR. LOVRIC:  Yeah, he put everything into that

2     unit from Fair Street.

3          THE COURT:  Okay.

4          MR. LOVRIC:  He took everything from 45 Fair

5     Street shed and put it in there.

6          THE COURT:  I understand that.  I just wanted

7     to know if he could identify.

8          MR. LOVRIC:  Also, the property in the storage

9     unit, a lot of it is self-identifying in that it has Mr.

10    Sacco's name, mail, his storage locker with his name on it.

11         THE COURT:  Okay.

12         MR. LOVRIC:  There's no question in my mind we

13    can show it's his property.

14         THE COURT:  Mr. Fischer.

15         MR. FISCHER:  Your Honor, some of the things

16    that Mr. Lovric mentioned are correct, that there are some

17    items in that storage unit that can be connected up to Mr.

18    Sacco.  There are some things in that storage unit that may

19    not be able to be connected up to Mr. Sacco.

20         THE COURT:  You're going to have to identify

21    which can and which can't.

22         MR. FISCHER:  Frankly, the item that I'm

23    talking about is the one bit of evidence that the prosecution

24    claims connects Mr. Sacco to this young women as physical

25    evidence and that's a used condom.  We have the DNA evidence

Terry Shultz - Direct

1   from the government which shows that the condom that was

2   found in that locker contains DNA linked scientifically to

3   Shannon O'Connor, also linked scientifically to some

4   unidentified male.  And that is the item that you know

5   Mr. Lockwood, I presume, is going to deny ever having seen

6   until it appeared in this locker.

7           THE COURT:  Well, this is the first time I

8   heard about that.  You're saying he specifically knows it

9   wasn't among the items he brought?

10          MR. FISCHER:  I don't know whether Mr. Clesson

11  Lockwood actually knows or doesn't know, Judge.  I presume I

12  know what he's going to say on the witness stand and that it

13  is not his but --

14          THE COURT:  It didn't belong to him.

15          MR. LOVRIC:  Judge, Mr. Lockwood didn't handle

16  a used condom, come on.  The used condom was found in a box

17  with envelopes in Mr. Sacco's dresser in that storage unit.

18          THE COURT:  Oh, yeah.

19          MR. LOVRIC:  Mr. Lockwood moved the dresser

20  from 45 Fair Street shed to the storage unit.  Mr. Lockwood

21  helped Mr. Sacco move the dresser from the upstairs apartment

22  to the shed.  So, he's not going to say he found a condom.

23  He's not going to wave it and say I found this but

24  circumstantially and logically it will show that all of this

25  property came from 45 Fair Street, into the shed to the

Terry Shultz - Direct

318

1    storage unit, and then from there it's argument to the jury

2    whether or not it is or isn't but it's clearly material that

3    is connected to him.

4                    MR. FISCHER:  I actually understand, your

5    Honor, that the dressers belonged to Mr. Piper originally.

6                    THE COURT:  Mr.?

7                    MR. FISCHER:  Mr. Piper, the old gentleman who

8    lived upstairs.  80 some years old.

9                    THE COURT:  Well, I think there's enough here

10   for the Court to admit the exhibits subject to connection and

11   that's what I'm going to do.

12                   Now, we're going to take a ten-minute break.

13                   (Short break taken).

14                   (At the Bench).

15                   THE COURT:  Mr. Fischer wants to make some

16   observations before we go forward.

17                   MR. FISCHER:  Thank you, your Honor.  Some of

18   the photographs show girl magazines, you know, apparently

19   young girls in pornography magazines and they appear to be

20   over-the-counter magazines but they are evidence of prior bad

21   acts.  Basically, as I understand what they're being offered

22   to introduce or to prove --

23                   THE COURT:  Do they depict underage girls and

24   prepubescent girls in sexually explicit conduct?

25                   MR. FISCHER:  What appear to be

Terry Shultz - Direct

1   over-the-counter magazines, probably not.

2               THE COURT:  How is that a bad act?

3               MR. FISCHER:  Immoral propensity I suppose is

4   what I would believe it to be offered for, that's the purpose

5   of it.

6               THE COURT:  It can't come in for any immoral

7   propensity purpose.  I don't think it's a prior bad act.  Is

8   it a bad act for somebody to have adult pornography?

9               MR. FISCHER:  I think you can make that

10  argument, Judge.  It's an immoral act.

11              THE COURT:  I don't think from a legal

12  perspective it is.  Maybe some moral objections to adult

13  pornography.  Probably most people don't look at it but some

14  do.

15              What's your position?

16              MR. LOVRIC:  It has nothing to do with

17  legality.  In this case, as I said before, unfortunately

18  there is a lot of information here about sex but that's what

19  the nature of this case is about.  The charges dealing with

20  sexual conduct and sexual matters.  The magazines here are

21  relevant to show Mr. Sacco's interest in young women but not

22  that some prior act or bad act -- it's not.

23              THE COURT:  Well, if Mr. Fischer wants me to,

24  I would be willing to give the jury a charge saying that if

25  the photographs depict magazines showing women that cannot be

Terry Shultz - Direct

320

1  considered for the purpose of concluding that Mr. Sacco has a

2  propensity to do anything to or with women.

3              MR. FISCHER:  Well, Judge, my concern, as I

4  understood Mr. Lovric to just say, basically to show just

5  that.  That the propensity of Mr. Sacco is that interest in

6  that particular type of pornography.  And if that's correct,

7  if my interpretation my, understanding of what Mr. Lovric is

8  saying, I think --

9              THE COURT:  It's really not a prior bad act

10  because what he's saying, it's to prove in this case and

11  these charges that this particular defendant had that

12  interest because he had that material in his storage locker

13  and I think for that purpose it can come in but if you want

14  me to charge the bad act aspect out of it, in other words,

15  that this defendant is inclined to do bad things because he

16  had those magazines.

17              MR. FISCHER:  No, Judge.  I would not like

18  that.

19              THE COURT:  I don't blame you.  But I offered

20  it.

21              MR. FISCHER:  I appreciate that.

22              THE COURT:  Okay.

23              (In open Court).

24              (At the Bench).

25              MR. FISCHER:  May I address one more issue?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct                    321

 1          THE COURT:  Yes.

 2          MR. FISCHER:  I guess I request, your Honor,

 3   at this point that the -- as I understand it, these are

 4   over-the-counter magazines, not depicting children.  That's

 5   my understanding.  And what I would ask then is an

 6   instruction to the jury to reflect that this is, in fact, not

 7   child pornography.  It's not being introduced --

 8          MR. LOVRIC:  I have no objection.

 9          THE COURT:  You got it.

10          MR. FISCHER:  Thank you.

11          (Jury present).

12          THE COURT:  As I understand it, Mr. Lovric, at

13   this time you're going to be offering Government 16 through

14   and including 33 in evidence?

15          MR. LOVRIC:  Yes, your Honor.

16          THE COURT:  Ladies and gentlemen, these are --

17   well, first of all, let me admit those exhibits, that's 16

18   through 33 inclusive, subject to connection.  These are

19   pictures purportedly of items that were in storage unit 129.

20   As I understand the discussion that we just had, in those

21   pictures, although I've never seen them so I don't have any

22   idea what they look like, they are portrayed as

23   over-the-counter type magazines that have images of ladies of

24   some kind.  It's -- this is not child pornography.  It's not

25   being offered to show that there was any child pornography in

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct

1    that unit.  But those pictures are displayed there I'm told.

2    There you go.

3    BY MR. LOVRIC:

4        Q    Investigator Shultz, I'd like to start by putting

5    on the document camera Exhibit 16 in evidence.  Do you

6    recognize what's in Exhibit 16?

7        A    Yes, I do.

8        Q    Can you briefly tell the jury what it is that

9    they're looking at in Exhibit 16?

10       A    Along the left side is the row of storage units

11   where storage unit 129 is contained.  On the right side

12   behind the pickup truck is another building containing other

13   storage units.

14       Q    And this storage unit area is the place that I

15   referred to as -- called the Storage Center?

16       A    That's correct.

17       Q    And that's located where approximately?

18       A    County Route 32 in the Town of Norwich.  Chenango

19   County.

20       Q    Okay.  And just, generally speaking, how far is

21   that from Norwich proper itself?

22       A    The outside -- it's in the Town of Norwich and it's

23   only a short distance outside of the City of Norwich, I

24   believe.  I'm not too familiar with the exact boundaries but

25   less than two miles outside of the city I believe.  Closer

1  to --

2     Q    Okay.  Now I'm going to put on the screen what's

3  numbered as Exhibit number 17.  Can you tell the jury what it

4  is we're looking at there?

5     A    That's a photograph storage unit 129 with a pad

6  lock on it.

7     Q    I'm now going to put on the screen Exhibit number

8  18 in evidence.

9     A    That would be me opening up storage unit number 129

10  with some of the contents inside of it.

11     Q    Okay.  Now, looking at Exhibit 18 as we're looking

12  at this doorway area, is this the entire width of this

13  storage unit from where I'm pointing to right now?

14     A    Not the doorway, no, it's not the entire width.

15     Q    About how much more inside in terms of width is

16  there approximately?

17     A    Probably two more feet on each side maybe.  A foot.

18     Q    Would you say it's a fairly narrow storage unit?

19     A    Yes.

20     Q    Now, putting on the screen Exhibit number 19, what

21  are we looking at there?

22     A    Photograph of the door entirely open with the

23  contents of unit 129.

24     Q    Okay.  Now, in this Exhibit 9 I'm going to point to

25  a couple of things if we can just talk about them.  Right

Terry Shultz - Direct

324

1  here to the forefront left in the photo there's a white

2  appearing shaped unit.  What is that?

3      A    It's a small refrigerator.

4      Q    Okay.  And then on top of that refrigerator, what

5  is that -- at some point after you removed that, what did you

6  find that to be?

7      A    Kind of like a little foot locker, other storage

8  container, like a personal storage container.

9      Q    Okay.  And then on the top right here there are

10 somewhat appear to be box type things.  What did those turn

11 out to be?

12     A    I believe those were dresser drawers.

13     Q    Okay.  Now, I'm going to put on the screen on the

14 document camera Exhibit number 20.  Is that a little bit more

15 of a close up of some of those items, especially the ones in

16 the top back there?

17     A    Yes.

18     Q    Okay.  So, again, pointing to this top right box

19 like things, you can actually see, I guess, the handles of

20 drawers there?

21     A    Yes.  The top two are dresser drawers and the third

22 one down is a cardboard box.

23     Q    Okay.  Now in this storage unit, did you and the

24 other investigators at some point locate inside there a

25 dresser?

1        A     Yes.

2        Q     Where in this storage unit was a dresser located?

3        A     If you stepped into the storage area and turned and

4    faced the refrigerator and that foot locker, I'll call blue

5    storage container, it would be just to the right of that.

6    Almost to the left of the bicycle tire, front of that bicycle

7    tire, or the front tire of the bicycle I mean would be on the

8    floor just to the left of that.

9        Q     So, to the left of this area right here that I'm

10   pointing to now near this bicycle tire area?

11       A     Yes.

12       Q     Putting now on the screen Government Exhibit 21 in

13   evidence.  This is a picture of what?

14       A     That's the foot locker I'll call it with the top

15   closed with the name Dino on the front on the top of it.

16       Q     Exhibit number 22 in evidence, give me one second,

17   Investigator.  One of the lights here is collapsed.  I'm

18   sorry about that.  And on the front part of the foot locker

19   it says -- reads Dean M. Sacco?

20       A     I believe that's the back of it actually.

21       Q     I'm sorry.  Putting on the screen now Government

22   Exhibit number 23, what are we looking at there?

23       A     Disks, what appear to be computer disks and these

24   were items that were located within side the unit, appear to

25   be sitting on top of the refrigerator at that point.  Also an

Terry Shultz - Direct

1   envelope addressed to Dean Sacco, 522 Westside Drive, I

2   believe, Jersey City, New Jersey.  And that is leaning up

3   against what appears to be clear plastic bin with some more

4   CDs in it and some other documents.

5       Q    Okay.  Now, during the course of searching this

6   storage unit, did you find any computer in that storage unit?

7       A    A computer itself, no, we didn't.

8       Q    Did you find any other computer equipment aside

9   from the CDs that we're looking at?

10      A    No, we did not.

11      Q    I take it, Investigator Shultz, these CDs I'm

12  pointing to here on the right, at least the top one, appear

13  to be the kind of CDs you would pop into a computer or work

14  into a computer?

15      A    Yes.

16      Q    Putting on the screen now Government's Exhibit

17  number 24, that's a photograph of what items?

18      A    At the top is an envelope, written on the front of

19  it is Linda's lease.  Below that is a month-to-month rental

20  agreement document that appears to be filled out regarding

21  Linda O'Connor renting 45 Fair Street from August 1, '06 and

22  to the right of that is a photograph of receipt.

23      Q    Okay.  Putting on the document camera Government's

24  Exhibit number 25, what is that we're looking at in the

25  picture?

Terry Shultz - Direct

1    A    A box of -- it's a Trojan box of condoms and there

2   appears to be three or six unwrapped condoms.

3    Q    In individual wrappers?

4    A    In individual wrappers, right.

5    Q    They're in wrappers, right?

6    A    Yes.

7    Q    Government Exhibit number 26.  What is it that

8   we're looking at there?

9    A    It's personal lubricant and that's -- the one on

10  the left, called Astroglide, and the one on the right is a

11  desensitizer.  Items that would be used commonly during a --

12  sex acts.

13    Q    They're sexual lubricants?

14    A    That's correct.

15    Q    Now, put on the document camera Government Exhibit

16  number 27, Investigator Shultz, let me just do this before I

17  break this machine, excuse me.  I'm having a little trouble

18  with the light.  Government Exhibit number 27 shows what?

19    A    A condom setting on top of an envelope, behind that

20  is an envelope box containing other unused envelopes.  The

21  condom is out of its wrapper and appears to have been used.

22    Q    Now, where was this used condom found?

23    A    That was found inside of that envelope box, next to

24  the envelopes, just setting on the bottom of the box and the

25  box itself was found inside of a dresser drawer which was in

Terry Shultz - Direct

1    the dresser which was inside the storage unit.

2         Q    And if I can zoom a little bit out in the picture.

3    I take it the envelope that this condom is sitting on right

4    now, was that envelope placed there by you and one other

5    investigator?

6         A    Yes, it was.

7         Q    So this condom was in this envelope box?

8         A    Correct.

9         Q    And this item that this box and the condom are

10   sitting on that I'm pointing to right now, the top, what is

11   at the top of that it's all sitting on?

12        A    That's the top of the refrigerator I believe.

13        Q    Okay.  This black top right here that I'm looking

14   at right now?

15        A    Oh, I'm sorry.  That's -- I'm looking at the --

16   what your photograph is sitting on top of.  It's the top of

17   the dresser.

18        Q    Okay.  I mean, if I pick up the photo I don't want

19   you to look at the camera equipment.

20        A    It's sitting on the top.

21        Q    This table top right here that the box is sitting

22   on, that's a part of the top of what?

23        A    The dresser.

24        Q    Okay.  And is that the dresser that you indicated

25   was -- had this box which had a condom in it?

Terry Shultz - Direct

1    A    Yes.

2    Q    Showing you know Exhibit number 28, what is that a

3  photo of?

4    A    Two computer -- well, I'm sorry, three computer

5  disks.  One at the top has a label but nothing is written on

6  it.  The one on the left has the word, I believe, book

7  written on it and one on the right says book 2, Dino Sacco,

8  1-201-792 and the number 7300 underneath and these are the

9  older three-and-a-half-inch diskettes.

10    Q    From your experience these diskettes, are these the

11  kind of diskettes that would also be used in a computer?

12    A    Yes, sir.

13    Q    Putting on the screen Government Exhibit number 29,

14  what are we looking at in Government Exhibit 29?

15    A    It's a photograph of two journals that were located

16  inside the storage unit and they're leaning up against that

17  foot locker.

18    Q    These two journals, where were they found?

19    A    I believe they were inside the foot locker.

20    Q    Okay.  Putting on the document camera, Exhibit

21  number 30, what are we looking at a photograph there of?

22    A    That's the foot locker with the top opened up with

23  several magazines, pornography magazines, laying on top of.

24  From inside the locker to the left are the two, to the left

25  on the bottom are the two journals, to the right is a manila

Terry Shultz - Direct                                    330

1    envelope.  I can't make out the writing on that and below

2    that in front of the envelope are some other documents.  All

3    from within unit 129.

4                    MR. LOVRIC:  Judge, if you want to take a

5    break.

6                    THE COURT:  Yeah.  Let's take a quick break.

7                    (Short break taken).

8                    (Jury present).

9                    THE COURT:  All right, Mr. Lovric.

10   BY MR. LOVRIC:

11        Q     Investigator Shultz, I'm putting next on the screen

12   here Government Exhibit number 31.  What is that a picture

13   of?

14        A     Photograph of a Polaroid camera with a flash.

15        Q     Was that also found in that storage unit?

16        A     Yes, it was.

17        Q     Now, putting on the document camera here Government

18   Exhibit number 32 in evidence, what is that a picture of?

19        A     It's a picture of a Sharp camcorder with a carrying

20   case above it.  Both found within the storage unit number

21   129.

22        Q     And then the last picture in this series,

23   Government Exhibit number 33.  What is that a picture of?

24        A     It's a photograph of an empty Trojan condom that's

25   been opened and the condom wrapper.

Terry Shultz - Direct                                    331

1       Q     Investigator Shultz, I'd like to hand you what I've

2    marked as Government Exhibit 34.  Do you recognize what that

3    is?

4       A     Yes, I do.

5       Q     What is that?

6       A     That's one of the journals that was in the

7    photograph that was located within the storage unit.

8       Q     And is that the actual journal that was recovered

9    from the storage unit?

10      A     Yes, it is.

11      Q     Okay.

12                  MR. LOVRIC:  Your Honor, I would offer the

13   exhibit.  I'm not going to ask to publish it with this

14   witness but I will be asking later to publish parts of that

15   exhibit.

16                  MR. FISCHER:  I do have an objection, your

17   Honor, based upon what's in it.  Not the fact that it was

18   there.

19                  THE COURT:  Well, he's not offering to put

20   that in front of the jury now, right.

21                  MR. LOVRIC:  I'm going to seek when Agent

22   Lyons testifies, I'm going to seek to publish, have Agent

23   Lyons read certain parts of that journal at that time.

24                  THE COURT:  Okay.  Before Agent Lyons is

25   allowed to read that, we will have an evidentiary hearing to

Terry Shultz - Direct

332

1    decide how much, if any, of that he can read.

2                    MR. FISCHER:  Thank you.

3                    THE COURT:  Miss Peebles.

4                    MISS PEEBLES:  I have no objection, Judge.

5                    THE COURT:  With that admonition, the Court

6    will receive Government's 34 in evidence.

7    BY MR. LOVRIC:

8         Q    One further question, Investigator Shultz.

9    Government's 34 in evidence, can you see these tabs?

10        A    Yes, I can.

11        Q    When you found the journal, were these tabs in the

12   journal?

13        A    No, they were not.

14        Q    Okay.  Have you since become aware that these were

15   placed in there by Agent Lyons?

16        A    Yes.

17        Q    But they weren't there when you found the journal?

18        A    Correct.

19        Q    Investigator Shultz, showing you what I marked as

20   Government's Exhibit 35 I believe, do you recognize this

21   item?

22        A    Yes.  That's the Polaroid camera and flash that

23   were found in the storage unit.

24                    MR. LOVRIC:  Your Honor, I would offer

25   Government's Exhibit 35.

Terry Shultz - Direct                                    333

1              MR. FISCHER:  No objection, your Honor.  Thank

2    you.

3              MISS PEEBLES:  No objection.

4              THE COURT:  Receive Government's 35 in

5    evidence.

6         Q    Investigator Shultz, next I'm going to show you

7    what's marked as Government Exhibit number 36 I believe, if

8    you take a look at that.  Do you recognize the bag and the

9    contents of that bag?

10        A    Yes.  That's the Sharp camcorder with the carrying

11   case and the instructions.

12        Q    And was that entire item with the bag and the

13   camcorder and instructions found in that storage unit?

14        A    Yes, it was.

15             MR. LOVRIC:  I would offer Government's 36

16   into evidence.

17             MR. FISCHER:  Again, your Honor, subject to

18   what objections I stated earlier, I have no objection in

19   particular.

20             THE COURT:  Yeah.  You're talking about

21   connecting up the item?

22             MR. FISCHER:  Yes.

23             THE COURT:  The Court will receive

24   Government's 36 subject to connection.

25        Q    Investigator Shultz, I previously showed you

Terry Shultz - Direct

1  Government Exhibit number 27, which was the photograph of

2  that condom in that envelope box.  At some point was that

3  condom sent anywhere for testing?

4      A    Yes.  On March 14 I took it to the State Police

5  Southern Tier Crime Lab here in Port Crane, New York.

6      Q    And then did that item at some point then go to the

7  New York State Lab in Albany?

8      A    Yes.

9      Q    And were there tests that were requested by

10  yourself and other investigators to be conducted on that

11  condom?

12      A    Yes.  To conduct an examination for the presence of

13  DNA or semen or sperm on the inside and outside of the

14  condom.

15      Q    And were you at some point notified or made aware

16  by the lab of any DNA findings on that condom?

17      A    Yes.  On March 31 I was notified that there was

18  female Jane Doe DNA located on the inside or, I'm sorry, on

19  the outside of the condom and also the female DNA Jane Doe on

20  the inside, mixed with another, at least one other donor male

21  on the inside.

22      Q    Okay.  And that was on what date that you received

23  notification?

24      A    March 31, 2008.

25      Q    And then in connection with being notified of those

Terry Shultz - Direct                                    335

1    results, did you on or about April 2 of 2008 take any

2    investigative steps?

3         A    Yes.  On April 2 I met with Shannon O'Connor and

4    obtained a DNA sample from her which consisted of -- it's

5    like a small tooth brush.  It's just a stick with little

6    serrated edges on the edge of it and the donor scrapes the

7    inside of their cheek, about 15 to 20 times, and they're

8    provided with a second one.  They do the other cheek 15, 20

9    times.  We secure them in the box and I transported the box

10   containing those DNA samples directly to the lab in Albany to

11   our State Police lab.

12        Q    And who's with you when you conducted this

13   gathering of DNA from Shannon in the way you described?

14        A    Agent Lyons was.

15        Q    If I can call them these swabs that you took from

16   Shannon's inside of her mouth, then where did you take these

17   swabs to?

18        A    To the State Police Crime Lab in Albany that same

19   day, the 2.

20        Q    Did you actually physically drive those there?

21        A    Yes, we did.

22        Q    Investigator Shultz, I'd next like to show you

23   three items marked as Government's Exhibits 37, 38, and 39.

24   Three photographs I'd like to show you.  Investigator Shultz,

25   can you take a look at 37, 38, and 39 and just tell us

Terry Shultz - Direct

1    generally what are they.

2         A    These are photographs of the outside of 45 Fair

3    Street in the City of Norwich.  Two of them depict just the

4    house and in the driveway.  The third depicts behind the

5    house where there's two garages and a storage shed and

6    there's a half of an automobile that can be seen.

7         Q    Were those items recovered from the course of the

8    search warrant?

9         A    Yes.  From the storage unit, yes, they were.

10        Q    Do they actually show 45 Fair Street premises that

11   involves this case that we're talking about?

12        A    Yes.

13             MR. LOVRIC:  I would offer 37, 38, and 39 into

14   evidence.

15             MISS PEEBLES:  No objection.

16             MR. FISCHER:  No objection.

17             THE COURT:  Okay.  We'll receive Government's

18   37, 38, and 39 in evidence.

19        Q    Investigator Shultz, putting on the screen

20   Government's Exhibit 37.  Is that a picture of 45 Fair

21   Street?

22        A    Yes, it is.

23        Q    And this photo is found in that storage unit?

24        A    Correct.

25        Q    I'd like turn this picture sideways.  Get the zoom

Terry Shultz - Direct

337

1    to work.  Can you see that imprint on that photo?

2        A    Yes.

3        Q    From there?

4        A    Yes.

5        Q    Okay.  Would you like me to bring it up there or

6    can you tell?

7        A    I can see parts of it but not very clearly.

8        Q    Let me bring it up to you and see if you can read

9    those digits.

10       A    Digits I read are 06 space 6 space 24.

11       Q    Have you ever seen cameras that imprint the date on

12   the film?

13       A    Yes, I have.

14       Q    Looking at those numbers, would you be able to look

15   at that and tell what the 06 stands for?

16       A    That would indicate to me 2006.

17       Q    And the next number being 6?

18       A    The month of June.

19       Q    And the 24?

20       A    Twenty-fourth day of June.

21       Q    And then before I put it up on the screen, if you

22   can take a look at Exhibit 38 and just indicate whether that

23   has the same imprint numbers or different from the one you

24   just read?

25       A    The same, 06/6/24.

Terry Shultz - Direct                                    338

1      Q    Okay.  Just so the jury can see.  I'm going to put

2   38, Exhibit 38 on the document camera we're looking at.  Is

3   that also a picture of the front right to 45 Fair Street?

4      A    Yes, it is.

5      Q    And finally 39, Exhibit 39 on the screen now.  What

6   does that depict?  Which area of 45 Fair Street, approximate

7   area?

8      A    It's behind the residence.  It's still part of the

9   property but it's behind the main residence and it basically

10  consists of two garages and a storage shed in the middle with

11  a basketball hoop on it.

12     Q    Okay.  I'm going to point to that basketball hoop

13  you're referring to.  Is that right here?

14     A    Yes, it is.

15     Q    Which is a little bit left of the center of the

16  photo and then right below that I'm pointing to now are the

17  structure, is that what you're referring to as the shed?

18     A    Yes.

19     Q    You see a red car there which is protruding from

20  outside of the garage I take it?

21     A    Yes.

22     Q    And then from the far right another set of garage-

23  type structure?

24     A    Correct.

25     Q    I'd like to show you what I've marked as Government

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct

339

1    Exhibit number 40 for identification.

2                   MR. FISCHER:  No objection, your Honor.  May I

3    have a standing objection to all of these items, subject to

4    the prior objections, otherwise I have no objection.

5                   THE COURT:  All right.  That's fine.

6                   MR. FISCHER:  We'll receive Government's 40

7    subject to the objections.

8        Q    Investigator Shultz, I'll put it on the document

9    camera and ask you a few questions.  Putting on the document

10   camera Exhibit 40 and its contents.  Generally speaking, what

11   is this?

12       A    It's an envelope with the name Dean Sacco and the

13   address of 522 Westside Ave, Jersey City, New Jersey 07304.

14       Q    This was found in that storage unit?

15       A    Yes.

16       Q    And I'd like to take the contents out, putting the

17   first page of the first brochure, what is in this brochure

18   that we're looking at?  What is it an advertisement for?

19       A    My understanding was it's an advertisement for a

20   trip or a tour to Bangkok for some type of sexual encounter.

21       Q    I'd like to put on the screen now the third page,

22   actually prices.

23       A    Yes.

24       Q    Far left.  There's indications for Bangkok,

25   Philippines combo and then various prices depending upon what

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Direct

1    appears to be where you're flying from?

2        A    Correct.

3        Q    Then putting on the screen a page found in that

4    brochure depicting -- what is it depicting?

5        A    A nude, what appears to me, to be a very young

6    female.

7        Q    And then on the bottom can you read that?

8        A    Yes.

9        Q    Does it appear to be some web site web page?

10       A    Yes.

11       Q    Putting the fourth page of that brochure, picture

12   of what appears to be what?

13       A    What appears to be a story about probably one who

14   went on the tour and then a photograph of -- I don't know if

15   it's the author of that story, and a half nude female.

16       Q    Putting on the screen the final page of that

17   brochure, the bottom right.  Fair to say it appears like

18   several women, two of which are engaged in an oral sex act?

19       A    Correct.

20       Q    I'm just going to put the envelope up.  And that

21   was addressed to an address in Jersey City, New Jersey?

22       A    Correct.

23       Q    But it was found in Norwich, New York?

24       A    Correct.  In the storage unit.

25       Q    I'd like to show you next, Investigator Shultz,

Terry Shultz - Direct

1    what I've marked as Government's Exhibits 41 and 42 for

2    identification.  If you can take a look at this, Investigator

3    Shultz, 41 and 42 and if you can just identify what is 41.

4        A    Forty-one is a document regarding a month-by-month

5    rental agreement between Dean Sacco and Linda O'Connor for

6    the property at 45 Fair Street.  The agreement is to begin on

7    August 1 of 2006 and it's like, I said, a month-by-month

8    agreement.

9        Q    And was that also found in that storage unit?

10       A    Yes.

11       Q    And what is Government Exhibit 42?

12       A    It's an envelope entitled Linda's lease.  It's just

13   written on the outside of the envelope.

14       Q    Is there anything on the inside of that envelope?

15       A    Yes.  On the inside is another lease agreement for

16   45 Fair Street, this went for January 1, 2007 between Dean

17   Sacco and Linda O'Connor.

18            MR. LOVRIC:  I would offer 41 and 42 into

19   evidence.

20            MR. FISCHER:  No objection.

21            MISS PEEBLES:  No objection.

22            THE COURT:  Receive Government's 41 and 42 in

23   evidence.

24       Q    Putting on the screen, Investigator Shultz, just

25   for the jurors to look at, Exhibit 41 on the screen.  Is that

Terry Shultz - Direct                                    342

1   the month-to-month lease you were just referring to?

2       A     Yes.  The first one for 2006.

3       Q     And what is the rent indicated for this lease,

4   lease on this document?

5       A     $600 a month.

6       Q     And I'm flipping it over to the other side and it

7   appears to have two signatures bearing what names?

8       A     Dean Michael Sacco and Linda O'Connor.

9       Q     And on the top front of that document, it indicates

10  or the document states that it was made on what date?

11      A     The agreement is on July 28, 2006.

12      Q     And then Government Exhibit 42, the envelope that

13  you just referenced.  I'm taking the item out of the

14  envelope.  Is that the lease agreement that you just referred

15  to?

16      A     Yes.  The one beginning January 1 of 2007.

17      Q     And then on the back portion, the middle of the

18  document that bears the names or is signatures of what

19  persons?

20      A     Dean Michael Sacco and Linda O'Connor.

21      Q     And this rent indicates would be in the amount of

22  how much?

23      A     $525 a month.

24      Q     And that's different than the first lease of $600?

25      A     Correct.

Terry Shultz - Direct

343

```
1    Q    Those two leases were both found in that unit?
2    A    Yes, they were.
3    Q    Investigator Shultz, you indicated earlier that at
4  some point when you were there to conduct a search warrant of
5  that storage unit, that you also obtained some records or
6  documents from that Storage Center?
7    A    Yes, I did.
8    Q    I'd like to show you what I marked as Government's
9  Exhibit number 43.
10             MR. FISCHER:  No objection, your Honor.
11             THE COURT:  Okay.  We'll receive Government's
12  43 in evidence.
13    Q    Investigator Shultz, I'll just hold it up.  Are
14  those the documents that you recovered from the Storage
15  Center office?
16    A    Yes, they are.
17    Q    Okay.  Let me put this on the screen.  What date or
18  not date -- when did you recover these documents or obtain
19  these documents from the Storage Center facility?
20    A    I believe it was March 11.
21    Q    Okay.  And this was from the actual business?
22    A    Yes.  Yes, it was.
23    Q    Did you talk to either the person that runs the
24  business or someone that works there about getting these
25  documents?
```

Terry Shultz - Direct                                    344

1          A     Yes.  I spoke to Christine Barnes who's an employee

2     at the Storage Center.

3          Q     Okay.  And this document that I have now, which is

4     the eight and a half by eleven piece of paper in 43, it

5     indicates -- tell us what it indicates, what it shows, what

6     information?

7          A     It's an agreement to rent storage unit 129.  It's

8     made out in the name of Clesson Lockwood who resides on

9     Silver Street in Norwich for the amount of $23 a month due

10    the 14th of each month for unit 129.

11         Q     What is it dated, what date?

12         A     June 14 of 2007.

13         Q     And then you did you also obtain this card, index

14    card, which is stapled to the entire Exhibit 43?

15         A     Yes, I did.

16         Q     And what is that card?

17         A     As it was explained to me, that's the handwritten

18    notes regarding who was currently renting storage unit 129,

19    their name and address, how much a month it is and then the

20    dates and how it appears, how each payment was paid.

21         Q     And then on the back of that card, just like to

22    have you identify or read a couple of things.  On the back of

23    this index card on the left-hand side here there are a number

24    of dates?

25         A     Yes.

1       Q     And then towards the middle appear to be PD 23,

2  presumably saying paid 23?

3       A     Yes.

4       Q     And then there's a columns of number 102, 112, 121,

5  127.

6       A     Yes.

7       Q     And then the far right dates?

8       A     Yes.

9       Q     And what do these numbers represent if you know?

10      A     My understanding is that the numbers reference a

11  check, a check number that was used had to pay for the

12  storage unit for that month.

13      Q     In connection with working on this investigation,

14  did you and other investigators obtain bank records for an

15  Elizabeth Dinunzio?

16      A     Yes.

17      Q     I'd like to show you what I mark as Government's

18  Exhibit number 44.

19            MR. FISCHER:  No objection.

20            THE COURT:  Okay.  We'll receive Government's

21  44 in evidence.

22      Q     Investigator Shultz, I'll put it on the screen and

23  I'll ask you some questions.  Okay.  I put on the screen

24  Government's Exhibit 44 which consists of five pages.  And on

25  page 1, what does page 1 show there?

Terry Shultz - Direct

346

1     A    It shows a copy of a check written from account

2  of -- the Bank of America account of Elizabeth Dinunzio of

3  Waterbury, Connecticut, paid to the order of Storage Center

4  for $23 on November 26, 2007 and in the memo portion of the

5  bottom left is written unit number 129 and signed by

6  Elizabeth Dinunzio.

7     Q    Going to page 2, what does that show?

8     A    Same thing, except for different dates.  This one

9  is December 14, 2007, check number 112, again to the Storage

10  Center, $23 for 129.

11     Q    And looking at the copy of what appears to be the

12  flip side of that check.  Does it actually have the Storage

13  Center account and deposit only stamp on it?

14     A    Yes, it does.

15     Q    And page 3, is that a similar type of check simply

16  for the next consecutive month?

17     A    Yes.

18     Q    Same account, same person?

19     A    Same account, same person.  This is January 13, 08,

20  unit 121.  This time in the bottom left corner is 129 and in

21  parentheses is C. Lockwood next to that number.

22     Q    Fourth page.

23     A    Again a copy of another check.  This one is dated

24  February 17, 2008, check number 127 for the Storage Center,

25  again drawn from the same account of Elizabeth Dinunzio, $23

Terry Shultz - Direct

1    for number 129.

2        Q    On the fifth page, that's for what month?

3        A    Again, it's for March 13 of '08, check 135 to

4    Storage Center, $23 for number 129, signed by Elizabeth

5    Dinunzio.

6        Q    Okay.  These five checks that we just saw in

7    Exhibit number 44 --

8        A    Yes.

9        Q    -- these are for that unit that you searched?

10       A    Yes, they are.

11       Q    The same unit where you found that used condom?

12       A    Yes, they are.

13       Q    And in the course of this investigation, did you

14   and other investigators determine who Elizabeth Dinunzio is?

15       A    Yes.  It's Dean Sacco's mother.

16       Q    Did you actually also confirm that she does, in

17   fact, live in the State of Connecticut?

18       A    Yes.

19       Q    In connection with this investigation, Investigator

20   Shultz, did you also obtain from the Norwich School District

21   an attendance record for Shannon O'Connor?

22       A    Yes, I did.

23       Q    I'm going to show you Exhibit 45.

24            MR. FISCHER:  No objection.

25            MR. LOVRIC:  Your Honor, I'm going to offer 45

Terry Shultz - Direct                    348

1    into evidence.

2                MR. FISCHER:  No objection.

3                MISS PEEBLES:  No objection.  I think it's the

4    same.

5                THE COURT:  I'm sorry.

6                MISS PEEBLES:  I believe it's the same as

7    exhibit -- as Defense number 4.

8                THE COURT:  Okay.  We'll make a note of that.

9    We'll receive Government's, 45 note it's the same as

10   Defendant's 4.

11   BY MR. LOVRIC:

12       Q    Investigator Shultz, just putting that on the

13   screen, Exhibit 45.   This is the record that you actually

14   obtained from the school district?

15       A    Yes, it is.

16       Q    Okay.  Investigator Shultz, based on your knowledge

17   working in the area, do you -- do you recall or do you know

18   rather whether in June of 2006 there was actually a

19   large-scale flood in the general area and more specifically

20   also in the Deposit, New York area?

21       A    Yes, I'm aware of that.

22       Q    How are you aware of that personally or how do you

23   have that knowledge?

24       A    Personally, I was a victim of the flood but also it

25   was flooding all over the place.  My town was part of it.

Terry Shultz - Direct

1    Broome County, Chenango County, Delaware County.  Like you

2    said it was a large-scale flood, over the whole area.

3         Q    Investigator Shultz, in connection with this case

4    did you also have the opportunity to obtain and do a property

5    search for 45 Fair Street in Norwich, New York?

6         A    Yes, I did.

7         Q    I'd like to show you what I marked as Government's

8    Exhibit number 46.

9              MR. LOVRIC:  Just showing it to counsel.

10             MR. FISCHER:  No objection.

11             MR. LOVRIC:  I would offer 46 into evidence.

12             MR. FISCHER:  No objection.

13             MISS PEEBLES:  No objection.

14             THE COURT:  Okay.  We'll receive Government's

15   46 in evidence.

16        Q    Investigator Shultz, putting Exhibit number 46 on

17   the document camera.  Does the records and deeds search

18   indicate the purchase of 45 Fair Street?

19        A    Yes, it does.

20        Q    And in the right-hand column about a third of the

21   way down the page it indicates that this property was sold

22   and thereby purchased on or about what date?

23        A    August 9 of 2005.

24        Q    Okay.  And it indicates that the purchaser or owner

25   to be is who?

Terry Shultz - Direct                       350

1        A       Dean M. Sacco.

2        Q       And the seller's name, is that also recorded in

3   this document?

4        A       Yes.  GDP LLC.

5        Q       Are you familiar where -- if that's a realty type

6   business in the area or some type of a corporation?

7        A       I can only assume that it's Gerald D. Parker only

8   because his name appears below and those are the initials

9   GDP, but I'm not aware of who he is.

10                    MR. LOVRIC:  Judge, my final topic with

11  Investigator Shultz deals with some records that I received

12  today and I gave counsel copies but I know they haven't had a

13  chance to look at it and if I would just be allowed to cover

14  that with him in the morning.  He has to come back any way

15  for cross-examination.

16                    THE COURT:  I realize that.

17                    MR. LOVRIC:  If that would be all right with

18  the Court.

19                    THE COURT:  Fine with me.  All right, ladies

20  and gentlemen.  That will do it for today and tomorrow I have

21  a 9:30, do I not?  Okay.  We'll be starting once again at

22  10:00 and let me give you the same instructions that I always

23  give.  Please don't the discuss the case among yourselves,

24  with anybody else or permit anyone to discuss it with you and

25  please having nothing to do with any media that's involved or

1    do any research on your own and have a nice evening.

2              (Court stands adjourned)

3                   C E R T I F I C A T I O N

4

5

6              I, VICKY A. THELEMAN, RPR, CRR, United

7    States Court Reporter in and for the United States

8    District Court, Northern District of New York, do

9    hereby certify that I attended at the time and place

10   set forth in the heading hereof; that I did make a

11   stenographic record of the proceedings had in this

12   matter and cause the same to be transcribed; that

13   the foregoing is a true and correct copy of the same

14   and the whole thereof.

15

16

17                          _____

18                          VICKY A. THELEMAN, RPR, CRR

19                          United States Court Reporter

20                          US District Court - NDNY

21

22

23   Dated:  August 8, 2008.

24

25