352

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------------------

4    UNITED STATES OF AMERICA,

5                      -versus-                    08-CR-77

6    LINDA O'CONNOR and DEAN SACCO.

7    ----------------------------------------------------------

8                      TRANSCRIPT OF JURY TRIAL

9    held in and for the United States District Court,

10   Northern District of New York, at the Federal Building and

11   Courthouse, 15 Henry Street, Binghamton, New York, on

12   FRIDAY, May 9, 2008, before the HON. THOMAS J. McAVOY,

13   Senior United States District Court Judge, PRESIDING.

14   APPEARANCES:

15   FOR THE GOVERNMENT:

16   UNITED STATES ATTORNEY'S OFFICE

17   BY:  MIROSLAV LOVRIC, AUSA

18        Binghamton, New York

19   FOR THE DEFENDANT O'CONNOR:

20   FEDERAL PUBLIC DEFENDER'S OFFICE

21   BY:  LISA PEEBLES, AFPD

22        Syracuse, New York

23   FOR THE DEFENDANT SACCO:

24   KELLY FISCHER, ESQ.

25   Binghamton, New York

Terry Shultz - Direct

1              (Jury present)

2              THE COURT:  Morning, ladies and gentlemen.

3   Sorry for the delay.  Sometimes it takes us a little longer

4   to get cranked up than other days.  Today is one of those

5   days.  I guess we're all set to go.  Do we have Investigator

6   Shultz here?

7              I'll remind you you're under oath.  You don't

8   have to be sworn again.  I believe Mr. Lovric was asking you

9   some questions.

10  DIRECT EXAMINATION CONTINUED

11  BY MR. LOVRIC:

12      Q    Good morning, Investigator Shultz.

13      A    Good morning, sir.

14      Q    You want to just pull that mike over?

15           Investigator Shultz, when we left off yesterday

16  afternoon, I was showing you a number of exhibits.  I'd next

17  like to show you what's been marked as Government's Exhibit

18  Number 95.

19           Investigator Shultz, if you could take a look at

20  Exhibit Number 95.  And how many pages to that exhibit?

21      A    Seven.

22      Q    And generally speaking, what is Exhibit Number 95?

23  What are those documents of?

24      A    Appear to be records kept in the course of business

25  at the Chenango County Sheriff's Department, specifically the

Terry Shultz - Direct

1    corrections office.

2         Q    And are those records pertaining to any specific

3    person?

4         A    Yes.  To Dean Sacco.

5         Q    And in the course of this case, were those records

6    obtained from the Chenango County Sheriff's Office and the

7    corrections department there?

8         A    Yes, they were.

9              MR. LOVRIC:  Your Honor, I would offer Exhibit

10   Number 95 into evidence.

11             MISS PEEBLES:  No objection.

12             MR. FISCHER:  No objection.

13             THE COURT:  Receive Government's 95 in

14   evidence.

15        Q    If I can just take those from you, Investigator

16   Shultz.

17             I'm going to put on the screen now, Investigator,

18   page 1 of Exhibit 95.  Can you see that?

19        A    Yes, I can.

20        Q    As soon as it stops being blurry.  That exhibit --

21   excuse me -- that page 1 of Exhibit 95, does that appear to

22   be a letter?

23        A    Yes.  That appears to be a handwritten letter from

24   Dean Sacco to Corrections Officer Hand.

25        Q    What's the date of that letter in the top right?

Terry Shultz - Direct

355

1    A    July 16, 2007.

2    Q    And then at the bottom, it has Dean Sacco, and can

3    you read the body of the letter?

4    A    Yes, I can.

5    Q    Okay.  Could you do that for us.

6    A    "Dear CO Hand:  Please allow me to send out four

7    checks:  1, $750 to Dean Sacco (care of Elizabeth Dinunzio,

8    power of attorney).  2, $50 Clesson Lockwood (power of

9    attorney).  3, $66, The Storage Center, LLC (self-serve mini

10   storage).  4, MMG Services or Inc. (publishing company), $50

11   total.  Total $916.  Thank you, Dean Sacco, C 11."

12   Q    The individual named in item 1 there, Elizabeth

13   Dinunzio, again, she is who?

14   A    Dean Sacco's mother.

15   Q    And we spoke yesterday of Clesson Lockwood in

16   relation to that storage unit that you searched.  Does that

17   appear to be the same person you were referring to yesterday?

18   A    Yes, it does.

19   Q    Yesterday we spoke about the search warrant you

20   conducted at unit number 129.  What was the name of that

21   business, that place that that unit was located?

22   A    The Storage Center.

23   Q    And with respect to inmates at a facility such as

24   Chenango County, are you familiar with a term called a

25   commissary account?

Terry Shultz - Direct

1    A    Yes.

2    Q    Generally speaking, what is that?

3    A    It's basically an account that holds monies for

4  inmates while they're detained at the facility.  They can

5  deposit money into that account.  They can make withdrawals

6  from that account to purchase food or other necessities that

7  they might need while they're in the facility.  They can also

8  use it to send money to people outside of the facility to

9  take care of expenses or bills for them.

10    Q    I'm going to turn and now put on the screen Exhibit

11  Number 95, page 2, and can you read that document, just

12  starting from the top?

13    A    Yes, I can.  It's Chenango County Correctional

14  Facility, inmate outgoing property sheet CCCF-103.  It's

15  dated May 31 of 2007.  Inmate's name is Dean M. Sacco, and

16  it's documenting property removed, which is one check for

17  $200, it was to be mailed out via the US Postal Service with

18  a letter to Clesson Lockwood, PO Box 795, Norwich, New York

19  13815, and it's signed by Dean Michael Sacco.

20    Q    I'll put on the screen now page 3 of Government

21  Exhibit Number 95.  Could you read page 3 for us.

22    A    To Sergeant Sholes from CO Hand.  Date:  7/24/07.

23  Subject:  Inmate Sacco.  "Ma'am, this inmate requested

24  several bills to be paid from his commissary account during

25  the month of June, at which time he was told by Sergeant Ryan

Terry Shultz - Direct                                    357

1    and me that he needed to set up someone on the outside that

2    could handle his financial obligations.  Inmate Sacco

3    informed me that he had set up power of attorney through

4    Clesson Lockwood and requested a check sent to them.  Checks

5    were sent to Clesson Lockwood for financial obligations and

6    James Downey for legal fees on June 5, 2007.  On July 16,

7    2007, inmate Sacco again requested money to be sent to pay

8    bills.  One of these checks was to Clesson Lockwood, one was

9    to Elizabeth Dinunzio, another power of attorney, and two

10   others were to businesses to pay bills.  Again, I informed

11   inmate Sacco that we can send a check to someone who can

12   handle his financial obligations but we cannot pay his bills

13   for him every month."

14        Q    I'm going to put on the monitor page 6 of Exhibit

15   Number 95.  And can you read that for us.

16        A    It's another Chenango County Correctional Facility

17   form, the outgoing property sheet, dated October 18, 2007,

18   inmate Dean M. Sacco.  And it's -- property to be removed was

19   outgoing check for $300 payable to Dean Sacco in care of

20   power of attorney E. Dinunzio, 44 Center Street, 8-9

21   Waterbury, Connecticut 06702, signed by Dean Michael Sacco.

22        Q    And then the other documents in this exhibit, is it

23   correct they have a couple of receipts for some of those

24   monies that we just talked about being sent out?

25        A    Yes.

Terry Shultz - Cross

358

1          MR. LOVRIC:  That's all the questions I have

2   at this time, your Honor.

3          THE COURT:  Okay.  Mr. Fischer.

4          MR. FISCHER:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MR. FISCHER:

7      Q     Investigator.

8      A     Good morning, sir.

9      Q     The date that you executed the search warrant at

10  storage unit 129, what was that date?

11     A     March 11, 2008.

12     Q     All right.  You found items in that storage unit

13  that you attribute ownership of to Mr. Sacco, am I correct?

14     A     Yes.

15     Q     You took a DNA test of the condom that you found

16  there, am I correct?

17     A     Correct.

18     Q     Are there other tests that can be performed to link

19  evidence, scientific tests that can link evidence to a

20  particular individual or exclude that individual?

21     A     As far as DNA testing?

22     Q     No, any type of scientific testing.

23     A     That can link that specific piece of evidence, even

24  a condom.

25     Q     A condom, a picture, a book, anything.

Terry Shultz - Cross

1       A     Fingerprint possibly.

2       Q     What about fingerprints, how does the

3   fingerprinting process work?

4       A     The items -- whatever would you have collected as

5   evidence would be dusted for the presence of fingerprints,

6   and then if there was fingerprint evidence obtained that

7   could be compared, that was good enough quality to be

8   compared, they would -- you would attempt to compare it to

9   the person who's a suspect in the case.

10      Q     What kind of things can you take fingerprints from?

11      A     I'm not a fingerprint collection expert by no

12  means.  I've never had any experience with collecting

13  fingerprints.  So I'm not hundred percent familiar with

14  what's a good surface and what's not.  But I know that you

15  can obtain fingerprints from glass, that would be a good

16  surface.  Sometimes.  Like possibly the refrigerator would

17  have been a good surface.  Boxes maybe sometimes.  There's --

18  it just depends on the surface of the object.

19      Q     You've been employed by the New York State Police

20  for how long?

21      A     Twenty years.

22      Q     During the 20 years you've performed how many

23  investigations would you say, approximately?

24      A     Thousands.

25      Q     So you've had opportunity to be involved in

Terry Shultz - Cross

1   investigations where fingerprints were taken on many

2   occasions?

3        A    Yes, I have.

4        Q    Did you take fingerprints of any of the items that

5   were retrieved from storage unit 129 in this case?

6        A    No, we did not.

7        Q    When did you first become involved in this case?

8        A    January 9, 2008.

9        Q    Did you ever speak with Mr. Lockwood, Clesson

10  Lockwood?

11       A    Yes, I did.

12       Q    When was that?

13       A    That would have been -- either early this month or

14  late April of 2008.

15       Q    That was after the execution on the search warrant?

16       A    Yes.

17       Q    After you found what you found in storage unit 129?

18       A    Yes.

19       Q    Did you speak with Mr. Lockwood about what you

20  found in storage unit 129?

21       A    No, I did not.  I'm sorry.  Let me correct one

22  thing there.  I spoke with Mr. Lockwood about something that

23  was not found in the storage unit was the only thing I spoke

24  to him about.

25       Q    Okay.  The next question that I have is:  In your

Terry Shultz - Cross

1    search of storage unit 129 did you ever find a tripod?

2        A    Like a camera tripod?

3        Q    Yes.

4        A    Not that I'm aware of.

5        Q    And you identified the bag containing the Viewcam,

6    the Sharp Viewcam, is it?

7        A    Yes.

8        Q    Did you ever find a small, maybe three- or

9    four-inch by two- or three-inch digital camera?

10       A    No, we did not.

11       Q    Did you ever find in that storage any pictures of

12   Shannon O'Connor?

13       A    No, we did not.

14       Q    Exhibit 40 contained a picture of a girl, is that

15   correct?

16       A    I'd have to see it to make sure that's Exhibit 40,

17   but I believe --

18       Q    Exhibit 40 is the brochure from Thailand?

19       A    Yes.

20       Q    All right.  And I understand there were no

21   fingerprints concerning that picture, am I correct?

22       A    Correct.

23       Q    Now, that picture has on it a date, correct?

24       A    I'd have to see it again.

25       Q    All right.  I'll show you that.

Terry Shultz - Cross

1    A    Yes, it does.

2    Q    It also has a web address on it, doesn't it?

3    A    Yes, it does.

4    Q    Okay.  Thank you.  In your investigative

5    experience, can you say whether it's possible, through

6    investigation, to determine, if you have the web address and

7    the date, whether there was an electronic transmission from

8    that web address or to that web address on that date, a

9    particular transmission?

10    A    Yes.

11    Q    And you can find out who owns the transmitting IP

12    address, am I correct?

13    A    Yes.

14    Q    And you can find out if you want to, if you

15    investigate it, who is the recipient's IP address, am I

16    correct?

17    A    Yes.

18    Q    All right.  So you could figure out with respect to

19    that picture, if it was transmitted in -- over the internet,

20    who sent it or whose computer, who the owner of the computer

21    is who sent it and who the owner of the computer is who

22    received it, am I correct?

23    A    Yes.

24    Q    Now that picture was contained in this envelope, am

25    I correct?

Terry Shultz - Cross

1    A    Yes, it was.

2    Q    This is an envelope that was apparently mailed to

3  Mr. Sacco, am I correct?

4    A    Correct.

5    Q    So it appears that whatever images contained in

6  here was apparently downloaded by somebody, put in the

7  envelope and mailed to Mr. Sacco, is that a fair conclusion?

8    A    Yes.

9    Q    All right.  Not that Mr. Sacco downloaded this

10 picture, is that a fair conclusion as well?

11   A    I would say so, yes.

12            MR. FISCHER:  Those are all the questions I

13 have.  Thank you, your Honor.

14            THE COURT:  All right.  Miss Peebles.

15 CROSS-EXAMINATION

16 BY MISS PEEBLES:

17   Q    Morning, Investigator.

18   A    Morning, ma'am.

19   Q    You have a lot of experience.  You've been employed

20 with the New York State Police since 1987?

21   A    Yes, ma'am.

22   Q    And you've conducted a lot of different types of

23 investigations, is that fair to say?

24   A    Yes, ma'am.

25   Q    And you've done a lot of investigation into

Terry Shultz - Cross

1   pornography types of cases and abuse cases regarding

2   children, is that true?

3        A    Abuse, many.  Pornography, a few.

4        Q    And you applied for a search warrant in this case.

5   Do you remember that?

6        A    Yes, I do.

7        Q    And that was the search warrant with regard to the

8   items that were found in the storage center?

9        A    Yes, ma'am.

10        Q    And in your search warrant application you indicate

11   that people who engage in criminal activity commonly keep

12   items that are used, obtained or produced during the

13   commission of their crimes as well as items documenting the

14   crimes themselves.  Is that a true statement?

15        A    Yes.

16        Q    And it's your experience that persons that engage

17   in the collection, dissemination of child pornographic images

18   commonly document their actions with writings and photographs

19   and rarely destroy those writings or photographic images,

20   isn't that true?

21        A    Yes.

22        Q    You talk about this Sharp camcorder that Mr. Lovric

23   introduced into evidence, do you remember that?

24        A    Yes, ma'am.

25        Q    And in your search warrant application you

Terry Shultz - Cross

365

1    indicated that it was not specifically described by the

2    victim, is that true?

3        A    Yes.

4        Q    Now you had an opportunity to interview the

5    individuals that were renting 45 Fair Street in or about

6    March or April, I'm sorry, of '08, is that correct?

7        A    That were renting in April of '08 or previous

8    renters?

9        Q    Previous renters.

10       A    That I interviewed in April?

11       Q    I'm sorry.  Strike that.  That's correct.  Previous

12   renters that you interviewed in April.

13       A    Yes.

14       Q    And who were those individuals that you spoke to?

15       A    I believe you're talking about Michael VanVilet and

16   Kimberly McKeon.

17       Q    Correct.  As a result of speaking to them, you

18   learned they never saw Linda O'Connor with any kind of

19   camera, is that correct?

20       A    Correct.

21       Q    They never saw her with any type of video

22   equipment, correct?

23       A    That's my recollection.

24       Q    And they never saw her using any type of computer,

25   correct?

Terry Shultz - Cross

1    A    Correct.

2    Q    In fact, what they did observe about Linda is that

3    they would see her walking her dogs, correct?

4    A    Yes.

5    Q    And they said she had the TV on constantly,

6    correct?

7    A    Yes.

8    Q    They also provided you with letters that they had

9    received from Mr. Sacco while Mr. Sacco was in jail, is that

10   correct?

11   A    Correct.

12   Q    And those letters were pertaining to the property,

13   correct?

14   A    Yes.

15   Q    And the rent?

16   A    Yes.

17   Q    And Mr. Sacco was concerned because he needed money

18   from them to pay the mortgage, correct?

19   A    Correct.

20   Q    And he was trying to tell them where to send the

21   money, correct?

22   A    I don't recall that part, but it sounds vaguely

23   familiar, that part, yes.

24   Q    Is it fair to say that the tone of his letter was

25   an attempt to make sure that he was able to maintain or keep

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Shultz - Cross

1   the property and pay the mortgage while he was in jail, is

2   that fair?

3       A    Yes.

4       Q    And is it also fair that these two individuals

5   never really had much contact at all with Mr. Sacco?

6       A    Correct.

7       Q    But the tone of the letters was something to the

8   effect, you know, like we can work together and keep the

9   property, something to that effect?

10      A    Correct.

11      Q    Did you follow up on the hard drive that was taken

12  from one of the Lang's, George Lang's computer that was taken

13  from his daughter's house?

14      A    I myself didn't, no.

15      Q    Did you speak to anybody about what was found on

16  the hard drive?

17      A    Yes.

18      Q    And there were no photographs of Shannon O'Connor

19  and George Lang on that computer, is that correct?

20      A    That's correct.

21      Q    And there were no images of child pornography that

22  were found on George Lang's computer, correct?

23      A    Correct.

24              MISS PEEBLES:  Nothing further.

25              THE COURT:  Mr. Lovric?

Terry Shultz - Redirect                              368

1  REDIRECT EXAMINATION

2  BY MR. LOVRIC:

3       Q    Just one question.  Investigator Shultz, you didn't

4  do the forensic examination of the Lang computer, right?

5       A    Correct, I did not.

6       Q    There was a forensic computer expert at CATS that

7  did that?

8       A    Correct.

9       Q    So would it be fair to say that person will

10 probably be better able to say what was on the Lang's

11 computer or what wasn't?

12      A    That's correct.

13                 MR. LOVRIC:  Okay.  Nothing further.

14                 THE COURT:  Anything further?

15                 MISS PEEBLES:  No, your Honor.

16                 MR. FISCHER:  No, your Honor.

17                 THE COURT:  Thank you, Investigator Shultz.

18 You may step down, sir.

19                 (Witness excused)

20                 MR. LOVRIC:  Next witness we call is Clesson

21 Lockwood.

22                 THE CLERK:  Mr. Lockwood, please come forward

23 to be sworn, sir.

24                 Would you state your name for the record

25 please.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Clesson Lockwood - Direct

1                    THE WITNESS:  Clesson Lockwood, Sr.

2    C L E S S O N    L O C K W O O D, SR., having been called as

3    a witness, being duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. LOVRIC:

6        Q    Good morning.  Morning, Mr. Lockwood.

7        A    Good morning.

8        Q    Okay.  Try to speak into the microphone, okay?

9        A    Okay.

10       Q    All right.  Just so we can all hear you.  All

11   right.  Could you tell the jury members again your full name,

12   please?

13       A    My full name is Clesson Lockwood, Sr.

14       Q    Okay.  And what county do you reside in?

15       A    Chenango County.

16       Q    And how long have you lived in the Chenango County

17   area?

18       A    Probably -- probably 35 years.

19       Q    Thirty-five?

20       A    Yes.

21       Q    About 35 years?

22       A    Yes.

23       Q    Did you grow up in New York State or did you grow

24   up anywhere else outside of New York State?

25       A    In New York State I grew up.

Clesson Lockwood - Direct

370

1    Q    How old are you right now?

2    A    Sixty-two.

3    Q    I'm sorry?

4    A    Sixty-two.

5    Q    Okay.  And do you reside -- you live alone, you

6    live with somebody?

7    A    I live with my wife.

8    Q    Okay.  How long have you been married?

9    A    Thirty-eight years.

10   Q    Thirty-eight?

11   A    Yes.

12   Q    That's a long time.  What do you do for a living,

13   Mr. Lockwood?

14   A    I work for myself, landscaping, hauling garbage and

15   stuff out.

16   Q    Is it fair to say you do a lot of handyman kind of

17   work?

18   A    Yes, I do.

19   Q    Whereabouts do you work, what area?

20   A    In Norwich, New York.

21   Q    Okay.  And do you from time to time mow lawns for

22   people?

23   A    Yes, I do.

24   Q    Do you from time to time cut bushes or trees and

25   haul them away for folks?

Clesson Lockwood - Direct

371

```
 1      A    Yes, I do.
 2      Q    How about garbage that people collect and put out
 3  and want taken to the dump, do you do that kind of work?
 4      A    Yes, I do.  I take that away too.
 5      Q    Okay.  Is that pretty much the way you make a
 6  living?
 7      A    Yes.
 8      Q    Okay.  Now, Mr. Lockwood, do you know a person
 9  named Dean Sacco?
10      A    Yes, I do.
11      Q    How do you know Dean Sacco?
12      A    Because he stopped to my house and asked me to haul
13  brush and stuff out of the garage in the back apartment on
14  Fair Street.
15      Q    Okay.  The first time that you met Dean Sacco,
16  where did you first meet him?
17      A    Down by my house.
18      Q    Okay.  Did he come to see you or did you go to see
19  him?
20      A    He came down to see me.
21      Q    Okay.  About when, like what year was it that you
22  remember meeting Dean Sacco?
23      A    I don't remember what year it was, no.
24      Q    Okay.  When you met Dean Sacco, did he own any
25  property or any house in the Norwich area?
```

Clesson Lockwood - Direct

372

```
 1    A    He owned one up on Fair Street.

 2    Q    Okay.  Do you remember the address at Fair Street?

 3    A    I think it was 48, I think.

 4    Q    Okay.  If I showed you a picture of the house,

 5  would you recognize it?

 6    A    Yes, I would.

 7              MR. LOVRIC:  I'd like to show the witness,

 8  your Honor, Exhibit 50 marked for identification.

 9              THE COURT:  Okay.

10    Q    Mr. Lockwood, I'm going to show you Exhibit 50.

11  Can you take a look at that photo.

12    A    Yes, I can.

13    Q    Okay.  Do you recognize what's in that photo?

14    A    Yeah.

15    Q    What is that?

16    A    That's a house.

17    Q    Is that the house that you're talking about that

18  Dean owned?

19    A    Yes, it is.  Yep.

20    Q    Okay.

21              MR. LOVRIC:  Judge, I'm going to offer

22  Government's Exhibit number 50 into evidence.

23              MR. FISCHER:  No objection.

24              MISS PEEBLES:  No objection.

25              THE COURT:  Receive Government's 50 in
```

Clesson Lockwood - Direct                    373

1    evidence.

2        Q    Mr. Lockwood, I'd like you to take a look around.

3    Do you see Dean Sacco in court today?

4             Do you need your glasses?

5        A    Yeah.

6        Q    Okay.  If you need to stand up, it's okay.

7        A    Okay.

8             THE COURT:  But you've got to stand up without

9    wrecking our microphone.

10       A    Yeah, he's over there (indicating).

11       Q    Okay.  What's he wearing?

12       A    Blue shirt with bald head.

13       Q    Okay.

14            MR. LOVRIC:  I would say that's definitely

15   identifying defendant Mr. Sacco.

16            THE COURT:  Record will so reflect.

17       Q    Okay.  Mr. Lockwood, so the first job that Mr.

18   Sacco -- Mr. Sacco had you do was to do what again?

19       A    Clean out the brush and stuff out of the garage

20   over on Fair Street.

21       Q    And you cleaned that out and did what with it?

22       A    I took it up to the dump.

23       Q    Okay.  Did Mr. Sacco pay you for that work?

24       A    Yes, he did.

25       Q    Do you remember about how much he paid you?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Clesson Lockwood - Direct

374

1     A     I think around 50 bucks.

2     Q     Okay.  And then from time to time did you do other

3    work for Mr. Sacco at that house that you pointed out for us?

4     A     Yes, I have.

5     Q     Okay.  And what other kind of work did you do for

6    him around the house?

7     A     I cleaned out his basement.  I took dirt out and

8    took it out of the -- took it out of the cellar.

9     Q     You took dirt out and you dug out the cellar?

10    A     Right.  Yeah.

11    Q     And what, did you haul that dirt away?

12    A     No, I hauled it out onto the lawn.

13    Q     Okay.  Onto the ground?

14    A     Yes.

15    Q     Okay.  So you kind of spread it around the

16    property?

17    A     Right.  Right.

18    Q     Okay.  And then did you do any hauling of garbage,

19    garbage that was put on the curb to be taken away or hauling

20    of garbage to the dump?

21    A     Yes.  That was up in his apartment up on the second

22    floor.

23    Q     From the second floor?

24    A     Right.

25    Q     Okay.  Did Mr. Sacco pay you for that as well?

Clesson Lockwood - Direct

375

1    A    Yes, he have.

2    Q    Okay.  Now, at that house, at 45 -- at the house

3  you identified on Fair Street, did you -- did you ever see

4  who lived upstairs in that apartment?  Did you know who lived

5  upstairs?

6    A    I seen them only one time before they moved out.

7    Q    Okay.  Who lived in the upstairs of that house?  I

8  don't mean by name.  What did the people look like that lived

9  up there?

10   A    Two old, older people.

11   Q    Okay.

12   A    Yes.

13   Q    Was it a man and a woman?

14   A    Yes, it was.

15   Q    Okay.  And by older, they were old old or...

16   A    Probably they better than 50.

17   Q    Wow.  I'm almost 50.  Okay.  So they were really

18  old?

19   A    Yeah.

20   Q    Okay.  And then you said they moved out at some

21  point?

22   A    Yes.  They moved out of the upstairs apartment.

23   Q    Okay.  I'm sorry.  Go ahead.  And then did you ever

24  know or see who lived downstairs?

25   A    I only seen her one time, and then she asked me

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Clesson Lockwood - Direct

376

1   about hauling her garbage away.

2       Q    Okay.  And who lived downstairs in that house, if

3   you know?  Who was it?  You said you'd only seen her one

4   time?

5       A    I don't know her name, no.

6       Q    Okay.  Do you see that person in court, the woman

7   or the person that lived downstairs?

8       A    Yeah, over there (indicating).  The one in the

9   yellow.

10      Q    The one on the right?

11      A    Yellow.

12      Q    Wearing yellow?

13      A    Yes.

14           MR. LOVRIC:  Just for the record, indicating

15  defendant O'Connor.

16           THE COURT:  Record will so reflect.

17      Q    Now, did you know whether anybody else lived with

18  the woman that you just pointed to?  Do you know if anybody

19  else lived with her downstairs?

20      A    There was some -- I think there was her daughter.

21      Q    A little girl?

22      A    Right.

23      Q    Okay.  Now, at some point did you move any property

24  or any things out of that second floor part of the house?

25  Did you move any stuff out of that second floor?

Clesson Lockwood - Direct

377

1    A    Yes, I have.

2    Q    Okay.  What was moved out of the second floor?

3  What was taken out?

4    A    There's some clothes.  There's some dressers,

5  refrigerator and black trunk.

6    Q    Okay.  And who was it that had you move the things

7  out of the second floor?

8    A    Dino.

9    Q    Okay.  Mr. Sacco?

10   A    Yes.

11   Q    Okay.  Did you do that by yourself or did anybody

12  help you move those things out of the second floor?

13   A    Him and I did.  We moved it out and put it in the

14  garage.

15   Q    Okay.  Okay.  And these things on the second floor

16  that were moved out, so it was you and Mr. Sacco and you took

17  them to the garage area?

18   A    Yes, we have.

19   Q    Now the garage, are we talking about the garage of

20  the same property, the same house?

21   A    Yes, they was.

22   Q    Okay.  Okay.  I'm going to show you what's been

23  marked as Government's Exhibit Number 51.

24        Okay.  Mr. Lockwood, I'm going to show you this

25  exhibit, and tell me if you recognize what's shown there.

1    Okay.

2          A     Yes, I do.

3          Q     Okay.  What is that?

4          A     That -- that's the garage.

5          Q     Is that the garage that you're talking about where

6    you moved this property from -- these things from the second

7    floor into?

8          A     Yes, they are.

9                 MR. LOVRIC:  Judge, I would offer Exhibit

10   Number 51 into evidence.

11                MR. FISCHER:  No objection.

12                MISS PEEBLES:  No objection.

13                THE COURT:  Receive Government's 51 in

14   evidence.

15         Q     Okay.  Mr. Lockwood, if you look at your screen

16   right there next to you, can you see that?

17         A     Yes, I do.  Yes.

18         Q     Okay.  Now, I'm going to point.  Can you see the

19   pen I'm pointing with?

20         A     Yes.

21         Q     Okay.  We see three doors to this left side

22   building.  Okay?

23         A     Yes.

24         Q     And then there's a center -- some kind of garage

25   part with a basketball hoop over it?

Clesson Lockwood - Direct

379

1      A    Yes.

2      Q    And then on the right you see three additional

3  doors to this building, right?

4      A    Right.

5      Q    Okay.  Now where did you move -- where did you and

6  Mr. Sacco move those things from the second floor apartment

7  to?

8      A    In the building beside the three garage doors.

9      Q    There's three buildings there; there's left, center

10  and the right.

11      A    That middle one.  The center one.

12      Q    Is that --

13              MR. LOVRIC:  Marlene, are you doing that the

14  green button?

15              THE COURT:  Where did that arrow come from?

16              MR. LOVRIC:  I've got the pen.  I'm just

17  saying, where did the green button come from?

18              THE COURT:  Mr. Lockwood, you put that green

19  arrow.

20      Q    You pressed the screen.  Do that again.  Press the

21  screen again.

22      A    Okay.

23      Q    Maybe I should just have you do this.  Okay.

24  That's the building you moved the property to?

25      A    Yes.

Clesson Lockwood - Direct

1    Q    Got it.  Okay.  So, the stuff that you and Mr.

2  Sacco moved from the upstairs went into that middle storage

3  area?

4    A    Yes, it did.

5    Q    Okay.  Now, did Mr. Sacco tell you why he was

6  moving the things out of the second floor apartment into that

7  middle storage area?

8    A    Yeah, because he said he wanted to get it fixed up

9  so he could rent it out.

10   Q    So he was getting ready to rent out the apartment

11  again?

12   A    After he got it fixed up.  After he got it fixed

13  back up.

14   Q    After he fixed it up.  Now this is after the two

15  old people moved out?

16   A    Yes, they was.

17   Q    Now, you mentioned that one of the things you moved

18  out of that second floor apartment was a dresser?

19   A    Yes.

20   Q    What kind of a dresser are we talking about?

21   A    The wooden one.  Brown wooden one, five-drawer

22  dresser.

23   Q    Was there one dresser or more than one dresser

24  moved out?

25   A    There were two moved out.

Clesson Lockwood - Direct

1    Q    And you and Mr. Sacco put those into that building?

2    A    Yes, we did.

3    Q    Did you ever look inside what was inside the

4  dresser?

5    A    No, I never did.

6    Q    Did Mr. Sacco tell you what was inside the dresser?

7    A    No, he hasn't.

8    Q    Okay.  Do you remember moving any bicycle out of

9  the apartment?

10    A    Yes, I did.

11    Q    Okay.  Where was the bicycle when you and Mr. Sacco

12  moved it into that building?

13    A    It was in the first garage door.  In the first

14  garage in on Fair Street.

15    Q    Why don't you point to it?

16    A    Okay.  (Indicating.)

17    Q    That's very good.  You taught us something today,

18  Mr. Lockwood.  I didn't know that could do that.

19         Okay.  So, on the first garage bay there.  And you

20  mentioned a refrigerator?

21    A    Yes.

22    Q    Where was the refrigerator when you and Mr. Sacco

23  moved that into that storage unit?

24    A    It was up there in the upstairs apartment.

25    Q    Okay.  Do you remember moving any kind of a chest

Clesson Lockwood - Direct

1    or a big container?

2        A    Yes.

3        Q    Okay.  Where was that when you moved it into this

4    storage, middle storage place?

5        A    It was up there in the bedroom, upstairs in the

6    apartment house.

7        Q    Do you remember anything about the storage chest?

8    Did you see anything about it that you remember?

9        A    That there was some books on top of it.

10       Q    Okay.  What kind of books were on top of it?

11       A    Dirty books.

12       Q    Okay.  Dirty magazines?

13       A    Right.

14       Q    Okay.  And when you moved that into this middle

15   building, that was where again?  In which place?

16       A    They were upstairs in that apartment house on Fair

17   Street.

18       Q    Okay.  Same one, upstairs apartment?

19       A    Yes.

20       Q    Now, did you -- did you ever talk to Mr. Sacco

21   about -- or did he ever talk to you, I should say.  I'm

22   sorry.  Did he ever talk to you about his downstairs tenant?

23       A    No, he had not.

24       Q    Okay.  Back when were you working for him, did he

25   ever say anything about his tenant downstairs?

Clesson Lockwood - Direct
383

```
 1     A    No, he did not.
 2               MISS PEEBLES:  Objection.  I'd object.  He
 3   already asked and answered.
 4               THE COURT:  Okay.
 5     Q    Did you at any point have any discussions -- Excuse
 6   me.  Let me withdraw that.
 7          Did you at any point meet any relatives of Mr.
 8   Sacco?
 9     A    Yes, I have.
10     Q    Okay.  Who did you meet?
11     A    His mother when she came up to the apartment when
12   we were tearing it up.
13     Q    When you were cleaning up the apartment?
14     A    Right.
15     Q    Did you know where his mother was from?
16     A    No.  They never said nothing about where they were
17   from.
18     Q    When you say they, was it his mother or somebody
19   else?
20     A    His mother and I think his son -- his brother, I
21   think.  They didn't say who they was.
22     Q    Okay.  And how many times did you meet Mr. Sacco's
23   mother?
24     A    One times.
25     Q    If you saw her, would you recognize her?
```

384

1    A    No, I would not.

2    Q    You don't remember what she looks like?

3    A    No.

4    Q    Okay.  Now, all these things that you told us about

5    that you moved from the second floor apartment into this

6    middle unit, what happened once everything was put into that

7    unit?  Let me ask you this:  Once everything was put into

8    that unit, was there any lock put on that unit?

9    A    Yes, there was.

10   Q    Who put the lock on?

11   A    Dino did.

12   Q    Mr. Sacco?

13   A    Yes.

14   Q    Who had the key for that lock?

15   A    Sacco gave me one and he kept one.

16   Q    Okay.  And sometime after you moved these things

17   with Mr. Sacco into that unit, into that -- I should call it

18   that building, I'm sorry.  Did -- At some point after that

19   did you learn that Mr. Sacco had been arrested and was at the

20   jail?

21   A    I did when -- after I seen it on the TV.

22   Q    Did Mr. Sacco at some point then reach out to you?

23   A    Yes, he did.

24   Q    How did he reach out to you?

25   A    He wrote to me from the county jail in Norwich.

Clesson Lockwood - Direct

385

1      Q      And what did he ask you to do?

2      A      He asked me to go up and get the storage chest so I

3   can get stuff out of the apartment, out of the garage

4   because -- before the people took it back over.

5      Q      Okay.  When you got this letter from Mr. Sacco, did

6   you go to see him?

7      A      I went and seen him, yeah.

8      Q      Okay.  You went over to the county jail?

9      A      Yes.

10     Q      And when you -- did you speak to him when you went

11  to see him?

12     A      Yes, I did.

13     Q      When you spoke to him, what was it he wanted you to

14  do?

15     A      He want me to send some of his dirty books out of

16  the storage shed.

17     Q      Let me back up one step, Mr. Lockwood.  Before this

18  conversation, was there a conversation where he asked you to

19  take things and get them into a storage area?

20     A      Yes, he did.

21     Q      Okay.  Let me talk about that first.  Okay.  When

22  was it that he asked you to go and get a storage area?

23     A      Before, before September.

24     Q      Okay.  Was -- was he in jail at the time that he

25  asked you to do that?

Clesson Lockwood - Direct

1    A    Yes, he did.

2    Q    Okay.  So is that the first time that you go to see

3    him at the jail, when he's talking to you about getting a

4    storage area?

5    A    Yes, it was.

6    Q    Okay.  What kind of a storage area was he asking

7    you to get?

8    A    Storage area so he could put all of his stuff in so

9    he could -- so nobody else can get into it.

10   Q    Okay.  And when he was saying all his stuff,

11   referring to what stuff?

12   A    The stuff that we moved out of the garage.

13   Q    All of the stuff that's in this building that you

14   pointed to?

15   A    Yes.

16   Q    And did you go out and get a storage unit?

17   A    Yes, I did.

18   Q    Okay.  Do you remember where that storage unit is?

19   A    Yeah.  It's over on East River Road in Norwich.

20   Q    What's the name of the road?

21   A    East River Road.

22   Q    East River Road?

23   A    Yes.

24   Q    Do you remember the name of the business, the name

25   of the business where the storage unit is located?

Clesson Lockwood - Direct

1    A    No, I don't.  No.

2    Q    Okay.  And did you go there and rent the storage

3 unit?

4    A    Yes, I did.

5    Q    Do you remember what storage unit it was?

6    A    Yeah.  129.

7    Q    And did you actually sign papers to rent that

8 storage unit?

9    A    Yes, I did.

10    Q    And after you got that storage unit, what was it

11 that Mr. Sacco asked you to do as far as that storage unit

12 was --

13    A    He told me to keep paying on it and he going to

14 send me the money.

15    Q    Okay.  And once you got the storage unit did you

16 put anything into the storage unit?

17    A    Yes.  I put all the stuff in it that came out of

18 the garage that I point at on Fair Street.

19    Q    Okay.  So, all the stuff you pointed to on this

20 screen, that middle building?

21    A    Yes.

22    Q    Okay.  So you took all that stuff and put it into

23 the storage unit?

24    A    Yes, I did.

25    Q    Okay.  Do you remember a bicycle?

Clesson Lockwood - Direct

```
1      A    Yes.

2      Q    A refrigerator?

3      A    Yes.

4      Q    A dresser?

5      A    Yep.

6      Q    Dresser drawers?

7      A    Yes.

8      Q    Some other boxes and materials?

9      A    Right.

10     Q    And all the stuff you put into that 129 storage

11   unit?

12     A    Yes, I did.

13     Q    And all those things came from where?

14     A    Came from the building that I point at on Fair

15   Street.

16     Q    Okay.  This building we were just talking about?

17     A    Okay.  Right.

18     Q    Did you ever look through that stuff?  Did you ever

19   open things up and go through it?

20     A    No, I haven't.

21     Q    You just took it and put it in there?

22     A    Right.

23     Q    Did Mr. Sacco actually give you or send you money

24   for the storage unit?

25     A    Yes, he have.
```

Clesson Lockwood - Direct

1    Q    Okay.  How did he send you money?

2    A    With a check.

3    Q    Okay.  And did you make payments on the storage

4  unit?

5    A    Yes, I did.

6    Q    Do you remember how much it was per month for the

7  storage unit?

8    A    Twenty-three dollars a month.

9    Q    Do you remember if you had to put any deposit down?

10   A    Yeah, we had to put 20-dollar deposit down.

11   Q    Okay.  And did you then make payments on that

12 storage unit for a number of months?

13   A    Yes, I have.

14   Q    Now, at some point did Mr. Sacco ask you to go into

15 that storage unit and to get something for him?

16   A    Yes, he did.

17   Q    What did he ask you to get out?

18   A    He wanted some -- he wanted some dirty magazines

19 and some under 18 book, send them down to the jail.

20   Q    Did you actually then go to that storage unit and

21 take out some of those magazines?

22   A    Yes, I have.

23   Q    Okay.  What did you do when you got those magazines

24 out of the unit?

25   A    I took them over to the post office and got a box

Clesson Lockwood - Direct

1    and ship them out to him.

2        Q    Okay.  You mailed it to him?

3        A    Right.

4        Q    Okay.  Other than getting some of those magazines

5    out, did you ever go into that storage unit any other time?

6        A    No, I have not.

7        Q    Okay.  All the things that you put into that

8    storage unit 129, are any of those things your property?

9        A    No, they are not.

10        Q    All the things in storage unit 129, did all of

11    those things come out of this building that you pointed to?

12        A    Yes, they have.

13        Q    And all of the things in this building, did all of

14    that except for the bicycle come from that second floor

15    apartment?

16        A    Yes, they did.

17        Q    Now, at some point did Mr. Sacco tell you that

18    somebody else would be paying for this storage unit?

19        A    Yes, he did.

20        Q    And who was that that was going to start paying on

21    this storage unit?

22        A    His mother was going to start paying on it.

23        Q    Okay.  And then once his mother started paying, I

24    take it you stopped paying, you didn't keep paying on the

25    storage unit, right?

Clesson Lockwood - Direct

391

1       A    Right.  I did not pay on it after that.

2       Q    Okay.  Okay.

3            MR. LOVRIC:  That's all the questions I have.

4  Thank you, Mr. Lockwood.

5            THE COURT:  Mr. Fischer.

6            MR. LOVRIC:  The other attorneys are going to

7  ask you some questions.

8            MR. FISCHER:  Thank you, your Honor.

9            Mr. Lovric, do you have exhibits 16 to 33?

10           MR. LOVRIC:  Yes.

11           MR. FISCHER:  May it please the Court, your

12  Honor.  Counsel.

13  CROSS-EXAMINATION

14  BY MR. FISCHER:

15      Q    Mr. Lockwood.  My name is Kelly Fischer.  I

16  represent Dean Sacco.  I'm going to ask you a number of

17  questions.

18           First of all, did I hear you correctly to say that

19  Mr. Sacco asked you to get some under 18 magazines and send

20  them to him?

21      A    Yes, I did.

22      Q    And did you get under 18 magazines out of that

23  storage unit and send them to Mr. Sacco?

24      A    Yes, I have.

25      Q    And where did you send them when you sent them to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Clesson Lockwood - Cross

1   Mr. Sacco?

2       A    I sent them to the jail in Norwich, New York.

3       Q    The jail in Norwich?

4       A    Yes, I have.

5       Q    How did you package those so that they got sent to

6   the jail?

7       A    I went over -- down to the post office and got a

8   box and put them in the box and mailed them out to him.

9       Q    You have given a written statement that you signed.

10  Do you remember doing that about two months ago?

11      A    Signed what?

12               MR. FISCHER:  My apologies, your Honor.  May I

13  have these marked, please?

14               THE COURT:  Not a problem.

15               THE CLERK:  S-3 marked for identification.

16               MR. FISCHER:  May I approach the witness, your

17  Honor?

18               THE COURT:  Yes, you may.

19               MR. FISCHER:  Thank you.

20  BY MR. FISCHER:

21      Q    Sir, I'll hand you what's been marked for

22  identification as Exhibit S-3.  Do you recognize that

23  document?

24      A    Yes.

25      Q    Did Detective Blenis come to you and bring that to

Clesson Lockwood - Cross

1    you and did you sign it?

2        A    Yes, he did.

3        Q    Does that refresh your recollection now about that

4    event?

5        A    Yes.  Yep.

6        Q    When did you first meet Mr. Sacco?

7        A    I really don't know when I really did meet him.

8    They didn't -- earlier spring because earlier spring when I

9    met him.

10       Q    He came to your home first?

11       A    Yes, he did.

12       Q    Was that in 2005?

13       A    It might have been.

14       Q    Do you remember whether it was summer or winter?

15       A    It was in the springtime.

16       Q    In the springtime?

17       A    Yes.

18       Q    All right.  And that's when you first began to work

19   with or for Mr. Sacco?

20       A    Yes.

21       Q    Now, 45 Fair Street, how close is that to your

22   home?

23       A    Probably about four blocks away, if not five.

24       Q    And you live at your home with yourself and your

25   wife?

Clesson Lockwood - Cross

394

1    A    Yes.

2    Q    Anybody else live there?

3    A    Not in our apartment.

4    Q    Do you have any children who live with you?

5    A    No, I don't.

6    Q    Do you have any children?

7    A    Yes.

8    Q    How old are they?

9    A    About 25, one is 28, and then I've got one daughter

10   27, I got one 32.

11   Q    And the boys, do they live in the Norwich

12   community?

13   A    Yes, they do.

14   Q    What are their names?

15   A    Thomas Lockwood, and one is Clesson Lockwood, Jr.

16   Q    What was the first job you did for Mr. Sacco?

17   A    I went up to the garage and took the brush out of

18   the garage and take it to the dump.

19   Q    Do you remember what the weather was like at that

20   time?

21   A    It was cold out.

22   Q    How long did that job take?

23   A    Probably four hours maybe.

24   Q    Did Mr. Sacco work with you when you did that work?

25   A    Yes, he did.

Clesson Lockwood - Cross

395

1      Q     Do you remember, have any idea whether it was a

2  weekday, Monday through Friday, or a weekend?

3      A     It was on the weekend.

4      Q     How long did you say this process took?

5      A     About four hours.

6      Q     Okay.  Did Mr. Sacco work with you during that four

7  hours?

8      A     Yes.

9      Q     Did you have a vehicle of some sort?

10      A     I had a pickup.

11      Q     Was it just one run that you had to take to the

12  dump to get rid of the junk?

13      A     Yeah.

14      Q     Now, did -- at this time did Mr. Sacco -- before

15  you ever worked on the garage, taking garbage out of the

16  garage, did Mr. Sacco at that time to your knowledge own the

17  property?

18      A     Not until he came down and said he owned the place

19  up on Fair Street.  He stopped down the house and told me.

20      Q     Had he done other work, to your knowledge, before

21  you worked on the garage?

22      A     No.

23      Q     What was the next opportunity that you had to work

24  with Mr. Sacco at 45 Fair Street?

25      A     In that job that I had to do.

Clesson Lockwood - Cross                    396

```
1    Q    No.  You worked on cleaning the garage out?

2    A    Yeah.

3    Q    How much did he pay you for that?

4    A    Fifty bucks.

5    Q    Okay.  And then when is the next time you worked at

6  45 Fair Street?

7    A    About -- about a week after I cleaned the brush out

8  of the garage.

9    Q    What kind of work did you do then?

10   A    Clean out the cellar, clean the dirt out of the

11 cellar.

12   Q    How much dirt did you have to clean out of the

13 cellar?

14   A    Oh, probably went down probably -- probably went

15 down two foot.

16   Q    You dug down two feet?

17   A    Right.

18   Q    For the whole cellar?

19   A    That back end of the cellar.  Back part of the

20 cellar.

21   Q    About how big, feet by feet?

22   A    Probably 12 by -- maybe 12 by 10.

23   Q    Did Mr. Sacco help you do any of that work?

24   A    Yes.

25   Q    How much did he help?
```

Clesson Lockwood - Cross

397

1    A    Quite a lot when I was down in there digging.

2    Q    Did he express to you why that had to be dug out?

3    A    He wanted to make another apartment down there

4    because he said he was going to move down in there.

5    Q    How long did that job take?

6    A    Probably two weekends.

7    Q    Okay.  So over the course of those two weekends the

8    two of you worked together to dig that basement out?

9    A    Yes.

10   Q    He worked there with you on both weekends?

11   A    Right.

12   Q    Now, when this work was being done, okay, was the

13   family, the woman that you see here, were they living at 45

14   Fair Street?

15   A    No, they was not.

16   Q    Who lived at 45 Fair Street at the time you were

17   digging out that basement?

18   A    Oh, yeah.  The woman over there was living there.

19   Q    The woman here in yellow?

20   A    Right.  Was living there downstairs.

21   Q    Now when you dug out the basement at 45 Fair

22   Street, was it still cold?

23   A    No.  Pretty nice out then when we digging that out.

24   Q    Did you do any work for Mr. Sacco after the two of

25   you dug out that basement?

Clesson Lockwood - Cross

398

1    A    Yes, I have.

2    Q    When is the next time you did any work for Mr.

3  Sacco at 45 Fair Street?

4    A    Oh, maybe -- probably about a month after we dug

5  the hole out.

6    Q    What did you do then?

7    A    We went upstairs and take the rugs and stuff off

8  the floor because he going to fix the apartment up so he can

9  rent it back out again.

10    Q    So when you went there to remove the belongings

11  from the upstairs apartment, the upstairs tenants had moved

12  out?

13    A    Yes, they have.

14    Q    When you took stuff from the garage and when you

15  dug out the basement, those upstairs tenants were still

16  living there?

17    A    No.  They was not.

18    Q    How much time did you spend removing things from

19  the second floor apartment out to the shed?

20    A    Oh, probably a half a day.

21    Q    On any of these occasions when you worked for Mr.

22  Sacco, did either of your boys come over and help you?

23    A    No, they have not.

24    Q    Do they ever work with you?

25    A    No.  Not very often.

Clesson Lockwood - Cross

1    Q    From time to time they will?

2    A    Yes.  Yep.

3    Q    What time of year was it when you moved the stuff

4  out of the second floor apartment out to the shed?

5    A    What was that again?

6    Q    What time of year was it when you moved the things

7  from the apartment out to the shed?

8    A    Oh, in July I think it was.  July, first part of

9  August.

10    Q    Okay.  And you said that took about a half a day?

11    A    Yes.

12    Q    And Mr. Sacco and you both participated, you both

13  worked doing that?

14    A    Right.

15    Q    Now at this time, was Mr. Sacco working in the

16  Norwich area?  Did he have a job up there?

17    A    He had a job -- yes, he did.

18    Q    What was that job?

19    A    It was up on Plymouth Street taking stuff -- taking

20  vegetables down to New York.

21    Q    Driving for a farmer?

22    A    Right.  Yep.

23    Q    Was Mr. Sacco a hard-working man?

24    A    Yes, he was.

25    Q    Oh.  Now, when you took the stuff from the

Clesson Lockwood - Cross

1  apartment out to the shed, you kept a key to the lock for the

2  shed?

3      A    Yes, I did.

4      Q    And Mr. Sacco kept a key to that lock?

5      A    Yes.

6      Q    Did anybody else, to your knowledge, have a key to

7  that lock?

8      A    No, they have not.

9      Q    Now, when the second floor apartment was vacated,

10 were there keys to a door that had to be unlocked to get into

11 that apartment?

12     A    No.

13     Q    There were no locks on the second floor doors?

14     A    No.  No.  Only if he had one, because I didn't have

15 one.

16     Q    Do you remember that there were keys hanging from a

17 nail or a screw on the stairway going from -- going down into

18 the basement?

19     A    Yeah.  Right.

20     Q    And those were the keys to that second floor

21 apartment?

22     A    Yes, it was.

23     Q    After you did the work with Mr. Sacco removing the

24 items from the apartment, did you do more work for him after

25 that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Clesson Lockwood - Cross

1      A    Yes.  Yes.

2      Q    What other work did you do with Mr. Sacco at that

3  building?

4      A    We tore the rugs and stuff out of the upstairs, in

5  the upstairs apartment.

6      Q    You took out the carpeting, the flooring?

7      A    Yes.

8      Q    How soon was that after you helped move the stuff

9  out of the apartment?

10     A    Probably about a week after we cleaned the stuff

11  out of the apartment.

12     Q    Now, on each of these occasions Mr. Sacco paid you

13  for your time, am I correct?

14     A    Right.

15     Q    Removing the flooring, how long did that take?

16     A    I really don't know.  I didn't keep track of all of

17  my time.

18     Q    Did anybody else other than you and Mr. Sacco work

19  doing that work -- removing the flooring?

20     A    No.

21     Q    Did you do any work for Mr. Sacco after you removed

22  the carpeting and flooring?

23     A    In the wintertime we done the sidewalk and mowed

24  the lawn.

25     Q    So in the summertime you'd get over and cut the

Clesson Lockwood - Cross

402

1    lawn at 45 Fair Street for him?

2        A    Yes, I have.

3        Q    In the wintertime you'd get over and you'd shovel

4    the driveway for him?

5        A    Yes, I did.

6        Q    Did you ever have to do other work inside the

7    building when he wasn't there?

8        A    No, I have not.

9        Q    How did you come to know about the keys to the

10   second floor apartment that were in that stairway going down

11   into the basement, how did you learn that?

12       A    Because he told me he leave them there so if I had

13   to get in there he'd give me the key, because if he called

14   and told me to do something, I would do it.

15       Q    Now, at some point you moved the stuff from the

16   storage shed at 45 Fair Street to like a storage unit, 129?

17       A    Yes.

18       Q    All right.  Does Gary Brightman own that storage

19   unit facility?

20       A    Yes, he does.

21       Q    And where is that located?

22       A    Over on the East River Road in Norwich.  East River

23   Road.

24       Q    When did you move the stuff from the storage unit,

25   the shed on 45 Fair Street over to unit 129?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Clesson Lockwood - Cross

1    A    That was I think the last week in August.  About
2  that.

3    Q    August of 2007?

4    A    Yes.

5    Q    How long did that take?

6    A    Probably about half hour to an hour, if that.

7    Q    So it took you a half a day to move, with Mr. Sacco
8  working with you, a half a day to move the stuff from the
9  apartment into the shed at 45 Fair Street, but working alone
10  it only took you about an hour to hour and a half to move the
11  stuff from the shed at 45 Fair Street to the storage unit
12  129?

13    A    Yes.

14    Q    Did you have anybody working with you when you
15  moved this stuff from the shed at 45 Fair Street to the
16  storage unit number 129?

17    A    No, I have not.

18    Q    You did it all by yourself?

19    A    Yes.

20    Q    Now, as I understand it, there were two dressers
21  that were removed from the apartment upstairs and put into
22  the storage shed, right?

23    A    Yep.

24    Q    So those two same dressers you moved from the
25  storage shed to unit 129?

Clesson Lockwood - Cross

1    A    Yes.

2    Q    How big were those dressers?

3    A    Probably about five, five-drawer dresser I think,

4  if not --

5    Q    Four or five feet?

6    A    About like that (indicating).

7    Q    Now, those dressers had drawers in them?

8    A    Yes, they did.

9    Q    Both dressers had drawers?

10   A    Yes.

11   Q    When you moved the stuff from upstairs to the

12 storage shed at 45 Fair Street, did you and Mr. Sacco remove

13 the drawers from the dressers before you moved it?

14   A    I don't remember.

15   Q    Okay.  When you moved the dressers from Fair Street

16 to unit 129, did you remove the drawers from the dressers?

17   A    No, I haven't.

18   Q    You lifted those full, the dressers with all the

19 drawers in them out of the storage shed and on to your

20 vehicle?

21   A    Yes.

22   Q    And then you also moved them with the drawers in

23 them from your vehicle into unit 129?

24   A    Yes.

25   Q    With no help?

Clesson Lockwood - Cross

405

1      A      Nope.

2      Q      Was there anything -- Withdraw that.

3             When you put the dressers into the unit at unit

4      129, did you take any of the drawers out of the -- out of the

5      dressers?

6      A      No, I didn't.

7      Q      So you don't know whether there was anything in

8      those dresser drawers when you moved the dressers into unit

9      129?

10     A      No, I don't.  Nope.

11     Q      There couldn't have been -- Well, withdraw that.

12            When you lifted those dressers, with the drawers

13     still in them, did it feel to you like there was anything in

14     them?

15     A      No.  They didn't have -- they wasn't that heavy.

16            MR. FISCHER:  May I approach, your Honor?

17            THE COURT:  Yes.

18     Q      Sir, I'm going to show you what's already a

19     document that's been admitted in evidence.  That's Exhibit

20     number 20.  I understand that is a picture taken later on of

21     the items in the storage shed.  Is that consistent with your

22     observation?

23     A      Yes.

24     Q      Okay.

25     A      Yep.

Clesson Lockwood - Cross

406

1      Q    In that picture, Exhibit Number 20, does it appear

2  to you that there are dresser drawers piled?  You can point

3  right to them.  Do you see those?

4      A    Yes.

5      Q    Is that how you put those in there?

6      A    Yes.

7      Q    So you did take the dresser drawers out and stack

8  them up?

9      A    Yep.

10     Q    All right.  When you took the dresser drawers out,

11 was there anything in them?

12     A    I don't look at stuff -- I only take them out and

13 move them.  I don't look to see what's in them.

14          THE COURT:  Okay.  We're going to take a

15 break, ladies and gentlemen.

16          (Short break taken)

17          (Jury present)

18          THE COURT:  Okay.  Mr. Fischer.

19          MR. FISCHER:  Please the Court, thank you,

20 your Honor.

21 BY MR. FISCHER:

22     Q    Mr. Lockwood, did there come a time when there was

23 a heating system that was brought to the building at 45 Fair

24 Street, a boiler system?

25     A    Yes.

1    Q    Do you remember that?

2    A    Yes.

3    Q    Was it a boiler or was it a hot air furnace or what

4  was it?

5    A    I don't really know what kind it was.

6    Q    It was heavy though, wasn't it?

7    A    Not bad.

8    Q    No.  Okay.  You helped Mr. Sacco move the boiler

9  system from the loading dock at the farm down to the house at

10 45 Fair Street, do you remember that?

11   A    Yes.

12   Q    That was in your vehicle?

13   A    Yes.

14   Q    Okay.  At that time the heating system that you

15 got, when you got it, it came off of a loading dock at the

16 farm?

17   A    Yes.

18   Q    All right.  Do you know why it wasn't -- Withdraw

19 that.

20        Was it a new system or was it an old used system?

21   A    I think it was a new one at the time.

22   Q    It was boxed up in wooden --

23   A    Yes.

24   Q    At that time, when you helped move that heating

25 system from the loading dock at the farm to 45 Fair Street,

Clesson Lockwood - Cross

408

1   you actually had to move it down into the basement at 45 Fair

2   Street?

3       A    Yes.

4       Q    Now, at this time when you did this work with Mr.

5   Sacco, was your son Tommy with you during this time?

6       A    Yes, he was.  That time he was.

7       Q    And he also helped move that down into the basement

8   at 45 Fair Street at that time, am I correct?

9       A    Yes, he did.

10      Q    Did you have conversations on the phone with Mr.

11  Sacco from time to time when he was living down in New Jersey

12  and you were up here in New York?

13      A    I don't remember.

14      Q    Do you remember there was a three-piece sofa, I

15  believe you called it brown?

16      A    Yes.

17      Q    Do you remember moving that three-piece sofa from

18  the porch on the first floor up into the apartment on the

19  second floor at one time?

20      A    Yes.

21      Q    That was done when Mr. Sacco couldn't be there and

22  you did that, do you remember that?

23      A    Yes.

24      Q    When you did that, was your son Tommy with you to

25  help you or did you do that by yourself?

Clesson Lockwood - Cross

409

1     A    Tommy was there to help me that time.

2     Q    Those are pretty big pieces of furniture, am I

3 correct?

4     A    Medium size.

5     Q    Now, you moved -- when you moved the stuff from the

6 second floor apartment out to the shed, did you move the

7 couch, etcetera, that three-piece couch out to the shed also?

8     A    Yes.

9     Q    And when you moved the stuff from the shed to unit

10 129, did you move that three-piece brown couch at that time

11 also?

12     A    Yes, I did.

13     Q    So, it would be in these pictures if it's in the

14 shed?

15     A    Yes.

16     Q    And the storage unit 129?  I apologize.

17     A    Right.

18     Q    There was also a white refrigerator or small

19 refrigerator?

20     A    Yes.

21     Q    How heavy was that?

22     A    Not that heavy.  One guy can pick it up and carry

23 it.

24     Q    In addition to cutting the lawns at 45 Fair Street

25 and shoveling snow at 45 Fair Street, you also did weekly

Clesson Lockwood - Cross

410

1  trash removal at 45 Fair Street?

2      A    I did that only one month.

3      Q    Okay.  When you opened the account for the unit

4  129, what I'll call it, okay, where did the money come from

5  to pay for that?

6      A    It came out of my pocket when I first opened it up.

7      Q    And that was in about August of 2007?

8      A    Yes.

9      Q    And did you get reimbursed for that at some point?

10     A    Yes, I did.

11     Q    Sometime later on?

12     A    Right.

13     Q    So you paid out of your own pocket, was it Gary

14  Brightman?

15     A    Gary Brightman, but the secretary was the one

16  taking care of the money.

17     Q    And you gave them cash?

18     A    Yes, I did.

19     Q    And they gave you a receipt?

20     A    Yes.

21     Q    And then later on Mr. Sacco reimbursed you for that

22  money?

23     A    Yes, he did.

24     Q    How much later did Mr. Sacco reimburse you for that

25  money?

Clesson Lockwood - Cross

1      A     About depend -- about two or three weeks after I

2   got the shed -- I got the shed done and then about two weeks

3   after that he sent me the money.

4      Q     At some point did Mr. Sacco pay the --

5   Mr. Brightman's business directly without giving you the

6   money and having you deliver it to the business?

7      A     Yes, he did.

8      Q     How much after you first opened the storage unit

9   129 or opened that account, how much after did that happen

10  that Mr. Sacco began paying Mr. Brightman directly?

11     A     Probably November maybe.  It might have been

12  November.  Something like that.

13                 MR. FISCHER:  Okay.  Those are all the

14  questions I have.  Thank you, your Honor.

15                 THE COURT:  Okay.  Miss Peebles.

16  CROSS-EXAMINATION

17  BY MISS PEEBLES:

18     Q     Mr. Clesson, you were the only one that had a key

19  to access that storage shed, isn't that true?

20     A     Right.

21     Q     And you went to the storage area to retrieve items

22  out of that shed one time?

23     A     Yes, I did.

24     Q     And you remember giving a statement previously to

25  the police, do you remember that?

Clesson Lockwood - Cross

412

 1      A    Yes, I do.

 2      Q    And when you told the police about going to the

 3  storage shed, you just said you went to get some dirty

 4  magazines out of the shed, correct?

 5      A    Right.

 6      Q    You never said they were under 18 when you gave

 7  that statement, correct?

 8      A    I don't know.  I don't remember if I did or not,

 9  but that's what they was.  They're under 18 magazines.

10      Q    Well, if you had a chance to look at your

11  statement, would that help refresh your recollection about

12  what you said?

13      A    Probably.

14           MISS PEEBLES:  May I approach, your Honor?

15           THE COURT:  Yes, you may.

16           MISS PEEBLES:  Was this previously marked as

17  an exhibit or not?

18           I guess this could be O-8.

19           This has been marked as S-3.

20           THE COURT:  Okay.

21      Q    I'm going to hand you, Mr. Clesson, what's been

22  marked as Exhibit S-3 and ask you, if you could, to read --

23  Excuse, me, sir.  Can you read?

24      A    Yeah.

25      Q    Okay.  I'm going to ask you to take a look down at

Clesson Lockwood - Cross

413

```
1   the second-to-last paragraph or last paragraph and read that
2   to yourself, and I'm going to ask you some questions, okay?
3           Did you have a chance to look at that, Mr. Clesson?
4       A   Yeah.
5       Q   Now in that statement that you gave -- and that was
6   on March 10 of 2008, is that when that was?
7       A   Yes.
8       Q   You didn't mention anything about underaged girl
9   magazine, did you, under 18?
10      A   No.
11      Q   Okay.  Now, Mr. Clesson, you never went back to
12  that storage shed after you got those magazines, that's your
13  testimony, correct?
14      A   Right.
15      Q   You were the only one who had a key to that storage
16  shed, correct?
17      A   Right.
18              MISS PEEBLES:  Thank you.  Nothing further.
19              THE COURT:  Mr. Lovric?
20              MR. LOVRIC:  I have no other questions, Judge.
21              MR. FISCHER:  Nothing further, your Honor.
22              THE COURT:  Okay.  Thank you, Mr. Lockwood.
23  You may step down, sir.
24              THE WITNESS:  Thank you.
25              (Witness excused)
```

William Sorvino - Direct                    414

1                MR. LOVRIC:  Next witness we call is William

2    Sorvino.

3                THE CLERK:  Would you state your full name for

4    the record, please.

5                THE WITNESS:  William Sorvino, S-O-R-V-I-N-O.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

William Sorvino - Direct

415

1   W I L L I A M   S O R V I N O, having been called as a

2   witness, being duly sworn, testified as follows:

3                    MR. LOVRIC:  May I, Judge?

4                    THE COURT:  Yes.

5   DIRECT EXAMINATION

6   BY MR. LOVRIC:

7       Q    Mr. Sorvino, could you, again, just for the members

8   of the jury, tell them your full name, please?

9       A    William Sorvino.

10      Q    And Mr. Sorvino, in what state do you reside in?

11      A    New Jersey.

12      Q    And how long have you lived in New Jersey?

13      A    Since 1963.

14      Q    And generally speaking, what kind of business are

15  you in and what kind of occupation?

16      A    Office furniture.

17      Q    And how long have you been in that kind of

18  business?

19      A    1996.

20      Q    And what is the name of -- Let me ask you this:  Do

21  you own your own company or run your own business?

22      A    I do with another partner.

23      Q    And what's the name of the business?

24      A    Glenwood Office Environments.

25      Q    And what does the business generally do, what

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

William Sorvino - Direct                              416

1  kind --

2      A    We buy and sell new and used office furniture.

3      Q    Okay.  And then when you say you sell, who's your

4  marketing audience that you're selling to?

5      A    It's very -- really wide variety of people, anyone

6  from one person up to medium size corporation, 50 or a

7  hundred people.

8      Q    You sell any courtroom furniture?

9      A    Excuse me?

10     Q    Do you sell any court furniture for the courts or

11 just primarily --

12     A    Primarily office furniture and also home office

13 furniture.

14     Q    Okay.  And where is the business located?

15     A    Right now it's located in Hillside, New Jersey.

16     Q    And was there a prior location that your business

17 was located?

18     A    930 Newark Ave., Jersey City.

19     Q    And around when was it that the business moved to

20 this most recent address?

21     A    About a year, year and a half ago.  I can't

22 remember exactly.

23     Q    Okay.  And then I take it prior to that, you were

24 located at that prior address from the beginning?

25     A    Correct.

William Sorvino - Direct

417

1    Q     Okay.  And Mr. Sorvino, in running this business,
2  do you have a number of employees that work for you?
3    A     I do.
4    Q     About how many people generally on average are
5  employed by your business?
6    A     Between 8 and 12.
7    Q     And employees range in terms of, I take it, what
8  kind of work they perform?
9    A     Yes.  Some are in sales and some are in
10  installation and delivery of office furniture, as well as
11  people in the back office repairing the furniture.
12    Q     Do you know a person named Dean Sacco?
13    A     I do.
14    Q     Do you see Mr. Sacco in court today?
15    A     I do.
16    Q     Can you just point where he is?
17    A     (Indicating.)
18    Q     The gentleman who just raised his hand?
19    A     Yes.  That's Dean Sacco.
20            MR. LOVRIC:  Okay.  For the record, indicating
21  the defendant.
22            THE COURT:  Record will so reflect.
23    Q     Mr. Sorvino, about how many years have you known
24  Mr. Sacco, approximately?
25    A     I would say approximately five and a half, six

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

William Sorvino - Direct

1    years.

2        Q    And did Mr. Sacco at one point work for you?

3        A    He did.

4        Q    And up until when did he work for your business?

5        A    About six months ago.

6        Q    Okay.

7        A    Something like that.

8        Q    All right.  I take --

9        A    Maybe a year ago.  Something like that.

10       Q    Okay.  I take it at some point you learned that he

11   had been arrested?

12       A    Correct.

13       Q    All right.  And up until that point was he employed

14   with your business?

15       A    He was.

16       Q    Now, during the time that Mr. Sacco was employed

17   for your business, was your business always at that first

18   address or did it change over to the second address at the

19   point --

20       A    We started at 930 Newark Ave. in approximately 1996

21   and then moved about a year and a half ago when we just

22   changed the name but really essentially the same business.

23   We bought a building rather than having rented at 930 Newark

24   Ave. for the previous eight or ten years.

25       Q    Let me just try to focus my question.  I'm sorry.

419

1  When Mr. Sacco worked for you, was it at that Jersey City
2  address or did he also work at the new place?
3      A    He worked at both places.
4      Q    Okay.  And when he first was working for you, what
5  kind of job was he doing?
6      A    Telemarketing, answering the phone.
7      Q    And generally speaking, what were his hours like
8  that he worked?
9      A    He made his own hours after a while.  He became
10 more of a company by himself, and then he would just submit a
11 bill to our company and we would pay him accordingly.
12     Q    Okay.  Are you familiar with the d/b/a, doing
13 business as Rising Sun?
14     A    I do.
15     Q    What is that?  What was that?
16     A    I think that's the name he called his company,
17 Rising Sun.
18     Q    Okay.  And at some point in time when he was doing
19 work for your business, did he get paid and bill you for work
20 performed under the name of d/b/a Rising Sun?
21     A    Correct.
22     Q    Okay.  And I take it you and your company paid him,
23 you know, based upon how many calls he made and things like
24 that?
25     A    Correct again, sir.

William Sorvino - Direct

1    Q    Now, when he worked at the Jersey City address,
2  location, what was Mr. Sacco's work area?  What did it
3  consist of?  Where did he physically work in that --
4    A    He had a work station where he worked whenever he
5  wanted to work.
6    Q    Okay.  And was this an office or was it --
7    A    No.  It was a cubicle, typical work station that
8  you would install in a large corporation with walls
9  approximately five and a half feet tall and a six by six
10  configuration with his own computer and telephone.
11    Q    Okay.  And was it generally from that cubicle area
12  that he would make these calls to people to see if they
13  wanted to buy furniture?
14    A    Correct.
15    Q    Now, the equipment that he had in that cubicle area
16  included a computer?
17    A    Correct.
18    Q    During the time that Mr. Sacco worked for your
19  business, did he have the same computer or different
20  computers throughout the time frame?
21    A    He had different computers.
22    Q    Okay.  Can you explain a little bit what happened.
23  How did he get more than one computer?
24    A    Very often when we pick up surplus office
25  furniture, there are times when there are excess computers so

William Sorvino - Direct

421

1   we just take them back to our warehouse, and because they're

2   older and perhaps less efficient than the modern ones, after

3   several months or a year or so they kind of give out and we

4   just take that off the shelf and give it to whoever needs

5   one.  His computer was not networked, own individual

6   computer, and it was inherited through some corporation on

7   two or three different occasions.

8        Q    Okay.  And over the course of time that Mr. Sacco

9   worked for you, do you know about how many computers he went

10  through in his cubicle area?

11       A    I would guess two or three.  Possibly four.  I

12  don't even know.

13       Q    Okay.

14       A    One of our people is a computer kind of person in

15  addition to being a delivery person.  He would just

16  arbitrarily go into the warehouse and pick out a computer and

17  then install it for him or for anybody else.

18       Q    Okay.

19       A    Sort of an informal situation.

20       Q    Okay.  And what happened to the old computers?

21       A    They were tossed.  They were thrown out.  No value.

22       Q    Okay.  And at the time that Mr. Sacco gets a new

23  computer, is he told that he's going to get a new computer or

24  a new one will be installed for him?

25       A    I'm not even involved with that because I think he

William Sorvino - Direct

1  would speak to this delivery fellow we have who is

2  knowledgeable about computers.  He'd take one off the shelf,

3  reinstall it in his cubicle and take the old one and probably

4  throw it away.

5      Q    Okay.  Now, the computer at any particular time

6  that Mr. Sacco had in his cubicle, did he have internet

7  access on that computer?

8      A    Yes, he did.

9      Q    I take it that was through the office's general

10 internet service provider?

11     A    I'm not really sure how that works out, but I know

12 he had internet capability.

13     Q    Okay.  Now, did you know of a person by the name of

14 Elizabeth Dinunzio?

15     A    I've spoken with Miss Dinunzio.  It's Dean Sacco's

16 mother.

17     Q    Have you ever met her?

18     A    I have not met her.

19     Q    Okay.

20     A    I don't think.  I may have met her a long time ago,

21 but I don't remember that.

22     Q    And did you know, generally speaking, where she

23 resided?

24     A    I think she resided in Connecticut, Waterbury or

25 that area.  On second thought, I don't think I ever met

1  Mrs. Dinunzio.

2      Q    I'm sorry?

3      A    On second thought, I don't think I ever met Miss

4  Dinunzio.  I've spoken to her on the phone on two or three

5  occasions.

6      Q    Okay.  Generally speaking, how was Mr. Sacco as an

7  employee?

8      A    He functioned just fine.

9      Q    Did his job?

10     A    Did his job.

11     Q    I presume he got paid?

12     A    Got paid.

13     Q    Okay.  Did you at any point -- Let me withdraw

14  that.

15          How would you describe your working relationship

16  with Mr. Sacco?  How did you see your relationship with him?

17     A    I saw it as a friendly one.  We exchanged many

18  ideas together.

19     Q    Okay.  While Mr. Sacco worked at the business you

20  described, did you ever see at the business him ever bring

21  any cameras to work or have them at work?

22     A    He did have his Polaroid camera and he also had a

23  video camera which he used to videotape himself making phone

24  calls to become more effective as a telemarketer.

25     Q    Okay.  So this was something he would set up in his

William Sorvino - Direct

424

1    cubicle?

2        A    Correct.

3        Q    And in the course of Mr. Sacco working at the

4    business, did you from time to time discuss with him other

5    things that he may be doing or other things going on in his

6    life?

7        A    Yeah.  We did.  We discussed perhaps his future and

8    his getting a truck driving license and getting a real estate

9    license and generally where he lived and his buying a house

10   in Norwich.  Just many, many different conversations

11   regarding his personal life and his work experience with us

12   and outside, as well.

13       Q    Okay.  Did Mr. Sacco talk to you about purchasing a

14   house in Norwich, New York?

15       A    He did.

16       Q    Did he tell you why he was buying that house?

17       A    I think he wanted to buy it, perhaps one day settle

18   up there.

19       Q    Did he talk or tell you anything about work that he

20   was doing at the house there?

21       A    He was trying to renovate one of the apartments and

22   also he had to reinstall a new furnace, and also he was

23   trying to dig out the basement I recall, as well as doing

24   something with the garages, but how far he ever got with it,

25   I do not know.

1    Q    Okay.  Did he ever talk to you about any of the

2 tenants at 45 Norwich?

3    A    When he first purchased the house, he said I think

4 he had two elderly tenants, tenants in both apartments, both

5 on the elderly side.

6    Q    Okay.  What did he say as far as the tenants, the

7 elderly tenants that lived in the house?  Did he say anything

8 about them?

9    A    He didn't say much.

10    Q    Okay.  Did he ever talk about any tenant at the

11 house regarding rent?

12    A    Are you talking about the tenant with the mother

13 and daughter?

14    Q    Yes.

15    A    He had mentioned to me that they had come to him by

16 virtue of a -- perhaps a social agency and that they gave her

17 some money so she could move in.  I think she was flooded out

18 where she lived before and the older -- one of the older

19 couples had moved out and he was in need of having a new

20 tenant to pay his mortgage and he very happily accepted them

21 as a tenant.

22    Q    Okay.  Did he ever talk about any problems with

23 rent of those tenants?

24    A    She was having problems with paying her rent.  The

25 answer is yes.

William Sorvino - Direct

426

Q    Okay.  What did Mr. Sacco say about that?

A    He was sending -- I think he sent her a letter or two.  He was trying to get her to pay the rent.  She was getting money from the social agency.  I think she bought an expensive dog rather than paying him his rent, that sort of thing.

Q    This is things he's telling you?

A    Strictly what he told me.

Q    I take it you had never been to this property.

A    I've never met the woman.  I've never seen the house.  I have no knowledge of it other than what he told me.

Q    Okay.  Did Mr. Sacco ever discuss or tell you about any kind of a trip that he took to the Dominican Republic?

A    He did.

Q    What did he tell you?

A    He told me he wanted to go down.  I forget what reason he wanted to go there.  I think he had met some -- he had done something on the internet in terms of family or woman, whatever, then he went down to pursue that, and really, why it happened, what occurred, he didn't kind of share that with me.  Other than taking back a picture of some young lady he met down there who had a couple of kids and he was sort of thinking of doing something with that family perhaps, but it just kind of faded away.

Q    Okay.  Now, I'd like to talk briefly, Mr. Sorvino,

William Sorvino - Direct

427

1   a couple of days or so prior to Mr. Sacco not showing up for

2   work and at that point being arrested.  Do you remember

3   seeing him a couple days before?

4         A    I did.  I saw him a day or two before he was

5   arrested, I think, and he didn't look good.  Unshaven.  Not

6   having showered, I think.  He didn't look -- didn't look or

7   smell clean.  And I said, Dean, what's going on?  He said, I

8   can't talk about it, saw a psychic, she gave me some bad

9   news.  And that was the extent of it.

10        Q    This was a couple of days before he was arrested in

11  New Jersey?

12        A    Correct.

13        Q    Was that usual or unusual, the way you saw him?

14        A    Totally unusual.

15        Q    How is that?

16        A    He was always very clean shaven, always bathed,

17  shined his shoes.  Very clean.

18        Q    Okay.

19        A    Neat.

20        Q    So this two days before was out of the ordinary?

21        A    Totally.

22        Q    Did he share with you anything about what it was

23  that --

24        A    He did not.

25        Q    -- was troubling --

William Sorvino - Direct                    428

1    A    He did not.

2    Q    -- or a problem with him?

3    A    No.

4    Q    Now, Mr. Sorvino, at some point in time, sometime

5    in the early part of this year, 2008, did you receive a visit

6    from the FBI?

7    A    I did.

8    Q    Did the FBI -- Agent Jim Lyons who is sitting here?

9    A    Correct.

10   Q    He came to see you?

11   A    He did.

12   Q    And he spoke to you at that time, didn't he?

13   A    He did.

14   Q    And in addition to speaking to you, did you provide

15   him with some materials?

16   A    I did.

17   Q    What was it that you gave and handed over to FBI

18   Agent Lyons?

19   A    When we moved from 930 Newark Ave. to 561 Route 22

20   West in Hillside, our new location, my partner gathered

21   together some of the things that looked like they might be of

22   a personal nature and put them in a couple of boxes, some of

23   which Mr. Sacco had already prepared for himself and kept his

24   personal things in.  So he put those things in boxes and said

25   to me, my partner that is, Tim Quill, I said, well I'll take

William Sorvino - Direct

1    them.  Let's see what happens with Dean.

2        Q    So you had these two boxes?

3        A    I put them in my garage.

4        Q    Okay.  And did you go through these boxes?

5        A    Never.

6        Q    Okay.  So --

7        A    No interest.

8        Q    Okay.  Other than knowing they came out of Mr.

9    Sacco's cubicle, you didn't go through them?

10       A    No.  There was papers and I think a whole bunch of

11   tapes, to the extent I remember.

12       Q    And when Agent Lyons came to see you, did you turn

13   these things over to him?

14       A    I did.

15       Q    So he took these from you?

16       A    He did.

17       Q    And I take it you gave him this stuff voluntarily?

18       A    Absolutely.

19       Q    Kind of nice to get rid of it out of your garage?

20       A    Absolutely.  One hundred percent.

21       Q    And in addition to the two boxes full of materials,

22   did you also give to Agent Lyons a letter that you had

23   received from Mr. Sacco?

24       A    I did.

25       Q    Mr. Sorvino, I'd like to show you what I marked as

William Sorvino - Direct

1   Government's Exhibit 64.

2              MISS PEEBLES:  No objection.

3      Q    Mr. Sorvino, if I could have you look at -- it's an

4   envelope and two pieces of paper.  If you can just generally

5   take a look at that.

6      A    This is the letter I gave to Mr. Lyons.

7      Q    Okay.

8              MR. LOVRIC:  Your Honor, I would offer

9   Government Exhibit 64 into evidence.

10             MISS PEEBLES:  No objection.

11             MR. FISCHER:  No objection, Judge.

12             THE COURT:  Receive Government's 64 in

13  evidence.

14             MR. LOVRIC:  If it's all right with the Court,

15  your Honor, I'll publish this at a later time, perhaps

16  through Agent Lyons.

17             THE COURT:  That's fine.  Whatever you want to

18  do.

19     Q    Let me just do one thing.  Mr. Sorvino, just for

20  the jury so they can take a look, I'm going to put on the

21  screen here, on the exhibit, that's the outside of the

22  envelope that you got from Mr. Sacco?

23     A    Correct.

24     Q    And this address that's on here, this is the

25  business address, I take it?

William Sorvino - Direct                              431

1    A    Correct.

2    Q    Okay.  And Mr. Sorvino, did you know Mr. Sacco more

3  on a work relationship or did you and he socialize?

4    A    It was more of a work relationship.  I had no

5  outside social contact with Mr. Sacco.

6    Q    Okay.  And my final question, Mr. Sorvino, is:  Did

7  Mr. Sacco ever mention a person by the name of Clesson

8  Lockwood to you?

9    A    I don't know that name.

10            MR. LOVRIC:  Okay.  Thank you very much.

11  Those are all the questions I have.

12            THE COURT:  Mr. Fischer.

13            MR. FISCHER:  Thank you, your Honor.  May it

14  please the Court, your Honor.

15  CROSS-EXAMINATION

16  BY MR. FISCHER:

17    Q    Mr. Sorvino, my name is Kelly Fischer.  I represent

18  Dean Sacco.  During the time that you knew Mr. Sacco, did you

19  meet any of his girlfriends?

20    A    No.

21    Q    Does the name Mary Carman sound familiar?

22    A    Yes, I did meet her, I think once.  It was some

23  young lady, they had met in New York somehow, and I think she

24  came to the warehouse once and I met her.  That was the

25  extent of it.

William Sorvino - Cross

1    Q    Okay.  I heard, as I heard what you said, am I

2  correct in assuming that the computers at which Mr. Sacco --

3  you said they weren't networked.  What do you mean by that?

4    A    We have -- we have software that we use in order to

5  utilize for customers.  That would be networking.  Several of

6  our computers are networked so we can do drawings.  We can

7  access our customer's files.  Mr. Sacco did not have that.

8    Q    Okay.  Now, with respect to internet access for

9  Glenwood Furnishings, was there one internet account that

10 Glenwood Furnishings kept?

11   A    I'm not sure.  It's really not my area of

12 expertise.

13   Q    Did any governmental agency come to you on behalf

14 of Glenwood Furnishings, ask if they can access any records

15 concerning your Glenwood Furnishings internet accounts?

16   A    No.  I don't think so.

17   Q    With respect to your conversations with Mr. Sacco

18 concerning his place in Norwich, how frequently would he

19 discuss that with you?

20   A    Rather frequently.

21   Q    Now he mentioned to you, as I understand it, that

22 he would travel to Norwich to work on this place?

23   A    Correct.

24   Q    Did he tell you what kind of work he was doing on

25 it?

William Sorvino - Cross

433

1     A    At one point he did some heat, another point he was

2 renovating the kitchen, another point trying to dig out his

3 basement, another point he was trying to do something with

4 the garages, but I can't recall exactly.

5     Q    I understand at one time you had apartment

6 buildings?

7     A    I did.

8     Q    You did work yourself on those apartment buildings?

9     A    I did.

10     Q    Did you have conversations --

11     A    I --

12     Q    -- with Mr. Sacco?

13     A    I did.

14     Q    What kind?

15     A    I tried to give him some input doing the work so he

16 can save some money.

17     Q    What conversation did you have about that?  How

18 often did you have those types of conversations?

19     A    Once a week, once every other week, something like

20 that.

21     Q    What kind of work did Mr. Sacco do for your

22 company?

23     A    He did answering the phone.  He did telemarketing.

24 Contacting people.

25     Q    How much time on a weekly basis -- When he first

William Sorvino - Cross

1   started working for your company, how many hours a week would

2   he work?

3       A    I don't really recall, but it was reasonably full

4   time.

5       Q    Was he paid on the -- based on number of hours he

6   worked?

7       A    Primarily on the calls and what he accomplished and

8   then commissions for things he brought in.

9       Q    Did you review any of those documents?

10      A    I did not.

11      Q    Would you recognize them if you saw them?

12      A    I probably would.

13      Q    Okay.

14           MR. FISCHER:  May I have this marked, please,

15   as S-4.

16           THE COURT:  Yes, sir.

17           THE CLERK:  S-4 marked for identification.

18      Q    Mr. Sorvino --

19           MR. FISCHER:  May I approach, your Honor?

20           THE COURT:  Yes.

21      Q    Mr. Sorvino, I'm going to show you what's been

22   marked for identification as Exhibit S-4.  Do you recognize

23   those documents?

24      A    I see checks signed by Mr. Raul, Mr. Quill, by me.

25   And it looks like his -- his pay stubs, it seems to me.

William Sorvino - Cross

435

1      Q     Okay.

2      A     Yeah.  That seems about right.

3      Q     That reflects payments made by your business to Mr.

4  Sacco for work that he did?

5      A     Correct.

6                  MR. FISCHER:  I will offer that exhibit in

7  evidence.

8                  MR. LOVRIC:  No objection from the government.

9                  MISS PEEBLES:  No objection.

10                  THE COURT:  Receive Defendant's S-4 in

11  evidence.

12                  MR. FISCHER:  Thank you.  I think those are

13  all the questions I have, your Honor.

14                  THE COURT:  All right.  Miss Peebles?

15  CROSS-EXAMINATION

16  BY MISS PEEBLES:

17      Q     Mr. Sorvino, the Government Exhibit 64, the letter

18  that Mr. Sacco wrote to you, was a heartfelt letter from Mr.

19  Sacco to you, was it not?

20      A     It was.

21      Q     He thanked you for everything you did for him,

22  correct?

23      A     Correct.

24      Q     And I'm going to show you in the letter he states,

25  "Unfortunately, Bill, in the area of my personal needs,

William Sorvino - Cross

1    namely, that is, of the opposite sex, you could not help me

2    because of that particular deficit.  In my own human need to

3    be loved by a female and a female I could love back, I sit

4    here in jail today.  There's nothing you or Tim or Raul could

5    have done, nor should you have.  You guys did good things for

6    me, great things for me, and I'm a better man because of

7    that."  That's what he wrote, correct?

8         A    That is correct.

9         Q    He also talks about the fact in the letter that,

10   "Foremost in the headlines in Norwich, and the court system

11   is overwhelmed, clearing up my case ASAP will appeal to them.

12   And of course, the charges come from my tenants downstairs."

13   That's what he told you, correct?

14        A    In the letter, yes.

15        Q    And that letter was drafted and sent to you on

16   April 7 of 2007, correct?

17        A    Yes.

18        Q    Now, Mr. Sorvino, were you aware that Mr. Sacco

19   received a check or received a wire transfer for $1,800 for

20   three months' worth of rent at 45 Fair Street?  Did he ever

21   tell you about that?

22        A    I don't really remember that clearly if he did.

23             MISS PEEBLES:  No further questions.  Thank

24   you.

25             THE COURT:  Mr. Lovric?

William Sorvino - Cross

437

1                MR. LOVRIC:  I have no other questions.

2                THE COURT:  Mr. Fischer?

3                MR. FISCHER:  Nothing further, your Honor.

4      Thank you.

5                THE COURT:  Thank you, Mr. Sorvino.  You may

6      step down.

7                     (Witness excused)

8                THE COURT:  I guess this is a good time to

9      break for lunch, ladies and gentlemen.  We'll see you back at

10     1:30.  Court stands adjourned.

11                    (Lunch break taken)

12               THE COURT:  Okay.  Mr. Lovric, who have you

13     got for us?

14               MR. LOVRIC:  Your Honor, the next witness the

15     government calls is Mallory Monagan.

16               THE CLERK:  Would you state your name for the

17     record, please.

18               THE WITNESS:  Mallory Monagan.

19

20

21

22

23

24

25

Mallory Monagan - Direct

438

1    M A L L O R Y   M O N A G A N, having been called as a

2    witness, being duly sworn, testified as follows:

3                    THE COURT:  Okay, Mr. Lovric.

4    DIRECT EXAMINATION

5    BY MR. LOVRIC:

6        Q    Good afternoon, Mallory.  You're going to have to

7    speak, okay?

8        A    Okay.

9        Q    Okay.  Make sure you have that microphone close to

10   you, okay?

11       A    M-m h-m-m.

12       Q    You have to say yes because Vicky --

13       A    Yeah.

14       Q    For the members of the jury, could you tell them

15   your full name again?

16       A    Mallory Monagan.

17       Q    And Mallory, how old are you right now?

18       A    I'm 15.

19       Q    And not telling us your birth date, but how long

20   have you been 15?

21       A    Couple of days.

22       Q    Okay.  Happy belated birthday.

23       A    Thank you.

24       Q    Mallory, what state do you reside in?

25       A    Connecticut.

Mallory Monagan - Direct

439

1    Q    And how long have you lived in Connecticut?

2    A    Most of my life.

3    Q    Okay.  And who do you live with in Connecticut,

4  just generally tell us?

5    A    My entire family, my parents and my brother and

6  sister.

7    Q    Are you going to school at this time?

8    A    M-m h-m-m.  Yeah.

9    Q    All right.  Just try to say yes so Vicky can take

10  everything down.

11    A    (Nods head.)

12    Q    What grade are you in, Mallory?

13    A    I'm a freshman.  So ninth.

14    Q    Okay.  And you're missing school today, I presume?

15    A    Yeah.

16    Q    Is that a good thing or bad thing?

17    A    It's all right.

18    Q    Okay.  Now you came -- you came here today from

19  Connecticut?

20    A    Yeah.

21    Q    And is one of your parents here with you?

22    A    Yeah.  My dad is.

23    Q    Is he also in the courtroom?

24    A    Yes.

25    Q    Okay.  Mallory, I'd like to talk about some things

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Direct

1   that happened to you in 2002 and 2003.  Okay.

2               MR. FISCHER:  Your Honor, I guess at this

3   point this is the place to place my objection on this.

4               THE COURT:  You want to do something at

5   side-bar?

6               MR. FISCHER:  Please.

7               (At the Bench)

8               MR. FISCHER:  My understanding, your Honor, is

9   that this young girl is going to testify basically that Mr.

10  Sacco had physical contact with her when she was a minor,

11  touched her inappropriately and that she, through her

12  parents, commenced a criminal complaint against him based

13  upon that conduct.  And I do believe that it's far more

14  prejudicial than probative under 403.  I understand that it's

15  offered under Federal Rules of Evidence 413, 414.

16              THE COURT:  Right.

17              MR. FISCHER:  But I suggest the probative

18  value of it versus the prejudicial value of it, the

19  prejudicial value far outweighs any probative value, and I

20  move to preclude it.

21              THE COURT:  Well, I think it certainly is

22  prejudicial, there's no doubt about it, but I think that's

23  what Congress intended when they passed that statute.  If you

24  go back and take a look at the record and take a look at

25  their intention, I think the members who voted on it

Mallory Monagan - Direct                    441

1    understood it was -- it was never before done and ordinarily,

2    unless it was 404(b) material and you can tie it in that way,

3    that wouldn't come in.  I think since that statute was passed

4    there's a clear congressional intent that the Congress

5    intended that to be allowed, even though it has a high

6    prejudicial effect.  So the Court's going to let it in and

7    give you an exception.

8                   MR. FISCHER:  Thank you.

9                   (In Open Court)

10   BY MR. LOVRIC:

11        Q    Okay.  Mallory, I'd like to talk about some things

12   that happened to you in 2002 and also into 2003.  Okay?

13        A    Yeah.

14        Q    Okay.  Back in 2002, how old were you then?  I know

15   that your birthday came sometime in the year.  About how old

16   were you then?

17        A    Around 9.

18        Q    Okay.  So you would've been 9 or maybe 10,

19   depending upon which part of the year?

20        A    Pretty sure.

21        Q    2003, you would have been about how old?

22        A    Ten, I believe.

23        Q    Okay.  And in 2002 and 2003, in those two years,

24   were you living at the same residence or a different

25   residence during that time?

Mallory Monagan - Direct

442

1     A     I lived in the same place.

2     Q     Okay.  And just if you can identify just the city

3  for us.

4     A     It was Southbury, Connecticut.

5     Q     Southbury, Connecticut.  And at that time who else

6  was living in your household?

7     A     Same people who live there now.  My parents and my

8  brother and sister.

9     Q     Okay.  And was there anyone living close by to you

10  that was related to your family?

11     A     Well, my mom's sister and her family.

12     Q     And where were they living in relation to your

13  family's house?

14     A     Right next door.

15     Q     Next door to your house?

16     A     Yes.

17     Q     Okay.  And if you could just for a moment talk

18  about the relatives living next door.  Now how were they

19  related to your family?

20     A     It's my mom's sister.

21     Q     Okay.  Was your mom's sister married to anybody?

22     A     Yeah.

23     Q     Do you remember who was the person she was married

24  to?

25     A     Mike Sacco.

Mallory Monagan - Direct

443

1    Q    Okay.  And Mike Sacco, do you know if he had any
2  brothers?
3    A    Yeah.
4    Q    Okay.  Which brother or brothers are you aware of?
5    A    Don and Dean Sacco.
6    Q    Okay.  And did you at some point meet Dean Sacco?
7    A    Yeah.
8    Q    And how old do you remember being when you first
9  met or at least you first remember meeting Dean Sacco?
10   A    I guess 9.
11   Q    Okay.  Now, do you see Dean Sacco in the courtroom
12  anywhere today?
13   A    Yeah.
14   Q    Can you just point out where he is so we all know
15  where you're talking about?
16   A    He's over there (indicating).
17   Q    What kind of shirt is he wearing?
18   A    A pole, a blue polo.
19        MR. LOVRIC:  Just for the record, identifying
20  defendant Dean Sacco.
21        THE COURT:  Record will so reflect.
22   Q    Now Mike Sacco lived next door to your family, and
23  his wife's name was what?
24   A    Dawn Sacco.
25   Q    Dawn is her first name?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Direct

1    A    Yeah.

2    Q    Did they have any children?

3    A    They had two.  Eric and Stevie.

4    Q    I'm sorry?

5    A    Eric and Stevie.

6    Q    Eric's a boy, right?

7    A    Stevie's a girl.

8    Q    That's what I was going to ask you.  How old --

9  Compared to you, about how old was Stevie?

10   A    Stevie is about one and a half, maybe two years

11 older than me.

12   Q    Okay.  Did you know or hang out with Stevie?  How

13 would you describe your relationship with Stevie?

14   A    We were really close.

15   Q    Okay.  And other than Stevie and her brother and

16 then Mike Sacco and Dawn, did anybody else live next door in

17 that household?

18   A    In that house, I don't remember at the time.

19   Q    Okay.

20   A    I know there was an apartment below, but in their

21 exact house, nobody lived there.

22   Q    Did you know a girl, a person by the first name of

23 CeCe?

24   A    Yeah, that's my other cousin.

25   Q    Now, CeCe, compared to your age is CeCe older,

Mallory Monagan - Direct

445

1   younger or the same as you?

2       A    She's older.

3       Q    About how much would you say?

4       A    Probably like half a year.  She's not that much

5   older.

6       Q    Okay.  In this time frame that we're talking about,

7   2002, 2003, did you go to school together with either Stevie

8   or CeCe?

9       A    No.  I don't think I was in school with either of

10  them.

11      Q    So they went to different schools?

12      A    Yeah.

13      Q    And from time to time did CeCe come over to play

14  with you and/or Stevie?

15      A    Yes, she did.

16      Q    Okay.  Did she live very far away or was she living

17  somewhere in town?

18      A    She lives about a half an hour away.

19      Q    Okay.  How would you describe the friendship

20  between you, CeCe and Stevie?

21      A    The three of us were all really close.

22      Q    Okay.  What kind of stuff would you guys do when

23  you'd get together either at Stevie's house or at your house?

24      A    I don't know.  We played a lot of dolls and stuff

25  like that.  We went outside a lot too.

Mallory Monagan - Direct

1      Q     Okay.

2      A     We just kind of hung out.

3      Q     All right.  Now, where -- where was it that you

4   first met and got to know Dean Sacco?

5      A     Down at my cousin's house.

6      Q     Okay.  And this cousin we're talking about is

7   Stevie's house?

8      A     Yeah.

9      Q     So the house next door to where you were living?

10     A     Yeah.

11     Q     How often would you see Dean Sacco?

12     A     I can't remember.

13     Q     Okay.  Let me ask you this:  Was -- First of all,

14  was he living next door at Mike and Dawn's house?

15     A     No, he wasn't living there, but he'd stay there.

16     Q     Okay.  Do you know where he was living around that

17  time?

18     A     No.

19     Q     Was he -- At some point was he visiting Mike and

20  Dawn?

21     A     I guess so, yeah.

22     Q     Okay.  So, is it fair you would see him every so

23  often?

24     A     Yeah.

25     Q     Okay.  Now, the times that he would be at Dawn and

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Direct

1    Mike's house, were there times that you were there when he

2    was there?

3         A    Yeah.

4         Q    And you were there doing what?

5         A    Hanging out with Stevie.

6         Q    Okay.  Were there times that CeCe was also there

7    with you and Stevie?

8         A    Yeah.  We all hung out a lot.

9         Q    Now, did either of those two houses, your house or

10   Stevie's house, have a swimming pool?

11        A    Yes.  Stevie's house did.

12        Q    Okay.  Were there times that you, Stevie and CeCe

13   would be jumping in the pool and hanging out at the pool as

14   well?

15        A    All the time.

16        Q    Okay.  Were there any times when you did that that

17   Dean Sacco was there also?

18        A    Yeah.

19        Q    Okay.  Now, were there times when you and Stevie

20   and CeCe were in the pool playing and Dean Sacco would come

21   out and play with you guys in the pool?

22        A    Yeah.

23        Q    Okay.  Now, I'd like to talk about some things,

24   Mallory, that happened, but what I'd first like to do is ask

25   you:  Did there come a point in time in December of 2003 that

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Direct

448

1    you revealed some things to a DARE police officer at your

2    school?

3         A    Yeah.

4         Q    Okay.  How was it that you communicated or revealed

5    some things that happened to you to this DARE officer?

6         A    Well, in my DARE class, there was a box that you

7    could put questions or concerns in, and I wrote it down and

8    put it in a box.

9         Q    And what did you write down that you put in this

10   box?

11        A    Well, at the time it was right before a bike

12   ride -- well, after a bike ride that we went to, and he ended

13   up -- well, I guess I fell and he said things to me and I

14   didn't seem right, so I wanted to talk to my DARE officer

15   about it.

16        Q    Okay.  So this was something that happened to you

17   with Mr. Sacco around?

18        A    Yeah.

19        Q    And then as a result of putting this in the DARE

20   box, did one of the school counselors then talk to you?

21        A    Yeah.

22        Q    Okay.  And then after that at some point do you

23   recall a Connecticut State Police officer, investigator

24   speaking and interviewing you?

25        A    Yeah.

Mallory Monagan - Direct

1    Q    Okay.  Do you remember his name, by any chance, or
2  you don't?
3    A    No.
4    Q    Okay.  Now, after you disclosed this information to
5  the DARE officer and then you were interviewed by the
6  Connecticut State Police, they sat down with you, the
7  investigators, and is it fair to say you told them about a
8  lot of things that happened at Stevie's house?
9    A    Yeah.
10    Q    Okay.  What was it that started to happen at the
11  pool area when Mr. Sacco was around with you, Stevie and
12  CeCe?
13    A    Well, around the pool a lot of times like we'd ask
14  to be like thrown into the water and just things like that.
15    Q    Okay.  And did Mr. Sacco do that?  Did he throw you
16  guys into the pool, in the water?
17    A    Yeah, he did.
18    Q    Okay.  Was there something about the way he was
19  doing that that made you feel uncomfortable?
20    A    Yeah.
21    Q    What was it?
22    A    It was just like he held us a different way than
23  like our parents when they throw us.
24    Q    What do you mean by that?
25    A    Like most of the time our parents would grab our

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Direct

1    hips or like places like that.  Instead of grabbing our hips,

2    he'd grab like our crotch, around that area.

3         Q    Okay.  So he would put his hand on what part of

4    your body?

5         A    Like in between our legs and there.

6         Q    Okay.  Now he's doing that on the outside of your

7    swimsuit, I presume?

8         A    Yeah.

9         Q    Okay.  During these times did he ever put his hand

10   on your vagina?

11        A    Yeah, I think so.

12        Q    Now, when these things happened, near the pool or

13   at the pool area, did you notice or did you see whether or

14   not Mr. Sacco did that to anyone other than yourself?

15        A    Well, CeCe and I talked about it and she said she

16   felt the same way.

17                   MR. FISCHER:  I'm going to object.

18                   THE COURT:  Sustained.

19        Q    Without telling us what CeCe said, did you ever see

20   Mr. Sacco doing that to CeCe as well?

21        A    Not that I noticed.

22        Q    Okay.  Now, did that -- did that make you feel

23   uncomfortable?

24        A    Yeah.

25        Q    Did you say anything to Mr. Sacco at that time?

Mallory Monagan - Direct

1    A    No.

2    Q    Okay.  Kind of just let it go?

3    A    Yeah.

4    Q    Now, were there things that -- Over the period of

5    time that Mr. Sacco visited, were there things that also

6    began and happened inside the house?

7    A    Like with us?

8    Q    With you --

9    A    Yeah.

10   Q    -- and Mr. Sacco.  Let me ask you, Mallory:  Mr.

11   Sacco being at Stevie's house, was it more than one time that

12   he was there?

13   A    Yeah.

14   Q    Okay.  Was it more than a few times that he was

15   there?

16   A    Yes.

17   Q    Okay.  When he was at Stevie's house, did you know

18   whether he would stay and spend the night there?

19   A    No, I have no idea.

20   Q    So you would see him when you would be at Stevie's

21   house and he was also there visiting?

22   A    Yeah.

23   Q    Was Mr. Sacco ever in the same room with you, CeCe

24   and Stevie when you were hanging out at their house?

25   A    Yeah.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Direct

1    Q    And were there things that happened that made you

2  feel uncomfortable?

3    A    Yes.

4    Q    Can you tell us a little bit that -- what were some

5  of the things that made you feel uncomfortable?

6    A    Well, many times we played like the tickle game, I

7  guess.  And he'd go from tickling like places that were

8  normal and then move to like our chest or down like into like

9  our vagina area (indicating).

10    Q    Okay.  And would he touch you there?

11    A    Yeah.

12    Q    Would he grab you there?

13    A    Not that I remember.

14    Q    Okay.  Did he say anything while he was doing this?

15    A    Not -- no, I don't think so.

16    Q    Did you say anything to him?

17    A    Not the first time, but after the second time I

18  said stop and just kind of left.

19    Q    Okay.  When you said that, did he stop?

20    A    Yeah.

21    Q    Okay.  Did he do this on more than one occasion?

22    A    Yeah.

23    Q    Did he do it more than twice?

24    A    Yeah.

25    Q    When you were there at Stevie's house and he was

Mallory Monagan - Direct

453

1    there, how often would this happen?

2        A    It wasn't that many times, but it was more than

3    like four.

4        Q    Okay.  And did it always start with this tickling?

5        A    Yeah.

6        Q    Where in Stevie house did these things happen?

7        A    In Stevie's room.

8        Q    When these things happened, were Stevie or CeCe

9    around?

10       A    CeCe was around but Stevie wasn't normally.

11       Q    Okay.  So he did this when the two of you were

12   there but not Stevie?

13       A    Yeah.

14       Q    And were there occasions when he tickled you and

15   then tickled CeCe?

16       A    Yeah.

17       Q    Did he tickle CeCe the same way he was tickling

18   you?

19       A    Yeah.

20       Q    You said some of these things happened in Stevie's

21   bedroom?

22       A    Yes.

23       Q    Anywhere else in the house?

24       A    Not that I remember.

25       Q    Do you recall anything ever happening on the bed?

Mallory Monagan - Direct                    454

1      A     Not really.

2      Q     Did he ever -- did he ever hold you on the bed or

3  have you on the bed?

4      A     Once.

5      Q     Okay.  What happened?

6      A     Well, after like the tickle game started, he threw

7  me on the bed and then went to touch me.

8      Q     Okay.  How did he touch you?

9      A     Well, it was like on my chest and then down to like

10 my vagina.

11     Q     Okay.  Did he ever put his hands inside your

12 clothing?

13     A     I don't remember.

14     Q     The times you do remember, was it on the outside of

15 your clothing?

16     A     Yeah.

17     Q     Did you say anything to him when he did this and

18 had you on the bed this way?

19     A     I just kind of got up.  I don't remember saying

20 anything.

21     Q     Okay.  How did it make you feel?

22     A     Very uncomfortable.

23     Q     The tickling with CeCe, same kind of tickling?

24     A     Yeah.

25     Q     Did Mr. Sacco ever say anything to you or in your

Mallory Monagan - Direct

1    presence about not telling anybody?

2        A    I kind of remember something but not specifically.

3        Q    Okay.  What do you remember?

4        A    I remember him saying, don't tell anyone about

5    this.  But I don't like really remember.

6        Q    Okay.  Now when these things happened in Stevie's

7    room, were any of the adults around?

8        A    No, they were all in the kitchen in the front of

9    the house.

10       Q    Okay.  At the time when these things happened did

11   you ever tell any adult at the time?

12       A    Well, after, I told my Aunt Dawn and my mom.

13       Q    Okay.  Sometime after that?

14       A    Yeah.

15       Q    Now, after these -- after these things happened to

16   you, and after the things that you described occurred when

17   Dean Sacco would come over to Stevie's house, did you then

18   try to stay away from him, kind of keep clear of him?

19       A    Yeah.

20       Q    Okay.  Kind of try not be in the same room alone

21   when he's there?

22       A    Yeah.  We tried to avoid him.

23       Q    While you were at Stevie's house at any point when

24   Mr. Sacco was there did he ever on any other occasions grab

25   you by the butt?

Mallory Monagan - Direct                    456

1     A     Not that I remember.

2     Q     Do you remember if he did that to Stevie or to

3  CeCe?

4     A     No.

5     Q     Now, after you reported this to the DARE officer

6  and then you were at some point interviewed by the

7  Connecticut State Police, do you remember that?

8     A     Yeah.

9     Q     Okay.  After that, did -- after that point in time

10  did Dean Sacco ever come over to visit Mike and Dawn?

11     A     No.

12     Q     So he stopped coming to that house?

13     A     As far as I know, yeah.

14              MR. LOVRIC:  Okay.  All right.  Thank you,

15  Mallory.  That's all the questions that I have.

16              THE COURT:  Mr. Fischer?

17              MR. FISCHER:  Thank you, your Honor.  May it

18  please the Court, your Honor, counsel.

19  CROSS-EXAMINATION

20  BY MR. FISCHER:

21     Q     Miss, good afternoon.  My name's Kelly Fischer.  I

22  represent Mr. Sacco in this case.  I'm going to ask you a

23  number of questions.

24     A     Okay.

25     Q     If you don't understand my questions, please let me

1    know, okay?

2         A    All right.

3         Q    When did these events occur?

4         A    In the summer of like 2003.

5         Q    About five years ago?

6         A    Yeah.

7         Q    So you're having to reach back five years to

8    remember these events?

9         A    Yeah.

10        Q    You've had some help in remembering these events,

11   am I correct?

12        A    Not really.

13        Q    Okay.  Have you reviewed any documents to help you

14   remember these events?

15        A    I haven't.

16        Q    Have you spoken with anybody from the government to

17   help you remember these events?

18        A    Not to remember.

19        Q    Have you spoken to anybody from the government to

20   help you prepare yourself to come here to testify?

21        A    No.

22        Q    Did you ever speak with a gentleman named Mr. Lyons

23   who was an FBI agent?

24        A    Yeah, I talked to him.

25        Q    Okay.  He's employed by the government?

458

```
1        A    Yeah.

2        Q    And what did you talk with Mr. Lyons about?

3        A    Just about what would happen in court.

4        Q    Did Mr. Lyons bring with him when you spoke with

5   him some documents for you to review?

6        A    I don't think so.  I didn't look over any.

7        Q    Did Officer Lyons -- I'm sorry.  Did Mr. Lyons come

8   to Connecticut to speak to you about this matter?

9        A    No.

10       Q    Did he speak with your parents, to your knowledge,

11  about this matter?

12       A    Not that I know of.

13       Q    You mentioned you referenced an event where you

14  were on a bike?

15       A    Yeah.

16       Q    Okay.  Do you remember that event?

17       A    Yeah.

18       Q    Do you remember that you fell off of your bike?

19       A    I don't remember if I was falling or if I fell or

20  if he did something to make me fall.  I'm pretty sure I just

21  turned wrong and fell.

22       Q    Okay.  Do you have some recollection that he may

23  have done something to make you fall?

24       A    I don't really remember.

25       Q    Do you remember the event?
```

1      A      Most of it, yeah.

2      Q      But you don't remember whether he did something to

3  make you fall or whether you fell because you were turning

4  around?

5      A      It was a while ago.  I can't remember all of it.

6      Q      Do you know anything about Mr. Sacco's relationship

7  with his brother, Michael Sacco?

8      A      Not really.

9      Q      Have you ever spoken with Michael Sacco about that

10 relationship?

11     A      No.

12     Q      Have you ever spoken with your father, mother,

13 anybody else about that relationship?

14     A      No.

15     Q      Have you discussed this matter with your parents

16 before coming to testify or on the way here?

17     A      Not really.

18     Q      You didn't talk about it?

19     A      Just talked about coming to court in general.

20     Q      You didn't talk about the events themselves?

21     A      No.

22     Q      You haven't discussed that with your parents at

23 all?

24     A      No.

25     Q      Did you discuss the events themselves with

460

1    Mr. Lyons?

2        A    No.

3        Q    Did you discuss the events with Mr. Lovric?

4        A    I don't remember.  I think we might have.

5        Q    But you're not sure whether you discussed it with

6    Mr. Lovric or no?

7        A    No.

8        Q    The first complaint you made to anybody about the

9    events that you claim occurred with Mr. Sacco, that happened

10   right after this bike incident, am I correct?

11       A    Yeah.

12       Q    Were you angry with Mr. Sacco about the bike

13   incident?

14       A    Yeah.

15       Q    And so it was right after that bike incident -- Let

16   me get it straight, though.  The bike incident, there was no

17   claim of inappropriate touching, am I correct?

18       A    Yeah.

19       Q    I'm correct about that?

20       A    Yes.

21       Q    And it was right after this incident involving the

22   bicycle when you were angry with Mr. Sacco about something

23   that happened with the bicycle fall?

24       A    Yeah.

25       Q    That's the first time you made a claim against Mr.

461

1    Sacco, correct?

2         A    Yeah.

3         Q    The events involving the swimming pool, throwing

4    you into the swimming tool, do you remember those events?

5         A    Yeah.

6         Q    At any time during those events, were you

7    unclothed?

8         A    No.

9         Q    You always had your clothes on?

10        A    Yeah.

11        Q    So it's just the way that Mr. Sacco threw you into

12   the water that you feel was inappropriate?

13        A    Yeah.

14        Q    Okay.  The tickle game you played with Mr. Sacco a

15   number of times?

16        A    Yeah.

17        Q    And it was the first time that you played the

18   tickle game that you felt it was inappropriate, am I correct?

19        A    I think it was like the second time.

20        Q    The second time.  You played that tickle game on a

21   number of occasions, am I correct?

22        A    Yeah.

23        Q    Now the tickle game, did that occur before or after

24   the incident involving the bicycle?

25        A    Before.

462

1      Q     Did it occur after the event with the bicycle at

2  any time?

3      A     No.

4      Q     When the event -- when you made the claim against

5  Mr. Sacco back in 2003, Officer -- was it Salibi?

6      A     Yeah.

7      Q     -- spoke with you?

8      A     M-m h-m-m.

9      Q     Do you remember telling Officer Salibi that the

10 tickle game only occurred on two occasions?

11     A     No.

12     Q     Now, as I understand it the tickle game occurred

13 when -- you're saying now when Stevie was not present?

14     A     Most of the time, yeah.

15     Q     How many times did it occur all together?

16     A     I can't remember.

17     Q     Hundred?

18     A     No.  Not that much.

19     Q     Ten?

20     A     No, more than ten.

21     Q     And on any of those ten occasions was Stevie

22 present?

23     A     She might have been.  I don't really remember.

24     Q     You don't remember?

25     A     No.

463

1      Q     Since 2003, have you reviewed any documents

2   concerning these claimed events?

3      A     None.

4      Q     Back in 2003, did you review any documents at all

5   concerning these claimed events?

6      A     No.

7      Q     Did you give a statement to anybody?

8      A     Well, yeah.

9      Q     Back then.  To whom did you give statements?

10      A     I don't remember names, but it was the police

11   officers and then -- well, the first time in my guidance

12   counselor's office with Officer Salibi and then the police

13   officers and that place with the two-sided mirror.  I don't

14   know what it's called.

15      Q     Did I understand you correctly to say that Mr.

16   Sacco did not ever touch you under your clothing?

17      A     Not that I remember specifically.

18      Q     So it's the way that he threw you into the water in

19   the swimming pool and the way that he played the tickle game

20   that were the basis for your claims against him, am I

21   correct?

22      A     Yeah.

23      Q     How many times did the throwing into the water

24   thing occur?

25      A     I think it was a couple times at one time in the

464

1    pool.

2        Q    Now, Mr. Sacco was there to visit his family, am I

3    correct?

4        A    Yeah.

5        Q    And this is at Michael Sacco's house?

6        A    Yes.

7        Q    And is this a weekend, do you remember, a weekday?

8        A    Pretty sure it was during the weekends.

9        Q    And who -- what adults were around when Mr. Sacco

10   would come and visit?

11       A    Around us, like when he was around me, CeCe and

12   Stevie, nobody was around, but the family was all in the

13   building.

14       Q    This is a house?

15       A    Yeah.

16       Q    And the Saccos live there?

17       A    Yeah.

18       Q    Michael Sacco and his wife?

19       A    Yeah.

20       Q    Is it a single story, do you remember, or is it two

21   stories?

22       A    Well, it's single story.  I guess it's two stories

23   because there's an apartment building underneath.  Well, not

24   an apartment building, just an apartment, but their house was

25   just a single story.

1      Q     So the apartment is underneath the ground, it's

2   below ground level?

3      A     Yeah.

4      Q     And the house is just a one-level, ground-level

5   house?

6      A     Yeah.

7      Q     So, there were no other people around other than

8   the girls and Mr. Sacco, Mr. Dean Sacco, is that your

9   statement?

10      A     Well, like with us, yeah.

11      Q     At the pool area, there were no other adults when

12   these events occurred?

13      A     They were right on the patio, but it's kind of far

14   from the pool.

15      Q     How far is it away from the pool, say here from

16   that wooden bar at the end of the jury box?

17      A     Maybe a little bit farther than that.

18      Q     Say the first row of benches there from where you

19   are?

20      A     I guess, yeah.

21      Q     That's about how close the other adults were when

22   these events occurred?

23      A     Yeah.

24      Q     The events concerning the tickle game, was it after

25   the tenth time that you decided that you wouldn't participate

466

1    in that any longer?

2         A    I don't think it was ten times, but after a while

3    he'd tickle, then we'd get uncomfortable and leave.  I guess,

4    I don't know, I guess I didn't expect it to happen every

5    time.

6         Q    But it was a number of times before you decided

7    that you didn't want to be around Mr. Sacco?

8         A    Probably like five.

9         Q    Okay.

10                  MR. FISCHER:  May I have just a moment,

11   please, your Honor?

12                  THE COURT:  Sure.

13        Q    In speaking with the police back in 2003, do you

14   remember whether you ever told them about Mr.  -- what you

15   talked about here about Mr. Sacco saying something about,

16   don't tell anybody?  Did you tell anybody about that back in

17   2003?

18        A    I don't remember.

19        Q    It could be that today is the first time you ever

20   said that?

21        A    I think so.

22        Q    Okay.

23                  MR. FISCHER:  Those are all the questions I

24   have.

25                  THE COURT:  Miss Peebles?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Mallory Monagan - Redirect

1          MISS PEEBLES:  I have no questions, your

2    Honor.

3          THE COURT:  Mr. Lovric, redirect?

4    REDIRECT EXAMINATION

5    BY MR. LOVRIC:

6     Q    Mallory, when the attorney asked you about Mr.

7    Lovric, do you know that's my name?

8     A    Yeah.

9     Q    Do you remember that or no?

10          Okay.  I don't want to put you on the spot.  I

11   spoke to you a few weeks ago, is that right?

12    A    Yeah.

13    Q    Okay.  We talked about you're going to be coming to

14   court, and I kind of went over what I'm going to be asking

15   you, right?

16    A    Yeah.

17    Q    I just didn't know if you knew who Mr. Lovric was.

18   I don't know if you remember it.

19          MR. LOVRIC:  That's all I have, Judge.

20          THE COURT:  Anything further, Mr. Fischer?

21          MR. FISCHER:  Nothing further, your Honor.

22          THE COURT:  Okay.  Thank you, Mallory.  You

23   may step down.

24          (Witness excused)

25          MR. LOVRIC:  The next witness, I need to use

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Cashman - Direct                          468

1    my laptop.  I just need to plug it in and get it.

2                    THE COURT:  Okay.

3                    MR. LOVRIC:  Michael Cashman will be the next

4    government witness.

5                    THE CLERK:  Would you state your full name for

6    the record, please.

7                    THE WITNESS:  Michael Joseph Cashman.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michael Cashman - Direct

1   M I C H A E L   C A S H M A N, having been called as a

2   witness, being duly sworn, testified as follows:

3                   MR. LOVRIC:  Just one moment, Judge?

4                   THE COURT:  Yes, you may.

5   DIRECT EXAMINATION

6   BY MR. LOVRIC:

7        Q    Good afternoon, Investigator?

8        A    Detective or investigator; it doesn't matter.

9        Q    Detective Cashman.  I forget everybody's title.  I

10  once called somebody a captain.

11            Detective Cashman, could you just again tell the

12  members of the jury your name and title and where you work.

13       A    Sure.  My name is Michael Joseph Cashman.  I'm a

14  detective with the Johnson City Police in Johnson City,

15  New York.

16       Q    And about how long have you been with the Johnson

17  City Police Department?

18       A    Well, I've been a policeman for 17 years.  I was a

19  policeman in Port Dickinson for almost eight years.  I left

20  there, I went to Johnson City back in 1998, and I've been

21  employed there ever since.

22       Q    And generally speaking, at this point in time, what

23  kind of work do you do at the police department?

24       A    As a detective, I am involved in most -- most major

25  crimes.  My actual assignment is the juvenile detective

Michael Cashman - Direct

470

1    though.  I investigate crimes that are both committed by

2    juveniles and committed against juveniles.

3         Q    And I take it prior to becoming a detective you

4    were a patrolman at some point?

5         A    Absolutely.

6         Q    Detective Cashman, in connection with the matter

7    here in court, did you at some point become involved to a

8    certain degree in an investigation dealing with a Mr. Dean

9    Sacco and Linda O'Connor?

10        A    Yes, sir.

11        Q    Approximately -- when approximately did you become

12   involved in this overall investigation?

13        A    Right around the first week of January of this

14   year, 2008.

15        Q    Okay.  And in connection with this investigation,

16   did you at some point obtain certain records from the Best

17   Western hotel in Johnson City?

18        A    I did.  There was a Detective James Gyten who

19   actually went and recovered those records, but I had since

20   conferred with the general manager at the Best Western about

21   those records.

22        Q    So at some point you went back to the hotel and

23   talked to the manager about these records that had been

24   retrieved?

25        A    Yes, sir.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Cashman - Direct

471

1    Q    I'm going to show you what's been marked as
Government's Exhibit 47.  If you just take a look at Exhibit
47.  And if you could page through it, just indicate whether
or not you recognize those.

5    A    I do.  These are the records from -- that we
obtained from the Best Western in Johnson City showing
different dates in which Linda O'Connor rented rooms at the
Best Western.

9    Q    Okay.

10            MR. LOVRIC:  If I can just have those back,
Detective.

12            Judge, I would offer Government's 47 into
evidence.

14            MISS PEEBLES:  No objection, but they're the
same -- no objection, but they're the same exhibit as
Defendant's Exhibit O-6.

17            THE COURT:  Identical to O-6?

18            MISS PEEBLES:  They're identical.

19            MR. FISCHER:  No objection.

20            THE COURT:  Okay.  Receive Government's 47
with the notation that they're the same as Defendant's O-6.
BY MR. LOVRIC:

23    Q    Now, Detective Cashman, at some point during this
overall investigation, did you also have the opportunity to
go to the Best Western in Johnson City and to take

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Cashman - Direct

472

1    photographs?

2         A    Yes.

3         Q    Okay.  And when you went to the Best Western, what

4    was the purpose for going over to take certain kinds of

5    photographs?

6         A    There were some photographs that were recovered by

7    the New York State Police in a search warrant at Miller

8    Street in Norwich.  Those photographs depicted Linda O'Connor

9    and her daughter Shannon at -- staying at a hotel.  At the

10   time we weren't sure where the hotel was, but we were trying

11   to verify whether or not those photographs showed Linda and

12   Shannon at the Best Western in Johnson City.

13        Q    Okay.  So, at the time that you went to the Best

14   Western, the photographs recovered pursuant to a search

15   warrant, you did not know if those were depicting the Best

16   Western or some other hotel somewhere else?

17        A    That's correct.

18        Q    Okay.  And in going over to the Best Western, did

19   you then take photographs of similar areas that you were

20   looking at that were in the photographs recovered during a

21   search warrant?

22        A    Yeah.  I guess technically it's called a

23   comparative analysis.  Try and compare the real-life hotel

24   where I was standing with the photographs that I was holding.

25        Q    Okay.  And did you -- when you took photographs

Michael Cashman - Direct                        473

1    inside the Best Western, was there also somebody with you at

2    some point?

3         A    Yes.  Larry Compton is an officer that works for

4    the Broome Security, so their CATS lab is a computer analysis

5    lab that they have.

6         Q    He was with you when you took some of these

7    photographs?

8         A    Yes, sir.

9         Q    Were you there for the taking of all the

10   photographs?

11        A    Yes, sir.

12        Q    And in addition to taking photographs inside the

13   Best Western, did you also take photographs of things

14   surrounding the Best Western?

15        A    Yes, we did.

16        Q    Okay.  And --

17             MR. LOVRIC:   Judge, if I can have a moment.

18   I'm just trying to get the laptop to cooperate here.

19             Judge, I've put together photographs that are

20   already in evidence that were seized from 14 Miller Street

21   and I have them in a PowerPoint along with photographs that

22   Detective Cashman took.  I'm going to offer those in

23   evidence.  I believe both sets have been provided to defense

24   counsel, but if they want to look at it, I have it here on

25   the laptop.  I will offer that in evidence and want to talk

Michael Cashman - Direct

474

1    to Detective Cashman about that.

2              THE COURT:  Any problem with that?

3              MISS PEEBLES:  No objection.

4              MR. FISCHER:  No objection.

5              THE COURT:  Okay.

6              MR. LOVRIC:  Marlene, I'm going to -- there's

7    something you have to hit to allow the computer to --

8    BY MR. LOVRIC:

9         Q    Detective Cashman, looking at the first photograph

10   that we have now on the screen, that's a photograph of what?

11        A    I was standing in the parking lot of the Best

12   Western Johnson City taking a picture of their logo outside.

13             THE COURT:  Wait a second now.  The first

14   picture you showed the jury, was that in evidence?

15             MR. LOVRIC:  This photograph -- well, Judge --

16             THE COURT:  Did you listen to my question?

17             MR. LOVRIC:  No, it's not, Judge.

18             THE COURT:  Well, then we have to have a

19   designation for it.  I don't think there's any objection to

20   it.  That's fine.  I'll receive it.  But the record has to

21   reflect, when you show him the picture of the logo of the

22   Best Western, what exhibit is that.

23             MR. LOVRIC:  Okay.  I was going to label the

24   entire PowerPoint as Government's -- I can do it either way,

25   Judge.  I was going to label Government Exhibit 48 the

Michael Cashman - Direct

475

1  PowerPoint, which has a series of photos, and then just talk

2  about photo 1, 2, but I can, if the Court wants, label each

3  photo separately.

4           THE COURT:  If you have a number for all of

5  them and you distinguish between each individual photo,

6  that's sufficient.

7           MR. LOVRIC:  I'm sorry, Judge.  Maybe I wasn't

8  clear.  Government 48 we've offered as the PowerPoint exhibit

9  that I believe there's no objection to, and then as I go

10  through each photo, I'll refer to them as photo 1 through

11  whatever of the Exhibit 48.

12           THE COURT:  Sure.

13           MR. LOVRIC:  If that's okay.

14  BY MR. LOVRIC:

15      Q    Detective Cashman, I have on the screen now

16  Government's 48, the PowerPoint presentation.  This first

17  photo, I'll call it photo 1 of Exhibit 48, this is a photo of

18  what?

19      A    Photo 1 is, again, the Best Western logo I took

20  from the parking lot, showing the hotel and the logo.

21      Q    Okay.  Just generally speaking, this hotel, it's

22  located in Johnson City?

23      A    Village of Johnson City, County of Broome, State of

24  New York.

25      Q    And in relation to the Oakdale Mall, about where is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Cashman - Direct

476

1   this hotel?

2       A    It's approximately half -- well, it's less than

3   that.  It's quarter of a mile to the east of the Oakdale

4   Mall.  On the other side of Reynolds Road.

5       Q    Okay.  And then I'm going to put on the screen now

6   photo number 2 of Exhibit 48.  Were you present when this

7   photo was taken?

8       A    Yes, I took this photo.

9       Q    Okay.  This photo is -- well, tell us, where are

10  you standing approximately?

11      A    I -- I'm actually -- when I was -- when I took the

12  picture of the Best Western logo, I turned around facing the

13  opposite direction.  I faced to the south.  This is a picture

14  of the Giant Market, which is just across Harry L Drive from

15  the Best Western and Friendly's.

16      Q    Okay.  And then in this same photo that we're

17  looking at now, the Friendly's restaurant is somewhere

18  directly to the right of this hotel as you're standing right

19  here?

20      A    To the left of the hotel -- the left of the

21  Friendly's is the hotel, correct.

22      Q    Okay.  The hotel -- As you're standing where this

23  picture is taken, the hotel is behind you?

24      A    That's correct.

25      Q    Then I'll scroll to photo number 3 of Exhibit 48.

Michael Cashman - Direct

477

1    What are you taking a picture of there?

2         A    At this point, taking a picture of the McDonald's

3    restaurant in its proximity to the hotel as well.  Shannon at

4    one time when she was interviewed by Pat Blenis, when she

5    talked about the hotel, she also talked about the Giant

6    Market.  She talked about the McDonald's being nearby as well

7    as the Oakdale Mall and a Dunkin' Donuts.

8         Q    Okay.  So that was what you were there taking

9    pictures of?

10        A    That's correct.

11        Q    I'll scroll to the fourth photograph in Exhibit 48.

12   And you're taking a picture of what?

13        A    I took that picture, you can see the ChiChi's sign,

14   but to the left of the ChiChi's sign is actually the Dunkin'

15   Donuts.  I'm in the same place in the parking lot, but now

16   I'm facing to the west and Oakdale Mall is just over the top

17   of the Dunkin' Donuts.

18        Q    Okay.  I'm going to put on the screen the fifth

19   photograph of Exhibit 48.  And this -- now this photograph,

20   this is a photograph that was provided to you?

21        A    Correct.  This is a photograph that was seized by

22   the state police in the Miller Street search warrant, and

23   it's a picture of Shannon sitting in the chair obviously

24   either speaking on the phone or pretending to be speaking on

25   the phone, and she's in the lobby of the hotel.

Michael Cashman - Direct

478

1    Q    And I'm going to scroll now to the sixth

2  photograph.  And that's a photo --

3    A    That's a photo that I took of the lobby of the Best

4  Western in Johnson City showing the chair, the table, the

5  telephone, the lamp, the couch.  All appear to be the exact

6  same ones that are in the picture that Shannon was previously

7  depicted in.

8    Q    And then the seventh photograph of that on the

9  screen now is those two --

10   A    The picture that I took on the bottom compared to

11  the picture that was taken in the Miller Street search

12  warrant on the top.

13   Q    Now I have the eighth photograph in Exhibit 48.

14   A    Again, a picture of Shannon sitting in a hotel

15  room.  Pretty nondescript hotel room at that point.  We

16  didn't know where it was.

17   Q    And picture number 9 in Exhibit 48.

18   A    Picture I took of the hotel room at the Best

19  Western in Johnson City, showing the curtains, the chair, the

20  table, the lamp, the wallpaper.  All the things that appeared

21  in the previous picture.

22   Q    Photo number 10.  That photo compares to the last

23  two photographs?

24   A    That's correct.

25   Q    Photo 11?

Michael Cashman - Direct                    479

1      A    Again, this is a photograph that was taken in the

2  Miller Street search warrant.  It shows Shannon jumping on a

3  bed in a hotel room.

4      Q    Photo 12 of Exhibit 48?

5      A    This is a picture that was actually taken by Larry

6  Compton, who is the -- I was present when this photograph was

7  taken -- showing the bedspread, the headboard, the actual

8  photograph on the wall, the wallpaper, the fire alarm, smoke

9  detector on the wall above the bed.

10     Q    Okay.  Photo number 12?

11     A    Is the comparison of the photos.

12     Q    Photo 13?

13     A    Again --

14          THE COURT:  We've got two 12s, Mr. -- we've

15  got Shannon jumping on the bed, just the bed was 12, and then

16  we had the comparison photo was also called 12.  Do you want

17  one to be 12-A?

18          MR. LOVRIC:  No, Judge.  It means I can't

19  count.

20          THE COURT:  Thank God for Vicky.

21          MR. LOVRIC:  Judge, if you have 12 as the

22  photo I have right now as the bedspread --

23          THE COURT:  I have 12 is picture of the room

24  with the bed taken by Officer Compton.  And that was the one

25  that was shown after 11, which was Shannon jumping on the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Cashman - Direct

480

1    bed.  So the next one logically should be 13.

2                     MR. LOVRIC:  I absolutely agree, Judge.

3                     THE COURT:  Wow.

4                     MR. LOVRIC:  So the picture right now that I

5    have would be 13.

6                     THE COURT:  Correct.

7                     MR. LOVRIC:  I'm sorry.

8                     THE COURT:  That's all right.  But the record

9    has to be straight.

10   BY MR. LOVRIC:

11        Q    Next photograph I have now on the screen is 14.

12   Can you just identify that again, Detective Cashman.

13        A    Again, that's taken in the Miller Street search

14   warrant, shows Shannon laying in the bed next to a nightstand

15   in a hotel.

16        Q    Picture I'm going to put up now is 15.

17        A    It's the picture that was taken by Officer Compton

18   showing the bed, headboard that's attached to the wall, the

19   nightstand, the lampshade matching those of the previous

20   picture.

21        Q    The next photograph, shows the comparison?

22        A    Comparison of the two photos.  That's correct.

23   With the headboard, the nightstand and the lampshade.

24        Q    And 17?

25        A    Picture taken from Miller Street of Mrs. O'Connor

Michael Cashman - Direct

481

1    in a plaid chair next to an end table with a lamp, brass lamp

2    and lampshade.

3        Q    Okay.

4        A    It's a photograph taken by Larry Compton while I

5    was present of a plaid chair and an end table and a brass

6    lamp, lampshade.

7        Q    And 19?

8        A    Okay.  That's the comparisons of the previous two

9    photos.

10       Q    Twenty?

11       A    This also was a photograph taken in Miller Street

12   of Mrs. O'Connor.  I guess more importantly in this photo was

13   the shadow on the wall and the way that the lamp cast a

14   shadow.  Which I believe is going to be compared to the next

15   photo.

16       Q    Next one I'm putting up is 21.

17       A    Right.  It shows the end table, the chair, the

18   table lamp, the shade with the curtains closed.  The shade

19   casting the shadow on the wall.

20            Comparison of those two.

21       Q    And 23?

22       A    Miller Street search warrant, Mrs. O'Connor laying

23   in bed, again the headboard attached to the wall of the bed

24   and the end table.

25       Q    And 24?

Michael Cashman - Direct                482

1      A    Photograph Officer Compton took while I was present

2   of those same things, the headboard, end table.

3      Q    And 25?

4      A    Is the comparison of the two.

5           MR. LOVRIC:  Those are all the questions I

6   have at this time, Judge.

7           THE COURT:  Okay.  Mr. Fischer?

8           MR. FISCHER:  No questions, your Honor.  Thank

9   you.

10          THE COURT:  Miss Peebles.

11  CROSS-EXAMINATION

12  BY MISS PEEBLES:

13     Q    Detective Cashman, no one ever spoke to Miss

14  O'Connor about whether she took Shannon to the Best Western

15  when you took all those photographs, is that correct?

16     A    I can't say whether anyone had.  I know I did not.

17     Q    Well, do you think you could have saved yourself a

18  little time if perhaps one would have talked to her about

19  whether she took her daughter to the Best Western?

20     A    I think the records told me already she had taken

21  her there.  I was just curious on whether or not the -- the

22  photographs showed Shannon there.  I knew that Mrs. O'Connor

23  was there.  I wasn't sure if the photographs were going to

24  tell me that Shannon was at the Best Western or not, and I

25  believe they did.

Michael Cashman - Cross                    483

1    Q    Well, are you aware that Mrs. O'Connor acknowledges

2  that she took Shannon to the Best Western in Johnson City

3  across from the Oakdale?

4    A    Am I aware of that?  No, I'm not.

5    Q    I'm going to talk to you about those registration

6  receipts, if I might.  I'm going to go through those receipts

7  with you, if I can.

8    A    Okay.  Can I look at them with you?

9    Q    I'm going to put them on the overhead.  They'll

10  show right up on the screen.

11        12/1/06 is the first one.  You see that?

12    A    I do.

13    Q    And the departing date is 12/3/06, correct?

14    A    Yes, ma'am.

15    Q    The next one is 3/31/06, depart date 4/1/06,

16  correct?

17    A    I see that.

18    Q    And then the next one is February 17 of '06 and

19  they leave on February 20, '06, correct?

20    A    Yes, ma'am.

21    Q    And then they arrive on August 1, '05 and they

22  depart on August 2, '05, correct?

23    A    That's correct.

24    Q    And they also arrive on February 11 of '05 and they

25  depart on February 14, '05, correct?

Michael Cashman - Cross

1    A    Correct.

2    Q    And all of those registrations are under the name

3  of Linda O'Connor, correct?

4    A    Yes.

5    Q    Now, having looked at Government's Exhibit Number

6  47, there was only one time that Miss O'Connor registered at

7  the Best Western after August 2006, correct?

8    A    Okay.  I can live with that, yes.

9    Q    And that was on December 1 of '06, correct?

10    A    Okay.

11    Q    And no other records after December 1 of '06,

12  correct?

13    A    Of her registering?

14    Q    That's correct.

15    A    Under her name, that's correct.

16    Q    That's correct.  Now you're aware that Shannon

17  O'Connor was interviewed in a videotaped interview and that

18  came in evidence in this case; are you aware of that?

19    A    I am aware of that.

20    Q    During the course of the interview what she said

21  was her mother took her to the Best Western after she moved

22  to Norwich on three different occasions and registered under

23  Linda O'Connor.  Did you know that?

24    A    Okay.  I'll take your word for that.

25    Q    Did you check phone records at the Best Western?

Michael Cashman - Cross

1    A    Yes.

2    Q    And you found no phone records, correct?

3    A    I found some phone records the first time that they

4 stayed there.  She had made maybe seven phone calls.

5    Q    They were various taxicab companies?

6    A    Taxicab company, correct, and pizza place.

7    Q    And you found no receipts for 2007, correct, under

8 the name Linda O'Connor?

9    A    No, ma'am, I didn't.

10         MISS PEEBLES:  Nothing further.  Thank you.

11         THE COURT:  Mr. Lovric.

12         MR. LOVRIC:  Just a couple questions.

13 REDIRECT EXAMINATION

14 BY MR. LOVRIC:

15    Q    Detective Cashman, the photos that you took at the

16 Best Western, about when was that?

17    A    That was in March of this year.  March of this

18 year.

19    Q    March of 2008?

20    A    Yes, sir.

21    Q    Okay.  Now Miss Peebles just asked you if you

22 bothered to call Miss O'Connor.  Miss O'Connor in March of

23 2008 was charged in this indictment?

24    A    That's correct.

25    Q    And is it fair to say that under state and federal

Michael Cashman - Redirect

486

 1    law, it's a violation of law to contact a defendant without

 2    going through her attorney?

 3        A    That's absolutely fair to say, yes.

 4        Q    So you didn't call Miss O'Connor because that would

 5    have been a violation of law, right?

 6        A    That's correct.

 7        Q    And could you have actually been disciplined and

 8    maybe even prosecuted?

 9        A    That's correct.

10        Q    Okay.  So that's why you didn't call Miss O'Connor?

11        A    That's correct.

12        Q    Now, let's talk about the phone records.  Do you

13    know Rich Berry?

14        A    Yes, sir.

15        Q    Did Investigator Rich Berry do certain phone

16    analysis on this case?

17        A    Absolutely.

18        Q    That wasn't part of your, if I can call it

19    assignment, duties in this investigation?

20        A    It was not.

21        Q    Okay.  So, are you aware that Mr. Berry did, in

22    fact, review and analyze TracFone records of Linda O'Connor?

23        A    I was aware of that, yes.

24        Q    Okay.  Are you aware that there are phone calls on

25    those TracFone records by Linda O'Connor, some of which while

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Cashman - Redirect                    487

1    she stayed at the Best Western?

2         A    Yes, I was aware of that.

3                   MR. LOVRIC:  Okay.  That's all I have.

4                   MISS PEEBLES:  A few follow-ups, Judge.

5                   THE COURT:  Sure.

6    RECROSS-EXAMINATION

7    BY MISS PEEBLES:

8         Q    Now you aren't working on a case in a vacuum all by

9    yourself, are you?

10        A    Absolutely not.

11        Q    So prior to January when you took these

12   photographs, there were other law enforcement officers

13   investigating this case, correct?

14        A    Yes, ma'am.

15        Q    And you were getting information about what they

16   were looking into, correct?

17        A    Some information, yes.

18        Q    All right.  And you were aware that they had

19   interviewed Shannon O'Connor in December of 2007, correct?

20        A    I was aware of that, yes.  I reviewed the

21   transcript.

22        Q    All right.  So at that time they spoke to you

23   about -- well, they didn't speak to you at that time, but

24   they spoke to you subsequent to that about interviewing

25   Shannon about going to the Best Western, correct?

Cashman - Recross                                    488

1      A      They told me that they had interviewed Shannon

2    about going to the Best Western, yes.

3      Q      But nobody ever spoke to Mrs. O'Connor about

4    whether or not she ever took Shannon to the Best Western,

5    isn't that true?

6      A      I did not, no.  I can testify to that.

7      Q      Well, you weren't in a vacuum doing this

8    investigation, you were working with other officers, correct?

9      A      I was.

10             MISS PEEBLES:  Nothing further.

11             THE COURT:  Mr. Lovric?

12             MR. LOVRIC:  I have no other questions, Judge.

13             THE COURT:  Okay.  Thank you, Detective

14   Cashman.  You may step down, sir.

15             (Witness excused)

16             MR. LOVRIC:  Judge, the next government

17   witness is Amanda Rising.

18             THE COURT:  All right.

19             THE CLERK:  Miss Rising, please come forward

20   to be sworn.

21             Would you state your name for the record,

22   please.

23             THE WITNESS:  Amanda Rising.

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct                           489

1    A M A N D A    R I S I N G, having been called as a witness,

2    being duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. LOVRIC:

5        Q    Miss Rising, for the jury, could you just tell them

6    your full name again and just what state you reside in.

7        A    Amanda Rising, New Jersey.

8        Q    And Miss Rising, just generally speaking, what part

9    of New Jersey do you reside in?

10       A    Jersey City.

11       Q    And did you grow up in New Jersey?

12       A    No, I grew up in Pennsylvania.  The Poconos.

13       Q    Okay.  And with respect to the matter that you've

14   been asked to come here, did you at some point -- did you at

15   some point get to know a person by the name of Dean Sacco?

16       A    Yes.

17       Q    How did you first get to know Dean Sacco?

18       A    He worked with my husband and we own rental

19   properties, and he moved into one of our rental properties.

20       Q    Okay.  Now your husband's name is?

21       A    Gerardo DiFiori.

22       Q    Okay.  And approximately, just by year,

23   approximately when was it that you would say you met Dean

24   Sacco?

25       A    I would say fall of '04.  Late fall of '04.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct

490

1  November, December of '04.

2      Q    Okay.  And just for the record, do you see Mr. Dean

3  Sacco in court today?

4      A    Yes.

5      Q    Can you just indicate where you see him so we know

6  who you're talking about?

7      A    Over there (indicating).

8      Q    Gentleman who just raised his hand?

9      A    Yes.

10          MR. LOVRIC:  For the record, the defendant

11  Sacco.

12          THE COURT:  Record will so reflect.

13     Q    Now, did there come a point in time where Mr. Sacco

14  lived in a rental property that you and your husband owned?

15     A    Yes.

16     Q    Okay.  Where was the first place that he resided?

17     A    The first one was 46 Monitor Street in Jersey City.

18     Q    Okay.  And that's approximately when that he came

19  to live there?

20     A    About -- I think about the time that I actually met

21  him, so I would say late fall of '04.

22     Q    Did that property have one apartment or more than

23  one apartment?

24     A    It's a four-family.

25     Q    Where in that building did he reside?

Amanda Rising - Direct

1        A      He was in the basement apartment.

2        Q      Okay.  And were there other people living in the

3    remainder of the building?

4        A      Yes.

5        Q      And at some point in time did you and your husband

6    actually also come to live at that building?

7        A      Yes.  We moved into that house in May of '05.

8        Q      And was Mr. Sacco still living in the basement of

9    that building?

10       A      Yes.

11       Q      And at that time -- at that time when you moved in

12   with your husband, where in the building did you guys move

13   in?

14       A      We were on the first floor.  Right above him.

15       Q      Okay.  Did there come a point in time when Mr.

16   Sacco then moved to another rental property that you and your

17   husband owned?

18       A      Yes.  Then he moved to 148 Randolph Ave.

19       Q      Is that also in Jersey City?

20       A      Yes.

21       Q      And what kind of rental unit or property was that?

22       A      That is a three-family, and he was in the basement

23   of that one, as well.

24       Q      Okay.  And again, approximately when was it that he

25   moved to the Randolph Ave. units?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct

1    A    I would say early fall of '05.  Like maybe

2  August/September of '05.

3    Q    Okay.  And until when did -- until what time frame

4  did Mr. Sacco remain or live at that 148 Randolph Ave. unit?

5    A    Until the day that he tried to kill himself.

6    Q    Now that's in March of '07?

7    A    Yes.

8    Q    Okay.  And between fall of '05 and March of '07 did

9  he live there continuously during that time frame?

10    A    I believe so, yeah.  Yeah.

11    Q    Now, during the time that you knew Mr. Sacco, were

12  there occasions when he would be at an event where you and

13  your husband were at, he would come by?

14    A    Like a barbecue at our house or our Christmas

15  holiday party.

16    Q    Okay.  Did you -- On occasions from time to time

17  did you speak to him?

18    A    Yep.

19    Q    Okay.  Did he ever talk about anywhere that he was

20  working or employed in any capacity?

21    A    Yeah.  Actually, we also did -- we attended an

22  event once at a place he was working.  He was doing like a

23  make-your-own-wine place and he had a wine-tasting party at

24  this place and we -- a group of us went.

25    Q    Okay.  Did you know whether or not he worked at any

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

 1   kind of furniture --

 2        A     The furniture store, yes.

 3        Q     Do you know what kind of work he did there?

 4        A     At the furniture store, no.

 5        Q     Okay.  Now, by what name did you know him or call

 6   him?

 7        A     Well, we called him Dino.  I know his name is Dean

 8   Sacco, D-E-A-N, but we called him Dino.

 9        Q     And that was a nickname, I take it?

10        A     I guess.  Sure.

11        Q     Now, did Mr. Sacco -- at any point in time did he

12   talk with you about any trips to the Dominican Republic?

13        A     Yes.

14              MR. FISCHER:  Your Honor, I guess at this

15   point I'll state an objection.  413, 414, 404 objections.

16              THE COURT:  404?

17              MR. FISCHER:  I'm sorry, 403.

18              THE COURT:  Well, we better make a record

19   then.

20              (At the Bench)

21              MR. FISCHER:  Your Honor, I've made my

22   position I think with respect to 414 and 413 evidentiary

23   objections and indicating my opinion that the evidence

24   proffered or about to be proffered is substantially more

25   prejudicial than probative.  I think that that holds true for

Amanda Rising - Direct

1  this evidence as well.

2            THE COURT:  Wait a minute now.  He's asking

3  the witness about discussing a trip, your client discussing a

4  trip he took to the Dominican Republic.  Is there any

5  evidence in the Dominican Republic that your client assaulted

6  someone or molested a child?

7            MR. FISCHER:  Well, there's a claim apparently

8  that he had sexual relations with a child -- with a girl

9  under age in the Dominican Republic.

10           THE COURT:  Let's find out from Mr. Lovric

11  what section he's offering that proof under.

12           MR. LOVRIC:  Well, it's offered under several

13  evidentiary rules.  The evidence and the information that she

14  has is Mr. Sacco, while she's speaking to him, at one point

15  tells her about this trip that he made to the Dominican

16  Republic to be with a girl that was either 18 or 19, and then

17  he goes on to tell her that things didn't work out.  Well,

18  I'm just summarizing.

19           THE COURT:  I understand.

20           MR. LOVRIC:  He then hooked up with two girls,

21  he shows her a picture of two girls that Mr. Sacco tells her

22  were 15 and 17, and Mr. Sacco tells her that he told these

23  girls how to pose and that he -- she'll describe it -- that

24  he essentially tells her that he had sex with these two

25  girls, the 15- and 17-year-old he's showing her a picture of.

Amanda Rising - Direct

1            THE COURT:  You're offering it under 414?

2            MR. LOVRIC:  Well, I think it's 413, 414, also

3    I think it's an admission to the conduct of what the case is

4    about, which is that he is attracted to minors.  It's an

5    admission on his part.

6            MR. FISCHER:  To a prior bad act.  It's an

7    admission to a prior bad act.  It's an admission --

8            THE COURT:  You're saying it's 404, which

9    can't be offered -- Stop a second, Miro.

10           MR. LOVRIC:  I'm not saying anything.

11           THE COURT:  I know.  I don't want you saying

12   anything.

13           -- which can't be offered to prove similarity

14   of characteristics.

15           MR. FISCHER:  Yes.

16           THE COURT:  That's clear in that statute.

17           MR. FISCHER:  Yes.

18           THE COURT:  Now you go back to 413, 414, once

19   again, the legislature clearly -- Congress has clearly

20   made -- manifests its intention to allow this type of

21   evidence to come in even though 403 has been long on the

22   books at the time, and the way those two sections read, this

23   evidence comes in notwithstanding any of the other Rules of

24   Evidence that are on the books, as I read it.

25           MR. FISCHER:  I just take the position, your

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct

496

1  Honor, that Rule 403 permits the Court discretion,

2  notwithstanding the existence of 413 and 414, to apply that

3  403, understanding that the reasons why 413, 414 were passed

4  and taking those rules into consideration in making a ruling,

5  but that the Court still basically -- 403 trumps all that,

6  the Court may use 403 to exercise discretion to exclude or

7  include that evidence and still applies that substantially

8  more prejudicial than probative standard even to 413, 414

9  evidence.

10              THE COURT:  Have you any case law that

11  discusses that principle?

12              MR. FISCHER:  I do, Judge, if I may.

13              THE COURT:  Ladies and gentlemen, let's take a

14  break here, please.

15              (Jury excused)

16              (At the Bench)

17              MR. FISCHER:  Off the record.

18              (Discussion held off the record)

19              THE COURT:  The Court is right now laboring

20  under the belief that even though 413 and 414 are on the

21  books and make the evidence initially admissible here, that

22  apparently other courts, circuit courts have decided that

23  this does not bar the Court from doing a 403 balancing,

24  balancing the value of the evidence against the unfair

25  prejudice, the probative value.  So, let me ask you, Mr.

Amanda Rising - Direct

1    Fischer, how is it that this evidence of this trip and the

2    relationship your client may have had with two young ladies

3    by admission to this witness makes the evidence unfairly

4    prejudicial as opposed to probative?

5              MR. FISCHER:  Basically, your Honor, it -- the

6    similarity of the claims in that case, that Mr. Sacco had

7    sexual relations with girls, one age is 15 years of age, that

8    Mr. Sacco took photographs of these girls and particularly

9    posed them in particular poses identical to the claims

10   concerning -- that, as I understand it, Miss Shannon O'Connor

11   makes against him in her later disclosures, and basically

12   it's prior bad acts evidence, the kinds the Court have

13   historically excluded for the reason, because somebody did

14   something in the past, doesn't mean they did it this time.  I

15   understand that 413 and 414 address those issues and that

16   Congress or the rule-making authorities, when drafting and

17   passing those rules, had that in mind, but I fall back to

18   the -- ultimately to the position that it is substantially

19   prejudicial and, frankly, that the prejudicial value

20   substantially -- substantially outweighs any probative value

21   as to whether Mr. Sacco committed the acts that Shannon

22   O'Connor in her later disclosures makes against him.

23             THE COURT:  Well, let's think about it for a

24   minute.  Mr. Lovric, you want to be heard?  Go ahead.

25             MR. LOVRIC:  Just briefly, Judge.  I mean, to

Amanda Rising - Direct                          498

1    cut to the point is -- that's what 413 and 414 were designed

2    to do.  Congress and the advisory congressional minutes says,

3    we want the evidence to come in to show propensity when it

4    deals with pedophilia and sexual assaults, whether it's

5    molestation of children or sexual assaults of even adults,

6    because 403 applies to adults as well, prosecutions.

7                    THE COURT:  That's right.

8                    MR. LOVRIC:  And it's clear that Congress

9    wanted this evidence to come in.  Obviously Congress was not

10   going to say, you know, we hereby get rid of Rule 403.  403,

11   I don't dispute Rule 403 is always there as a rule that the

12   Court has authority to utilize, but if I'm hearing correctly,

13   the defense's real objection, in my view, when the defense

14   says this is prejudicial, it really means this really, really

15   hurts a lot because it's so on point to the core of what

16   we're doing here, which is trying to show that Mr. Sacco is a

17   person attracted to minors and sexually attracted to minors

18   and is a pedophile and therefore has a propensity to commit

19   acts against minors.  It's exactly what 413, 414 were

20   intended to do.  So saying it's prejudicial, I don't think --

21   prejudicial, it seems to me, is a kind of buzzword.  It

22   doesn't really tell us anything.  The defense isn't really

23   saying yes, it's prejudicial because it's so helpful to the

24   government and it's so relevant.  If that is prejudicial,

25   well, that's the good kind of prejudicial that I think

Amanda Rising - Direct                           499

1    Congress intended to come in.

2              THE COURT:  From your point of view.

3              MR. LOVRIC:  The probative value, it's

4    extremely probative.  That's the whole point so, you know,

5    yes, the Court can exclude it, but the Court can exclude

6    everything.  I don't believe that this should be excluded,

7    especially in this kind of a case, and in this case where we

8    have to prove that this defendant committed these acts and

9    Congress has said we can use propensity, prior propensity

10   acts to do so.

11             MR. EGAN:  At some point, though, haven't you

12   shown enough propensity?

13             MR. LOVRIC:  If Mr. Sacco wants to plead

14   guilty, I'll be happy to stop, but I don't think --

15             THE COURT:  I think what John says, it's kind

16   of at the heart of the 403 test, and one of the things that

17   comes to my mind is that there are no pictures that somebody

18   took of Shannon O'Connor having sex with the defendant Mr.

19   Sacco.  So in order to prove the case, the government has

20   more of a need to show he did that on other occasions because

21   on this occasion there's no pictures to show anybody.  So

22   that would push me toward letting the evidence in.

23             On the other hand, if you're going to parade a

24   number of witnesses in, which is John's point, to show that

25   he was always photographing witnesses in this condition

Amanda Rising - Direct

500

1    during these types of activities, then under 403 this may be

2    excludable because it's cumulative and it's prejudicially

3    cumulative, the bad kind of prejudice.

4              So what the Judge did in the case that Mr.

5    Fischer handed me was he let the evidence in but he said it's

6    subject to development.  In other words, if it turns out that

7    there's a shower of evidence of the same effect, that he

8    might later on exclude this evidence.  And you may say, well,

9    to me you can't unring a bell.  I've heard that at least five

10   hundred times, but I understand the principle involved.

11             So, does anybody else want to make a record

12   before we go further?

13             MISS PEEBLES:  No.

14             THE COURT:  I'll probably let it in.  If it

15   turns out that there's going to be a lot more evidence

16   offered, I can rule on that evidence in light of what's

17   already in and 403 analysis and, as the judge in the Seventh

18   Circuit did, go back and revisit that issue if it became

19   necessary and the Court is finding that the evidence is

20   extremely prejudicial in the bad sense and it's extremely

21   probative.  So the balancing has to do with the fact that

22   maybe the only kind of evidence that deals with photographic

23   depictions in terms of this type of subject matter.

24             And let's take a break.

25             (In Open Court)

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct

501

1           (Jury present)

2           THE COURT:  Okay, Mr. Lovric.  You may

3   continue.

4   BY MR. LOVRIC:

5       Q    Miss Rising, before the break we were talking

6   about:  Did you at some point have conversations with Dean

7   Sacco about trips that he had made to the Dominican Republic?

8       A    Yes.

9       Q    Did he provide some details to you about his

10  visitation to the Dominican Republic?

11      A    Yes.

12      Q    Can you tell us what came first and how the topic

13  came up about the Dominican Republic?

14      A    Okay.  The first time -- well, both instances were

15  at a barbecue that we had at our house.  Like I said, he

16  lived in the basement, we lived on the first floor, our yards

17  connected, so he would come out to our barbecue in the

18  summertime.  I would say the first time was probably late

19  May, early June, he said he was doing one of those mail order

20  bride kind of things with a woman from the Dominican

21  Republic, well, a woman, a 19-year-old female, and her name

22  was Uverkies.  I remember her name.  It was very unique.  She

23  was 19, she had two kids, she lived in the mountains, she was

24  poor.  And so the first time he went, whatever, he went and

25  got along really well with her.  They corresponded via -- I'm

Amanda Rising - Direct

502

1    not sure, maybe phone, letters, e-mails, things like that.

2    So things were going okay, I suppose.  And then the next time

3    was probably late July, early August and he brought pictures

4    back.

5         Q    What year are we talking about?

6         A    Oh, sorry.  2005.

7              Okay.  So the second trip he brought photos back,

8    had shown me some photos from the trip, and what happened

9    was, he told me he went to see her on the second trip, and

10   when he got into town he met these two young girls in town,

11   whatever.  I'll get back to that in a second.  So he met

12   these two young girls in town.  So then he goes up to the

13   hills, the mountains to visit this woman, Uverkies, and he --

14   his exact words were to me, she was very cold to him.  He

15   didn't know how things were going to work out with her

16   because she was very cold to him.  I said, what do you mean?

17   Well, she had her period so she didn't want to have sex with

18   me.  I said, okay, whatever.

19             So then he stayed, he went back down into town and

20   hooked up with these two chicks that he had met earlier in

21   the day or earlier in his trip, whatever.  Apparently they

22   were cousins.  One was 15, one was 17, and he said -- I don't

23   remember if it was when he first got into town and he met

24   them or when he went back into town later he said that the

25   adults, the parents of one of the girls basically threw these

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct

1    girls at him and asked him to take them out.  And so he took

2    them out that evening and had a good time with them.  And so

3    he showed me photos of the trip.

4         Q    Okay.  Those were his words, he took them out and

5    had a good time?

6         A    Yeah.

7         Q    Did he show you any photographs?

8         A    Yes.

9         Q    Did he show you any photographs of the 15- and

10   17-year-old?

11        A    Yes.

12        Q    How did you know they were 15 and 17?

13        A    He told me.

14        Q    Okay.  So those were words he used?

15        A    Yes.

16        Q    And did he say anything about how they were

17   portrayed or posed in the photographs?

18        A    Yeah.  I mean, he had pictures not just of them.

19   He had a pictures of a lot of young kids.  Like way younger

20   than those two, like 8-year-olds and such.  Just a mix, boys,

21   girls, everything.  And he said not just those two girls, all

22   of the pictures of all the children, he said that, you know,

23   he was telling them how to pose, they were striking sexy

24   poses for him and stuff.

25        Q    Okay.  Are those the only photos he ever showed you

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Direct                                    504

1    or did he ever show you any photos that you recall?

2         A    No.  I just remember that trip to the Dominican

3    Republic.  Yeah.  That's it.

4         Q    Okay.  Have you ever seen Dean Sacco with any

5    cameras?

6         A    Yeah.  One of those old-school Polaroid cameras

7    with the giant flash on it.

8         Q    Okay.  Any other camera besides that?

9         A    No, I don't think so.  No.

10        Q    Okay.

11             MR. LOVRIC:  That's all the questions I have

12   for Miss Rising.

13             THE COURT:  Mr. Fischer.

14             MR. FISCHER:  Thank you, your Honor.  May it

15   please the Court, counsel.

16   CROSS-EXAMINATION

17   BY MR. FISCHER:

18        Q    Miss Rising, my name is Kelly Fischer.  I represent

19   Mr. Sacco.  I'd like to ask you a number of questions.

20        A    Sure.

21        Q    Did you speak with anybody in preparation for

22   coming here to testify?

23        A    Yeah.

24        Q    Who?

25        A    You mean like before like -- like today to come to

Amanda Rising - Cross                              505

1    testify or people that just came and asked me questions in

2    regards to testifying or in regards to information?

3        Q    I understand what you're asking me.  Did you speak

4    with anybody particularly to prepare you to come here and

5    testify?

6        A    Yeah.

7        Q    Who?

8        A    These two.  Jim and Miro.

9        Q    Mr. Lyons and Mr. Lovric?

10       A    Yes.

11       Q    Did you review any documents in preparation for

12   your testimony?

13       A    No.

14       Q    Did you review a statement that you gave to the

15   FBI?

16       A    No.  I mean, I saw them looking at something that I

17   assume was from me because I saw my name written on the top

18   of it.  I didn't review it, no.

19       Q    They didn't give that to you to review?

20       A    No.

21       Q    Uverkies, she was -- she was 19, thereabouts?

22       A    Nineteen is what he told me.

23       Q    The pictures that you saw were a stack of pictures?

24       A    I wouldn't say a stack (indicating).  I would say

25   less than that.  You know, like from a roll of film, 24

Amanda Rising - Cross

506

1    exposures.

2        Q    Do you know whether it was 12, 24, 36?

3        A    No.

4        Q    Basically, it was a stack of pictures that someone

5    who went on vacation could bring back and say, look, I went

6    on vacation, here are my pictures, look at them?

7        A    Yeah.

8        Q    And there were pictures of young people in those

9    pictures?

10       A    Yeah.

11       Q    And there were pictures of older people in those

12   pictures as well?

13       A    No.

14       Q    There was a picture of a family at one point?

15       A    I didn't see that one.  My husband apparently saw

16   that one, which he'll talk to you about.  I didn't see the

17   one of the family, no.

18       Q    Did you look through all of the pictures?

19       A    No.  He was holding them, showing them to me.  He

20   didn't hand me the pile of photos and let me flip through

21   them.  He just showed me a few of them.

22       Q    Among some of the pictures you looked at there were

23   some pictures that you believe were pictures of children who

24   were 15- and 17-year-old females?

25       A    He told me they were, so, yeah.

Amanda Rising - Cross

507

1     Q     Were they clothed in those pictures?

2     A     Yeah.  They were on the street.

3     Q     What length of time in total did you rent to Mr.

4  Sacco?

5     A     Let me think.  Maybe like two years.  When did

6  he -- when did he go to the hospital?  When was that?

7     Q     If you can give me your best estimates based on the

8  information that you have.  If you can't, that's okay.

9     A     Okay.  I'll say two years then.

10    Q     Okay.  And during the two years, Mr. Sacco lived in

11  two different apartments that you and your husband owned?

12    A     Yes.

13    Q     Did Mr. Sacco speak with you about -- at any time

14  about his building in Norwich?

15    A     Yes.

16    Q     All right.  What were those conversations?

17    A     He didn't talk as much to me as he did my husband

18  because I'm not really into the whole real estate thing.

19  Basically he just said he had a house, he bought a house as a

20  rental property.  I think he told us he paid like $30,000 for

21  it or something really cheap like that.  He was having

22  problems paying the mortgage, and a water heater or boiler or

23  something broke and he had to pay a couple thousand dollars

24  to get that fixed and he didn't know how he was going to pay

25  that.  And I remember he said something about -- somebody was

Amanda Rising - Cross

508

1   moving out.  I think either a couple was moving out or

2   someone moved out and a couple was moving in, and he was

3   happy about that because he was going to be able to pay his

4   bills.  I think that was all he really talked to me about.

5   And he asked us if we wanted to buy it.

6        Q    That was my next question.  Do you recall in fact

7   that he suggested that he might have paid around $70,000 for

8   the house and was trying to sell it to you?

9        A    Yeah.  He did -- I know he did offer to sell it to

10  us.

11       Q    Do you remember the figures now being approximately

12  $70,000?

13       A    Like I said, I don't get into real estate so --

14       Q    Your husband's into real estate?

15       A    Yes.

16       Q    Is that his primary business?

17       A    Yes.

18       Q    Do you work?

19       A    Yes.

20       Q    What kind of work do you do?

21       A    I'm an actress.

22       Q    During the time that you rented to Mr. Sacco did

23  you ever see that he had a computer?

24       A    I never went in his apartment.

25       Q    No.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Cross

509

1    A    So no.

2    Q    You had a Christmas party that Mr. Sacco came to?

3    A    Yeah.

4    Q    He brought a girlfriend?

5    A    I don't know.  I don't think she was a girlfriend.

6    She was a woman.  Not a girlfriend.

7    Q    And her name was Mary?

8    A    Yeah.

9    Q    You remember that specifically?

10   A    Yeah.

11   Q    Do you remember her last name?

12   A    No.  I think she was -- she was some type of Middle

13   Eastern because I remember we talked about baklava.  I

14   remember baklava we were serving at our party.  I think she

15   was like Egyptian or something.  I know that's not Middle

16   Eastern that's African.

17   Q    Do you remember Mary telling you at that Christmas

18   party that she specifically did not use marijuana?

19   A    No.

20   Q    Do you or your husband at those parties have

21   occasion to see people using marijuana?

22   A    Yeah.

23   Q    Mr. Sacco owed you a substantial amount of money,

24   am I correct?

25   A    Probably, yeah.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Amanda Rising - Cross                          510

1        Q    You don't know for sure?

2        A    My husband will tell you all that.  I don't deal

3   with the rental properties.

4        Q    So you don't know whether he owed you money?

5        A    Oh, I'm sure he owed my husband money.  The amount,

6   no idea.

7        Q    Okay.

8              MR. FISCHER:  Those are all the questions I

9   have.

10             THE COURT:  Miss Peebles.

11             MISS PEEBLES:  I have no questions.

12             THE COURT:  Mr. Lovric.

13             MR. LOVRIC:  No further questions, your Honor.

14             THE COURT:  Okay.  Thank you, Miss Rising.

15   You may step down, ma'am.

16             THE WITNESS:  Thank you.

17             (Witness excused)

18             MR. LOVRIC:  The next witness we call is

19   Gerardo DiFiori.

20             THE COURT:  Okay.

21             THE CLERK:  Would you state your name for the

22   record, please.

23             THE WITNESS:  Gerardo DiFiori.

24

25


                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct                          511

```
 1   G E R A R D O      D I F I O R I, having been called as a

 2   witness, being duly sworn, testified as follows:

 3                  THE COURT:  Okay, Mr. Lovric.

 4   DIRECT EXAMINATION

 5   BY MR. LOVRIC:

 6       Q    Good afternoon, Mr. DiFiori.

 7       A    Good afternoon.

 8       Q    Mr. DiFiori, could you just, for the members of the

 9   jury, again tell them your full name.

10       A    Gerardo DiFiori.

11       Q    And Mr. DiFiori, the woman that just left the

12   courtroom, do you know her?

13       A    Amanda Rising.

14       Q    Right.

15       A    My wife.

16       Q    Okay.  About how long have you been married,

17   approximately?

18       A    September 1, 2001.

19       Q    Okay.  And just generally, and from what state do

20   you reside in?

21       A    I reside in Jersey City, New Jersey.

22       Q    Okay.  And how long have you lived in the Jersey

23   City area?

24       A    1999.

25       Q    Okay.  And generally speaking, what kind of work or
```

Gerardo DiFiori - Direct                        512

1    business are you involved in, Mr. DiFiori?

2        A    Real estate.  I'm a licensed real estate agent in

3    New Jersey and New York.

4        Q    And, okay.  And I take it your primary way of

5    making a living is you sell properties?

6        A    Yeah.  I work in New York City.  I have done sales

7    in New York City.  I have sold time shares.

8        Q    Time shares?

9        A    Yes.  In New York City at a place, Manhattan Club.

10       Q    Okay.  And what is the Manhattan Club?  Just

11   generally describe it for us.

12       A    It's fraction ownership property in 56 and 7th

13   Ave., New York City, in which you sell a portion of the

14   property to a user.  The apartment is divided into 52 weeks,

15   in which you sell one week out of the year, so you come to

16   New York City, stay at a hotel and utilize that apartment for

17   that period of time.

18       Q    So the apartment or apartments, do you actually own

19   those?

20       A    Yes, it's deeded property.  Yep.  You can use the

21   week intervals or as one night at a time.

22       Q    Okay.  So you sell these time shares?

23       A    Yeah.  At that time.

24       Q    Okay.  At that time.  Okay.  And then currently

25   what kind of real estate do you do?

Gerardo DiFiori - Direct                    513

1      A     Sell homes, regular homes.

2      Q     Okay.

3      A     Some rentals, and for the last four months I have

4  started a new business, which is teeth whitening.

5      Q     Okay.  And you do that also in Jersey City?

6      A     I have a kiosk at Newport Mall in Jersey City.

7      Q     Mr. DiFiori, do you also own some rental properties

8  in Jersey City?

9      A     Yes, I do.  I own three multifamily homes.

10     Q     Okay.  And I'd like to talk to you a little bit

11  about a person named Dean Sacco.  Do you know a person named

12  Dean Sacco?

13     A     Yep, I do.

14     Q     Can you tell us if you see him in court today?

15     A     Yes.  Right there (indicating).

16     Q     The gentleman who put his hand up.

17           MR. LOVRIC:  For the record, indicating

18  defendant Sacco.

19           THE COURT:  Record will so reflect.

20     Q     How did you first meet Dean Sacco?

21     A     Manhattan Club.  I worked there for many years.  I

22  believe I started in -- somewhere in May of '99.  And he came

23  to work as a salesperson, same job I used to do there.

24     Q     And did you know him socially first or did you know

25  him more professionally?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct                                    514

1    A    I met him at work.

2    Q    At work.  Did he do work at the Manhattan Club for

3    a short time?

4    A    For a short time.

5    Q    Okay.  And did there come a point in time after you

6    met him that he came to live or reside at one of your

7    properties?

8    A    Yeah.  A few weeks after he was there he asked

9    around if anybody know about an apartment for rent, and I

10   happened to have an apartment available.  And I offered him

11   if he wanted to rent that apartment.

12   Q    Okay.  And where was that?

13   A    Forty-six Monitor Street.

14   Q    In Jersey City?

15   A    Yes.

16   Q    And did he actually rent an apartment at that

17   building?

18   A    Yes.

19   Q    Okay.  Where in the --

20   A    The lower floor.

21   Q    Okay.  Was it the first floor or below the first

22   floor?

23   A    Below the first floor.

24   Q    Okay.  So it would be like a basement apartment?

25   A    Yeah, subbasement.

Gerardo DiFiori - Direct

1    Q    Okay.  And he rented that from you?

2    A    Yes.

3    Q    Okay.  Did he live there for a time?

4    A    Yes, he did.

5    Q    Do you remember what the rent was?

6    A    At the beginning it was 750, I believe.

7    Q    Okay.

8    A    Two months -- I guess two months later he wasn't at

9    the Manhattan Club working any longer, then he couldn't pay

10   the full rent, so I told him to pay me 500 and then -- I'm

11   sorry -- as time passed by, he couldn't afford to pay me that

12   and he was paying less and less.

13   Q    So during the time that he lived at 46 Monitor

14   Street, he wasn't always giving you the full amount of rent

15   that was due?

16   A    That's correct.

17   Q    Okay.  You nevertheless let him stay there?

18   A    Yeah.  I never ever even evict a person.  I

19   actually have a few tenants behind rent.  I am -- I try to

20   help them out, you know, I guess I put myself second

21   before -- second.  I put myself always in second place, try

22   to give them time to be able to come up with the rent.

23   Q    Okay.  Now, did there come a point in time where

24   Mr. Sacco then moved to another place that was your property

25   that he also moved into for rental?

Gerardo DiFiori - Direct

1    A    Yes.

2    Q    Okay.  Where was that?

3    A    148 Randolph.

4    Q    I'm sorry?

5    A    148 Randolph Ave.

6    Q    Randolph Ave.  Is that also in Jersey City?

7    A    Yes, it is.

8    Q    Where in that unit?

9    A    Same situation.

10   Q    Okay.

11   A    In the lower floor.

12   Q    Okay.  The semibasement apartment?

13   A    Yes.

14   Q    And how did the rent work?

15   A    Well, by the time I moved into 46 Monitor Street,

16   when he still was living there, I moved into the first floor.

17   Since we were in the same building, I get to know him better,

18   I guess we saw each other more often.  He wasn't at work any

19   longer, same workplace, Manhattan Club.  One day he mentioned

20   to me that, I have to tell you that many years ago I was in

21   jail, I think he said nine or ten years for some --

22               MR. FISCHER:  Your Honor, I'm going to object

23   and move to strike.

24               THE COURT:  Yeah.  I'll strike that.

25   Q    Let me -- Mr. DiFiori, let me kind of focus you a

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct

1  little bit.  While Mr. Sacco lived at 46 Monitor Street at

2  some point you and your wife moved into that first floor

3  apartment?

4      A   Yes.

5      Q   Okay.  And for a while you and your wife lived in

6  the same building where he was renting the basement

7  apartment?

8      A   Correct.

9      Q   Okay.  And from time to time would you see him and

10  socialize either at barbecues or around the building?

11      A   Correct.

12      Q   So you got to know him a little bit?

13      A   Yes.

14      Q   Now, there came a point in time where he then moves

15  to another building that you also own that you rent to him?

16      A   Correct.

17      Q   Okay.  That's the Randolph Ave.?

18      A   Yes.

19      Q   Okay.  When he moved to Randolph, did you discuss

20  with him what kind of rent he would be paying?

21      A   I told him that I have somebody else to put into

22  that apartment.  But if he didn't have a place, he could stay

23  in an empty room on 148 Randolph.

24      Q   So you had somebody that was going to come and rent

25  the basement apartment at Monitor Street?

Gerardo DiFiori - Direct

518

1    A    No, I did not at that time.

2    Q    Okay.  But he moved over to the Randolph Ave.?

3    A    Yes.

4    Q    And did you charge him anything or just let him

5    stay?

6    A    Well, I never received any payment, if that's your

7    question, but I mentioned that, you know, if he gave me $75 a

8    week, that would be fine.  Reason why I told him that I have

9    somebody to move into the apartment and I need to collect the

10   rent was because I got to find out through him of some of his

11   history and I didn't want him to live in the same building

12   where I am with my family.

13            MR. FISCHER:  Your Honor, I move to strike

14   that.  Objection.

15            THE COURT:  Yeah, I don't think it was

16   responsive.  It was in a way.

17            MR. LOVRIC:  Judge, I'll move on.  I'm just

18   trying to get past the apartment.

19            THE COURT:  I know where you want to go.

20   BY MR. LOVRIC:

21   Q    Mr. DiFiori, so Mr. Sacco moves to the Randolph

22   Ave. basement apartment?

23   A    Right.

24   Q    And he has a room there?

25   A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct

519

1    Q    And he pays you sometimes, sometimes not?

2    A    He probably pay me, let's say two weeks, and then

3    he had trouble to pay me anymore.

4    Q    Okay.  Now, when he was living at the Randolph Ave.

5    apartment, in the basement, would you see him from time to

6    time?

7    A    Yeah.  From time to time.  Come twice a week or

8    three times a week around the other houses that I have,

9    including that one, to make sure the garbage is out on

10   garbage day, that kind of thing, or landscape, just to make

11   sure everybody's around and to collect the rent from whoever

12   is the tenant, unless they mail me a check.

13   Q    Okay.  Did Mr. Sacco ever talk to you about where

14   he was working or what kind of jobs he was doing?

15   A    Yes.  He mentioned he -- at one point he was

16   working at a furniture place.  He was working at a place they

17   make -- you make your own wine, I guess, and I think -- I

18   think it's next to each other on Newark Avenue.

19   Q    Okay.  Did Mr. Sacco ever tell you or talk to you

20   about any property that he owned in New York State?

21   A    Yes.

22   Q    Okay.  What did he tell you about that?

23   A    That he owned a home, I believe he owned his house

24   either before we met at the Manhattan Club, that he own a

25   house, rental property.  I believe it's Norwich, I think it's

Gerardo DiFiori - Direct

1   Norwich, he mentioned that sort of name, New York.

2       Q    Did he ever say anything about the house, what it

3   was, why he bought it or anything like that?

4       A    I think he mentioned, if I remember right, he paid

5   $70,000 originally, I think.  From time to time he will

6   consult me, you know, what type of boiler or something

7   related to some handy work need to be done in the house, like

8   the conversation I have about his house.

9       Q    Did he ever tell you how it was he was able to

10  afford to buy the house --

11      A    No.

12      Q    -- where he came up with the money or how --

13      A    No.

14      Q    -- anything like that?

15      A    No.

16      Q    Did you ever go to that house or see that house or

17  anything like that?

18      A    No.  Not that I remember.

19      Q    Okay.  Now, I'd like to talk with you, Mr. DiFiori,

20  when Mr. Sacco was living at 148 Randolph Ave. in Jersey

21  City.  Do you recall an event right around March 19 of 2007

22  where you went there and you found Mr. Sacco?

23      A    Yes.

24      Q    Okay.  And at some point after you found him did

25  you take him somewhere?

Gerardo DiFiori - Direct

521

1    A    To the hospital.

2    Q    Okay.  Now, I'd like to use that date, that time

3    frame in your mind.  When was the -- prior to going to 148

4    Randolph Ave., finding him and taking him to the hospital,

5    when was it that you saw him before that?

6    A    The night before.

7    Q    Okay.  Where did you see him?

8    A    The afternoon before.

9    Q    I'm sorry?

10   A    The afternoon before.  Maybe I guess 5, 6:00 PM.

11   Q    Okay.

12   A    Somewhere around that time.

13   Q    Where did you see him the afternoon before?

14   A    In the apartment downstairs in his room.

15   Q    Okay.  And were you just stopping by or what was

16   the purpose going over there?

17   A    Like every day I would go to -- every other day or

18   every three days, I would check the house, make sure

19   everything is fine.

20   Q    Okay.  Did you have a conversation with Mr. Sacco?

21   A    Yes, I did.

22   Q    Okay.  Now, this conversation that you had with him

23   was, if I understand correctly, the day before you found him

24   and then took him to the hospital?

25   A    That's correct.

Gerardo DiFiori - Direct                    522

1      Q      Okay.  And what was the conversation about?  What

2  did Mr. Sacco say to you?

3                  MR. FISCHER:  Your Honor, I have an objection,

4  please.

5                  THE COURT:  Go to side-bar.

6                  (At the Bench)

7                  MR. FISCHER:  Your Honor, if there are

8  admissions that are about to be offered, I just want to know.

9  For the record, I haven't received any notification of them.

10  And I also need to know at this point -- in that specific

11  regard, first, that I assume that Mr. Lovric is going to

12  offer evidence as to Mr. Sacco's appearance, which, frankly,

13  I don't -- it's been discussed earlier, I'm not sure what

14  probative value it has, if any, its relevance at all.  And I

15  also have another issue that I wanted to raise that is, I

16  believe that Mr. DiFiori may wish to testify or Mr. Lovric

17  may wish to have him testify that he received from Mr. Sacco

18  a letter when Mr. Sacco was incarcerated where Mr. Sacco

19  allegedly said, I'll take care of you when I come out.  I'm

20  plugging in the "I" because that's not in the quote.  I think

21  that that is 404 character and prior bad acts evidence.

22                  THE COURT:  You mean because he was behind in

23  his rent?

24                  MR. FISCHER:  No.  They had a disagreement

25  about some other issues, but basically pertaining to taking

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct                              523

1    care of some Mr. Sacco's business.  And as I understand it,

2    Mr. DiFiori didn't agree to do this and Mr. Sacco said, well,

3    I'll take care of you when I get out.

4                    MR. LOVRIC:  When is this?

5                    THE COURT:  This is all brand new to me.

6                    MR. LOVRIC:  No.  I just asked him about this

7    meeting the day before.

8                    MR. FISCHER:  I'm preclusively addressing it

9    because I don't --

10                   THE COURT:  That's all right.

11                   MR. LOVRIC:  What's the question?

12                   THE COURT:  Let me ask you this:  What are you

13   seeking to elicit from the witness?

14                   MR. LOVRIC:  The defendant confessed to him.

15                   THE COURT:  That he did what?

16                   MR. LOVRIC:  That he had raped a 12-year-old

17   girl.

18                   MR. FISCHER:  There's absolutely no notice of

19   that.

20                   MISS PEEBLES:  I've never seen anything about

21   that.

22                   MR. LOVRIC:  There's no report with that in

23   it.  That's correct.

24                   MR. FISCHER:  There's no indication at all in

25   anything I've come across.

Gerardo DiFiori - Direct                           524

 1                THE COURT:  Well, first of all, if you're

 2    talking about 413 and 414 evidence, you have to give prior

 3    notice.

 4                MR. LOVRIC:  No.

 5                THE COURT:  I understand you're not offering

 6    it under 413, 414.  You're just offering it as an admission.

 7                MR. LOVRIC:  Correct.

 8                THE COURT:  I don't have a problem with that.

 9    You folks do, right?  If you want to articulate that on the

10    record.

11                MISS PEEBLES:  I guess we'd like to know

12    exactly what it was that was said.  I think we haven't seen

13    anything what's been said.

14                MR. LOVRIC:  Sorry.  What?

15                MISS PEEBLES:  We haven't been told.  I want

16    to know what was said.

17                MR. LOVRIC:  He will testify that the day

18    before he found Mr. Sacco, Mr. Sacco told him that he had

19    received a call from a girl that he had raped and that in the

20    phone call the girl told him and was talking to him about

21    condom and about sex with him, and he told this gentleman

22    that he had raped her.  And then he goes on to talk about

23    what Mr. Sacco said about the girl.

24                MR. FISCHER:  No notice of that whatsoever,

25    Judge.  There's no notice of it at all.  We have FBI reports

Gerardo DiFiori - Direct                    525

1  taken from interviews indicating that there was no such

2  statement, or at least maybe somebody forgot it is the case

3  because it wasn't addressed in the statements that we

4  received.  There's no notice about this whatsoever.  There's

5  been an interview of the witness where he didn't mention

6  anything about this in the interview whatsoever, and --

7           THE COURT:  First of all, this is not 413 or

8  414 because this has to do with the principal act for which

9  we're on trial.  So what it sounds to me like it's purely an

10  admission.  Can you tell me what, under what rule the

11  government had to produce an oral admission by a witness?

12           MR. FISCHER:  Well, just generally, the

13  disclosure rules concerning what evidence we expect to see at

14  a trial and any --

15           THE COURT:  I agree with you, the flavor of

16  the rules, the rules taken together would seem to me to

17  mandate that the defendant's attorney get some kind of notice

18  what's coming, but I can't think of any specific rule that

19  says that, if you want to know the truth.

20           MR. LOVRIC:  After he testifies I'd be happy

21  to tell the Court how I found out about this, but quite

22  frankly, I'm not going to tell the defense how I learned

23  things and why, because some of them are strategic things.

24  But I'd be happy to put on the record so it's clear, it

25  wasn't something I intentionally did.  But you're right, it's

Gerardo DiFiori - Direct                    526

1    not in some FBI report.  I agree with you.

2                 MR. FISCHER:  It's in nothing.

3                 MR. LOVRIC:  I agree with you.

4                 MR. FISCHER:  Not in an FBI report.

5                 MR. LOVRIC:  I agree with you.

6                 MR. FISCHER:  There is absolutely nothing.

7                 MR. LOVRIC:  I agree with you.

8                 THE COURT:  Well, if I can find out something,

9    if I could hear some rule that precludes this type of

10   presentation, I'd be interested in looking at it to analyze

11   it.

12                MR. LOVRIC:  It's an admission by the

13   defendant, oral admission, not in any written document that I

14   know of, and it wasn't recorded or written by anybody.

15                THE COURT:  Does this come under Crawford?

16                MR. LOVRIC:  No.  It's an admission by the

17   defendant.

18                THE COURT:  Okay.  I'm just thinking.

19                MISS PEEBLES:  It's cumulative.

20                (In open Court)

21                THE WITNESS:  Could I have some water, please.

22                THE COURT:  We'll get you some more.

23   BY MR. LOVRIC:

24       Q    Mr. DiFiori, when we left off, the date -- you said

25   the day before you found Mr. Sacco and then took him to the

Gerardo DiFiori - Direct                              527

1    hospital, you had a conversation with him at 148 Randolph

2    Ave.?

3         A    Yes.

4         Q    Okay.  And Mr. Sacco told you some things and

5    talked to you about some things?

6         A    Yes.

7         Q    Can you start with what was the first thing that

8    you remember he told you?

9         A    When I came in, I -- he didn't look right.  He

10   mentioned, I'm in trouble.  I did something wrong.

11        Q    This is him talking?

12        A    Yes.

13        Q    Okay.

14        A    And he had some pills, and I said, what's going on?

15   And he said, well, I did something wrong, and he mentioned --

16   he mentioned, if they get me, they're going to give me 30

17   years.

18        Q    So he says that to you?

19        A    Yes.

20        Q    What else did he say to you?

21        A    I says, what have you done?  I says, what have you

22   done?  You don't want to know.  I says, I do want to know

23   because you're in my property.  And -- and prior to this he

24   mentioned, if they get me, I'm going to kill myself before.

25   I'm going to take these pills.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct

1    Q    Okay.

2    A    So I says to him, what have you done?

3    Q    I'm sorry?

4    A    I said to him, what have you done?  He says, you

5 don't want to know.  I do want to know because you're in my

6 house telling me you want to take some pills and they're

7 going to give you 30 years, so you better tell me what it is.

8 And he said, I had sex with a minor.

9    Q    Okay.  Were those his words:  I had sex with a

10 minor?

11    A    Yes.

12    Q    Did he say anything about who this minor was?

13    A    No.

14    Q    Did he say how old the minor was?

15    A    I asked him how old this lady was; he said, she's

16 12.

17    Q    Twelve years old?

18    A    Yes.

19    Q    Did he say anything about who this girl was or what

20 she was?

21    A    I -- I says to him -- can I say exactly what I

22 said?

23    Q    Sure.

24    A    Even if it's cursing?

25    Q    Yes.

Gerardo DiFiori - Direct

1      A      I said, are you out of your fucking mind?  And he

2  said, well, she's a prostitute.

3      Q      Did he say where this 12-year-old prostitute lived

4  or anything about that?

5      A      No.

6      Q      Did he say anything about who was going to come to

7  arrest him or who's looking for him?

8      A      I believe I asked him -- I believe either I asked

9  him or he offered the information, which was first, but I

10  says to him, how do you know they're looking for you?  And he

11  said that the girl called him and the way she talked to him,

12  she asking me -- she asking me if you use -- like if he used

13  protection.

14      Q      So he's saying this girl called him, was asking him

15  about whether he used protection?

16      A      And the way she was talking to him, he says he felt

17  like she was trying to incriminate him and have him talk

18  to -- like somebody's behind the phone.

19      Q      Okay.  Like somebody was listening to the phone,

20  listening to the conversation?

21      A      That's correct.

22      Q      Okay.  Did he say when it was that this girl had

23  called him or she was talking to him?

24      A      No.

25      Q      Okay.  But he's telling you this about a day before

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct

1    you find him and take him to the hospital?

2        A    That's correct.

3        Q    Okay.  Did he say anything else about this girl?

4        A    No.

5        Q    How did he appear to you?

6        A    I -- I -- I don't know if it was -- I couldn't

7    believe what I was listening -- I didn't know if I was

8    listening to a true story or he was making up the story.  I

9    was -- I guess I didn't know how to react to the situation.

10       Q    Okay.

11       A    When -- I don't recall talking a lot more.  In any

12   case, the hours that they came, I was in my house with my

13   wife and I had a very weird situation, because I was not

14   telling her anything about this, and that's not who I am, and

15   couldn't sleep very well at night.  And 5:00 in the morning,

16   another tenant who lives there is called Luis calls me up at

17   5 in the morning.

18       Q    If I can just stop you.  So this is after you leave

19   Mr. Sacco, after this conversation?

20       A    Yes.

21       Q    You went home?

22       A    Yes.  I mean, I couldn't believe what just

23   happened.  I have like a movie in my head, didn't know what

24   to do, didn't know what not to do.  I guess I keep it to

25   myself through the few hours that they came along.

Gerardo DiFiori - Direct

1    Q    So you go home?

2    A    Yeah.  And at 5:00 in the morning, I receive a

3  call, a phone call from Luis, who also lives in the same

4  apartment downstairs.

5    Q    With Mr. Sacco?

6    A    In another room.

7    Q    Okay.  So he calls you and then -- Don't tell us

8  what he said to you.

9    A    Okay.

10   Q    After you get the call, you go over to 148

11  Randolph?

12   A    Yeah.

13   Q    What do you find when you get there?

14   A    Well, he calls me, telling me --

15        THE COURT:  Hold on.

16   Q    Don't tell us what he said.  When you get to 148,

17  what do you see?

18   A    Dino was completely drugged up.  Apparently he took

19  a lot of pills and drinking wine.

20   Q    What did you do?

21   A    I says to Luis, let's grab this guy and take him to

22  the hospital and let's go with --

23   Q    You took him to a nearby hospital?

24   A    Yes.

25   Q    Okay.  And after you took him to the hospital, did

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct                              532

1   you come back the following day to check up on him or see

2   him?

3        A    Yes, I did.

4        Q    And did you find him at the hospital?

5        A    No.  They wouldn't tell me anything.

6        Q    Okay.

7        A    And I questioned -- I went to two or three

8   different hospitals because I thought, somebody trying to

9   kill himself -- then he wasn't there.  Then I says, where's

10  he?  The day before when he went, I asked the doctor how long

11  he be here for, he won't be here for.

12                  MR. FISCHER:  Judge, I'm going to object.

13                  MR. LOVRIC:  Let me withdraw the question.

14                  THE COURT:  Sustained.

15       Q    When you went to look for him, at some point did

16  you learn that the police had arrested him?

17       A    They told me in the hospital, you should call the

18  police.

19       Q    Okay.

20                  MR. LOVRIC:  That's all the questions I have

21  right now.

22                  THE COURT:  Okay.  Mr. Fischer.

23                  MR. FISCHER:  Thank you, your Honor.  Please

24  the Court, counsel.

25                  Your Honor, may I have this marked, please.  I

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Direct                      533

 1  believe it is S-5.

 2             THE COURT:  S-5 would be correct.

 3             THE CLERK:  Defendant's Exhibit S-5 marked for

 4  identification.

 5             MR. FISCHER:  Thank you.

 6  CROSS-EXAMINATION

 7  BY MR. FISCHER:

 8      Q    Mr. DiFiori, my name is Kelly Fischer.  I'm the

 9  attorney for Mr. Sacco.  I'm going to ask you a number of

10  questions.  If you don't understand my questions, please let

11  me know.

12      A    Okay.

13      Q    As I understand your testimony, when you went to

14  the hospital, somebody told you to contact the police?

15      A    Yes.

16      Q    Did you?

17      A    To find out -- I didn't.

18      Q    You did not contact the police?

19      A    No.

20      Q    What was the next contact -- You want to change

21  your answer?

22      A    No.  I went to the hospital the day after, the next

23  day, you know, the following day.  The day I took him to the

24  hospital was the next day, the following.  And I receive a

25  letter.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross

1      Q    I'm asking --

2      A    Okay.

3      Q    My question is this -- and I'll ask you a question.

4  If you can answer my question, that will help.

5      A    Yes.  Go ahead.

6      Q    Did you go to the police?

7      A    No.

8      Q    Thank you.  You don't want to change that answer,

9  do you?

10     A    No.  I received a letter from Dino from jail --

11     Q    I understand.

12     A    -- at that time.

13     Q    But my question is --

14     A    Okay.

15     Q    -- you don't want to change your answer about not

16  going to the police?

17     A    No.  I didn't go to the police.

18     Q    Okay.  Somebody from a police agency at some point

19  contacted you, am I correct?

20     A    Yes.

21     Q    Who contacted you?

22     A    FBI agent Steve, I don't recall the last name.  And

23  another individual, Santiago was his last name.  They came to

24  our home.

25     Q    Where were you when Steve the FBI agent contacted

Gerardo DiFiori - Cross

535

1    you?

2       A    I was driving into the driveway of my house.  And

3    they were on the stairways talking to my wife when I arrived.

4    They were there -- we arrived sort of at the same time.

5       Q    And the FBI agent and Officer Santiago asked you

6    about your relationship with Dean Sacco, am I correct?

7       A    Yes.

8       Q    In a very general sense?

9       A    M-m h-m-m.

10      Q    And you told them about your relationship with Mr.

11   Sacco, didn't you?

12      A    M-m h-m-m.

13      Q    And you understood that they were investigating Mr.

14   Sacco with respect to charges, criminal charges, against him;

15   did you understand that?

16      A    Yes.

17      Q    And you understood in speaking with the officer

18   from the Federal Bureau of Investigation and Officer Santiago

19   that it was important that you give them all of the

20   information that you had concerning any potential criminal

21   charges against Mr. Sacco, didn't you know that?

22      A    Yes.

23      Q    But you didn't give them all of the information

24   that you had concerning Mr. Sacco, did you?

25      A    I was --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross                                    536

1       Q     No.  That's a question.  You can answer yes or no.

2       A     I did not disclose what I just disclosed here,

3   that's correct.

4       Q     When you say this information you just disclosed

5   here, the information -- let me finish my question, please --

6   the information about Mr. Sacco making this admission to you,

7   you did not disclose that in your driveway to the FBI agent

8   or Officer Santiago, am I correct?

9       A     That's correct.

10      Q     Did you -- were you contacted by a Mr. Haumann, an

11  investigator with respect to this matter?

12      A     Somebody else called me.  I don't remember the

13  name.

14      Q     And you spoke with that investigator?

15      A     I received a phone call from -- I don't know if

16  he's an investigator, but I think somebody representing the

17  lady that ask me if I know such a lady.  That's the only

18  other phone call or other person that I have talked to

19  regarding these situations.  I don't remember the name of the

20  person.

21      Q     Okay.  Did you speak with that person about Mr.

22  Sacco?

23      A     No.

24      Q     Have you -- Withdraw that.

25      A     They only ask me about if I knew the lady, which I

Gerardo DiFiori - Cross

537

1    don't remember the name.

2        Q    Okay.  Mr. Sacco attended a Christmas party at your

3    residence, am I correct?

4        A    Yeah.  Some party.  Could be Christmas.  Could be

5    Christmas party or another party.

6        Q    And he brought with him a lady?

7        A    Yes.

8        Q    Is that the lady that you discussed on the phone?

9        A    No.  I don't even know the name of that lady.

10   There were probably 50 people at my house, friends bring

11   friends, so it's not like I get to know everybody.

12       Q    Do you remember that the lady that Mr. -- that

13   accompanied Mr. Sacco to your Christmas party -- do you

14   remember that she may have mentioned that she did not smoke

15   marijuana?

16       A    Not at all.

17       Q    Were people using marijuana at that party?

18       A    Probably.

19       Q    Did you review any documents in preparation for

20   coming here to testify?

21       A    Did I bring documents?

22       Q    Yes.

23       A    Every document which I have, which was letters that

24   Dino --

25       Q    Let me stop you, if I may, please.  Did you review

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross                          538

1    any documents?

2         A    Review?  I thought you say if I brought any

3    documents.

4         Q    No.  Did you review any documents in preparation

5    for your coming here to testify?

6         A    I don't know what documents.  I don't have any

7    documents to review.

8         Q    You brought certain documents with you, did you

9    not?

10        A    Here?

11        Q    When you came from your residence up here to

12   testify?

13        A    Some papers, I guess maybe my wife brought them

14   with her.  I didn't have anything with me.

15        Q    So you didn't bring any documents?

16        A    My wife brought documents, I guess.  I flew in

17   from -- I -- I was in Los Angeles for the last few days on a

18   business trip for two days.  I flew in and I arrive 8:00

19   yesterday morning.  We shower, we got ready, and we drove up

20   here.  And I believe Kathleen Torres contact my wife and left

21   a voice message in my phone a few days ago letting me know

22   that we needed to be here today.  Any papers we need to bring

23   with us, my wife carried them.

24        Q    So the answer to my question is that your wife had

25   brought the documents, correct?

Gerardo DiFiori - Cross                                   539

1        A       Whatever documents she has, yes.

2        Q       Did you review those documents?

3        A       No.

4        Q       When's the last time you reviewed those documents?

5        A       I don't even have a document to review.

6        Q       Did you ever review any documents in connection

7   with this matter?

8        A       I don't even know if I've ever been given any

9   documents in preparation to court.  I have read --

10       Q       Let me ask you if I understand correctly to say you

11  don't know whether you've ever been given any documents?

12       A       No.  I'm sorry.

13       Q       Do I understand -- let me finish my question.  Do I

14  understand -- my question --

15               THE COURT:  Hold on.  One person at a time.

16               MR. LOVRIC:  I object.

17               THE COURT:  You stand on your feet, tell me

18  what your objection is.

19               MR. LOVRIC:  I would like counsel to let the

20  witness explain what documents, if any, he's aware of or not.

21  He's interrupting him.

22               THE COURT:  Well, the attorney who's asking

23  the questions has a right to ask the witness whatever he

24  wants.  And if he doesn't get an answer he thinks is

25  appropriate, he can ask him again.  But it can't become

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross

540

1    badgering.  So let's go that way.

2              MR. LOVRIC:  He needs to let him answer it

3    before he starts up with another question.

4              THE COURT:  Yes, that's right.  It's hard for

5    the stenographer to take two people at once so kind of -- if

6    the witness starts to say something you think is

7    inappropriate, then you address that with me and I'll take

8    care of it.

9              Okay.  Go ahead.

10             MR. FISCHER:  Thank you.

11   BY MR. FISCHER:

12       Q    Let me ask you the question:  Did I just understand

13   you correctly to say that you do not know whether you were

14   given any documents in connection with this case?

15       A    They give me documents saying that they will let us

16   know when to come, saying that the allowance they were going

17   to give us, whether it's gas and anything in terms of the

18   cost to coming up here.  I read those documents.  If that's

19   your question, if you're referring to those documents.

20       Q    Are those the only documents that you have reviewed

21   concerning this matter ever?

22       A    And also that I was going to be contacted.  I

23   receive a letter at some point, I guess a month ago, three

24   weeks ago, that I will be brought up to testify here.

25       Q    Did you speak with anybody from the FBI on any

Gerardo DiFiori - Cross                           541

1    occasion other than the time when they came to you in your

2    driveway?

3         A     They came twice to my house.

4         Q     A total of two times including the driveway or a

5    total of three times including the driveway?

6         A     Two times.  I -- I drove in the driveway, they were

7    on the staircase, I invite them into my house, and we have

8    the talk in my living room both times.

9         Q     Okay.  When was the first time?

10        A     The date?

11        Q     The approximate date.

12        A     I don't know.  Maybe a month, month and a half ago,

13   I guess.

14        Q     That was the first contact that you had with the

15   FBI concerning this matter was a month to a month and a half

16   ago?

17        A     I believe so.

18        Q     And at that time you did not disclose to the FBI

19   anything concerning Mr. Sacco's admission, am I correct?

20        A     Correct.

21        Q     When is the second time that the FBI came to speak

22   with you?

23        A     To let us know that like -- I guess it was either a

24   week or two weeks after the first time.  I don't recall the

25   exact date, if that's your question.

Gerardo DiFiori - Cross

542

1    Q    The approximate date is okay.

2    A    Yeah.  And to let us know that to give me a paper

3    to contact the lady called Kathleen Torres from the

4    attorney's office to let us know that somewhere about this

5    time we will have to come and testify up here.

6    Q    During that second occasion when the FBI came to

7    your house, was there any discussion between you and the FBI

8    or other police officers, if there were any there, about this

9    matter other than arranging your testimony here?

10    A    Another phone call he asked me if I have a phone

11    number from a lady called Regina Carter, who used to be my

12    tenant on the first floor at that time.

13    Q    And during those second set of conversations you

14    did not mention what you testified to here today about an

15    admission, am I correct?

16    A    Correct.

17    Q    Have you spoken with Mr. Lyons about this matter?

18    A    Yes.

19    Q    The gentleman sitting here?

20    A    Yes.

21    Q    When did you speak -- Withdraw that.

22         Your conversation with Mr. Lyons is in addition to

23    the two times that you just talked about?

24    A    Yeah.  Him.  He is not the FBI, the agent that I

25    talked to in my house.  I met him here.

Gerardo DiFiori - Cross

543

1    Q    When did you meet Mr. Lyons here?

2    A    Yesterday.

3    Q    Did you have a -- You were up here yesterday?

4    A    Pardon me?

5    Q    You were here yesterday?

6    A    Yes, I was.

7    Q    When did you speak with Mr. Lyons yesterday?

8    A    In the afternoon, late afternoon, 7 PM.

9    Q    How long did you spend speaking with Mr. Lyons

10   yesterday?

11   A    Half an hour, probably.

12   Q    Did you speak with Mr. Lovric yesterday?

13   A    Mr. Lovric is behind you?

14   Q    Yes.

15   A    Yes.

16   Q    When did you meet with him?

17   A    Same time.  Both at the same time.

18   Q    Did you meet with Mr. Lyons again today?

19   A    Yes, I did.

20   Q    How long did you meet with Mr. Lyons again today?

21   A    I received a phone call from Kathleen Torres, I

22   believe is her last name, Kathleen from the office, letting

23   me know that we -- we not have to be here until 2:00, and I

24   said that I needed to speak with both of them before coming

25   to the courtroom.  And then she mentioned once, Mr.  -- I'm

Gerardo DiFiori - Cross

1    sorry, I don't remember his last name, this gentleman.

2        Q    Yes.

3        A    -- gets a break, she will let him know and I was

4    going to be able to speak with him.

5        Q    How long did you spend speaking with them today?

6        A    First I spoke with the agent and then -- for maybe

7    ten minutes, 15 minutes.  And maybe another ten minutes.

8        Q    In your conversations yesterday with Mr. Lyons and

9    Mr. Lovric, did Mr. Lyons and Mr. Lovric tell you anything

10    about this case?

11        A    Well, they asked me questions.

12        Q    Did they tell you anything about this case?

13        A    They mentioned the same things, I guess, I know.

14        Q    What did they tell you?

15        A    Well, that I would have to come here, testify, they

16    would ask me questions.  They went over the same things that

17    the other agent went over when he was in my house two months

18    ago, whatever it was, that Steve.  I -- I guess they have

19    written down what I had talked to him at that time and they

20    wanted to reiterate and go over everything already.

21        Q    Did they show you any documents about what you had

22    spoken with the FBI about earlier?  You said they had written

23    something down.

24        A    Yeah.  I didn't see what they are written, but they

25    went over things, I guess, to, you know, ask me the same

Gerardo DiFiori - Cross                                    545

1    things that I have spoken with agent Steve.

2         Q    So they asked you the same things that you had

3    spoken about with agent Steve, am I correct?

4         A    They verify everything I have told Steve with me.

5         Q    Was last night the first time that you told the FBI

6    about this alleged admission?

7         A    Today.

8         Q    Today.  When did you tell him today?

9         A    This morning, I guess.  When I came here, probably,

10   12, 1:00, around that time, or 2:00, within that time.

11   Before I walk in here, within the last two hours, hour and a

12   half, within that time.

13        Q    Who did you speak to?

14        A    To him first and with him.  I'm nervous, so

15   recalling when I spoke with both of them -- First I spoke

16   with the agent, and I spoke with him again before walking

17   into this courtroom.

18        Q    In speaking with Agent Lyons today, did Agent Lyons

19   tell you anything?

20        A    He asked me why I didn't say this before.

21        Q    I don't want to know at this point what you said to

22   him, just what he said, okay?

23        A    That's what he asked me.

24             MR. LOVRIC:  I object.

25        A    Why I didn't --

Gerardo DiFiori - Cross                    546

1            MR. LOVRIC:  I object to counsel restricting

2     what he should say.  He's asking for a hearsay conversation.

3     I have no objection.  He should be entitled to the

4     conversation in --

5            THE COURT:  He can ask him what he wants and

6     gets the response, and if you want to ask him something

7     different on redirect, that's up to you.

8            Let's take a minute at side-bar.

9            (At the Bench)

10            THE COURT:  I guess that shoots our 4:30 time

11     frame.

12            MR. FISCHER:  Sorry about that.

13            THE COURT:  I'm not restricting you for a

14     minute.  Are you in a posture to ask all the questions you

15     need to ask today?  I mean, I know this guy's from New

16     Jersey.  It's not the far side of the moon.

17            MISS PEEBLES:  If I might, I have a recording

18     that I want to play on cross with him, and it's not here.  I

19     didn't think I needed it.  It's at my office.  I'm going to

20     need him back on Monday.

21            MR. FISCHER:  I can answer your question, no,

22     I'm not prepared to do that today.

23            THE COURT:  You know, this is -- and I don't

24     want to say with all due respect, I think that means bend

25     over.  This is something that's unusual.  Here comes

Gerardo DiFiori - Cross

547

1    something that's a very powerful piece of evidence in this

2    case and you didn't, Mr. Lovric, even know about it until

3    this afternoon, if this witness is to be believed, that's why

4    there aren't any 302s or he withheld the information from the

5    first agent.  I'm not blaming the witness.  He made his

6    choices.  I think in order to get this thing in a posture

7    where everybody can fully exhaust the knowledge that this

8    witness has, I think we probably ought to, you know, continue

9    some more with the cross-examination but then allow him to be

10   brought back so that Miss Peebles can play the recording and

11   Mr. Fischer can prepare whatever he's got to do.

12                MR. LOVRIC:  I have no problem with that,

13   Judge.  I want to put on the record, what he says is true,

14   which is -- let me put down on the record what I'm saying he

15   says is true.  While Miss Rising was testifying, I was

16   notified by the agent that Mr. DiFiori had asked to speak to

17   him as he was waiting upstairs as the next witness and that

18   at that time Mr. DiFiori told the agent, there's something

19   that I haven't told you folks and here it is, and he told the

20   agent.  And Agent Lyons then told me.  And then while we were

21   on break with that, while Miss Rising was up with that break

22   arguing over that photo, I went upstairs and said to

23   Mr. DiFiori, what is it you haven't told me?  And then he

24   told me what he just testified to.  And that's why I said

25   before, you're right, it's not in the 302 but it's not

Gerardo DiFiori - Cross                           548

1    something that I knew, and that's what it is.

2                    THE COURT:  Okay.  Once again, it's a powerful

3    piece of evidence.

4                    MR. LOVRIC:  I have no problem, Judge.

5                    THE COURT:  I want to make sure the witness is

6    adequately cross-examined by everybody.

7                    MR. FISCHER:  Thank you.

8                    (In open Court)

9                    MR. FISCHER:  I'm sorry, your Honor.  I

10   apologize.  Shall I continue at this point or is this a good

11   time --

12                   THE COURT:  Well, as I understand it, we're

13   going to have to bring the witness back on Monday.  So maybe

14   this would be a good time.  It will give everybody a head

15   start to get home for the weekend, so I think we'll break

16   now, if nobody has an objection.  If somebody objects to

17   that, I'll be glad to stay until the bitter end.  Nobody

18   objects to that, okay.

19                   All right, ladies and gentlemen.  We're going

20   to conclude for today now.  Let's see.  Madam clerk, Monday,

21   what time is that motion going to be argued before trial?

22                   THE CLERK:  9:00, Judge.

23                   THE COURT:  9:00.  Well, shouldn't take any

24   longer than an hour, so let's shoot again for 10:00.  And let

25   me remind you not to discuss the case among yourselves, with

Gerardo DiFiori - Cross

1    anybody else, or permit anyone to discuss it with you.

2    Please stay away from anything that's in the media.  If

3    anybody does try to talk to you about the case, contact you,

4    please let us know, either the clerk or myself, right away.

5    And you have a pleasant weekend.

6                   (Jury excused)

7                   THE COURT:  All right.  Now, what we're going

8    to do is excuse the witness, and if there's any more legal

9    argument or application, I want to have that now.  And that

10   does not foreclose more to come on Monday, but I'd like to

11   get on the record anything that anybody wants to put there

12   with respect to these matters at this time.

13                  So, Mr. DiFiori, we'd ask you to step down,

14   sir, please, and I think Agent Lyons will be with you.

15                  (Witness excused)

16                  THE COURT:  First of all, Miss Peebles, is

17   there anything with respect to the recording that you

18   mentioned that you don't have here in Court today?  Is there

19   going to be any problem with admissibility?

20                  MISS PEEBLES:  Judge, it's -- the recording

21   itself is relatively short.  It's on a regular cassette, not

22   a DVD.

23                  THE COURT:  Okay.

24                  MISS PEEBLES:  Or CD, I should say.  I have a

25   device, my investigator tells me that everybody should be

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

550

1    able to hear it, so I'll work on it over the weekend and make

2    sure it works.

3              THE COURT:  That shouldn't be a problem.

4              MISS PEEBLES:  I don't think so, Judge.

5              THE COURT:  Anything else at this time,

6    applications regarding what exists or does not exist?

7              MR. FISCHER:  Well, Judge, I -- I think that

8    generally I stated my position on the record about the late

9    notice and basically the bombshell type evidence that is not

10   supposed to happen, in my understanding of generally the

11   direction of the disclosure rules in federal court.  And the

12   concern that I have about that, on top of Adam Lurie having

13   been called as another kind of surprise witness.  After we've

14   picked a jury, after we've already addressed all those issues

15   in opening.  It is tremendously prejudicial.  The Court

16   inquired specifically whether I have any direct law on point.

17   I do not at this point, but I'd like the opportunity to

18   research it.

19             THE COURT:  Absolutely.  Submit whatever you

20   can and we'll take a look at it Monday.  I have a motion to

21   argue at 9:00 by videoconference, but it shouldn't take any

22   longer than hopefully 45 minutes and then I'll have some time

23   to look at whatever law is submitted to me.  We'll take time

24   to make a record and examine everything before we continue.

25             MR. LOVRIC:  Judge, I'd like to make a record.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    These accusations are, in my view, just legal puffery.  First

2    of all, there has been no surprise which has violated any

3    laws or statutes.  I've explained to counsel, but I don't

4    remember if it was on the record, but Adam Lurie explained it

5    on the stand how that came about.  There was no surprise.

6    There was no prejudicial violation of any notice of any kind.

7    Adam Lurie was reading a newspaper article on the day that we

8    were in trial here and then when he saw that, as he

9    explained, he realized he thought he knew a Dean Sacco.  He

10   then, through the FBI, located Agent Lyons, who then told me

11   that an AUSA from New Jersey wanted to speak to me during the

12   lunch break.  He called me, actually, and I -- quite frankly,

13   I was about to tell him, I'm on trial, whatever you need to

14   talk to me, call me after the trial.  He continues to tell

15   me, I know Dean Sacco.  That's how that all comes about.  The

16   defense counsel representation that's somehow prejudicial

17   with no notice, it's just not accurate.

18              THE COURT:  It is accurate, but you couldn't

19   give notice of what you didn't know.  The Court understands

20   that.

21              MR. LOVRIC:  Can't give them notice of

22   something that has happened yet.

23              THE COURT:  Right.

24              MR. LOVRIC:  It's a little unfair for counsel

25   to categorize it as something the government had in its

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

552

1   possession, we didn't disclose it to them.  That's simply not

2   the case.

3              THE COURT:  I didn't hear him say that.

4              MR. LOVRIC:  As far as this witness is

5   concerned, I put it on the record, I learned of that aspect

6   of his testimony as his wife was on direct, and that's when

7   he told the secretary first that he needed to tell Agent

8   Lyons something and then told Agent Lyons, who then came

9   down, passed me a note.  That's when I found out about it.  I

10  want the record to be clear, there was no intentional or

11  unintentional notice not given, but more importantly, notice

12  is not required.  Had the FBI agents in New Jersey decided to

13  go to lunch and not fill out a 302 and never put together a

14  report on what he said, counsel would have had nothing, and I

15  wasn't required to write down everything that I might learn

16  from interviewing him.  So there is no notice requirement.

17  And I just state that for the record because there's too many

18  buzzwords that are being plugged in by counsel about failure

19  of notice.  There is no notice requirement.

20             THE COURT:  Okay.  The record is complete for

21  today.

22             MR. FISCHER:  Yes.

23             THE COURT:  Have a nice weekend, everybody.

24             (Court stands adjourned)

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

553

1                      C E R T I F I C A T I O N

2

3

4          I, VICKY A. THELEMAN, RPR, CRR, United

5    States Court Reporter in and for the United States

6    District Court, Northern District of New York, do

7    hereby certify that I attended at the time and place

8    set forth in the heading hereof; that I did make a

9    stenographic record of the proceedings had in this

10   matter and cause the same to be transcribed; that

11   the foregoing is a true and correct copy of the same

12   and the whole thereof.

13

14

15                            _____

16                            VICKY A. THELEMAN, RPR, CRR

17                            United States Court Reporter

18                            US District Court - NDNY

19

20

21   Dated:  August 11, 2008.

22

23

24

25