554

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF NEW YORK

3  ----------------------------------------------------------

4  UNITED STATES OF AMERICA,

5              -versus-                    08-CR-77

6  LINDA O'CONNOR and DEAN SACCO.

7  ----------------------------------------------------------

8              TRANSCRIPT OF JURY TRIAL

9  held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  MONDAY, May 12, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Binghamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

USA vs O'Connor and Sacco                               555

1            MR. FISCHER:  Judge, there have been a couple

2    of surprise disclosures during the course of this trial.

3    First is the AUSA from New Jersey.  Now we have a witness

4    who, at the eleventh hour, 4:00, 3:00 on a Friday afternoon,

5    after having met with the AUSA and the lead FBI agent,

6    discloses a fact that goes directly to the heart of the case

7    that could not be any stronger, more direct or more important

8    really.  It appears to me that the only reason I found out

9    about it before I crossed him is because I made an objection

10   to something leading up to it.  There was no disclosure made

11   prior to, apparently there was no attempt to disclose that

12   information before I cross-examined the witness.

13            In this case, Mr. Sacco faces potentially a

14   life sentence.  This is as important as it gets, this

15   evidence, and your Honor, the consequences of this surprise

16   couldn't be more devastating, so I want to point out, Judge,

17   that even if there's no discovery violation, that it is in

18   the sound discretion of the trial court to refuse to admit

19   evidence of a witness, to exclude or include a witness, and I

20   cite US v. Combs, Tenth Circuit case from 2001, 267 F 3d

21   1167.

22            THE COURT:  267 F 3d 1167.

23            MISS PEEBLES:  Yes.

24            MR. FISCHER:  I also note the general tenor of

25   the disclosure rules basically giving notice to the defense

USA vs O'Connor and Sacco

556

1   so that they can confront the evidence against them.  There

2   was no notice, absolutely zero in this regard.  And, you

3   know, I point out some older decisions of the Supreme Court:

4   US v. Gault from 1967, 387 US 1, that notice to the parents

5   the night before a juvenile delinquency hearing is

6   constitutionally inadequate.

7           THE COURT:  In either one of the cases you

8   cited, did the court give a reason for what it did?  I mean,

9   like from what I understand, the AUSA -- I don't want -- Mr.

10  Lovric has made it abundantly clear what his position is.

11  The AUSA read a newspaper, came up here and testified, and

12  the government didn't know about him until he called.  And

13  the same thing with this witness.  As I understand it, there

14  was never a disclosure.  Even though this witness had been

15  questioned in the past by FBI agents, he never disclosed to

16  anybody the testimony he gave Friday until he talked with a

17  representative of the US Attorney's Office upstairs, who

18  asked Mr. Lyons to speak with him and Mr. Lyons did, and that

19  revelation was then made to Mr. Lyons, who passed it on to

20  Mr. Lovric.  Is there something that the government did or

21  didn't do that you could point to that would be a basis for

22  the Court saying, I'm going to exercise my discretion in not

23  letting this evidence before the jury or striking whatever

24  has been presented to the jury thus far?

25          MR. FISCHER:  No, your Honor.  I accept prima

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

1    facie what Mr. Lovric said about AUSA Lurie and that the

2    disclosure concerning Mr. DiFiori was made to him the day of

3    Mr. DiFiori's testimony.  I understand that that is his

4    position.  I have no reason to refute that.  But I do point

5    out, in a case like Powell v. Alabama, the Supreme Court

6    decision where a trial attorney was appointed the morning of

7    the trial, that wasn't due to the fault of the prosecution in

8    that case but that was a constitutionally informal proceeding

9    because -- for a number of primarily Sixth Amendment reasons.

10   But basically the same thing applies in this situation, that

11   time to investigate, yes, there was an opportunity to discuss

12   this with -- to interview Mr. DiFiori, but the allegation

13   that Mr. DiFiori made was very different than what he has now

14   testified to. So it is a surprise.  If it was a surprise to

15   the FBI who interviewed the witness three, potentially four

16   times, it certainly is a surprise to the defense, and I think

17   this -- the nature of it coming after we've picked a jury and

18   after we've done our opening statements deprives Mr. Sacco of

19   the opportunity to truly address and confront all of these

20   issues with a jury that's going to decide his fate in this

21   case.  That's very troubling.  That goes to the heart of

22   justice in this case, Judge.

23           And I go to state court and try civil cases,

24   and nondisclosure of witnesses a month in advance of trial is

25   going to mandate a dismissal of a case.  438 disclosure on

USA vs O'Connor and Sacco

558

1   Friday afternoon is far more powerful than that.

2                So, what I ask, Judge, on the basis of the

3   law, little bit of law that I've cited, which I'm aware

4   addresses the due process aspects of these late disclosures,

5   is, first, I ask for a mistrial.  Second, I ask, if there is

6   no mistrial, that at least the testimony of Mr. DiFiori

7   concerning the alleged confession be stricken, with an

8   appropriate instruction to the jury, or -- and thirdly, in

9   the alternative, at least that there be an adjournment of

10  this matter so we may undertake further investigation of

11  Mr. DiFiori's background, experience, because the relative

12  importance of Mr. DiFiori's testimony has come from way back

13  in the line to the head of the line and is -- the priority of

14  addressing has changed dramatically.

15               THE COURT:  Thank you, Mr. Fischer.

16               Miss Peebles.

17               MISS PEEBLES:  Your Honor, I concur with what

18  Mr. Fischer states in terms of the significance of his

19  testimony and the fact that we have been investigating this

20  case for several months and we've talked to just about

21  everybody, including Mr. DiFiori, your Honor.  So I mean, I

22  guess I would just concur with what Mr. Fischer is stating,

23  the nature of it, the gravity of what he's now suggesting in

24  light of what he stated in the past and the fact that, you

25  know, we weren't able to fully and properly investigate his

USA vs O'Connor and Sacco

1    background, because what he stated in the past was relatively

2    insignificant and what he's saying now is obviously very

3    significant.  We don't know much about him.  It wasn't an

4    avenue we explored fully because it wasn't something, when we

5    spoke to him, my investigator spoke to him, nothing remotely

6    even close to what he stated on the stand on Friday.  So, you

7    know, perhaps striking his testimony with a curative

8    instruction would be an appropriate course of action that --

9    I guess that would be our position at this point, your Honor.

10                  THE COURT:  Let me ask you this:  What's your

11   position on a mistrial and a continuance?  Same as Mr.

12   Fischer?

13                  MISS PEEBLES:  Yes.

14                  THE COURT:  You want a mistrial?

15                  MISS PEEBLES:  Well, I would rather a

16   continuance as opposed to mistrial at this point.

17                  THE COURT:  How long of a continuance do both

18   of you seek?

19                  MISS PEEBLES:  I would say at least two weeks,

20   Judge.

21                  THE COURT:  I'm sorry?

22                  MISS PEEBLES:  I would say at least two weeks.

23                  MR. FISCHER:  I would ask for at least a week,

24   your Honor, to get that done.

25                  THE COURT:  All right.  Mr. Lovric?

USA vs O'Connor and Sacco

560

1          MR. LOVRIC:  All done?

2          THE COURT:  He said done.

3          MR. FISCHER:  For now.

4          MR. LOVRIC:  Judge, first of all, this is

5   posturing, in my view.  This is posturing by both defendants.

6   These buzz words being thrown around, notice by defense

7   counsel.  There is no notice required.  They keep referring

8   to late notice, no notice, whatever notice they keep

9   referring to.  First of all, there is no notice requirement

10  under the law, case law, under any Rule 16, under any Federal

11  Rules of Evidence.  They received all the discovery and all

12  the notice that the law requires and plus some.  The fact of

13  the matter is, they keep referring to this as late notice.

14  There is no late notice.  There is no late anything in this

15  case.  The fact of the matter is, the defendants are

16  complaining that they learned things during trial that they

17  did not know from all of the volumes of discovery and

18  materials given to them, and that is true.  Just like I

19  learned things that I didn't know and could not prepare for

20  from all the volumes of materials that I reviewed to those

21  things that are at heart here.

22          Adam Lurie's testimony, I had no idea Adam

23  Lurie existed on this planet.  I went through and explained

24  how I learned of his existence and how that came about.  Adam

25  Lurie.  The defendant or defendants are claiming that they

USA vs O'Connor and Sacco

1   are somehow surprised by that.  My response to that is, so

2   what.  We're all surprised at trial by a lot of things that

3   we can't prepare for or envision.  They can't point to any

4   case law or statute or Rules of Evidence to show that it was

5   some type of unfair surprise or some type of surprise, where

6   it was someone's fault that they were surprised, and that's

7   what -- that's what it's all about in the courtroom.  You

8   have to be able to point to something to say, this is why I'm

9   entitled to remedy.  It's not enough for a defendant simply

10  to say, I'm surprised.  To be quite honest, Judge, that's

11  irrelevant.  It's irrelevant as to any motion, it's

12  irrelevant as to any curative instruction, it's irrelevant,

13  period.  And for the defendants to want a mistrial or a

14  continuance is absolutely irrelevant simply because they're

15  surprised.  I'm sure they'd be surprised by other things

16  which they're not discussing with us, but it's irrelevant.

17              Mr. DiFiori's testimony, no different than

18  Mr. Adam Lori's, no different.  They keep saying notice.

19  There's no notice requirement if I learn of it as his wife is

20  testifying.  Ten minutes before he comes into the courtroom,

21  I learn of this information.  Frankly, even if I had learned

22  of it nine weeks ago, there's no notice requirement other

23  than I would turn over to them any additional reports filled

24  out by any investigator or agent in connection with that new

25  information.  But if there was no such reports filled out or

USA vs O'Connor and Sacco

1    no such summaries prepared, there is no notice violation.

2    There is no law violation.  There is no case law violation.

3    The defendants say they're surprised by it.  I was surprised

4    too, and again, my response to that, it's simply irrelevant

5    as to what they're seeking in terms of remedy.

6                    Continuance -- Well, first let me address the

7    motion for a mistrial.  I don't see any basis in law, none,

8    none.  If a witness were to walk in and say, I hold in my

9    hands five videotapes of Mr. Sacco raping the victim, he

10   would get a copy, as I would, and those would go into

11   evidence as long as I can establish those are the tapes.  The

12   fact that they walked in two minutes before May 12 testimony

13   starts, it's irrelevant.  It simply has no basis in law for

14   what the remedy is they're seeking at this point.

15   Continuance to do what?  Continuance to look into

16   Mr. DiFiori's background?  Well, they had the whole weekend

17   to do that.

18                    I might point out, DiFiori is a witness that

19   was on the government's list.  And I know the defense has

20   talked to almost every witness they could find and looked

21   into every witness' background, so they've done a lot of

22   things that they normally would do and should do, and if the

23   defendants want to continue looking through Mr. DiFiori's

24   background, this trial is going to go on at least another

25   week, as I foresee it, they can continue it.  And they have

USA vs O'Connor and Sacco

563

 1    their investigator here.  They can go out and interview

 2    Mr. DiFiori's neighbors if they want to and so on.  They can

 3    recall him if they choose to.  There's no basis for a

 4    continuance, Judge, any more than there is for a mistrial.

 5              I simply wanted the record to be clear that

 6    there are no notice violations, nor was there any notice

 7    required, and that whatever surprises, if you want to call it

 8    surprises, the defense encountered, I likewise encountered

 9    the same as they occurred.

10              And that being said, Judge, we're ready to

11    proceed forward.

12              THE COURT:  All right.  Well, of course this

13    situation, at least with respect to Mr. DiFiori, developed

14    late Friday afternoon, and instead of following my usual

15    practice, which would have been to complete his

16    cross-examination and redirect, even though it was late in

17    the day because he was from out of state so not to have to

18    drag him back here on Monday, the Court adjourned and there

19    was time that elapsed, the weekend, to do whatever

20    investigation the defense felt should be done.

21              Secondly, I agree with the government that

22    there was no notice in this particular instance.  You can't

23    give notice to something you don't know, number one.  Number

24    two, if they did know it, I don't think there was any

25    requirement because there was no writings to turn over.

USA vs O'Connor and Sacco

1    Certainly isn't Brady material.

2              So the Court's going to deny the motions of

3    both counsel for a mistrial and continuance and give you both

4    an exception on the record.

5              I'll ask the clerk to bring the jury in and

6    have the witness.

7              (Jury present)

8              THE COURT:  Morning, ladies and gentlemen.

9    Morning.  I know that you're glad to be here this morning

10   because its snowing in Altoona and Johnstown.  It's not

11   snowing here so it's much better to be here.

12             Are we ready to proceed with the witness, Mr.

13   Fischer?

14             MR. FISCHER:  Yes, your Honor.  Thank you.

15   May it please the Court, counsel:

16   CROSS-EXAMINATION CONTINUED

17   BY MR. FISCHER:

18       Q    Good morning.

19       A    Good morning.

20       Q    I'd like to take you back to the Christmas party.

21   Did you speak with Mr. Sacco at the Christmas party?

22       A    Yeah, probably did.  Absolutely.

23       Q    I'm sorry.  I couldn't understand.

24       A    I did.  I'm sure.  I spoke with most people there.

25       Q    Do you remember what you spoke with Mr. Sacco

Gerardo DiFiori - Cross

1    about?

2        A    Not in particular.

3        Q    Did Mr. Sacco show you pictures at that Christmas

4    party?

5        A    He was taking pictures.

6        Q    Did he show you pictures from a trip that he took?

7        A    Not at the Christmas party, but he showed me

8    pictures of the trip he took.

9        Q    When did he show you pictures of the trip he took?

10       A    When he came back from the trip.

11       Q    When was that?

12       A    I don't know the dates.  I saw pictures of a girl

13   with the family and two kids.  He said she was 19 years old.

14   He said prior to going on the trip it was a girl he was going

15   to go visit.

16       Q    My question was this:  When did -- when did this

17   happen that he showed you these pictures?

18       A    When he came back from his trip.

19       Q    I understand that.  Can you give me an approximate

20   date of when that occurred.

21       A    I don't know.

22       Q    Was it before the Christmas party or after the

23   Christmas party?

24       A    I don't know the dates.  I'm sure this information

25   of his trip, it would be after that.

Gerardo DiFiori - Cross

566

1    Q    Where was Mr. Sacco living at the time he showed

2    you those pictures?

3    A    On 46 Monitor Street.

4    Q    Do you remember where you were when he showed you

5    those pictures?

6    A    I was in his apartment.

7    Q    How often did you go to his apartment?

8    A    Would be couple times a week.  He's in the same

9    building up and down.

10   Q    So you would actually enter his apartment several

11   times a week?

12   A    No.  He would invite me over.  I wouldn't have a

13   key to any of my tenants.  Walking to a nearby tenant's

14   apartment.

15   Q    Whether Mr. Sacco invited you or whether you

16   entered in some other way, you in fact were --

17   A    There is no other way for me to enter or reason to

18   enter into a tenant's apartment.

19   Q    Okay.  But you were in Mr. Sacco's apartment a

20   couple of times a week?

21   A    Well, he was there, he would invite me over.  He

22   would call me down.  As a matter of fact, I remember now

23   before his trip he have this -- before going to his trip,

24   because apparently he got in touch with his lady through the

25   internet, he would have a copy of pictures.

Gerardo DiFiori - Cross

567

1                    MR. FISCHER:  Your Honor, may I interrupt.

2      I'm going to move to strike the response as nonresponsive and

3      ask you direct that the witness respond to the question that

4      I'm asking.

5                    THE COURT:  The last part of the answer

6      regarding what he did with respect to the internet and before

7      he went on his trip is nonresponsive and will be stricken.

8      And just kind of listen to what he's asking.  Think about it

9      before you start to answer.

10                    THE WITNESS:  Okay.

11     BY MR. FISCHER:

12         Q    Were you or were you not in Mr. Sacco's apartment a

13     couple of times a week on average?

14         A    Once in a while.  I don't know if it's couple times

15     a week, one time a week, two times a week.  I don't

16     understand the -- I was very friendly with him.  I never

17     considered -- considered him a friend.  He was a

18     tenant/colleague/coworker.  I have some deal of trust with

19     him.  I never have any reason for anything.  And if he

20     invites me down to his apartment and he then mentioned he

21     wanted to go visit his girl, he would show me pictures of

22     her.  He says, maybe one day you will help me with Spanish in

23     going to visit this girl down here.  He showed me pictures

24     before, pictures he printed from the internet, and when he

25     came back he showed me pictures of that as well.  He showed

Gerardo DiFiori - Cross

1    me other pictures with other girls that seem to be much

2    minor.

3         Q    May I interrupt you, please?

4         A    Yes.

5              MR. FISCHER:  Your Honor, I'm going to ask

6    that the witness' answer be struck as nonresponsive and ask

7    for instruction that he respond to the question that I asked.

8              THE COURT:  Well, the part of when he was

9    discussing when he was there a couple times a week or once a

10   week, that part can stand.  The remainder of the answer will

11   be stricken.

12        Q    It's fair to say that you were in Mr. Sacco's

13   apartment at least once a week on average?

14        A    Possibly.

15        Q    And how long did Mr. Sacco rent from you?

16        A    He -- I don't recall the dates, but I can tell you

17   because he start working in the Manhattan Club.  Whenever he

18   start working in the Manhattan Club, which is information you

19   can, I guess, ask the Manhattan Club.  Was about two weeks

20   after he started working at that company, and he was employed

21   at the company as an independent contractor with a real

22   estate license he had, like everybody who have to work at the

23   place.  Would be about two to three weeks, estimating, that I

24   met him at the office.  Two to three weeks is when I start

25   renting to him, whatever that time was.  What is the exact

Gerardo DiFiori - Cross                                    569

1    date, I don't recall now.  But there should be information

2    that you can receive free and know the exact date, if that's

3    what you want to know.

4         Q    Did Mr. Sacco rent from you for more than a year?

5         A    I believe so.

6         Q    Did Mr. Sacco rent from you for more than two

7    years?

8         A    I guess might be somewhere around that time.

9         Q    So is it fair to say that you were in Mr. Sacco's

10   apartment at least 50 or 60 times?

11        A    No.  He didn't live in that apartment all the time,

12   once I move into that house.

13        Q    I understand.  Let me ask you this:  When Mr. Sacco

14   lived in a different apartment that you owned, did you also

15   visit him weekly?

16        A    Not particularly.  I visit him -- that apartment

17   was two roommates, two brothers, Luis and Andre Medina that

18   were sharing that apartment.

19        Q    How often did you visit Mr. Sacco in that

20   apartment?

21        A    Maybe -- It's not like I visit him, it's like I'm

22   visiting a friend.

23        Q    How often did you visit that apartment when

24   Mr. Sacco --

25        A    About once a week.

Gerardo DiFiori - Cross                    570

1    Q    About once a week?

2    A    Yes.

3    Q    So is it fair to say you visited 579 in which Mr.

4    Sacco lived that you owned at least 50 or 60 times?

5    A    The second apartment?

6    Q    Combined.

7    A    Could be.  Could be 20, could be 50, could be 30.

8    Q    On the occasions when you visited Mr. Sacco's

9    apartments did you ever see any pictures there other than the

10   pictures from his vacation?

11   A    Some pictures from two of his vacations.  He went

12   twice to the Dominican Republic that I know.

13   Q    Other than those pictures from the Dominican

14   Republic, you didn't see any other pictures during these

15   visits?

16   A    That's all the pictures I've seen.

17        MR. FISCHER:  Excuse me.

18   Q    Before last week, have you discussed this matter

19   with your wife?

20   A    No.

21   Q    Have you discussed even the topic of when you were

22   supposed to be here?

23   A    Well, they send us -- the officers came to talk

24   twice to the house, and then the second time they wrote a

25   letter about the time we supposed to be here and we're

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross

1    supposed to call Kathleen -- I don't remember her last name,

2    which is, again, from this office.  I call her, she said she

3    would be notifying me.  I explained to her I had a business

4    trip and I explained the dates of the trip.  That should be

5    fine.  And then she call us, and I was actually on the

6    business trip when she call, and I came right on time for

7    this.

8         Q    I'll rephrase my question.

9         A    Okay.

10        Q    Did you discuss with your wife coming up here?

11        A    Discuss what?

12        Q    Coming up here to testify in this case, did you

13   discuss that at all with your wife?

14        A    This, discuss what the case -- what you -- I don't

15   know what you're trying to ask me.  Discuss what

16   specifically?

17        Q    I'm sorry.  I'll try to make my question

18   understandable.

19        A    Okay.

20        Q    Did you ever speak with your wife about making

21   arrangements to physically come from New Jersey --

22        A    Of course.

23        Q    -- to Binghamton --

24        A    Of course.

25        Q    -- for your testimony?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross                               572

1        A      Yes, we need to coordinate.  I was in Vegas and

2    California and I flew in, and the day I flew in, I left

3    her -- we drove up here, stayed at the hotel and testified

4    the next day, which was Friday.

5        Q      So the answer to my question is, yes, you did?

6        A      Of course.

7        Q      Did you ever discuss with your wife any of the

8    testimony that either of you were going to give here?

9        A      Any of the testimony?  I'm sorry.

10       Q      That you were going to give in this court?

11       A      No.

12       Q      Was your wife present the first time the FBI agent

13   and State Police investigator came to your home?

14       A      She was present both times.

15       Q      And after the State Police investigator and FBI

16   agent left your home, did you have any discussion at all with

17   your wife about the subjects discussed in that interview?

18       A      Not in particular.  Everything we wanted to show

19   them, like all the information I had, the letter he sent me,

20   for example, the letter he sent me when he was in jail, I

21   turn them in to the prosecutor.  That's pretty much about it.

22       Q      Let me see if I can rephrase my question.

23       A      Okay.

24       Q      After the investigator and the FBI agent left your

25   home the first time --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

 1       A     Okay.

 2       Q     -- did you have any discussions with your wife

 3   about this matter?

 4       A     I don't think I went through any details.  The same

 5   things I spoke, she spoke.  The same things I spoke here and

 6   she spoke there.  The only thing I have not mentioned at that

 7   point to the officer was the fact of what he had told me that

 8   they found in the apartment prior to bringing him to the

 9   hospital the following morning.

10       Q     I cannot tell from your answer --

11       A     Okay.

12       Q     -- whether after the police left your house the

13   first time you did or did not have conversations with your

14   wife about this matter.

15       A     I'm sure we did.  You know, we -- other than --

16   what kind of conversations that you ask me I had?  I don't

17   understand.  What is it exactly you're asking me that I have

18   conversations?  They left the apartment and talk about what?

19   About what we have talked to them?  We talk in front of them.

20       Q     Let me see if I can make my question more direct.

21   Did you at any time, after the FBI agent and the state

22   trooper Santiago left your house after the first interview,

23   after that time or after they left did you ever have any

24   conversations, any conversations with your wife about this

25   matter?

Gerardo DiFiori - Cross

1    A    Probably did.  I probably have a conversation.  I

2  don't think we sit down for an hour to talk about this, but I

3  probably have some comments and she has her comments.  I

4  guess -- I guess normal conversation after a police officer

5  comes to your house, question, and they leave, I guess we

6  have a conversation.  We talked to each other.  I'm sure we

7  did.

8    Q    Before the FBI agent and state trooper came to your

9  house the first time, did you and your wife ever discuss the

10  pictures that Mr. Sacco showed you from the Dominican

11  Republic?

12    A    The -- the first trip with the girl, that was 19 --

13    Q    I want to make it clear, I'm asking whether you had

14  the conversations or not, not for the substance.

15    A    There is two difference pictures of this situation.

16  One is with her family, the girl was with her family, family

17  and her children, and he's saying she was 19; very small

18  girl.  The other pictures, they were -- you look at these --

19  when I look at these pictures, I see my niece.  They were not

20  pictures in which you will see an adult person in there.

21  They seem teens.  They seem little teenagers, if you will.

22  And she didn't have a good feeling of all that, of all that.

23    Q    Mr. DiFiori, let me interrupt you, please.

24    A    Yes.

25    Q    Let me ask you a little bit about your background,

Gerardo DiFiori - Cross                    575

1    please.

2         A    Yes.

3         Q    You are a businessman?

4         A    Yes, I am.

5         Q    You transact business with very bright, sharp

6    people every day, don't you?

7         A    Yes, I do.

8         Q    In New York City?

9         A    In different places.

10        Q    Around New York City?

11        A    Yeah.  Around New York, California, and here and

12   other countries as well.

13        Q    I didn't hear.

14        A    In other countries as well, New Mexico, in business

15   as well.  Also Argentina where I am from originally.

16        Q    You're from Argentina?

17        A    Originally.

18        Q    How long have you lived here in the US?

19        A    First time I came was in Miami, 1990.

20        Q    And how old are you now?

21        A    I'm going to be 38.  Thirty-seven.

22        Q    So you were 19, 20 years old when you came to the

23   US?

24        A    Yeah.  Twenty, I believe.

25        Q    What did you do in Argentina before you came to the

Gerardo DiFiori - Cross                                576

1   US?

2        A    I studied.  I had businesses.  I came to -- When I

3   came to the United States, I brought money, invest in a

4   restaurant in Florida.  I have different businesses in

5   Argentina from import/export, retail stores, like clothing

6   stores, ice cream shops, shop one.  When I was actually 19, I

7   was creator of sales for organization with hundred people

8   under me.

9        Q    Do you have a good relationship with your wife?

10       A    Excellent.

11       Q    You're able to speak about many subjects?

12       A    Pretty much everything.  The only thing my entire

13  life I never told my wife about, about the other day, last

14  Friday that I was here, was that Sacco has confessed to me

15  the night before I took him to the hospital.

16       Q    Now the night before you took him to the hospital,

17  as I understand your testimony, you said that Mr. Sacco

18  appeared, for lack of a better word, rough?

19       A    Yeah.  And as this weekend went through, I remember

20  also as I walk in and I see him there like within a picture

21  what he was doing with those pills.  He was actually opening

22  the sole of his shoe to try to feed them in there.

23       Q    This is the night before?

24       A    That is the day I find him.  I forgot to mention

25  him -- I find him with the pills.  He was trying to fit in

Gerardo DiFiori - Cross

577

1    the pills in the sole of the shoe.  Then I ask him what he's

2    doing, and he told me that he -- they were going to come and

3    get him; if they did, he was going to swallow the pills, that

4    he will have time, he says, to do that.

5        Q    So this is the night before?

6        A    This is the afternoon -- that is the day I found

7    him with the pills and he confessed to me.

8        Q    When he confessed to you, he also expressed to you

9    the potential that he might try to harm himself?

10       A    He say, if they take me in, I'm going to kill

11   myself, I'm going to swallow these pills, I don't want to go

12   in for 30 years.  He's going to ask him what he have done.

13       Q    Okay.  And after you left him that night or that

14   afternoon, did you call anyone to report that he had

15   discussed the potential of harming himself?

16       A    No, I did not.

17       Q    Now, as I understand what you're saying today, is

18   that Mr. Sacco confessed to you that he had a sexual

19   relationship with a minor, is that what you're saying?

20       A    That's exactly what he said.  And that she was 12

21   and that she was a prostitute.

22       Q    Okay.  And also that he could get 30 years?

23       A    That's what he verbalized.

24       Q    And the first time that you disclosed that

25   confession was last Friday, correct?

Gerardo DiFiori - Cross

1      A    That's correct.

2      Q    And that was after you met Thursday night with Mr.

3  Lovric and Mr. Lyons?

4      A    That was the morning before walking here.

5      Q    That 30-year sentence, where did that come from?

6      A    You can ask your client.  That's what he said.  He

7  says, I've been in before for nine or ten years, something

8  like that, so if they get me, they're going to give me 30

9  years.

10      Q    He specifically mentioned 30 years?

11      A    Thirty years.  And he even say, I remember right

12  now, my face is going to be in all the papers.

13      Q    So he was in rough shape at that time that day

14  before you found him.

15      A    What would you say if you find somebody in that

16  situation?

17      Q    I'd say he was in rough shape.  But you didn't do

18  anything to help him?

19      A    I didn't know what to do.  I was paralyzed.  I was

20  stunned about the situation.

21      Q    You were paralyzed?

22      A    Meaning, not paralyzed, I couldn't walk.  Meaning I

23  didn't know what to do, what not to do.  I didn't know what

24  to believe or not to believe.

25      Q    You grew up in another country, you came to America

Gerardo DiFiori - Cross                    579

1  and you built a very, very successful business.  You've been
2  through a hard time, but you were paralyzed in this
3  situation?
4       A    I want to rephrase myself.  Let's take paralyzed
5  aside.  I was not paralyzed.  I was -- I didn't know what to
6  believe or what not to believe.  It's like at one point you
7  want to connect all the dots, I guess, you know.  When he
8  mentioned this about this girl, then you think, you know,
9  about the pictures he show me before about these other girls
10 in the past, you know, there are things I guess that when you
11 have trust in somebody, you -- you don't really see that part
12 of the person, and I guess, you know, at that point is
13 like -- I didn't know what to do or not to do.  I asked Luis,
14 which this guy living there --
15            MR. FISCHER:  I'm going to interrupt you at
16 this point.
17      A    M-m h-m-m.  I asked him to keep an eye on him.
18      Q    I'm going to interrupt you at this point.
19      A    M-m h-m-m.
20      Q    I'm not trying to put words in your mouth.  I'm
21 asking you -- it was your word, paralyzed.  Were you
22 paralyzed, or you want to change that?
23      A    I want to change that.
24      Q    Okay.
25      A    Meaning that I was paralyzed, apparently not what I

Gerardo DiFiori - Cross

580

1   what I wanted to --

2                    MR. FISCHER:  I want to interrupt.

3                    THE COURT:  Hold on.

4                    MR. FISCHER:  And if there's an explanation, I

5   withdraw that.  I ask that the witness be directed only to

6   answer the questions that I ask him.

7                    THE COURT:  Well, I think he understands that,

8   but I'll tell him to do that.  Okay.

9                    THE WITNESS:  Okay.

10                   THE COURT:  Okay.

11  BY MR. FISCHER:

12       Q    How much time passed between the time when you

13  found Mr. Sacco at your apartment and the time that Agent

14  Steve and state police officer Santiago came to your house?

15       A    I'm sure if you want an exact time because I -- I

16  can't recall that kind of time -- the day he was checking

17  into the hospital, that was the night before, and then -- and

18  then there should be documentation when the detective came to

19  my house, I'm sure dates, and that would be the time.  So

20  that will give you an accurate time.  I'm sure you'll have

21  the perfect dates.

22       Q    Do you know how long that was?

23       A    I'm sorry?

24       Q    Do you know how long that was?

25       A    Pardon me?

Gerardo DiFiori - Cross

581

1    Q    Do you know how long that time frame was?

2    A    No, I don't know.

3    Q    Okay.  After Mr. Sacco made this confession to you,

4 did you go home?

5    A    Yeah.  Probably have things to do.

6    Q    Did you speak with your wife about it?

7    A    No.

8    Q    Why not?

9    A    Could I explain the answer?

10    Q    At that time, at that time you hadn't received --

11    A    My wife --

12    Q    Let me ask you the question.

13    A    I ask you --

14    Q    Let me ask the question, if I may.  You can answer

15 my questions, okay?

16    A    M-m h-m-m.

17    Q    At that time when this confession was made, you

18 hadn't received any letters from Mr. Sacco from jail, am I

19 correct?

20    A    When he confess to me, he was not in jail.  He was

21 in the apartment.

22    Q    And you had not at that time received any letters

23 addressed to you from Mr. Sacco in jail --

24    A    Yes, I receive after.

25    Q    -- before that time?  After, exactly.

Gerardo DiFiori - Cross                            582

1        A     How he going to send me a letter from jail when he
2   didn't go to jail yet?
3        Q     Exactly.  So, after Mr. Sacco confessed to you, and
4   before you ever received any letters from him from jail?
5        A     Correct.
6        Q     Okay.  During that time frame, did you ever discuss
7   this matter with your wife?
8        A     I never told her up until the day I told here that
9   morning to the officers that he confessed to me.
10       Q     Did you have -- Between the time Mr. Sacco
11  confessed to you and the time that you received any letters
12  from Mr. Sacco from jail, during that time frame did you ever
13  have any discussions with your wife about Mr. Sacco and
14  anything that Mr. Sacco said to you relating to this matter?
15       A     Repeat the times.  What you say, from where to
16  where?  I'm sorry.
17       Q     From the time Mr. Sacco confessed --
18       A     Okay, that day, yes.
19       Q     -- to you to the time you received any
20  correspondence from Mr. Sacco while he's in jail, during that
21  time frame did you have any conversations with your wife
22  about Mr. Sacco and anything that relates to this matter?
23       A     The next morning when Luis called me -- Luis is one
24  of the roommates, Luis Medina -- he called me up I would
25  guess about five in the morning -- for accurate times, I'm

Gerardo DiFiori - Cross
                                                                    583

1   sure we can track the phone calls on my cellphone if you want

2   a specific time.  I got up, took him to the hospital, came

3   back and explained to her that he took all his pills and

4   drink whatever wine he drunk, and I took him to the hospital.

5        Q    At that point you did not disclose to your wife

6   that Mr. Sacco had made a confession concerning a crime to

7   you --

8        A    I didn't --

9        Q    I'm not done with my question.  May I finish my

10  question?

11       A    Yes, you may.

12       Q    That day that you took Mr. Sacco to the hospital,

13  you didn't come back and have a discussion with your wife

14  about this confession?

15       A    I never did up until last Friday, period.  And I

16  can give you a reason why, which I like to explain.

17       Q    I understand.  I understand that.

18       A    Couple reasons why.

19       Q    But I'm not asking you that question.  I'm asking

20  you whether --

21       A    I think I answered you many times, no, I did not

22  spoke with my wife up until last Friday.

23            MR. FISCHER:  Thank you.

24       Q    Do you use marijuana on a regular basis?

25       A    Occasionally.


                VICKY ANN THELEMAN, RPR, CRR
                UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross                              584

1      Q     How frequently is occasionally?

2      A     Maybe once a month.

3            MR. FISCHER:  Those are all the questions I

4    have.  Thank you.

5            THE COURT:  All right.  Miss Peebles.

6    CROSS-EXAMINATION

7    BY MISS PEEBLES:

8      Q     Mr. DiFiori, you're an intelligent guy, wouldn't

9    you say?

10     A     You could say so.

11     Q     And you're fairly worldly.  Have you a lot of

12   contact with a variety of different people, that fair to say?

13     A     Yes, I do.

14     Q     And you trusted Mr. Sacco, that's what you stated,

15   right?

16     A     Yes, I did.

17     Q     Now, you had a conversation with a gentleman about

18   you said a lady, do you remember that?  You were talking on

19   cross-examination on Friday?

20     A     I have a conversation with a gentleman.

21     Q     On behalf of a lady.  Do you remember that someone

22   called you about this case?

23     A     M-m h-m-m.

24     Q     On behalf of a lady?  Do you remember?

25     A     Yes.

Gerardo DiFiori - Cross                        585

1      Q    Yes.  And that was around --

2      A    I believe who the person who was -- and I think was

3   a male, I think so, first called my wife.  My wife says, you

4   know, I think she passed me the phone, they're going to call

5   you.  I was doing something.  They asked me if I knew some

6   lady, they say a name.  I didn't know the name.

7      Q    All right.  You had a conversation, and that was

8   sometime around the first or second week of April, first week

9   of April 2008, is that about right?

10     A    April.  Could be.  I guess could be about a month,

11  month and a half ago.  I mean, I don't know the dates

12  exactly.

13     Q    I'm going to play something for you and ask if you

14  remember it.

15     A    Okay.

16            (Playing videotape)

17            MR. LOVRIC:  Is this in evidence?

18            THE COURT:  Hold on.  Turn it off.  Mr.

19  Lovric, what's the problem?

20            MR. LOVRIC:  Is it in evidence?

21            THE COURT:  No.

22            MISS PEEBLES:  No.

23            MR. LOVRIC:  Well, then it should be played

24  for the witness only, Judge, if it's being used to refresh

25  his recollection.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Gerardo DiFiori - Cross

586

1           THE COURT:  Is this an attempt to refresh his
2  recollection?
3           MISS PEEBLES:  Yes -- not necessarily, no,
4  Judge.  It's a combination of purposes.
5           THE COURT:  Well, you should probably offer
6  it, shouldn't you?
7           MISS PEEBLES:  Your Honor, I'll offer this
8  conversation in evidence at this point, unless the government
9  has objections.
10           THE COURT:  All right.  Before the government
11  objects or does not object, could you please enlighten the
12  Court as to whom this conversation is between.
13           MISS PEEBLES:  This witness and my
14  Investigator Richard Haumann.
15           THE COURT:  That identifies it properly.
16           Mr. Lovric?
17           MR. LOVRIC:  I never heard it so if I can hear
18  it, I can say I have no objection or -- or an objection.  I
19  have no idea what's on it.
20           THE COURT:  It's like surprise evidence.
21           MR. LOVRIC:  It's like my exhibits.  I'd like
22  to look at it.  I'd just like to hear it so I can hear it.  I
23  have no idea what's on it.
24           THE COURT:  Ladies and gentlemen, you want to
25  step outside.

Gerardo DiFiori - Cross                        587

1              (Jury excused)

2              THE COURT:  Just so the record has its

3  reference, my recollection is on Friday afternoon, Miss

4  Peebles said at side-bar -- and I can't remember who was

5  there but the record will probably reflect that -- that she

6  had a recording I believe of Mr. DiFiori and that she was

7  going to play it on cross-examination, or words to that

8  effect.  So, do you recall that, Mr. Lovric?

9              MR. LOVRIC:  I recall the conversation, yes,

10  Judge.  I think she said she was going to offer it into

11  evidence.  I'd just like to hear it because I don't know

12  what's on it, Judge.

13             THE COURT:  I understand that.

14             MISS PEEBLES:  I can play it now.

15             Should the witness be excused from the

16  courtroom, your Honor?

17             THE COURT:  Yes.  Why don't you step down.

18  Stick around outside so we can find you.

19             (Witness steps down)

20             (Playing conversation)

21             THE COURT:  If you want to play it privately

22  for Mr. Lovric, that's fine.

23             MR. LOVRIC:  I just want to hear it.

24             MISS PEEBLES:  I have a transcript as well.

25             THE COURT:  Whatever you want to do.

Gerardo DiFiori - Cross                    588

1              MR. LOVRIC:  I have no objection, Judge.

2              THE COURT:  Okay.  You want to bring the jury

3    back in.

4              (Jury present)

5              THE COURT:  All right.  Miss Peebles, you may

6    play that recording for the jury.

7              MISS PEEBLES:  Thank you.

8              (Playing tape)

9    BY MISS PEEBLES:

10       Q     That was you?

11       A     Yes.

12       Q     Mr. DiFiori, you think you read maybe one too many

13   newspaper clippings about this case?

14       A     Pardon me?

15       Q     Do you think maybe you read one too many newspaper

16   clippings about this case before you came here and testified?

17       A     If I what?

18       Q     You think you might have read a couple of newspaper

19   articles before you came here and testified on Friday?

20       A     I only have seen one newspaper article.

21              MISS PEEBLES:  Thank you.

22              THE COURT:  Mr. Lovric.

23   REDIRECT EXAMINATION

24   BY MR. LOVRIC:

25       Q     Just a couple of questions.

Gerardo DiFiori - Redirect                          589

1      A    Yeah.

2      Q    Mr. DiFiori, after Mr. Sacco went to jail, did he

3  send you any letters from jail?

4      A    Yes, he did.

5      Q    I'd like to show you what's marked as Government

6  Number 96.

7           If you take a look at this piece of paper, do you

8  recognize what that is?

9      A    Yes.

10     Q    What is that?

11     A    This is I believe the, if I recollect, third letter

12 Dean send me from jail.

13     Q    Okay.

14              MR. LOVRIC:  I would offer number 96 into

15 evidence.

16              MR. FISCHER:  I object, your Honor.  I don't

17 think that in evidence it's necessary -- I don't think it's

18 appropriate as a document in evidence.

19              THE COURT:  Necessary, I take it you mean

20 relevant?  Or are you saying it's a 403 objection,

21 cumulative?

22              MR. FISCHER:  Both relevance, 403, and it is

23 an out-of-court statement and therefore hearsay as third.

24              THE COURT:  Sure, it's hearsay.  It would be

25 an admission.

Gerardo DiFiori - Redirect                           590

1          I'd like to see that document, if I could.

2    Thank you, Mr. DiFiori.

3               THE WITNESS:  You're welcome.

4               THE COURT:  Well, the Court has reviewed the

5    document and believes that it can be admitted over the

6    hearsay objection and 403 objection, and will receive it in

7    evidence.

8    BY MR. LOVRIC:

9       Q    Mr. DiFiori, you can look on your screen on the

10   right there.  I'm going to put Government 96 --

11      A    There is nothing here.

12      Q    It will be there.

13           Do you see that?

14      A    Yes, I do.

15      Q    This is the letter you received from Mr. Sacco?

16      A    Yes, I did.

17      Q    Could you read that for us, please.

18      A    "You have not responded to any letters I have sent

19   regarding my US passport and my other personal belongings.  I

20   am going to assume that you let the Mexicans have my property

21   without my permission.  I will deal with you when I get out,

22   which is going to be sooner than you think."

23      Q    After you received this letter from Mr. Sacco, how

24   did you take this letter as far as what he was saying when he

25   gets out?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

DiFiori - Recross

1      A     I -- he was threatening me.

2                  MR. LOVRIC:  That's all I have, Judge.

3                  THE COURT:  Mr. Fischer.

4                  MR. FISCHER:  Thank you, your Honor.

5   RECROSS-EXAMINATION

6   BY MR. FISCHER:

7      Q     What's the date of that letter, sir?

8                  THE COURT:  You want to know the date, Mr.

9   Fischer?

10                 MR. FISCHER:  Yes, your Honor.

11                 THE COURT:  I think Mr. Lovric has the letter.

12     Q     I'll show you Government's Exhibit 96.

13     A     Yes.

14     Q     What's the date of that letter?

15     A     There is no date in the letter.

16     Q     When did you get it?

17     A     After the other two he sent me.  The other two have

18  the date.  This one did not have a date.

19     Q     Did you review that document in preparation for

20  coming here to testify?

21     A     I gave this document the first day the officer that

22  visit my house.  And they gave me receipt for letters I gave

23  them.  I didn't keep any copies.

24     Q     Did you review -- In the past three or four days,

25  other than sitting here as a witness, have you reviewed any

DiFiori - Recross

1   documents?

2      A    You mean these documents.  I give this up.  I

3   didn't have this in my possession.  Officer -- I believe it's

4   officer Steve Santiago -- I don't recall the last name --

5   when they came to my house first time, I gave them all the

6   letters, they gave me a receipt, and they took this letter

7   from me, and I never have access to this again.

8      Q    Listen to my questions.

9      A    Yes.

10     Q    In the past three or four days, have you reviewed

11  any documents concerning this case?

12     A    They gave me documents in regards to my hotel,

13  where I'm going to stay.  I fill in some papers.  I -- in

14  regards to mileage and everything related to expenses I will

15  have coming here.

16     Q    Did you review that exhibit in the past week?

17     A    There's no way I could review it.  It wasn't in my

18  possession.

19     Q    So nobody showed it to you?

20     A    No.

21     Q    Okay.  Did you speak with anybody from the FBI over

22  the weekend since you were here last Friday?

23     A    No.

24     Q    Have you spoken with anybody from the government

25  about this matter since last Friday?

DiFiori - Recross                                    593

1      A    No.

2      Q    You also wrote letters to Mr. Sacco while he was

3  incarcerated, am I correct?

4      A    Answer to this letter.  Before doing that, I call

5  his mother.

6      Q    I just asked if you wrote to him.

7      A    Yes.  Okay.

8      Q    You did write to him?

9      A    Yes, I did write a letter to him.

10     Q    Just one letter?

11     A    One letter.

12     Q    Let me ask you a little bit about your conversation

13  with the investigator.

14     A    Well, it was in --

15     Q    Yes.  When the investigator called you, did he

16  explain to you what he was calling you about?

17     A    He was calling and asking me if I knew about a

18  house that Dean Sacco have upstate and that sort of

19  conversation, if I recollect correctly.  I'm sure you have

20  exactly every word I say on the phone and was in the

21  recording, but that's basically -- if you don't put that in,

22  I have to remember the conversation.  He asks -- asking me

23  how much I know about the house he have upstate, and all I

24  knew about the house, he would ask me -- he would consult me

25  on, you know, change the boiler.  He mentioned once that he

DiFiori - Recross                    594

1  wanted to do an apartment in the garage, I believe, and that

2  sort of thing related to that.

3       Q     You specifically remember that it was a boiler that

4  he was changing?

5       A     Yeah.  He told once that he need to change the

6  boiler because winter was coming, I believe, or something of

7  that and, you know, because the house has no heat, the boiler

8  broke down, he mention.

9       Q     How often did he come up to Norwich to work on the

10  house, how frequently?

11       A     I don't know.  I mean, maybe he came once a week,

12  every two weeks, I have no idea.

13       Q     Does that sound about right, once a week, once

14  every two weeks?

15       A     If he was coming up here or I wouldn't know where

16  somebody was going, how could I know.

17       Q     He was gone many weekends?

18       A     I would say yeah.  Most weekends.

19       Q     And he was talking to you during this time about

20  the work he was doing in Norwich upon this house?

21       A     He probably throughout the time of this house,

22  maybe three or four times he would mention.  One time he

23  mentioned, we scraping all the floors in the kitchen.  Then

24  another time about the apartment, he wanted to put in the

25  garage.  Another time about the boiler change and that kind

DiFiori - Recross                    595

1    of thing, pretty much.

2         Q    Mr. Sacco owes you a substantial amount of money,

3    am I correct?

4         A    I don't consider he owes me --

5         Q    It may not be substantial or --

6         A    Not really.

7         Q    How much money does Mr. Sacco --

8         A    I have no idea because I never care about getting

9    money back from him up until -- up until this happen.  I was

10   sort of helping him out.  I never care to even receive

11   anything.  I was always telling him, you know, do as much as

12   you can to pay me, and I just put a figure to that room he

13   was there, just to give him a hand.  Today I have three

14   tenants behind on rent.  I wish they can pay me, I wish they

15   can pay me, because then they're in a good position because I

16   can pay my mortgage, since I'm fine.  Money to me is not an

17   object on this.  As a matter of fact, if -- the first letter

18   he sent me from jail, he's asking me for $20 if I can send

19   him, and he's bragging about how nice I've been to him

20   always.

21        Q    Would it be fair to say that he owes you at least

22   $10,000 in rent?

23        A    No.

24        Q    Okay.  His rent at the first place he lived there

25   was $750 a month, am I correct?

DiFiori - Recross

596

1    A    Yes.

2    Q    And he lived there for approximately how long, a

3  year?

4    A    I don't think it was a year, but let's say it was a

5  year.

6    Q    All right.  And the second place that he lived that

7  you owned?

8    A    Let me go back.  When he could not pay me the full

9  750, he told me, I cannot pay all this amount.  He even tell

10  me, do you mind bringing the rent down.  How much can you

11  pay, can you pay 500, 550, I have no problem.  Pay me 550.

12  That apartment today, my parents are visiting me and they're

13  staying in that apartment.  It's an apartment that, you know,

14  even originally I had built for family visiting me from

15  Argentina so I have an extra room so we don't have to be all

16  cramped up.  Friends of mine, you know, needed an apartment,

17  they come to visit for a little while, I will use it.  When I

18  met Dino at Manhattan Club, that apartment was empty.  When

19  he mention he needed an apartment, listen, I have an

20  apartment there if you need, come check it out.  If you like

21  it, I have no problem, you can rent it out.

22    Q    How long did Mr. Sacco live in the second

23  apartment?

24    A    Maybe six months.  Just a guess.

25    Q    What was the rent there?

DiFiori - Recross                                    597

1       A    I believe I told him, just give me $75 a week, you

2   know, something of that.  It's not expecting -- he couldn't

3   pay -- the other apartment was too much.  At this time I

4   learned through him, you know, he -- I guess at the time he

5   considered me my friend and he will tell me things and he

6   told me one thing he have done in the past, a long time ago,

7   that he was in for like nine, ten years.

8       Q    May I interrupt you, please.

9       A    Yes.

10               MR. FISCHER:  Your Honor, I'm going to look to

11   the Court for an objection.  First, move to strike.  My

12   question was, how long did he live there.  I move to strike

13   the balance of any answer.

14               THE COURT:  I think the last question you

15   asked him before he -- What was the rent there, according to

16   the record?

17               THE WITNESS:  Seventy-five dollars.

18               THE COURT:  According to the record.

19               MR. FISCHER:  Thank you.

20       Q    Did he pay you?

21       A    Once in a while, yes; once in a while, no.

22       Q    Is it consistent with your recollection that he

23   owed you probably at least several thousand dollars in rent?

24       A    No.

25       Q    How much do you believe he owed you?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

DiFiori - Recross                    598

1    A    I don't even have a number.  I never care to
2    collect the rent from him.
3    Q    More than a thousand?
4    A    When you have somebody that you're helping out,
5    like I have done my whole life and barely can pay $75, it
6    doesn't matter to me if they can come up or not.  To me, if
7    they can come up with the money, because for themselves, they
8    create a habit of paying rent.  If you let somebody live for
9    free somewhere and they don't pay you anything, then it
10   becomes taking advantage side of the picture.
11   Q    Listen to my questions.
12   A    Yes.
13   Q    Listen to my questions.  Do you know how much money
14   Mr. Sacco owed you?
15   A    No.
16   Q    Okay.
17             MR. FISCHER:  Thank you.  Those are all the
18   questions.
19   A    I don't consider he owes me money.
20             THE COURT:  Hold on.  Hold on.  There's no
21   question pending.
22             MISS PEEBLES:  I have no more questions.
23             THE COURT:  Mr. Fischer, you're all set?
24             MR. FISCHER:  All set.
25             THE COURT:  Mr. Lovric?

Lyons - Direct                                    599

1              MR. LOVRIC:  I have no further questions,

2    Judge.

3              THE COURT:  Okay.  Thank you, sir.  You may

4    step down.

5              (Witness excused)

6              THE COURT:  Mr. Lovric?

7              MR. LOVRIC:  Judge, the next witness is going

8    to be FBI agent Jim Lyons.  I didn't know if the Court wanted

9    to take a break.  I need to set up my laptop real quick.

10             THE COURT:  Okay.  We'll take a break now.

11             (Jury excused)

12             (Jury present)

13             THE COURT:  Okay, Mr. Lovric.

14             MR. LOVRIC:  I would call our next witness,

15   FBI agent James Lyons.

16             THE CLERK:  Please state your name for the

17   record.

18             THE WITNESS:  James T. Lyons, Jr.

19

20

21

22

23

24

25

                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT

James Lyons - Direct                                    600

1    J A M E S   L Y O N S, J R., having been called as a witness,

2    being duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. LOVRIC:

5        Q     Good morning, Agent Lyons.

6        A     Good morning, Mr. Lovric.

7        Q     Agent Lyons, if you could just, for the members of

8    the jury, again, tell them your full name, where you work,

9    and what kind of work you do.

10       A     My name is James T. Lyons, Jr.  I'm a special agent

11   with the Federal Bureau of Investigation.  I've been with the

12   FBI slightly over 11 years, and all 11 years I've been here

13   at the Binghamton office.  I investigate a variety of

14   criminal offenses to include -- in the past I've done gang

15   investigations, drug investigations, and I've also conducted

16   investigations involving the sexual exploitation of children.

17       Q     Agent Lyons, at some point, did the FBI become

18   involved in an investigation dealing with Mr. Sacco and Miss

19   Linda O'Connor?

20       A     Yes, sir.

21       Q     Approximately when was it that the FBI became

22   involved?

23       A     It was about January 17, 2008.

24       Q     And at the time that the FBI became involved, what

25   other agency or agencies were involved in that investigation

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1  at that time?

2      A    Norwich Police Department and the New York State

3  Police and the Johnson City Police Department.

4      Q    And at the time that the FBI became involved then,

5  did you become the lead FBI agent in the matter?

6      A    Yes, sir.

7      Q    Now, at the time that your involvement in the

8  investigation commenced, at that time was Mr. Sacco already

9  in custody at that time?

10     A    Yes, he was.

11     Q    Where was that, in relation to what?

12     A    It was in relation to an arrest on some state

13  charges.  He was in the Chenango County jail.

14     Q    And at the time of the FBI's commencement of the

15  involvement, had Miss O'Connor been charged in relation to

16  this case anywhere?

17     A    No, sir.

18     Q    Did there come a point in time when both Linda

19  O'Connor and Dean Sacco were charged in connection with the

20  federal charge?

21     A    Yes, sir.

22     Q    About what date was that?

23     A    February 10, 2008.

24     Q    And after the federal involvement by the FBI

25  commenced, were there certain investigative techniques and

James Lyons - Direct

1    investigative things that were done in terms of pursuing

2    additional evidence or gathering additional evidence?

3         A    Yes, sir.

4         Q    I'd like to talk about a couple of those and ask

5    you some questions.  Are you familiar with a search warrant

6    done at 14 Miller Street?

7         A    Yes, I am.

8         Q    And who was -- whose residence was it that was

9    searched at that residence?

10        A    It was the apartment of Linda O'Connor.

11        Q    When was that search warrant done, approximately?

12        A    It was done the week after Miss O'Connor's arrest I

13   believe in February 6, 2008.

14        Q    And then are you familiar with the search warrant

15   conducted at a place called The Storage Center on Unit 129?

16        A    Yes, sir.  Yes, sir.

17        Q    And whose storage unit was searched at that

18   location?

19        A    Mr. Dean Sacco's.

20        Q    In fact, Agent Lyons, were you also in fact present

21   during the execution of that search warrant?

22        A    I was.

23        Q    Now, did there also come a point in time when a

24   search warrant was executed at 45 Fair Street?

25        A    Yes, sir.

James Lyons - Direct                                    603

1      Q      Approximately when was that search warrant
2  executed?
3      A      I believe that was March 24 of 2008.
4      Q      And were you also present at that location?
5      A      Yes, I was.
6      Q      And did there come a point in time when a DNA
7  sample was taken from Shannon O'Connor in connection with
8  this case?
9      A      Yes, sir.
10     Q      And were you also present when that was conducted?
11     A      Yes, I was.
12     Q      And who else was with you at that time?
13     A      Investigator Terry Shultz from the New York State
14 Police.
15     Q      And did that occur sometime around April 4 of this
16 year, April 2 of this year?
17     A      April 2, yes, sir.
18     Q      Now, Agent Lyons, in connection with this
19 investigation, did you also personally travel to the state of
20 New Jersey to interview certain individuals and to obtain
21 certain evidence?
22     A      Yes, I did.
23     Q      Approximately when was it that you traveled to New
24 Jersey?
25     A      Traveled to New Jersey on March 4 of 2008.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1    Q    And then were you in the New Jersey area for
2  approximately a couple of days?
3    A    Yes, sir.
4    Q    Now, at some point while you were in New Jersey --
5  Let me just narrow it down.  Approximately what city or what
6  area were you conducting these investigations down in New
7  Jersey?
8    A    Jersey City, New Jersey and Hillside, New Jersey.
9    Q    And when you were there, did you have the
10 opportunity to meet with a person by the name of William
11 Sorvino?
12   A    Yes, I did.
13   Q    And did you speak to Mr. Sorvino while you were
14 there?
15   A    Yes, sir.
16   Q    At some point in time did Mr. Sorvino turn over to
17 you certain items and materials?
18   A    Yes, he did.
19   Q    Can you describe generally what it was that he
20 turned over to you or gave to you.
21   A    He provided me with two boxes of materials that I
22 understood to be Mr. Sacco's personal belongings from his
23 prior place of employment at Glenwood Furniture.  The
24 belongings were numerous audio cassette tapes, a number of
25 small 8-millimeter or video cassette tapes, and there was an

James Lyons - Direct

1    audio recorder in the box, and also there was a folder

2    containing personal paperwork and documentation of Mr. Sacco.

3         Q    And did you have a chance to review and to go

4    through all of those materials?

5         A    Yes, I have.

6         Q    And in that folder or file that you mentioned, were

7    there a number of different kinds of documents and items,

8    whether it be documents or some type of personal items

9    belonging to Mr. Sacco?

10        A    Yes, sir.

11        Q    Okay.  Now, Agent Lyons, I'd first like to show you

12   what's already in evidence as Government's Exhibit Number 64.

13   Agent Lyons, I'd like to show you Government Exhibit 64, and

14   it's already in evidence, and I believe one of the counsel

15   already read parts of that, and I'd ask you if you could take

16   a look at that exhibit and read the entire first page of that

17   exhibit.  First page being front and back sides.

18        A    First page at the top says, Norwich jail, telephone

19   (607)337-1967.  Norwich weather, 33/18, snow.  It's dated 07

20   April 2007.  Dear Bill --

21             THE COURT:  When was that offered and received

22   in evidence?

23             MR. LOVRIC:  It came in through Mr. Sorvino.

24             THE COURT:  Let me just look.

25             MR. LOVRIC:  Then I think Miss Peebles had the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1    witness read a paragraph of it.  It's number 64.

2                   THE COURT:  Yeah, I know it's 64.

3                   Okay.  I've got it.  Go ahead.

4                   THE WITNESS:  Thank you, Judge.

5        A    Just so I understand you clearly, Mr. Lovric, you

6    want me to read the front and back of the first page?

7        Q    That's correct.

8        A    Dear Bill:  First of all, I'd like to express my

9    thanks for all of the love, support and advice you gave me

10   since hiring me on the 27th of February 2002.  Please don't

11   feel that any of it was in vain.  I grew a lot with you guys.

12   I liked myself a lot more because of your belief in me,

13   earned more money and had a better life-style than ever

14   before.  For every mozzarella or Chinese lunch, for every

15   paycheck and commission and for every word of wisdom, I will

16   never forget.  Thank you.  Unfortunately, Bill, in the area

17   of my most personal needs, namely, that of the opposite sex,

18   you could not help.  Because of that particular deficit in my

19   own human need to be loved by a female and a female I could

20   love back, I sit here in jail today.  There is nothing you or

21   Tim or Raffi could have done, nor should you have had to do.

22   You guys did good things for me, great things for me, and I'm

23   a better man because of it.  It's another hard lesson for me,

24   Bill, a lesson you know doubt feel I should not have needed

25   to undertake, but I'm here undertaking it.  Lucky, I guess,

James Lyons - Direct

1    to be in a brand new jail in Norwich.  If we are extremely

2    fortunate, my lawyer Scott Clippinger (607-336-4657) says I

3    will be able to plea bargain to a class D charge.  That would

4    put me in the slammer for about three years.  And this may

5    only be possible because a separate murder and attempted

6    murder are foremost in the headlines in Norwich and the court

7    system is overwhelmed.  Clearing up my case ASAP will appeal

8    to them, and of course the charges come from my tenants

9    downstairs.  I'm enclosing a note to the JCPD on Summit

10   Avenue.  They have my wallet, cellphone and watch.  I'm only

11   asking your help to retrieve my wallet, cell and watch, that

12   someone place those items and my office stuff into a box and

13   mail it to my mother, E.M. Dinunzio, 44 Center Street, 8-P,

14   (203)768-7224, Waterbury, Connecticut, 06702.  I beg of you

15   to help me tie up these loose ends and of course any further

16   mail could be labeled, quotes, return to sender, end quotes.

17   I am praying that your pals at JCPD will allow you or a rep

18   from Grandview to retrieve my wallet and phone.  My license,

19   Social Security and birth certificate are in there.  I'll

20   continue to stay in touch, Bill, and keep you posted of

21   events.  I still value you as my friend and hope your love

22   for me was not conditional.  I look forward to coffee and

23   mots with you again.  You'll be 74 and me 52 (I hope).  Have

24   a healthful (?) day.  Love, Dino."

25         Q    Agent Lyons, I'd like to next show you what I

James Lyons - Direct

```
 1   marked as Government's Exhibit 65 and 66.

 2              MR. FISCHER:  Can I have just a moment, your

 3   Honor?

 4              THE COURT:  Sure.

 5              MR. FISCHER:  Thank you, your Honor.

 6              THE COURT:  You're welcome.

 7   BY MR. LOVRIC:

 8        Q    Agent Lyons, if you could look at Government

 9   Exhibit 65 and 66, and I'd like to ask you some questions

10   about those two items.  Looking first at 65, do you recognize

11   what that is?

12        A    Yes, I do.

13        Q    What is it?

14        A    It's the United States passport for Dean Sacco.

15        Q    And where did that passport come from, if you know?

16        A    This was in the folder that I received from

17   Mr. Sorvino in New Jersey.

18        Q    Okay.  Among those two boxes of items that was

19   handed over to you?

20        A    Yes, sir.  It was in a folder that was provided to

21   me in addition to the two boxes.

22        Q    And then looking at Government Exhibit 66, what is

23   that?

24        A    This is paperwork for a Mitsubishi vehicle in the

25   name of Dean Sacco, color red, and also it looks like a sales
```

James Lyons - Direct                              609

1   sticker that's attached to it.

2        Q    Where did that item come from, Exhibit 66?

3        A    This was in the same folder as Mr. Sacco's

4   passport.

5             MR. LOVRIC:  Your Honor, I would offer

6   Government 65 and 66 into evidence.

7             MISS PEEBLES:  No objection.

8             MR. FISCHER:  Your Honor, with respect to 66,

9   the Mitsubishi agreement, I have no objection.  With respect

10  to 65, if it's offered to prove the truth of matters asserted

11  in there, I object because it's hearsay.

12            THE COURT:  Isn't there an exception to that

13  in the rules and regs under 800, documents, official

14  documents?  Let me just take a look.

15            MR. FISCHER:  I'm not sure that there's --

16            THE COURT:  Let's look and see if I'm

17  misremembering.

18            What do you say, Mr. Lovric, does that fit in

19  any of those exceptions?

20            MR. LOVRIC:  I believe it is, Judge.  I

21  believe it's an officially issued document by official

22  governmental agency, that has always included birth

23  certificates, passports, driver's licenses, visas, those

24  documents are self-authenticating, and they in fact are

25  official documents issued by the governmental entity.

James Lyons - Direct

1      THE COURT:  Which one is that?

2      MR. LOVRIC:  What the exhibit is, Judge?

3      THE COURT:  No, it's 803 sub what, 9?

4      MR. LOVRIC:  Judge, I don't have the code in

5  front of me.

6      THE COURT:  Here.  You want to take a look at

7  mine?

8      MR. LOVRIC:  Sure.

9      THE COURT:  I know there are four or five

10  which it could fit under, but I'm not sure which one you're

11  offering it under.

12      MR. LOVRIC:  I think it's under 803(8), public

13  records and properties.  Talks about --

14      THE COURT:  What do you say about that, Mr.

15  Fischer?  Do you have a book?

16      MR. FISCHER:  No, your Honor.  I understand

17  the general tenet of the rule and I recall it.  If it is

18  authenticated, it is admissible as an exception.  I'm not

19  sure that I concur with Mr. Lovric with respect to the

20  self-authentication aspect of that evidence.  I'm not sure

21  there's a foundation then, if it's being offered, in that

22  exception for the admission of the evidence at this time.

23      THE COURT:  I think they're

24  self-authenticating.  Is that what you're offering it under?

25      MR. LOVRIC:  I was going to go to the

James Lyons - Direct                          611

1    self-authentication section, your Honor, but I believe it is

2    self-authenticating.

3                    THE COURT:  Right.  I do too.  I'm not

4    concerned about that one.  I was wondering which section you

5    were under 803 sub --

6                    MR. LOVRIC:  Eight.

7                    THE COURT:  All right.  The Court will receive

8    Government's Exhibit 65 and 66 in evidence.

9    By MR. LOVRIC:

10       Q    Agent Lyons, looking at Exhibit 65, I'll just

11   briefly put it under the document camera.  Do you recall

12   that's the US passport, Exhibit 65?

13       A    Yes, sir.

14       Q    Are there indications on that document as to what

15   country Mr. Sacco traveled to?

16       A    Yes, sir.  The June 13, 2006 stamp is Dominican

17   Republic, as is the January 15, 2006 stamp.

18       Q    And then are there a couple of other entries here

19   in the passport also indicating travels to the Dominican

20   Republic?

21       A    I don't recall.  I'd have to see.

22       Q    Actually, I'm sorry.  They were all on that page.

23   Excuse me.  So the passport does indicate travels to the

24   Dominican Republic?

25       A    Yes, sir.

                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT

James Lyons - Direct

1    Q    Now, Exhibit Number 66 in evidence.  I'll just put

2  that briefly on the document camera.  And that indicates the

3  lease of what type of a vehicle?

4    A    It's a red Mitsubishi 2006 Galant.

5    Q    And that's dated on the first line there, what date

6  does that have?

7    A    December 22, 2005.

8    Q    Now, Agent Lyons, among the materials in those

9  boxes that you recovered from Mr. William Sorvino, can you

10 describe some of the items that you recovered and saw in

11 those two boxes?

12   A    Yes, sir.  There were numerous audiocassette tapes.

13 There was an audio recorder.  There were 13, if I recall

14 correctly, 8-millimeter video cassette tapes in there.

15 That's the general nature of what was contained in those

16 boxes.

17   Q    Okay.  Now, the 8-millimeter videotapes, did you

18 have a chance to view those tapes, approximately 13 tapes?

19   A    Yes, I did.

20   Q    And on what did you view them on?

21   A    I viewed them on the video camcorder that was

22 seized during the search warrant of Mr. Sacco's storage shed

23 up in Norwich.

24   Q    I'm going to hold up Government Exhibit Number 36.

25 The video camera used to view those tapes, is that this video

James Lyons - Direct

1    camera in this bag?

2         A    Yes, sir.

3         Q    Can you describe what the nature of the materials

4    that were on the videotapes of the 13 tapes that you viewed.

5         A    Yes, there were many hours of video recordings of

6    Mr. Sacco.  Couple of occasions, he videotape recorded

7    himself while he's riding his bicycle.  He rides his bicycle

8    and holds the camera out so he talks to the camera, and you

9    can actually see him riding his bicycle.  He video recorded

10   himself at work making phone calls and playing the guitar.

11   He video recorded himself sitting down with his dad watching

12   a baseball game.  He also videotape recorded himself doing

13   Italian lessons, lengthy recording where he's reading Italian

14   into the video camera.  And I recall one other one where he

15   was video recording himself as he had a meal with some

16   individuals.

17        Q    And did you actually watch hours and hours of these

18   type of self-recordings?

19        A    Yes, sir.

20        Q    Now, in connection with these 13 or so videotapes

21   that you reviewed, I've marked as exhibits 69, 70, 71, and 72

22   short excerpts from these 13 videotapes.  Have you had the

23   opportunity to review and to see and watch exhibit 69, 70,

24   71, and 72?

25        A    Yes, I have.

James Lyons - Direct                           614

1      Q     And in connection with exhibit excerpt 69 with

2   respect to a videotape and a recording studio, did you watch

3   that excerpt?

4      A     Yes, I did.

5      Q     In that video recording who was present in that

6   video itself?

7      A     Mr. Sacco and several other men.

8      Q     And in connection with that excerpt, is there a

9   discussion in that video by Mr. Sacco as to why he bought

10  this video camera?

11     A     Yes, sir.

12           MR. LOVRIC:  Your Honor, at this time I would

13  offer Exhibit 69, which is an excerpt of a videotape

14  recovered.

15           MR. FISCHER:  Judge, without knowing what's

16  being offered, what portion, it's difficult for me to say

17  whether I have an objection or not.

18           THE COURT:  You haven't seen that?

19           MR. FISCHER:  I understand what's on it as a

20  whole.  I'm not sure what specifically is being offered, what

21  portion.

22           THE COURT:  Okay.  We'll ask the jury to step

23  aside a minute so we can check that out.

24           (Jury excused)

25           THE COURT:  Display that for us, Mr. Lovric.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1      MR. LOVRIC:  Should I play for the courtroom

2  or Mr. Fischer want to watch it here?

3      THE COURT:  However you guys want to do it.

4      MR. FISCHER:  I can come over if it's easier.

5      Your Honor, there are three other parts of

6  these tapes that Mr. Lovric is going to offer, and I can look

7  at those, take the time now to do that, if you'd like, rather

8  than doing them one at a time.

9      THE COURT:  How long are they going to be in

10  total, Mr. Lovric?

11      MR. LOVRIC:  I think they're each about three

12  to four minutes.  Approximately five minutes, I'd say.

13      THE COURT:  Show them to him right now.

14  Unless there's something else we can do between now and the

15  lunch hour.

16      MR. LOVRIC:  I was going to go into this next

17  so it has to do with the jury, things that were obtained.

18      THE COURT:  All right.

19      MR. FISCHER:  Should we address the issues

20  before the jury comes out, Judge?

21      THE COURT:  Please.

22      MR. FISCHER:  First of all, I don't see any

23  evidence concerning the time frame in which these were

24  supposedly made or taken.  I have a foundational objection on

25  that basis.

James Lyons - Direct

1          Second, I don't know whether they're being

2     offered as 413, 414 type evidence or whether they're being

3     offered as primary evidence, rather than character evidence.

4     And the objections to those are somewhat different.  If it's

5     being offered as 413 and 414 character evidence, the

6     probative value of it -- Let me address the first tape where

7     there are the men in the recording studio.  There's no

8     conversation that I heard concerning anything under age.

9     There are conversations concerning men having sex with women.

10    There is a discussion about money at some point.  It's not

11    really clear what is being said as I hear it.  I'm sure it

12    can be interpreted in a number of different ways.  Its

13    probative value is somewhat limited in my opinion.  It does

14    establish -- if it's being offered to establish the

15    purpose -- for the purpose of establishing that Mr. Sacco had

16    a video camera, and knew how to use it, that's another

17    purpose, and again, the probative value is relatively

18    minimal.  You are -- the camera in evidence is already pretty

19    well connected to Mr. Sacco.  So, the probative value is not

20    that strong.  The prejudicial value is substantial and

21    although admissible, I think that the prejudicial value

22    substantially outweighs the probative value, and I ask 403

23    preclusion of that evidence or evidentiary ruling.  If the

24    evidence is offered to prove that the discussions related to

25    the -- specifically the charges in this indictment, that the

James Lyons - Direct

1    events discussed in that conversation are events that are

2    alleged in this indictment, that's a different issue, but if

3    that's the purpose of it, there is no foundational evidence

4    that I can see to support that.  So, I object on that basis

5    as well.

6             With respect to the second tape of Mr. Sacco

7    riding his bike, getting money out of the ATM really has no

8    probative value except as I see it, he takes pictures of some

9    young women walking by and makes a comment, aren't they

10   pretty, or something to that effect.  The probative value is

11   next to nil, prejudicial value is just heaping on more

12   irrelevant evidence, and even if admissible under 413, 414, I

13   think it should be excluded under 403.

14            With respect to the third item, Mr. Sacco

15   reading or practicing Italian, it cuts in to a picture of a

16   girl, a young woman, and they have a discussion about

17   videotape -- videotaping sex.  Something to the effect of,

18   why are you here?  Or here you came to us for videotaped sex.

19   No indication of when that portion of that recording was

20   made.  If it's offered again for the -- as proof that that

21   videotaping of that girl, if it eventually happened, was part

22   of the facts alleged in this indictment, that absence of any

23   proof concerning time frames makes it inadmissible at this

24   point, I suggest.  If it's offered for the 413, 414 evidence,

25   there's a big pile of that already.  It's additional and

James Lyons - Direct                              618

1   cumulative and substantially more prejudicial than probative.

2   I request preclusion on that basis for the 403 ruling

3   evidence.

4            The last tape concerns a phone call made to

5   Mr. Sacco where somebody is calling apparently in response to

6   an ad, and I've stated the arguments.  All the arguments I

7   made so far concerning the other tapes apply to this as well.

8   If it's offered as proof that the events that are the subject

9   of that discussion are the same events alleged in the

10  indictment, without any reference to time frames being

11  involved in the time frame that we're discussing here, it's

12  not admissible.  And again, with respect to the 403, 413, 414

13  aspect of it, I also suggest they're cumulative and minimally

14  probative and substantially prejudicial on top of everything

15  we already have.

16           And those are essentially the basis I

17  understand for the objections that I have at this point.

18           THE COURT:  Well, Mr. Lovric, I want you to

19  address those arguments if you would.

20           MR. LOVRIC:  Yes, Judge.  First and foremost,

21  Judge, I go to the general objections and arguments by the

22  defendant on this.  For a number of these excerpts -- there

23  are four excerpts that we're offering.  First of all, these

24  are excerpts as they're found on original hours and hours of

25  videotapes.

James Lyons - Direct

1    We first point out to the Court that we're not

2    seeking to introduce 30 hours of videotapes of Mr. Sacco

3    videotaping himself and other activities.  We've honed in on

4    what we believe is a total of approximately 20 minutes of

5    excerpts that are the most relevant and are relevant.  The

6    defense counsel objects to foundation.  These tapes were in

7    Mr. Sacco's custody, tapes he had at his workplace, as

8    Mr. Sorvino testified, which were gathered up at his

9    workplace and put into these boxes.  They were Mr. Sacco's

10   belongings and they're his videotapes.  In many ways they're

11   self-authenticating because he is in each one of these videos

12   and is a speaker in those videos.

13   Thirdly, these videos were produced on the

14   video camera that was recovered in the storage unit up in

15   Norwich, New York.  So foundation, I submit, is really in

16   this case -- it's not an issue.  The fact is these videotapes

17   were in his possession, they were found in his possession,

18   they were created by him because he is in the video and in

19   fact engages the camera so he knows he's videotaping it.  In

20   fact, in two of the videos he sets two of the videos he sets

21   up the video camera to show himself.

22   Addressing the prejudicial/probative argument.

23   Judge, I submit we keep hearing the same objection and I

24   submit to this Court that it's -- this 403 argument is being

25   used incorrectly by the defense.  403 deals with evidence

James Lyons - Direct

1    where its probative value may have marginal usefulness and

2    the impermissible prejudice exists.  I suggest to this Court

3    that the defense here is, when they say prejudice, they

4    really mean the good kind of prejudice that the government is

5    allowed to put in, which is direct evidence, and that's not

6    what 403 stands for.  If it's very relevant and it goes to

7    the heart of an issue at the trial, that's not prejudice.

8    That's called evidence.  The defense would like this Court to

9    think that everything that hurts the defendant is

10   prejudicial.  Of course it is.  All direct evidence of any

11   sort showing -- tending to show he is guilty is prejudicial

12   to him, but courts don't exclude that just because it hurts

13   the defense.  Really what's at the heart of 403 is

14   impermissible prejudice, prejudice that otherwise is not

15   relevant in the case.

16               Going to the first tape, the excerpt.  It's

17   not prejudicial because it goes to the heart of what this

18   case is about.  In this first excerpt, the defendant, who is

19   on the video, is talking to several other men in a recording

20   studio.  They're sitting around, and the topic of sexual acts

21   is being discussed, and during that topic the defendant tells

22   these other individuals in no uncertain terms that the reason

23   he bought this video camera, the video camera that's

24   recording and on, is because he wants and has a plan to

25   produce pornographic sexual tapes where women are engaging in

James Lyons - Direct                    621

1   sex, and that's the reason for buying this camera.  In this

2   case, it's relevant because we have charged this defendant

3   with videotaping sexual acts at the Norwich residence with

4   the minor in this case on a number of occasions.  And in fact

5   the minor will testify that this video camera she recalls at

6   least on one occasion being used to record the rape in that

7   apartment.  So this excerpt is relevant.  It is this

8   defendant stating his intent in buying this camera and what

9   he intends to do with it.

10              THE COURT:  So you're not at all offering it

11  under 413, 414 has nothing to do under those sections.  It's

12  402 you're offering it --

13              MR. LOVRIC:  It's not 413, 414.

14              THE COURT:  That's what I just said.  Is that

15  right?

16              MR. LOVRIC:  Yes.

17              THE COURT:  Thank you.

18              MR. LOVRIC:  Excerpt 2, excerpt 2 is the

19  videotape of Mr. Sacco riding his bicycle when he's holding

20  the camera and he's taping himself as he's riding his bike.

21  On occasions he interacts with the camera.  When he gets to a

22  corner, there are three or four teenage girls, and he pans

23  the camera over to them and zooms in on their behinds and

24  makes the comment something like very nice or nice into the

25  camera.  And then he continues, goes to the bank, and then

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1  when he exits the bank, there are several -- I think couple

2  other teenage girls, and he pans his camera onto them.  That

3  is being offered for two purposes:  One, it is for 413, 414,

4  the prior actions of his, which is videotaping teenagers and

5  stating something that certainly is indicative of his

6  interest in teenagers.  The second is, it is another example

7  of his utilization, utilizing of a video camera in order to

8  tape other persons, teenage kids in the course of his

9  interacting with those teenagers.  I submit, again, that this

10 prejudicial argument really misses the point, in my view,

11 because it seems to hone in on it's prejudicial because it's

12 so relevant or it's prejudicial because it is so indicative

13 of his intentions or his intent.

14         The third video excerpt is an excerpt where it

15 is clear that Mr. Sacco has deleted what came before and what

16 comes after because he is reading Italian and then the tape

17 breaks in and there is a girl who says she's from the

18 Dominican Republic and then Mr. Sacco quizzes the girl why is

19 she there, to produce a pornographic videotape, and then it

20 cuts back out to Mr. Sacco reading Italian.  That's the way

21 we found this video.  That's Mr. Sacco's editing, whenever he

22 accomplished that.  It is relevant to his intent.  He's

23 saying his intent of what he intends or what he is doing with

24 this camera.  He is videotaping in this particular instance a

25 girl, albeit with her clothes on, but quizzing her as to why

James Lyons - Direct

1    she's there to engage in these sexual acts.

2              THE COURT:  Hold on, Mr. Lovric.  You want to

3    bring the jury back in.  I want to let them go to lunch and

4    we can continue this discussion.

5              (Jury present)

6              THE COURT:  All right, ladies and gentlemen.

7    What's happened while you went back in the jury room is that

8    we have been having a discussion regarding the admissibility

9    of certain government's exhibits that were offered before we

10   asked you to step aside for a few minutes.  That discussion

11   is not over so we thought it would be well to send you to

12   lunch.  Hopefully while you guys are gone we can finish up

13   with that discussion and the Court will rule on the

14   admissibility, and when you come back at 1:30, you'll either

15   see the exhibits or you won't, depending on the Court's

16   ruling.  So you're excused now until 1:30.

17             (Jury excused)

18             THE COURT:  The last one you were addressing

19   now.

20             MR. LOVRIC:  Yes, Judge.

21             THE COURT:  Go ahead.

22             MR. LOVRIC:  Last excerpt of several minutes

23   is directly related again to Mr. Sacco's intent in purchasing

24   this camera.  In the last excerpt Mr. Sacco is videotaping

25   himself at his office cubicle and he gets a phone call on his

624

1   cellphone and he answers it and he is talking to the other

2   person.  We cannot hear the other person but we hear Mr.

3   Sacco saying to that other person that he had put an ad in

4   the paper looking for girls, that he was looking to create --

5   and summarizing what the gist of the conversation is, he's

6   looking --

7                   THE DEFENDANT:  Women, Mr. Lovric, women.

8                   MR. LOVRIC:  He's looking to pay girls 150 --

9                   THE DEFENDANT:  Women, Mr. Lovric.

10                   MR. LOVRIC:  Judge, I would ask the defendant

11   not address me directly.  If he wants to say something to his

12   counsel.

13                   THE COURT:  Mr. Sacco, talk to your attorney,

14   not in open court.

15                   THE DEFENDANT:  Sorry, your Honor.

16                   THE COURT:  That's okay.

17                   MR. LOVRIC:  He is talking to this other

18   person about having girls engage in sex for $150 per hour and

19   he is looking to videotape, create a videotape of those

20   actions.  He then says to the person to e-mail him pictures

21   of the person who he's talking to and also says, but send

22   some of the girls, e-mail some of the girls.  It directly

23   goes to the heart of what we're trying to prove here which is

24   that he bought this camera, and the camera that he bought, he

25   intended to use and in fact was talking to -- about using it

James Lyons - Direct

625

1  to take pictures of sex acts with girls.  And that's at the

2  heart of this case of what we're trying to prove.  I don't

3  see how the defense can argue that it's impermissibly

4  prejudicial.  It's probative, but to say that it's

5  impermissibly prejudicial, I don't see it, Judge.

6          THE COURT:  Well, unfortunately I'm going to

7  have to look at these excerpts because there's some variables

8  in here that the Court thinks might push it one way or

9  another in its determination of admissibility.  I don't

10 really think this is 413, 414 material.  I think this

11 material in question may bear on intent, purpose, plan,

12 motive, those kinds of things, but it's not 404(b).  It's not

13 413, it's not 414, I don't believe.  It certainly isn't 415

14 evidence.  So how do I get to see these things?

15          MR. LOVRIC:  Judge, I can give you my laptop

16 and you can take it in chambers and watch, or if you want to

17 watch it here.

18          (Discussion held off the record)

19          THE COURT:  Court stands adjourned.  1:30.

20          (Lunch break taken)

21          THE COURT:  Defense counsel is welcome to come

22 back during the plugging in ceremony.

23          All right.  The Court has reviewed each of the

24 video clips offered as Government 69 through and including

25 72, and the Court once again iterates, I guess reiterates

James Lyons - Direct

1   that the Court doesn't believe any of that material falls

2   within the rules of 413 or 414 but the Court does believe

3   that the information presented could be taken by the jury as

4   probative information of the charges in the indictment that

5   relate to production of pornographic -- child pornographic

6   material, and of course that ties in with the video camera

7   and what was shown thereon.

8           As to the dates when those photos were taken,

9   I think looking at the video clips, one can discern in

10  looking at the defendant in court that they certainly were

11  taken at or about the same stage in his life and at a time

12  frame, at least in one of them, when he was employed at the

13  Glenwood Furniture position.

14          With respect to -- I don't know what the

15  numbers are here -- but the first one was labeled 2005, so

16  that tells you I guess maybe some of the time frames, but it

17  was the group of gentlemen in a room where at the end of the

18  clip it looked like maybe they didn't know that the

19  video/audio camera was on, but the first part of that tape,

20  the Court believes the prejudicial effect outweighs the

21  probative value.  That's the part up until where the

22  defendant begins discussing as to why he bought the video

23  camera.  Now, it's probative, there's no doubt about it, but

24  the Court just feels it's unduly prejudicial and will not

25  admit the part that comes before the time frame three

James Lyons - Direct

1   minutes, five seconds, but after that the Court will permit

2   that.

3                   The second tape entitled Bike Ride, the Court

4   thinks that that can be edited just by using the computer to

5   show the portion of the ride where the camera focuses on the

6   females, but we don't need the part about being in the bank

7   and anything else.

8                   The last two should be admitted in their

9   entirety.  The Court finds that the prejudicial effect does

10  not outweigh the probative value and is talking about -- I'm

11  talking about impermissible prejudicial effect.

12                  So, that's my ruling.  The Court believes it's

13  relevant and should be admitted, and the jury will have to

14  make what they think is appropriate of it.

15                  Bring the jury in, please.

16                  Can you do what I directed?

17                  MR. LOVRIC:  Can I do that now as to the first

18  exhibit before they come in?  That's the one where they're in

19  the studio.

20                  THE COURT:  Go ahead.

21                  MR. LOVRIC:  Judge, the first one, I have it

22  cued at three minutes and six seconds.

23                  THE COURT:  That's fine.

24                  (Jury present)

25                  THE COURT:  Okay.  Mr. Lovric.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct                                    628

1    BY MR. LOVRIC:

2        Q    Agent Lyons, before the break I was just asking you

3    a couple of questions regarding Exhibit 69.  And you

4    indicated in Exhibit 69 there are a number of people talking.

5    And one of those people is whom?

6        A    Mr. Sacco.

7        Q    Okay.

8             MR. LOVRIC:  I'm now going to play the

9    appropriate portion of Exhibit 69, Judge.

10            THE COURT:  Okay.

11            (Playing Exhibit 69)

12            THE COURT:  Let's see now.  Did you play 69?

13            MR. LOVRIC:  Yes, Judge.

14            THE COURT:  Okay.  Why don't you identify them

15   as you play them by number, if you would.

16            So 69 has been played for the jury.

17            MR. LOVRIC:  Yes, Judge.  That was Exhibit 69.

18   BY MR. LOVRIC:

19       Q    Agent Lyons, Exhibit Number 70 that shows Mr. Sacco

20   on a bike ride, do you recall viewing a video where that was

21   portrayed on the actual videotape that you watched?

22       A    Yes, sir.

23       Q    And Exhibit 70, the excerpt, is that a copy and a

24   snippet of a small portion of the 8-millimeter video that you

25   viewed?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1      A    Yes, it is.

2                 MR. LOVRIC:  At this point, Judge, I'd just

3      like to cue up Exhibit 70 as discussed earlier.

4                 THE COURT:  Yes.

5                 MR. LOVRIC:  I think I have it here, Judge.

6                 THE COURT:  Okay.

7                 (Playing Exhibit 70)

8      BY MR. LOVRIC:

9      Q    Earlier I asked you if you looked at Exhibit

10     excerpt -- Government Exhibit Number 71 prior to coming here

11     today.

12     A    Yes, sir.

13     Q    And is Exhibit Number 71 an excerpt, an actual

14     snippet of a videotape that you watched from one of those

15     8-millimeter videos?

16     A    Yes, it is.

17                MR. LOVRIC:  At this time, Judge, I would play

18     in its entirety the snippet of excerpt labeled as

19     Government's Exhibit Number 71.

20                THE COURT:  Okay.

21                (Playing Government Exhibit 71)

22     Q    Agent Lyons, in that last video excerpt, Exhibit

23     71, the video that we just saw has Mr. Sacco reciting a

24     foreign language and then it cuts into some type of

25     videotaping of a young lady as observed and then it cuts back

James Lyons - Direct

1   to Mr. Sacco reading this foreign language.  Is that the way

2   you found the actual 8-millimeter video that you viewed, the

3   original?

4        A    Yes, I did.

5        Q    So that's the way it was spliced or cut as you

6   found it?

7        A    Yes, sir.

8        Q    Agent Lyons, Government's Exhibit 72, is that also

9   an excerpt video of a longer videotape that you viewed in one

10  of those 8-millimeter videos?

11       A    Yes, it is.

12            MR. LOVRIC:  At this time, Judge, I'll play

13  Government Exhibit Number 72, the excerpt, in its entirety.

14            (Playing Government's Exhibit 72)

15       Q    Agent Lyons, those four excerpts that we heard and

16  viewed, were from those 8-millimeter videos that you

17  discussed?

18       A    Yes, sir.

19       Q    And those were found again where?

20       A    I received those from Mr. Sorvino in New Jersey.

21       Q    Now, Agent Lyons, did you participate in the

22  execution of a search warrant at 45 Fair Street in Norwich,

23  New York?

24       A    Yes, I did.

25       Q    Approximately when was that search warrant

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct                    631

1   conducted?

2        A    March 24, 2008.

3        Q    And what areas of those premises were searched?

4        A    The downstairs apartment, the upstairs apartment,

5   the basement and the rear garages and shed.

6        Q    And were you present during the entire search?

7        A    Yes, I was.

8        Q    I'd like to first show you Government Exhibits 49

9   through 55, 49 through 55 and --

10            MR. LOVRIC:  Judge, just for the record, 50

11  and 51 are already in evidence.  They came in evidence

12  through Mr. Clesson Lockwood, but I'm going to show the agent

13  49 through 55.

14            THE COURT:  Any objections?

15            MISS PEEBLES:  No, your Honor.

16            MR. FISCHER:  No objection, Judge.

17            THE COURT:  All right.  We'll receive

18  Government's 49, 52 through and including 55 in evidence.

19       Q    Agent Lyons, I'd like to put on the screen the

20  photographs just received in evidence and have you tell us a

21  little bit about what they show.  Exhibit 49 I'm putting on

22  the screen.

23            Exhibit 49 that's on the screen now, that's a

24  picture of what?

25       A    That's a photograph that was taken by Special Agent

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

632

1    Kevin Talley on the day of the search of 45 Fair Street, the

2    front of 45 Fair Street in Norwich.

3         Q    Okay.  Does that picture show the premises as it

4    appeared on March 24 when the search warrant was conducted?

5         A    Yes, sir.

6         Q    Now, I'd like to talk about a couple of things that

7    we see in this photograph.  First, I'm going to point -- see

8    where the arrow is right now?

9         A    Yes.

10        Q    What is that arrow pointing to?

11        A    That's pointing to the door that leads to one of

12   the entrances to the upstairs apartment.

13        Q    Okay.  How many entrances and thereby exits are

14   there to the upstairs apartment?

15        A    Two.

16        Q    So this is one of the two?

17        A    Yes, sir.

18        Q    Agent Lyons, what I'd like to do, just so we have

19   this memorialized on the actual photo itself, I'm going to

20   put a U for upstairs and a number 1 for the first

21   exit/entrance that we talked about.  You can see that mark

22   there, U1?

23        A    Yes.

24        Q    I'm now going to put on the screen Exhibit 50

25   that's in evidence, and can you just tell us briefly what

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1    that is?

2        A    It's also a photograph of 45 Fair Street, front of

3    the residence, front left side taken by Agent Talley.

4        Q    And I'm going to put a green arrow on a place on

5    the photo.  Do you see that arrow?

6        A    Yes, I do.

7        Q    What is that green arrow pointing to that I just

8    put in there right now?

9        A    It's an entrance to the downstairs apartment.

10       Q    Now the downstairs apartment at 45 Fair Street, in

11   total how many entrances and exits are there leading to that

12   apartment?

13       A    Three.

14       Q    And is where I put the arrow, is that one of the

15   three entrances and exits to that apartment?

16       A    Yes, it is.

17       Q    Now, I'm going to write on the actual photo a D for

18   downstairs and a 1.  Do you see that?

19       A    Yes, I do.

20       Q    Is that correct that's an entrance/exit to the

21   downstairs apartment?

22       A    Yes, sir.

23       Q    I'm going to next put on the screen Exhibit 51 in

24   evidence.  And generally what does Exhibit 51 show?

25       A    It's a photograph of the rear garages and shed at

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1   45 Fair Street also taken by Agent Talley.

2       Q    Now, during the course of the search at 45 Fair

3   Street did you and other investigators also search the

4   garages and the shed that's located back there?

5       A    Yes, we did.

6       Q    Next I'm going to put on the screen Government's

7   Exhibit 52 in evidence.  What is that a picture of?

8       A    It's a picture of a Bartles & Jaymes wine cooler

9   that was located in the kitchen in the first floor apartment

10  at 45 Fair Street.

11      Q    And is that the way you found it when you searched

12  the apartment?

13      A    Yes, sir.

14      Q    Next I'm going to put on the screen Government's

15  Exhibit 53 in evidence.  What is that a photograph of?

16      A    It's a prescription bottle for Linda O'Connor that

17  was located in a garbage bag in the basement of the 45 Fair

18  Street residence.

19      Q    Was the container -- did it have anything in it or

20  was it empty when you found it?

21      A    It was empty.

22      Q    Can you read who its prescribed to on the actual

23  bottle?

24      A    Linda O'Connor, 45 Fair Street, Apartment 1,

25  Norwich, New York 13815.

James Lyons - Direct

1    Q    Can you read in the bottom left portion of the

2  bottle what the substance is that was alleged was inside that

3  bottle.

4    A    Vicodin.

5    Q    Putting on the screen Exhibit number 54, is that a

6  picture of the same bottle?

7    A    Yes, sir.

8    Q    Turned slightly more to the left I take it?

9    A    Yes.

10    Q    Does that also a little bit more clearly show the

11  Vicodin name at the bottom, towards the bottom left of the

12  bottle?

13    A    Yes, sir.

14    Q    Now, the Vicodin bottle, where in the premises was

15  that found or recovered?

16    A    It was in the basement, in a plastic garbage bag.

17    Q    On the screen is Exhibit Number 55.  What is that?

18    A    It's a cowboy hat that was also located in the

19  basement on the floor of 45 Fair Street.

20    Q    And Agent Lyons, I'm going to show you the cowboy

21  hat, in addition to photographing -- let me withdraw that.

22  The way it was photographed, is that the way you found it?

23    A    Yes, sir.

24    Q    Did you actually also retrieve that cowboy hat?

25    A    Yes, we did.

James Lyons - Direct

1      Q    I'd like to just show you the exhibit.  I'm not
2  going to bring it up but it's exhibit marked for
3  identification 63.
4           MR. FISCHER:  I have no objection.
5      Q    Is that the cowboy hat that you found?
6      A    Yes, it is.
7           MR. LOVRIC:  I would offer Government's
8  Exhibit 63, Judge.
9           MISS PEEBLES:  No objection.
10          MR. FISCHER:  No objection.
11          THE COURT:  Receive Government's 63 in
12 evidence.
13     Q    I'd next like to show you, Agent Lyons, what I
14 marked as Government Exhibit 98 through 102 inclusive.
15          MR. LOVRIC:  If I can just show it to counsel.
16          THE COURT:  Okay.
17          MR. FISCHER:  May I have just a moment, your
18 Honor?
19          THE COURT:  Sure.
20          Any objections?
21          MISS PEEBLES:  No, your Honor.
22          MR. FISCHER:  I'm not sure what they're
23 offered for, your Honor.  They're cumulative.  To some of
24 those I suppose I have some objection --
25          THE COURT:  I'm going to have to look at them

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1   if you have an objection on 403 grounds.

2           The only ones I've seen before, Mr. Fischer,

3   is 98, which I think is already in evidence from a different

4   view.

5           Mr. Lovric, did you want to come up here with

6   the stenographer and we'll have counsel up here so I can hear

7   arguments on which exhibits.

8           (At the Bench)

9           MR. FISCHER:  I can --

10          MR. LOVRIC:  Ninety-eight, it's not the one.

11  It's the door to the left of D1, which is a little bit more

12  clearly seen in this picture.

13          THE COURT:  Well, you could see it but you

14  couldn't see it clearly.

15          MR. LOVRIC:  You couldn't see it from the

16  front; you can just see the railings.

17          THE COURT:  Ninety-nine is the rear.

18          MR. LOVRIC:  That's the rear.

19          THE COURT:  And 100, that's another door.

20  Different door.

21          MR. LOVRIC:  Correct.  That's the far left

22  door on the back.  This is a close-up of the rear showing of

23  the two doorways from the back and 100 is a close-up of the

24  door to the far left back, which you can only see the

25  railings.  You can't see the actual door.  So that's a

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

 1   close-up of it.

 2               MR. FISCHER:  I just wanted to say, Judge, it

 3   appears to me these were taken sometime after Mr. Sacco was

 4   unavailable to work on the house.  They show the house, they

 5   show portions of the house that are particularly found in

 6   disrepair, and presumably there's a dual purpose, one might

 7   speculate to show that Mr. Sacco did not do a good job or

 8   didn't take the time to take care of the place.

 9               THE COURT:  That's not an issue in the case.

10               MR. FISCHER:  Dual purpose.  Oh, I think a

11   dominant purpose for coming to Norwich is relevant to the --

12   to the Mann Act violation, I think it's the seventh count in

13   the indictment, the purpose for coming across state lines,

14   one purpose being legitimate and the other purpose being

15   illegal.  If the jury finds that the dominant purpose in

16   coming to Norwich was the legal purpose, then there's no

17   violation of the Mann Act.

18               THE COURT:  Is that right?

19               MR. FISCHER:  Yeah.

20               THE COURT:  I'll have to take a look at that.

21               MR. FISCHER:  I believe that's correct, Judge.

22   There's a case, a Second Circuit decision, I just haven't put

23   it in writing, US v. Sirois, that sets that out.

24               THE COURT:  So it's okay if you come across

25   state lines to have illegal sex, as long as your dominant

James Lyons - Direct

1  purpose is to fix your house.

2          MR. FISCHER:  That's my reading of Sirois,

3  Judge.

4          THE COURT:  That's interesting.

5          MR. FISCHER:  Under the Mann Act count, that's

6  my reading what the courts have said.

7          THE COURT:  Okay.

8          MR. FISCHER:  I'll --

9          THE COURT:  I'll read it.

10          MR. FISCHER:  This was taken a year after he

11  was incarcerated.  It is prejudicial in that respect.  That's

12  the reason I stated the objection.

13          THE COURT:  Are you going to ask about when

14  these pictures were taken?  Mr. Fischer can ask on cross.

15          MR. LOVRIC:  Yeah.  The agent said they were

16  taken on March 24, 2008.

17          THE COURT:  That's right, for Special Agent

18  Talley.

19          MR. LOVRIC:  I'm not offering them to show any

20  disrepair.  Actually, I think the house is in pretty good

21  shape.  The reason is to clearly show the entrances and exits

22  to the house because that is relevant to testimony the minor

23  is going to provide, so these pictures are showing all the

24  exits and entrances to the residences.

25          Just as a matter of record, I disagree with

James Lyons - Direct

1    the reading of the Mann Act.

2              THE COURT:  We'll get into that later.

3              MR. LOVRIC:  The case law is just the

4    opposite, as long as it's one of the purposes of traveling,

5    but I'm not offering to show -- I'm not quite sure I follow

6    the argument.  But I'm not showing these or asking to

7    introduce them to show Mr. Sacco was a poor handyman or

8    anything like that.

9              THE COURT:  The Court's going to receive these

10   exhibits subject to connection because they have to be

11   connected based on the testimony of someone who will show us

12   why it's relevant to something, okay?

13             MR. FISCHER:  Thank you.

14             (In Open Court)

15             MR. LOVRIC:  May I, Judge?

16             THE COURT:  Yes.

17   BY MR. LOVRIC:

18        Q    Agent Lyons, I'm going to put on the screen

19   Government Exhibit 98 in evidence, and I'd like to just --

20   and while I have 98 there, let me once again over that photo

21   put briefly Exhibit 50, and then I'd like to ask you a couple

22   of questions.  Exhibit 50 which we saw earlier, I put a D1

23   right here on this door.  Do you recall that?

24        A    Yes, sir.

25        Q    Okay.  Now, you indicated that's one of the

James Lyons - Direct

1    entrances/exits to the downstairs, correct?

2         A    Yes, sir.

3         Q    Okay.  I'm going to point now to the left of D1.

4    There's a banister and to the -- this area.  What is located

5    there?

6         A    That's another doorway into the downstairs

7    residence.

8         Q    Okay.  And now I'd like to lift up Exhibit 50 and

9    showing Exhibit 98, what is right here in 98 in the center

10   we're looking at?

11        A    It's an entrance way to the downstairs residence.

12        Q    Okay.  Is that -- Putting on the screen again

13   number 50, is that the door that's in this banister to the

14   left of D1, the next door over?

15        A    Yes, it is.

16        Q    So, what I'd like to do now is on Exhibit 98 I'm

17   going to put a D2 for Downstairs 2.  Is that correct, that's

18   the second doorway leading to the exit/entrance to the

19   downstairs?

20        A    Yes.

21        Q    Next I'm going to put on the screen Exhibit Number

22   99 in evidence.  What is that a picture of?

23        A    That's a photo of the rear of 45 Fair Street as

24   it's taken toward the street, towards Fair Street.

25        Q    Okay.  And if I could point to a couple of places

James Lyons - Direct

1   on that picture.  On the right-hand side of this picture to

2   the right of the house, the corner of the house, we see a

3   banister near that green arrow that I just placed.  Do you

4   see that?

5        A    Yes.

6        Q    What is located there by that banister?

7        A    It's a doorway to the upstairs apartment.

8        Q    Okay.  Now, earlier I had shown you Exhibit 49,

9   which I'm going to put on the screen briefly.  And we put up

10  U1 on this door that's closest in Exhibit 49 to the street.

11  Do you recall that?

12       A    Yes.

13       Q    So, it's signifying upstairs exit/entrance number

14  1?

15       A    Yes, sir.

16       Q    This banister on Exhibit Number 99 that I'm

17  pointing to now, that is a second entrance/exit to the

18  upstairs?

19       A    Yes.

20       Q    If it's okay, I'm going to put a U2 right there.

21  It's a little dark, but can you see that U2 --

22       A    Yes.

23       Q    -- where the green arrow is?  Now, to the left on

24  Exhibit 99, on the left-hand side of the house from the rear

25  where I'm pointing to now, do you see that, where the green

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1    arrow is?

2        A    Yes.

3        Q    What is located there?

4        A    That's the third entrance to the downstairs

5    apartment.

6        Q    And if it's okay, I'm going to put a D3 for

7    downstairs, and that would be the third entrance/exit that

8    you identified so far?

9        A    Yes.

10       Q    Do you see that D3 --

11       A    Yes.

12       Q    -- right before the stairwell?  Now I'm going to

13   put on the screen Government Exhibit Number 100.  Do you see

14   that exhibit?

15       A    Yes, I do.

16       Q    What is that a picture of in Exhibit 100?

17       A    The door to the left in 100 with the stairs and

18   banisters, that goes to the upstairs apartment.  The door on

19   the right which is open goes to the basement.

20       Q    Okay.  I'll temporarily put back on the screen

21   Exhibit Number 99 in evidence, and I had placed a U2 near

22   this banister right off the corner on the right-hand side of

23   the house in the back.  Do you see that?

24       A    Yes.

25       Q    And then what does this banister lead up to?

James Lyons - Direct

1    A    The doorway to the upstairs apartment.

2    Q    Is that the doorway pictured in 100 on the screen?

3    A    Yes.

4    Q    I'll put a U2 in the center of that door to

5    represent that second entrance/exit.  Would that be correct?

6    A    Yes.

7    Q    Then putting on the screen Exhibit Number 101, what

8    does that close-up show?

9    A    The photograph of the rear of 45 Fair Street.

10   Q    Again, this banister on the right-hand side of the

11   house, is that the banister that leads to the stairs going to

12   the upstairs?

13   A    Yes.

14   Q    Is that what we labeled in the other photograph,

15   U2?

16   A    Yes.

17   Q    I'll just put a U2 there.

18        Then the banister on the left-hand side, off the

19   left-hand corner of that house on this Exhibit 101, again,

20   what does that banister lead to?

21   A    It's an entrance to the downstairs apartment.

22   Q    Is that what we've labeled in the previous exhibit,

23   that being Exhibit Number 99, D as in David 3, Downstairs 3?

24   A    Yes.

25   Q    I'll put a D3 there as well.

James Lyons - Direct

1          Finally, placing on the screen Exhibit Number 102.

2     What is that a photograph of?

3          A     That's a close-up of what you labeled D3 entrance

4     to the downstairs apartment.

5          Q     So that's the third entrance/exit to the

6     downstairs?

7          A     Yes.

8          Q     I'll put a D3 on this photo door as well.

9          Now, Agent Lyons, when were you there to conduct

10    the search warrant, these photographs that we were looking at

11    that we've just gone through, were these actually photos

12    taken on that date when you were there to do the search

13    warrant?

14         A     Yes, sir.

15         Q     And once inside the residence, were you able to

16    walk through the residence as you conducted your search?

17         A     Yes.

18         Q     And as -- with respect to the upstairs, were you

19    able to determine that the U1 and the U2 stairwell

20    exits/entrances did connect up to the same one apartment in

21    the upstairs?

22         A     Yes.

23         Q     And then while in the downstairs apartment and

24    searching through it, were you able to identify those three

25    entrances/exits from the inside, D1, D2 and D3?

James Lyons - Direct

1      A    Yes.

2      Q    So those were in fact ways to get in and out of

3  that upstairs apartment and downstairs apartment?

4      A    Yes.

5      Q    Agent Lyons, in addition to the photographs and the

6  cowboy hat that we saw, did you also recover a few other

7  items during the course of that search warrant?

8      A    Yes.

9      Q    At this point I'd like to show you Exhibit 58, 59,

10  and 62.

11            MR. LOVRIC:  If I can just show it to counsel

12  first.

13            THE COURT:  No objections?

14            MR. FISCHER:  Yes, Judge, I have an objection.

15  With respect to the one receipt, I can't read what the

16  purchase items are.  With respect to -- the lined paper

17  contains some writings.  I don't know who created those or

18  any foundational evidence.

19            THE COURT:  All right.  Let's go to side-bar.

20            (At the Bench)

21            THE COURT:  This is -- Exhibit 62 is white

22  paper with lines on it headed by the name Shannon O'Connor.

23  What did you want to say with respect to that exhibit, if

24  anything?

25            MR. FISCHER:  First, I don't know when it was

James Lyons - Direct

647

1    allegedly created.  Two, I don't know who created it.  Third,

2    I don't know what it's offered for, what it's probative of.

3    And given the nature of what's stated on it, it can create

4    some prejudices that I think are the bad kind of prejudice in

5    this case.

6            MR. LOVRIC:  Judge, I believe this was created

7    by Shannon O'Connor while she lived at 45 Fair Street, which

8    was between August of '06 and February 26 of '07.  I guess --

9            MISS PEEBLES:  You can offer it through her.

10           THE COURT:  I'm sorry?

11           MR. LOVRIC:  I have to at least have this

12   agent talk about the fact that he recovered this.  But to be

13   perfectly honest, Judge, I don't know why the defense is

14   arguing to keep this out because it talks about Shannon

15   committing suicide, which is everything they opened on, I

16   presume we're going to question everyone on.  The victim is

17   going to testify.  I'll have her also state when she drafted

18   this or wrote this, but it has to do with finding something

19   indicative of her state of mind while she lived at that

20   residence, which I thought everybody agreed they were going

21   to bring out anyway.  So -- but that's what I'm offering it

22   for.

23           THE COURT:  Well, 62 is received subject to

24   connection.  I want to know -- if in fact it was created

25   during that time, it has more probative value.  But there's

James Lyons - Direct                              648

 1   no indication when that was created.  It may have been

 2   created before that time.  We're going to hear that when she

 3   testifies, I assume.

 4              And Exhibit 58, which is a Wal-Mart receipt,

 5   what's the problem with that?

 6              MR. FISCHER:  No objection to that one.

 7              THE COURT:  Okay.  K-Mart receipt.

 8              MR. FISCHER:  I can't tell what it's for.

 9              THE COURT:  Fifty-nine.

10              MR. FISCHER:  What it's for.

11              MR. LOVRIC:  Skateboard.

12              THE COURT:  Skateboard.

13              MR. LOVRIC:  But the relevance is not what

14   it's for.  It's the timing.  These are dated purchases.

15              THE COURT:  In Binghamton, New York.

16              MR. LOVRIC:  During the time that Linda

17   O'Connor and Shannon were at the Best Western between

18   December 1 and December 3 of 2006.  This exhibit is dated

19   December 3, 12:51 PM, that being Exhibit 59; and Exhibit 58

20   is dated 12/2/06 at 17:14.  And Shannon will also testify

21   they went shopping at several places, including K-Mart and a

22   Wal-Mart and some --

23              MR. FISCHER:  I'll withdraw my objections to

24   the receipts then.

25              THE COURT:  Sure.  These two receipts, one

James Lyons - Direct                              649

1    from K-Mart, Wal-Mart, they were recovered by the witness on

2    the stand during the search warrant at 45 Fair Street.

3                   MR. LOVRIC:  Correct.

4                   THE COURT:  The Court will receive those

5    exhibits.

6                   (In Open Court)

7                   MR. LOVRIC:  Judge, I'd like to offer Exhibit

8    Number 59, 58 and 62 and allow the witness to testify where

9    they were recovered from.

10                  THE COURT:  The Court will receive

11   Government's 58 and 59 and Government's 62 subject to

12   connection.

13   BY MR. LOVRIC:

14       Q    Let me do it this way, Agent Lyons.  Agent Lyons,

15   I'm going to put on the camera -- monitor Exhibit Number 58.

16   Can you see that exhibit?

17       A    Yes, sir.

18       Q    During the course of that search warrant, where

19   approximately was this Exhibit Number 58 found?

20       A    It was found in the rear garage, the rear garage

21   nearest the residence, 45 Fair Street, in the garage bay that

22   was near the house as well.

23       Q    And on this receipt -- and I'll put an arrow.  Does

24   it indicate that -- the date the receipt was issued by

25   purportedly Wal-Mart?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

650

1      A      Yes, sir.  December 2, 2006.

2      Q      And then putting on the screen Exhibit Number 59.

3  Is that what appears to be a K-Mart receipt?

4      A      Yes, sir.

5      Q      And the portion where the arrow is located, does it

6  indicate when that receipt was issued?

7      A      December 3, 2006.

8      Q      Can you make out what is purported to have been

9  purchased on that date on this K-Mart receipt?

10     A      Appears to be a 31-inch skateboard.

11     Q      And then putting back on the screen Exhibit 55, can

12  you make out generally some of the items that are being

13  purchased pursuant to that Wal-Mart receipt?

14                  THE COURT:  Fifty-five?

15                  MR. LOVRIC:  I'm sorry, Judge, if I said that.

16  Fifty-eight.  Excuse me.

17     A      Yes.

18     Q      What are some of the items that are being purchased

19  pursuant to the receipt?

20     A      The items listed as candy tin, oral pain, candy

21  Trident, candy, panty and tank.

22     Q      Okay.  The next, Agent Lyons, putting on the

23  document camera Government Number 62.  During the course of

24  that search warrant where was this 8½ by 11 piece of paper

25  found?

James Lyons - Direct

1    A    Investigator Berry with the New York State Police

2  located this in the shed.  That would be the building with

3  the basketball hoop on it in the rear at 45 Fair Street.

4    Q    Putting on the screen Exhibit Number 51 for a

5  moment.  You're referring to a shed.  Which one of those

6  buildings are you referring to?

7    A    The middle building, the one I just touched, where

8  the arrow indicates right there on the screen.

9    Q    Okay.  So this document was found in the shed?

10    A    That's correct.

11    Q    And can you read that where you're sitting, Agent

12  Lyons?

13    A    I can read parts of it.

14    Q    Okay.  Can you go ahead and read what you're able

15  to make out from the screen?

16    A    "Shannon O'Connor, I want -- I want --" it says "to

17  die."  That's crossed out.  "I hate myself" is scribbled out.

18  Can't really read what, but I see the word "die," but I can't

19  really make that out on the monitor.  Underneath that, "I

20  hate myself," with a drawing, and also, "I'm going to

21  myself."

22    Q    Then it has some drawings or doodlings as well?

23    A    Yes.

24    Q    Now, Agent Lyons, in addition to being involved in

25  the search warrant at 45 Fair Street, were you also present

James Lyons - Direct

1    and participate -- did you also participate in a search

2    warrant at the storage center when unit number 129 was

3    searched?

4        A    Yes.

5        Q    And were you actually there when the items were

6    recovered and various photographs taken?

7        A    Yes.

8        Q    I'd like to show you what's previously been marked

9    as Government's Exhibit Number 34.  If I can hold it up.

10   Have you seen that book before?

11       A    Yes, sir.

12       Q    Where was this located or found?

13       A    That was found inside the chest that had the name

14   Dean or Dean M. Sacco on it at the storage shed number 129 in

15   Norwich.

16       Q    Now in the chest was there also other materials

17   found along with that Exhibit Number 34?

18       A    Yes, sir.

19       Q    Have you had a chance to read the entire contents

20   of Exhibit Number 34?

21       A    Yes, sir.

22       Q    And in reading Exhibit 34, does it indicate to you

23   who the author was of this Exhibit 34?

24       A    Through my readings, it's clear to me it was Mr.

25   Sacco.

James Lyons - Direct

1    Q    And in reading Exhibit 34, is there mention in

2  there by Mr. Sacco of a storage unit somewhere in the New

3  Jersey area?

4    A    Yes, sir.

5    Q    And in reading Exhibit 34, does Mr. Sacco in there

6  also write about obtaining things that he calls illegal

7  materials?

8              MR. FISCHER:  Your Honor, I have objections to

9  some of the substance of what is contained in that document.

10  If there is a reference to particular items, we should talk

11  about the admissibility of each, I suggest.

12              THE COURT:  All right.  Thirty-four is in

13  evidence subject to connection.

14              MR. FISCHER:  I understand.

15              THE COURT:  Should we go to side-bar?  You

16  want to show me what you want?

17              MR. LOVRIC:  Sure, Judge.  Or there's -- there

18  are 13 -- 14, excuse me, separate snippets that I would be

19  offering, so I don't know if the Court wants to give the

20  jurors a break while we go through that or not.  I'm just

21  making a suggestion.

22              THE COURT:  I think the jury should take a

23  break while we go through that.

24              (Jury excused)

25              MR. LOVRIC:  Judge, it probably would be

James Lyons - Direct                                   654

1    faster and easier if I had Agent Lyons read the 14 -- they're

2    three- or four-sentence clips, so the Court knows what they

3    are.  To be very honest, I probably did a poor job of reading

4    the snippet than Mr. Lyons.

5                    THE COURT:  Let's have Agent Lyons read them

6    then.

7                    MR. LOVRIC:  Judge, I can have Agent Lyons

8    refer to them.  They're all labeled 1 through 14, so when he

9    reads 1, he'll indicate it's 1, when he reads 2, he'll

10   indicate it's 2.

11                   THE COURT:  Wouldn't it be faster if I read

12   them myself?

13                   MR. LOVRIC:  If you can read Mr. Sacco's

14   handwriting.

15                   THE COURT:  I don't know if I can or not.

16   I'll try.  Thank you.

17                   All right.  Mr. Fischer, with respect to

18   number 1, what's your specific objection to that?

19                   MR. FISCHER:  Well, Judge, part of my

20   difficulty, I'm not sure which portions -- I don't have the

21   portions marked.

22                   THE COURT:  Well, let's have Mr. Lovric come

23   up here then and we'll -- that's not without question.  I

24   agree with you.

25                   (At the Bench)

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1          MR. FISCHER:  Your Honor, this exhibit is

2    purported to contain admissions all from Mr. Sacco.  I'm not

3    sure that there's the foundational proof other than it was

4    found in a locker, I mean, a storage unit 129, as I

5    understand it, that Mr. Lockwood moved stuff into.  It is

6    written in the first person tense, but without much more

7    foundation that these are Mr. Sacco's words, when they were

8    made, I have a foundational objection to that evidence at

9    this point.  That's the gateway of the objection.

10          With respect to the substance of it,

11   particularly some references to a storage unit, that it

12   doesn't reference which storage unit, where.  At one point it

13   talks about a street, which is not apparently a street where

14   the storage unit 129 was located, and in some amorphous terms

15   talks about some things that were stored in there.  And so I

16   think that it is entirely lacking at this point with

17   foundation with respect to those claims and those

18   allegations.

19          With respect to the remainder, again, I object

20   to that.  It is cumulative.  It's on top of the substantial

21   evidence that we already have and the other direct evidence

22   that I'm sure will come in.  This is circumstantial, and its

23   probative value with respect to the allegations in this

24   indictment is substantially outweighed by not just prejudice

25   but a prejudice that this fellow did something in the past

James Lyons - Direct

1   and may have an inclination again here.  And I think it is

2   objectionable under 403 at the very least.

3           MISS PEEBLES:  Can I be heard as well, Judge,

4   about that?

5           THE COURT:  Yes.

6           MISS PEEBLES:  If that's going to be used to

7   insinuate that Mr. Sacco somehow was going to destroy things

8   in the storage shed, I think that would be confusing and

9   misleading to the jury, particularly because Mr. Lockwood had

10   already testified that he had the only key and only access to

11   that.  There was no proof offered otherwise.  As Mr. Fischer

12   pointed out, it did pertain to a different storage area, and

13   it's not clear when that was drafted.  Frankly, I think it

14   would lead to confusion on that particular point.  I don't

15   think it's relevant or probative on top of that, as well as

16   foundational issues.  We've already heard from Mr. Lockwood

17   with regard to the storage shed.

18           MR. LOVRIC:  With regard to foundation, this

19   was found in Mr. Sacco's chest that said Dean M. Sacco on it.

20   This diary along with another diary, along with all the

21   magazines that we saw a picture of.  So circumstantially it

22   links this diary to him.

23           Secondly, I took out -- there were photographs

24   in here.  One of them was his mother and his sister that were

25   pasted in the book.

James Lyons - Direct                                657

1           Third, the agent has read all of the contents
2    of this, and when you read the entire diary, it's clear that
3    the author is Dean Sacco, based on the content.  He talks in
4    here about his job, the furniture place.  He talks about his
5    prior criminal history.  So by its contents, even though all
6    the contents may not be admissible here, by reading this
7    through, the content, it is clear to the reader, it's being
8    conveyed that the writer is Dean Sacco.
9           Third, the objection about the storage unit.
10   These entries in here are not about the storage unit in
11   Norwich, they're entries about a storage unit in New Jersey,
12   because in the writing Dean Sacco indicates, as he's writing
13   about what he just did for lunch or whatever, that he's going
14   to run over to his storage unit, and it's clear by the
15   context that he's talking about some storage unit in New
16   Jersey, which the government has not found or located and
17   which we certainly have the right to argue that there may
18   have been materials that were stored there that we didn't
19   uncover or recover in this case.  The specific writings that
20   we identified, which is the 12, are very specific, pointed
21   admissions, and they're being offered as admissions of the
22   defendant.  For the defendant to argue that they're
23   prejudicial is --
24           THE COURT:  Well, I don't understand how
25   references to a storage shed that the government indicates

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct                                    658

1   was not the unit 129 in Norwich but was some storage shed

2   accessible to him very quickly by Mr. Sacco and then to

3   speculate what might have been in it and it would have been

4   of an incriminating nature, I don't see how you can go there.

5               MR. LOVRIC:  Defense argued and has in their

6   opening that the government never found videotapes of Shannon

7   or photographs of Shannon, that they've never been recovered

8   in any of the places that we searched or looked.  And that's

9   correct.  But the government has the right to counter-argue

10  and say there are places that we haven't been able to find

11  but we know exist, such as the New Jersey storage unit,

12  because he writes about it, and that he had time, from the

13  time that the controlled calls were made by the victim to

14  him, to go to that storage unit and either get rid of things

15  or not go there at all.  Simply, those things are still in

16  some unlocatable storage unit.  The defense is going to

17  argue, and has, we didn't find these things.  We should be

18  able to argue there are some out there we know of that exist.

19  He wrote about it.

20              MISS PEEBLES:  There's a problem with that

21  argument, actually.

22              MR. LOVRIC:  It's argument we should be able

23  to make.

24              MISS PEEBLES:  First of all, you don't have a

25  time period he's referencing in there.  That could have been

James Lyons - Direct

1   five years before he even met Shannon O'Connor.  It's a

2   misleading argument, and I would object.

3              MR. FISCHER:  There's no time foundation.

4              MR. LOVRIC:  I don't know how the defense can

5   object to a reasonable argument that we intend to make based

6   on logic and common sense.  The jury will decide if it's

7   reasonable or unreasonable.  For the defense to say -- they

8   can argue we didn't find it, we can't say anything about we

9   didn't find it, that defies logic.  How can you argue that.

10             MR. FISCHER:  The argument I have, I echo what

11  Miss Peebles said about time frames.  It's a foundational

12  issue.  If this was created in 2001, it has no probative

13  value with respect to the storage unit that is alleged to

14  have existed sometime after August of 2006.  The time -- the

15  absence of any foundation and time frame is fatal.

16             MR. LOVRIC:  The reason the defense would like

17  to keep this out, because it is so relevant.

18             THE COURT:  What about the time frame?

19             MR. LOVRIC:  The time frame, Judge, this was

20  written prior to the events in -- prior to the videotaping at

21  45 Fair Street.  These writings occurred -- Mr. Sacco didn't

22  write this after he was arrested.  We know that because he

23  didn't have access to these books.  He wrote these things

24  before.  It's no different than if the defendant was writing

25  about a place that he owned, another residence, another

James Lyons - Direct

1  house, and if he wrote in there, this is where I keep all of

2  my films that I produce of children and we couldn't find it

3  or identify it, the defense would say it's irrelevant.

4          THE COURT:  They're talking about foundation

5  as to could these writings have been created prior to 2006,

6  prior to August 1, 2006.

7          MR. LOVRIC:  They were, Judge, because they

8  were created prior to August 2006.

9          THE COURT:  You say it doesn't make any

10  difference because it talks about the storage place.

11          MR. LOVRIC:  Right.  It doesn't make any

12  difference.  It's a thing he is talking about owning and

13  having a storage unit where he keeps his belongings,

14  property.  I don't know how that's not relevant given the

15  fact that the defendants want to argue that we didn't find it

16  and we have an obligation to find it.  Here's this unit.  We

17  can't find it; we don't know where it is.

18          MISS PEEBLES:  That's misleading and may not

19  have been when Shannon O'Connor moved in in 2006.  It's

20  misleading, like everything else.

21          MR. LOVRIC:  No, it's not.

22          MISS PEEBLES:  Yes, it is.

23          MR. LOVRIC:  I don't have it.  Here's the

24  location, go get the records.  I'll be happy to get the

25  records.  That's not the argument.

1            THE COURT:  I think it's admissible to show

2    that there could be other places, but it's only admissible in

3    response, as I see it, to the arguments made by defendants

4    that any depictions were not found and therefore they don't

5    exist, and I think that's one of the defendants' main

6    thrusts, is there any such videotapes, is there any such

7    pictures, that's why you should acquit my client.  The

8    government wants to say, we know your client had a place in

9    New Jersey and could get there rather easily and we couldn't

10   find it.  So I think that for that purpose only it would be

11   admissible.  That's that.

12            (In Open Court)

13            (Jury present)

14            THE COURT:  All right, Mr. Lovric.

15   BY MR. LOVRIC:

16       Q    Agent Lyons, before we broke, I asked you if you

17   had a chance to read the entirety of Exhibit Number 34, the

18   diary found in Mr. Sacco's chest.

19       A    Yes, sir.

20       Q    Okay.  I'm going to hand you Exhibit 34 and I'm

21   going to ask you, you know, first of all, in going through

22   that exhibit, did you at my request tab certain portions?

23       A    Yes, I did.

24       Q    And those are the tabs that we see on Exhibit 34?

25       A    Yes, sir.

James Lyons - Direct

662

1     Q     Okay.  So those weren't there before when the item

2  was first recovered, right?

3     A     That's correct.

4     Q     Okay.  If you could look at tab number 1 in Exhibit

5  34, and could you read that for us.

6     A     Yes, sir.  Tab number 1 is on page 49.  "Back to

7  the YMCA where I found a sample photo from years ago of Wendy

8  and where I chatted again with Earl and soon I was geared up

9  with both cameras and out the door feeling like a

10 professional photographer.  It all weighed so much on me,

11 started asking people as soon as I got on the train, first a

12 guy and his kids and then three young teens who I snapped on

13 the subway and then on the steps of the United States Post

14 Office."

15    Q     Next, can you read tab number 2 in that exhibit.

16    A     Yes, sir.  Tab 2 is on page 50.  "Talked to Louis

17 and got him to give me two more packs of Polaroid film so I

18 can go out tomorrow (on Easter) and try to do a professional

19 job with my camera and make myself $100.  He ended up giving

20 me two packs, and I was very grateful and appreciative."

21    Q     Then next, can you read tab number 3?

22    A     Yes, sir.  Tab 3 is on page 63.  "One bad thing did

23 happen though.  I spent so much time on little girl sites, I

24 missed a lesson in typing class and was so confused and

25 disappointed at myself.  I felt like a fuck-up in my high

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

663

1    school days.  I had no idea what to do on the computer when I

2    returned and just sat there wanting to start school all over

3    but got my patience back and finally got some work done.

4    Scary."

5         Q    And then exhibit, is it 4?

6         A    Yes.  Four is on page 64.  "At work I compromise

7    myself yet once again spending entire day more concerned with

8    getting some good young girl porno to look at than getting

9    furniture sales on phone.  I do interact with little girls

10   that Elaine brought to work however, making them laugh and

11   even running my fingers through little curly haired one's

12   locks.  Very pretty girls."

13        Q    Can you next read tab number 5.

14        A    Page 5 or tab 5 is page 65.  "But there is an

15   increasing sense that young girl porno on the internet is a

16   true alive and potentially dangerous vice of mine that I must

17   bridle and reign in, especially while at work, where job is

18   priority number 1."

19        Q    Next can you read tab 6.

20        A    Tab 6 is also page 65.  "So essentially, we have a

21   major occurrence that has taken place, something that finally

22   has shaken my excellent track record out on the street thus

23   far and nothing so far has had such an extensive effect on my

24   personality, work performance and even self-esteem.  As the

25   internet --" the internet is underlined twice -- "and

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1   specifically the searching for young preteen and teenie sex.

2   This has potentially self-destructive implications if I get

3   too careless or irresponsible or let my sexual urges mandate

4   my behavior."

5       Q    Can you read tab 7 next.

6       A    Yes, sir.  Tab 7 is page 66.  "Came back and joked

7   and kicked it with Thai -- T-H-A-I -- Thai guys at first

8   place and had great talk with guy about how to score young

9   underaged girls in his country and surrounding countries."

10      Q    Agent Lyons, before we go to tab 8, the storage

11  unit where you recovered that diary, is that also the storage

12  unit where an envelope with sex type materials from the

13  Philippines and Thailand was located?

14      A    Yes, sir.

15      Q    Can you read tab 8 next.

16      A    Tab 8 is page 67.  "But I did not reach the state

17  of mind I had targeted for myself.  Some extra yoga and

18  meditation to counteract this new (but old behavior)

19  impatient and angry Dean that has been surfacing lately as a

20  direct result of my internet activities and frustrations at

21  workplace where every day for six days (counting today) I

22  have frustrated myself trying to find illegal material on the

23  net."

24      Q    The last reading -- I just want to make you

25  pronounce that -- was illegal as opposed to legal?

James Lyons - Direct

1    A     Illegal, yes, sir.

2    Q     Can you read tab 9 next.

3    A     Tab 9 is page 71.  "At work I surfed internet for

4    Polaroid camera but ended up back on triple X sites surfing

5    for young girl porn and it happened for tenth workday in a

6    row.  I got myself all bent out of shape, out of character

7    and impatient with others.  And it was all because of letting

8    myself get frustrated because sex sites I wish to look at

9    won't stay on screen and advertisement junk I don't want

10   keeps taking over computer over and over and over again."

11   Q     Can you read the next -- I believe we're up to tab

12   10.

13   A     Tab 10 is page 78.  "I begin phone work, leisurely

14   surfing internet for mail order brides and looking at 200

15   Russian women and others before slipping back into Lolita

16   land, where I stayed for rest of day.  Could not stop myself

17   either but plan to at least only stay on L -- for Lolita --

18   sites instead of infecting my entire computer with young girl

19   evidence.  So there you have it.  Human nature.  Internet too

20   stimulating to ignore."

21   Q     Agent Lyons, in your work of the child exploitation

22   area, are you familiar with the term Lolita material or

23   Lolita sites?

24   A     Yes, sir.

25   Q     What is that a reference to, Lolita sites?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct                    666

1      A     You frequently find child pornography associated

2   with those sites.

3      Q     Can you read tab 11 next.

4      A     Yes, sir.  11 is page 81.  "Spent evening cutting

5   up BMW internet photos of girls and taping them up on my wall

6   and enjoying it.  I told Ralph today that I might as well get

7   into the porno business on some level and get computer and

8   digital camera, etcetera if I love it so much.  And it's

9   true.  Might as well maybe make it a hobby."

10      Q     Can you read tab 12 next.

11      A     Yes, sir.  Tab 12 is page 89.  "At work I get right

12   down to business and start off surfing a great Philippino

13   wife site.  Found some awesome VY girls who are gorgeous.  I

14   printed out a photo and sheet of favorites.  Went to triple X

15   sites next and basically surfed them rest of day, although I

16   did also shop for digital camera and some mail checking."

17      Q     Can you read the next tab, being tab 13.

18      A     Yes, sir.  Tab 13 is page 72.  "Downstairs I joked

19   with Louis, looked in Yellow Pages for storage place.  Bought

20   mouthwash for 99 cents at corner place, then at 8:00 took

21   walk down West Grand (nice street) and found storage place.

22   Ended up renting a tiny space for $50 and $10 security."

23      Q     Can you read next tab 14.

24      A     Yes, sir.  Tab 14 is page 73.  "At 12 though I was

25   back out front just in time to see Mike and Don pull up in a

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1  gold van.  Out came Don looking heavy and healthy and worn

2  out but whom I gave a huge hug, and my brother Mike, who

3  looked good and whom I gave a hug also.  Mike had to use

4  bathroom in Y gym while I talked with Don Jr.  Then we were

5  off to the storage place next, where Don and I mostly talked

6  and moved my boxes into storage unit."

7      Q    Now, Agent Lyons, in connection with those

8  notations in that diary, did the FBI attempt to locate any

9  storage areas that Mr. Sacco might have rented in New Jersey?

10     A    Yes, sir.

11     Q    Were you able or were other agents able to locate

12 any of his storage unit facility or areas that he had rented

13 a storage unit?

14     A    No, sir.

15     Q    Now, Agent Lyons, in the course of this

16 investigation, did you come to learn that Mr. Sacco had

17 written an autobiography book?

18     A    Yes, I did.

19     Q    Did you actually obtain a copy of that

20 autobiography book?

21     A    Yes, sir.

22     Q    Did you also from the publisher obtain the contract

23 agreement that Mr. Sacco entered into in having that book

24 published?

25     A    Yes, sir.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

1      Q    I'd like to show you what's been marked as

2   Government's Exhibits Number 67 and 68.

3               MR. FISCHER:  May I take one moment to look at

4   these?

5               THE COURT:  Sure.

6               MR. FISCHER:  Mr. Lovric.  Thank you.

7   BY MR. LOVRIC:

8      Q    Agent Lyons, if I can show you Government's Exhibit

9   67 and 68.  If you could identify Exhibit 67 and then 68 for

10  us.  Generally speaking, what is Exhibit 67?

11     A    Sixty-seven is the publication agreement that the

12  company who Mr. Sacco dealt with for his autobiography had

13  forwarded to us.

14     Q    And then what is Government's Exhibit Number 68?

15     A    Sixty-eight is the autobiography by Dean Michael

16  Sacco.

17     Q    And on Exhibit 68, is there a photograph on the

18  front page of that book?

19     A    Yes, sir.

20     Q    Who's it a photograph of?

21     A    Mr. Sacco.

22     Q    And are there also other photographs depicted

23  somewhere in the other parts of the book or on the back

24  cover?

25     A    Yes, sir.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct

669

1           THE COURT:  Is there any objection to the
2   exhibit?
3           MR. FISCHER:  No.  That question, I didn't
4   object, but do I have, generally speaking, some objections?
5   Yes, Judge.
6           THE COURT:  You want to put them on the record
7   now?
8           MR. FISCHER:  Yes, please.
9           (At the Bench)
10          THE COURT:  You have exhibits, you've got tabs
11  in the -- in 68, and are you proposing that you read the tabs
12  to the jury?
13          MR. LOVRIC:  Yes, Judge, that is my intention,
14  to offer and read only the tabs.
15          MR. FISCHER:  Judge, I've looked at the
16  exhibit.  They're from, at the very latest, 2000.  So their
17  only purpose can be basically character evidence.  413, 414
18  type evidence.  This is written apparently when he is
19  incarcerated and so it can't be evidence of a plan or
20  preparation and is not admissible as to the substance of the
21  claims in the indictment as I understand it, Judge.
22          THE COURT:  What do you think it would be
23  evidence of, motive or intent?
24          MR. FISCHER:  I really believe it's not,
25  Judge, and plus it's remote in time.  This was written ten

James Lyons - Direct

1   years plus ago, parts of it at the very least, because he was

2   incarcerated from approximately 1992 into the 2000s, until at

3   least the time this was published.  And it was a work in

4   progress for a long time, I assume, given the length of it.

5   And so these were probably statements made more than, if any,

6   more than ten years ago.  Their probative value is weak at

7   best, and as I read the book itself, it says essentially that

8   it is an enhanced almost fictional work.  I think in the

9   first couple of pages you can find a disclaimer saying it is

10  not a direct autobiography.  There's a chapter in the book

11  called The Stranger written in the third person, so I

12  disagree with the contention that it is an autobiography,

13  period.

14          MR. LOVRIC:  The defendant has stated it's an

15  autobiography.  He stated that in the book but he also states

16  that to Investigator Pandiscia, and it's clear from reading

17  the book that it's an autobiography.  I don't know where the

18  defense gets the argument that it's some kind of a half

19  fiction or not.  He's always -- defendant has always claimed

20  it's an autobiography of his life.  The portions that we've

21  outlined are directly related to his intent and his

22  pedophilia because he writes it and he writes about things

23  that are in his mind and in his head.  I don't know what can

24  be more relevant than a defendant putting what's in his mind

25  and what his thoughts are in writing, even if he were to try

1    to argue somehow it's not true.  The fact of the matter, he

2    claimed it's an autobiography, and it's up to the jury to

3    decide if it is or isn't.  All the evidence points to the

4    fact that it is his pouring out his mental guts into a book.

5    I can't think of a more probative thing than the defendant's

6    own words and admissions and statements about his thoughts,

7    about attraction to children, about his thoughts about things

8    that he did and things that he was doing and why he was doing

9    them.  It's his mind on paper.

10                   THE COURT:  Well, number 1, tab number 1 of

11   Exhibit 68 contains a number of pages of materials, and I

12   have to have time to read those over.

13                   MR. LOVRIC:  I can take a look, Judge.

14                   THE COURT:  Oh, it's backwards.

15                   MR. LOVRIC:  It's demarked.

16                   THE COURT:  Well, I've read the first four

17   excerpts.  While some of them may be probative, I think

18   there's cumulative material.  There's a lot of the same type

19   of stuff, and it concerns me, and I need to have time to go

20   through all this material and think about it to decide which

21   parts are admissible, if any, and which parts are not,

22   because a lot of this repeats his plan of doing what he does

23   to young ladies.  Once again, I don't think you can just dump

24   this in wholesale.  In fact, I'm not going to permit that.

25   I'm going through it part by part, decide which part can come

James Lyons - Direct                672

1    in.

2                    MR. LOVRIC:  The only parts that we're

3    offering are the ones that are tabbed.

4                    THE COURT:  It's clear --

5                    MR. LOVRIC:  I'm not offering the whole book.

6                    THE COURT:  I'm going to reserve decision on

7    this.

8                    Now let's talk about 67.  What is this?

9                    MR. LOVRIC:  That's just laying the additional

10   foundation.  That's the contract for the book.  It shows that

11   Mr. Sacco is the one that had it printed and sent it away for

12   publishing.

13                   THE COURT:  Is there any dispute about that?

14                   MR. FISCHER:  No, there's no dispute that 68

15   is in fact Mr. Sacco on the front of the book and it is his

16   name as the author in the book.

17                   THE COURT:  With the same hat.

18                   MR. FISCHER:  We're not going to contend -- I

19   wouldn't guess.

20                   MR. LOVRIC:  Judge, I was offering because I

21   don't know what the objections are ahead of time.  67 was the

22   foundation to 68, to his book.

23                   MR. FISCHER:  It's his book.

24                   THE COURT:  They say there's no dispute about

25   it.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct                    673

1              Not a problem.

2              MISS PEEBLES:  Not a problem.

3              THE COURT:  Okay.  So we don't need 67.  I'll

4    have to take time to look at this and decide, in light of

5    evidence I know that's come in and in light of evidence that

6    I think is coming in, to decide how much, once again if any

7    of this, should come in.

8              MR. LOVRIC:  Okay.

9              THE COURT:  It's powerful stuff.  It's

10   disgusting.

11             MR. LOVRIC:  Well, I hate to say it, Judge,

12   the substance of this case is disgusting and very powerful.

13             THE COURT:  We all understand that.

14             MR. LOVRIC:  Unfortunately, it's not a drug

15   case or something of that sort.

16             Judge, I'm almost finished with this witness

17   in terms of what I have to cover.  I'm not sure -- I had

18   maybe one or two other questions.  This was my final topic to

19   cover with him.  And then I have the next witness.  But I

20   don't know how you want to proceed as far as this goes.

21             THE COURT:  Why don't you withdraw him at this

22   time.  He's the case agent.  He's going to be around.  He

23   doesn't have any place to travel.  And we'll put your next

24   witness on and have cross-examination as close to the end of

25   the day as we think is appropriate.  I can look at that stuff

James Lyons - Direct

674

1    overnight, you can put Agent Lyons back on, and then they can

2    cross-examine them.

3                    MR. FISCHER:  Judge, might I also suggest, as

4    a time-saving measure, that I'm going to ask Mr. Lyons what

5    did he review in preparation for his testimony.

6                    MR. LOVRIC:  You have everything that he

7    reviewed.

8                    MR. FISCHER:  All right.

9                    MR. LOVRIC:  I don't know if that helps you.

10                    THE COURT:  Because otherwise we might be here

11   a week.

12                    MR. FISCHER:  That helps.

13                    THE COURT:  Is that acceptable to you?

14                    MR. LOVRIC:  Sure, Judge.  You want me to put

15   the next witness on without him being crossed at this time?

16                    THE COURT:  You probably want to.

17                    MR. FISCHER:  I have no objection to

18   postponing his cross and having the next witness come in and

19   crossing after we get a ruling concerning the evidence.

20                    MISS PEEBLES:  Who's next?

21                    MR. LOVRIC:  David Pandiscia.

22                    MISS PEEBLES:  I have no problem.

23                    (Jury present)

24                    THE COURT:  All right, ladies and gentlemen.

25   We're going to suspend with Agent Lyons, the remainder of

1    direct.  I'm informed there's very little left to ask on

2    direct examination and the last document, Government 68,

3    that's being offered, excerpts from that, the Court has to

4    examine and take some time to look at before I decide what

5    part is admissible and what part is not.

6              So, Mr. Lovric has indicated -- defense has no

7    objection -- that we're going to ask Special Agent Lyons to

8    step down now, and we have another witness ready to go, and

9    then there will be cross-examination of Special Agent Lyons

10   when he takes the stand shortly.

11             MR. LOVRIC:  Judge, the next witness we call

12   is Investigator David Pandiscia --

13             THE COURT:  Okay.

14             MR. LOVRIC:  -- Connecticut State Police.

15             THE CLERK:  Sir, kindly state your name for

16   the record.

17             THE WITNESS:  Detective David Pandiscia,

18   P-A-N-D-I-S-C-I-A.  Pandiscia.

19

20

21

22

23

24

25

David Pandiscia - Direct

1   D A V I D   P A N D I S C I A, having been called as a

2   witness, being duly sworn, testified as follows:

3                    THE COURT:  Okay, Mr. Lovric.

4   DIRECT EXAMINATION

5   BY MR. LOVRIC:

6        Q    Detective, for the members of the jury, could you

7   please tell them your full name and tell them where you work.

8        A    My name is Detective David Pandiscia, Connecticut

9   State Police, major crime detective.

10       Q    And Detective Pandiscia, how long have you been

11  with the Connecticut State Police?

12       A    Been with the Connecticut State Police a little bit

13  over 11 years now.

14       Q    And just generally speaking, what kind of work and

15  what kind of duties do you perform currently as a detective?

16       A    As a detective, I investigate mostly major crime

17  incidents, homicide, kidnappings, sexual assaults, serious

18  matters.

19       Q    And prior to becoming a detective, did you work in

20  any other capacity with the Connecticut State Police?

21       A    Yes, sir.  I worked as a, first, when I came on, as

22  a patrol trooper, and also I was a SRO, which would be school

23  resource officer, basically full-time police officer works

24  within the towns and the schools.

25       Q    Detective Pandiscia, this afternoon I would like to

David Pandiscia - Direct                    677

1    talk with you about a person by the name of Dean Sacco.  Are

2    you familiar with a person by that name?

3         A    Yes, sir.

4         Q    And the person that you know as Dean Sacco, do you

5    see him in court anywhere today?

6         A    Yes, sir.

7         Q    Can you just for the record indicate where you see

8    him.

9         A    Right there, sir, in the blue shirt.

10        Q    The gentleman who just raised his hand.

11        A    Yes, sir.

12             MR. LOVRIC:  Just for the record, indicating

13   defendant Sacco.

14             THE COURT:  Record will so reflect.

15        Q    Detective, in 2003, approximately, the fall time

16   frame of 2003, did you happen to be working and have occasion

17   to work on a case that dealt with a person by the name of

18   Mallory Monagan?

19        A    Yes, sir.

20        Q    And at that time was Mallory Monagan a minor, a

21   teenage girl?

22        A    Yes, sir.

23        Q    And in addition to Mallory Monagan, did you also

24   have the opportunity to work in connection with the Monagan

25   matter and that investigation with two other teenage kids

David Pandiscia - Direct

1  that were involved in that matter?

2      A    Yes, sir.

3      Q    Now, in connection with that investigation, in

4  December of 2003, did you have the opportunity to interview

5  Mr. Dean Sacco?

6      A    Yes, sir.

7      Q    And in what state was it that that interview

8  occurred?

9      A    New Jersey, sir.

10     Q    And did you actually -- I presume you traveled to

11 New Jersey to conduct the interview?

12     A    Yes, sir.  One of my detectives, a partner and

13 myself traveled there.

14     Q    And did Mr. Dean Sacco agree to speak with you?

15     A    Yes, sir.

16     Q    And did you sit down with Mr. Sacco and then

17 conduct an interview for at least -- for quite some time,

18 that lasted quite some time?

19     A    Yes, sir.

20     Q    Now, during the course of that interview, prior to

21 interviewing Mr. Sacco, did you advise him of what we heard

22 here, what we hear called Miranda warnings or Miranda rights?

23     A    Yes, sir.

24     Q    Did he agree to speak with you without an attorney

25 being present?

David Pandiscia - Direct                              679

1        A     Yes, sir.

2        Q     And how did the conversation start or commence,

3    what did you speak to him about, what kind of conversations

4    did you have with him?

5                    MR. FISCHER:  Judge, I have an objection.  403

6    objection, cumulative basis.  Miss Monagan's already

7    testified about the events back then.  We have all this other

8    evidence.  I have an objection on that basis.

9                    THE COURT:  I don't know what this witness is

10   going to say so I have no way of making a 403 ruling.  Did

11   you want to give us a proffer, Mr. Lovric?

12                   MR. LOVRIC:  Yes, Judge, I can.

13                   THE COURT:  Okay.

14                   (At the Bench)

15                   THE COURT:  Go ahead.

16                   MR. LOVRIC:  During the course of the

17   interview Mr. Sacco made statements to this detective which I

18   believe are admissions as to his conduct relating to Miss

19   Monagan.  We're offering those as admissions by the

20   defendant.

21                   THE COURT:  Well, I don't see how that can be

22   cumulative.  We heard Miss Monagan, what she thinks was done

23   to her.  We haven't heard Mr. Sacco's version of this.  I

24   don't know any evidence of that.

25                   MR. FISCHER:  I have Mr. Lyons' grand jury

                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT

David Pandiscia - Direct

680

1  testimony where he recites what this witness said and I read

2  it, and I do not see in here that Mr. Sacco admitted anything

3  with respect to Miss Monagan.  I offer -- I can pull it out

4  and offer it as an exhibit if necessary.

5          THE COURT:  You've got to cross-examine him

6  with it.

7          MR. LOVRIC:  Let me make sure I'm clear,

8  Judge.  We may dispute whether or not it's an admission.  Mr.

9  Sacco doesn't come out and say, yes, I did everything she

10  says I did, but I submit what he does say to this

11  investigator and the way he says it and when taken in the

12  whole context, I believe it's an admission on defendant

13  Sacco's part.  That may or may not be a correct reading, but

14  I believe it is, and that's what I'm offering it as.  I'm not

15  offering it as anything else, but they're his words and his

16  statements about what did or didn't happen while he was

17  tickling Miss Monagan.

18          MR. FISCHER:  It's not an admission.  It is

19  413 and 414 evidence is what it is.

20          THE COURT:  Well, it's not 415 evidence.  This

21  isn't a civil suit.  It could be 413 and 414 evidence, yes.

22          MR. FISCHER:  Yes, I am sorry.

23          THE COURT:  It could be an admission or it

24  could be both.  We don't know.  If you've got things from the

25  grand jury minutes that you can cross this guy with, I think

David Pandiscia - Direct

1    that's the way we'll handle it.

2                    MR. FISCHER:  Okay.

3                    (In Open Court)

4    BY MR. LOVRIC:

5        Q    Detective, when you started your interview of Mr.

6    Sacco, what were just some of the first things you talked

7    about to kind of get the interview process going?

8        A    We just had a casual conversation about where he

9    was from, his father being a highly decorated Army officer,

10   Army ranger living in various bases.  Just very casual

11   conversation.

12       Q    And then did you have any discussions with Mr.

13   Sacco about a book that he had written or authored?

14       A    Yes, sir.

15       Q    Okay.  And then at some point did you speak with

16   Mr. Sacco and was there discussions about the substance of

17   what you were there to talk to him about, being the

18   allegations regarding Miss Mallory Monagan?

19       A    Yes, sir.

20       Q    And did Mr. Sacco, when he began to talk to you

21   about those events, did he talk to you about his version of

22   what may or may not have occurred in connection with Miss

23   Mallory Monagan?

24       A    Yes, sir.

25       Q    Did he describe or did he start to describe to you

David Pandiscia - Direct                                    682

1    what it was that he believed occurred during this event with

2    Miss Monagan?

3        A    Yes, sir.

4        Q    Can you describe a little bit about what he said

5    occurred or did not occur with respect to Miss Monagan?

6        A    Yes, sir.  He -- on his version of how the whole

7    thing went down and how he felt, that sometimes people bigger

8    than smaller children, they might be afraid of him and stuff

9    like that, and he also made some statements on that, if I can

10   refer to my notes.

11       Q    If you need to refresh your recollection,

12   certainly.

13       A    Yes.  Mr. Sacco said he was aware of the

14   allegations, that his family was concerned about the outcome,

15   the family was concerned about the outcome of those

16   allegations.  He said apparently, from what he heard, someone

17   felt uncomfortable.  I could look scary to a little kid, I

18   might be hard for a child to be comfortable around.  I might

19   be unshaven that day and a kid could be freaked out over it.

20   And he also stated, I can hug a little bit too hard, I can

21   play a little bit too hard.  I do everything a little too

22   hard, I guess.  Humans have a need for affection.

23       Q    And then did Mr. Sacco talk about with respect to,

24   in hindsight, why at least he thought that the children in

25   this case might have been a little afraid of him?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

David Pandiscia - Direct

683

1    A    Yes, sir.

2    Q    What did he point to or say in connection with why

3 the children that had made these allegations, why they might

4 have thought there was something wrong going on?  What did he

5 attribute that to?

6    A    He attributed that to -- oh, in hindsight, he would

7 say he's bigger, bigger guy to them, his breath might stink.

8 He might -- might not need to be the same -- I'm sorry.  My

9 breath might stink, my needs might not be the same as a

10 child, they might have been taught in school that if an adult

11 plays a little too rough, that's not right.  And then I asked

12 Mr. Sacco, was there anything that you were horse playing

13 with the kids that would make them feel something was going

14 on?  And he replied, yeah, I didn't want to put barriers up

15 and wanted to be new to me and show that I had changed.

16    Q    Did he talk about his perception of girls, how he

17 viewed them?

18    A    Yes, he did, sir.

19    Q    What did he describe girls as opposed to boys, how

20 they were different to him?

21    A    Yes, sir.  He described the girls are different

22 than male relatives.  They were different creatures, like

23 Venus and Mars.  Mr. Sacco stated that girls were -- in

24 particular are fun to be with, and I want to be a kid doing

25 the things they wanted to do.  He also stated -- and he also

David Pandiscia - Direct

684

1    stated with a question, did I sexually touch, did I go over

2    the line and do anything in a sexual way?  No, I did not.

3    However, I can say I learned a lot about dealing with kids.

4        Q    Did Mr. Sacco at some point then in the interview

5    go on to expand about what he meant about whether he touched

6    any of the children inappropriately or not and specifically

7    as it related to any genitalia being touched?

8        A    Yes, sir.  I asked Mr. Sacco while tickling the

9    girls -- oh, I asked Mr. Sacco while tickling the girls he

10   accidentally touched them in the wrong place.  Mr. Sacco

11   replied, you know, I know where the genitalia is, and to get

12   a sneaky touch, I know where the line is and I didn't cross

13   the line.  And then he also added, I cannot rule that

14   possibility out hundred percent.

15       Q    Did he then talk about where he was tickling

16   Mallory at the time that this tickling occurred?

17       A    Yes.  He said around the rib area at that time.

18       Q    Did he say where in the house this occurred?

19       A    Up in the bedroom, sir.  And Stevie's bedroom.

20       Q    Did he indicate or elaborate on whether or not --

21   in his words whether or not he was in a position to get a

22   feel, if he wanted to, of the children?

23       A    He said, If I tried to get a cheap feel off, I

24   think I would have been able to admit to it.  Then he went on

25   to say, To tell you the truth, Officer, I do not think any

David Pandiscia - Direct

1   genitalia was compromised.  From day one I made a choice not

2   to be afraid to interact with children.  It's been a

3   wonderful experience.  And then he explained that that day

4   the tickling occurred, it took place about three to five

5   minutes.

6       Q    What did Mr. Sacco say in connection to whether or

7   not he accidentally touched the genitalia of Mallory or any

8   of the other children?

9       A    He stated, Did I accidentally touch the genitalia?

10  I'm too smart for that.

11      Q    Okay.

12      A    Can I say those words too?

13      Q    Yes.

14      A    Then he said, Did I accidently touch the genitalia?

15  I'm too smart for that.  I know where a pussy is, I know

16  where an asshole is.  However, I can't rule that out.  I

17  don't think any way, shape or form, I compromised a child's

18  genitalia.  I can't admit to that.  Sorry.

19      Q    And then did Mr. Sacco then deny any inappropriate

20  touching?

21      A    Then he said, honest to God, I pretty much know I

22  didn't touch her.  I asked Mr. Sacco if he tickled her about

23  three months ago in Stevie's room.  Mr. Sacco responded, My

24  recollection is kind of foggy.

25      Q    Did Mr. Sacco go on to describe his view of kids

David Pandiscia - Direct                    686

1  and what kind of -- in his words what kind of creatures they

2  are?

3      A    Yes, sir.  He stated that, If I could have guessed,

4  I could have smarted and sneaked -- I could have started with

5  Stevie, then Mallory.  I asked Mr. Sacco what he meant about

6  not being afraid of children?  Mr. Sacco replied, I'm not

7  saying I was afraid.  I mean to be afraid not to open up.

8  Mr. Sacco then stated, Let's face it, kids are beautiful

9  creatures, not being afraid to get right in with them.

10     Q    Did Mr. Sacco during the course of this interview

11 at all indicate to you at any point in time whether or not he

12 had any attraction to 8-, 9- and 10-year-old girls?

13     A    Yes, sir.  He did.  He said he was attracted to 8-,

14 9-, 10- and 11-year-old girls.  Mr. Sacco stated that all

15 girls are attractive.

16     Q    Now, in connection with this interview, did you at

17 some point ask Mr. Sacco to write down on a piece of paper

18 the substance of your interview with him?

19     A    Yes, sir.  At the end I gave him a statement paper.

20 I explained to him to write out as much detail as possible

21 and to put it in his own words, provided enough statement

22 paper, as much as he needed.

23     Q    Okay.  Did he write out on a one-page piece of

24 paper some of the things you talked to him about?

25     A    Yes, sir.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

David Pandiscia - Direct

1    Q    After he wrote that out, did you ask him any

2    questions about what he had written in that document?

3    A    Yes, sir.  After he was done I reviewed the

4    statement with him, and after he signed it and then I asked

5    him, why didn't you put in the statement how you were

6    attracted to 8- or 9-, 10-year-old girls?  Mr. Sacco

7    replied -- didn't deny it but replied, I don't know how that

8    would help your investigation.

9    Q    Did he ever write that down on that piece of paper?

10   A    On being attracted to 8, 9, 10, 11 years old?

11   Q    Correct.

12   A    No, he did not, sir.

13   Q    Okay.  In connection with this investigation and

14   also including the interview of Mr. Sacco, did you at some

15   point arrest Mr. Sacco and charge him with certain offenses?

16   A    Yes, sir.

17   Q    And I'm sorry.  Go ahead.

18   A    I applied for an arrest warrant for that individual

19   and went through our court system, signed off by my

20   supervisor, state attorney as well as the Judge.

21   Q    And then at some point Mr. Sacco was arrested in

22   connection with this matter?

23   A    Yes, sir.

24   Q    And that was in the state of Connecticut?

25   A    He was arrested in New Jersey and then he waived

David Pandiscia - Direct                    688

1    extradition, and then myself and my partner that I was with

2    on that assignment traveled to New Jersey and picked him up.

3         Q    Okay.  While you interviewed Mr. Sacco what was his

4    demeanor while he was talking with you?

5         A    Friendly.  Friendly.  Very open.  More than happy

6    to sit down and talk with us.

7         Q    Okay.

8              MR. LOVRIC:  Those are all the questions I

9    have at this time, Judge.

10             THE COURT:  Mr. Fischer?

11             MR. FISCHER:  Thank you, your Honor.

12             May it please the Court, counsel.

13   CROSS-EXAMINATION

14   BY MR. FISCHER:

15        Q    Sir, my name is Kelly Fischer.  I represent Mr.

16   Sacco.

17        A    Yes, sir.

18        Q    Did you review any documents in preparation for

19   your testimony?

20        A    Yes, sir.

21        Q    What documents did you review?

22        A    The whole case jacket that I sent up to the state's

23   attorney here and his statement, sir.

24        Q    Did you bring that case jacket with you?

25        A    Yes, sir.

David Pandiscia - Cross

1    Q    Did you review any documents other than what's

2  contained in that case jacket?

3    A    No, sir.

4         MR. FISCHER:  Your Honor, may I review those

5  documents, please?

6         THE COURT:  Sure.

7         MR. FISCHER:  Thank you.

8         MR. LOVRIC:  Just for the record, Judge,

9  they're the same as I've provided to counsel before, all the

10  reports that I had.

11    Q    Do you have, sir, another document that you have

12  with you?

13    A    Yes.  This is the statement form that's also in the

14  jacket, sir.

15    Q    Okay.  Thank you.

16         MR. FISCHER:  May I just take one moment

17  please, Judge?

18         THE COURT:  Sure.

19         MR. FISCHER:  Thank you, your Honor.

20    Q    Sir, did you speak with Mr. Lovric in preparation

21  for this case?

22    A    Yes, sir.

23    Q    When?

24    A    Just a little while ago, sir.

25    Q    Have you spoken with him before this?

David Pandiscia - Cross

1    A    Yes, sir.

2    Q    When?

3    A    That was approximately three months ago, I believe.

4    Q    Have you spoken with Mr. Lyons, the FBI

5    representative?

6    A    Yes, sir.

7    Q    When?

8    A    Today, sir.

9    Q    Have you spoken with Mr. Lyons before this?

10   A    Yes.

11   Q    When was that?

12   A    This was a few months ago, sir.

13   Q    When you spoke with Mr. Sacco, it was your

14   intention to extract from him evidence that you could use to

15   prosecute him for the incident involving Miss Monagan, am I

16   correct?

17   A    No, sir.

18   Q    Did you know Miss Monagan's family before this

19   incident occurred?

20   A    No, sir.

21   Q    Have you learned subsequently anything about Miss

22   Monagan's family?

23   A    No, sir.

24   Q    Mr. Sacco, to make it clear, denied the claims that

25   were made against him, am I correct?

David Pandiscia - Cross

1    A    He did make some statements, yes, sir.

2    Q    I'll refer you to your statement.  You have your

3    statement in front of you, am I correct?

4    A    Yes, sir.

5    Q    At page 2 of 3.  Is it correct that -- and I'm

6    right about in the middle of the page.  Am I correct in

7    saying that Mr. Sacco told you, and I quote, "I had no

8    inkling, propensity to outright violate someone anymore"?

9    A    Yes, sir.

10   Q    Do you see that?

11   A    Yes, sir.

12   Q    Did he in fact tell you that at that time he no

13   longer had any such propensity?

14   A    Anymore.

15   Q    Is that what he said?

16   A    That's right.

17   Q    When was your statement taken from him?

18   A    That day we interviewed him is -- I remember.

19   Q    That day being what date?

20   A    I believe that was December -- if I can refer to

21   the date.  I believe it was December 15.

22   Q    Yes.  At one point Mr. Sacco tried to make it clear

23   to you, as I understand it, that he had changed, do you

24   remember that?

25   A    Yes, sir.

David Pandiscia - Cross                                    692

1      Q     At one point Mr. Sacco says that his recollections

2   of the events are foggy, do you remember that?

3      A     Yes, sir.

4      Q     Now the events alleged are alleged to have occurred

5   approximately three months before you interviewed Mr. Sacco,

6   am I correct?

7      A     Yes, sir.

8      Q     Mr. Sacco came to you -- he voluntarily spoke with

9   you about these incidents, didn't he?

10     A     Yes, sir.

11     Q     He never refused to speak with you about any of

12  these incidents, did he?

13     A     No, sir.

14           MR. FISCHER:  All right.  Those are all the

15  questions I have.  Thank you, Judge.

16           THE COURT:  Okay.  Miss Peebles?

17           MISS PEEBLES:  No questions, Judge.

18           THE COURT:  Mr. Lovric?

19           MR. LOVRIC:  I have no further questions, your

20  Honor.

21           THE COURT:  Okay.  Thank you, Detective

22  Pandiscia.  You may step down.

23           THE WITNESS:  Can I have the report back?

24           THE COURT:  Yes.  Can we have the reports

25  back.

693

1                    (Witness excused)

2                    THE COURT:  All right, ladies and gentlemen.

3      Because everybody thought that Agent Lyons would be on longer

4      because there was no cross-examination yet, we're going to

5      stop today.  We don't have anything further for you.  And

6      tomorrow we're starting a half an hour early because Colleen

7      let me off the hook.  And we'll start at 9:30 in the morning.

8                    And let me remind you not to discuss the case

9      among yourselves, with anybody else or permit anyone to

10     discuss it with you.  If there's anything in the media,

11     please just ignore it, and don't do any research on your own.

12                   Have a nice evening.  I hope it's warmer

13     tomorrow.

14                    (Court stands adjourned)

15

16

17

18

19

20

21

22

23

24

25

                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT

694

1                    C E R T I F I C A T I O N

2

3

4           I, VICKY A. THELEMAN, RPR, CRR, United

5    States Court Reporter in and for the United States

6    District Court, Northern District of New York, do

7    hereby certify that I attended at the time and place

8    set forth in the heading hereof; that I did make a

9    stenographic record of the proceedings had in this

10   matter and cause the same to be transcribed; that

11   the foregoing is a true and correct copy of the same

12   and the whole thereof.

13

14

15                            _____

16                            VICKY A. THELEMAN, RPR, CRR

17                            United States Court Reporter

18                            US District Court - NDNY

19

20

21   Dated:  August 11, 2008.

22

23

24

25