695

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                   -versus-                      08-CR-77

6   LINDA O'CONNOR and DEAN SACCO.

7   ----------------------------------------------------------

8                   TRANSCRIPT OF JURY TRIAL

9   held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  TUESDAY, May 13, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Binghamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

USA vs O'Connor and Sacco

696

1          THE COURT:  Okay.  With respect to

2    Government's Exhibit 68, the Court is going to make the

3    following ruling:

4               Tabbed matter 1, 2 and 3 is admissible in its

5    entirety.

6               Tabbed matter 4 is excluded.  403.  The

7    prejudicial effect outweighs the probative value and it's

8    cumulative.

9               Same ruling for number 5.

10              Number 6, the first 11 lines are out.  The

11   rest is in.  Eleven.  Same ruling.  Cumulative.

12              7 is out.  It's something that may shock

13   somebody, but it has no meaning as far as this case is

14   concerned.  Cumulative, irrelevant, prejudicial effect

15   outweighs the probative value.

16              8 is in.

17              Are you ready?  It is the part where you start

18   screaming, crawling in the bedroom.

19              MR. LOVRIC:  Judge, if it's okay, I'll just

20   repeat just so I'm telling the agent correctly.  1, 2, 3 tabs

21   are admissible.

22              THE COURT:  Right.

23              MR. LOVRIC:  4 is not.

24              THE COURT:  Right.

25              MR. LOVRIC:  5 is not.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco                                    697

1                    THE COURT:  Right.

2                    MR. LOVRIC:  6, the first 11 lines are not,

3    the rest is.

4                    THE COURT:  Right.

5                    MR. LOVRIC:  7 is not.

6                    THE COURT:  Right.

7                    MR. LOVRIC:  And 8 is admissible.  If I can

8    just go through with the agent, make sure he understands.

9                    Judge, just so I'm clear.  I'm looking at tab

10   6, and the Court put a penciled X.  So everything up until

11   that penciled X is out?

12                   THE COURT:  Correct.

13                   MR. LOVRIC:  Okay.  And then the remainder of

14   6 we can read.

15                   THE COURT:  Correct.

16                   MR. LOVRIC:  Okay.  I just want to make sure

17   that was the right...

18                   (Jury present)

19                   THE COURT:  Morning, ladies and gentlemen.

20   Can we get outside today at all?  It's really nice out there.

21                   All right.  Mr. Lovric, you have Agent Lyons

22   on the stand.  You have some questions to ask him, do you?

23                   MR. LOVRIC:  Yes, thank you, Judge.

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1   DIRECT EXAMINATION CONTINUED

2   BY MR. LOVRIC:

3       Q     Good morning, Agent Lyons.

4       A     Good morning.

5       Q     Yesterday when we broke for the day, we were

6   discussing an Exhibit 68, and I'll just show it to you.  Can

7   you see that Exhibit 68?

8       A     Yes, sir.

9       Q     And again, what is that?

10      A     That's the autobiography of Mr. Sacco.

11      Q     I'm just going to put on the screen the cover with

12  the exhibit.  Is that the cover of the book?

13      A     Yes, sir.

14      Q     And Exhibit 68, did you have the opportunity to

15  read that?

16      A     Yes, I did.

17      Q     I'd like to hand you Exhibit 68 and we'll just talk

18  about a couple of portions, couple relevant portions of that

19  book.  Agent Lyons, in Exhibit 68 there are several tabs in

20  that book, is that correct?

21      A     Yes, sir.

22      Q     Is it a fair statement that those tabs were not

23  there when you received that book?

24      A     That's correct.

25      Q     In fact, who were those placed there by?

James Lyons - Direct

1     A    I placed the tabs in the book.

2     Q    Agent Lyons, I'd first like you to turn to tab 1,

3  and if you could read for the members of the jury what is

4  contained in that book under tab 1.

5     A    Tab 1 is page 71.  "A couple of weeks later I got

6  up in the middle of the night and went into my little

7  sister's room.  While she slept I carefully pulled back her

8  panties and examined, then touched her vagina.  Choosing to

9  sneak in on my little sister in the middle of the night,

10  crawling in on her nor her friends and trying to touch them,

11  continued into my mid teens.  It was as if I was repeating

12  the same unfinished act with Kim, stuck on a loop, an

13  endless, repeating movie reel, striving to complete some

14  initiation rite.  One particular night Susan would never

15  forget.  Me waking her up attempting to fondle her.  That was

16  the night she got scared and cried, the night I had to sit up

17  with her and get her to stop crying before I left her room

18  and went back to bed.  It was the time she would bring up in

19  later years, the episode she'd scream at me about, and reveal

20  to everyone else.  She would never let me live it down, even

21  after we talked about it as adults."

22     Q    Can you next turn to tab 2 in that autobiography

23  book and read tab 2.

24     A    Yes, sir.  Tab 2 is page 86.  "Girls I liked

25  avoided me during the 1973/74 sophomore school year at

James Lyons - Direct

1  Leavenworth High.  They remained aloof and obscure, suddenly

2  further out of my reach than ever before.  Erections

3  straining against the fabric of my jeans, hard-ons with minds

4  of their own didn't help either.  Girls could spot the

5  symptoms a mile away.  The overeager nervous smile, red face

6  flushed with anticipation, eye shifting to strategic points

7  on their bodies.  I didn't get laid once while at Leavenworth

8  but molested a young freshman nicknamed Blondie in our

9  housing area one night.  It was raining like hell, storming,

10  and we both approached each other going home.  It was late.

11  No one was out.  I got her to stop, tried to get her to make

12  out with me on the side of a duplex.  She protested.  I

13  forced myself on her, grabbed her breast.  No.  She pulled my

14  hand off.  I grabbed her crotch, cupped her pubic mound real

15  good.  We fell into the mud.  A struggle went on for 30

16  minutes with her trying to break away and me grabbing

17  strategic places of her body and kissing her.  Then her mom

18  called and I released her.  She ran home soaking wet and all

19  muddy.  Neither one of us spoke about the incident."

20      Q    Can you next read tab 3 in Mr. Sacco's book.

21      A    Yes, sir.  Tab 3 is page 88.  "I began a routine of

22  sneaking out of our house late at night and peeping into

23  certain girls' windows around the housing area.  And how

24  exciting, to grab the 20-foot ladder from the side of the

25  neighbor's house and prop it against Patty Doctor's bedroom

James Lyons - Direct

1  window or her mother's.  Come to think of it, her mother had

2  a super nice body too.  Patty looked great exercising and

3  posing in her underwear in front of her mirror.  In addition

4  to becoming a peeping Tom, this is when I made my sister

5  Susan upset by waking her up while trying to steal looks at

6  her body or touch her as she slept.  Even her pretty

7  girlfriend Shelly who spent a week staying at our place did

8  not escape my new perverted hobby.  At 2 and 3 in the morning

9  I'd sneak into their room and peel back Shelly's panties to

10 have a nice exciting look and maybe an ever so gentle touch

11 of her hairless vagina."

12    Q    Can you next turn to tab 6 and read the appropriate

13 portion in tab 6 of Mr. Sacco's book.

14    A    Yes, sir.  Tab 6 is page 158.  "And he broke into

15 the bedroom window of the young blonde girlfriend of his

16 brother Steve's.  Saw her inside on her bed sleeping in her

17 nightshirt, and he knew how to pop the window screen and how

18 to climb inside, and he knew how to slither into her bedroom

19 like a snake, heart pounding, down the wall, eyes always

20 fixed on the living, breathing form.  And he got in and she

21 kept sleeping, and he crawled alongside and reached to touch

22 her and she woke up.  She jumped up, recognized him, did not

23 scream and wake her mother.  He tried to kiss her, grabbed

24 her by the shoulders and tried to put his tongue in her mouth

25 and she bit it, yet his dick got hard, and she looked so sexy

James Lyons - Direct                          702

1    standing there with heaving breasts, and they struggled and

2    she bit his tongue again and threatened to scream if he did

3    not leave.  And he left after trying once more to fondle her.

4    He got into another home one late night and it was another

5    blonde, a full-chested blonde he'd known from high school but

6    hadn't seen since.  And he popped the pins on her screen

7    window and made it to her bedroom.  She lay there sleeping on

8    her bed, her cascading blonde hair inviting in the darkness,

9    and he knelt beside her bed and touched her and she screamed.

10   She screamed and rolled over and recognized him, pushed him

11   into her closet while her mother came into the bedroom to

12   investigate."

13          Now going to page 159.  "I had a bad dream,

14   Mom.  That's all.  I'll be all right.  And then she threw him

15   out after asking how he got into her home in the first place.

16   The doors and windows were all locked.  In girls' yards he

17   ignored the fierce mosquitoes biting him and he never got

18   tired of peeping and waiting, and waiting and peeping, and

19   this risky extracurricular activity gave him sexual pleasure,

20   and they fired him from his job at Hungry Bull Restaurant and

21   the summer wore on."

22       Q    In reading the book, Agent Lyons, does the author

23   of that book use the word "he" in the third person at times?

24       A    Yes, he does.

25       Q    Based on the context of that book that you read, is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Direct                                    703

1   there any indication when you read it as to who the "he"

2   refers to?

3        A    It's Mr. Sacco.

4        Q    Can you then finally read for us tab 8 of that

5   book.

6        A    Yes, sir.  Tab 8 is page 183.  "In a triple X booth

7   I switched back from a lesbian video to some Girl Scouts

8   doing an old man and ejaculated all over the floor."

9        Q    If I can take Exhibit 68 back, please.

10                MR. LOVRIC:  Those are all the questions I

11   have at this time, your Honor.

12                THE COURT:  Okay.  Mr. Fischer.

13                MR. FISCHER:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. FISCHER:

16        Q    May it please the Court, counsel.  Mr. Lyons.  I

17   don't need to introduce myself, do I?

18        A    No, sir.

19        Q    The portions of the book that you just read, the

20   book itself, when was it written?

21        A    Really want me to answer that question?

22        Q    Give me a time frame.

23        A    It's when your client was in state prison.

24        Q    When was that?

25        A    It was prior to 2000, I believe.

James Lyons - Cross

1     Q    So the book was written prior to 2000, am I

2  correct?

3     A    That's my best estimation.  Yes, sir.

4     Q    And the references, let's say in tab 1, the events

5  that are described occurred 30 years ago at least?

6     A    In tab 1.

7     Q    Yes.

8     A    Yes, when he was a young teen.

9     Q    And that's true for the references at least in tabs

10  2 and 3, that these events occurred in the early 1970s or

11  earlier?

12     A    Yes, sir.

13     Q    At least 35 years ago, 30, 35 years ago?

14     A    That's correct.

15     Q    When did Mr. Sacco work at the Hungry Bull?

16     A    I'm not sure.

17     Q    That's information that you could have found out,

18  am I correct?

19     A    It's an autobiography.  I took his statements in

20  the book as fact.

21     Q    That's not my question.  That's information you

22  could have found out, am I correct?

23     A    It's not necessary.

24     Q    That's not my question either.  That's information

25  that you could have found out, am I correct?

James Lyons - Cross

1    A    Sure I could have pursued that.

2    Q    Thank you.  How long have you been working on this

3   case?

4    A    Since January of 2008.

5    Q    How many hours have you spent working on this case,

6   if you can approximate?

7    A    Couldn't say.  Totally speculative.

8    Q    A lot of time?

9    A    Yes.

10    Q    Through all of the investigative work that you've

11   done -- Withdraw that.

12         You're not the only investigator involved in

13   investigating this federal charge, am I correct?

14    A    That's correct, sir.

15    Q    How many other federal investigative employees have

16   participated in investigating these charges?

17    A    Had one FBI agent in Newark who assisted me.  I had

18   Kelley Molanare, who's a financial analyst in Syracuse also

19   provided assistance, and also two agents in my office who

20   helped to serve some subpoenas.

21    Q    You originally got involved in this case

22   approximately mid January of 2008?

23    A    That's correct.

24    Q    At that point were you working in conjunction with

25   Mr. Lovric in the investigation and prosecution of this case?

James Lyons - Cross

1    A    When I got involved, yes, I was.

2    Q    Originally?

3    A    Yes, sir.

4    Q    Have you worked continually and closely with Mr.

5  Lovric throughout the prosecution and investigation of this

6  case?

7    A    Yes.

8    Q    As part of your work on this case, you prepared a

9  criminal complaint, am I correct?

10    A    Yes, sir.

11    Q    And that criminal complaint is dated February 10 of

12  2008, am I correct?

13    A    Yes.

14    Q    And in support of that criminal complaint you

15  submitted an affidavit, am I correct?

16    A    Yes, I did.

17    Q    A sworn affidavit?

18    A    Yes, sir.

19    Q    And in that affidavit you outlined in part the

20  investigative steps you had taken up to that point that you

21  believe supported the criminal complaint, am I correct?

22    A    Yes, sir.  I pretty much used much of the

23  information that the Norwich Police Department had already

24  investigated.

25    Q    And you relied on the tapes of the phone calls?

James Lyons - Cross

1     A    Absolutely.

2     Q    And the interview, the two interviews that were

3 tape recorded with Elizabeth Chesebro and Shannon O'Connor?

4     A    Yes, sir.

5     Q    You relied upon then Detective Blenis' notes.

6     A    I'm not sure I ever saw his notes.

7     Q    Did you rely upon statements obtained by Detective

8 Blenis?

9     A    Yes, I did.

10    Q    At the time in February, February 10 of 2008, you

11 were aware of the allegations made by Shannon O'Connor

12 concerning the events that she alleged occurred at the Best

13 Western Hotel, am I correct?

14    A    Yes, sir.

15    Q    And you were aware that there had been an

16 interview, at least one interview between Detective Blenis

17 and Linda O'Connor, am I correct?

18    A    Yes.

19    Q    And at that point in February 10, 2008 you had

20 undertaken an investigation of Mr. Sacco's background, am I

21 correct?

22    A    Yes, sir.

23    Q    The indictment in this case, as I understand it,

24 was handed down on February 15 of 2008, is that correct?

25    A    On or about that date, yes, sir.

James Lyons - Cross

1    Q    And you presented testimony to the grand jury that

2  handed down that indictment?

3    A    I did.

4    Q    And you recounted all this investigative work that

5  you had done?

6    A    Yes, sir.

7    Q    You were aware that the allegations that Shannon

8  O'Connor made concerning photographs only came out first --

9  photographs concerning Mr. Sacco only came out first on or

10  about October 25 of 2007, is that true?

11    A    Yes, sir.

12    Q    And the interview, the first recorded interview

13  with Shannon O'Connor was October 29 of 2007, is that right?

14    A    I believe Pat Blenis interviewed her prior to that.

15    Q    The taped, recorded interview was prior to

16  October 29 of 2007?

17    A    No, sir, but that's not what you asked me.

18    Q    Okay.  Are we in agreement that the taped, first

19  videotaped interview of Shannon O'Connor concerning the

20  claims made against Mr. Sacco about photographs, that that

21  tape was done -- the interview that's shown in the tape was

22  done on October 29, 2007?

23    A    Yes, sir.

24    Q    In February of 2008, when you drafted your

25  affidavit in support of the criminal complaint, were you

1  aware at that time of Shannon O'Connor's psychiatric history?

2      A    I was aware that she had attempted to commit

3  suicide.

4      Q    You had undertaken substantial investigation prior

5  to February 10 of 2008 regarding this matter?

6      A    That's incorrect.  It was 30 days maybe or less.

7      Q    So you had undertaken insubstantial investigation

8  as of February 10, 2008, is that correct?

9      A    Me personally.  I conducted about 30 days' worth of

10 investigation.  The other agencies had conducted more than I

11 had.

12     Q    Did you ever, prior to February 10 of 2007, speak

13 with Elizabeth Chesebro concerning Shannon O'Connor's

14 background?

15     A    I don't recall speaking to Miss Chesebro, sir, no.

16     Q    You were aware at least from the videotaped record

17 that Miss Chesebro was the CPS caseworker on this case, am I

18 correct?

19     A    Yes, sir.

20     Q    You were aware she had substantial communications

21 with Shannon O'Connor at least up until the time of the video

22 interviews, am I correct?

23     A    Yes, sir.

24     Q    But prior to February 10 of 2008 you did not reach

25 out to Elizabeth Chesebro to find out anything about Shannon

James Lyons - Cross

1   O'Connor's background, am I correct?

2        A    No.  I knew she had attempted to commit suicide, as

3   I said earlier.

4        Q    Was that based upon you had -- a conversation you

5   had with Miss Chesebro or a writing of some sort?

6        A    My conversations with Investigator Blenis.

7        Q    Okay.  Prior to February 10 of 2008 did you ever

8   reach out or did anybody employed by the federal government

9   at your direction, to your knowledge, reach out to Elizabeth

10  Chesebro to find out anything about Shannon O'Connor's

11  psychiatric history?

12       A    Everything I learned was from Pat Blenis, who was

13  working closely with Miss Chesebro.

14       Q    You didn't call Miss Chesebro, did you?

15       A    No.  I said I hadn't.

16       Q    Did you look at any records that Miss Chesebro

17  created regarding Shannon O'Connor's psychiatric history?

18       A    What time period?

19       Q    Prior to February 10 of 2008 when you prepared the

20  affidavit in support of your criminal complaint?

21       A    No, sir, I don't believe I did.

22       Q    Other than speaking with Detective Blenis, did you

23  undertake any investigation to inquire about Shannon

24  O'Connor's psychiatric condition at any time prior to

25  February 10 of 2008?

James Lyons - Cross

1       A       No.  I knew she was troubled, like I said, based

2  upon the fact that she attempted to commit suicide.

3       Q       But you didn't ask beyond that information to

4  determine anything further about the nature of that trouble?

5       A       Said she was sexually abused by her mother and Mr.

6  Sacco.  I believe that's the nature of her trouble.

7       Q       My question is not what the nature of your belief

8  is.  My question is this:  You didn't undertake any further

9  investigation beyond receiving information from Detective

10  Blenis to determine for yourself based on records created

11  about what her psychiatric condition was; am I correct in

12  saying that?

13       A       Yes.  That's correct.

14       Q       Thank you.  The criminal complaint that you created

15  was confined to claims involving sexual abuse of Shannon

16  O'Connor and pictures of Shannon O'Connor, am I correct?

17       A       In addition to the fact that she had attempted to

18  commit suicide, that was in the complaint also.

19       Q       So those three things: she attempted to commit

20  suicide; that she was the subject of pictures; and that she

21  was the subject of sexual abuse, correct?

22       A       Yeah.  I'd have to look at it, but it was a lengthy

23  complaint.  I wouldn't say it was just three items in there.

24       Q       Is that -- is my description of what's in that

25  criminal complaint inconsistent with your recollection of

James Lyons - Cross

1  what's in there?

2      A    No, sir, but she had been raped by Mr. Sacco,

3  sexually abused by her mother, photographs taken by both Miss

4  O'Connor and Mr. Sacco.

5      Q    Okay.

6      A    Also the information regarding the Best Western.

7      Q    Okay.  As I recall your testimony from yesterday,

8  you spoke about a letter that was written by Mr. Sacco

9  wherein he talks about being offered some sort of a deal to

10  get out in three to four years.  Do you remember that?

11      A    Yes, sir.

12      Q    You know that he's facing charges by New York

13  State, am I correct?

14      A    Yes, sir.

15      Q    You are aware of what those charges are, am I

16  correct?

17      A    I don't know the specific charge but I know the

18  underlying reason for the charges.

19      Q    You sat in that chair right there when Detective

20  Blenis sat right in that chair right there and described all

21  of the charges against Mr. Sacco, am I correct?

22      A    Yeah.  That's correct.

23      Q    Are you aware that those charges carry with them

24  maximum penalties?

25      A    I don't know state law.  I don't know the state law

James Lyons - Cross

1    maximums for those.

2        Q    You are aware of the federal rules concerning

3    penalties, am I correct?

4        A    Yes, sir.

5        Q    Gerardo DiFiori, you spoke with Gerardo DiFiori at

6    some point?

7        A    Yes, I did.

8        Q    When did you first speak with him?

9        A    I first spoke with him on Thursday evening.

10       Q    Prior to that time, FBI agent Steve, and I've

11   forgotten his last name, spoke with Mr. DiFiori on at least

12   two occasions, am I correct?

13       A    That's correct.

14       Q    Do you know whether Agent Steve ever spoke with

15   Mr. DiFiori about the maximum or minimum federal sentences on

16   these charges?

17       A    I wasn't present.

18       Q    When you spoke with Mr. DiFiori, did you ever

19   discuss the figure with Mr. DiFiori of 30 years?

20       A    No, sir, I didn't.

21       Q    Did he discuss it with you?

22       A    Yes, he did.

23       Q    That's the first time you've heard of that out of

24   Mr. DiFiori's mouth, am I correct?

25       A    Yes, sir.  That was on Friday.

James Lyons - Cross

1     Q    Is it customary for an FBI agent investigating a

2  claim of this nature to inquire of a potential witness

3  whether or not the defendant made any statements?

4     A    Sure.

5     Q    Do you know whether those questions were posed to

6  Mr. DiFiori when Agent Steve investigated this matter?

7     A    I don't know what questions were posed.

8     Q    Are there protocols within the FBI directives as to

9  what procedures should be followed when you perform an

10  investigation of a criminal case?

11     A    Some, yes, sir.

12     Q    Do you receive training about how you should go

13  about inquiring or interrogating a witness when investigating

14  a federal criminal charge?

15     A    Yes.  We're taught how to interview witnesses.

16     Q    And is asking the witness whether there were any

17  statements by the defendant, isn't that part of what you're

18  trained to do?

19     A    Yes.

20     Q    You use computer technology in your work, don't

21  you?

22     A    Yes, sir.

23     Q    You received training as to how to use computer

24  technology?

25     A    Yes, sir.

James Lyons - Cross

715

1       Q       Now, yesterday you played some videotapes for the

2   jury, correct?

3       A       Yes, sir.  Mr. Lovric did.

4       Q       The US government, can you agree, is probably the

5   most technologically advanced organization in the world?

6       A       Absolutely not.

7       Q       The videotape that was played concerning Mr. Sacco

8   reading or speaking Italian, broke into that certain pictures

9   of a young woman wearing a maroon-colored sweater.  Do you

10  recall that?

11      A       Yes, I do, sir.

12      Q       In those pictures, Mr. Sacco is not shown, is that

13  correct?

14      A       Heard but not shown, that's correct.

15      Q       His voice is there, but he is not depicted in those

16  pictures, correct?

17      A       That's correct.

18      Q       When did you first get these tapes?

19      A       I retrieved them from Mr. Sorvino on March 5 of

20  2008.

21      Q       Now, the tapes that you got from Mr. Sorvino were

22  about, you said, 30 hours of tapes?

23      A       I'm not sure if I put a specific number on it.

24      Q       Is that a fair approximation, approximately 30

25  hours?

James Lyons - Cross

1       A    I'm not sure.  I reviewed the tapes and I can't

2    give you an exact figure.

3       Q    More than 20 and less than 40 hours?

4       A    It's possible.

5       Q    Now, who transcribed the 8-millimeter tapes from

6    the tape to the CDs, or whatever you call those devices, that

7    were played yesterday?

8       A    It was an individual at the Broome County computer

9    analysis and technical unit.  I think it's Larry Compton.

10   I'm not certain on that.

11      Q    Who originally took possession of those tapes?

12      A    I did.

13      Q    What did you do with them after you took possession

14   of them?

15      A    Brought them back to the office here in Binghamton.

16      Q    Who had access to those tapes while they were at

17   your office?

18      A    Myself and other agents.

19      Q    What other agents?

20      A    Agent Bokal, Agent Talley, Agent Walters.

21      Q    Did anybody else have access to those tapes?

22      A    At some point the defense did and Mr. Lovric also.

23      Q    Where were those tapes kept?

24      A    In my office until I turned them over to the US

25   Attorney's for you all to look at.

James Lyons - Cross

717

1     Q    When they were kept at your office, did anybody

2  other than FBI agents have access to those tapes?

3     A    No, sir.

4     Q    Any other federal employees have access to those?

5     A    We have a translator who works in our office.

6  She's in the office space.  She would have access to -- and

7  also there's a New York State Police investigator, Daniel

8  Mastronardi.  He also has access to our office space.

9     Q    As part of your investigation in this case, have

10  you reviewed telephone records?

11     A    Not many.

12     Q    What telephone records have you reviewed?

13     A    Actually I think I've just reviewed a summary

14  chart.  Haven't actually seen a full set of telephone

15  records.  Investigator Berry was doing all the telephone

16  analysis.

17     Q    As the lead FBI investigator in this criminal case,

18  was it important for you to verify that what the complaining

19  witness, Shannon O'Connor, said about dates when she had

20  contact with Mr. Sacco was correct or incorrect?

21     A    Yes.  We attempted to corroborate certain dates.

22     Q    Did you review the phone records to determine

23  whether Mr. Sacco was in fact in Norwich on the dates when

24  Miss O'Connor, Shannon O'Connor, said he was there?

25     A    I don't recall her giving specific dates.  I recall

James Lyons - Cross

1    her giving time frames.

2         Q    You don't remember her mentioning the day of her

3    birthday?

4         A    Yes, sir.

5         Q    And you verified the date of her birthday, am I

6    correct?

7         A    I know the date of her birthday, yes.

8         Q    December 27?

9         A    That's -- that's correct.

10        Q    Did you undertake an investigation with respect to

11   the telephone records to substantiate whether Mr. Sacco was

12   in Norwich on December 27, 2006?

13        A    Investigator Berry obtained those phone records.

14        Q    Were you able to conclude from those phone records

15   anything about where Mr. Sacco was at any time on

16   December 27, 2006?

17        A    I haven't seen those.  Investigator Berry did the

18   analysis of those records.

19        Q    So you personally didn't inquire to make sure that

20   Mr. Sacco was or was not present when Shannon O'Connor said

21   he was?

22        A    I confirmed that he had been up there on many

23   occasions.

24        Q    You then -- I'll rephrase my question -- did not

25   personally, as the lead FBI investigator in this case,

James Lyons - Cross

1  undertake to verify with this other gentleman that the phone

2  records showed that Mr. Sacco was or was not present on

3  December 27, 2006, am I correct?

4      A    Phone records, no, I did not, sir.

5      Q    You were present when the search warrant concerning

6  storage unit 129 was executed, am I correct?

7      A    Yes, I was.

8      Q    And you saw the condition of the items inside that

9  storage unit when it was first opened, am I correct?

10     A    Yes, I did.

11     Q    I'm going to show you what's in evidence as Exhibit

12  19.  That shows the items inside the storage unit, am I

13  correct?

14     A    Yes, sir.

15     Q    Is that the condition they were in when the door

16  was first opened up?

17     A    Yes, it was.

18     Q    So what's depicted in the next photograph in that

19  pile, Exhibit Number 20, is not the condition in which those

20  items were originally configured when the door was opened, am

21  I correct?

22     A    That's correct.

23     Q    Who moved that stuff?

24     A    Investigator Shultz was inside and did most of the

25  searching with Investigator Berry.

James Lyons - Cross

1    Q    So between Exhibits 19 and Exhibit 20, things were

2   removed from the storage shed and then put back into the

3   storage shed, am I correct about that?

4    A    Yes, sir.

5    Q    So in Exhibit 19, you see in that photograph on the

6   right-hand side of the storage shed what appears to me to be

7   dresser drawers, do you see those?

8    A    Yes, I do.

9    Q    Were those dresser drawers out like that when you

10  first opened up the door to storage unit 129?

11   A    Yes, they were.

12   Q    You found dressers in storage unit 129?

13   A    Yes, sir.  Two dressers, actually.  One black

14  dresser where the condom was found was next to the

15  refrigerator with the drawer still inserted.

16   Q    Generally when you find things on a search warrant,

17  do you make a list of everything that you found?

18   A    Yes, sir.  That we take.  Not that we find but we

19  take.

20   Q    The drawers, the dressers, etcetera, where did they

21  go after the search warrant was over?

22   A    Back in the storage shed.

23   Q    Items that were found in that storage shed, I know

24  Investigator Shultz from New York State Police also talked

25  about this but I want to confirm it with you.  There were no

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Cross

721

1    fingerprints taken from any items that were retrieved from

2    the storage unit, am I correct?

3         A    That's correct.

4         Q    And other than the condom that was found in that

5    storage shed, there were no DNA tests taken with respect to

6    any items that were in that storage shed, am I correct?

7         A    Yes, sir.

8         Q    Yesterday -- I'm done with those exhibits.  You can

9    set them down.  Yesterday you were shown a piece of paper

10   with white lines on it with Shannon O'Connor's name on it and

11   some drawings, etcetera, do you remember that?

12        A    Yes, I do.

13        Q    I'm referring to Exhibit 62.  I'll show that to

14   you.  Where did you find that document?

15        A    Investigator Berry found this in the shed at 45

16   Fair Street.  That was the rear building that had the

17   basketball backboard up on the building.

18        Q    The shed was locked when you got there?

19        A    I don't recall if it was.

20        Q    That item, Exhibit 62, was not in the garages?

21        A    No, sir.

22        Q    It was actually in the shed?

23        A    In the shed, yes, sir.

24        Q    Did the shed door have to get opened up or was it

25   open when you got there?

James Lyons - Cross

722

1    A    We had to open it.

2    Q    You don't remember whether it was locked or not?

3    A    I don't.

4    Q    In the items retrieved from storage unit 129 there

5  was this Sharp 8-millimeter camera, am I correct?

6    A    Yes, sir.

7    Q    That camera has a zoom function on it, am I

8  correct?

9    A    Yes, it does.

10    Q    But when it zooms, the lens doesn't come out like

11  an old style 35-millimeter camera, am I correct?

12    A    That's correct.

13    Q    Concerning the diaries from which you read

14  yesterday, there were items contained in the diaries that you

15  removed prior to their being introduced in evidence, am I

16  correct?

17    A    That diary, may have been a couple of photographs

18  taped to the inside cover, I believe.

19    Q    Of Mr. Sacco's mom smiling with her niece?

20    A    Yes, sir.

21    Q    In prosecuting this case, you never interviewed

22  Shannon O'Connor, am I correct?

23    A    That's correct.

24    Q    And in investigating this case, you never found any

25  pictures, any pornographic pictures of Shannon O'Connor, am I

James Lyons - Cross

1    correct?

2         A    That's correct.

3         Q    Now, you read from Mr. Sacco's diary yesterday

4    about a storage unit on West Grand Ave.?

5         A    Yes, sir.

6         Q    In Elizabeth, New Jersey?

7         A    It didn't say that in the journal, but yes, I

8    believe that's where it's located.

9         Q    At the time of those entries, Mr. Sacco was living

10   at the YMCA in Elizabeth, New Jersey, is that fair to say?

11        A    I'm not sure where he was residing at the time.

12        Q    Well, you've reviewed the journal entries a number

13   of times, haven't you?

14        A    Yes, I have.

15        Q    How many times have you reviewed those?

16        A    I can't give you an exact number.  It took me a

17   while to read both journals.

18        Q    You're familiar with the contents of those

19   journals?

20        A    Yes, I am.

21        Q    Is it fair to say around the pages concerning that

22   storage unit there are references to Mr. Sacco residing at

23   the YMCA in Elizabeth?

24        A    Yes, sir.

25        Q    Now, West Grand Ave. in Elizabeth, New Jersey, did

James Lyons - Cross

724

1  you ever undertake to figure out where that is?

2      A    Yes, sir.

3      Q    Did you ever go to West Grand Ave. in Elizabeth,

4  New Jersey as part of your investigation in this case?

5      A    Another agent went there.

6      Q    Who went there?

7      A    Steven Grassi.

8      Q    Did you ever undertake to determine whether there

9  are any storage facilities, commercial storage facilities

10 located in Elizabeth, New Jersey on West Grand Ave.?

11     A    Yes, sir.  Agent Grassi went to one.

12     Q    What investigation did he undertake?

13     A    Attempted to identify if Mr. Sacco had a storage

14 unit there.

15     Q    And he was unable to do that?

16     A    No.  He showed a photograph to the individuals

17 there.  One of the employees recognized Mr. Sacco, but there

18 were no records of him having a unit at the place.

19     Q    Do you know how far back that storage unit's

20 records went?

21     A    I don't know.

22     Q    Was there any inquiry, to your knowledge, about

23 producing those records and producing those records at all?

24     A    Yes, sir.  They were unable to produce records.

25     Q    They were unable to produce any records?

James Lyons - Cross

1    A    That Mr. Sacco had a unit there.

2    Q    Is it your understanding that they, in fact, did

3    have records concerning who rented storage units from them?

4    A    Yes, they did.

5    Q    Do you know how far back their records went?

6    A    I'm not sure.

7    Q    And who was this that did the investigation?

8    A    Steven Grassi.

9    Q    Steven Grassi is the same FBI agent who interviewed

10   Gerardo DiFiori, is that correct?

11   A    That's correct.

12   Q    I think I mispronounced his name.  Do you know

13   whether there was any investigation undertaken -- withdraw

14   that.

15        It was important to determine in this case whether

16   you could find any pornographic photographs of Shannon

17   O'Connor, is that fair to say?

18   A    Yes, sir.  We were trying to locate those.

19   Q    Did you undertake a search of any other storage

20   facilities in the Elizabeth, New Jersey or Jersey City area

21   other than the one you mentioned just a moment ago?

22   A    We were unable to search any there because we

23   couldn't find any in Mr. Sacco's name.  We were unaware of if

24   he had one in his name because the one in Norwich was in

25   Mr. Lockwood's name.  So no, the only storage unit we

James Lyons - Cross

726

1    searched was in Norwich.

2         Q     To your knowledge did anybody investigating this

3    case on behalf of the government of the United States of

4    America undertake to contact any other storage facilities in

5    the Elizabeth, New Jersey or Jersey City, New Jersey area to

6    determine whether Mr. Sacco's name might appear?

7         A     No, sir.

8         Q     During the video that was played yesterday, there

9    is a fellow named Eric at Glenwood.  Do you remember that?

10        A     Yes, I did.

11        Q     Did anybody speak with him?

12        A     Yes, sir.

13        Q     Who spoke with him?

14        A     I believe that was also Agent Grassi and possibly

15   Mr. Santiago, who is a Jersey City police detective.

16        Q     In the film that was played yesterday, there are a

17   couple of men in a recording studio.  Do you remember that?

18        A     Yes, I do.

19        Q     Did you interview those men?

20        A     No, I did not.

21        Q     Was there any effort undertaken to determine who

22   those men were?

23        A     No, sir.

24        Q     You're aware that Shannon O'Connor has made the

25   claim that one of the two men at the Best Western knew her as

James Lyons - Cross                                727

1    a child, am I correct?

2                    MISS PEEBLES:  Objection.  That's not a fact.

3                    THE COURT:  Well, I don't know what's a fact

4    and what's not.  That comes from the witnesses, and I don't

5    understand the basis for that objection.  If you want to make

6    a record, we'll go to side-bar.

7                    MISS PEEBLES:  I don't think so.  That's fine,

8    Judge.

9         Q    Do you understand my question?

10        A    No.  Could you repeat it please so --

11             (Record read back)

12        A    I became aware of something similar to that later

13   on in the investigation.

14        Q    What did the FBI do to investigate that further?

15        A    The claim that somebody had known her?

16        Q    Yes.

17        A    We looked at the phone records from the hotel.  We

18   tried identifying if anybody was contacted from the phone

19   records, from Miss O'Connor's records.  There were cab

20   companies.  We actually disseminated Miss O'Connor's picture

21   to a number of cab agencies to see if anybody would come

22   forth with information regarding either Miss O'Connor and/or

23   her daughter, and that's pretty much all we had to go on so

24   that's what we did.

25        Q    You never asked Shannon O'Connor about that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Cross

1      A     I testified earlier, Mr. Fischer, I never spoke to

2   Shannon O'Connor.  Never interviewed her in this case.  I was

3   present I think three times when Mr. Lovric met with Miss --

4   Miss Shannon O'Connor.

5      Q     Okay.  When was that?

6      A     I don't remember the exact dates.

7      Q     Can you give approximate dates?

8      A     One was early on in the investigation.  Mr. Lovric

9   had her to the office just to introduce himself, explain to

10  her the process, that she would have to come to court.  He

11  would ask her very specific questions about what she said

12  happened to her.  The next time I had met Miss O'Connor,

13  Shannon, was at facility in Upstate New York where she was

14  receiving treatment for a brief period of time.  I brought

15  the cowboy hat with me that you had seen before, which she

16  identified as one she recalled Mr. Sacco wearing on one

17  occasion when he raped her, and the last time was within the

18  past month I believe just for Mr. Lovric to tell her that the

19  trial was coming up and trial -- prepare her for trial.

20     Q     How long did those interviews of Shannon O'Connor

21  last?  Or I'll rephrase the question.  How long did those

22  meetings where you and Mr. Lovric and Shannon O'Connor were

23  present, how long did those last?

24     A     It varied.

25     Q     Approximately how long did each of them last?

James Lyons - Cross

1    A    The first one, when we brought Miss Shannon

2  O'Connor to the office, just had some pizza.  Didn't discuss

3  anything about the case other than to get her comfortable

4  with Mr. Lovric.  That one was maybe an hour and a half.  The

5  second time that she was -- that I saw Miss O'Connor, Shannon

6  O'Connor, that one may have been two and a half hours.  The

7  last time may be two hours.

8    Q    On any of those occasions did any of the evidence

9  that has been presented in this case by the government, any

10  of the physical items, were any of those produced?

11    A    When I was present on the one occasion, I brought

12  the hat, as I testified.

13    Q    Were any other items of physical evidence produced?

14    A    I'm aware that Mr. Lovric had met her on other

15  occasions, and I believe he did show her some items or an

16  item.

17    Q    How do you know that?

18    A    Mr. Lovric told me.

19    Q    The occasion when you participated in the meeting

20  with Shannon O'Connor, was that the first, second or third

21  occasion?

22    A    Which one was this?

23    Q    The meeting in which you were present.

24    A    For --

25    Q    Meetings with Miss O'Connor, Miss Shannon O'Connor,

James Lyons - Cross

1   or were you present for all three?

2       A    I'm not sure I understand what you're asking me,

3   Mr. Fischer.

4       Q    On the occasions when, to your knowledge, Mr.

5   Lovric met with Shannon O'Connor, you were present on one,

6   two or three of those occasions?

7       A    Three occasions, I believe.

8       Q    On any of those occasions did you make any notes?

9       A    No, sir.

10      Q    Were those interviews -- were those meetings

11  recorded?

12      A    I believe Miss Chesebro when she was present was

13  taking notes or was writing reports.

14      Q    Was there any audio or visual recording made of the

15  conversations with Miss Shannon O'Connor?

16      A    No, sir.

17      Q    So you have no record that you made of what Shannon

18  O'Connor said during those meetings?

19      A    Not that I made, no.

20      Q    Why not?

21      A    Because Miss Chesebro was her guardian and she was

22  present and documenting what was occurring.

23      Q    But isn't it important for you as an FBI agent

24  investigating this prosecution to have notes of your own to

25  recall what occurred?

James Lyons - Cross

1    A    Not when Mr. Lovric's trial prepping a witness,

2    absolutely not.

3    Q    So if the witness were to say something other than

4    what in this case she said before, you wouldn't make a note

5    of that?

6    A    No, sir.

7    Q    Why not?

8    A    I just explained that to you.  When Mr. Lovric is

9    trial prepping witnesses, I don't take notes.  I take notes

10   and write reports when I sit down and conduct an interview.

11   Q    Why don't you take notes during those interviews?

12   A    Because it's not an interview.  It's not my

13   interview.

14   Q    If you took notes, you'd have to produce them,

15   wouldn't you?

16   A    If requested.

17   Q    When you were present during the conversations

18   between Mr. Lovric and Shannon O'Connor, did you participate

19   in those conversations at all?

20   A    Mr. Lovric asked the questions.  I did speak with

21   Miss Shannon O'Connor.  Didn't ask her any details of the

22   case.  Mr. Lovric was asking all of the information regarding

23   the case.

24   Q    What questions did you ask Miss Shannon O'Connor?

25   A    Asked her how she was doing, is she getting the

James Lyons - Cross                    732

1    help she needs, how she's feeling.

2         Q    Did you ask her any questions at all, any

3    substantive questions about this matter?

4         A    Not that I recall.

5         Q    The exhibit that you have in front of you -- and I

6    believe it's 62?

7         A    Yes, sir.

8         Q    Was there any discussion with Shannon O'Connor

9    about that exhibit when you were present?

10        A    No, sir.  Not to my knowledge.  Not that I can

11   remember.

12        Q    Do you remember whether there were ever any

13   questions when you were present of Miss O'Connor concerning

14   whether she had been in that shed?

15        A    No, sir.

16        Q    Was Miss O'Connor questioned -- when I say Miss

17   O'Connor, I'm referring to Miss Shannon O'Connor.  Was she

18   ever questioned about whether she had accessed the upstairs

19   apartment when Mr. Sacco was not present?

20        A    Are you asking over the entire course of the

21   investigation or are you still talking about when Mr.

22   Lovric -- when I was present when Mr. Lovric was speaking

23   with her?

24        Q    I can rephrase the question.  During the

25   interviews, the three interviews where Mr. Lovric was present

James Lyons - Cross

1  with Miss Shannon O'Connor, was Miss Shannon O'Connor ever

2  asked whether she ever accessed the upstairs apartment when

3  Mr. Sacco was not present?

4       A    Not that I can recall.

5       Q    Was there ever any application to take Mr. Sacco's

6  DNA by the government?

7       A    Yes.  We sent you a letter and asked if we could

8  get his DNA and he refused.

9       Q    You could take it if you wanted by application to

10  the Court, am I correct?

11       A    Yes, sir.

12       Q    You didn't make that application?

13       A    No.  We asked you and he refused.

14       Q    I understand it.  But if you really wanted it, you

15  still could have gotten it, right?

16       A    It wasn't -- my understanding of the DNA, it

17  wouldn't have been a positive match, so really for us

18  investigatively, it wouldn't have been worth the application

19  because it would not have shown a positive match on male DNA

20  is my understanding.

21       Q    You could have included or excluded, couldn't you

22  have?

23       A    Yeah.  He could have volunteered.

24       Q    That's not my question, sir.  My question is this:

25  Could you have -- the government could have --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Cross

734

1    A    Yes, we could have.

2    Q    -- included or excluded, am I correct?

3    A    No, sir.  Not included or excluded on the DNA.  Is

4  that what you're asking me?

5    Q    That's my question.

6    A    Yeah.  That's not correct.

7    Q    Did you review Mr. Lovric's letter to me concerning

8  that inquiry?

9    A    I spoke to Mr. Lovric about the letter.

10   Q    Okay.  That's not my question.  Did you review the

11 letter --

12   A    Did not see --

13   Q    -- he wrote to me concerning that inquiry?

14   A    No, sir.  I did not see it to my knowledge.

15   Q    So it's clear that beyond that request that there

16 was no other effort taken by the United States government to

17 obtain a DNA sample from Mr. Sacco, am I correct?

18   A    That's correct.

19        MR. FISCHER:  Your Honor, may I have just one

20 moment, please?

21        THE COURT:  Sure.

22   Q    Mr. Lyons, you're aware that Shannon O'Connor

23 was -- that she spoke about a scar on Mr. Sacco's stomach.

24 Am I correct?

25   A    I don't remember if that was -- I can't remember if

James Lyons - Cross

1    that was -- if it was Shannon O'Connor or Miss Monagan.  I

2    can't remember who told me that or -- I know I didn't hear

3    Shannon say that but I think I heard Miss Monagan tell us

4    about that.

5         Q    You understand Shannon O'Connor went to the YMCA in

6    Norwich when Mr. Sacco was present at the YMCA in Norwich, am

7    I correct?

8         A    Yes, sir.

9         Q    You're aware on occasion they would swim at the

10   YMCA in Norwich, is that correct?

11        A    I was unaware of that.

12        Q    Are you aware of any inquiry made of Shannon

13   O'Connor concerning any other physically identifying

14   characteristics about Mr. Sacco?

15        A    Not that I recall.

16        Q    If Miss O'Connor, Miss Shannon O'Connor was able to

17   identify certain unique characteristics with respect to Mr.

18   Sacco, that would be important information for you to have in

19   your investigation, wouldn't it?

20        A    I had the phone calls that I believed she did

21   identify them.

22        Q    I'll rephrase my question.  If there are any

23   unique, physical identifying characteristics about Mr. Sacco,

24   it would be an important thing for the Federal Bureau of

25   Investigation to know in prosecuting this case, am I correct?

James Lyons - Cross

736

1    A    No.  It was clear to me from those recorded phone
2    conversations that she had contact with Mr. Sacco in a sexual
3    way.
4    Q    Now, those phone conversations as you're aware from
5    Detective Sergeant Blenis' testimony were based in part upon
6    typewritten scripts created by Mr. Blenis?
7    A    That's correct.
8    Q    With assistance from Miss Chesebro?
9    A    Yes, sir.
10   Q    So you relied exclusively upon those in determining
11   whether to further undertake any investigation with respect
12   to any physical characteristics of Mr. Sacco, am I correct?
13   A    Yes, sir.  My ears did not lie to me.
14   Q    So I understand -- withdraw that.  So based upon
15   those phone calls alone then, you formed an opinion in this
16   case, am I correct?  I'm not asking for your opinion; I'm
17   asking whether you formed an opinion.
18   A    Yes, I did.
19   Q    And you've proceeded in investigating this case in
20   reliance upon those telephone conversations that you listened
21   to, am I correct about that?
22   A    Not that exclusively, but yes.
23   Q    Primarily?
24   A    No, not primarily, but that was one factor in the
25   investigation.

James Lyons - Cross

1    Q    So based upon what you heard in those phone calls,

2  you did not undertake any further inquiry and nobody at your

3  direction, to your knowledge, undertook any further inquiry

4  of Shannon O'Connor to determine whether she could explain or

5  describe any unique physical characteristics about Mr. Sacco,

6  am I correct?

7    A    Yes.  Not to my knowledge.

8              MR. FISCHER:  Thank you, Judge.  Thank you.

9              THE COURT:  Miss Peebles.

10  CROSS-EXAMINATION

11  BY MISS PEEBLES:

12    Q    Agent Lyons, Shannon O'Connor did not testify in

13  front of the federal grand jury, is that correct?

14              MR. LOVRIC:  Objection.

15              THE COURT:  What's the basis for that

16  objection?

17              MR. LOVRIC:  First of all, this agent is not

18  present in the grand jury when any other witness testifies.

19  Secondly, it's a violation of law for this agent to disclose

20  anything other than his own testimony in the grand jury.

21              THE COURT:  Well, that's a proceeding in a

22  grand jury.  That doesn't go the to issue of -- does he know

23  if somebody appeared?

24              MR. LOVRIC:  It's a violation of law.

25              THE COURT:  He can't reveal any of the --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Cross                                738

1    except on cross-examination if it becomes a fact.

2                    MR. LOVRIC:  It's a violation of 6(e) for any

3    person to disclose any matter in front of the grand jury

4    other than their own testimony, Judge.

5                    THE COURT:  I don't think the question went to

6    that.  Overruled.

7                    MR. LOVRIC:  She's asking him who else

8    testified in the grand jury.

9                    MISS PEEBLES:  That wasn't my question.

10                   THE COURT:  I didn't think it was.

11   A     No, she did not.

12                   MR. LOVRIC:  I object to that answer.

13   BY MISS PEEBLES:

14   Q     You did testify, though, in front of the grand

15   jury, correct?

16   A     Yes, ma'am.

17   Q     And you read reports to the grand jurors throughout

18   your testimony, is that correct?

19   A     That's correct.

20   Q     And you specifically read through the first

21   statement that Shannon O'Connor gave, which has been marked

22   as Defendant's Exhibit O-1, is that correct?

23   A     Yes, ma'am.

24   Q     And in that statement she talks about the fact that

25   Dean told her not to make any noise because her mother might

James Lyons - Cross

1   hear, correct?

2       A    Yes, ma'am.

3       Q    And he said also at one point he became very

4   nervous because a friend of Shannon's had come to the house

5   and she heard her mother yelling for her, is that correct?

6       A    Yes, ma'am.

7       Q    And she also said in that first statement that she

8   would ask her mother if she could go play games or cards with

9   Dean, is that correct?

10      A    I remember something about games.  I don't remember

11  the exact verbiage.

12      Q    If I read to you the statement that's marked as

13  Defendant's Exhibit O-1, would that help refresh your

14  recollection?

15      A    Yes, ma'am.

16      Q    "Dean told me to ask my mom if I could come up and

17  play cards.  Mom said it was okay.  I went upstairs."  Does

18  that refresh your recollection?

19      A    Yes, ma'am.

20      Q    Now that statement was read to the grand jurors

21  first, correct?

22      A    Yes, ma'am.  I actually read from Mr. Blenis'

23  report.

24      Q    All right.  And then you were asked a question by

25  Mr. Lovric and that was specifically -- well, strike that.

1        During the time that Shannon O'Connor gave the

2  statement, which was March 2 of 2007, she was actually in the

3  custody of her foster home at that point, the Hamiltons, is

4  that correct?

5        A    Yes, ma'am.

6        Q    Now you were asked a question after you read that

7  first statement that she gave by Mr. Lovric in front of the

8  grand jurors and the question was:  "At some point after that

9  interview with Shannon O'Connor, at some point after that

10  interview was Shannon taken out of custody from Linda

11  O'Connor and no longer with her mother Linda O'Connor?"  And

12  your answer was, "Yes, sir," is that correct?

13        A    Yes, ma'am.

14        Q    And then the next question is:  "And then

15  subsequent to that she was at some type of foster care

16  facility or under the care of Child Protective Services, is

17  that correct?"  And your answer was, "That's correct."  Do

18  you remember that?

19        A    Yes, I do.

20        Q    And then the next question is:  "And when this

21  occurs, she's no longer living with her mother?"  And you

22  answered yes.  And then the question is:  "After -- in sum

23  and substance can you indicate to the grand jurors what

24  Shannon revealed once she was no longer in the custody and

25  control of her mother, Linda O'Connor?"  Then you go on to

James Lyons - Cross

741

1    read the second statement that she gave from October of 2007,

2    is that correct?

3        A    Yes, ma'am.

4        Q    Okay.  But that was not accurate, was it?

5        A    That she was in foster care first, you mean, with

6    the first statement?

7        Q    Your testimony to the grand jurors led the grand

8    jury to believe that she was not in the care and custody and

9    control of her mother in the second statement but she was in

10   fact in the first statement, but that wasn't true, correct?

11       A    Yeah.  I must have misspoke in the grand jury.

12       Q    Well, that was pretty critical because what Mr.

13   Lovric was attempting to do through your testimony is

14   explain --

15                   MR. LOVRIC:  Objection.

16                   THE COURT:  Let her finish, but it's going to

17   be sustained.  You better ask another question.

18   BY MISS PEEBLES:

19       Q    The bottom line, Agent Lyons, is that Shannon

20   O'Connor was never in the care, custody and control of her

21   mother when this entire investigation started, isn't that

22   true?

23       A    That's correct.  It was disclosed to Investigator

24   Blenis in March.  That's correct.

25       Q    Correct.  And she was in foster care starting

James Lyons - Cross

742

1    February 27 of 2007?

2         A    That's right.

3         Q    Now, you were also asked a question concerning the

4    Best Western.  Do you remember that?

5         A    I remember I was asked questions about the Best

6    Western, yes, I do.

7         Q    And you were specifically asked the question:  "And

8    in the course of investigation is it a fair statement, Agent

9    Lyons, that investigators have recovered from the Best

10   Western, the one near Oakdale Mall, receipts indicating

11   Shannon -- excuse me -- that Linda O'Connor on five separate

12   occasions had rented a room at the Best Western?"  And your

13   answer was, "Yes, sir."  Correct?

14        A    Yes, ma'am.

15        Q    Now, that was all he asked you about receipts from

16   the Best Western, correct?

17        A    To my recollection, yes.

18        Q    He didn't ask you about the dates or anything of

19   that nature, did he?

20        A    I don't recall if he did.

21        Q    Would it refresh your recollection if I showed you

22   your grand jury testimony?

23        A    Yes, ma'am.

24        Q    Agent Lyons, I'm going to hand you what's been

25   marked as Defendant's Exhibit O-9 and ask you to take a

James Lyons - Cross

743

1    look -- near page 30 is the question about the Best Western.

2    Did you have an opportunity to review the grand jury minutes?

3        A    Yes, I did.

4        Q    And do you recall whether or not there were any

5    other questions about the Best Western and those registration

6    receipts?

7        A    Yes, ma'am.  There were not.

8        Q    Now, you sat through and you listened to the

9    videotape interviews, and I'm quite sure -- is it fair to say

10   you reviewed those before you came into court?

11       A    The video clips?

12       Q    Yes.

13       A    Yes, ma'am.

14       Q    And in the video clip and Shannon's statement on

15   December 5 it's very clear that she indicates that her mother

16   took her to the Best Western after they moved to Norwich on

17   three separate occasions, is that true?

18       A    I believe that's accurate, yes.

19       Q    And in fact, she indicates that the first time they

20   went, she just went shopping and stuff and went to Wal-Mart

21   and they just hung out, is that true?

22       A    Yes, ma'am.

23       Q    In fact, we introduced the Wal-Mart receipt

24   yesterday and that indicated a date of December 2, I believe,

25   is that correct?

James Lyons - Cross

744

1    A    Yes.  That's correct.

2    Q    Now, the registration receipts that were gathered

3  from the Best Western hotel indicate that there was only one

4  time that Mrs. O'Connor went to the Best Western with her

5  daughter after they moved to Norwich and that was on

6  December 1 of '06, is that correct?

7    A    Yes, ma'am.  The receipts in the name of Linda

8  O'Connor, the ones you're referring to.

9    Q    That's correct.

10   A    Yes, ma'am.

11   Q    The receipts you testified about in front of the

12  grand jury on five separate occasions?

13   A    That's correct.

14   Q    Now, during her videotaped interview Shannon is

15  very clear that she had sex with the landlord, and after she

16  had sex with the landlord it was on two separate occasions

17  right around her birthday that her mother took her to the

18  Best Western, is that correct?

19   A    Yes, ma'am.

20   Q    Now, she also says when she's being interviewed

21  that her mother used her own name, is that what she said?

22   A    Yes, she did.

23   Q    Never did she say that her mother used somebody

24  else's name, is that correct?

25   A    Yes.  On that interview, that's correct.

James Lyons - Cross

1    Q    Now she says -- she states that she remembers

2    that -- when asked what day of the week you guys went down,

3    she says she didn't go to school that week so it was during

4    the school week.  Do you recall her stating that when she was

5    being interviewed?

6    A    Yes, I do.

7    Q    Now, we know December 1 of '06 was on a Friday,

8    correct?

9    A    Yes, ma'am.

10    Q    And December 3 was on a Sunday, correct?

11    A    Yes.

12    Q    And they checked out on Sunday, correct?

13    A    Yes, ma'am.

14    Q    And they -- and they had arrived on Friday, fair?

15    A    Yes.  That's what the records reflect.

16    Q    Now, she says the second time her mom took her to

17    the Best Western, the next time they had gone up she had

18    registered under her own name, and they're asking her when

19    this happened during the course of the interview and she says

20    it was right around her birthday.  Do you recall that?

21    A    Yes, I do.

22    Q    And you already testified that her birthday's on

23    December 27, correct?

24    A    Yes, ma'am.

25    Q    And she specifically asked did she use her own name

James Lyons - Cross

1    at the hotel again and she specifically says yes, correct?

2         A    That's correct.

3         Q    Now, what you found when you tried to corroborate

4    what she said during that interview did not match up to what

5    she said, is that fair to say?

6         A    There was one stay in December of 2006.

7         Q    My question was what she said in that interview

8    didn't match up with what you were able to find at the Best

9    Western, is that correct?

10        A    That's correct.

11        Q    Now, she also says during the course of her

12   interview that they would -- that there were pictures of her

13   in sexually explicit activity that was put on to George

14   Lang's activity.  Do you remember that?

15        A    Yes, I do.

16        Q    In fact, what she describes is a camera, that the

17   pictures go directly from the camera to the computer.  Do you

18   recall that?

19        A    Yes, I do.

20        Q    Now, George Lang's computer was confiscated from

21   his daughter's house, correct?

22        A    Yes.

23        Q    And there was extensive forensic evaluation that

24   was done on that hard drive, correct?

25        A    Yes.

James Lyons - Cross

1      Q      There were no pictures of either Shannon O'Connor

2  in sexually explicit activity, correct?

3      A      That's correct.  None were recovered.

4      Q      There were photographs that were recovered?

5      A      Yes, ma'am.

6      Q      Am I correct?

7      A      Yes, that's correct.

8      Q      And there were no pictures of George Lang in any

9  type of sexually explicit activity, is that correct?

10     A      That's correct.

11     Q      And there were no pictures of Linda O'Connor in any

12 type of sexually explicit activity, is that correct?

13     A      That's correct.

14     Q      Now, I want to talk to you about Elizabeth

15 Chesebro.  You're the lead investigator in this case after

16 January of '08, correct?

17     A      Yes, ma'am.

18     Q      You would read all materials pertinent or relative

19 to this case?

20     A      It's impossible to read all materials.

21     Q      You would make an effort?

22     A      I tried my best, but it's impossible to read all

23 materials.  I have to provide other investigators to read

24 materials and provide me with results.

25     Q      In order to follow up on leads or attempt to

James Lyons - Cross

1   corroborate, you to have knowledge about what's being said,

2   correct?

3        A    Yes, I do.

4        Q    Now you know Elizabeth Chesebro had spoken to Mr.

5   Lovric, correct?

6        A    Yes, ma'am.

7        Q    And you know he had all of her case notes, correct?

8        A    Yes, I did.

9        Q    And I suspect that the two of you would discuss the

10  case, correct?

11       A    Yes.  That's correct.

12       Q    And he would indicate to you what to do or what

13  leads to follow up on, correct?

14       A    Sometimes.

15       Q    In fact, wasn't it Miss Chesebro who in her notes

16  indicated that she had a suspicion that Shannon was having

17  sex with the landlord in exchange for rent?

18       A    I didn't see that note.

19       Q    Did Mr. Lovric ever talk to you about that?

20       A    No, ma'am.

21       Q    Did you know what the extent of Miss Chesebro's

22  relationship was with Shannon O'Connor when you took the case

23  over in January of '08?

24       A    Yes, I did.

25       Q    And is it fair to say that they had a very close

James Lyons - Cross

1   relationship?

2        A    Yes.  That's fair.

3        Q    And is it fair to say they spent numerous hours

4   together, is that fair to say?

5        A    I don't know how much time they spent together but

6   I know they had a fairly close relationship.

7        Q    They went shopping together?

8        A    Yes.  I believe they did.

9        Q    They went to dinner together?

10       A    I'm not sure about that.

11       Q    You know they talked on the phone?

12       A    Yeah.  I'm sure they did.

13       Q    You know they went out in car rides together?

14       A    Yes.

15       Q    Now, I want to discuss the search of 14 Miller

16   Street, and that would be Mrs. O'Connor's home where she was

17   residing at the time she was arrested, the charges that are

18   contained in the indictment.  Okay?

19       A    Yes, ma'am.

20       Q    Now, I assume you tried to go through all of her

21   personal papers when you went through and searched her home,

22   is that fair to say?

23       A    I wasn't -- I wasn't present for the search.

24       Q    Were the items that were found given to you after

25   the search?

James Lyons - Cross                              750

1      A    Yes, they were.

2      Q    Were you ever provided with a Western Union money

3 transfer in the amount of $1,800 from Linda O'Connor to Dean

4 Sacco?

5      A    From the search?

6      Q    Yes.

7      A    I don't remember if I saw from the search or in a

8 different document -- different documents, ma'am.

9      Q    Did you ever see a Western Union wire transfer from

10 Linda O'Connor to Dean Sacco?

11      A    Yes, I have.

12      Q    Agent Lyons, I'm going to hand you what's been

13 marked as Defendant's Exhibit O-10 and ask if you can

14 identify this document for me.

15      A    Yes, ma'am.

16      Q    And what is it?

17      A    It's a Western Union money order of $1,800 from

18 Linda O'Connor to Dean Sacco.  It says Deposit and August and

19 September rent, 2006.

20           MISS PEEBLES:  Your Honor, I'd like to offer

21 this into evidence at this time.

22           THE COURT:  Any objection?

23           MR. LOVRIC:  No objection.

24           MR. FISCHER:  No objection.

25           THE COURT:  Receive Defendant's O-10 in

James Lyons - Cross

1    evidence.

2        Q    Now, this receipt, as you just indicated, states

3    it's $1,800, it's for a deposit in August and September of

4    2006 rent, is that correct?

5        A    That's correct.

6        Q    And the date on the wire transfer is July 24 of

7    '06, is that correct?

8        A    Yes, ma'am.

9        Q    And the total, $1,800, that would cover essentially

10   three months' worth of rent if she's being charged $600 a

11   month, correct?

12       A    It was a security deposit, I believe, and two

13   months rent.

14       Q    But 600 times 3 is 1800.  That would be essentially

15   what was wire transferred to Mr. Sacco, correct?

16       A    Yes.

17       Q    Now, Shannon O'Connor in her first disclosure -- I

18   think in fact she's maintained throughout that she had sexual

19   contact with Dean Sacco in August of 2006, correct?

20       A    Yes, ma'am.

21       Q    Now I would suspect that you also were able to

22   obtain bank records pertaining to Mrs. O'Connor, is that

23   correct?

24       A    Yes, ma'am.

25       Q    And you had an opportunity to review those bank

1    records, correct?

2        A    Kelly Molanare, who is our financial analyst, she

3    reviewed all the bank records.

4        Q    You would want to know what information was in the

5    bank records, I would suspect?

6        A    Of course.

7        Q    But you yourself didn't personally review any bank

8    records?

9        A    No, ma'am.

10       Q    But were you told on November 1 there was a

11   withdrawal of $600 cash from Mrs. O'Connor's ATM?

12       A    I don't recall that.

13       Q    Agent Lyons, I'm going to hand you what's been

14   marked as Defendant's Exhibit O-11 and ask if you've ever

15   seen this document and if you can identify it.

16       A    I don't believe I've ever seen this document.

17       Q    Do you know what it is?

18       A    I can read it.  But I've never seen it.

19       Q    What is it?

20       A    It appears to be some kind of banking document.

21       Q    For?

22       A    For Linda O'Connor.

23            MISS PEEBLES:  Your Honor, I'd like to offer

24   Defendant's Exhibit O-11 into evidence.

25            MR. FISCHER:  No objection.

James Lyons - Cross

1            THE COURT:  Receive Defendant's O-11 in

2    evidence.

3            MR. LOVRIC:  Judge, I don't object to it being

4    offered at some point.  This agent has no knowledge of this

5    document.

6            THE COURT:  I understand that he said he never

7    saw it before.  You didn't object, did you?

8            MR. LOVRIC:  I was thinking.  I wasn't yet

9    standing up, Judge.  I'm objecting that he doesn't have any

10   knowledge of it.  I don't know what he can say about it.

11           THE COURT:  I don't know either, but you

12   didn't object to it coming in evidence, did you?

13           MR. LOVRIC:  Judge, I didn't stand up quick

14   enough.  I was looking kind of perplexed as to why it's being

15   offered through somebody who hasn't seen it before.  I

16   object.  He has nothing to say about it.  He doesn't know

17   what it is.  He hasn't seen it before.  If later the defense

18   wants to put it in --

19           THE COURT:  The Court received the exhibit in

20   evidence.  At the time there was no objection.  If counsel

21   wants to ask the witness about his knowledge about that

22   exhibit, she can ask and you can object if there's a problem.

23           MR. LOVRIC:  I withdraw my objection.

24           THE COURT:  Okay.

25           MR. LOVRIC:  I'm sorry I was late on the

James Lyons - Cross

1  trigger.

2          THE COURT:  Well, sometimes all of us are that

3  way.

4  BY MISS PEEBLES:

5      Q    So Agent Lyons, you didn't see the bank record that

6  indicates a withdrawal of a total of $600 on November 1,

7  that's your testimony?

8      A    Yes, ma'am.  I don't recall seeing this document.

9      Q    Now, December 1 is the registration at the Best

10  Western that was obtained under Linda O'Connor's name,

11  correct?

12     A    Yes, ma'am.

13     Q    Did you review bank records for December 1 for

14  Linda O'Connor?

15     A    I personally did not.

16     Q    Did you speak to anybody that did review her

17  records?

18     A    I spoke to Kelly Molanare about bank records, yes,

19  ma'am.

20     Q    In December -- for December 1 specifically; that's

21  what I'm asking.

22     A    I spoke to her about a lot of dates.  I'm not sure.

23  I can't say specifically that date.

24     Q    Well, you know that Linda O'Connor collects Social

25  Security Disability, correct?

James Lyons - Cross

1        A     Yes, ma'am.

2        Q     And you know, based on your own knowledge and the

3    fact that you've been the lead investigator in this case,

4    that her deposits would go in the 1st of the month, is that

5    fair to say?

6        A     I haven't seen the banking records reflecting that,

7    but I would say it's fair to say.

8        Q     Well, her bank records would be an important part

9    of this investigation, would they not?

10       A     Absolutely, and Kelly Molanare did all the analysis

11   on those.

12       Q     You would not know this, you would not speak to

13   that individual, since you're the lead investigator, would

14   you?

15       A     I spoke to her.

16       Q     After Mrs. O'Connor departs from the Best Western

17   and returns home and she's home on December 3, it's

18   December 6 that you learn that Mr. Sacco starts making phone

19   calls to the Department of Social Services because Miss

20   O'Connor hadn't paid her rent, is that fair?

21       A     I don't remember the exact date, but I am aware he

22   started making calls, yes, ma'am.

23       Q     Were you aware that Linda O'Connor received a check

24   of over $3,000 in September for reimbursement for being a

25   victim of the flood?  Were you aware of that?

James Lyons - Cross

1      A     Yes, I was.

2      Q     Were you also aware that she received a check of a

3  total of $5,400 from FEMA as a result of being a flood

4  victim?  Were you aware of that?

5      A     Yes, ma'am.

6      Q     And were you aware that the flood money she

7  recovered -- $5,400 was the money she received on July 20 --

8  was in fact what she used to pay $1,800 to Mr. Sacco?  Did

9  you know that?

10     A     No.  I didn't know that.

11     Q     Now, you did have knowledge of phone records --

12     A     Yes.

13     Q     -- as part of this investigation?

14     A     Yes, I did.

15     Q     And were you aware that Shannon O'Connor had been

16  using her cellular phone to call Dean Sacco?  Did you know

17  that?

18     A     I know she did have a cellular phone and I do

19  believe there are calls on that phone to Dean Sacco, yes,

20  ma'am.

21     Q     And you were aware that Dean Sacco had actually

22  called DSS a second time and threatened to evict both Linda

23  and Shannon, is that fair to say?

24     A     Yes, ma'am.

25     Q     And then is it also fair to say that Linda O'Connor

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Cross

1  was applying for HUD assistance during that time period, is

2  that fair?

3      A    In December to January?

4      Q    Yes.

5      A    Yes.

6      Q    And as a result of what you found through your

7  investigation, she in fact received a check in the amount of

8  $2070 from Delaware Opportunities, is that fair to say?

9      A    In January of 2008?

10     Q    8, yes.

11     A    January of 2008, yes, ma'am.  2070.

12     Q    In fact, January, HUD began paying most -- a

13  substantial portion of Mrs. O'Connor's rent, is that fair to

14  say?

15     A    That's correct.

16     Q    Now, during Shannon's interview on December 5, she

17  talks about her mother having sexual contact with Mr. Sacco.

18  Do you remember her saying that?

19     A    Yes, I do.

20     Q    All right.  Now, you sat through the course of

21  yesterday's testimony and were here last week, and you read

22  through some journals and you saw some videotapes.  Do you

23  remember all those?

24     A    Yes.

25     Q    And you saw the types of women that Mr. Sacco or

James Lyons - Cross

1   females that Mr. Sacco would talk about, correct?

2       A    Spoke about many types of females.

3       Q    Well, slim females, attractive females, is that

4   fair?

5       A    Prostitutes in his diaries.

6       Q    Well, okay.  Can you answer my question?

7       A    Yeah, I believe he did; he spoke about many types

8   of women.

9       Q    He talked --

10      A    I'm sure.

11      Q    He talked about slim females, correct?

12      A    Sometimes.

13      Q    Young females?

14      A    Sometimes.

15      Q    Most of the time?

16      A    Depends on where you're reading in the diary.

17      Q    Was there anything that you read in the diary that

18  would cut against what I'm asking you right now, anything

19  that you read to this jury that would cut against what I'm

20  asking you right now?

21      A    I don't know what you're asking me right now.

22      Q    The types of women and females that Mr. Sacco was

23  describing in his videos, in his newspaper ads?

24      A    Yes.  He talked about prostitutes sometimes and

25  didn't describe them.

James Lyons - Cross

1    Q    Well, based on what you saw, based on what you saw
2    is what I'm asking you.
3    A    Based upon what I saw, Mr. Sacco talked about many
4    women and children and he provided sometimes description of
5    these women.  Sometimes slim, sometimes he didn't provide
6    descriptions.
7    Q    When he was advertising for models in the newspaper
8    add, didn't he specifically ask the women on the phone
9    whether they were slim or whoever he was speaking to on the
10   other end of the phone?
11   A    Yes, he did.
12   Q    In the first statement by Shannon O'Connor she
13   never said anything about video camera, fair to say?
14   A    That's correct.
15   Q    In the second statement that she gives in October,
16   October 29, she never says anything about a video camera in
17   that statement either, correct?
18   A    I don't believe she talked about a video camera.
19   That's correct.
20   Q    Now, December 5 she's interviewed again, correct?
21   A    Yes.
22   Q    And it's videotaped, and we saw that?
23   A    Yes, ma'am.
24   Q    And there was never mention about it being
25   videotaped in that statement that she gave either, is that

James Lyons - Cross

1    correct?

2         A    She talked about pictures, it was my recollection.

3         Q    Photographs, correct?

4         A    A photographic device, yes, she talked about.

5         Q    A camera, correct?

6         A    Yes.

7         Q    In fact, you were here when Agent Shultz testified,

8    and he specifically stated that Shannon O'Connor never

9    identified a video camera.  Do you remember that?

10        A    Yes.

11        Q    Now, is it fair to say that when Shannon O'Connor

12   became aware that her case was going to be a federal case and

13   her mother had been indicted that she was shocked?  Were you

14   aware of that?

15        A    I suppose.  I don't know how she reacted.  I wasn't

16   present when she was told.

17        Q    And then when she was told, the prosecutor threw a

18   pizza party for her here, is that correct?

19        A    No, it wasn't a pizza party.  What it was, we

20   had --

21             MR. LOVRIC:  Objection.

22        A    -- Miss O'Connor, Shannon O'Connor come to the

23   building so she could see the building and Mr. Lovric could

24   explain to her the types of questions she would be asked in

25   open courtroom about the conduct that she described her

James Lyons - Cross

1   mother did and Mr. Sacco did and the very specific questions

2   that he'd be asking her.

3       Q    Agent Lyons, didn't you testify earlier you had

4   pizza for her and nothing was asked about the case?  Isn't

5   that what you said?

6       A    Yes.  We didn't ask her details about the case.  We

7   sat her down, and it was for her to get comfortable with Mr.

8   Lovric and the process.

9       Q    And Miss Chesebro brought her here for that pizza

10  party?

11      A    Again, I'd say it wasn't a party at all.  She was

12  brought here to be told what was expected of her in this

13  process and to get comfortable with Mr. Lovric.

14      Q    Did you ever speak to Renee Lang about George

15  Lang's medical condition when you heard about the allegations

16  that Shannon made about George Lang?

17      A    I spoke to Renee Lang, yes, ma'am.

18      Q    Did you ever review any of his medical records?

19      A    No, I did not.

20      Q    And again, Shannon O'Connor, when she's talking

21  about George Lang, refers to her birthday again, is that fair

22  to say?

23      A    Could you repeat that, ma'am?

24      Q    When Shannon O'Connor's discussing what she's

25  claiming happened with George Lang, she again refers to her

James Lyons - Cross                        762

1    birthday, is that fair to say?

2         A    I believe so, yeah.

3         Q    So is it fair to say that every time Shannon is

4    talking about something that happened, it all happens right

5    around her birthday, is that fair?

6                   MR. LOVRIC:  Objection.

7         A    No, because when she --

8                   THE COURT:  Sustained.

9         Q    Agent Lyons, based on what you know about Mr.

10   Sacco, what are the chances he would have a sexual

11   relationship with Linda O'Connor?

12        A    I think Mr. Sacco would have a sexual relationship

13   with anybody.

14                  MR. FISCHER:  Objection.

15                  THE COURT:  Sustained.  Stricken.

16                  MISS PEEBLES:  Nothing further.  Thank you.

17                  THE COURT:  Mr. Lovric.  I think we'll take a

18   break, ladies and gentlemen.  You look tired.

19                  (Jury excused)

20                  (Jury present)

21                  THE COURT:  Okay.  Mr. Lovric.

22   REDIRECT EXAMINATION

23   BY MR. LOVRIC:

24        Q    Morning, Agent Lyons.

25        A    Good morning.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Redirect

1     Q    Agent Lyons, I just want to go over a few things

2  that were raised by Mr. Fischer and Miss Peebles.

3         Let's lay to rest this pizza party that Miss

4  Peebles brought up.  Was there some kind of a pizza party

5  that took place in this case or anything dealing with this

6  case?

7     A    No, sir.  What happened was, Miss Shannon O'Connor

8  was brought to the building by Elizabeth Chesebro.  She was

9  brought here so that she could sit down, get comfortable with

10  Mr. Lovric.  Mr. Lovric in the very first meeting could

11  explain to her the process that she would undergo, coming to

12  the federal building, coming into the courtroom and speaking

13  in front of complete strangers about some of the conduct that

14  she stated happened.  We wanted to describe and he did

15  describe some of the process to her.  And there was pizza.

16  It was over lunch.  Just to get her comfortable with the

17  process that she would be undergoing.

18     Q    So the United States government bought Shannon

19  pizza from Nirchi's for lunch?

20     A    I guess if you're the United States government,

21  then yes.

22     Q    Somebody paid for it from the US government, is

23  that right?

24     A    To my knowledge, yes.

25     Q    There weren't any party balloons or a big

James Lyons - Redirect

1   celebration or anything of that sort, were there?

2       A    No, sir.  It wasn't a very happy occasion.

3       Q    In fact, did Miss Shannon O'Connor during that

4   meeting and some of the other meetings appear very, very

5   scared and very concerned about --

6                MISS PEEBLES:  Objection.  Leading.

7   BY MR. LOVRIC:

8       Q    Why don't you describe for us how scared Shannon

9   O'Connor appeared when we interviewed her.

10               THE COURT:  Sustained.  You can answer that.

11  The first question I rule was leading, but he rephrased it.

12      A    She was very nervous.  She was fearful.  Very

13  anxious, a lot of anxiety about what would be happening in

14  the process, and it was -- she was emotional and it was

15  difficult for her to speak at times.  Not even the fact we

16  didn't talk to her that first meeting, Mr. Lovric didn't ask

17  her a single question about anything that happened, but just

18  knowing that she would have to speak about it, she was very

19  upset.

20      Q    She wasn't yelling for joy or clapping --

21               MISS PEEBLES:  Objection.

22      Q    -- and happiness?

23               THE COURT:  Sustained.

24      Q    So this pizza party that Miss Peebles described,

25  was it really a party?

James Lyons - Redirect

1    A    Absolutely not.

2    Q    Now, you were asked by Miss Peebles at some point

3  about the HUD portion of rent for Miss O'Connor.

4  Approximately when was it that she first began to get any

5  kind of HUD assistance for rent?

6    A    I don't know the specific date, but it was in

7  January, January of 2007.  Late January, I believe, 2007.

8    Q    Okay.  And then prior to that, who was responsible

9  for paying all of the rent at 45 Fair Street?

10    A    Mrs. O'Connor.

11    Q    And Miss Peebles asked you quite a few questions

12  about whether you were aware of Linda O'Connor's financial

13  status and monies that she received, and if you recall, she

14  showed you some bank records.  Do you remember those

15  questions that you were asked by counsel?

16    A    Yes, I do.

17    Q    And my question to you is, Agent Lyons:  In

18  everything that you've reviewed with respect to Miss

19  O'Connor's financial situation, the records and everything

20  else that you looked at about her, did you come to some

21  conclusion as to her ability to keep or maintain money or

22  have money for paying of things that needed to be paid on a

23  monthly basis?

24            MISS PEEBLES:  Objection.

25            THE COURT:  Sustained.

James Lyons - Redirect

1    Q    Did you look at her bank records?

2    A    I did not personally analyze her bank records.  I

3  saw some records.  All of the bank records were sent to Kelly

4  Molanare, who is the financial analyst in this case, as were

5  the phone records.  It was Rich Berry who did the analysis.

6  I saw some but did not analyze them.

7    Q    Did Kelly Molanare, in the course of looking

8  through these materials, advise you as to Miss O'Connor's

9  financial situation or stability?

10   A    Yes, sir.

11   Q    And what was it that you found in her financial

12  paperwork?

13            MISS PEEBLES:  Objection.

14            THE COURT:  Sustained.

15            MR. LOVRIC:  Judge, it's directly asked by

16  counsel.  She asked the agent, and I'm going into an area --

17  she asked it.

18            THE COURT:  I heard the question, Mr. Lovric.

19  I sustained the objection.

20   Q    In your investigation, Agent Lyons, did you find

21  whether or not Miss O'Connor had cash on hand?

22            MISS PEEBLES:  Objection.

23            THE COURT:  That's a different question.

24            MISS PEEBLES:  No foundation.

25            THE COURT:  No, I'll overrule that.  Does he

James Lyons - Redirect                              767

1  know whether or not she had cash on hand; yes, no, maybe.

2      A    I really can't answer that question because Kelly

3  Molanare would be the one to answer that.  I'm aware of some

4  things, but I really can't answer it with any degree of

5  certainty.

6      Q    Miss Peebles asked you about the Lang computer.  Do

7  you remember those questions?

8      A    Yes, sir.

9      Q    She went into some detail about what was not found

10 on the Lang computer?

11     A    Yes.

12     Q    Are you aware of a forensic analysis done on the

13 Lang computer?

14     A    Yes, I am.

15     Q    Are you aware of whether or not the forensic

16 analysis revealed that things were there and had been

17 deleted?

18     A    I'm aware that, yes, images were on the computer.

19 The images that were recovered, there were some that were

20 pornographic pictures and that other analysis revealed that

21 images, digital images had been on that computer.

22     Q    But had been deleted before police authorities got

23 the computer?

24     A    I don't recall that specifically.  I did speak to

25 the examiner, but I can't say for certain.

James Lyons - Redirect

1      Q     At some point Mr. Fischer asked you about -- spoke

2   to you about DNA of Mr. Sacco.  Do you recall that --

3      A     Yes, I do.

4      Q     -- line of questions?  Are you aware that Mr. Sacco

5   was asked to provide a DNA sample?

6      A     Yes, I am.

7      Q     How did you become aware of that?

8      A     I learned that you had sent him a letter, asked if

9   he would be willing to volunteer his DNA, and if he failed to

10   reply, it would be interpreted that he did not.  He refused.

11      Q     And did Mr. Sacco ever provide a DNA sample?

12      A     He did not.

13            MR. LOVRIC:  Your Honor, I've marked as

14   Government's Exhibit Number 103, which is a

15   self-authenticating document filed with this Court dated

16   April 17, 2008 from the US Attorney's Office to the

17   defendant, Mr. Sacco, through his lawyer.  I would offer

18   Exhibit Number 103 into evidence.

19            MR. FISCHER:  I have an objection to it.

20            THE COURT:  Do you want to place it on the

21   record?

22            MR. FISCHER:  Please.

23            (At the Bench)

24            THE COURT:  Yes, sir.

25            MR. FISCHER:  The witness has spoken about the

James Lyons - Redirect

1    letter, Judge.  My understanding of his direct -- I'm

2    sorry -- his cross-examination was he has not seen the

3    letter, did not know its contents.  Discussed it with Mr.

4    Lovric but never saw the letter.  Only information that this

5    witness has was based upon information from Mr. Lovric.  Mr.

6    Lovric wants to testify, we can talk to him about this

7    letter.  But based on what this witness has said, this is

8    bootstrapping in the worst degree and is just -- can't be

9    used for the purpose it's being offered for.

10                  THE COURT:  Okay.  Well, I'm not sure I agree

11   with everything you said, but I do agree that this letter is

12   inadmissible and I'll sustain the objection.  It's hearsay.

13   It's a product of the attorney that's trying the case for the

14   government.  There may be ethical concerns about this.  So

15   it's not coming in.

16                  MR. LOVRIC:  All right.

17                  (In Open Court)

18       Q    Agent Lyons, on cross you indicated to Mr. Fischer

19   that -- what was the result of the DNA request made to Mr.

20   Sacco?

21       A    There was no reply.

22       Q    Now you were asked on cross about the men in that

23   exhibit, Exhibit 69, I believe, the men with Mr. Sacco in the

24   videotape where he was describing why he bought that video

25   camera.  Did you have any knowledge or any idea who those men

James Lyons - Redirect

1    are or were?

2        A    No, sir.

3        Q    So Mr. Fischer asked you if you took any steps to

4    find them.  Did you have any idea where to look or who those

5    persons might be?

6        A    Not that I recall from the video.

7        Q    And then Mr. Fischer asked you some questions about

8    the storage unit that the FBI in New Jersey went to.  Do you

9    recall that line of questions?

10       A    Yes, sir.

11       Q    I take it that that storage unit, like any other

12   storage unit, it all depends on the name of the person in

13   order to be able to find the specific unit, of whether or not

14   there is one?

15       A    Yes, sir.

16       Q    And you indicated that a photograph was shown of

17   Mr. Sacco?

18       A    Yes.

19       Q    And what again was the result of that photograph

20   being shown?

21       A    An employee identified Mr. Sacco as having been to

22   that storage place, but they were unable to provide any

23   records that Mr. Sacco had a storage unit at that location.

24       Q    Okay.  So if I understand your testimony correctly,

25   the employee recognized the photograph of Mr. Sacco having

James Lyons - Redirect                              771

1   come to that storage center, but when they looked under his

2   name, they could not find it under his name?

3       A    That's correct.

4       Q    Okay.

5            MR. LOVRIC:  That's all the questions I have,

6   Judge.

7            THE COURT:  Okay.  Mr. Fischer.

8            MR. FISCHER:  Thank you, your Honor.

9   RECROSS-EXAMINATION

10  BY MR. FISCHER:

11      Q    Mr. Lyons, a storage unit in New Jersey would be an

12  important thing for you to investigate if you could, am I

13  correct?

14      A    If I had enough information to lead me to a

15  specific location, yes, sir.

16      Q    Because if there were pictures of Shannon O'Connor

17  engaged in illegal sexual activities, that would be pretty

18  important to this case, right?

19      A    Yes.

20      Q    In fact, if you found those in a locker in New

21  Jersey that you could trace to Mr. Sacco, that would be

22  pretty much the end of this ballgame, wouldn't it?

23      A    Be it for Mr. Sacco.

24      Q    It would go a long way toward resolving this

25  matter, wouldn't it?

James Lyons - Recross

772

1    A    I believe it would, yes.

2    Q    Do you believe it would be important?

3    A    Important to what, find those?

4    Q    Would it be important for you in this case to find

5    it if it was there?

6    A    Yes.

7    Q    Very important?

8    A    Yes, sir.

9    Q    You have the wherewithal to go back to Mr. Sacco's

10   financial records, am I correct?

11   A    Yes.  Miss Molanare did that.

12   Q    How would you go about doing that?

13   A    The actual satchel or folder that Mr. Sorvino

14   provided me when I was in New Jersey had many documents in

15   there of Mr. Sacco, which had some banking information on

16   there.  Some account information and subpoenas were sent out

17   to those financial institutions to obtain his records.

18   Q    Did you or anybody else at the FBI go through those

19   records to figure out whether there was payments to a storage

20   place in New Jersey?

21   A    Yes, I believe they did.

22   Q    What did they find?

23   A    We didn't find any.

24   Q    Did you find some bank records though that showed

25   there were payments with respect to the storage unit number

James Lyons - Recross

773

1    129 in Norwich?

2         A    Yes, sir.

3         Q    Did you speak with Mr. Lovric over the break we

4    just took?

5         A    Yes, I did.

6         Q    Do I understand your testimony correctly that you

7    did not review every document that the government has

8    obtained concerning this case?

9         A    Yes, sir.  It's impossible to do that as one

10   person.

11        Q    How big a pile of documents are we talking about?

12        A    I believe I heard you describe them as that big or

13   so (indicating).

14        Q    Darn right, and I've gone through them.  Have you?

15        A    I haven't gone through every one.  I have other

16   people assisting.

17             MR. FISCHER:  Thank you.

18        A    Sure.

19             THE COURT:  Miss Peebles.

20   RECROSS-EXAMINATION

21   BY MISS PEEBLES:

22        Q    Agent Lyons, I want to ask some questions about the

23   Lang computer and what was found on the Lang computer, okay?

24        A    Yes, ma'am.

25        Q    Now there were a lot of things that were found on

page

James Lyons - Recross

1    that hard drive, correct?

2         A    There were things.  I wouldn't say a lot of things,

3    but there were things.

4         Q    There were e-mails?

5         A    Some.

6         Q    Did you review all of the e-mails?

7         A    I reviewed some of the e-mails, yes, ma'am.

8         Q    Molanare.  Agent, I'm going to hand you what's been

9    marked as Defendant's O-12 and ask if you saw that document

10   before?

11        A    Yes, I have.

12        Q    Can you identify it?

13        A    It's a photograph of George and Renee Lang.

14             MISS PEEBLES:  At this point I'd like to offer

15   Defendant's Exhibit O-12.

16             MR. LOVRIC:  Objection.

17             MR. FISCHER:  No objection.

18             THE COURT:  Basis.

19             MR. LOVRIC:  He didn't do the forensic

20   analysis of the Lang computer.  I have no objection when the

21   forensic person is on the stand to talk about how he

22   recovered that.  But this agent just said he hasn't done the

23   forensic work.

24             THE COURT:  I didn't hear any question about

25   how that picture was recovered.  I just heard the attorney

James Lyons - Recross

1    offer a picture into evidence.

2                    MR. LOVRIC:  I object to foundation.  This

3    person doesn't -- this agent didn't do the forensic analysis

4    on the computer, Judge.  A forensic expert who's going to

5    testify --

6                    THE COURT:  I know that.  What do you say

7    about that?

8                    MISS PEEBLES:  Well, your Honor, he was the

9    lead investigator.  I'm quite sure he reviewed all of the

10   contents that were retrieved from the hard drive.  Therefore,

11   he has firsthand knowledge.  While he may not have printed

12   this out, he was certainly involved in reviewing these

13   documents as part of his investigation, and he was able to

14   identify it as one that he had seen.  So based on that, your

15   Honor, I would offer it.  I'm not going to ask him how it was

16   retrieved from the hard drive, but it's a simple follow-up on

17   some of the questions Mr. Lovric had asked.

18                    THE COURT:  Maybe you can ask him a

19   foundational question as to where he did get this particular

20   document.

21                    MISS PEEBLES:  Yes.

22   BY MISS PEEBLES:

23       Q    Mr. Lyons, do you recall where you saw, first saw

24   this document?

25       A    I believe it was in the report of the forensic

James Lyons - Recross

1  examination of the Lang computer.

2      Q    And who was the forensic examiner?

3      A    James Thompson.

4      Q    He was working on behalf of you and your agency?

5      A    Yeah.  State Police actually provided the Lang

6  computer to his unit.

7              MISS PEEBLES:  At this point, your Honor, I'd

8  like to offer this exhibit.

9              THE COURT:  Okay.  We'll receive Defendant's

10  O-12 in evidence.

11      Q    And that was -- this O-12 is a photograph of Renee

12  Lang and her husband George Lang, correct?

13      A    Yes, ma'am.

14      Q    Now, Mr. Lovric was asking you questions about

15  photographs that were obtained off of the Lang computer, and

16  you indicated that there were some digital pictures that were

17  actually talked about when he was asking you some questions.

18  Is that fair to say?

19      A    Yes, ma'am.

20      Q    All right.  Now, this is a JPEG picture, correct?

21      A    Yes.

22      Q    Now that does not require the user to hook up a

23  digital camera to the hard drive in order to get it onto the

24  computer, is that fair to say?

25      A    Not always, that's correct.

James Lyons - Recross

1    Q    Now, when you are retrieving information -- Well,

2  strike that.

3         In order to get a digital camera hooked up to a

4  computer, you need a USB port, correct?

5    A    I believe so.  But if there's technology that I'm

6  unaware of, I'm not a forensic examiner -- but that's my

7  understanding.

8    Q    And that would be important for you to know if it

9  were regarding the use of a digital camera, correct?

10   A    Regarding to know what?  I'm not sure what you're

11  asking me.

12   Q    To know whether or not a digital camera was ever

13  hooked up to a hard drive, whether there was a USB port,

14  correct?

15   A    Yes, that would be a logical question.

16   Q    There was no USB port that was hooked up to this

17  particular hard drive, is that fair to say?

18   A    I've never seen the actual system.

19   Q    But you spoke to the computer forensic analysis

20  individual in this case, correct?

21   A    Yes, ma'am.

22   Q    Did you review some e-mails that were retrieved off

23  of the hard drive?

24   A    Yes, I did.

25   Q    Those e-mails were between the Langs and Mrs.

James Lyons - Recross                    778

1   O'Connor, is that fair to say?

2        A    Yes, ma'am.

3        Q    And those e-mails -- well, I'm going to hand you

4   what's been marked as Defendant's Exhibit O-13 and ask if you

5   can identify this document.

6        A    Yes, ma'am.

7        Q    This is a document that was recovered from the

8   computer.  Lang computer.  Was this also provided to you by

9   your forensic analysis individual?

10       A    Yes, it was.

11            MISS PEEBLES:  Your Honor, again, I'd like to

12   offer Defendant's Exhibit O-13 into evidence.

13            MR. LOVRIC:  No objection.

14            MR. FISCHER:  No objection.

15            THE COURT:  Receive Defendant's O-13 in

16   evidence.

17       Q    Now looking at Defendant's Exhibit O-13, in the

18   contents of that e-mail, it's from Linda O'Connor to the

19   Langs, correct?

20       A    Yes.

21       Q    And could you read Exhibit O-13, please.

22       A    From Linda O'Connor, Linda2u2@hotmail.com to

23   Onemarsh@worldnet.att.net.  Saturday, April 15, 2006, 5:57

24   PM.  Subject:  Read this dad please.  "I'm sorry I have been

25   so distant with you and mom.  I am still in shock and I'm

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Recross

779

1  having a very hard time with this, but I know we need to see

2  each other as well.  I'm sure you are very weak as well as

3  sick.  I don't want you to go through this alone.  Do you

4  forgive me?  I hope you do.  I love both of you.  Linda."

5      Q    Did you, after getting this e-mail, speak to Renee

6  Lang about this?

7      A    I don't know if it was before or after when I

8  interviewed Mrs. Lang.

9      Q    But you became aware at some point during your

10 investigation that the Langs had a falling-out with Mrs.

11 O'Connor, is that fair to say?

12     A    Yes.

13     Q    Agent, I'm also going to hand you what's been

14 marked as Defendant's Exhibit O-14 and ask if you can

15 identify that document.

16     A    Yes.  This is also an e-mail that was retrieved

17 from the Lang computer.

18     Q    And that was also provided to you by your forensic

19 analysis individual?

20     A    Yes, it was.

21     Q    Is that Mr. Thompson, Agent Thompson?

22     A    Yes.

23          MISS PEEBLES:  Again, at this point I'd like

24 to offer Defendant's Exhibit O-14.

25          MR. LOVRIC:  No objection.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Recross

780

1          MR. FISCHER:  No objection.

2          THE COURT:  Receive Defendant's O-14 in

3     evidence.

4      Q     Agent Lyons, I would ask if you could read

5     Defendant's O-14 into evidence.

6      A     From Linda O'Connor, Linda2u2@hotmail.com to

7     Onemarsh@att.net, sent Monday, April 17, 2006, 1:40 PM.

8     Subject:  Re:  For Shannon.  "I will tell her that you said

9     you didn't know she was sick.  She went to the hospital, her

10    breathing was 82 percent oxygen, IVs and oxygen.  I did not

11    call you because I knew you had enough to deal with.  I am

12    praying for you very much.  I miss you, but Shannon and I

13    cannot take the stress.  She was in the hospital for two

14    nights, three days.  We left at 11:00 PM on last Monday and

15    got home Wednesday at 2 PM.  I will censor all mail that

16    comes in here.  She cannot take any more stress.  I am sorry,

17    but for me to live, it has to be this way."

18          From Onemarsh@att.net to Linda2u2@hotmail.com

19    (Linda O'Connor).  Subject:  For Shannon.  Date, Monday, 17

20    April 2006.  18:32:32 + 0000.  "Shannon, I am sorry you are

21    sick.  I did not know.  I hope you feel better now.

22    Remember, we will always love you.  Love, Grandpa and

23    Grandma."

24     Q     Now, again Agent Lyons, it appears that there's

25    somewhat of a strain in the relationship between the

James Lyons - Recross

781

1   O'Connors and the Langs, is that fair to say?

2        A    I think in around July 2006, June, July, that's

3   when the relationship was strained.  Yes, ma'am.

4        Q    Well, these e-mails were in April of 2006, is that

5   fair?

6        A    Yes, ma'am.

7        Q    Now, Mr. Lang at that point was very sick, is that

8   fair to say?

9        A    Yes.

10       Q    And he died in July of 2006?

11       A    Yes.  He did.

12       Q    And you were aware that Mrs. O'Connor was not

13  permitted to go to the funeral, is that fair to say?

14       A    I don't know whether she wasn't permitted or she

15  just wasn't informed.

16       Q    And the other e-mails that were found were in sum

17  and substance very similar to what you just read, is that

18  fair to say?

19       A    I don't remember.  I'd have to see them.

20            MISS PEEBLES:  No further questions.  Thank

21  you.

22            THE COURT:  Mr. Lovric.

23            MR. LOVRIC:  I just have three questions,

24  Judge.

25

James Lyons - Redirect

1   REDIRECT EXAMINATION

2   BY MR. LOVRIC:

3       Q    Agent Lyons, the question Mr. Fischer asked you

4   about how important it would be to check New Jersey storage

5   sites to find this storage unit, if Mr. Sacco had one, do you

6   remember those questions?

7       A    Yes, I do.

8       Q    The storage unit in Norwich was under whose name?

9       A    Clesson Lockwood.

10      Q    And before Clesson Lockwood was interviewed, had

11  you ever seen or heard of his name in any of those thousands

12  of documents that you looked at?

13      A    Not that I recall.

14      Q    So looking at all those documents and reviewing all

15  those records, including bank records, did that in any way

16  help you to find Clesson Lockwood?

17      A    No, sir.

18      Q    Mr. Fischer asked you about -- You did find checks

19  for the Norwich storage unit being paid, is that correct?

20      A    Yes, I did.

21      Q    But in whose bank account were those checks found?

22      A    Mr. Sacco's mother, Elizabeth Dinunzio.

23      Q    Doesn't even have the same last name as him?

24      A    That's correct.

25      Q    It wasn't in his bank account that you found any

James Lyons - Redirect                              783

1    information leading you to the Norwich storage center?

2         A    That's correct.

3         Q    And is it fair to say you have no idea what other

4    persons he may have known or had him help him out to get

5    storage units?

6         A    Other fam -- I knew of names of other family, but

7    other than that, no.

8         Q    My final question is:  Miss Peebles just had you go

9    over a couple of e-mails between George Lang and Linda

10   O'Connor.

11        A    Yes, sir.

12        Q    Those e-mails that you looked at and you read,

13   those e-mails all occurred prior to Shannon disclosing any

14   sexual abuse by George or Linda O'Connor or Mr. Sacco?

15        A    That's correct.

16             MR. LOVRIC:  That's all I have.

17             THE COURT:  Anything, Mr. Fischer?

18             MR. FISCHER:  Yes, your Honor, just briefly,

19   if I may.

20   RECROSS-EXAMINATION

21   BY MR. FISCHER:

22        Q    You have records where Mr. Sacco specifically asked

23   for transfers of funds to pay for the unit 129, am I correct?

24        A    Yes, sir.

25        Q    And those were retrieved from the jail, weren't

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Recross                    784

1    they?

2         A    Yes, they were.

3         Q    So you do have direct evidence, I mean, you were

4    able to find direct evidence that Mr. Sacco was saying

5    transfer funds from point A over to pay for this storage

6    unit, am I correct?

7         A    For that storage unit in Norwich, yes.

8         Q    It's not your testimony that you could not have,

9    with all the power of the government, ever found this

10   information if it existed about Mr. Sacco paying for a

11   storage unit prior to August of 2006; you're not saying that,

12   are you?

13        A    I'm saying I have to have some information that

14   leads me to a location.  The storage unit we found in

15   Elizabeth, we learned it from his diary.

16        Q    Did you find anything from Mr. Sacco's mother, the

17   mother's account, indicating that she paid for this storage

18   unit in New Jersey?

19        A    No, sir.

20        Q    Did you find anything in her banking records at all

21   indicating that she ever paid for any storage unit other than

22   this storage unit when Mr. Sacco was in jail?

23        A    Not to my knowledge.

24             MR. FISCHER:  All right.  Thank you.

25             THE COURT:  Miss Peebles?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Lyons - Recross

1          MISS PEEBLES:  I have no further questions.
2  Thank you.
3          THE COURT:  Mr. Lovric?
4          MR. LOVRIC:  I have no other questions, your
5  Honor.
6          THE COURT:  Thank you, Special Agent Lyons.
7  You may step down, sir.
8          (Witness excused)
9          MR. LOVRIC:  Judge, the next witness is Judith
10  Wingate-Wade.
11          THE COURT:  All right.
12          THE CLERK:  Ma'am, please come forward and
13  state your name for the record.
14          THE WITNESS:  Judith Wingate-Wade.
15
16
17
18
19
20
21
22
23
24
25

Judith Wingate-Wade - Direct                    786

1    J U D I T H     W I N G A T E - W A D E, having been called

2    as a witness, being duly sworn, testified as follows:

3                    THE COURT:  Okay.  Mr. Lovric.

4    DIRECT EXAMINATION

5    BY MR. LOVRIC:

6         Q    Is it okay if I call you Miss Wade?

7         A    Sure.

8         Q    You'll have to speak into the microphone so

9    everybody can hear you, okay?

10        A    Yes.

11        Q    Can you just indicate for the jury again your full

12   name and tell us where you work, what kind of agency you work

13   for.

14        A    My name is Judith Wingate-Wade and I work for the

15   City of Norwich Housing Authority.

16        Q    And what is your position at the Norwich Housing

17   Authority?

18        A    I'm the executive director.

19        Q    Miss Wade, briefly, can you just tell us, what is

20   the Norwich Housing Authority and what kind of services do

21   you provide?

22        A    We're the municipal housing authority for Norwich,

23   New York.  We have two public housing projects, and we also

24   provide rental assistance through the federally funded

25   Housing Choice Voucher Program.

Judith Wingate-Wade - Direct

1    Q    Is the program that you provide housing through,

2    the federal program, is that sometimes referred, commonly

3    referred to as HUD or the HUD funding?

4    A    Yes.  Quite a few of the -- a common name for it is

5    the HUD program.

6    Q    Now, Miss Wade, in preparing to come here to

7    testify, were you requested to look at a file involving a

8    person by the name of Linda O'Connor?

9    A    Yes.

10    Q    And was Linda O'Connor a person that had at some

11    point received financial assistance from the Norwich Housing

12    Authority?

13    A    Yes.

14    Q    And what I'd like to do is just briefly talk about

15    Linda O'Connor's assistance from Norwich Housing Authority

16    and through this HUD program that your agency administers.

17        Okay.  Approximately when was it first that Norwich

18    Housing was reviewing an application for Linda O'Connor to

19    receive any type of housing assistance?

20    A    In late December 2006 and early January '07.

21    Q    Okay.  And that's when the application process was

22    proceeding through your agency?

23    A    Yes.

24    Q    And the application for housing assistance for

25    Linda O'Connor, was that for what premises or what apartment?

Judith Wingate-Wade - Direct                    788

1     A     At the time that she came to our agency, I believe
2  she was residing on 45 Fair Street in Norwich.
3     Q     Okay.  And was she applying for housing assistance
4  for that premises, for living at that premises?
5     A     The program is a choice program, so when you apply,
6  you can have your choice of housing, but at that time I
7  believe she was requesting that we assist her at that
8  address.
9     Q     Okay.  And prior to December of 2006, was Linda
10  O'Connor receiving any type of housing assistance from your
11  agency?
12     A     No.
13     Q     So prior to December -- Well, excuse me.  Let me
14  withdraw that.  When -- when was it, if at all, that your
15  agency approved any type of housing assistance to Linda
16  O'Connor, approximately when?
17     A     January 2007.
18     Q     And then when was it approximately that your agency
19  began to provide financial assistance to her in terms of
20  paying her housing?
21     A     We began housing assistance payments on January 18,
22  2007.
23     Q     Prior to January 18, 2007, did the Norwich Housing
24  Authority provide any financial housing assistance to Linda
25  O'Connor?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Judith Wingate-Wade - Direct                    789

1     A     No.

2     Q     So whatever financial or whatever rental

3  obligations she had, your agency was not involved in helping

4  her with the rent?

5     A     That's correct.

6     Q     And when your agency did approve the housing

7  assistance for her, you indicated that was January 18 of '07?

8     A     Yes.

9     Q     And then did your agency commence to assist and pay

10  for some of her rental obligations?

11     A     Yes.

12     Q     How much per month did your agency contribute to

13  Linda O'Connor's rental obligations?

14     A     $366 a month.  I'm going to check my file, if I

15  may.

16     Q     Okay.

17     A     Yes.  $366 a month was the Housing Authority

18  portion of the rental payment.

19     Q     Okay.  And whatever remainder was owed for monthly

20  rent, who was responsible for that?

21     A     That would be the tenant, Linda O'Connor.

22     Q     And when you -- Excuse me.  When your agency

23  commenced to provide this assistance in January of '07, that

24  first month, January '07, did your agency pay for any part of

25  the rent for that month?

Judith Wingate-Wade - Direct                                    790

1    A    Yes.  We would have -- we made a prorated payment

2    starting on the 18th of January through the end of January.

3    Q    Okay.  So is it fair to say it would have been less

4    than 366 that was paid for that first month?

5    A    Yes.  We would have prorated it on a daily basis.

6    Q    Okay.  Is it fair to say, January 18 being

7    somewhere around the middle of the month, that payment would

8    have been approximately about half of 366?

9    A    Yes.

10   Q    Whatever that number is.  Now, who was the landlord

11   at the time that your agency was making partial payments for

12   the rent?

13   A    Mr. Dean Sacco.

14   Q    Okay.  And when -- when your agency commenced to

15   contribute to the total rent, where were the rent payments

16   initially sent to?

17   A    They were sent to Mr. Sacco at a Jersey City, New

18   Jersey address.

19   Q    Okay.  And the portion that the Norwich Housing

20   Authority paid, starting January 18 of 2007 and then

21   continuing forward, was that portion always sent directly to

22   the landlord, Mr. Sacco?

23   A    Yes.

24   Q    So, the portion that Norwich Housing was

25   contributing, you didn't hand that money over to Linda

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Judith Wingate-Wade - Direct

1    O'Connor to send to Mr. Sacco?

2        A    No.

3        Q    That was sent directly to him?

4        A    Yes.

5        Q    And then whatever additional rent was owed on the

6    monthly rent, then that was Linda O'Connor's obligation to

7    pay that directly to the landlord?

8        A    Yes.

9        Q    Just -- if I can be clear.  Prior to that first

10   check in January, after January 18 of '07, that prorated

11   amount -- By the way, do you know what the prorated amount

12   is, just so we can indicate it?

13       A    I'm going to check the file.

14       Q    Okay.

15       A    $165.34.

16       Q    That was sent sometime after January 18, 2007?

17       A    Yes.

18       Q    It was sent to Mr. Sacco directly?

19       A    Yes.  $165.34.

20       Q    Were -- prior to that were there any monies sent by

21   Norwich Housing Authority to Dean Sacco prior to that?

22       A    No.

23       Q    Until approximately when did Norwich Housing

24   Authority continue to contribute to the monthly housing for

25   Linda O'Connor; until what point in time?

Judith Wingate-Wade - Direct

1    A    Until November 30 of '07.

2    Q    And then as of sometime after November 30 of '07,

3  did the Housing Authority then learn that Miss O'Connor moved

4  to another location?

5    A    Yes.  We assisted her at 14 Miller Street in

6  Norwich.

7    Q    Okay.  And did she continue to receive Housing

8  Authority assistance at that new location sometime after

9  November of '07?

10    A    Yes.

11    Q    Now at some point you indicated the Norwich Housing

12  Authority was initially sending these monies monthly to Mr.

13  Sacco in New Jersey, is that correct?

14    A    Yes.

15    Q    And then at some point did your authority commence

16  to send them to a different location for Mr. Sacco's rent for

17  45 Fair Street?

18    A    Yes.  We sent them to the Chenango County

19  Correctional Facility.

20    Q    And do you know about approximately when that

21  started, that you started sending them to the correctional

22  facility?

23    A    In May of '07.  Excuse me.  Yes.  May of '08 -- no,

24  I'm sorry.  May of '07.

25    Q    Okay.  As of May of '07 then, you began to send

Judith Wingate-Wade - Direct                    793

1    them to a correctional institution to Mr. Sacco?

2         A    Yes.

3         Q    And did that continue until about November of 2007?

4         A    Yes.

5              MR. LOVRIC:  That's all the questions I have,

6    Judge.

7              THE COURT:  Mr. Fischer.

8              MR. FISCHER:  Your Honor, I'm going to ask for

9    an opportunity to review the file that she brought with her.

10   I don't know if you want to break now.

11             THE COURT:  How much of a file is there?  That

12   looks pretty thick.

13             MR. LOVRIC:  Judge, I can make it simpler.

14   It's exactly the file I copied for everybody.  I obtained it

15   and I copied it for everybody so, I don't know.

16             THE COURT:  Take a quick look, Mr. Fischer.

17   Do it now.  If you need more time, let me know and we'll take

18   it.

19             MR. FISCHER:  Thank you.  May I?

20             THE WITNESS:  Sure.

21             MR. FISCHER:  Your Honor, I'm all set.  I'm

22   going to mark it as an exhibit before I go forward.

23             THE COURT:  Good.

24

25

Judith Wingate-Wade - Cross

1   CROSS-EXAMINATION

2   BY MR. FISCHER:

3       Q    Ma'am, I marked your file that you just handed me

4   as Exhibit S-10.

5       A    Yes.

6       Q    That's the file that you brought with you?

7       A    Yes, it is.

8       Q    As I open it up, I find a small 3½ by 5 piece of

9   paper.  Do you see that piece?

10      A    Yes, I do.

11      Q    Was that provided to Mr. Lovric some time ago?

12      A    No.

13      Q    That's a recent creation, am I correct?

14      A    That's a note, that page of notes that I took when

15  I had a telephone conversation with Mr. Lovric.

16      Q    You didn't send this over to Mr. Lovric to send to

17  me, did you?

18      A    I don't believe that was the -- in the file when we

19  copied it, no.

20      Q    Okay.  But everything else in the file, did you

21  send to Mr. Lovric to send over to me?

22      A    Yes.  With the exception of the subpoena notices

23  which are in the file.

24      Q    And these notes on the sheet that you did not send

25  over are based upon your conversations with Mr. Lovric, am I

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Judith Wingate-Wade - Cross                    795

 1   correct?

 2        A    Yes.  One telephone conversation with him.

 3              MR. FISCHER:  Those are all the questions I

 4   have.  Thank you, Judge.

 5              THE COURT:  Mrs. Peebles.

 6   CROSS-EXAMINATION

 7   BY MISS PEEBLES:

 8        Q    Good morning, Miss Wade.

 9        A    Good morning.

10        Q    In connection with Linda's application for

11   assistance, there was a new lease that was prepared, is that

12   correct?

13        A    When the apartment was approved, yes.

14        Q    You have to go through an approval process before

15   they'll agree upon an amount for rent, is that fair to say?

16        A    Yes.

17        Q    I'm going to hand you what's been marked as

18   Defendant's O-15 and ask if you can identify this document.

19        A    This appears to be page 1 of a copy of a lease

20   between Linda O'Connor and Dean Sacco and -- but the other --

21   the second page is the last page of an application that Linda

22   O'Connor submitted to our office.

23        Q    Do you have a full copy of the lease in your file

24   with you?

25        A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Judith Wingate-Wade - Cross

1    Q    Can I take a look at that, please?

2    A    Yes.

3    Q    Can you detach it from your documents.  I

4  apologize.  I just want to make sure.

5         Is this -- would this be the entire --

6              MISS PEEBLES:  I'm going to mark this --

7  excuse me -- as Defendant's Exhibit O-16.

8    Q    Can you identify this document?

9    A    This was a lease that was prepared by our office

10  and executed by Miss O'Connor and Mr. Sacco, and it was

11  effective January 18 of '07.

12             MISS PEEBLES:  Your Honor, I'd like to offer

13  this into evidence at this time.

14             MR. LOVRIC:  No objection.

15             MR. FISCHER:  Can I see it, please?

16             No objection.

17             THE COURT:  Receive Defendant O-16 in

18  evidence.

19  BY MISS PEEBLES:

20    Q    Now, the amount of the rent that was decided upon

21  in the lease that now has been entered into evidence as

22  Defendant's O-16 was reduced from the original 600 to 479, is

23  that correct?

24    A    If the original rent was 600, we would not have

25  approved that amount.  Apparently it was over our rent limits

Judith Wingate-Wade - Cross

1   for our program.

2       Q    So in order to accept Norwich Housing Authority

3   assistance, the rent was required to be reduced to $479, is

4   that correct?

5       A    That's correct.

6       Q    And Mrs. O'Connor's portion of the rent would have

7   been $113 after that, is that correct?

8       A    Yes.

9       Q    Now, her housing assistance through Norwich Housing

10  Authority was essentially just absorbed as a result of her

11  assistance that she had received when she was in Deposit or

12  Delaware County, is that true?

13      A    That's correct.  She was a ported voucher, in other

14  words, she could carry her assistance from Delaware County to

15  Chenango County and from Chenango County to Chenango to our

16  agency, because we cover the city, and we did absorb her into

17  our program as a full voucher.

18      Q    Now, there were some letters that have been

19  generated by Mr. Sacco in connection with the property of 45

20  Norwich.  Are you aware of that?

21      A    In spring of '07, yes.  To our agency.

22      Q    Yes?

23      A    Yes.

24      Q    Okay.  Were they specifically addressed to a woman

25  by the name of Lisa Robinson?

798

1      A    Yes.

2      Q    And in those letters is it fair to say that he was

3   very concerned about losing the property, is that fair to

4   say?

5      A    Yes.  I believe one of the letters was actually

6   addressed to me.

7      Q    And in those letters he was asking you for

8   assistance to help him in order to coordinate getting the

9   mortgage paid, is that fair to say?

10     A    That's correct.

11     Q    Now, there was a point in time where Mrs. O'Connor

12  was in the county jail for a 90-day period during the time

13  she was collecting housing assistance.  Is that fair to say?

14     A    Yes.

15     Q    And those payments were going to Mr. Sacco because

16  all of her furnishings were still at 45 Fair Street, is that

17  fair to say?

18     A    Yes.

19     Q    And did you know why she was in the county jail?

20     A    I don't believe we did until after she was released

21  and visited our office.

22     Q    And did she tell you why she was in the county

23  jail?

24     A    I believe she gave us a document from the Family

25  Court which described the reason why.

Judith Wingate-Wade - Cross                          799

1     Q     Do you know she was released from jail mid October

2  2007, is that fair to say?

3     A     Yes.

4     Q     And she moved to 14 Miller Street in November of

5  2007, is that fair to say?

6     A     I'm not sure of the exact date.  We began assisting

7  her at Miller Street as of December 1, '07.

8     Q     Do you have anything in your file that would

9  reflect when Mrs. O'Connor moved to 14 Miller Street?

10    A     I'll check.

11          I don't have any documents stating exactly when she

12  moved.  I know we ended our assistance at the first address

13  on November 30 and began at the new address on December 1.

14    Q     Okay.  Did you become aware of a situation when

15  Linda O'Connor was released from jail when she went back to

16  45 Fair Street where she had problems because of the water

17  and everything had been shut off?

18    A     Yes.

19    Q     And your agency became involved at that point?

20    A     I believe we tried to remedy the problem of no

21  water by paying part of our portion of the housing assistance

22  payments directly to the city water department, which the

23  city water department agreed to accept.

24          MISS PEEBLES:  Thank you.  I have no further

25  questions.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Judith Wingate-Wade - Cross                      800

```
 1                    THE COURT:  Mr. Lovric?

 2                    MR. LOVRIC:  I have no other questions, Judge.

 3                    THE COURT:  Mr. Fischer?

 4                    MR. FISCHER:  Thank you, your Honor.  No, your

 5    Honor.  Thank you.

 6                    THE COURT:  Thank you, Miss Wingate-Wade.  You

 7    may step down, ma'am.

 8                    (Witness excused)

 9                    THE COURT:  All right, ladies and gentlemen.

10    It's a good time to break for lunch.  We'll see you back at

11    1:30.  Court stands adjourned.

12                    (Lunch break taken)

13                    (Jury present)

14                    THE COURT:  Okay.  Mr. Lovric, who do you got?

15                    MR. LOVRIC:  Next witness we call is Naomi

16    Panus.

17                    THE COURT:  Okay.

18                    THE CLERK:  Ma'am, please state your name for

19    the record.

20                    THE WITNESS:  Naomi Panus.

21

22

23

24

25
```

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    N A O M I    P A N U S, having been called as a witness,

2    being duly sworn, testified as follows:

3                   THE COURT:  Okay, Mr. Lovric.

4    DIRECT EXAMINATION

5    BY MR. LOVRIC:

6        Q    Miss Panus?

7        A    Yep.

8        Q    Just for the members of the jury, again tell them

9    your full name and tell us also, where do you work?

10       A    Naomi Panus.  I'm a caseworker at Broome County

11   Department of Social Services.

12       Q    And Miss Panus, how long have you been with the

13   Broome County Department of Social Services?

14       A    I've been there a little over a year.

15       Q    And prior to coming to work for Broome County, I'll

16   just abbreviate it as DSS, where were you working prior to

17   that?

18       A    Chenango County Department of Social Services.

19       Q    And how long had you worked at Chenango County DSS?

20       A    Approximately a year and a half.

21       Q    And I'd like to talk a little bit about the kind of

22   work that you currently perform at Broome County DSS and the

23   kind of work that you performed at Chenango County DSS.  How

24   would you describe your work?  What is it that you do for the

25   Department of Social Services?

Naomi Panus - Direct

1      A    We receive state reports about child abuse and

2  maltreatment and we go and investigate the reports that we

3  receive.

4      Q    Excuse me.  And in connection with working with

5  DSS, Department of Social Services, do you also interact from

6  time to time with other agencies?

7      A    Yes.

8      Q    For example, would it be common sometimes for you

9  to also interact with perhaps a housing authority, within the

10  county, as it may relate to a case that you're working on?

11     A    Yes.

12     Q    Do you -- do you, as a caseworker for DSS, do you

13  have also any type of legal obligations to advise law

14  enforcement if there's something that was committed that may

15  have actually caused a crime to be committed to a minor, for

16  example?

17     A    Yes.

18     Q    Now, in coming to work for Chenango County DSS, how

19  would you describe your background, training in terms of

20  prior to coming to work for Chenango County?

21     A    I have a bachelor's from Binghamton University in

22  human development, and then working with Social Services,

23  they sent us to core training, they sent us to CPS training,

24  sex abuse, medical training, legal training, different

25  varieties, domestic violence, substance abuse trainings.

Naomi Panus - Direct

1    Q    Okay.  And I take it the trainings that you're

2  talking about are trainings that you received at the time you

3  came to work for the Chenango County DSS?

4    A    Yes.

5    Q    Now, while you worked at Chenango County DSS, how

6  large or small a staff did -- would you describe was present

7  there as far as caseworkers?  Just about how many caseworkers

8  were there?

9    A    About 12.

10   Q    Okay.  When you were working at Chenango County

11 DSS, how would cases be assigned, cases that dealt with, for

12 example, minors that needed to be investigated?

13   A    Our supervisor Maureen Span would give them out to

14 whoever was up in the rotation where they were located.

15 That's how we would get them.

16   Q    Okay.  So fair to say you try to keep the case load

17 evened out so everybody's working an equal amount of cases?

18   A    Yes.

19   Q    Approximately, you said, you've been with the

20 Broome County DSS about a year?

21   A    Yes.

22   Q    Prior to that you were in Chenango County?

23   A    Yes.

24   Q    And when you went from Chenango to Broome County,

25 was it better scenery, more money?  How would you describe

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    the move?

2        A    More money, closer to home.

3        Q    Okay.  I'd like to talk a little bit about a

4    particular case that you worked on while you were at Chenango

5    County DSS, and the case I'd like to talk about is a case

6    involving a Linda O'Connor and a Shannon O'Connor.  Are you

7    familiar with that case?

8        A    Yes.

9        Q    Now, approximately when was it that you became

10   involved in the Linda O'Connor and Shannon O'Connor DSS case?

11       A    August 11, 2007.

12       Q    Okay.  Was it 2007 or 2006?

13       A    I'm sorry.  2006.

14       Q    Now, prior to that time, did you or Chenango County

15   DSS, you or the county DSS, prior to that date, did you have

16   any other involvement of any type with Linda O'Connor prior

17   to that date?

18       A    No.

19       Q    And how was it on August 11, 2006, how was it that

20   you first became aware of a matter which then became a case

21   that you worked on?

22       A    We received a child protective report from the

23   state regarding Linda O'Connor and her daughter Shannon.

24       Q    Did you receive any particular information as to

25   where to go or what might have occurred?

Naomi Panus - Direct

805

1      A     We received the report stating that Shannon had

2  taken pills from her mother and that she was sick and she was

3  at the Y camp.

4      Q     Okay.  And on that date, on August 11, 2006, were

5  you actually assigned to go and investigate this matter?

6      A     Yes.

7      Q     And where did you go on that date, on August 11 of

8  2006?

9      A     I first went up to the Y camp in Norwich to try and

10  interview Shannon, but when I arrived, they were taking her

11  out on an ambulance.

12      Q     Okay.  Do you know where they took her at that

13  point in time?

14      A     To the Chenango Memorial Hospital in Norwich.

15      Q     Okay.  And when you arrived at the camp, did you

16  get a chance to speak to Shannon there at the camp or not?

17      A     No.

18      Q     And when you arrived at the camp, was Linda

19  O'Connor at the camp when you arrived?

20      A     No.

21      Q     Now, did you at some point go over to Chenango

22  Memorial Hospital then?

23      A     Yes.

24      Q     And when you arrived at the hospital, did you have

25  a chance to then at some point meet and talk to Shannon

1   O'Connor?

2       A    Yes.

3       Q    Prior to that date, had you ever met Shannon

4   O'Connor before?

5       A    No.

6       Q    And at some point while you were at the hospital

7   did Linda O'Connor arrive at the hospital?

8       A    Eventually, yes, she did.

9       Q    Now, do you see Linda O'Connor in court today?

10      A    Yes.

11      Q    Can you just indicate where just so, for the

12  record, we know?

13      A    Right over there (indicating).

14      Q    What's she wearing on top?

15      A    She's got the yellow blouse on, red hair, glasses

16  on top of her head.

17              MR. LOVRIC:  Just for the record, indicating

18  the defendant O'Connor.

19              THE COURT:  Record will so reflect.

20      Q    When Linda O'Connor arrived at the hospital, did

21  you have any conversations with Linda O'Connor?

22      A    Yes.

23      Q    What was the conversation with her about?

24      A    I was explaining to her what was going on with her

25  daughter and that Shannon did not want to see her.  She was

1    afraid to see her mom.  Shannon -- or Linda started yelling

2    and screaming that she wanted to see her child.  And then I

3    told her that Shannon had said she doesn't want to see her.

4                  MISS PEEBLES:  Objection.  Objection.

5                  THE COURT:  Sustained.

6                  MR. LOVRIC:  It's not being offered for the

7    truth, Judge.  It's being offered as to the conversation

8    between the defendant and this witness as to why she's

9    talking with her.

10                 THE COURT:  Not for the truth of what she told

11   her.

12                 MR. LOVRIC:  It's not being offered for the

13   truth of what Shannon O'Connor said; rather their

14   communications and the reasoning for it.

15                 THE COURT:  Okay.

16   BY MR. LOVRIC:

17        Q    So you're having this conversation with Linda

18   O'Connor?

19        A    And I had explained to her that Shannon had said,

20   you know, Linda yells at her, hits her.  The first remark,

21   you don't see any bruises on her, do you?

22        Q    Who said that?

23        A    Linda said that to me.

24        Q    Okay.  How would you describe Linda O'Connor -- how

25   would you describe Linda O'Connor's demeanor when she's

Naomi Panus - Direct

1   speaking to you?

2       A    She was very agitated.  She just -- she wasn't --

3   she was very nasty when she was speaking to me.

4       Q    Now, at the point in time when you spoke to Linda

5   O'Connor, had you already had some discussions or had you

6   already interviewed Shannon O'Connor to some degree at that

7   point in time?

8       A    Yes.

9       Q    Now, did you have any conversations at that time at

10  the hospital, Chenango Memorial, with Linda O'Connor about

11  any kind of CPS history?

12      A    Yes.

13      Q    What did you ask her?

14      A    I asked her if she had a previous CPS history.  She

15  told me no, she didn't.

16      Q    Okay.  Now, at that point in time did you know

17  anything about Shannon or -- excuse me -- Linda O'Connor's

18  prior history, anything like that?

19      A    No.

20      Q    So you had no knowledge?

21      A    Not at that time.

22      Q    So when Linda O'Connor told you no, you took it at

23  face value that she had no prior CPS history?

24      A    Correct.

25      Q    From the hospital, where was Shannon O'Connor then

Naomi Panus - Direct                                    809

1    taken, from Chenango Memorial?

2        A    She was taken to Syracuse, Upstate Medical.

3        Q    And did you -- how did you know that, I guess is my

4    question?

5        A    The doctor had told us when we were there.

6        Q    Now just an approximation, do you recall about how

7    much time Shannon spent in the Syracuse hospital?

8        A    About four days.  Four or five days.

9        Q    And during the time that she was in the hospital,

10   did you have communications or contact with Shannon?

11       A    Yes.

12       Q    Okay.  Was it in person or telephonic?

13       A    Through phone.

14       Q    And did you continue to talk to Shannon about her

15   living situation and things that were going on at the house?

16       A    A little.

17       Q    Okay.  And during the time that Shannon was in the

18   hospital in Syracuse, did you -- during that time did you

19   also have any additional conversations with Linda O'Connor?

20       A    Yes.

21       Q    Where did those take place?

22       A    One was at her house, the other one was at the

23   office.

24       Q    Whose office?

25       A    At our office, at the DSS office.

Naomi Panus - Direct

810

1     Q     Okay.  And in speaking to Linda O'Connor, did you

2   again ask her about any prior CPS history?

3     A     She was asked on both days if she had a CPS

4   history.

5     Q     What did she tell you?

6     A     She said no, she didn't.

7     Q     CPS history, CPS refers to what?

8     A     Child Protective Services.

9     Q     And on both of those occasions she denied having

10  any other prior history?

11    A     Correct.

12    Q     Now prior to Shannon O'Connor coming out of the

13  hospital from Syracuse, did you have any conversations with

14  Linda O'Connor about how things would be when Shannon comes

15  back home?

16    A     Yes.  She said that things were going to be

17  different this time.

18    Q     And this is Linda O'Connor?

19    A     Yes.

20    Q     Did she elaborate on that?  Did she elaborate about

21  what she meant by things would be different?

22    A     No.

23    Q     Now, at that point in time, when you're speaking to

24  Linda O'Connor, this -- and this is prior to Shannon coming

25  out of the hospital from Syracuse?

Naomi Panus - Direct

1    A    Yes.

2    Q    We're still talking about prior to Shannon --

3    A    Yes.

4    Q    Did you have any information about what was going

5  on at home?  Did you have information at this point in time?

6    A    Just that Shannon had said that mother --

7         MISS PEEBLES:  I'm going to object, Judge.

8  I'm not even sure of the time frame he's referring to.

9         MR. LOVRIC:  I'll narrow the time frame, if

10  that's the problem.

11         From the time Shannon went to the Syracuse

12  hospital and prior to her getting out several days, that's

13  the time frame I'm asking this witness about.

14         THE COURT:  Don't you have to identify the

15  source?

16         MR. LOVRIC:  Yes, Judge.  I'm asking her if

17  she had information.

18         THE COURT:  She told us she did.  Can you

19  identify the source.

20  BY MR. LOVRIC:

21    Q    How did you learn things about what was going on in

22  the household, at the O'Connor household?

23    A    Through Shannon.

24    Q    Did she describe for you or tell you what was going

25  on in the household?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

1    A    She said her mom was yelling at her, she would hit

2  her.  I asked how.  She said with her fist or any object she

3  can get her hands on.

4    Q    Okay.  Did you then -- In connection with that, did

5  you then ask Linda O'Connor about those things?

6    A    Yes.

7    Q    And what was Linda O'Connor's response to those?

8    A    She said, you don't see any bruise on her, do you?

9    Q    Was that, in sum and substance, her exact wording?

10   A    Pretty much, yes.

11   Q    Now did Shannon O'Connor leave the Syracuse

12  hospital after a few days?

13   A    Yes.

14   Q    And how did she get home, if you know?

15   A    I picked up Linda and both of us drove up -- I

16  drove up to Syracuse with Linda and picked up Shannon and

17  brought her back home.

18   Q    Okay.  When you say back home, where was she taken

19  to?

20   A    Forty-five Fair Street.

21   Q    And that's in Norwich?

22   A    Yes.

23   Q    And what was your understanding as far as who lived

24  at 45 Fair Street?

25   A    Linda and Shannon lived downstairs, and then there

Naomi Panus - Direct

1  was the neighbors that are upstairs, the Pipers.

2      Q    Okay.  To your knowledge, who were the Pipers?

3      A    All I know is that they were just neighbors

4  upstairs.  Elderly people in their 80s.

5      Q    Okay.  At that point in time, did you know whether

6  or not Linda O'Connor rented or owned or what the apartment

7  situation was for her?

8      A    Yep.  She told me she rented from Dean Sacco, he

9  was the -- she actually told me he was the one that got

10 Shannon into the Y camp and he drives her around because she,

11 Linda, doesn't have a car, and he would drive Linda around to

12 places she needed to go.

13     Q    Had you ever met Dean Sacco?

14     A    No.

15     Q    If you ran into him, you wouldn't know who he was?

16     A    No.

17     Q    The things you do know about Dean Sacco, who was it

18 that told you those things?

19     A    A little -- just a little from Linda and then a

20 little from Shannon.

21     Q    Okay.  And when did Linda tell you that Dean Sacco

22 had gotten Shannon into the Y camp?

23     A    This is before Shannon came home from the hospital.

24     Q    And when did Linda O'Connor tell you that Dean

25 drives her around in the Norwich area?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

1    A    Right before she came home from the hospital as

2 well.

3    Q    Shannon was taken to the hospital for what purpose,

4 to your knowledge?

5    A    To my knowledge, she took three of her mother's

6 pills and injected herself with insulin that was her

7 mother's.

8    Q    Okay.  Do you know or did you ever learn what kind

9 of pills these were?

10    A    I don't know.

11    Q    Okay.  And when she was taken up to Syracuse, was

12 it just for her physical well-being or was there also a

13 mental evaluation that was done with respect to Shannon?

14    A    I do believe there was a mental as well because she

15 wanted to kill herself.  That was her reason for taking the

16 pills.

17    Q    Okay.  And when she was released from Syracuse, do

18 you know what the conclusion was as far as releasing her as

19 far as her mental stability issues were concerned?

20    A    I don't.

21    Q    Okay.  Now, the first contact you indicated was on

22 August 11, 2006?

23    A    Correct.

24    Q    I'd like to now direct your attention to

25 approximately August 20 of 2006, some nine days later.  Did

Naomi Panus - Direct

1    there come about an event that caused you to again directly

2    become involved with Linda O'Connor and Shannon O'Connor?

3        A    Yes.

4        Q    What was that?

5        A    Linda had gone to the hospital for kidney stones

6    and left Shannon home alone.

7        Q    And when you say Shannon was left home alone, what

8    do you mean by that?

9        A    Linda made no arrangements for any kind of

10   supervision for Shannon when she was in the hospital.

11       Q    And did you -- did you reference or did you find

12   out what, if any, food provisions were left in the house for

13   Shannon?

14       A    Shannon had called a counselor because she tried to

15   cook French fries in a deep fryer and almost burned herself.

16   And the next day, when we were there, there was rotten,

17   spoiled food that was in the refrigerator, everything in the

18   freezer was frozen, she didn't know how to cook it.

19       Q    Okay.  Were these observations that you made once

20   you went to 45 Fair Street?

21       A    Once in the home, yes.

22       Q    And based on what you saw there, what was your

23   assessment of whether or not Shannon was able to provide or

24   care for herself while Linda was in the hospital?

25       A    Shannon wasn't able to care for herself.

Naomi Panus - Direct

816

1    Q    Did you have any indication that there was any

2  adults or adult that was supposed to care for her at that

3  time when Linda O'Connor was in the hospital?

4    A    The upstairs neighbors were supposed to check on

5  her, but they said they couldn't do it because of Shannon's

6  constant needed supervision.  They were unable to do it, they

7  said.

8    Q    On or about August 20 of 2006, what was the plan in

9  terms of getting Shannon into some type of supervision, to

10  have somebody supervise her?

11    A    The plan was to have Shannon go and stay with Renee

12  Lang.

13    Q    Now, how did Renee Lang come about in terms of the

14  person to have Shannon go and stay with?

15    A    She was like a grandmother to Shannon.  Linda has

16  known her and her husband for many years.

17    Q    Now at that time, this being August 20 of 2006,

18  were you aware of any other direct family that Linda O'Connor

19  had, any other family members in the area or anybody else

20  that's directly related to her?

21    A    No.  Not at that time.

22    Q    And at some point was Renee Lang contacted or was

23  there communication with her whether she'd be willing to take

24  Shannon and have her stay with her?

25    A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

817

1    Q    And did the Family Court actually become involved
2    at some point in connection with Renee Lang taking temporary
3    custody of Shannon?
4    A    Yes.
5    Q    Now, approximately when is it that Shannon goes
6    then to stay and live at Renee Lang's house?
7    A    She goes that day, August 20.
8    Q    And did she -- At that time did she continue to go
9    to that Y camp that you mentioned earlier?
10   A    Yes.
11   Q    And how would she get to the Y camp?
12   A    I'd pick her up every morning and take her and
13   bring her back.
14   Q    And you would pick her up at whose house?
15   A    At Renee's house.
16   Q    And then drop her off at the camp?
17   A    Yes.
18   Q    And how would she get home to Renee Lang's house?
19   A    I'd pick her up at the camp and drop her back off
20   at Renee's house.
21   Q    And at that time when you're doing this, you're
22   picking Shannon up and then dropping her off and picking her
23   up at the end of the day, did you have a chance to observe
24   Shannon's demeanor and how she was doing living at Renee
25   Lang's?

1    A    Yes.

2    Q    How would you describe Shannon's appearance,

3  demeanor and her outward appearances to you?

4    A    She seemed like a typical kid when she was there.

5  She was happy that someone was getting up with her in the

6  morning, had breakfast for her.  She settled in really good

7  at Renee's house.

8    Q    And at the same time, approximately the end of

9  August, was there a petition actually issued by the Family

10  Court judge in connection with Shannon staying with Renee

11  Lang?

12    A    Yes.

13    Q    What was that?  What was the result of that

14  petition?

15    A    Renee was given temporary custody of Shannon.

16    Q    Now, the Y camp that you would drive Shannon to and

17  pick her up, did that last until sometime when the school

18  year began?

19    A    Yes.

20    Q    And I take it the school year begins sometime after

21  Labor Day, approximately?

22    A    Correct.

23    Q    Did Shannon actually then commence school in

24  September of 2006?

25    A    Yes.

Naomi Panus - Direct

819

1    Q    And what school district was it that she began

2  school at?

3    A    She was in Harpursville.

4    Q    So she wasn't -- she wasn't coming back or brought

5  back up to Norwich?

6    A    No.

7    Q    And in connection with, thus far, the intervention

8  of DSS and the activities that occurred, was there a petition

9  that DSS filed with the Family Court in connection with Linda

10 O'Connor's custody of Shannon?

11   A    Yes.

12   Q    What was that petition?

13   A    A neglect petition.

14   Q    What does that mean?

15   A    It's basically everything that has happened, the

16 lack of supervision, the lack of food for Shannon, anything

17 that has happened with mom and neglect stuff.

18   Q    That petition was filed approximately when,

19 approximately?

20   A    September 14, around.

21   Q    It's 2006?

22   A    Yes.

23   Q    Now, at the time when the petition is filed around

24 September 14, and thereafter, do you have additional

25 conversations with Linda O'Connor about the status of what is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

820

1    going on?

2        A    Yes.

3        Q    What kind of conversations were you having with

4    Linda O'Connor?  What were you explaining to her, what was

5    she saying to you?

6                    MISS PEEBLES:  Objection, your Honor.

7    Foundation.

8                    THE COURT:  Foundation as to time, place,

9    speaker?

10                   MISS PEEBLES:  Time, place, yes.  Yes, Judge.

11                   THE COURT:  I thought we were in September of

12   '06, is that right, Mr. Lovric?

13                   MR. LOVRIC:  Yes, Judge.  My question was as

14   of September 14 of 2006 and then the days after that, the

15   conversations that she was having with Linda O'Connor.

16                   THE COURT:  You can answer.

17       A    I explained to Linda that -- about the supervision

18   that Shannon needs.  And Linda wasn't cooperative at all.

19   She would just yell and scream, and there was many times I'd

20   have to end our conversations.  She wasn't very cooperative.

21       Q    Were these conversations with Linda O'Connor in

22   person or were they over the telephone or both?

23       A    Both.

24       Q    Did she ever hang up on you?

25       A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    Q    And what was she angry about?

2    A    I explained to her that a neglect petition was

3  going to be filed, and she said she figured so and hung up

4  the phone.

5    Q    Did she, Linda O'Connor, did she offer any

6  explanations as to lack of food being present in the house?

7    A    No.

8    Q    Did she offer any explanation as to why she didn't

9  arrange for Shannon to have supervision while she went to the

10  hospital?

11    A    She said the neighbors upstairs were supposed to

12  watch her.

13    Q    Now, while Shannon was living at Renee Lang's

14  house -- and the time frame that I want to focus on is

15  towards the end of September of 2006 and then into the early

16  part of October of 2006.  Did you find or learn of any gifts

17  and things of that nature Linda O'Connor was purchasing?

18    A    Linda was purchasing a lot of gifts for Shannon.

19  Different clothes, items like that she'd bring to visits.

20  Then she would send Shannon packages.  She also would tell

21  Shannon that she was doing her whole room over for her and

22  buying her all kinds of different things for her bedroom.

23    Q    And did you observe or see what kind of effect this

24  had on Shannon?

25    A    Shannon liked it.

Naomi Panus - Direct

822

1    Q    Did Shannon express at some point she wanted to go
2 back then to her mother?
3    A    Yes.
4    Q    And around this time -- and again, the time I'm
5 talking about is end of September of 2006 and then early
6 October of 2006 -- did you come to learn about an incident
7 where Shannon had viewed Triple X porn sites and pregnancy
8 sites?
9    A    Yes.
10   Q    Where did that happen?
11   A    At Renee Lang's daughter's house.
12   Q    Did Renee or her daughter inform of you that?
13   A    Both of them did.
14   Q    And what was Renee Lang's reaction to this conduct?
15   A    She was very upset and she didn't want Shannon
16 there anymore.
17   Q    And did you then at some point have a discussion
18 with Shannon --
19   A    Yes.
20   Q    -- about her having gone to porno sites and
21 pregnancy sites?
22   A    Yes.
23   Q    When you first confronted Shannon, when you first
24 asked her about it, did she admit any of that?
25   A    No.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

823

1    Q    Did you then persist in talking to her about it?

2    A    Yes.

3    Q    What was her reaction at some point after you

4  persisted to ask her questions about it?

5    A    She started to cry and said that she remembers

6  seeing them on her mom's --

7              MISS PEEBLES:  Objection, your Honor.

8  Hearsay.

9              THE COURT:  Sustained.

10             MR. LOVRIC:  Judge, I believe this is going to

11 be offered, but if I'm wrong, I'll move on.

12             THE COURT:  You mean when another witness

13 testifies?

14             MR. LOVRIC:  It's going to be testified to by

15 Shannon when she testifies.

16             THE COURT:  That's what I was referring to.

17 What's that got to do with whether or not it's admissible

18 from this witness?

19             MR. LOVRIC:  Well, Judge, I'll move on to the

20 next question.

21             THE COURT:  All right.

22 BY MR. LOVRIC:

23   Q    You spoke to Shannon about these materials that she

24 had accessed and viewed?

25   A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

824

1    Q    Then at some point did you confront and talk to
2  Linda O'Connor --

3    A    Yes.

4    Q    -- about the information that you had learned?

5    A    Yes.

6    Q    And what did you say to Linda O'Connor and what did
7  she say back?

8    A    I asked her about the pornographic stuff that she
9  had on her computer.  She said she didn't.  Then I asked her
10  about the adult toys that she had.  And she just had a blank
11  look on her face and didn't say anything.

12    Q    Linda O'Connor?

13    A    Yes.

14    Q    When you say adult toys, did you say adult toys?

15    A    Yes.

16    Q    You used the word adult toys?

17    A    Yes.

18    Q    Did you at any point in talking with Linda O'Connor
19  say anything to her about porn sites that she and George Lang
20  had exchanged photographs of?

21    A    Yes.

22    Q    And what was Linda O'Connor's reaction to that?

23    A    She said she doesn't have them.

24    Q    What was her appearance like when you were
25  discussing these things with her?

Naomi Panus - Direct

1      A     She appeared shocked that I knew.

2                  MISS PEEBLES:  Objection.

3                  THE COURT:  Basis?

4                  MISS PEEBLES:  She's going to testify about

5   her state of mind.  I object.

6                  THE COURT:  No, this witness can testify as a

7   lay witness about the appearance of somebody else when she

8   said something to her.

9                  MISS PEEBLES:  That's correct, and I have no

10  objection to that portion of her testimony.

11                 THE COURT:  What portion are you objecting to?

12                 MISS PEEBLES:  Her state of mind as to what

13  was going through her mind at the time.

14                 THE COURT:  She's saying what she observed

15  about the witness.

16                 You can't tell us what you were thinking, you

17  can tell us what she saw or how she felt about it.

18  BY MR. LOVRIC:

19      Q     Did you ask Linda O'Connor about porn that was sent

20  to Linda O'Connor by George Lang?

21      A     I did.

22      Q     She have any reaction to that?

23      A     No.

24      Q     Did she deny it?

25      A     No.

Naomi Panus - Direct

1    Q    Now, at the time that you learned of these sites

2  that Shannon had visited, did there come a point in time soon

3  after that event that the Family Court became involved in

4  terms of Shannon O'Connor's placement?

5    A    Yes.

6    Q    And did that happen actually in court?

7    A    Yes.

8    Q    And do you recall about what date that was?

9    A    October 11, 2006.

10   Q    And was Linda O'Connor present at that proceeding?

11   A    Yes.

12   Q    And what was DSS's recommendation to the Court as

13 far as Shannon's placement at that time?

14   A    That she goes into foster care.

15   Q    And did the judge agree with that?

16   A    No.

17   Q    What did the judge do with respect to placement of

18 Shannon O'Connor at that time?

19   A    He returned her back to mom, Linda.

20   Q    Back to Linda O'Connor's custody?

21   A    Yes.

22   Q    And on October 11 of 2006 did the judge instruct

23 Linda O'Connor as to anything that she should or shouldn't do

24 as far as Shannon's -- as far as Shannon having access to any

25 person?

1    A    Yes.

2    Q    What was that?

3    A    He told her that she was not to have -- Shannon was

4    not to have unsupervised contact with Dean Sacco.

5    Q    Were you aware of what it was that Shannon

6    disclosed that caused that recommendation to be made to the

7    court?

8    A    Shannon stated that Dean creeps her out and scares

9    her and tries to hug her a lot.

10    Q    And other than that, did Shannon disclose anything

11    else up to that point in time?

12    A    No.

13    Q    Based on that, did DSS recommend that the Court

14    issue this order?

15    A    Yes.

16    Q    And did the judge actually issue that order?

17    A    Yes.

18    Q    As of October 11 of 2006, where did Shannon then

19    commence to reside again?

20    A    Back at 45 Fair Street, Norwich.

21    Q    And what occurred as far as her going to school?

22    Where did she go to school at that point?

23    A    She went to Norwich schools.

24    Q    So she was then transferred from Harpursville to

25    Norwich school system?

Naomi Panus - Direct

1      A      Right.

2      Q      How would you describe your interactions with Linda

3  O'Connor after October 11 of 2006, after the judge issued

4  this order?

5      A      They were brief.

6      Q      Okay.  From about October 11, 2006 until the middle

7  of November of 2006, did you have a great deal of interaction

8  with Linda O'Connor or Shannon O'Connor?

9      A      I had some.

10      Q      Okay.  What kind of -- what kind of interaction was

11  that?

12      A      Home visits usually.

13      Q      Okay.  And when you -- on the occasions you made

14  the home visits, did you ever meet this other person named

15  Dean Sacco?

16      A      No.

17      Q      Now, towards the middle of November of 2006, did

18  there come a point in time that another caseworker would be

19  coming into this case?

20      A      Yes.

21      Q      And how did that come about that another caseworker

22  would be assigned to this matter?

23      A      I took a job with the Broome County Department of

24  Social Services and Elizabeth Chesebro took over the O'Connor

25  case.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Direct

829

1    Q    And approximately sometime in the middle of

2  November or so is when this transfer occurred?

3    A    Yes.

4    Q    Okay.  I mean transfer of the case from you to Liz

5  Chesebro?

6    A    Yes.

7    Q    And I take it from sometime the middle of November

8  of 2006 forward, did you have any participation in the case

9  involving Linda O'Connor and Shannon O'Connor?

10   A    No.

11   Q    And I take it you started your job in Broome County

12 soon thereafter and picked up a whole new caseload?

13   A    Yes.

14   Q    When you learned that you were going to be leaving

15 and a new caseworker was going to be assigned, did you

16 provide that information to Linda O'Connor?

17   A    I didn't know who it was at the time, but I told

18 her a new caseworker would be contacting her.

19   Q    Okay.

20        MR. LOVRIC:  Those are all the questions I

21 have, your Honor.

22        THE COURT:  Okay.  Mr. Fischer?

23        MR. FISCHER:  Thank you, your Honor.

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    CROSS-EXAMINATION

2    BY MR. FISCHER:

3         Q    Miss Panus, my name is Kelly Fischer.  I represent

4    Mr. Sacco.  Do you have a file?

5         A    Yes.

6         Q    Do you have it with you?

7         A    Yes.

8              MR. FISCHER:  May I just take a moment to look

9    at it, please?

10             THE COURT:  Yes, you may.

11             MR. FISCHER:  Thank you.

12        Q    Did you bring with you other documents other than

13   your file?

14        A    No.

15        Q    You have documents on your lap.

16        A    Just my notebook.  I mean, they're the same files.

17        Q    Why did you bring those documents with you today?

18        A    Because I had them with me.

19        Q    Do they pertain to this matter?

20        A    Oh, yes.

21        Q    May I look at them, please?

22        A    Sure.

23             MR. FISCHER:  With the Court's permission.

24        A    Do you want everything?

25        Q    Yes, please.

Naomi Panus - Cross

831

1              MR. FISCHER:  Your Honor, there are a number
2    of documents that I have not reviewed.  I'd like to take a
3    couple of minutes, if I may please, to review these before I
4    cross-examine the witness.
5              THE COURT:  Yeah, you can do that, but those
6    are not among the documents the Court provided.
7              MR. FISCHER:  I do not believe so, Judge.
8              THE COURT:  Ladies and gentlemen, you want to
9    step aside for a few minutes and we'll get this done.
10             (Jury excused)
11             (Jury present)
12             THE COURT:  Okay, Mr. Fischer.
13             MR. FISCHER:  May it please the Court, your
14   Honor, counsel.
15             Your Honor, before I proceed, I'd like to
16   offer in Exhibit S-13, Chenango Memorial Hospital records.
17             MR. LOVRIC:  No objection.
18             THE COURT:  All right.  The Court will receive
19   Defendant's S-13 in evidence.
20             MR. FISCHER:  Thank you, your Honor.
21   BY MR. FISCHER:
22       Q    Miss Panus, have you reviewed the Chenango Memorial
23   Hospital records from March 12 of 2007?
24       A    No.
25       Q    The records that you brought with you here today in

Naomi Panus - Cross

832

1    part are your notes that you kept in the course of your

2    duties, am I correct?

3        A    Correct.

4        Q    So when you had -- would have contact with in this

5    case Shannon O'Connor, you'd make a note on the database,

6    your computer some place?

7        A    Right.

8        Q    And those were chronologically arranged at some

9    point --

10       A    Yes.

11       Q    -- until I looked at your records?

12       A    Yes.

13       Q    I'm going to go through those with you and cover

14   them.  Have you those in front of you?

15       A    Yep.

16       Q    Okay.  I want to go to the initial call narrative,

17   if I can.  That's August 11 of 2006, correct?

18       A    Yes.

19       Q    With respect to the complaint, first of all, that

20   call narrative mentions, "Source can also be reached."  The

21   source in this case is Shannon O'Connor, am I correct?

22       A    No.

23       Q    Who is the source?

24            MR. LOVRIC:  Objection.

25            THE COURT:  Basis?

Naomi Panus - Cross

833

1          MR. LOVRIC:  Confidential source that makes a

2    complaint to DSS.  I don't think -- there has to be some

3    basis to reveal that person.

4          THE COURT:  Is that right?  Is that source

5    confidential?

6          THE WITNESS:  Yes.  We don't tell anyone our

7    source at all.

8          THE COURT:  Okay.  Try another question.

9          MR. FISCHER:  Okay.

10   BY MR. FISCHER:

11       Q    The next thing you do after getting this

12   information, this call from the source is you go through your

13   investigative actions, correct?

14       A    We go on that right there?

15       Q    Yes.

16       A    After I call the source, I go up to see the child.

17   I go to interview the child.

18       Q    And at some point you go back and list all the

19   investigative actions that you've taken?

20       A    Correct.

21       Q    And you did that in this case?

22       A    Yes.

23       Q    When did you see the child?

24       A    That first day, August 11.

25       Q    Did you make what's called a safety assessment?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Cross

834

1      A     Yes.

2      Q     What's a safety assessment?

3      A     To make sure the child is safe, assess the

4  surroundings and environment and what's going on.

5      Q     Is that a formal procedure as a Department of

6  Social Services employee you're required to follow?

7      A     Yes.

8      Q     What things do you check for in making that safety

9  assessment?

10     A     If the child is safe.  If it's been harmed, if the

11 child has been harmed.  What's going on in the home.

12     Q     Do you have your safety assessment from 8/11/06

13 concerning this matter?

14     A     With me?

15     Q     Yes.

16     A     Yes.

17     Q     Part of your inquiry when performing the safety

18 assessment is to determine whether the caretaker's previously

19 committed or allowed abuse or maltreatment of children, am I

20 correct?

21     A     Correct.

22     Q     Did you undertake that inquiry here?

23     A     I did that back at the office.

24     Q     What did you determine?

25     A     That Linda had a history of child protective

1    reports.

2        Q    Did you also inquire as part of your safety

3    assessment whether the caretaker's apparent or diagnosed

4    mental health status affects his or her ability to supervise

5    the children?

6        A    As far as Linda's?

7        Q    Yes.

8        A    At that time, I don't have -- didn't have all of

9    her records if she has any mental health issues.

10       Q    As part of the safety assessment, did you undertake

11   an inquiry in that regard?

12       A    Yes.

13       Q    What inquiry did you undertake at that point

14   concerning that issue?

15       A    That there was some possibilities that Linda had

16   some mental health concerns.

17       Q    As part of the safety assessment -- and I'm going

18   to page 12 -- am I correct that it was your understanding as

19   of August 11, 2006 that Shannon was taken to Chenango County

20   Mental Health on two different occasions?

21       A    Prior to this?

22       Q    Well, I'm reading your note as to that.  Am I

23   reading that correctly that -- your August 11, 2006 note,

24   page 12, about a third of the way down the page under

25   Comments and just above Safety Assessment.  Do you see that?

Naomi Panus - Cross

836

1    A    She was taken after she got out.  We have seven

2    days to do the assessment.

3    Q    As of August 11, 2006, had Shannon been taken to

4    Chenango County Mental Health on two different occasions?

5    A    No.

6    Q    This report date is 8/11/06, am I correct?

7    A    I believe this one is the investigation,

8    determination safety assessment.

9    Q    When was that done?

10   A    10/6/06.

11   Q    So at the top of the page, INT report date 8/11/06,

12   that's only referencing the date of the report, the initial

13   call?

14   A    I do believe so.

15   Q    I understand.

16   A    I do believe so.

17   Q    Would you please go to page 15 of your notes, lower

18   third of the page, Elevated Risk Elements.  Now when was that

19   portion of your notes prepared?

20   A    I believe it's 40 days after we get the

21   investigation.

22   Q    So, approximately mid September of 2006, mid to

23   late September?

24   A    Correct.

25   Q    In mid to late September of 2006, was it your

Naomi Panus - Cross

1   assessment of elevated risk elements that there were no

2   repeated incidents of sexual abuse?

3       A    At that time, yes.

4       Q    And also at that time it was your assessment that

5   sexual abuse of a child and perpetrator is not likely to have

6   current access to child, am I correct in that?

7       A    Correct.

8       Q    Would you go to page 14, back one page, please.

9   That's a risk assessment profile --

10      A    Yes.

11      Q    -- that you prepared --

12      A    Yes.

13      Q    -- on or about mid September of 2006?

14      A    Yes.

15      Q    And that continues over onto the top of page 15?

16      A    Yes.

17      Q    Number 10 on the top of page 15, you made an

18  inquiry as to whether the caretaker had a serious mental

19  health problem, didn't you?

20      A    Yes.

21      Q    You made an assessment about that?

22      A    Yes.

23      Q    And your assessment was that?

24      A    I believe there was some mental health issues;

25  however, I don't have any documentation saying there was yet.

Naomi Panus - Cross

1      Q     It was not just your assessment that the caretaker

2  had some mental health issues but a serious mental health

3  problem, am I correct?

4      A     That was the only button that there are as far as

5  mental health.

6      Q     You were following something generated by the

7  system and you're only given certain options?

8      A     Yes.

9      Q     Let me go, if I can, to page -- it appears to be

10 page 1, the investigation progress notes.  Progress note

11 narrative.  Do you see that page?

12     A     Yes.

13     Q     Now, as I understand it, this is based in part upon

14 what this unidentified source said, am I correct?

15     A     Correct.

16     Q     The source, whoever this person was, apparently

17 knew Shannon O'Connor?

18     A     Correct.

19     Q     And the source made an assessment about stories

20 that Shannon had told, am I correct?

21     A     Correct.

22     Q     And the source stated that she, Shannon, does come

23 up with some odd stories and that they're not sure if they're

24 true or not.  Am I correct there?

25     A     Correct.

Naomi Panus - Cross

839

1    Q    And that was the source's words as of August 11,
2    2006, not some later date?
3    A    Right.
4    Q    You made a progress note narrative entry date --
5    well, referring to page 2 of that investigation progress
6    notes, on August 6 of 2006 -- I'm sorry.  October 6,
7    October 6 of 2006, you had a conversation with Shannon, am I
8    correct?
9    A    I do believe so.
10   Q    Do you know where that was?
11   A    I'd have to look at my notes and see.
12   Q    If you want to take a moment to do that, please.
13   A    October 6.
14   Q    I'm sorry?
15   A    October 6.
16   Q    October 6.
17   A    I don't have an October 6.
18   Q    I'm looking at -- well, let me -- I'll hand you
19   what's been marked for identification as Exhibit S-13.  Those
20   are my marked-up notes.  Do you see that entry?
21   A    I do.
22   Q    Did you make an entry on October 6 of 2006?
23   A    Yes.
24   Q    And that was based upon your conversations with
25   Shannon O'Connor?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Cross

840

1    A    Yes.

2    Q    Face-to-face conversations?

3    A    Correct.

4    Q    And where was that?

5    A    This was at Chenango Memorial.  The date is wrong

6    on it.

7    Q    What was the correct date?

8    A    August 11, 2006.

9    Q    So, the information reflected on this page, page 26

10   of your investigative progress notes, in fact reflects

11   conversations that you had with Shannon on August 11, 2006,

12   and not October 6, 2006?

13   A    Correct.

14   Q    That October 6 is a mistake?

15   A    Correct.

16   Q    Okay.  Now, as of October 11, 2006 when you spoke

17   with Shannon at the hospital, she recounted that she was

18   there because her mom hit her, correct?

19   A    Right.

20   Q    But you made an inquiry beyond that, didn't you?

21   A    Yes.

22   Q    You made an inquiry about whether there had been

23   any sexual contact, didn't you?

24   A    Yes.

25   Q    Specifically, you discussed with Shannon -- and at

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1  that point Shannon is 13 years old, 12 years old?

2      A    Twelve, I think, yeah.

3      Q    All right.  So you discussed with her in terms that

4  were designed to work with a 12-year-old; that's how you

5  framed your inquiry of her concerning sexual contact, am I

6  correct?

7      A    Right.

8      Q    And how did you phrase that?

9      A    Talked about good touch and bad touch.

10     Q    How long did you spend speaking with her about that

11 subject?

12     A    A few minutes.

13     Q    Did she express to you that she understood or did

14 not understand what you were asking her?

15     A    She said she understood.

16     Q    And what did she say about that?

17     A    She said no, she hadn't been touched.

18     Q    On August -- tell me if I'm correct about this --

19 I'm looking at page 6 of your investigative progress notes.

20 A face-to-face at the LDSS office.  Do you see that?

21     A    Yes.

22     Q    Did that event, that conversation occur on

23 August 14, 2006?

24     A    Yes.

25     Q    That's where Shannon said that Mr. Sacco got her

Naomi Panus - Cross

1   into the YMCA camp, am I correct?

2       A    No, Linda did.

3       Q    Going to August 21, 2006, page 9 over to page 10,

4   you had a conversation on that date with the Pipers, am I

5   correct?

6       A    Correct.

7       Q    Mr. Piper is Larry Piper?

8       A    Correct.

9       Q    You spoke with him about Shannon?

10      A    About Shannon, yes.

11      Q    In your direct testimony, as I understood it, you

12  discussed the idea that the neighbors didn't know that

13  Shannon needed such constant supervision.  Do you remember

14  saying that?

15      A    Yes.

16      Q    In fact, when you spoke with them, it was clear to

17  you that they were not aware of the seriousness of Shannon's

18  mental health issues at that point, am I correct?

19      A    Correct.

20      Q    What mental health issues were you referring to at

21  that point?

22      A    Basically her trying to hurt herself, her taking

23  the pills, her cutting herself.

24      Q    When Shannon went to Renee Lang's, you spoke with

25  Renee about your concerns about Shannon's psychological

Naomi Panus - Cross

843

1    status, am I correct?

2         A    Yes.

3         Q    Shannon accessed the internet to get to porn sites

4    at some point.  When was that?

5         A    When she was staying with Renee.  The end of

6    September.

7         Q    And she did that from Renee's computers or Renee's

8    daughter's computer?

9         A    Renee's daughter's computer.

10        Q    Where was Renee's daughter living?

11        A    I don't know the address.

12        Q    Do you know whether, when Shannon accessed those

13   sites, she was with another girl?

14        A    Not that I'm aware of.

15        Q    Do you know whether Renee's daughter has a

16   daughter?

17        A    I don't recall.

18        Q    What porn sites was she accessing?

19        A    It was a triple X adult movie, men seeking men,

20   teen pregnancy.

21        Q    Adult chat rooms?

22        A    And adult chats, yes.

23        Q    What's a chat room?

24        A    You go in there and talk with adults.

25        Q    How?

Naomi Panus - Cross

1    A    As --

2    Q    What's your understanding of what that means?

3    A    I guess it could go either way.  You can talk with

4  somebody or I would take it as -- maybe like a sexual chat

5  room.

6    Q    So you understood her to say she was accessing

7  sexual chat rooms?

8    A    Yes.

9    Q    She admitted that to you finally?

10   A    Correct.

11   Q    Was that during the first time that you spoke with

12 her about the issue?

13   A    Yes.

14   Q    How long did it take before your first inquiry

15 about that matter and the time that she said yes, that's

16 true?

17   A    Not long.

18   Q    How long is that?

19   A    Total minutes, couple of minutes.

20   Q    Did you inquire of her at that time about whether

21 she had ever had sex before?

22   A    Yes.

23   Q    What conversation did you have with her about that

24 at that time?

25   A    I asked her if she thought she was pregnant, that's

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Cross

845

1    why she was looking at teen pregnancy sites, and she said no,

2    she's never had sex before.

3        Q    You asked her whether she might be pregnant because

4    she might have had sex before?

5        A    Correct.

6        Q    Did you -- did you specify what you meant by did

7    she ever have sex before?  Did you say, did you ever have sex

8    with a man because that is why you might be pregnant?

9        A    No.

10       Q    Did you ever inquire of her whether she had any

11   other kinds of sex at all?

12       A    No.

13       Q    Did you inquire of her -- and I don't mean to be

14   crude but it's part of the case so I have to.  Did you

15   inquire of her whether she had ever masturbated?

16       A    No.

17       Q    She, Shannon, was -- also apparently came into

18   contact with what you described as adult toys?

19       A    Correct.

20       Q    Was there information made available to you that

21   she had in fact used that?

22       A    Renee had said that she caught -- she was caught

23   rubbing it on herself.

24            MR. FISCHER:  Those are all the questions I

25   have right now.  Thank you, Judge.

Naomi Panus - Cross

1              THE COURT:  Okay.  Miss Peebles.

2    CROSS-EXAMINATION

3    BY MISS PEEBLES:

4         Q    Miss Panus, talking about August 11, when you went

5    to the Chenango County Memorial Hospital and you met Shannon

6    for the first time, you had an opportunity to speak with the

7    physician that was working on the case, is that correct?

8         A    Correct.

9         Q    And were you aware that Shannon's blood levels were

10   normal?

11        A    No.

12        Q    Did you ever view any of the medical documentation

13   after she had blood work done?

14        A    No.

15        Q    Did you know they referred to --

16             MR. LOVRIC:  Objection.  Unless the documents

17   are in evidence, if they want to introduce them.

18             THE COURT:  Do you have the documents?

19             MISS PEEBLES:  I do.

20             THE COURT:  Can you have them marked?

21             MISS PEEBLES:  Sure.

22   BY MISS PEEBLES:

23        Q    Miss Panus, I'm going to approach and have you look

24   at what's been marked as Defendant's Exhibit O-17.  Have you

25   ever seen that document before?

Naomi Panus - Cross

1    A    Not that I recall.

2    Q    Now, were you aware that the physician made a note

3  and referred to the incident as a suicidal gesture?  Were you

4  aware of that?

5    A    No.

6    Q    Now, Shannon O'Connor did not stay at the hospital

7  for any type of physical treatment on that day, is that fair

8  to say, after the blood work was completed?

9    A    I thought it was for both.

10    Q    You thought what was for both?

11    A    For taking the pills and also for trying to commit

12  suicide.

13    Q    But you never talked to the physician about her

14  blood levels and whether she actually took any pills, is that

15  correct?

16    A    Correct.

17    Q    And she was the same day sent to a psych at -- for

18  psychiatric evaluation in Syracuse, correct?

19    A    Right.

20    Q    Now, you learned through speaking with the

21  physician that Shannon had told a Y counselor that she had

22  attempted suicide on two other occasions, is that correct?

23    A    Not that I can recall.

24    Q    If I showed you the notes, would that refresh your

25  recollection?

Naomi Panus - Cross

848

1      A    Yes.

2      Q    I'm going to hand you what's been marked as

3   Defendant's Exhibit 18 and ask if you can identify that

4   document?

5      A    What was your question again?  I'm sorry.

6      Q    Can you identify that document?

7      A    I've never seen this one.

8      Q    Is there a notation that it was a social worker

9   note?

10     A    Correct.

11         MISS PEEBLES:  Your Honor, I'd like to offer

12   Defendant's Exhibit O-18 into evidence.

13         MR. LOVRIC:  Can I see it, Judge?

14         THE COURT:  Sure.

15         MR. LOVRIC:  I have no idea what it is.

16         Judge, can I have a voir dire on this?

17         THE COURT:  Sure.

18   VOIR DIRE

19   BY MR. LOVRIC:

20     Q    Miss Panus, do you know what document this is, what

21   record this is from?

22     A    I've never seen it before today.

23     Q    Is it -- I mean, is there -- there's a stamp up

24   here, Chenango Memorial Hospital.  Are these records records

25   that are anywhere in your files?

Naomi Panus - Cross

1      A      No.

2              MR. LOVRIC:  I would object, Judge.  I don't

3      know where this document came from.  It may be admissible,

4      but not through this witness.

5              THE COURT:  Right.  There's no foundation for

6      it.

7              MR. FISCHER:  May I see it, please?

8              THE COURT:  Sustained.

9      BY MISS PEEBLES:

10     Q      So you didn't bother to review any of the medical

11     documentation that was prepared in connection with her trip

12     to the Chenango County hospital on August 11, is that fair to

13     say?

14     A      Correct.

15     Q      As far as you knew when you spoke to Shannon, that

16     prior to August 11 she had never tried to commit suicide, is

17     that fair to say?

18     A      Correct.

19     Q      So you wouldn't know what she told anybody else at

20     the hospital?

21     A      Correct.

22             THE COURT:  Hold on just a minute.  I have to

23     execute a document.

24     Q      So Miss Panus, you were aware that Shannon was

25     taken to the hospital by ambulance from the Y camp, is that

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    correct?

2        A    Correct.

3        Q    And that was done simply as a precautionary

4    measure, correct?

5        A    Right.

6        Q    In fact, when she did that, she was not under any

7    distress at that time?

8        A    I believe she was feeling sick at that time.

9        Q    Well, did Mr. Lance Thorn tell you that they called

10   the ambulance because they were doing it for precautionary

11   measures?

12       A    I thought it was both.

13       Q    Well, you were aware there were no toxic symptoms

14   that were present, correct?

15       A    Correct.

16       Q    And her nutrition appeared within normal limits,

17   correct?

18       A    I would assume so.

19       Q    Her affect appeared within normal limits, correct?

20       A    Right.

21       Q    Now, when you met with Shannon, she was mad at her

22   mother, that was her testimony, right?

23       A    Correct.

24       Q    She didn't want to see her mother?

25       A    Correct.

Naomi Panus - Cross

1    Q    And you had asked her -- well, through asking her

2    questions you found out -- you asked her whether her mother

3    was a drinker or did drugs and she told you no, correct?

4    A    Correct.

5    Q    Now, when you talked to Mrs. O'Connor about

6    Shannon's demeanor and what she said about her, Mrs. O'Connor

7    told you that there was a lot of stress in the house because

8    of the puppy, is that true?

9    A    That was after the fact.

10    Q    Well, did Shannon also relate that to you as well?

11    A    I don't believe it was that day.

12    Q    But between the time she was in the psychiatric

13    hospital and the time she returned home?

14    A    Yes.

15    Q    During that time period?

16    A    Yes.

17    Q    And at some point Shannon indicated to you it

18    became too much because of the puppy and she couldn't deal

19    with it, is that fair to say?

20    A    Yep.

21    Q    Now, on August 20 when were you notified when

22    Shannon had been left home, you went to the Y camp, is that

23    correct?

24    A    Yes.

25    Q    And you noticed that she had some scratches on her,

Naomi Panus - Cross

1    is that correct?

2         A    Cut marks.  Yes.

3         Q    And you asked her about those cut marks?

4         A    Yes.

5         Q    And she told you that she had fallen in some type

6    of brush or something of that nature, is that correct?

7         A    Right.

8         Q    And you didn't believe her, is that fair to say?

9         A    Yes.

10        Q    And the cuts weren't consistent with somebody

11   falling in brush, fair to say?

12        A    Correct.

13        Q    And you knew at that point that Shannon needed a

14   higher level of care, is that correct?

15        A    Correct.

16        Q    Now you met Mr. Piper, you met Mr. Larry Piper?

17        A    Yes.

18        Q    And he lived upstairs at 45 Fair Street?

19        A    Yes.

20        Q    And he was a decent guy, is that fair to say?

21        A    Yes.

22        Q    And in fact, Mr. Piper is the one that took Mrs.

23   O'Connor to the hospital when she was doubled over in pain on

24   August 20, is that correct?

25        A    Yes.

Naomi Panus - Cross

1    Q    And you were made aware that the transport on

2  August 20 to the hospital was not something that had been

3  planned, is that fair to say?

4    A    Correct.

5    Q    In fact, it was an emergency situation and she was

6  transported to the hospital, is that fair?

7    A    Correct.

8    Q    Now, Shannon O'Connor's placed with Renee Lang

9  during that time period.  You had -- were you monitoring the

10  situation, is that fair?

11   A    Yes.

12   Q    And Linda was released, Mrs. O'Connor was released

13  from the hospital at some point after September, is that fair

14  to say?

15   A    Yes.

16   Q    In fact, Mrs. O'Connor wound up having

17  complications as a result of the kidney stones and wasn't

18  able to come home right away, is that correct?

19   A    Yes.

20   Q    Once Mrs. O'Connor returned home, she wanted

21  Shannon to come back home and stay with her, is that correct?

22   A    Yes.

23   Q    And she was upset that Shannon was living with

24  Renee Lang, is that fair to say?

25   A    Yes.

Naomi Panus - Cross

854

1    Q    In fact, Renee Lang and Mrs. O'Connor weren't

2    getting along during that time period, is that fair to say?

3    A    I do believe.

4    Q    And Mrs. Lang, Renee Lang was required to monitor

5    any phone contact between Mrs. O'Connor and her daughter

6    Shannon, is that correct?

7    A    Yes.

8    Q    Now, when you confronted Shannon O'Connor about

9    viewing pornography, you were in the middle of transporting

10   her to a home visit with her mom, is that correct?

11   A    Yes.

12   Q    And in fact, after you confronted her about that,

13   well, she specifically stated she was looking at Bo Bice

14   sites, correct?

15   A    Correct.

16   Q    And Walt Disney web site?

17   A    Yes.

18   Q    And when you insisted that you had proof that she

19   was on these other sites, she eventually admitted it,

20   correct?

21   A    Yes.

22   Q    And she begged you not to tell her mother, is that

23   correct?

24   A    Yep.

25   Q    She was very upset, she was crying?

Naomi Panus - Cross

1      A     Yes.

2      Q     And you promised her that you wouldn't tell her

3  mother before the visit, is that correct?

4      A     Correct.

5      Q     And you didn't want to spoil the visit that she was

6  about to go on with her mother, is that correct?

7      A     Correct.

8      Q     And at some point after that, Mrs. Lang verbalized

9  her displeasure with Shannon and how she was acting at her

10  house, is that fair to say?

11      A     Yes.

12      Q     In fact, Renee Lang had concerns because Shannon

13  O'Connor was hanging all over the men in her family, is that

14  fair to say?

15      A     Yes.

16      Q     In fact, Renee was concerned that Shannon would

17  falsely accuse them of doing something, is that fair to say?

18      A     Yes.

19      Q     At that point Shannon really wanted to return home

20  and stay with her mother, is that correct?

21      A     Yes.

22      Q     Now, when Shannon returned home to live with her

23  mother, that was on August 11 and that was after the Family

24  Court appearance, correct?

25      A     October.  October 11.

1    Q    What did I say?

2    A    August.

3    Q    I'm sorry.  October.

4         I'm going to hand you what's been marked as Defense

5    Exhibit 19.  Mrs. Panus, can you identify that document?

6    A    This is from family -- the Chenango County Family

7    Court.

8    Q    Is that the order of protection that was issued?

9    A    Yes.

10        MISS PEEBLES:  Your Honor, at this time I'd

11   like to offer Defendant's Exhibit O-19 into evidence.

12        MR. LOVRIC:  Can I just take a look at it,

13   Judge?

14        THE COURT:  Sure.

15        MR. LOVRIC:  Could I have a voir dire?

16        THE COURT:  Sure.

17   VOIR DIRE

18   BY MR. LOVRIC:

19   Q    Miss Panus, this order, Defense Exhibit 19, issued

20   November 22, 2006, where it is signed, is this written order

21   the same order that was issued by the judge in open court?

22   A    Yes.

23   Q    And this is dated November 22, '06, written order

24   was dated, I take it, this date that's on it?

25   A    It was for October 11.

Naomi Panus - Cross

857

1      Q     Okay.  The order that you were previously
2  testifying about, that was the order given in court by the
3  actual judge?
4      A     Right.
5      Q     On the record?
6      A     Right.
7      Q     This is the written order that comes later at some
8  point?
9      A     Correct.
10           MR. LOVRIC:  I have no objection.
11           MR. FISCHER:  May I just see the document?
12           I have no objection.
13           THE COURT:  Okay.  We'll receive Defendant's
14  O-19 in evidence.
15  BY MISS PEEBLES:
16      Q     So -- so this Family Court order was verbally
17  issued on October 11 when you appeared in court, correct?
18      A     Yes.
19      Q     And then the judge executed the actual order itself
20  on November 22 of '06, correct?
21      A     Yes.
22      Q     Now after Shannon returned home to live with her
23  mom, they started receiving services, is that fair to say?
24      A     Yes.
25      Q     Now, let me take you back.  When Mr. Fischer was

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Cross

858

1   asking you questions about Mrs. O'Connor having a prior CPS

2   history, do you remember that?

3        A    M-m h-m-m.

4        Q    That pertained to her son Walter Burkett Jr., is

5   that correct?

6        A    Yes.

7        Q    Now, the services that they received -- Mrs.

8   O'Connor had asked whether she could have a parent aide, is

9   that correct?

10        A    Yes.

11        Q    You provided her with a parent aide, correct?

12        A    Yes.

13        Q    And they each began counseling during that time

14   period?

15        A    Yes.

16        Q    In fact, Mrs. -- Linda was going to see a woman by

17   the name of Miss Lydia Smith?

18        A    Yes.

19        Q    Shannon was seeing Lydia Smith, but she was

20   assigned to her own counselor, is that fair to say?

21        A    Yes.

22        Q    Now, you made several home visits throughout this

23   time period.  You made a home visit on October 20 while

24   Shannon was in school, correct?

25        A    Yes.

Naomi Panus - Cross

1      Q      And you did that in order to update and find out
2  what was going on, is that correct?

3      A      Correct.

4      Q      And in order to monitor, attempt to monitor the
5  financial or the management of the money by Mrs. O'Connor, is
6  that fair to say?

7      A      Somewhat.

8      Q      You brought the parent aide over to the home on
9  October 26, and then on that date and time Shannon was home,
10  correct?

11      A      Yes.

12      Q      And Mrs. O'Connor was home?

13      A      Yes.

14      Q      And Shannon had an intake appointment with her
15  counselor on October 20, and she started her counseling
16  during that time?

17      A      Yes.

18      Q      And then you made a home visit on November 16, do
19  you remember that?

20      A      Yes.

21      Q      And you did that because Shannon had a burn mark on
22  her arm, is that correct?

23      A      Correct.

24      Q      And you went over to the home to find out or to
25  investigate what happened, correct?

Naomi Panus - Cross

1    A    Yes.

2    Q    You found out she had burned her arm in a pan,

3  correct?

4    A    Yes.

5    Q    And Mrs. O'Connor was chastised and told she had to

6  be more careful in the kitchen with Shannon, is that correct?

7    A    Yes.

8    Q    And at that point Mrs. O'Connor mentioned perhaps

9  buying a kitten for Shannon, correct?

10    A    Yes.

11    Q    You told her that would be inappropriate because

12  you already had a dog and a turtle, is that correct?

13    A    Dog and a hamster, yes.

14    Q    And you basically told Mrs. O'Connor at that point

15  that she should concentrate more on her bills and not worry

16  about buying animals for Shannon, is that correct?

17    A    Yes.

18    Q    And after you went to the Broome County Department

19  of Social Services, that wasn't the last contact you had with

20  Shannon O'Connor, is that fair to say?

21    A    I think this was.

22    Q    You had absolutely no contact with Shannon O'Connor

23  after -- after November of 2006?

24    A    She sent me a message on MySpace.

25         MISS PEEBLES:  No further questions.  Thank

Naomi Panus - Cross

1    you.

2                      THE COURT:  Mr. Lovric.

3                      MR. LOVRIC:  Just a couple of follow-up

4    questions, Judge.

5                      THE COURT:  Okay.

6    REDIRECT EXAMINATION

7    BY MR. LOVRIC:

8        Q    Miss Panus, Miss Peebles just spoke with you a few

9    minutes ago about Lydia Smith.  Who is Lydia Smith?

10       A    She's a counselor with Chenango County Mental

11   Health.

12       Q    And what role did Lydia Smith have with respect to

13   Linda O'Connor?

14       A    She was Linda's counselor as well.

15       Q    And did -- do you know whether Linda O'Connor -- At

16   the time that you were the caseworker in this matter, do you

17   know if Linda O'Connor at some point began to meet regularly

18   with Lydia Smith?

19       A    I think when I was involved there was only maybe

20   one or two contacts that she had with Lydia.

21       Q    Okay.  And I'm just trying to differentiate.  Lydia

22   Smith, compared to your job as a caseworker, what's Lydia

23   Smith's job or purpose within the DSS system?

24       A    She's with mental health.  It's different.  She

25   does counseling and diagnosis and stuff like that.  I don't.

Naomi Panus - Redirect

1    Q    Okay.  So she was talking with Miss Linda O'Connor

2  or about mental health issues that Miss Linda O'Connor may

3  have?

4    A    Right.

5    Q    Miss Peebles also asked you about prior CPS history

6  that you became aware of for Linda O'Connor?

7    A    Yes.

8    Q    That was for Walter Burkett?

9    A    Yes.

10   Q    Who did you say Walter Burkett was?

11   A    That's Linda O'Connor's son.

12   Q    And if you know, how much age difference between

13  Walter Burkett and Shannon?

14   A    At least ten.

15   Q    And did you at some point become aware of that CPS

16  history?

17   A    A little bit, yes.

18   Q    And was there considerable Child Protective Service

19  involved with Burkett?

20              MISS PEEBLES:  Objection.

21              THE COURT:  Basis.

22              MISS PEEBLES:  Leading.

23              THE COURT:  No, the question wasn't leading.

24  Anything else?

25              MISS PEEBLES:  Irrelevant.

Naomi Panus - Redirect

863

```
 1              THE COURT:  That's closer.  What's this
 2   relevant to?
 3              MR. LOVRIC:  I didn't bring it up, Judge, the
 4   defense did.  I'm just trying to establish what it was.  Miss
 5   Peebles brought it up.
 6              THE COURT:  Yeah, I know, but whether she
 7   brought it up or didn't, she did -- is there anything
 8   relevant to the proof in this case?
 9              MR. LOVRIC:  Miss Panus asked Linda O'Connor
10   at that point if she had prior CPS history and Linda O'Connor
11   on two occasions, at least, denied such history.
12              THE COURT:  Then it became apparent that there
13   was a history now.  Do we have to know why there was a
14   history?
15              MR. LOVRIC:  No.  I was simply asking if there
16   was considerable CPS history.  I'm not going into any
17   details.
18              THE COURT:  Okay.
19        A    Yes, there was a long history.
20        Q    When Linda O'Connor said to you there wasn't
21   history, I take it it wasn't like there was one minor event
22   and then that's it, many, many years ago?
23              MISS PEEBLES:  Objection.
24              THE COURT:  Leading.
25              MISS PEEBLES:  Leading.
```

Naomi Panus - Redirect

1          THE COURT:  Sustained.

2          MR. LOVRIC:  I'll move on to my next topic,

3   Judge.

4     Q     Miss Peebles talked to you about what Shannon said

5   to you when you were on your way over for a home visit and

6   you had learned about -- from Renee about Shannon visiting

7   the sites.  Do you recall that question?

8     A     Right.

9     Q     And you indicated to Miss Peebles that Shannon --

10  and you said begged you not to tell her mother.  Do you

11  recall that?

12    A     Right.  Yes.

13    Q     And what was Shannon's appearance when she's

14  begging you not to tell her mother about these sites that

15  she's been on?

16    A     She appeared afraid what her mom was going to do if

17  I told her mom.

18    Q     Did she seemed scared?

19    A     A little bit.

20    Q     Mr. Fischer asked you at the very end, close to the

21  very end of his questions whether you were informed by Renee

22  Lang that she caught Shannon using one of those adult toys.

23    A     Correct.

24    Q     Do you remember that question?

25    A     Correct.  Yes.

Naomi Panus - Redirect

865

```
 1      Q     What did you learn from Renee?  What did she tell
 2   you Shannon had done?
 3                   MISS PEEBLES:  Objection.  Hearsay.
 4                   THE COURT:  It is hearsay.  You're right.
 5                   MR. LOVRIC:  Judge -- Judge, the defense
 6   brought this out.  I'm simply going back to something the
 7   defendant brought out.
 8                   MISS PEEBLES:  That was not my question,
 9   Judge.
10                   MR. LOVRIC:  I'm responding to what Mr.
11   Fischer raised.
12                   THE COURT:  I understand that, but how does it
13   make the response not hearsay?
14                   MR. LOVRIC:  I think by not objecting to it
15   when Mr. Fischer asked, then defendant O'Connor has waived
16   that objection.  I don't know how when he asked, they don't
17   object, then I want to come back and clarify, they object.  I
18   can't talk about something they raised?
19                   THE COURT:  Well, when he asked the question,
20   I don't recall you objecting to the question.
21                   MR. LOVRIC:  I didn't.
22                   THE COURT:  Are you saying now --
23                   MR. LOVRIC:  But neither did defendant
24   O'Connor.
25                   THE COURT:  I know.
```

Naomi Panus - Redirect

866

1           MISS PEEBLES:  May I be heard?

2           THE COURT:  Okay.

3           (At the Bench)

4           MISS PEEBLES:  Mr. Fischer didn't ask what

5  Renee Lang said.  That's why there was no objection.  He

6  asked whether she had been caught using an adult toy.  That's

7  her firsthand observation.  This witness now is asking what

8  she said, and that's the basis of my objection, Judge.  And I

9  didn't waive anything and it's hearsay.  There's no

10  exception.

11          MR. LOVRIC:  Mr. Fischer asked this witness

12  whether this witness became aware that Renee Lang caught

13  Shannon using a sex toy.

14          THE COURT:  That's right.

15          MR. LOVRIC:  The way she became aware of that

16  is Renee Lang told her that.  She wasn't there.  And that was

17  brought out.  I'm simply asking to go back to discuss

18  something that was brought out by the defendant, and I do

19  think that if defendant O'Connor objected, because defendant

20  O'Connor knows how this information came to Miss Panus'

21  attention, she has to object when it's brought out by

22  defendant Sacco.  If she doesn't -- I don't see how she can

23  now object when I want to go back and clarify and talk about

24  what -- exactly what was said and wasn't.  It was hearsay the

25  first time it was said.  I didn't have any objection.  Now

Naomi Panus - Redirect

1    she wants to keep that out --

2                    THE COURT:  I'm going to have -- I don't

3    understand -- I understand what you're saying.  Ordinarily

4    when somebody brings something out, you're allowed to

5    clarify.  That's what -- the ordinary rule, but when it's

6    pure hearsay, I'm not sure that applies, and I'm going to

7    find out.

8                    MR. FISCHER:  Judge, we're going to face this

9    same question then.

10                   THE COURT:  I'll have an answer.

11                   MR. FISCHER:  Okay.

12                   (In open Court)

13                   THE COURT:  Okay.  I tried to recall any rules

14   or regulations or treatise that I've gone through in my not

15   short life, and I find none that covers this situation.  I

16   was thinking under the rule of completeness.  I was thinking

17   about opening doors.  I thought about all kind of things.  I

18   think even though that topic was brought up and referred to

19   by Mr. Fischer, that the question you're asking for calls for

20   hearsay.  I'm not going to let you ask that question.

21                   MR. FISCHER:  Judge, where I intended to go

22   with this witness raises a similar question.

23                   THE COURT:  You've been -- this witness,

24   you're telling us you're going back with her?

25                   MR. FISCHER:  Well, based on questions Miss

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Redirect                              868

1    Peebles asked.

2                     THE COURT:  Right.

3                     MR. FISCHER:  Renee expressed concerns

4    regarding Shannon O'Connor making false allegations against

5    me.  I intended to follow up on her questioning, but it seems

6    to me to be the same thing.

7                     THE COURT:  It may well be.  If you ask it,

8    we'll see what happens.  That's the rule.  I'd like to change

9    it but I can't.

10                    MR. FISCHER:  Okay.

11                    (In open Court)

12                    (Jury present)

13                    THE COURT:  Okay, Mr. Lovric.

14                    MR. LOVRIC:  Those are all the questions I

15   have, Judge.

16                    THE COURT:  All right.  Mr. Fischer.

17                    MR. FISCHER:  Thank you, your Honor.  May it

18   please the Court, briefly.

19   RECROSS-EXAMINATION

20   BY MR. FISCHER:

21       Q    I'd like to follow up on some questions that Miss

22   Peebles asked you.

23            Would you go to page 23 of your investigation

24   progress notes.

25       A    Okay.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Naomi Panus - Recross

869

1    Q     That discusses the time when -- when you found out

2    that Shannon O'Connor was accessing the porn sites?

3    A     Correct.

4    Q     Miss Peebles inquired of you about some things that

5    do not appear in your notes.  Miss Peebles inquired of you

6    concerning Renee expressing a concern about Shannon O'Connor

7    making false allegations concerning men.  That does not

8    appear in your note, does it?

9    A     There's another part of it where she says that in a

10   different note that has -- that she hangs all over men in her

11   family, she's -- they're afraid she's going to make an

12   accusation against them.

13   Q     Does it say that they're afraid that she's going to

14   make an accusation against them?  Does that say that in your

15   note?

16   A     I can look, refer to my notes and look.

17   Q     Please do.

18   A     It doesn't say she's afraid.

19   Q     What does the note itself say?

20   A     It says, she stated next she's going to say

21   they're -- it says, she stated next she's going to say

22   they're doing something with her.

23   Q     This is Renee Lang saying that next Shannon's going

24   to say they're doing something with her?

25   A     Right.

Naomi Panus - Recross

870

1    Q    This is a phone call with Renee Lang?

2    A    Yes.

3    Q    And the phone call with Renee was what date?

4    A    October 6.

5    Q    Subsequent to that phone call, did you have any

6    conversations with Shannon O'Connor about that subject?

7    A    Which one?

8    Q    About the subject with respect to Shannon O'Connor

9    kind of being -- hanging on men?

10   A    No.

11   Q    Did you discuss with Shannon anything about what

12   Renee told you concerning the fear that Shannon would make a

13   false accusation against the men?

14   A    No.

15          MR. FISCHER:  Those are all the questions.  I

16   thank you.

17          THE COURT:  Miss Peebles?

18          MISS PEEBLES:  Nothing further.

19          THE COURT:  Mr. Lovric?

20          MR. LOVRIC:  Judge.

21   REDIRECT EXAMINATION

22   BY MR. LOVRIC:

23   Q    This conversation with Renee Lang, this is

24   October 6 of 2006, about?

25   A    Around there.

Naomi Panus - Redirect

871

1  Q  Okay.  And is this conversation around the time

2 that Shannon was discovered to be on these sites that we've

3 talked about?

4  A  Yes.

5  Q  And to your knowledge, did Shannon ever accuse

6 anybody in the Renee Lang family of sexually abusing her?

7  A  Not to my knowledge.

8      MR. LOVRIC:  That's all I have.

9      THE COURT:  Anybody else?

10     MR. FISCHER:  No, your Honor.

11     MISS PEEBLES:  No, your Honor.

12     THE COURT:  Thank you, Miss Panus.  You may

13 step down, ma'am.

14     (Witness excused)

15     MR. LOVRIC:  Next witness is Elizabeth

16 Chesebro.

17     THE COURT:  Okay.

18     THE CLERK:  Ma'am, please state your name for

19 the record.

20     THE WITNESS:  Elizabeth Chesebro.

21

22

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                                    872

1   E L I Z A B E T H   C H E S E B R O, having been called as a

2   witness, being duly sworn, testified as follows:

3                  MR. LOVRIC:  May I, Judge?

4                  THE COURT:  Sure.

5   DIRECT EXAMINATION

6   BY MR. LOVRIC:

7        Q    Good afternoon, Miss Chesebro.

8        A    Good afternoon.

9        Q    I'm just going to ask you to try to speak into the

10  mike so we can all hear you.

11       A    Okay.

12       Q    And just for the members of the jury, could you

13  please tell them your full name and tell them where you work.

14       A    Yes.  My name is Elizabeth Chesebro.  I work for

15  Chenango County Department of Social Services.

16       Q    And Miss Chesebro, how long have you worked with

17  Chenango County DSS, as I'll refer to it?

18       A    Since August of 2005.

19       Q    And what kind of work do you perform at Chenango

20  County DSS?

21       A    I'm a caseworker in the Child Protective and

22  Preventive Unit.

23       Q    And during the time you've been employed there,

24  have you always had the title of caseworker?

25       A    Yes.

Elizabeth Chesebro - Direct

873

1      Q      And what kind of training and background do you

2    have in that area?

3      A      I have a bachelor's degree from Niagara University

4    in social work.

5      Q      And during your time with Chenango County DSS have

6    you also from time to time gone to training centers or

7    training sessions and gone through a number of sessions where

8    you're kind of trained to handle and deal with a variety of

9    different kind of cases that you may encounter?

10     A      Yes, I have.

11     Q      Miss Chesebro, we just heard from a person by the

12   name of Naomi Panus.  Do you know Naomi?

13     A      Yes, I do.

14     Q      How do you know her?

15     A      We both worked at Chenango County Social Services

16   together.

17     Q      Okay.  And at the time that you and she worked in

18   that office, were there other caseworkers also that worked

19   with the two of you?

20     A      Yes.

21     Q      And now, you're aware that Naomi no longer works in

22   the Chenango County DSS office?

23     A      Yes.

24     Q      Okay.  Were you aware or did you become aware

25   that -- at around the time that she was going to be leaving

1    that office?

2         A    Yes.

3         Q    Okay.  And did you become aware that she was going

4    to a similar agency but in another county?

5         A    Yes.

6         Q    Now, I'd like to talk about a matter dealing with a

7    Linda O'Connor and Shannon O'Connor in connection with

8    Chenango County DSS.  Did you at some point come to become

9    the caseworker in that matter?

10        A    Yes.

11        Q    About when, approximately when was it that you

12   became the caseworker?

13        A    I was assigned during the month of November in

14   2006.

15        Q    And your assignment to that case was as a result of

16   what happened?

17        A    Naomi Panus left the agency.

18        Q    Okay.  Were you aware at that time she was going to

19   work at Broome County DSS?

20        A    Yes.

21        Q    And prior to that time frame, that being November

22   of 2006, had you ever prior to that had any type of

23   interaction with Linda O'Connor or Shannon O'Connor?

24        A    My only interaction, prior to becoming the

25   caseworker, was having seen them in the office.  On occasion

Elizabeth Chesebro - Direct                    875

1    Naomi had brought them to the office for visitation.

2         Q    Okay.

3         A    Other than that, I had no direct interaction with

4    them.

5         Q    Okay.  So you'd kind of see them when Naomi was

6    working on the case as a caseworker?

7         A    Yes.

8         Q    And when -- at the time that you became the

9    caseworker as to this case, in whose custody was Shannon at

10   the time that you came into the case?

11        A    She was in her mother's custody.

12        Q    Linda O'Connor?

13        A    Yes.

14        Q    Now, just for the record, do you see Linda in court

15   today?

16        A    Yes.

17        Q    Can you indicate where you see her, just for the

18   record?

19        A    She's over at the table, the second person from the

20   end.

21        Q    What does she have on top, what she's wearing?

22        A    I can't see her right now.  A yellow top.

23              MR. LOVRIC:  Just for the record, indicating

24   defendant O'Connor.

25              THE COURT:  Record will so reflect.

Elizabeth Chesebro - Direct

876

1     Q    Now, when you became the caseworker in this matter,

2  was there any type of a petition pending in Family Court when

3  you came into the case in November of 2006?

4     A    There was a neglect petition pending.

5     Q    Okay.  And just very briefly, what does it mean

6  when we say the petition was pending in a court, Family

7  Court?

8     A    At the time that I came on the case, it was

9  between -- between hearings.  I believe they were waiting for

10  a fact-finding hearing to see if the allegations of neglect

11  were true.

12     Q    Okay.  Now, at that point in time, November of

13  2006, what -- what are the neglect allegations in this

14  petition?  What specifically is before the Family Court?

15     A    Can I refer to a document I have?

16     Q    Sure.  If that will refresh your recollection.

17     A    The -- what was pending at the time were concerns

18  about Linda and how she treated her daughter in regards to

19  yelling and hitting her on a regular basis.  About Shannon's

20  mental health and supervision issues that had arisen.

21     Q    Okay.

22     A    That was the basis for the neglect.

23     Q    Okay.  And when you came on as the caseworker

24  towards the middle of November of 2006 and then into early

25  December of 2006, did you or any person at DSS, to your

Elizabeth Chesebro - Direct                    877

1    knowledge, did you have any indication or any allegation from

2    any source that Shannon had been sexually abused by anyone at

3    that point in time?

4        A    Not to my recollection.

5        Q    Okay.  And what was it that in -- in your

6    assessment, what was it that DSS was looking to do?  I'm

7    talking about now the time frame from the time that you

8    became the caseworker into December of '06.  What is it that

9    you as the caseworker and DSS is looking to do with respect

10   to Linda O'Connor and Shannon O'Connor's situation?

11       A    At that time our goal was to continue Shannon to be

12   in the custody of her mother working on mental health issues

13   for both of them, addressing budgeting concerns that we had

14   and parenting skills.

15       Q    Okay.  Let's talk about budgeting concerns.  What

16   was it that you were working with Linda O'Connor with respect

17   to budgeting?

18       A    We -- we regularly developed a budget based on her

19   income and then what she needed to spend her money on so that

20   she could ensure her bills were paid, any debt she had, and

21   continue to meet the needs of Shannon.

22       Q    Okay.  And as far as parenting skills, was there

23   anything specific or was it just generally to work with Linda

24   O'Connor about parenting issues?

25       A    It was more of a general topic of helping her

Elizabeth Chesebro - Direct

878

1    understand Shannon's needs and the difficulties that every

2    parent has with raising a teenager.  How to address those

3    things in an appropriate manner rather than hitting, yelling,

4    screaming, throwing things.

5        Q    Okay.  And I take it throughout this time frame --

6    now we're talking about November/December -- did you have any

7    sense of any need to explore or to discuss any sexual abuse

8    issues?

9        A    No.

10       Q    So you had no reason to even think of that?

11       A    At that time I didn't have any information, no.

12       Q    When you first began to interact with Shannon,

13   November and December of 2006, how would you describe her?

14   She was how old at that time, approximately?

15       A    Approximately 12.

16       Q    Okay.  And I believe her birthday is sometime in

17   December?

18       A    Yes.

19       Q    How would you describe her?  What was she like at

20   that time?

21       A    She was fairly quiet, not really offering too much

22   information, not wanting to really engage in conversation

23   with me or go back and forth about telling anything related

24   to her family.  Pretty closed about sharing information.

25       Q    Okay.  Were there times that you felt like you had

Elizabeth Chesebro - Direct                  879

1   to really pull things from her and kind of wrestle them out

2   of her?

3                MISS PEEBLES:  Objection.  Leading.

4                MR. FISCHER:  I concur with that objection,

5   Judge.

6                THE COURT:  Sustained.

7        Q    All right.  Why don't you describe for like when --

8   when would you have conversation with Shannon, what was it

9   like to get information out of her at things happening in her

10  life or home?

11       A    Often sometimes I'd have to ask very direct

12  questions, and she really only provided information that was

13  directly asked for.

14       Q    Okay.  So if you don't happen to ask a very

15  specific direct question, you may not get a clear and candid

16  answer from them?

17       A    Correct.

18       Q    What was Shannon like in those months?  And I'll

19  talk about from the time you start in November through

20  December and even into January of '07.  What was she like in

21  terms of providing to you information about things that were

22  going on at home, specifically in her household?

23       A    I didn't have much information from Shannon at that

24  point in time.  I didn't have very detailed accounts of what

25  things were like in her house.  Whenever I did speak to her,

Elizabeth Chesebro - Direct

880

1    her answers were things were good, things were fine.  Very

2    simple answers like that.

3         Q    Very general answers?

4         A    Yes.

5         Q    Same question, different person.  What was Linda

6    O'Connor like to deal with from the time you started and into

7    November -- excuse me -- January of '07?

8         A    There were ups and downs in working with Linda.

9    Sometimes she was very willing to provide me information and

10   cooperate and meet with me regularly, and there were other

11   times where she just didn't want to either answer my

12   questions or have me involved in her life or talk to Shannon.

13   It varied by the day, it seemed like.

14        Q    The times that you spent with Linda O'Connor and

15   Shannon O'Connor together, did you make any observations

16   about what kind of relationship they had in how they

17   interacted with each other?  Did you make any of those

18   observations?

19        A    I don't recall observing in that time period

20   anything unusual at that point in time.

21        Q    Okay.  The times that you saw them, did they get

22   along?

23        A    Yeah, they did.

24        Q    Now, at some point when you became the caseworker

25   on the case, at some point around January of 2007, did you

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                                    881

1    become aware of a dog that was purchased?

2        A    I wasn't aware of a dog until -- I believe it was

3    sometime in February of '07.

4        Q    Okay.  How did you learn of that?

5        A    Shannon shared that with me that they had purchased

6    a dog.

7        Q    Okay.  Did you ever speak to Linda O'Connor about

8    that?

9        A    I did.

10       Q    What did she say about purchasing that dog?

11       A    She didn't deny that they had.  They purchased it

12   in Binghamton.

13       Q    Okay.  Did you learn at all how much she paid for

14   that dog?

15       A    Yes.

16       Q    How much?

17       A    Approximately $800.

18       Q    How did you learn that?

19       A    I learned first from Shannon.

20       Q    Did you ask Linda why or how she spent $800 on a

21   dog?

22       A    I did.  I didn't get a clear answer though.

23       Q    What do you mean by that?

24       A    She didn't provide me with any reason why she

25   bought it.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                    882

1       Q     Now, when you became the caseworker in November of

2   2006, did you familiarize yourself with the case file up

3   until that point in time which had been tended to by Naomi

4   Panus?

5       A     Yes.

6       Q     So at some point were you aware of certain events

7   that happened on or about August 11 of 2006?

8       A     Yes.

9       Q     And were you also aware of events that happened

10  thereafter on or about August 20 of '06?

11      A     Yes.

12      Q     And would you also be aware then of matters

13  occurring while Shannon lived with Renee Lang?

14      A     Yes.

15      Q     And did you at some point become aware of Shannon

16  cutting herself?

17      A     Yes.

18      Q     And did you actually see some of the results of

19  those cuttings?

20      A     No, I did not.

21      Q     What I mean, on her body, Shannon's body.  At any

22  point did you see any of those?

23      A     She had shown me some very faint scars that she had

24  well after the fact but not any time around the time that she

25  did that.

Elizabeth Chesebro - Direct

883

1    Q    Okay.  Now, at some point after becoming the

2  caseworker, were you aware of a court order issued by a

3  Family Court judge regarding Shannon and Mr. Dean Sacco?

4    A    Yes.

5    Q    Now, have you ever met Dean Sacco?

6    A    No.

7    Q    You wouldn't know him if you ran into him?

8    A    The only reason I'd know him is from the media that

9  I'd seen.

10   Q    We're not going to talk about the media in court.

11 In your professional dealings with Linda O'Connor and

12 Shannon, you never met Mr. Sacco?

13   A    No.

14   Q    Now, Miss Chesebro, in December of 2006, while you

15 were the caseworker for Linda O'Connor and Shannon O'Connor,

16 were you aware of a person named Lydia Smith?

17   A    Yes.

18   Q    Okay.  Who is Lydia Smith?

19   A    She was Linda's mental health counselor.

20   Q    What does that mean?

21   A    She was the person that had been assigned to work

22 on various issues through the Chenango County Mental Health

23 Clinic.

24   Q    Okay.  What agency does Lydia Smith work for?

25   A    Chenango County Mental Health Clinic.

Elizabeth Chesebro - Direct

884

1    Q    How are they different, if at all, or related to

2  the Department of Social Services, if at all?

3    A    They're two separate entities.  Both are in the

4  same building, but they function completely separate from one

5  another.

6    Q    If you can, I'm just trying to figure out -- are

7  they separate county agencies?

8    A    Yes.

9    Q    Okay.  And what -- what's the purpose for Mental

10  Health Services versus Department of Social Services?

11    A    The Department of Social Services and Children

12  Welfare and Children Services, we work with the -- the whole

13  family on whatever issues the family may have that need to be

14  changed.  Whereas Mental Health, they work primarily with one

15  individual and assess their needs and find services to suit

16  their needs.

17    Q    Okay.  And so Lydia Smith was working with Linda

18  O'Connor?

19    A    Yes.

20    Q    Was she at any point working with -- also with

21  Shannon O'Connor?

22    A    Yes, she was.

23    Q    Did that continue throughout or did that change?

24    A    No.  That changed.

25    Q    Okay.  When you say change, how did it change?

Elizabeth Chesebro - Direct

1     A     Shannon was assigned a different counselor.  So

2  they had two separate people to work with.

3     Q     Do you recall about how -- just very approximately,

4  when that occurred?

5     A     I don't recall.  I believe it was either towards

6  the end of Naomi's involvement with the family, at the very

7  beginning of my involvement.  Sometime in that time frame.

8     Q     Okay.  And then I take it then -- who was it that

9  kept Lydia Smith as their mental health worker?

10    A     Linda did.

11    Q     And Shannon received assignment of a new mental

12 health person?

13    A     Yep.

14    Q     Now, in December of 2006, Miss Chesebro, did the

15 Department of Social Services receive a telephone call on or

16 about December 6, 2006 from a person by the name of Dean

17 Sacco?

18    A     Yes.

19    Q     How did you become aware of that phone call?

20    A     The worker that received the call came to me and

21 just recorded to me Mr. Sacco's concerns about the family.

22    Q     And who was that worker?

23    A     The worker at the time was Jennifer Anderson.

24    Q     Where in the Department of Social Services did

25 Jennifer Anderson work?

Elizabeth Chesebro - Direct

886

1      A      She worked in the employment unit.

2      Q      What is the employment unit?

3      A      The employment unit at that time encompassed anyone

4   that was applying for public assistance that was unemployed

5   at the time.  They did various work force activities to find

6   these people jobs or do continued education.  They also cover

7   the grantee cases, meaning public assistance for children.

8      Q      Okay.  Jennifer Anderson made you aware of this

9   call from Mr. Sacco?

10     A      Yes.

11     Q      And did you then make any notations in your file or

12  your files?

13     A      Yes, I did.

14     Q      And what notations did you make in your file?

15     A      I put in my case note a record of what Jennifer had

16  told me.

17     Q      What was it that you wrote down in your case file?

18     A      I'd like to refer to my case notes.

19     Q      Sure.

20     A      Jennifer reported to me that Mr. Sacco had

21  concern --

22             MR. FISCHER:  I'm going to object at this

23  point.  If it's based on what somebody else -- Mr. Sacco said

24  to somebody who said to this witness, I object on the hearsay

25  basis.  Pretty clear.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                                887

1              MISS PEEBLES:  Judge, can we have a side-bar

2    on this?

3              THE COURT:  Yeah, I guess so.

4              (At the Bench)

5              MR. FISCHER:  I'll withdraw my objection.

6              THE COURT:  Thank you very much.

7              (In open Court)

8              THE COURT:  Okay, Mr. Lovric.

9    BY MR. LOVRIC:

10        Q    Miss Chesebro, could you tell us what it was that

11   you recorded in your progress notes in relation to this

12   December 6, 2006 phone call?

13        A    I reported to what Jennifer had told me that Mr.

14   Sacco reported Linda hadn't paid her rent for November or

15   December.  Linda had reported to Mr. Sacco that the county

16   was vendoring her payment, which Jennifer told me was not the

17   case.  The county was not responsible for sending the checks

18   directly to him.  And she just wanted me to be aware that

19   that was -- that was the case.

20        Q    Jennifer Anderson wanted to make you aware?

21        A    Yes.

22        Q    I take it she was able to somehow find out who the

23   caseworker was to relay this information to you?

24        A    Yes.

25        Q    And at that point in time, December 6 of 2006, was

Elizabeth Chesebro - Direct                                    888

1    Linda O'Connor, was she receiving any kind of subsidy for

2    housing from Norwich Housing Authority at that point in time?

3         A     Not to my knowledge.

4         Q     Okay.  And did you at some point then on

5    December 19 of 2006 have a conversation with Misty Davis?

6         A     Yes, I did.

7         Q     And Misty Davis is who?

8         A     At the time she was the supervisor of the

9    employment unit.

10        Q     Same unit as Jennifer Anderson was working in?

11        A     Yes.

12        Q     And did Misty Davis convey information to you

13   regarding a phone call from Mr. Dean Sacco?

14        A     Yes.

15        Q     And what -- did you then record that in your

16   progress notes in the report you filled out?

17        A     Yes, I did.

18        Q     And what information did you record in your

19   progress notes?

20        A     Mr. Sacco had relayed to her if the rent wasn't

21   paid immediately, he would be evicting Linda and Shannon, and

22   she, Misty Davis, told me what assistance Linda was

23   receiving, so that I was aware of her income.

24        Q     Okay.  So, you then became aware of what Linda

25   O'Connor was getting from any assistance and what she wasn't?

Elizabeth Chesebro - Direct                    889

1      A    Yes.

2      Q    And did you at that point know that she wasn't

3  getting any kind of housing assistance, money for housing?

4      A    Not through the county.

5      Q    Okay.  Now, at some point after the December 19,

6  2006 phone call by Mr. Sacco to DSS, did you have a

7  conversation with Linda O'Connor about these calls from Mr.

8  Sacco regarding rent and eviction and that sort of topic?

9      A    Yes, I did.

10     Q    I'm sorry?

11     A    Yes, I did.

12     Q    And what was Linda O'Connor's response?

13     A    She was shocked.  She said she wasn't aware that

14 there was the possibility of eviction and that her landlord

15 knew that she was trying to work with HUD and he was willing

16 to work with her and HUD as well.

17     Q    And did you at some point have any subsequent

18 conversations about -- with Linda O'Connor about whether or

19 not this had become ironed out or not?

20     A    I received a call sometime after that and she said

21 she had spoken with her landlord, everything was fine.  He

22 was going to work with her and HUD.

23     Q    Okay.  And from that point on, did you -- did you

24 have any other either direct or indirect complaints regarding

25 the rent and Linda O'Connor and Mr. Sacco from that point on?

Elizabeth Chesebro - Direct                      890

1      A     No.

2      Q     Now, at any point in time in December, when Mr.

3  Sacco calls DSS on these two occasions, at any point in time

4  did Linda O'Connor show you any kind of rent receipt or any

5  kind of receipt about paying rent or anything like that?

6      A     No, she did not.

7      Q     Did you ask for any kind of proof like that?

8      A     I don't believe I did at that time.

9      Q     Okay.  The case that you're working at that time,

10  December of 2006, is it still under this neglect petition as

11  you described?

12      A     Yes.

13      Q     And it's still just pending in the Family Court?

14      A     Yes.

15      Q     Did you at any point in December of 2006 become

16  aware of Linda O'Connor being unable to pay and unable to

17  have money in the bank account to cover checks that she was

18  issuing?

19      A     I know that that was an ongoing issue.  I don't

20  know if it was during December of '07 that I became aware of

21  that, though.

22      Q     December of '07 or '06?

23      A     '06, I'm sorry.

24      Q     Okay.  But you were aware of it in general terms,

25  generally speaking?

Elizabeth Chesebro - Direct

1      A     Yes.

2      Q     Now, in January of 2007, do you recall an event --

3  or let me ask you:  Do you know of an event where Shannon ran

4  away to the Parmalee house?

5      A     Yes, I do.

6      Q     What was that all about?

7      A     My understanding, that there had been an argument

8  between Linda and Shannon.  Shannon was afraid her mom was

9  going to hit her and she took off.

10     Q     By took off, she went where?

11     A     She went to a friend's house in the same town.

12     Q     Okay.  And the last name of the friend's house?

13     A     Parmalee.

14     Q     Okay.  And was this friend of hers a friend from

15  around the neighborhood or a friend from school?

16     A     From school.

17     Q     And how long was she missing at this friend's

18  house, about?

19     A     I would say at the most, an hour or two.

20     Q     Okay.  So, authorities quickly figured out where

21  she was and went to get her?

22     A     The authorities received a call from the Parmalee

23  residence that she was there and she had run away from home.

24     Q     Okay.  After that event, in January, did you have

25  any conversations with Linda O'Connor about what is going on?

Elizabeth Chesebro - Direct                   892

1      A     In general, yeah, I did.

2      Q     Okay.

3      A     Conversations about how her and Shannon were

4  getting along, and reports were that things were fine, that

5  they were doing well.

6      Q     That's the feedback you were getting?

7      A     Yes.

8      Q     Was Shannon difficult to get information out of at

9  this point?

10     A     Not -- not difficult.  I mean, she agreed to meet

11  with me, but she gave very simple answers, very basic, yes,

12  no, things are fine, things are good.  No specific instances

13  of problems.

14     Q     Okay.  Directing your attention now to February 26

15  of '07.  Did you become involved in an event that

16  precipitated from something that happened at Pizza Hut?

17     A     Yes, I did.

18     Q     How did you learn of that?

19     A     I received a child protective report about the

20  incident on the 25th.

21     Q     Okay.  So, the event occurred on February 25 but

22  you became involved on February 26?

23     A     Yes.

24     Q     And who did you first speak to -- Let me with

25  withdraw that.  Did you -- did you interview Linda O'Connor

Elizabeth Chesebro - Direct                    893

1    on February 26 about this thing that happened at Pizza Hut?

2         A    Yes, I did.

3         Q    And where was this interview conducted?

4         A    At her home.

5         Q    And what did Linda O'Connor tell you happened?

6         A    That they hadn't had any food in the residence for

7    quite some time and that as a means to feed her daughter that

8    they had gone to Pizza Hut, eaten and walked out without

9    paying.

10        Q    Did Linda O'Connor tell you how long it had been

11   that they were out of food at the house?

12        A    It was approximately a week, I believe, that they

13   had very minimal food and were eating things like pickles,

14   oatmeal packets, things of that sort.

15        Q    And -- and did you talk to Linda O'Connor whether

16   or not this was the first time that this happened at Pizza

17   Hut?

18        A    Yes, I did.

19        Q    And what did she say?

20        A    That that was actually the third time that they had

21   left Pizza Hut without paying.

22        Q    And did you discuss -- Let me ask you:  Did you

23   also interview Shannon O'Connor on February 26?

24        A    Yes.

25        Q    Where was that interview conducted?

Elizabeth Chesebro - Direct

894

1    A    I interviewed her at Perry Brown School.

2    Q    At Perry Brown?

3    A    Perry Brown.

4    Q    Okay.  Now Perry Brown School is located where?

5    A    In Norwich.

6    Q    And at the time where was Shannon going to school?

7    A    At Perry Brown.

8    Q    So that's the name of the school in Norwich?

9    A    Yes.

10    Q    And when you interviewed Shannon, describe

11 Shannon's demeanor when you're speaking to her.

12    A    I recall when she came in the room, she was very

13 distant.  Sullen.  Didn't make eye contact.  Gave very brief

14 answers.  But she seemed to warm up pretty quickly and was

15 very open with me about what had gone on.  Her feelings about

16 being involved with stealing with her mom.  Her worries about

17 herself being arrested for that.  And by the end of the

18 conversation, she was very open with me.  Making good eye

19 contact.

20    Q    Did Shannon O'Connor confirm the lack of food

21 present at the house?

22    A    Yes, she did.

23    Q    In fact, did you note or was there discussed how

24 much weight Shannon had lost?

25    A    Yes.  She reported she lost five pounds during the

1    February break.

2        Q    And was there discussion about the availability or

3    lack of availability of money to buy simple things like food?

4        A    Yes.

5        Q    Did you discuss that with Linda O'Connor?

6        A    Yes, I did.

7        Q    And what was Linda O'Connor's response?

8        A    She wasn't willing to give me much of an answer of

9    why she didn't have money for food.  I, based on my interview

10   with Shannon, actually brought it to Linda's attention.  I

11   thought it was because of the purchase of a dog.  And she

12   kind of skirted around the subject.

13       Q    When you say she, you're referring to who?

14       A    She, Linda.

15       Q    Did Shannon on February 26 confirm any of the

16   things that Linda O'Connor had told you regarding not paying

17   for things and walking out?

18       A    Yes, she did.

19       Q    And at that point in time, February 26, 2007, were

20   you able to make any assessment as to what was going on as

21   far as Linda O'Connor providing or not providing for Shannon

22   O'Connor and her physical well-being?

23       A    Yes.  At that point, based on the information I

24   had, it didn't appear that Linda was able to meet Shannon's

25   needs at that specific time.

Elizabeth Chesebro - Direct

896

1      Q      Now, what happened to Shannon as a result of this

2  event on February 25 of 2007?  And I apologize, I might have

3  said '06 before.  Any time I'm referring to February 25 or

4  26, I'm meaning to reference 2007.  What happened to Shannon?

5      A      She was placed in foster care that day.

6      Q      Okay.  That day being what day?

7      A      February 26 of 2007.

8      Q      And that was foster care by what mechanism?

9      A      Linda had signed a consent for her placement in

10  foster care.

11      Q      How did that happen?

12      A      I was at the home talking to Linda about the

13  report, having left Wal-Mart.  This was after interviewing

14  Shannon.  And I -- I explained to her at that time I didn't

15  feel that Shannon was safe in her care and that she couldn't

16  meet Shannon's needs and asked that she sign the consent.

17      Q      You mentioned Wal-Mart.  You mean Wal-Mart or Pizza

18  Hut?

19      A      I'm sorry.  I didn't mean to say Wal-Mart.  I meant

20  to say Pizza Hut.

21      Q      I heard Wal-Mart.  I just want to make sure if

22  you're referring to Wal-Mart or Pizza Hut.

23      A      No, I was referring to Pizza Hut.

24      Q      With that, Shannon then goes into foster care?

25      A      Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                    897

1      Q      And was she in fact placed into a foster care
2  family?
3      A      Yes, she was.
4      Q      And that was on the 26th of February?
5      A      Yes.
6      Q      From that point on, had Shannon ever gone back into
7  the custody of Linda O'Connor from that point on?
8      A      No, she has not.
9      Q      Up until the present time?
10     A      Correct.
11     Q      And to your knowledge, was that the first and only
12  time that Shannon has been taken out -- out of Linda
13  O'Connor's custody and never returned to her custody?
14     A      That would be the first time she was never
15  returned, yes.
16     Q      So what, we're talking about now approximately over
17  a year?
18     A      Yes.
19     Q      The foster family that Shannon went to, I don't
20  want to -- I'm not going to mention the name or names, but
21  I'd like to just talk about the general status of her life in
22  this family.  The family that she was placed with, any other
23  children in that family?
24     A      Yes, there are many children in that family.
25     Q      About how many?

Elizabeth Chesebro - Direct                    898

1      A     I believe there were seven total, including

2    Shannon.

3      Q     Okay.  And was it a mother and a father foster

4    parents?

5      A     Yes.

6      Q     And I take it you've been to see and observe

7    Shannon in that foster care family a number of times?

8      A     Yes.

9      Q     How would you describe that foster care family?

10     A     They are very busy.  They keep the kids all

11   involved with various community activities.  They have a

12   large extended family so they're always coming and going and

13   having family members at their house for various activities.

14   Very busy family.

15     Q     And when Shannon was first placed into that family,

16   can you describe -- describe Shannon?

17     A     She was a changed child.  She was very outgoing and

18   bubbly and smiling all the time.  Just very happy.  Very

19   typical of what you would expect of a 13-year-old being just

20   very focused on school and friends and going to the movies,

21   typical teenage activities.

22     Q     While she was in this foster care family, where was

23   she going to school at the time when she went into foster

24   care?

25     A     She remained in the Norwich district.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct    899

1    Q    Okay.  And how -- how would she get from the foster

2  care family to the school in Norwich?

3    A    She took the bus.

4    Q    Okay.  Very early on, when she first was placed,

5  and by that I mean February 26 or 27, was she taking the bus?

6    A    I believe right from the first day she took the

7  bus.  I don't recall ever transporting her when she was first

8  placed in foster care, no.

9    Q    Okay.  Now, I'd like to direct your attention, Miss

10  Chesebro, to March 2, 2007.  Did you receive a phone call on

11  that date?

12    A    My supervisor received a phone call.

13    Q    Okay.  And then did you at some point become aware

14  of the substance of that phone call?

15    A    Yes, I did.

16    Q    And what was it that DSS received a call about?

17    A    A call was received from the school stating Shannon

18  had gone to a teacher and said she had been sexually abused

19  by the landlord of her mother's residence.

20    Q    And was that the first time that you or to your

21  knowledge any DSS worker was advised that Shannon had made

22  this disclosure?

23    A    Yes.

24    Q    And what did you do as a result of receiving or --

25  receiving that information from that phone call?  What did

Elizabeth Chesebro - Direct

900

1   you do as a result?

2       A    I went to the foster family's home and interviewed

3   her.

4       Q    And was this during the school day or after school

5   or how -- what time, I guess?

6       A    The call was received at the very end of the school

7   day.  Shannon was actually on her way home from school at

8   that point, so I went up to the foster home in the evening.

9       Q    Okay.  Did you then have a conversation and a

10  discussion and did you interview Shannon?

11      A    Yes, I did.

12      Q    And this occurred at the foster care family's home?

13      A    Yes.

14      Q    Were you and she alone or were there other members

15  around?

16      A    No.  We spoke in private.

17      Q    Okay.  And can you describe Shannon's demeanor and

18  appearance when you first began to talk to her about this

19  disclosure?

20      A    She was very shaken.  She appeared embarrassed to

21  be talking about a very private subject.  She didn't make

22  good eye contact with me.  Her voice was very low.  She

23  didn't seem like the child I had seen recently that just

24  wanted to tell me all about everything and with such

25  exuberance.  She was very unique about it.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                901

1    Q    Did she have a difficult time telling you all the

2  details?

3    A    Yes.

4    Q    About how long would you say you and she spoke and

5  talked about -- about what had happened to her?

6    A    I would say approximately an hour to an hour and a

7  half.

8    Q    And during the course of that conversation, did

9  Shannon disclose to you what had been done to her?

10   A    Yes, she did.

11   Q    And during that conversation, who was it that she

12 was talking about that had done things to her?

13   A    The landlord of her mom's residence, Dean Sacco.

14   Q    Now, did she refer to him by name?

15   A    She calls him Dean.

16   Q    Okay.  And during that conversation did she

17 describe a number of events to you?

18   A    Yes, she did.

19   Q    And during that conversation, on March 2, did she

20 ever disclose anything at all about any type of sexual abuse

21 by Linda O'Connor?

22   A    No, she did not.

23   Q    And during the conversation at the foster care

24 family's home, did you at that point in time tell her that

25 you would need to notify the authorities?

1    A    Yes, I did.

2    Q    And what was her reaction to that?

3    A    She seemed to accept it.  I think she understood

4    that it was -- the things we were talking about were very

5    serious and needed to be addressed.

6    Q    Now, did you -- did you know what it was that

7    caused Shannon to say something to a teacher at school?

8    A    Yes.

9    Q    What was it?

10   A    They had been talking about puberty in science

11   class and the -- in the discussions, some kids asked

12   questions about just various sexual activities, and after the

13   class Shannon went to the teacher in private and asked if

14   it's -- if it's wrong if one person never says no.

15   Q    I take it that led to the teacher then asking a few

16   questions of Shannon?

17   A    I assume so, yes.

18   Q    That's how the call came in to DSS?

19   A    Yes.

20   Q    Now, as a result of speaking with Shannon, when did

21   you notify any law enforcement authorities?

22   A    I contacted my supervisor after interviewing

23   Shannon to discuss how to proceed, and she actually made the

24   arrangements with the Norwich Police for Shannon to be

25   brought down that same night to talk to the detective.

Elizabeth Chesebro - Direct

1    Q    Okay.  Did you accompany her?

2    A    Yes, I did.

3    Q    Okay.  And where did you and Shannon go?

4    A    We went from the foster home down to the center of

5    town where the Norwich police station is.

6    Q    And did you at some point meet a Detective Patrick

7    Blenis?

8    A    Yes, I did.

9    Q    Did you know Detective Blenis prior to this event?

10   A    Yes, I did.

11   Q    From around the area as a police officer?

12   A    Just from my professional capacity, having worked

13   at DSS.

14   Q    Okay.  From time to time police become involved in

15   your line of work?

16   A    Yes.

17   Q    And did -- and who was present when you went and

18   met with Detective Blenis?

19   A    Just Detective Blenis, myself and Shannon.

20   Q    And were you present when Detective Blenis

21   interviewed Shannon?

22   A    Yes, I was.

23   Q    And did Shannon go on at that interview with

24   Detective Blenis and you to describe the same things that she

25   had told you about back at the foster care home?

Elizabeth Chesebro - Direct

1      A     Yes, she did.

2      Q     And did Shannon then go on to describe things that

3   were done to her by Dean Sacco?

4      A     Yes, she did.

5      Q     During that interview with Detective Blenis did

6   Shannon ever disclose anything about sexual abuse of herself

7   by anyone other than Dean Sacco?

8      A     No, she did not.

9      Q     Approximately about how long would you say you and

10  Shannon spent at Detective Blenis' office?

11     A     We were --

12     Q     Just an approximation.

13     A     We were there for quite some time.  I'd say at

14  least two hours.

15     Q     Okay.  And did -- where did -- where did Shannon go

16  after this interview with Detective Blenis?

17     A     I took her back to the foster home.

18     Q     Okay.  Was the -- what was the plan in terms of

19  Shannon, where she was going to remain after this disclosure

20  that she had made?

21     A     The plan was that she remain at her foster home.

22     Q     Okay.  Do you know whether or not the foster

23  family, the parents, not necessarily the other children but

24  the parents, were they made aware of what transpired?

25     A     The foster mother was.  I'm not aware if she shared

Elizabeth Chesebro - Direct

905

1    that with the foster father or not.

2        Q    Who informed her as to what Shannon had disclosed?

3        A    Prior to my going to talk to my supervisor that

4    night, after interviewing Shannon, I asked Shannon if I could

5    have the foster mom come in and sit with her while I talked

6    to her supervisor on the phone and asked if it would be okay

7    with Shannon if I shared what we had been talking about with

8    the foster mom.  We brought the foster mom into the room and

9    I shared the concerns, just general overview of what Shannon

10   had shared with me to the foster mom, and then she sat with

11   Shannon while I spoke with my supervisor.

12       Q    I take it you wanted in some way to make the foster

13   parents aware of the disclosure Shannon made as to what had

14   happened to her?

15       A    Yes.

16       Q    Just so they were aware of it?

17       A    Yes.

18       Q    Now, following the interview on March 2 by

19   Detective Blenis, did you at some point then look to arrange

20   to make an appointment for a physical examination of Shannon?

21       A    Yes, I did.

22       Q    Now, Miss Chesebro, on March 8 of 2007, did you

23   have a conversation with Lydia Smith?

24       A    Yes, I did.

25       Q    And Lydia Smith is the same Lydia Smith that we

Elizabeth Chesebro - Direct                          906

1    talked about earlier?

2        A    Yes, sir.

3        Q    And what I'd like to do at this point is, I'd like

4    to show you what's marked as Government's Exhibit Number 104.

5    I'm going to mark it as Government's 104, Government Exhibit.

6              MISS PEEBLES:  No objection.

7    BY MR. LOVRIC:

8        Q    I'd like to show you Exhibit 104, Miss Chesebro.

9    Take a look at that and just generally tell us, what is

10   Exhibit 104?

11       A    It's a copy of my case notes.  A partial copy of my

12   case notes.

13       Q    Okay.  It's a two-page document?

14       A    Yes, it is.

15       Q    And at the very bottom of that document, then,

16   going to the very top of the second page, is there a progress

17   note in connection with your conversation with Lydia Smith on

18   March 8 of 2007?

19       A    Yes, there is.

20       Q    And does that progress note in that two-page

21   document memorialize a conversation and information that you

22   recorded based upon this conversation with Lydia Smith?

23       A    Yes, it does.

24             MR. LOVRIC:  I would offer Government Exhibit

25   104.

Elizabeth Chesebro - Direct                          907

1          MISS PEEBLES:  No objection.

2          MR. FISCHER:  May I have just one moment to

3    look at it in my binders, Judge?

4          THE COURT:  Sure.

5          MR. FISCHER:  I have no objection.

6          THE COURT:  All right.  Receive Government's

7    104 in evidence.

8    BY MR. LOVRIC:

9      Q    Next, I'd like to show you, Miss Chesebro,

10   Government Exhibit Number 14 for identification.

11         MR. FISCHER:  Just a moment, Judge?

12         THE COURT:  Yes, you may.

13     Q    If I can show you Exhibit Number 14, Miss Chesebro.

14   If you just take a look at that.  And does Exhibit 14 reflect

15   progress notes of yours regarding those two phone calls on

16   December 6 and December 19 by Dean Sacco to DSS?

17     A    Yes, it does.

18         MR. LOVRIC:  At this time, your Honor, I would

19   offer into evidence Exhibit Number 14 and Exhibit 104.

20         MISS PEEBLES:  No objection.

21         MR. FISCHER:  No objection.

22         THE COURT:  I already received 104, but we'll

23   receive Government's 14.

24   BY MR. LOVRIC:

25     Q    Miss Chesebro, if you could look at Exhibit Number

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                908

104.  And if you could read the progress note notations that

you made in connection with this conversation with Lydia

Smith?

     A    Would you like it read directly from here?

     Q    Yes, please.

     A    PC.

     Q    If I can just preface, if there's like a letter,

can you tell us what the letter means, since you wrote it.

Like PC, what does that mean?

     A    That means phone call.  "Phone call from Lydia

Smith, CCMH," which stands for Chenango County Mental Health.

"She is aware of Shannon's sexual abuse disclosure.  I

reiterated to her that this has not yet been discussed with

Linda and don't wish for it to be addressed in the counseling

session yet.  I told Lydia that I will make her aware once it

is addressed with Linda.  Linda will be seen next Tuesday at

4 PM.  At the last session she came in crying and wanting to

address all of the issues, but Lydia believed this will take

a significant amount of time since her history is so

extensive.  Based on her conversation with Reverend Myrick,

Lydia is concerned that Linda may have prostituted Shannon as

an exchange for the rent.  We will be in contact as needed."

End of note.

     Q    Okay.  Now, this notation, these are your

notations?

Elizabeth Chesebro - Direct                    909

1     A    Yes.

2     Q    And the person you're speaking to is Lydia Smith?

3     A    Yes.

4     Q    Who is Linda O'Connor's mental health counselor?

5     A    Yes.

6     Q    And Lydia Smith is telling you this information
7 about something about a conversation with Pastor Myrick and
8 then Lydia suspecting that Miss O'Connor may have prostituted
9 Shannon out?

10    A    Yes.

11    Q    So this is Lydia telling you this?

12    A    Yes, it is.

13    Q    This is not writing this about what you suspect?

14    A    Correct.

15    Q    Did Lydia Smith ever elaborate on what made her
16 tell you this or what made her believe what she was telling
17 you?

18    A    No.

19    Q    Did she go on and tell you anything about Pastor
20 Myrick?

21    A    No.

22    Q    Did you know who Pastor Myrick was?

23    A    I did, yes.

24    Q    Okay.  Did you know at the time?

25    A    Yes, I did.

Elizabeth Chesebro - Direct

1    Q    Okay.  Who was Pastor Myrick?

2    A    I became aware of her because Linda and Shannon had

3  referenced her before.  She was a pastor from the old church

4  they attended.

5    Q    In what area?

6    A    In the Deposit area, I believe.

7    Q    Okay.  And beyond that, did you know what it was

8  that Lydia was basing this information or this impression

9  that she's conveying to you?

10   A    No.

11   Q    Now, during the conversation with Lydia Smith, you

12  indicated to her that -- and this conversation is on March 8?

13   A    Yes.

14   Q    And you indicated to her that you did not want

15  Lydia to yet inform Linda O'Connor about Shannon's

16  disclosures?

17   A    Yes.

18   Q    And why is that?  Why are you asking Lydia not to

19  reveal that?

20   A    Because there was an ongoing law enforcement

21  investigation.

22   Q    Okay.  Were you aware that law enforcement was

23  going to be looking to pursue and try to gain information

24  about things that Mr. Sacco was being accused by Shannon of

25  doing?

Elizabeth Chesebro - Direct                          911

1       A     Yes.

2       Q     And did you at that point in time, that being

3  March 8 of 2007, did you at that point in time yet reveal

4  anything to Linda O'Connor about the criminal investigation

5  being conducted by Detective Blenis?

6       A     No.

7       Q     What I'd like to do next is show you Government's

8  Exhibit Number 104 -- excuse me, 105.

9             MR. FISCHER:  Just one moment, Judge, please.

10            THE COURT:  Sure.

11            MR. FISCHER:  Thank you.

12  BY MR. LOVRIC:

13      Q     Miss Chesebro, I'd like to show you Exhibit Number

14  105.  Do you recognize what that is?

15      A     Yes, I do.

16      Q     What is that?

17      A     It is a couple of case notes that I had written.

18      Q     Okay.  And on that form, are they referred to as

19  progress notes?

20      A     Yes, they are.

21      Q     And does the -- the specific item, one page of 105,

22  does it relate to an entry by you of March 5, 2007?

23      A     Yes, it does.

24      Q     Is there an entry on there regarding an event on

25  March 5 of 2007 at about 2:31 PM?

Elizabeth Chesebro - Direct

1    A    Yes, there is.

2    Q    And did you make that entry?

3    A    Yes.

4         MR. LOVRIC:  I would offer Exhibit 105 into

5    evidence.

6         MR. FISCHER:  No objection.

7         MISS PEEBLES:  No objection.

8         THE COURT:  Receive Government's 105 in

9    evidence.

10    Q    And can you read that entry at 2:31 PM?

11    A    "PC," phone call.  "From Sheila Narr, Perry Brown.

12    She left a message that Shannon is with her and has questions

13    she'd like to discuss."  End of note.

14    Q    Okay.  And how was it that you were able to

15    indicate specifically 2:31 PM?

16    A    When we receive voice messages on our office

17    phones, they give the date and time that the call was

18    received.

19    Q    Okay.  So you got that right from your machine that

20    the message was left on?

21    A    Yes.

22    Q    And Perry Brown again is the school where Shannon

23    was attending?

24    A    Yes.

25    Q    And the teacher, this is a teacher that identified

Elizabeth Chesebro - Direct                    913

1    herself as making a phone call?

2         A    Sheila Narr is a counselor at the school.

3         Q    At that very school?

4         A    Yes.

5         Q    In that message she said Shannon is with her and

6    they have some questions for you?

7         A    Yes.

8         Q    Okay.  You can put that down.  Then I won't have

9    you read it, Miss Chesebro.  Exhibit 14, I think I asked you

10   before.  Does that have the -- your notes about those calls

11   that Jennifer Anderson and Misty Davis received from Mr.

12   Sacco?

13        A    Yes, it does.

14        Q    Okay.  Now, Miss Chesebro, did you -- on or about

15   March 12 of 2007, did you accompany Shannon to a physical

16   examination?

17        A    Yes, I did.

18        Q    And how was that examination arranged?  How did

19   that happen?

20        A    I made the arrangements by calling Chenango

21   Memorial Hospital.  That's where Dr. Waters, our area's only

22   certified physician to do sex abuse exams, is located, and I

23   made the arrangements for a time that he would be available

24   to do the exam.

25        Q    Okay.  You said he's the only certified what, to

Elizabeth Chesebro - Direct

1    conduct what kind of exam?

2        A    A sex abuse examination.

3        Q    So you made this call ahead of time to arrange to

4    have an examination done?

5        A    Yes.

6        Q    Why was it that you were taking Shannon to have

7    this physical examination done?

8        A    It's pretty typical in cases where we have had a

9    child allege them being sexually abused with penetration that

10   we have a sexual abuse exam done to look to see if the hymen

11   is still intact for a female child, to screen for diseases,

12   and in Shannon's case, for pregnancy as well.

13       Q    At that point in time I take it, based on what

14   Shannon had said to you, you had some reason to believe that

15   she had been sexually penetrated?

16       A    Yes.

17       Q    Was that from your conversations with her?

18       A    Yes.

19       Q    And that examination, was it in fact conducted by

20   Dr. Waters?

21       A    Yes, it was.

22       Q    Did you ever become aware of the results of his

23   examination or not?

24       A    Yes, I did.

25       Q    How did you become aware of them?

Elizabeth Chesebro - Direct                    915

1       A    I took Shannon from the exam and received paperwork

2    when it was completed for my case file.

3       Q    Did you actually get a copy of the report, the

4    medical report that was completed by hospital personnel, some

5    of which Dr. Waters completed?

6       A    Yes.

7                 MR. LOVRIC:  I'll continue, Judge.  I don't

8    have the exhibit with me that I need.

9       Q    Miss Chesebro, at some point around March 12,

10   March 13 of 2007, did you -- did you have a conversation with

11   Linda O'Connor about whether or not she had allowed Mr. Sacco

12   to have access to Shannon unsupervised?

13      A    I don't recall.  But I'd like to look at my case

14   notes.

15      Q    Sure.

16      A    What time frame was that you were asking for?

17      Q    Approximately in the middle of March of 2007.

18      A    Not to my knowledge.

19      Q    Okay.  Do you recall an event on March 13 of 2007

20   in Family Court?

21      A    Yes, I do.

22      Q    What transpired there on that date?

23      A    There was a Family Court appearance for the

24   original neglect that had been filed by Naomi Panus.  And it

25   was also the initial appearance -- I filed an amended neglect

Elizabeth Chesebro - Direct

1    petition based on the information I got interviewing Shannon

2    and Linda in February.  So this was the appearance for that.

3    Shannon was ordered to remain in foster care at that time.

4         Q    By the Family Court judge?

5         A    By the Family Court judge, yes.

6         Q    Did the Family Court judge place any term limit up

7    until when it was she was going to remain in foster care, at

8    least at that time?

9         A    Until October of 2007.

10        Q    And were -- at that point in time, Shannon was

11   still in the foster care family that you described?

12        A    Yes.

13        Q    Okay.  So she was going to at least continue

14   through October of 2007?

15        A    Yes.

16        Q    And what was Shannon's reaction to that?

17        A    She was very excited to hear that.  I would say she

18   had a sense of relief that she was going to remain where she

19   was.

20        Q    And did you at that point -- at some point soon

21   after March 13 or even on March 13 did you have a

22   conversation with Linda O'Connor where she expressed some

23   concerns about her financial situation based upon the judge's

24   order?

25        A    I do recall she was concerned that without Shannon

Elizabeth Chesebro - Direct

917

1   in the home, she would lose housing assistance and her

2   grantee case, which would be the public assistance for having

3   a child.

4       Q    Okay.  So, Linda O'Connor was saying what to you,

5   what would happen?

6       A    That without that, she wouldn't have a place to

7   live.

8       Q    Okay.  Did she mention she would get less money

9   because Shannon's no longer with her?

10      A    Yes.

11      Q    Did Linda express to you, Linda O'Connor, on

12  March 13, Linda express to you any feelings about what she

13  thought about the judge's order to order Shannon continued in

14  foster care through October of '07?

15      A    Not that I recall.

16      Q    Did she say anything about it?

17      A    Not that I recall, other than without Shannon she

18  would lose some of her income.

19      Q    Did Linda O'Connor express any anger to you or

20  dissatisfaction with the judge's order?

21      A    Not that I recall.

22      Q    Now that court proceeding was March 13 of '07?

23      A    Yes.

24      Q    Now, do you recall going to the Norwich Police

25  Department on March 14 of 2007?

Elizabeth Chesebro - Direct

918

1      A    Yes, I do.

2      Q    And what was your understanding of going to the

3   Norwich PD on that date, March 14?

4      A    That Shannon would be making a controlled phone

5   call to Dean Sacco.

6      Q    Okay.  When you say controlled phone call, what do

7   you mean by that?

8      A    My understanding was, there was a device to be used

9   which would be recorded -- we'd record both Shannon and

10  Dean's end of the conversation.

11     Q    And were you present on March 14 during the entire

12  time that Shannon was at the police station?

13     A    Yes.

14     Q    And do you recall whether phone calls were actually

15  placed to Dean Sacco --

16     A    Yes.

17     Q    -- while you were there?

18     A    Yes, there were.

19     Q    And were you able to hear what Shannon was saying

20  to Dean on the telephone?

21     A    Yes.

22     Q    Now, during the time that these calls were made on

23  March 14, were there also things that you or some other

24  person like Detective Blenis would write down for Shannon to

25  say to Dean Sacco?

Elizabeth Chesebro - Direct

1    A    Yes.

2    Q    And was this something that was discussed before

3  the calls were actually placed to Dean Sacco?

4    A    Yes.

5    Q    Okay.  To your recollection, who was it that kind

6  of explained to Shannon what it was that was going to be

7  happening and what -- what you wanted her to do when she

8  spoke to Dean Sacco on the telephone?

9    A    It was Detective Blenis and Assistant Chief

10  VanMiles that were explaining to her the purpose and how she

11  would go about conducting the phone calls.

12    Q    Okay.  And I take it then a number of calls were

13  made on March 14?

14    A    Yes.

15    Q    Now, were you aware that the first, very first call

16  made to Dean Sacco, that the device didn't record that?  Were

17  you aware or not aware of that?

18    A    Not at the time, but I learned about it at the

19  completion of our time at the police station that day.

20    Q    Okay.  So it's not something Detective Blenis

21  shared with you after the very time it occurred?

22    A    No.

23    Q    Do you recall more than one call being placed to

24  Dean Sacco?

25    A    Yes, I do.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                    920

1    Q    Without getting into who said what, the topics

2    discussed during the phone calls to Dean Sacco, were they the

3    same kind of topics during the first and second call or were

4    they different topics?

5    A    It was the same general topic.

6    Q    Okay.  Do you recall some of the topics that were

7    discussed by Shannon and Dean Sacco?

8              MR. FISCHER:  Your Honor, at this point I do

9    have an objection because I can't cross it, and I have an

10   objection on that basis.

11             THE COURT:  It seems to me we heard some

12   telephone calls, did we not?

13             MR. FISCHER:  I'm sorry?

14             THE COURT:  Did we not hear telephone calls?

15             MR. FISCHER:  I think, as I understand the

16   question, it's concerning telephone calls we did not hear.

17             THE COURT:  I'm sorry.  I may have

18   misunderstood.

19             Yeah, first and second call.  We didn't hear

20   the first call.  You're right, Mr. Fischer.  It wasn't

21   recorded.  So I'll sustain the objection.

22   BY MR. LOVRIC:

23   Q    I guess my question, Miss Chesebro, not what is the

24   substance of the calls but the topics discussed.  Were they

25   the same or different topics?

Elizabeth Chesebro - Direct                    921

1              MR. FISCHER:  Asked and answered.  The exact

2    same question was answered two questions ago.

3              MR. LOVRIC:  If I asked it, I don't remember.

4    Maybe I'm getting a little punchy up here.  I'm trying to

5    determine if they were the same or different.  If I asked

6    it --

7              THE COURT:  I think you asked that question

8    and she said they were the same.

9              MR. LOVRIC:  Okay.  I'm sorry.  I'll move on.

10             THE COURT:  But that's up to the jury to

11   recall.

12   BY MR. LOVRIC:

13        Q    Miss Chesebro, in December -- Excuse me.  In March

14   of 2007, while Shannon -- and let me talk about March, middle

15   of March and then to the end of March of 2007.  While Shannon

16   is in foster care, does DSS have a mechanism by which Shannon

17   and Linda O'Connor are communicating and seeing or talking to

18   each other?

19        A    They're having supervised visits at that point.

20        Q    And what does that mean?

21        A    That meant a DSS staff member was always present

22   for their visits to monitor what was going on.

23        Q    Where were those supervised visits taking place?

24        A    To my recollection, during March the visits were at

25   Linda's home.

Elizabeth Chesebro - Direct

922

1    Q    Okay.  Forty-five Fair Street?

2    A    Yes.

3    Q    Okay.  And were the -- were the communications

4  between Shannon and Linda O'Connor always supervised visits

5  or did it change depending on the time frame of this case?

6    A    Any face-to-face contacts were supervised.  There

7  were unsupervised telephone calls at one point.

8    Q    Okay.  And -- and were there any issues or

9  problems, to your knowledge, with respect to communications

10 between Linda O'Connor and Shannon in terms of the type of

11 information that was flowing back and forth?

12   A    Yes.

13   Q    What was that?

14   A    There were concerns about topics being discussed

15 that DSS -- we didn't feel appropriate for Shannon to be

16 talking about with her mom.  Concerns about Linda's health,

17 what she was eating, taking medications.  There was a period

18 when she was asked to sneak phone calls at a point when they

19 were being supervised.

20   Q    Okay.  Did you have any conversations with Linda

21 O'Connor about -- Linda O'Connor about these concerns and

22 issues?

23   A    Yes.

24   Q    What did you say to her and what did she say to

25 you?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                       923

1       A    She had already signed visitation rules outlining

2  what was expected of her during visits and what was and

3  wasn't to occur during visits, so that was readdressed, that

4  she already signed and agreed to these rules.  She was asked,

5  you know, if clarification was needed or if she was able to

6  abide by them.

7       Q    And what was Linda O'Connor's response?

8       A    That she was able to abide by them.

9       Q    Okay.  And what was the purpose for DSS in

10 requiring that Linda O'Connor not discuss certain types of

11 things with Shannon O'Connor?

12      A    The purpose was mainly that Shannon didn't have

13 information about adult topics that she didn't need to have

14 information about.  That had been an ongoing concern, that

15 Shannon was aware of way too many adult things that normal

16 13-year-olds shouldn't have access to and wanted to limit

17 that as much as possible so she was only getting knowledge

18 about things that were appropriate for someone her age.

19           Was there a second part to that question that I

20 forgot to answer?

21      Q    No.

22      A    Okay.

23      Q    Now, at this point in time -- and by this point in

24 time I mean towards the end of March 2007 and early April of

25 2007 -- has Shannon disclosed any type of sexual abuse of her

Elizabeth Chesebro - Direct

924

1    by either Linda O'Connor or anyone other than Dean Sacco?

2        A    No.

3        Q    At that point in time, again, March and April of

4    2007, what is the -- if I can call it -- what is the

5    long-term goal of the Department of Social Services as it

6    relates to Linda O'Connor and Shannon O'Connor and their

7    family situation?

8        A    The goal was to reunite parent and child.

9        Q    By doing what?

10       A    Providing whatever services were necessary to have

11   the child go back in her home.

12       Q    Okay.  Did you at that point in time or did DSS at

13   that point in time envision or plan that Shannon would go to

14   foster care forever and ever?

15       A    No.

16       Q    Were there things that you and other members of the

17   Department of Social Services were involved in in trying to

18   give Linda O'Connor tools to help reunite her and Shannon as

19   a family?

20       A    Yes.

21       Q    What kind of things were being offered to Linda

22   O'Connor in order to try to meet these goals?

23       A    She was encouraged to participate in her mental

24   health counseling and be as open and honest as possible.  She

25   was provided a parent aide, which was a woman who was

Elizabeth Chesebro - Direct

925

1    available to her at a minimum of once a week.  They were to

2    talk about different parenting issues, how to manage her

3    household.  Learning to -- learning to address her anger in a

4    healthy way so it didn't come out against her daughter.  The

5    department provided transportation to casework activities.

6    But getting assistance.  Department of Social Services can

7    encompass basically whatever their family needs.

8         Q    And during -- during this time frame now, into

9    April of '07 and continuing into the summer of 2007, does --

10   does Shannon have any information, to your knowledge, about

11   this long-term goal to reunite her with her mother?

12        A    Yes, she's aware that was the goal.

13        Q    How is she aware about that?

14        A    Through conversations with me about what the plan

15   was.

16        Q    And during -- during this time frame, I'll put it

17   at 2007, summer, does Shannon, to your knowledge, express any

18   desires or wants to be reunited with her mother?

19        A    There was a brief period where she was interested

20   in that, but the majority of the time she expressed wanting

21   to stay in foster care.

22        Q    Okay.  And did she from time to time nevertheless

23   ask about her mother?

24        A    Yeah.

25        Q    Now, at some point in the summer of 2007 -- and I

Elizabeth Chesebro - Direct                    926

1    take it Shannon remained in foster care through the summer of

2    2007?

3        A    Yes.

4        Q    Same family we talked about?

5        A    Same family.

6        Q    And at some point during that summer time frame did

7    Linda O'Connor actually go to jail, spent some time in the

8    county jail?

9        A    Yes, she did.

10       Q    Were you aware of the reason for that or not?

11       A    Yes.

12       Q    What did it relate to?

13       A    The incident having walked out of Pizza Hut without

14   paying, as well as having broken the Family Court order

15   stating that Shannon couldn't be unsupervised with Dean

16   Sacco.

17       Q    Okay.  And did Linda ever say to you or express to

18   you anything regarding why she allowed Shannon to be with Mr.

19   Sacco alone?

20       A    Nothing in particular other than that she trusted

21   him and didn't think that the court order needed to be

22   followed because she knew Dean.

23       Q    Okay.  When Linda O'Connor was in the county jail,

24   did DSS still allow and facilitate contact between Shannon

25   and Linda O'Connor?

Elizabeth Chesebro - Direct

1       A     Yes.

2       Q     How was that brought about?

3       A     There were several phone calls on a speaker phone

4    at Shannon's end so I was monitoring the phone calls, and

5    they also exchanged letters back and forth.  Shannon would

6    give me her letter I would forward on to Linda.  Linda's

7    letter would be sent to me, read to make sure they were

8    appropriate, and then I would forward them on to Shannon.

9       Q     When you say appropriate, what do you mean by that?

10      A     What I was looking for at that point, that she was

11   asking Shannon about her activities, about how her summer was

12   going, things she was involved in.  Keeping any casework kind

13   of information out of it so that they were just -- just

14   writing letters back and forth that were keeping each other

15   updated on their lives without being too filled with adult

16   information.

17      Q     Okay.  Prior to Linda O'Connor going to the county

18   jail, how would you describe the interaction and relationship

19   between you and Linda O'Connor?

20      A     We saw one another regularly, whether at the

21   office, sometimes in public locations, being that it's a

22   small area, and sometimes at her home.  Sometimes she was

23   very cooperative and willing to talk with me and sit down and

24   discuss various issues, and sometimes she just didn't wish to

25   do that.

Elizabeth Chesebro - Direct                    928

1      Q    Okay.  Did you and Linda O'Connor ever have heated

2  exchanges?

3      A    There were times, yes.

4      Q    How would you characterize those?  Besides heated.

5  I'm sorry.  I guess I meant to have you describe it, not use

6  my word heated, but I can't think of a better way to at least

7  ask you.

8      A    A lot of times the conversations revolved around

9  Linda not taking responsibility for something and being

10  focused merely on herself.  She'd become enraged, you know,

11  yelling.  Oftentimes conversations were ended where she was

12  told we'd talk when she was calm again.

13      Q    Okay.  Did Shannon at any point, while in foster

14  care, did she at any point disclose or reveal to you alcohol

15  use?

16      A    Yes.

17      Q    About when would you say was the first time she

18  disclosed that she had been given alcohol?  By that, I mean

19  just approximately.

20      A    It was at some point after she was placed in foster

21  care.

22      Q    Okay.  And did she describe specific events or

23  specific time frames when she would be given alcohol?

24      A    Yes.

25      Q    Was this alcohol that she retrieved on her own or

Elizabeth Chesebro - Direct

1   was this alcohol that was given to her?

2       A    It was provided to her.

3       Q    And who did she say provided alcohol to her?

4       A    Her mother Linda as well as George Lang.   There was

5   also an occasion where alcohol was provided by Dean Sacco.   I

6   don't know who actually handed her the alcohol, but she did

7   say he had purchased it and brought it to the residence.

8       Q    Now, prior to Shannon advising you of that, did you

9   have any information about alcohol being given to her?

10      A    No.

11      Q    Did you -- did you at any point discuss that with

12  Linda O'Connor?

13      A    After I was aware of the fact based on what Shannon

14  had told me, yes.

15      Q    What was Linda O'Connor's reaction?

16      A    That Shannon may have had some alcoholic drinks

17  before but that she had served herself.   Just taken it from

18  the fridge or wherever it was located.

19      Q    Did Linda O'Connor in any way express to you

20  surprise that Shannon had taken or been drinking alcohol?

21      A    Not that I recall.

22           THE COURT:   All right.   I think this is a good

23  time to break.   There's probably still more direct

24  examination and there's going to be cross-examination.   We'll

25  be here quite late.   So we're going to break until 10 in the

Elizabeth Chesebro - Direct                    930

1    morning.  I have a 9:30 proceeding.

2              Let me remind you not to discuss the case

3    among yourselves with anybody else or permit anyone to

4    discuss it with you.  And once again, please ignore anything

5    that might be in the media, and don't do any research on your

6    own.

7              Have a nice evening.

8              (Jury excused)

9              (Court stands adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T I O N

2

3

4          I, VICKY A. THELEMAN, RPR, CRR, United

5    States Court Reporter in and for the United States

6    District Court, Northern District of New York, do

7    hereby certify that I attended at the time and place

8    set forth in the heading hereof; that I did make a

9    stenographic record of the proceedings had in this

10   matter and cause the same to be transcribed; that

11   the foregoing is a true and correct copy of the same

12   and the whole thereof.

13

14

15                              _____

16                              VICKY A. THELEMAN, RPR, CRR

17                              United States Court Reporter

18                              US District Court - NDNY

19

20

21   Dated:  August 15, 2008.

22

23

24

25