1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF NEW YORK

3  ----------------------------------------------------------

4  UNITED STATES OF AMERICA,

5             -versus-                    08-CR-77

6  LINDA O'CONNOR and DEAN SACCO.

7  ----------------------------------------------------------

8               TRANSCRIPT OF JURY TRIAL

9  held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  WEDNESDAY, May 14, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Binghamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

Elizabeth Chesebro - Direct                    933

1         (In open court)

2         THE COURT:  Miss Chesebro, you don't have to

3    be sworn again.  You're still under oath, ma'am.

4         (Jury present)

5         THE COURT:  Morning, ladies and gentlemen.

6    Miss Chesebro is here, ready to go.

7         So Mr. Lovric, you have some questions.

8         MR. LOVRIC:  Yes, Judge.

9    DIRECT EXAMINATION CONTINUED

10   BY MR. LOVRIC:

11        Q    Miss Chesebro, when we left off yesterday around 5

12   PM, the next event that I'd like to talk with you about to

13   continue in the time frame is:  Shannon was in foster care

14   with the foster family that you described until approximately

15   when?

16        A    September 19, 2007.

17        Q    And then where did she go on September 19 of 2007?

18        A    She was then assessed to be in need of inpatient

19   psychiatric treatment.

20        Q    And where was she placed?

21        A    She was admitted to the Greater Binghamton Health

22   Center.

23        Q    And what was it in terms of the information that

24   came to you that caused you to believe that she needed to go

25   to the Binghamton Health Center?

Elizabeth Chesebro - Direct

934

1    A    She was overwrought with emotion and suicidal.

2    Q    And was she then actually admitted and placed into

3  the Binghamton Health Center?

4    A    Yes, she was.

5    Q    And at that time was Shannon, in so many words,

6  conveying information about wanting to commit suicide?

7    A    Yes, she was.

8    Q    Her admission into the Binghamton center, was that

9  primarily based upon her suicidal expressions and suicidal

10  thoughts?

11    A    Yes.

12    Q    Now, while Shannon was in the Binghamton Health

13  Center, on or about October 24 of 2007, was there a

14  proceeding called a permanency hearing?

15    A    Yes, there was.

16    Q    Okay.  What is that?

17    A    Permanency hearing takes place eight months after

18  the child was placed in foster care, and after that it's

19  every six months afterward.  Permanency hearing gives the

20  court an update on the child and the family, the progress,

21  the goals and the department's involvement with the family.

22    Q    Okay.  Now, when you say court, you're referring to

23  what court?

24    A    Family Court.

25    Q    The same Family Court we have been discussing

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                                    935

1    yesterday?

2         A    Yes.

3         Q    And what information was included in the permanency

4    hearing conducted on October 24?

5         A    It included information about Shannon's mental

6    health counseling and her participation in that.  Linda's

7    mental health counseling and participation.  The attempts of

8    the agency to involve Linda in appropriately budgeting her

9    finances.  I'd like to look at my report.

10             It included any attempt for our department to find

11   any relatives that were a suitable placement for Shannon, as

12   well as her involvement with her foster family at the time.

13   It did include the information that Shannon had been placed

14   at the Greater Binghamton Health Center as well.

15        Q    Okay.  And in that report did you or -- well, let

16   me ask you:  Who prepared that report?

17        A    I did.

18        Q    Okay.  Did you in that report also advise the court

19   of the various issues that Linda O'Connor had with respect to

20   finances?

21        A    Yes.

22        Q    Living, ability to provide a good living

23   environment for Shannon and those kind of things?

24        A    Yes.

25        Q    Now, based on that permanency hearing on

Elizabeth Chesebro - Direct                    936

1   October 24, what did the court do or say was going to be the

2   next step?

3        A    The court approved my permanency report and

4   approved that the current goal would be to continue placement

5   with the goal of returning her to her parent but that there

6   was an anticipated plan that she wouldn't be able to make the

7   changes and possibly be placed for adoption.

8        Q    So if I understand you correctly, there was at this

9   point in time a mixed view or evaluation of what would or

10  wouldn't possibly happen in the future with respect to Linda

11  O'Connor getting custody back of Shannon?

12       A    We call it concurrent planning so that there's

13  always two plans in the works.  There was the current

14  planning, continuing to work with the family to meet their

15  needs with the hopes that Shannon could return home, but in

16  the event that wasn't able to happen, we had had a

17  generalized plan for the future that she could be placed for

18  adoption.

19       Q    Okay.  That's as of October 24?

20       A    Yes.

21       Q    As of October 24, had Shannon disclosed, to your

22  knowledge, to anyone, to yourself or anyone else, any sexual

23  abuse by Linda O'Connor of Shannon?

24       A    Not any actual sexual abuse.

25       Q    And on October 25 of 2007, the day after the

Elizabeth Chesebro - Direct                937

1   permanency hearing, did Shannon disclose to you certain

2   information, including Mr. Sacco as well as her mother Linda

3   O'Connor?

4       A    Yes, she did.

5       Q    And where was that interview of Shannon O'Connor

6   conducted?

7       A    It took place at the Greater Binghamton Health

8   Center.

9       Q    I'd like to show you what I've marked as

10  Government's Exhibit Number 106.

11           Miss Chesebro, if you take a look at Exhibit 106.

12  And can you just tell us what that is, if you recognize it.

13      A    Yes.  It's my progress note from October 25 of

14  2007.

15      Q    And did you prepare those notes?

16      A    Yes.

17      Q    And do those notes summarize to some degree of

18  detail the interview of Shannon O'Connor on October 25 of

19  2007?

20      A    Yes.

21           MR. LOVRIC:  Judge, I would offer Government's

22  Exhibit 106 into evidence.

23           MISS PEEBLES:  No objection.

24           MR. FISCHER:  No objection.

25           THE COURT:  Receive Government's 106 in

Elizabeth Chesebro - Direct                    938

1    evidence.

2              MR. LOVRIC:  With the Court's permission, I'd

3    like to publish by reading Government's Exhibit 106.

4              THE COURT:  Yes.

5       Q    Miss Chesebro, do you have also a copy of this

6    report in front of you?

7       A    Yes, I do.

8       Q    I'm going to read the 106 exhibit, but I ask you to

9    follow along just in case I misstate something.

10      A    Yes.

11      Q    And I will also put on the screen Exhibit 106 as I

12   read it.  I'll start reading the progress note narrative.

13             "Interview with Shannon after her treatment team

14   meeting.  Present for most of the time was Lisa

15   Florance-Diaz, GBHC social worker.  The team interview

16   process took over two hours.  She was hesitant to disclose

17   and kept saying she couldn't talk about things because she

18   was scared.  Her emotions varied throughout, sometimes

19   remaining calm and sometimes crying.  It was extremely

20   difficult to reassure Shannon of her safety and for her to

21   understand what happened was not her fault.  I asked Shannon

22   how she was doing, and her response was awful.  I told her I

23   was glad she was honest and not trying to pretend everything

24   is okay.  Shannon said things aren't okay and she has more to

25   tell.  I told Shannon that was why I was there.  I asked

Elizabeth Chesebro - Direct

1    Shannon if something happened to make her decide she needed

2    to talk about whatever else has gone on.  She doesn't think

3    there was anything in particular that triggered it but said

4    she just can't keep everything inside anymore.  Shannon asked

5    if I was mad at her because she hadn't told the full truth

6    from the start?  I told Shannon I was not mad at all but that

7    I did want her to talk about it now so she can keep getting

8    better.  Shannon continually said 'I can't say it' and

9    similar statements.  Shannon appeared very uncomfortable so I

10   told her we could come back to this topic in a bit, but I

11   wanted to talk then about what she shared with the nurse.

12   Shannon matter of factly said her mom had let her drink on

13   many occasions.  Shannon mainly remembers drinking wine

14   coolers but also vodka on occasion.  Shannon said her mom and

15   George Lang would allow her two to three vodka and orange

16   juice drinks to get -- to get her loopy.  I asked her for an

17   explanation of what that meant.  Shannon described loopy as

18   everything's funny, she laughed a lot and couldn't walk

19   straight.  Shannon knows it was vodka she drank because she

20   would see her mom and/or George make the drink.  Shannon was

21   first given medication sometime after the third time Dean

22   sexually abused her.  Shannon went to her mom because she

23   couldn't sleep.  Her mom gave her five Vicodin and said it

24   would help her sleep.  Shannon knows the pills were Vicodin

25   because she saw the bottle her mom got them from and they

Elizabeth Chesebro - Direct

1   were prescribed to her for kidney stones.  She described them

2   as white.  Shannon started puking about half hour after

3   taking them.  She told her mom, who said to puke in the

4   bathroom and then went to bed herself.  After she finally

5   stopped puking, she was constantly dizzy and had stabbing

6   stomach pains.  Shannon continued to be sick for over a week,

7   during which time she missed school and never went to the

8   doctor.  Shannon reminded me this was the time she was sick

9   from school and tall Brian (CW Brian Christopherson) had

10  brought her homework to her at home.

11          "The second time Shannon was given medication not

12  prescribed by her was after New Year's Eve.  Shannon wasn't

13  sure of an exact date.  Says it was -- remembers when they

14  had little food in the house.  Shannon had been complaining

15  of a headache, which she attributed to thinking a lot.  Her

16  mom gave her a pill and said to take it with wine coolers.

17  The pill looked the same as Vicodin her mom had given her

18  before.  Shannon then had four strawberry kiwi wine coolers

19  but her mom had two to three berry wine coolers.  At one

20  point while they were drinking these, Shannon fell and her

21  mom laughed at her.  Shannon said Buddy the dog barked at

22  this and her mom told him to shut up.  Shannon reported after

23  drinking the fourth drink, she blanked out.  She woke up in

24  her bed and assumed she fell asleep.

25          "Shannon and Linda each had one wine cooler the day

Elizabeth Chesebro - Direct

1   before Shannon was removed to foster care.  Shannon said this

2   was after her mom had been arrested for not paying at Pizza

3   Hut and they were watching -- and they were watching Juvies

4   together on MTV.  That night Shannon couldn't stop crying and

5   was sure she would also get in trouble for not paying at

6   Pizza Hut.

7          "On New Year's Eve, Shannon had two or three wine

8   coolers at the house with her mom and Dean Sacco.  Buddy also

9   had some of the wine cooler that Linda had poured in the

10  dog's dish.  Dean had brought beer for himself and wine

11  coolers for Shannon and Linda.  They had spaghetti with no

12  sauce for dinner, but Shannon reported not eating because

13  Dean was there.  They also watched the ball drop that night.

14         "Shannon also recalled having a wine cooler around

15  Halloween of this past year, stating she knows it was then

16  because they had decorations up around the house.  Shannon

17  only had one drink because she didn't like the taste of it,

18  but couldn't recall the flavor.

19         "Shannon denied smoking anything in her mom or

20  Dean's presence.  She had tried cigarettes and cigars once in

21  the fourth grade with a girl named Miranda.  Shannon was

22  scared her mom would be mad at her after being arrested for

23  not the court -- following the court order.

24         "Shannon didn't notice her mom acted any different

25  after the arrest.  She attributes this to never being alone

Elizabeth Chesebro - Direct

942

1   with her mom because all visits were supervised.  She thinks

2   if she had unsupervised visits or was living with her mom

3   that she would have gotten yelled at and hit for telling what

4   Dean did to her.  Shannon said her mom seemed happy while in

5   jail.

6          "Shannon talked about her mom inviting Dean to have

7   Thanksgiving dinner with them.  Shannon was mad that Dean was

8   there and feels her mom should have been concerned because

9   she wasn't eating and was crying.  Buddy the dog was her only

10  comfort.  Dean and her mom drank beer while Shannon had

11  watermelon wine coolers and Bahama Mama wine coolers.

12         "The week after Thanksgiving Shannon felt she would

13  blow up if she didn't tell someone what Dean was doing to

14  her.  She told her mom Dean was doing inappropriate stuff.

15  Her mom asked for no further clarification and said it's fine

16  because we have a roof over our head and it's better than

17  being homeless.  Shannon then cried and screamed.  She went

18  to her room and cried some more.  Shannon thought at that

19  time of running away or hurting herself.  After this her mom

20  didn't act any different.  Shannon reported her mom needed to

21  slowly pay off rent because she owed a lot, over three

22  months' worth.  Shannon feels her mom should have known what

23  was going on with Dean.  Not only did she tell her mom he was

24  doing inappropriate things, but one time before New Year's,

25  Shannon came down from having been abused in the upstairs and

Elizabeth Chesebro - Direct

1    was crying.  Her mom looked at her, turned away and went in

2    her bedroom.  Shannon then took a long shower to clean

3    herself and cried.

4           "Shannon reported her mom made her steal diet pills

5    from Rite Aid.  Shannon was worried she could be arrested for

6    that now, even though it happened a while ago.  She said it

7    was Lexatrim that her mom told her to steal.  It came in a

8    white bottle with green lettering.  Shannon reported her mom

9    hid all -- all alcohol and diet pills in the -- her mom hid

10   them because she knew you and Naomi sometimes checked the

11   refrigerator.

12          "Shannon reported her mom and photographs were

13   involved with a time Dean sexually abused her, which she had

14   not disclosed before.  This would have been the third time

15   Dean raped her and occurred before Thanksgiving 2006.

16   Shannon could not recall what time it was but said it was

17   after lunch.  Shannon had been in her room listening to

18   Carrie Underwood.  Someone knocked on the apartment door.

19   Her mom answered and it was Dean.  Dean and her mom came into

20   her bedroom.  Dean told Shannon to take her clothes off,

21   which she did.  He said her mom would watch and take pictures

22   and that if she screamed, no one would hear her.  After her

23   clothing was off, Dean told her to lie on the bed.  At that

24   time her mom was sitting against the door.  She reported,

25   'Dean was kissing me and putting his dick inside me.'  She

Elizabeth Chesebro - Direct

944

1    could see her mom get up, take a picture, sit down, get up,

2    take a picture, etcetera.  Shannon said this made her want to

3    'punch my mom in the face.'  She reported her mom had put her

4    tiger sheet up over the window while at school.  Shannon at

5    that time -- at that time -- excuse me.  Shannon thought at

6    that time it was because she was explaining the sun beamed in

7    there and the neighbors were nosey, but now Shannon suspects

8    it was because her mom knew what she and Dean were going to

9    do.  Shannon believes her mom took three or four pictures.

10   She did not hear the camera make any noises.  She said the

11   camera belonged to Dean and was silver.  She described the

12   size of the camera, leading me to believe it was digital.

13   When Dean finished raping her, he got dressed and he and her

14   mom left Shannon's bedroom.  Shannon took a shower right

15   away, locking both doors that lead to the bathroom.  She felt

16   like running away then but couldn't get out of her bedroom

17   window because it was painted shut.  Shannon and her mom

18   didn't talk for two days after.  One of those days Shannon

19   went to Brook Parmalee's house until 8:00 PM and did homework

20   when she got home so she wouldn't have to talk to her.

21          "The second time that Dean raped Shannon he also

22   took pictures.  This occurred the week after Shannon returned

23   home from living at Renee Lang's.  After raping her, Dean

24   used a camera to take pictures of her while still naked.  He

25   would move her arms and legs around to the position he wanted

Elizabeth Chesebro - Direct

1    and told her to stay.  At first Shannon told him no.  He got

2    mad at that and backhanded her across the face.  She said the

3    area became red but it didn't leave a bruise.

4         "The third time Dean took photos of her was a

5    couple of weeks before Shannon went into foster care.

6    Shannon was told to go upstairs under the guise she and Dean

7    would be playing Jenga in the room at the front of the house.

8    Dean took pictures of himself kissing her.  Shannon imitated

9    how he did this, holding an imaginary camera in front of her

10   as if taking several portraits.  She remembers that Dean was

11   wearing a button-down flannel shirt that day and he had

12   candles burning around the room.  After taking approximately

13   seven photographs of Shannon naked, both with Dean and by

14   herself, he raped her.  She believes the same camera was used

15   during all three times the photos were taken.  She described

16   the camera being on something with three legs that was --

17   sounded to be a tripod.  While on the tripod, Dean would

18   touch something on the camera and then walk away.

19        "The second to last time that Dean raped Shannon,

20   she told him she was sick of it and would tell someone.  Dean

21   told her he would stab her and while she was slowly dying he

22   would rape her.  Shannon is sure he means this and will find

23   a way out of jail to get to her.  I explained all of the

24   security at the Chenango County Jail and reviewed security at

25   GBHC.  She could not be reassured.

Elizabeth Chesebro - Direct

946

1        "Shannon said that after a while you just give up.

2   Linda would hit Shannon when she wouldn't do what was

3   expected of her.  She remembers an instance when her mom told

4   her to take the dog out so Shannon was getting her coat on

5   but then her mom told her to do the dishes.  Shannon didn't

6   know which she should do first and her mom got angry.  Linda

7   threw a snowman plate in Shannon's direction which shattered

8   when it hit the wall.  Shannon was upset that her mom broke

9   something Shannon had given her as a present.

10       "Shannon talked about the time she ran away from

11  the Hamiltons with Mandy.  Shannon said she wouldn't do

12  something like that again and she learned that Kim won't give

13  up on her even if she makes bad choices like that.  She

14  doesn't believe her mom would love her unconditionally like

15  Kim does.  Shannon told me a quote she made up recently.

16  Love me or hate me, at least you're thinking of me.  She said

17  that's how she feels about her mom.

18       "Shannon had her dinner in the room with me but

19  barely ate anything.  By the time I left she was much calmer

20  but appeared exhausted.  She reported feeling drained and

21  said she would probably go to bed early."

22       And then there's an ending note with respect to you

23  notifying Dr. Toth, is that correct?

24  A    Yes.

25  Q    Now, the information that I just read in

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                947

1    Government's Exhibit 106, is that what Shannon told you on

2    October 25?

3         A    Yes.

4         Q    Following that disclosure by Shannon O'Connor, did

5    you then notify any police agency?

6         A    Yes.  I spoke to Detective Blenis of the Norwich

7    City Police.

8         Q    Okay.  Same detective you talked about yesterday?

9         A    Yes.

10        Q    And did you then make arrangements to have Shannon

11   interviewed with Detective Blenis being present?

12        A    Yes.

13        Q    And where were those arrangements made for the

14   interview to be conducted?

15        A    At the Broome County Child Advocacy Center.

16        Q    And on October 29 of 2007, was that interview

17   conducted at the child advocacy center?

18        A    Yes, it was.

19        Q    And who was present when Shannon was interviewed on

20   that date?

21        A    Myself and Detective Blenis.

22        Q    And was that interview of Shannon actually

23   videotaped?

24        A    Yes.

25        Q    And have you had a chance -- Since the videotaping

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                    948

1    of that interview on October 29, have you had a chance to

2    view and review that tape?

3        A    Yes, I have.

4        Q    And is it fair to say, Miss Chesebro, it's a little

5    difficult -- withdraw that -- it's very difficult to hear a

6    lot of that tape unless you play it perhaps over and over?

7        A    Yes.

8        Q    Now, you were present during that videotaping, is

9    that correct?

10       A    Yes.

11       Q    And having reviewed that interview in that tape,

12   were the things that you and Detective Blenis discussed with

13   Shannon October 29, were they consistent with what she told

14   you on October 25?

15                MISS PEEBLES:  I'm going to object.  It's in

16   evidence, your Honor.

17                THE COURT:  Sustained.

18       Q    You were present during the October 29 interview?

19       A    Yes.

20       Q    Okay.  And who was asking questions of Shannon

21   O'Connor?

22       A    Primarily Detective Blenis, but myself as well.

23       Q    Okay.  And the topics discussed were the things

24   that Shannon had talked to you about previously to that?

25       A    Yes.

Elizabeth Chesebro - Direct                    949

1      Q     Okay.  Now, after the October 29 -- let me withdraw

2   that.  The disclosures by Shannon O'Connor on October 25 and

3   the progress notes that I read to you and then on October 29,

4   is that the first time that you became aware of Shannon

5   describing Linda O'Connor's involvement in any sexual abuse

6   of her?

7      A     Yes.

8      Q     That's the first time Shannon has disclosed that?

9      A     In October, yes.

10     Q     Now, I'd like to direct your attention to the date

11  of November 6 of 2007.  On that date, did you become aware of

12  Shannon attempting to commit suicide?

13     A     Yes.

14     Q     How did you become aware of that?

15     A     I received a phone call that night.

16     Q     And who did you receive a phone call from?

17     A     Adriana, she's a staff member at the Greater

18  Binghamton Health Center.

19     Q     I'd like to show you what I've marked as

20  Government's Exhibit 107.

21           MR. FISCHER:  Your Honor, although we have all

22  of these records, I haven't interviewed them independently.

23  I'd like to take a moment so I understand which record this

24  is.

25           THE COURT:  Absolutely.  Go ahead.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct                    950

1          MR. FISCHER:  Thank you.  Thank you.

2          THE COURT:  Okay.  Mr. Lovric.

3    BY MR. LOVRIC:

4       Q    Miss Chesebro, if I can show you Government's

5    Exhibit 107.  If you can just take a look at that and

6    indicate if you recognize it and what you recognize it to be.

7       A    The progress notes I've written.

8       Q    And on that first page, is there a progress note

9    that you wrote regarding this conversation with Adriana?

10      A    Yes.

11         MR. LOVRIC:  Your Honor, I would offer

12   Government's Exhibit 107 into evidence.

13         MR. FISCHER:  No objection.

14         MISS PEEBLES:  No objection.

15         THE COURT:  Receive Government's 107 in

16   evidence.

17      Q    I put on the screen, Miss Chesebro, Exhibit 107,

18   and in the center of the screen I now have your progress note

19   regarding this call from Adriana.  Do you see that?

20      A    Yes.

21      Q    And let me just back up, Miss Chesebro, because I

22   think I actually wanted to ask you a question before we got

23   to that.  The suicide attempt by Shannon occurred on November

24   6?

25      A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

951

1    Q    And do you recall what time of the day it was that

2  you were notified that she had attempted suicide?

3    A    I was notified in late evening.

4    Q    Okay.  And prior to being notified of that had you

5  also spoken to Adriana at the Binghamton Health Center prior

6  to getting that call?

7    A    Yes, I did.

8    Q    And in that previous call, did Adriana discuss with

9  you how Shannon was doing and some things that Shannon was

10  writing in poetry, things of that nature?  Maybe if I can

11  just direct you.  If you look at Exhibit 107, which I'll put

12  on the screen right now.  And there's a progress note dated

13  11/6/07, 6:15 PM.  Do you see that?

14    A    Yes.

15    Q    Is that a conversation you had with Adriana

16  regarding Shannon and how she's doing?

17    A    That's a conversation I actually had with Shannon

18  herself.  The phone call originated with Adriana and then she

19  turned the phone over to Shannon.

20    Q    So she puts Shannon on the phone and you speak

21  directly to Shannon?

22    A    Yes.

23    Q    And that's earlier in that day?

24    A    Yes.

25    Q    Okay.  And then describes for you what it says in

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

1    this progress note, I take it?

2        A    Yes.

3        Q    And if you read in that note, she talks about

4    writing poems, things of that nature?

5        A    Yes.

6        Q    And if I can read in the middle of that progress

7    note, it states the following:  "Shannon said the last two

8    days have been difficult.  She's having a mixture of emotions

9    and does not know if something in particular triggered it.

10   She has written eight poems since we talked last, all of

11   which are about death.  She hasn't written any letters to her

12   mom but said most of her poems are directed towards her mom.

13   Shannon thinks her mom has wanted her to die all along.  She

14   asked again if Detective Blenis has talked to her mom.  I

15   reminded Shannon I told her I would let her know when that

16   takes place.  Shannon said she wants me to visit so she can

17   cry in your arms.  She says she's needs a good cry and feels

18   comfortable doing that in my presence."

19            When you have this conversation with Shannon

20   O'Connor, is -- to your knowledge is Shannon aware whether or

21   not the police at any point would be confronting Linda

22   O'Connor with the disclosures she made in October about

23   Linda's participation?

24       A    Yes.  She knew that would be taking place at some

25   point.

Elizabeth Chesebro - Direct

1    Q    How do you know that she knew that?

2    A    Myself and Detective Blenis had both shared that

3    with her.

4    Q    So that took place sometime after that videotaped

5    interview of her.

6    A    Yes.

7    Q    And then it was -- excuse me.  Then it was later

8    that same evening that you learned Shannon tried to commit

9    suicide?

10    A    Yes.

11    Q    How was it that Shannon tried to kill herself?

12    A    She used a shoelace around her neck.

13    Q    And how was she found or discovered?

14    A    She was found by a staff member in her room.

15    Q    Did you know or were you made aware whether or not

16    there was a suicide note that was found?

17    A    Yes.

18    Q    What do you know about the suicide note?

19    A    I have -- I was faxed a copy of it by her therapist

20    the following day, and it contained a poem, and then I guess

21    I would describe it like sort of a time line of the events of

22    Shannon's abuse.

23    Q    After the suicide attempt on November 6, was

24    Shannon placed in or put under much more intensive

25    supervision at Binghamton Health Center and monitored much

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

954

1    more closely?

2        A    Yes.

3        Q    Now, on November 30 of 2007, did you have a

4    conversation with Karen Whitbeck?

5        A    Yes, I did.

6        Q    And who is Karen Whitbeck?

7        A    She's a nurse at the Greater Binghamton Health

8    Center.

9        Q    Was this a telephonic or in-person conversation?

10       A    Over the telephone.

11       Q    I'd like to show you what's marked as Government's

12   Exhibit 108.  Miss Chesebro, if you take a look at Exhibit

13   108 and just tell us if you recognize it and what do you

14   recognize it to be?

15       A    Those are progress notes I'd written.

16       Q    And does that include the conversation that you had

17   with Karen Whitbeck?

18       A    Yes, it does.

19            MR. LOVRIC:  Your Honor, I would offer

20   Government's Exhibit 108 into evidence.

21            MISS PEEBLES:  No objection.

22            MR. FISCHER:  No objection.

23            THE COURT:  Receive Government's 108 in

24   evidence.

25       Q    Miss Chesebro, I'm going to put on the screen

Elizabeth Chesebro - Direct

1   Exhibit 108.  And I'd like to read the portion dealing with

2   your conversation with Karen Whitbeck.  It reads, under

3   Progress Note Narrative:  Phone call from -- PC stands for

4   what again?

5       A    Phone call.

6       Q    Okay.  "Phone call from Karen Whitbeck, GBHC.  She

7   left a message stating I can call her back for further

8   information about today's incident.

9            "Phone call to Karen Whitbeck.  There are things

10  being discussed in therapy that seem to be disturbing

11  Shannon.  She again is saying there is something she needs to

12  disclose but won't do so at this time.  Shannon says the

13  thing she needs to talk about will get her mom in a lot of

14  trouble and she'll go back to jail.  Shannon is expressing

15  anger and guilt for all the trauma.  Today the team tried for

16  an hour and 15 minutes to get Shannon to use other techniques

17  to calm herself.  At one point Shannon was under a table

18  trying to get away from them.  At another point Shannon was

19  in the stairwell and they were concerned she would throw

20  herself down.  She didn't make this threat but there was

21  concern because of her impulsivity.  This is the third day

22  that Shannon has been saying there is something she needs to

23  tell.  KW brought up that for many kids anniversaries of

24  events can be triggers.  I let her know that there was an

25  instance just after Thanksgiving last year when Shannon was

Elizabeth Chesebro - Direct

956

1    raped.  KW suspects that may have triggered this current

2    instability.  Shannon harbors a lot of guilt and anger about

3    her abuse.  She will continue on one-on-one until further

4    notice, and Dr. Toth will touch base with Shannon before

5    leaving today.  Shannon was started on Trazodone

6    25 milligrams on 11/29.  This was at Shannon's request

7    because she was having difficulty sleeping, including

8    intrusive memories.  She's been on melatonin 1 milligram for

9    sleep but that wasn't working.  Shannon also started back on

10   Zoloft 50 milligrams.  I told KW that I was not made aware of

11   any of those changes and reminded her I needed to be notified

12   every time something changes.  KW apologized and said she

13   would again review this with her staff.  The staff will

14   continue to encourage Shannon to disclose and remind her of

15   her safety while at GBHC."

16          Is that the sum and substance of your conversation

17   with Karen Whitbeck?

18       A    Yes, it is.

19       Q    Now, at that time, on that date, that being

20   November 30, when you had this conversation with Karen

21   Whitbeck, did you know at that time what the substance was of

22   these additional disclosures that Shannon is saying she needs

23   to make?

24       A    No.

25       Q    So she hadn't told you or anyone, to your

Elizabeth Chesebro - Direct                    957

1   knowledge?

2       A    No.

3       Q    I'd next like to direct your attention to

4   December 3 of 2007.  On that date did you have a conversation

5   with Lisa Florance-Diaz?

6       A    Yes, I did.

7       Q    And who is Lisa Florance-Diaz?

8       A    She's a staff social worker at the Greater

9   Binghamton Health Center.

10      Q    And how was she related to Shannon's case?

11      A    She was Shannon's primary therapist there.

12      Q    At the health center?

13      A    Yes.

14      Q    And on December 3 of '07 did you have a

15  conversation with Miss Diaz regarding additional information,

16  disclosures that Shannon had made?

17      A    Yes, I did.

18      Q    I'd like to show you what's marked as Government's

19  Exhibit 109.

20              MR. FISCHER:  Thank you.

21  BY MR. LOVRIC:

22      Q    Miss Chesebro, if I can have you look at Exhibit

23  109 and if you can tell us, please if you recognize it and

24  what is it if you recognize it?

25      A    It's progress notes I'd written.

Elizabeth Chesebro - Direct                958

1    Q    Does that Exhibit 109 relate to this conversation

2  you had with Miss Diaz on December 3?

3    A    Yes, it does.

4         MR. LOVRIC:  Your Honor, I would offer Exhibit

5  109 into evidence.

6         MISS PEEBLES:  No objection.

7         MR. FISCHER:  No objection.

8         THE COURT:  Receive Government's 109 in

9  evidence.

10 BY MR. LOVRIC:

11   Q    Miss Chesebro, I'm going to put on the document

12 camera Exhibit 109, and I'd like to read starting with the

13 notation, it says 5:40 PM.  This is the third paragraph or

14 indentation on that December 3 progress note.

15        "Phone call to Lisa Florance-Diaz, GBHC."  And then

16 it has some item blacked out.  Do you know what that is, or

17 you don't?

18   A    I suspect what it is, I believe the Department of

19 Social Services attorney was the one who actually blocked it

20 out.

21   Q    It has something there that was blacked out by the

22 attorney before they gave us this document?

23   A    Yeah.

24   Q    "Since last week Shannon has been talking about

25 needing to tell something more.  On Friday, during Shannon's

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

1    breakdown, she seemed to be calm at one point, and as soon as

2    the physical restraint ceased, she took off running down the

3    hall.  She ran upstairs and threw herself on the floor of the

4    rec room.  LFD," what does that stand for?

5        A    Lisa Florance-Diaz.

6        Q    "-- suspects Shannon was seeking the physical

7    restraint and wanted someone to be stern and tell her the

8    behavior wasn't acceptable.  Shannon has been away from the

9    other kids since then and remains on one-on-one observation.

10   At one point on Friday, a two-on-one was considered.  Since

11   saying she needs to disclose, Shannon has been seeking out

12   Lisa Florance-Diaz multiple times a day.  Today Dr. Toth told

13   Shannon that she would see Lisa and that was her only chance

14   for today.  During that session, Shannon decided to disclose.

15   Once making this decision, Shannon was forthcoming with the

16   information.  She told that her mom has been sexually abusing

17   her since she was 12 years old.  The abuse by her mom

18   included intercourse, manual and oral.  Shannon shared that

19   on one occasion while staying at the Best Western, her mom

20   prostituted her to a Hispanic man and a black man.  That

21   instance was for $150, although it was not clear if that was

22   for one or both men.  Her mom was involved with the sexual

23   abuse with both the landlord and George, the man she calls

24   her grandfather.  Shannon said pictures of the abuse with

25   George were taken and can be found on the computer that

Elizabeth Chesebro - Direct

960

1    George's wife Renee still has.  I arranged to interview

2    Shannon tomorrow at 10:30 AM.  End of note."

3            Is that the information that you received from Miss

4    Lisa Florance-Diaz?

5        A    Yes, it is.

6        Q    And then subsequent to this conversation with Miss

7    Diaz, did you arrange for Shannon to be interviewed soon

8    after this conversation?

9        A    Yes, I did.

10       Q    On what date was she then interviewed again?

11       A    December 5.

12       Q    And where did that interview take place?

13       A    Again it was at the Broome County Child Advocacy

14   Center.

15       Q    Who was present when Miss Shannon O'Connor was

16   interviewed?

17       A    Myself and Denise Oliver, forensic interviewer,

18   conducted the interview, and Detective Blenis was in the

19   observation room where he could view what was occurring,

20   listen in, as well as provide information and questions

21   through an earpiece that Miss Oliver was wearing.

22       Q    Okay.  And on this date, that being December 3 of

23   2007, is that the first time to your knowledge that Shannon

24   describes to anyone, to your knowledge, anything regarding

25   the sexual abuse by George Lang and two men at the Best

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

1    Western hotel?

2        A    Yes, it is.

3        Q    And is that the first time that Shannon discloses

4    Linda O'Connor's involvement as to the abuse with George Lang

5    and the men at the hotel?

6        A    Yes.

7        Q    Now the interview on December 5, was that also

8    videotaped?

9        A    Yes, it was.

10       Q    And since the videotaping after that interview,

11   have you had a chance to review and watch that interview?

12       A    Yes.

13       Q    And is that the interview that you and Denise

14   Oliver actually conducted of Shannon?

15       A    Yes, it is.

16       Q    Now, I'd like to show you Exhibit 110 that I've

17   marked for identification.

18            MR. FISCHER:  Thank you.

19   BY MR. LOVRIC:

20       Q    Miss Chesebro, if I can have you look at Exhibit

21   110, and again, if you just tell us if you recognize it.  And

22   what do you recognize it to be, if you do?

23       A    Yes, I do.  It's progress notes I've written.

24       Q    And are those progress notes that you wrote related

25   to information dealing with an event on December 24 of 2007?

Elizabeth Chesebro - Direct                    962

1      A    Yes.

2                MR. LOVRIC:  Your Honor, I would offer Exhibit

3     Number 110 into evidence.

4                MISS PEEBLES:  No objection.

5                MR. FISCHER:  No objection.

6                THE COURT:  Receive Government's 110 in

7     evidence.

8      Q    Exhibit 110 I'll put on the screen, Miss Chesebro.

9     The very bottom of 110.  It indicates that you had a phone

10    conversation with Kelly McCauley?

11     A    Yes.

12     Q    And who's Kelly McCauley?

13     A    She's a nurse.

14     Q    At the Greater --

15     A    At the Greater Binghamton Health Center.

16     Q    And in the conversation with her did she describe

17    for you issues and problems that Shannon was having as

18    reported on December 24?

19     A    Yes.

20     Q    Did she describe for you that Shannon was having

21    auditory hallucinations, hearing crying babies and voices of

22    her abusers?

23     A    Yes.

24     Q    Miss Chesebro, on December 27, 2007, do you recall

25    being at the Greater Binghamton Health Center on that date?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

963

1    A    Yes, I do.

2    Q    And what was the purpose for going there?

3    A    That was Shannon's 14th birthday.

4    Q    And did you actually see her on that date?

5    A    Yes, I did.

6    Q    Can you tell us a little bit about what happened on

7    that date.

8    A    When I arrived there, her psychiatrist, Dr. Toth,

9    offered that she could have an off-campus pass for a little

10   while, and Shannon and I went to the mall to walk around for

11   a little while and we had dinner together.

12   Q    What was Shannon like?  What did she appear like to

13   you?

14   A    She was ecstatic to be off the campus.  It was the

15   first time she had a privilege like that since she went to

16   Greater Binghamton.  She was just very, very happy and

17   cheerful.

18   Q    And did you and Shannon have any conversations

19   about her future in terms of where she might be living or

20   things of that nature?

21   A    Yes.  She shared with me that she would like to be

22   adopted and what her ideal foster or ideal adoptive family

23   would be like.

24   Q    And what was your response to her regarding those

25   possibilities?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Direct

964

1      A      We talked that at that point in time the goal for

2   DSS was to continue working with her mom but there was a

3   possibility that enough change couldn't be made in her life

4   that Shannon could return home there and in that case we

5   would be looking for an adoptive family for her.

6      Q      Okay.  What was Shannon's reaction to that?  What

7   did she think of that?

8      A      She was fine with that.

9      Q      Now, did Shannon remain after that point in time at

10  the Greater Binghamton Health Center for a while?

11     A      Yes, she did.

12     Q      And did there come a time then that she was

13  transferred to another type of facility?

14     A      Yes.

15     Q      What kind of facility is that?

16     A      She was transferred to a residential treatment

17  facility.

18     Q      What is that?  What's the difference between a

19  residential treatment facility as opposed to Greater

20  Binghamton Health Center?

21     A      Greater Binghamton is an acute health care facility

22  for immediate crisis resolution.  The residential treatment

23  facility is a place where Shannon would live and work with

24  therapists intensively.  There's other children there as well

25  so she would participate in group activities and whatever --

Elizabeth Chesebro - Direct                965

1   whatever services she needed.  Her education was provided

2   there, mental health treatment.  Everything was right on

3   site.

4        Q    Miss Chesebro, at some point in the earlier part of

5   this year did you come down to this building to the United

6   States Attorney's Office?

7        A    Yes, I did.

8        Q    And who else accompanied you when you came down?

9        A    I brought Shannon O'Connor with me.

10       Q    And were there a number of meetings that you were

11  present at in the United States Attorney's Office?

12       A    Yes.

13       Q    And during these meetings who was present at these

14  meetings?

15       A    Yourself, myself, Shannon, at times her

16  psychiatrist, Dr. Michelle Toth, Jim Lyons.

17       Q    Okay.  Without going into what was said, is it fair

18  to say that all of the things involving Shannon's background

19  and things that occurred were at some point discussed during

20  these meetings?

21       A    Yes.

22            MR. LOVRIC:  Those are all the questions I

23  have at this time, Judge.

24            THE COURT:  Mr. Fischer.

25            MR. FISCHER:  Thank you, your Honor.  May it

Elizabeth Chesebro - Cross                        966

1   please the Court, your Honor, counsel.

2   CROSS-EXAMINATION

3   BY MR. FISCHER:

4       Q    Miss Chesebro, my name is Kelly Fischer.  I

5   represent Mr. Sacco.

6       A    Good morning.

7       Q    Did you bring with you documents today?

8       A    Yes, I did.

9       Q    Other than the documents that you brought with you,

10  did you review any documents in preparation for your

11  testimony?

12      A    I reviewed the videotapes that were done at the

13  Broome County Child Advocacy Center, as well as the

14  controlled phone calls that were conducted.

15      Q    Other than those items, did you review any other

16  items in preparation for coming here to testify?

17      A    Over the last couple of weeks I've reviewed my

18  entire case file, which includes all Family Court documents.

19      Q    What else does it include?

20      A    It includes letters written back and forth between

21  Shannon and her mom.  It includes educational information,

22  medical information on Shannon.  It's a complete history of

23  the department's involvement with the family.

24      Q    What medical information concerning Shannon does

25  that file contain?

Elizabeth Chesebro - Cross

967

1    A    It contains the medical record from when Shannon

2  had her sexual abuse examination at Chenango Memorial.  It

3  includes my case notes, various information about medication

4  she's been prescribed and different times that she was seen

5  by the doctor at facilities, her shot record.  Trying to

6  recall what else might be in there.

7    Q    Did you review any medical records concerning

8  Shannon that were made to your knowledge prior to August of

9  2006?

10    A    Not to my knowledge.

11    Q    May I look at the documents that you did bring with

12  you here today, please?

13    A    That's fine with me.

14         MR. FISCHER:  May I approach, your Honor?

15         THE COURT:  Yes, you may.

16         MR. FISCHER:  May I take one moment, please,

17  your Honor?

18    Q    Miss Chesebro, I've affixed an exhibit marker to

19  the outside of that notebook, marked it Exhibit S-16?

20    A    Okay.

21    Q    Can you see that?

22    A    Yes, I do.

23    Q    That exhibit that you brought with you contains

24  your case notes, am I correct?

25    A    Partially what it contains.

Elizabeth Chesebro - Cross                          968

1    Q    In part?

2    A    Yes.

3    Q    And your case notes detail what you did on various

4  occasions with respect to Miss Shannon O'Connor's care, am I

5  correct?

6    A    Yes.

7    Q    If you did something you would record it in your

8  case notes?

9    A    That's typically how we do it, yes.

10   Q    Is that always how we do it?

11   A    There are occasions where something may not have

12 been documented.

13   Q    Did that happen in this case?

14   A    To my knowledge, everything's included in this.

15   Q    When were you -- when did you first work with CPS?

16   A    I started August 10 of 2005.

17   Q    There's a reference that I see in that concerning a

18 trainee, I see the phrase trainee.  Were you a trainee at,

19 say, as of October of 2006?

20   A    As of October 2006?

21   Q    Yes.

22   A    No.  We never have the title of trainee.  This, I

23 think what you were saying, this is a record of the trainings

24 I've attended.  When we start we have the title of case

25 worker.

Elizabeth Chesebro - Cross

969

1    Q    Okay.  So when you started you were a case worker?

2    A    Yes.

3    Q    Before you started working on this case, did you

4  review Miss Panus' records?

5    A    Yes, I did.

6    Q    And you are familiar with those in a general sense?

7    A    In a general sense, yes.

8    Q    Miss Chesebro, Mr. Lovric used an exhibit with you,

9  106.  I hand you that document.

10   A    Yes.

11   Q    Is that document in your file?

12   A    Yes, it is.

13   Q    Now, your file was provided to the government

14  before this trial, am I correct?

15   A    My entire case record was subpoenaed.

16   Q    But that record was omitted from that original

17  submission, am I correct?

18   A    Yes, it was.

19   Q    I'll take it back.  Thank you.  From having

20  reviewed Miss Panus' notes in October of '06 when you got

21  involved, you were aware of Shannon O'Connor's psychiatric

22  history at least going back to August 11, 2006, am I correct?

23   A    Yes.

24   Q    Did you ever undertake any investigation to

25  determine whether there was any psychiatric history

1    concerning Shannon O'Connor prior to August 11, 2006?

2         A    Not while I was assigned the case.

3         Q    Did you ever undertake any such an investigation?

4         A    No.

5         Q    I'd like to spend some time going through your

6    notes with you.  You may refer to those, if you need to.  Let

7    me go to originally February 26 of 2007.  Do you have that

8    note?

9         A    Yes, I do.  I'm assuming you mean from my

10   interviews from Linda and Shannon that day?

11        Q    Yes, please.  Now, February 26, 2007, let me set a

12   time frame before I talk about this particular note.  Am I

13   correct in saying that the first disclosure that Shannon

14   O'Connor ever made concerning any claims concerning Mr. Sacco

15   was made on March 2 of 2007?

16        A    Yes.  That was the 2nd of March.

17        Q    Okay.  Now going back to February 26 of 2007,

18   within a week before March 2 --

19        A    Yes.

20        Q    -- am I correct?  Within a week before the

21   disclosure that Shannon made about Mr. Sacco, Shannon was

22   made aware that her mother had been arrested for leaving the

23   Pizza Hut without paying?

24        A    She was present when that happened.

25        Q    When was the date of that event?

Elizabeth Chesebro - Cross

971

1    A    That was February 25 of 2007.

2    Q    And on the 26th of February, you had a conversation

3  with Shannon about that, her mom being arrested for the Pizza

4  Hut matter?

5    A    Yes.

6    Q    How did she react to that?

7    A    To just the Pizza Hut discussion?

8    Q    That her mom had been arrested.

9    A    She was very fearful that she too would be

10 arrested.  She was embarrassed of what had happened and was

11 very emotionally distraught by it.

12   Q    Now that February 26 conversation you had with

13 Shannon was a fairly lengthy conversation?

14   A    Yes.

15   Q    And by the end of the interview that you had with

16 Shannon, Shannon's body language showed that she was much

17 more comfortable and relaxed, am I correct?

18   A    Yes.

19   Q    Now, you were also aware on or about the 26th of

20 February 2007 that Linda also had spent a lot of money to buy

21 a dog, is that right?

22   A    Yes.

23   Q    And at that point you felt that by conducting

24 herself in that way Linda had put Shannon in a horrible

25 situation, is that correct?

Elizabeth Chesebro - Cross

972

1    A    Yes.

2    Q    Now, this is before any disclosures that Shannon

3  O'Connor made concerning Mr. Sacco, am I correct?

4    A    Yes.

5    Q    In fact, this is the same time frame about a week

6  or so before that disclosure?

7    A    Yes.

8    Q    If you'll go to February 28, please, page 21, if

9  mine match up.  Do you see that?

10   A    I do not appear to have a page 20 and 21 in my

11 binder.

12   Q    There's an event date 2/28/07, a face to face.  Do

13 you see that?

14   A    I don't have that page here.  I stand corrected.  I

15 do have it.  My pages are in backwards.

16   Q    Okay.  And that's a progress note narrative?

17   A    From 2/28/07, yes.

18   Q    On that date, February 28, '07, Shannon and you

19 spoke about dreams that she was having, am I correct?

20   A    If I can have just a moment to review this?

21   Q    Sure.

22   A    Yes, we did discuss that that day.

23   Q    Did Shannon tell you what kind of dreams she was

24 having at that time?

25   A    She called them weird dreams.

Elizabeth Chesebro - Cross

973

1    Q    Did she tell you about what the substance of those

2  dreams were?

3    A    Nothing other than in the dreams she and her mom

4  stabbed one another.

5    Q    What happened with respect to Linda O'Connor and

6  Shannon O'Connor living together from February 25, 2007 to

7  February 28, 2007?

8    A    She was placed in foster care.

9    Q    Where was she, Shannon O'Connor placed?

10    A    In the Norwich area.

11    Q    With the Hamiltons?

12    A    A certified foster home.

13    Q    And Kim and Richard Hamilton?

14    A    Correct.

15    Q    Before that time, before say February 25, 26, 27,

16  28, 2007, did Shannon know the Hamiltons?

17    A    Prior to that, no.

18    Q    So during this time frame her mom walks out of

19  Pizza Hut without paying, mom gets arrested, Shannon gets

20  placed in a foster home, am I correct?

21    A    Correct.

22    Q    This is all during the week before she makes the

23  disclosure concerning Mr. Sacco?

24    A    Correct.

25    Q    Shannon had other stressors in her life at about

Elizabeth Chesebro - Cross

1   that time, didn't she?

2       A    Is there something in particular you're thinking

3   of?

4       Q    Yeah.  Concerning her father she had -- without

5   revealing exactly what the stressors are, is it fair to say

6   that Shannon revealed to you information that you would deem

7   to be a fairly substantial stressor in a girl's life?

8       A    Regarding her father?

9       Q    Yes.

10      A    I don't recall off the top of my head having

11  discussed her father at that period of time.

12      Q    There's a note, as I read it, February 28, 2007,

13  8:30 AM.  Review that to yourself, please.

14      A    Okay.

15      Q    Does that refresh your recollection that there was,

16  in fact, conversation between you and Shannon concerning an

17  event that might be deemed a stressor in Shannon's life

18  regarding her father?

19      A    This conversation actually took place with another

20  case worker who was at the foster home that night.  I did not

21  actually discuss it with Shannon herself.

22      Q    The information, if it's accurate concerning

23  Shannon's father, is fairly substantial in your opinion?

24      A    Yes.

25      Q    And there was also some discussion concerning

Elizabeth Chesebro - Cross                                 975

1    Shannon's problems that Shannon's brother had in that same

2    note.  Do you recall having conversations with Shannon about

3    that issue?

4         A    No.

5         Q    At any time, not just February 28?

6         A    I don't recall ever discussing that issue about her

7    brother.

8         Q    In any event, these discussions concerning that

9    reflected in the note occurred on February 28, am I correct?

10        A    This would have occurred the night before,

11   February 27.

12        Q    Okay.  On or about March 1 of 2007, did Shannon

13   express a fear of her mother?

14        A    I don't know that it could be classified as a fear

15   at that point.  She did say she didn't wish to see her mom at

16   that point in time.

17        Q    Would you go to an entry in your notes of March 1,

18   2007, 9:35 AM and read that to yourself, please.

19        A    Yes.

20        Q    Does that refresh your recollection that on March 1

21   of 2007 Shannon expressed a fear of her mom?

22        A    That report came from her case manager at mental

23   health.  She apparently expressed the fear to the case

24   manager.

25        Q    Does that refresh your recollection that Shannon

Elizabeth Chesebro - Cross

976

1   did, in fact, on March 1 express a fear of her mother?

2       A    She expressed that fear prior to March 1.

3       Q    Do you know when she did that, when she made that

4   expression?

5       A    I don't know.

6       Q    Okay.  Well, on March 1, did you have a

7   conversation with Shannon?

8       A    Yes, I did.

9       Q    About what time of day was that?

10      A    I was present in Family Court.  I don't recall what

11  time of day the Family Court appearance was.

12      Q    Your conversation with Shannon that day was while

13  you were in Family Court?

14      A    Outside the court, yes.

15      Q    How long did that conversation with Shannon last?

16      A    I'm not able to give an approximation.

17      Q    That conversation of March 1, 2007 is the day

18  before Shannon makes the first disclosure concerning

19  Mr. Sacco, correct?

20      A    Yes.

21      Q    At that time during your conversation with Shannon,

22  March 1, 2007, did Shannon express a concern about her mom

23  making Shannon feel guilty about Shannon liking foster care?

24      A    Can you repeat your question.

25      Q    You know, I'll withdraw the question and I'll ask

Elizabeth Chesebro - Cross

977

1   you a different question.  Did you drive Shannon to that

2   Family Court appearance?

3       A    Yes, I did.

4       Q    Did you drive her back to the Hamiltons that day?

5       A    I'm not sure if I did.  I know her foster mom was

6   present at the time.  One or the other of us would have taken

7   her.

8       Q    Refer, please, if you will to your note that says

9   event date 3/1/2007, event time 2:45 PM.

10      A    Yes.

11      Q    Do you see that?

12      A    Yes.

13      Q    Would you look about halfway through that note,

14  please.  Starting with during the drive and read that to

15  yourself, please.  Do you see that?

16      A    Yes, I do.

17      Q    Does that refresh your recollection that you drove

18  Shannon home, I'm sorry, to the Hamiltons from Family Court

19  that day?

20      A    To my recollection, I believe that this was much

21  later in the day after a supervised visit that she was driven

22  home but, yes, I did transport her back to the residence.

23      Q    Okay.  During that drive back to the Hamilton

24  residence it was just you and Shannon in the vehicle?

25      A    Yes.

Elizabeth Chesebro - Cross

978

1    Q    You had a discussion with Shannon at that time?

2    A    Yes.

3    Q    What was the substance of that discussion at that

4    time?

5    A    We were talking about what they were learning about

6    in her science class, about puberty.

7    Q    And subjects surrounding that topic?

8    A    Puberty, yes.

9    Q    Did Shannon talk to you about anything that had --

10   that she had seen on the school bus earlier that week?

11   A    Yes.

12   Q    What did she say to you about that?

13   A    Another child had brought in a condom that the

14   children all looked at.

15   Q    Now, this is what she says to you on March 1, 2007,

16   the day before the disclosures that she made about Mr. Sacco,

17   correct?

18   A    Yes.

19   Q    On March 2, did you have any discussion with

20   Shannon about Shannon going into long-term foster care?

21   A    What do you mean by long-term foster care?  At that

22   point she'd only been in a week.  She knew she'd be in foster

23   care until her mom was able to resolve her issues.

24   Q    You were aware on March 2, 2007 the possibility

25   that Shannon would go into long-term foster care, am I

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    correct?

2         A    Yes.

3         Q    When you talk about long-term foster care, what do

4    you mean?

5         A    When I think -- when I consider foster care, long

6    term to me would be six months or more.

7         Q    When Shannon originally made the disclosure to you

8    concerning Mr. Sacco, she spoke about having a conversation

9    with her teacher, am I correct?

10        A    Yes.

11        Q    Did she disclose to you that she had asked her

12   teacher that if someone older has sex with someone younger is

13   it illegal or something to that effect, am I correct?

14        A    Something to that effect, yes.

15        Q    Did she also ask the question at that time,

16   Shannon, of her teacher, as Shannon related to you, that is,

17   is it considered rape if someone says no, if someone does not

18   say no out loud?

19        A    Yes.

20        Q    Did she say both of those things to you?

21        A    My recollection is that she shared that they had

22   discussed in class the difference of people having sex, an

23   older person and a younger person, and then she then in

24   private asked the teacher if it's wrong if the person does

25   not say no.

Elizabeth Chesebro - Cross

980

1    Q    On March 2 of 2007, when Shannon made this
2  disclosure to you, were you aware of any concerns expressed
3  by anybody else that Shannon might make false accusations?
4    A    Not to my recollection.
5    Q    Have you ever made an inquiry about whether Shannon
6  has made false accusations?
7    A    Inquiry to who?
8    Q    To anybody.
9    A    Not that I recall.
10   Q    Are you aware as you sit here today that anybody
11 has ever expressed a concern about Shannon making false
12 accusations?
13   A    Not that I recall.
14   Q    On or about March 14 of 2007 Shannon placed what
15 you described as a controlled phone call to Mr. Sacco, am I
16 correct?
17   A    Yes.
18   Q    Now, before she placed any phone calls to Mr.
19 Sacco, you and Detective Blenis had prepared some sort of a
20 script for her to work from, am I correct?
21   A    I was not involved in preparing that script.  I was
22 aware that there was a script.
23   Q    At any time before or during those conversations,
24 did you write on Detective Blenis' script anything to suggest
25 to Shannon what she should say?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

981

1    A    I believe I did, yes.

2    Q    You recall in the conversation that was recorded

3    between Mr. Sacco and Miss O'Connor, Miss Shannon O'Connor,

4    the part where Mr. Sacco talks about Shannon making

5    disclosures to him about her grandfather abusing her?

6    A    Yes.

7    Q    Do you remember that part?

8    A    Yes, I do.

9    Q    And she denied it at that time, am I correct?

10   A    Yes.

11   Q    Now, when those phone calls were over, did you ever

12   inquire that during that day or couple days thereafter of

13   hand, anything about that subject?

14   A    We briefly processed it after the phone call that

15   day and she continued to say that that had never occurred.

16   Q    Is there anything in your notes reflecting that you

17   and Shannon discussed that after the phone call?

18   A    I don't believe there is.

19   Q    That wasn't important enough to put in your notes?

20   A    Some things do get overlooked.

21   Q    I'm sorry?

22   A    Some things do get overlooked.

23   Q    Was that one thing that just got overlooked?

24   A    I don't see it in my notes, yes.

25   Q    Approximately a month after Shannon made the

Elizabeth Chesebro - Cross

982

1   disclosures concerning Mr. Sacco, Shannon's father Ray tried

2   to reach out to Shannon, am I correct?

3       A    He petitioned the court for a contact with her.

4       Q    Now, she had not seen Ray in some time before that,

5   am I correct?

6       A    To my knowledge, yes.

7       Q    In fact, her father was incarcerated, am I correct?

8       A    Yes.

9       Q    And she became aware of Ray's petition and Ray was

10  petitioning to have custody of Shannon?

11      A    I believe that's how the petition read; that he was

12  asking for custody and visitation.

13      Q    And he was still incarcerated at this time?

14      A    Yes.

15      Q    Now Shannon was made aware of this?

16      A    Yes, she was.

17      Q    When was she made aware of it?

18      A    What was the date you gave that he petitioned

19  again?

20      Q    I'm not sure that I did.  If you can give an

21  approximate date when Shannon was made aware of that.

22      A    I don't recall.

23      Q    Ray was not Shannon's biological father, am I

24  correct?

25      A    I've never gotten a clear answer on that, to be

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1   honest.

2       Q    Is Shannon or was Shannon at that time aware that

3   there was a question whether Ray who was incarcerated and

4   petitioning to obtain custody and visitation of Shannon may

5   not be her biological father?

6       A    To my knowledge she was aware of that, yeah.

7       Q    How long did Shannon stay with the Hamiltons after

8   the February 25 event at Pizza Hut?

9       A    She was with them from the day she entered foster

10  care until the day she was admitted to the Greater Binghamton

11  Health Center.

12      Q    Approximately what date was she admitted to the

13  Greater Binghamton Health Center?

14      A    Approximately September 19, September 20.  It was

15  about midnight when she was admitted.

16      Q    At times Shannon, during the time from February 25,

17  2007 until she was admitted to the Greater Binghamton health

18  center, Shannon expressed concerns to you that she was not

19  happy with the Hamiltons, am I correct?

20      A    I know there were times when there were bumps in

21  the road.  She was an only child being assimilated into a

22  family of six other children.  I don't think it would be fair

23  to say that she wasn't happy living there.

24      Q    Do you remember that on or about April 17 of 2007

25  Shannon wrote to you indicating that she didn't want to be at

Elizabeth Chesebro - Cross

984

1   Kim's any more and that she wanted to move?

2       A   Are you recalling a phone call I had with Kim

3   Hamilton?

4       Q   I don't know.  I asked whether you're aware of

5   that.

6       A   To my recollection, I did not have a conversation

7   with Shannon about her not wanting to be there.

8       Q   Did you see a letter that Shannon wrote indicating

9   that Shannon was not happy at the Hamiltons and that Shannon

10  wanted to move?

11      A   Not to my recollection.

12              THE COURT:  Okay.  We're going to take a

13  break, ladies and gentlemen.

14              (Jury present)

15              THE COURT:  Okay, Mr. Fischer.

16              MR. FISCHER:  Thank you, your Honor.

17  BY MR. FISCHER:

18      Q   Miss Chesebro, I've moved back here so the jurors

19  might hear both of us.

20      A   Okay.

21      Q   I'd like to go back to your entry into the case in

22  October of 2006.  When you entered the case in October of

23  2006, were you aware that prior to that time Shannon O'Connor

24  had been on pornography web sites?

25      A   I just want to make a correction.  I wasn't

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1   assigned the case until November 2006 but when I was assigned

2   the case, I was made aware of that information, yes.

3       Q    Were you aware she was also in chat rooms?

4       A    Yes.

5       Q    Were you aware when you came onto the case that

6   there was a claim concerning Linda O'Connor and George

7   sending e-mails back and forth?

8       A    I believe at that time I was aware, yes.

9       Q    Do you know -- did you know, I'm sorry, in November

10  of 2006 when you came onto the case the nature of the e-mails

11  that were sent back and forth between Linda O'Connor and

12  George?

13      A    I don't recall if I learned about their content

14  before or after that.

15      Q    In November of '06 when you got on the case, were

16  you aware that Shannon had been exposed to an adult sex toy?

17      A    Again, I don't recall if I learned of that before

18  or afterwards.

19      Q    If it occurred before you were on the case, it

20  would be important for you to know coming into the case,

21  wouldn't it?

22      A    Yes.

23      Q    Let's go up to about the first of the year, first

24  of 2008.

25      A    Okay.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

986

1     Q    I'm sorry.  I apologize.  June of 2007.  In about

2  June of 2007, specifically June 11 or thereabouts, were the

3  visits between Linda O'Connor and Shannon O'Connor supervised

4  in some way?

5     A    Yes, they were.

6     Q    Up to that time had visits been supervised?

7     A    Yes.  Face-to-face contact was supervised.

8     Q    How it was it supervised?

9     A    By a DSS staff member.

10     Q    Who was that?

11     A    There were several of us that supervised visits

12  during the course of our involvement.  Myself, other case

13  workers, parent aids with the agency.

14     Q    Now, in June of 2007 Shannon was getting ready to

15  have her graduation from sixth grade?

16     A    Yes.

17     Q    Do you remember some question whether Kim Hamilton

18  or Linda O'Connor or both were going to be allowed to attend

19  that graduation ceremony?

20     A    Yes.

21     Q    And was Shannon aware of that dispute for lack of a

22  better word?

23     A    To my knowledge, she wasn't aware of anything other

24  than she wanted her mom to attend.

25     Q    In June of 2007, did you have a suspicion that

Elizabeth Chesebro - Cross                    987

1   Shannon wanted to be privy to pornographic material?

2        A    During June 2007?

3        Q    Yes.  June 12.

4        A    I don't recall that.

5        Q    Would you refer to your note of June 12, 2007, 3:40

6   PM, the last line of that note if you'll.  Read that to

7   yourself.

8        A    Yes.

9        Q    Does that refresh your recollection?

10       A    Yes.

11       Q    And what is your recollection about that subject?

12       A    That was discussed, that statement was, about

13  Shannon wanting to know adult information, that when she had

14  been living with her mom she would have been privy to but

15  that a normal 13, 14-year-old wouldn't normally know about.

16       Q    It doesn't say something in this note about what a

17  normal 13 or 14-year-old would want, does it?

18       A    Not in the note it does not.

19       Q    It does talk about your suspicion that Shannon

20  wants to access pornographic material, am I correct?

21       A    There's nothing in that note about pornographic

22  material.

23       Q    Adult material?

24       A    Correct.  It does say adult material but that was

25  referencing adult conversation, adult matters, not

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    988

1   pornography.

2       Q    I stand corrected.  I understand.  In June of 2007,

3   at some point did Shannon's mother go back into jail?

4       A    I believe she entered jail the beginning of July

5   '07.

6              MISS PEEBLES:  Objection.

7              THE COURT:  What's the basis of your

8   objection?

9              MISS PEEBLES:  She didn't go back into jail,

10  she went to jail.  It's assuming facts not in evidence what

11  he just stated.

12             THE COURT:  Overruled.

13      Q    Did Linda go to jail in June of '07?

14      A    I believe she entered jail at the beginning of July

15  of '07.

16      Q    Did you speak with Shannon at about that time?

17      A    Yes.

18      Q    Was Shannon made aware of that fact?

19      A    That her mother was going to jail?

20      Q    Yes.

21      A    Yes.

22      Q    Did you have a conversation with Linda O'Connor

23  about June 27 of 2007, a supervised visitation?

24      A    Were you asking if I had a conversation with Linda?

25      Q    I can rephrase the question.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    989

1    A    Thank you.

2    Q    Were you present between a supervised visit during

3    Linda and Shannon on that date?

4    A    Yes, I was.

5    Q    Did you hear what was said back and forth?

6    A    Between mother and daughter, yes.

7    Q    Did the subject of Clesson, the caretaker of the

8    property, come up during that conversation?

9    A    Yes, it did.

10   Q    June 27, 2007?

11   A    Yes.

12   Q    That's before the FBI got involved in this case, is

13   that correct?

14   A    To my knowledge.

15   Q    Linda fixated on the subject of Clesson, am I

16   correct?

17   A    Yes.

18   Q    You found that strange?

19   A    Yes.

20   Q    The week before Linda had said something to you

21   about not liking Clesson Lockwood, am I correct?

22   A    Yes.

23   Q    In July of 2007, when Linda was incarcerated, did

24   you have conversations with Kim Hamilton about Kim Hamilton

25   adopting Shannon?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                          990

1      A    I know conversations were had with Kim about that.

2  I don't recall if it was in July.

3      Q    I refer you to July 10, 2007 note, 2:30 PM.  Would

4  you read that to yourself, please.  Am I correct that you had

5  conversations at about that time with Kim concerning Kim's

6  adoption of Shannon?

7      A    Her willingness to adopt, yes.

8      Q    And at that time, as I understand it, Kim expressed

9  a willingness to adopt Shannon if Shannon was freed?

10     A    Yes.

11     Q    That's your language?

12     A    Yes.

13     Q    Freed?

14     A    Freed for adoption.

15     Q    Freed from Linda?

16     A    Freed from the custody, yes.

17     Q    Now, when Linda was incarcerated, was there a

18  restriction on Linda's ability to communicate with Shannon by

19  the mails?

20     A    Any communication was to come to me first to be

21  screened and then forwarded on to Shannon.  That's mailed

22  communication.

23     Q    Did Shannon act differently when she was around her

24  mom than when she was not around her mom?

25     A    Oftentimes, yes.

Elizabeth Chesebro - Cross

1    Q    Can you describe what that difference was?

2    A    She was very giggly and I'm just trying to think of

3    a good way to summarize the way they acted together.  She was

4    very giggly and spoke very fast and hyper, bouncing from

5    topic to topic.  Clung close to her mom and frequently they

6    would exchange I love yous back and forth or hugs whenever

7    they did have contact.

8    Q    In the summer of 2007, Shannon was in the YMCA

9    camp?

10    A    Yes.

11    Q    Do you know the names of the people who were

12    involved in running that YMCA camp?

13    A    I know some names, yes.

14    Q    Were there some men who were involved in running

15    the YMCA camp who had some contact with Shannon?

16    A    Yes.  There were male counselors there.

17    Q    Were you ever concerned about the way that some of

18    those men dealt with Shannon and the way that Shannon dealt

19    with some of those men being too close?

20    A    I believe that was brought to my attention by

21    someone else, but I never witnessed their behaviors.

22    Q    During the summer of 2007 Shannon had a boyfriend?

23    A    Yes.

24    Q    Casey?

25    A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    Q    Casey Hitchin?

2    A    I'm sorry?

3    Q    Casey, Casey Hitchin, am I correct?

4    A    Shannon reported to me, yes.

5    Q    At times did Shannon express to you that she wanted

6    to be with her mom?

7    A    At times, yes.

8    Q    And at times she was pretty upset that she couldn't

9    be with her mom, am I correct?

10   A    Occasionally, yes.

11   Q    In fact, sometimes she'd be very upset about that,

12   wouldn't she?

13   A    I think that's a language, you know, just a

14   difference between words.  I know she was upset at times,

15   yes, because her mother was the only family she had.

16   Q    Did you ever say that Shannon was very upset about

17   that?

18   A    It's possible I described it that way.

19   Q    Do you have any independent recollection of

20   describing it that way?

21   A    No.  Not off the top of my head I do not.

22   Q    Would you go to your note of August 27, 2007,

23   please, 9:00 AM, first line of that note.  Read it to

24   yourself, please.

25   A    You said 9:00 AM?

Elizabeth Chesebro - Cross

993

1    Q    Yes.

2    A    Okay.

3    Q    Does that refresh your recollection that Shannon

4    was very upset about that subject?

5    A    My note says she sounded very upset and asked when

6    she could call her mom again.

7    Q    When you interview witnesses or when you interview

8    children in your care, do you sometimes use leading questions

9    like we do?

10   A    It's possible, yes.

11   Q    You know the difference between a leading question

12   and an open-ended question?

13   A    Yes.

14   Q    What's the purpose of a leading question with a

15   child?

16   A    The purpose?

17   Q    Yes.

18   A    I suppose sometimes that could be asked when the

19   answer is already known if it's an issue that has been

20   discussed before.

21   Q    Do you use leading questions when you want to

22   suggest an answer to the person you're interviewing?

23   A    Suggest an answer that they've given me prior?

24   Q    I can rephrase my question.

25   A    Thank you.

Elizabeth Chesebro - Cross                    994

1      Q     Do you use leading questions if there's an answer
2   that you want the person you're interviewing to speak?
3      A     No.
4      Q     In August of 2007, you came to form an opinion
5   about the transactions between Linda O'Connor and Dean Sacco,
6   am I correct?
7      A     Yes.
8      Q     And you had those suspicions about those
9   transactions between Linda O'Connor and Dean Sacco all along,
10  am I correct?
11     A     No.
12     Q     Would you go to your note of August 29, 2007,
13  please, 9:15 AM.  About the middle of that note, since
14  reading I told Amanda I have -- and read that to yourself,
15  please.
16     A     Yes.
17     Q     Does that refresh your recollection that you had
18  those suspicions all along?
19     A     I did put that in my note that I had the suspicions
20  all along.
21     Q     Does that refresh your recollection that you did
22  have those suspicions all along?
23     A     That's what I put in my note that day.
24     Q     I understand that.  Do you now independently recall
25  that you had those suspicions all along?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

995

1    A    No.  I think that was a bad term that I put in my
2    note.  I think I should have chosen other words in my note.
3    I don't believe all along really is --
4    Q    So that note does not accurately reflect what you
5    really thought, is that what you're saying?
6    A    That statement all along does not --
7    Q    Were you concerned that one of the counselors at
8    the Y-camp was too buddy buddy with, among other children,
9    Shannon?
10   A    Yes.
11   Q    With respect to Ray, Shannon was concerned that her
12   mother might choose Ray over Shannon, am I correct?
13   A    Yes.
14   Q    She was pretty concerned about that, wasn't she?
15   A    Yes.
16   Q    That upset her quite a bit, didn't it?
17   A    Yes.
18   Q    And that was -- that subject was being discussed
19   with Shannon at approximately what time frame?
20   A    My best estimation would be late summer, beginning
21   of the school year.
22   Q    Into September of 2007?
23   A    Approximately that time.
24   Q    And into mid September of 2007, did that concern
25   expressed by Shannon about mom choosing Ray over Shannon, did

Elizabeth Chesebro - Cross

996

1    that continue into mid September of '07?

2        A    That was an ongoing concern of Shannon's.

3        Q    Now, the disclosure concerning -- that Shannon made

4    that was videotaped, the first one with Detective Blenis,

5    that disclosure was made in October of 2007, am I correct?

6        A    Yes.

7        Q    And when was Shannon moved into the Greater

8    Binghamton Health Center?

9        A    September of 2007.

10       Q    At about the same time that these concerns about

11   mom and leaving for Ray were being expressed to you?

12       A    Yeah, that was an ongoing concern.  There was

13   overlap there, yes.

14       Q    Now, in September of 2007 Shannon was no longer

15   allowed to visit her mother at all, am I correct?

16       A    Face-to-face contact was stopped when Linda went to

17   jail in July, yes.

18       Q    And Shannon was upset that she couldn't see her

19   mom?

20       A    There was a period during the summer months that

21   she did want to visit her mom, yes.

22       Q    Was she still upset about that in September of

23   2007?

24       A    I don't recall that she brought that to my

25   attention.

Elizabeth Chesebro - Cross                          997

1      Q      Okay.  Would you refer to your note of
2  September 17, 2007, please.  The fourth bullet, if you'll
3  proceed that to yourself, please.
4      A      The supervised phone call between the two of them?
5      Q      I'm sorry.  As I read it, method, face to face.  L,
6  DSS, office field.  Case worker contact.  Family
7  participants, Linda O'Connor, Shannon O'Connor.  It's a
8  fairly long note?
9      A      Okay.  Yes, I see what you're discussing.  Yes.
10     Q      Does that refresh your recollection that into
11 September, in fact, on September 17, 2007, Shannon was still
12 concerned -- she was upset that she couldn't see her mother
13 in jail?
14     A      Yes.  At that time she was.
15     Q      And at that time she thought her mom might take off
16 to live with Ray when she -- when Linda's released from jail?
17     A      Yes.
18     Q      Now that's pretty upsetting to a kid, isn't it?
19     A      I could imagine it would be.
20     Q      You deal with children on a regular basis?
21     A      Yes.
22     Q      Are you aware of any mental illness that Linda
23 O'Connor was diagnosed with?
24     A      Yes.
25     Q      When did that come to your attention?

Elizabeth Chesebro - Cross

998

1    A    There were various conversations throughout my case

2  involvement with mental health counselors and their

3  evaluations of her.

4    Q    Do you know how long Linda has labored under mental

5  illness?

6    A    My understanding is it's been an ongoing issue for

7  upwards of two to three decades.

8    Q    Going back to the question about Ray and Linda.

9  Shannon felt she had no control over that situation, am I

10  correct?

11    A    That's a fair assessment.

12    Q    And she was hopeless over that, wasn't she?

13    A    In what regard?

14    Q    Did she express to you that she, Shannon, felt a

15  sense of hopelessness about her lack of control about what

16  her mother was going to do, whether her mother was going to

17  go with Ray or not?

18    A    Yeah.  She was very frustrated by the fact that she

19  had no control over those actions that then affected her.

20    Q    And Shannon went to the Greater Binghamton Health

21  Center a few days after September 17, 2007, am I correct with

22  that?

23    A    Yes.

24    Q    Did she go to the hospital first?

25    A    Yes.

Elizabeth Chesebro - Cross

1    Q    What hospital did she go to first?

2    A    She was evaluated at the Binghamton Crisis Center.

3    Q    What event triggered Shannon going to the hospital

4  on or about September 19 of 2007?

5    A    I'd like to start with September 17.  She had the

6  supervised phone call with her mom and was very distraught

7  after that, unable to calm her emotions.  I contacted her

8  mental health therapist which is in the same building where

9  we had the phone call.  Her mental health therapist was able

10 to see her so she had an emergency appointment with the

11 therapist.  She was pretty down and out at that point but

12 didn't have any plan or intent to kill herself.  She -- that

13 was on Monday.  She had a regularly scheduled appointment on

14 Wednesday.  When she went back on Wednesday the 19th, she

15 continued to be very distraught and her mental health

16 therapist found her in need of further evaluation.

17   Q    Later in September you spoke with Shannon about the

18 relationship between Mr. Sacco and Shannon and Linda

19 O'Connor, am I correct?

20   A    I'd like to --

21   Q    I'm specifically referring to the time frame

22 September 24, 2007, does that sound familiar to you?

23   A    I don't see from my notes here that I had contact

24 with Shannon that day on the 24th.

25   Q    I'm looking at a note 9/24/07, be 1:15 PM.

Elizabeth Chesebro - Cross                    1000

1      A     Okay.

2      Q     Do you see that?

3      A     Yes, I do.

4      Q     Does that refresh your recollection that you had a

5 conversation with Shannon about that date?

6      A     I had a conversation at that point with Lisa

7 Florance-Diaz, her primary therapist.

8      Q     The conversation then reflected in that note is not

9 a conversation you had with Shannon?

10     A     No, it is not.

11     Q     At that point you asked Miss Diaz whether Shannon

12 had ever said that her mother prostituted her, didn't you?

13     A     Yes, I did.

14     Q     And Miss Diaz said to you, in part, Shannon did not

15 put it in those words, is that what Miss Diaz said to you?

16     A     That was the essence of the conversation, yes.

17     Q     And that's when Miss Diaz expressed to you Miss

18 Diaz's opinion about what really happened, am I correct?

19     A     Based on her conversations with Shannon, that was

20 my understanding of it.

21     Q     And there's a reference -- withdraw that.  There's

22 something Shannon didn't know for a fact, whether that was

23 correct, am I reading that correctly?

24               MR. LOVRIC:  Objection.

25               THE COURT:  Sustained.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    Q    During that conversation you said to Miss Diaz that

2    you had been suspicious of that subject all along, didn't

3    you?

4    A    Yes, I did use that phrase.

5    Q    Now, do you want -- is that another mistake?

6    A    Again, I think all along was a poor choice of words

7    at that time.

8    Q    When Shannon went into the Greater Binghamton

9    Health Center she got worse, her psychiatric condition got

10   worse, am I correct?

11   A    For a period, yes.

12   Q    Was there any concern on your part that that

13   admission to the psychiatric center was, in fact, worsen

14   cause of the worsening condition?

15   A    I'm sorry.  Can you rephrase that.

16   Q    I'll withdraw it.  There were different triggers

17   for Shannon to have reactions, is that fair to say, when she

18   was at the Greater Binghamton Health Center?

19   A    That's a very broad question I feel.

20   Q    I intend it to be very broad.

21   A    Okay.

22   Q    Generally speaking, is that a fair statement?

23   A    Yeah.

24   Q    Sometimes a phone call with Kim Hamilton would

25   trigger an incident?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1002

1      A    At one point, yes.

2      Q    Sometimes a phone call with her mother would

3  trigger an incident, am I correct?

4      A    She never had phone calls with her mom while she

5  was at Greater Binghamton.

6      Q    What other triggers -- withdraw that.  At one point

7  when Shannon was at the Greater Binghamton Health Center she

8  was involved in what's been described, as I understand it, as

9  an up roar or a riot.  What happened?

10     A    My recollection is that Shannon was involved with

11 other adolescents on the unit planning some sort of -- the

12 words you used, up roar and riot is what was told to me -- to

13 cause a problem on the unit.  I was told that she wasn't the

14 instigator or leader of that but she was following along with

15 the other ideas.

16     Q    In October of 2007, say the first week or two of

17 October of 2007, did it come to your attention that there was

18 a concern that Kim Hamilton, the foster parent, was showing

19 signs of rejecting Shannon?

20     A    I believe what you may be referring to a

21 conversation that we had -- during a treatment team meeting

22 where her therapists were concerned that when Shannon was in

23 the Hamiltons home, that there had been some sort of

24 rejection shown.  I don't recall at that time that that was

25 an ongoing issue though.

Elizabeth Chesebro - Cross

1    Q    When you say ongoing, how long was that an issue?

2    A    The main concern was that Shannon had been told if

3  she were to cut again, self-mutilate, that she wouldn't be

4  able to stay at the Hamiltons and the therapist brought to my

5  attention, they feel Shannon kept that with her all along and

6  she didn't want to disappoint the Hamiltons.

7    Q    How long did that remain an issue?

8    A    I never had that conversation with Shannon.

9    Q    Did you ever discuss with Shannon Shannon's

10 feelings about being rejected by Kim Hamilton?

11   A    Not to my recollection.

12   Q    Was that important?

13   A    That was something that she was processing with her

14 therapist at the Greater Binghamton Health Center.

15   Q    Was that important?

16   A    That is an important topic, yes.

17   Q    When did Linda O'Connor get out of jail?

18   A    I don't recall the exact date.  It was in October

19 of 2007 though.

20   Q    Does it sound familiar that Linda was released from

21 jail on or about October 11 or 12, 2007?

22   A    Yes.  It was in that time period.

23   Q    And on October 15, Kim Hamilton, the foster mother,

24 visited Shannon at the Greater Binghamton Health Center?

25   A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    Q    Was Shannon in conflict between her biological

2  mother, Linda O'Connor, and her foster mother, Kim Hamilton,

3  in mid October of 2007?

4    A    I think that would be fair to say.  She -- that was

5  a conflict for her because there was the potential that she

6  could return home to her mom.  That was still in flux because

7  of the Family Court proceedings or the potential that her

8  mom's rights would be terminated and that she would need to

9  live elsewhere.

10    Q    By October 24 you observed in Shannon certain

11  conduct about her being -- varying between being oppositional

12  and mean on one side and kind of a depressed or flat affect

13  on the other side, is that correct?

14    A    I believe that was the assessment her therapist had

15  made and shared with me.

16    Q    Was that consistent with your observations at that

17  time?

18    A    I did not witness her being oppositional.  That

19  was, I believe, based on her actions on her unit at the

20  Greater Binghamton Health Center.

21    Q    On October 25, 2007, you attended a treatment team

22  meeting, correct?

23    A    Yes.

24    Q    Who was present at that treatment team meeting?

25    A    At the treatment team meeting there were -- can I

Elizabeth Chesebro - Cross

1005

1   read them from my list here?

2       Q    If you can refresh your recollection by reading the

3   list, by reading the list to yourself and then telling the

4   jury who was present, please.

5       A    At the treatment team meeting was myself, her

6   psychiatrist, her social worker, a psychologist, treatment

7   team coordinator.  Shannon was present for part of the

8   meeting, as well as the foster mom.

9       Q    Kim Hamilton was present on that October 25, 2007

10  visit?

11      A    Yes.

12      Q    Meeting?

13      A    Meeting, yes.

14      Q    Shannon wasn't present during the entire meeting?

15      A    Correct.

16      Q    She was brought in at the end to sign a treatment

17  plan?

18      A    Yes.

19      Q    But during the meeting was Shannon -- did Shannon

20  talk at all about any events in her life?

21      A    Not that I recall during the meeting.

22      Q    Prior to that meeting -- withdraw that.  During

23  that meeting did it come to your attention that Shannon had

24  talked recently about being sexually abused by her

25  grandfather, George, for approximately a year?

Elizabeth Chesebro - Cross                    1006

1       A    Yes.

2       Q    Did you interview Shannon after that meeting about

3  that subject?

4       A    Yes, I did.

5       Q    When did you speak to Shannon about that subject?

6       A    Immediately after that meeting.

7       Q    How long did you speak with Shannon about that?

8       A    That was a very long meeting.  A couple of hours

9  would be a good approximation.

10      Q    Did you make a note in your records about that

11  October 25 meeting?

12      A    Yes, I did.

13      Q    And that's the note that was omitted from the

14  original submission, am I correct, that we talked about

15  earlier?

16      A    That was accidentally left out, yes.

17      Q    Exhibit S-106 for the record.

18           MR. FISCHER:  Yes.  106 which I marked

19  previously.  I marked it as S-106.  That is the October 25,

20  2007 note that was mailed later.

21      Q    In any event, Miss Chesebro, October 25, 2007, you

22  made a long note?

23      A    Yes.

24      Q    And it's at that time that Shannon gives you

25  detailed information concerning the events involving George?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1007

1    A    Correct.

2    Q    What did Shannon say about when those events

3  occurred?

4    A    Those events occurred when -- prior to living in

5  Chenango County, prior to the flood when she was, I believe,

6  between the ages of 11 and 12.

7    Q    That was before August 1 of 2007?

8    A    Yes.

9    Q    All of the events involving George occurred before

10  August 1 of 2007?

11    A    Yes.

12    Q    And the October 29, 2007 interview with Detective

13  Blenis is based on that October 25 disclosure by Shannon?

14    A    Yes.

15    Q    In November of 2007, Shannon had a kidney stone, am

16  I correct, or was it Linda that had a kidney stone?

17    A    November of 2007, yes.  That would have been

18  Shannon.

19    Q    That's a painful condition?

20    A    To my knowledge, yes.

21    Q    Did she receive pain medication for that?

22    A    Yes, I believe so.

23    Q    What pain medication did she receive?

24    A    I don't recall.

25    Q    Do you know how long she was given pain medication

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    for the kidney stone issue in mid November 2007?

2        A    There was a period when she was in the hospital

3    that they provided her with pain medication.

4        Q    What other medications did Shannon receive while

5    she was at the Greater Binghamton Health Center?

6        A    She received medications to assist with sleeping,

7    as well as antidepressant medications.  And there was a

8    course, excuse me, a course of an antipsychotic medication.

9        Q    When were those antipsychotic medications

10   administered, to the best of your knowledge?

11       A    It was in the time frame where she had been hearing

12   voices.  We spoke about that earlier.  The auditory

13   hallucinations.

14       Q    About what time frame was that?

15       A    I'm not finding it at this point.

16            MR. FISCHER:  S-18.  May I approach, your

17   Honor?

18            THE COURT:  Yes.

19       Q    Ma'am, I'll show you what's marked for

20   identification as Exhibit S-18.  What is that?

21       A    This just, briefly scanning it, appears to be

22   progress notes, evaluations, and physician orders from the

23   Greater Binghamton Health Center.  I believe I see a

24   treatment plan as well.

25       Q    Have you seen that document before?

Elizabeth Chesebro - Cross

1    A    No, I have not seen this document.

2    Q    Do you know whether Shannon had been administered

3  antipsychotic medication as of approximately October 1, 2007?

4    A    She did receive emergency medication around that

5  time, yes.

6    Q    And what emergency medication was that?

7    A    She was provided -- I don't know -- I don't know

8  that I know the name of the medication but the hospital, they

9  called them stat meds for when a child was out of control.

10   Q    Do you know whether Shannon was administered

11 Thorazine during the time that she was at the Greater

12 Binghamton Health Center?

13   A    I do believe she was, yes.

14   Q    During the time that Shannon was in the Greater

15 Binghamton Health Center and before October 25, 2007 when she

16 made the disclosure about George, you had already been privy

17 to the telephone conversation between Shannon and Mr. Sacco

18 where Mr. Sacco asks about Shannon speaking about her

19 grandfather?

20   A    Yes.

21   Q    Did you bring that to the attention before

22 October 25, 2007 to anybody at the Greater Binghamton Health

23 Center?

24   A    Not to my recollection, I did not.

25           THE COURT:  Okay.  Ladies and gentlemen, we're

Elizabeth Chesebro - Cross                    1010

1    going to break for lunch.  We'll see you back at 1:30.

2                    (Lunch break taken)

3                    MR. FISCHER:  S-13, Chenango County Hospital

4    record, I don't know if the witness has it or Colleen has it.

5                    (Jury present)

6                    THE COURT:  Okay, Mr. Fischer.

7    BY MR. FISCHER:

8        Q    Miss Chesebro.

9        A    Yes.

10       Q    Are you aware that on or about December 24, 2007,

11   excuse me, Miss O'Connor, Miss Shannon O'Connor was

12   prescribed Risperdal?

13       A    Yes, I am.

14       Q    Do you know what that is?

15       A    It's a medication for a variety of symptoms.

16       Q    What symptoms?

17       A    I believe hers was prescribed at that time for

18   auditory hallucinations.

19       Q    What auditory hallucinations was Shannon O'Connor

20   having in December of 2007?

21       A    It was shared with me that she was hearing voices

22   of her abusers and crying babies.

23       Q    Going into January of 2008, this year, Shannon was

24   still at the Greater Binghamton Health Center?

25       A    Yep.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1011

1    Q    You were still discussing with Kim Hamilton the

2    possibility of Kim Hamilton and Richard Hamilton adopting

3    Shannon O'Connor, am I correct?

4    A    I believe at that point it was brought to my

5    attention by them that they were still interested in that, if

6    that would be a possibility down the road.

7    Q    At that point it was still the agency's intention,

8    am I correct?

9    A    Of what?

10   Q    To have Kim and Richard Hamilton adopt Shannon

11   O'Connor.

12   A    No, nothing had been decided about that.

13   Q    Did you make a note January 7, 2008 about 11:30 AM?

14   A    Yes.

15   Q    Would you read that to yourself, please.  Does that

16   refresh your recollection that Kim asked if Shannon would be

17   freed for adoption and you confirmed that is the agency's

18   intention at that time on January 7, 2008?

19   A    Yes.

20   Q    But there were concerns about the Hamilton family's

21   ability to provide for Shannon's high mental health needs, am

22   I correct?

23   A    Yes.

24   Q    Did Shannon have a phone, a cellphone?

25   A    At one point she did, yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1012

1      Q    When was that?

2      A    She had that when she entered foster care.  Her

3   cellphone was then taken into evidence after the controlled

4   phone calls, and then the Norwich City PBA replaced that

5   phone for her.

6      Q    Did Linda O'Connor have a cellphone?

7      A    Yes.

8      Q    Did Linda have a cellphone, say, from August of

9   2006, to your knowledge, until she was incarcerated?

10     A    I did not know if she had one that entire time.

11     Q    During the month of January 2008 how did Shannon's

12   condition progress or regress?

13     A    Is there a specific time frame you're looking for?

14     Q    No.  I'm asking generally at this point concerning

15   your recollections of January 2008, your observations of

16   Shannon's symptoms.

17     A    She continued to be comfortable at the place which

18   she was at, which was the health center at that point.

19   Continued to work with her therapist there and develop coping

20   skills to know how to handle her emotions in a more

21   appropriate and healthy fashion than she had prior.  She

22   seemed to be making improvements.

23     Q    By the end of January of 2008 did Shannon still

24   exhibit to you signs of mental illness?

25     A    Yes.

Q Did it appear to you that Shannon's condition deteriorated following contact with the Hamilton family?
A I did not witness that directly. That was her therapist's opinion.
Q Would you disagree with that opinion?
A No. I feel that that was accurate given the information they gave me.
Q Is it consistent with your observations that after contact with the Hamilton family, Shannon's condition would deteriorate?
A Yes.
Q That was during the month of January 2008?
A Without going through day by day in my notes, I believe it was in January.
Q That sounds consistent?
A Yes.
Q What is Celexa, C-E-L-E-X-A?
A That is a medication. I believe it's classified as an antidepressant.
Q Shannon was prescribed Celexa in February of 2008, am I correct?
A Yes.
Q She was also given Benadryl at one point?
A Yes.
Q What other antidepressants were prescribed for

Elizabeth Chesebro - Cross                    1014

1    Shannon?

2         A    Zoloft.

3         Q    How much?

4         A    I believe there were different dosages ranging from

5    25 milligrams upwards.

6         Q    Upwards to how high?

7         A    I don't know that.

8         Q    Do you know whether the dosage got up to

9    150-milligram dosages?

10        A    I don't recall.

11        Q    At some point it became known to Shannon that she

12   was to testify in a state court trial, am I correct?

13        A    Yes.

14        Q    Do you remember discussions with Shannon concerning

15   not making herself look too old for that trial?

16        A    Yes.

17        Q    What's Trazodone?

18        A    Trazodone is a medication that was used for Shannon

19   as a asleep aid.

20        Q    At some point after the federal government got

21   involved in this matter, you spoke with Mr. Lovric, am I

22   correct?

23        A    Yes.

24        Q    That was in approximately February of this year?

25        A    Yes.

Elizabeth Chesebro - Cross                    1015

1      Q      Does the date of February 10 or February 11, 2008
2   sound right?
3      A      Approximately, yes.
4      Q      At that point Shannon is still severely mentally
5   ill?
6      A      She was still hospitalized at that time.
7      Q      Was she still severely mentally ill at that time?
8      A      She was -- I don't feel I am the professional that
9   should be answering that question.
10     Q      Did you reflect in your notes that Shannon was
11  severely mentally ill?
12     A      That's very possible, yes.
13     Q      Shannon was hospitalized on February 14 of 2008?
14     A      Yes.  Excuse me.  You're speaking the medical
15  hospital?
16     Q      Yes.
17     A      Okay.
18     Q      What were the complaints that required her
19  hospitalization at that time?
20     A      She was having abdominal pain.
21     Q      Where was she admitted?
22     A      I believe she was admitted to Lourdes Hospital.
23     Q      Did she also go to Wilson at one point?
24     A      Yes, she did.
25     Q      So she went to Wilson first and then to Lourdes?

Elizabeth Chesebro - Cross                              1016

1      A     That's my understanding of it, yes.

2      Q     She was admitted overnight, am I correct?

3      A     Yes.

4      Q     Do you remember what her complaints were beyond

5   abdominal pain at that point?

6      A     She was having urine retention.

7      Q     I'm sorry?

8      A     Urine retention.

9      Q     In late February of this year you had a

10  conversation, February 26 of 2008, you had a conversation

11  with Shannon, correct?

12     A     I don't believe I did speak with her on that date.

13     Q     Okay.  You spoke with Mr. Lovric on that date?

14     A     Yes, I did.

15     Q     You spoke with doctor -- is it Dr. Toth --

16     A     Yes.

17     Q     -- on that date, am I correct?

18     A     Yes.

19     Q     You noted, am I correct, that Shannon has been

20  weepie and irritable this last week in part because she just

21  got her period?

22     A     Yes.

23     Q     You made that note?

24     A     Based on what -- based on my conversation with Dr.

25  Toth, yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    Q    Why did you note that?

2    A    That was part of her up date to me about Shannon's

3    demeanor on how she was handling things.

4    Q    This is Dr. Toth passing this information to you?

5    A    Yes.

6    Q    And Dr. Toth is Shannon's psychiatrist?

7    A    Yes.

8    Q    You met with Mr. Lovric here in the Federal

9    Building on March 7 of this year?

10   A    Yes, I did.

11   Q    Who else was present?

12   A    Myself, Dr. Toth, Shannon and Miro Lovric.

13   Q    Was Mr. Lyons present?

14   A    I don't have in my note that he was for that

15   meeting.

16   Q    At that time did Shannon indicate that she started

17   going on the internet in fifth grade?

18   A    Yes, she did.

19   Q    Did she indicate at that time that she went into

20   chat rooms at that time?

21   A    Yes, she did.

22   Q    Did she indicate during that meeting that her mom

23   and George had e-mailed and instant messaged each other on

24   the computer?

25   A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1018

1      Q      You, again, met with Mr. Lovric next on what date,

2    March 14?

3      A      Correct.

4      Q      Is that right?

5      A      Yes.

6      Q      Who was present for that meeting?

7      A      Shannon, myself, Dr. Toth and Miro Lovric.

8      Q      Was Mr. Lyons present during that meeting?

9      A      I don't have noted that he was.

10      Q      This was your third meeting with Mr. Lovric and

11    Shannon?

12      A      It's my recollection that was my second meeting

13    with them.

14      Q      Did you have an initial meeting with Mr. Lovric at

15    which there was pizza brought in?

16      A      Yes.

17      Q      An initial get to know you meeting?

18      A      Yep.

19      Q      Then on March 7 there was a longer meeting where

20    some of the substance of this claim was discussed, am I

21    correct?

22      A      If I remember correctly, that was the same

23    incident.

24      Q      In any event, on the March 14 meeting you had a

25    lengthy meeting, am I correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    A    Yes.

2    Q    Where the substance of this matter was discussed,

3    is that right?

4    A    Yes.

5    Q    Did Shannon speak at that meeting about her

6    physical relationship with George?

7    A    Yes, she did.

8    Q    What did she say about that?

9    A    She basically walked us through a description of

10   what occurred between the two of them involving herself,

11   George, and her mom telling us the events.

12   Q    Did she say when that physical contact with

13   George -- withdraw that.  The contact with George that

14   Shannon described during that March 14, 2008 meeting, that

15   was sexual contact, am I correct?

16   A    Yes.

17   Q    Did Shannon say when that sexual contact began?

18   A    It's my recollection that contact began when she

19   was approximately 11 and a half, 12 years old.

20   Q    Did Shannon say during that meeting when that

21   sexual contact stopped?

22   A    It stopped prior to the flood of 2006.

23   Q    What Shannon disclosed during that March 14, 2008

24   meeting was consistent with what Mr. Sacco said on the

25   telephone -- controlled telephone conversation with Shannon

Elizabeth Chesebro - Cross                    1020

1   with respect to whether George had or not had sexual contact

2   with Shannon, am I correct?

3       A    Contact was discussed in the phone call, yes.

4       Q    And it was also discussed in this March 14, 2008

5   meeting?

6       A    Yes.

7       Q    You have talked about some suicide attempts, as I

8   understood, as you described them that Shannon made?

9       A    Yes.

10      Q    Did Shannon make a suicide attempt after she was

11  caught using the Lang's computer to access porn sites?

12      A    Yes, she did.

13      Q    How did she attempt to commit suicide at that

14  point?

15      A    She took a shot of Clorox and a shot of perfume.

16      Q    That just made her sick, right?

17      A    To my understanding, yes.

18      Q    Let me go back to March 12, 2007, approximately ten

19  days after Shannon first claimed anything concerning Mr.

20  Sacco, okay?

21      A    Yes.

22      Q    On that date you took -- on that March 12, 2007

23  date you took Shannon to the hospital, am I correct?

24      A    Yes, I did.

25      Q    And did you accompany Shannon during the entire

Elizabeth Chesebro - Cross                    1021

1   visit?

2       A    Yes.

3       Q    During that visit did the doctor ask Shannon when

4   her last menstrual period was?

5       A    I believe he did, yes.

6       Q    Do you remember her answer?

7       A    I believe she estimated that it was approximately a

8   month prior to that.

9       Q    January?

10      A    I believe so, yes.

11      Q    I don't want to put words in your mouth.  I'll hand

12  you Exhibit S-13.

13      A    Okay.

14      Q    I'll ask you to look at the second page of that,

15  please, under history?

16      A    Yes.

17      Q    Under past HX, would you read the last to yourself,

18  the last sentence of that entry, please?

19      A    Yes, I did.

20      Q    Does that refresh your recollection as to what

21  Shannon told the doctor?

22      A    Yes.

23      Q    What did Shannon say at that time?

24      A    That her last normal period was in January.

25      Q    The doctor notes who the historian was that gave

Elizabeth Chesebro - Cross

1      the histories, am I correct?

2          A     I haven't read this whole thing.

3          Q     Is it consistent with your recollection that both

4      you and Shannon were the historians that gave the information

5      to the doctor?

6          A     I did assist with that.

7          Q     When you were present on that March 12, 2007 visit

8      at Chenango Hospital, did Shannon describe what she claimed

9      occurred with Mr. Sacco?

10         A     To my recollection she did.

11         Q     When she talked with the doctor on March 12 of

12     2007, did the doctor ask her if there had been any physical

13     violence against her in that incident?

14         A     It may be in his report here.  I don't recall.

15         Q     If you will go -- you don't have an independent

16     recollection as you sit there?

17         A     No, I do not.

18         Q     If you'll continue two more pages, please.

19     Physician clinical report, do you see that?

20         A     Okay.  The header here is what you're saying?

21         Q     Yes.  Go down to that list under history of present

22     illness, additional history.  Would you read that to

23     yourself, please.  Does that refresh your recollection that

24     the doctor asked Shannon at that time whether there was any

25     physical violence?

Elizabeth Chesebro - Cross                1023

1       A    I don't recall whether it was asked but it notes

2   here no physical violence.

3       Q    Shannon was forthright with the doctor at that

4   time, am I correct?

5       A    Yes.

6       Q    And she gave a consistent history at that time, am

7   I correct?

8       A    Yes.

9       Q    On that March 12 visit with the doctor, they

10  performed a physical examination of Shannon O'Connor, am I

11  correct?

12      A    Yes.

13      Q    The doctor did an examination of Shannon O'Connor

14  to determine whether she had a torn hymen, am I correct?

15      A    Yes.

16      Q    And she did, am I correct?

17      A    Correct.

18      Q    You don't know what caused that, am I correct?

19      A    I only know what Shannon reported to me.

20      Q    Shannon never reported to you that she had used an

21  adult sex toy before that date, am I correct?

22      A    No.

23      Q    I'm not correct or --

24      A    You are correct in that.

25      Q    Thank you.  When you left the doctor's office

Elizabeth Chesebro - Cross                    1024

1    Shannon was told that if she did not have her period within
2    the next -- within the next week, that she should follow-up
3    with the doctor's office, am I correct?
4         A    I'd like to see what the discharge instructions
5    were.  Yes.
6         Q    And she did not follow-up with that Chenango
7    Hospital within a week, am I correct?
8         A    She was only seen one time by Dr. Waters.  She had
9    an at-home pregnancy test done after at the one week period.
10        Q    And she was not pregnant?
11        A    Correct.
12        Q    From the time that Shannon originally made a claim
13   against Mr. Sacco, you've never had any doubt in your mind
14   that what she told you was absolutely true, am I correct?
15        A    She's never given me a reason to believe that she
16   wasn't being truthful with me.
17        Q    You never undertook any substantial investigation
18   to -- with respect to whether she -- I'll withdraw that.  You
19   never asked her about a physical description of Mr. Sacco,
20   did you?
21        A    I believe she gave a physical description when we
22   were at the police station for the first interview.
23        Q    And do you recall what that was?
24        A    I remember a statement that he had a scar, I
25   believe, on his abdomen and that he was bald and she gave an

Elizabeth Chesebro - Cross                    1025

1    approximate age.

2         Q    Part of your job involves speaking with children

3    about difficult issues involving sex abuse, am I correct?

4         A    Yes.

5         Q    You're trained to ask difficult questions?

6         A    Yes.

7         Q    Did you ask Shannon whether she observed anything

8    physically about Mr. Sacco with respect to his genitals?

9         A    I don't recall that I did.

10             MR. FISCHER:  Thank you, Judge.  Those are all

11   the questions I have.

12             THE COURT:  Miss Peebles.

13   CROSS-EXAMINATION

14   BY MISS PEEBLES:

15        Q    Miss Chesebro, when you were first hired by the

16   Chenango County Department of Social Services in August of

17   '05, you were 22 years old at that time?

18        A    I believe that to be accurate.

19        Q    And you were assigned or inherited the O'Connor

20   case approximately a year and three months after that, is

21   that correct?

22        A    Actually it -- I was hired in August and I acquired

23   the case in November.

24        Q    August of '05?

25        A    Of '05, so approximately a year and a half.

Elizabeth Chesebro - Cross

1    Q    Year and about three months, you were employed by

2    DSS for a year and three months, and at that time when you

3    first came into the O'Connor household, you were 23 years

4    old, is that correct?

5    A    Correct.

6    Q    Now you knew there was a court order in place at

7    that point in time that was handed down by the Family Court

8    judge which required Mrs. O'Connor to not allow Shannon

9    around Dean Sacco unsupervised, correct?

10   A    Yes.

11   Q    Now, you were aware that Mr. Sacco was residing in

12   the apartment upstairs, is that correct?

13   A    I was not aware that he was residing there.

14   Q    In fact, you didn't make any inquiry about Dean

15   Sacco and where he lived or what contact Shannon was having

16   with him at that point, if any, is that fair to say?

17   A    Other than just talking with the family about if

18   they had seen Dean, if he had come around at all.  Other than

19   that, I didn't look any further than talking to the family,

20   no.

21   Q    When you say family, you're talking about Mrs.

22   O'Connor and you're talking about Shannon, correct?

23   A    Yes.

24   Q    Now, you indicated you didn't know he was residing

25   upstairs in the upstairs apartment, is that what you're

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1027

1    saying here today?

2        A    Yes.

3        Q    All right.  Mr. Sacco makes a phone call on

4    December 6 indicating that Mrs. O'Connor hadn't paid the rent

5    yet for December, and you've got that information through

6    another employee, is that fair to say?

7        A    Yes.

8        Q    Now at that point in time did you ever talk to

9    Linda about whether or not she was around or allowing Shannon

10   to be around Dean Sacco?

11       A    There were conversations about that, yes.

12       Q    Did you make any notations about that in any of

13   your case notes?

14       A    In reviewing my case notes, no, they're not in

15   there.

16       Q    You never mentioned any conversation that you had

17   with Shannon or Linda concerning Mr. Sacco, is that true?

18       A    Correct.

19       Q    You had a conversation with Mrs. O'Connor's

20   counselor, Lydia Smith, in December, December 4.  You had a

21   meeting with her, correct?

22       A    Yes.

23       Q    And during that meeting you learned that Linda

24   O'Connor wanted counseling in order to help her get along

25   better with her daughter Shannon, correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1028

1       A    Yes.

2       Q    And at that point in time it was determined that

3  she needed parenting classes, is that fair?

4       A    Assistance with parenting in some way, shape or

5  form, yes.

6       Q    Correct.  In regard to her counseling, Mrs.

7  O'Connor had signed a lease and asked her counselor to

8  contact Reverend Kathy Myrick, is that fair to say?

9       A    I have no idea about that.

10      Q    Did you note that anywhere in your case notes?

11      A    I remember a note that Lydia Smith said that she

12 had had contact with Kathy Myrick.  How that came about, I

13 don't know.

14      Q    But you know that Linda O'Connor went to see

15 counseling from Kathy Myrick in Deposit when she lived in

16 Deposit, is that fair?

17      A    Yes.

18      Q    You knew that because you spoke to Mrs. O'Connor

19 about that, is that correct?

20      A    I knew that that was her pastor at the time.  I

21 wasn't aware until much later that she ever had counseling

22 with Pastor Myrick.

23      Q    But at some point you learned she had some

24 counseling from Pastor Myrick in Deposit?

25      A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1029

1     Q    Now it's Lydia Smith who reaches out to Kathy

2  Myrick in Deposit, correct?

3     A    Yes.

4     Q    And it's at that point in time that Lydia Smith

5  contacts you and relays information that she got the

6  impression after speaking with Kathy Myrick about Shannon

7  O'Connor being prostituted in exchange for rent, is that fair

8  to say?

9     A    Yes.

10     Q    Had you ever met with Kathy Myrick?

11     A    No.

12     Q    You ever speak to Kathy Myrick?

13     A    I made attempts, but I did not.

14     Q    Now, at some point Linda O'Connor expresses

15  concerns during that time period that she's unable to help

16  Shannon with her homework, is that fair to say?

17     A    Yes.

18     Q    And in fact, she felt like she needed help with

19  that because she just was not able to assist her in that

20  regard, is that correct?

21     A    Yes.

22     Q    And you were going to make arrangements for her to

23  get tutoring as a result of Mrs. O'Connor's concerns,

24  correct?

25     A    I was going to make the attempt, yes.

Elizabeth Chesebro - Cross                    1030

1    Q    Now, throughout the month of December of 2006, is

2  it fair to say that you had quite a bit of interaction

3  between Mrs. O'Connor and Shannon O'Connor?

4    A    I would say I had an average amount for what my

5  caseload allows.

6    Q    Well, you had contact with Mr. Sacco through

7  someone at your agency regarding her failure to pay the rent

8  December 6, correct?

9    A    Yes.  There was a phone call received about that.

10   Q    And then there was a period of time during December

11 where Shannon hadn't gone to school you were making contact

12 between the school counselor and Mrs. O'Connor, correct?

13   A    Yes.

14   Q    And then you had a conversation with Mrs. O'Connor

15 concerning her failure to pay the rent on time because you

16 had conversations with individuals at your agency about what

17 Dean Sacco had said, correct?

18   A    Yes.

19   Q    And Mrs. O'Connor had told you that she was getting

20 the ball rolling for HUD assistance at that point in time,

21 correct?

22   A    Yes.

23   Q    Now, there's an incident in January where you were

24 asked on direct examination whether Shannon ran away from

25 home.  Do you remember that?

Elizabeth Chesebro - Cross                        1031

1      A    Yes.

2      Q    And that was on January 12, is that correct?

3      A    I believe she actually ran away on the 11th, but I

4  was aware of it on the 12th, yes.

5      Q    You became aware of it on the 12th?

6      A    Yes.

7      Q    In fact, you had an office visit with Mrs. O'Connor

8  concerning that incident, is that correct?

9      A    I passed her in the office, told her I was on my

10 way out, couldn't speak then, and we had a phone call later,

11 but yes, I did speak with her about that.

12     Q    And you made a note and you thought that she didn't

13 take any responsibility for Shannon leaving the house that

14 night, is that correct?

15     A    Yes.

16     Q    And Shannon indicated to you that she was -- there

17 was an increase in fighting between her and her mother at

18 that point, is that correct?

19     A    I believe she reported that to her school

20 counselor.

21     Q    That was reported to you?

22     A    Through the school counselor.

23     Q    And then you made a note of it, is that fair to

24 say?

25     A    Yes.

Elizabeth Chesebro - Cross                    1032

1     Q     Now, I want to talk to you about February 26, the

2  Pizza Hut incident, do you understand?

3     A     Yes.

4     Q     Now, you were aware because you inherited this case

5  through Naomi Panus, correct?

6     A     Yes.

7     Q     You knew there was a neglect petition against Mrs.

8  O'Connor?

9     A     Yes.

10    Q     And you knew it dealt with her inability to provide

11 for Shannon, correct?

12    A     Yes.

13    Q     And you were aware that Mrs. Panus had told Mrs.

14 O'Connor if she couldn't provide food for Shannon that they

15 would find a home where they could, correct?

16    A     I think that was probably taken out of context.  I

17 was not there if that was ever said between Naomi and Linda,

18 but that is a general statement that's often made to parents,

19 that that's one of their key jobs is to provide food for

20 their children.

21    Q     Did you look at Naomi's case notes before you took

22 over the case?

23    A     Yes.

24    Q     Did you review the case notes?

25    A     Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                          1033

1      Q      Do you recall seeing a notation in there by her

2  concerning that?

3      A      Concerning the lack of food?

4      Q      Yes.

5      A      I don't recall at this point.

6      Q      Now, on February 26 you meet with Shannon at the

7  school.   That's after Mrs. O'Connor had been arrested the

8  night before for leaving Pizza Hut, correct?

9      A      Yes.

10     Q      During that conversation you told Shannon that it

11 would be in her best interest to be in foster care at that

12 point, is that correct?

13     A      That was my assessment, but I needed to speak with

14 my supervisor.

15     Q      After you were done talking with Shannon about the

16 incident you went over and you had a conversation with Mrs.

17 O'Connor at her home, is that correct?

18     A      Yes.   It was after that.

19     Q      And you told Linda that if she had not purchased a

20 dog she would have had money to feed Shannon, is that

21 correct?

22     A      I believe I asked if that was the case.

23     Q      You didn't tell her that had she not purchased a

24 dog she would have had money to feed Shannon?   Would it help

25 if you referred to your case notes?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    A    Yes.  After I asked if purchasing a dog had

2 anything to do with not having money for food and she would

3 not answer, that's when I did say, if she hadn't bought the

4 dog I thought that she wouldn't have had to put her daughter

5 in that situation.

6    Q    And yet you chastised Linda, you told her she put

7 Shannon in a very bad situation at that point, is that fair?

8    A    She did.

9    Q    And you told her in fact you wanted her at that

10 point to sign a consent to have her placed in foster care,

11 correct?

12    A    Yes.

13    Q    Linda didn't want to do that, is that correct?

14    A    Correct.

15    Q    And Linda was crying at that point, is that

16 correct?

17    A    Yes.

18    Q    And you told her that Shannon wasn't safe in her

19 care, correct?

20    A    Yes.

21    Q    And you told Linda that she had plenty of

22 opportunities to get help but she refused, is that correct?

23    A    Yes.

24    Q    And you also told her if she didn't consent to

25 placing her in foster care, you were getting a court order

Elizabeth Chesebro - Cross

1    asking a judge to put her in foster care, is that correct?

2        A    I let her know -- I let her know if she didn't sign

3    the consent, I would be asking the judge for an order to

4    remove Shannon.

5        Q    Now, you went back to the school after that

6    conversation, you picked Shannon up from school that

7    afternoon, is that correct?

8        A    Yes.

9        Q    You drove her back to Mrs. O'Connor's house and she

10   packed her stuff and you took her to the Hamiltons, is that

11   correct?

12       A    Yes.

13       Q    And you picked her up from the Hamiltons and

14   transported her to Family Court, is that correct?

15       A    Yes.

16       Q    And at that point the court ordered supervised

17   visitation between Shannon and Linda, is that correct?

18       A    Yes.

19       Q    Now, after Shannon was placed with the Hamiltons

20   she was happy when she got to the Hamiltons, is that fair to

21   say?

22       A    Yes.

23       Q    In fact, she loved having a mother and a father and

24   siblings all together in one household, is that fair to say?

25       A    She definitely liked their family lifestyle.

Elizabeth Chesebro - Cross                    1036

1    Q    And you began to develop a close relationship with
2  Shannon during that time period, is that fair to say?

3    A    As her caseworker, yes.

4    Q    All right.  Well, you had constant communication
5  with Shannon throughout that time period while she was with
6  the Hamiltons, is that fair to say?

7    A    Yes.

8    Q    In fact, you had phone contact, phone contact?

9    A    Yes.

10   Q    And you had car transportation.  You took her to
11 doctor appointments, to and from school on occasion, is that
12 correct?

13   A    Yes.

14   Q    You took her to the police station in March, twice
15 for the recorded phone conversations, correct?

16   A    Yes.

17   Q    You also had e-mail correspondence with Shannon, is
18 that correct?

19   A    I believe she did write to me on the internet, yes.

20   Q    In fact, she had set up a MySpace account; you were
21 aware of that, correct?

22   A    Yes.

23   Q    Mrs. Chesebro, I'm going to hand you what's been
24 marked as Defense Exhibit 021 and ask if you can identify
25 that document?

Elizabeth Chesebro - Cross

1      A      Yes.  This is Shannon's MySpace page.

2              MISS PEEBLES:  Your Honor, at this time I'd

3      like to offer Defendant's Exhibit O-21 into evidence.

4              MR. LOVRIC:  Can I take a look at it?

5              No objection.

6              MR. FISCHER:  No objection.

7              THE COURT:  All right.  We'll receive

8      Defendant's O-21 into evidence.

9      Q      Now, I'm going to refer to her MySpace page where

10     she -- Now you knew she had this, correct?

11     A      Correct.

12     Q      And she created this when she was living with the

13     Hamiltons, within the first week she was there, is that

14     correct?

15     A      Correct.

16     Q      She refers to herself as party girl, and you knew

17     she did that, correct?

18     A      Yeah.

19     Q      And she referred to herself as being a female who

20     was 17 years old living in Norwich, is that correct?

21     A      Yes.

22     Q      And she had to do that in order to access adult

23     MySpace accounts, is that correct?

24     A      I suppose.  I don't know why she has those on

25     there.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                        1038

1    Q    But you knew she put 17 on there; you were aware of

2    that?

3    A    Yep.

4    Q    Now she had you as one of her MySpace best friends,

5    is that correct?

6    A    She had me on her list, yes, she did.

7    Q    She had you and Naomi, is that correct?

8    A    Yes.

9    Q    She also had another friend, or another caseworker

10   as one of her friends, Theresa Jones.  Were you aware of

11   that?

12   A    No.

13   Q    All right.  Through her MySpace account she could

14   access everything that was on your MySpace account, correct?

15   A    Correct.

16   Q    And she could access everything on Mrs. Naomi

17   Panus' MySpace account as well, correct?

18   A    Assumably, yes.

19   Q    I'm going to hand you what's been marked as

20   Defendant's Exhibit O-22 and ask if you've ever seen that?

21   A    I've seen this portion of it.  I don't know that I

22   have seen that part though.

23   Q    The top -- the top four pages you recognize?

24   A    Yes.

25   Q    And they're from your MySpace account?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1039

1     A    Yes.

2          MISS PEEBLES:  Your Honor, at this point I'd

3    like to offer Defendant's Exhibit O-22 into evidence.

4          MR. LOVRIC:  Is that the pages she identified?

5          MISS PEEBLES:  Yes.

6          MR. LOVRIC:  I have no objection.

7     Q    Now, Exhibit O-22, the first page is an e-mail --

8          THE COURT:  There's no objection, the Court

9    will receive O-22.

10         MISS PEEBLES:  Thank you.

11         THE COURT:  Okay.

12    Q    O-22 is an e-mail from Naomi Panus to you that

13   Shannon had access to for your MySpace?

14    A    It's a comment on my page.

15    Q    It says, "Are you ready to party like rock stars?"

16   And that was from Naomi, is that correct?

17    A    Yes.

18    Q    And there's another e-mail to you that says, "Happy

19   birthday, Z Boner."  And that's from your MySpace account,

20   correct?

21    A    That is.

22    Q    And there's another e-mail that was sent to you

23   with a photograph of somebody drinking a shot that says,

24   "Cheers to your birthday, shots when I come to your city

25   soon."  Correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1040

1    A    Yes.

2    Q    Then there's another e-mail that had been sent with

3    an attached cartoon that says, "I'm full of diapers and

4    underwear.  How degrading.  You think that's bad, I'm full of

5    lube and gay porno magazines.  Hey guys, I'm full of PT

6    feminine hygiene products.  Douche bag."  That was part of

7    your MySpace page, correct?

8    A    Yes.

9    Q    I'm going to hand up what's been marked as Defense

10   Exhibit O-23 and ask if you can identify those documents.

11   A    I know I've seen some of these before, but if

12   you're asking me if they're from my page, I don't believe

13   that they are.  Some of these people, I don't know who they

14   are.

15   Q    But they were accessed through your MySpace

16   account, you've seen those before, is that fair to say?

17   A    I have seen some of the graphics.

18   Q    Which graphics have you seen?

19   A    I know I've seen that one with the --

20   Q    Pull out all the ones that you're familiar with.

21   A    Those are the graphics I'd seen before.  Whether it

22   was through e-mail, MySpace, internet, I do not know.

23   Q    Now, Theresa Jones is a caseworker that you were

24   friendly with, correct?

25   A    She's a caseworker in the unit, yes.

Elizabeth Chesebro - Cross                    1041

1    Q    You guys e-mail back and forth on MySpace, is that
2    correct?
3    A    She sent me comments before.  It's not a regular
4    occurrence though.
5    Q    But she sent you comments before and photographs?
6    A    Yes.
7    Q    And some of those photographs are pretty graphic,
8    aren't they?
9    A    They have been, yes.
10   Q    In fact, there were a lot of crude cartoons that
11   she'd sent, is that correct?
12   A    I don't recall specifically if I received crude
13   cartoons from her.
14   Q    Well, were there a lot of sexually explicit
15   cartoons that she was sending you?
16   A    Honestly, I do not recall.
17   Q    If she were, Shannon had access to those by virtue
18   of her access to her MySpace account through your MySpace
19   account, is that correct?
20   A    Yes, she would have had access to those.
21   Q    I want to talk about some of the correspondence
22   that Mrs. O'Connor attempted to give to her daughter when she
23   was in foster care and/or at the psychiatric hospital but the
24   letters weren't given to her.  Do you understand that?
25   A    The letters weren't given to her, as in Shannon?

Elizabeth Chesebro - Cross                          1042

1      Q     Correct.

2      A     Yes.

3      Q     I'm going to hand you what's been marked as Defense

4    Exhibit O-23 and ask if you can identify those exhibits.

5                THE COURT:  We have an O-23.

6                MISS PEEBLES:  I'm sorry.  O-24.

7      Q     Do you know what these documents are?

8      A     Yes.

9      Q     What are they?

10     A     They're all documents that -- from Linda to Shannon

11   that were not provided to Shannon for various reasons.

12               MISS PEEBLES:  Your Honor, at this point I'd

13   like to offer Defense Exhibit O-24.

14               THE COURT:  Okay.

15               MR. LOVRIC:  I am sorry.  I didn't catch.  Did

16   she indicate she did not turn these over to Shannon?  I

17   didn't hear the last --

18               THE WITNESS:  Yes.

19               MISS PEEBLES:  Correct.

20               MR. LOVRIC:  I guess I'd just ask, what's the

21   relevancy?

22               THE COURT:  Let me just see if I'm up with the

23   witness.  These letters came from Linda O'Connor?

24               THE WITNESS:  Yes.

25               THE COURT:  But they were not given to Shannon

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1043

1    O'Connor?

2                    THE WITNESS:  They were given to me and then I

3    chose professionally that they weren't appropriate for

4    Shannon for various reasons.

5                    THE COURT:  They weren't given to Shannon?

6                    THE WITNESS:  Nothing that Shannon viewed.

7                    THE COURT:  Let's go to side-bar.

8                    (At the bench)

9                    THE COURT:  Okay.  I take it you're offering

10   to show the state of mind of Linda O'Connor at the time?

11                   MISS PEEBLES:  No.

12                   THE COURT:  What for?

13                   MISS PEEBLES:  I'm just offering them -- she

14   determined these were inappropriate.  I would like an

15   explanation.  She was accessing a MySpace --

16                   THE COURT:  As to why they're inappropriate?

17                   MISS PEEBLES:  Exactly.  It goes to what her

18   professional role was, counseling between Shannon and Mrs.

19   O'Connor, and she chose after reading them not to give them

20   to her in her professional capacity for a specific reason.

21   I'd like to question her as to why they're inappropriate.

22                   THE COURT:  Okay.

23                   MR. LOVRIC:  I don't have any objection to

24   that being obviously cross-examined, but I don't know why the

25   letters have to go in since you can cross-examine her about

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1044

1    that without --

2                  MISS PEEBLES:  I want to read from them.

3                  MR. LOVRIC:  I guess that's my objection is

4    that it never came to Shannon so I don't know what it has --

5    I guess I don't see --

6                  THE COURT:  This witness' -- credibility with

7    every witness is on the line, and she did certain things in

8    this case that related to Shannon and Linda O'Connor, in some

9    cases using her professional judgment.  In this case she got

10   material from Linda and didn't turn it over to Shannon and I

11   think that may have some bearing on what her -- the witness'

12   mind-set was as she did what she did or did what she didn't

13   do.  I think for that purpose they seem to be appropriate for

14   me.

15                 MR. LOVRIC:  Okay, Judge.

16                 MISS PEEBLES:  Thank you.

17                 (In open court)

18                 THE COURT:  All right, ladies and gentlemen.

19   The Court is going to receive Defendant O'Connor O-24 in

20   evidence, and you probably won't remember this and I don't

21   blame you a bit.  Way back in the beginning when I was giving

22   you all those general instructions, I said, sometimes the

23   Court might give you an exhibit or let evidence in and tell

24   you it's for a limited purpose and when I do that you've got

25   to follow those instructions, and this is one of those times.

Elizabeth Chesebro - Cross                    1045

1          These letters are in evidence to be --

2    questions will be asked of the witness by Miss Peebles, and

3    the issue that they're coming in on, what was this witness'

4    state of mind with respect to how she was interfacing between

5    Linda O'Connor and Shannon O'Connor when she decided not to

6    give these letters to Shannon O'Connor.  They're not being

7    offered for the truth of the contents of the letter but as to

8    why this witness did what she did or didn't do.  Okay.

9    BY MISS PEEBLES:

10        Q    Now I'm going to go through and read one of the

11   letters dated August 27 of 2007, which starts with, "Release

12   date October 12 and, yes, Mommy is walking home, lose more

13   weight.  Shannon O.  Hi.  How is everything with you?  I'm

14   doing very well.  I have some exciting news to tell you

15   about.  Do you remember all my medications I was on before my

16   August arrest?  Look at the bottom of the page for a minute.

17   I thought that would make you happy.  I also lost more

18   weight.  I'm down to -- to -- drum roll please -- 175.  I've

19   lost 27 pounds.  My blood work that was for my sugar, 6.8

20   normal and 6.5 my sugar, almost perfect.  No more fatty liver

21   either.  My health is much better and it will stay this way.

22   Also, Mommy is in class now.  It starts for employment and

23   life skills transition program.  I should learn some things

24   while I'm in here.  I might as well make the most out of my

25   time in here.  Maybe I'll get a certificate from the teacher

Elizabeth Chesebro - Cross

1   if I do well and go to all my classes.  I hope this letter

2   makes you happy.  I'm excited about writing it.  I've got to

3   tell you also that I'm going to call you next Tuesday 9/4 at

4   1:15.  I'll call Liz at 1:10 to find the number to call.

5   Also, when you go to school I will have to call at 3:10 or

6   3:15, if I can at all earlier let me know, okay, but look in

7   it at 3:45 and we need to talk for a bit.  I'll find out."

8   She talks about her medication down there, is that correct?

9        A    Yes.

10       Q    And on the back of the letter it says, "All the

11  information when I talk to you Tuesday.  Well, Sweetie, the

12  angels are in between the stars keeping you safe and

13  protecting you.  Don't forget it.  Roses on your pillow.

14  Love you, Noodles.  Love you always always.  Mom."

15            "Sent back to Linda for not being appropriate.  See

16  letter to Linda dated 9/6/07."  You wrote that note at the

17  bottom, is that correct?

18       A    Yes.

19       Q    And this letter wasn't given to Shannon so she's

20  never seen this, is that correct?

21       A    Correct.

22       Q    And you chose not to give her this because she was

23  talking about her health, that is, Mrs. O'Connor's health?

24       A    It was a decision made between my supervisor and I,

25  yes.

Elizabeth Chesebro - Cross

1    Q    And then there's another letter that was addressed

2    to Shannon September 4, 2007.  "Shannon, how is my princess

3    doing today?  I'm good.  Looking forward to seeing you soon.

4    I miss you very much.  And I am looking forward to being

5    released from here.  I'm hoping I receive your letter today.

6    Just tested my sugar.  102, perfect.  This morning it was

7    121.  Dinner is soon.  Ham and yam.  I'll make a ham sandwich

8    and eat my fruit, get a snack later.  We received the mail

9    and no letter.  It must have gotten lost.  Anyway, I know

10   you'll write me again soon, Sweetie.  It's 11:00 PM and I'm

11   going to cut this letter short, but the angels are in between

12   the stars keeping you safe and protecting you.  Don't forget

13   it.  Angels are always there to protect you.  Roses on your

14   pillow.  Love, Mom."  There's a note at the bottom, "not

15   given to Shannon but copied so it could be put in a binder."

16   That was your notations, correct?

17        A    Yes.

18        Q    And then there is another letter dated October 18,

19   '07 that starts by saying, "Shannon, I do love you with my

20   whole heart and I need to make that clear to you so you

21   believe that.  I received your letter letting me know exactly

22   how you feel concerning Ray.  I am not upset about that

23   letter.  As a matter of fact, I was glad you were honest with

24   me about how you feel.  Shannon, when I had you, I made the

25   choice to put you first and everything, and I know that you

Elizabeth Chesebro - Cross

1048

1    feel that I would have to make a decision on who I want in my

2    life.  Rest assured, that decision was made when I first held

3    you in my arms.  I want only you.  I will not have anything

4    to do with Ray.  I will move from here and do everything

5    Social Services wants.  No more fighting then.  I know you

6    need to see proof of this and you will have it.  This is what

7    Mom wants.  I want my Noodles and only you, okay, Sweetie?  I

8    do love you and I am truly sorry for the hurt I caused you.

9    Please forgive me and Shannon, always remember, the angels

10   are in between the stars keeping you safe and protecting you

11   and don't forget it.  Roses on your pillow.  Loving you

12   always, Mom."  And that was not given to Shannon either, is

13   that correct?

14        A    Correct.

15        Q    December 12 she writes another letter to Shannon,

16   and this is when she's in the Greater Binghamton Health

17   Center, correct?

18        A    Yes.

19        Q    And when Shannon was placed in the Greater

20   Binghamton Health Center she had absolutely no contact with

21   her mom, is that correct?

22        A    On the therapist's recommendation, yes.

23        Q    The letter states, "Hi, Shannon.  How is my sweetie

24   doing?  I'm doing good.  I've moved to a new apartment, 14

25   Miller Street.  It's a nice apartment.  I miss you very much

Elizabeth Chesebro - Cross                     1049

1    and I'm doing everything I'm asked to do so you can come home

2    to me.  Shannon, we will celebrate the holidays when you come

3    home, but for now I will give you a few gifts for Christmas

4    in a few weeks if I'm permitted to do so.  I love and miss

5    you.  Do everything you're asked to do.  I will write you

6    again soon.  Love, Mom."  That was not given to Shannon

7    either, correct?

8         A    Yes.

9         Q    And Shannon's birthday is on December 27, correct?

10        A    Yes.

11        Q    And Mrs. O'Connor tried to send her a birthday

12   card?

13        A    I believe that was a Christmas card.

14        Q    A Christmas card.  And this was not given to her,

15   correct?

16        A    At the recommendation of the therapist.

17        Q    It says, "Shannon, Happy Birthday.  Although I

18   can't be there to share your happiness, I hope you know I

19   wish you all the joy that you deserve.  Love, Mommy."  That

20   was a birthday card, correct?

21        A    Yes.

22        Q    You and your supervisors made a decision not to

23   give these to Shannon?

24        A    Yes.

25        Q    That's your testimony?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1050

1     A    Yes.

2     Q    Because you felt that the content was not

3  appropriate?

4     A    The first two letters, if I recall correctly, what

5  the first two were letters that we did not feel were

6  appropriate for her at the time.

7     Q    Let me stop you right there.  All right.  Referring

8  to those first two letters, but going on to a MySpace

9  account, seeing crude cartoons is appropriate?

10              MR. LOVRIC:  I object.

11              THE COURT:  Sustained.

12     Q    Now there were some letters that were actually

13  given to Shannon that Mrs. O'Connor wrote to her?

14     A    Yes.

15     Q    I'm going to hand you what's been marked as Defense

16  Exhibit O-25 and ask if you can identify those documents.

17     A    Would you like me to read each of them?

18     Q    I'm just asking if you can identify them.

19     A    As a generalization, yes.  Yes.  These are letters

20  that Linda had sent to Shannon.

21              MISS PEEBLES:  At this time, your Honor, I'd

22  like to offer Defendant's Exhibit O-25 into evidence.

23              MR. LOVRIC:  I have no objection.

24              MR. FISCHER:  No objection.

25              THE COURT:  Receive Defendant's O-25 in

Elizabeth Chesebro - Cross                          1051

1   evidence.

2   BY MISS PEEBLES:

3       Q    I'm not going to read all of these letters that we

4   introduced into evidence but I'm going to read a couple of

5   them and ask if -- "Shannon, Mommy wishes she could be there

6   to comfort you, but you know I'm always here to talk to.  I

7   will pray for you as well.  Here are pictures you asked for

8   as well as your YMCA card and jacket.  Hey, there, the angels

9   are in between the stars and keeping you safe and protecting

10  you.  Don't forget it.  Roses on your pillows.  Love you,

11  Noodles.  Mom."

12          Now you had sent a letter at one point to Mrs.

13  O'Connor instructing her not to refer to herself as Mommy, do

14  you remember that?

15      A    That recommendation was made.

16      Q    Yes.  And you sent her a letter in that regard and

17  you told her Shannon's too old, don't refer to yourself as

18  Mommy, in sum and substance?

19      A    I believe it was in a letter, yes.  That was based

20  on the fact that Shannon didn't refer to her as Mommy.

21      Q    As far as you knew she didn't?

22      A    Correct, in my contact with Shannon, yes.

23      Q    But you don't know how she referred to Mrs.

24  O'Connor outside of your presence, is that fair?

25      A    Correct.

Elizabeth Chesebro - Cross                              1052

1      Q      Now referring to Theresa Jones, within the first

2  week that Shannon O'Connor was residing at the Hamiltons,

3  Theresa Jones went over and had dinner at the Hamilton house

4  with Shannon, correct?

5      A      With the whole family, yes.

6      Q      And she had specific conversation with Shannon at

7  that time, is that correct?

8      A      I can only tell you what Theresa Foster Jones

9  reported back to me.

10     Q      And you wrote and put in your case notes, correct?

11     A      Yes.

12     Q      And in your case notes you indicate that there was

13 a conversation between Shannon and Theresa Jones?

14     A      That Shannon had provided information, yes.  I

15 don't know in what context that took place.

16     Q      Now, Linda wasn't -- let's go to March 2, 2007 when

17 Shannon first discloses that she had sex with Dean Sacco.

18 Okay?

19     A      Yes.

20     Q      Do you understand?  You went to the Hamiltons that

21 night and you interviewed Shannon O'Connor first?

22     A      Yes.

23     Q      Now, after that you take her down and she's

24 interviewed by Detective Blenis, correct?

25     A      Yes.

Elizabeth Chesebro - Cross                    1053

1      Q     And there's a decision not to tell Mrs. O'Connor
2  about what Shannon said, is that correct?
3      A     Based on the law enforcement investigation, yes.
4      Q     But at some point Linda is told what Shannon has
5  said about Dean Sacco, correct?
6      A     The police interviewed her, yeah.
7      Q     You were present for the first interview, isn't
8  that correct?
9      A     With Linda?
10     Q     Were you at the police department with Detective
11 Blenis when she was being confronted about allowing her to
12 allow Shannon around Dean Sacco unsupervised?
13     A     No, I was not.
14     Q     After Linda was told, you had a conversation with
15 Linda about the sex abuse and between Dean Sacco and Shannon
16 O'Connor, correct?
17     A     Yes.
18     Q     And in fact, at one point Linda wanted Shannon to
19 know that she was probably going to be going to jail for the
20 Pizza Hut incident and the corridor incident, is that
21 correct?
22     A     Yes.
23     Q     And you didn't want to tell Shannon at that point,
24 is that correct?
25     A     Based on the information I had at the time, yes.

Elizabeth Chesebro - Cross                    1054

1      Q      My question is:  You didn't -- you made a decision

2   and you didn't want to tell Shannon that her mom might be

3   going to jail at that point, correct?

4      A      Linda didn't know for sure she was going to jail at

5   that point.  I didn't feel it was necessary for Shannon to

6   assume her mom was going to jail until that was a sure fact.

7      Q      What you told Linda is because Linda was concerned

8   that Shannon was going to be upset if she wasn't told that

9   her mom was going to jail, is that fair to say?

10     A      Yes.

11     Q      In fact, what you told Linda is that Shannon would

12  be mad at her for not following the court order, do you

13  remember that?

14     A      M-m h-m-m.

15     Q      And then you further told her that it was her fault

16  that Shannon was sexually abused, correct?

17     A      Are you reading that as a quote or just an overall

18  summarization?

19     Q      Do you need to refer to your case notes?

20     A      Yes.  That would be great.  Do you have a specific

21  date you're looking at?

22     Q      You had an entry of March 6 on there.  Entry date

23  was September 25.

24     A      Okay.  Can you repeat the question for me.

25     Q      You told Linda it was her fault that Shannon was

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1   sexually abused?

2       A   I don't see where it says that I told her that it

3   was her fault, but by not following the court order, Linda

4   allowed the abuse to continue.

5       Q   Well, in other words, you made Linda feel as though

6   it was her fault that Shannon had been sexually abused during

7   that conversation with her, correct?

8       A   It's possible she felt that way.

9       Q   But you basically told her had she followed the

10  court order, it never would have happened, correct?

11      A   It never would have continued happening.

12      Q   Now, at that point in time when there was a court

13  order issued in November, it was handed down on October 11

14  but was executed in November, there was no indication that

15  there was any type of sex abuse allegations, is that correct?

16      A   Correct.

17      Q   In fact, you weren't concerned about sex abuse

18  allegations at that point in time, is that correct?

19      A   I had no information to say there were sex abuse

20  allegations.

21      Q   Well, that's correct, and you never even followed

22  up to find out whether Dean Sacco was anywhere near the

23  property, is that fair to say?

24      A   I had conversations of whether they had seen him

25  around but there was no extensive locating him or asking all

Elizabeth Chesebro - Cross                          1056

1   sorts of people.

2       Q    Did you ever specifically ask Linda O'Connor

3   whether she allowed Shannon to be around Dean Sacco

4   unsupervised?

5       A    Yes.

6       Q    Did you ever ask her that?

7       A    Yes.

8       Q    Did you ask her that when you were down at the

9   police station with Detective Blenis?  Is that when you asked

10  her?

11      A    I was not with him when he interviewed her about

12  that.  That first interview I was not present for.

13      Q    After that, after Shannon is in with the Hamiltons,

14  any phone contact between Mrs. O'Connor and Shannon is

15  monitored, is that fair to say?

16      A    No, not all contact was.

17      Q    Well, it was supposed to be at certain points,

18  correct?

19      A    Yes, at certain points.

20      Q    In fact, Kim Hamilton, the foster mother, was

21  listening in on many of the phone conversations, is that fair

22  to say?

23      A    She was monitoring.

24      Q    And at one point she voiced concerns to you

25  regarding Shannon being very manipulative and not telling the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                        1057

1    truth, do you recall that?

2         A    I do.

3         Q    In fact, she was concerned because Shannon had lied

4    to her mom during that course of that phone conversation,

5    correct?

6         A    Yes.

7         Q    Linda was not permitted to speak to Shannon about

8    any of the sex abuse allegations that she had made against

9    Dean Sacco, is that correct?

10        A    Yes.

11        Q    In fact, on March 7 Shannon was taken to a home

12   visit to see her mother, 2006, do you remember that?

13        A    March 7, 2006 we weren't involved with the family.

14        Q    I'm sorry.  2007.

15        A    Yes.  There was a supervised visit that day.

16        Q    And in fact, before the visit you told Shannon,

17   hey, if you're uncomfortable and don't want to be there, just

18   tell the parent aide and we'll cut the visit short.  Didn't

19   you tell her that?

20        A    Yes.  That's an option that's given to many of our

21   foster kids.

22        Q    Shannon was voicing concerns about her mother's

23   diet and whether she was eating healthy or not, is that

24   correct?

25        A    Yes.

Elizabeth Chesebro - Cross                            1058

1      Q     After that visit Linda had to ask permission as to

2   whether she could put together an Easter basket for Shannon,

3   is that correct?

4      A     Yes.

5      Q     You had to approve anything she put in a basket in

6   order to decide whether or not to give it to Shannon, is that

7   correct?

8      A     Yes.

9      Q     Now at some point you speak to Lydia Smith, Mrs.

10   O'Connor's counselor, after Linda finds out about what

11   happened to Shannon, correct?

12      A     I would assume I spoke to her at some time after

13   that, yes.

14      Q     Well, didn't Mrs. Smith tell you that Mrs. O'Connor

15   was shaken and visibly upset by finding out what had happened

16   to Shannon?

17      A     I don't recall.  Is there a specific date that you

18   were referencing?

19      Q     In your case notes, is it your testimony that you

20   don't recall that?

21      A     It's very possible that that was reported to me.

22      Q     But it wasn't of any concern or significance to you

23   about Linda's reaction when she found out about that, is that

24   fair to say?

25      A     I don't know that -- can you repeat that for me one

Elizabeth Chesebro - Cross                    1059

1    more time.

2         Q    You weren't concerned about Linda's reaction when

3    she was told what had happened to her daughter, is that fair

4    to say?

5         A    I don't think that's fair to say.  Took note of it

6    that that was the case, if it's from my case notes.

7         Q    But sitting here today you don't have a

8    recollection about how Mrs. O'Connor reacted when she found

9    out?

10        A    There's no way I can remember everything about all

11   my cases.

12        Q    Well, were you still involved in providing services

13   for Mrs. O'Connor during that time period?

14        A    Yes.

15        Q    Because at some point you told Lydia Smith not to

16   discuss anything regarding the sex abuse between Shannon and

17   Dean Sacco, you instructed her counselor about that, isn't

18   that true?

19        A    I believe that was prior to the police talking to

20   Linda about the sex abuse and violating the court order.

21   That was so the legal or the law enforcement investigation

22   wasn't compromised.

23        Q    But you were the case coordinator at that point, is

24   that fair to say?

25        A    Yes.

Elizabeth Chesebro - Cross                          1060

1     Q     You were communicating between all agencies and

2    everyone in the family, correct?

3     A     Yes.

4     Q     In fact, you had conversations with Walter Burkett

5    Jr., correct?

6     A     Yep.

7     Q     And you questioned him about whether he had ever

8    been sexually abused, correct?

9     A     Yes.

10    Q     And he denied ever being sexually abused?

11              MR. LOVRIC:  Objection.

12              THE COURT:  Sustained.

13    Q     And on March 13 you drove Shannon to Family Court

14   for the amended neglect petition, do you recall that?

15    A     Yes.

16    Q     And you're the one that filed the petition?

17    A     The amended petition, yes.

18    Q     And you set forth all the allegations, is that

19   correct?

20    A     There were allegations included from the original

21   neglect, but I added the additional ones.

22    Q     And prior to court you sat out and talked to

23   Shannon, correct?

24    A     Yes.

25    Q     And at that court appearance you were asking the

Elizabeth Chesebro - Cross                    1061

1    judge to have Mrs. O'Connor have a payee rep of some sort,

2    correct?

3         A    Yes, a representative payee.

4         Q    In order to help her with her finances, is that

5    correct?

6         A    Yes.

7         Q    Now at some point you're communicating with Mrs.

8    O'Connor's counselor and a psychiatrist that had done an

9    evaluation, is that correct?

10        A    I don't believe at that point she had a

11   psychiatrist evaluation.

12        Q    Well, at some point during your involvement with

13   Mrs. O'Connor you had a conversation with a psychiatrist, is

14   that correct?

15        A    Yes.

16        Q    And in fact, you learned that Mrs. O'Connor was

17   intellectually limited; he told you that, correct?

18        A    Yes.

19        Q    And you were concerned that Mrs. O'Connor wouldn't

20   have the ability to change even if she wanted to, is that

21   correct?

22        A    Correct.

23        Q    In fact, that was a general -- the general

24   consensus among the case workers and the providers, the

25   mental health providers, is that fair to say?

Elizabeth Chesebro - Cross                    1062

1      A     Yes.

2      Q     And that information had been communicated to

3  Shannon, is that correct?

4      A     I don't feel that's fair to say.  What was

5  communicated to Shannon was that although people -- although

6  we try to help people change and we offer them services to

7  change, they're not always able or willing to change.

8      Q     But your statement to Shannon was, you can lead a

9  horse to water but you can't make them drink.  Do you

10 remember saying that?

11     A     Correct.

12     Q     In fact, you said that numerous times to Shannon?

13     A     I did say that to her.

14     Q     In fact, what that statement says, hey, we've

15 tried, she just doesn't want our help.  That's what that

16 says, correct?

17     A     That's your interpretation of it.

18     Q     Well, is that your interpretation?

19     A     No.  I was giving Shannon that statement, just an

20 idea for her to kind of summarize that we can offer things to

21 her mom, we can try to assist her in any way we can, but we

22 cannot force people to do things.

23     Q     Well, yeah.  We've put it all out there for her but

24 she's just not willing to take advantage of it; that's what

25 you're saying to her, correct?

Elizabeth Chesebro - Cross                    1063

1       A    Or able to.  Whatever your interpretation of that

2    is.

3       Q    The judge denied your request to have her have a

4    payee rep, is that correct?

5       A    Yes, he did.

6       Q    And on March 14 you told Linda that if she feels

7    she needs to tell Shannon something, she can call you first

8    to get approval.  Do you remember making a note of that?

9       A    Yes, I do.

10      Q    Otherwise you said Shannon will call her when she

11   wants to, is that correct?

12      A    Yes.  That was based on Shannon being disrupted by

13   phone calls.

14      Q    Now, there was a time in May, right around Mother's

15   Day, when Shannon was not permitted to make phone calls to

16   Mrs. O'Connor, her mother, do you remember that?

17      A    I don't recall if she wasn't permitted at that time

18   or if they were to be supervised at that time.

19      Q    She wasn't allowed to just call her mom if she

20   wanted to?

21      A    She couldn't pick up the phone and call.  I don't

22   believe at that time that was a possibility.

23      Q    But she did sneak a phone call, correct?

24      A    Yes.

25      Q    She snuck her cellphone and called her mother on

Elizabeth Chesebro - Cross

1064

1     Mother's Day?

2         A    Yes.

3         Q    She was chastised for doing that, wasn't she?

4         A    She was chastised for going about it the wrong way,

5     for not asking permission, for not saying that's what she

6     wanted to do when she knew the rules that were expected of

7     her mom to follow by.

8         Q    Well, she also wanted her mother to go to one of

9     her track meets, do you remember that, in June, when she was

10    with the Hamiltons?

11        A    Yes.

12        Q    In fact, when her mother didn't show up, she was

13    very upset by that, correct?

14        A    Correct.

15        Q    And you told Shannon, hey, your mom wasn't allowed

16    to go to track meet because we told her she couldn't,

17    correct?

18        A    Yes.  There wasn't anyone available at the

19    department to supervise that day.

20        Q    In fact, when you talked to Shannon about having

21    her phone called supervised, you said -- and this was on a

22    car ride from school -- you told her that, I'm concerned that

23    your mom will try and make you feel guilty and talk about

24    things that she shouldn't so Kim will be listening in on any

25    phone calls she makes.  Correct?

Elizabeth Chesebro - Cross

1    A    I'm assuming you're reading it right from my

2  documents, yes.

3    Q    Does that sound familiar?

4    A    That sounds familiar, yes.

5    Q    Shannon told you she missed her mom and she missed

6  her dogs, correct?

7    A    Yes.

8    Q    In fact, Kim Hamilton voiced a concern to you that

9  Shannon thought you were her best friend, didn't she?

10   A    Yes.

11   Q    Throughout your involvement with Shannon O'Connor,

12 she's made many phone calls to you, is that fair to say?

13   A    Yes.

14   Q    And some of those phone calls, she was desperate in

15 wanting to see you, is that fair to say?

16   A    Yes.

17   Q    In fact, on November 6 when she was in the

18 psychiatric hospital, she -- she had called you and wanted

19 you to go and visit her that next day, do you remember that?

20   A    Yes.

21   Q    And you had to explain to her that you had some

22 family obligations and you had been out of the office and you

23 couldn't see her, do you remember that?

24   A    M-m h-m-m.

25   Q    And as a result, she was disappointed when she hung

Elizabeth Chesebro - Cross                    1066

1    up the phone, correct?

2         A    I believe I made note of that.

3         Q    And in fact, less than two hours later is when she

4    ties a shoelace around her neck in a suicidal gesture, is

5    that fair to say?

6         A    She did do that.

7         Q    And that was about two hours after the phone call

8    with you?

9         A    It was the same evening.

10        Q    In fact, everybody around her, including the

11   counselors, were shocked by that, by that revelation, is that

12   fair to say?

13        A    What revelation?

14        Q    That she tried to put a shoelace around her neck at

15   that point?

16        A    There were staff members at the hospital that were

17   surprised by that, yeah.

18        Q    As a result of that gesture, she got a lot of extra

19   attention that next day by Lisa Florance-Diaz, didn't she?

20        A    They had to process everything with her and find

21   out exactly what was going on and why she was doing the

22   things she was doing.

23        Q    Well, was she out playing games, laughing and

24   running around that very next day with Lisa Florance-Diaz.

25   Did you make note of that?

Elizabeth Chesebro - Cross

1   A    I believe she was outside with a group.  It was rec

2   time or lunchtime or what.

3   Q    But Shannon was very happy with that extra contact

4   with Mrs. Florance-Diaz?  Is that reflected in your notes?

5   A    For a child that has no one else to pay attention

6   to her, I would say yes.

7   Q    Now, I want to talk with you about Shannon when she

8   ran away from the Hamiltons on April 17.  Do you recall that?

9   A    Yes, I do.

10   Q    She took off with Mandy and they ran away to a

11   bowling alley, is that fair to stay?

12   A    Yes.

13   Q    Mandy was one of the foster children that was

14   living with the Hamiltons?

15   A    She's not a foster.

16   Q    She was adopted?

17   A    Yes.

18   Q    So Shannon became kind of close with Mandy while

19   she was living at the Hamiltons, is that fair to say?

20   A    Yes.

21   Q    Particularly in the beginning when she moved in?

22   A    I would say more so then.

23   Q    She was a couple years older than Shannon?

24   A    Yes.

25   Q    And at some point the police are called and they

Elizabeth Chesebro - Cross                    1068

1    actually have to run her down and tackle her -- Shannon, that

2    is, is that correct?

3         A    I don't know if they tackled her.  I believe they

4    grabbed her arm, something similar to that.

5         Q    And at that point Shannon told you that the only

6    reason she did it is because she was following Mandy, is that

7    correct?

8         A    Yeah.

9         Q    In fact, you became aware that Mandy Hamilton had

10   accused somebody of raping her, do you remember that?

11                    MR. LOVRIC:  Objection.

12                    THE COURT:  Sustained.

13                    MISS PEEBLES:  It's not offered for the truth

14   of the matter, your Honor.  It was simply a statement that

15   was made.

16                    THE COURT:  You're offering it to show

17   Shannon's state of mind?  I'm sorry.  I couldn't hear.  Go to

18   side-bar.

19                    MISS PEEBLES:  Yes.

20                    (At the bench)

21                    THE COURT:  You said you're not offering it

22   for the truth?

23                    MISS PEEBLES:  Right.  She said she was raped

24   by somebody but it was later determined to be false.  It was

25   just the fact that it was -- Shannon had knowledge about it

Elizabeth Chesebro - Cross

1    and she knew she had knowledge about it.

2              THE COURT:  So it is to show state of mind.

3              MISS PEEBLES:  Shannon's state of mind.  I

4    thought you meant Linda's state of mind.

5              MR. FISCHER:  The effect upon the listener.

6              THE COURT:  Yeah.  That's an appropriate --

7              MR. LOVRIC:  The listener isn't on the stand.

8    The listener is Shannon.  This is hearsay because they're

9    trying to say because Shannon heard this from Mandy, it put

10   some kind of thought into Shannon's mind, but it's being

11   asked of this witness who wasn't present, so it is hearsay.

12             THE COURT:  But if it's offered not for the

13   truth of the matter asserted, it's not by rule hearsay, isn't

14   that right?

15             MR. LOVRIC:  But as to this witness.

16             THE COURT:  As to any witness.

17             MR. LOVRIC:  She has no knowledge of this

18   statement other than what somebody told her.

19             THE COURT:  Right.  But it's not offered for

20   the truth; it's being offered to show Shannon's state of

21   mind, isn't it?

22             MR. LOVRIC:  Not really, Judge.  I think

23   that's just a smoke screen.  It's being offered for the fact

24   to show this statement.

25             THE COURT:  That may be true, but that's not

Elizabeth Chesebro - Cross

1    the inquiry that the Court goes through.  It's a question of

2    what the Rules of Evidence permit or don't permit.

3              MR. LOVRIC:  It's one thing if Shannon was on

4    the stand.  Then the argument was, what was the effect on

5    Shannon or Shannon's state of mind.  But this is being asked

6    of this witness, not Shannon.  This witness may know that the

7    statement was said, but asking this witness --

8              THE COURT:  Well, Shannon is going to be on

9    the stand, is she not?

10             MR. LOVRIC:  Yeah, but she's not yet.  This

11   witness is being offered --

12             THE COURT:  You want me to suspend her

13   testimony and then we call her back later?

14             MR. LOVRIC:  No.  I think this question is

15   more appropriate for Shannon, if they ask Shannon.

16             THE COURT:  She's choosing to ask this

17   witness.

18             MR. LOVRIC:  She can ask Lyons this.  It would

19   be hearsay.

20             THE COURT:  It would be, but it's not being

21   offered for the truth of the matter asserted so by

22   definition, it's not hearsay.

23             MISS PEEBLES:  She was using information to

24   calculate her treatment recommendations.  This is in her case

25   notes and part of the file.  It isn't offered for the truth

Elizabeth Chesebro - Cross

1    of the matter.

2                    MR. LOVRIC:  Sure it is.

3                    MISS PEEBLES:  Okay.

4                    THE COURT:  It's coming in.

5                    MR. LOVRIC:  Sure it is.

6                    (In open court)

7                    THE COURT:  Once again, ladies and gentlemen,

8    this statement is not being offered for the truth of the

9    statement.  It's being offered for what effect it had on this

10   witness or any other person who might have heard that

11   statement.

12   BY MISS PEEBLES:

13       Q    You can answer the question.

14       A    I need it repeated for me.

15       Q    You became aware that Mandy had made allegations

16   about being raped, correct?

17       A    Yes.

18       Q    In fact, you learned that those allegations were

19   not true, correct?

20       A    Correct.

21       Q    Now Shannon graduated from the sixth grade in June

22   of 2007, correct?

23       A    Yes.

24       Q    And the only way Linda, Mrs. O'Connor, was going to

25   be able to attend was if she were supervised, is that

Elizabeth Chesebro - Cross                    1072

1    correct?

2       A    Yes.

3       Q    And Mrs. O'Connor did go to Shannon's graduation,

4    correct?

5       A    Yes.

6       Q    She was allowed to take pictures and photographs,

7    correct?

8       A    Yes.

9       Q    And on June 15 Shannon was asking you whether her

10   mom was going to go to jail, do you recall that?

11      A    Yes.

12      Q    And you weren't permitting Linda to talk about that

13   at that point, is that correct?

14      A    No.  I believe that at that point in time Linda had

15   a court appearance for sentencing so it was being allowed in

16   supervised phone calls to be talked about.

17      Q    Well, on June 27 you actually met with Shannon and

18   she was actually inquiring about whether her mom was going to

19   go to jail, do you recall that?

20      A    Yes.

21      Q    In fact, you told her that her mom hadn't called,

22   isn't that what you said?

23      A    Yes.

24      Q    And Shannon couldn't understand what was wrong with

25   her mother, why she wasn't letting her know this, is that

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    correct?

2        A    She was frustrated at that point, I believe.

3        Q    But you never told her that her mom wanted to talk

4    to her about it, is that fair to say?

5        A    I don't recall that at that time Linda and I had

6    talked about it either.  There was a previous incident quite

7    some time before that when Linda wanted to tell Shannon she

8    was going to jail, but that was before she was sentenced.

9        Q    Linda had a pretty good indication she was going to

10   wind up going to jail, isn't that fair to say?

11       A    Yes.

12       Q    And you took her on a home visit to see her mom

13   right before she was going to go into jail several days

14   before, is that correct?

15       A    Yes.

16       Q    And you were going to make arrangements for Shannon

17   to visit with her mother in jail but you needed to get a

18   birth certificate, is that correct?

19       A    Linda needed to get the birth certificate, yes.

20       Q    And Linda said she was going to make arrangements

21   to in fact do that, to get the birth certificate?

22       A    Yes.

23       Q    And Linda did make steps and did obtain her birth

24   certificate, correct?

25       A    Yes.  It was sent to the agency.

Elizabeth Chesebro - Cross                    1074

1    Q    But Shannon was never permitted to visit with her

2  mother while she was in jail, is that correct?

3    A    Correct.  Once we did have the birth certificate,

4  her mental health counselors didn't think it would be a wise

5  choice for her.

6    Q    But that wasn't Shannon's decision, is that

7  correct?

8    A    Right.

9    Q    And on July 10 of 2006 Shannon inquired about

10 visiting her mother, do you remember that?

11   A    Yes.

12   Q    And it was Shannon's belief at that point that her

13 mom didn't bother to get all the paperwork together, is that

14 correct?

15   A    Yes.

16   Q    And it was shortly after that, around July 12, that

17 Shannon stated she wanted her mother to sign off on her

18 parental rights, do you remember that?

19   A    Yes, I do.

20   Q    And on August 13 Shannon had given you a letter

21 that she wrote to her mother and in the letter she stated she

22 wanted to go home to her mom, do you remember that?

23   A    Yes, I do.

24   Q    And you were confused by that, correct?

25   A    Yeah.  That was different than other reports she'd

Elizabeth Chesebro - Cross                                    1075

1    given me.

2        Q    Because a month before she was saying she wanted to

3    be in foster care, is that fair to say?

4        A    Yes.

5        Q    In fact, what you told her was that her mom has

6    been making bad decisions for years and something like that

7    doesn't change quickly.  Do you remember that?

8        A    Yes.

9        Q    And Shannon said she wanted her mom to at least

10   try, i is that fair to say?

11       A    Yes.

12       Q    In the letter that she wrote to her mom on

13   August 14 she wanted to make sure her mom was serious about

14   changing, correct?

15       A    Yes.

16       Q    And you told her that sometimes it takes people a

17   very long time to make changes like her mom needs to do and

18   the person has to want to change.  That's what you told her,

19   right?

20       A    Yes.

21       Q    And at that point she stated she wanted to actually

22   speak with her mother by phone, correct?

23       A    Yes.

24       Q    And on August 15 you supervised a phone call

25   between Shannon and her mother, correct?

Elizabeth Chesebro - Cross                    1076

1     A    Yes.

2     Q    And Shannon stated to her mom that she would love

3  her even if she was saggy and wrinkly.  Do you remember that?

4     A    Yes.

5     Q    On the same day you spoke with -- or you supervised

6  that phone conversation, you had a conversation with the

7  foster parent and you learned that Shannon was constantly

8  talking about wanting to remain in foster care, is that

9  correct?

10    A    Yes.

11    Q    And it was on August 20.  Did you have a phone

12 conversation that you learned that Linda O'Connor was going

13 to be released from jail on October 11 of 2007, is that

14 correct?

15    A    Yes, I did learn that.

16    Q    And you had a phone conversation on August 27 with

17 Mrs. O'Connor and she explained to you that she was going to

18 be enrolling in an employment and life skills course while

19 she was incarcerated.  Do you recall that course?

20    A    Yes.

21    Q    Shannon really wanted to see her mother on that

22 day.  Do you recall that conversation?

23    A    She asked when she could call her mother again.

24    Q    And she felt very bad about her mother being in

25 jail, is that correct?

Elizabeth Chesebro - Cross                    1077

1    A    Yes.

2    Q    And you told her, your mom made the choice to break

3    the court order and you had no control over that, that's what

4    you told her, correct?

5    A    That I had no control over that.

6    Q    That she had no control over it but you were --

7    A    Yes.  We were trying to have Shannon understand

8    there were consequences for breaking the law.

9    Q    Now you had weekly contact and interaction with

10   Shannon throughout that summer of 2007, is that fair to say?

11   A    Roughly, yeah.

12   Q    Now it was on August 29 when you spoke to Shannon's

13   counselor, Mrs. Hartman, and you asked Mrs. Hartman whether

14   Shannon disclosed that her mother was prostituting her for

15   rent, do you remember that?

16   A    That was a follow-up to Amanda Hartman telling me

17   that Shannon discussed knowing -- that Shannon discussed in

18   counseling that her mom knew what Dean was doing to her.

19   Q    Shannon was of the belief that her mom knew and she

20   disclose that during the summer, during that time period of

21   2007, is that correct?

22   A    Yes.

23   Q    And then on August 29 you state that she did

24   disclose that her mother was prostituting her for rent; that

25   was your words, correct?

Elizabeth Chesebro - Cross                    1078

1      A    I'd like to just read it right from here.  It's

2    very clear.  It says, Shannon then told Amanda she thought it

3    was because they weren't able to pay the rent.  In essence,

4    Shannon disclosed knowing her mom was prostituting her to pay

5    the rent.

6      Q    Is it fair to say that repeatedly everyone was

7    asking Shannon why, why did this keep happening?  Is that

8    fair to say?

9      A    No, no.

10     Q    No one ever asked her, why did you keep going up to

11   Mr. Sacco's apartment?  No one ever asked her that?

12     A    That was talked about when she was first

13   interviewed.  That wasn't an ongoing question.  She was

14   dealing with those things in therapy.

15     Q    And you knew that Shannon had testified in front of

16   the grand jury in a case against Mr. Sacco in state court.

17   You knew that, right?

18     A    Yes.

19     Q    And at that point she's testifying and she's under

20   oath and they ask her, why didn't you tell your mother?  And

21   she said because she was embarrassed and scared.  You knew

22   that, right?

23     A    I don't know the contents of her testimony.

24     Q    Because you didn't care?

25     A    I wasn't in the room.  I was a possible witness or

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1079

1   a possible someone that was to testify.

2       Q    Did you care what she would say to that question?

3       A    What was the question again?

4       Q    Why didn't you tell your mother?  Did you care?

5       A    Of course.

6       Q    How many times do you think you asked Shannon

7   O'Connor that question?

8       A    I can't approximate that.  I know it was asked

9   throughout the course of my conversation.

10      Q    A dozen?

11      A    I can't approximate it.

12      Q    Now, did you bother to find out how Mrs. O'Connor

13  was paying the rent?

14      A    There was a period of time where she was asked to

15  keep all of her receipts for one-month period at a time and

16  we were going through all of her receipts, and during that

17  time it was expected she was to keep her rent payments.

18      Q    Did you know she had wire transferred Mr. Sacco

19  three months' worth of rent when they moved to Norwich on

20  August 1 of 2006?  Did you know that?

21      A    I knew in the beginning that she had sent him a

22  payment.  The amount, I had no idea about.

23      Q    Well, did you think that might be important when

24  you start throwing out accusations that she was prostituting

25  her daughter for rent?

Elizabeth Chesebro - Cross

1          MR. LOVRIC:  Objection.

2          THE COURT:  Sustained.

3     Q     On September 17 Shannon has a phone conversation

4  with her mother while her mother is still in jail and it's

5  monitored by you, do you recall that?

6     A     Yes.

7     Q     When she got off the phone she was very upset, i is

8  that fair to say?

9     A     Yes.

10     Q     In fact, she didn't think her mother was going to

11  change; that's what she told you, correct?

12     A     Yes.

13     Q     And she was convinced at that point that her mom

14  was going to choose Raymond O'Connor over her, correct?

15     A     Yes.

16     Q     And that's when she said she believed her mother

17  was going to run away and she'd never see her again, is that

18  correct?

19     A     Yes.

20     Q     And Shannon told you she thought her mother was

21  mentally ill, do you recall that?

22     A     I do remember having conversation about that.

23     Q     And again you told Shannon that her mother had many

24  years of issues to work through.  Is that correct?

25     A     Yes.

Elizabeth Chesebro - Cross                    1081

1      Q    And Shannon was very angry at her mother's lack of

2   progress at that point, is that correct?

3      A    Yes.

4      Q    And September 20 is the day she's taken to the

5   psychiatric hospital, and you were the case coordinator,

6   correct?

7      A    I was the caseworker assigned.

8      Q    Well, you were conveying information to Lisa

9   Florance-Diaz, is that correct?

10     A    Yes.

11     Q    You wanted to give her a whole history of what had

12  been taking place, is that correct?

13     A    Whatever information she needed to coordinate

14  services for Shannon.

15     Q    Well, that would be a full history of her

16  background, is that fair to say?

17     A    As complete as the department had it.

18     Q    Same holds true with her psychiatrist Michelle

19  Toth; you provided information to Dr. Toth, correct?

20     A    I provided mainly to Dr. -- or, I'm sorry, Lisa

21  Florance-Diaz, who then disseminated information to the

22  appropriate people.

23     Q    But you were having contact with these individuals?

24     A    Yes.  She was in the department's custody at that

25  time.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1082

1    Q    And you had all sorts of team meetings --

2    A    Correct.

3    Q    -- while she was at the psychiatric hospital?

4    A    Yeah.

5    Q    Now I want to talk about the number of times that

6    Shannon was taken to the hospital while she was at the

7    psychiatric hospital.  She was taken to the hospital on

8    several occasions while she was there, is that fair to say?

9    A    Yes.

10   Q    And each time she was taken to the hospital, they

11   couldn't figure out what was wrong with her, is that fair to

12   say?

13   A    As a general rule, yes.  There was no concrete

14   diagnosis for her abdominal pain.

15   Q    Can you tell the jury how many times Shannon

16   O'Connor was taken to the hospital when she was at the

17   psychiatric hospital?

18   A    I don't know the exact number.  It was several

19   times.

20   Q    Several meaning five or six?

21   A    I would say at least that, yes.

22   Q    More like ten probably, is that correct?

23   A    From my recollection, between five and ten would be

24   a good approximation.

25   Q    And every time she went, they couldn't figure out

Elizabeth Chesebro - Cross

1    what was wrong with her, is that fair to say?

2         A    She was diagnosed with kidney stone the one time.

3         Q    And when she first arrived at the psychiatric

4    hospital she was out of control, running through the facility

5    and setting off alarms, do you remember that?

6         A    No.

7         Q    You didn't make notations of that on September 24

8    in your case notes?

9         A    There was a time she woke up out of fear, she ran

10   out of her room at night and the alarm was set off.

11        Q    She was also trying to kill herself at that point?

12        A    She was hospitalized for suicidal ideations.

13        Q    Was she trying to kill herself on September 24,

14   four days after she got to the hospital?

15        A    That was the report I was given.

16        Q    And it was on October 1 that Kim Hamilton had a

17   phone call with Shannon and after the phone conversation

18   Shannon had an outburst, is that fair to say?

19        A    Yes.

20        Q    That's where she was banging her head against the

21   wall and screaming and kicking, is that fair to say?

22        A    Yes.

23        Q    And that's when she had to be given stat

24   medication?

25        A    Yes.

Elizabeth Chesebro - Cross                          1084

1     Q    Now, let's be clear:  During this time period,

2   after September 20, Mrs. O'Connor had no contact with

3   Shannon, is that correct?

4     A    Correct.

5     Q    In fact, Mrs. O'Connor hasn't seen her daughter

6   since June 26 of 2007, almost a year, is that correct?

7     A    Face-to-face contact, yes.

8     Q    She actually hasn't had any contact since

9   September 20 of 2007?

10    A    September 17 was the last contact, yes.

11    Q    That's not because Shannon didn't want to have

12  contact with her mother, isn't that true?

13    A    At times she did want contact.

14    Q    Shannon had no idea what was going on with Mrs.

15  O'Connor, her mother, when she was at that psychiatric

16  hospital, is that fair to say?

17    A    No.  She would ask how her mom has been, if I had

18  seen her mom or talked to her mom, and I provided her just

19  brief up -- basic updates of, yes, I talked to your mom,

20  she's going to counseling, she's moved, general things like

21  that to kind of ease Shannon's mind, let her know her mom was

22  okay, to my knowledge.

23    Q    Didn't you have a conversation with her on

24  October 24 when she asked, what's my mom been doing since

25  she's been home from jail?  Do you remember that?

Elizabeth Chesebro - Cross                          1085

1      A    Yes.

2      Q    And do you recall saying to her, not much?  Do you

3  remember telling her that?

4      A    Not much?  I don't believe.  I would like to look

5  at my note though.

6           I did note your reference.

7      Q    That's what you said to her, correct?

8      A    It was in the context of she asked what her mom has

9  done since being released from jail two weeks prior.

10     Q    You said not much?

11     A    Yes.

12          MISS PEEBLES:  Judge, would this be an

13  appropriate place to take a break?

14              THE COURT:  I think so.

15              Okay, ladies and gentlemen.  We'll take a

16  break.

17              MISS PEEBLES:  Thank you.

18          (Jury excused)

19          (Jury present)

20              THE COURT:  Miss Peebles.

21  BY MISS PEEBLES:

22     Q    Miss Chesebro, I'm going to hand you what's been

23  marked as Defendant's Exhibit O-29 and ask if you can

24  identify that document.

25     A    Yes, this is a letter I wrote to Linda.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1086

1     MISS PEEBLES:  Your Honor, I'd like to offer

2  Defendant's Exhibit O-29 into evidence.

3     MR. LOVRIC:  No objection.

4     MR. FISCHER:  No objection.

5     THE COURT:  Receive Defendant's O-29 in

6  evidence.

7  BY MISS PEEBLES:

8     Q    Mrs. Chesebro, this is a letter where you were

9  telling Linda what would be appropriate to put in letters

10  that she sent to Shannon, is that a fair description of

11  what's contained in Defense Exhibit O-29?

12     A    Yes.

13     Q    And in fact, this is a letter where you're saying

14  she shouldn't refer to herself as Mommy because you've never

15  heard Shannon call her that, is that correct?

16     A    It was just a suggestion I made.

17     Q    I'm going to hand you what's been marked as

18  Defendant's Exhibit O-28 and ask if you can identify this

19  document.

20     A    This is another letter I wrote to Linda.

21     MISS PEEBLES:  I'd like to offer Defense

22  Exhibit O-28 into evidence.

23     MR. LOVRIC:  No objection.

24     THE COURT:  Receive Defendant's O-28 in

25  evidence.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                           1087

1    Q    Miss Chesebro, this is in essence a letter to Linda

2    explaining that Shannon won't be visiting her at the jail, is

3    that fair?

4    A    Yes.

5    Q    Now, on November 7 you had been speaking with Mrs.

6    O'Connor's psychiatrist.  Do you recall a conversation with

7    her psychiatrist around that time?

8    A    November 7 is the date you gave?

9    Q    Correct.  That was the day after the shoelace

10   incident with Shannon.

11   A    Yes.

12   Q    You recall having a conversation with a

13   psychiatrist?

14   A    Yes.

15   Q    It's at that point you learn that Linda didn't have

16   a sense of what's going on?

17   A    As reported to me by the doctor.

18   Q    Yes.  As was put into your case notes, correct?

19   A    Yes.

20   Q    Now on November 14 you went down to the police

21   station with Detective Blenis and that's where you had an

22   interrogation of Mrs. O'Connor.  Do you recall that?

23   A    I was present when issues were discussed.

24   Q    Issues concerning Mrs. O'Connor allowing Shannon

25   around Dean Sacco unsupervised, correct?

Elizabeth Chesebro - Cross                1088

1    A    That was part of what was discussed, yes.

2    Q    And the recent allegations that Shannon had made on

3  October 29, correct?

4    A    I don't recall the actual allegations were

5  addressed, but questions were asked to try and see if there

6  was a camera involved that Linda was aware of or knew the

7  whereabouts of.

8    Q    And you were asking Mrs. O'Connor questions during

9  that interrogation, is that fair to say?

10   A    Yes.

11   Q    And in fact, after that interrogation you reported

12  back to Lisa Florance-Diaz; you said Linda didn't provide any

13  incriminating information at that point, is that what you

14  said?  That would be November 16.

15   A    Yes.  That was what I recorded back to her.

16   Q    And November 16 you spoke with David Flynn, who at

17  that time was counseling Mrs. O'Connor, do you recall that?

18   A    Yes.

19   Q    And he -- and you learned at that point that he was

20  recommending again parenting classes, correct?

21   A    Yes.

22   Q    And that Linda was very cooperative?

23   A    His assessment of her, yes.

24   Q    And she was willing to change, correct?

25   A    Yes.

Elizabeth Chesebro - Cross                    1089

1      Q     And you conveyed to him Shannon's allegations about

2    Mrs. O'Connor on that day, is that correct?

3      A     Yes.

4      Q     On November 30, Shannon began acting out at the

5    psychiatric hospital?

6      A     Yes.

7      Q     You were asked about that?

8      A     Yes.

9      Q     And she was running through the facility banging

10   her head against the wall, is that fair to say?

11     A     Yes.

12     Q     It was on December 4 that you began to make

13   arrangements with Detective Blenis and set up another

14   videotaped interview of Shannon, is that correct?

15     A     Yes.

16     Q     And after that interview, you took her outside and

17   you gave her a pair of pants?

18     A     I believe that was the day I gave her the winter

19   clothing or the outdoor apparel that the department had

20   purchased for her.

21     Q     You gave her a hat?

22     A     Yes.

23     Q     Gloves?

24     A     Yes.

25     Q     And a jacket?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                          1090

 1      A    Yes.  Snow pants and boots as well.

 2      Q    And the very next -- or on that date is when you

 3  filed your intake report concerning the allegations that

 4  Shannon was making during the course of that videotaped

 5  interview, is that correct?

 6      A    I don't understand your question.

 7      Q    Did you file a Child Protective Services report?

 8      A    No, I did not.  I was assigned a report.

 9      Q    Was there a report generated?

10      A    Yes.

11      Q    Had you seen the report?

12      A    Yes.

13      Q    Were you responsible for providing the information

14  that was contained in the report?

15      A    No.

16      Q    You didn't give any information about what was

17  contained in the report?

18      A    The information I received on the child protective

19  report came from the source.

20      Q    Did Shannon call Child Protective Services?

21      A    No.

22      Q    You called Child Protective Services?

23      A    No, I did not.

24      Q    Who gave the information to Child Protective

25  Services?

Elizabeth Chesebro - Cross

1091

1    A    The source of the report is always confidential.

2    Q    I'm going to hand you what's been marked as Defense

3  Exhibit O-30 and ask if you've ever seen this before.

4    A    Yes.

5    Q    This was the first child protective report that was

6  filed in March, correct?

7    A    In March, yes.

8    Q    And there were two subsequent child protective

9  reports that were filed after that, is that correct?

10    A    Yes.

11    Q    And as a result of that report, the Family Court

12  petition was yet again amended and it became an abuse

13  petition, is that correct?

14    A    No.  An abuse petition was not filed.

15    Q    It remained a neglect petition?

16    A    We -- at that point we already had a neglect

17  adjudication and there was a petition pending in front of the

18  Family Court.

19    Q    And now on December 5 --

20    A    I do stand corrected.  We're talking about March of

21  '07 or '08?

22    Q    March of '08.

23    A    In March of '08 we had the neglect adjudication and

24  there was nothing pending at that time.

25    Q    On December 5 Linda had been trying to get ahold of

Elizabeth Chesebro - Cross                    1092

1    you, is that correct?

2        A    Yes.

3        Q    And she was trying to call and find out about

4    Shannon, correct?

5        A    Yes.

6        Q    She tried to call on December 4, correct?

7        A    Yes.

8        Q    And December 5, correct?

9        A    Yes.

10       Q    And December 7?

11       A    Yes.

12       Q    And you didn't call her back until December 10?

13       A    Yes.

14       Q    And December 7 Shannon was taken to the hospital

15   again, right?

16       A    Yes.

17       Q    And she was in the hospital for four days.  She was

18   released on the 11th of Decesmber, correct?

19       A    Yes.

20       Q    And all tests at that point were inconclusive?

21       A    Yes.

22       Q    And you were aware that Linda wanted to see Shannon

23   at that point, correct?

24       A    I don't recall that she necessarily wanted to see

25   her.  She did leave a message that she missed Shannon.

Elizabeth Chesebro - Cross                    1093

1    Q    But that wouldn't be an indication to you that

2  she'd want to see her?

3    A    That's very possible.  I can't assume that, though,

4  based on her message.

5    Q    Now when Shannon was first brought to the

6  psychiatric hospital, they did an intake evaluation, do you

7  recall that?

8    A    I wasn't present for that.

9    Q    Well, were you aware that they asked her whether

10 she had any auditory or visual hallucinations; they

11 specifically asked her that question, are you aware of that?

12   A    That's a typical question at intake.

13   Q    At that point she said no, correct?

14   A    To my knowledge.

15   Q    Now it's not until December 24 that she comes up

16 with she's having auditory and visual hallucinations, is that

17 correct?

18   A    That was when I was made aware that she was

19 reporting that.

20   Q    Now, on December 25, Christmas Day, you call

21 Shannon, is that correct?

22   A    Yes.

23   Q    And Linda wasn't allowed to call Shannon Christmas

24 Day, correct?

25   A    Correct.  Her therapist did not want her having

Elizabeth Chesebro - Cross                    1094

1    contact at that point.

2        Q    And you gave Shannon a Christmas card, correct?

3        A    I don't recall.  I believe it was one that various

4    people in the office had sent, which is very typical of other

5    caseworkers and parent aides to send foster children birthday

6    cards, Christmas cards.

7        Q    You gave her a birthday card?

8        A    Yes.

9        Q    In fact, you took her out for her birthday on

10   December 27?

11       A    Yes, I did.

12       Q    You took her to the Oakdale Mall, correct?

13       A    Yes.

14       Q    In fact, Oakdale Mall is a place Linda used to take

15   Shannon all the time, right across from the Best Western.

16       A    Correct.

17       Q    Shannon wanted to go look at the puppies when they

18   were at the Oakdale Mall, do you remember that?

19       A    I don't recall that.

20       Q    Shannon never mentioned she likes to go to the pet

21   store and look at the puppies?

22       A    She mentioned that before.  I don't recall she

23   asked to go there.

24       Q    And she's at the Oakdale Mall shopping with you and

25   she's having a great time, correct?

Elizabeth Chesebro - Cross

1095

1    A    Yes.

2    Q    In fact, when you dropped her off, that was the
3    happiest she had been in a while, is that correct?

4    A    Yes.

5    Q    Nothing about the Oakdale Mall that stressed her
6    out that day, correct?

7    A    Not to my knowledge.

8    Q    On December 31 you tell Linda that she's made no
9    progress since Shannon was placed in foster care.  Do you
10   recall telling her that?

11   A    I don't recall that I said she made no progress.
12   But I believe I would have said she hadn't made significant
13   progress.

14   Q    Why don't we look at your notes.

15   A    Okay.

16   Q    You said there was lack of progress, correct?

17   A    Yes.

18   Q    And you told her she was not able to care for
19   Shannon?

20   A    I told her at that time it did not appear that she
21   was able to.

22   Q    You never told her that Shannon missed her,
23   correct?

24   A    Not at that time I did not.

25   Q    You never told her Shannon loved her, correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1096

1    A    At that time I did not.

2    Q    Rather, you told her Shannon should be adopted;

3    that's what you told her on December 31, correct?

4    A    I recall telling her that that was what Shannon

5    wanted at that point in time.

6    Q    You never told Mrs. O'Connor that Shannon was

7    asking about her, isn't that true?

8    A    No.  That's not true.  There were times that I did

9    tell her Shannon had asked about her.

10   Q    Linda was crying during that visit, wasn't she?

11   A    We're still talking about the December 31?

12   Q    December 31.

13   A    Yes.

14   Q    She was very upset, correct?

15   A    Yes.

16   Q    And she told you she would never sign off on

17   Shannon's -- on her parental rights, is that correct?

18   A    Yes.

19   Q    In fact, at that point -- Mrs. O'Connor felt that

20   her life had been ruined, isn't that true?

21   A    She did tell me that.

22   Q    On January 2, Shannon was taken to the hospital

23   again, do you recall that?

24   A    I believe I recall what you're talking about.

25   Q    I'm sorry.  I didn't hear you.

Elizabeth Chesebro - Cross                                1097

1   A    I believe I recall what you're talking about.

2   Q    And you spoke to Linda about that, do you remember

3   that?

4   A    Yes.

5   Q    And Linda was really weepy on the phone when you

6   were talking to her, correct?

7   A    Yes.

8   Q    And she said she really missed Shannon, correct?

9   A    Yes.

10  Q    On January 12 you went and you had a visit with

11  Shannon, do you remember that, at the psychiatric hospital?

12  A    Yes, I do recall that.

13  Q    And you brought her McDonald's?

14  A    Yes.

15  Q    And you told Shannon that you hadn't heard from her

16  mother in a couple of weeks; do you recall telling her that?

17  A    She asked her -- she asked about her mom, and I

18  told her that I hadn't spoken with her in a couple of weeks.

19  Q    You never told her that her mom was crying and

20  saying she would never sign off on her parental rights, is

21  that right?

22  A    I didn't feel that was in her best interest to

23  know.

24  Q    You didn't tell her that her mom missed her,

25  correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                1098

1      A     On that day I did not.

2      Q     You never told her that her mom loved her, correct?

3      A     On that day I did not.

4      Q     Shannon was concerned about her mom on that day, on

5  January 12, wasn't she?

6      A     Yes.

7      Q     She wanted to know why she had not checked in with

8  her, meaning you?  She had said, isn't my mom supposed to

9  check in with you, correct?

10     A     Yes.

11     Q     In fact, Shannon got the impression after that

12  conversation that her mother just did not care, isn't that

13  fair to say?

14     A     I don't think that's fair to say.

15     Q     You were actually involved or keeping up to date

16  with whether or not Detective Blenis had gotten any Best

17  Western hotel receipts, do you remember that?

18     A     I do recall that I was checking on the status of

19  the investigation, yes.

20     Q     And you reported in your case notes that the Best

21  Western records were from 2004/2005, correct?

22     A     That was per a phone call from Pat Blenis, yes.

23     Q     And you learned that there were no calls relative

24  to the hotel?

25     A     From what he told me, that there were no calls

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                    1099

1    recorded.

2        Q    And you noted that there were no guests, correct?

3        A    From what he told me.

4        Q    On January 24 you speak to Linda, do you recall

5    that?

6        A    Yes, I do.

7        Q    And you told Linda that Shannon hadn't asked about

8    Linda the last time you saw Shannon, is that correct?

9        A    Yes, I did.

10       Q    That wasn't true, was it?

11       A    To my recollection that would be true.

12       Q    Well, you never told her about the conversation

13   that you had with her on January 12?

14       A    It appears that my records state that the last time

15   I spoke with Shannon she hadn't asked about her; not

16   necessarily in the recent past.

17       Q    But you never told Mrs. O'Connor that Shannon was

18   asking about her and crying about her when you talked to

19   Shannon about a week earlier, is that correct, January 12?

20       A    I don't recall that I did share that.

21       Q    On January 24 you also spoke to Shannon; that same

22   day you spoke to Shannon, do you remember that?

23       A    Yes.

24       Q    And she asked about her mother again and she said

25   she missed her mother, correct?

Elizabeth Chesebro - Cross

1100

1    A    I recall that she asked about her mom -- oh, yeah,
2  she did say she still misses her mom.
3    Q    You never told her that you talked to her mom that
4  day, correct?
5    A    Not -- I'm not obligated to share every time I
6  speak with a parent.
7    Q    On January 27, three days later, you spoke with
8  Shannon again, correct?
9    A    Yes.
10   Q    And you still hadn't said anything about her
11 mother, is that correct?
12   A    Correct.
13   Q    On January 31 Shannon's making suicidal statements
14 again, do you recall that?
15   A    Yes.
16   Q    On February 7 you're discussing trial preparation
17 with Shannon, do you remember that?
18   A    Yes.
19   Q    And you were instructing her what to wear and not
20 to wear any makeup, do you recall that?
21   A    Yes, I do.
22   Q    You told her not to look too old, do you remember
23 that?
24   A    Yes.
25   Q    And you told Shannon that you would meet her and

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1    bring her a pizza with extra cheese, do you recall that?

2         A    That's what she asked for lunch that day.

3         Q    And it's during that time that Shannon's taking

4    Celexa, correct?

5         A    Yes.

6         Q    And she's taking Risperdal, correct?

7         A    Yes.

8         Q    And she's taking Trazodone, correct?

9         A    Yes.

10        Q    Now you learn on February 10 that George Lang's

11   computer contained no pictures of Shannon O'Connor, is that

12   correct?

13        A    Yes.

14        Q    And you made a note of that in your case notes?

15        A    Yes.

16        Q    And then you were informed on February 11 that this

17   case was going to generate a lot of media attention, do you

18   recall that?

19        A    Yes.

20        Q    And you talked to Shannon and told her that the

21   case was going to be federal, do you recall that?

22        A    Yes.

23        Q    And Shannon was shocked to hear that her mother was

24   arrested and the case was going to be federal, do you recall

25   that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                              1102

1       A       Yes.

2       Q       And Shannon immediately stated she wanted to meet

3  the prosecutor, do you remember that?

4       A       Yes.

5       Q       She wanted to know who was going to be working on

6  things, correct?

7       A       Yes.

8       Q       And you told Shannon that you were very proud of

9  her during that phone conversation, do you recall that?

10      A       Yes, I did say that, because she had been taken off

11 of continuous observation.

12      Q       And on February 13, Walter Burkett called you

13 because he had read the paper, do you recall that?

14      A       Yes.

15      Q       He was shocked?

16              MR. LOVRIC:  Objection.

17      Q       Do you recall?

18              THE COURT:  Sustained.

19      Q       You told Walter Burkett --

20              MR. LOVRIC:  Objection.

21              MISS PEEBLES:  To what?

22              THE COURT:  Let her finish the question.

23              MR. LOVRIC:  It's hearsay.  It doesn't matter

24 what the question is.

25              MISS PEEBLES:  She told Walter Burkett --

Elizabeth Chesebro - Cross                    1103

1          THE COURT:  That is hearsay.  What this

2   witness said in an out-of-court statement to somebody else is

3   hearsay, even though the whole trial --

4          MISS PEEBLES:  But, Judge, I would say I'm not

5   offering it for the truth of the matter.

6          THE COURT:  You're not.

7          MISS PEEBLES:  I am --

8          THE COURT:  What are you offering it for?

9          MISS PEEBLES:  For state of mind.

10          THE COURT:  Okay.  I'll let it come in for

11   that purpose.

12   BY MISS PEEBLES:

13      Q    You told Walter Burkett that the information

14   gathered by your agency and the police led to Linda having

15   traded Shannon for rent money, that's what you told Walter

16   Burkett Jr., correct?

17      A    That's what I recorded here, yes.

18      Q    On that same day Shannon's taken again to the

19   hospital by ambulance, correct?

20      A    Yes.

21      Q    And she was in the hospital for three days on that

22   particular occasion?

23      A    I don't recall the exact amount of time, yes.

24      Q    And again, there was no finding after that hospital

25   stay, is that fair to say?

Elizabeth Chesebro - Cross                    1104

1     A    Correct.

2     Q    And on February 22 you spoke to Shannon on the

3    phone.  Do you recall that?

4     A    Yes.

5     Q    And she wanted a big party at the hospital, do you

6    remember that?

7     A    Yes.

8     Q    And she stated she wanted you to bring everyone

9    from DSS and have a big party, do you remember that?

10    A    Yes.

11    Q    On March 7 you brought Shannon to meet Mr. Lovric,

12    do you remember that?

13    A    Yes.

14    Q    And after you met with -- well, the next day you

15    took Shannon to the Barnes & Noble and then you took her to a

16    movie, do you recall that?

17    A    Yes.

18    Q    And she had asked you if you were going to be the

19    one to drive her to college when she started college, do you

20    recall that?

21    A    Yes.

22    Q    On March 18 Shannon no longer wants Lisa

23    Florance-Diaz as her counselor, is that correct?

24    A    Yes.

25    Q    And in fact she says she's not helping her anymore,

Elizabeth Chesebro - Cross                    1105

1   is that correct?

2       A    That's Shannon's report.

3       Q    She thought at that point you were the only person

4   she had in her life, is that correct?

5       A    I believe that's what she did report that day.

6       Q    And Shannon was taken out of the psychiatric

7   hospital and placed at Hillside -- sometime in April of 2008

8   this year, is that correct, last month?

9       A    I believe it was March 26.

10      Q    At that point she leaves and she's at Hillside

11  March 26?

12      A    Yes.

13      Q    And there's an Easter celebration at Hillside?

14      A    No.  There was -- Easter was before she was at

15  Hillside.

16      Q    Well, did you go to a family dinner at the

17  Hillside --

18      A    Yes, I did.

19      Q    -- for Shannon?  Did you make her an Easter basket?

20      A    The agency put together an Easter basket.

21      Q    Did you take her to Wal-Mart?

22      A    Yes.

23      Q    Back on October 31 -- strike that.  Back on

24  October 29, during the interview session, during the

25  videotaped interview of Shannon, at the end when the two of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross                         1106

```
1   you are sitting in the room by yourself, do you remember

2   that?

3        A    Yes.

4        Q    There's a conversation about a Halloween party, do

5   you recall that?

6        A    Yes.

7        Q    In fact, Shannon's asking you whether you're going

8   to attend her Halloween party, do you recall that?

9        A    Yes.

10       Q    And you kind of nodded like you were, do you

11  remember that?

12       A    Yes.

13       Q    You didn't go to the Halloween party, correct?

14       A    My grandfather was hit by a car and passed away.

15       Q    Very sorry to hear that.  Shannon didn't know that?

16       A    She knew I had a family emergency and I was not

17  able to attend to her.

18       Q    You weren't able to go to the Halloween party

19  because of this tragedy?

20       A    Yes.

21       Q    And at that time Shannon went nuts and started

22  banging her head against the wall that night at the Halloween

23  party, is that correct?

24       A    It was the same night, yes.

25       Q    And she had to be given stat medications at that
```

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Cross

1107

1   point?

2        A    I don't recall if she was given stat meds at that

3   point.

4        Q    She was also taken off site with Dr. Toth, her

5   psychiatrist, a couple of times, is that true?

6        A    Yes.

7        Q    And she went to dinner with her one time, is that

8   correct?

9        A    I'm not aware of that.

10       Q    Did she go to an antique store, do you recall that?

11       A    Yes.

12       Q    Shannon is currently on the antipsychotic

13  medication Seroquel?

14       A    Yes.

15       Q    I just want to ask you a couple more questions

16  about the e-mail communication that you had with Shannon.

17       A    Okay.

18       Q    Probably had how many communications, 20 or so?

19       A    That or less, I would say.

20       Q    Pardon?

21       A    That or less than.

22       Q    And as a result of her being able to access your

23  MySpace page she was allowed to gain access to a lot of your

24  personal information, is that fair to say?

25       A    Whatever was available on my page, yes.

Elizabeth Chesebro - Cross                    1108

1    Q    And in your MySpace page you talk about liking Bud

2    Light, do you remember that?

3    A    It's very possible.  I'm not sure when you access

4    it shows that page as well either though.

5    Q    Was it fair to say there were a lot of references

6    to alcohol consumption?

7    A    I am of legal age.

8    Q    I understand that.

9    A    Okay.

10   Q    I'm just saying --

11   A    Yeah.

12   Q    -- in your MySpace --

13   A    There likely was, yes.

14   Q    Adult content, I should say, a lot of adult content

15   contained in your MySpace?

16   A    There was at that time, yes.

17   Q    Shannon drafted a lot of poems throughout her stays

18   at the psychiatric hospital, is that correct?

19   A    Yes.

20   Q    And a lot of these poems, is it fair to say, they

21   come right from her heart, is that a fair statement?

22   A    Yeah.  What she shared with me, yes.

23   Q    And one in particular that she mentioned to you and

24   she mentioned to you the day she was being videotaped in that

25   interview on October 29 was, you can love me or you can hate

Elizabeth Chesebro - Cross

1109

1    me, but you will think of me.  She came up with that,

2    correct?

3        A    She -- that's what she had told me, yes.

4        Q    Is it fair to say that Mrs. O'Connor has been

5    thinking about Shannon for a long time?

6        A    Yes.

7            MISS PEEBLES:  No further questions.

8            THE COURT:  Mr. Lovric.

9            MR. LOVRIC:  If I can just have a moment,

10   Judge?

11           THE COURT:  Sure.  If we can have a moment.

12   REDIRECT EXAMINATION

13   BY MR. LOVRIC:

14       Q    Miss Chesebro, I'd like to just follow up on some

15   questions brought up by Miss Peebles and Mr. Fischer.

16           Miss Chesebro, when Shannon attempted to commit

17   suicide on November 6 of 2007, did you become aware of a

18   suicide note that she left?

19       A    Yes.

20       Q    Do you have a copy of that note?

21       A    I do.

22       Q    Is that in your copy of the file?

23       A    Yes.

24       Q    Could you pull that note out?

25       A    How many pages is it, two?  Two.

Elizabeth Chesebro - Redirect                    1110

1              MR. LOVRIC:  Judge, I'd like to have that

2    marked if I could.

3              THE COURT:  All right.

4              MR. LOVRIC:  Judge, I'd like to have this

5    marked as Government's Exhibit Number 111.

6              THE COURT:  Okay.

7    BY MR. LOVRIC:

8        Q    To your knowledge was this the note that Shannon

9    had left when she tried to commit suicide on November 6,

10   2007?

11       A    Yes.

12             MR. LOVRIC:  Judge, I would offer Government's

13   Number 111 into evidence.

14             MR. FISCHER:  No objection.

15             MISS PEEBLES:  No objection.

16             THE COURT:  Okay.  We'll receive Government's

17   Number 111 in evidence.

18   BY MR. LOVRIC:

19       Q    Miss Chesebro, I'm going to put on the screen

20   Government's 111, the first page.  Do you see that?

21       A    Yes.

22       Q    And if I could, I'm going to read that note that we

23   see on the screen, page 1.  It reads, "Don't feel bad for me.

24   I don't feel a thing.  Death was the only way to get rid of

25   all the pain.  The reason I killed myself was because I had

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                    1111

1   to go.  I had to get away," and it's scratched out, the word.

2   And below it says, "from all the pain I was going through.

3   Please don't be mad just because I'm dead.  Maybe you'll be

4   happy just like my mother is going to be.  I'm dead when my

5   heart was," and crossed out "stolen," and below that is

6   "broken.  When you read this, I'll be dead."

7           And I'm going to next put page 2 on the document

8   camera.  Is that the second part of that note?

9        A    Yes.

10       Q    And on the left-hand side there are three numbers,

11   1, 2 and 3.  In front of 1 it has a "No shower."  In front of

12   2 it says, "Yes bedroom."  3, "No candles."  And I'll read

13   below that first one.  "Mom told me to go upstairs with

14   towels.  Mom sat by the door, took photo, watched.  3, photos

15   with candles."  Below that, "If you tell, I will stab you,"

16   and it has a line blank "you while you die."  And then below

17   that it reads, "Mom said it's better than being homeless."

18   And then at the top right-hand portion it has number 1,

19   "August 1."  Number 2, "A week from when I got home."  3, it

20   says "Thanksgiving."  4, "Two weeks after Thanksgiving."  5,

21   "B'day."  6, "A week -- a week later B'day.  New Year's."  7,

22   "January two weeks before I went to Kim."  And then to the

23   left it has again "shower," below it "bedroom," below it

24   "candles."  This was the note that was found at some point

25   after Shannon tried to commit suicide?

Elizabeth Chesebro - Redirect                    1112

1    A    Yes.

2    Q    Based on what information you had prior to November

3    6 of 2007, the things that are left in this note, the things

4    that are talked about in this note, are there things that

5    Shannon wrote in this note that were consistent with what she

6    had said had been done to her by either her mother or Dean

7    Sacco?

8              MISS PEEBLES:  Objection.

9              THE COURT:  Sustained.

10   Q    Okay.  Let's talk about what Shannon had told you

11   with respect to what Linda O'Connor had done to her with

12   respect to the sex abuse.  Had Shannon disclosed to you

13   anything regarding Linda O'Connor taking pictures?

14   A    Yes, she had.

15   Q    What was it that she said about Linda O'Connor

16   taking pictures?

17   A    That her mom had taken pictures while she was being

18   sexually abused by Mr. Sacco.

19   Q    And at some point did Shannon say anything about

20   candles being lit during any of the rapes that occurred to

21   her?

22   A    Yes.

23   Q    What was it that she said about candles?

24   A    The final time that photographs were taken, there

25   were candles lit throughout the room in which she was being

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1  raped.

2      Q    And at some point did Shannon reveal and disclose

3  to DSS things that were done to her by Linda O'Connor in the

4  shower and in the bedroom?

5      A    Yes.

6      Q    And what did she disclose about what was done to

7  her in the shower and the bedroom?

8              MISS PEEBLES:  Your Honor, I'm going to

9  object.  She's already testified about this and it's in

10  evidence.  The videotape's in evidence.

11              THE COURT:  Well, she's --

12              MISS PEEBLES:  Asked and answered.

13              THE COURT:  He's apparently relating this to

14  the writing, is that right, Mr. Lovric?

15              MR. LOVRIC:  Yes, Judge.

16              THE COURT:  And the Court sustained an

17  objection to whether or not what she said was consistent on

18  the writing, consistent with what she had said before to this

19  witness.  Are you attempting to show that consistency?

20              MR. LOVRIC:  Well, I'm doing it without asking

21  for opinion though.

22              THE COURT:  I understand that, Mr. Lovric.

23              MR. LOVRIC:  Yes.

24              THE COURT:  I didn't need an analysis of that.

25  Yes or no, are you doing --

Elizabeth Chesebro - Redirect                    1114

1              MR. LOVRIC:  Yes.

2              THE COURT:  -- to show there was consistency?

3              MR. LOVRIC:  Yes.

4              THE COURT:  You may do that.  Overruled.

5   BY MR. LOVRIC:

6       Q    Do you remember the question, Miss Chesebro?

7       A    I need it repeated, please.

8       Q    What, if any, information did Shannon O'Connor

9   provide to the Department of Social Services about sexual

10  abuse by Linda O'Connor that included shower and a bedroom?

11      A    She provided information that her mom had begun

12  touching her inappropriately while in the process of bathing

13  immediately prior, immediately before.

14      Q    Okay.  And what, if any, information had Shannon

15  O'Connor provided to DSS about the number of times that Dean

16  Sacco had raped her?

17      A    She provided that there had been seven instances.

18      Q    And the note that we're looking at right now, that

19  I just read, does it have references to those topics that I

20  just asked you about?

21      A    Yes, it does.

22      Q    Now, this -- Miss Peebles had asked you a number of

23  questions regarding whether you had taken Shannon to a number

24  of places; I think Wal-Mart, shopping, to the mall.  I think

25  if you recall, there was a question about whether you'd given

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1115

1    Shannon apparel for winter, winter clothing, things like

2    that.  Was that your personal money that you were spending on

3    Shannon?

4         A    No.

5         Q    Where did that money come from?

6         A    It was the department's money.

7         Q    What department?

8         A    Department of Social Services.

9         Q    And was Shannon the only person that you ever

10   bought these kind of items for?

11        A    No.

12        Q    Was it unusual for what you did for Shannon as

13   compared to other children that were in similar situations as

14   Shannon?

15        A    No.

16        Q    Have you ever -- have you ever taken -- without

17   getting into names, have you ever taken another child that

18   you were a caseworker for shopping?

19        A    Yes.

20        Q    Had you ever bought another child that you were a

21   caseworker for clothing, if they needed certain clothing?

22        A    Yes.

23        Q    How about to the movies?

24        A    I have not taken other children to the movies.

25        Q    Okay.  Have you spent money, DSS money on other

Elizabeth Chesebro - Redirect

1    children depending on their needs or depending on what they

2    might like to do?

3        A    Yes.

4        Q    Okay.  So, all those things that Miss Peebles asked

5    you that you did with Shannon, I take it this was not your

6    personal assets or money that you were spending on her?

7        A    No.

8        Q    And is it fair or not that the things you did for

9    Shannon were the typical kind of things that you or other

10   caseworkers did for other children who were either in foster

11   care or in the type of need that Shannon was in?

12       A    Considering the circumstances, at the time, yes, it

13   would be consistent with what we would normally do, yes.

14       Q    And were -- were your supervisors aware of these

15   things that you were doing with Shannon and providing for

16   her?

17       A    Yes.

18       Q    In fact, when you -- when you had to get money in

19   order to expend on something for Shannon, how would you go

20   about doing that?

21       A    There were a variety of ways we can get the money.

22   Whether it was purchasing it on a Wal-Mart card, having it

23   taken out of her clothing allotment from the department or

24   being reimbursed later.

25       Q    Okay.  But I take it there's a protocol, a

Elizabeth Chesebro - Redirect                    1117

1   procedure that's followed?

2        A    Yes.

3        Q    You don't just -- you just don't do it or spend it

4   and nobody knows what it's spent on or where it's went?

5        A    No.

6        Q    Is that correct?

7        A    Yes.

8        Q    Now, Miss Peebles asked you about what you knew

9   about the George Lang computer and the forensics done on

10  that.  Do you remember that question?

11       A    Yes.

12       Q    Do you know exactly what was in fact found on that

13  computer?

14       A    No.

15       Q    Okay.  So you were given a small piece of

16  information that you indicated to Miss Peebles, but do you

17  know all the things that were or were not located on that

18  computer?

19       A    No.

20       Q    Do you know all the details about that?

21       A    No.

22       Q    I'd like to talk a little bit about -- Miss Peebles

23  asked you some questions about what you had or had not

24  reported back to either Linda O'Connor as far as what Shannon

25  might have said or wanted and then vice versa, vice versa,

Elizabeth Chesebro - Redirect                    1118

1    what you might have reported back to Shannon as far as what

2    Linda O'Connor wanted to be conveyed to her or not.  Do you

3    understand the issue or the topic I want to talk about?

4         A     I think so.

5         Q     Okay.  That wasn't the clearest -- let me start

6    with -- in your line of work, when you're working as a

7    caseworker -- and I'm going to talk about this case

8    specifically, the Linda O'Connor and Shannon O'Connor case,

9    in January of 2008.

10        A     Okay.

11        Q     Moving forward, by that I mean January, February,

12   March of 2008, do you have an obligation as a caseworker to

13   report to Linda everything that Shannon wants or doesn't want

14   you to tell Linda O'Connor?

15        A     No.  It's done on a case-by-case basis.

16        Q     How about the other way?  Do you have, as a

17   caseworker, an obligation to tell Shannon everything that

18   Linda O'Connor would like to tell Shannon or would like her

19   to know?

20        A     Again, it's on a case-by-case basis.

21        Q     And what does that depend on?

22        A     All different things are taken into account.

23   Primarily with this case, a lot of times things were

24   dependent on Shannon's mental health status, how stable she

25   was at the time and the content of the information, how it

Elizabeth Chesebro - Redirect                    1119

1    was suspected it would influence or affect her.

2         Q    Okay.  For example, when Miss Peebles asked you a

3    number of questions and she gave you a number of dates and

4    said, did you speak to Linda O'Connor and did she tell you to

5    say the following to Shannon and then Miss Peebles asked you

6    did you say that to Shannon, do you remember those line of

7    questions?

8         A    Yes.

9         Q    When those kind of things are happening with Linda

10   O'Connor, are you also speaking to any other health care

11   providers for Shannon as to what information Shannon should

12   be given or not given?

13        A    Yes.

14        Q    Why's that?

15        A    What was the question?

16        Q    Why is it you're speaking to Shannon's either

17   psychologist or mental health worker as to whether or not you

18   should be conveying some information from Linda O'Connor to

19   Shannon?

20        A    Because we wanted to assess whether there was an

21   appropriate time for Shannon to have such information or

22   contact with her mom.

23        Q    Okay.  Now, this -- this line of questions that

24   Miss Peebles talked to you about in January, specifically

25   whether you had conveyed information back and forth to either

Elizabeth Chesebro - Redirect                    1120

1    Shannon or Linda, this is -- this is after Shannon has

2    described the sexual abuse at the hand of Linda O'Connor?

3        A    Yes.

4        Q    Given that information, would you ever have allowed

5    Linda O'Connor to have direct contact with Shannon, physical

6    contact, given that Shannon had described this sex abuse?

7        A    Once again, it's all done on a case-by-case basis.

8    In this case it wasn't just my decision, it was her mental

9    therapist saying it was not in Shannon's best interest to

10   have any contact with her mommy.

11       Q    It wasn't as though you simply decided on your own

12   you weren't going to pass along information from Linda

13   O'Connor to Shannon?

14       A    No.

15       Q    And vice versa, from Linda O'Connor on to Shannon?

16       A    Yes.

17       Q    And it wasn't simply your decision?

18       A    No.

19       Q    I take it the mental health persons that were

20   mentioned, Dr. Toth, for example, is a person that was

21   greatly involved with these kind of decision-making

22   processes?

23       A    Yes.

24       Q    And then Miss Florance-Diaz at some point?

25       A    Yes.

Elizabeth Chesebro - Redirect                     1121

1    Q    And were there other mental health workers at the
2  health center as well?
3    A    There were a whole team of people that were working
4  with Shannon there.
5    Q    So am I correct or not, is it simply Elizabeth
6  Chesebro that's making these decisions?
7    A    No, it's not just me making the decisions.
8    Q    During the time you were the caseworker for Linda
9  O'Connor and Shannon, based on your observations and also
10  communications with Linda O'Connor and with Shannon, did you
11  form any conclusions as to the kind of relationship that
12  Linda O'Connor and Shannon had, how they related to each
13  other in terms of, was it a mother/daughter relationship, or
14  was it something other than a mother/daughter relationship?
15    A    I saw it more as peers.  They were acting more on a
16  peer-to-peer level.
17    Q    What do you mean by that?
18    A    Just from my observations and information I
19  gathered, it appeared that, more than Linda setting down the
20  rules and having consequences for Shannon, things like that,
21  there was -- Shannon was treated more as just a friend.
22  Someone who was an adult, not a teenage child.
23    Q    And what was wrong with that?
24    A    I just -- based on my training and my professional
25  capacity, I don't feel that that's in a child's best

Elizabeth Chesebro - Redirect                    1122

1    interest.

2         Q    Okay.  So, when you say peer to peer, Miss O'Connor

3    was not treating Shannon as a daughter but more like a buddy?

4         A    That's fair to say.

5         Q    And based on your experience and your professional

6    view, that was simply not an appropriate relationship?

7         A    Not the typical relationship, not the most

8    functional relationships either.

9         Q    Taking Shannon out on her birthday.  Any other

10   children at the health center get special treatment on their

11   birthday?

12        A    Yeah, they all do.

13        Q    Okay.  So that's something that's done to kind of

14   recognize a special day for them?

15        A    Yeah.  That would be typical for someone's

16   birthday.

17        Q    Okay.  Now, I'd like to ask a question that I

18   thought I heard, and I just want to ask if you heard it,

19   whether it was correct.  Miss Peebles asked you a question

20   about Shannon having auditory and visual hallucinations.

21   Were there any visual hallucinations reported?

22        A    Not to my knowledge.

23        Q    If that was stated that's not correct, I take it?

24        A    No.

25        Q    It was just auditory?

Elizabeth Chesebro - Redirect                    1123

1      A      Yes.

2      Q      And what was the auditory that was reported?

3      A      Crying babies and the voices of her abusers.

4      Q      That's what Shannon reported she was hearing?

5      A      That was reported to the health center staff, which

6    they relayed out to me.

7      Q      And Miss Peebles asked you -- gave you three dates,

8    December 4, 2007, December 5 and December 7, and asked you

9    whether or not you had conveyed to Shannon that Linda

10   O'Connor had called you and was seeking to either speak or

11   contact Shannon.  Do you remember that line of questions?

12     A      Yes.

13     Q      And that's right at the time, isn't it, that

14   Shannon is disclosing to Miss Florance-Diaz the final

15   disclosure about the sex abuse that occurred all the way back

16   to when she was 11 years old in Deposit, New York?

17     A      Yes.

18     Q      That's right around the time, December 5?

19     A      Yes.

20     Q      And that's also the time that these three separate

21   days Linda O'Connor is attempting to make contact with

22   Shannon?

23     A      She attempted contact with three --

24     Q      Through --

25     A      -- but that was in the time period.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                    1124

1    Q    Were you aware or were you not at that time frame,
2    December of 2007, that the Norwich Police Department had
3    commenced to investigate Linda O'Connor as far as sexual
4    abuse was concerned?
5    A    I was aware.
6    Q    You knew that from whom?
7    A    Detective Pat Blenis.
8    Q    And did you share that with Linda O'Connor?
9    A    No.
10   Q    Why not?
11   A    That's my role -- that was not my role.  I was to
12   leave that portion of things to the investigators.
13   Q    But you didn't tell Linda O'Connor that the police
14   were also investigating her, did you?
15   A    No.
16   Q    Miss Chesebro, do you remember Miss Peebles showed
17   you Defense O'Connor Exhibit 28 and 29 which are in evidence,
18   the letters that you sent to Linda O'Connor where you
19   expressed to her in sum and substance the appropriateness of
20   what she should or should not write or communicate to
21   Shannon?
22   A    Yes.
23   Q    Do you remember those letters?
24   A    Yes.
25   Q    Do you need me to show them to you or you pretty

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                1125

1    much know --

2         A    I know the basis of them.

3         Q    Okay.  What was it that you were trying to

4    communicate to Linda O'Connor?

5         A    I was trying to suggest ways to better communicate

6    with her daughter, things to ask about that Shannon would

7    give answers to, such as things she had done, recent

8    activities, her upcoming school schedule, things like that,

9    as a way of kind of keeping her involved in Linda's life but

10   by having Shannon report that stuff, not me report that

11   stuff.

12        Q    Okay.  And I'm going to put on the screen Defense

13   Exhibit 28 that's in evidence.  Can you see that, Miss

14   Chesebro?

15        A    Yes.

16        Q    And I'd like to read the letter.  It says

17   September 12, 2007.  "Dear Linda:  The issue of having

18   Shannon visit you at jail has been discussed with both

19   Shannon's mental health counselor and her law guardian."  Now

20   her law guardian, a law guardian is what?

21        A    It's court appointed through Family Court, and the

22   law guardian represents the child and no one other than the

23   child.

24        Q    And is the law guardian an actual lawyer?

25        A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                    1126

1      Q    Okay.  And do they have legal rights to represent

2   the child based on the judge's orders?

3      A    Yes.

4      Q    And then it reads, "Based on the consultations with

5   those individuals, it would appear it is not in Shannon's

6   best interest to visit you while you are incarcerated.

7   Shannon has struggled with recent feelings of guilt as a

8   result of your incarceration.  In addition, she is very

9   uncomfortable knowing Mr. Sacco is housed at the same

10  correctional facility as yourself.  Therefore, I hope you can

11  appreciate the current position that visitation at this time

12  would not be beneficial to her."  This is what you sent to

13  Linda O'Connor?

14     A    Yes.

15     Q    And this was in response to Linda O'Connor

16  requesting and stating that she would like personal visits

17  from Shannon with her at the Chenango County Jail?

18     A    Yes.

19     Q    And I take it that this was again not your decision

20  alone?

21     A    No.

22     Q    And I take it that one of the reasons is, what it

23  says in the letter, that Shannon simply going to the same

24  jail that Linda O'Connor and Mr. Sacco are incarcerated,

25  would probably not be in her best mental health?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                    1127

1      A      Correct.

2      Q      I'm going to put on the screen the Defense Exhibit

3   Number 29, dated September 6 of 2007.  Can you see that?

4      A      Yes.

5      Q      And in there you write, it reads, "Dear Linda:  I'm

6   returning the enclosed letter because I don't feel it is

7   necessary for Shannon to know all the details about your

8   medication.  That is a personal matter which Shannon has no

9   control over.  You handled things very well two phone calls

10  ago when you told Shannon you've lost weight and in turn your

11  medications have been decreased.  In the letter, however,

12  there are many more details that a 13-year-old does --

13  13-year-old does not need to know about, such as your blood

14  work and the specifics of your medications.  While Shannon

15  does worry about your health, it will do her more good to

16  know that you've lost weight but not burden her with the

17  specifics."

18           You then go on to say, "Another thing I've noticed,

19  throughout your letters you tend to call yourself Mommy.

20  I've yet to hear Shannon refer to you in that way.  She may

21  associate better with the letters if you call yourself Mom,

22  which is how she typically refers to you.  Although Shannon

23  is a child, she's 13 and has begun to mature, and Mommy is

24  typically something heard from someone much younger.  At

25  times in the letters it seems you aren't sure of things to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                    1128

1    talk about.  Here are some suggestions."  Then you list five

2    different suggestions for Miss O'Connor to consider talking

3    about in your communications, is that right?

4         A    Yes.

5         Q    And the reason you did this was, I take it, because

6    based on your and the other mental health experts, you feel

7    that certain things Shannon simply should not be burdened

8    with having to know details about?

9         A    Yes.

10        Q    And you made some suggestions to Miss O'Connor?

11        A    Yes.

12        Q    Now Miss Peebles spoke to you, Miss Chesebro, about

13   a conversation I believe you had with Amanda Hartman in

14   connection to whether Shannon believed that Linda O'Connor

15   was aware of Dean Sacco raping her and whether or not she

16   believed it was in exchange for rent.  Do you recall that

17   line of questioning?

18        A    Yes.

19        Q    Now, that occurred approximately when, that

20   conversation with Amanda Hartman?  Maybe I can help you.  If

21   you can look at August approximately.

22        A    August 29 of '07.

23        Q    Now as of August 29 of '07, obviously October 25

24   hasn't yet occurred, has it?

25        A    No.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                     1129

1    Q    So that October 25 disclosure by Shannon to you has

2    not taken place yet?

3    A    Correct.

4    Q    And I know I'm stating the obvious, but the

5    December 5 disclosures have not occurred yet either?

6    A    Correct.

7    Q    So this information that was conveyed to you first

8    came to you from Amanda Hartman.  And she was whom in

9    relation to Shannon?

10   A    She was her mental health therapist.

11   Q    And was Amanda Hartman meeting with Shannon in

12   therapy sessions?

13   A    Yes.

14   Q    And was this information something that Amanda

15   Hartman learned through therapy sessions with Shannon?

16   A    Yes.

17   Q    And so this information is being conveyed to you

18   but prior to you knowing all the details that Shannon reveals

19   on October 25 and then later additionally other details on

20   December 5?

21   A    Yes.

22   Q    Okay.  And can you -- can you read what it is that

23   was told to you by Amanda Hartman?

24   A    Would you like the whole progress note read?

25   Q    Sure.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1    A    "PC, phone call from Amanda Hartman, CCMH, Chenango

2  County Mental Health Clinic.  She met with Shannon yesterday.

3  Shannon seemed much happier and relieved that they're taking

4  a break from the trauma narrative.  Shannon did not ask but

5  Amanda did let her know they will revisit the narrative in

6  the future.  First Amanda will be addressing all of the

7  coping skills again.  Yesterday they spoke for a little bit

8  about the abuse.  Shannon disclosed that her mom was aware of

9  what Dean was doing.  Amanda asked Shannon in an open-ended

10  fashion why her mom would know she was abused but not do

11  anything about it?  Shannon then told Amanda she thought it

12  was because they weren't able to pay the rent.  In essence

13  Shannon disclosed knowing her mom was prostituting her to pay

14  the rent.  I told Amanda I've had my suspicions all along

15  about that but did not have anything concrete such as a

16  disclosure.  Shannon talked about not talking to her foster

17  parent about what is going on in her head.  Shannon told

18  Amanda she is comfortable talking to her, Amanda, and myself,

19  caseworker Chesebro, but not them because she doesn't want

20  anything at home to change.  Amanda will bring Kim in to

21  discuss what Shannon needs for support and how to handle the

22  situation.  Amanda asked that I not tell Shannon she is the

23  one who brought the prostitution to my attention.  She does

24  not want their developing working relationship to be

25  jeopardized.  Amanda asked if there will be additional

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect                    1131

1    charges based on the new information.  I told her that would

2    be up to law enforcement but is a possibility.  I asked

3    Amanda if she could write something up about yesterday's

4    disclosure.  She said if necessary she could and she'd be

5    willing to speak with law enforcement as well.  In Amanda's

6    opinion Shannon should never return to Linda's care.

7    Shannon's next appointment is 9/19/07 at 4 PM.  End of note."

8         Q    So that was something that came out during private

9    therapy sessions --

10        A    Yes.

11        Q    -- between Shannon and Amanda Hartman?

12        A    Yes.

13        Q    And then it wasn't until sometime later that

14   Shannon disclosed specific details, including some of the

15   topics that she spoke to Amanda Hartman about?

16        A    Yes.

17        Q    Now, Miss Peebles talked to you about a suicide

18   gesture on November 6 of 2007.  In your view was what Shannon

19   tried to do to herself a gesture?

20        A    I think it was a very real attempt on her behalf.

21        Q    Why do you believe that?

22        A    Based on the information, the hospital staff

23   reported to me that they felt she was near -- she nearly lost

24   consciousness and that she was very upset that she hadn't

25   been successful in killing herself.

Elizabeth Chesebro - Redirect                      1132

1    Q    Did you obtain information about how it was that

2    Shannon tried to kill herself on November 6?

3    A    Yes.

4    Q    How was it that she tried to kill herself?

5    A    She used a shoelace around her neck.

6    Q    What did she do?

7    A    She pulled the shoelace --

8    Q    To what extent?

9    A    To the extent that there were brush marks that the

10   shoelace left around her windpipe, around the neck area and

11   petechiae around her face.

12   Q    What's petechiae?

13   A    I'm not a medical professional, obviously, but my

14   understanding is that it's burst capillaries under the skin

15   that are caused by trauma in the adjacent areas.

16   Q    So is it fair to say that's when blood vessels

17   actually break because the blood is under such pressure from

18   something that is holding back the blood flow?

19   A    That's my understanding, yeah.

20   Q    Now, on March 2007 you were asked questions --

21   excuse me.  Miss Peebles asked you questions about March 2,

22   2007, and the disclosure made by Shannon to the Norwich

23   Police Department.  Do you recall the topic being discussed

24   by Miss Peebles?

25   A    Yes.

Elizabeth Chesebro - Redirect                    1133

1     Q     And you were asked that you did not reveal any

2  information to Linda O'Connor about that disclosure at that

3  time, did you?

4     A     Yes.

5     Q     Why not?

6     A     There was a current law enforcement investigation.

7  That was their responsibility to handle that portion.

8     Q     And at that time when that disclosure is made by

9  Shannon, did you have any idea whether or not Linda O'Connor

10 was involved at that time?

11    A     I had no information at that point.

12    Q     Okay.  So you didn't know?

13    A     No.

14    Q     And when that disclosure was made by Shannon

15 March 2, 2007, as of that date you did know that Linda

16 O'Connor had violated a court order and allowed Dean Sacco

17 access to Shannon?

18    A     Yes.

19    Q     Has that already occurred some months prior to

20 that?

21    A     Correct.

22    Q     Were the communication rules, the dos and don'ts,

23 were those things explained to Miss Linda O'Connor?

24    A     Yes, they were.

25    Q     How many, one time, more than once?

Elizabeth Chesebro - Redirect                    1134

1        A    More than once.  She also signed visitation rules

2   that are generally used for parents that are ordered to have

3   supervised visits.

4        Q    So it wasn't as though these things -- when she

5   would send a letter and it would be returned to her, it

6   wasn't as though this should have been a surprise to Linda

7   O'Connor?

8        A    No.

9        Q    Okay.  I mean, she had been told about what she

10  should or shouldn't communicate in letters or phone calls,

11  for that matter?

12       A    You can never anticipate everything that might be

13  touched on, but she was given examples of what would and

14  wouldn't be appropriate.

15                 MR. LOVRIC:  Can I just have a moment, Judge?

16                 THE COURT:  That's it?

17                 MR. LOVRIC:  No, I want a moment.

18                 I have a few other questions.

19                 THE COURT:  Okay.

20  BY MR. LOVRIC:

21       Q    Miss Chesebro, I'd like to ask you a couple of

22  questions about in evidence S-13, Chenango Memorial Hospital

23  records on March 12, 2007.  Do you remember being asked by

24  Mr. Fischer about taking Shannon to be examined by Dr.

25  Waters?

Elizabeth Chesebro - Redirect                    1135

1      A    Yes.

2      Q    And at some point you were asked by Mr. Fischer

3  whether or not Shannon provided information to the doctor and

4  staff there about the sexual abuse.  Do you recall that?

5      A    Yes.

6      Q    Did Shannon provide information to them?

7      A    She did provide.

8      Q    What kind of information did she provide to them on

9  that date?

10     A    She provided information about a general overview

11 of the abuse she had endured, answered his questions about

12 her own physical health.

13     Q    Okay.  Did she tell the doctor that she had been

14 penetrated, sexually penetrated, vaginally penetrated?

15     A    Yes.  The doctor was aware of that.

16     Q    So she did discuss and inform him that she had had

17 sexual intercourse in the course of Mr. Dean Sacco raping

18 her?

19     A    Yes.

20     Q    Okay.  So the doctor was aware of that?

21     A    Yes.

22     Q    I'd like to put on the screen, it's Defense S-13,

23 and I'm going to turn to page 5 of that exhibit.  Can you

24 read that, Miss Chesebro?

25     A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1136

1    Q    Okay.  And reading -- as soon as I find the part
2  I'm trying to read, I'll read it.
3            MR. LOVRIC:  I'm sorry, Judge.  I'm just
4  trying to focus on the place that I wanted to read.
5    Q    And I'll point to it on the screen, on page 5.  Can
6  you see that green arrow, Miss Chesebro?
7    A    Yes.
8    Q    And did the examination reveal, as stated on page
9  5, an abnormal genital inspection and it reads, "Completely
10  torn hymen, no acute trauma, no hematoma or lacerations,
11  hymen not intact"?  And was that the finding based on that
12  examination by Dr. Waters?
13    A    Yes.
14    Q    And then below it reads, Clinical Impression, and
15  the doctor writes down, "Sexual assault"?
16    A    Yes.
17            THE COURT:  I think we're going to quit for
18  today.  I imagine there's going to be some more
19  cross-examination tomorrow after you finish.  So, tomorrow is
20  another 9:30 day.  I don't have anything to worry about
21  before you folks get here as far as this trial is concerned.
22  So let me remind you not to discuss the matter among
23  yourselves, with anybody else or permit anyone to discuss it
24  with you.  No research, no media.
25            Have a nice evening.  Enjoy the rain.

Elizabeth Chesebro - Redirect                    1137

1          (Jury excused)

2          (Court stands adjourned)

3              C E R T I F I C A T I O N

4

5

6          I, VICKY A. THELEMAN, RPR, CRR, United

7    States Court Reporter in and for the United States

8    District Court, Northern District of New York, do

9    hereby certify that I attended at the time and place

10   set forth in the heading hereof; that I did make a

11   stenographic record of the proceedings had in this

12   matter and cause the same to be transcribed; that

13   the foregoing is a true and correct copy of the same

14   and the whole thereof.

15

16

17                    _____

18                    VICKY A. THELEMAN, RPR, CRR

19                    United States Court Reporter

20                    US District Court - NDNY

21

22

23   Dated:  August 15, 2008.

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT