1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                   -versus-                    08-CR-77

6   LINDA O'CONNOR and DEAN SACCO.

7   ----------------------------------------------------------

8                   TRANSCRIPT OF JURY TRIAL

9   held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  THURSDAY, May 15, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Binghamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

1       (In open court)

2       THE COURT:  What do you got, Mr. Fischer?

3       MISS PEEBLES:  Can we have a side-bar before

4   we call the jury?

5       (At the bench)

6       MISS PEEBLES:  I would like the Court to

7   inquire with one of the jurors, I believe it's juror number

8   8, the social worker.

9       THE COURT:  Oh, yeah.

10      MISS PEEBLES:  I would like you to ask, if you

11  would please, whether she recognizes Liz from any training

12  sessions they've been at or anything of that nature.  I

13  noticed an awful lot of eye contact, like some familiarity

14  between the two of them yesterday, and I'm a little concerned

15  about that, Judge.  She may not have even recognized her

16  until she took the stand.  If you could just inquire if she's

17  seen her before or had any interaction with her.

18      THE COURT:  Well, she did say that -- I think

19  I remember back in voir dire that she said she had gone to

20  training sessions before she actually went on the job or

21  maybe even after but that there were people there she didn't

22  know their names.  Isn't that what she said?

23      MISS PEEBLES:  I really don't recall.  No, I

24  do think she said that I think maybe now she knows her.

25  That's a concern.  I would -- I would ask if the Court would

1    mind inquiring about that.

2              THE COURT:  Supposing she says, yeah, I know

3    her; what do we do, make an application to excuse her, move

4    for mistrial?

5              MISS PEEBLES:  Not move for mistrial, but I

6    would ask the Court to excuse her and replace her with an

7    alternate.

8              THE COURT:  What's the government going to say

9    about that?

10             MR. LOVRIC:  No, Judge.  This is no different

11   than a juror that says, I know of somebody, I know somebody,

12   and then they ask them the question, is that going to affect

13   anyway your abilities to judge this case on the facts, the

14   evidence?  And then you evaluate if the juror says no,

15   especially since I don't know this person other than I've

16   seen them around versus, well, if they say, we go out to

17   dinner twice a week, three times, and then you evaluate that.

18   If the juror says, let me just add -- my recollection of this

19   juror at voir dire was, and she gave us very honestly, a very

20   complete, detailed information about her background and her

21   background I believe in Ulster County and working through DSS

22   departments and other departments, and if she says -- and

23   these are all ifs -- if she says, I might have seen them at a

24   conference but other than that, I don't know them,

25   interact --

1    THE COURT:  Let's find out.  It's funny, I

2  noticed the same thing you did, but my mind worked

3  differently because I remember how she gave us the list of

4  professional background which she's done and my mind was

5  starting to say, this lady is really scrutinizing this

6  woman's testimony based on her background.  That's what I was

7  thinking.

8    MISS PEEBLES:  Judge, that's one of the

9  reasons why I wanted her on.

10    THE COURT:  It's a double-edged sword.

11  Believe me.

12    MISS PEEBLES:  I know.

13    THE COURT:  Depends on how the lady, everybody

14  and these jurors, and if you've got somebody who knows how

15  DSS works, if I were in your position, I'd want them on too.

16    MR. LOVRIC:  It's like having a lawyer or a

17  judge on the jury.  It can be good.

18    MISS PEEBLES:  I just want to make sure she

19  doesn't have any personal connection.

20    THE COURT:  Do you want to do it with all of

21  them present?

22    MISS PEEBLES:  No.  I don't want to embarrass

23  her.  I would leave it entirely up to you, Judge.

24    THE COURT:  We've got to have a record.

25    MISS PEEBLES:  Yeah.  Yes, we have to have a

1  record.

2           MR. LOVRIC:  I would suggest it differently.

3           THE COURT:  What would you suggest?

4           MR. FISCHER:  I concur we could do it

5  differently.  The defendants can waive their right to be

6  present at the time.  We've all -- all three of us have

7  absolute confidence in your ability to speak with her in

8  camera essentially.  On Mr. Sacco's behalf I have no

9  objection at all to that procedure.

10           MISS PEEBLES:  I would agree, Judge.

11           MR. LOVRIC:  I would suggest, Judge, maybe you

12  ask her to step in the hallway from out there, have the

13  stenographer with you and just ask out of the others'

14  presence and out of our presence.  If she says, I don't know

15  them, I've never seen them, then that's the end of the story.

16           THE COURT:  Let's do that.

17           (In vestibule)

18           THE COURT:  Good morning, how are you?  State

19  your name for the record.

20           JUROR GREENE:  Susan Greene.

21           THE COURT:  The counsel wanted me to ask you

22  just to see what you'd say.  Did you ever know Liz Chesebro?

23           JUROR GREENE:  No.

24           THE COURT:  Never had a training session with

25  her?

1    JUROR GREENE:  No.  No, I've never seen her.

2    THE COURT:  This is the first time you saw her

3  when she walked into courtroom?

4    JUROR GREENE:  Yes.

5    THE COURT:  Have a nice day.

6    (In open court)

7    (Jury present)

8    THE COURT:  Morning, ladies and gentlemen.

9  I'd like to start you out with a happy thought today.  How's

10  that for a change.  There won't be any court tomorrow.  And

11  also Monday morning we'll be not here, but Monday afternoon

12  at 1:30 we'll begin again and go to the end, so that's --

13  it's unavoidable.  I'd be here if I could.  I can't so I

14  won't.

15    Mr. Lovric.

16    MR. LOVRIC:  Thank you, Judge.

17  REDIRECT EXAMINATION CONTINUED

18  BY MR. LOVRIC:

19    Q    Miss Chesebro, I want to continue with the

20  follow-up questions I had for you yesterday when we finished

21  at 5 PM.  And the first follow-up question that I'd like to

22  talk with you about, yesterday afternoon Mr. Fischer asked

23  and talked to you about a progress note entry that you made

24  in your reports dated March 1 of 2007 regarding Shannon and

25  Linda O'Connor.  Do you recall that progress note that date?

Elizabeth Chesebro - Redirect                1144

1    A     Yes, I do recall that.

2    Q     And could you read that progress note again.

3    A     "PC, phone call, from Christen Crandall, CCMH,

4    Chenango County Mental Health.  She spoke with Shannon's

5    teacher this morning.  Earlier in the week Shannon had to

6    leave the classroom because she felt like she was going to

7    throw up.  She then later reported to the guidance counselor

8    she didn't know if she was going to throw up or cry.  The

9    emotions and physical response were in fear of her mom.  I

10   told Christen that Shannon had reported this to me as well.

11   The teacher also said that Shannon had been unfocused at

12   beginning of week but now appears to be better able to

13   concentrate.  End of note."

14   Q     Okay.  Now this is on March 1 --

15   A     Yes.

16   Q     -- of 2007.  Yes.  This is the date before Shannon

17   reveals to you and to the teacher and counselor about being

18   raped by Mr. Sacco?

19   A     Yes.

20   Q     Now, yesterday Mr. Fischer talked with you about

21   Shannon's father, Ray, Ray O'Connor, do you recall that?

22   A     Yes.

23   Q     And then Miss Peebles also talked to you about Ray

24   O'Connor and his submission of some type of application to

25   the Family Court in connection with his paternal rights.  Do

Elizabeth Chesebro - Redirect

1  you recall that?

2      A    Yes.

3      Q    Now who is Ray O'Connor?

4      A    He is Linda's husband.

5      Q    How did you know that?

6      A    She provided me that information.  He's also listed

7  as Shannon's father on her birth certificate.

8      Q    Okay.  When you say she, you mean who?  She

9  provided it, who?

10     A    Linda.

11     Q    Linda O'Connor?

12     A    Yes.

13     Q    And did you ever have any discussions with Linda

14  O'Connor about how it is that she knew or met Ray O'Connor?

15     A    Yes, I did.

16     Q    What did she tell you?

17     A    She told me she had been in a relationship with

18  someone that Mr. -- Mr. O'Connor knew from prison and that

19  when their relationship ended, Ray kind of consoled her and

20  helped her through that healing process and then they became

21  in a relationship.

22     Q    Did Linda O'Connor tell you whether she met Ray in

23  prison or out of prison?

24     A    My understanding was she met him in prison.

25     Q    So Ray O'Connor was in prison at the time?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1    A    Correct.

2    Q    Did you ever learn what he was in prison for?

3    A    Yes.

4    Q    What was that?

5    A    Murder.

6    Q    Did you have any idea what sentence he was serving,

7  what kind of sentence, length of sentence?

8    A    If I recall, it was a possible life sentence, but

9  he did face the Parole Board.

10    Q    And Linda O'Connor in so many words told you that

11  she met Ray O'Connor while Ray O'Connor was in prison?

12    A    Yes.

13    Q    And did you ever have any discussions with Linda

14  O'Connor whether or not Ray O'Connor was actually Shannon's

15  father?

16    A    Yes, I did.

17    Q    And what did Linda O'Connor tell you about that?

18    A    There were times when she said he was her

19  biological father and there were also times she said he was

20  not her biological father.

21    Q    Did Linda O'Connor ever expand on whether or not

22  someone other than Ray O'Connor was actually Shannon's

23  father?

24    A    Yes.

25    Q    What did she tell you about that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1147

1    A    On at least one occasion she told me it was

2  possibly a man from Elmira that was her father.  She didn't

3  provide any details other than he was from Elmira and he had

4  two daughters.

5    Q    Did she ever tell you this person's name?

6    A    No, she wouldn't provide that to me.

7    Q    Did you ask her?

8    A    Yes.

9    Q    She just wouldn't give it to you?

10   A    Correct.

11   Q    Why not?

12   A    I don't know.

13   Q    Did she ever give you this person's name from

14 Elmira?

15   A    No.

16   Q    And you directly asked for that from her?

17   A    Yes.

18   Q    Now, yesterday Miss Peebles talked to you about Ray

19 O'Connor petitioning the Family Court at some point regarding

20 parental rights for Shannon.  About when is this taking place

21 in Family Court, just a general time frame?

22   A    I believe it was in the spring of '07.

23   Q    Okay.

24   A    After Shannon entered foster care.

25   Q    Okay.  And at that time Ray O'Connor is where?

Elizabeth Chesebro - Redirect

1    A    In prison.

2    Q    Still in prison?

3    A    Yes.

4    Q    And did you know why it was that Ray O'Connor was

5    submitting some kind of an application to the court as far as

6    parental rights?

7    A    I never had that conversation with him.

8    Q    Okay.  Now, were you aware whether or not Ray

9    O'Connor at the time, around the time he was submitting this

10   application to the court, Family Court, whether or not he was

11   coming up for a parole hearing?

12   A    Yes, he was.

13   Q    Did that coincide fairly around the time that he

14   was going before the Parole Board?

15   A    The petition was submitted prior to that, a few

16   months prior.

17   Q    Okay.  As of today's date, do you know where Ray

18   O'Connor is?

19   A    He remains in prison, to my knowledge.

20   Q    And when Ray O'Connor submitted this petition to

21   the court, did you find that unusual or usual?

22   A    I found it very unusual.

23   Q    Why is that?

24   A    Because he'd written several letters to the court

25   as well as outside persons declaring that Shannon was not his

Elizabeth Chesebro - Redirect                    1149

1    child.  He cared nothing to have any rights or say in the

2    future of her life.  They were very degrading letters.  So it

3    was a major shock to hear all of a sudden he wanted custody

4    and visitation with her.

5        Q    Okay.  And this application by him was close to the

6    time that he was going to go up before the Parole Board?

7        A    Yes.

8        Q    Now, did you ever discuss with Linda O'Connor Ray

9    O'Connor's steps to file this petition in Family Court?

10       A    No, I did not.

11       Q    Did she ever disclose or tell you anything about

12   what or why Ray O'Connor might be submitting this to the

13   court?

14       A    I do recall at one point she told me that he --

15   well, he had had written her a letter, Shannon a letter and

16   sent it to Linda.  The department did not feel it was in

17   Shannon's best interest to read the letter and I told Linda I

18   did not approve of her reading the letter to Shannon, and

19   Shannon -- or, I'm sorry, Linda told me she was going to have

20   the judge decide that, and it was shortly after that the

21   petition was filed.

22       Q    Okay.  Now, whatever became of Ray O'Connor's

23   petition to the court, Family Court petition that he wanted

24   some kind of parental rights exercised?  Whatever became of

25   that?

Elizabeth Chesebro - Redirect                    1150

1      A      He was granted mail contact.  He was supposed to

2   send letters to me at the Department of Social Services and

3   then I would forward them to her mental health counselor at

4   that time, whatever location she was in, and then the mental

5   health counselor was to screen the letters to see if they

6   were appropriate for Shannon in all or in part, and he did

7   not act on the judge's allowing that.

8      Q      After doing all that Ray O'Connor never took

9   advantage of commencing communications with Shannon?

10     A      Correct.

11     Q      And was that around the time sometime after his

12  parole was actually denied?

13     A      I don't recall the date of the parole hearing.

14     Q      Okay.

15     A      But since it was ordered that he was allowed mail

16  contact, the department has not heard from him.

17     Q      So he just kind of fizzled away into the wind?

18     A      Yes.

19            MISS PEEBLES:  Objection.

20     Q      He fizzled away into prison, where he still

21  remains?

22            MISS PEEBLES:  Objection.

23            MR. LOVRIC:  I'll withdraw that, Judge.

24            THE COURT:  Okay.

25            MR. LOVRIC:  I'll move on.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Redirect

1    Q    Now yesterday Miss Peebles talked to you at some

2  length about the various communications between -- excuse me.

3  Let me phrase this a little more accurately.  You were asked

4  questions about things that Shannon was asking be relayed to

5  her mother Linda O'Connor and then you were asked questions

6  about things that Linda O'Connor was requesting DSS pass on

7  to Shannon.  Do you recall that line of questions?

8    A    Yes.

9    Q    Now, you indicated yesterday that a good portion of

10  these types of communication and information was screened by

11  yourself and other DSS workers?

12    A    Yes.

13    Q    And we talked yesterday that those decisions were

14  made not solely by you but by a team that was working with

15  Shannon and some of those team members working with Linda

16  O'Connor, is that a fair statement?

17    A    Yes.

18    Q    Now, what I'd like to ask you about that:  Was the

19  Family Court judge who was handling the Family Court matter

20  also informed by DSS of this screening process that would

21  take place as to what will or won't be allowed to go back and

22  forth between Linda O'Connor and Shannon?

23    A    Yes.  Both the judge and her law guardian were

24  aware, based on my permanency reports, that Shannon's mental

25  health therapist didn't feel it was in her best interest to

Elizabeth Chesebro - Redirect                    1152

1    have contact with her mom and that contact wasn't being

2    allowed until further recommendation was different.

3        Q    Okay.  Now, when was that?  When was that

4    permanency report?

5        A    That was submitted to the court in October of 2007.

6        Q    And in that report, do you -- well, let me ask you:

7    Who drafted that report?  Who wrote that report?

8        A    I did.

9        Q    And that was submitted to the Family Court judge?

10       A    Yes.

11       Q    And was a copy also provided to Shannon's law

12   guardian?

13       A    Yes.

14       Q    And in that report did you itemize and state that

15   certain types of information back and forth would not be

16   permitted based on the mental health worker's assessment that

17   it's not in Shannon's best interest?

18       A    At that point my statement was that no contact was

19   being allowed based on the therapist's recommendation.

20       Q    And so the Family Court judge was aware of that?

21       A    Yes.

22       Q    And what was the Family Court judge's view of that?

23       A    He approved my permanency plan.

24       Q    So the Family Court judge was aware that you were

25   going to -- you and DSS were going to filter what goes back

Elizabeth Chesebro - Redirect                    1153

1    and forth and approve that plan?

2                    MISS PEEBLES:  Objection.

3                    THE COURT:  Sustained.

4        Q    Was that permanency plan approved by the Family

5    Court?

6        A    Yes.

7        Q    At any time did the Family Court judge direct you

8    or any other DSS personnel to act differently?

9        A    No.

10                   MISS PEEBLES:  Objection.

11                   THE COURT:  Sustained.

12                   MR. LOVRIC:  I'll move on to the next topic,

13   Judge.

14                   THE COURT:  Okay.

15       Q    Now, yesterday Miss Peebles, in one of the first

16   topics that she discussed with you, asked you a line of

17   questions whether or not you personally did any investigating

18   to determine if Dean Sacco was in any way violating that

19   court order issued October 11 of 2007, that being -- that he

20   was not to be allowed to have any unsupervised contact with

21   Shannon.  Do you remember that line of questions by Miss

22   Peebles?

23       A    Yes.

24       Q    Now, at that time, and that being the time frame

25   after October 11, 2007 and all the way up until

Elizabeth Chesebro - Redirect                    1154

1   February 26 -- excuse me.  October 11 of 2006.  I misspoke

2   there.  So the court order I'm referring to is October 11 of

3   '06, from there up until February 26 of 2007.  During that

4   time frame did you expect that Linda O'Connor would tell you

5   if Dean Sacco had unsupervised access to Shannon?

6        A    Yes.

7        Q    Did you know that she was present in court on

8   10/11/06 when the Judge issued that order to her?

9        A    Yes.

10       Q    And did Linda O'Connor -- between October 11, 2006

11  and February 26 of 2007, did Linda O'Connor ever call you and

12  inform you that Dean Sacco was, in fact, having access to

13  Shannon unsupervised?

14       A    No.

15       Q    Did Linda O'Connor ever tell you that she would

16  allow Shannon to go upstairs with Dean Sacco alone?

17       A    No, she did not.

18       Q    Did Linda O'Connor ever tell you that Dean Sacco

19  would take Shannon horseback riding?

20       A    No.

21       Q    Did Linda O'Connor ever tell you that Dean Sacco

22  would take Shannon somewhere with some guy named Steve?

23       A    No.

24       Q    Did you know any of that at that time?

25       A    No, I did not.

Elizabeth Chesebro - Redirect                    1155

1      Q     Did you rely on her to tell you if something like

2   that happened?

3      A     Yes.

4      Q     Now, Miss Peebles asked you about this conversation

5   you had with Lydia Smith.  And Lydia Smith, I believe

6   yesterday I asked you who she was and you indicated she is

7   who?

8      A     She was Linda's mental health therapist.

9      Q     And you made a progress note that we read

10  yesterday -- I'm not going to ask you to read it again --

11  that Lydia Smith advised you of some suspicions that she was

12  conveying to you about Shannon possibly being traded for sex

13  for rent.  Is that a fair summarization of that?

14     A     Yes.

15     Q     And that came about as a result of Lydia Smith

16  talking to Kathy Myrick, Linda O'Connor's pastor, is that

17  correct?

18     A     Yes.

19     Q     So whatever information Lydia Smith conveyed to you

20  initiated or originated with Pastor Kathy Myrick?

21     A     Yes.

22     Q     So that wasn't something that you were just

23  creating on your own and just writing a progress note saying

24  that you think this might be going on?

25     A     No.

Elizabeth Chesebro - Redirect                1156

1    Q    And yesterday Miss Peebles talked with you about

2  both progress notes that you made and information in your

3  reports dated January 24 of 2008, January 27, 2008, in

4  connection with not either allowing Linda O'Connor to contact

5  Shannon or speak to Shannon and vice versa, not allowing

6  information from Shannon to go back to Linda O'Connor.  Do

7  you remember those questions?

8    A    Yes.

9    Q    At that time, January of 2008, were you aware that

10 Linda O'Connor was under criminal investigation by the

11 Norwich Police Department and some point also by the FBI?

12   A    Yes.

13   Q    And in following your course not to allow

14 information back and forth, in addition to you and the other

15 counselors making decisions on the well-being of Shannon,

16 were you also attempting not to compromise a criminal

17 investigation?

18   A    Yes.

19   Q    Now, Miss Chesebro, at any given time while you

20 were Shannon's caseworker for DSS, about how many cases,

21 other cases would you carry and have?  What kind of caseload

22 did you have?

23   A    It varies almost day to day by what's assigned to

24 us.  On average I carry about 20 to 22 cases.

25   Q    Twenty to 22 approximately different kind of

Elizabeth Chesebro - Redirect                    1157

1    matters dealing with a lot of either child issues or

2    parent-to-child issues or family issues?

3         A    Yes.

4         Q    So this wasn't the only case that you were handling

5    at the time?

6         A    No.

7              MR. LOVRIC:  Those are all the questions I

8    have at this time, your Honor.

9              THE COURT:  All right.  Mr. Fischer.

10             MR. FISCHER:  Thank you, your Honor.

11   RECROSS-EXAMINATION

12   BY MR. FISCHER:

13        Q    Good morning.

14        A    Good morning.

15        Q    I'm going to ask you some questions about both what

16   Mr. Lovric asked you this morning and yesterday and about

17   what Miss Peebles spoke with you about yesterday.

18        A    Okay.

19        Q    Okay.  There was a discussion, further discussion

20   about the March 12, 2007 visit to the Chenango Memorial

21   Hospital.  Do you remember that?

22        A    Yes.

23        Q    I want to make it clear that when you made that

24   visit, you were aware that in September of 2006 Shannon had

25   had access to an adult sex toy, am I correct?

Elizabeth Chesebro - Recross                    1158

1    A    I don't recall that she had access to it.  I recall
2  she was aware her mother had one.
3    Q    Did you read Miss Panus' notes?
4    A    Yes.
5    Q    And is it true that Miss Panus refers specifically
6  to a conversation wherein Miss Lang said she found Shannon
7  using an adult sex toy?
8    A    I don't recall that at the moment.  If you could
9  refer me to something, I'll take a look at it.
10                   MR. FISCHER:  Just a moment please, Judge.
11                   THE COURT:  Sure.
12    Q    Do you remember reading Miss Panus' notes
13  concerning September of 2006 where Miss Panus had a
14  discussion with Shannon about Shannon accessing pornography
15  sites?
16    A    Yes, I do recall that.
17    Q    Do you remember reading it about the same time a
18  reference to Shannon using that adult sex toy?
19    A    As I stated before, I don't recall that particular
20  incident, but if I could look at it -- if you could refer me
21  to something, a specific date even.
22    Q    If it was in Miss Panus' notes that in about
23  September of 2006 Shannon was using an adult sex toy, it
24  would be important information to pass along to the doctor
25  who's performing the examination on March 12, 2007, am I

Elizabeth Chesebro - Recross                    1159

1   correct?

2       A   I don't know that I would in my normal course of

3   business pass that along.  We were there for a specific

4   examination.

5       Q   The specific examination was with respect to

6   Shannon's claim that she had been raped, am I correct?

7       A   Yes, it was.

8       Q   And to determine whether there was any evidence at

9   all of a rape, am I correct?

10      A   Yes.

11      Q   And you were aware going into that March 12, 2007

12  examination that part of the purpose of that examination was

13  to determine, if at all possible, when it occurred and how it

14  occurred, am I correct?

15      A   Yes.

16      Q   But you didn't think that it was important or you

17  don't think as you sit here that it would be important

18  information for a doctor making that assessment to have, that

19  the girl had used a sex toy in the past, am I correct about

20  that?

21      A   I'm not stating I don't think it would be

22  important.  I don't know if I would have recalled that

23  information at that time.

24      Q   If you had, if you had been aware of it on

25  March 12, 2007, that would have been information that would

Elizabeth Chesebro - Recross

1  have been important to pass along to the doctor, am I

2  correct?

3      A    If I had recalled it at that point, yes, I may have

4  included that.

5      Q    You may not have included it if you had known about

6  it?

7      A    I was obviously aware of it because I read

8  caseworker Panus' notes.  It's impossible to remember

9  everything about every case, unfortunately.  I can't state

10  going back, whether I would have included that in my report

11  to the doctor or not.

12      Q    I understand that as you sit here now you don't

13  specifically recall that on March 12, 2007 you did or did not

14  remember the September note from Miss Panus, okay?

15      A    M-m h-m-m.

16      Q    But assuming that you did know about it --

17              MR. LOVRIC:  Objection.

18              THE COURT:  Sustained.

19              MR. FISCHER:  I believe there's testimony

20  yesterday about this very subject.

21              THE COURT:  That may be true, but you've got

22  to watch the form of your question.  Rephrase it.

23  BY MR. FISCHER:

24      Q    On March 12, 2007, if you had known about the

25  September 2006 claim that Shannon had a sex toy, would that

Elizabeth Chesebro - Recross

1  have been important information that you would have passed

2  along to the doctor?

3      A    I feel I've already answered that.  I don't -- at

4  the time I don't believe I was recalling that that was, you

5  know, something that Naomi had gathered information on at the

6  time and therefore, no, it was not included in my information

7  to the doctor.

8      Q    Before you went to the doctor's office wasn't it

9  important for you to understand the history with respect to

10 Shannon and any physical or sexual contact that she may have

11 had in the past?

12     A    Yes.  That is important.

13     Q    But you don't know here as you sit here whether you

14 did that review of Shannon's sexual history prior to going to

15 the doctor's on March 12, 2007, am I correct?

16     A    No, I know I did not go through my entire case file

17 prior to taking her to that exam.

18             MR. FISCHER:  Excuse me.  I am going to need a

19 moment of assistance, if I can, with some of the technology

20 so that I can use the exhibits with the witness.

21             THE COURT:  Colleen is the courtroom techie.

22             MR. FISCHER:  Your Honor, may I approach the

23 witness for just a minute?

24             THE COURT:  Yes, you may.

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1162

1    BY MR. FISCHER:

2         Q    Ma'am, I'll show you Government's Exhibit 111.  Do

3    you see that document?

4         A    Yes, I do.

5         Q    That's the document that the government offered in

6    evidence yesterday when you were testifying, do you remember

7    that?

8         A    Yes.

9         Q    What is that?  That's a two-page note?

10        A    Yes.  It's a two-page document.

11        Q    It shows at the top of the document a fax memo, a

12   11/7/2007?

13        A    Yes.

14        Q    Who did that come from?

15        A    That was sent to me by the Greater Binghamton

16   Health Center.

17        Q    So when you received this, it was not stapled like

18   this?

19        A    Correct.

20        Q    You stapled this document together?

21        A    Yes.

22        Q    Is this stapled document the document you provided

23   to the government?

24        A    I believe that would be a copy that my attorney

25   provided to the government.

Elizabeth Chesebro - Recross

1    Q    So somebody from Greater Binghamton Health Center

2  faxed you two pages.

3    A    Yes.

4    Q    And you stapled it and got it to your attorney?

5    A    It was in my case file for a while, but yes, the

6  attorney's aware of it.

7    Q    And eventually you got it to your attorney and the

8  attorney turned it over to the government, am I correct?

9    A    Yes.

10   Q    Was there a cover sheet that came with this?

11   A    I don't recall at the time.  There may be a page

12 number on the top, though that would reference if that was

13 the second.

14   Q    I'll show you the document.

15   A    No, it doesn't appear there would have been a cover

16 letter.

17   Q    Okay.  Thank you.  November 6 of 2007, you had a

18 conversation with Shannon at -- sometime between 6 and 7 PM

19 that day, am I correct?

20   A    Roughly, yes.  I know it was in the evening, yes.

21   Q    A telephone conversation?

22   A    Yes.

23   Q    And during that telephone conversation Shannon was

24 expressing to you that she really wanted you to come over and

25 see her at Greater Binghamton Health Center, am I correct?

Elizabeth Chesebro - Recross

1    A    Yes.

2    Q    You said, no, I can't do that?

3    A    Yes.

4    Q    When were you notified about Shannon's suicide

5    attempt?

6    A    Later that evening.

7    Q    Between 8 and 9 PM?

8    A    Yes, it was during that time.

9    Q    This document was faxed over to you, if it says

10   14:24, about 2:30 in the afternoon the next day?

11   A    Yes.

12   Q    You weren't present when anybody found these

13   documents at the Greater Binghamton Health Center, were you?

14   A    No.

15   Q    Do you know whether there were any other documents

16   in Shannon's room -- withdraw that.  Do you know whether

17   these were found in Shannon's room?

18   A    I don't know where they were found.

19   Q    Do you know whether the person who found these

20   found any other documents written by Shannon?

21   A    No, I don't.

22   Q    Do you know whether these two pages were created at

23   the same time by Shannon?

24   A    No, I do not.

25   Q    Do you even know whether these were in fact created

Elizabeth Chesebro - Recross                    1165

1  by Shannon?

2      A    I know what the hospital reported to me that was

3  found.

4      Q    No.  I'm sorry.  My question was terrible.  I'm

5  going to interrupt you.  Do you know personally -- you never

6  saw Shannon write these two documents?

7      A    No, no.

8      Q    Are you familiar with Shannon's handwriting?

9      A    Vaguely, yes.

10     Q    I'm going to show you a document that's marked for

11  identification as Exhibit S-19.  Can you read that?

12     A    Would you like me to?

13     Q    No, to yourself.  Is it legible?

14     A    Yes.  Yes, it is.

15     Q    And you've seen letters from Shannon before, am I

16  correct?

17     A    Yes.

18     Q    You're familiar with her handwriting, am I correct?

19     A    Yeah.

20     Q    Does that exhibit --

21     A    I've seen it before.

22     Q    Does that appear to be her handwriting?

23     A    To my knowledge I do recall she'd given me to send

24  to her mom.

25     Q    So you remember -- that's obviously a photocopy,

Elizabeth Chesebro - Recross                1166

1   but that original she gave to you?

2        A    Yes.

3        Q    Thank you.

4             MR. FISCHER:  Your Honor, I will offer Exhibit

5   S-19.

6             MR. LOVRIC:  No objection.

7             MISS PEEBLES:  That's fine.

8             THE COURT:  No objection?

9             MISS PEEBLES:  No objection.

10            THE COURT:  All right.  We'll receive

11  Defendant's S-19 in evidence.

12   By MR. FISCHER:

13       Q    I'm putting on the screen Exhibit S-19.  Do you see

14  that?

15       A    Yes.

16       Q    And that's the document that shows Shannon's

17  handwriting, is that correct?

18       A    Yes.

19       Q    I'm going to next put on the screen the second page

20  of Government Exhibit 111.  Do you see that?

21       A    Yes.

22       Q    Does that appear to you to be the same handwriting?

23       A    I don't know that I'm qualified to judge that.  I

24  know this was sent to me and told that it was Shannon's

25  document.

Elizabeth Chesebro - Recross                        1167

1     Q    So you can't tell by looking at that?

2     A    I don't think that's fair of me to judge, no.

3     Q    Okay.  On March 14 of 2007 when you met with

4   Detective Blenis, Detective Blenis had the script, correct?

5     A    Yes.  Yes.

6     Q    And you made notes on that script?

7     A    Yes.

8              MR. FISCHER:  May I approach, your Honor?

9              THE COURT:  Yes, you may.

10    Q    I'm going to show you a one-page document, exhibit

11  marked 1-20.  Do you see that?

12    A    Yes, I do.

13    Q    Is that part of the script Detective Blenis

14  prepares?

15    A    Yes.

16    Q    There's handwriting?

17    A    Yes, there is.

18    Q    Whose handwriting is that?

19    A    It appears to be mine other than what's at the top

20  here and the circle and the arrow.

21    Q    Okay.  Thank you.

22              MR. FISCHER:  I'll offer the document in

23  evidence.

24              MR. LOVRIC:  I have no objection.  I thought

25  it was in evidence.

Elizabeth Chesebro - Recross

1          THE COURT:  What's that exhibit number?

2          MR. FISCHER:  This is S-20.

3          THE COURT:  Okay.

4          No objection to that?

5          MISS PEEBLES:  No objection.

6          MR. LOVRIC:  No objection.

7          THE COURT:  The Court will receive S-20 in

8    evidence.

9    BY MR. FISCHER:

10       Q    I put on the screen Exhibit S-20.  Your handwriting

11   is the example.  I thought you may be able to help, am I

12   correct?

13       A    Yes.

14       Q    That's your handwriting?

15       A    Yes.

16       Q    Do you know whether Shannon O'Connor had visual

17   hallucinations?

18       A    It was reported to me from the hospital staff.

19       Q    Okay.  That she did in fact have visual

20   hallucinations?

21       A    Oh, no, I'm sorry, auditory hallucinations.

22       Q    My question concerns visual hallucinations.

23       A    No, I'm not aware of that.

24       Q    You were involved with Shannon on a fairly close

25   basis from November of '06 until how recently?

Elizabeth Chesebro - Recross

1    A    I have ongoing contact.  I'm still assigned as her

2  caseworker.

3    Q    When's the last time you spoke with her?

4    A    Yesterday.

5    Q    What time?

6    A    5:30 or 6:00.

7    Q    After your testimony here?

8    A    Yes.

9    Q    How long did that conversation last?

10    A    I spoke with her in the US Attorney's Office about

11  what her plans were for the day and for the weekend.

12    Q    How long did that conversation last?

13    A    I don't know exactly how long I was with her.  We

14  were probably up there half an hour or more.

15    Q    Did you speak with Mr. Lovric after your testimony

16  yesterday?

17    A    I spoke with him, yes, but not about my testimony.

18    Q    About what time frame from November of 2006 until

19  the present, based on your observations, was Shannon having

20  the most severe psychiatric symptoms?

21    A    She has fluctuated throughout.  There were many

22  different times where she had a very, very hard time

23  controlling her emotions and knowing how to handle those in

24  appropriate ways.  It comes and goes, fluctuates.

25    Q    Do you know the first time that Shannon received

Elizabeth Chesebro - Recross

1   Thorazine was October 1 of 2007?

2       A    That sounds accurate to me.

3       Q    Do you know the last time she received Thorazine?

4       A    I don't recall.

5       Q    The Greater Binghamton Health Center, what kind of

6   a facility is that?

7       A    That's an inpatient psychiatric hospital.

8       Q    There are a number of psychiatric patients at that

9   hospital?

10      A    Yes.

11      Q    When did Shannon go into the Greater Binghamton

12  Health Center?

13      A    She was admitted there, I believe it was just after

14  midnight on the 20th of September.

15      Q    She spent her days in large part around other

16  patients?

17      A    Yes.

18      Q    Other psychiatric patients?

19      A    Correct.

20      Q    When was she released from the Greater Binghamton

21  Health Center?

22      A    She was transferred to the residential treatment

23  facility on March 26, I believe, if I recall correctly.

24      Q    So the first time that Shannon made any claims that

25  Mr. Sacco had taken any photographs came on October 25, 2007?

1     A    Yes.

2     Q    After -- withdraw that.  Do you know what drugs

3  Shannon had been administered during say the month before

4  that October 25, 2007 date?

5     A    I know that she was on various drugs.  I don't

6  recall specifically what they were at that time.

7     Q    Other than Thorazine, had she gotten any other

8  antipsychotic medications during the month before October 25,

9  2007, to the best of your knowledge?

10    A    I know I testified yesterday at one point she was

11 prescribed Risperdal, which I believe is in the antipsychotic

12 category.  I don't recall at this point when that was,

13 though.  It's possible she was because she was at a

14 psychiatric hospital.  They treated her for her symptoms.

15    Q    I'd like to go back to March -- I'm sorry,

16 August 11 of 2007.  That's the first time that Child

17 Protective Services got involved with Shannon O'Connor?

18    A    That was in 2006.

19    Q    August 11, 2006?

20    A    Yes.

21    Q    That's when Naomi Panus responded?

22    A    Yes.  She was assigned the case at that time.

23    Q    Within a couple of weeks, at the very least, after

24 August 11, 2006, Naomi Panus had some very frank

25 conversations with Shannon O'Connor, based on your

Elizabeth Chesebro - Recross

1  recollection, is that correct?

2      A    Yes.

3      Q    And some of those conversations had to do with sex,

4  am I correct?

5      A    Yes.

6      Q    The first time that Shannon O'Connor made any claim

7  against Dean Sacco with respect to pictures -- withdraw that.

8  The first time that Miss O'Connor ever made any claims

9  against Mr. Sacco was after you had been working closely with

10  her for at least four months, am I correct?

11      A    I was assigned in November of '06 -- '07, excuse

12  me.  No, '06, I'm sorry.  And then it was in February of --

13  no, March of '07 that she disclosed.

14      Q    So that's about four months?

15      A    Approximately.

16      Q    Do you know the last time Shannon had contact with

17  Ray?

18      A    Direct contact with him?

19      Q    Any contact, either correspondence or any

20  conversations?

21      A    I don't recall that she's had contact in quite some

22  time, I believe since she was in her mother's care.

23      Q    When was that?

24      A    Prior to February of '07.

25      Q    Prior to the March 2, 2007 date when Shannon first

Elizabeth Chesebro - Recross

1    made a claim against Mr. Sacco, during the prior ten days her

2    mother had been arrested, correct?

3        A    Yes.

4        Q    Her mom had been incarcerated?

5        A    No.

6        Q    Shannon had been removed from the home?

7        A    Yes.

8        Q    She'd been placed in a new home?

9        A    Yes.

10       Q    With people she didn't know?

11       A    Correct.

12       Q    She had to go to Family Court on a couple of

13   occasions?

14       A    She wasn't present in Family Court but she did

15   attend so she can meet with her law guardian, yes.

16       Q    She knew that there were Family Court proceedings

17   involving removing her from her mom's custody and placing her

18   someplace else, am I correct?

19       A    Yes.

20       Q    And at that time in March of 2007 she was aware

21   about Ray's seeking to become involved with her, am I

22   correct?

23       A    Not at that time, I don't believe.  I believe it

24   was after that that he first petitioned the court.

25       Q    Do you know whether prior to March 2 of 2007

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                1174

1  Shannon had -- had any discussions concerning whether Ray was

2  her real father?

3       A    I don't know that she -- she may have had those

4  discussions with her mother.  I'm not aware of that though.

5       Q    Now, in March of 2007, as of March 2, 2007, at that

6  point to your knowledge Shannon was not taking any

7  antipsychotic medication, am I correct?

8       A    To my knowledge.

9       Q    To your knowledge Shannon was not being prescribed

10  any medication with respect to her mood, correct?

11       A    To my knowledge, yes.

12       Q    There was a conversation with you on March 2, 2007,

13  with Shannon, with respect to her menstrual period, am I

14  correct?

15       A    Yes.

16       Q    And what was that conversation?

17       A    That she had not gotten her period yet that month.

18       Q    You knew the last time she had her period was in

19  January, is that correct?

20       A    That's what she reported to me.

21       Q    Is it fair to say that there were quite a few

22  seriously stressful events that occurred during let's say the

23  two weeks before Shannon O'Connor made her first allegation

24  against Mr. Sacco?

25       A    Yes.

Elizabeth Chesebro - Recross

1                  MR. FISCHER:  Those are all the questions I

2      have.  Thank you.

3                  MISS PEEBLES:  Your Honor, may we take a

4      five-minute or ten-minute recess?

5                  THE COURT:  You need the time to look at

6      something?

7                  MISS PEEBLES:  To hook up the laptop.

8                  THE COURT:  Okay.

9                  MISS PEEBLES:  Thank you.

10                  THE COURT:  All right, ladies and gentlemen.

11                  (Jury excused)

12                  (Jury present)

13                  THE COURT:  Miss Peebles.

14      RECROSS-EXAMINATION

15      BY MISS PEEBLES:

16          Q    Miss Chesebro, I want to follow up on some

17      questions Mr. Lovric asked you about your assessment of Mrs.

18      O'Connor's relationship with her daughter, Shannon.  Do you

19      understand?

20          A    Yes.

21          Q    And that you refer to their relationship as a

22      peer-to-peer type of relationship.  That was your take on it,

23      is that fair?

24          A    Yes.

25          Q    I'm going to hand you now what's been marked as

Elizabeth Chesebro - Recross                    1176

1    Defense Exhibit 29 and ask if you can identify this document.

2        A    Yes.

3                  MISS PEEBLES:  At this time, your Honor, I'd

4    like to offer Defense Exhibit O-29.

5                  MR. LOVRIC:  I have no idea what it is, Judge.

6    I have to take a look at it.

7                  No objection.

8                  MR. FISCHER:  No objection.

9                  THE COURT:  Okay.  Receive Defendant's O-29 in

10   evidence.

11                 THE CLERK:  Mr. Egan indicated the number

12   should be 31.

13                 MISS PEEBLES:  It will be Defense Exhibit

14   O-31.

15                 THE COURT:  Last one I received is 29.  We'll

16   receive O-31 in evidence.

17   BY MISS PEEBLES:

18       Q    Now, looking at this document, can you tell the

19   jury what this document is.

20       A    This is a foster care form that the department has

21   for parents to grant permission for various activities.  I

22   think it's called the high risk form.  They're high-risk

23   activities.

24       Q    And on that document Linda O'Connor was required to

25   authorize permission for her to partake in some of these

Elizabeth Chesebro - Recross

1    activities, is that correct?

2        A    Yes.

3        Q    She had some safety concerns she noted on the form,

4    is that fair to say?

5        A    Yes.

6        Q    She wanted to make sure she was wearing a helmet,

7    correct?

8        A    Yes.

9        Q    And abiding by safety concerns, safety rules, is

10   that fair?

11       A    Yes.

12       Q    Now, I hand you some documents in Defendant's O-26

13   that you were able to identify.  I'm going to show you those

14   documents again and ask you to identify what those documents

15   are.

16       A    These are cartoons that I've seen on the internet

17   before.

18            MISS PEEBLES:  Your Honor, at this point I'd

19   like to offer Defense Exhibit O -- whatever I marked it.

20   O-26, Judge.

21            THE COURT:  Okay.

22            MR. LOVRIC:  Can I have a voir dire, Judge?

23            THE COURT:  Yes, you may.

24   VOIR DIRE EXAMINATION

25   BY MR. LOVRIC:

Elizabeth Chesebro - Recross                1178

1    Q    Where did these come from, Miss Chesebro?

2    A    Mrs. Peebles presented them up to me.  I have no

3 idea.

4    Q    I guess my question is:  She asked you if you'd

5 ever seen these before?

6    A    Yes.

7    Q    Where have you seen them before?

8    A    I don't know specifically where, whether it was in

9 e-mail or somewhere on the internet.

10   Q    Had Shannon ever seen these?

11   A    I don't know.

12   Q    Did she ever tell you that she saw these?

13   A    No.

14   Q    Do you have any knowledge whether Shannon ever saw

15 or ever had anything to do with these cartoons in any way?

16   A    I don't have knowledge about that.

17             MR. LOVRIC:  I would object.

18             THE COURT:  Sustained.

19             MISS PEEBLES:  Well --

20  BY MISS PEEBLES:

21   Q    Is it fair to say these cartoons were on your

22 MySpace account?

23   A    No they were not.  That's not my MySpace account.

24   Q    Well, she was able to access your MySpace account

25 and other caseworker's MySpace account?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1179

1       A    I know she was able to access my MySpace account.

2       Q    If she were viewing your MySpace account, she was

3   able to access and see what you had on your MySpace account,

4   is that right?

5       A    Whatever was on my page at that time.

6       Q    Because if I were able to access Shannon O'Connor's

7   MySpace account, through her MySpace account, then I could

8   access your MySpace account, is that fair to say I would be

9   able to do that if I went through her MySpace account?

10      A    Yes.

11      Q    If I were able to get these documents from your

12  MySpace account through her MySpace account, that's a fair

13  statement, right?

14      A    I don't know where those documents are from.  The

15  people that posted those are not people that I know.

16      Q    Well, you know Theresa Jones?

17      A    I do know Theresa Jones.

18      Q    And it's a caseworker?

19      A    She's a senior caseworker, yes.

20      Q    And she, is it fair to say, had some pretty crude

21  cartoons on her MySpace account?

22      A    I've not looked at her MySpace account in quite

23  some time.

24      Q    But you knew Shannon, you knew Shannon had put down

25  that she was 17 years old; you knew that, right?

Elizabeth Chesebro - Recross

1    A    Yes, I did.

2    Q    And you condoned that?

3    A    I did not condone it, the fact I told her to do

4  that or allowed her to do that, but at her foster parent

5  household, she was allowed to have a MySpace page.

6    Q    You never confronted her about saying she was 17

7  years old on her MySpace account?

8    A    I do believe we had a conversation about that.

9    Q    But you continued to e-mail through MySpace account

10  over 20 times while she was in foster care, isn't that true?

11    A    She would send me messages when she couldn't reach

12  me at the office at times.

13    Q    Are you telling me you never sent her e-mail

14  through MySpace account?  Is that what you're testifying to?

15    A    No.  I'm saying she sought me out through that

16  means.

17    Q    And you e-mailed her back, correct?

18    A    Yes, yes.

19    Q    So, you don't know whether or not Shannon saw a

20  cartoon with an adult dildo sticking in a snowman's nose?

21  You don't know whether she saw that through your MySpace

22  page?

23              MR. LOVRIC:  Objection.

24              THE COURT:  Sustained.

25    Q    And you knew that Shannon viewed you as her best

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                1181

1   friend because she put that on her MySpace page, isn't that

2   true?

3        A    I was not aware that was on her MySpace page.

4             MISS PEEBLES:   Colleen, may I have the

5   exhibits?

6        Q    I'm going to show you what's been offered into

7   evidence and accepted into evidence, Defense Exhibit O-21,

8   and show you Shannon's MySpace page where she has, "Party

9   Girl has 21 friends," and you're listed as one of her top

10  friends, one of her top four friends on her MySpace page.  Do

11  you see that?

12       A    Yes.

13       Q    And she thought you were one of her top friends,

14  isn't that fair?

15       A    I have no control over who she puts in her top

16  friends.

17       Q    Did you ever talk to her about the fact that she

18  put on her MySpace page that she loves hot guys?  Did you

19  ever talk to her about that?

20       A    I don't know that I did.

21       Q    Let's talk about Casey.  She has on there, "I love

22  Casey."  Now you talked about Casey when you were asked some

23  questions I believe by Mr. Fischer.  Do you recall that?

24       A    Yes.

25       Q    In fact, at one point Shannon told you that Casey

Elizabeth Chesebro - Recross                          1182

1    was abusing her.  Do you remember that?

2        A    She did tell me that he had hit her on the knee at

3    one time.

4        Q    That wasn't true, was it?

5        A    I do not know.

6        Q    Well, you just automatically believed her, is that

7    fair to say?

8        A    I had no reason not to believe her at that time.

9        Q    Well, Casey Fairbanks was a CIT at YMCA, is that

10   correct?

11       A    Yes.

12       Q    You never went to the YMCA and voiced a concern

13   about whether Shannon was telling you a fib that she had been

14   hit by this boyfriend of hers named Casey?

15       A    I do recall I had a conversation, a conversation

16   with Rhett Jenung who was the --

17       Q    And Rhett Jenung didn't believe Casey would strike

18   Shannon, is that true?

19                  MR. LOVRIC:  Objection.

20                  THE COURT:  Sustained.

21       Q    Did you ever talk to Casey about whether or not he

22   hit Shannon?

23       A    No, I did not.

24       Q    In fact, when Shannon said that, you said, no one

25   has the right to hit you, right?  You told her that?

Elizabeth Chesebro - Recross

1    A    That's possible.

2    Q    Now, would it be fair to say that the peer-to-peer

3  relationship really existed between you and Shannon and not

4  Mrs. O'Connor and Shannon, is that a fair statement?

5    A    I was assigned as her caseworker.

6    Q    But you had contact with her above and beyond being

7  her caseworker through her MySpace account, isn't that true?

8    A    There's -- DSS doesn't have a policy that that

9  can't be used as a means to communicate.

10    Q    Did your supervisor know that Shannon O'Connor was

11  portraying herself as being a 17-year-old and communicating

12  with you over her MySpace account?  Did your supervisor know

13  that?

14    A    I don't know.

15    Q    That's not something you would typically do with

16  the other kids that you say you buy things for and go

17  shopping, is it?

18    A    It's not restricted to that, though.

19    Q    Have you ever communicated with any other children

20  through your MySpace account?

21    A    I've had other clients that have contacted me

22  through that.

23    Q    How old would they be?

24    A    I'm trying to think of who that -- different ages.

25  I don't recall.  If you're getting at if others were

Elizabeth Chesebro - Recross                    1184

1   children, I don't recall.

2        Q    So you don't recall whether any other children that

3   you were involved with had communicated through your MySpace

4   account, you don't recall that?

5        A    No.

6        Q    I want to go back and talk about Raymond O'Connor,

7   Mrs. O'Connor's husband.

8        A    Yes.

9        Q    When Mr. O'Connor petitioned the court to have

10  contact with Shannon, you told Mrs. O'Connor you didn't care

11  what letters he sent, you were never going to give them to

12  Shannon, isn't that true?

13       A    At that time, yes, we were not giving those

14  letters.

15       Q    Whether he sent letters or not, you weren't going

16  to give them to her anyway?

17       A    Not without a court order we weren't.

18       Q    So he just didn't fizzle off into the sunset; you

19  weren't going to give those communications to Shannon.

20       A    I never received direct communication from him that

21  was to be sent to Shannon.

22       Q    But if you had, you told him you weren't going to

23  send them to her anyway.

24       A    Until I had a court order.  Once I received the

25  court order, I still did not receive any communication from

Elizabeth Chesebro - Recross                    1185

1    him.

2        Q    Now Mr. O'Connor is incarcerated and he was

3    convicted of killing his girlfriend.  Did you know that?

4        A    According to what Mrs. O'Connor had shared with me.

5        Q    And anything that you learned about Raymond

6    O'Connor really you learned through Mrs. O'Connor; she told

7    you all that, correct?

8        A    Yes.

9        Q    And in fact, you talked about some nasty letters

10   that Mr. O'Connor wrote in connection with Shannon at some

11   point, do you recall that?

12       A    Yes.

13       Q    And wasn't it true that he was very upset when

14   there was a question about whether or not he was the

15   biological father of Shannon?  Did you know that?

16       A    Can you rephrase that.

17       Q    He became upset when there was a question as to

18   whether or not he was the actual biological father of

19   Shannon, isn't that true?

20       A    At what point in time?

21       Q    During the point in time when he was married to

22   Mrs. O'Connor.

23                 MR. LOVRIC:  Which year?  Objection.  What

24   year?

25                 THE COURT:  See if you can rephrase your

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross

1  question.  I'll sustain the objection.

2  BY MISS PEEBLES:

3      Q    During the time frame you were working with Mrs.

4  O'Connor, during that time frame, during 2006 and running

5  into 2007, you had conversations with Mrs. O'Connor about

6  Raymond O'Connor, correct?

7      A    Yes.

8      Q    And you became aware of some letters that were

9  generated that were rather nasty that Mr. O'Connor had sent,

10 do you recall that?

11     A    Yes.

12     Q    He was very upset, particularly with Mrs. O'Connor,

13 is that fair to say?

14     A    Yeah.

15     Q    And he had -- there was a question about whether or

16 not Shannon was actually his biological daughter, is that

17 fair to say?

18     A    Yes.

19     Q    Now, Raymond O'Connor was married to Mrs. O'Connor,

20 Shannon's entire life before she was born, is that correct?

21     A    Yes.

22     Q    And were you aware that the government through

23 their investigation interviewed Raymond O'Connor in

24 connection with this case?  Were you aware of that?

25     A    Yes.

1    Q     Were you present for that interview?

2    A     No.

3    Q     There was a point in time during that summer when

4  Shannon was with the Hamiltons in 2007 where Shannon voiced a

5  desire to have a relationship with Raymond O'Connor, isn't

6  that true?

7    A     Yes.

8    Q     Now, I want to talk about Kathy Myrick in Deposit,

9  New York.  Her name was brought up.  Do you remember her?

10    A     I remember speaking about her, yes.

11    Q     And you spoke -- and you learned about her through

12  Lydia Smith, correct?

13    A     Bill Connors had also shared with me she was

14  involved with their family in the past.

15    Q     In fact, Mrs. O'Connor thought Kathy Myrick was her

16  friend?  She thought Kathy Myrick was her friend?

17    A     She portrayed her both as a friend and as a pastor.

18    Q     But she thought she had a good relationship with

19  Mrs. Myrick, correct?

20    A     Yeah.

21    Q     Now, after you had this conversation with Lydia

22  Smith, you never reached out to Kathy Myrick, you never spoke

23  directly to her, is that fair to say?

24    A     I attempted to reach her and never received

25  returned phone calls.

Elizabeth Chesebro - Recross                    1188

1      Q      Have you talked to Kathy Myrick since this case

2  started?

3      A      No.  I've never spoken directly with her.

4      Q      Did you speak to anybody that knew this Kathy

5  Myrick other than Mrs. O'Connor?

6      A      And Shannon.

7      Q      And Shannon?

8      A      Not to my recollection, no.

9      Q      Were you aware that Kathy Myrick is a town gossip

10  in Deposit?

11      A      No.

12             MR. LOVRIC:  Is this based on Miss Peebles'

13  knowledge?  How is she aware of -- I object.

14             MISS PEEBLES:  She spoke to Mrs. O'Connor.

15             MR. LOVRIC:  I object unless we can have some

16  direction that this witness has knowledge of that directly.

17             THE COURT:  Well, she's asking her a direct

18  question about her own knowledge, whether she knew a fact or

19  didn't know a fact.  Whether that fact is true or not true,

20  we have no way of knowing that at all from the question.

21  You're asking her does she have any knowledge about Miss

22  Myrick's reputation in Deposit?

23             MISS PEEBLES:  Correct.

24             THE COURT:  How do you ask that question?

25             MISS PEEBLES:  Well, if she had conversations

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                     1189

 1   with Shannon O'Connor and Mrs. O'Connor, she might have that

 2   knowledge.

 3                 THE COURT:  About that topic?

 4                 MISS PEEBLES:  Yes, Judge.

 5                 THE COURT:  All right.  I'll permit it.

 6                 THE WITNESS:  Can you repeat your question.

 7   BY MISS PEEBLES:

 8        Q    Do you have any knowledge as to whether or not

 9   Kathy Myrick is known as a town gossip in Deposit, New York?

10        A    No.

11        Q    Now, I want to talk now about the medications that

12   Shannon was on.  There was a point in time when she was in

13   the psychiatric hospital where you demanded to know when she

14   changed her medication or changed her dosages, is that true?

15        A    Yes.

16        Q    And you made a note of that in your case notes,

17   correct?

18        A    Yes.

19        Q    You wanted to know what they were giving her?

20        A    She's in the department's custody.

21        Q    So that was important information for you to know?

22        A    That's our obligation, yes.

23        Q    You would want to know why they gave that

24   medication to her, you'd want to know why, correct?

25        A    Yes.

Elizabeth Chesebro - Recross

1     Q     I'm going to hand you now what's been marked as

2  Government's Exhibit 32 and ask you to take a look at that.

3               THE COURT:  Not Government's.

4               MISS PEEBLES:  I'm sorry.  O'Connor Defense O.

5               THE COURT:  O-32.

6     A     Just the highlighted portions?

7     Q     Just the highlighted portions.

8     A     Is there more than this one page you want me to

9  look at?

10    Q     Just the highlighted portions.

11    A     Okay.

12    Q     Does that refresh your recollection as to whether

13  Shannon told those at the psychiatric hospital that she was

14  having visual hallucinations along with auditory

15  hallucinations?

16    A     That's the first I've seen that document, first

17  I've known about any visual hallucinations.

18               MR. LOVRIC:  Objection.  I don't think the

19  document's in evidence.

20               THE COURT:  Side-bar.  Not in evidence.

21               (At the bench)

22               THE COURT:  Now if you're going to use the

23  document to refresh her recollection, I think it's pretty

24  well established through her that she didn't know anything

25  about any visual hallucinations but she knew about auditory

1    hallucinations.  I don't know what this record says.

2    Apparently it must say something about visual hallucinations.

3                    MISS PEEBLES:  Yes.

4                    THE COURT:  Are you going to offer the

5    document into evidence?

6                    MISS PEEBLES:  I can.  I will.

7                    THE COURT:  Is there going to be any

8    objection?

9                    MR. LOVRIC:  She has no knowledge of this

10   document.  My whole objection, Judge, the defense counsel

11   can't show a witness a document and say does this refresh

12   your recollection when the witness is saying, I had no

13   knowledge of this information and I've never seen this

14   document before other than now, I'm going to read it to you

15   and tell you what it says.  That's not -- that's not

16   refreshing recollection.  That's asking a witness to tell the

17   jury what's in a document that's not in evidence and that

18   this witness has no direct knowledge of even the existence of

19   the document or the knowledge of what's in the document.

20   That's why I object.  You have to call somebody who created

21   this document, who has direct knowledge of it.

22                   MR. FISCHER:  If I may.  I understand Mr.

23   Lovric's objection to be a foundational objection.  Am I

24   correct?

25                   MR. LOVRIC:  No.

Elizabeth Chesebro - Recross                    1192

1           MR. FISCHER:  There's no foundation.

2           MR. LOVRIC:  Somebody who has knowledge.

3           THE COURT:  There's two different issues.

4    That issue that you're raising, Mr. Fischer, goes to if she

5    offers it in evidence, then he can object to say, well, this

6    witness didn't know about it.  She didn't make it.  She never

7    saw it before.  She's got no knowledge of it.  What now

8    becomes the foundation for the offer of that.  That's one

9    issue.

10           This is another issue.  She showed her the

11   document, asked her to read it to herself, the highlighted

12   portion, and evidently the document has language that talks

13   about visual hallucinations.  And I agree with the objection.

14   I'm going to sustain it.

15           MISS PEEBLES:  Judge, then I'll just I guess

16   have to call somebody from Greater Binghamton Health Center

17   that created the notes at this point.

18           MR. LOVRIC:  Great.

19           MISS PEEBLES:  But my foundation I think was

20   laid through the -- through asking her she was monitoring the

21   medication and she wanted to know why she was getting the

22   medication.

23           THE COURT:  That's true.

24           MISS PEEBLES:  Exactly.  That would be

25   something that she would have been told through the Greater

Elizabeth Chesebro - Recross

1   Binghamton Health Center.

2             THE COURT:  We don't know if she would have

3   been told.  You'd like to think she would have been told that

4   so she knew what was going on.  We don't know that for a fact

5   except we do know she denied knowing about any visual

6   hallucination.  So I don't know how -- how you can impeach

7   her on that issue.

8             MISS PEEBLES:  I can call somebody.

9             MR. LOVRIC:  If the defense wants to on their

10  case put somebody on, that's the way to do it.  You can't

11  cross-examine a witness who has no knowledge of the fact and

12  who has no knowledge of a document that contains the fact and

13  then bring that fact out.

14            MISS PEEBLES:  It's interesting that you're

15  making that argument since you've been doing it throughout

16  the course of the entire trial.

17            MR. LOVRIC:  I have?

18            THE COURT:  That happens all the time.  People

19  don't object to stuff and they turn around and raise the same

20  objection.

21            MR. LOVRIC:  I don't have a problem with

22  documents her being aware of being shown to her, even if she

23  didn't create that.  That's like showing her that MySpace

24  thing.  She never had any idea --

25            MISS PEEBLES:  I got her through MySpace

Elizabeth Chesebro - Recross                    1194

```
 1   account.
 2                 MR. LOVRIC:  Then put Dick on the stand.
 3                 (In open court)
 4    BY MISS PEEBLES:
 5        Q    Now, I'm going to talk to you about the phone call,
 6   the controlled phone call on March 14 that you were present
 7   for.  Okay?  Do you understand that?
 8        A    Yes.
 9        Q    I'm going to play a portion of that phone call for
10   you, and I want you to listen to it carefully and I'm going
11   to ask you some questions after, okay?
12        A    Okay.
13                 (Playing March 14 phone call)
14        Q    Now you were present when that conversation was
15   taking place and you heard this tape subsequent to that
16   conversation, correct?
17        A    I heard the tape quite some time after, but I could
18   hear Shannon's portion of the conversation then.
19        Q    You did listen to it, though, afterwards to hear
20   what Dean Sacco was saying to her, correct?
21        A    I listened to it in preparation for testifying but
22   not immediately after.
23        Q    You never talked to her about why Mr. Sacco would
24   be saying that to her, is that what your testimony is?
25        A    I testified yesterday that I did talk to Shannon
```

Elizabeth Chesebro - Recross

1   about that after the fact and that she continued to deny she

2   wasn't ready to disclose.

3      Q   Did it strike you as odd that this information --

4   she would have shared any information whatsoever with Mr.

5   Sacco in that regard if her relationship with him was

6   something that she was trying to portray to you?

7      A   In the way she presented that to me, yes, that does

8   seem odd.

9      Q   In fact, George Lang did have cancer, isn't that

10   true?

11      A   That's what was reported to me by Shannon and her

12   mom.

13      Q   When you heard about George Lang, did you ever talk

14   to Renee Lang?  Did you ever talk to Renee Lang?

15      A   I did not.

16      Q   But you knew that Shannon had lived with Renee

17   during a period of time when Mrs. O'Connor was in the

18   hospital.  You knew that, right?

19      A   She lived with Renee while she was in the hospital

20   and for the period after when she had custody.

21      Q   Yes.  She lived with Renee, correct?

22      A   Yes.

23      Q   So you could have reached out to Renee to ask her?

24      A   I wasn't the assigned caseworker at that time.

25      Q   I'm not talking about that time.  After you heard

Elizabeth Chesebro - Recross                    1196

1   the tape, and you said you talked to Shannon about it, and

2   she denied anything ever happened with her grandfather, you

3   never talked to Renee Lang about it, is that fair to say?

4       A    No, I did not.

5       Q    Did you know George Lang was referred to as Captain

6   Hook?

7       A    No.

8       Q    Did you know George Lang was impotent?

9       A    No.

10              MR. LOVRIC:  I just object.  These aren't

11  facts in evidence.  I know she's asking the witness

12  questions.  I want to make that clear, I object to being

13  stated as facts.

14              THE COURT:  Overruled.

15      Q    Further on in the tape Mr. Sacco goes on to talk

16  about this friendship that they had.  He's talking about --

17  do you remember that?

18      A    Yes.

19      Q    Did you ever inquire further of Shannon about what

20  did he mean by that?  Did you ever ask her anything at all?

21      A    I don't know that we did discuss that.

22      Q    Now you knew she had a cellular telephone, correct?

23      A    Yes.

24      Q    And were you aware that she had been calling Mr.

25  Sacco with her cellular telephone?  Did you know that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross

1    A    I knew that she had the number in her phone book.

2  She told me that it was in there, her mom said if she needed

3  it in an emergency.  I don't know what calls were made

4  though.

5    Q    You knew it was in her cellular telephone, she was

6  instructed by her mom to call him if there was an emergency,

7  is that what you're saying?

8    A    Yes.

9    Q    You also knew there was an order of protection

10  during that time period and Mrs. O'Connor wasn't supposed to

11  allow Shannon around Mr. Sacco unsupervised, correct?

12    A    There wasn't an actual order of protection but

13  there was a court order stating there wasn't supposed to be

14  any unsupervised contact.  Yes, I learned about that when

15  Shannon was -- after the controlled phone call.  It may have

16  been prior, when she offered her cellphone as being able to

17  call Mr. Sacco from it.

18    Q    Well, would it surprise you to know she had regular

19  phone contact with Mr. Sacco?

20            MR. LOVRIC:  Objection.

21            THE COURT:  Sustained.  I know it's the same

22  type.

23    Q    Now, I want to talk about the shoelace incident

24  that occurred at the Greater Binghamton hospital on November

25  6.  Do you understand my question?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1198

1      A    Yes.

2      Q    Okay.  Now, Shannon O'Connor tied a shoelace around

3  her own neck, correct, she put it around her own neck?

4      A    Your hand is up like that.  I don't know where her

5  hands were.  I was told it was around her neck.

6      Q    She didn't tie it on to anything else, is that

7  correct?

8      A    Not to my knowledge.

9      Q    So you think she could kill herself if she tied a

10 shoelace around her neck?

11     A    I can't answer to that.  I know what the hospital

12 reported, that she had used a shoelace as a suicide attempt,

13 she put it around her neck.

14     Q    But it wasn't tied to anything that you're aware

15 of?

16     A    To my knowledge.

17     Q    Now, October 25 you take a -- you type up a

18 statement that you had after speaking with Shannon, and it's

19 in evidence I think.  Right now I'm not sure what the

20 Government exhibit is.  October 25, do you remember that?

21     A    Yes.

22     Q    In that statement Shannon says that her mom had

23 given her five Vicodin, and that's what you put in the

24 report, yes?

25     A    Yes.

Elizabeth Chesebro - Recross

1    Q    Do you know medically what would happen to an

2  85-pound girl if she took five Vicodin?

3    A    I could imagine she'd be very sick, but I'm not a

4  medical professional.

5    Q    She was never hospitalized for any type of cardiac

6  arrest, was she?

7    A    Not to my knowledge.

8    Q    You were aware that Shannon, on August 11, was

9  taken to Chenango County Memorial Hospital after telling the

10  Y camp director that she had taken her mother's medication,

11  correct?

12    A    Yes.

13    Q    Now, did you ever look to see what the lab results

14  were with regard to that hospital visit?

15    A    I don't know that I did view those records.

16         MR. LOVRIC:  Okay.  What date are we talking

17  about?  I'm sorry.  I missed that.

18         MISS PEEBLES:  August 11, 2006.

19         MR. LOVRIC:  I object.  She wasn't the

20  caseworker on August 11 of '06.

21         THE COURT:  Well, the records cease to exist,

22  they magically appear when the caseworker changes?  I don't

23  understand your objection.

24         MR. LOVRIC:  I guess -- never mind, Judge.  I

25  object.

Elizabeth Chesebro - Recross                    1200

1          THE COURT:  I take it these records were of an

2    event when Shannon was or was not taken to the hospital.

3          MR. LOVRIC:  I withdraw my objection.  I'm

4    sorry.

5          THE COURT:  Okay.

6    BY MISS PEEBLES:

7    Q    So you never looked at those lab results, that's

8    your testimony?

9    A    My testimony is that I don't recall seeing lab

10   results at all.  I don't believe they were even in the case

11   file.

12   Q    So in other words, nobody confirmed whether Shannon

13   had actually taken any of her mother's medication on

14   August 11, is that a fair statement?

15   A    I can't speak for what the caseworker at the time

16   did.

17   Q    But you didn't?

18   A    When I was assigned the case work, yes.

19   Q    Did you ever talk to Miss Panus when she handed the

20   case over to you about that incident?

21   A    She gave me an overview of the family and her

22   involvement and their service needs.

23   Q    And did she ever talk to you about any -- reviewing

24   any lab results?

25   A    Not to my recollection at this point.

Elizabeth Chesebro - Recross                    1201

1    Q    So you took everything that Shannon O'Connor said

2    and believed it, is that fair to say?

3    A    I wasn't the caseworker at that time.  I had no

4    involvement.

5    Q    Since your involvement with Shannon O'Connor,

6    whenever she told you something, you believed it, is that

7    correct?

8    A    I'd say that's fair to say, yes.

9    Q    But you never did anything to check the validity of

10   anything she was telling you, is that fair to say?

11   A    I guess I'm kind of confused by your question.  I

12   don't know what I would have done.  We don't try to disprove

13   children's statements and we get statements from them.

14   Q    You'd want to check the validity of what they're

15   saying, wouldn't you?

16   A    That's what the law enforcement investigation was

17   for.

18   Q    You were part of that, weren't you?

19   A    In what regard?

20   Q    Well, let's talk about what you did through the

21   course of this investigation.  You were first involved --

22   well, you first showed up with Detective Blenis for the

23   videotaped interview, correct --

24   A    Correct.

25   Q    -- on October 29?

Elizabeth Chesebro - Recross

1    A    Correct.  That's per --

2    Q    One question at a time.  So you were present for

3  that?

4    A    Yes, I was present.

5    Q    And you were also -- but you had already previously

6  interviewed yourself, interviewed Shannon yourself on

7  October 25, correct?

8    A    I believe that was the 24th, yes.  I'm sorry, on

9  the 25th.  You're right.

10    Q    So you did those two things.  All right.  And then

11  subsequent to that, there was another videotaped interview?

12    A    Yes.

13    Q    And you were present for that?

14    A    Yes.

15    Q    And you were asking most of the questions during

16  that interview, is that fair to say?

17    A    I did ask questions.  I don't know what portion of

18  them.

19    Q    Now you were also present for an interrogation of

20  Mrs. O'Connor at the police station with Detective Blenis,

21  correct?

22    A    Yes.

23    Q    You were also present for the two controlled phone

24  calls on March 14, correct?

25    A    Yes.

Elizabeth Chesebro - Recross                          1203

1     Q     And then March 15, correct?

2     A     Yes.

3     Q     Now, didn't you also investigate Mr. Sacco's

4  background for the United States government?  Didn't you do

5  that?

6     A     In what regard?

7     Q     Didn't you go to Barnes & Noble and pick up his

8  autobiography American Desperado?

9     A     No.  I was already aware of that from the previous

10 state side investigation.  Detective Blenis had told me there

11 was an autobiography, and yes, I did look it up on the

12 internet.

13    Q     You faxed over information to Mr. Lovric?

14    A     I did.  I recall that I did.

15    Q     As a matter of fact, you tried to get ahold of my

16 client in March of this past year, '08, while this case is

17 pending?

18    A     Your client is also the mother of the child in the

19 department's custody.

20    Q     Yes, that's correct.  And she's facing a very

21 serious charge here, isn't that true?

22    A     Yes.

23    Q     And you reached out to her and wanted her to give

24 you a call, correct?

25    A     Absolutely.

Elizabeth Chesebro - Recross                    1204

1    Q    You never notified me about that, did you?

2    A    I wasn't aware that I needed to go through you

3    first.  As protocol, we contact the parents.

4    Q    You're part of this investigative team with the

5    government, Mrs. O'Connor is facing very serious charges --

6              MR. LOVRIC:  Judge, I object to the very

7    serious charges.  She's facing charges.  I don't think the

8    jury is permitted to know what's serious or not serious.

9              THE COURT:  Wait a minute now.  Mr. Lovric,

10   they're going to hear -- the jurors -- the jury will decide

11   what it thinks about the charge.  It's true the jury has

12   absolutely no role in connection with punishment in these

13   kind of charges, and I'll instruct them on that.  But serious

14   charges, that's -- or just charges, I think it's up to the

15   jury to decide.

16   BY MISS PEEBLES:

17   Q    Federal charges she's facing, you try to contact

18   her, you don't call me, true?

19   A    Yes.

20   Q    Isn't it true that you also tried to get a

21   recording device to record phone conversations?  Did you

22   mention that to the detective?

23   A    The recording device for what phone calls, between

24   who?

25   Q    Between either Mr. Sacco or Mrs. O'Connor, anybody

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1205

1   named in this investigation.  Didn't you tell them that?

2       A    Did I tell who what that?

3       Q    Did you offer up trying to get a recording device,

4   that's my question, in connection with this case?

5       A    No.

6       Q    Never said that?

7       A    I'm obviously very confused what you're even

8   asking.  I don't recall ever offering a recording device.

9       Q    I'm going to play a portion of the interview from

10  December 5 that you were present for, and it's specifically

11  in connection with the Best Western statements that were made

12  by Shannon during that interview.

13      A    Okay.

14           (Playing December 5 call)

15      Q    Mrs. Chesebro, during that interview you heard

16  Shannon when she was asked whether she used -- whether her

17  mom used her own name when she checked into the Best Western.

18  You asked her those questions, do you remember that?

19      A    Yes.

20      Q    And Shannon said on both occasions she did, is that

21  correct?

22      A    Yes.

23      Q    In fact, toward the end of the interview she

24  clarifies the number of trips that they made to the Best

25  Western, do you recall that?

Elizabeth Chesebro - Recross

1    A    In the portion you just heard?

2    Q    Not in the portion we just heard.  She does later

3  on clarify the numbers of trips, is that correct?

4    A    If I recall correctly, yes.

5    Q    Now, she tells you all the trips that she's

6  referring to she says happened after they moved to Norwich on

7  August 1 of 2006, is that correct?

8    A    I believe that's the case.

9    Q    Yes.  And she was asked the question had this ever

10  happened to her before, and she said yes, with the landlord.

11  That's what she said during that interview, is that correct?

12    A    Yes.

13    Q    Now, when she clarifies the number of trips at the

14  end of the video, she says there were three trips that they

15  took after they moved to Norwich.  One where her and her mom

16  just went shopping, right?

17    A    Yes.

18    Q    And they go to Wal-Mart, correct?

19    A    I believe that's where they went that time.

20    Q    Then she said there were two other trips after

21  that, correct?

22    A    Yes.

23    Q    She said on both of those occasions her mom had men

24  come up to the hotel room, is that correct?

25    A    Yes.

Elizabeth Chesebro - Recross                    1207

1    Q    The Best Western receipts did not reflect what

2  Shannon told you on December 5 during that interview, is that

3  true?

4                  MR. LOVRIC:  Objection.

5                  THE COURT:  What's the basis for that?

6                  MR. LOVRIC:  Has she ever reviewed all the

7  Best Western receipts to make that conclusion.

8                  THE COURT:  I don't know that.  Ladies and

9  gentlemen, we're going to take a break now.

10                  (Jury excused)

11                  THE COURT:  I think if you're going to ask her

12  about the receipts, you've got to show them to her.

13                  MISS PEEBLES:  Okay.  Just for the record, I

14  asked her questions about that yesterday.

15                  THE COURT:  I think I recall that.  So that

16  means Rule 403 says you can't ask them anymore.

17                  MISS PEEBLES:  No, Judge, but I will do that.

18                  THE COURT:  Give her the receipts when you ask

19  her the question.

20                  MISS PEEBLES:  Yes.

21                  (Short break taken)

22                  (Jury present)

23                  THE COURT:  Okay.  Miss Peebles.

24  BY MISS PEEBLES:

25    Q    Miss Chesebro, I'm going to hand you what's been

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1208

1   marked as Defense Exhibit O-6 and ask if you can identify

2   that exhibit.

3        A    It appears to be some sort of receipt or

4   transaction from the Best Western hotel.

5        Q    And these receipts were generated as a result of

6   the investigation after the interview with Shannon O'Connor

7   on December 5 of 2006, is that correct?

8        A    That's the first I've seen that document.

9        Q    You made notations in your case notes about the

10  receipts after speaking with Detective Blenis, did you not?

11       A    To what he reported to me, yes.

12       Q    And the report was that the receipts they found or

13  registrations they found did not comport with what Shannon

14  O'Connor had said in the December 5 interview?

15       A    That was the generalization of that, yes.

16       Q    Fair to say.  I'm going to hand you now what's been

17  marked as Exhibit O-34 and ask if you can identify this

18  document.

19       A    It's a progress note.

20       Q    And did you create that progress note?

21       A    Yes, I did.

22            MISS PEEBLES:  Your Honor, at this point I'd

23  like to offer Defendant's Exhibit O-34 into evidence.

24            MR. LOVRIC:  Can I voir dire, Judge?

25            THE COURT:  Sure.

Elizabeth Chesebro - Recross

1    VOIR DIRE EXAMINATION

2     BY MR. LOVRIC:

3        Q    Maybe I'll hand this up to you.  Do you have a copy

4    of this, Miss Chesebro?

5        A    Is it a May date?  I may have the copy of it.  I

6    just don't know the date.

7        Q    May 3, 2008 is the event date.  May 3, '08 is the

8    event date.

9        A    I do not have a copy of that with me.

10        Q    Let me hand you Exhibit D O-34.  When was that

11    created?  When was that created?

12        A    This is a recollection of events on May 3, '08.

13        Q    And you wrote that progress report?

14        A    Yes.

15        Q    What was the purpose in writing that report?

16        A    Can I briefly read it?

17        Q    Sure.  What was the purpose for writing that

18    report?

19        A    Just documenting the phone call I had with Shannon.

20        Q    How did it come to be that you had contact with

21    Shannon in connection with this report?

22        A    It initiated as a phone call to her and she called

23    me back when she was available.

24        Q    Okay.  And the things that are recorded in here,

25    are these things that she had told you about?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1210

1        A    Yes.

2        Q    And other than recording what she told you, did you

3   have any further discussions with her other than what's

4   reflected in this report?

5        A    Progress notes are meant to be just a summarization

6   of what was discussed.

7        Q    Okay.  I guess my question is:  Were there any

8   other communications or discussions with Shannon about the

9   things in this report but which are not reflected in this

10  report?

11       A    This appears to be an accurate reflection of my

12  recollection.

13            MR. LOVRIC:  Okay.  I have no further

14  questions.  I have no objection.

15            THE COURT:  Mr. Fischer?

16            MR. FISCHER:  No objection.

17            THE COURT:  Receive Defendant's O-34 in

18  evidence.

19   BY MISS PEEBLES:

20       Q    Now, Miss Chesebro, in this report Shannon states

21  that she was in a cult with the other girls from her unit and

22  she is ashamed she went against her own religion and was

23  worshiping the devil.  That's what she told you in one of the

24  more recent phone calls?

25       A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross

1    Q    Shannon says she doesn't know who she is right now,

2  is that correct?

3    A    Yes.

4    Q    Do you know whether she is taking any antipsychotic

5  medication today?

6    A    I don't recall at this time.

7    Q    I'm going to hand you what I've marked as

8  Defendant's Exhibit O-27 and ask if you can identify this

9  document.

10    A    Yes.

11    Q    Was that a letter that was drafted for you, to you,

12  addressed to you?

13    A    Yes.  It was addressed to me.

14    Q    And when was that letter sent to you?

15    A    It was received on May 3 of 2007.

16         MISS PEEBLES:  Your Honor, at this time I'd

17  like to offer Defense Exhibit O-27 into evidence.

18         MR. LOVRIC:  I have no objection.

19         MR. FISCHER:  No objection.

20         THE COURT:  Receive Defendant's O-27 in

21  evidence.

22  BY MISS PEEBLES:

23    Q    Now, this letter that was sent to you, it was from

24  the Probation Department on behalf of Shannon O'Connor,

25  correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                1212

1    A    Yes.

2    Q    And in that letter the probation officer refers to

3  you about -- as Shannon as being your daughter, is that

4  correct?

5    A    That's what it reads.

6    Q    And you had conversations with Mr. Yearington about

7  Shannon, correct?

8    A    I don't recall having a conversation with him

9  specifically.  I know I spoke with staff in his department.

10   Q    Do you recall Kim Hamilton speaking with you about

11 being concerned with regard to the nature of the relationship

12 you had with Shannon?

13   A    Based on statements Shannon gave to her, yes.

14   Q    In fact, didn't Shannon tell Mrs. Hamilton that she

15 could get you to do whatever she wanted?

16   A    She did report that.

17   Q    And Shannon felt that about Naomi as well, isn't

18 that true?

19   A    I don't know the answer.

20   Q    I'm going to hand you what's been marked as Defense

21 Exhibit O-33 and ask if you can identify this document.

22   A    Yes.

23   Q    Is that a document off of your MySpace page?

24   A    It appears to be, yes.

25            MISS PEEBLES:  Your Honor, at this time I'd

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross                    1213

```
 1  like to offer Defense Exhibit O-33.
 2              MR. LOVRIC:  Can I voir dire, Judge?
 3              THE COURT:  Yes, you may.
 4  VOIR DIRE EXAMINATION
 5   BY MR. LOVRIC:
 6      Q    Who posted these things?
 7      A    The people who are listed there.
 8      Q    Which is whom?  Who are those people?
 9      A    People that I know from -- that I have on MySpace
10  as friends.
11      Q    Okay.  Was any of it posted by yourself?
12      A    No.
13      Q    Did Shannon see any of this stuff?
14      A    I don't know.
15      Q    Did she ever indicate to you whether she saw it?
16      A    No.
17      Q    Did you know whether or not she accessed your site
18  other than sending you a message or an e-mail?
19      A    I have no idea.
20              MR. LOVRIC:  I object, Judge.
21              THE COURT:  Sustained.
22   BY MISS PEEBLES:
23      Q    I want to talk about Shannon's being prone to
24  suggestion.  Do you understand?
25              MR. LOVRIC:  Judge, I'm going to object.  I
```

Elizabeth Chesebro - Recross                    1214

1  haven't objected so far, but I think this is way beyond any

2  redirect or re-redirect, so I think we've gone into an area

3  I'm not sure anybody's covered, but it certainly wasn't

4  covered by me or Mr. Fischer.

5                  MISS PEEBLES:  Your Honor --

6                  THE COURT:  Yes.

7                  MISS PEEBLES:  He was trying to get

8  Mrs. Chesebro to talk about whether something was consistent

9  with what -- with what Shannon had said, and I'm getting into

10  areas that he specifically covered on his redirect

11  examination.

12                  THE COURT:  Well, I'll have to hear what

13  you're going to say because I don't know what you're going to

14  ask.  Go ahead.

15  BY MISS PEEBLES:

16      Q    When you were asking questions to Shannon O'Connor

17  concerning the information that she was writing on this note

18  about a shower and candles and that sort of thing, do you

19  remember that?

20      A    No, I don't.

21                  THE COURT:  Government's 111, are you talking

22  about?

23                  MISS PEEBLES:  Yes.

24      Q    Government's 111?

25      A    Can I see that to recall what the number is?

Elizabeth Chesebro - Recross

1      Q     The document attached to the November 6 suicide

2   note.

3      A     Okay.  I know what you're talking about.  I didn't

4   know what 111 was.

5      Q     Now, Shannon was asked specific questions about the

6   use of a camera.  Do you remember that?

7      A     Yes.

8      Q     And you said was there a tripod or someone said --

9   Detective Blenis asked was there a tripod and she said yes,

10  is that correct?

11     A     If I recall correctly, I know there was discussion

12  about a tripod or something the camera may have been set on.

13     Q     She was asked that question.  You don't remember

14  that?

15     A     Not right now, I don't.

16     Q     When she was asked about questions describing men

17  at the Best Western, you said did he have glasses and she

18  said uh-uh, do you remember that?

19     A     If that was part of the video, it's been a while

20  since I reviewed the video.

21     Q     You asked did he have any tattoos, she says uh-uh,

22  then she says a Chinese symbol?

23     A     Yes.

24     Q     Any time that you asked her a question that

25  contained an answer, she agreed with you, is that fair to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth Chesebro - Recross

1216

1    say?

2        A    Based on those two examples, that would be

3    consistent.

4        Q    Now, Shannon is a pretty strong, wild young lady,

5    is that fair to say?

6        A    It's an accurate representation.

7        Q    And you referred to her a couple times as a tough

8    cookie.  You refer to her in that way, is that fair?

9        A    Yes.

10       Q    Now, she tells you that when she's 11 and a half,

11   almost 12, her mom starts coming into the bathroom while

12   she's taking a shower.  That's what she told you, correct?

13       A    Yes.

14       Q    She tells you at that point her mom comes in,

15   doesn't say anything, and just starts sexually abusing her.

16   That's what she says, right?

17       A    Yes.

18       Q    And then at some point she says, I was going to run

19   away but the windows were painted shut.  She said that,

20   right?

21       A    Yes.

22       Q    Now, Shannon had no trouble walking out of the

23   house any time she felt like it, is that fair to say?

24                MR. LOVRIC:  Judge, I object.  This is more

25   like summation argument.  I object because this is way beyond

1    redirect -- or recross, I should say.  I'm sorry.

2                   THE COURT:  Yeah, I think it's pretty far

3    afield.  We have been covering a lot of topics.  It may not

4    have been brought up in redirect.

5    BY MISS PEEBLES:

6        Q    As far as Shannon being alienated from her mother,

7    Shannon had no idea what was going on between you and your

8    supervisors concerning the contact with her mother, is that

9    fair to say?

10       A    She knew that -- that she was being told that she

11   wasn't to have contact with her mother.

12       Q    But did she -- but you didn't discuss with her the

13   conversations you were having with your supervisor, correct?

14       A    No.

15       Q    In fact, that wouldn't be reflected in any of your

16   notes?

17       A    What do you mean?

18       Q    In your case notes.  You didn't notate anything in

19   there about discussions you had with Shannon concerning

20   meetings with your supervisor and her not being able to have

21   contact with her mother?

22       A    It wasn't just between my supervisor and I.  That

23   was a team effort.

24       Q    Okay.  So the team effort was never talked about

25   with Shannon, is that fair to say?

Elizabeth Chesebro - Recross                              1218

1     A    No, that's not fair to say.  She was aware that it

2  was not felt to be in her best interest because of her recent

3  disclosures and her unstable mental state.

4     Q    Shannon didn't know her mom tried to send her those

5  letters, did she?

6     A    No.  We established that yesterday.

7     Q    Well, it's about whether Shannon knew what was

8  going on.  That's what I'm asking you about.  Shannon didn't

9  know --

10    A    Whether the child knew everything that was going on

11 in her case --

12    Q    Correct?

13    A    No.

14    Q    Of course not.  Is that fair to say?

15    A    Yes.

16    Q    So as far as Shannon knew, her mom just didn't care

17 anymore, is that fair?

18              MR. LOVRIC:  Objection.

19              THE COURT:  Sustained in that form.

20              MISS PEEBLES:  No further questions.

21              THE COURT:  Mr. Lovric.

22              MR. LOVRIC:  I am going to be very brief,

23 Judge, but there's a couple things I want to go back to.

24              THE COURT:  I think from anybody's standpoint

25 I think we pretty much exhausted this witness' --

Elizabeth Chesebro - Recross                    1219

1            THE WITNESS:  Thank you, Judge.

2            THE COURT:  So please make it very brief.

3            MR. LOVRIC:  I will, Judge.  I'm not going to

4    go into anything I've covered already.

5            THE COURT:  Then how can it be redirect?

6            MR. LOVRIC:  Only things Miss Peebles or Mr.

7    Fischer just talked about which I didn't in any way talk

8    about.

9            THE COURT:  All right.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REDIRECT EXAMINATION

2     BY MR. LOVRIC:

3        Q    Miss Peebles asked and you said -- I'd just like to

4    have you clarify that at some point you learned that Linda

5    O'Connor had told Shannon that in case of an emergency to

6    contact Dean Sacco?

7        A    Yes.

8        Q    When did you learn that from Shannon?

9        A    I learned that around the time that we were

10   conducting the controlled phone calls.

11       Q    And then if I heard you correctly, you told Miss

12   Peebles that in Shannon's phone was programmed Dean Sacco's

13   number, and who was it that either programmed that phone

14   number in her phone or had her do it?

15       A    Linda.

16       Q    And at the time that the taped conversations were

17   made, March 14 and March 15 between Shannon and Dean Sacco,

18   you were present?

19       A    Yes.

20       Q    After that did you become involved in any way in

21   the criminal investigation being conducted by law

22   enforcement?

23       A    I think that's a difficult question to answer

24   because we do have a team approach through the

25   multidisciplinary team.

Elizabeth Chesebro - Redirect                    1221

1    Q    Let me rephrase it.

2    A    Yeah, thank you.

3    Q    Miss Peebles talked to you about why you didn't go

4  out and interview Renee Lang?

5    A    Correct.

6    Q    Did you ever go to Renee Lang after those March 14

7  and March 15 telephone calls?

8    A    No, I didn't.

9    Q    Why?

10    A    That wouldn't have been my responsibility at that

11  point in time.

12    Q    Who was going to go and interview Renee Lang?

13    A    That wouldn't have been the department's

14  responsibility.  That would be up to law enforcement.

15    Q    Okay.  That's the reason why you didn't go and

16  interview Renee Lang?

17    A    Yes.

18    Q    Miss Peebles asked you if you believed Shannon

19  about the sexual assault and sexual abuse allegations.  Do

20  you remember your answer?

21    A    That we don't question children disclosures.

22    Q    What do you mean by that?

23    A    Although it's important to evaluate the child's

24  ability to give a valid statement, my job is to protect the

25  children.  It's not to question their every action, their

Elizabeth Chesebro - Redirect

1    every statement and/or degrade their disclosure.  It's not my

2    role.

3        Q    And what is your role with respect to children that

4    reveal sexual abuse or sexual assaults upon them?

5        A    That disclosure is then discussed with law

6    enforcement and they conduct their investigation.

7        Q    And as far as your continued work with that child,

8    what is your primary goal after a child reveals that kind of

9    information?

10       A    It varies from case to case.  It can be from

11   anything, making sure they're comfortable in their current

12   setting or not having any adverse reactions to having

13   disclosed such traumatic events.

14       Q    Okay.  And then you leave the other part to law

15   enforcement and the criminal courts?

16       A    Yes.

17       Q    Miss Peebles asked you about Miss Myrick, if you

18   knew of her reputation.

19       A    Yes.

20       Q    Do you remember that question?

21       A    Yes, I do.

22       Q    You had left messages for the pastor Miss Myrick to

23   call you?

24       A    Yes.  At some point I did.

25       Q    She never called you back?

Elizabeth Chesebro - Redirect                    1223

1    A    I never heard from her.

2    Q    Did you know what type of relationship Linda

3  O'Connor had with Pastor Myrick?

4    A    Only in what was reported to me.

5    Q    By whom?

6    A    By Linda and Shannon.

7    Q    What did Linda O'Connor tell you about her

8  relationship with Pastor Myrick?

9    A    I was under the impression that it was her pastor

10  as well as -- I don't know if friend is the right word.  I

11  can't speak on behalf of either one of them.  But I was given

12  the impression that Pastor Myrick was a support to Linda and

13  Shannon both and that Linda sought her out as necessary when

14  she was living in that area.

15    Q    You got that impression from speaking to Linda

16  O'Connor?

17    A    Yeah.

18    Q    Do you personally know whatever happened to Linda

19  O'Connor's first husband, Walter Burkett?

20    A    No.

21    Q    Did she ever talk about Walter Burkett?

22    A    I don't believe.

23         MISS PEEBLES:  Judge, I'm going to object.

24  This is beyond the scope.

25         THE COURT:  Yeah, it sounds like it is to me

Elizabeth Chesebro - Redirect                1224

1    too.

2                   MR. LOVRIC:  I put a note down when they asked

3    her about --

4                   MISS PEEBLES:  I never asked her.

5                   MR. LOVRIC:  Mr. Fischer.

6                   THE COURT:  Mr. Fischer never did.

7                   MISS PEEBLES:  No.

8                   MR. LOVRIC:  I'll move on, Judge.

9     BY MR. LOVRIC:

10        Q    You didn't allow Ray O'Connor to have contact by

11   mail or otherwise communications with Shannon until the

12   court, Family Court judge decided that there was going to be

13   allowed mail contact, is that correct?

14        A    Yes.

15        Q    And then my last question is:  Exhibit 111?

16        A    I think I do recall what 111 is, though.

17        Q    It always seems to disappear.  Can you see that?

18        A    Yes, I can.

19        Q    That's the two-page note, document that was faxed

20   to you?

21        A    Yes.

22        Q    Mr. Fischer asked you about that.  I just want to

23   put it up on the screen.  We see a date of 11/7/07, 4:24.

24   That's the date this was sent to you, right?

25        A    Yes.

Elizabeth Chesebro - Redirect                    1225

1    Q    And I asked you, and yesterday you pulled this out

2  of your file that you have with you?

3    A    Yes.

4    Q    So this isn't the document that was sent to the

5  government or this court, this is a document that came out of

6  your file?

7    A    Yes.

8    Q    Okay.

9              MR. LOVRIC:  That's all I have, Judge.

10              THE COURT:  Okay.  Mr. Fischer.

11              MR. FISCHER:  Nothing further, your Honor.

12              THE COURT:  Miss Peebles.

13              MISS PEEBLES:  Nothing further.  Thank you.

14              THE COURT:  Thank you, Miss Chesebro.  You may

15  step down, ma'am.

16              THE WITNESS:  Thank you.

17              (Witness excused)

18              MR. LOVRIC:  Next witness we call is Renee

19  Lang.

20              THE COURT:  Okay.

21              THE CLERK:  Ma'am, please state your name for

22  the record.

23              THE WITNESS:  Renee Lang.

24

25

Renee Lang - Direct

1  R E N E E   L A N G, having been called as a witness, being

2  duly sworn, testified as follows:

3              THE COURT:  Okay, Mr. Lovric.

4  DIRECT EXAMINATION

5  BY MR. LOVRIC:

6      Q    Good afternoon, Miss Lang.

7      A    Good afternoon.

8      Q    I'll just ask you to try to use the mike just so we

9  can all hear you, okay?

10     A    Okay.

11     Q    Miss Lang, for the members of the jury, could you

12  just again please tell us and tell them your full name and

13  just the county that you reside in.

14     A    My full name is Renee Marie Lang and I reside in

15  Broome County.

16     Q    And Miss Lang, about how old are you right now?

17     A    I'm 65.

18     Q    And Miss Lang, I'd like to talk about a number of

19  persons that I'll bring to your attention and a number of

20  events, but I'd like to start by asking you, do you know a

21  person named Linda O'Connor?

22     A    Yes, I do.

23     Q    Do you see Linda O'Connor in court today?

24     A    Yes, I do.

25     Q    Can you just tell us where she's sitting, just for

Renee Lang - Direct

1    the record.

2        A    She's sitting out there.  She just raised her hand.

3            MR. LOVRIC:  Okay.  Indicating defendant

4    O'Connor.

5        Q    Miss Lang, how long have you known Linda O'Connor?

6        A    I would say approximately -- well, a long time, but

7    we became really friendly for about four, five years maybe.

8        Q    Okay.  When you say you've known Miss O'Connor a

9    long time, how far back?  When would you say you got to know

10   her?  How old was she when you got to know her or knew of

11   her?

12       A    I believe she was about 13 and I knew her through

13   her mother Betty.

14       Q    You knew Linda O'Connor's mother as well?

15       A    Yes, I do.

16       Q    And when you met Linda O'Connor and her mother, in

17   what area, by locale?  Was it New York State, was it

18   somewhere else that you got to know them?

19       A    It was upstate here, in Deposit, New York.

20       Q    Okay.  And did you know whether or not Linda

21   O'Connor and her mother had moved from any other area to the

22   Deposit, New York area?

23       A    I don't believe so.  Betty showed up first and then

24   she got Linda.

25       Q    Okay.  Now, did you ever know Linda O'Connor's

Renee Lang - Direct

1  father?

2      A    No.

3      Q    Never met him, didn't know who he was or anything

4  like that?

5      A    No.

6      Q    And the time that you knew Linda O'Connor, was it

7  always in the Deposit, New York area?

8      A    Yes.

9      Q    And during those earlier years, if I can put them

10  that way, did you -- did you know Linda and Betty well or

11  just knew of them and who they were?

12     A    I knew them both very well.

13     Q    Now, at some point, to your knowledge, did Linda

14  O'Connor get married to a person named Walter Burkett?

15     A    Yes, she did.

16     Q    Were you there?

17     A    Yes, I attended the service.

18     Q    Where was that?

19     A    I think it was in East Branch or Fishs Eddy.  I'm

20  not quite sure.  I'm saying more East Branch.

21     Q    Okay.  Whereabouts is that, just approximately?

22     A    That's on Route 17 east of Binghamton, past

23  Hancock.

24     Q    Okay.  And did you know Walter Burkett that she was

25  marrying?

Renee Lang - Direct

1      A     No, I did not.  I met him at the wedding and that

2  was -- that was it.

3      Q     Okay.  And do you know whether or not Linda had a

4  son named Walter Burkett Jr.?

5      A     Yes, she did.

6      Q     And approximately how old was Linda when that

7  occurred?

8      A     Oh, wow.  I'm not sure.  She came to Deposit and

9  she was already pregnant with the baby.  But I'm not -- I'm

10  really not sure.  I'm going to say about 17, 18.  Right

11  around in there.

12      Q     Okay.  And did you know Linda in the first few

13  years of Walter Burkett Jr.'s birth?

14      A     No, I hadn't seen her.

15      Q     Okay.  So after this wedding you really didn't have

16  much contact with her for a while?

17      A     No.

18                MISS PEEBLES:  I'm going to object, your

19  Honor.  Relevance.

20                THE COURT:  I don't see any relevance.

21                MR. LOVRIC:  Just setting background, Judge.

22                THE COURT:  How far back are we going to go

23  for background?

24                MR. LOVRIC:  I'll move forward.

25                THE COURT:  Okay.

Renee Lang - Direct

1    BY MR. LOVRIC:

2        Q    Miss Lang, at the time of the things that we just

3    discussed, at that time were you married?

4        A    Yes, I was.

5        Q    Who were you married to?

6        A    George Lang, Sr.

7        Q    And how long were you married to George?

8        A    Forty-six years.

9        Q    And the place where you and your husband resided,

10   was it in the Deposit, New York area?

11       A    Yes, it was.

12       Q    Okay.  Has it always been pretty much in that area?

13       A    Yes.

14       Q    Now, I'd like to talk about a time frame that talks

15   and deals about Linda O'Connor residing at 44 Pine Street in

16   Deposit, New York.  Did you know Linda at that time?

17       A    Yes, I did.

18       Q    Who else was residing at 44 Pine Street with Linda

19   O'Connor?

20       A    Her daughter Shannon.

21       Q    And about how old approximately would you say

22   Shannon was when she and Linda were at Pine Street, just an

23   approximation?

24       A    Nine or ten.

25       Q    Okay.  And at that time, being when they resided at

1    Pine Street, were you attending any church service, places in

2    Deposit, New York?

3        A    The Assembly of God church in Deposit, New York,

4    yes.

5        Q    And who was the pastor at that church?

6        A    Reverend Katherine Myrick.

7        Q    Now, has she been the pastor there for quite some

8    time?

9        A    Yes, she has always been the pastor there.

10       Q    Okay.  And at the time that Linda O'Connor was

11   residing at 44 Pine Street with Shannon, do you know whether

12   Linda O'Connor was attending the church of Pastor Myrick?

13       A    Yes.

14       Q    How do you know that?

15       A    I would go to church and I would see her there.

16       Q    And did you see Shannon with Linda O'Connor?

17       A    Yes, I did.

18       Q    And how would you describe the relationship or

19   friendship, if I can just call it, but how would you describe

20   that between you and George and Linda O'Connor at the time

21   that they were residing at 44 Pine Street?

22       A    We were friendly.  We did talk to each other.  We

23   did visit with each other and George did help her with her

24   computer.

25       Q    Okay.  When Linda O'Connor was living at 44 Pine

Renee Lang - Direct

1    Street, to your knowledge did George ever go over there and

2    visit Linda at that address?

3         A    Alone?

4         Q    With -- alone or with you?

5         A    With me, yes, we both did.

6         Q    What was the purpose to going to Pine Street?

7         A    To help her with her computer.  She was having

8    problems with it and George was kind of knowledgeable about

9    it.

10        Q    Okay.  Now, at that time did you know where Linda

11   O'Connor got her computer from?

12        A    She bought it from a friend of hers, from the

13   church.  Her name was Barbara Conway.  I think Barbara sold

14   it to her.

15        Q    At that time did your husband George already have a

16   computer?

17        A    Yes, he did.

18        Q    How would you describe George's interest in the

19   computer and computer kind of stuff?

20        A    For himself, he was in love with his computer.  He

21   knew everything about it and he enjoyed it.

22        Q    How were you with computers?

23        A    Totally ignorant.  I hated the computers and that's

24   it.

25        Q    So you didn't know much about them then.  Do you

Renee Lang - Direct

1   know much about them today?

2        A    No, I do not.

3        Q    Okay.  And how often would you say George, with

4   you, would go over to Pine Street to help Linda out with her

5   computer?

6        A    I'd say at least three or four times a week, yes.

7   Yes.  He would teach her how to use the computer and do

8   different things.

9        Q    And at that time did you, from time to time, did

10  you see Shannon around at Pine Street?

11       A    Yes.  But most of the time Shannon was at the

12  school.

13       Q    Okay.  So this would be like during the week?

14       A    Yes.  Yes.

15       Q    Okay.  And during that time when Linda O'Connor

16  lived at Pine Street did Linda O'Connor and Shannon ever come

17  to visit you and George at your place?

18       A    Yes, they did.

19       Q    How would you describe Shannon at that time, at

20  that age?

21       A    At that age she was just a typical little girl.  In

22  love with her dolls.  Just a little girl.  And she was, you

23  know, really happy, that I could see anyway.

24       Q    Okay.  Seemed like a well-adjusted, regular kid?

25       A    Yes.  Yes.

Renee Lang - Direct

1234

1    Q    And you said she was in school at the time that you
2    and George sometimes would go to Linda O'Connor's place?
3    A    Most of the time, yes.
4    Q    Okay.  Did you get any sense -- when they would
5    come to visit at your house, did you get any sense how
6    Shannon was performing or doing in school?
7    A    Shannon was having trouble in school but she was
8    struggling to try and make it.  She was really lax on
9    performing homework, chores and things like that.  She had no
10   interest I think at that point.
11   Q    Okay.  Did she ever express to you or in front of
12   you needing help or needing somebody to help her out with
13   homework and things like that?
14   A    Yes.  We both did, Linda and I.
15   Q    Okay.  And the visits by Linda O'Connor and Shannon
16   to your house when they were living at Pine Street, this
17   would occur on the weekends?
18   A    Yes, it would.  Normally on a Friday and they would
19   go home on a Monday after church.
20   Q    So they would stay over at your house sometimes?
21   A    Yes.
22   Q    Stay overnight?
23   A    Yes.
24   Q    Now, when George, your husband, was helping Linda
25   O'Connor with her computer, did you know whether or not at

Renee Lang - Direct

1  any point they would communicate via computer?

2      A    Yes, they did.  They used to send little e-mails

3  and pictures and different things to help Linda and to, you

4  know -- whatever they do.  They'd talk back and forth, yes.

5  That was e-mails.

6      Q    Okay.  Now, did you -- at some point did you know

7  that -- whether Linda O'Connor moved to another location,

8  another place after Pine Street?

9      A    Yes, she did.  She moved to River Street.

10     Q    Okay.  And then who resided at the River Street

11 house with Shannon?

12     A    Linda and Shannon.

13     Q    So just the two of them again living at that place?

14     A    Yes.  Yes.

15     Q    Now, at Pine Street you indicated that Linda

16 O'Connor had a computer.  Do you know if she had a computer

17 at River Street?

18     A    Yes, she did.  She took the computer with her.

19     Q    The one that she had at Pine Street?

20     A    Yes.

21     Q    And do you know if at any point while she's living

22 at River Street did she acquire a second computer?

23     A    Yes, she did.

24     Q    Where did that one come from?

25     A    It came from Staples or Circuit City.  One of those

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct                                    1236

1    stores, yes.

2         Q    Okay.

3         A    It was brand new.

4         Q    Okay.  How do you know she bought a second

5    computer?

6         A    We went with her.

7         Q    When you say we?

8         A    My husband and I.

9         Q    Okay.  And why did George come along when Linda

10   O'Connor went to buy another computer?

11        A    Because he knew about computers, and I was no help,

12   of course, and him and Linda got together and spoke to the

13   people and they got the best computer I think that would suit

14   Linda.

15        Q    Okay.  And then at the River Street house did Linda

16   have both of those computers, the new one and older one?

17        A    Yes.  To my knowledge she gave the old one to

18   Shannon.

19        Q    The one that used to be at Pine Street?

20        A    The old one, yes.

21        Q    And did you know whether, from the 11 River Street,

22   whether Linda O'Connor and George communicated via computers?

23        A    Yes, they did.

24        Q    And did you know whether or not Linda O'Connor and

25   George would send each other pictures over -- through the

1    computer?

2        A    Basically, yes.  It was -- George was very, very

3    interested in his Native American things, and at that point

4    in time they were exchanging pictures of flags and stuff like

5    that.

6        Q    Okay.  Did you learn whether they were exchanging

7    other kind of photographs at some point?

8        A    Eventually, down the road, yes.  My husband was

9    into porn and so was Linda, so they would send porn pictures

10   back and forth.

11       Q    Okay.  So they began to e-mail each other

12   pornography?

13       A    Yes.  Adult pornography.

14       Q    These were things at some point you saw on the

15   computer?

16       A    George tried to show them to me but I wasn't very

17   interested.  I blocked off that computer completely.

18       Q    Were there times that you were present at your

19   house when George would be on the computer with Linda and

20   they were talking back and forth on the computer?

21       A    I'm confused here.  Now she would send him e-mails

22   or would they both be together at my house?

23       Q    Okay.  Maybe I wasn't clear on the question.  I

24   guess my question is:  Were you ever present in the area in

25   your house where the computer was?

Renee Lang - Direct                                    1238

1       A    Yes.

2       Q    And were you ever present when George is actually

3   sending Linda something on the computer and getting something

4   back?

5       A    Yes.  Yes.

6       Q    Okay.  And were some of those things that were

7   going back and forth pornography photographs?

8       A    Adult pornography and adult jokes, yes.

9       Q    I'd like to talk briefly about the computer that

10  George had.  Where in your house was that computer located?

11      A    That was placed in the living room.

12      Q    Okay.  And you indicated you didn't know much about

13  computers.  Did you even know how to turn the computer on?

14      A    No.  No, I'm sorry, I didn't.

15           THE COURT:  We're going to break for lunch

16  now.  Be back at 1:30.

17           (Lunch break taken)

18           MR. FISCHER:  We have Miss Lang's diary.

19  Actually, I don't know if the witness should be here.  I

20  should have raised it earlier.  I'm sorry.

21           THE COURT:  Well, she can step outside for a

22  minute.

23           MR. FISCHER:  If you wouldn't mind.

24           THE COURT:  Would you step outside.

25           THE WITNESS:  Okay.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct                    1239

1           (Witness excused temporarily)

2           MR. FISCHER:  Thank you, your Honor.  The

3    prosecution has provided us with a copy of Miss Lang's

4    diaries.  In an entry dated 9/29/06, Miss Lang expresses her

5    opinion, and I quote, "I honestly feel she," being Shannon,

6    "has been molested by someone."  I just want to, in advance

7    make sure that that opinion, unless it's for some purpose

8    other than to show that she was in fact molested by someone,

9    does not be presented to the jury.

10          THE COURT:  Mr. Lovric.

11          MR. LOVRIC:  Judge, I thought the diary would

12   come in, but I thought part of what we were doing with

13   Elizabeth Chesebro was bringing in opinions of hers or her

14   belief or not belief of Shannon and what happened to Shannon

15   and those kind of things, and I thought that was already over

16   as far as the defense was concerned.

17          THE COURT:  We're dealing here with a lay

18   opinion, Mrs. Lang's lay opinion.  She's not being produced

19   as an expert.  The statement read to you by Mr. Fischer is

20   based upon her observation.  If she had said in that diary, I

21   think Shannon has been struck because I see a bruise, that

22   would come in.  But molested has a lot of components in it

23   that the average person, to look at someone or observe them,

24   unless there's certain predicates, wouldn't be able to form

25   that opinion.  Now if those predicates are here, they're

Renee Lang - Direct

1    going to come in later.  I don't know what's going to happen.

2              MR. LOVRIC:  The only thing that I point out

3    is, Liz Chesebro was a lay witness.  She's not an expert.

4              THE COURT:  Because people didn't object,

5    witness is being from one evidence, doesn't mean that rule of

6    evidence and people can't object to something the next

7    witness is going to say, does it?

8              MR. LOVRIC:  No, Judge.  I agree with you.  I

9    don't think -- I don't have any problem with that standing.

10   What I do, defendant Sacco, through Elizabeth Chesebro, went

11   into things she did or didn't believe with Shannon --

12             THE COURT:  If some of those things were

13   inadmissible opinions, then an objection could have been

14   raised and the Court could have ruled on it.  The Court can't

15   look inside your head and say, you know, this isn't right.

16   I'm not going to say anything, maybe the judge will sustain

17   me.

18             MR. LOVRIC:  My point is, the defendant waived

19   that objection.

20             THE COURT:  Where does this waiver stuff come

21   in?  Show me the rule of evidence, somebody waiving their

22   right to make an objection from another witness, even the

23   same witness.

24             MR. LOVRIC:  If the defendant brings it out,

25   initially, and then we go back to that same topic and the

1  defendant objects, he can't object to something that he

2  injected into the trial, that he disclosed to the jury.  It's

3  a common sense rule, Judge.  I mean, otherwise the defendant

4  could get up and artfully get out of the witness what he

5  wants and then when the government wants to go back to that

6  same topic, I object because that didn't come in.

7              THE COURT:  This isn't at all like that

8  situation, is it?  If the diary does come in, that statement

9  can be redacted.  Unless somebody can elicit why Mrs. Lang

10 had that opinion, it's based upon observations she made of

11 Shannon.

12             MR. LOVRIC:  Well, it is based upon her

13 conversations with Shannon.  I mean, she just didn't dream it

14 up.  In the diary she said she discussed it with Shannon.

15             THE COURT:  Maybe we ought to bring her in and

16 have a proffer before we get the jury in.

17             MR. LOVRIC:  I can show you the diary.  I

18 don't know if that helps.  I know defense has copies of it.

19             THE COURT:  Not going to help.  I want to know

20 what Mrs. Lang said about how she formed that opinion.

21 That's what the rule says, doesn't it?

22             MR. LOVRIC:  Yes.  That's correct.

23             THE COURT:  Let's get her on the stand.

24             (Jury excused)

25             THE COURT:  All right.  Mrs. Lang, in your

Renee Lang - Direct

1    absence Mr. Fischer informed the Court that there may be an

2    introduction into evidence of a diary that you kept at one

3    time or another and in that diary we -- the Court was told

4    that you expressed an opinion that you had a belief that

5    Shannon was molested.

6                    THE WITNESS:  Yes.

7                    THE COURT:  The Court wants to know, what was

8    the basis for that belief?

9                    THE WITNESS:  Okay.  It was from her actions

10   in the way she would go around rubbing her stomach and trying

11   to, you know -- just her actions.  I could tell there was

12   something deep rooted and wrong.  I had known Shannon for

13   many years and she was never like that.  When she came to me,

14   she was very secretive and she was really nervous and she

15   would rub her stomach, want to watch the baby programs, like,

16   you know, Bringing Home Baby and stuff like that, and I

17   wasn't too thrilled about that, but she insisted that it

18   would help her to get through school, sex education class, so

19   I agreed.  I said, that's fine.  I watched a movie with her

20   on Lifetime about an underage child who got pregnant and had

21   a baby and she got very emotional and ran in her bedroom.

22                   THE COURT:  Okay.  Well, you can ask -- you

23   can tell us all the things you just said, but that opinion is

24   not admissible.

25                   MR. LOVRIC:  I don't know if the Court

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    wants --

2                    THE COURT:  You can.

3    BY MR. LOVRIC:

4        Q    Hi, Miss Lang.

5        A    Hi.

6        Q    During the time that Shannon was with you in August

7    of '06 until about October 11 of '06 --

8        A    Right.

9        Q    -- did Shannon ever tell you anything regarding --

10   either anything regarding Mr. Sacco or anybody else, about

11   being afraid or in any way being or any way characterize

12   anything of a sexual nature about those persons?

13       A    A sexual nature, no.  But she did tell me she

14   didn't like him.  She was afraid of him.  She didn't want him

15   around.  She resented him.  And she was afraid at one point

16   when she came to me that Linda and him were going to come and

17   take her away and bring her back to Norwich.  And I told her

18   no, that the courts gave her custody to me and that nobody

19   was going to come and hurt her or harm her in any way.

20                    MR. LOVRIC:  Can I ask her about a note that

21   she made in her diary, Judge?

22                    THE COURT:  Yes, you can.

23       Q    I read in your diary you indicated that Shannon had

24   said something to the effect that --

25                    MR. FISCHER:  Can we have a date?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1           MR. LOVRIC:  Of the diary?

2           MR. FISCHER:  Yes.

3           MR. LOVRIC:  I'll have to find it.  I believe

4    it's under 9/29.  I'm just trying to find it, Miss Lang.

5           THE COURT:  Okay.

6           MR. LOVRIC:  I can't find the entry, Miss

7    Lang.

8    BY MR. LOVRIC:

9       Q    My question was:  Do you remember whether Shannon

10   told you anything to the effect that Mr. Sacco was a pervert?

11      A    Once she got there, yes, she did.  She said he was

12   a pervert and she hated him and she didn't want to be around

13   him.  That was all she said.

14          MR. LOVRIC:  That's all I have, Judge.

15          MR. FISCHER:  Your Honor, may I please?

16          THE COURT:  I'm sorry?

17          MR. FISCHER:  May I briefly ask the witness a

18   few questions please?

19          THE COURT:  Sure.

20   BY MR. FISCHER:

21      Q    Ma'am, you've reviewed your diary?

22      A    Yes.

23      Q    Did you also review the statement that the FBI took

24   March 3 of 2008?

25      A    No, I did not, but my children did.

Renee Lang - Direct

```
 1       Q    Would it surprise you if I told you that in your

 2   diary there's nothing mentioned about Mr. Sacco or him being

 3   a pervert but in the March 3, 2008 report by Mr. Lyons that

 4   that is mentioned?  Would that surprise you?

 5       A    No.  Because she did say, and I probably omitted it

 6   from the diary because I kept the diary at the end of the

 7   day.

 8                 MR. FISCHER:  For the record, your Honor, I'd

 9   like to mark the exhibits and offer them for this purpose

10   only if there was a question as to what was said in the diary

11   and what was said in the FBI report.  Because I read the

12   diary.  It doesn't say anything about the subjects Mr. Lovric

13   asked about.

14                 THE COURT:  It's going to depend on how those

15   questions and issues come up.  Certainly keep your options to

16   do that.  Mr. Lovric, are you all set?

17                 MR. LOVRIC:  Yes, Judge.

18                 THE COURT:  Want to bring the jury in please,

19   Colleen.

20                 (Jury present)

21                 THE COURT:  Okay.  Mr. Lovric.

22   DIRECT EXAMINATION CONTINUED:

23    BY MR. LOVRIC:

24       Q    Good afternoon, Miss Lang.

25       A    Good afternoon.
```

Renee Lang - Direct

1    Q    Try to speak into the microphone.

2    A    Good afternoon.

3    Q    Thank you.  That's better.  Miss Lang, when we

4    broke for lunch, we were talking about George's computer.

5    You indicated that it was in the living room area of the

6    residence?

7    A    Yeah.

8    Q    Can you just basically describe the residence at

9    the time that we're talking about, your residence where the

10   computer was and -- where were the other rooms in relation to

11   the computer?

12   A    Okay.  The living room was where the computer was.

13   It was my chair, the computer, and a big round sofa.  Okay.

14   Then there was a hall that led down to the back bedroom, to

15   the back bathroom, and then to a bedroom right off the hall.

16   And the kitchen area, right off the living room was my

17   bedroom, the laundry room and my personal bathroom.

18   Q    Okay.  And how many bedrooms were there?

19   A    Three.

20   Q    Okay.  And where was the third bedroom, if I can

21   call it that?

22   A    Okay.  It would be my bedroom, the middle bedroom,

23   and I guess the bedroom that Linda and Shannon slept in would

24   be considered the third bedroom.

25   Q    Okay.  The bedroom that Linda O'Connor and Shannon

Renee Lang - Direct

1    would stay in, where was that bedroom in relation to the

2    bedroom that you would be in?

3         A    The other end of the house.

4         Q    So on opposite ends of this long hall?

5         A    Yes.  Yes.  It was separated by the living room,

6    the kitchen and my bedroom.

7         Q    Okay.  So they're on opposite ends, I take it?

8         A    Yes.

9         Q    And the living room is somewhere in the middle?

10        A    Yes.

11        Q    The computer that was in the living room, to your

12   knowledge, did George allow anybody else to use that

13   computer?

14        A    No.  That was his baby and nobody was to touch it.

15        Q    Did you ever see anybody use his computer or go on

16   his computer?

17        A    No.

18        Q    Did he make it clear to you that nobody else was to

19   touch that?

20        A    Yes.  That was his.

21        Q    To your knowledge, did he have any password or

22   passwords needed to get on the computer?

23        A    The only password I could think of that he did use

24   quite frequently would have been "Halfbreed".

25        Q    Okay.  And how did you know that or how did you

1  come to learn that?

2      A    He always used "Halfbreed" for everything, and I

3  think he once told me, because he wanted to teach me the

4  computer, and he says, you have to have a password.  Mine's

5  "Halfbreed".  And I told him I didn't want any part of the

6  computer so I didn't worry about a password.

7      Q    Okay.  The computer that was in your living room,

8  were you ever -- were you ever there when George was on the

9  computer?

10     A    Yes.

11     Q    Did he spend a lot of time on the computer or a

12  little bit?  How would you describe it?

13     A    A great deal of time.  It was his pastime, his toy,

14  his baby, yes.

15     Q    How would you describe the amount of time that

16  George spent on the computer communicating with Linda

17  O'Connor?

18     A    I do believe that they spoke mostly in the evenings

19  during the week.  Sometimes during the day but mostly

20  evenings.

21     Q    When you say they spoke, what do you mean they

22  spoke?

23     A    Sent e-mail messages back and forth.

24     Q    Okay.  Once in a while or was it a lot?

25     A    Oh, they contacted each other quite a bit, yeah.

Renee Lang - Direct

```
 1     Q    Now, the -- the computer that Linda O'Connor had,

 2  the two computers that we talked about at the River Street

 3  residence, did you actually see those computers there?

 4     A    Yes, I did.

 5     Q    Did you ever go over to River Street to visit Linda

 6  O'Connor?

 7     A    Yes, I did.

 8     Q    Would George go with you or would you go sometimes?

 9     A    Yes, I did.  George did come with me.

10     Q    Okay.  Did you ever go there without George to stop

11  in on her?

12     A    Once in a while, if George was busy doing

13  something.  Yeah, he would leave me there and I would visit,

14  we'd have coffee or iced tea or whatever.

15     Q    Okay.  You say "we," you and Linda O'Connor?

16     A    And Shannon probably too at that point.  Because it

17  was late in the day most likely.

18     Q    Okay.  Did you ever -- in visiting Linda O'Connor

19  at the River Street residence, did you ever observe or talk

20  to her about her financial situation?

21     A    We did to a certain percentage, yes.  Yes.

22     Q    Okay.  Did you make any observations about Linda's

23  finances and how she was doing or getting along or able to

24  get along financially?

25     A    I think she was really struggling and having some
```

Renee Lang - Direct                           1250

1   problems.

2       Q    What makes you believe that?

3       A    Well, they would turn off her TV, they would turn

4   off her telephone.  They would turn off her computer and she

5   would go to another computer company.  Things like that.

6       Q    In the time that you were visiting her, did you

7   ever see mail or late notices or did she ever talk to you

8   about those kinds of things?

9       A    No.  I don't believe really she did.  She might

10  have mentioned it, but I never saw the notices.

11      Q    Do you know whether the place she was staying at,

12  River Street, was she renting or did she own that?

13      A    She was renting the downstairs apartment.

14      Q    Okay.  Do you know whether she had any difficulties

15  paying that rent?

16      A    Yes, she did.

17      Q    How do you know that?

18      A    Because she got a 30-day notice or 32-hour notice

19  or something like that.

20      Q    A notice for what?

21      A    To pay the rent or get out, you know.  This was it.

22  But she did have problems with paying the rent.

23      Q    Okay.  That notice, was that some type of eviction

24  notice that she got?

25      A    I guess.  If I recall, the landlord himself brought

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    it over to Linda and handed it to her.

2         Q    Okay.

3         A    So it was kind of a thing, you know, get out or pay

4    me.

5         Q    Now, did you -- from time to time when George would

6    go with you to Linda's -- at the River Street place, did you

7    and George from time to time drive Linda around or take her

8    places she needed to go?

9         A    Yes, we did.  Yes.

10        Q    Was that something that was frequent or just once

11   in a blue moon?

12        A    Oh, no.  We always drove around together to the

13   stores and stuff like that.

14        Q    How did Linda and -- Linda O'Connor, how did she

15   and George get along at this time when she's living at River

16   Street?

17        A    They got along very well.

18        Q    Very good terms?

19        A    Very good terms, yes.

20        Q    Now, did you ever -- did you ever go to River

21   Street and observe Linda or Shannon in any state of undress?

22        A    Yes.

23             MISS PEEBLES:  Objection.  Leading.

24             MR. LOVRIC:  I'll rephrase it, Judge.

25        Q    Miss Lang, could you tell us what you know about

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    Linda O'Connor and Shannon being in a state of undress, if

2    you know anything about it?

3         A    One day when I went in -- and normally the door was

4    open.  Like she'd come to my house, knock on the door, walk

5    in.  Well, I knocked on the door and I walked into her

6    apartment and they were totally nude, and I kind of screamed

7    and hollered about that and spoke to her about that, you

8    know, at least lock your door.  You know, don't walk around

9    nude with the door open, or unlocked, I should say.  And they

10   did get dressed, they put on some underclothes at that point.

11   And after that the door was always locked, so I don't know

12   whether they were walking around in just their underwear, no

13   clothes.

14              MISS PEEBLES:  I will object, your Honor.

15   Objection.

16              THE COURT:  The last part, door was locked,

17   that can stand.

18        Q    This event when you went over to Linda O'Connor's

19   residence, you walk in and she is completely naked?

20        A    Her and Shannon, yes.

21        Q    And Shannon, completely naked.

22        A    Yes.

23        Q    And Linda O'Connor was about how old at that time?

24        A    Oh, I don't know how old she was.  Shannon was,

25   well, 9 or 10.  I don't know how old Linda was at that point.

Renee Lang - Direct

1    But it was a very warm apartment.  Very little ventilation.

2    The landlords did not let them open the windows so she had

3    fans, and it was during the summer.

4        Q    Okay.  When you walked in on this occasion, where

5    was Linda when you first saw her naked, where was she?

6        A    In the living room.

7        Q    Where was Shannon?

8        A    I believe Shannon was in the kitchen.

9        Q    And did Linda say anything about what they were

10   doing or -- when you walked in?

11            MISS PEEBLES:  Objection.

12       A    No.

13            MISS PEEBLES:  Your Honor --

14       A    No.

15            THE COURT:  Overruled.

16       Q    And then after that, after that event, were you

17   able to ever walk in on your own?

18       A    No.  They did keep the door locked.

19       Q    Now, when Linda O'Connor lived at the River Street

20   residence, were there times on weekends that she and Shannon

21   would come to your and George's house and spend the weekend

22   and spend the night, overnights?

23       A    Yes, Friday, Saturday and probably half a day on

24   Sunday because we would take her home after church.

25       Q    Where would Linda O'Connor and Shannon stay at

Renee Lang - Direct                                    1254

1    night in your residence?

2        A    That would be in the back bedroom, the third

3    bedroom we were talking about.

4        Q    Okay.  And in relation to your bedroom again, where

5    is that bedroom that they were staying in?

6        A    They're at opposite ends of the house.

7        Q    Okay.  Now, at that time, Miss Lang, what was your

8    medical condition like around that time when they were coming

9    and spending weekends?

10       A    I was having a lot of emotional problems.  I was

11   dealing with diabetes very badly and it wasn't under control.

12   Emotional stress because of the fact that, you know, I

13   couldn't get my sugar under control and I couldn't eat

14   certain foods.  I had to take certain medicines and -- it

15   really upset me at that point in time.  One time I really,

16   really did get very sick and they wound up putting me on a

17   nerve medicine to calm me down.

18       Q    Okay.  At that time were there ever occasions when

19   you would -- in the evening hours when you would stay up with

20   George and Linda O'Connor and Shannon in the living room area

21   when you would be sitting around watching television or just

22   be kind of hanging out in the living room?

23       A    Yeah.

24            MISS PEEBLES:  Objection.  I'd like a

25   foundation, time frame, Judge.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1255

1    THE COURT:  Can you give us a time frame.

2    MR. LOVRIC:  I guess let me rephrase that,

3  Miss Lang.

4    Q    What I'm trying to ask you is, at the time when

5  Linda O'Connor's living at River Street, you indicated from

6  time to time on weekends she would come over to your and

7  George's place and stay over the weekend?

8    A    Yes.

9    Q    Okay.  On occasions when they did that, while they

10  were living at River Street but coming to stay at your place

11  on weekends, were there times when all of you'd be gathered

12  in the living room, just kind of hanging out?

13    A    Yes.

14    Q    And what would happen towards the evening hours to

15  you as far as your being able to stay awake and kind of hang

16  around with them?

17    A    No.  I was still having problems with my sugar and

18  my high blood pressure and George would always encourage me

19  to stay awake, stay awake.  About 9, 9:30 at night my eyes

20  would just close and I'd be a very bad snorer.  I could win

21  an award for snoring.  I'd wake myself up sometimes.  But

22  they would turn around and say, why don't you just go to bed,

23  and I took the advice and I did go to bed.

24    Q    Were you a pretty sound sleeper?

25    A    Yes.  Yes.

Renee Lang - Direct

1256

1    Q    When you would go off to bed where would George,

2  Linda and Shannon be?

3    A    In the living room, probably on the sofa.  George

4  would sit at the end, Shannon would kind of maybe sit in the

5  middle, and Linda would lie on the other end there with a

6  pillow, and sometimes Shannon would lay on the floor with a

7  pillow.  It was a very big sofa.  It was curved.

8    Q    Okay.  I take it, due to your condition as you

9  described and medications, you would pretty much be out of it

10  once you went to bed?

11    A    Exactly.  I would fall asleep, not hear a thing.

12    Q    Now, Miss Lang, at some point in time during the

13  time that Linda O'Connor is at the River Street residence,

14  did there come a point when you learned something about Linda

15  O'Connor to be adopted by George?

16    A    Well, Linda had initiated an adoption process that

17  she wanted us, my husband and I, to adopt her and Shannon.

18  My husband was all for that and I was kind of for that myself

19  at that point.  Because she had nobody that really cared.  No

20  friends, no family, and she wanted to be part of a family and

21  so did Shannon.

22    Q    So this adoption idea was whose idea?

23    A    Linda's, and we were agreeable to it.

24    Q    How did you first learn about it?  From whom did

25  you first learn about it?

Renee Lang - Direct                                    1257

1      A     Linda and George and I talked about it.

2      Q     Okay.  At that point in time, does Linda have any

3   other family members in the area anywhere that you're aware

4   of?

5      A     I think her son was living in Binghamton at that

6   point in time but they had no contact with each other, and I

7   believe her mother was living in Newark -- New York City.

8   Other than that, no, I don't believe there was any other

9   relatives.

10     Q     Okay.  And what was -- did the rest of your family

11  know about this adoption issue?

12     A     Yes, they did.

13     Q     You have family members?

14     A     I have seven children and grandchildren and they're

15  all married and out and on their own with their own families.

16     Q     And did your other family members talk to you about

17  this adoption thing?

18     A     They completely objected.  They did not like Linda.

19             MISS PEEBLES:  Judge, I'm going to object.

20             THE COURT:  Sustained.

21     Q     How did that adoption thing work out?  What

22  happened to it?

23     A     It just went away by itself.  It never took place.

24  We never did adopt her or Shannon, and as far as I know,

25  according to what Linda had told me, she couldn't afford to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    pay the lawyer fee so she never did get adopted.

2        Q    The sending and e-mailing of pornography between

3    George and Linda O'Connor, was that something that was

4    frequent and usual when they were communicating with each

5    other?

6        A    I don't really know, to be honest.

7                MISS PEEBLES:  I'll object, your Honor.

8                THE COURT:  Hold on a second.

9                MISS PEEBLES:  Objection.

10               THE COURT:  What's the basis?

11               MISS PEEBLES:  The characterization of usual.

12   Foundation.

13               THE COURT:  Well, yeah.  Rephrase it.

14               MR. LOVRIC:  I'll rephrase it.

15   BY MR. LOVRIC:

16       Q    Miss Lang, the sending of pornography back and

17   forth, how often did that happen, if you know?

18       A    Honestly, I do not know.  When he was on the

19   computer, I just kind of built an imaginary wall between him

20   and I because I didn't approve of pornography, and him and

21   Linda did this, it was something that they shared, but I

22   don't know how often because I wasn't watching the computer.

23       Q    Miss Lang, did Linda O'Connor at some point talk to

24   you about obtaining a sex toy?

25       A    Yes.

Renee Lang - Direct

1    Q    And can you tell us how that happened.

2    A    Basically, Linda had talked to George about sex

3    toys.  This was the male organ kind of a sex toy, and she had

4    expressed a desire to have one, and she said she was too

5    embarrassed or ashamed to go into the novelty store to buy it

6    herself.  And she really wanted one.  And so one day when we

7    went to Binghamton, my husband did pull into the novelty

8    store and buy her the sex toy, the male organ.

9    Q    Did somebody give that sex toy a name?

10   A    Linda called it "Georgie Boy".

11   Q    And during the time that Linda O'Connor and

12   Shannon -- at any time during the time Linda O'Connor and

13   Shannon stayed at your residence, did you become aware

14   whether Linda O'Connor had used that sex toy in the presence

15   of Shannon?

16   A    Yes.  Shannon came out one day.

17              MISS PEEBLES:  Objection, your Honor.

18              THE COURT:  Sustained.

19              MR. LOVRIC:  Could I ask why, Judge?

20              THE COURT:  This is a conversation she's

21   reporting that Shannon told her these things.

22              THE WITNESS:  Yes.

23              MR. LOVRIC:  It's not being offered for

24   whether it happened.  It's being offered to the state of mind

25   of Shannon when she testifies about certain things that she

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct                                    1260

1   did, that were brought up by the defense, I might add, with

2   Elizabeth Chesebro.

3                  MISS PEEBLES:  Judge, it's hearsay.

4                  THE COURT:  Well, if it's not being offered

5   for the truth of the matter like some of the things that were

6   offered before, if it's being offered to show what the

7   witness' state of mind was at the time, then it can come in

8   for that purpose only.  And that's all the jury can consider

9   it for.

10  BY MR. LOVRIC:

11       Q    Answer.

12       A    Yes.  She did use the sex toy down in the bedroom.

13  Shannon was there sleeping in the other bed, and then one day

14  Shannon came out and she looked like she was death warmed

15  over.  She was so tired.  I said, are you sick?  Don't you

16  feel good?  She says, no, I'm fine, Grandma, but Mommy had me

17  up all night playing with Georgie Boy and I didn't get any

18  sleep.

19       Q    That was in the bedroom that they shared?

20       A    Yes.  Yes.

21       Q    During the time that Linda O'Connor and Shannon

22  visited on weekends at your residence, did you ever see

23  anyone provide any alcohol to Shannon?

24       A    One night when we bought the computer, the second

25  computer, the new computer.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    Q    For Linda O'Connor?

2    A    Yes.  Linda bought that computer.  She went across

3  the street and we both walked into the liquor store and she

4  bought this bottle of vodka.  At that point in time she

5  brought it home and I think George was making screwdrivers at

6  that point.  I had one and him and Linda had a few, and

7  Shannon expressed a desire to have one, and I believe it was

8  Linda that got up and made her a very weak vodka and orange

9  juice drink.  I kind of objected.  I was told to shut up,

10  mind my own business, that Shannon was her daughter and that

11  she would do what she wanted.  And I turned around, finished

12  my drink and went to bed.

13    Q    Did you at that point know whether or not Shannon

14  had been given alcohol on prior occasions prior to that

15  event?

16    A    No.

17    Q    Miss Lang, do you recall the flood approximately in

18  June of 2006?

19    A    Yes.

20    Q    I take it that area was fairly heavily damaged and

21  flooded, generally, the locale in that area?

22    A    Deposit, yes, it was.

23    Q    And did you -- did you learn or did you know where,

24  immediately after the flood, where Linda O'Connor and Shannon

25  went to live?

Renee Lang - Direct

1    A    They went to stay with a friend called Pat who was

2  on Front Street, and then during the course of the middle of

3  the night, the boats came and had to take Pat and her

4  children and her dog and Linda and Shannon, and I believe

5  they went to Assembly of God Church where the Red Cross had

6  set up a meeting place, you know, with food, clothes, coffee,

7  things like that.

8    Q    And after the initial flood, that couple of days,

9  do you know where Linda O'Connor and Shannon went to reside

10 or stay for the short term?

11   A    Well, she supposedly, I heard -- now her and I were

12 not to --

13         MISS PEEBLES:  Objection.

14         THE COURT:  Sustained.

15   Q    Miss Lang, at some point did you have any

16 discussions with George about them coming to stay or live

17 with you?

18   A    Yes.  He wanted me to call them up to tell her to

19 stay with us because they were homeless, pictures of

20 furniture floating in a house on TV is exactly what happened.

21   Q    What did you say to that?

22   A    And I said no.  I had two other family members who

23 were standing with no home, no nothing, and I was not going

24 to take Linda and Shannon in at that point.  I said no.

25   Q    What was George's reaction to that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    A    He was angry about it and we did argue, but -- I

2  won and they were not invited.

3    Q    Now, Miss Lang, George passed away at some point,

4  is that correct?

5    A    July 20, 2006.

6    Q    And was that approximately about a month or so

7  after the flood that we just talked about?

8    A    Yes.  Yes.  I believe the flood was the 6th of June

9  and George passed away on the 20th of July.

10   Q    Now, just prior to the passing away of George and

11 the flood, prior to that time frame, what was the

12 relationship like between Linda O'Connor and George?

13   A    We had differences, and at that point in time I do

14 not believe Linda and Shannon or George were talking to each

15 other.  Something happened and they split their friendship.

16   Q    About approximately -- if you can put a time frame,

17 about how long prior to -- if I can use the flood as a

18 guiding post, about how long prior to the flood of '06 in

19 June did this relationship between Linda O'Connor and George

20 dissipate or end?

21   A    Okay.  Flood was in June.  I'm saying around March,

22 maybe April.  Right around in there someplace.

23   Q    Of that some year, '06?

24   A    Possibly even after the first of the year.

25   Q    Okay.  So --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct                               1264

1     A     There was months that they didn't talk, that we had

2   no contact with them.

3     Q     So a number of months?

4     A     Yes.

5     Q     A few months, several months, whatever?

6     A     Right, right.

7     Q     A fair characterization.  Just several months,

8   approximately?

9     A     Right.  Right.

10     Q     Do you know what happened, what caused this?

11     A     Rift between George and Linda?

12     Q     Yes.

13     A     No.  They had their own private argument, but I had

14   broken my relationship with Linda before that.

15     Q     Okay.  So, prior to that, you and Linda O'Connor

16   were not on good terms?

17     A     We were not really talking, friendly or anything

18   like that.

19     Q     Why's that?

20     A     We had gotten into an argument at my house in my

21   kitchen.  I just don't remember what the argument was about,

22   but it was a very heated argument and she turned around and

23   slapped me in the face.  And I got very angry about that.  I

24   mean, this is my house, I opened it to you in friendship, you

25   slap me in the face.  So I turned around, I had groceries on

Renee Lang - Direct

1    the table and I had yogurt, slammed it on her head, smacked

2    her around my kitchen, smacked her into the living room, and

3    that was basically my break with Linda.

4         Q    Was George present when this happened?

5         A    Yes.

6         Q    What was his reaction?

7         A    I think he was in a state of shock because I had

8    never ever gone after anybody.  It's just not my nature.  And

9    I was angry.  He separated us, and Linda did apologize, but

10   it didn't really make a difference.  I was very annoyed by

11   the fact that she could turn around and slap me in the face.

12        Q    And that's when pretty much you and she stopped

13   speaking?

14        A    Yeah.  We broke our relationship.  It drifted off

15   right after that, yes.

16        Q    Now after that event, did Linda O'Connor and

17   Shannon continue on some occasions to come to your residence?

18        A    That's a good question.  I think they did.  I think

19   they did because George kind of smoothed it over.

20             MISS PEEBLES:  Objection, Judge.

21             THE COURT:  Hold on.

22             MISS PEEBLES:  Objection.

23             THE COURT:  To what?

24             MISS PEEBLES:  I think I did -- it's

25   speculation.

Renee Lang - Direct

1266

1    THE COURT:  She can tell us what she knows

2    about it.  Right.  She can't speculate.

3    BY MR. LOVRIC:

4    Q    To the best of your knowledge?

5    A    I do believe that she did visit a few occasions

6    after that, yes.

7    Q    Why or how was it that she would come?

8    A    Because George really had a friendship with her,

9    and his childhood and her childhood were kind of similar, you

10   know.  Neither one of them finished school.  He had no

11   friends.  His family was just his mother and father and he

12   didn't get along with his brothers and sisters.  So, he felt

13   alone like she did.  And as far as having friends, there

14   wasn't many, you know, so he really kind of felt sorry for

15   her and he could relate to how she lived and what she was

16   going through.

17   Q    Did you at any point suspect that George had a

18   relationship with Linda O'Connor?

19            MISS PEEBLES:  Objection.  Objection.

20            THE COURT:  Sustained.

21   Q    Were you ever present when anyone talked to George

22   about this issue?

23            MISS PEEBLES:  Objection.

24            THE COURT:  Sustained.

25            MR. LOVRIC:  Judge, I'm offering this for a

Renee Lang - Direct

1    purpose related to the charges in the case.

2              MISS PEEBLES:  It's hearsay.

3              THE COURT:  You're offering it for the truth,

4    aren't you?

5              MISS PEEBLES:  Yes.

6              MR. LOVRIC:  I'm sorry?

7              THE COURT:  You're offering it for the truth,

8    are you not?

9              MR. LOVRIC:  No.  But I'd be willing to

10   explain at side-bar.

11             THE COURT:  You're going to have to because I

12   don't understand it.

13             (At the bench)

14             MR. LOVRIC:  Shannon is going to testify that

15   she caught George and Linda in sexual activity and Shannon's

16   going to testify that it was following that she then was

17   brought into -- by Linda and George into sexual activities,

18   and part of why she was brought in is because Shannon

19   believed because she -- her mother and George were in a

20   relationship, that it was expected of her to come in and to

21   do whatever it is that the two of them wanted.  So -- and the

22   other part is -- I'm sorry.  Go ahead.

23             THE COURT:  It seems to me that that's -- even

24   though these things may be linked together in a fashion, what

25   George told her about having sex with Linda, I'm not sure how

Renee Lang - Direct

```
1    that implicates -- unless you've got some direct evidence of
2    that from Shannon, which you do have, right?
3                    MR. LOVRIC:  Shannon will say that.
4                    THE COURT:  I don't see how that you're not
5    offering it for the truth of what occurred because you're
6    using that as a predicate to show why Shannon came in when
7    she did and how she did.
8                    MR. LOVRIC:  Right.  It's Shannon's state of
9    mind when she first became involved in the sexual activity
10   that Shannon believed and felt that these two were in a
11   relationship already and then through her mother she was
12   required to partake in that relationship.  That's correct.
13                   MISS PEEBLES:  And that's still hearsay and we
14   still have a rule of evidence --
15                   THE COURT:  Well, yeah, they do, but if it's
16   being offered for the state of mind only.
17                   MISS PEEBLES:  Anything could be argued it's
18   for state of mind.
19                   THE COURT:  You frequently argue with that.  I
20   appreciate that.
21                   MR. LOVRIC:  I think I said that earlier in
22   one of my objections.
23                   MISS PEEBLES:  But actually, your Honor, the
24   only allegation comes from Shannon herself, and Shannon --
25   and anything else is pure speculation, and we know, because
```

Renee Lang - Direct

1   we spoke to Renee about this, it's all speculation on her

2   part.  She has no idea.  That's the bottom line.  I think

3   it's misleading and I don't think it's fair.

4              THE COURT:  What do you anticipate the witness

5   is going to say to answer the question?

6              MR. LOVRIC:  She was present when her son

7   confronted George and they had a heated argument over it.

8   And George denied it.  But it was the way that the event

9   occurred that was in my mind telling.  But you know what,

10  Judge, I'll move on, you know what, because it's not worth

11  it.  I'll move on.  I'm sorry I wasted everybody's time.

12             (In open court)

13  BY MR. LOVRIC:

14      Q    Miss Lang, after your husband passed away in July

15  of 2006, did there come a point in time -- let me first ask

16  you, after July of '06 did Linda O'Connor ever come to your

17  residence again to visit?

18      A    No.

19      Q    And then did there come a point in time after July

20  of 2006 that you ended up taking Shannon in to live with you?

21      A    Yes.

22      Q    Okay.

23      A    It was around the middle of August.

24      Q    Of the same year?

25      A    Yes.

Renee Lang - Direct

1    Q    And how do you recall that occurring, that she came

2  to live and stay with you for a while?

3    A    Chenango Social Services Family Services called me

4  and told me they had taken Shannon away from Linda, and I

5  guess it was at Shannon's request that she wanted to come and

6  stay with me because she had to give them my name, my

7  address, my phone number, and that's how they contacted me.

8    Q    And did she -- did she end up coming and staying

9  and living with you sometime in August of '06?

10    A    For approximately six weeks, yes.

11    Q    Do you recall about when was it until she remained

12  in your custody and lived with you?

13    A    Until Family Court was -- I think it was somewhere

14  in October.  11th, 12th, right around in there.

15    Q    Okay.  Same year, 2006?

16    A    2006, yes.

17    Q    Okay.  And at the time that Shannon was going to be

18  coming to live with you, stay with you in August of 2006, did

19  you actually go to Family Court sometime in August of 2006?

20    A    Yes, I think I did, where they gave me full custody

21  of Shannon.

22    Q    Okay.  And that was in some kind of a court

23  setting?

24    A    Yes.  Yes, it was.

25    Q    And at that time when Shannon came to live with

Renee Lang - Direct

1271

1    you, via the court, family, did you know much, if at all,

2    about what had happened with Shannon in the weeks or month or

3    so preceding that?  Did you know much about that or any of

4    that?

5         A    No.  She never shared any of the issues and

6    problems that were going on up in Norwich.  I have no

7    knowledge of any of it.

8         Q    Did Social Services provide you any information or

9    tell you anything that had been taking place in Shannon's

10   life?

11        A    No.  Just they took her away from Linda for

12   neglect.

13        Q    Did they get specific about what it was about?

14        A    No.  Well, she wasn't caring for her.  That was all

15   I knew.

16        Q    Now, do you recall the first day that Shannon came

17   home with you?

18        A    Yes, I do.

19        Q    Can you describe that day, what was she like?

20        A    Well, she was very happy.  She come running up to

21   me and gave me a hug and saying to me, she says, you know

22   that I can stay with you, Grandma, I want to stay with you.

23   I want to live with you.  And, you know, I was happy.  Then

24   when we got in the house, she was telling me that she hated

25   her mother.  She hated Mr. Sacco.  She didn't want to be

Renee Lang - Direct

1  around him, that he was a pervert, and her mother, she

2  resented her mother terribly because of the fact that Mr.

3  Sacco --

4          MISS PEEBLES:  Objection.

5          THE COURT:  Sustained.

6          MR. LOVRIC:  I'm offering the statement

7  Shannon made at the time that they were made to establish her

8  state of mind when she comes into this witness' custody.

9          THE COURT:  You asked what was Shannon like,

10  that was your question, and she began by describing Shannon's

11  happiness and how she hugged her and came in the house, and

12  now she is beginning without a question to tell us statements

13  that were made by the witness.

14          MR. LOVRIC:  All right.  Judge, I'll ask a

15  question.

16          THE COURT:  That would be a good idea.

17          MR. LOVRIC:  Thank you.

18  BY MR. LOVRIC:

19      Q    That first day when Shannon came to live with

20  you --

21      A    Yes.

22      Q    -- and after you brought her to the house, did she

23  describe or tell you what it was that occurred and why she

24  was happy to be with you?

25      A    Actually she did not describe any of the goings-on

Renee Lang - Direct                                    1273

1  up in Norwich.  As I said before, I had no knowledge but she

2  was very depressed, very emotional, glad to be with me, of

3  course, and she just kept saying, if my mother --

4              MISS PEEBLES:  Objection, your Honor.  It's

5  hearsay.

6              THE COURT:  Being offered for the state of

7  mind of Shannon O'Connor.

8              MR. LOVRIC:  Yes.

9              THE COURT:  For that purpose only.

10  BY MR. LOVRIC:

11      Q    Go ahead, Miss Lang.

12      A    Okay.  She told me if her mother thought that Mr.

13  Sacco was going to take care of her and babysit her while her

14  mother had gone to the hospital -- I believe at that time

15  Linda was sick and going to the hospital -- her mother was

16  crazy.  She says, I'm not going to stay with that man.  He is

17  not going to babysit me.  I'd sooner run away or I'd sooner

18  kill myself.

19      Q    Did she say why?

20      A    She did not like Mr. Sacco and she was very

21  emotional about it when she showed up on my doorstep.  I

22  believe she would have really tried to kill herself because

23  she was already slicing her arm, slices.  She was harming

24  herself, so that's how depressed and emotional this child

25  was.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    Q    Did she say anything about Mr. Sacco as far as what

2   he was or what she believed he was?

3    A    She hated him.

4         MR. FISCHER:  Objection, Judge.

5         THE COURT:  Overruled.

6    A    She hated him.  She despised him.  And she was

7   afraid of him, basically.  She was very afraid of him.  She

8   was so afraid that Linda and him would come to my place of

9   residence and take her away and take her back.  And I said,

10  no, no, they're not going to do that.  You're safe with me

11  and they can't come here.  And she kind of started to relax

12  with the fact that nobody was going to bother her.

13   Q    Now, during the time that Shannon was with you,

14  living with you for the time that we described, did you keep

15  a diary, a daily diary of events and ongoings specifically

16  directed towards keeping a record of how Shannon was doing

17  and what she was doing?

18   A    Yes, I did.

19   Q    And do you remember at some point the FBI coming to

20  your house?

21   A    That was February.

22   Q    Not when.  Do you remember the FBI --

23   A    Yes.  The FBI came knocking on my door.

24   Q    Did you give them that diary?

25   A    At that time -- well, first it was the State

Renee Lang - Direct

1   Police, the investigators that came to my door.  After that

2   it was Mr. Lyons and Terry Schultz.  At that point in time,

3   yes, I did give them the diary.

4        Q    Okay.  I'd like to show you what's been marked

5   as -- or what I'm going to mark as Government's 113,

6   Miss Lang.  Could you just take a look at that and tell me if

7   you recognize that.  You can open it up if you need to.

8        A    Yes.  This is my diary and I wrote all these things

9   in here.

10       Q    Okay.  And did you write the things -- did you

11  write those things in that diary sometime around the time

12  that they're happening, either on that day or soon

13  thereafter?

14       A    Yes, I did.

15       Q    And the things that you wrote in your diary, did

16  you also put dates on them?

17       A    Yes, I did.

18       Q    And the dates that are in that diary, are those

19  dates that reflect the dates that Shannon was living with you

20  during this time between August and October of 2006?

21       A    Yes.

22       Q    And the things you wrote down, are they true and

23  accurate?

24       A    Yes.

25                 MR. LOVRIC:  Your Honor, I would offer

Renee Lang - Direct

1    Government's 113 in evidence.

2                     MISS PEEBLES:  No objection.

3                     MR. FISCHER:  Subject to what we discussed

4    earlier, your Honor.

5                     THE COURT:  Yeah.  The Court will receive

6    Government's 113 subject to redaction.

7                     You can keep that.  They'll probably ask you

8    some questions about it.

9    BY MR. LOVRIC:

10        Q    Miss Lang, what I'd like to do now is, I have the

11   diary in my hand and I'd like to read certain select portions

12   and then ask you some questions, if I may.

13        A    Surely.

14        Q    I'm going to read from page 1, date August 22.  It

15   reads as follows:  "Shannon had a good night.  Ate French

16   toast for breakfast.  Commented," and then you have

17   quotations, "'It's good to have food to eat again.'"  End of

18   quotation.  "Said she did not like the landlord.  He stays "

19   -- you know, I can't make this word out.  Can you help me?

20   Could you ask the girls to please give me my glasses?  I

21   cannot read without them.  I don't think yours are going to

22   do it.

23        Q    Is it a family member?

24        A    Yes.

25        Q    I'm sorry.  This word right there.

Renee Lang - Direct

1    A    "He stays overnight."  He was supposed to stay with

2  her overnight the day her mother was taken to the hospital.

3  "Said no way was she going to stay overnight with him.  Also

4  she said she had the best night's sleep she has had in a long

5  time.  Seemed a little depressed this evening.  Said they're

6  going to have a family night at the Y."  She was going to a

7  youth camp up in Norwich with the YWCA, whatever it was.  "I

8  said I would go and she asked Kelly to go with me."  Kelly

9  being my other daughter-in-law.  "And she said that her and

10  the girls would like to go.  We watched Jaws Revenge, a

11  movie.  She got very tired and went to bed at 8:00."

12    Q    So this is -- this is your entry on August 22 --

13    A    Yes.

14    Q    -- relating to what Shannon says about Mr. Sacco?

15    A    Yes.

16    Q    And this is in August, so it's been how long would

17  you say that she's been at your house at this point, about?

18    A    Probably one night.  I think she came on the 21st

19  and I started the diary I think on the 22nd.

20    Q    Okay.  I'd like to now read an entry made on

21  September 10, and about halfway through the entry, Miss Lang,

22  it says the following:  "Linda left messages that she was

23  very sick.  Wanted us to take the dog back while she was

24  going to the hospital.  The second message she left she said

25  the vet was taking the dog.  We tried to call her but we got

Renee Lang - Direct

1  no answer.  I called Lourdes Hospital to see if she was

2  there.  They said no.  I tried Chenango Memorial, they also

3  said she was not a patient there either.  Linda is noted for

4  phony illnesses, being sick for attention.  Maybe she is.  We

5  will have to wait to hear from her.  Shannon does not seem

6  upset."  And you go on to talk about a movie that you and she

7  watch.  Was Linda calling when Shannon was living with you?

8  Was she calling you?

9       A    Yes.  She was permitted phone calls and I had to

10  supervise the phone calls.  The social worker said, okay,

11  Linda was granted visitations at one point and, yes, she did

12  call Shannon, but I had to supervise the phone calls, and

13  that was a nightmare and a half because I would be accused of

14  all sorts of things, cursed at, hollered at, accused of

15  trying to steal her daughter from her.  At one point in time

16  she was so angry with me and she screamed in the phone and

17  told me to get F-U-C-K-E-D.  I hung up the phone at that

18  point.

19          Next time she called, I told her, you know, this is

20  a privilege I am permitting you.  This is my house, this is

21  my telephone, and if you can't respect that, I will not let

22  you call here and talk to Shannon anymore.  The reason I have

23  to monitor the phone calls is because Social Services, I had

24  to do that.

25       Q    And what was it that you were asked to monitor for

Renee Lang - Direct

```
 1   during these conversations between Shannon --
 2       A    Any kind of a problem or something that, you know,
 3   something secret that she would probably try to say to
 4   Shannon.
 5            MISS PEEBLES:  Objection.
 6            THE COURT:  This is something that she was
 7   told by some social worker?
 8            THE WITNESS:  Yes, your Honor.
 9            MR. LOVRIC:  As to why she needed to monitor
10   the phone calls.
11            THE COURT:  I'll sustain the objection.
12            THE WITNESS:  I was told.
13            THE COURT:  Hold on a second.
14            THE WITNESS:  I'm sorry.
15            THE COURT:  That's okay.  Mr. Lovric is
16   thinking of the next question to ask you.
17   BY MR. LOVRIC:
18       Q    I'm going to go to the next question, Miss Lang.
19   In fact, from your diary, September 13, it says:  "I finally
20   heard from Linda.  Very nasty attitude.  She says to me to go
21   get fucked."  You wrote that in there.
22       A    That's what I just said to you, yes, yes.
23       Q    "Wants to know why I am stealing her daughter.
24   Said she would tell everyone."  I'm going to ask you to read
25   this again.  I'm sorry.  Maybe you can read it.  I'm sorry.
```

Renee Lang - Direct

1    Why don't you read September 13 for us.

2       A    Okay.  "I finally heard from Linda.  Very nasty

3    attitude.  She told me to get fucked.  Wants to know why I am

4    stealing her daughter.  She said she would tell everyone how

5    bad and nasty George was to me and to the children.  George

6    was gone and I am not mean to Shannon.  She said she would

7    have her taken away.  And I am no good.  I will scream, I

8    will scream -- I will screen the phone calls and not talk to

9    her anymore.  I will let Shannon call her once a day.  I will

10   also monitor the phone calls."

11      Q    Okay.  Now, was this the typical -- was this the

12   typical ongoings between you and Linda O'Connor while Shannon

13   was living with you?

14      A    Yes.

15           MISS PEEBLES:  I'm going to object to the

16   phrase typical.

17           THE COURT:  Sustained.

18      Q    Miss Lang, why don't you tell us, during the whole

19   time that Shannon was living with you, what was it like

20   getting calls from Linda O'Connor?

21      A    She resented the fact that I had to monitor the

22   phone calls and she would just talk to Shannon, of course,

23   and tell her different things.  You know, they would talk

24   about things they were doing, and then she would really get

25   nasty about the fact that I had Shannon.  She wanted Shannon

Renee Lang - Direct                                    1281

1    to go to someplace else and -- let's see.  And the incident

2    we're talking about with the hospital, Linda was --

3                    MISS PEEBLES:  Objection, Judge.  It's

4    nonresponsive.

5                    MR. LOVRIC:  I'll go to the next question,

6    Judge.

7                    THE COURT:  Okay.

8     BY MR. LOVRIC:

9        Q    I'd like to read Miss Lang a notation on

10   September 25.  Shannon -- it reads:  "Shannon is still very

11   depressed and is also getting very snippy.  Talks to Linda

12   every day now.  She tells her about all the things she bought

13   for her and how much she misses her.  Tells her about all the

14   plans she has for her when she comes home.  I really think

15   she is trying to buy her back.  Linda has always done things

16   like that.  Never paid her bills but always got for Shannon.

17   Shannon in my opinion needs her mother's love and attention

18   and not all the material things she gives her.  She also says

19   she said some things because she was mad at her mom."

20            Then she writes -- excuse me, you write:  "She just

21   wanted to get even with her.  Shannon never says what was not

22   true or not.  She is really troubled and definitely needs

23   physical help.  She is very confused about her priorities."

24   Do you remember writing that?

25       A    Yes, I do.

Renee Lang - Direct

1    Q    Okay.  Now, what was going on with respect to Linda

2  and telling Shannon about these things that she's buying her?

3    A    Okay.  It was during visitations now that Linda was

4  permitted to have.  Naomi Panus was the social worker and

5  used to take Shannon up to visit her mom, and they used to

6  meet at McDonald's and Linda would give her little gifts at

7  McDonald's and things like that.  She was really trying to

8  encourage Shannon to come back to her, and at this point in

9  time I believe Shannon was missing her mother.  She was

10  getting concerned.  She missed her mother and she did want to

11  go back, which is a normal pattern for Shannon, you know, to

12  go back to her mother, but that's a child's thing.  Your

13  mother is your mother.  And so as a result, Linda used to

14  call her up and tell her, well, I bought you a beautiful

15  chair today.  I paid a hundred dollars for this chair.  It

16  was in the shape of a high heel with a sort of leopard skin

17  design on it.  And Shannon was excited about that.  I bought

18  you this, I bought you that.  Then she used to send her

19  packages in the mail of new clothes, sneakers, toys, cookies,

20  all sorts of things, and she used to get a package at least

21  once a week.  And like I said, I felt that Shannon needed her

22  love more than the material things, but this is the way Linda

23  was buying her back.  And that really upset me.  And then of

24  course -- well, ask me.

25    Q    Okay.

Renee Lang - Direct

1    A    Ask me about school.

2    Q    What about school?

3    A    Okay.  Thank you.  It seems that when she came here

4  in August, it was about two and a half weeks before school

5  started, okay.  Shannon had no clothes.  Nothing.  No school

6  clothes.  The school -- the clothes she came with were summer

7  clothes, but there was nothing for school.  And I discussed

8  it with the social worker, you know, how am I going to put

9  her in school?  I can't let her go like this.  So Naomi was

10  able to get a voucher from Family Services so that I could

11  buy her clothes to go to school with.  Sneakers, etcetera.

12  And that was fine, but the voucher wasn't going to come in

13  until about the third week of September.  Oh, I borrowed $200

14  from a family member and then I repaid them.  But what upset

15  me most was the fact that she was buying her all these other

16  things and sending her nice packages of good clothes.  I

17  mean, these were not cheap things that she sent her in the

18  mail, but why didn't she buy her school clothes to go to

19  school with?  This poor child didn't even have a pair of

20  socks.

21                MISS PEEBLES:  Objection.

22                THE COURT:  Sustained to that last part.

23  BY MR. LOVRIC:

24    Q    Miss Lang, did you notice what started to happen

25  with Shannon when she started to get all these gifts and all

1    these things from Linda O'Connor?

2         A    She was very happy.  Her mother was buying her back

3    and Shannon loved this kind of a response from her mother.

4         Q    And as a result of that did Shannon start to speak

5    to you about telling the Family Court judge to put her back

6    with her mother?

7         A    Yes.

8         Q    And what was -- what was that conversation like

9    with Shannon?

10        A    Well, it was her law guardian.  I guess she had a

11   law guardian.  And she had expressed a desire to go back to

12   her mother, and of course, I was going to Family Court that

13   day and Shannon wants to go with me and I was a little leery

14   about that so I sent her to school that day but I promised

15   her I would tell the judge that Shannon had expressed a

16   desire to go back to her mother.  And when we got to the

17   court, I did tell him that, and he felt that Linda was

18   complying with all the stipulations and rules that Social

19   Services has down for her, parenting classes, counseling,

20   etcetera, and he said, okay, she can go back to her mother,

21   and she was returned to her mother the same day.

22        Q    Okay.  Now, we've kind of leapfrogged over to

23   October of 2006.

24        A    Yes.

25        Q    Okay.  So my question, Miss Lang, is:  From the

1    time Shannon first arrived in your custody, August 22 of

2    2006, and then a short month later, the end of September

3    2006, has her desire changed 180 degrees as far as not

4    wanting to be at the address where Mr. Sacco is now to

5    wanting to be there?

6        A    Well, the judge had left specific orders that Mr.

7    Sacco was not to be present around her, have any kind of

8    contact or anything with Shannon.

9        Q    Okay.

10       A    And that was the condition of her going back with

11   her mother.

12       Q    Okay.  I guess my question is:  Did Shannon's

13   entire attitude change in that one-month period?

14       A    Yes.  Because her mother had bought her all sorts

15   of nice things and she felt, you know, well, okay, now I'm

16   going to get my things and I'm the center of attention.

17   Linda bought her three Halloween costumes.  What child needs

18   three Halloween costumes?

19       Q    Miss Lang, September 26 you write the following in

20   your diary.  I'll read and I'll ask you a question.  "My

21   daughter Linda."  Now, you have a daughter named Linda?

22       A    Yes, I do.

23       Q    So this is Linda your daughter you referenced?

24       A    Not Linda O'Connor.

25       Q    "My daughter Linda called me concerning the other

Renee Lang - Direct

1   night when we babysat.  Shannon was on the computer,

2   downstairs in the basement.  My daughter went into the

3   histories, histories.  Shannon was on an X-rated adult sites.

4   She was on instant messenger adult sites.  Pregnancy sites.

5   All porn sites that are very explicit about sex and sexual

6   sites.  She was also into pregnancy calendars, week-by-week

7   information on baby development and body changes for pregnant

8   women.  Linda," and then you have "(my daughter) and myself

9   talked to Naomi.  She said she would deal with this tomorrow

10  as she was taking Shannon to see her mom on a visitation.  I

11  noticed that Shannon did not have a period this month.  I

12  asked her about it.  Her answer was, oh, yes, I had it the

13  other day.  I never tell anyone about it, only my mom."  You

14  wrote that?

15       A    Yes, I do.

16       Q    What was it that happened at your daughter Linda's

17  house about the computer?

18       A    She went on the computer and she just did all these

19  things, and my daughter went back on the computer, all these

20  things came up in her face, you know, looking at this.  She

21  called me up and told me what Shannon had done and said that

22  Shannon was no longer welcome at her house, because I was

23  planning to spend the winter with my daughter.

24       Q    Okay.

25       A    And at that point in time if she did not go back to

Renee Lang - Direct

1   her mother, Shannon was going to be able to come with me.  It

2   would have been the same school district, the same everything

3   but a different address.  And Social Services said, that's

4   fine, no problem.  But after that, Linda got concerned for

5   her own family and said Shannon was no longer welcome, and I

6   didn't want to take the chance.  I knew she was having more

7   problems than I could deal with.

8       Q    This is Linda your daughter saying this?

9       A    Right.

10      Q    Okay.  And I take it that was upsetting to you?

11      A    Yes.  Yes.  I did discuss it with Naomi.  Shannon

12  did admit it to me she did that.  She also admitted it to

13  Naomi.

14      Q    Then on that note you write, September 27, diary

15  notation.  "Naomi picked up Shannon at school for a visit

16  with her mom.  She also confronted Shannon about the use of

17  the computer.  At first she denied it and then started crying

18  and told the truth.  Shannon knows she really caused a

19  problem now.  She said she learned about it on her mom's

20  computer," and then you have "(George my husband and Linda

21  were into these sites very badly).  Shannon asked me to

22  forgive her, to forgive.  I have, I do love her dearly."  So,

23  Shannon, when she was confronted initially, said nothing or

24  nothing happened, then broke down and began crying?

25      A    Then she did admit the truth, yes.

Renee Lang - Direct

1      Q     Were you there when this happened?

2      A     Not with Naomi, but she had admitted to me and then

3   she did admit to Naomi as they were going to Norwich for

4   visitations.

5      Q     When you talked to Shannon about it, did you just

6   outright come and ask her?  How did that go?

7      A     I approached her with it truthfully and she said

8   she was sorry and she wanted to call my daughter and

9   apologize and, you know, I said, look, it's too late.  And I

10  can't deal with it.  I'm going there for this winter.  I have

11  to.  I had just lost my husband.  And we're going to have to

12  take you back to Social Services.

13             MR. LOVRIC:  Just looking for something,

14  Miss Lang.

15     Q     I'm going to read a notation in your diary,

16  October 1.  "Today is a quiet day.  I do not feel very well

17  so we decided to stay in and watch --"

18             MR. FISCHER:  Can I have just one moment to

19  find the place, your Honor?

20             THE COURT:  Okay.

21  BY MR. LOVRIC:

22     Q     October 1, it reads:  "Today's a quiet day.  I do

23  not feel very well so we decided to stay in and watch TV this

24  morning.  We both watched TV all afternoon.  The sun is out

25  now so we will go out and clean the yard.  The bear was here

Renee Lang - Direct

1    and made a mess of our garbage.  We came in to have dinner.

2    Linda called again.  She told Shannon about all the things

3    she has for Shannon.  Shannon is very excited to go home.

4    Linda told her -- Linda told her to tell Naomi she wants to

5    see her mom more than once a week, also for more than an

6    hour.  Linda is telling Shannon to write a letter to the

7    judge about how much she misses her mom and wants to go back

8    home now.  Linda also told Shannon to tell the lawyer how

9    much she loves her mom and wants to go back home now.

10   Shannon thinks she is going home in November when I go to

11   live with my daughter.  Shannon went to bed early.  I made

12   her clean up her mess.  She does not -- she does get

13   resentful when I tell her to do things.  Will take her time

14   doing it."

15           So during those conversations on October 1 with

16   Linda O'Connor, Miss O'Connor is instructing Shannon to tell

17   the judge and these people about how she wants to tell them

18   that she wants to come back to Linda O'Connor?

19       A    Yes.  I did not let her write a letter to the

20   judge.  I did tell the judge.  I promised Shannon I would and

21   I did.  And as far as the law guardian or Shannon's guardian,

22   I believe Shannon told him herself.

23       Q    Okay.  Now do you recall an event on approximately

24   September 29 when you and Shannon were watching a movie and

25   then Shannon went into the bedroom and you eventually

Renee Lang - Direct

1    followed into that bedroom?

2         A    Yes, I do.

3         Q    Can you describe what happened.

4         A    It was a movie about an unwed mother and the father

5    of the baby didn't want any part of it and how she was

6    struggling to manage with the baby and how her parents kind

7    of resented her.  It bothered Shannon.  It bothered Shannon a

8    whole lot.  She ran in the bedroom, slammed the door.  I

9    waited a few minutes and then I went in and opened the door.

10   She had taken off all her clothes and was under the covers

11   fondling herself.  And I said, what are you doing?  And she

12   says, oh, I'm going to take a shower but I got cold so I went

13   under the covers.  Oh, okay.  Well, she came out about two

14   minutes later.  She had her pajamas on.  She never did take

15   her shower until the next morning.

16        Q    So you caught her in some fashion or another --

17        A    Fondling herself.

18        Q    -- sexually masturbating?

19        A    Something under the covers, yes, yes.

20        Q    Did you have any conversation with Shannon as to

21   where she learned to do things like that --

22        A    No.

23        Q    -- what possessed her to start doing that or

24   anything like that?

25        A    No.  And when I spoke to Naomi the social worker

Renee Lang - Direct                              1291

1    about it, she says that little girls --

2                    MISS PEEBLES:  Objection.

3                    THE COURT:  Sustained.

4        Q    Okay.  Miss Lang, now you wrote in the diary a

5    notation about -- and this is about -- this is specifically

6    on September 29.  You wrote in the diary that Shannon clings

7    to male members, male members of your family and is very

8    clingy to them.  Do you recall that?

9        A    Yes, I do.

10       Q    Can you tell us a little bit more about that;

11   describe that.

12       A    I really feel she was starved for a male figure in

13   her life.  She wanted affection more than buying purposes,

14   and whenever they came she would put her arms around them and

15   hug them and tell them she loved them and things like that.

16   Yeah, yeah.  She was very clingy.

17       Q    When you say male members of your family, you mean

18   like your sons?

19       A    Right.

20       Q    I take it it was your family members, right?

21       A    Yes.

22       Q    Did that make your sons and the persons very

23   uncomfortable?

24       A    Yes, it did, and they kind of, you know, pushed her

25   away.  Said, yes, I do love you and, you know, we can do

Renee Lang - Direct

1    things together.

2         Q    Did Shannon strike you at the time that she's with

3    you as a child who was just extremely wanting of emotional

4    and physical comfort?

5         A    Yes.  Yes, she did.  She was very insecure.

6         Q    Now, do you know a person named -- or do you know

7    of a person named Ray O'Connor?

8         A    Yes.  With Social Services, when I got custody of

9    Shannon, Linda had Ray O'Connor on the birth certificate as

10   the legal father.  So as a result Social Services wrote to

11   him and contacted him for support for his daughter, and I

12   received letters from him saying he was not the biological

13   father of Shannon, that only Linda knows who the real father

14   is, and that he wanted a test to prove that he was not

15   Shannon's father, and they never did that.

16        Q    I'd like to show you what's marked as Government

17   Exhibit 112.  I just want you to take a look at it first.

18   First tell me if you know what it is, or do you recognize it?

19        A    Yes.  This is one of the letters that I got from

20   Ray O'Connor.  There was two.  I misplaced or lost the other

21   one.  But yes, this is one of the letters that he wrote to

22   me.

23        Q    And do you recall about when it was that you got

24   that letter from Ray O'Connor?

25        A    I guess it's August -- end of August, according to

Renee Lang - Direct                          1293

1    the date, yeah.

2        Q    Is this during the time that Shannon is living and

3    residing with you?

4        A    Yes.

5                  MR. LOVRIC:  Your Honor, I would offer

6    Government's Exhibit 112.

7                  MISS PEEBLES:  Objection.

8                  THE COURT:  Sustained.

9                  MR. LOVRIC:  Can we have a side-bar, Judge?

10                 THE COURT:  Yes.

11                 (At the bench)

12                 MR. LOVRIC:  This letter was talked about by

13   defense counsel with Elizabeth Chesebro, the letter from Ray

14   O'Connor to Miss Lang.

15                 MISS PEEBLES:  Never spoke about a letter.

16                 THE COURT:  I don't remember that either.

17                 MISS PEEBLES:  Never spoke about a letter.

18                 MR. LOVRIC:  From Ray O'Connor.  I believe I

19   had heard mention of it.

20                 MISS PEEBLES:  Misheard.

21                 MR. FISCHER:  I recall that there was some

22   testimony about Ray O'Connor reaching out but that Shannon

23   O'Connor had not been made aware of that.  That was my

24   recollection of Liz Chesebro's testimony.

25                 THE COURT:  Seems to me I remember something

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1   like that too.

2              MR. LOVRIC:  I thought I heard mention of a

3   letter that Ray O'Connor sent.

4              THE COURT:  I thought there was a

5   correspondence he may have sent to Family Court.

6              MISS PEEBLES:  That's what we were talking

7   about.

8              MR. LOVRIC:  I think it was both, but that's

9   my recollection.

10             THE COURT:  Well, first of all, this is

11  hearsay, obviously.  Now what's --

12             MISS PEEBLES:  It's not even relevant.

13             THE COURT:  How do you get around that?

14  What's the relevance?

15             MR. LOVRIC:  It's not even relevant?  It's

16  completely relevant to the entire line of questioning of Liz

17  Chesebro in Family Court and what Ray O'Connor was or wasn't

18  doing by petitioning the Family Court in the application.

19  The defense brought it up on cross and then I went back on

20  redirect and talked about Ray O'Connor's motivations and

21  depending upon when it was he was communicating with the

22  court.  And it was discussed on cross for the first time

23  because I didn't ask Liz Chesebro about Ray O'Connor at all.

24  In fact, if I'm not mistaken, both defense attorneys asked

25  Liz Chesebro about Ray O'Connor and when it was he became

Renee Lang - Direct

1  involved in petitioning the court for any kind of parental

2  rights as far as Shannon was concerned, and then I came back

3  and talked to Liz Chesebro about that.

4            MISS PEEBLES:  What it was was Shannon's

5  concern that Linda was going to choose Ray over her and

6  that's when the discussion was, and that was raised by the

7  government, and particularly about the petition and who she

8  was married to, and it was followed up by Mr. Fischer and I

9  cleaned it up after he got done on redirect regarding why he

10  was incarcerated and the reason why he didn't follow through

11  with the letter correspondence after he petitioned Family

12  Court.  And this is not even relevant to the case.

13            MR. LOVRIC:  I didn't bring it up.  I didn't

14  bring it up on the direct of Liz Chesebro.

15            MR. FISCHER:  The only reason, as I

16  understand, it's offered during any examination of Miss

17  Chesebro was to determine whether there was an effect upon

18  the hearer or recipient of the information, that is, Shannon

19  O'Connor.  Not for the substantive purpose of it.  I'm not

20  sure what this -- why it's relevant, frankly.

21            MISS PEEBLES:  There's no reason for it.  It's

22  totally irrelevant, extraneous.

23            MR. LOVRIC:  I have a difficult time

24  understanding how it's relevant when the defense brings it up

25  with Miss Chesebro, not with Shannon O'Connor, because you're

1    saying now that it's what effect it had on Shannon through

2    Liz Chesebro, but Liz Chesebro did not indicate that Shannon

3    was aware of those letters sent by Ray O'Connor.

4              THE COURT:  Why is this relevant --

5              MISS PEEBLES:  Exactly.

6              THE COURT:  -- if it doesn't bear on Shannon's

7    state of mind?

8              MR. LOVRIC:  Because it counters exactly what

9    the defense brought out that Ray O'Connor was in fact

10   petitioning and was in fact looking to get some kind of

11   parental rights and did have some kind of stake in the game.

12             THE COURT:  What difference does it make that

13   Ray O'Connor was trying to get some parental rights?

14             MR. LOVRIC:  I don't think it makes any

15   difference.

16             THE COURT:  Neither do I.

17             MR. LOVRIC:  The letter indicates it's true.

18             THE COURT:  He doesn't want to pay for the

19   kid.  He wants her but doesn't want her.

20             MR. LOVRIC:  My request will be at some point

21   the Court tell the jury to disregard everything they've heard

22   about Ray O'Connor.

23             THE COURT:  I can't do that.

24             MR. LOVRIC:  The defense is saying it's

25   irrelevant.

Renee Lang - Direct

1           THE COURT:  They're saying that this

2    particular letter that's been written to Mrs. Lang in

3    connection with her custody, in connection with money Social

4    Services was seeking to get from Ray O'Connor is not really

5    an issue that this jury should have to deal with, and under

6    403 I think it is confusing.  It's like adding another

7    dimension to this trial.  But the fact -- but the fact that

8    there may have been a concern on the part of Shannon that her

9    mother was going to run away with Ray, that is very relevant

10   to Shannon's mental state and other issues in the case, so

11   you can't say lump it and throw Ray out of the case

12   completely.

13           MR. LOVRIC:  I agree with that.

14           THE COURT:  That's not what you just said.

15           MR. LOVRIC:  That's my visual reaction to the

16   defense saying it's irrelevant.  This is relevant to counter

17   defense's claim through Liz that Shannon was concerned or

18   affected by this letter-writing by Ray.  This letter says

19   just the opposite.  Ray is not interested.  Ray has no

20   interest.

21           MISS PEEBLES:  Shannon never even saw that

22   letter.

23           MR. FISCHER:  It's hearsay because it's not

24   offered -- to offer the effect, to prove the effect upon the

25   listener by any means.  This is indeed hearsay.

Renee Lang - Direct                                    1298

1              THE COURT:  I agree with you, Kelly, he's not

2    saying that.  Her mental health state is not an issue in this

3    trial.  Why don't you let the opposition see the letter.

4              MR. LOVRIC:  They have seen it.

5              MISS PEEBLES:  I've seen it.

6              THE COURT:  I think we spent way too much time

7    on this.

8              MR. LOVRIC:  Okay.

9              (In open court)

10   BY MR. LOVRIC:

11       Q    Miss Lang, did you -- you personally, did you ever

12   have any conversations with Shannon about Ray O'Connor?

13       A    She read the letter once and she knew what it said

14   and that he denied being her father.

15       Q    Okay.  The letter that I just showed you, Exhibit

16   112?

17       A    Yes.  That one or the other one.  Like I said,

18   there was two.  I lost one.

19       Q    Sorry?

20       A    I said I lost one but she did get ahold of it and

21   read it herself.

22       Q    Okay.  So she read the letters that Ray O'Connor

23   sent?

24       A    One of them, yes.

25       Q    And the one that she read, do you know what the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1   substance of that was?

2       A    That he was not her father.

3           MISS PEEBLES:  Objection.

4           THE COURT:  Sustained.

5           MR. LOVRIC:  Judge, I reoffer 112 for the

6   reasons we discussed, it's being offered for the same reason

7   that I indicated was brought up with Miss Chesebro,

8   especially since now it is determined that Shannon O'Connor

9   did read that letter.

10          THE COURT:  I couldn't tell from this witness'

11  testimony which letter Shannon read, the letter that this

12  witness misplaced or said she did and the letter that you

13  have here in court.  Could you tell that.

14          MR. LOVRIC:  Well, I asked her, there was an

15  objection, so I'll ask her again if she can clarify.

16          THE COURT:  Okay.

17   BY MR. LOVRIC:

18      Q    Miss Lang, there were two letters that Mr. Ray

19  O'Connor sent?

20      A    Yes.

21      Q    What letter or letters did Shannon read, if you

22  know?

23      A    I'm not sure of which letter she read, but they

24  both contained the same material:  He was not her father.

25      Q    Okay.  And you read both letters?

Renee Lang - Direct                              1300

1     A     Yes, I did.

2     Q     And did both letters talk about the same things?

3     A     Basically, yes.  He wanted a divorce from Linda.

4               MISS PEEBLES:  Judge, objection.

5               THE COURT:  Sustained.

6               MR. LOVRIC:  Judge, with that, I'd offer

7    Exhibit 112.

8               MISS PEEBLES:  Same objection.

9               THE COURT:  Sustained.

10   BY MR. LOVRIC:

11    Q     At any point in time did Shannon indicate to you

12   anything regarding her intentions to either want to or not

13   want to have Ray O'Connor in her life?

14    A     I don't believe she even knew him so --

15    Q     My question is:  Did she ever tell you anything

16   about whether she wanted or did not want --

17    A     No.

18    Q     Did --

19    A     No.

20    Q     Did Shannon ever express to you any issue or

21   concern with Linda O'Connor being with Ray O'Connor?

22    A     No.  No.  Not to my knowledge, no.

23    Q     Okay.  Now, Miss Lang, at some point after Shannon

24   had gone back to live with Linda O'Connor so sometime after

25   October of 2006, did you find a note in your house written by

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct

1    Shannon?

2         A    Yes.  When I returned to my trailer in April, I

3    cleaned out the room because I was going to make a den for

4    myself out of it.  It was an extra room.  And I had to go

5    under the bed and clean out all the little treasures that

6    children throw under the bed.  And I got rid of the bed and I

7    started going through all the garbage and everything and

8    there was a scribbled little note.  Now, I had that note for

9    quite a while and then I misplaced it or threw it out with

10   the Ray O'Connor letter, but it said --

11                   MISS PEEBLES:  Objection.

12                   THE COURT:  Sustained.  You can't tell us what

13   it said.

14                   MR. LOVRIC:  It's being offered for the state

15   of mind of Shannon O'Connor.

16                   THE COURT:  What is?

17                   MR. LOVRIC:  That note that she wrote.  That

18   Shannon O'Connor wrote.

19                   THE COURT:  Note's not in evidence.

20                   MR. LOVRIC:  She read it.  I don't have the

21   note.  She just indicated she can't find the note.

22                   THE COURT:  How can it come into evidence?

23                   MR. LOVRIC:  I'm not introducing a note.  I'm

24   introducing her reading the note, what it said on it.

25                   MISS PEEBLES:  Objection.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Direct                                    1302

1          MR. LOVRIC:  I don't have a note to offer,

2     Judge.

3          THE COURT:  I hear you.  So you can't offer

4     what the witness says about the note either?

5          MR. LOVRIC:  It's not her note, Judge.  Can we

6     just have a side-bar so I can explain to your Honor what --

7     the rule that I'm applying?

8          (At the bench)

9          (Jury excused)

10         THE COURT:  Tell me.

11         MR. LOVRIC:  This witness -- just so that I'm

12    clear, this witness found a note written by Shannon and read

13    it and she remembers what the note said.  She thereafter has

14    either thrown away the note or misplaced it but it's not

15    anywhere to be found.  I'm asking her what the note said and

16    she's told me.  She remembers it verbatim what the note said

17    because it was a one-sentence note.  And what was written on

18    that note is as to Shannon O'Connor's state of mind when she

19    was at this witness' house.  I don't know how that's any

20    different than if I had the note.  She can be cross-examined

21    as to whether she's making it up or not, but that's not the

22    admissibility issue.  If I had the note, it would be offered

23    for the state of mind of Shannon, and I believe under the

24    consistent rulings we've seen thus far, it would go into

25    evidence.

Renee Lang - Direct

1    THE COURT:  That's probably true.

2    MR. LOVRIC:  The fact it's not in existence

3  simply -- it's simply an indicator -- it would be like Liz

4  Chesebro saying, well, I remember that at one point I wrote

5  down a progress note.  Where is it, I don't know.

6    THE COURT:  They were all produced and she was

7  cross-examined on those, the progress notes.

8    MR. LOVRIC:  She testified about some things

9  she didn't write down in her progress notes.

10    MISS PEEBLES:  Not stuff that she read from

11  somebody else that we didn't have access to.  First of all,

12  we can't even challenge the authenticity.  How can we

13  effectively cross-examine this witness?  It's not fair.  It's

14  inadmissible; it's double hearsay.

15    MR. LOVRIC:  It's not being offered for the

16  truth.  It's not hearsay.  It's being offered for Shannon's

17  state of mind.

18    THE COURT:  It's not hearsay.  This witness

19  could be testifying to a whole lot of things that we can't

20  look at or that no one can test.

21    MR. LOVRIC:  She did that when she said what

22  Shannon said to her.  You admitted that.  She talked about

23  Shannon told her at that time; they were not written

24  anywhere.  She's testifying, and that's not being admitted

25  for hearsay.  It's being admitted for state of mind of

Renee Lang - Direct                            1304

1   Shannon and that was admitted.

2                 MR. FISCHER:  May I make my objection known?

3   I have an authentication problem with that because there is

4   no evidence whatsoever that there was a note other than her

5   statement.  And second, that it was written by Shannon

6   O'Connor.  I have no idea where that note came from.  She

7   says it came from Shannon but I don't know that.  I can't

8   verify in one direction or the other whether that's --

9   whether there's any truth to that whatsoever, and that's my

10  objection.

11                MR. LOVRIC:  But that's always the case with

12  anything a witness says that a person said orally.  All you

13  have is their telling you this is what the person said to me.

14  The admissibility, what is it being offered for.  This

15  writing that she read is not being offered for the truth of

16  what's in it but for what was Shannon's state of mind when

17  she's living with this witness.

18                MR. FISCHER:  I disagree with respect to the

19  authentication issue.

20                MR. LOVRIC:  I'm not offering the note.

21                THE COURT:  Sometimes when you're offering

22  statements, that's one thing, and they've been coming in to

23  prove the state of mind of the person who makes the

24  statement.  But here now you've got a witness testifying to a

25  writing and sometimes jurors think when things are in writing

Renee Lang - Direct

1   they're much more true than they are if they're not in

2   writing and the writing can't be produced.  It doesn't seem

3   to satisfy the best evidence rule.

4              MR. LOVRIC:  But it does when the best

5   evidence is not available; you can go to the next best

6   evidence.

7              THE COURT:  That's generally true.

8              MR. LOVRIC:  And the next best evidence is a

9   witness who read that note.  I mean, it's not as though --

10             MR. FISCHER:  But the best evidence rule where

11  the witness was the one who disposed of it, I think that

12  would go into the equation.

13             MR. LOVRIC:  She threw it away accidentally.

14  She didn't dispose of it.

15             THE COURT:  There's no spoliation issue.

16             MR. LOVRIC:  Its clearly being offered for

17  state of mind.

18             MISS PEEBLES:  I understand what you're

19  saying.  We cannot cross-examine her on something we don't

20  have.

21             MR. LOVRIC:  Sure you can.

22             MISS PEEBLES:  We cannot.  How can we test the

23  authenticity of the note?

24             MR. LOVRIC:  You can ask her where she found

25  it allegedly, what did it -- how it read.

Renee Lang - Direct

1          MISS PEEBLES:  She doesn't even know firsthand

2     who wrote the note period.

3          MR. LOVRIC:  You can cross-examine her and she

4     will tell you that everything where she found it and how it

5     was found is consistent that it was Shannon's note.

6          THE COURT:  Well, see if you can lay a

7     foundation for that.

8          MR. LOVRIC:  Okay.

9          (In open court)

10          (Jury present)

11          THE COURT:  Okay, Mr. Lovric.

12     BY MR. LOVRIC:

13     Q    Miss Lang, before I forget, Shannon, when she

14     referred to you or to George Lang, how did she refer to the

15     two of you?  What did she call you by?

16     A    Grandma and Grandpa Lang.

17     Q    And Miss Lang, before the break we were talking

18     about at some point you cleaned out the room that Shannon was

19     staying in when she stayed with you?

20     A    Yes.

21     Q    Okay.  And was that the room that Shannon stayed

22     only when she was at your house during this --

23     A    During the visit with me from August to October,

24     yes, that was the room.

25     Q    Okay.  And then you indicated that you found a

Renee Lang - Direct

1    note.  Can you describe the note.  What was -- what did the

2    piece of paper look like?  Let me ask you that.

3        A    Okay.  If you can picture a piece of looseleaf

4    paper, it looks like she has just scribbled this note on the

5    bottom corner and then ripped it out and scrunched it up and

6    threw it under the bed.

7        Q    Okay.  Could you tell if it was her writing; could

8    you tell by looking at it?

9        A    It was Shannon's writing, yes.

10       Q    Okay.  So from seeing her write stuff or scribble

11   stuff in books, at least, you felt it was her scribble?

12       A    Yes.

13       Q    Okay.

14            MR. LOVRIC:  At this time, Judge, I would ask

15   to be allowed to ask the witness to tell us what that note

16   said.

17            THE COURT:  Okay.  Over objection of the

18   defendant.

19       Q    What did the note say, Miss Lang?

20       A    "I hate my mother.  She used me."

21       Q    Was there anything else on that note or just that?

22       A    Just that.

23       Q    And you seem to -- are you certain as to the

24   wording of that?

25       A    Yes.

Renee Lang - Direct

1    Q    Miss Lang, at the court proceeding where Shannon

2  was returned to the custody of Linda O'Connor, were you

3  actually present at that court proceeding or at that

4  proceeding?

5    A    Yes, I was.

6    Q    And were you present when the judge, the Family

7  Court judge ordered that Shannon not be allowed any

8  unsupervised contact with Dean Sacco?

9    A    Yes.

10    Q    And was Linda O'Connor there?

11    A    Yes.

12    Q    Now the final topic I want to talk about, Miss

13  Lang, at some point after your husband passed away and at

14  some point when you were cleaning out his things, what

15  happened to his computer?

16    A    After he passed away I gave it to a family member.

17  I always told him, soon as you go, that computer goes because

18  I don't need it.

19    Q    You told George this?

20    A    George knew it.

21    Q    And you got rid of the computer?

22    A    Yes.

23    Q    Do you know what became of it after you got it to

24  this family member?

25    A    They took it, they used it very briefly, and then I

Renee Lang - Direct

1    think it crashed or broke or something like that.  And they

2    set the tower out on the back porch and it remained there for

3    the longest time.

4         Q    Okay.  So the computer pretty much was done soon

5    after you gave it to them?

6         A    Yes.

7         Q    Do you recall then at some point the State Police

8    coming to your house and asking about that computer?

9         A    Yes.

10        Q    And did you tell them where they could go, at least

11   from where you knew, to get that computer?

12        A    Yes.  I called my daughter-in-law and they went up

13   and took the computer.

14        Q    Okay.  That was out on the back porch?

15        A    That was out on the back porch.

16        Q    Okay.  And did you -- did you ever know exactly all

17   the things that were on that computer?  Did you ever have

18   knowledge of that?

19        A    No.

20        Q    I know you told us you don't know computers, but

21   did George ever go in and show you everything that was on the

22   computer?

23        A    The only thing he did show me was he had I think a

24   file for me and it had pictures of my grandchildren, my

25   family members, etcetera, like that.  Other than that, I had

Renee Lang - Direct                                    1310

1   no interest in it.

2        Q    Okay.  Did he have other files that he didn't show

3   you?

4        A    Yes, he did.

5        Q    When you looked at this, could you tell what was in

6   those other files?

7        A    No.  He never opened them up and I never asked him

8   to.

9        Q    Okay.

10            MR. LOVRIC:  That's all the questions I have,

11   Judge.

12            THE COURT:  Okay.  Mr. Fischer.

13            MR. FISCHER:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. FISCHER:

16        Q    Miss Lang, my name is Kelly Fischer.  I represent

17   Mr. Sacco.

18        A    Okay.

19        Q    You described an incident when Shannon came out of

20   the room in the morning and said that she had been up all

21   night, something about Georgie Boy.  Do you remember that?

22        A    Yes, I do.

23        Q    When was that event?

24        A    Wow.

25        Q    Let me try to help.  Was it before the flood?

Renee Lang - Cross

1    A    Yeah.  It had to be right around December, before

2  the end of '05, right around in there sometime because he did

3  give it to her before Christmas, so I'm saying way up there.

4    Q    So when you said when he did give it to her before

5  Christmas, you mean that George gave the adult sex toy to

6  Linda before Christmas of 2005, am I correct?

7    A    Yes.

8    Q    Why did you keep a diary?

9    A    Because of the fact that my girlfriend had foster

10  children that she takes care of and I was planning to keep

11  Shannon, and as a result, she advised me to keep records day

12  by day because Social Services would want to know what this

13  child was doing, what I was doing, and I followed her advice.

14    Q    And the first day that you had Shannon at your

15  house, was that August 21, 2006, am I correct?

16    A    Yes.  That was sometime during the day.  I think it

17  was late in the afternoon when she finally showed up.

18    Q    And she stayed overnight?

19    A    She stayed with me until October.

20    Q    And on August 22 then, when Shannon came down, you

21  had a discussion with Shannon at that time?

22    A    About what?

23    Q    She slept well, best night sleep she's had in a

24  while?

25    A    Yes, yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Cross

1    Q    And you noted that it was the best night's sleep

2 she had in a while, you noted that in your diary, is that

3 correct?

4    A    That's what she told me.

5    Q    That was important to know?

6    A    Yes.

7    Q    At that time she also said to you, as I understand

8 your testimony, that if she had to go back to where the

9 landlord lives she'd commit suicide, is that correct?

10   A    She would either run away or kill herself sooner

11 than stay with him, yes.

12   Q    But you didn't say that in your diary at that time

13 on August 22 now, did you?

14   A    I don't recall, but that's what she told me.

15   Q    Ma'am, I'll show you your diary, Exhibit 113.  Read

16 yourself that entry for August 22, if you would, please.

17   A    Okay.

18        That was the first day she was there.  She said she

19 did not like the landlord.  He stays overnight.

20   Q    My question is, before you begin testifying -- may

21 I interrupt you please?

22   A    Yes.

23   Q    You had an opportunity to read that whole night to

24 yourself?

25   A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Cross

1    Q    My question to you is this:  You didn't record in

2  your diary what you told this jury about Shannon saying she

3  would kill herself?

4    A    But she did -- I didn't record it, but yes, those

5  were her words, she would sooner run away or kill herself

6  sooner than stay with him.

7    Q    We're clear, that's not what you put in the diary.

8    A    I eliminated that from the diary.

9    Q    Intentionally?

10    A    No.  It was just an oversight.

11    Q    At some point during your direct testimony from Mr.

12  Lovric you mentioned that -- I withdraw that.  You were in

13  contact on August 21 and August 22 when Shannon first came

14  over with a woman from DSS named Linda Panus, correct?

15    A    Naomi Panus.

16    Q    I'm sorry, Naomi Panus.  Apologize.  Did you speak

17  with Naomi Panus on August 22 or 23, to your recollection,

18  about Shannon expressing the potential that she would make a

19  suicide attempt?

20    A    I don't believe I did, but I told her she was very

21  emotional and she was very, very depressed, and we did point

22  out the fact that she was harming herself on her arms.  She

23  was slicing herself.  She was that emotional.  And to me,

24  that was kind of an expression of trying to harm herself.

25    Q    But did you tell Naomi Panus about Shannon saying

Renee Lang - Cross

1    she was going to kill herself; yes or no?

2        A    No.  No.

3        Q    Thank you.  Now, when you testified earlier, you

4    said that on that August 22 occasion, that Shannon said that

5    the landlord was a pervert.  Do you remember saying that?

6        A    Yes.

7        Q    But you didn't say that in your diary, did you?

8        A    No.

9        Q    All right.  And on January 9 of 2008, about four

10   months ago, a State Police investigator came to your home and

11   interviewed you?

12       A    Yes.

13       Q    And you didn't mention anything to the State Police

14   investigator at that time about this comment concerning Mr.

15   Sacco being a pervert, did you, ma'am?

16       A    No.  Maybe I didn't express that word but I did

17   express her feelings toward him.  She hated him.  She

18   despised him.  She was terrified of him.

19       Q    And you said that to the investigator January 9,

20   2008?

21       A    Yep.

22       Q    Is it correct that Mr. Lyons came to see you on

23   March 3 of this year, about a little over two months ago?

24       A    Yeah.  That's probably about the right time, yes.

25       Q    Do you recognize Mr. Lyons here?

Renee Lang - Cross

1    A    Yes, I do.  He came in with Mr. Shultz.

2    Q    And on that March 3 -- as a result of that March 3,

3    2008 visit with Mr. Lyons, that is where you expressed to

4    Mr. Lyons what Shannon had said to you about the landlord

5    being a pervert, am I correct?

6    A    Yes.  She did not like that man.

7    Q    In your direct testimony -- withdraw that.  You did

8    not like Linda O'Connor?

9    A    We had differences and, yes, at that point in time

10   we had broken off our relationship completely.

11   Q    With respect to Shannon accessing pornographic

12   sites, do you remember that event?

13   A    Yes.

14   Q    Shannon also showed those -- showed pornography to

15   your 4- and 6-year-old grandchildren, am I correct?

16   A    I don't believe she showed it to them directly, but

17   they were there.

18   Q    Did Shannon expose some of the sites to your

19   grandchildren, 6 and 4 years old?

20   A    I do not know.  I was not there.  I was not

21   present.

22   Q    Would you go to your diary -- withdraw that.  Do

23   you remember writing in your diary:  "Shannon did expose some

24   of the sites to my grandchildren"?

25   A    They were in the room with her, yes.  Yes.  I don't

Renee Lang - Cross                              1316

1    think she directly showed it to them, but they were present

2    when she was on the computer.  Yeah.

3         Q    And that is what you wrote here in your diary, that

4    Shannon exposed them, am I correct?

5         A    Yes.  She exposed them to it.  They could have seen

6    it, they could have looked at it.  They were in the same room

7    all together.

8                   MR. FISCHER:  Those are all the questions.

9    Thank you.

10                  THE COURT:  Miss Peebles.

11   CROSS-EXAMINATION

12    BY MISS PEEBLES:

13        Q    Good afternoon, Mrs. Lang.

14        A    Good afternoon.

15        Q    We've met before.

16        A    Yes, we have.

17        Q    We've sat, myself and my investigator, we sat and

18   had coffee with you one afternoon, is that correct?

19        A    Yes.

20        Q    And you talked to us at length about this case, is

21   that fair to say?

22        A    Yeah.  We discussed all the issues.

23        Q    And you never mentioned anything about going over

24   to Linda's while she's sitting in the house naked; you never

25   told us that, correct?

Renee Lang - Cross                              1317

1      A    I don't know, but I don't know why I wouldn't have.

2  It happened.

3      Q    But you never told us that, did you?

4      A    I don't recall.

5      Q    Well, you met with the FBI and they did a lengthy

6  interview with you as well, do you recall that?

7      A    Yes, I do, and I think I did mention it to them.  I

8  don't know why I did not mention it to you.

9      Q    Mrs. Lang, I'm going to hand you what's been marked

10  as Defense Exhibit O-35, ask you if you can identify that

11  document.  Can you?

12      A    O-35.  This whole page, right?

13      Q    Yes.

14      A    Okay.

15      Q    Now, I'd like you to look through that, to

16  yourself, and when you're done, I want to ask you a couple of

17  questions about whether or not you told the FBI you ever

18  walked in Linda O'Connor's house --

19                  MR. LOVRIC:  Objection.

20                  THE COURT:  What's the basis for that?

21                  MR. LOVRIC:  It's not a statement of the

22  witness, your Honor.

23                  THE COURT:  She hasn't finished the question

24  yet.

25                  MISS PEEBLES:  I'm asking her to refresh her

Renee Lang - Cross

1    recollection after she -- during the course of the interview

2    that she had with the FBI agent she didn't recall whether she

3    told them anything about what she's testified here in the

4    courtroom today, and I want to see whether that refreshes her

5    recollection.

6                    THE COURT:  I thought it was just the

7    opposite.  I thought she remembered telling the FBI --

8                    THE WITNESS:  Yes, I did.

9                    THE COURT:  Wait a second.  I shouldn't be

10   getting into this either.

11                   THE WITNESS:  Sorry.

12                   THE COURT:  -- telling the FBI, she did tell

13   them.  She couldn't be sure whether or not she told you.

14   Maybe she just didn't tell you.

15                   MISS PEEBLES:  Well, your Honor, I'd like this

16   witness to read through that exhibit and then see if she's

17   going to change her testimony about whether or not she

18   actually saw Linda O'Connor naked in her house.

19                   MR. LOVRIC:  And I object.

20                   THE COURT:  No, she can show her an

21   out-of-court document to attempt to impeach her on that

22   issue.

23                   MR. LOVRIC:  It's not a statement of this

24   witness, Judge.  I object.

25                   THE COURT:  I don't know what it is.  I

Renee Lang - Cross

1  haven't seen it, Mr. Lovric.

2              MR. LOVRIC:  I know what it is.  Can we go to

3  side-bar?  I don't want to argue law in front of the jury.

4              (At the bench)

5              THE COURT:  You can't impeach her with a 302.

6              MR. LOVRIC:  I did.

7              THE COURT:  You didn't tell me that.

8              MR. LOVRIC:  I didn't want to say in front of

9  the jury what it is.  My objection is, it's an FBI agent's

10 302 which she has never been shown ever and it's not her

11 statement, it's not Jencks as to her.  You'd have to

12 cross-examine the FBI agent whether he wrote it or not.  It's

13 not her statement.

14             THE COURT:  That's true.  That's right.

15             MISS PEEBLES:  I withdraw the question.

16             THE COURT:  Okay.

17             (In open court)

18 BY MISS PEEBLES:

19    Q    Mrs. Lang, didn't you tell Investigator Haumann

20 when we got done speaking, now you know everything that I

21 know?  Didn't you say that?

22    A    Yes, I did.

23    Q    But you never mentioned that detail, is that your

24 testimony?

25    A    It was just probably an oversight.  I was very

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Cross

1  upset that day, unprepared for your visit, but if I'd thought

2  about it I would have told him, because it's a fact.

3       Q    Now, Mrs. Lang, I want to talk about your husband

4  George.

5       A    George Lang, Sr.

6       Q    George Lang, Sr., correct?

7       A    Correct.

8       Q    He passed away in July of 2006?

9       A    Yes, he did.

10      Q    And he had cancer?

11      A    Yes, he did.

12      Q    When did he first develop cancer?

13      A    Sometime in the early part of 2005 because we had

14  undergone six months of chemotherapy, then he had two months

15  off -- no, it had to be 2004, because we had gone through

16  chemotherapy in December, he had gotten two months off from

17  the chemo, and we went back in February and we found out that

18  the cancer spread to his brain.  And at that point in time he

19  had to go through radiation treatments.

20      Q    And that was --

21      A    That was in 2006.

22      Q    February of 2006?

23      A    Yeah.  We had six weeks of radiation, yes.

24      Q    So he was going through radiation from February of

25  2006 up until when?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Cross

1    A    Six weeks.

2    Q    And after the radiation, what kind of medical

3  treatment was he receiving?

4    A    He was in very, very, very bad shape at that point

5  in time.   Oncology recommended hospice because there was no

6  future.

7    Q    And did hospice come in and assist you?

8    A    Yes.

9    Q    Do you recall when that was?

10    A    That was in -- okay.  Let me see.  Probably around

11  the beginning of July, just before he passed away.

12    Q    Did there come a time where you were unable to care

13  for your husband because the cancer had gone to his brain?

14    A    Yes.

15    Q    And when was that?

16    A    That was in July.

17    Q    Did there come a time when you ever moved in with

18  your daughter because it became difficult for you to care for

19  your husband because of his state?

20    A    No.  No.

21    Q    Were you his primary caretaker when he was sick?

22    A    Yes.

23    Q    Were you taking care of him when he was going

24  through the chemotherapy?

25    A    Yes.

Renee Lang - Cross

1    Q    And what did the chemotherapy -- what kind of

2  effect did the chemotherapy have on your husband when he was

3  undergoing the treatment?

4    A    He used to get a lot of pain, a lot of nausea, a

5  lot of headaches.  He was very, very tired and he would get

6  forgetful.

7    Q    Now, you know -- what kinds of medications was your

8  husband taking at that time?

9    A    Well, I honestly don't remember all the

10  medications, but I know he was on Vicodin and they did

11  eventually put him on morphine.

12    Q    Do you know when they put him on morphine?

13    A    That had to be right around the flood time.  Maybe

14  even before.

15    Q    Now, you're aware of the allegations that Shannon

16  O'Connor has made against your husband?

17    A    Yes.

18    Q    What was your husband's nickname when he was alive?

19    A    George.

20    Q    Did anyone refer to him as Captain Hook?

21    A    Yes.  Me.

22    Q    Okay.  What was that in reference to?

23    A    It was in reference to the fact that since he got

24  cancer, even before he had cancer, his little package no

25  longer could stand at attention.  It would just (indicating)

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Cross

1  be limp.

2      Q    Can you give me a time period during which George,

3  Sr. had difficulty getting an erection?

4      A    That was before the cancer and before the chemo,

5  but during the chemo, everything stopped.  Even the medicine

6  he took said it would prevent him from having an erection.

7      Q    Given your husband's physical state, is it possible

8  that he could have sexually abused Shannon in the way that

9  she --

10                MR. LOVRIC:  Objection.

11                THE COURT:  Sustained.

12     Q    Your husband never owned a digital camera, true?

13     A    No.  He never did.

14     Q    And Linda never owned a digital camera, correct?

15     A    I don't know.  I don't think so, but I don't

16  honestly know.

17     Q    Did you ever -- did you ever see Linda with a

18  digital camera?

19     A    She had a camera.  I don't know whether it was

20  digital or whatever it was.

21     Q    Was it a disposable camera?

22     A    No, I don't think it was.  I think it was a regular

23  camera.  I could be wrong.

24     Q    Did you tell myself and Investigator Haumann when

25  you sat with us you've never seen Linda use a digital camera?

Renee Lang - Cross                                    1324

1    Did you tell us that?

2        A    Yeah.

3        Q    I want to talk a little bit about Reverend Kathy

4    Myrick.  She's a friend of yours, isn't she?

5        A    She's the pastor of my church.

6        Q    You're pretty close?

7        A    Yes.

8        Q    You guys talk a lot?

9        A    I counsel with her from time to time, yes.

10       Q    And you've talked to her recently?

11       A    No.  She's been very, very busy right now but -- I

12   haven't talked to her recently as far as counseling or

13   anything like that.

14       Q    Have you talked to her at all about this case?

15       A    She knows what I was going through, yes.  Yes.

16       Q    And she talked to you about this case, correct?

17       A    Yes.  Yes.

18       Q    Now, it's common knowledge, is it not, that Linda

19   routinely would spend money on Shannon that she didn't have,

20   is that fair to say?

21       A    Yes.  Yes.

22       Q    In fact, if Shannon wanted something, Linda bought

23   it for her, correct?

24       A    In most cases, yes.

25       Q    And if Shannon asked for a puppy, Linda would buy

Renee Lang - Cross

1    her a puppy, correct?

2        A    Well, she did, yes.

3        Q    And after the flood you knew that Mrs. O'Connor had

4    received over five thousand dollars from FEMA; you were aware

5    of that, correct?

6        A    I was told indirectly that she did get a lot of

7    money, yes.

8        Q    You and Linda haven't been on good terms for a

9    while, is that fair to say?

10       A    That's correct.

11       Q    In fact, at this point you don't have much use for

12   Mrs. O'Connor, is that correct?

13       A    It isn't that I don't have much use for her.  I

14   have just disconnected her from myself.  She stays here and I

15   stay here.  After she moved to Norwich I had no contact with

16   her.

17       Q    I want to talk to you about one of your diary

18   entries, the last one that you -- one of the last ones that

19   you made regarding Shannon staying with you.  You state that:

20   "Today was a slow day for Shannon.  She was angry about the

21   fact that she couldn't go to Linda's so she couldn't get over

22   the computer incident.  Linda had to watch the neighbor's

23   kids.  Shannon still wanted me to pick her up.  I told her it

24   was not necessary, she could come home on the bus.  Linda,

25   her mother, sent her some Burger King coupons.  I did take

Renee Lang - Cross

1  her to Sidney so we could use the coupons.  All Shannon kept

2  saying, those are my mom's and I will keep them.  They closed

3  Burger King in Sidney.  We ate at McDonald's.  We got in an

4  argument over the band.  She took the flute.  Shannon hardly

5  ever practices the instrument.  Today Shannon announced she

6  was giving up the flute.  The teacher said she should

7  practice the blowing of the flute.  Now he is teaching the

8  class music.  She said she is just going to quit.  I said,

9  no, you started it, you finish it.  She said, no, I won't.  I

10  said, oh, yes, you never even tried to learn it.  Well, just

11  write me a note so I can quit.  You need parent's permission

12  to quit.  I told her no, I would not do it.  Her answer was,

13  it doesn't matter, I will tell Naomi to write me a note.  I

14  told her to clean her room.  She left cat litter bags in the

15  room.  I told her and told her, so finally I took the garbage

16  out of the room.  They had maggots in the bags.  When I came

17  home, I told her to clean that room.  She walked away and

18  slammed the door."  That was your last journal entry,

19  correct?

20      A    Yes.

21      Q    By that time you couldn't -- you didn't have any

22  control over what Shannon was doing, is that fair to say?

23      A    I had control but she was really, really fighting

24  me back -- really getting snippy.  It started to be an

25  argumentative situation.

Renee Lang - Cross

1    Q    In fact, if Shannon didn't want to do something,

2    she just wouldn't do it, isn't that fair to say?

3    A    That's correct.  She hated orders.

4    Q    And she didn't particularly care for orders coming

5    from her mother either, is that fair to say?

6    A    Very true.

7    Q    In fact, Mrs. O'Connor didn't have much control

8    over Shannon, and that was one of the problems between the

9    two of them, is that fair to say?

10   A    That could be, yeah.  Yeah.

11   Q    Is it also fair to say that Linda really wasn't

12   equipped to handle Shannon during certain outbursts that she

13   was having, is that fair to say?

14   A    Linda could have handled it, but I think she just

15   gave in to Shannon sooner than argue with her.

16            MISS PEEBLES:  Thank you, Mrs. Lang.  Nothing

17   further.

18            THE COURT:  Mr. Lovric.

19            MR. LOVRIC:  Two questions.

20   REDIRECT EXAMINATION

21    BY MR. LOVRIC:

22   Q    The incident that you described with Linda O'Connor

23   and Shannon being naked, did that happen?

24   A    Yes.

25            MISS PEEBLES:  Objection, Judge.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Redirect                    1328

1      A    Yes, it did.

2              THE COURT:  Well you crossed her on that issue

3      so, redirect.

4              MISS PEEBLES:  It was asked and answered.

5              THE COURT:  Pretty much.

6              MR. LOVRIC:  It's been asked and answered

7      quite a bit, so I'll move on to my second question:

8      BY MR. LOVRIC:

9      Q    Do you know what Linda O'Connor did with that five

10     thousand dollars that she got from FEMA for the flood?

11     A    I have no idea.

12             MR. LOVRIC:  Okay.  Thank you.

13             THE COURT:  Mr. Fischer?

14             MR. FISCHER:  No questions.

15             THE COURT:  Miss Peebles?

16             MISS PEEBLES:  Nothing, Judge.

17             THE COURT:  Okay.  Thank you very much, Miss

18     Lang.  You may step down, ma'am.

19             (Witness excused)

20             (Meeting at the bench off the record)

21             THE COURT:  Okay, ladies and gentlemen.  I

22     think we're going to finish up early today; now, as a matter

23     of fact.  I guess you're all disappointed, I can see.  You're

24     going to have to bear with me.  I'm going to change a little

25     bit.  I won't be here tomorrow, but Monday, instead of 1:30

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Renee Lang - Redirect

1329

1   we're going to start at 2:00, so it will be a very short day.

2   I have to be here at 2 then.

3                So, let me remind you not to discuss the case

4   among yourselves, with anybody else or permit anyone to

5   discuss it with you.  We'll see you Monday afternoon at 2 PM.

6   No media and no investigation or research.  No Google.

7                Court stands adjourned.  Hope you have a nice

8   weekend.

9                (Court stands adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1330

1        C E R T I F I C A T I O N

2

3

4        I, VICKY A. THELEMAN, RPR, CRR, United

5   States Court Reporter in and for the United States

6   District Court, Northern District of New York, do

7   hereby certify that I attended at the time and place

8   set forth in the heading hereof; that I did make a

9   stenographic record of the proceedings had in this

10  matter and cause the same to be transcribed; that

11  the foregoing is a true and correct copy of the same

12  and the whole thereof.

13

14

15                          _____

16                          VICKY A. THELEMAN, RPR, CRR

17                          United States Court Reporter

18                          US District Court - NDNY

19

20

21  Dated:  August 15, 2008.

22

23

24

25