1331

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                      -versus-                    08-CR-77

6   LINDA O'CONNOR and DEAN SACCO.

7   ----------------------------------------------------------

8                   TRANSCRIPT OF JURY TRIAL

9   held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  FRIDAY, May 19, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Binghamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

1      (In open court)

2      MISS PEEBLES:  I think there's one thing I

3   wanted to discuss before we bring the jury in.

4      THE COURT:  Do you want to go to side-bar?

5      MISS PEEBLES:  Yes.

6      (At the bench)

7      MISS PEEBLES:  My understanding, the

8   government's going to call their computer expert that

9   examined the hard drive of George Lang, and I understand, as

10  my expert has also found, there's adult pornography,

11  pornographic pictures on there.  And I understand the

12  government's position about, you know, there was nothing on

13  the hard drive that had photographs of Shannon O'Connor,

14  Linda or George in any kind of nude image.  But as far as the

15  adult pornography that was found on the computer, I would

16  object to that coming in because I don't think it's relevant

17  and there's no indication that my client would have ever seen

18  those adult images in any event.  They had e-mail

19  communication back and forth.  Obviously, anything sent

20  between the two of them, I don't object to.  In fact, some of

21  the e-mails I introduced into evidence.  I wanted to bring it

22  to the Court's attention before we brought the jury in.

23      THE COURT:  What's the government's position?

24      MR. LOVRIC:  Maybe I can just clarify, Judge.

25  Is the defense objecting to photos being shown or talked

1333

1   about what was found on the computer?  I'll be able to answer

2   that.  Which, or both?

3               MISS PEEBLES:  Well, both, simply because I

4   don't know how it would be relevant to the prosecution in

5   this case other than we've already heard testimony from Renee

6   Lang he had adult pornography on his hard drive that she saw,

7   but it's not relevant to this case.

8               THE COURT:  What do you say about relevance?

9               MR. LOVRIC:  Well, it is relevant, Judge, but

10  just to clarify, I'm not introducing any photographs, so my

11  intention was never to show the jury the -- any of the adult

12  pornography, nor do I have any of that labeled.  The reason

13  it is relevant is because Shannon has stated and will testify

14  as well that when she was being physically abused at the Lang

15  residence by both defendant O'Connor and George Lang that

16  they did in fact show her adult pornography on the computer

17  and that George would tell her what some of the images that

18  he showed her, this is what he'd like for her to do to him

19  based on what it was she was being shown.  So the adult

20  pornography is relevant because the victim will testify this

21  was shown to her by Lang, George Lang and O'Connor at the

22  time that they were abusing her and that part of it was to

23  show her what he liked for her to do to him.  So it clearly

24  is relevant to what was being done to her and what actions

25  were being committed.

1334

1            THE COURT:  Okay.  So we're clear that there

2   are not going to be any photos.

3            MR. LOVRIC:  Right.  I'm not offering and I've

4   not marked any exhibits, but the computer expert can talk

5   about having found, you know, certain kinds of photos that

6   he'll describe just generally what they are.  I'm not

7   offering the images because offering the images, I don't

8   really think is -- I don't think there's any reason to do

9   that.

10           THE COURT:  Might be excludable under 403

11  perhaps anyway.

12           MR. LOVRIC:  So that's where we are.

13           (In open court)

14           (Jury present)

15           THE COURT:  Afternoon, ladies and gentlemen.

16  You guys all ready to go?  Long rest, the whole weekend?

17  Nice warm weekend.

18           All right.  Mr. Lovric, have you got a witness

19  for us?

20           MR. LOVRIC:  Yes, Judge.  The next witness we

21  call is James Thompson.  He's coming right in.

22           THE COURT:  All right.

23           THE CLERK:  Please state your full name.

24           THE WITNESS:  James T-H-O-M-P-S-O-N.

25


                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT

James Thompson - Direct                    1335

1    J A M E S    T H O M P S O N, having been called as a witness,

2    being duly sworn, testified as follows:

3                    THE COURT:  Okay.  Mr. Lovric.

4    DIRECT EXAMINATION

5    BY MR. LOVRIC:

6         Q    Good afternoon, Mr. Thompson.

7         A    Good afternoon.

8         Q    Just try to speak into the mike so we can all hear

9    you.

10        A    Good afternoon.

11        Q    Mr. Thompson, could you, for the members of the

12   jury, tell them again your full name and can you tell us

13   where you work.

14        A    Yes.  My name is James P. Thompson.  And I work for

15   Broome County Government, Security Division, and I'm the

16   chief investigator and administrator of the computer analysis

17   and technical services unit, otherwise known as CATS.

18        Q    And Mr. Thompson, how long have you worked with the

19   Broome County Security Division, approximately?

20        A    About nine years.

21        Q    And during the nine years you've been with the

22   security division, about how long have you worked in the CATS

23   unit, as I'll call it?

24        A    Since 2000.  Eight years now.

25        Q    And can you tell us a little bit more just in terms

James Thompson - Direct

1   of what it is that the CATS unit is designed to do and what

2   kind of work does the CATS unit perform?

3           A    Sure.  CATS operates as a resource for law

4   enforcement, and what we do is process audio, video and

5   computer forensic cases.  A law enforcement agency will seize

6   media in the course of investigating the case, and we're the

7   ones that they bring it to to actually process that media and

8   turn over a report and analysis when we're done with it.

9           Q    And what is your function within the CATS unit?

10          A    I am the chief investigator.  I serve as an

11  assistant director for our division for Broome County

12  Government Security Division, and I have a lot of

13  administrative duties on that side of the wall.  And then

14  with the CATS unit I serve as the lead investigator and lab

15  director.

16          Q    Now, the police agencies that your unit helps and

17  assists, what types of agencies are those within the area?

18          A    They would consist of state and local and federal

19  agencies from six counties from central New York.

20          Q    And in the course of working at the CATS unit and

21  in your capacity as assistant director within the security

22  division, have you also, yourself, analyzed and done analyses

23  of medium such as computers or other media of electronic

24  storage?

25          A    Yes, I have.

James Thompson - Direct

1337

1    Q    And for about how many years have you been doing

2    that kind of work?

3    A    Since 2000.

4    Q    And about -- and again, approximately about how

5    many, if you can, quantify about how many different types of

6    medium have you either conducted analysis of or assisted in

7    conducting analysis of?

8    A    Different types of medium would be computers,

9    cellphones, CDs, DVDs, removable flash media such as thumb

10   drives.  Anything that is capable of storing digital

11   information, iPods, MP3 players.

12   Q    And over the years, how would you quantify the

13   number of items that you've conducted analysis of?

14   A    Well, I personally probably have worked on close to

15   80 cases myself that I've performed.  Typically, the CATS

16   unit will, on the computer end, process between 40 and 50

17   cases a year.

18   Q    Okay.  And when you say cases, are you referring to

19   a case that's actually investigated or prosecuted by an

20   agent?

21   A    Yes.

22   Q    And what type of computer training and computer

23   knowledge in the sense of formal training or formal knowledge

24   have you obtained over the course of these years?

25   A    I have over 550 hours of training in computer

James Thompson - Direct

1338

1  forensic and investigation.

2      Q    And in the course of your job and your work, do you

3  also receive any type of certifications from computer-based

4  associations?

5      A    Yes.  I have two certifications.  I am certified as

6  a computer crime investigator by the High Tech or High Tech

7  Crime Network and I have the seized computer evidence

8  recovery specialist designation from the Federal Law

9  Enforcement Training Center.

10     Q    And from time to time do you still go to various

11 conferences or training centers to keep yourself up to date

12 to the newest technology that's out there?

13     A    I do.  We require that our analysts attend a

14 minimum of 40 hours a year in ongoing training.

15     Q    And in your capacity at the CATS unit do you also

16 instruct other individuals and actually train or teach them?

17     A    I do.  I assist in the training, I direct the

18 training of any new analyst that may come into or be assigned

19 to the CATS unit, and I conduct training for the Broome

20 County Police Academy.  I do a four-hour-long on digital

21 evidence with those people.

22     Q    Mr. Thompson, do you also from time to time as need

23 be provide either testimony or written documentation in terms

24 of your analyses on the cases that you either work or assist

25 others in working?

James Thompson - Direct                              1339

1       A    Yes, I do.  After -- at the end of every case, at

2  the conclusion of every investigation that we do, we produce

3  a printed report that's turned over to the case agent.

4       Q    Okay.  And the other members in the CATS unit, the

5  other investigative computer -- computer investigative

6  personnel, do they -- when they prepare reports, do they

7  also -- those reports come across to you for any type of

8  verification or to sign off on?

9       A    Yes.  All reports that I do not complete come to me

10  and I sign off on them.  I review them for methodology and

11  sign off as a matter of supervisory review.  Any report that

12  I manufacture or complete is also given to another

13  investigator for peer review.

14       Q    Okay.

15            MR. LOVRIC:  Your Honor, at this time I'm

16  going to go into a number of areas with Mr. Thompson, some of

17  which will require him to offer his opinion based on his

18  knowledge and based on his training.  So at this point I

19  would ask to be allowed to do that with this witness.

20            THE COURT:  Does the defense wish any voir

21  dire?

22            MISS PEEBLES:  I'm not sure in what area he's

23  going to be offered as an expert.  In terms of examining the

24  hard drive, I have no objection to that part of it.

25            THE COURT:  Okay.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct                    1340

1            MISS PEEBLES:  If he's going to be an expert
2     as to what he saw, I might have a problem with that, Judge.
3            THE COURT:  All right.  We'll allow him to
4     testify in this area of the computer analysis, analyses of
5     the hard drive.  If it gets to be a problem, please just
6     object.
7            MISS PEEBLES:  Yes.
8            THE COURT:  Mr. Fischer, is that all right
9     with you, sir?
10           MR. FISCHER:  Yes, your Honor.  Thank you.
11           THE COURT:  You may proceed, Mr. Lovric.
12    BY MR. LOVRIC:
13      Q    Mr. Thompson, I'd like to talk about an analysis
14    that you performed with respect to a computer.  I'll call it
15    the Lang computer.  Do you recall being involved in the
16    analysis of a computer that was brought to you by the New
17    York State Police?
18      A    I do.
19      Q    And about when, approximately when was it?
20      A    I believe it was January 10 of this past year.
21      Q    Of the current year?
22      A    Current year.
23      Q    And just generally speaking, what was it that was
24    brought to your -- to the CATS unit for analysis?
25      A    It was an eMachines brand tower computer with

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1341

1    off-the-shelf configuration.

2        Q    And when you say eMachines, what does that mean?

3    What is that?

4        A    EMachines is the brand name manufacturer, if you

5    will.

6        Q    Okay.  And the item that's brought to you, was it

7    just the computer, the tower part or the monitor and keyboard

8    and all those kind of things also brought to you?

9        A    No.  It was just the tower.

10       Q    Okay.  Did you then at some point conduct a

11   forensic examination of that tower, that computer in

12   connection with the case at hand here?

13       A    I did.

14       Q    And can you just very briefly tell the jurors, when

15   you set out to do a forensic examination or analysis of a

16   computer system or the tower in this case, what do you do

17   generally in order to start to do a forensic analysis of it?

18       A    Well, after the computer or computers is accepted

19   into our evidence stream and it's assigned to myself or

20   another analyst, the first thing we would do is we'd review

21   the case file, any accompanying documentation that came in

22   with it.  We'd analyze or examine the exterior of the

23   computer, the computers for any scratches, dents, any broken

24   parts and any unusual configurations.  If there was anything

25   obvious from the exterior of the computer that we might want

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1342

1    to pay particular attention to.  For example, the addition of

2    high-end video card or some sort of other device.  We

3    photograph everything from all angles, take the computer

4    apart again, photograph the inside, look at it again for

5    anything unusual that would be out of the ordinary.  Look for

6    the storage device, which would be the hard drive or hard

7    drives -- many times computers would contain more than one

8    hard drive -- and label the wires, disconnect them from the

9    hard drive.  We would then hook the computer up to one of our

10   computers and examine the input and output settings of the

11   computer, otherwise known as BIOS or CMOS settings that would

12   determine things like date and time settings of the -- in

13   boot sequence.  The computer actually interfaces the software

14   with the user.

15          After that particular point in time we would start

16   the forensic imaging process, and when I say imaging, we use

17   proprietary software to actually make what's referred to as a

18   bit stream copy of that hard drive.  It's an exact copy of

19   beginning to end, all the available space on that particular

20   hard drive or hard drives or electronic media.  When that's

21   complete, we verify that the forensic image that we made is

22   exact to the original media and then we would, with the

23   original media, put the computer back together, assign it

24   back into our evidence stream so it's stored in our evidence

25   storage, and we would load the forensic image into one of our

James Thompson - Direct

1343

1    forensic software programs and then begin our search based on

2    the information we were given by the case agent or the

3    warrant or the consent.  In the course of doing the search,

4    we would bookmark, set aside, if you will, the information

5    that we would consider important to be included in the final

6    report, and at some point in time we would take that

7    information and compile it into the final report and analysis

8    and call up the case agent and deliver the report and explain

9    it, obviously, to the case agent.

10       Q    Okay.  Now, in this particular case, the agency

11   that provided the computer to you to analyze was what agency?

12       A    New York State Police.

13       Q    Okay.  And the -- the things that you just

14   described what you do, Mr. Thompson, I take it from your just

15   description, do you or any member of your unit, do you

16   actually work on the actual hard drive or you work on that

17   image that you just described was created?

18       A    We work on the image.  That way the original

19   evidence isn't altered in any way.

20       Q    Okay.  So that original hard drive or original

21   computer is then preserved, and whatever you do to

22   forensically look for things, you do it on that copy you

23   made?

24       A    Correct.

25       Q    The -- this particular computer, the Lang computer,

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1344

1  how many hard drives did it have?

2       A    This had one hard drive.

3       Q    Okay.  Is that fairly typical of most people's

4  computers?

5       A    I would say it's typical.

6       Q    Now, although it may seem obvious, the hard drive

7  of a computer is -- does what?  What does it exactly do?

8       A    The hard drive in its most basic form is merely

9  the -- the device within a computer that will store both the

10 operating system files, the files that actually make the

11 computer work, like Windows, for example, and all

12 user-created files.  Those electronic files would be stored

13 on that hard drive.

14      Q    Okay.  So, in layman's terms, if a person -- let's

15 use the Lang computer.  If a person is going to create

16 documents, letters that they perhaps would send or if they're

17 going to have any kind of photographs that they want to store

18 or save or e-mails that they send to and from someone, where

19 on the computer would all those things be stored?

20      A    Well, any user-created files would be stored on the

21 hard drive.

22      Q    Okay.  Now, when you conducted the forensic

23 analysis of the Lang computer, just generally can you tell us

24 what it is that you did to search that computer and how is

25 that performed in terms of your forensic analysis.

James Thompson - Direct

1345

1    A    In this particular case we were asked to search the

2  computer for any images of an approximately 12- to

3  14-year-old female.  I was furnished with her name, and once

4  the image file was actually loaded into the forensic program,

5  I performed a file recovery.  In other words, I had the

6  computer go out and look through the entire hard drive for

7  any image files that may have been deleted that were still

8  recoverable.  And once that occurred, all those files that we

9  found in that manner were added to the total bulk of the

10 graphic images, and I visually examined all those graphic

11 images in the file or in the case.

12   Q    Okay.  So, in this particular case you were given

13 some information to look for a particular type of photograph

14 or photographs or images?

15   A    I was.

16   Q    Okay.  And I take it at some point did you learn

17 the person that you were being asked to look for was any

18 image or photograph of Shannon O'Connor?

19   A    Yes.

20   Q    Okay.  Did you find any photographs or images of

21 Shannon O'Connor on the Lang computer?

22   A    I did not.

23   Q    Now, when you went through forensically and were

24 extracting photographs or images on the Lang computer, did

25 you find images or photographs of some type on that computer?

James Thompson - Direct

1346

1    A    Yes, I did.

2    Q    What -- can you describe what you found and what

3    you did observe when you went through the Lang computer.

4    A    As far as the images are concerned?

5    Q    Yes.  Just the images I'd like to talk about at

6    this point.

7    A    Well, there were -- if I recall correctly, there

8    were a little over 5,000 total image files on the computer.

9    Roughly 3 to 400 of those files were pornographic in nature,

10   adult porn, if you will.

11   Q    Did you at some point actually look at those

12   images, view those images, the pornographic images?

13   A    You have to do that.  If I'm looking for one

14   particular file, I would have to view all the files, yes.

15   Q    And can you just describe generally what you saw in

16   terms of kinds of images that were on the computer.

17   A    The images of the adult pornography consisted of

18   images of oral sex, bondage and sadomasochistic type images

19   usually involving two adults, two or more adults.

20   Q    And were those -- how would you characterize the 3

21   to 400 images of pornography, were they -- in terms of the

22   persons depicted in the images, were they adults in terms of

23   what you were viewing or were they not adults?  How would you

24   describe that?

25   A    I would say they were adults.

James Thompson - Direct

1    Q    Okay.  Were there any images that you found where

2  they were of younger-looking persons or young-looking adults,

3  if I can put it that way?

4    A    Yes.  There were a handful of images, I believe

5  four to six images that I bookmarked that were of what I

6  considered young females.

7    Q    Okay.  Were these also included in the pornography

8  type images that you indicated you found?

9    A    Yes.

10    Q    Now, in addition to finding the pornography that

11  you described, did you also recover any e-mails from that

12  Lang computer?

13    A    Yes.  Approximately six e-mails that appeared to be

14  between a Linda O'Connor and a George Lang.

15    Q    And with respect to the images and the e-mails that

16  you did recover, did you -- did you find or did you come to

17  any conclusions whether or not there were any other files

18  that were on that computer at some point but which you could

19  not retrieve?

20    A    Yes.  In searching for -- when we're working on a

21  case that involves graphics, graphic images, often we will

22  look for artifacts that's created by the Windows operating

23  system in this case that would indicate the presence of files

24  that aren't retrievable anymore.  In particular, with image

25  files, the image files in this particular case, the Lang

James Thompson - Direct

1    computer, were stored in a folder called My Pictures.  It was

2    a default location that Windows creates on installation.

3    Inside that folder and any subsequent folder that contains

4    graphic images, Windows creates by default a hidden file

5    called thumbs.db.  In order to create that file, the

6    thumbnail view or the film script view has to be enabled in

7    Windows, and that is a default setting when you install

8    Windows.  Thumbs.db exists for the purposes of speeding up

9    viewing, facilitating viewing of any images you may have

10   stored there.  What it does, though, is it caches all the

11   file names that are present in that folder that are graphic

12   images and keeps a record of those.  Because it is a hidden

13   file, oftentimes when images are moved or deleted from a

14   particular folder, that file gets left behind and never gets

15   deleted and that file, that thumbs.db file -- and again, one

16   can exist for every folder that contained graphic images --

17   those hang around in the computer forever because they've

18   never been deleted.  And again, it's a source of information

19   for us because we can look at these files and say that these

20   particular files, even though they are not being able to be

21   found at present on the computer, existed at some point in

22   time on the computer.

23        Q    Okay.  So, let me ask you if we understand -- we

24   can stay on that topic for a few moments, Mr. Thompson.  On

25   the Lang computer, were you able to, through this thumbs

James Thompson - Direct

1  cache, as you described, were you able to tell whether at

2  some point in time there were other images, photographs, on

3  that computer which you could no longer retrieve to look at

4  but which were there at some point in time?

5      A    Yes.

6      Q    Okay.  And what could you tell from this cache as

7  to what was there?

8      A    Again, the cache file will keep track of any image

9  file that was in that particular location where the thumbs

10  file exists in that particular folder.  So a file could be

11  put there and deleted and the name of that file will remain

12  in that thumbs.db file.

13     Q    Okay.  So, the name of the file, you can see it and

14  you found it, but you couldn't retrieve the file itself

15  anymore?

16     A    That's possible, yes.

17     Q    Okay.  Now, with respect to the Lang computer, did

18  you find or identify file names that were indicative of

19  photographs that used to be there but no longer were on the

20  Lang computer?

21     A    Yes.  Everything in the thumbs.db file will be

22  image files including photographs.  So, yes, I did.

23     Q    Okay.  Now, when you conducted your forensic

24  analysis, could you tell at all -- could you tell or not, by

25  the file name that remains, what that photograph was or was

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1350

1    not of?

2        A    Not really.  Again, a file can have any name.  It

3    can be -- because it says O1O.jpg, I have no idea what that

4    could actually be.  Some files names can be very descriptive,

5    you have a good idea as to what they are.  I can't tell for

6    certain if I can't see the picture.

7        Q    So just by that remnant name, it doesn't tell you

8    necessarily what the image was of?

9        A    Correct.

10       Q    Did you find any file names which were nondescript,

11   for example?

12       A    Yes.  Many of them would have a series of numbers

13   before the .jpg, which is the suffix that would indicate a

14   jpeg image file.  Obviously, that, I have no idea of telling

15   what those are, or a series of letters and numbers that

16   wouldn't be descriptive at all of anything.

17       Q    Could you -- just for the jury can you indicate

18   what jpg and jpeg, what does that signify in computer lingo?

19       A    That's probably the most common compressed image

20   file format that we deal with, that anybody deals with.  It's

21   jpeg, or jpg, commonly referred to as jpegs, are typically

22   what -- if you took pictures with your digital camera,

23   probably a set default to save them as jpeg files.

24   Downloading pictures from the internet oftentimes will come

25   down as jpeg.  The reason for that, it uses a compression

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1351

1    format where it can actually make the file size smaller,

2    which makes it easier to transmit over the internet, upload,

3    download, and it also makes the media that contains those

4    images capable of storing more files.  So that's why it's so

5    common.

6         Q    So, on the Lang computer, when you're looking and

7    you see something, either letters or numbers, and then you

8    have .jpg or .jpeg, those last three or four letters signify

9    to you what?

10        A    It's an image file.

11        Q    By image, that means what?

12        A    A graphic picture, a graphic image file.

13        Q    Versus a document, for example?

14        A    Correct.

15        Q    Now, on the Lang computer, you found, as you

16   indicated, some of these file names which indicate that

17   something was there before but no longer can be retrieved, is

18   that correct?

19        A    Yes.

20        Q    Can you tell by your forensic analysis what caused

21   that file to -- that graphic image to no longer be

22   retrievable?

23        A    I can't tell for certain why it isn't there

24   anymore.  There are several reasons why it could be gone.

25   Purposeful deletion by a user, corrupted files, files that

James Thompson - Direct

1352

1  have been scrambled, if you will, by the operating system or

2  by some particular occurrence that went on within the

3  operating system.  Most typically, though, they're gone

4  because the user deleted them or moved them somewhere else.

5      Q    Okay.  So, is it fair -- Mr. Thompson, it could be

6  intentional or unintentional reasons behind why an image is

7  no longer there, if you can tell it was there at some point?

8      A    That's fair, yes.

9      Q    Now, in the Lang computer, you indicated you found

10 file names that indicate to you that these were at some point

11 graphic images that were present --

12     A    Yes.

13     Q    -- no longer there?

14     A    Yes.

15     Q    Did you also find any file names at least by the

16 name indicative of some type of pornographic material?

17     A    By description of the file itself, the file name,

18 yes, you have to draw a conclusion that it would be

19 pornographic.

20     Q    Based on the wording in the file name?

21     A    Exactly.

22     Q    In conducting the examination of the Lang computer,

23 did you also find file names or remnants of folders, or

24 files, rather -- excuse me -- where you saw the letters DSC

25 and DSCF?

James Thompson - Direct

1    A    I believe there were three or four entries in the

2 thumbs.db cache that would meet those descriptions.

3    Q    And what is -- in computer lingo what significance

4 is there to a file that begins DSC or DSCF?

5    A    In computer lingo, huh?  Okay.  DSC is a common

6 format that is created by Sony DSC model cameras, and the

7 existence of those files on media to me would be consistent

8 with the fact that those files were created, taken by a Sony

9 DSC model camera and not renamed.  That was -- would be how

10 they would appear directly from the camera.

11    Q    Okay.  And obviously if the person chooses to

12 rename it and they rename it, then you won't find that file

13 name as the camera had given it the name?

14    A    Unless they saved the original format also.

15    Q    Okay.  The original format of the original picture?

16    A    Of the original picture.

17    Q    Now, these file names that you found through your

18 forensic examination but which you can no longer retrieve the

19 actual files, based on your examination of the Lang computer,

20 is there any way to retrieve these or reconstruct these where

21 you found file names but no longer can retrieve these, or is

22 it simply they're gone?

23    A    In my opinion, in this particular computer, some of

24 those files were gone and I could not retrieve them.

25 Typically, when I run a file recovery at the beginning of the

James Thompson - Direct

1   case and I try to look through the entire contents of the

2   media for image files, what the software does, and what we

3   would do manually if we didn't have automated software, is to

4   look for a signature.  Every file, every format has a

5   particular signature, and the computer, the forensic software

6   actually searches the bulk of the media for the existence of

7   that particular -- what they call a file header, and if it

8   can't find that, it doesn't identify it as a picture.  It is

9   possible and indeed it occurs in nearly every case we work

10  where image files are corrupted in some way, shape or manner

11  or they've been deleted and some of the information has been

12  overwritten and they end up being nonrecoverable.

13      Q    Okay.  On the Lang computer, based on your

14  analysis, are you able to speak to whether or not there were

15  at one point graphic images that are no longer recoverable,

16  that are no longer there?

17      A    I would say yes, that there were, based on the

18  contents of the thumbs.db cache and what we found, certainly

19  there are graphic images that I wasn't able to locate, at

20  least by title, by description.

21      Q    Okay.  And which were there at some point, based on

22  what you saw?

23      A    Yes.  If they're in the thumbs.db cache, they were

24  on the media at some point in time.

25      Q    With respect to those, were you not able to come to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1355

1    any conclusion whether they were intentionally or

2    unintentionally removed?

3        A    No, I wasn't.

4        Q    Now, in looking at the Lang computer, conducting

5    the examination, were you able to tell whether or not the

6    Lang computer ever had any scanner attached to it?

7        A    Yes.  I determined that there was, I believe, a

8    Visioneer model scanner attached through USB port at some

9    point in time to that computer.

10       Q    Again, just for all of us but mostly for the

11   record, can you describe very briefly what is a scanner and

12   how does that -- how does the scanner get utilized with a

13   computer?

14       A    A scanner is very similar to a copy machine, and

15   instead of having a hard copy output, what you're doing is

16   copying an existing document or photograph, and instead of

17   printing out a piece of paper, it actually creates a computer

18   file that you can store on digital media.

19       Q    Okay.  And so by way of example, if someone

20   utilizing the Lang computer had wanted to save a photograph

21   that they had, a hard copy of the photograph, how would they

22   go about utilizing a scanner to save it onto the computer?

23       A    They'd simply put the photograph in the scanner and

24   start it through its routine, and the scanner in most cases,

25   like a copy machine, you'll see a light go across the glass

James Thompson - Direct

1356

1    platen.  It will make a digital copy of what's on the platen,

2    in this case an image, and it will ask you to give it a

3    title, give it a file name and a location you'd like to save

4    it to.  And it's that simple.

5        Q    And then once that photo has been scanned and saved

6    on the computer, then can the individual, in this particular

7    case whoever would be using the Lang computer, could they,

8    for example, e-mail that photograph to somebody?

9        A    Certainly.

10       Q    Or could they -- could they print it out at some

11   later date and have a hard copy of that photograph?

12       A    Yes.

13       Q    Now, in looking at the Lang computer, were you able

14   to determine whether or not that computer at any point in

15   time had a thumb drive storage attached to it?

16       A    Yes, it did.

17       Q    Can you first tell us, what is the thumb drive

18   storage unit that was attached to the Lang computer?

19       A    What's referred to as a thumb drive or a flash

20   drive is a -- contains electronics that's referred to as

21   flash media or flash memory.  It's very similar to the memory

22   cards that you have in your digital cameras and some people

23   have in their cellphones.  The same electronic principle

24   exists.  Something the size of your thumbnail, the actual

25   digital media, it is capable of holding a lot of information.

James Thompson - Direct

1357

1  I believe the biggest ones I've seen on the market today are

2  around 8 gigabytes.  The entire device itself typically could

3  be an inch and a half, two inches long, very, very thin and

4  again, about the size of a human thumb except for a lot

5  thinner and could be carried easily in a pocket.  It's meant

6  to make data portable.

7      Q    And with respect to the Lang computer were you able

8  to determine what type of a thumb drive or flash drive, as

9  you indicated?

10     A    Yes.  I believe it was a SanDisk Cruzer,

11 C-R-U-Z-E-R.  SanDisk is a manufacturer of flash drives.

12     Q    Okay.  How would such a drive -- or excuse me.  How

13 would such a storage unit be utilized, specifically on the

14 Lang computer?  Where would somebody put that in or plug it

15 in?  How would they do that?

16     A    There are ports or receptacles, in this particular

17 case, on the front and the back of the computer, where

18 somebody could just simply insert this small device, and the

19 computer, through the operating system, would recognize this

20 device and you'd be able to access any files that were

21 already on it or put new files on the device.

22     Q    Okay.  And you indicated that you could tell

23 through your forensic analysis that such a device at some

24 point had been used on the Lang computer?

25     A    Yes.  In the Windows operating system there's a

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1358

1  section of the operating system called the registry, and the

2  registry is basically a database of all the settings in the

3  computer, all the software that a person has loaded in this

4  computer.  This is the depository of all the defaults that

5  the person has chosen, the way the software and the computer

6  interact, basically, if you will.  And there's a section of

7  the registry that keeps track of all USB devices that were

8  inserted into that particular computer.

9      Q    Okay.  And the SanDisk thumb drive, disc thumb

10 drive or flash drive device, how much data or how much

11 storage capacity are we saying or talking about that this

12 could hold, given the fact it may depend on how many

13 gigabytes of information you can hold?  What are we talking

14 about, generally speaking, how much data these things can

15 hold?

16     A    Well, again, I have no way of telling how big this

17 particular device was in terms of size of digital media.  It

18 could have been a small one or probably been up to 2

19 gigabytes a couple years ago.  This is about the biggest you

20 can get.  If you consider that perhaps that device was 256 or

21 512 megabytes and that a typical jpeg file, one that may have

22 been taken with a digital camera, for example, not just the

23 jpeg but any other image file format might be 5 to 10

24 megabytes, that would be a very high-resolution typical

25 snapshot that someone would take, that can hold quite a

James Thompson - Direct

1    number of images.

2        Q    And I take it that this thumb drive, flash drive

3    device, as you indicated, is sometimes portable?

4        A    Absolutely.

5        Q    If a person has a thumb drive, can they use it just

6    on their computer or can it be used on any computer?

7        A    No, it can be ported to any computer and used on

8    any computer that would have a Windows operating system and

9    actually any Mac computer would recognize a thumb drive.

10       Q    So the thumb drive that was -- at some point as you

11   indicated there was a thumb drive attached to the Lang

12   computer.  That same thumb drive, at that time, whenever it

13   was utilized, could have been taken to any other person's

14   computer and plugged in and you could view whatever is on

15   that thumb drive?

16       A    Sure.

17       Q    You talked a little bit about the hard drive of the

18   Lang computer, and we have been talking about this thumb

19   drive that at some point was connected to the Lang computer.

20   If the person operating the Lang computer wanted to save

21   something, okay, wanted to save it, would they necessarily

22   have to save it on the hard drive if they have a thumb drive

23   that's also plugged into the computer?

24       A    No.  When you plug in a thumb drive, the operating

25   system, once it recognizes the fact that the drive is there,

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1    gives it what we call a logical operator or a letter, a drive

2    letter number.  Typically your hard drive in most cases will

3    be referred to as the C drive or it will have the letter C in

4    front of it, designating the main hard drive volume.  It

5    could, when you plug in the thumb drive, be called any

6    letter, depending on how your computer is set up, or almost

7    any letter, and that person would -- the person saving the

8    file would have a choice when they go to save the file as to

9    where they want the file to be.  Anyone who's operated a

10   Windows computer would be familiar with the window that comes

11   up, and at the top of that window it will have the location

12   where the file you're saving is going to be.  So that can be

13   changed simply by dropping down the little arrow and steering

14   the computer toward the thumb drive and, for that matter, you

15   can divide the thumb drive up and put it in any particular

16   folder within the thumb drive and save it there.

17        Q    Okay.  So, you could save it to the thumb drive

18   without ever having to save it to the hard drive?

19        A    Yes.

20        Q    And then you can take that thumb drive to somebody

21   else's computer, plug it in and pull up whatever photo images

22   you had stored on your thumb drive?

23        A    It's possible.

24        Q    Now, when you got the Lang computer and started it

25   up, were you able to tell anything about the Lang computer as

James Thompson - Direct

1  you began the computer, it started or tried to get it to

2  start up to start conducting your imaging and the things that

3  you described earlier?

4      A    Right.  We didn't actually start the computer up.

5  We never start up the subject computer because that would

6  actually change files that are inside the computer.  It came

7  to my attention that possibly the computer hadn't been used

8  in a while because it had some difficulty with the operating

9  system.  In examining the operating system, we determined

10  that the software installed on that computer that would

11  actually facilitate recovery if something did happen to the

12  computer -- and with this particular software package, it's

13  in my experience that if you aren't familiar with it and you

14  try to run other recovery software or corrective software on

15  this machine or a machine that has it on there, that what's

16  going to happen is you're going to have a lot of corrupted

17  files.

18      Q    Okay.  So when it got to you, the hard drive, did

19  it appear that someone had tried to do something with it

20  which may have corrupted a lot of files that were prior to

21  that on that computer?

22      A    It was difficult to enter the -- what we had

23  considered called the BIOS system, basic input/output system.

24  And again, based on that fact, we did obviously get in there,

25  but based on that fact and the information that I was given

James Thompson - Direct                              1362

1   that the computer hadn't been used because there was

2   difficulty with it, we suspected that there was some problem

3   with the operating system or software that was contained on

4   it.

5              MR. LOVRIC:  Those are all the questions I

6   have, Judge.

7              THE COURT:  Mr. Fischer?

8              MR. FISCHER:  Thank you, your Honor.

9   CROSS-EXAMINATION

10   BY MR. FISCHER:

11       Q    Sir, I'm Kelly Fischer, I represent Mr. Sacco.  I

12   want to make it clear, you found no pictures of Shannon

13   O'Connor, am I correct?

14       A    That's correct.

15       Q    Did you find any pictures of Linda O'Connor?

16       A    No, I did not.

17       Q    Did you find any pictures of George Lang?

18       A    Yes, I did.

19       Q    Did you find any pictures of Dean Sacco?

20       A    No, I did not.

21              MR. FISCHER:  Those are all the questions.

22   Thank you.

23              THE COURT:  Miss Peebles.

24   CROSS-EXAMINATION

25   BY MISS PEEBLES:

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Cross                                    1363

1      Q      Agent Thompson, you prepared an investigative

2   analysis report in this case?

3      A      I did.

4      Q      And you submitted that report to investigator Terry

5   Schultz of the New York State Police?

6      A      Yes.

7      Q      And you shared with him your findings concerning

8   the analysis of the hard drive, and that's really essentially

9   what's in your report, right?

10     A      Yes.

11     Q      And you knew exactly what you were looking for when

12  you were examining the hard drive, the Lang hard drive?

13     A      Well, I knew I was looking for image -- image of a

14  12- and 14-year-old female, and I was furnished with her name

15  and Miss O'Connor's name and that was pretty much it.

16     Q      And you talked about USB ports, you mentioned that

17  there was a flash drive and you also mentioned a scanner.

18  There was no evidence that a digital camera had ever been

19  hooked up to one of the USB ports on the Lang computer?

20     A      There was not.

21     Q      Correct.  And you were able to find thousands of

22  files in unallocated space on the hard drive?

23     A      Not sure of the number, but yes, there were many

24  files recovered from the unallocated space.

25              MISS PEEBLES:  I have no further questions.

James Thompson - Redirect

1    Thank you.

2                    THE COURT:  Mr. Lovric.

3                    MR. LOVRIC:  Just one question, Mr. Thompson.

4    REDIRECT EXAMINATION

5     BY MR. LOVRIC:

6        Q    If a person using the Lang computer had a US -- a

7    USB thumb drive, the thing we discussed earlier, and if they

8    went to another computer, attached the digital camera, could

9    they then save that to the thumb drive and view it on the

10   Lang computer?

11       A    Certainly.  Any file that's created on a thumb

12   drive can be ported to another computer.  If it's there, it

13   can be viewed.

14                   MR. LOVRIC:  That's all I have.

15                   THE COURT:  Mr. Fischer.

16                   MR. FISCHER:  Nothing.  Thank you.

17                   THE COURT:  Miss Peebles.

18                   MISS PEEBLES:  One other question, Agent

19   Thompson.

20   RECROSS-EXAMINATION

21    BY MISS PEEBLES:

22       Q    As far as the DSC files that you mentioned, the

23   couple of photographs that had that next to it, is it not

24   true that if you go onto an internet site you can pull off

25   DSC pictures and put them onto your hard drive?

James Thompson - Recross                                   1365

1        A     Certainly.

2                    MISS PEEBLES:  No further questions.

3                    THE COURT:  Anything further from anybody?

4                    MR. FISCHER:  No, your Honor.

5                    (Witness excused)

6                    THE COURT:  Thank you, Agent Thompson.  You

7    may step down, sir.

8                    MR. LOVRIC:  The next witness is coming down.

9    It's James Parmalee.

10                   THE COURT:  Okay.

11                   THE CLERK:  Please state your full name.

12                   THE WITNESS:  James Parmalee, P-A-R-M-A-L-E-E.

13

14

15

16

17

18

19

20

21

22

23

24

25

James Parmalee - Direct                                    1366

1   J A M E S    P A R M A L E E, having been called as a witness,

2   being duly sworn, testified as follows:

3               MR. LOVRIC:  Judge, if I can have a moment

4   just to set or turn on this machine.

5               THE COURT:  Okay.

6   DIRECT EXAMINATION

7   BY MR. LOVRIC:

8        Q    Good afternoon, Mr. Parmalee.

9        A    Good afternoon.

10       Q    Mr. Parmalee, could you, for the members of the

11  jury, state your full name for them.

12       A    James Freeman Parmalee.

13       Q    Mr. Parmalee, what county do you reside in?

14       A    Chenango County.

15       Q    And about how long have you lived in the Chenango

16  County area?

17       A    Off and on since I was the age of 6.  I'm 38 now.

18       Q    Okay.  Quite a while?

19       A    Yes.

20       Q    Mr. Parmalee, I'd like to talk about an event with

21  respect to a location of 45 Fair Street in Norwich, New York

22  and a person by the name of Shannon O'Connor.  Let's talk

23  about Shannon O'Connor.  Did you know or do you know who

24  Shannon O'Connor is?

25       A    Yes, I do.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct

1    Q    How did you come to interact or know Shannon

2    O'Connor?

3    A    Shannon was my daughter's best friend.

4    Q    Okay.  And I take it your daughter's approximately

5    the age of Shannon O'Connor?

6    A    Yes, she is.  She's 13.

7    Q    I'm sorry?

8    A    She's 13.

9    Q    And in 2006, the fall of 2006, if I can talk about

10   that, your daughter would have been in what grade at school,

11   level, grade?

12   A    She would have been in sixth grade.

13   Q    And was Shannon O'Connor, if you know, in the same

14   grade or the same grade level as your daughter?

15   A    That I don't know.

16   Q    Okay.  Do you know if they went to school together?

17   A    Again, I don't know.  I believe they did but I

18   don't fully know.

19   Q    Okay.  And to your knowledge how did Shannon

20   O'Connor and your daughter know each other?

21   A    I'm not exactly sure exactly how they met, but I

22   believe through school and other acquaintances.

23   Q    Okay.

24   A    They were friends at school, but I'm not sure if

25   they were in the same grade.

James Parmalee - Direct

1368

```
 1      Q    Okay.  Do you know if they went to the same school?

 2      A    They were both in the Stanford J. Gibson School,

 3   yes, at the same time.

 4      Q    Okay.  And at some point in time I take it you met

 5   Shannon O'Connor through your daughter either having her over

 6   for a play date or playing together, something of that sort?

 7      A    Yes.

 8      Q    Did you know or -- did you know much about Shannon

 9   O'Connor's mother, as far as, did you ever meet her, did you

10   ever get to know her, anything like that?

11      A    Just in passing.  I never really sat down and

12   talked to her, no.

13      Q    Okay.  Did you meet her, or you never really met

14   her, just kind of knew who she was?

15      A    Just knew who she was.  Never -- I met her maybe

16   twice, but it was for a brief one minute, two minutes.

17      Q    Okay.  All right.  Would you recognize her if you

18   saw her here?

19      A    Yes, I would.

20      Q    Okay.  Take a look around the court.  Do you see

21   her in court anywhere?

22      A    Yes, I do.

23      Q    Can you just tell us where.

24      A    She's sitting over there, the second person on the

25   left.
```

James Parmalee - Direct

1369

1   Q    Okay.  Second person from the far left?

2   A    Yes.

3            MR. LOVRIC:  Just for the record, defendant

4   O'Connor.

5   Q    I take it you didn't know Mrs. O'Connor at all, it

6   sounds like?

7   A    No.

8   Q    The interaction you had had with Shannon was

9   primarily through your daughter either playing with her or

10  being with her?

11  A    Yes, it was.

12  Q    Now, I'd like to talk about an event sometime prior

13  to Christmas of 2006.  Do you recall going to the O'Connor

14  residence at 45 Fair Street?

15  A    Yes, I do.

16  Q    And what was the purpose in going there?

17  A    Shannon had missed a couple of days of school that

18  week, and Brooke was wondering how she was doing, if she was

19  okay, she was sick.  So we had stopped over to see her.

20  Q    Okay.  Brooke is your daughter?

21  A    Yes.

22  Q    And at that time did you go over to Shannon's

23  house?

24  A    We went on -- I believe it was either Thursday or

25  Friday to see her, to see if things were okay.

James Parmalee - Direct

1    Q    At that point did you know where Shannon lived

2  or -- or you didn't at that point?

3    A    Yes, I did know.

4    Q    Okay.  Had you ever been there before to that

5  residence?

6    A    Maybe once or twice.  That was just to drop Shannon

7  off or pick Brooke up.

8    Q    Okay.  And this event where you went to the

9  O'Connor residence to see how Shannon was doing, to the best

10  of your recollection do you know if this was before or after

11  Christmastime of that month?

12    A    I believe it was before Christmas.

13    Q    Okay.  And who went to the O'Connor residence in

14  addition to yourself?

15    A    Myself, my daughter and my wife and my son.

16    Q    Okay.  Did you -- how did you get there?

17    A    We drove our Jeep.

18    Q    Okay.  So you drove over there?

19    A    To the residence, yes.

20    Q    And at some point did you go up to the house to

21  knock on the door?

22    A    My daughter and I went to the house.  My wife

23  stayed along with my son in the vehicle.

24    Q    Okay.  Now, Mr. Parmalee, what I'd like to do is --

25  I'd like to show you -- it will be on your monitor -- some

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct

1371

1   photographs that are already in evidence, but I'd like to put

2   them on the screen and just have you tell us where at the

3   house you went on this occasion.

4        A    Okay.

5        Q    Mr. Parmalee, just for the record, I'm going to put

6   on the screen Government's Exhibit 50.  And can you see that

7   on your screen?

8        A    Yes, I can.

9        Q    Okay.  Now, do you recognize that house, first of

10  all?

11       A    Yes, I do.

12       Q    Okay.  What is that that you see there?

13       A    That's the house where we went to see Shannon, and

14  I dropped her off before at that house.

15       Q    Okay.  So, that's the residence you went on this

16  day sometime prior to Christmas?

17       A    Yes, it is.

18       Q    Now, when you arrived at that house, you indicated

19  that you drove there?

20       A    Yes, we did.

21       Q    Okay.  Can you just tell us, approximately where

22  was it that you parked your vehicle when you came up to the

23  house that's in that picture?

24       A    We were to the -- in front of this tree that you

25  can see right in front of the house.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct

1372

1    Q    Okay.

2    A    In between that tree and the bush.

3    Q    Okay.  So what I'd like to do is, I'm going to

4    point to the screen.  You're talking about the tree and the

5    bush, in between the two, somewhere approximately there?

6    A    Yes.

7    Q    Okay.  So that's where you parked your vehicle?

8    A    Yes.

9    Q    And in what direction was the vehicle pointed or

10   facing when you parked it there?

11   A    Facing on the same side of the street down.

12   Q    I'm sorry?

13   A    Same side of the street down.  Just like we drove

14   up, like right next to the house.

15   Q    So is the front of your vehicle, is it parked on

16   the side of the street where the O'Connor house is located?

17   A    Yes, it was.

18   Q    And the front of your vehicle, is it closer to the

19   bush or the tree?

20   A    Closer to the bush.

21   Q    Okay.  So, and your vehicle is pointed towards the

22   bush, in the direction of the bush from the tree?

23   A    The bush is where the front engine part of the

24   vehicle was.

25   Q    Okay.  What I'm going to do, Mr. Parmalee, is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct                    1373

1  showing Exhibit 50, so I take it from what you're describing,

2  your car is pointed from the right to the left position, is

3  that what you're saying?

4       A    Just like you drove right up to the house.

5       Q    Okay.  So I'm going to put an arrow on this exhibit

6  to show what direction your car was facing.  Is that

7  accurate?

8       A    Yes, it is.

9       Q    Okay.  And who was driving that day?

10      A    I was.

11      Q    And you indicated who else was with you in the car?

12      A    My daughter, my son and my wife.

13      Q    Okay.  Where in the car was your wife?

14      A    Wife was in the passenger front seat.

15      Q    Okay.  I take it your daughter and son were

16  somewhere in the back seat?

17      A    Yes, they were.

18      Q    And at some point did you exit the vehicle and go

19  up to the house?

20      A    Yes.  After we parked the vehicle.

21      Q    Okay.  And who went up to the house?

22      A    My daughter and I.

23      Q    And where were your wife and your son when you and

24  your daughter went up to the house?

25      A    Still in the vehicle.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct
1374

1    Q    And from the time you exited the vehicle to the
2  time that you came back to it, did your wife and son ever get
3  out of that vehicle?
4    A    No, they did not.
5    Q    So they remained in the car, which is parked
6  where -- near where that arrow is, in the direction that the
7  arrow is pointed, is that right?
8    A    Correct.
9    Q    And when you went up to the house, you and your
10  daughter, can you tell by looking at this photograph which
11  door you went to when you went up to the house?
12    A    The best of my recollection, it was the second
13  door, not the one that's -- that has the D-1 on it.
14    Q    Okay.
15    A    The next one to the left.
16    Q    Why don't you hit the screen where that was.
17    A    Right here.
18    Q    Okay.  So where the green arrows and the green dot
19  just popped up?
20    A    Yes.
21    Q    So you went to that second stairway to the left of
22  this picture as you're looking at it and that being to the
23  left of the door of D-1, the next door over?
24    A    Yes.  I believe so.
25    Q    Okay.  And if it's okay, Mr. Parmalee, I'm going to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct                    1375

1    put a P on the photograph itself, P for Parmalee.  Is that

2    the stairwell you went up to the door?

3         A    Yes.  I believe so.

4         Q    And then I'd like to put on -- next on the screen

5    Government's Exhibit Number 98 which is in evidence.  Can you

6    see that photograph, Mr. Parmalee?

7         A    Yes, I can.

8         Q    And is that -- is that the actual door that you

9    first went up to when you went to the house?

10        A    Yes.  I believe so.

11        Q    And it has a D-2 there, you see that?

12        A    Yes, I do.

13        Q    Okay.  And what did you do when you got up to that

14   door?

15        A    We knocked to find out if anybody was home.

16        Q    Try to pull that mike a little closer.  You knocked

17   on the door?

18        A    Yes.

19        Q    And your daughter was with you, I take it?

20        A    Yes, she was.

21        Q    And did anybody answer that door?

22        A    Yes.

23        Q    Who answered that door?

24        A    Shannon's mother.

25        Q    Okay.  Now, prior to this event, had you met her

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct                    1376

1  before or knew who she was by seeing her?

2       A    Just by sight.

3       Q    Okay.  What was the conversation like?  What did

4  you say to her, what did she say to you?

5       A    The conversation was about Shannon, you know, if

6  she was all right, could we see her, because she had missed a

7  couple days of school and Brooke was worried about her.

8       Q    And did Mrs. O'Connor say anything about that?

9  What do you recall her saying?

10      A    All I remember, she said she was out back in the

11 upstairs room apartment and that the door was in the back or

12 on the side farther back.

13      Q    Okay.  Did she say anything more as far as what

14 Shannon -- what she was doing or how she was feeling,

15 anything about --

16      A    Not that I recall.

17      Q    Now, did Mrs. O'Connor indicate to you where you

18 should go if you wanted to see Shannon to have her -- or to

19 talk to you?

20      A    She said it was the back door or the side back door

21 I believe is what she had said.

22      Q    Okay.  Did she point or did she indicate in any

23 way?

24      A    I don't recollect if she pointed or not.  But we

25 knew where to go.

James Parmalee - Direct                                    1377

1      Q    Okay.  So, let me put on the screen Exhibit 50

2  back.  And can you see -- let me ask you:  At some point then

3  did you go to another door after you had this conversation

4  with Mrs. O'Connor?

5      A    Yes, we did.

6      Q    Can you see that doorway or that area that you went

7  to next?

8      A    Yes.  Yes, you can.

9      Q    Can you on your screen just point to it.

10      A    Right there (indicating).

11      Q    Okay.  At that pointer, you put a green pointer

12  mark now in Exhibit 50.  There's what looks -- appears to be

13  a white handrail, is that correct?

14      A    Yes, it is.

15      Q    Okay.  I'm going to put a P-2 there, if that's

16  okay.  Okay.  Can you see that?

17      A    Yes, I can.

18      Q    And that's the stairway that you went to next?

19      A    Yes, it is.

20      Q    Okay.  I'd like to put on the screen next Exhibit

21  Number 101 that's in evidence.  Can you see that,

22  Mr. Parmalee?

23      A    Yes, I can.

24      Q    And I'm pointing to this right-hand stairway being

25  viewed from the back.  It has a U-2 next to it with the right

James Parmalee - Direct

1378

 1   handrails.  Is that the stairway looking at it from the back

 2   of the house?

 3       A    I believe so.

 4       Q    Okay.  And then I'll put on the screen now

 5   Government Exhibit 100 that's in evidence.  Do you see the

 6   doorway there marked U-2?

 7       A    Yes, I do.

 8       Q    Okay.  Does that appear to be the door that you

 9   then went to next?

10       A    Yes, it is.

11       Q    Now, when you went to this door that's marked U-2

12   on Exhibit 100, was your daughter with you?

13       A    Yes, she was.

14       Q    What did you do when you got to this doorway?

15       A    We walked up to the door and knocked.

16       Q    Okay.  Did you go inside?

17       A    No, we did not.

18       Q    Now, after you left the doorway where you first

19   knocked that you spoke to Mrs. O'Connor and you came over to

20   this doorway that's marked U-2, did you see Mrs. O'Connor or

21   where she was at that point?

22       A    No, I did not.  I believe she went back inside.

23       Q    Okay.  Did she come over with you to this doorway

24   marked U-2?

25       A    No, she did not.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct

1    Q    Did she stand outside while you're knocking on this

2  door?

3    A    I don't believe so, no.  I believe she went back

4  in.

5    Q    Okay.  So after you left the door where you were

6  speaking to her and came over, you didn't have any more

7  contact in terms of sight contact with her at that time?

8    A    No, I did not.

9    Q    Okay.  And while you were at this door, U-2, you

10  indicated you knocked?

11    A    Correct.

12    Q    You didn't go inside, though?

13    A    No, we did not.

14    Q    What happened after you knocked?

15    A    We actually had to knock twice, and Shannon finally

16  came down.

17    Q    Okay.  Was it -- can you describe how long it was

18  you were waiting and standing there as you knocked the first

19  and second time?

20    A    Fifteen, 20, 30 seconds.  It was cold, so time

21  seemed to be a little longer than it could have been.  But we

22  had to knock a couple of times for her to come down.

23    Q    Okay.  And during the time that you're waiting at

24  this entrance, at any time did Mrs. O'Connor come over to

25  where you're knocking?

James Parmalee - Direct                        1380

1    A    No, she did not.

2    Q    Okay.  And at some point did Shannon O'Connor come

3  downstairs?

4    A    Yes, she did.

5    Q    Do you recall how she was dressed?

6    A    Not fitting for the weather.  I don't remember

7  exactly what she was wearing.  I'm thinking she was having

8  shorts or something of that nature and a T-shirt.  So -- and

9  it was quite cold outside.

10   Q    When she came downstairs, where -- did Brooke talk

11 with her briefly somewhere in the vicinity where you guys had

12 just been standing?

13   A    Brooke and I both talked to her.

14   Q    Okay.  And where were you speaking with her?

15   A    We were still right on the porch.

16   Q    Okay.  When you say porch --

17   A    The landing right here.

18   Q    Okay.  Let me just clear that, those two.

19        So right here on this landing, which is Exhibit

20 100?

21   A    Correct.

22   Q    So you guys talked there for how long would you

23 say, approximately?

24   A    Couple of minutes.  Maybe two, three, four minutes.

25   Q    Okay.  And during the time that you're -- you

James Parmalee - Direct

1   and/or your daughter is talking to Shannon, did you at any

2   point see Mrs. O'Connor anywhere outside or anywhere in your

3   line of sight?

4       A    No, I did not.

5       Q    Did you know where she was?

6       A    I assume she was back inside.

7       Q    Okay.  But you didn't know --

8       A    I didn't see her come out or anything of that

9   nature.

10      Q    I'm sorry?

11      A    I didn't see her come out or anything of that

12  nature.

13      Q    Okay.  And during the entire time that you and your

14  daughter spoke to Shannon, was it always on this landing?

15      A    I believe so, yes.

16      Q    Okay.  And other than the three of you, did you

17  ever see anybody else outside or anywhere near the house at

18  that point?

19      A    No, I did not.

20      Q    Okay.  Now, while you and your daughter were

21  speaking to Shannon, where was your wife and your son?

22      A    In the vehicle.

23      Q    Did they ever at any point come out and come over

24  or anywhere come on the property?

25      A    No, they did not.

James Parmalee - Direct                          1382

1    Q    And at the time that you and your daughter spoke to

2    Shannon, I don't want to get -- was it just the general

3    nature of your visit there to check to see how she was doing,

4    things of that sort?

5    A    Yes, it was.  We were just concerned.

6    Q    Did she indicate to you any kind of a problem or

7    anything of that nature?

8    A    No, she did not.

9    Q    Did you notice anything about her to lead you to

10   believe there was any kind of a problem or anything of that

11   sort?

12   A    No, there was not.

13   Q    Okay.  And what did you do once you and your

14   daughter had finished speaking with Shannon?

15   A    We walked back to the vehicle and I believe went to

16   the store.

17   Q    Okay.  And when you walked back to the vehicle, did

18   you walk back the same way that you had initially gone

19   towards each of those doorways, first the one here that has

20   the P and then the one that has a P-2?  Did you walk back to

21   the vehicle on the same side of the house?

22   A    Yes, we did.

23   Q    Okay.  And when you walked back to your vehicle,

24   did you see or did you know -- well, did you see where

25   Shannon went as you walked back to your vehicle?

James Parmalee - Direct                    1383

1        A     No, I did not.  I don't know if she went back

2   upstairs or went to the house.  I don't know.

3        Q     Okay.  And as you walked back to your vehicle, did

4   you see Mrs. O'Connor at any point during that time?

5        A     No, I did not.

6        Q     And I take it when you got in your vehicle, then

7   you drove off?

8        A     Yes.  Yes, I did.

9        Q     Now, the event that we were just talking and that

10  you described, this was, you indicated, prior to Christmas of

11  that year?

12       A     M-m h-m-m.

13       Q     Now, the year we're talking about, this is what

14  year we're discussing?

15       A     2006.

16       Q     Okay.  And how much, if anything, did you know

17  about Shannon and Mrs. O'Connor as far as their living

18  situation?

19                   MISS PEEBLES:  Objection.

20                   THE COURT:  Basis?

21                   MISS PEEBLES:  Foundation.

22                   THE COURT:  He's asking for personal

23  knowledge.

24                   MISS PEEBLES:  Relevance.

25                   THE COURT:  I don't know.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct                              1384

1   BY MR. LOVRIC:

2       Q    Do you understand my question, Mr. Parmalee?

3       A    Yes, I do.  I didn't know much about her mother or

4   Shannon at all except as being friends with Brooke.

5       Q    So you didn't know much about their business?

6       A    No, I did not.

7       Q    And I'm going to show you Government Exhibit Number

8   99 in evidence.  Can you see that photograph, Mr. Parmalee?

9       A    Yes, I can.

10      Q    And I'm going to point to the right, this white

11  handrail.  Do you see where that's located?

12      A    Yes, I do.

13      Q    Is that the handrail to the steps that you went to

14  to knock on the door?

15      A    Yes, it is.

16      Q    Okay.  And did you at any point in time, while you

17  were either waiting for Shannon or at any point in time after

18  Shannon came down, did you at any point in time go over to

19  the door where the green arrow is pointed now?

20      A    No, we did not.

21      Q    Okay.  Did you at any point in time go anywhere on

22  the side of the house where the green arrow is pointed now,

23  which is to the far left of this photograph?

24      A    No.

25           MR. LOVRIC:  That's all the questions I have.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Direct                                    1385

1              THE COURT:  Mr. Fischer.

2              MR. FISCHER:  Thank you, your Honor.

3              May it please the Court and counsel.  Mr.

4    Lovric, may I use those photographs?

5    CROSS-EXAMINATION

6     BY MR. FISCHER:

7        Q    Mr. Parmalee, my name is Kelly Fischer.  I

8    represent Mr. Sacco.

9              Mr. Lovric asked you about the date of this event

10   and he suggested that it occurred before Christmas?

11       A    Correct.

12       Q    Are you certain of that date?

13       A    I'm not certain of the exact date, no.

14       Q    Are you certain that it was before Christmas?

15       A    I believe it was before Christmas.

16       Q    How certain are you about that?

17       A    Fairly certain.  There was no snow on the ground.

18   It was right before Christmas we actually had snow.

19       Q    Do you remember in March of this year, March 25,

20   2008, having a telephone conversation with an investigator

21   about this subject?

22       A    Yes, I do.

23       Q    Do you remember the investigator inquiring about

24   the time frame when this event occurred?

25       A    I believe he asked the time frame, but I don't

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Cross

1   remember the exact time frame.

2        Q    Well, do you remember telling that investigator

3   that this event occurred possibly around December?

4        A    That's possible.  But I still believe it was before

5   Christmas.

6        Q    You may have told the investigator on March 25 of

7   2008 when you had the conversation that this event occurred

8   possibly around December, but now on May 19, 2008 you're

9   pretty certain that it occurred right around Christmastime,

10  am I correct?

11       A    Before Christmas.

12       Q    Before Christmastime but definitely in December?

13       A    I don't know.  I just know it was before Christmas.

14       Q    Was it before Thanksgiving?

15       A    I just know it was before Christmas and it was

16  cold.

17       Q    You mentioned that part of the reason you went

18  over, as I understand it, was because Shannon O'Connor had

19  been out of school for several days beforehand?

20       A    Correct.

21       Q    Do you know that Shannon O'Connor missed several

22  days of school leading up to January 10, 2007?  Did you know

23  that?

24       A    Possibly.  I did not know, no.

25       Q    When Mr. Lovric just asked you, you didn't talk at

James Parmalee - Cross

1  all about an event that occurred in January of 2007 when the

2  police came to your house, did you?

3       A    No.

4       Q    Do you remember that event?

5       A    I'm not really sure.

6       Q    Do you remember an event when the police came to

7  your house because Shannon had run away from home and had

8  come to your house?

9       A    I was not home at that time.  I was away on

10  military duty.

11       Q    When was that?

12       A    January.

13       Q    January of 2007?

14       A    If that's what you said.  You said they came to my

15  house in January.  I just know when Shannon ran away, I was

16  away on military duty.

17       Q    Do you recall that that was in fact in January of

18  2007?

19       A    I do not remember the date.

20       Q    The event that you just described concerning going

21  to the O'Connor residence, did that occur before or after the

22  police came to your house?

23       A    I believe it was before.

24       Q    When did you go into military duty?

25       A    I go so many different times, I can't -- I don't

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Cross                                    1388

1    know.  When did I join the military, is that the question

2    you're asking, or when did I leave for that particular one?

3         Q    I'll rephrase my question.  My understanding is

4    that in January of 2007 that when the police came to your

5    home, you weren't at home because you were at military duty?

6         A    Yes, I was.

7         Q    How long did that military leave from your home

8    last?

9         A    I believe it was three weeks.

10        Q    When did it begin and when did it end?

11        A    I don't -- I don't know the exact dates.  I do not.

12        Q    I've put Exhibit 50 on the screen.  I'm trying to

13   figure out how you parked your car.  Did you park your car

14   right along the curb or did you park your car facing to the

15   back of the property?

16        A    Right along the curb.

17        Q    As you look at Exhibit 50, that's looking kind of

18   at the front left part of the house from the street?

19        A    Correct.

20        Q    There was a driveway on the property, am I correct?

21        A    I don't know if there was a driveway or not.  We

22   never parked in the driveway.  We always parked on the curb,

23   basically right where this picture is taken from.

24        Q    So you had been to this residence on occasions

25   before and after this event?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Cross

1389

1    A    I can't say after.  I know before, because I've
2  dropped Shannon off and I've picked my daughter up.
3    Q    How many times have you done that?
4    A    I don't know.  A few.  A couple.  One or two.
5    Q    What school was your daughter attending at this
6  time?
7    A    Stanford J. Gibson.
8    Q    Not the Perry Brown school?
9    A    I'm sorry.  You're correct.  That is Perry Brown.
10  They've been switching those two around.  She started at
11  Stanford, then they went to Perry Brown, or it actually was
12  Perry Brown.
13    Q    When you came to the property on the day that
14  you're talking about, did you see that lights were on
15  downstairs and upstairs?
16    A    I have no clue.
17    Q    When you had dropped Shannon off before, had you
18  gone to Shannon's apartment?
19    A    No.  I drove to the house, she got out, and I
20  waited for her to get to the door and go in before we would
21  leave.
22    Q    So you saw which door she entered before?
23    A    Yes.  But I cannot recall which one.  It was one of
24  the first two on the left-hand side right here.  D-1 or D-2.
25    Q    When you pulled up on the date in question, the

James Parmalee - Cross

1  date you got out of the vehicle with your daughter -- and as

2  I understand it, as you came to the house you passed -- as

3  you're looking at the front of the house from the right, you

4  passed across the front of the house and parked on the left

5  side of the house as you're standing on the street looking at

6  it?

7      A    Yes.

8      Q    Do you know whether Linda O'Connor had a car?

9      A    I don't know.

10     Q    Well, when you were there on the date that you got

11  out of your vehicle, you eventually worked your way around to

12  the back of the house to that landing where you had the

13  conversation with Shannon, am I correct?

14     A    Not -- well, I don't consider it the back of the

15  house because it's still on the side.

16     Q    When you were standing on the landing having a

17  conversation with Shannon, could you see the garages out

18  back?

19     A    I never looked at the garages.

20     Q    You weren't aware that there were garages back

21  there?

22     A    I see the pictures with the garages, but I never

23  noticed the garages.

24     Q    Were there any vehicles parked back there when you

25  had this conversation with Shannon O'Connor?

James Parmalee - Cross

1    A    I do not know.  I did not see any -- I didn't see

2  any.

3    Q    You don't remember seeing a red car there, am I

4  correct?

5    A    Correct.

6    Q    What day of the week did this event occur?

7    A    It was either a Thursday or a Friday.

8    Q    About what time of day was it?

9    A    4:00, my best guess.

10    Q    4 PM?

11    A    Yes.  Because it was definitely after school

12  because my daughter was home.

13    Q    Where were you coming from?

14    A    My house.

15    Q    Where were you going to?

16    A    We were going to the store after we left their

17  house.

18    Q    You're aware generally of the charges in this case,

19  am I correct?

20    A    Kind of.  I haven't really followed it so --

21    Q    Did you speak with anybody in preparation for

22  coming here to testify?

23    A    I spoke with the investigators and I spoke to --

24  sorry, I forgot your name.

25           MR. LOVRIC:  Me?

James Parmalee - Cross

1392

1    MISS PEEBLES:  Mr. Lovric.

2    Q    Who's raising his hand?

3    A    Yes, that was it.

4    Q    Did you speak to anybody about this matter?

5    A    Not that I know of.  Not that I can recall.

6    Q    Do you see Linda O'Connor sitting here?

7    A    Yes, I do.

8    Q    Have you been informed generally of the nature of

9    the charges against Linda O'Connor?

10   A    Not formally, that I just -- just from the

11   subpoena, you know, and some headlines I've seen, but I don't

12   clearly follow the news.

13   Q    You understand, generally speaking, what those

14   charges are?

15   A    Yes.

16   Q    Now, as I understand your testimony, the day that

17   you went there with your daughter, you went up and went into

18   Linda's apartment first?

19   A    We didn't go into any of the apartments.  We

20   knocked on the door and she came out.

21   Q    She came out onto the porch?

22   A    Right into the opening of the door.  I don't think

23   she came out on the porch.  She was in the doorway.

24   Q    She was on the other side of the doorway, you were

25   outside?

James Parmalee - Cross

```
 1      A    Yes.

 2      Q    Did she seem nervous to you?

 3      A    Not that I can recall.

 4      Q    She just said, yeah, you can go see Shannon around

 5  that way?

 6      A    I don't remember the exact conversation.  I do

 7  recall she told us she was in the back doorway or upstairs.

 8  We had to go up to that door.

 9      Q    The gist of it was, if you want to go speak with

10  Shannon, just go help yourselves?

11      A    Yes.

12      Q    It took 15 to 30 seconds from the time you first

13  knocked to the time that Shannon came down, am I correct?

14      A    I knocked twice.  So yes.

15      Q    My question had to do with the time frames.

16      A    To the best of my recollection it was a few -- 15,

17  20, 30 seconds or so, yes.

18      Q    You spoke with Shannon on the landing?

19      A    Correct.

20      Q    Was Shannon outside the doorway and standing on the

21  landing?

22      A    Yes, she was.

23      Q    And that conversation lasted two to four minutes?

24      A    Two to four minutes.

25      Q    How did the conversation end?
```

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Parmalee - Cross

1394

1    A    I believe she said that she'd be back in school on

2  Monday.

3    Q    And what did you and your daughter do?

4    A    We said okay, we'd see you later, got in the

5  vehicle and left.

6    Q    When you said good-bye, all three of you were

7  standing up on the landing?

8    A    I believe so.  I may have been standing on the

9  second step down so there was enough room, but all three of

10  us were there.

11    Q    And so when you said good-bye to Shannon, you came

12  down the steps from the landing, am I correct?

13    A    I believe so, yes.

14    Q    And your daughter came down the steps from the

15  landing, am I correct?

16    A    Correct.

17    Q    Did Shannon come down the steps from the landing?

18    A    I don't recall.

19    Q    You had to kind of walk around the side of the

20  house to get back to your vehicle, am I correct?

21    A    We followed the concrete walkway, yes.

22    Q    And you kind of had to walk past the entrance to

23  Linda's apartment that you'd already been to and left, am I

24  correct?

25    A    Correct.

James Parmalee - Cross                                    1395

1      Q     Do you remember that Shannon came with you and

2  walked up the entrance to Linda's apartment and went inside

3  there?

4      A     I really don't remember.  She may have.  I don't

5  know.

6               MR. FISCHER:  Those are all my questions.

7  Thank you.

8               THE COURT:  Miss Peebles.

9               MISS PEEBLES:  I have no questions for this

10  witness.

11               THE COURT:  Mr. Lovric.

12               MR. LOVRIC:  Just one question.

13  REDIRECT EXAMINATION

14   BY MR. LOVRIC:

15      Q     The event that caused you and your daughter to go

16  to see Shannon was she had been out of school for a period of

17  time?

18      A     Correct.

19      Q     Okay.

20               MR. LOVRIC:  That's all.

21               THE COURT:  Mr. Fischer.

22               MR. FISCHER:  Excuse me.  Nothing further.

23  Thank you.

24               THE COURT:  Miss Peebles.

25               MISS PEEBLES:  Nothing.

James Parmalee - Redirect                    1396

1          THE COURT:  Thank you, Mr. Parmalee.  You may
2    step down, sir.
3               (Witness excused)
4          MR. LOVRIC:  The next witness will be
5    Investigator Richard Berry.
6          THE CLERK:  Please state your full name.
7          THE WITNESS:  Richard C. Berry.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

James Parmalee - Redirect

1397

1    R I C H A R D   C.   B E R R Y, having been called as a

2    witness, being duly sworn, testified as follows:

3                    THE COURT:  Okay, Mr. Lovric.

4    DIRECT EXAMINATION

5    BY MR. LOVRIC:

6        Q    Good afternoon, Investigator Berry.

7        A    Good afternoon.

8        Q    Could you, for the members of the jury, tell them

9    your full name again and tell us where you work.

10       A    Richard Berry.  I'm with the New York State Police.

11   I'm an investigator for the past 14 years.

12       Q    And how long have you been with the New York State

13   Police?

14       A    Going on 15 years.

15       Q    And in terms of your most current assignment as an

16   investigator, can you just tell the members of the jury a

17   little bit about, generally speaking, what kind of work do

18   you do and what kind of matters do you work on?

19       A    I work with the major crimes unit.  We work violent

20   crimes.  Typically I'll analyze phone records, third-party

21   records, that type of information.

22       Q    And in connection with your work as an

23   investigator, among the other matters that you work on, have

24   you also come to be someone that reviews and obtains

25   telephone records and deciphers or extracts information out

Richard C. Berry - Direct                                    1398

1   of various kinds of telephone records?

2        A    Yes, I do.

3        Q    And Investigator Berry, I'd like to talk a little

4   bit about a matter dealing with Linda O'Connor and Dean Sacco

5   in connection with this case.  Did you at some point become

6   an investigator that worked on some matters dealing with this

7   case?

8        A    Yes, I did.

9        Q    Okay.  Approximately, just a rough approximation,

10  approximately when was it that you came to assist in this

11  matter?

12       A    I believe it was beginning of the year.  Sometime

13  in January.

14       Q    Of this current year?

15       A    Yes.

16       Q    And in addition to yourself, were there other

17  investigators that were also working on this case at the time

18  that you became involved?

19       A    Yes, there was.

20       Q    Now, in assisting in this investigation in this

21  case, did you take part in every single aspect of this case?

22       A    No, I did not.

23       Q    Okay.  Did you go out on every single search

24  warrant that was executed in this case?

25       A    No.

Richard C. Berry - Direct                                          1399

1       Q     Okay.  Is it fair to say that you assisted as to

2  some things but you did not either have involvement or even

3  have knowledge of all the various aspects of this case?

4       A     That would be correct.

5       Q     Now, initially, I would like to talk to you a

6  little bit about the execution of a search warrant at 45 Fair

7  Street in Norwich, New York.  Were you actually present at

8  the time that the search warrant was conducted at that

9  location?

10      A     Yes.

11      Q     And were there also other investigators or other

12  law enforcement persons that --

13      A     Yes.

14      Q     -- that were helping out in that search warrant?

15      A     Right.

16      Q     Did you also assist and help in searching the

17  premises and the garage storage areas?

18      A     Yes, I did.

19      Q     And I'd like to show you what's been marked as

20  Government Exhibit Number 60 for identification.

21            MISS PEEBLES:  Your Honor, may we have a

22  side-bar?

23            THE COURT:  Sure.

24            (At the bench)

25            MISS PEEBLES:  Judge, I've never seen this

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1400

1    letter so I need time to read it.

2                   THE COURT:  Do you want to take a couple of

3    minutes?

4                   MISS PEEBLES:  Yes.

5                   THE COURT:  Take a short break, ladies and

6    gentlemen.

7                   (Jury excused)

8                   MISS PEEBLES:  I think I've read everything.

9    I've never seen this before.

10                   MR. LOVRIC:  That was also all the stuff when

11   you looked at -- when you came down, that was also in the

12   search warrant materials that were taken out of 45 Fair

13   Street.

14                   MISS PEEBLES:  I'm telling you right now, I

15   never saw this.  I need to read it.  I'm not clear I ever got

16   this, so I'm going to read it right now.

17                   MR. LOVRIC:  I just wanted to be clear, it's

18   all the materials that were made available to the defense,

19   and you guys came over and looked at everything.

20                   MISS PEEBLES:  I know I did.

21                   MR. LOVRIC:  I want to make it clear, it was

22   on the record, that was a part of everything that was there.

23                   (Jury present)

24                   THE COURT:  You can identify that Government's

25   60.  We can have it in evidence.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1401

1   BY MR. LOVRIC:

2       Q    Investigator Berry, if you can look at Government's

3   60, and do you recognize what that is?

4       A    Yes, I do.

5       Q    What is that?

6       A    This was a letter that was found at the 45 Fair

7   Street residence in one of the -- it was a smaller shed type

8   in the back of the building.  There was like three garages

9   and a smaller shed in the middle.

10      Q    Is that something you were present when it was

11  recovered at that search location?

12      A    Yes.

13           MR. LOVRIC:  I offer Government 60 into

14  evidence.

15           THE COURT:  No objection, I understand.

16           MISS PEEBLES:  No objection.

17           MR. FISCHER:  No objection.

18           THE COURT:  All right.  We'll receive

19  Government's 60 in evidence.

20  BY MR. LOVRIC:

21      Q    Investigator Berry, Government 60 on the screen is

22  the letter that was found at -- during the course of that

23  search warrant, and it reads, it's addressed to a person by

24  the name of Ray?

25      A    Yes.

Richard C. Berry - Direct

1402

1    Q    And then at the very end of the second page does it
2  have closure saying, "Well, good night, Bubbles," smiley
3  face, and "I love you," and signed L-I-N, at least what can
4  be made out as far as a signature?

5    A    Right.

6    Q    And if I can read paragraph 2, it states, "I did a
7  lot of thinking on the way home, and to sit down and write
8  all of my grievances on a piece of paper probably will not
9  work out in court.  I will go into court humbly and apologize
10 to the court for teaching Shannon how to lie, sneak and how
11 to go against Social Services rules."  And then it reads on
12 further, "However, I will bring up the fact that I cannot
13 enhance my parenting skills with Shannon if I'm not allowed
14 to talk to her about her true feelings on you as well as
15 putting our family back together."  And it goes on, is that
16 correct?

17   A    Correct.

18   Q    Now, the top right-hand corner there's a date, 10/,
19 and can you make out the middle number or not?

20   A    It's either 24 or 14.

21   Q    And then the last part appears as 07?

22   A    Correct.

23   Q    Now, Investigator Berry, at some point in
24 connection with this investigation, did you examine and look
25 at a variety of telephone records affiliated with this case?

Richard C. Berry - Direct                    1403

1      A    Yes, I did.

2      Q    Okay.  What I'd like to do now is -- I'd like to

3  show you Government's Exhibits 80 and 81, and I'll ask you a

4  couple of questions about those.

5           Investigator Berry, if you can look at Government

6  Exhibit 80 first, and if you can tell us, what do you

7  recognize that as, if you recognize it?

8      A    These are T-Mobile cellphone records for Dean

9  Sacco.

10     Q    And did you have a chance to obtain those records

11 from the T-Mobile cellular telephone company and also to

12 review those records?

13     A    Yes.

14     Q    And then if you could look at Exhibit Number 81.

15 What is that, if you recognize it?

16     A    These are TracFone records for (607)226-6539.

17     Q    During the course of this investigation did you

18 learn that that phone was at one point utilized by Shannon

19 O'Connor?

20     A    Yes.

21     Q    And did you also obtain those records from the

22 telephone company called TracFone?

23     A    Yes, I did.

24     Q    Did you also have the opportunity to review those

25 records?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1404

1        A     Yes.

2                  MR. LOVRIC:  Your Honor, I would offer Exhibit

3    80 and 81 into evidence.

4                  MISS PEEBLES:  No objection.

5                  MR. FISCHER:  Your Honor, may I have a brief

6    voir dire, please?

7                  THE COURT:  Sure.

8    VOIR DIRE EXAMINATION

9     BY MR. FISCHER:

10        Q     Sir, those are only portions of telephone records

11    that you've had access to, am I correct?

12        A     These were -- are you asking for 80 or 81 or both?

13        Q     Let's start with 80.

14        A     This is all the available phone, cellphone records

15    for Mr. Sacco's cellphone.

16        Q     That shows incoming phone calls and outgoing phone

17    calls?

18        A     Yes, it does.

19        Q     Do you know whether T-Mobile provided cellphone

20    service that could be accessed from the Norwich area around

21    45 Fair Street?

22        A     Do I know if T-Mobile -- all cellphone companies

23    can roam off different cell companies towers?

24        Q     Do you know whether T-Mobile could be used while

25    the phone was -- T-Mobile phone was in Norwich?

Richard C. Berry - Direct

1    A    Could it be used?

2    Q    Yes.

3    A    Yes.

4    Q    And what's the basis for that information?

5    A    The basis for that information is my experience and

6    knowledge with cellphones, that you can use a cellphone from

7    a different company being that -- with your roaming charges

8    on cellphones come from like -- TracFone does not -- is not

9    proprietary.  TracFone does not own its own cell towers.

10   They use other carriers' cell towers.

11   Q    There are contractual relationships between the

12   various cellphone providers?

13   A    Yes.

14   Q    You're not aware who and what contracts with whom

15   and when, am I correct?

16   A    No.

17   Q    With respect to Exhibit 81, is that just a portion

18   of the records?

19   A    These were all the records that TracFone had

20   available for the time period we requested.

21   Q    And what was that time period?

22   A    That was 8/1 of '06 to 8/31 of '07.

23   Q    All right.

24        MR. FISCHER:  Your Honor, with respect to the

25   first exhibit, Exhibit 80, I'm not sure there's an adequate

Richard C. Berry - Direct                              1406

1    foundation, frankly, to show really what the document is

2    intended to prove.

3                    And with respect to Exhibit 81, I don't have

4    any objection.

5                    THE COURT:  All right.  First of all, I'll

6    receive Government's 81 in evidence.  I take it, Miss

7    Peebles, you have no objection?

8                    MISS PEEBLES:  No objection.

9                    THE COURT:  Are you objecting to relevancy or

10   are you saying that you're not quite sure why these records

11   are being introduced?

12                   MR. FISCHER:  Well, I think the latter, and

13   some foundational objection as well, your Honor.

14                   THE COURT:  Well, I guess if we can find out

15   where the witness got the records from and how he got them,

16   what they contain.  Mr. Lovric?

17                   MR. LOVRIC:  I'm not quite sure what the

18   objection is, Judge.  I'm a little confused.

19                   THE COURT:  He wants some foundational

20   information as to where these records came from.  Did they

21   magically appear in the witness' hands one day?

22    BY MR. LOVRIC:

23    Q    Investigator Berry, looking at Exhibit 80, T-Mobile

24    records, were those records actually subpoenaed from the

25    telephone company?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct

1407

1    A    Yes, they were subpoenaed.

2    Q    And all those records that you have in Exhibit 80,

3    are all of those records the records that the phone company,

4    T-Mobile, sent in compliance with that subpoena?

5    A    Yes.

6    Q    And the subscriber for the T-Mobile records,

7    Exhibit 80, that subscriber is who?

8    A    Dean M. Sacco.

9    Q    Is there also an address for the subscriber that

10   those records relate to?

11   A    Yes.  It's 930 Newark Ave., Floor 2, Jersey City,

12   New Jersey 07306.

13   Q    And at the time that you obtained those records,

14   Exhibit 80, from T-Mobile, were you familiar with that phone

15   number for those records as having been a number that was

16   called by the Norwich PD in connection with a recorded

17   telephone call?

18   A    Yes.

19   Q    And are those the records that relate to that

20   telephone number that was called by the Norwich PD in making

21   calls that they tape recorded?

22   A    Yes.

23            MR. LOVRIC:  I would offer Government's

24   Exhibit 80, Judge.

25            THE COURT:  Any further objection?

Richard C. Berry - Direct

1        MR. FISCHER:  No, your Honor.  Thank you.

2        THE COURT:  All right.  We'll receive

3  Government's 80 in evidence.

4  BY MR. LOVRIC:

5    Q    Investigator Berry, Exhibit 80 we just spoke of.

6  The subscriber information, can you just for the record read

7  the phone number that Exhibit 80 relates to?

8    A    It's cellphone number (908)906-7917.

9    Q    And you indicated that those are records for a Dean

10 Sacco's cellular telephone, is that correct?

11   A    Correct.

12   Q    Just so we're clear, those are not records of a

13 hard line phone, a phone that you might find plugged into a

14 wall in a building or an office, is that correct?

15   A    Correct.

16   Q    And with respect to Exhibit Number 81, you

17 indicated that those are records -- and you read the phone

18 number earlier but -- records for a TracFone, is that

19 correct?

20   A    Correct.

21   Q    And can you just very briefly just describe what a

22 TracFone is.

23   A    TracFone is a prepaid service.  You can go to

24 Wal-Mart, K-Mart and buy off the shelf a phone and pay for

25 how many minutes you want to use it for.

Richard C. Berry - Direct                    1409

1    Q    Okay.  And when you -- when a person does that, and
2  they go to a Wal-Mart or a K-Mart and they purchase a
3  TracFone, do they also have to purchase some type of card
4  that puts minutes on that phone, being how many minutes
5  they're buying?
6    A    Typically it comes with something and then you buy
7  additional minutes.
8    Q    Okay.  And when an individual does that for a
9  TracFone, do they have to sign any kind of a contract with
10  the TracFone company or anything like that?
11    A    No.
12    Q    Do they even have to provide their name or address
13  or anything of that sort?
14    A    No, they don't.
15    Q    And how is it that the TracFone itself and the
16  minutes that are used -- how does that work?  How does the
17  person get minutes on the phone so they can speak on that
18  phone?
19    A    Typically there's a number you can dial from the
20  phone or 800 number you can dial to add minutes with the
21  prepaid card that you purchased at Wal-Mart, K-Mart or
22  something like that.
23    Q    Okay.  And --
24    A    And then you add the minutes on to the phone and
25  then you're allowed to use that phone until the minutes are

Richard C. Berry - Direct

1    gone, and when it gets to the end of your minutes, it will

2    notify you that you have five minutes left or whatever.  Each

3    phone company's different.

4        Q    Okay.  And a TracFone user, do they receive some

5    kind of a bill or statement every month from the phone

6    company?

7        A    No.

8        Q    Why is that?

9        A    Because this is prepaid.  Most people buy these

10   type of phones because they don't want to get into dealing

11   with contracts and stuff like that.  It's for their leisure

12   for whatever they like to use it for.

13       Q    So you get no bill because you buy this card ahead

14   of time and put these minutes on the phone?

15       A    Right.

16       Q    Now -- and this particular TracFone with the number

17   (607)226-6539, did you come to learn that was a TracFone that

18   Shannon O'Connor at least utilized during a time period that

19   the Norwich PD made calls to Mr. Dean Sacco?

20       A    Yes.

21       Q    And I'd like to show you next Exhibit Number 82.

22            Investigator Berry, if you can look at Exhibit

23   Number 82, and do you recognize what that is?

24       A    This is a summary chart of phone calls between

25   Exhibits 81 and 82, particular calls.

Richard C. Berry - Direct                           1411

1      Q    Okay.  Just several particularized calls that are

2  found in Exhibits 80 and 81?

3      A    Right.

4      Q    And who prepared Exhibit Number 82?

5      A    I did.

6      Q    And is the information that's contained in Exhibit

7  82, is it also contained somewhere in those Exhibits 80 and

8  81?

9      A    Yes.

10              MR. LOVRIC:  Your Honor, I would offer Exhibit

11  Number 82 into evidence.

12              MR. FISCHER:  No objection.

13              MISS PEEBLES:  No objection.

14              THE COURT:  Okay.  We'll receive Government's

15  82 in evidence.

16  BY MR. LOVRIC:

17      Q    Investigator Berry, I'm going to put on the screen

18  Government Exhibit Number 82.  Can you see that exhibit,

19  Investigator Berry?

20      A    Yes, sir.

21      Q    And Exhibit 82 you indicated summarizes just

22  several calls found in the Exhibits 80 and 81, is that

23  correct?

24      A    Yes, sir.

25      Q    Okay.  I take it Exhibits 80 especially and 81 to

Richard C. Berry - Direct                1412

1   some lesser degree contain numerous phone call information,

2   date, time, duration, things of that nature?

3        A    Yes.

4        Q    Okay.  And looking at Exhibit 82 now, I'd like to

5   point out and ask you, on the far left of that exhibit

6   there's a column called Target Phone.  What does that mean,

7   Target Phone and the number listed there?

8        A    When I prepared the information, we have to put

9   into the database phone calls related to a specific phone.

10       Q    Okay.

11       A    And that would have been Mr. Sacco's phone.

12       Q    The (908)906-7917.

13       A    Correct.

14       Q    So that number, is that the -- is that the phone

15   number for the records that are contained in Government's

16   Exhibit 80?

17       A    Yes.

18       Q    Okay.  And target name is an indicator for the

19   phone who is either subscribed to or user?

20       A    Correct.

21       Q    And then the date signifies what?

22       A    The date the call was made.

23       Q    And time indicating the time?

24       A    Correct.

25       Q    And then under Number Dialed, does that indicate

Richard C. Berry - Direct                    1413

1  whether that was an outgoing or incoming phone call?

2       A    Incoming will say incoming or IN and then the

3  number.  It's an incoming call from the Norwich Police

4  Department.

5       Q    Okay.  So if that column Number Dialed does not say

6  In or Incoming, what does that mean then?

7       A    That it was an outgoing call from the target phone.

8       Q    And dialed name, is that the phone that either

9  called the target or got a call from the target, who that

10  phone belonged to?

11       A    Correct.

12       Q    And I take it duration is the approximate duration

13  of the phone call?

14       A    Right, in minutes.

15       Q    If I can have you indicate for line number 1 there,

16  that information indicates what occurred on March 14 of 2007?

17       A    That at 5:08 PM the Norwich Police Department

18  called Mr. Sacco's cellphone for 12 minutes.

19       Q    Okay.  And incoming means it was an incoming call

20  to Mr. Sacco's phone?

21       A    Right.

22       Q    And then the second line, what does that second

23  line -- what information does that convey?

24       A    It shows that 5:43 PM on the 14th of March, 2007,

25  that Dean Sacco called (607)336-7075, it's a landline phone,

Richard C. Berry - Direct

1    to Linda O'Connor, for six minutes.

2        Q    Okay.  So that's a call that went from Mr. Sacco's

3    cellphone to Linda O'Connor's landline phone, is that

4    correct?

5        A    Correct.

6        Q    And that landline phone, 336-7075, at that time,

7    that being March 14 of 2007, where was that phone located,

8    that hard line?

9        A    Forty-five Fair Street in Norwich.

10       Q    And so that was a call for about approximately six

11   minutes?

12       A    Correct.

13       Q    And that occurred on the same date just shortly

14   after the first call was placed by Norwich PD to Dean Sacco?

15       A    Correct.

16       Q    And then the third line, March 14, 2007, still the

17   same day.  What does that third line show, what information?

18       A    5:48 PM on March 14, 2007, Dean Sacco's cellphone

19   receives a call from the Norwich Police, 15-minute phone

20   call.

21       Q    Okay.  So, those three calls that we just talked

22   about all occurred on that same date, March 14?

23       A    Correct.

24       Q    And all between 5:08 PM and approximately 5:48 PM?

25       A    Correct.

Richard C. Berry - Direct                    1415

1    Q    And at the time when you were examining these

2 telephone records contained in Government's Exhibit 80 and

3 81, did you have information from other investigators about

4 recorded calls placed from Norwich PD and Shannon O'Connor's

5 speaking to Dean Sacco on March 14 of 2007?

6    A    Yes.  I was advised by other investigators.

7    Q    Okay.  And these were the -- those were the phone

8 calls that you were looking for in these records, I take it?

9    A    Correct.

10   Q    Or some of the calls that you were looking for?

11   A    Right.

12   Q    And then if you could go to line 4, what does that

13 line -- what information does that convey?

14   A    On March 15, 2007 at 3:19 PM, Dean Sacco receives

15 an incoming call from Shannon O'Connor for 11 minutes.

16   Q    And the phone that Dean Sacco's phone receives a

17 call from, that's from that TracFone that you just spoke of

18 in Exhibit Number 81?

19   A    Yes, sir.

20   Q    And that call was approximately 11 minutes?

21   A    Correct.

22   Q    And then what does the fifth line show?

23   A    On March 15, 2007, 3:30 PM, Dean Sacco's cellphone

24 calls Shannon O'Connor's cellphone for seven minutes.

25   Q    Still the same date, March 15?

Richard C. Berry - Direct                          1416

1      A    Correct.

2      Q    And then what does the sixth line -- what

3  information does that convey?

4      A    That shows Shannon O'Connor's cellphone on

5  March 15, 2007 at 3:38 PM receives an incoming call from

6  Glenwood Office Furniture for six minutes.

7      Q    Okay.  And at the time that you're examining these

8  records, were you aware and provided the sequence of calls

9  made on March 14 and March 15 from the Norwich PD or to and

10 from Shannon's cellphone in connection with her making

11 recorded calls to Mr. Sacco?

12     A    Yes.

13     Q    Now, in looking at line 2 -- and excuse me.  In

14 looking at lines 1, 2, and 3 of Exhibit 82, line 1 shows that

15 the time placement of the call was 5:08 for 12 minutes, is

16 that right?

17     A    Correct.

18     Q    So that would take -- that would take us up to what

19 approximately, what real time when that call ended?

20     A    5:20.

21     Q    And then 23 minutes later, line 2 indicates that

22 the Dean Sacco cellphone called Linda O'Connor's home phone

23 in Norwich?

24     A    Correct.

25     Q    And that lasted for a six-minute conversation, is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1417

1    that right?

2        A    Correct.

3        Q    And six minutes approximately from 5:43 puts us

4    right at 5:49, is that correct?

5        A    Correct.

6        Q    And then we see at 5:48 a call from Norwich PD

7    incoming to Dean Sacco on his cellphone, is that correct?

8        A    Correct.

9        Q    Okay.  Now I just want to have you explain -- we

10   see 5:43 as the beginning of the second call going for 6

11   minutes and then 5:48 the initiation of a third call.  There

12   appears to be overlap of one minute there.

13       A    Right.

14       Q    Are you familiar with how phone companies stamp

15   times in terms of their records?

16       A    Not all phone companies use the same time format

17   and not all phone companies will start the clock when the

18   phone rings.  Some phone companies, when you pick up the hand

19   set and start to dial, the time will start.  Other phone

20   companies, you pick up the hand set and once you make the

21   connection, the time will set.

22       Q    Okay.  And then what about rounding -- what if you

23   hang up at 5:48 and 20 seconds?  How do phone companies -- do

24   they give you the minute back?

25       A    No, they always round up.

Richard C. Berry - Direct                1418

1    Q    So they round up.  So if you end the call at 5:48

2  and 1 second, they record that as ending at what time?

3    A    5:49.

4    Q    Okay.  Investigator Berry, I'd next like to show

5  you -- I'm going to show you three exhibits:  Government's

6  Exhibit Number 83, 84, and 85.

7              MR. FISCHER:  Thank you, Mr. Lovric.

8    Q    Investigator Berry, if I can have you -- we're

9  going to start.  If you can take a look at Government Exhibit

10  Number 83.  And looking at Exhibit 83, do you recognize,

11  generally speaking, what that is?

12    A    Yes, sir.

13    Q    What is that?

14    A    These are the home phone records for (607)336-7075,

15  which was -- the subscriber was Linda O'Connor at 45 Fair

16  Street, Apartment 1, Norwich, New York.

17    Q    And in connection with this investigation, did you

18  obtain records for a particular general time frame?

19    A    Yes.

20    Q    Approximately.  And what time frame approximately

21  are we talking about?

22    A    August of 2006 through March -- no.  Through May of

23  2007 -- no, June of 2007.

24    Q    Okay.  And looking at Exhibit 84, do you recognize

25  what kind of records those are?

Richard C. Berry - Direct

1419

1     A     Yes.  These are TracFone records.

2     Q     Okay.  For what number are they TracFone records?

3     A     (607)372-9820.

4     Q     And in connection with this investigation, were you

5  provided information that that was a TracFone utilized by

6  Linda O'Connor?

7     A     Yes, sir.

8     Q     And do those records also reflect whatever records

9  were available by TracFone for this approximate time frame?

10    A     Yes.

11    Q     And then looking at Exhibit Number 85, what are

12  those records of?

13    A     These are hard line phone records for Glenwood

14  Office Environment, Inc. and there are several different

15  phone numbers that go with this.

16    Q     Okay.  The business had several lines or numbers

17  that came in?

18    A     Yes.

19    Q     And just for record, what's the phone number for

20  those records?

21    A     The main business number was (201)792-7300.

22    Q     And during the course of the investigation, did you

23  become aware that Mr. Sacco worked at some time at that

24  Glenwood Furniture?

25    A     Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                                    1420

1      Q     And are those records records during the time frame

2    that we just identified that was in question that you -- or a

3    portion of that time, I should say?

4      A     Yes, it was.

5      Q     Not necessarily the entire time.  But at least a

6    portion of the time frame?

7      A     Right.

8              MR. LOVRIC:  Your Honor, I would offer Exhibit

9    83, 84, and 85.

10             MR. FISCHER:  Your Honor, may I just briefly

11   voir dire?

12             THE COURT:  Sure.

13   VOIR DIRE EXAMINATION

14    BY MR. FISCHER:

15     Q     Sir, are those all of the records that you

16   requested concerning those phone numbers?

17     A     All of the records -- well, I'm sure there's other

18   types of records.  Now if you're speaking in particular for

19   the home phone of Linda O'Connor, the 7075, that was the

20   records but they do not provide incoming calls.  So the

21   records only reflect outgoing calls.

22     Q     I guess my question is this:  You requested records

23   from these phone providers, correct?

24     A     Yes.

25     Q     And are the documents that you have before you all

                     VICKY ANN THELEMAN, RPR, CRR
                     UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                1421

1    of the records that you received in response to those

2    requests?

3        A    Yes.

4             MR. FISCHER:  Those are all my questions.  I

5    have no objection, Judge.  Thank you.

6             MISS PEEBLES:  No objection.

7             THE COURT:  Okay.  We'll receive Government's

8    83, 84, and 85 in evidence.

9    BY MR. LOVRIC:

10       Q    Investigator Berry, I'm going to show you Exhibit

11   86, but before I do that, I want to confirm again, Exhibit 83

12   is what kind of a phone and who's the subscriber of that

13   phone?

14       A    It's a landline phone at a residence, 45 Fair

15   Street.  The subscriber was Linda O'Connor.

16       Q    Okay.  And then Exhibit 84, what kind of a phone is

17   that and who --

18       A    That's a TracFone, one of the prepaid cellphones,

19   for Linda O'Connor.

20       Q    Okay.  Same kind of TracFone that you spoke of

21   earlier for Exhibit Number 81 with respect to a Shannon

22   O'Connor TracFone?

23       A    Yes.

24       Q    And then Exhibit 85 is what kind of telephone?

25       A    That's a hard line, landline phone for a business.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1422

1        Q    Okay.  Now, in connection with those three

2    exhibits, did you prepare a summary of the contacts between

3    telephones that were either subscribed or utilized by Linda

4    O'Connor and Dean Sacco?

5        A    Yes.

6        Q    Okay.  I'd like to show you Government's Exhibit

7    86.

8              MISS PEEBLES:  Can I have a quick voir dire,

9    your Honor?

10             THE COURT:  Sure.

11   VOIR DIRE EXAMINATION

12    BY MISS PEEBLES:

13       Q    With regard to the landline, the hard line at 45

14   Fair Street, during the time period for which you obtained

15   the record, Shannon O'Connor was also residing with Linda

16   O'Connor, and you knew that, right?

17       A    What was the time frame?  I know what time she was

18   there and time frame she was not there.

19       Q    Between August of '06 and February 26, '07, Shannon

20   O'Connor resided at 45 Fair Street and you were aware of

21   that, correct?

22       A    I'm not a hundred percent certain.

23       Q    So you don't know who resided at 45 Fair Street?

24       A    I know that Shannon O'Connor was there at some

25   point.  The exact time frame, I don't know.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                                    1423

1    Q    Well, in preparation of these records, is it fair

2 to say that during the time period between August and

3 February of '07, August of '06 and February of '07, any calls

4 that were outgoing to Mr. Sacco could have been dialed by

5 Shannon O'Connor or Linda O'Connor during that time period,

6 is that fair to say?

7    A    That's fair to say.

8    Q    But that's not indicated on this chart; you only

9 reference Linda O'Connor.  Is that what this chart reflects?

10    A    Yes.

11             MISS PEEBLES:  No objection.

12             THE COURT:  Mr. Fischer.

13             MR. FISCHER:  No objection.

14             THE COURT:  Receive Government's 86 in

15 evidence.

16  BY MR. LOVRIC:

17    Q    Investigator Berry, I'll put on the screen Exhibit

18 Number 86.  Can you see that?

19    A    Yes, sir.

20    Q    Okay.  And just to orient the jurors, if I can

21 start with the -- let me zoom that in a little bit.  Looking

22 at Exhibit 86, the first page, just to orient everyone.  The

23 first column on the far left hand indicates -- states Target.

24 What phone or phone number is represented under the Target

25 column?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1424

1      A     That's Dean Sacco's cellphone or Linda O'Connor's

2    cellphone.

3      Q     Generically speaking, Target references what in

4    that whole column going down?

5      A     Well, the three records.  The exhibits that you

6    have listed here.

7      Q     Okay.  So it references one of the numbers that is

8    being called or else calling out?

9      A     Right.

10     Q     Okay.  And then Target Name is the subscriber

11   associated with that phone, is that a fair statement?

12     A     Yeah.  The person associated with that phone.

13     Q     And then Date and Time are self-explanatory.

14   Indicates the date, the approximate time of the phone

15   contact?

16     A     Right.  And the time is in military time.  This is

17   done on a program that only accepts military time.

18     Q     Okay.  And for those not in the military time, 1400

19   hours would represent what time?

20     A     Two PM.

21     Q     Okay.

22     A     The way I usually teach people how to do it is if

23   it's after 12 noon, if it's say 1 PM, you add 12 to it so it

24   would be 13, and you go all the way up to 11:00 PM, add 12,

25   that would be 23, 23, 00 is midnight, obviously, 01 would be

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct

1    1 AM, 2 AM --

2        Q    Correct.  And then the number dialed, does that

3    indicate what number the target phone either dialed or what

4    number called the target phone?

5        A    Right.  It would be either an incoming call from

6    that number if it says in, or if it doesn't say in, it's an

7    outgoing call to that number.

8        Q    And then the last column, Name, as far as who that

9    phone is either subscribed or associated to?

10       A    Correct.

11       Q    Okay.  So, just by way of example, the first line,

12   okay, on that date, the first line, what phone, what phone

13   number or what phone is being called?

14       A    Dean Sacco's cellphone is receiving an incoming

15   call from Linda O'Connor's cellphone at 2:08 PM.

16       Q    Okay.  And that's why there is that reference there

17   under number dialed?

18       A    Correct.

19       Q    Now, this summary chart, Government Exhibit 86,

20   does this multipage exhibit summarize contacts by the three

21   different phones in Government's Exhibits 83, 84, and 85?

22       A    Yes.

23       Q    And are each of the contacts between either Linda

24   O'Connor home phone or Linda O'Connor TracFone, and Sacco

25   business phone, summarized in this exhibit?

Richard C. Berry - Direct

1426

1     A     Yes.

2     Q     Okay.  Now, does 86 also include contact between

3  the Sacco T-Mobile cellular phone and any of the Linda

4  O'Connor phones that we just identified?

5     A     Cellphone?

6     Q     Yes.

7     A     Yes.

8     Q     Okay.  So is it fair to say that Government Exhibit

9  86 summarizes all of the contacts between either a Dean Sacco

10 phone or a Linda O'Connor phone?

11    A     Correct.

12    Q     Now that Exhibit 86 actually provides the

13 information as to date, time, duration, and whether it's an

14 incoming or outgoing call, is that correct?

15    A     Right.

16    Q     I'd like to next show you Government Exhibit 87.

17          Investigator Berry, if you could look at Exhibit 87

18 and just tell us if you recognize that, what that is.

19    A     Yeah.  That's a summary of the three exhibits here.

20    Q     Who created Exhibit Number 87?

21    A     I did.

22    Q     And Exhibit Number 87, does it summarize by raw

23 number the number of contacts between any of the phones that

24 were identified as being subscribed and used by Linda

25 O'Connor and any phones subscribed or used by Dean Sacco?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                                    1427

1       A    Yes, it does.

2                  MR. LOVRIC:  I would offer Government Exhibit

3  Number 87.

4                  MR. FISCHER:  Your Honor, I just had a

5  question as to when, what time frame.

6                  THE COURT:  Sure.  You can ask him.

7  VOIR DIRE EXAMINATION

8   BY MR. FISCHER:

9       Q    What time frame?

10      A    That this was -- the document or summarizing the

11  records?

12      Q    The summary, Exhibit 87 that's before you now, what

13  time frame or time frames is covered in that document?

14      A    July of '06 until March of '07.

15      Q    For all three summaries set forth in that, am I

16  correct?

17      A    For all three of these phones but the Dean Sacco

18  cellphone.

19                  MR. FISCHER:  Thank you.  I have no objection.

20                  MISS PEEBLES:  I have a couple questions,

21  Judge.

22  VOIR DIRE EXAMINATION

23   BY MISS PEEBLES:

24      Q    When you say contacts, many of those contacts

25  between phones were less than a minute, is that fair to say?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct                    1428

1   There are numbers that you counted there where it doesn't

2   appear there was actually a conversation?

3        A    Well, they would either show a minute or more.

4        Q    Right.  But you count those in your total

5   tabulation?

6        A    Yes.

7        Q    You don't have the contacts on your sheet between

8   Shannon O'Connor's cellphone and Dean Sacco's cellphone, is

9   that correct?

10       A    Correct.

11              MISS PEEBLES:  No objection.

12              THE COURT:  All right.  Receive Government's

13  87 in evidence.

14  BY MR. LOVRIC:

15       Q    Can I just have that for a moment?

16            And putting on the screen Exhibit Number 87,

17  Investigator Berry, can you read the first line and then I'll

18  just ask you a question about that?

19       A    There are 111 contacts between Sacco's cell,

20  (908)906-7917, and Linda O'Connor's home number,

21  (607)336-7075.

22       Q    And that's between July of '06 and March of '07?

23       A    Correct.

24       Q    When you say contacts, does that include,

25  regardless of which, which person's affiliated phone calls

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Direct

1    with which person?

2         A    Right.

3         Q    Then the second notation is 27 contacts between

4    Sacco cellphone and O'Connor cellphone.  When you say

5    O'Connor cellphone, which cellphone is that?

6         A    (607)372-9820.

7         Q    Is that that O'Connor TracFone that you described

8    earlier?

9         A    Yes.  Exhibit 84.

10        Q    And then the final notation is 9 contacts between

11   Sacco work number and Linda O'Connor home and/or cell number,

12   is that correct?

13        A    Correct.

14        Q    And that establishes how many contacts the Sacco

15   work phone called O'Connor or affiliated phones?

16        A    Correct.

17             MR. LOVRIC:  Those are all the questions I

18   have at this time, Judge.

19             THE COURT:  Okay.  Mr. Fischer.

20             MR. FISCHER:  Thank you, your Honor.

21   CROSS-EXAMINATION

22    BY MR. FISCHER:

23        Q    Sir, I'm Kelly Fischer.  I represent Mr. Sacco.

24   The last summary that you just spoke about, and in fact any

25   of the summaries that you prepared, when it shows that

Richard C. Berry - Cross

1430

1  there's a call to or from say Linda O'Connor's home land

2  phone, you don't know who at the O'Connor residence is making

3  that call or receiving that call, correct?

4      A    Correct.

5      Q    It could be that Shannon O'Connor is making that

6  phone call, am I correct?

7      A    Could be.

8      Q    And that is also true with respect to the TracFone

9  number registered to Linda O'Connor?

10     A    Correct.

11     Q    Do you know when -- what time frames that Shannon

12  O'Connor was residing not at 45 Fair Street but in fact was

13  residing with Renee Lang?

14     A    I don't know that.

15     Q    On voir dire I asked you some questions about

16  T-Mobile cellphone coverage in Norwich.  Do you remember

17  that?

18     A    Yes.

19     Q    Is it your testimony that a T-Mobile phone,

20  cellphone in Mr. Sacco's name from August of 2006 through

21  March of 2007 had coverage where that phone could be used

22  while in Norwich?

23     A    While in Norwich itself?

24     Q    Yes.

25     A    Particularly, I don't know that.

Richard C. Berry - Cross                    1431

1      Q     Exhibit 60, the letter that was found in the shed,

2   are you familiar with that document?

3      A     Yes.  Yes.

4      Q     Do you need to look at it again?

5      A     No.

6      Q     That appears to be a document created by Linda

7   O'Connor, am I correct?

8      A     Appeared to be, yes.

9      Q     This document was found when?

10     A     The day we did the search warrant.  I believe it

11  was March 24.

12     Q     Of what year?

13     A     This year.

14     Q     And this document is dated either 10/14 or

15  10/24/2007, correct?

16     A     I'd have to look at it again.  I think that sounds

17  right.

18           Yeah.  To me I would say 24, but it could be 14 of

19  2007.

20     Q     So it appears the document wasn't created until mid

21  to late October, 2007, is that correct?

22     A     That's when it's dated.  I couldn't tell you when

23  it's created.

24     Q     Mr. Sacco did not have access to that shed from at

25  least March 19, 2007, until now, am I correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Cross                           1432

1        A     Correct.

2        Q     He did not have access to that shed on or about

3   October 14 or 24, 2007, to the best of your knowledge, am I

4   correct?

5        A     To the best of my knowledge, no.

6              MR. FISCHER:  All right.  Those are all the

7   questions.  Thank you.

8              THE COURT:  Okay.  Miss Peebles.

9   CROSS-EXAMINATION

10   BY MISS PEEBLES:

11       Q     Investigator Berry, did you count the number of

12   phone contacts between Shannon O'Connor's TracFone and Mr.

13   Sacco's, the phones associated with Mr. Sacco?

14       A     Did I count them?

15       Q     Yes.

16       A     Roughly.

17       Q     And how many did you come up with?

18       A     I believe there was nine.

19       Q     How about 13, does that sound about right?

20       A     Well, on some of the records there's duplicates,

21   like the contacts between Shannon's cellphone and Mr. Sacco's

22   was on 12/30 of '06 and 11 of '07.

23       Q     Right around New Year's?

24       A     Right around New Year's.

25       Q     I want you to go through and I want you to count

Richard C. Berry - Cross                    1433

1    the number of phone calls out of 111 and tell the jury

2    approximately how many were one minute.

3         A    From the summary chart?

4         Q    From the summary chart.  You said you compiled the

5    chart.  You said there were 111 contacts.

6         A    I don't have that in front of me.  I think it was

7    like five pages.

8              Is this between all the phones?

9         Q    All the phones.  Well, you have the home phone

10   where it says 111 contacts.  That's my question.  Of those

11   111 calls that you tabulated, I want to know how many were

12   one minute, that duration indicates one minute.

13        A    Okay.  Seventeen on the first page.  Twenty-three

14   on the second page.  Sixteen on the third page.  Seven on the

15   fourth page.  Nineteen on the last page.

16        Q    So 82 of the calls were a minute in duration if we

17   totaled it up?

18        A    If you added it up.

19        Q    Eighty-two out of 111.  Now, let's talk about

20   March 14, the phone call to -- from Dean Sacco to Linda

21   O'Connor at 45 Fair Street.  Now, on the other summary chart

22   that you did -- do you know which one I'm referring to?

23        A    Okay.  I think it's 82, maybe.

24        Q    All right.  Looking at the second call, March 14 at

25   5:43 --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Cross

1      A      Right.

2      Q      -- do you see that?  Now, you were aware, because

3  you were part of the investigation, that the first phone call

4  from the Norwich Police Department was disconnected or

5  interrupted; you were aware of that?

6      A      I was aware of that after the fact.  Not then at

7  that time.

8      Q      But you know?

9      A      I became aware of that.

10     Q      All right.  And the phone call was interrupted and

11 was not recorded; you're aware of that, correct?

12     A      Right.

13     Q      And then it appears that Mr. Sacco attempted to

14 call Linda O'Connor after that phone call was disconnected,

15 is that what it looks like from the chart?

16     A      From the chart, yeah, there was a call from --

17     Q      Norwich Police Department and Mr. Sacco?

18     A      Right.  In between there, there were other calls.

19     Q      I'm looking at 5:43.

20     A      Just on the summary chart?

21     Q      Just on the summary chart; that's what I'm talking

22 about.  So it appears Mr. Sacco is trying to call Shannon

23 back after they had been disconnected at the Norwich Police

24 Department; was that your assessment after you listened to

25 the recording and heard what was said?

1       MR. LOVRIC:  Objection.  I don't believe that

2  that's an accurate statement of fact.

3       THE COURT:  Well, she's asking the question.

4  Let's see what the answer is.  Overruled.

5       A    Would you repeat it, please.

6       Q    Did you ever listen to the tapes that were recorded

7  between Mr. Sacco and Shannon O'Connor?  Did you ever listen?

8       A    All the tapes, no.

9       Q    Did you listen to the March 14 recorded phone

10  conversation?

11       A    Not the whole thing, no.

12       Q    Did you listen to any of it?

13       A    Some of it.

14       Q    Did you listen to the beginning of it?

15       A    I believe it was the beginning.  I listened to a

16  few minutes of it.

17       Q    Okay.  So did you hear when Mr. Sacco said, I just

18  got off the phone with your mother, she says you're in foster

19  care?  Do you remember hearing that part of it?

20       A    I don't.  I don't recall that, no.

21       Q    So you prepared this chart but have you no idea in

22  what context these phone calls were made, is that what you're

23  saying?  Is that what your testimony is?

24       A    No.

25       Q    Well, do you know in what context --

Richard C. Berry - Cross

1    A    We know there was a phone call, we would call it a

2    controlled phone call from Shannon O'Connor at the Norwich

3    Police --

4    Q    Correct.

5    A    -- to Mr. Sacco.

6    Q    Correct.

7    A    Okay.  The phone call for some reason did not

8    record and they made another phone call 40 minutes later.

9    Q    Correct.  But there's a phone call in between those

10   two phone calls; that's what I'm saying.  What you're saying,

11   you don't know in what context the phone call from Mr. Sacco

12   to Linda O'Connor was placed, is that what your testimony is?

13   That's what I'm asking.

14   A    I don't know what context -- understand that

15   question.

16   Q    Do you know for what reason Mr. Sacco was calling

17   Linda O'Connor during that time period?

18   A    Do I know why he called her, no.

19   Q    You didn't put it in context based on what you

20   heard on the first phone call on March 14?  That's all I'm

21   asking.

22   A    I put it in the summary chart chronologically as

23   the way things happened.

24   Q    Exactly.  And you didn't think about in what

25   context the call was made, is that your testimony?  That's

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    all I'm asking.

2        A    Well, your context could be different than my

3    context.

4        Q    What is your context?

5        A    That Mr. Sacco contacted Miss O'Connor for some

6    reason.

7                    MISS PEEBLES:  No further questions.

8                    THE COURT:  Mr. Lovric.

9                    MR. LOVRIC:  No other questions, Judge.

10                   THE COURT:  Mr. Fischer.

11                   MR. FISCHER:  Your Honor, if I may just follow

12   up on Miss Peebles' questions.

13   RECROSS-EXAMINATION

14    BY MR. FISCHER:

15       Q    You're familiar with Shannon O'Connor's claims in

16   this case?

17       A    Yes.

18       Q    You're familiar with the dates she claimed certain

19   events occurred?

20       A    Some of them, yes.

21       Q    Did you undertake to match up phone calls from or

22   to Mr. Sacco's cellphone to see if they match or didn't match

23   with the dates that Shannon O'Connor alleged certain events

24   occurred?

25       A    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Recross                    1438

1    Q    When did you do that?

2    A    When did I match them up?

3    Q    Yes.

4    A    Over the last several months.

5    Q    For example, did you determine that on let's say

6  November 25 of 2006 there was no telephone call to or from

7  Dean Sacco's cellphone?  Did you determine that?

8    A    To who?

9    Q    To or from anybody.

10   A    I would have to look at these phone records.

11   Q    Please do.

12   A    They're not here.

13   Q    I'll show you Exhibit 80.

14   A    Thank you.  The date again, sir, November?

15   Q    Twenty-five, 2006.

16   A    According to these records, there's no billable

17 calls that Mr. Sacco made or received on that date.

18   Q    A billable call would have been a call to Linda's

19 landline?

20   A    If you call a number and hang up in transit, say

21 before the answering machine comes in, if they don't have an

22 answering machine, if you dialed the number, you're not

23 billed, if you hang up before some type of answer, whether

24 it's an answering machine or gets routed somewhere else.

25   Q    So if there was a telephone call between Mr.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Recross                    1439

1   Sacco's cellphone and Linda's landline on November 25, 2006

2   where there was actually a conversation, it would show up in

3   those records, wouldn't it?

4        A    It would show in Mr. Sacco's records.

5        Q    And there is no call on November 25 of 2006, am I

6   correct?

7        A    Not in his records.

8                  MR. FISCHER:  Those are all the questions.

9                  THE COURT:  Miss Peebles?

10                 MISS PEEBLES:  Nothing further.

11  REDIRECT EXAMINATION

12   BY MR. LOVRIC:

13       Q    Do you have any idea what November 25 has anything

14  to do with this case?

15       A    No idea.

16                 MR. LOVRIC:  No other questions.

17                 THE COURT:  All right.  Thank you,

18  Investigator Berry.  You may step down, sir.

19                 (Witness excused)

20                 THE COURT:  All right, ladies and gentlemen.

21  It's five after 5.  Begin tomorrow morning at 9:30.  Remind

22  you not to discuss the matter among yourselves, with anybody

23  else.

24                 We'll see you tomorrow morning.  I hope you

25  don't freeze to death.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard C. Berry - Redirect                    1440

1          (Jury excused)

2          (Court stands adjourned)

3              C E R T I F I C A T I O N

4

5

6          I, VICKY A. THELEMAN, RPR, CRR, United

7   States Court Reporter in and for the United States

8   District Court, Northern District of New York, do

9   hereby certify that I attended at the time and place

10  set forth in the heading hereof; that I did make a

11  stenographic record of the proceedings had in this

12  matter and cause the same to be transcribed; that

13  the foregoing is a true and correct copy of the same

14  and the whole thereof.

15

16

17                      _____

18                      VICKY A. THELEMAN, RPR, CRR

19                      United States Court Reporter

20                      US District Court - NDNY

21

22

23  Dated:  August 15, 2008.

24

25