1838

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------------

4   UNITED STATES OF AMERICA,

5                   -versus-                    08-CR-77

6   LINDA O'CONNOR and DEAN SACCO.

7   ----------------------------------------------------------

8                   TRANSCRIPT OF JURY TRIAL

9   held in and for the United States District Court,

10  Northern District of New York, at the Federal Building and

11  Courthouse, 15 Henry Street, Binghamton, New York, on

12  THURSDAY, May 22, 2008, before the HON. THOMAS J. McAVOY,

13  Senior United States District Court Judge, PRESIDING.

14  APPEARANCES:

15  FOR THE GOVERNMENT:

16  UNITED STATES ATTORNEY'S OFFICE

17  BY:  MIROSLAV LOVRIC, AUSA

18       Binghamton, New York

19  FOR THE DEFENDANT O'CONNOR:

20  FEDERAL PUBLIC DEFENDER'S OFFICE

21  BY:  LISA PEEBLES, AFPD

22       Syracuse, New York

23  FOR THE DEFENDANT SACCO:

24  KELLY FISCHER, ESQ.

25  Binghamton, New York

Kelley Molanare - Direct

1    (In open court)

2    (Jury present)

3    THE COURT:  Morning, ladies and gentlemen.

4  How's everything today, all right?

5    Okay.  Mr. Lovric, who do you got for us?

6    MR. LOVRIC:  The next witness that we call is

7  Kelley Molanare.

8    THE COURT:  Okay.

9    THE CLERK:  State your name for the record.

10    THE WITNESS:  Kelley Molanare,

11  M-O-L-A-N-A-R-E.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kelley Molanare - Direct

1    K E L L E Y    M O L A N A R E, having been called as a

2    witness, being duly sworn, testified as follows:

3                    THE COURT:  Okay.  Mr. Lovric.

4    DIRECT EXAMINATION

5     BY MR. LOVRIC:

6         Q    Good morning, Miss Molanare.

7         A    Good morning.

8         Q    Am I pronouncing that correctly?

9         A    That's fine.  Yes.

10        Q    Miss Molanare, could you once again for the jurors

11   just tell them your full name and please tell them where you

12   work and what your title is?

13        A    My name is Kelley Molanare.  And I am a financial

14   analyst for the FBI and I work out of the Syracuse resident

15   agency.

16        Q    Miss Molanare, about how long have you worked for

17   the FBI?

18        A    I've worked for the FBI for 20 years.

19        Q    And you're currently assigned out of the Syracuse

20   office, is that correct?

21        A    That's correct.

22        Q    About how long have you been assigned with the

23   Syracuse office?

24        A    Twenty years.

25        Q    Okay.  And you indicated that you're a financial

Kelley Molanare - Direct

1    analyst with the FBI?

2        A    That's correct.

3        Q    Can you tell us a little bit about what that means

4    and what kind of work you do.

5        A    I am an assistant to the special agents.  I help

6    them with their financial cases, any case that may involve

7    financial analysis.

8        Q    And from time to time in your capacity, do you have

9    interaction with FBI agents with respect to a case that they

10   might be working but more specifically dealing with financial

11   type inquiries or analyses?

12       A    Exactly.  That's exactly what I do.

13       Q    Now when you do assist an FBI agent in their case,

14   do you necessarily become involved in all aspects of their

15   case or that investigation?

16       A    No.  Only those pertaining particularly to the

17   financials.

18       Q    Okay.  And is it a fair statement that you pretty

19   much will examine or look at various aspects of the financial

20   matter that the agent maybe directs you to or asks you to

21   take a look at?

22       A    Yes.  That's correct.

23       Q    Okay.  So in cases that you become involved, do you

24   kind -- do you take over and kind of go off -- you pretty

25   much rely on the agent to tell you where -- what he or she

Kelley Molanare - Direct

1  would like you to take a look at?

2      A    Generally speaking, they will give me an idea of

3  the records they want reviewed.  I review them.  I provide

4  summary sheets to them and explain to them what exactly the

5  records contained.

6      Q    Now, in the case at hand, did you at some point

7  become involved in assisting FBI Agent Jim Lyons, who's

8  seated in front of me?

9      A    Yes, I did.

10     Q    And at some point were you asked to take a look at

11  certain documentation, certain records in connection to this

12  matter?

13     A    Yes, sir.

14     Q    And in a moment I'll be talking and having you look

15  at a number of documents.  But just as an approximation, you

16  know, approximately when was it that you became involved in

17  doing this financial examination?

18     A    Probably ten weeks ago.

19     Q    Okay.  And since that time, and since doing some of

20  these financial analyses, have you and I sat down and gone

21  over some of these records?

22     A    Yes, we have.

23     Q    And in furtherance of the records that we're going

24  to be discussing, did you also prepare summaries of what

25  those records or some of the kinds of things that those

Kelley Molanare - Direct

1    records contained?

2        A    Yes, I did.

3        Q    And the summaries that you prepared, are those

4    summaries based upon the actual information contained in the

5    actual records that you examined?

6        A    Yes.

7        Q    Miss Molanare, I'd like to show you first

8    Government Exhibit 73.  If you can take a look at that, Miss

9    Molanare.  Do you recognize what that is?

10       A    Yes, sir.  The records we received from eBay.

11       Q    Okay.  And the stack of records in front of you, to

12   whom do those records relate or concern?

13       A    The information concerns Dean Sacco.

14       Q    And are those records that you actually at some

15   point received and then also examined and analyzed for

16   certain information?

17       A    Yes, they are.

18            MR. LOVRIC:  Your Honor, I would offer

19   Government's Exhibit Number 73 into evidence.

20            MR. FISCHER:  Your Honor, may we have a

21   side-bar please?

22            THE COURT:  Sure.

23            (At the bench)

24            MR. FISCHER:  Your Honor, as I see it, you

25   have about an inch-high stack of documents relating to eBay

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct                   1844

1   that are being offered.  I don't know why they're being

2   offered, whether they're relevant or not at this point

3   without any further proffer.  There's a lot of stuff in there

4   that doesn't relate to cameras.  I presume it's being offered

5   to prove purchase of cameras, that's my guess at this point,

6   and as to those items, they are relevant and probably should

7   come in, but with respect to the remainder, I don't think

8   that there's any relevance.

9              THE COURT:  Okay.  Let's hear from the

10  government.

11             MR. LOVRIC:  Yeah, Judge.  The records that

12  eBay has for Mr. Sacco shows everything that he's purchased

13  or sold.  The relevance has to do with directly, he purchased

14  three cameras during a time frame.  One of them is the video

15  camera, one of them is a Polaroid camera, another one is a

16  Fuji zoom camera, and that is relevant in this particular

17  case.  The other things I don't think are in any way

18  prejudicial.  He also bought a camera battery for the video

19  camera that he used.  That's in evidence.  There's nothing

20  prejudicial about other things.  It just shows he bought a

21  speaker or bought a -- I think, you know, just regular

22  things, but it's not as though there's something in there the

23  jury is going to see that has nothing do with the case but

24  it's prejudicial.  It's not like we're offering that he

25  bought 4,000 condoms or anything like that.  There's

Kelley Molanare - Direct

1   anything -- but I just want to include all the records so

2   it's clear.

3           MR. FISCHER:  I think we can stipulate to the

4   purchases on those dates of those items.  And if I may, with

5   respect to the remainder, what the documents do tend to show

6   is that Mr. Sacco was a prolific computer user, that he spent

7   a lot of time on the computer doing certain things.  There

8   are also some --

9           THE COURT:  The government hadn't thought of

10  that, Kelly.

11          MR. LOVRIC:  Thank you.

12          MR. FISCHER:  I'm trying to help every way I

13  can.

14          There are also some things in there about

15  fraud investigations that I think are prejudicial that are

16  not relevant.

17          THE COURT:  Well, let's do this.

18          MR. LOVRIC:  There's nothing in there about

19  fraud.

20          THE COURT:  Let's do this.  The Court's going

21  to receive the exhibit insofar as it pertains to cameras and

22  camera bags, camera accessories.  The rest of it is going to

23  be redacted out.

24          MR. LOVRIC:  I have next a summary which shows

25  a summary of what he purchased.  In there is cameras and

Kelley Molanare - Direct

1  camera batteries.

2          MR. FISCHER:  I think we can do the same thing

3  with respect to that exhibit.  Other items are redacted out,

4  with respect to camera batteries, those do go in the

5  summaries based on the eBay documents themselves.

6          MR. LOVRIC:  I guess I don't understand why

7  it's being redacted.  It shows what he's purchasing.

8          THE COURT:  It's not relevant to this case,

9  and if the attorney who's representing the defendant

10  indicates that he objects to it and the government can't

11  establish relevancy, then I'm going to have to sustain the

12  objection.

13          MR. LOVRIC:  I like defense arguments about

14  computer usage.  I think it's good.

15          THE COURT:  Maybe Mr. Fischer can stipulate to

16  that.

17          MR. FISCHER:  I think it's cumulative.

18          MR. EGAN:  It probably is.

19          THE COURT:  We'll receive those two exhibits

20  subject to redaction.  We'll worry about how to redact them.

21          (In open court)

22          THE COURT:  Okay.  The Court will receive

23  Government's Exhibits 73 in evidence subject to redaction.

24  BY MR. LOVRIC:

25      Q    Miss Molanare, the eBay records that you examined,

Kelley Molanare - Direct                    1847

1  that are in front of you, those eBay records pertain again to

2  whom?

3      A    Dean Sacco.

4      Q    And the eBay records, do they indicate an address

5  for Dean Sacco?

6      A    They do.

7      Q    Can you read that to us?

8      A    Sure.  It's 930 Newark Ave., Jersey City, New

9  Jersey, Zip code 07306-1202.

10     Q    And do they indicate an e-mail address for that

11 user, Dean Sacco?

12     A    Yes, sir.  That is americandesperado@hotmail.com.

13     Q    And does the information in the eBay records also

14 provide a telephone number for Dean Sacco?

15     A    Yes, it does.

16     Q    What is that?

17     A    That is (908)906-7917.

18     Q    And in examining the eBay records, were you able to

19 determine and look at purchases made by Dean Sacco on eBay?

20     A    Yes.

21     Q    And in examining those records, were you able to

22 determine to what address Mr. Sacco had the items sent to

23 that he purchased on eBay?

24     A    Yes, I did.

25     Q    And what address were the items that were purchased

Kelley Molanare - Direct                                    1848

1   sent to?

2       A    They were sent to Glenwood Furniture, which is his

3   employer.

4       Q    Okay.  And with respect -- with respect to the

5   purchases made by Mr. Sacco, do the records indicate how it

6   was that Mr. Sacco paid for purchases that he made?

7       A    Yes, it does.

8       Q    How is that?

9       A    Through PayPal.

10      Q    Okay.  What is PayPal?

11      A    PayPal is a secure method of payment for people who

12  use internet purchase, who make internet purchases.

13      Q    Okay.  And is that the form of payment that Mr.

14  Sacco utilized in making purchases from eBay?

15      A    Oftentimes, yes.

16      Q    Okay.  Now, Miss Molanare, I don't want to assume.

17  I want to ask you, are you familiar with what eBay is?

18      A    Yes.

19      Q    What is it, generally?

20      A    The best way to describe it is like an online

21  auction or classified ad situation, like a newspaper almost.

22  You bid for items that are for sale and you purchase them on

23  line.

24      Q    Okay.  So for example, if a person has an item to

25  sell, whatever that item might be, how would they utilize

Kelley Molanare - Direct                          1849

 1  eBay to sell that item?

 2       A    They would register and set up an account and

 3  either buy or sell their product that they're interested in.

 4       Q    Okay.  And if a buyer goes onto the eBay site and

 5  sees something that they'd like to buy, how do they then

 6  conduct that transaction in order to buy the item?

 7       A    They bid on it, and if they're the winning bidder,

 8  then they would purchase it usually through a PayPal account.

 9       Q    Okay.  And Miss Molanare, this eBay auction or

10  buying/selling company, how do you access it?

11       A    Via the internet.

12       Q    Okay.  So you need a computer?

13       A    Correct.

14       Q    Is there a place that you can go and like be

15  physically present and look to buy something from eBay?

16       A    No, you cannot.

17       Q    So it's just on the internet?

18       A    Exactly.

19       Q    I'd like to next show you Government Exhibit Number

20  74.

21            MR. FISCHER:  Thank you.

22       Q    Miss Molanare, if you can take a look at Government

23  74.  Just tell us generally, do you recognize what it is?

24       A    Yes, I do.

25       Q    What is that?

Kelley Molanare - Direct                     1850

1     A    It's a summary sheet that I prepared regarding the

2  purchases that Mr. Sacco made.

3     Q    Okay.  And does that include some of the purchases

4  that Mr. Sacco made from this eBay company on the internet?

5     A    Yes, sir.

6              MR. LOVRIC:  Your Honor, I would offer Exhibit

7  74 to the extent discussed at the side-bar.

8              MR. FISCHER:  On that basis, no objection.

9              THE COURT:  Okay.  We'll receive Government's

10  74 subject to redaction.

11  BY MR. LOVRIC:

12     Q    Miss Molanare, what I'd like to ask you to do is,

13  on Government Exhibit 74, I've highlighted several items, do

14  you see that?

15     A    Yes, I do.

16     Q    And the items that are highlighted there, what do

17  they represent, the highlights?  What are those things in

18  connection with Dean Sacco's eBay account?

19     A    They're items that he purchased, when he purchased

20  them, how much he paid for them.

21     Q    Okay.  And the information that is highlighted, is

22  that information that you found and obtained from those

23  records in Government Exhibit Number 73?

24     A    Yes, they are.

25     Q    I'd like to ask you if you could go to the first

Kelley Molanare - Direct

1  item highlighted and read, what is that item that was

2  purchased by Mr. Sacco?

3       A    The first item was purchased on or around 9/23/03.

4  It's a Sharp camcorder, Viewcam camcorder.

5       Q    What date was that purchased again?

6       A    On or around 9/23/2003.

7       Q    Okay.  That Sharp video camcorder, how much did Mr.

8  Sacco pay to purchase that?

9       A    $180.50.

10      Q    And based on your examination of the records, how

11 did he accomplish the payment for that item?

12      A    Via PayPal account.

13      Q    Okay.  And where was that item shipped once Mr.

14 Sacco purchased it?

15      A    To Glenwood Furniture.

16      Q    Okay.  Can you read the second item highlighted.

17 What is the purchase for that item?

18      A    That is a Sharp series battery, VLHA series

19 battery.

20      Q    When was that purchased?

21      A    On or about 6/18/2004.

22      Q    And how much did Mr. Sacco pay for that?

23      A    $29.90.

24      Q    And where was that item shipped to?

25      A    Glenwood Furniture.

Kelley Molanare - Direct                          1852

1     Q      Same place in New Jersey that you mentioned

2  earlier?

3     A      Correct.

4     Q      Can you read the next highlighted item.

5     A      The next item is a Polaroid EE 100 Special Land

6  camera.  And that was purchased on or about June 23, 2004.

7     Q      And how much was paid by Mr. Sacco for that item?

8     A      $8.99.

9     Q      Where was that shipped to?

10    A      Glenwood Furniture in New Jersey.

11    Q      I take it all these items so far we discussed were

12  paid through this PayPal account?

13    A      Correct.

14    Q      Can you read the next highlighted item.

15    A      The next item was purchased on June 23, 2005, on or

16  about that date.  It's a Samsung T-Mobile R225 cellphone,

17  plus case.

18    Q      How much was paid for that item?

19    A      $31.25.

20    Q      And shipped to where?

21    A      Glenwood Furniture in New Jersey.

22    Q      And can you read the next item.

23    A      The next item was purchased on or about May 18,

24  2006.  It's a Fuji Discovery 1000 zoom 35-millimeter film

25  camera.

1    Q    And how much was that item purchased for?

2    A    $38.41.

3    Q    And that was shipped to where?

4    A    Glenwood Furniture in New Jersey.

5    Q    Miss Molanare, I'd next like to talk to you about

6  some analysis, review that you did of various bank accounts.

7  In connection with your involvement, did you also -- were you

8  also asked to examine certain bank records and bank accounts?

9    A    Yes, I was.

10    Q    And were those bank records and bank accounts that

11  you examined, were they both for Mr. Sacco and for a person

12  named Linda O'Connor?

13    A    Yes, they were.

14    Q    I'd like to show you first Government Exhibit

15  Number 75.  Miss Molanare, if you can take a look at Exhibit

16  75.  And can you tell us if you recognize that, and what is

17  it?

18    A    Yes, I recognize it.  It's Provident Bank account

19  in the name of Dean M. Sacco d/b/a Rising Sun.

20    Q    And are those bank records that were received from

21  Provident Bank?

22    A    Yes, sir, they were.

23    Q    Are those records that you reviewed and analyzed in

24  connection with a request by Agent Lyons?

25    A    Yes, they are.

Kelley Molanare - Direct

1        MR. LOVRIC:  Your Honor, I would offer

2   Government's Exhibit 75 into evidence.

3        MR. FISCHER:  May I have a brief voir dire,

4   your Honor?

5        THE COURT:  Sure.

6   VOIR DIRE EXAMINATION

7   BY MR. FISCHER:

8        Q    Ma'am, what time frame do those records cover?

9        A    They are from February '06 through April of '07.

10       Q    Is it just Mr. Sacco care of Glenwood Furniture or

11  are there other business -- I'm sorry.  Was it care of

12  Glenwood?

13       A    Yes, it was.

14       Q    Are there any records there care of Rising sun?

15       A    That's his d/b/a so the account is in his name as

16  well as d/b/a.

17       Q    The document you have in front of you is in both

18  the name of Mr. Sacco and Rising Sun care of Glenwood?

19       A    Correct.

20       MR. FISCHER:  Thank you, your Honor.  No

21  objection.

22       THE COURT:  All right.  We'll receive

23  Government's 75 in evidence.

24  BY MR. LOVRIC:

25       Q    Now, Miss Molanare, you had a chance to examine and

Kelley Molanare - Direct                    1855

1    review all of those exhibits in Exhibit 75?

2        A    I did.

3        Q    I'd like to show you next Government Exhibit 76.

4             MR. FISCHER:  Your Honor, may I have just a

5    moment, please?

6             THE COURT:  Sure.

7    BY MR. LOVRIC:

8        Q    Miss Molanare, if you can take a look at Government

9    Exhibit 76 and tell us what that is, if you recognize it.

10       A    It's a summary of the records that are contained in

11   Exhibit 75.

12       Q    And Exhibit 76 that you're holding right now, does

13   that exhibit summarize in a chart form the usage of the Dean

14   Sacco bank card relating to the bank account in Government

15   Exhibit Number 75?

16       A    Yes, it does.

17       Q    Now, the bank account referenced in Exhibit 75,

18   what kind of account was or is that?

19       A    It's a business advantage checking account.

20       Q    And that's in the name of what again?

21       A    Dean M. Sacco d/b/a Rising Sun.

22       Q    Okay.  And the address for that account is what

23   address?

24       A    In care of Glenwood Furniture, 930 Newark Ave.,

25   Jersey City, New Jersey, and the Zip code is 07306-6316.

Kelley Molanare - Direct                           1856

1      Q     And the records contained in Exhibit 75, do they

2    contain monthly statements for that account?

3      A     Yes, they do.

4      Q     Do those records in Exhibit 75 also contain copies

5    of checks that were written or drawn upon the account?

6      A     Yes, they do.

7      Q     And Government's Exhibit 75, does it -- in those

8    statements that you just referenced, are there also record

9    notations in those statements that show when the check bank

10   card, magnetic card was used at various either ATMs or other

11   locations?

12     A     Yes, it does.

13     Q     And in preparing Exhibit Number 76, did you go

14   through the records in Exhibit 75 and extract certain

15   information such as when checks are drawn on that account or

16   when the card, bank card is used at an ATM or when it's used

17   at a gas station or some other type of business to pay for

18   purchases?

19     A     Yes, I did.

20     Q     And did you then summarize that in Exhibit Number

21   76?

22     A     Yes, sir, I did.

23           MR. LOVRIC:  Your Honor, I would offer 76 into

24   evidence.

25           MR. FISCHER:  No objection.

Kelley Molanare - Direct                          1857

1          MISS PEEBLES:  No objection.

2          THE COURT:  Receive Government's 76 in

3   evidence.

4    BY MR. LOVRIC:

5      Q    Miss Molanare, I'd like to go through Government's

6   Exhibit 76 with you.  I'm going to put on the screen page 1.

7   Can you see that?

8      A    I can.

9          MR. LOVRIC:  Is everybody's monitors on?

10     Q    Miss Molanare, I've highlighted certain portions of

11  Exhibit 76 and page 1 we're now looking at.  The first entry

12  highlighted, 2/16 of 2006, what does that entry represent?

13  What occurred on or about that date as far as this bank

14  account of Mr. Sacco's?

15     A    There was a check written to Gerardo DiFiori for

16  $125.

17     Q    And then there's a notation:  "Rent 46 Monitor."

18  Where does that information come from?

19     A    From the memo portion of the check.

20     Q    Right on the check itself?

21     A    Exactly.

22     Q    We see a similar entry on February 22, 2006, same

23  thing as the other one except a different date?

24     A    That's correct.

25     Q    So that involves a check written by -- written by

Kelley Molanare - Direct                          1858

1    someone on Dean Sacco's account?

2         A    That's correct.

3         Q    And then looking down on March 3, 2006, what is

4    that?

5         A    That's another check to the same payee, Gerardo

6    DiFiori, for rent for $125.

7         Q    And does the same occur on March 9 of 2006 and

8    March 16, 2006?

9         A    Yes, it does.

10        Q    Then again at the very bottom, does the same occur

11   on March 24, 2006?

12        A    Yes.  That's correct.

13        Q    I take it in the right-hand column of the memo,

14   whatever is written there is what you found on the actual

15   check written?

16        A    That's exactly correct.

17        Q    Turning to page 2 of Exhibit 76.  On 4/24 of 2006

18   do you see that entry?

19        A    I do.

20        Q    Okay.  Is that another check to a Mr. DiFiori?

21        A    Yes, it is.

22        Q    And then under the memo, is that the information as

23   you found it on the check?

24        A    That's correct.

25        Q    Turning now to page 3 of Exhibit 76.  At the --

Kelley Molanare - Direct                    1859

1  towards the bottom of that page 3, August 22, 2006, do you

2  see that?

3       A    I do.

4       Q    What does that represent, that line entry?

5       A    There was an ATM withdrawal of $101.50 and the

6  location of the terminal was at 52 South Broad Street,

7  Norwich, New York.

8       Q    Okay.  And Miss Molanare, are you familiar with ATM

9  machines at withdrawal, if you're withdrawing money from a

10  bank that's not the bank that your account is drawn from?

11       A    Yes.

12       Q    Is it commonplace for ATM machines that are not the

13  bank that the account is at to charge a small withdrawal fee

14  if you're taking money out?

15       A    Absolutely.  It's a service charge.

16       Q    Okay.  What kind of denominations are those service

17  charges from various banks?

18       A    Generally speaking, they're a dollar 50 and up.

19       Q    So it could be a dollar 50 or more of a service

20  charge?

21       A    Correct.

22       Q    So for example, if you're going to take out a

23  hundred bucks, is it possible that you're going to be charged

24  a dollar or more for service fee?

25       A    Exactly.

Kelley Molanare - Direct

1    Q    Then we see entries below that.  August 23, there's

2  two entries.  Can you indicate what those two entries

3  represent on this Sacco account?

4    A    The first one is Hess, that's a gas station, and

5  the purchase was for $2.49, located in Bainbridge, New York.

6  The next one is Curtis, and I believe that's Curtis Lumber.

7  The purchase was for $21.69, in Norwich, New York.  And then

8  on August 24, Eckerd Corporation for 3.99 in Norwich,

9  New York.

10   Q    Are you familiar with Eckerd pharmacies?

11   A    Yes.

12   Q    Pharmacy chain in Upstate New York?

13   A    That's correct.

14   Q    Turning next to page 4 of Exhibit 76.  August 29,

15  2006.  Purchase at where?

16   A    At Super 7 for $10, and the location is Sloatsburg,

17  New York.

18   Q    And then September 1 of 2006?

19   A    Purchase at Eckerd Corporation for $4.80 in

20  Norwich, New York.

21   Q    Now, these purchases that we've discussed, these

22  last several, four or five, the bank records indicate that

23  these are purchases that are debited from this Sacco account,

24  and how has that happened?  Are these checks or is there

25  something else that debits the account?

Kelley Molanare - Direct

1    A    There's a debit card and it's used at a point of

2  sale location, and the location would be identified as the

3  gas station or restaurant, grocery store.

4    Q    So is it pretty much like we have observed of those

5  check cards we have that's affiliated with the checking

6  account?

7    A    Yes, it is.

8    Q    9/5/2006, what does that relate to?

9    A    Penn Traffic, P & C.  It's a purchase of $28.54 in

10  Norwich, New York.

11    Q    And what is P & C?

12    A    P & C is a grocery store.  Penn Traffic is the

13  parent company of P & C.

14    Q    Turning to page 5.  9/18/2006, we see a debit for

15  Norwich YMCA?

16    A    That's correct.  Twenty-eight dollars.

17    Q    Then October 10, there's another entry for that

18  Curtis Lumber you indicated earlier?

19    A    Yes.  For $8.46.

20    Q    Now October 10, Hess for 42.45?

21    A    That's correct.  In Bainbridge, New York.

22    Q    And at the very bottom, another debit for Norwich

23  YMCA, is that correct?

24    A    Yes, it is.

25    Q    Page 6.  Just generally directing your attention.

Kelley Molanare - Direct                    1862

1  You see the October 23, 2006 and then October 25, 2006

2  purchases at Eckerd and then at P & C, both in Norwich,

3  New York?

4      A    Right.

5      Q    Are those also purchases made with the debit card

6  that you described a little bit earlier?

7      A    Yes, they are.

8      Q    Then October 27, that first one, ATM withdrawal?

9      A    Yes.

10     Q    Okay.  So that's cash being taken out?

11     A    Right, at 18 South Broad Street, Norwich.

12     Q    Okay.  And if the cash was taken out of the bank,

13 not Provident, would it be likely that a service charge of

14 some sort was charged?

15     A    That's correct.

16     Q    Then October 27, another purchase for $20 in

17 Norwich?

18     A    That's correct.

19     Q    And then at the next entries, October 30, 31, and

20 November 2, purchases in various locations in New York, New

21 York state?

22     A    Yes, they are.

23     Q    Looking at page 7, and I'll just refer you to the

24 left-hand column dates.  Does that indicate purchases made on

25 November 6 of 2006, November 13 of 2006, at various places in

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1   Norwich, Bainbridge and Deposit, New York?

2       A    Yes, they are.

3       Q    Exhibit 76, page 8.  Just pointing your attention

4   to the dates November 20, November 21 of 2006.  Purchases in

5   Norwich, New York?

6       A    Yes.  That's correct.

7       Q    Towards the bottom, three purchases on December 4

8   of 2006 in Norwich, New York, Bainbridge and Deposit area?

9       A    That's correct.

10      Q    Page 9, just directing your attention to the dates.

11  December 11, 2006, purchase in Oxford, New York?

12      A    That's correct.

13      Q    And then we have another debit for the YMCA in

14  Norwich, and then following that is a purchase on

15  December 26, 2006 where?

16      A    At Wal-Mart in Norwich.

17      Q    And that was for what amount at Wal-Mart?

18      A    $5.12.

19      Q    That indicates a purchase, a purchase date being

20  the date after Christmas of 2006?

21      A    That's correct.

22      Q    And then directing your attention, January 2, 2007

23  indicates two purchases, one in Bainbridge, one in Norwich,

24  New York?

25      A    That's correct.

Kelley Molanare - Direct

1    Q    Now these purchases on this page, these purchases

2    were accomplished how?

3    A    By way of a debit card.

4    Q    Same bank card you described earlier?

5    A    Exactly.

6    Q    And then we see January 16, 2007, purchase at a

7    Norwich tire company in Norwich, New York?

8    A    That's correct.

9    Q    Then January 17, another debit for the Y?

10   A    That's correct.

11   Q    Looking at page 10.  January 23, 2007.  What does

12   that entry indicate?

13   A    On January 23, 2007, check number 164 was written

14   to Pedersen Plumbing for $500.  The memo on the check

15   indicated an install at 45 Fair Street.

16   Q    That was a check?

17   A    That's correct.

18   Q    That's that 164 check number?

19   A    That's correct.

20   Q    And then further down we see another Norwich YMCA

21   debit, and then we see the three items under February 26,

22   2007?

23   A    Yes.

24   Q    Okay.  Now those three items under February 26,

25   2007, at P & C, Hess and Rite Aid, those purchases were made

Kelley Molanare - Direct                    1865

1   how?

2       A    By way of a debit card.

3       Q    And those three, two occurred in Norwich, one in

4   Bainbridge of New York?

5       A    That's correct.

6       Q    Now, Miss Molanare, do you see the highlighted

7   portion -- this is page 11.  Do you see the highlighted

8   portion on page 11?

9       A    Yes.

10      Q    What is that?  What does that show in these

11  records?

12      A    It indicates that a deposit was made on 36/20/07

13  and the deposit was for $100.  The deposit contained a US

14  postal money order.

15      Q    And what was the amount of the money order?

16      A    The money order was in the amount of $113.

17      Q    Okay.  And it indicates a memo.  What does that

18  mean?

19      A    On the postal money order you have an area where

20  you can write a memo, and on that memo it said:  "Rent for

21  March.  Amount due 300 for January."

22      Q    Take a look at Government Exhibit 77, Miss

23  Molanare, tell me if you recognize that.

24      A    I do.

25      Q    What is that?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct                          1866

1      A     US postal money order paid to Dean Sacco, and it

2  was paid by Linda O'Connor.

3      Q     And is that a copy of part of the records that were

4  contained in Exhibit Number 75, which is the records for this

5  Provident Bank account of Dean Sacco's?

6      A     Yes, they were.

7                MR. LOVRIC:  Judge, I would offer Government

8  Exhibit 77 into evidence.

9                MR. FISCHER:  No objection.

10               MISS PEEBLES:  No objection.

11               THE COURT:  Receive Government's 77 in

12  evidence.

13  BY MR. LOVRIC:

14     Q     I'm going to put on the screen, Miss Molanare,

15  Government Exhibit 77.  Can you see that?

16     A     I can.

17     Q     Is that one page a copy that's found in all of the

18  records that are in Exhibit 75?

19     A     Yes, it is.

20     Q     Okay.  And can you just -- well, I'll read it since

21  it's on the screen.  Indicates:  "Pay to Dean Sacco, 930

22  Newark Ave., Jersey City, 07306."  And below that it says,

23  "Rent for March."  And below that it says, "Amount due 300

24  for January."  Then on the right-hand side it says, "From

25  Linda O'Connor, 45 Fair Street, Norwich, New York 13815."  Is

Kelley Molanare - Direct

1    that what it reads?

2        A    Yes, it does.

3        Q    And then the amount of the money order is $113.00,

4    is that correct?

5        A    That's correct.

6        Q    And then on the back of that item appears a

7    signature of a Dean Sacco and then account number?

8        A    That's correct.

9        Q    The account number I take it is this Provident

10   account that is Exhibit 75?

11       A    Yes, it is.

12       Q    Now, Miss Molanare, this postal money order was

13   deposited into this Dean Sacco account?

14       A    Yes, it was.

15       Q    And that was deposited on what date?

16       A    March 6 of 2007.

17       Q    Okay.  Now, are there any other either money orders

18   or checks or any other type of instrument from Linda O'Connor

19   deposited into this Dean Sacco account?

20       A    No, there was not.

21       Q    Miss Molanare, before I leave this topic, I want to

22   put on the screen again Exhibit 76.

23       A    Okay.

24       Q    And at the very top where there's a date,

25   February 7, 2006, do you see that?

Kelley Molanare - Direct

1    A    I do.

2    Q    When was this account opened?

3    A    It was opened on February 7, 2006 with a cash

4 deposit of $50.

5    Q    Okay.  And so the account is opened on that date.

6 And when is the account closed?  And I'm putting on the

7 screen now the 11th page of your summary.

8    A    April 20 of 2007 the account was closed with a

9 credit of $141.43.

10    Q    Okay.  I'd like to next show you, Miss Molanare,

11 Exhibit 78 and 79.

12         Miss Molanare, if you can look at 78 and 79 and

13 tell me if you recognize what those items are.

14    A    Yes, I do.

15    Q    What is 78 first?

16    A    Number 78 is a receipt and warrant for a purchase

17 at Pet Depot.

18    Q    And what date does that reference as far as the

19 purchase?

20    A    The purchase date shows August 1, 2006.

21    Q    And then what is 79?

22    A    Purchase date shows January 30, 2007.

23    Q    And what business does that relate to, Government

24 Exhibit 79?

25    A    Seventy-nine relates to Pet Depot as well.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct

1869

1       Q     Okay.

2                   MR. LOVRIC:  I would offer Government Exhibit

3   78 and 79, Judge.

4                   THE COURT:  No objection?

5                   MISS PEEBLES:  No objection.

6                   MR. FISCHER:  No objection.

7                   THE COURT:  Receive Government's 78 and 79 in

8   evidence.

9    BY MR. LOVRIC:

10      Q     Miss Molanare, looking at Government Exhibit 78,

11  what is that purchase for?

12      A     It is for a dog as well as some miscellaneous

13  items.

14      Q     And that's dated when?

15      A     August 1, 2006.

16      Q     And what's the total purchase on that date?

17      A     Total purchase was $731.62.

18      Q     And does it indicate who the person was that was

19  making that purchase on that document?

20      A     Yes.  The purchaser is Linda O'Connor at 45 Fair

21  Street, Norwich.

22      Q     And then Exhibit 79, would you look at that again.

23  What is purchased with Exhibit 79?  What does that indicate

24  is being bought?

25      A     Puppy.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct

1    Q    And the date again on that?

2    A    January 30, 2007.

3    Q    And what was the amount spent on that date at Pet

4  Depot?

5    A    $810.

6    Q    And who's the person buying that dog that day?

7    A    Linda O'Connor at 45 Fair Street, Norwich,

8  New York.

9    Q    In fact, do both of those records indicate Miss

10  O'Connor's 45 Fair Street address?

11    A    Yes, they do.

12    Q    Miss Molanare, I'd next like to show you Government

13  Exhibit Number 114.  If you could take a look at Exhibit 114

14  and tell us if you recognize what that is.

15    A    Yes, I do.

16    Q    What is that?

17    A    It's account statement for Linda O'Connor.

18    Q    And what institution does that relate to, what

19  banking institution?

20    A    That is NBT account, I believe.

21    Q    And in looking at financial documents, did you

22  examine the records that are contained in Government's

23  Exhibit Number 114?

24    A    Yes, I did.

25    Q    And in examining those records, did you then at

Kelley Molanare - Direct                    1871

1   some point prepare a summary of the transactions that are

2   reflected in those documents?

3       A    Yes, I did.

4       Q    Next I'd like to show you Government Exhibit Number

5   115.

6            MR. FISCHER:  Thank you.

7       Q    Miss Molanare, looking at Government's Exhibit 115,

8   can you tell us if you recognize that and what that is.

9       A    I do recognize it.  It's a summary chart for the

10  account listed as Exhibit 114.

11           MR. LOVRIC:  Judge, I would offer Government's

12  114 and 115 into evidence.

13           MR. FISCHER:  No objection.

14           MISS PEEBLES:  Your Honor, may I have a quick

15  voir dire of this witness?

16           THE COURT:  Sure.

17  VOIR DIRE EXAMINATION

18   BY MISS PEEBLES:

19      Q    Ms. Molanare, are there withdrawals or deposits

20  that aren't reflected on your chart that you have in front of

21  you?

22      A    No.  It's all-inclusive.

23      Q    You're positive about that, based on what you have

24  in front of you?

25      A    Yes.

Kelley Molanare - Direct                    1872

1      Q      There's no indications of any December deposits and

2   withdrawals of '06 on that document, it only goes to

3   November?

4      A      Yeah.  I'll check it.

5             No.  That's correct.

6             MISS PEEBLES:  No objection, Judge.

7             THE COURT:  Okay.  We'll receive Government's

8   114 and 115 into evidence.

9   BY MR. LOVRIC:

10     Q      Miss Molanare, I'm going to put on the screen

11  Exhibit 115, your summary chart.

12     A      Okay.

13     Q      Can you see that?

14     A      I can.

15     Q      Now, this summary chart is a summary for a bank

16  account relating to whom?

17     A      Linda O'Connor.

18     Q      And you had already indicated it's an NBT account?

19     A      That's correct.

20     Q      And what type of an NBT account was this?

21     A      Checking.

22     Q      And the account address for the account is what?

23     A      Forty-five Fair Street, Norwich, New York 13815.

24     Q      Okay.  And this summary chart that you prepared

25  goes from approximately September 21 of '06, is that correct?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct                1873

1    It starts at September 21 of '06?

2        A    Yes.

3        Q    And then I'll flip to the last page, and it goes up

4    until when?

5        A    November 16, 2006.

6        Q    Okay.  And what happens on November 16 of 2006 to

7    this account?

8        A    The bank charges off this account because it had a

9    negative balance, and the negative balance amount was

10   $456.98.

11       Q    What does that mean, the bank charges off the

12   amount?

13       A    They've been -- they're unable to collect the

14   money.  They take a loss themselves for the account.

15       Q    So that's the amount that the person that opened

16   this account owes them and the account gets closed with that

17   loss to the bank?

18       A    That's correct.

19       Q    I'm going to put on the screen the first page of

20   this account again and just have you talk a little bit about

21   it.  Just for the jury's edification, can you just describe

22   what the debits and credits column represent, what

23   information you placed in there and what that shows?

24       A    The debits indicate a withdrawal or a decline in

25   the balance of the account, and the credits show an addition

Kelley Molanare - Direct                    1874

1   to the account.

2       Q    Okay.  So if money is being put in either by way of

3   checks or cash, that would show up in which column?

4       A    As a credit.

5       Q    And then if money is being withdrawn either through

6   an ATM machine or checks or a bank card, that would show up

7   in which column?

8       A    As a debit.

9       Q    Now, do you see that deposit of 2,000 on

10  September 21, 2006?

11      A    I do.

12      Q    And then looking at the left columns, September 25

13  of '06, 26, and then continuing October 4, 5, and down to

14  November -- excuse me.  Down to October 16, there's various

15  either ATM withdrawals or withdrawals from this account, is

16  that correct?

17      A    That's correct.

18      Q    And what happens to this account between

19  September 21 of 2006 and October 17 of 2006, less than a

20  month later?

21      A    It's depleted.  It's drawn down to $4.26.

22      Q    And on October 17 of 2006, what does this account

23  balance actually show?

24      A    On October 17 the balance is negative $12.34.

25      Q    Now, on the far right-hand column, what does it

Kelley Molanare - Direct                    1875

1    signify when you have parens around the amount?

2         A    That's a negative balance.

3         Q    So for example, on parentheses, so for example

4    there when it -- when it says $4.26, is that a positive or

5    negative balance?

6         A    That's a positive.

7         Q    Immediately below it, when it says (12.34), what

8    does that signify?

9         A    That's a negative $12.34.

10        Q    And what is signified by insufficient funds and

11   overdraft fees?  What does that indicate in this account?

12        A    That means the account is overdrawn or the item

13   that was drawn on the account was larger than the amount that

14   was in the account.

15        Q    Not enough money in the account?

16        A    Correct.

17        Q    Then turning to page 2 of that exhibit, we see

18   numerous entries, returned check, redeposit check and

19   returned check.  Do you see that?

20        A    I do.

21        Q    Checks bouncing on the account?

22        A    Exactly.

23        Q    I'd next like to show you Government's Exhibit 116

24   and 117.  If you take a look at Exhibit 116 first and tell us

25   if you recognize what that is.

Kelley Molanare - Direct

1    A    Yes.  That's an NBT account for Linda O'Connor.

2    Q    And what time frame does that account cover,

3  approximately?

4    A    December 2005 to October 2006.

5    Q    And then what is Government Exhibit Number 117?

6    A    Number 117 is a summary sheet that I created

7  regarding Exhibit Number 116.

8         MR. LOVRIC:  I would offer 116 and 117 into

9  evidence.

10        MISS PEEBLES:  Just a quick question.

11  VOIR DIRE EXAMINATION

12   BY MISS PEEBLES:

13   Q    Miss Molanare, that doesn't reflect any activity in

14  November or December of 2006.  It stops right at October?

15   A    Correct.

16        MISS PEEBLES:  No objection.

17        MR. FISCHER:  No objection.

18        THE COURT:  Receive Government's 116 and 117

19  in evidence.

20   BY MR. LOVRIC:

21   Q    I'll put on the screen Exhibit Number 117.  And

22  looking at 117, specifically looking at February 17, 2005,

23  there's a deposit, do you see that?

24   A    Yes, I do.

25   Q    That's a deposit of what and from where?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct

1      A     It is a deposit of $909 from US Treasury and it was

2   a tax refund.

3      Q     On that same date does that entire amount get

4   withdrawn?

5      A     It is.

6      Q     And then on February 21 of '05 is there a deposit?

7      A     There's a deposit for $181.  It was a New York

8   State tax refund.

9      Q     And on that same date is almost the entire amount

10  withdrawn?

11     A     Yes, it is.

12     Q     And then do you see the deposit on July 24, 2006?

13     A     Yes.

14     Q     What amount is that?

15     A     $3,573.51.

16     Q     And then between July 24 of '06 and down to

17  approximately August 8 of 2006, some less than two weeks

18  later, is almost the entire amount withdrawn or depleted?

19     A     Yes, it is.

20     Q     And are most of the transactions withdrawals of

21  cash or some type of cash form?

22     A     Yes, they are.

23     Q     Now, at the -- further down on September 1, 2006,

24  do you see a deposit for $611?

25     A     Yes, I do.

Kelley Molanare - Direct                      1878

1      Q      Where is that deposit coming from?

2      A      It's a US Treasury check, Supplemental Security.

3      Q      Okay.  Is that some kind of SSI, typically called

4   SSI?

5      A      Yes.

6      Q      Miss Molanare, I'd next like to show you

7   Government's Exhibits 118 and 119.

8              MISS PEEBLES:  Your Honor, may we have a

9   side-bar?

10             THE COURT:  Sure.

11             (At the bench)

12             MISS PEEBLES:  These date back to 2004.  I

13  don't even know why they're being offered.

14             MR. LOVRIC:  I couldn't hear you.

15             THE COURT:  So they go back to 2004 and she

16  fails to see the relevance of documents from that time frame.

17             MR. LOVRIC:  The relevance is Linda O'Connor

18  is, along with Dean, but along -- Linda O'Connor is charged

19  with sex trafficking between January of 2004 through March of

20  2007.  There's been testimony and it is the government's

21  belief and theory that one of the reasons that Linda O'Connor

22  allowed George Lang to engage in sexual contact with Shannon

23  O'Connor during the time frame that's charged is because she

24  was getting -- and in fact there was testimony she was

25  getting assistance from George Lang in terms of financial

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct

1  assistance in terms of helping with rent and helping with

2  other ways.  These records show that Linda O'Connor had

3  financial difficulties during that time and in fact did not

4  have money, and our belief is that they're relevant to show

5  that is one of the reasons why she was allowing George to do

6  what he did to her, because she needed money, and George was

7  willing to give her assistance, money and rent.

8          MISS PEEBLES:  That was not gleaned by the

9  testimony that was offered.  Renee Lang never said anything

10  about paying her rent or anything --

11          THE COURT:  There was testimony about George

12  giving her money.  I can't remember the source of that.

13          MISS PEEBLES:  That was Shannon who said she

14  thought.  She didn't even have any firsthand knowledge of

15  that, Judge.

16          THE COURT:  That's a way of speaking, when

17  somebody made an objection from the bench, I think this

18  happened or I don't think it happened.  It's just a

19  phraseology of speech.  And it doesn't characterize the

20  degree of certainty; I agree with that.  It's not like, oh,

21  I'm sure that, you know, George was helping her.  It's the

22  way people talk.  I think this happened, I think it didn't

23  happen.  So if there's support for the fact that there was

24  money coming from Mr. Lang to Miss O'Connor, I think that's

25  relevant and I think part of something that would tend to

Kelley Molanare - Direct

1  establish it's more likely than not that Linda O'Connor may

2  have prostituted her daughter to George Lang.

3          MISS PEEBLES:  Well, in light of the fact that

4  she stated that it started occurring in December of '05,

5  which is what she said, and she said -- that's what she said

6  on the tape, then it doesn't go back to '04 anyway.

7          MR. LOVRIC:  It does, because when I

8  redirected Shannon, she indicated that she recalls Christmas

9  at the Langs in December of '04, and she indicated that when

10  the abuse started it was still wintertime.  Approximately

11  2004.

12          THE COURT:  It was snowing, it could have been

13  July in Deposit.

14          MR. LOVRIC:  Well, possibly, but my argument

15  is that it was in 2004 and there is support for that.  We can

16  argue that.  These records are relevant to show at the time

17  Linda O'Connor did have financial difficulties.

18          MISS PEEBLES:  You can go back her entire

19  life, she's had financial difficulties.

20          THE COURT:  That's probably true.

21          MR. LOVRIC:  But it would be one thing if I

22  was putting in records from 2000.  This is at a time that's

23  charged in the indictment.  The indictment charges sex

24  trafficking from 2004 through March of '07.

25          THE COURT:  I think it's relevant.  Again,

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct                    1881

1   you're still able to argue what you've argued here at

2   side-bar to the jury.  Here's what the government -- this is

3   the great proof they've got.  Look, they're going back to

4   2004, she said nothing happened until 2005.  So -- Overruled.

5                (In open court)

6                THE COURT:  Okay.

7   BY MR. LOVRIC:

8        Q    Miss Molanare, I'm going to show you Government

9   Exhibit 118 and 119.  If you can look at 118 first.  Just

10  tell us if you recognize it, what it is.

11       A    I do.  It's bank statements for NBT Bank for Linda

12  O'Connor.

13       Q    And 118 records reflect what time frame?

14       A    They are from April of '04 through October of '04.

15       Q    And then what is Exhibit 119?

16       A    That is my summary that I created reflecting the

17  information that's in Exhibit Number 118.

18                MR. LOVRIC:  I would offer 118 and 119 into

19  evidence.

20                THE COURT:  The Court will receive those

21  exhibits subject to objection on the record.  118 and 119.

22       Q    I'm going to put on the screen, Miss Molanare,

23  Exhibit 119.

24       A    Okay.

25       Q    And that first page shows a summary of account

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct                                    1882

1    activity with respect to Linda O'Connor starting April 30,

2    2004?

3         A    That's correct.

4         Q    And what type of an account was this?

5         A    It's a budget checking account.

6         Q    Okay.  And what is the address on the account?

7         A    11 River Street, Deposit, New York, 13754.

8         Q    And then I'm going to flip to the third page of

9    your summary.  I'm putting that on the screen, the third page

10   of Exhibit 119.  And again, on the right-hand column we see

11   numbers in parentheses, and that indicates what?

12        A    Negative balance.

13        Q    And then putting on the screen the fifth page, on

14   the fifth page of Exhibit 119, there's references to returned

15   checks, and on the right-hand column the balances appear all

16   to be negative for that entire page, is that correct?

17        A    That's correct.

18        Q    And by October 1 of 2004, what is the balance in

19   this account?

20        A    The balance is negative $586.22.

21        Q    And then on the last page of Exhibit 119, page 6.

22        A    The last transaction on October 7, 2004 is a

23   closing transaction with a credit of $315.78, bringing the

24   balance to close.

25        Q    Okay.  Now, what does that mean?  What did the bank

Kelley Molanare - Direct                    1883

1    do on October 7, 2004?

2        A    They closed the account down and took a loss of

3    $315.78.

4        Q    And finally, I'd like to show you Government's

5    Exhibits 120 and 121.

6             I'm going to show you Exhibit 120, 121, Miss

7    Molanare, and if you take a look at 120, do you recognize

8    that?

9        A    Yes, I do.

10       Q    What is 120?

11       A    120 is People's National Bank account for Linda

12   O'Connor.

13       Q    And what time frame does Exhibit 120 relate to?

14       A    December of 2004 through December of 2007.

15       Q    And what type of an account is that?

16       A    It is a checking account.

17       Q    And then what is Exhibit 121?

18       A    121 is a summary sheet that I created of the

19   contents in Exhibit 120.

20             MR. LOVRIC:  I would offer Exhibit 120 and 121

21   into evidence.

22             THE COURT:  No --

23             MR. FISCHER:  No objection.

24             MISS PEEBLES:  No objection.

25             THE COURT:  Receive Government's 120 and 121

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Direct                          1884

1    into evidence.

2    BY MR. LOVRIC:

3        Q    Putting on the screen, Miss Molanare, Exhibit 121,

4    the first page indicating that the account was opened about

5    when?

6        A    December 30, 2004.

7        Q    And then towards the bottom portion we see a

8    deposit on February 11, 2005, $818.  Again, do you see that?

9        A    I do.

10       Q    That's a deposit of what?

11       A    $818, it's US Treasury tax refund.

12       Q    Further on March 1 of '05, $222 from where?

13       A    New York Tax refund.

14       Q    Same date, deposit of $587, do you see that?

15       A    I do.

16       Q    And that's a deposit of what?

17       A    Supplemental Security Income.

18       Q    Page 2, Exhibit 121, do you see that entry on

19   March 9, 2005?

20       A    Yes, I do.

21       Q    What kind of a transaction was that?

22       A    March 9, check number 132 is for $100, month of

23   July back rent.

24       Q    And then check number 134, what is that?

25       A    Written on March 9, 2005, to Sharon Wright for $200

1    for back rent.

2        Q    And again, directing your attention to the

3    right-hand column, we see from time to time on this page

4    parentheses around the balances.  Again, that indicates what?

5        A    A negative balance.

6        Q    4/1/05, you see a deposit of 587.  Again, is that

7    also that same SSI check?

8        A    Yes, it is.

9        Q    On page 4 of Exhibit 121, numerous insufficient

10   funds charges, do you see that?

11       A    I do.

12       Q    And negative balances?

13       A    That's correct.

14       Q    On page 5, looking at the bottom portion, August 3

15   of '06, there's entries August 3, September 5, October 3,

16   November 5, December 3, all showing negative balances, is

17   that correct?

18       A    That's correct.

19       Q    And then into January of 2007, showing a negative

20   balance?

21       A    That's correct.

22       Q    And then the final page, page 6.  Into 2007, all

23   those dates again showing negative balance?

24       A    That's correct.

25                MR. LOVRIC:  Those are all the questions I

Kelley Molanare - Direct

1    have, Judge.

2                    THE COURT:  Okay.  Mr. Fischer?

3                    MR. FISCHER:  Your Honor, based on the

4    summaries that I have not seen before, I'd like to take some

5    time to go through those before I question.

6                    THE COURT:  Okay, ladies and gentlemen.  Do

7    you want to step aside for a few moments, please.

8                    (Jury excused)

9                    (Jury present)

10                   THE COURT:  Okay, Mr. Fischer.

11                   MR. FISCHER:  Thank you, your Honor.  May it

12   please the Court.

13

14

15

16

17

18

19

20

21

22

23

24

25

Kelley Molanare - Cross                          1887

1   CROSS-EXAMINATION

2    BY MR. FISCHER:

3        Q    Miss Molanare, my name is Kelly Fischer.  I

4   represent Mr. Sacco.  The Provident Bank records that you

5   produced today --

6        A    Yes.

7        Q    -- are they all of the Provident Bank records that

8   you've reviewed?

9        A    Yes, they are.

10       Q    The documents that you produced and have been

11  offered in evidence today, are those all of the documents

12  that you reviewed in preparing for this matter?

13       A    Yes, they are.

14       Q    What was the date, the time frame for the Provident

15  Bank records that you were asked to review?

16       A    It would show on my summary sheet.  I don't have it

17  in front of me.  It's located at the bottom of the sheet.

18       Q    I'll show you Government's Exhibit 76 and ask if

19  that identifies the time frame.

20       A    Yes.  It does.  It identifies February 7, '06

21  through April 20, '07.

22       Q    Thank you.  You were not asked to review records

23  prior to February 7 of 2006 for the Provident Bank, am I

24  correct?

25       A    Everything that's in that -- I reviewed is in that

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Cross                        1888

1    summary sheet.

2         Q    You did not review records from HSBC?

3         A    I did review records.

4         Q    From HSBC?

5         A    I did.

6         Q    So you reviewed documents other than the documents

7    that we have here?

8         A    Correct.

9         Q    What documents other than what we have here did you

10   review in preparation for your testimony?

11        A    I don't have a list of them with me, but I did see

12   an HSBC account.  I can't recall them off the top of my head.

13        Q    Do you remember also seeing records from a Bank of

14   America account?

15        A    Yes.

16        Q    Did you see records from an HSBC credit card

17   account?

18        A    I did.

19        Q    Did you see a Bank of America credit card account?

20        A    Yes.  I believe so.

21        Q    When did you review those?

22        A    Within the last ten weeks.

23        Q    The accounts that you reviewed -- withdraw that.

24   Did you also review Provident Bank records that were dated

25   prior to February 2006?

Kelley Molanare - Cross                                    1889

1      A     Different account, yes.

2      Q     A different Provident account?

3      A     Yes.  I believe so.

4      Q     Did you review any Provident account records from

5  the account reflected in Exhibit 75 that predated February of

6  2006?

7      A     No.  Everything that's included there, that I

8  reviewed.

9      Q     In reviewing Mr. Sacco's credit card bills, do you

10 remember that, say, end of 2006, into early 2007 he carried a

11 balance?

12     A     I believe so, yes.

13     Q     Do you recall that he carried a balance on the --

14 let's say, HSBC account of over a thousand dollars?

15     A     I couldn't tell you without looking at it.

16     Q     I'll show you Exhibit S-25.

17           MR. FISCHER:  If I may approach, your Honor?

18           THE COURT:  Yes.

19     A     Okay.

20     Q     Can you identify what that is?

21     A     That's an HSBC credit card statement.

22     Q     Can you tell the time frame that covers by looking

23 at the document?

24     A     Shows January -- January of '06 through -- I'm

25 sorry.  These are backwards.  October of '06 through January

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Cross

1    '07.

2       Q    Can you tell -- withdraw that.  Did you review

3    those documents?

4       A    I did.

5       Q    Does that refresh your recollection that -- about

6    the amount that Mr. Sacco owed end of '06 into early '07?

7       A    Yes.

8       Q    How much was that?

9       A    $1,749.48.

10      Q    Do you remember looking at the Bank of America

11   credit card records?

12      A    Yes.

13      Q    I'll show you Document S-26.  Can you identify

14   that?

15      A    This is a Bank of America account in the name of

16   Dean Sacco.

17      Q    That's a credit account?

18      A    Yes.

19      Q    That shows money that Mr. Sacco owed to the Bank of

20   America?

21      A    Correct.

22      Q    You reviewed those records?

23      A    Yes.

24      Q    How much did Mr. Sacco owe the Bank of America on

25   that credit card account, say, in January 2007?

Kelley Molanare - Cross                    1891

1     A     In January 2007, he owed $6,003.26.

2     Q     Did you review copies of checks from Bank of

3  America drawn on Mr. Sacco's account?

4     A     I did.

5     Q     I'll show you Exhibit S-27.  I have my tab on one

6  of those yellow pages.  Other than that, can you identify

7  that document?

8     A     Yes.

9     Q     What is that document?

10     A     These are checks that Mr. Sacco wrote on his

11  account to pay bills.

12     Q     From approximately what time frame to what time

13  frame does that cover?

14     A     This shows December of '06 through March of '07.

15             MR. FISCHER:  Your Honor, I'll offer this

16  document into evidence, Exhibit S-27.

17             MR. LOVRIC:  I have no objection.

18             MISS PEEBLES:  No objection.

19             THE COURT:  Receive Defendant's S-27 in

20  evidence.

21   BY MR. FISCHER:

22     Q     Miss Molanare, during the time frame, say November

23  of '06 into early 2007, Mr. Sacco was paying bills at this

24  time, am I correct?

25     A     Correct.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Cross                    1892

1    Q    He was paying against his Bank of America credit

2  card?

3    A    I believe so, yes.

4    Q    He was paying the water bill in Norwich -- I can

5  use the viewer.  I'll try to use the viewer to show these to

6  you.  He was paying his water bill in Norwich?

7    A    Right.

8    Q    He was paying a Chase home finance mortgage loan?

9    A    Right.

10   Q    Do you know whether he carried a second mortgage on

11  that property?

12   A    Yes.  I believe he did, or a line of credit.

13   Q    Do you know that Mr. Sacco was paying a bankruptcy

14  lawyer at this time?

15   A    Yes, I did see that in the records.

16   Q    And that's this Gene Seelinger, S-E-E-L-I-N-G-E-R?

17   A    Correct.

18   Q    He was paying NYSEG during this time?

19   A    Yes.

20   Q    He also paid a fellow by the name of Ron Donahue on

21  March 4 of 2007, $350 for floor.  Is that correct?

22   A    Yeah.  That's what the check says, yes.

23   Q    Can you tell when that check went through for

24  payment?

25   A    Looks like the date is March 9 that it was paid.

1      Q      And the check itself is dated March 4?

2      A      Right.  But it cleared the bank on the 9th.

3      Q      Five days later?

4      A      Right.

5      Q      In reviewing Mr. Sacco's banking records, you

6   remember seeing payments to a plumbing company?

7      A      Yes.

8      Q      Curtis Lumber?

9      A      Correct.

10     Q      Pedersen Plumbing?

11     A      Yes.

12     Q      Do you remember seeing indications that Mr. Sacco

13  was checking his credit scores and Experian score card

14  reference?

15     A      Yep, I did see that.

16     Q      He was paying Liberty Mutual for insurance?

17     A      Right.

18     Q      Back in May of '07 Mr. Sacco paid a thousand

19  dollars to Mooney Real Estate, do you remember that?

20     A      Yes, I believe I did see that.

21     Q      You remember any indications that Mr. Sacco was

22  paying his income tax?

23     A      Yes.

24     Q      He was paying the real estate taxes on the property

25  at 45 Fair Street?

Kelley Molanare - Cross

1894

1       A     Correct.

2       Q     Do you remember he paid some parking fines down in

3  the city?

4       A     Correct.

5       Q     Paid for his utilities?

6       A     Yes.

7       Q     And he was paying for rents to Mr. DiFiori down in

8  the city?

9       A     Correct.

10      Q     Paying his phone bill?

11      A     Yes.

12      Q     His car loan?

13      A     Yes.

14      Q     The Wal-Mart, December 26, 2006 summary, Exhibit

15  76, can you find that on that document, please.

16      A     Okay.

17      Q     Now that summary is based on a summary of Exhibit

18  75, am I correct?

19      A     Yes.

20      Q     In Exhibit 75, can you locate the place where that

21  December 26, 2006 Wal-Mart charge appears?

22      A     It's right here.

23      Q     I'm sorry?

24      A     It's right here.

25      Q     Can I see it, please?  Thank you.  That shows an

Kelley Molanare - Cross

1895

1   EFT transfer on that date, am I correct?

2       A    Correct.

3       Q    What does EFT mean?

4       A    Electronic funds transfer.

5       Q    It's for $5.12?

6       A    Correct.

7       Q    It says POS space PUR/PIN space CHK/EFT space

8   TRANS.  Is that what it says?

9       A    Correct.

10      Q    Can you translate that?

11      A    Point-of-sale purchase, pin check electronic funds

12  transfer.

13      Q    What does that mean?

14      A    He made a point-of-sale purchase at Wal-Mart for

15  $5.12.

16      Q    He did; that's your testimony?

17      A    He owns the account.

18      Q    I understand he owns the account.  You came to the

19  conclusion that he made this purchase?

20      A    There's nobody else listed on the account.

21      Q    Do you see any occasions where people other than

22  the person listed on the account have made purchases with

23  cards?

24      A    Yes.

25      Q    Does that happen fairly frequently?

Kelley Molanare - Cross

1    A    Only if the person's a signer on the account.

2    Q    So it's your testimony that if somebody's not a

3  signer on the account, they can't go to a store and use

4  somebody else's credit card?

5    A    They can attempt to.  I would not --

6    Q    It would be illegal.

7    A    Exactly.

8    Q    But they could do it?

9    A    They could do it.

10    Q    Other than the fact that nobody other than Mr.

11  Sacco was a signatory on this account, you cannot say that it

12  was in fact Mr. Sacco who made this purchase, am I correct?

13    A    It's my testimony that what's reflected in here

14  would be his purchases.

15    Q    And that testimony is based upon the fact that only

16  Mr. Sacco is the signatory on the account?

17    A    Right.

18    Q    What time was that purchase made?

19    A    There's not a time on this.

20    Q    This record is from Provident Bank that you're

21  looking at, correct?

22    A    Correct.

23    Q    And this is based upon information that was

24  provided from somebody to Provident Bank?

25    A    That's correct.

Kelley Molanare - Cross

1    Q    Who provided the information to Provident Bank?

2    A    Wal-Mart.

3    Q    How do you know that?

4    A    That is where the card was used.

5    Q    So Wal-Mart's connected directly to Provident Bank

6    or is this information transferred along the way to a

7    different bank and then to Provident Bank?

8    A    I don't know the correct sequence, but it's my

9    understanding it goes directly from the point-of-sale

10   terminal to the location of the bank.

11   Q    Your understanding is based on what?

12   A    Discussion with financial institutions.

13   Q    How is that information transferred?

14   A    Electronically.

15   Q    So your understanding is there's a direct

16   connection between Wal-Mart and Provident Bank -- may I

17   approach -- correct?

18   A    Correct.

19   Q    This shows that Wal-Mart charged Provident Bank

20   five dollars and change on December 26, 2006, correct?

21   A    Correct.

22   Q    And from that you conclude that the purchase was

23   made at that time?

24   A    Correct.

25   Q    Are there delays ever in those electronic funds

Kelley Molanare - Cross                                    1898

1   transfers?

2       A    Yes.

3       Q    Exhibit 74 concerning eBay --

4       A    Okay.

5       Q    -- that shows the last purchase -- did you

6   highlight these things in these summaries?

7       A    I did not.

8       Q    Who did that?

9       A    Mr. Lovric.

10      Q    That shows the purchase of a Fuji 1,000 zoom

11  camera?

12      A    Correct.

13      Q    And that's a 35-millimeter camera?

14      A    Yes.  That's how it was described in the records.

15      Q    35-millimeter means a film camera, not digital?

16      A    Correct.

17      Q    I'm going to show you what's been marked for

18  identification as Exhibit S-23.

19      A    Okay.

20      Q    Can you tell by looking at that document where that

21  picture came from?

22      A    No.  I have no idea.

23      Q    There's some writing on the bottom of that

24  document.  Do you see that?

25      A    Okay.  EBay.

Kelley Molanare - Cross                                    1899

1     Q     Does it appear to you that that document came from
2  eBay?
3     A     That's what it appears.
4     Q     You did some investigation with respect to eBay, am
5  I correct?
6     A     I reviewed the documents from eBay.
7              MR. FISCHER:  Well, I'll offer the exhibit.
8  Exhibit S-23 I'll offer.
9              MR. LOVRIC:  Could I have a voir dire, Judge?
10             THE COURT:  Sure.
11 VOIR DIRE EXAMINATION
12  BY MR. LOVRIC:
13    Q     Miss Molanare, do you know what this picture is of?
14    A     It appears to be a camera.
15    Q     Do you know if this is a picture of a camera which
16 Mr. Sacco purchased?
17    A     I have no idea.
18             MR. LOVRIC:  I object.
19             MR. FISCHER:  I understand these are
20 foundational objections, your Honor.
21             THE COURT:  Sounds like it.
22             MR. LOVRIC:  There's no evidence that this is
23 the camera or kind of camera.  I have no problem if this is
24 the camera.  She doesn't know that, I don't know that.
25             THE COURT:  Foundational.  Do you want to lay

Kelley Molanare - Cross

```
 1   a foundation or hold on it and wait?
 2                   MR. FISCHER:  No, I'll continue, if I may, and
 3   try to lay some more foundation.
 4                   THE COURT:  Sure.
 5    BY MR. FISCHER:
 6        Q    Ma'am, the camera that's shown in that summary
 7   document that you have from eBay, the last purchase on that
 8   summary, I think we've clarified it, was a Fuji 1,000 zoom
 9   camera, am I correct?
10        A    Yes.
11        Q    When you look at Exhibit S-23, can you tell from
12   that picture what kind of a camera that is?
13        A    It shows that it is a Fuji 1,000.  I couldn't tell
14   if it's film or not film.  I'm not a camera person.
15        Q    It says zoom?
16        A    Yes.
17                   MR. FISCHER:  I'll again offer the document,
18   your Honor.
19                   MR. LOVRIC:  I have no idea if that's the
20   camera.  None of us do.  This witness doesn't know if that's
21   the camera that Mr. Sacco's purchased.
22                   THE COURT:  I don't think she's been asked
23   that question.
24                   MR. LOVRIC:  She says she doesn't know that.
25                   THE COURT:  She said she's not a camera
```

Kelley Molanare - Cross

1    person.  She told us about a couple characteristics that the

2    photo displayed to her.  That's the extent I heard.  If

3    there's more, maybe Vicky can read it back for me.

4              MR. LOVRIC:  My point is, Judge, there's no

5    information as to whether that is the type of camera or not.

6    I don't know if -- what this looks like.  I don't know how

7    this piece of paper can be introduced into evidence through

8    this witness.

9              THE COURT:  What do you say, Mr. Fischer?

10             MR. FISCHER:  There is a foundational issue

11   concerning introduction at this time.  I understand it.  I

12   still offer the document.

13             THE COURT:  Let me ask you this:  We do

14   sometimes in cases like this, if you can assure the Court

15   that you're going to connect that document up some way, I can

16   let it in subject to connection.

17             MR. FISCHER:  What I'll do, your Honor, is

18   reserve my right to reoffer it when we do.

19             THE COURT:  That's fine.

20             MR. FISCHER:  Those are all the questions I

21   have.  Thank you.

22             THE COURT:  Miss Peebles.

23   CROSS-EXAMINATION

24    BY MISS PEEBLES:

25        Q    Good morning.

Kelley Molanare - Cross                    1902

1      A     Good morning.

2      Q     Mrs. Molanare, you looked at some bank documents

3  for NBT Bank on an account in the name of Linda O'Connor

4  stemming back from July of '06 I believe through the end of

5  October of '06?

6      A     Correct.

7      Q     And there was a deposit on Government's Exhibit 116

8  in the amount of $3,573.  Do you see that?

9      A     I do.

10     Q     Now, there's a subsequent withdrawal of funds right

11 below that the very next day, do you see that?

12     A     I do.

13     Q     Now, were you ever shown the Western Union receipt

14 from Linda O'Connor to Dean Sacco in that amount of -- total

15 amount of $1,921.99?

16     A     Yes, I was.

17     Q     With a wire transfer you just get the cash, it's

18 not required that you deposit it in order for anything to

19 clear, correct?

20     A     Exactly, yes.

21     Q     So when Mr. Sacco were to receive this money, he

22 wouldn't have to deposit it in order to collect it?

23     A     No, he would not.

24     Q     In fact, in his bank account records there's no

25 indication that this wire transfer was ever deposited in any

Kelley Molanare - Cross

1   of the accounts that you testified about, correct?

2       A    No, there wasn't.

3       Q    Now, you testified about a money order in the

4   amount of $115?

5       A    Yes.

6       Q    Now a money order has to clear through the bank in

7   order for you to get the money from the bank first, correct?

8       A    Yes.

9       Q    You have to deposit the money order in order to

10  collect, correct?

11      A    It's a cash instrument so it's not necessary it's

12  deposited.  He could have received the entire amount in cash

13  if he wanted to.

14      Q    But ordinarily when you go to a bank, they require

15  it to clear first?

16      A    Yes.

17      Q    Now, with regard to the bank records, the -- you

18  also looked at the savings account summary for Mrs. O'Connor,

19  I take it?  You testified about that?

20      A    Yes.

21      Q    You didn't have on there November and December of

22  the savings account in your summary chart, is that fair to

23  say?

24      A    I don't believe so.  I don't have it in front of me

25  but --

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Cross

1    Q    Did you see on Defense O-11 in the account of Linda

2  O'Connor there's a cash withdrawal on November 1 in the

3  amount of $600?  Do you recall seeing that?

4    A    I don't recall seeing that.

5    Q    That's not reflected on your summary chart?

6    A    If I did not see it, it's not on my summary chart.

7         MR. LOVRIC:  What document is that, Judge?  If

8  I can ask the document that's on -- the document that was

9  just on.  I was asking for the number of the exhibit.

10        MISS PEEBLES:  O-11.

11        MR. LOVRIC:  Is that in evidence?

12        MISS PEEBLES:  Yes, it is.

13 BY MISS PEEBLES:

14   Q    You testified as well for her savings account for

15 October of '06, do you remember that?

16   A    Yes.

17   Q    I'm going to hand you what's been marked as O-64

18 and ask if you've ever seen this document.  If you can

19 identify it.

20   A    Yes, I have seen this.  It is a HUD check that was

21 issued to Linda O'Connor.

22   Q    Not a HUD check.

23   A    I'm sorry.  Check for Department of Labor Family

24 Grant Program.

25   Q    And you've seen that document before?

Kelley Molanare - Cross

1      A    I have.  Briefly.

2           MISS PEEBLES:  Your Honor, I would like to

3    offer this document into evidence at this time, Defense

4    Exhibit O-64.

5           MR. FISCHER:  No objection.

6           THE COURT:  Mr. Fischer?

7           MR. FISCHER:  No objection.

8           THE COURT:  Receive Defendant's O-64 in

9    evidence.

10   BY MISS PEEBLES:

11     Q    Now, looking at this overhead, this is a check that

12   was issued to Mrs. O'Connor in July for $5,493.51?

13     A    Yes.

14     Q    Now, I'm going to hand you what's been marked as

15   Defense Exhibit O-65 and ask if you've seen this document.

16     A    Yes, I have, and it's a -- it's a check from a

17   grant program response or by the government, Department of

18   Labor for $3,380 to Linda O'Connor.

19           MISS PEEBLES:  I'm going to offer Defense

20   Exhibit O-65.

21           MR. LOVRIC:  No objection.

22           MR. FISCHER:  No objection.

23           THE COURT:  Receive Defendant's O-65 in

24   evidence.

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Kelley Molanare - Cross

1  BY MISS PEEBLES:

2      Q    So this is a check that Mrs. O'Connor received in

3  September, is that correct?

4      A    Yes, it is.

5      Q    Now, looking at the -- I'm going to hand you now

6  what's been marked as Defense Exhibit O-63 and ask if you've

7  seen those documents.

8      A    Yes, I have seen those.

9           MISS PEEBLES:  Your Honor, at this time I'd

10  also like to offer Defense Exhibit O-63.

11          MR. LOVRIC:  No objection.

12          MR. FISCHER:  No objection.

13          THE COURT:  Receive Defendant's O-63 in

14  evidence.

15  BY MISS PEEBLES:

16      Q    Now, looking at this document, it appears that

17  there is a $600 cash withdrawal on September 21, that's

18  reflected on there, is that correct?

19      A    That's correct.

20      Q    I'm going to show you Government Exhibit 121, page

21  2.  It indicates that on April 4 of 2005 there was a check

22  that was drafted or written to Mr. George Lang, do you see

23  that on there?

24      A    I do.

25      Q    And then on August of '05 it appears that there's a

Kelley Molanare - Cross                    1907

1    check written to a Renee Lang in the amount of $100, that's

2    reflected on this chart?

3         A    That's correct.

4         Q    Now, you testified about a Social Security check

5    that Mrs. O'Connor receives, do you recall that testimony?

6         A    It's Supplemental Security Income.

7         Q    And it's deposited on the first of the month, it's

8    reflected in her bank statements on the first of the month?

9         A    Correct.

10        Q    Did you go back any further with regard to

11   Mrs. O'Connor's banking accounts from beyond 2004?

12        A    I don't believe we did.

13        Q    You didn't see any records from 2000 or 2001?  If I

14   showed you documents, may it refresh your recollection?

15        A    Yes.  Would you show me them.

16        Q    I'm going to hand you what's been marked as Defense

17   Exhibit 66 and ask if you've ever seen that document.

18        A    Yes, I have.  It's a savings account for Linda

19   O'Connor.

20        Q    And I'm going to hand you what's been marked as

21   Defense Exhibit 67.  Did you ever see that before?

22                   THE COURT:  O-66 and O-67.

23                   MISS PEEBLES:  Yes.  Sorry.

24        A    What's the account number?  Yeah, it's just an

25   earlier period.

Kelley Molanare - Cross

1908

1    Q    It's different -- same account, different periods?

2    A    Correct.

3    Q    '01 and 2000?

4    A    Yes.

5    Q    It doesn't look like Mrs. O'Connor had money back

6    then either, based on these records, is that fair to say?

7    A    That's correct.

8         MISS PEEBLES:  Nothing further.  Thank you.

9         THE COURT:  Mr. Lovric.

10        MR. LOVRIC:  Miss Molanare, I just have one

11   area I wanted to clarify, or if you could clarify.  I'm

12   sorry.

13   REDIRECT EXAMINATION

14    BY MR. LOVRIC:

15   Q    Mr. Fischer talked with you about that December 26,

16   2006 EFT.  Do you remember that?

17   A    Yes.

18   Q    What does EFT stand for?

19   A    Electronic funds transfer.

20   Q    If a person with Mr. Sacco's bank card went to that

21   Wal-Mart on December 26 of '06 and they bought something for

22   $5.12 with that bank card, what would they have to do in

23   order to do an EFT purchase?

24   A    They would have to submit a PIN, punch in a

25   four-digit code in order for it to go through.

Kelley Molanare - Redirect

1    Q    Okay.  And in your experience, do stores have a

2  little machine where you swipe your bank card through?

3    A    Yes.

4    Q    And then there's a key pad?

5    A    That's correct.

6    Q    And you have to indicate your --

7    A    Secret pass code.

8    Q    -- secret password, your PIN number, usually -- how

9  many digits is that, usually?

10    A    It's usually four.

11    Q    And then is there like a split second while the

12  machine checks to see if there's a balance and to approve the

13  transaction?

14    A    That's correct.

15    Q    And is that what EFT stands for?

16    A    Yes, it does.

17    Q    And then Mr. Fischer asked you about point-of-sale

18  purchase.  What does that mean with respect to that purchase?

19    A    That's the location of where the sale took place.

20    Q    So, a person was physically present there to make

21  this purchase, right?

22    A    That's correct.

23    Q    And is there any indication in Mr. Sacco's account,

24  that Provident Bank account that that purchase relates to,

25  that he ever reported this transaction as a fraud or that

Case 3:08-cr-00077-TJM  Document 171  Filed 12/24/08  Page 73 of 155

1    somebody had used this PIN?

2        A    Absolutely not.

3                MR. LOVRIC:  That's all I have.

4                THE COURT:  Mr. Fischer?

5                MR. FISCHER:  Thank you, your Honor.  Yes

6    please.

7    RECROSS-EXAMINATION

8     BY MR. FISCHER:

9        Q    Miss Molanare, the banking business in electronic

10   information doesn't remain static, it's changed through the

11   years, hasn't it?

12       A    Absolutely.

13       Q    It's better now than it was?

14       A    Absolutely.

15       Q    And in fact, for example, M&T Bank now has a way to

16   verify instantly whether funds are in a particular place and

17   transfer funds immediately, am I correct?

18       A    Absolutely.

19       Q    There was a time not too long ago when that

20   couldn't be done, am I correct?

21       A    That would be accurate.

22       Q    December 26, 2006, at Wal-Mart.  Do you know

23   whether Wal-Mart had a high or low volume of electronic

24   transfers at that time?

25       A    I'd suspect they were high.

Kelley Molanare - Recross

1     Q     Does the volume of transfers affect how quickly

2  information is conveyed from institution to institution?

3     A     I would say yes.

4             MR. FISCHER:  Those are all the questions I

5  have.  Thank you.

6             THE COURT:  Miss Peebles.

7             MISS PEEBLES:  One.

8  RECROSS-EXAMINATION

9   BY MISS PEEBLES:

10    Q     Mrs. Molanare, I'm going to hand you what I've

11  marked as Defense Exhibit O-69 and ask if you've ever seen

12  this document.

13    A     Yes, I have.  It's a check to Linda O'Connor from

14  Delaware Opportunities for $2,070.20.

15            MISS PEEBLES:  Your Honor, at this time I'd

16  like to offer Defense Exhibit O-69.

17            MR. LOVRIC:  Judge, even though it's not

18  subject to the recross, I don't have any objection.

19            MISS PEEBLES:  No objection.

20            MR. FISCHER:  No objection.

21            THE COURT:  Receive Defendant's O-69 in

22  evidence.

23   BY MISS PEEBLES:

24    Q     So this is a check that Mrs. O'Connor received in

25  January, January 26, 2007?

Kelley Molanare - Recross

1     A    That's correct.

2                MISS PEEBLES:  No further questions.

3                THE COURT:  Mr. Lovric?

4                MR. LOVRIC:  No questions, Judge.

5                MR. FISCHER:  Nothing further.  Thank you.

6                THE COURT:  Okay.  Thank you, Agent Molanare.

7  You may step down, ma'am.

8                (Witness excused)

9                MR. LOVRIC:  Judge, the next witness is Andrea

10  Lester.

11                THE COURT:  Okay.

12                MR. LOVRIC:  She's on her way down.

13                THE CLERK:  Ma'am, please state your name for

14  the record.

15                THE WITNESS:  Andrea Lester, L-E-S-T-E-R.

16

17

18

19

20

21

22

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Direct                        1913

1   A N D R E A   L E S T E R, having been called as a witness,

2   being duly sworn, testified as follows:

3                THE COURT:  Okay.  Mr. Lovric.

4   DIRECT EXAMINATION

5    BY MR. LOVRIC:

6        Q    Good morning, Miss Lester.

7        A    Good morning.

8        Q    Miss Lester, for the members of the jury, could you

9   please tell them again your full name and tell us where

10  you're employed.

11       A    My name is Andrea Lester, and I'm employed with the

12  New York State Police Forensic Investigation Center in

13  Albany, New York.

14       Q    And how long have you been employed with the New

15  York State Police Investigation Center?

16       A    About eight years now.

17       Q    And in what section of that laboratory and that

18  unit do you work?

19       A    I am in the biological sciences section.

20       Q    And what is your title or job description?  How

21  would you characterize that?

22       A    I'm a forensic scientist.

23       Q    And as a forensic scientist, Miss Lester, can you

24  tell the members of the jury basically what you do and what

25  kind of work does that entail?

Andrea Lester - Direct

1914

1    A    What I do is perform serological examination on

2  items of evidence that comes into the laboratory, which

3  consists of identifying any biological material that is

4  present on the item.  I preserve it and also process it

5  through DNA and determine a profile on that item of evidence

6  as well as controls that are submitted to the lab.

7    Q    And what kind of background do you have in order to

8  perform these duties as a forensic scientist?

9    A    I have a degree in anthropology from the University

10  of Rhode Island, of which I received in May of 2000.  During

11  my senior year there I interned at Rhode Island Department of

12  Health in the forensic crime lab section where I assisted

13  forensic sciences with processing case work.  And in July of

14  2000 I received a job with the New York State Police Forensic

15  Investigation Center as a senior laboratory technician and

16  where I underwent approximately a year of training in DNA

17  extraction, quantification and amplification, upon which

18  completing that, I then was assigned to a forensic scientist

19  to assist him in doing those duties on items of evidence.

20  After about six months of working as an SLT, I then was

21  promoted to forensic scientist, where I underwent another

22  eight months of training specifically in serological

23  examinations, where I was taught how to identify, separate

24  the samples and preserve them for DNA analysis as well as

25  trace evidence and hair analysis.  After working as a

Andrea Lester - Direct

1915

1    serologist for about three years, I then became trained in

2    DNA analysis, where I was able to analyze DNA and interpret

3    the results and report them for court purposes.

4              On top of all of that training, I have to stay

5    proficient in the field, which means I have to have

6    continuing education as well as partake in class work with

7    molecular biology, biochemistry, DNA -- or, excuse me --

8    genetics and statistics.

9         Q    Now, Miss Lester, while working with the New York

10   State Police Forensic Investigation Center as a forensic

11   scientist, during the course of your career have you in fact

12   performed DNA testing and analysis on things that were

13   submitted to the laboratory?

14        A    Yes.  Hundreds of items I've worked with.

15        Q    And in connection with those analyses and testing

16   that you performed, have you then prepared reports of your

17   findings and distributed those finding reports to either

18   courts or to law enforcement agencies?

19        A    Yes, I have.

20        Q    And in connection with your work have you testified

21   in any proceedings as to your testing and analysis?

22        A    Yes.  In multiple areas around the entire state of

23   New York.

24        Q    Miss Lester, the laboratory that you work at, is

25   that laboratory accredited?

Andrea Lester - Direct

1    A    Yes, it is.

2    Q    What does that mean when we say accredited?

3    A    Accredited means we have received certification,

4    allow us to take in evidence to the laboratory, how we

5    process our evidence, how we conduct our analysis and report

6    it so that it's considered worthy to be in the courtroom and

7    that it's allowed for you to see as well as for us to testify

8    on.

9    Q    And at the laboratory that you just described for

10   us, how does evidence or materials get submitted to the

11   laboratory?

12   A    Our laboratory is very large.  We have a section in

13   the laboratory called the evidence receiving section.  That

14   section brings in -- or if an agency drops off evidence

15   there, whether it's UPS or specific agencies will bring the

16   evidence within that section.  The individual cases will

17   receive a case number unique to that case.  They will be

18   given a bar code, sort of what you see in a supermarket, that

19   is only on that item, identifying that item to be part of

20   that particular case number.  Within the evidence receiving

21   section there are four levels of a vault that's locked, very

22   similar to a bank vault.  In that vault are different

23   locations, depending on the type of evidence.  If it's drug

24   analysis evidence that comes in, it goes into one location.

25   If it's biological evidence, then it goes into either a

Andrea Lester - Direct

1    refrigeration or freezer section within that vault, and only

2    the people who have access to the vault are the evidence

3    receiving technicians that are within there and a couple of

4    higher-ranking people within the laboratory.  I do not have

5    access to that vault.  I have to go to the vault myself.  I

6    have a bar code associated with my name with a specific

7    password, and the evidence is transferred to me through that

8    bar code and through that password.

9        Q    And at the point in time when you are ready to

10   examine a piece of evidence then, you've indicated that you

11   would go to this vault and obtain or take this evidence out?

12       A    An evidence clerk would actually transfer the

13   evidence into my custody.

14       Q    And then where do you perform your work and testing

15   and analysis on any piece of evidence?

16       A    I can either work at a bench designated within my

17   section or we have evidence examination rooms that are under

18   lock and key.

19       Q    And when evidence arrives at the laboratory and is

20   placed into the vault when it first arrives, is that evidence

21   item sealed?

22       A    Yes, it has to be in order to be submitted to the

23   lab.

24       Q    So for example, if an item came to the lab that was

25   not sealed or did not have a sealing, would the lab accept an

Andrea Lester - Direct                        1918

1   item like that?

2        A    Let me define what sealed means.  It has to contain

3   tape that completely seals the item, no way of opening it up,

4   and has the initials and date of the person collecting the

5   item or the person submitting the evidence.

6        Q    Miss Lester, I would like to talk about a test and

7   an analysis, an examination that you performed on a condom

8   that was sent to the laboratory in connection with a person

9   named Dean Sacco.  Do you recall working and performing

10  analysis on the condom that I just mentioned?

11       A    Yes, I did.

12       Q    And did you perform certain tests and certain

13  analyses of this condom that were sent to your lab?

14       A    Yes.

15       Q    And I'd like to talk a little bit about what you

16  did.  Can you describe for the members of the jury, with

17  respect to this condom that we're talking about now, what

18  were the examinations or tests and analyses that you

19  performed.  Can you explain that for the members of the jury.

20       A    Sure.  The initial examination I conducted on this

21  condom was the initial serological examination.  We're

22  identifying any possible bodily fluids that are present.

23  Upon opening up the item, noting the contents that were

24  within that item, I noted that it appeared to be a used

25  condom.  I noted any possible stains that I'd seen on the

Andrea Lester - Direct

1    outside, slight dark reddish staining on the outside of the

2    condom.  I -- then I took sterile swabs and swabbed the

3    outside of the condom individually from the inside of the

4    condom to try and preserve any bodily fluids that are present

5    on both the inside and outside, completely separate from each

6    other.  On those swabs now I've transferred some of that

7    possible bodily fluids onto the swabs.  I then performed the

8    analysis on the swabs.  So I tested those swabs for the

9    presence of blood, of which I was able to determine that

10   there was a presumptive screening test for blood and that it

11   was positive.  Also determined if there was any seminal fluid

12   present on either of those swabs.  I was able to determine

13   that within the condom I found seminal fluid using

14   prostate-specific antigen analysis.

15       Q    Just to maybe expand a little bit, you did

16   swabbings on the outside of the condom?

17       A    Yes.

18       Q    And did you also do swabbings on the inside of the

19   condom?

20       A    Yes.

21       Q    And the positive tests for blood was on where,

22   which part of the condom?

23       A    For the presumptive screening test, the majority of

24   it was on the outside.  There was a slight speckling reaction

25   of the chemical on the inside of the condom from the swabs.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Direct                    1920

1     Q    Okay.  And then the -- you indicated the term that

2   you used for the presence of seminal fluid was where?

3     A    From the inside of the condom it came up,

4   prostate-specific antigen analysis positive, meaning I could

5   not identify sperm but in seminal fluid there is not only

6   just sperm heads you'll find, and the PSA or

7   prostate-specific antigen analysis determines when there's

8   presence of seminal fluid with the absence of sperm.

9     Q    Okay.  I'd like to just have you talk briefly and

10  describe for the members of the jury what DNA is.

11    A    DNA stands for deoxyribonucleic acid.  It's a large

12  molecule with every nucleated cell of your body.  It contains

13  all the genetic material that makes who you are.  It's

14  hereditary material as well.  So you have -- receive half

15  from your mother and half from your father.

16    Q    And where is DNA found in the human body?

17    A    In nucleated cells.

18    Q    What does that mean?

19    A    It means there's -- a majority of your cells in

20  your body have a nucleus within them.  The only cells that do

21  not contain a nucleus are red blood cells.

22    Q    For example, sperm; would sperm have DNA?

23    A    Yes, it does.

24    Q    Blood, other than red blood cells?

25    A    Yes, there's also white blood cells contained in

Andrea Lester - Direct

1  your blood, so that's able -- where we would extract DNA

2  from.

3      Q    Skin?

4      A    Yes.

5      Q    How about the inside of one's mouth?

6      A    Absolutely.  That's a diagnostic source for DNA.

7      Q    And is DNA in all cells the same or different?  How

8  would you describe that?

9      A    It's all the same.

10     Q    With respect to DNA, do any two people have the

11  same DNA profile?

12     A    The only two people that have the same exact

13  genetic profile are identical twins.

14     Q    Okay.  How about relatives, mother/daughter, for

15  example?

16     A    Not exact, no.  You might share some alleles and

17  hereditary, but not identical, no.

18     Q    Now are there tests that detect a person's genetic

19  type or genetic type, as we call it?

20     A    Yes.  There are many out there.  We used what's

21  known as PCR of STR regions or polymerase chain reaction of

22  short tandem repeat regions of the DNA.

23     Q    What tests -- with respect to this condom that

24  we're talking about, what tests did you perform with respect

25  to doing testing and analysis for DNA?

Andrea Lester - Direct                                    1922

1      A     We utilized STRs.

2      Q     And what is -- I know you mentioned what an STR is.

3   But how is it and what do you go about doing in order to do

4   testing on this condom based on the STR testing?

5      A     The swabs that I mentioned before that I took from

6   both the outside and the inside of the condom go through an

7   extraction process.  Basically I'll take a small amount of

8   that swab and place it into a tube, where it will undergo

9   initial extraction or removing any of the possible bodily

10  fluids from that swab and separating it from the substrate.

11  It then breaks those cells open in order to get into the DNA

12  or nucleus of the cell to pull out the genetic material.

13  Once it has gone through that extraction, it is then

14  quantified, which determines the amount of DNA present within

15  that sample.  Once we've determined that, we amplify it or

16  molecularly xerox it to make DNA a little more robust so we

17  can find an easier location of the DNA we're looking at.  It

18  is processed through a genetic analyzer, where the

19  information that the software gives me and genetic analyzer

20  gives me, I'm able to determine the profile present on that

21  item of evidence.

22     Q     Okay.  When you say profile, with respect to the

23  item of evidence, what does profile mean?  What does that

24  signify?

25     A     Profile is sort of like your name.  It's what makes

Andrea Lester - Direct

1   you who you are.  It's very unique to you as opposed to

2   anyone else.  It makes you exactly who you are, your skin

3   color with everything else, but the profile we're looking at

4   is your unique DNA.

5        Q    And what is the reason or purpose for performing

6   DNA analysis in this particular case on that condom, the

7   inside and outside of the condom?

8        A    We perform DNA analysis to determine a source of

9   items of evidence, and we compare those items of evidence

10  with the profile developed from those items of evidence to

11  controlled samples.  Our samples are -- we know exactly who

12  donated that.

13       Q    Now, in conducting these tests, is there a term

14  called an allele that describes certain testing and analyses

15  that you eventually performed on the DNA found on the condom?

16       A    Yes.  Let me explain what a gene is first and then

17  I'll transition into allele.  It makes it a little more

18  easier to explain.  A gene, I'm sure you all have heard of,

19  is a specific location on the genetic molecule that has a

20  specific function.  For instance, your hair color.  Within

21  that gene -- every individual has that gene.  Every

22  individual has hair, for the most part, gene.  Now, within

23  that gene, though, there are variations which make you have

24  the color hair you have from someone else.  It's those

25  variations of the same gene that we refer to as alleles.

Andrea Lester - Direct

1    Q    And alleles in relation to genes are what again?

2    A    Alleles are an alternate form of a gene.  It's a

3  means of showing what the variations are, and we represent

4  them as numbers.

5    Q    Okay.  Now, Miss Lester, what I'd like to do next

6  is, I'd like to look at --

7              MR. LOVRIC:  The next number, Judge?

8              THE COURT:  We had 121.

9              MR. LOVRIC:  It will be Government's 122.

10   Q    What I'd like to do next, Miss Lester, I'm going to

11 show you Government's Exhibit 122.

12              If I can show you Government Exhibit 122, if you

13 can take a look at that to yourself.  Okay?

14   A    M-m h-m-m.

15   Q    Do you recognize what that is, Government Exhibit

16 122?

17   A    Yes.  This is the first report I issued in this

18 case.

19   Q    And Exhibit 122, the report, does that show your --

20 summarily your analysis and then more importantly your

21 findings as to your examination and testing of that condom

22 relating to the Dean Sacco matter?

23   A    Yes.  On the first page here you'll see it shows

24 all my examination results, our serological examination

25 results of the individual swabs that I took from the condom,

Andrea Lester - Direct                    1925

1  and also my DNA results from my analysis, noted here in this

2  chart.

3           MR. LOVRIC:  Judge, I would offer Exhibit

4  Number 122 into evidence.

5           MISS PEEBLES:  No objection.

6           MR. FISCHER:  No objection.

7           THE COURT:  Miss Peebles?

8           MISS PEEBLES:  No objection, your Honor.

9           THE COURT:  Receive Government's 122 in

10 evidence.

11 BY MR. LOVRIC:

12    Q    Miss Lester, what I'd like to do is put this on the

13 monitor and then ask you to tell us and tell the jury

14 essentially what is reflected in this report, okay?

15    A    Yes.

16    Q    Okay.

17    A    Okay.  Here is again the first report issued in

18 this case dated March 31 of 2008, and you'll see up here in

19 the right-hand corner the unique lab case number, 08SL00293.

20 That is given to this case once submitted to the laboratory.

21 You'll see the item number 1 is the condom, and A and B are

22 the swabbings I took of the outside of the condom and the

23 examination results to the right of that that I performed.

24 Again, presumptive screening test for blood was positive.

25 Through the seminal fluid analysis I determined first that

Andrea Lester - Direct

1    there was no sperm present on the outside of the condom that

2    I saw.  And that it was negative for prostate-specific

3    antigen analysis.  However, to still get a profile, we still

4    submitted it for DNA analysis because it was blood positive.

5          Now, the next part, you'll see items C through D,

6    swabbings of the inside of the condom.  Again, to the right

7    are examination results, where it is positive for presumptive

8    screening for blood, and sperm negative, I did not note any

9    sperm, but I did continue and found it was positive for

10   prostate-specific antigen analysis consistent with human

11   seminal fluid.

12        Q    What does that mean, positive for antigen test

13   results?

14        A    It means that there was seminal fluid present on

15   the inside of the condom with the absence of sperm.

16        Q    Okay.  Now, seminal fluid comes from where?

17        A    It comes from the penis, it's excreted from the

18   penis through the testes.

19        Q    Is it fair to say it's the fluid that, when a male

20   ejaculates, come out of the penis and within that fluid there

21   may or may not be sperm?

22        A    Yes.

23        Q    For example, if a male has a vasectomy, would there

24   be sperm in the seminal fluid?

25        A    No.

Andrea Lester - Direct                                    1927

1        Q    Is it possible that there isn't sperm for some

2   other reason, yet there's seminal fluids?

3        A    Right.  There could be some sperm present, but as

4   far as having enough for me to be able to see, that can take

5   place, that's why we continue on with the prostate-specific

6   antigen analysis, to determine there is still seminal fluid

7   there even if I did not note there was sperm.

8             Now, in this case, I don't know if my notes are

9   admitted or not.  I did note, when looking at the slides that

10  I generated from these swabs from the inside of the condom,

11  there were a lot of yeast cells, so with knowing that, it was

12  a good likelihood that sperm cells, if present, would have

13  been broken down through -- just through age and any bacteria

14  and whatever that's there.

15       Q    Okay.  I'd like to flip to the second page of your

16  report.  Can you see that, Miss Lester?

17       A    Yes.

18       Q    Can you describe for the jury what the second page

19  reflects in connection with your testing and analysis.

20       A    Sure.  I'll start here at the top of the bank.

21  Indicating that the items 1A through B, swabbings of the

22  outside of the condom, and items 1C through D, swabbings of

23  the inside of the condom, were processed for DNA analysis.

24            The second half here is a chart that reflects my

25  results of the DNA found on these items.

Andrea Lester - Direct

1    Now, to better explain this, referring to DNA,

2   think of DNA as a book.  Okay.  Over here in the far

3   left-hand column, the column that's titled Locus, you have 14

4   different rows.  Now, if you think of those rows as pages of

5   that book, the 14 rows down here stating Amelogenin is the

6   page that refers to the sex chromosome, or the section Gene,

7   again, X refers to you being a female, XY is for males.  If

8   we start here at the top row, treating it as a page of a book

9   of DNA, at D3, when we're scanning through that page of the

10  DNA, we're looking for a specific key four-letter word, when

11  you see example of fish.  Once we hit that key four-letter

12  word, we then count any tandemly repeated fish, the word fish

13  right after another.  This is where STR comes from.  The

14  Short Tandem Repeat.  Once we have counted all of those, we

15  then represent it as an allele or this number here.

16   Now, because you receive half your DNA from your

17  mother and half from your father, we look at two different

18  copies of the book.  Again, going to the second copy, we're

19  going to the first page, again, scanning to look for that

20  specific key word again, counting how many repeats of

21  tandemly repeated words of that one word, counting them and

22  referring to them as an allele or a number.  Now, in this

23  case, for items 1A through B, the swabbings of the outside of

24  the condom, in the first page D3, it shows one number, 18.

25  That is because it is considered a homozygous allele, meaning

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Direct

1   that the individual contributing to this profile at D3 or

2   page 1 received, from both copies of that book, the same

3   number of repeats.  Just to stay conservative, we only list

4   it as one number.

5            To better explain that, if you go to the second

6   page of the DNA and which is called VWA, you'll see two

7   different numbers there.  That means that in the first copy

8   of the book, there were 16 repeats of that word fish and the

9   second copy there were 18 repeats of the word fish, meaning

10  that at that page, the person's profile is a 16/18.  Now

11  looking at all of those 13 different pages and the 14th page

12  being Amelogenin, that profile developed or all those unique

13  alleles present at those different pages makes this profile

14  unique.

15      Q    And the profile in that first column listed under

16  items 1A and 1B, that profile is, if I understand you

17  correctly, for the DNA that you found from the swabbings on

18  the outside of the condom?

19      A    Correct.  And it's a single-source profile.

20      Q    What does that mean, it's a single-source profile?

21      A    Single-source profile, meaning that there are no

22  more than two alleles or two repeating numbers present in

23  that profile at any locations or any pages of the DNA.

24           If I can move on to items 1C through D, you'll see

25  for this item there are two different columns.  There's

Andrea Lester - Direct

1  what's noted as a sperm fraction and a nonsperm fraction.

2  Now this is the profile developed from the inside of the

3  condom, the swabbings taken from the inside of the condom.

4  Because I have two different fractions here, we back up to

5  how we do our extractions when referring to anything with

6  seminal fluid.  We perform what's called a differential

7  extraction.  This is different from our other types of

8  extraction when we know seminal fluid is involved.  The best

9  way to look at it is, think of a large box with really

10  fragile glass Christmas bulbs and golf balls.  During that

11  extraction process, think really shaking that box as hard as

12  you can.  When you open the box, you will expect the glass

13  bulbs to be broken and fall to the bottom of the box but

14  what's still intact are the golf balls.  Those golf balls

15  represent sperm or seminal fluid.  Now, we profile separate

16  sperm fraction versus nonsperm fraction or any skin cells

17  that are present within that item.  That's why here you see

18  two separate columns, one representing sperm fraction, one

19  representing nonsperm fraction.  Looking at these fractions

20  as a whole, I refer to these as mixture profiles.  The reason

21  why is because if you look at the page marked D21 S11.

22      Q    I'm going to put a green arrow -- oh, you did.

23      A    That one left arrow is pointing to D21 S11.  Scan

24  over to item 1C through 2, sperm fractions inside of the

25  condom, you'll note there are three different numbers or

Andrea Lester - Direct

1931

1    three different alleles.  There's a 28, 32, and a 32.2.  That

2    means that there are more than one contributor to that

3    profile, because there's more than two alleles present.

4    You'll also see at other location D18, again, three alleles,

5    indicating more than one contributor to this profile.

6        Q    Okay.  Now, just to make sure that I understand

7    this, Miss Lester, the profile of the person who left the DNA

8    on the outside of the condom, which is the first column --

9        A    Yes.

10       Q    -- does that testing and analysis and results

11   indicate to you whether one or more persons left the DNA

12   material on the outside of the condom?

13       A    That is a single source or one person contributing

14   to that profile on the outside of the condom.

15       Q    Okay.  And then looking at the second and third

16   columns, what -- what does that testing and analysis show as

17   far as the number of persons that left any portions of their

18   DNA on the inside of the condom?

19       A    Because it's of -- some locations of this profile

20   or pages of the DNA book there are more than two alleles or

21   two numbers present, that means that there is at least -- or

22   there's more than one contributor to this profile, meaning

23   that there's at least two individuals contributing to this

24   profile.

25       Q    Okay.  And with respect to column 1, the outside of

Andrea Lester - Direct                                    1932

1    the condom, are you able to tell from the Amelogenin that you

2    indicated whether that person who left that DNA on the

3    outside of the condom, what their sex was as far as that

4    person?

5        A    Based on the Amelogenin or the 14th page down

6    here, the single-source profile contributed to the outside of

7    the condom is a female profile because of that X.  The

8    mixture profile, the sperm fraction and nonsperm fraction,

9    had also a male contributor because of the Amelogenin,

10   there's an X and a Y.

11       Q    Okay.  So the mixture on the inside indicates that

12   there was at least one female and at least one male

13   contributors to the DNA on the inside of the condom?

14       A    Correct.

15            THE COURT:  Okay.  Ladies and gentlemen, we're

16   going to break for lunch, and immediately after lunch we're

17   going to have a test.  Get ready to respond to that.

18            (Lunch break taken)

19            (Jury present)

20            THE COURT:  Okay.  Mr. Lovric.

21   BY MR. LOVRIC:

22       Q    Good afternoon, Miss Lester.

23       A    Hello.

24       Q    When we left off before lunch, I had up on the

25   screen Government Exhibit 122 in evidence.  I'm going to put

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Direct

1    that up.

2         A    Okay.

3         Q    You can see that?

4         A    Yes.

5         Q    Okay.  I'd just like to continue where we left off.

6    I think one of the last things I covered with you is that

7    based on your testing and analysis, the profiling column 1,

8    which is for items 1A and 1B swabbing outside the condom, you

9    indicated that profile is of a single female donor.

10        A    Correct.

11        Q    And then I was going over to column 2, and column 2

12   and column 3, which is relative to swabbings of the inside of

13   the condom, I think I covered with you -- you indicated that

14   that indicated that there were more than one donor of DNA for

15   the material found on the inside of the condom?

16        A    Correct.

17        Q    And then my next question to you is:  With respect

18   to the material found on the inside of the condom, to the

19   more than one donor, were you able to determine from your

20   analysis and testing whether the more than one donor, more

21   than one donors were male, female or a combination?

22        A    Based on the first report that I looked at, it's a

23   combination of a male and a female, or at least I can't

24   exclude a male.  There is a male contributor in this profile

25   because of the XY at the Amelogenin.

Andrea Lester - Direct

1    Q    So the substance on the inside of the condom

2  indicates that there was a male contributor and there was

3  also a female contributor?

4    A    Correct.

5    Q    Now, I'll turn to page 3 of the report.  And

6  specifically in the first paragraph, you indicate what you

7  just told us about, that items 1A and 1B are consistent with

8  DNA from a single unknown female donor?

9    A    Correct.

10   Q    And then paragraph 2, you state -- and I'm reading

11  from the report:  "In relevant part, swabbings of the inside

12  of the condom - sperm and nonsperm fractions - are consistent

13  with DNA from Jane Doe and admixed with DNA at least 0

14  additional donor, at least one of which is male."  What does

15  that mean when you're saying that?

16   A    When you look at the single-source female donor

17  contributing to the outside of the condom -- because when I

18  first wrote this report I didn't have any controls and I had

19  that single-source profile, and I named it Jane Doe because I

20  don't know whose it is.  I used that to compare with the

21  profile present in the mixture profiles.  So I was able to

22  establish that the alleles present in the single-source

23  profile of the swabbings from the outside of the condom at

24  those different pages that I talked about earlier in

25  association with the mixture profiles, I could conclude that

Andrea Lester - Direct

1  they were consistent with this Jane Doe or the female

2  contributing the initial profile and mixed with an additional

3  person.  And because of the Amelogenin, because there is a Y

4  present, it has to be a male contributing to the other part

5  of that profile.

6       Q    Okay.  So the female part contributor on the inside

7  of the condom is consistent with the female that you

8  identified on the outside of the condom profile?

9       A    Correct.

10       Q    Now, at some point after you completed your testing

11  and analysis and actually prepared the report we just read,

12  Exhibit 122, did the lab where you work and then you

13  particularly, did you receive and analyze a female sample

14  taken from a person named Shannon O'Connor, her DNA taken in

15  what we call a buccal swab?

16       A    Yes.  A known control from this individual was

17  submitted to the laboratory for comparison with the first

18  report.

19       Q    Okay.  And did you perform testing and analysis on

20  that known control swabbings of Shannon O'Connor?

21       A    Yes, I did.  The exact same type of extraction.

22       Q    Okay.  Now, I just want to make sure I understand,

23  Miss Lester.  At the time that you conducted your

24  examinations and testing on the condom, as you described for

25  us up until this point in time, at that time did the lab even

Andrea Lester - Direct                    1936

1    have Shannon O'Connor's swabbings at the lab at that time?

2         A    No.  Not at all.

3         Q    It had not even arrived at the lab?

4         A    No.

5         Q    And is it correct to say that her known swabbings

6    arrived at the lab after you had finished all of your testing

7    on the condom?

8         A    Yes.

9         Q    Now, I'd like to show you what's marked as

10   Government Exhibit 123.

11              MISS PEEBLES:  No objection.

12              MR. FISCHER:  Thank you.

13        Q    Miss Lester, if you could take a look at Exhibit

14   123 and just tell us if you recognize that and what is it.

15        A    This is the second report I generated after

16   receiving the controlled swab from Shannon O'Connor.

17        Q    And does that report, Exhibit 123, relate to your

18   testing and analysis of the known DNA samples sent to your

19   lab and then your comparing those results to the results of

20   the condom testing that you just testified about?

21        A    Yes.

22              MR. LOVRIC:  I would offer Government Exhibit

23   123 into evidence.

24              MISS PEEBLES:  No objection.

25              MR. FISCHER:  May I just briefly voir dire,

1    your Honor?

2                    THE COURT:  Sure.

3    VOIR DIRE EXAMINATION

4     BY MR. FISCHER:

5         Q    Miss Lester, that report is dated what?

6         A    This report is dated April 9 of 2008.

7         Q    That's a supplemental report?

8         A    Yes, it is.

9         Q    That contains the information concerning the DNA

10   that you extracted from the condom?

11        A    Correct.

12        Q    With a comparison of the DNA taken from the swab

13   from Shannon O'Connor?

14        A    Correct.

15        Q    And that's what it contains.

16        A    Yeah.

17                    MR. FISCHER:  No objection.  Thank you.

18                    THE COURT:  We'll receive Government's 123 in

19   evidence.

20    BY MR. LOVRIC:

21        Q    Miss Lester, I'm going to put on the monitor

22   Exhibit 123, the first page.  Can you see that?

23        A    Yes.

24        Q    And can you just very briefly tell the members of

25   the jury what's contained in the items and the examination

Andrea Lester - Direct                    1938

1    results, what does that pertain to?

2        A    Sure.  Again, let me just start -- again, you see

3    the top right date, April 9, 2008, and the lab case number,

4    08SL00293, so you know it's associated with the same case

5    that we previously talked about in my report.  Scroll down,

6    and item 2 is a New York State DNA control buccal kit.  What

7    a buccal is, it's a swab that looks similar to a comb that

8    has a little bit of sharp edges, and it scrapes the inside of

9    a person's mouth.  This is because you have a lot of cells

10   within the inside of your mouth, so it's easier to produce a

11   control sample from the individual knowing you're going to

12   get a very good sample.  So again, item 2 is a buccal kit

13   from this individual Shannon O'Connor, and item A is

14   controlled buccal swab, and I used that for DNA purposes.

15   The other swab also contained in that kit, I did not do an

16   examination on because they're collected from the same

17   individual and I didn't need the second swab to perform DNA

18   analysis on.

19       Q    Okay.  That second swab was sort of backup if you

20   need to do additional testing?

21       A    Yes.

22       Q    Now, you testified earlier about the DNA testing

23   that you conducted on the condom once you swabbed the outside

24   and the inside.  Is the actual DNA testing that's performed

25   on this buccal swab of Shannon O'Connor, is it the same kind

Andrea Lester - Direct

1939

 1    of procedure essentially?

 2         A    Yes.  It's the same technology, same process we use

 3    on evidentiary samples.  We subject the control samples to

 4    the same type.

 5         Q    Now, after you performed that testing and analysis

 6    on the buccal swab taken from Shannon O'Connor, did you -- as

 7    you described the profile that you generated for the condom

 8    exterior, did you then quantify the profile for Shannon

 9    O'Connor's buccal swab?

10         A    I was able to develop a profile from her buccal

11    swab, yes.

12         Q    Okay.  If we take a look at column 1, which is

13    labeled item 2A, what does that column show on this page 2 of

14    Exhibit 123?

15         A    The column listed as item 2A, control buccal swab

16    from Shannon O'Connor, here yields a single-source profile,

17    that is, her profile.  It's her unique STR DNA profile.

18         Q    So that column 1 is Shannon O'Connor's DNA profile?

19         A    Correct.

20         Q    And then next to that we see column 2, and it's

21    labeled at the top items 1A and 1B.  What is that profile

22    again?

23         A    These other columns you see here are the profiles

24    developed from the first report, the record dated March 31,

25    and using these profiles in reference or referring to these

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Direct

1    profiles when I'm using her control as a comparison.  So

2    again, the second column listed as items 1A through B,

3    swabbings of the outside of the condom, is a single-source

4    female profile.

5        Q    So, the second column on this report that we're

6    looking at right now, the page, that's the profile of the

7    donor of the DNA that you found on the outside of that

8    column?

9        A    Correct.

10       Q    And to the left of that is the -- Shannon

11   O'Connor's actual DNA profile?

12       A    Correct.

13       Q    And what conclusions did you arrive at after you

14   compared Shannon O'Connor's DNA profile and the profile of

15   the unknown female donor from the outside of the condom?

16       A    That the profile developed from the condom, the

17   outside swabbings, matches Shannon O'Connor's profile.

18       Q    Okay.  And what is your conclusion as to whose DNA

19   it was that was on the outside of that condom?

20       A    It matches Shannon O'Connor.

21       Q    And when we look at these two columns, for example,

22   line 1, as you refer to them as pages of a book, we see 18 on

23   the left, 18 on the right; as we go down, we see the exact

24   same numbers at those pages of that book that you've

25   described for us, is that right?

Andrea Lester - Direct

1      A      Correct.

2      Q      There's one additional thing I want to ask you

3  about.  I'll wait until I get to the next page.

4           Now, once you determined that Shannon O'Connor's

5  DNA matches the outside of the condom DNA, did you then look

6  at Shannon O'Connor's DNA profile and look at it and how that

7  compares to any of the donors of the mixture on the inside of

8  the condom?

9      A      I used her control in comparison with those

10 mixtures to see if she was a contributor to those mixture

11 profiles on the inside of the condom, and I concluded that

12 the mixture profile is consistent with her DNA admixed with

13 at least one additional donor, at least one of which is male.

14     Q      When you say that Shannon O'Connor's DNA profile is

15 consistent with the female donor of the inside condom

16 mixture, what does that mean when you say it's consistent

17 with?

18     A      It means that at all these pages of this book of

19 DNA and the mixture profile, she shares an allele or a number

20 within that mixture profile.

21     Q      Now, I'm now going to turn to the third page of

22 your report from Exhibit 123.  Can you see that?

23     A      Yes.

24     Q      And in reading from it, the second paragraph, you

25 indicate, "Profile from the swabbings of the outside of the

Andrea Lester - Direct

1    condom matches the STR DNA profile from Shannon O'Connor."

2    Essentially you say in the record it's a match --

3         A    Correct.

4         Q    -- her DNA to the outside of the condom?

5         A    Correct.

6         Q    You indicate the probability of selecting an

7    unrelated individual with an STR DNA profile that matches

8    these items is less than 1 in 300 billion?

9         A    Correct.  When we have a match in a case, we add a

10   statistical probability to that, meaning that if -- if I look

11   at 300 billion people, I would expect to find that profile

12   once.  And in this case, I'd just seen that profile once.

13        Q    And in the scientific community, what significance

14   can you testify and indicate as to this statistical number, 1

15   in 300 billion, as it relates to whether there's a positive

16   and absolute match?

17        A    That she was a contributor of the profiling on the

18   outside of the condom.

19        Q    Then you go on in the third paragraph to talk about

20   the mixture profiles from the swabbings of the inside of the

21   condom - sperm and nonsperm fractions - are consistent with

22   DNA from Shannon O'Connor.  Again, that's where you are

23   stating what as to the material found on the inside of the

24   condom?

25        A    That she's a contributor to that mixture profile.

Andrea Lester - Direct                        1943

1    That she's one of the individuals involved with that profile.

2         Q    Okay.  Now, you also in this report -- and I think

3    you indicate earlier -- state that the inside -- the material

4    on the inside of the condom has a contributor, one of which

5    is a male, is that correct?

6         A    Correct.

7         Q    Now, based upon your testing and examination, once

8    you finished examining the condom as you described and once

9    you had the known DNA of Shannon O'Connor and you concluded

10   your testing and examination, what can you say as far as the

11   male contributor portion of the material on the inside of the

12   condom as far as how many alleles are there that would or

13   would not allow you to do any kind of a matching?  How would

14   you state that?

15        A    I don't think I quite understand the question.

16        Q    Okay.  It was a little too long.  I'm sorry.  I

17   guess my question is:  What, if anything, can you say about

18   the male contributor DNA profile on the inside of the condom

19   as far as what could you or could you not do if you had a

20   donor who actually left that DNA?

21        A    When looking at the mixture profile in comparison

22   to Shannon's known profile, I eliminate any alleles that she

23   may have contributed to that mixture profile and I look at

24   the alleles that are left over, assuming that those alleles

25   or that remaining profile came from a male.  Now I can't do

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Direct

1    anything with that male profile because I have nothing to

2    compare it to.

3         Q    Okay.  If you had -- based on what you found by

4    examining the inside of the condom, the DNA, if you had had

5    any samples to compare it to, are you able to state whether

6    or not you could make any determination as to a positive

7    match as to that DNA?

8         A    Because it's a mixture profile, I can't say match,

9    but if I had a male's profile or known profile from an

10   individual, the only two possible conclusions I could come up

11   with would say either the male is a contributor or is

12   excluded as a contributor to that profile.  That's all I

13   could conclude.

14        Q    Okay.  You couldn't state that it's a positive

15   match as to that individual?

16        A    No.  Because it's a mixture profile, no, I cannot.

17        Q    Okay.  Miss Lester, you talked a little bit about

18   the inside of the mouth, just a little bit earlier.

19        A    Correct.  When collecting a buccal swab, yes.

20        Q    My questions with respect to the inside of the

21   mouth, how would you describe the inside of the mouth as far

22   as being a place where cells are located as to how easily or

23   not easily DNA can be removed or scraped off from the inside

24   of the mouth?

25        A    Your mouth is a very good source of DNA because

Andrea Lester - Direct                                    1945

1    it's very moist, and every time you swallow, you're

2    technically recycling what's in your mouth, so you always

3    have the saliva in your mouth, you know, moving the cells

4    around.

5         Q    Okay.  If an individual was performing oral sex on

6    a male penis --

7         A    Yep.

8         Q    -- would there be, in your observation, a

9    possibility that they're scraping off DNA cells from the

10   inside of the mouth of the person in whose mouth the penis is

11   in?

12        A    It's possible, yes.

13        Q    Now you indicated that when you examined the condom

14   that was sent to you -- were you able to tell by examining

15   the condom whether that condom had been removed by rolling it

16   backwards or whether it was still rolled on the way it would

17   be rolled on to an erect penis?

18        A    It was unraveled, what you would expect to find an

19   unused condom in its wrapper as far as what side was inside

20   or outside.  I don't know if that's what you mean.

21        Q    But it was unwrapped?

22        A    Yes.

23        Q    And the mixture of DNA that you described that you

24   found on the inside of that condom, is that mixture -- the

25   way you found it, would that be consistent or not with a

Andrea Lester - Direct                    1946

1    situation where a person, female, had performed oral sex on a

2    male and then afterwards the male put the condom on and

3    engaged in sexual intercourse with a female?

4              MR. FISCHER:  Your Honor, I think that is

5    going beyond this witness' particular expertise, I really do,

6    and it's leading and speculative.

7              THE COURT:  I think it certainly is a

8    hypothetical question, and certainly this witness has

9    expressed sufficient qualifications to testify about how

10   DNA -- what it is and how it's used.  I think it probably is

11   within the realm of her ability, so I'm going to overrule

12   your objection.

13        A    All I can say, it is a possibility.

14        Q    Okay.  Final question, Miss Lester:  The inside of

15   a woman's or a girl's vagina, is that a place where you would

16   expect DNA to be very readily scraped off during the course

17   of a sexual intercourse act?

18        A    Yes.

19             MR. LOVRIC:  Those are all the questions I

20   have, Judge.

21             THE COURT:  Okay.  Mr. Fischer.

22             MR. FISCHER:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MR. FISCHER:

25        Q    Miss Lester, my name is Kelly Fischer.  You spoke

Andrea Lester - Cross

1   about a possibility that, as I understand, DNA could be

2   transferred from the inside of somebody's mouth to a penis

3   and then from a penis to the inside of a condom, correct?

4       A    Yes.  It's a possibility.

5       Q    Since we're in the realm of possibilities, would

6   you say that it's possible for female DNA to be transferred

7   say from any other object that was used inside of a female

8   vagina and then that object placed inside the condom?

9       A    Sure.

10      Q    Okay.  I want to make sure that I understand this.

11  Your testimony is that the male DNA that was found inside

12  this condom was DNA -- a mixture of DNA, am I correct?

13      A    There's a mixture profile in that condom, meaning

14  there's more than one individual in the inside of the condom.

15      Q    One of the individuals whose DNA you found inside

16  the condom was Shannon O'Connor, a female?

17      A    I couldn't -- exactly.  Yes.

18      Q    And you also found DNA inside the condom that was

19  from -- that was male DNA?

20      A    Correct.

21      Q    But you can't say whether it was from one male, two

22  males, or any number of males, am I correct?

23      A    I know there's at least two individuals involved

24  with that mixture.  I don't know how many males.  If I'm

25  using her control and eliminating the alleles that she has

Andrea Lester - Cross

1  present, with the alleles that are in the mixture, I only see

2  one other individual or possibility of just one other

3  individual.  We concluded there's at least one additional

4  donor.

5      Q    Well, there's a difference between one additional

6  one and at least one additional donor, isn't there?

7      A    Correct.  Without controls, I can't conclude

8  anything else.

9      Q    So you can't say here with any reasonable degree of

10  certainty whether it was one additional donor or more than

11  one additional donor, am I correct?

12      A    As far as the male contributor?

13      Q    Yes.

14      A    No.  Not without controls.

15      Q    Does your testing allow you to determine how long

16  ago the DNA that you found on this condom was put there?

17      A    No.

18      Q    You talked at one point about yeast, that yeast

19  found on the inside of the condom.  Do you remember speaking

20  about that?

21      A    Yes.

22      Q    Can you tell me more about what that means.

23      A    Not really sure.  Just observing the skin cells or

24  whatnot on the inside of the condom, I saw a lot of yeast

25  cells.  As far as where they came from, I don't know.

Andrea Lester - Cross

1     Q     What does the presence of yeast cells in that

2  setting signify to you?

3     A     Not really anything.  Just that there's yeast

4  present.  I guess if I could assume perhaps that item had

5  been left there for a while for possible breakdown of the DNA

6  present.  All I saw really were yeast cells.  I saw very few

7  epithelial cells or skin cells and I did not observe any

8  sperm cells.

9     Q     And the presence of yeast then was an indicator

10  that some time had passed before you tested that condom?

11     A     Assuming, yes.

12     Q     You have been working with New York State Police

13  for approximately eight years, is that your testimony?

14     A     Correct.

15     Q     Are you affiliated with Troop C at all?

16     A     As far as?

17     Q     The New York State Police Troop C?

18     A     I know where they are.  I don't work with them.

19     Q     You don't work with them?

20     A     If they -- if a case goes to them, they submit it

21  to my laboratory, but as far as working with that particular

22  troop on a personal basis daily, I don't.

23     Q     So you don't work with them daily on a personal

24  basis?

25     A     No.

Andrea Lester - Cross

1950

1    Q    But you do work with them from time to time?

2    A    They're just like any other agency that drops off

3    evidence to our lab.

4    Q    So you do work with Troop C from time to time?

5    A    Sure.  Just as any other troop in the state.

6    Q    Now when you began with Troop C -- I'm sorry.  When

7    you began with the New York State Police approximately eight

8    years ago, was that before or after the matter involving

9    Officer Lishansky?

10                   MR. LOVRIC:  Objection.

11                   THE COURT:  Sustained.

12   A    I don't -- I'm sorry.

13   Q    Chain of custody is important?

14   A    Correct.

15   Q    Where did this item, this condom, to your

16   knowledge, come from?

17   A    I don't really know much about the case other than

18   what happens to it when it comes into the laboratory.

19   Q    You have any idea where this came from?

20   A    No.

21   Q    At any time other than the time it showed up on

22   your desk, you have no idea who's had access to this condom?

23   A    No.

24   Q    Who delivered it to you?

25   A    It was delivered by the troop to evidence

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Cross

1   receiving.  When the case was assigned to me, I went to

2   evidence receiving, they retrieved the item from the vault

3   that I explained earlier and scanned it into my custody.

4        Q    You said it was delivered to you by the troop.

5   What do you mean?

6        A    Sir, I'm not quite sure what you're asking.  I

7   wasn't present when the item was brought to the lab.  As far

8   as what took place then, I don't know.  I just know what

9   happens to the item when it's scanned into my custody.

10       Q    You used the word troop, and I was inquiring what

11  you meant by that.

12       A    Oh.  That it was the agency that dropped off.  You

13  had referred to troop, so it was the State Police case, I

14  believe, and I believe that's the agency that dropped off the

15  items of evidence to our evidence receiving section.

16       Q    The male DNA that you found inside the condom, did

17  you check that DNA against any samples that were obtained

18  from the state of New Jersey?

19       A    No.

20       Q    Did you check that DNA against any samples that

21  were taken from the state of Connecticut?

22       A    No.

23       Q    You were not asked to do that?

24       A    No.

25       Q    You did not compare that male DNA against samples

Andrea Lester - Cross                           1952

1   taken from any other males in the Norwich area, am I correct?

2        A    No, I did not have any other male controls in the

3   case.

4        Q    This was a rush job?

5        A    Define rush job.

6        Q    I'll refer to -- in the documents that are in

7   evidence that you reviewed, is there any mention that this is

8   a rush?

9        A    Yes.  Meaning that I had to put all my other cases

10  assigned to me aside and only focus on this particular case

11  at that time.  Which if it means working 12 hours that day to

12  get it done, I do.

13       Q    You spoke about statistical probabilities?

14       A    Correct.

15       Q    Did you do a match of the male DNA that you found

16  against any of, say, five predominant genetic backgrounds

17  that you might find in North America?

18       A    No.  There's no statistic applied to anything in

19  the mixture profile, only with the female profile on the

20  outside of the condom because I had a control to refer with.

21       Q    Were you able to determine whether the male DNA

22  found inside the condom, that there was a probability of any

23  sort if you compared it against say the African-American

24  population in North America?

25       A    No, sir.  Unless I had a control to use as a

Andrea Lester - Cross

1    comparison, there is no stat applied to a mixture at all.

2        Q    So if you had a good sample of the DNA that you

3    found inside that condom, with plenty of DNA material that

4    had not been degraded, would you be able to say that the

5    probability is 1 in 7 million that this person is of -- has

6    some African-American descent in them?

7        A    No.  First off, we don't do that.  We don't do any

8    race typing.  Also, that would not be applicable in this

9    sense because the only thing I could possibly conclude,

10   having a male profile, known male profile, is to either

11   include the individual in that mixture profile or exclude him

12   as a contributor.  Meaning he's possibly in there or he's not

13   at all in there.  I cannot apply stat to that because it's a

14   mixture profile.

15       Q    So is it your testimony that -- that say an

16   Asian-American DNA sample would be very similar in regard to

17   the DNA that you tested for to say an African-American DNA

18   sample?

19       A    Sir, I guess I'm not quite sure where you're going

20   with this.  We don't do any race typing.  Our stats don't

21   specifically say an individual is of this racial descent.

22       Q    Does anybody do that type of comparison?

23       A    I'm sure.  We don't in our laboratory.

24       Q    Do you know whether any steps were taken to sample

25   say anybody from --

Andrea Lester - Cross

1        MR. FISCHER:  I'll withdraw the question

2    anyway, your Honor.

3        Q    What's involved in actually performing the tests

4    that you perform if you're given a sample?  What do you

5    physically have to do to generate the reports that are in

6    evidence?

7        A    I guess starting at what point, sir?

8        Q    When you receive the sample on your desk.

9        A    Okay.  In relation to the condom, I use sterile

10   swabs to swab the outside of the condom separate from the

11   inside, as I stated earlier, to remove any possible skin

12   cells or anything that might be left on either side of the

13   condom, just preserving the possible DNA from that item onto

14   the swab.  I then test the swab for -- with chemical

15   screening tests, determine what samples, what type of samples

16   are present, what type of bodily fluids are present, and then

17   I take a cutting from that swab and place it into a tube for

18   extraction, which takes all the way through quantification,

19   amplification, and then to DNA analysis.

20       Q    Start to finish, how long does that process take?

21       A    Each step takes a certain period of time.  For me

22   making the actual cutting and doing the testing,

23   approximately --

24       Q    In this case how long did it take?

25       A    I'd have to look at the notes, but I know it only

Andrea Lester - Cross

1    took a few days, maybe a week, I believe, from the beginning

2    to when the report was issued.

3        Q    So is it fair to say that it would only take you

4    about a week to test another sample if you were given another

5    sample?

6        A    Absolutely.  Given the chance to eliminate all my

7    other cases from my desk, to only focus on that, yes.

8        Q    In order to do a comparison, you wouldn't require a

9    physical specimen to compare against the information that you

10   had concerning the male DNA found inside this condom, am I

11   correct?

12       A    I'm not quite sure what you mean.

13       Q    Well, you could take the information that you

14   gleaned from the male DNA that you found inside this condom

15   and you wouldn't need a physical specimen to compare the two,

16   would you?

17       A    I would need a buccal control specimen, yes.

18       Q    What if somebody else tested a buccal control from

19   somebody, another lab, and they produced this information

20   using the same tests that you used and gave you that

21   information, could you compare them on paper and make a

22   determination of whether they match up?

23       A    It's possible, but I believe we'd still want it

24   ourselves; that way we know exactly what's happened with that

25   item, that control item coming from that exact individual.

Andrea Lester - Cross

1    Q    I understand you would like that.  My question is:

2    Could you -- could you do that paper comparison?

3    A    I believe so, yes.

4    Q    Using this --

5              MR. FISCHER:  Can I use the exhibit, please?

6    Q    I'll show you what's in evidence as Exhibit 123.

7    Do you see that?

8    A    Yes.

9    Q    You used the polymerase chain reaction using

10   AmpflSTR Profiler Plus and AmpflSTR COfiler, those are the

11   tests that you used?

12   A    Those are the kits utilized, yes.

13   Q    Those kits, are they utilized by other police

14   agencies, to your knowledge?

15   A    Laboratories in the nation, yes.

16   Q    Is it a fairly commonly used kit?

17   A    Yes.

18   Q    If another laboratory used that kit to test DNA and

19   they checked against these particular locus, loci in this

20   left-hand column, and they produced results showing the

21   allele numbers that are shown in these columns --

22   A    The profile from an individual, is that what you're

23   referring to?

24   Q    Yes.  If another lab produced something structural

25   like this with those same loci using those same kits, you

Andrea Lester - Cross

1    could take them side by side and compare them, couldn't you?

2        A    I believe so.  I'm not quite sure what our

3    procedure is when it comes to that because it would be from

4    another state, I'm assuming you're saying.

5        Q    You'd have to rely on that other state's laboratory

6    to produce a trustworthy result?

7        A    Which is -- I believe we would have to have a

8    control taken from that individual and were able to see the

9    chain of custody, where it is collected, who collected it and

10   whatnot.  That's why I'm not -- again, I'm not quite sure our

11   procedures.  I don't believe we can rely on another state's

12   profile just because we're not quite sure where it is coming

13   from.

14       Q    You would not rely on them because you wouldn't

15   feel comfortable that they did what they were supposed to do

16   in producing that result, is that your testimony?

17       A    If it's an accredited laboratory, I would assume

18   yes.  I'm not quite sure, familiar with procedures pertaining

19   to out-of-state laboratories, comparing profiles from that,

20   out-of-state laboratories to profiles I developed from an

21   item.

22       Q    Your laboratories for New York State Police in

23   Albany is an accredited laboratory?

24       A    Correct.

25       Q    So if you got results from another state's

Andrea Lester - Cross                                    1958

1    laboratory that was coming from an accredited laboratory

2    using the same kits against the same loci, would you rely on

3    that?

4         A    I'm saying it's a possibility.  I don't know if our

5    procedures and our rules in our laboratory allow for that to

6    take place.  Sure, it's possible, because it's on paper, but

7    I don't know if we are allowed to do that.

8         Q    So the New York State Police rules might say, we're

9    not going to permit you to do that, am I correct?

10        A    I'm assuming.  I'm not sure.  I've never had to do

11   that before and I don't know of any other cases where we've

12   had to do that.  That would be something that would be asked

13   of the supervisor of the procedures because, quite

14   truthfully, I don't know.

15        Q    Have you ever had occasion to go to other state's

16   laboratories to find DNA to match against a known sample?

17        A    Not recently.  I work in my lab alone.

18        Q    Do you know whether the State Police have ever had

19   occasion to do that in the past?

20        A    State Police troopers or lab personnel?

21        Q    State Police lab personnel.

22        A    Not that I know of.

23             MR. FISCHER:  Okay.  Thank you.  Those are all

24   the questions I have.

25             THE COURT:  Miss Peebles?

Andrea Lester - Redirect

1      MISS PEEBLES:  I have no questions, your

2 Honor.

3      THE COURT:  Mr. Lovric.

4 REDIRECT EXAMINATION

5  BY MR. LOVRIC:

6      Q    You were asked by Mr. Fischer about the yeast on

7 the condom?

8      A    Yes.

9      Q    Is that consistent, finding yeast on a condom like

10 that, let's say, if that condom was in a storage unit when it

11 was fairly hot during the summer and that condom stayed in

12 there for some period of time in a storage unit?  Would that

13 possibly yield to yeast growing on the condom?

14     A    I'm really not sure.  I do know I've never

15 encountered yeast on the inside or outside of a condom.

16 That's why I noted it in my notes, because it just seemed

17 interesting.  I've never seen that before.

18     Q    Okay.  You indicated -- Mr. Fischer asked you about

19 that -- that some indication that the item, the condom had

20 been left around for a while?

21     A    It's a possibility.  If there's going to be yeast

22 present, I would assume it would be over a period of time to

23 have that many yeast cells.

24     Q    Okay.

25          MR. LOVRIC:  That's all I have, Judge.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Recross

1       MR. FISCHER:  May I follow up on that, your

2  Honor?

3                   THE COURT:  Sure.

4  RECROSS-EXAMINATION

5   BY MR. FISCHER:

6       Q    This is the first time that you have ever

7  encountered the situation that you found with respect to this

8  condom concerning yeast in particular?

9       A    I've never seen yeast on a condom before.

10      Q    Have you seen yeast when testing human bodily

11  fluids DNA?

12      A    On older items of evidence, yes.

13      Q    What types of items of evidence are you speaking

14  about?

15      A    Well, I usually work homicides, so a lot of times

16  if we have clothing that's pulled off of a body that's been

17  in the ground for a while, things like that.

18      Q    Things that are like moldy?

19      A    Sometimes, yes.

20      Q    Have you tested condoms before to find DNA?

21      A    Oh, absolutely.

22      Q    How many times?

23      A    How many condoms I have worked on?

24      Q    Yes.

25      A    Twenty or 30.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Andrea Lester - Recross

1    Q    Have you ever done any reading, anecdotal reading

2    about other tests of condoms to learn how to do it?

3    A    How to perform tests on a condom?

4    Q    Yeah.

5    A    No.

6    Q    What training did you receive, if any, with respect

7    to how to test a condom for DNA?

8    A    I went through serology training that just trained

9    us on how to examine items, how to remove some of the

10   materials or bodily fluids from any number of items, whether

11   it's clothing, condom, underwear, anything.  So it's just a

12   general training that we do for general items that we work

13   on.  We don't have specific training as to how to examine a

14   condom.  I just use it as any other item I examine.

15   Q    And since September of 2001 you've been a forensic

16   scientist with the biological science section, New York State

17   Police, Albany, New York, correct?

18   A    Correct.

19   Q    And July 2000 to September 2001 you were

20   assigned -- I'm sorry -- a senior laboratory technician,

21   biological science section, same place?

22   A    Correct.

23   Q    And you've had eight months of on-the-job training

24   under supervision of a section supervisor in DNA analysis and

25   interpretation?

Andrea Lester - Recross

1962

1   A   Correct.

2   Q   And the training in forensic serology that you

3   mentioned was October of 2001 to April 2002?

4   A   I believe so.

5   Q   And that was forensic serology training inclusive

6   of collection, examination and preservation of biological

7   evidence?

8   A   Correct.

9   Q   And in January 2002 you had semen identification

10  training conducted by a supervisor of DNA services, Forensic

11  Investigation Center, Albany, New York?

12  A   Correct.

13  Q   And back in 2000, 2001, ten months of on-the-job

14  training in DNA extraction, quantification and amplification

15  under the supervision of a supervisor of DNA services,

16  correct?

17  A   Correct.

18  Q   In all of those years of training and experience,

19  this is the only time you ever found the situation you found

20  with respect to this condom, that is, the presence of yeast,

21  am I correct?

22  A   Yes.  That's why I noted it.  I just found it to be

23  odd.

24              MR. FISCHER:  Thank you.

25              THE COURT:  Miss Peebles?

Andrea Lester - Recross                    1963

1              MISS PEEBLES:  No questions.

2              THE COURT:  Mr. Lovric?

3              MR. LOVRIC:  I have no other questions.

4              THE COURT:  Thank you, Miss Lester.  You may

5   step down.

6              (Witness excused)

7              MR. LOVRIC:  Government rests, your Honor.

8              THE COURT:  Okay.  That's a surprise.  I guess

9   based on our conversation yesterday, the defense is not

10  prepared to go forward with any witnesses, is that right?

11             MR. FISCHER:  No, your Honor, based on that

12  conversation, we're not.

13             THE COURT:  Because we were led -- we thought

14  that the government's proof would take the rest of the day.

15  So would you prefer to wait until tomorrow morning to do --

16             MR. FISCHER:  Yes, your Honor, please.  I just

17  don't have my witnesses ready to go yet.

18             THE COURT:  Let's go to side-bar for just a

19  minute before I cut the jury loose.

20             (Meeting at the bench off the record)

21             (In open court)

22             THE COURT:  All right, ladies and gentlemen.

23  What we were doing at side-bar basically was trying to get a

24  feel for what the future holds in terms of the length of the

25  proof and where we'll be.  And tomorrow the defense indicates

1  that there's witnesses that will take up the time period that

2  you assigned to us from 9:30 to 1, and then the next question

3  was, how much do you have maybe the following Tuesday when we

4  come back together.  And there may be some, there may be a

5  little bit, but it looks overall that we may finish with the

6  entire proof -- of course, I haven't heard about rebuttal

7  from the government yet, but we may finish with the proof on

8  Tuesday and if not, certainly by Wednesday.  So at least

9  there's an end in sight, which I know you're all waiting to

10 hear.

11          The procedure is, after the proof is all in

12 and before you, then at that time the Court will -- there'll

13 be closing arguments to be made from everyone, and then I'll

14 charge you on the law and give you the case.  So if you can

15 figure out how long that's going to take, try it, but I

16 really can't tell you.  My best guess is that you'd have this

17 case to decide it by sometime Thursday.  So hopefully we can

18 accomplish that and we can have a result.

19          So, now, we're going to recess until tomorrow

20 morning, 9:30, when we're going to go to 1 in the afternoon

21 per your instructions.

22          So let me remind you not to discuss the case

23 among yourselves, with anybody else, or permit anyone to

24 discuss it with you.  Don't view or listen to any media and

25 no research on your own unless you want to go home and read a

1    book about what we heard today.  I don't think you want to do

2    that.

3              Have a nice evening.  Hope it will be warmer

4    tomorrow.

5              (Jury excused)

6              THE COURT:  All right.  The government has

7    rested so the defendants are free to make any motion they

8    feel is appropriate at this time.

9              MR. FISCHER:  Thank you, your Honor.  On

10   behalf of Mr. Sacco I'd like to make the application to

11   dismiss with respect to count one, selling and buying of

12   children.  I understand actually that is the count against

13   Miss O'Connor, if I recall correctly, and the second count is

14   against Mr. Sacco, so I'll address only the second count

15   number two.  There are some conclusions that have been

16   reached apparently by DSS workers about that point but there

17   is no direct proof of it.  In fact, all the financial

18   evidence, as I see, that came in today shows Linda O'Connor

19   paid her rent.  It also shows Mr. Sacco was deeply in debt.

20   There's nothing other than the speculation as recited by Liz

21   Chesebro that she had suspected all along something was going

22   on but that Shannon O'Connor denied that it was going on at

23   the time in the note that we read with Miss Chesebro.

24   There's nothing other than that to support that claim against

25   Mr. Sacco and I move to dismiss it on that basis.

1966

1       In addition, the interstate commerce element

2   is lacking in that, yes, Mr. Sacco did travel at times from

3   New Jersey to New York but he had a number of different

4   purposes.  There's been no proof with respect to the dominant

5   purpose test, which I also suggest based on the Second

6   Circuit decision in US versus Sarios, I do not have the cite

7   at hand.  We discussed earlier that it must be established

8   beyond a reasonable doubt that one of the dominant purposes

9   was for the illegal purpose and that the illegal purpose was

10  not just an incident to other legitimate purposes.  I move on

11  that basis as well.  There's absence of proof supporting the

12  claim.

13      With respect to the sex trafficking charge

14  against Mr. Sacco, I submit your Honor that the interstate

15  commerce aspect of that is also lacking for the same grounds

16  I just stated with respect to the second count and, again,

17  the sex trafficking of children by force, fraud or coercion.

18  The proof, the only proof of coercion as I see it is the

19  statement by -- Shannon O'Connor made at a time when she was

20  in a psychiatric hospital, taking psychotropic medications on

21  a regular basis, and I submit is incredible as a matter of

22  law.  It cannot support beyond a reasonable doubt the charges

23  against Mr. Sacco in this case.

24      With respect to the 2251 charge, sexual

25  exploitation of children, there is no visual depiction.

1    There's no proof that there has been a visual depiction other

2    than, again, testimony from this young girl, 14 years old at

3    a time when I think it's at the point where the Court can

4    rule as a matter of law that her credibility is not

5    sufficient under any reasonable interpretation of it to

6    support the charges against Mr. Sacco.

7                    THE COURT:  I kind of thought that was the

8    jury's job to decide, wasn't it?

9                    MR. FISCHER:  There comes a point, your Honor,

10   I submit that it's the Judge's job if it's so incredible that

11   the Court may, as a matter of law, make that determination

12   and I think in cases that I've seen, few of them through the

13   years, the proof has been substantially stronger than this in

14   cases that are permitted to go to the jury and the only proof

15   being from this girl that the proof concerning any pictures,

16   photographs, etcetera coming out when it did under the

17   circumstances in which it did after she had been lead around

18   for six or nine months by government people who had their own

19   motivation to have her tell her story is something that this

20   Court does have discretion to say it's insufficient as a

21   matter of law to let it get to the jury.

22                    THE COURT:  Okay.

23                    MR. FISCHER:  And, again, the Mann Act

24   violation with respect to Mr. Sacco, the last count -- the

25   count against Mr. Sacco based on 2423 as I understand it is

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    again lacking in its interstate commerce aspect.  There's no

2    proof about dominant purpose whatsoever and there's no proof

3    that this is anything except incidental.  If that is so, that

4    does not, as a matter of law, meet the burden that the

5    government faces beyond a reasonable doubt.

6            With respect to the receiving or possessing

7    child pornography, the only evidence in this case, unlike

8    most cases that I've read about, is the Exhibit 40,

9    Government's Exhibit, that was mailed to Mr. Sacco that

10   contains an image of a young woman or a girl standing there

11   that comes from the 2002 internet apparently.  That, as a

12   matter of law, does not suffice to be proved sexually

13   explicit material.  There's no focus on sexual areas.  She's

14   not engaging, in any way, in any sexual activity.  I also

15   suggest, your Honor, that that was not possessed at the time

16   of the creation of the criminal complaint in this case.  It

17   was not possessed at the time the matter was presented -- was

18   not known by the government, I apologize, at the time the

19   matter was presented to the grand jury.  It was not known

20   about, as I understand it, by the government at the time the

21   issuance of the indictment.  I did not ask for a bill of

22   particulars, I probably wouldn't have gotten one anyway, but

23   I submit also based upon the government's opening in this

24   case that their proof and their intent and the confines of

25   this case relate to photographs of Miss Shannon O'Connor, not

1    objects taken subsequent to the indictment, to boot strap and
2    I do submit those are outside the realm of this prosecution
3    and should not be properly considered as part of this case
4    against Mr. Sacco.  But even if they're, the photographs that
5    are shown in there, the one photograph I've addressed.  The
6    other photographs that are in a brochure mailed through the
7    US mails, apparently from Louisiana, was an envelope bearing
8    date stamp 2006, shows no explicit sexual contact as I see it
9    as it's defined in the statute.  There is nothing specific
10   showing genital, genital to oral or any other type of
11   prohibited behavior and that cannot be deemed the basis for
12   this charge against Mr. Sacco.

13              With respect to Shannon O'Connor saying that
14   she was photographed in sexual positions, if it's deemed
15   true, then that might be deemed sexually explicit conduct but
16   again we have lacking interstate commerce aspect of it.  No
17   evidence, as I understand it, about where these cameras were
18   manufactured, where they were purchased other than the E-Bay
19   records which don't show, as I understand it, where they were
20   transported from or to.  The interstate commerce aspect is
21   absolutely lacking on these charges.  In addition, I
22   reiterate the dominant purpose test.  There's no evidence on
23   this whatsoever to indicate anything other than this is
24   purely and in the strangest sense a coincidence and on that
25   basis I do not believe that there's enough proof here to

1    support the charges against Mr. Sacco at this point.

2                 THE COURT:  Okay.  Mr. Lovric, you want to be

3    heard or you want to wait until we hear from Miss Peebles.

4                 MR. LOVRIC:  I can do it either way, Judge.

5                 THE COURT:  Let's have Miss Peebles tell us

6    why the counts against her client should be dismissed and

7    then you can reply as to both.

8                 MISS PEEBLES:  Your Honor, it's pure

9    significance we would echo some of the same arguments that

10   Mr. Fischer has made on behalf of Mr. Sacco.  But based on

11   what we heard throughout the course of the government's case,

12   there has been a complete lack of evidence to sustain a

13   conviction on any of the five counts that charge Miss

14   O'Connor.  She's charged in count one with selling her

15   daughter to Dean Sacco for purposes of producing child

16   pornography and the government's theory is that Mrs. O'Connor

17   allowed Mr. Sacco to do this in lieu of paying rent.  We have

18   submitted proof that, in fact, Mrs. O'Connor paid her rent

19   through -- up through January when HUD began taking over her

20   rent payments.  Specifically, your Honor, we submitted proof

21   of a wire transfer from Mrs. O'Connor back in July of '06 in

22   the amount of $1,800 with an extra hundred dollars or so for

23   the cost of the wire transfer.  On top of that we have a

24   withdrawal on the first of November of '06, a cash amount of

25   $600, and after that, your Honor, Mr. Sacco is calling and

1   threatening the Department of Social Services to evict Mrs.

2   O'Connor and her daughter.

3            Now, your Honor, HUD takes over in January and

4   we have proof there was an application through Delaware

5   Opportunities that Mrs. O'Connor began applying for

6   assistance.  The fact that Mr. Sacco called and was basically

7   letting them know he was going to evict them flies in the

8   face of the government's argument to suggest that somehow

9   they're in cahoots in exchanging Shannon for rent money.  It

10   makes absolutely no sense that Mrs. O'Connor would even owe

11   any kind of back rent which is indicated on the money order

12   that the government introduced today in January for $113,

13   that she still owed him $300 for January and that's when HUD

14   began to take over.

15            So, your Honor, if the government's theory is

16   to be believed through speculation by the witness because

17   apparently she had no firsthand knowledge of it, that the

18   government's theory is to be believed, your Honor, it makes

19   absolutely no sense that Mrs. O'Connor would owe him anything

20   for January if they were in some kind of cahoots about

21   Shannon O'Connor being exchanged for rent money for purposes

22   of producing child pornography.  So, your Honor, I don't

23   believe there is sufficient evidence whatsoever to sustain

24   count one of the indictment because the government's theory

25   is that she did not pay her rent and in lieu of that provided

1    her daughter to Mr. Sacco.  And I have to also emphasize,

2    your Honor, that Shannon O'Connor said that Mr. Sacco had

3    sexual relations with her in August of '06 when they first

4    moved in and there's absolutely no proof whatsoever that Mrs.

5    O'Connor knew that and she had paid the rent and then Shannon

6    O'Connor is out of her custody while she's with Renee Lang

7    from that period of August 20 through October 11, your Honor.

8    We already have proof that she paid October's rent and we

9    have -- November 1 we have a 600 withdrawal for Mr. Sacco.

10   Mr. Sacco never deposited any cash funds that were provided

11   from Mrs. O'Connor.  We heard the testimony today that the

12   1,800-dollar wire transfer had never been deposited into any

13   of Mr. Sacco's accounts.  It was cash he took.  His pattern

14   of behavior would be the same.  It would not be surprise that

15   he would not deposit the 600-dollar cash payment that she

16   made on November 1.  Then, again, the only trouble with the

17   rent payment, your Honor, in December he's calling DSS.  He

18   calls her looking for money on December 6 because she hadn't

19   paid him yet.  So with that, your Honor, I think there's a

20   complete lack of proof.  There's no evidence whatsoever to

21   sustain a conviction on count one of the indictment based on

22   the government's theory.

23            And then if we look to count three, which

24   charges sex trafficking, your Honor, notwithstanding the

25   credibility of the witness which I would echo Mr. Fischer's

1973

1    argument with respect to that in terms of her recall which he

2    had zero recall with the defense but she was able to recall

3    specific dates that weren't even the same from time past when

4    she gave previous disclosures.  With that, your Honor, it's

5    all based on the government's theory that in 2004 and

6    sometime during that time period that Mrs. O'Connor allowed

7    George Lang to have sex with Shannon.  That's the 2004 date.

8    But if the Court looks at her, Shannon O'Connor's, original

9    videotaped interview she specifically says on six occasions

10   it started Christmas time right before her 12th birthday

11   which would be December of 2005, that's what she says over

12   and over again.  The only time she mentions 2004 is when she

13   comes into the courtroom to testify, that's after Renee Lang

14   establishes that George Lang, not only was he impotent the

15   year before he had cancer which was 2004, but also by the

16   time in 2005 rolled around he had undergone so many

17   treatments in chemotherapy he was a very sick man.  Not less

18   than six months later he died.  Cancer goes to the brain, it

19   metastasizes in February.  It's literally impossible that

20   Mrs. O'Connor would have been able to take pictures of

21   Shannon O'Connor giving George Lang a blow job while she's

22   taking photographs with what Shannon O'Connor describes is a

23   digital camera, not only in this courtroom but also on the

24   prior videotaped interviews.

25              Now, the testimony was George Lang never owned

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    a digital camera.  Linda O'Connor never owned a digital

2    camera and there was no digital camera, no evidence that is

3    was ever hooked up to the USB hard drive on the Lang

4    computer.  Not only that, they found over five thousand data

5    image files on that hard drive and they did find adult

6    pornography, there's no child pornography found on that

7    computer and there are absolutely no naked images or sexually

8    explicit images of Shannon O'Connor.

9            With regard to the Best Western because that's

10   also alleged in count three which the government's theory is

11   the Best Western activity, she specifically states that her

12   mom took her there three times after they moved to Norwich.

13   Says that in the December interview.  They get the hotel

14   registrations, your Honor, and they establish that Mrs.

15   O'Connor took her there on December 1 which coincidentally is

16   the same day she gets her SSI check for $611.  On top of that

17   it's coincidentally on December 6 Mr. Sacco hadn't received

18   his rent money because they had gone to the Best Western on

19   December 1.  So by then, your Honor, Shannon admits they had

20   gone shopping.  Government introduces receipts from Wal-Mart

21   that they had gone shopping.  There are no hotel

22   registrations after that at all.  What Shannon O'Connor says

23   in her videotaped interview is two separate occasions after

24   that her mom uses her own name and two men show up at the

25   hotel after they've already registered and checked in.  What

1975

1    she -- I think what the government was eliciting from her is

2    that one time they went after that there was a man upstairs

3    waiting in the hotel room.  Well, that was never elicited

4    through the videotaped interview.  That's not what she said

5    and the receipts don't bear that out which is exactly why she

6    would now have to say something different which is not

7    supported by the home phone records which are in evidence.

8    Specifically, Mrs. O'Connor makes a phone call to the Best

9    Western on November 30 and the Oneonta bus stop.  They take

10   the bus to Johnson City.  If you look at the phone records

11   there's never any calls to the Best Western after December 1.

12   Not one telephone call to support that she ever took her to

13   the Best Western after that.  The hotel phone records or home

14   phone records establish that there's never two consecutive

15   days where she's not home.  Her phone was in use all through

16   January and the dog had not been kenneled and the government

17   points out on January 14 the government -- the dog was given

18   away.  If you look at the records, the home phone records up

19   through January 30, they get another dog, a puppy, and

20   throughout that time period there's never two consecutive

21   days where that home phone is not in use.  It always been

22   used.  With that, your Honor, I don't think there's credible

23   evidence to sustain a conviction on count three.  I would ask

24   the Court to dismiss that count.

25              With respect to the production of child

pornography.  I have yet to see a camera or any materials
that had been shipped through interstate commerce that had
been identified as being used in the production of any child
pornography, notwithstanding an issue concerning her
credibility.  So with that, your Honor, I would also suggest
that there is no proof that anything -- any materials had
been used or mailed or shipped, transported in interstate
commerce because we haven't seen any photographs.  There are
no photographs.  There's nothing to suggest anything was used
to even attempt to produce any child pornography with mails
that had mailed, shipped or transported in interstate
commerce.  Investigator Shultz himself testified that Shannon
O'Connor had not identified a Sharp video camcorder.  She had
never mentioned being videotaped in any of her statements.
Ever.  And she comes into the courtroom and Mr. Lovric pulls
it out because it had been found in the storage shed.  She
had never claimed that she had been videotapes.  In fact, we
were talking about photographs in all the prior statements
and as far as the actual possession of child pornography,
there's absolutely no proof whatsoever that Linda O'Connor
ever possessed child pornography.  Ever.  And anything that
was found on the Lang computer, even if the government were
going to attribute it to Mrs. O'Connor, it was adult
pornography.  No image of child pornography found on that
computer.

1          So, based on all of those reasons, your Honor,

2   I submit that there is a complete lack of evidence to sustain

3   a conviction against Mrs. O'Connor and I would ask that those

4   counts against her be dismissed.

5          Thank you.

6          THE COURT:  Mr. Lovric.

7          MR. LOVRIC:  Judge, I respectfully not only

8   disagree with defense counsel but indicate to the Court that

9   the arguments that defendants raise and point out to the

10  Court are very selective in memory of my view of the trial

11  evidence.  For most of the facts that were solicited on this

12  argument by defense counsel, there are equal and numerous

13  other facts that indicate just the opposite.  First of all,

14  there is substantial evidence against Mr. Sacco to establish

15  that Mr. Sacco is a sexual predator.  That he's a rapist.

16  That he is a pedophile and that he has a propensity to engage

17  in that kind of conduct with minors.  And based upon federal

18  law that is, in fact, admissible for this jury to consider

19  his propensity to rape children, to attack sexually children

20  and to engage in sexual conduct.  The fact of the matter is

21  that in this particular case the victim's testimony alone is

22  sufficient if the jury is convinced beyond a reasonable doubt

23  to convict both of these defendants of all the charges.  But

24  this case doesn't rest on simply the victim's testimony and

25  the victim's articulation of the things that were done by

1   these two defendants.  The victim's testimony alone does, in

2   fact, establish each one of these counts.

3           Count one as it relates to Mr., excuse me,

4   Linda O'Connor, selling of a child.  Well, selling of a child

5   in federal law doesn't mean selling.  It can also and does

6   equally mean transferring.  Linda O'Connor allowing Mr. Sacco

7   to take temporary custody of her daughter for the purpose of

8   engaging in sex acts and in order to produce child

9   pornography is sufficient to convict her.  It does not

10  require the sale as we may think of in the natural sense.

11  But the fact of the matter is there is sufficient evidence

12  here for the jury to conclude that she did, in fact, transfer

13  temporary custody of Shannon to this defendant in order for

14  him to rape the victim and to photograph her.  How is that?

15  Well, the victim herself testified that on the second or I

16  believe it's the second or third occasion when Mr. Sacco

17  raped her, she came downstairs and told her mother he is

18  doing things to me.  And this defendant O'Connor said to the

19  minor, in response to that, well, it's better than being

20  homeless.  That fact alone can cause this jury to conclude

21  that defendant O'Connor at that moment knew that defendant

22  Sacco's raping her daughter, had no problem with the fact

23  that he's raping her daughter and she in her mind believed

24  that it was for the overall good of not being evicted or not

25  having trouble making rent payments.  That fact alone, but

1    there is more than that.  There is a clear picture that this
2    defendant O'Connor was consistently financially incapable and
3    was constantly in the hole of all that eight or ten thousand
4    dollars that went into her bank account.  In one month it all
5    got siphoned out within a matter of weeks.  The government's
6    never claimed, we don't claim she didn't pay any rent.  If
7    the defense thinks that's our argument, well, they missed the
8    boat.  That's not at all the point.  The point is defendant
9    O'Connor was incidentally in the hole monetarily.  That piece
10   of evidence is crystal clear from all the evidence, defense
11   and government.  The other portion of that is crystal clear
12   that when she was in the hole on money, she was in dire
13   straits.  She couldn't pay rent.  She couldn't pay rent at
14   River Street.  She couldn't pay rent to Mr. Sacco.  Mr. Sacco
15   called DSS.  Other people were aware that she was behind on
16   rent.  In fact, her own statement in the money order that she
17   does send still indicates she still owes him three hundred
18   bucks.  That fact alone can lead this jury to conclude that
19   defendant O'Connor did, in fact, allow Sacco access to her
20   daughter in exchange, quid pro quo, for either sliding on the
21   rent, not paying it on time, not paying all of it, getting
22   away with not paying some of it.
23           The other factors with respect to count one,
24   transferring custody of the child, is the victim herself said
25   this defendant O'Connor did, in fact, participate in the

1    photographing of a rape.  Now, the defendants are arguing,

2    well, that's incredible.  Well, with all due respect to them,

3    that's for this jury to decide and I submit to your Honor

4    that there is more than sufficient reason for this jury to

5    believe this victim because there are numerous instances

6    which I will outline for the jury in my summation of how it

7    is she's corroborated and corroborative evidence.

8                    The first count as to Linda O'Connor is amply

9    presented for the jury's consideration and for them to

10   decide.  I've heard mention about the interstate commerce

11   aspect.  Interstate commerce, I believe defense counsel do

12   not understand how minimal that has to be.  Interstate

13   commerce aspect in all federal statutes and Second Circuit,

14   US Supreme Court has consistently said it has to have some

15   minimal effect.  Let me count the ways.  Renting the room at

16   a hotel effects interstate commerce.  Traveling from New

17   Jersey.  Paying bills in New York State from a New Jersey

18   bank account.  Traveling to New York State with a car with

19   New Jersey license plates.  Taking a camera that you buy from

20   E-Bay that's shipped to New Jersey.  Transporting it

21   interstate to New York effects interstate commerce.  Both of

22   those cameras have on them, one was manufactured in Japan,

23   the other one is Thailand or Malaysia or some other East

24   Asian country.  Those are about seven different ways

25   interstate has been effected in this case.  There are

1    numerous other ways.  Wire transfer by Miss O'Connor to New

2    Jersey effects interstate commerce.  The wiring of money.

3    Mailing of a postal money order to New Jersey effects

4    interstate commerce.  The fact that defendants don't think

5    it's adequate doesn't carry the day because the law says the

6    effect has to be minimal.

7                    Count two as to Mr. Sacco, Mr. Sacco I believe

8    argues that the purpose for traveling must be solely --

9    that's simply an incorrect statement of law.  Mr. Sacco can

10   have multiple purposes in why he traveled to New York so long

11   as one of the purposes was to engage in sexual acts with the

12   minor for the purpose of producing or taking pictures of

13   those acts.  That is sufficient.  But I submit to this Court

14   that, in fact, Mr. Sacco traveled predominantly to have sex

15   with Shannon O'Connor and the way this Court knows that and

16   the jury knows that is because when you looked at all the

17   evidence that's in front of this jury and all the documents,

18   Mr. Sacco's travels ignited from August of 2006 through March

19   of 2007, just coincidentally the time frame Shannon and her

20   mother are living in Norwich.  Prior to that he barely is in

21   New York State, barely has any contact, even though he owns

22   property.  There is more sufficient evidence to show one of

23   his reasons for traveling was to engage in sexual acts with

24   this minor and for the jury to conclude that.  Sex

25   trafficking count as to both defendants it applies and there

1    is sufficient evidence for both.  The victim telling the jury

2    that she was taken to hotels on two occasions where men had

3    sex with her and she saw money that was left on the table

4    from those men for defendant O'Connor is sufficient to allow

5    the jury to conclude that she trafficked Shannon for sexual

6    acts.  The other evidence I already covered with respect to

7    rent and how the evidence supports the fact that there was

8    consideration given by Mr. Sacco to the defendant for rental

9    exchange.

10              Count three Mr. Fischer argues requires force.

11   I believe that's an incorrect statement of law.  Count three

12   can be violated in one of two ways and, in fact, the statute

13   is designed to address two different types of acts.  One is

14   if the sexual acts and the sex trafficking involves people

15   above the age of 18.  The statute then requires force.  But

16   there is a second part of that statute which says that if the

17   person is a minor, under the age of 18, there is no force

18   element required and the sex trafficking then becomes the

19   quid pro quo for something in exchange for allowing one

20   person to engage in sex acts with another which effects

21   interstate commerce.  So count three does not require any

22   force with respect to Shannon O'Connor because that is the

23   second way that that statute can be violated and not the

24   first.

25              A large portion of the defense argument here

1    is that the victim is incredible.  That's for the jury to

2    decide with all due respect, and if the jury decides that

3    this victim is credible, either partly or wholly, there is a

4    sufficient basis for them to convict both defendants.

5                    The possession and the child pornography

6    images involved.  They involve both.  They involve images

7    that were taken of Shannon O'Connor either by Mr. Sacco or by

8    defendant O'Connor by George Lang it can be any one or more

9    of those.  It also does include any images that were found in

10   any possessions of the defendants and in this case Mr. Sacco.

11   So with all due respect I disagree with Mr. Fischer's

12   analysis of what is or is not charged.  Simply put, Judge,

13   the interstate aspects here are proven in many different

14   ways.  The production counts relate to specific instances of

15   a child being raped and photographed.  The fact that

16   photographs aren't found is not by any stretch the end all of

17   the argument or of the jury's consideration of the case.  I

18   compared it to something of the nature, because we have a

19   dead body in a murder case but we don't have a gun, the

20   murder didn't happen.  It does flow.  The fact that there is

21   sufficient evidence presented to a jury of specific acts

22   involving a minor where photographs were taken and then those

23   photographs are either destroyed or in some way secreted

24   doesn't make the act go away and it doesn't mean that the

25   crime was committed.  There's more than enough evidence for

1    this jury to conclude that.  There's physical evidence and

2    testimonial evidence and on all those bases, Judge, I believe

3    this case is simply a case where the jury needs to decide

4    what are the facts, what aren't the facts and to decide

5    whether the evidence supports the charges.

6                    THE COURT:  All right.  Well, the Court will

7    reserve decision on the motion.  I'll be issuing a writing.

8    I'd like to see counsel right now in chambers.  We're going

9    to start our charge conference.

10                   (Chambers for charge conference).

11                   THE COURT:  Defendant Sacco's attorney, Mr.

12   Fischer, has listened to the Court's proposed charge on the

13   fact that the jury need not focus on investigative techniques

14   and he objects to that and the Court's going to charge it in

15   any event and give him an exception to that?

16                   Did you want to make a further record.

17                   MR. FISCHER:  No, your Honor.  That's direct

18   and fair.

19                   THE COURT:  Okay.

20                   (Continuation of Charge Conference).

21                   THE COURT:  The Court has indicated it's going

22   to give an aiding and abetting charge and has read the charge

23   in its entirety to all those present.  And defense counsel

24   all together unanimously agree that's inappropriate in this

25   case and it should not be charged and insofar as the Court

1  charges it, I will give each of -- every defendant

2  individually an exception to the charge.

3                    MISS PEEBLES:  Which count?

4                    MR. EGAN:  Count three requires commercial sex

5  which would require a quid pro quo in exchange.  I don't see

6  how you can aid and abet unless you're getting something.

7                    THE COURT:  If you don't do every act that you

8  have to do to violate that statute, but you merely help

9  somebody perform that act, that can be aiding abetting.

10                    MR. EGAN:  One person is getting something,

11  one person is getting something, rent money, Shannon, right?

12  You have to have an exchange between two people.

13                    THE COURT:  I agree with that.

14                    MR. LOVRIC:  That also applies to the Best

15  Western.

16                    MISS PEEBLES:  Again, money is being

17  exchanged.

18                    MR. EGAN:  Linda can't just be an aider and

19  abettor.

20                    THE COURT:  First of all, Dean Sacco can't be

21  aiding and abetting the Best Western accounts because it's

22  not possible but with the production count it seems to me

23  that --

24                    MR. EGAN:  It may but count three, the

25  commercial sex act.

```
 1                    THE COURT:  You think it doesn't apply?
 2                    MR. EGAN:  I can't see how it does.
 3                    THE COURT:  Explain that to us, Miro.
 4                    MR. LOVRIC:  I'm just looking at the elements
 5       real quick.
 6                    THE COURT:  I don't know.  He's arguing the
 7       statute can't be violated unless you have a quid pro quo,
 8       therefore, you can't have aiding and abetting.  It's a double
 9       concept.
10                    MR. LOVRIC:  Yeah, I'm not sure with count
11       three that I would require it.
12                    THE COURT:  Think about it.
13                    MR. LOVRIC:  But I do think it applies to the
14       production counts because production is here, not here.
15                    THE COURT:  So you talking about count four?
16                    MR. LOVRIC:  Yes.  Count four and also count
17       five because count five Sacco can aid and abet O'Connor.
18       O'Connor is charged only in count five but Sacco may have
19       committed or aided and abetted in commission of the elements
20       that she didn't commit.  And because count five charges her
21       as being a parent involved in the production of child porn
22       but again the jury could say, well, you know, he did the
23       picture taking, for the part that we believe she didn't and
24       how is it that she's guilty of count five if she didn't snap
25       pictures.  That's where aiding and abetting comes into play.
```

1   Count four, it applies to both of them.  One may have done

2   certain elements, the other one not.  There's no way around

3   that.

4               THE COURT:  It's inapplicable to count three,

5   we can agree on that.

6               MR. LOVRIC:  I would agree with that.

7               THE COURT:  Move it.

8               LAW CLERK:  Limit it to four and five?

9               MR. LOVRIC:  Four, five, and seven.

10  Possession.  Same thing.  He took pictures and he can possess

11  the camera but she aided and abetted in the creation of that.

12               (Continuation of Charge Conference)

13               THE COURT:  Between in or about August 2006,

14  March 2007, in the Northern District of New York and

15  elsewhere, the defendant Dean Sacco did travel in interstate

16  commerce for the purpose of engaging in illicit sexual

17  conduct with a minor under the age of 18.  One of the

18  elements is that one of the purposes of defendant's travel

19  across state lines was to engage in illicit sexual conduct

20  with another person and you say, Kelly, that's got to be a

21  dominant purpose.  In other words, he wasn't coming up here

22  to be with Shannon.  He was coming up here to fix the house

23  up so it could be rented?

24               MR. FISCHER:  Well, and there's language in

25  this decision, US against Sarios, this relates to 2251.  As I

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1     re-read this, it applies to 2251.  At some point in 2251
2     there's a charge that as long as the travel is in connection
3     with the illicit purpose.  As I re-read this, it doesn't just
4     apply to Mr. Sacco traveling up for count six.  I believe it
5     also applies to the earlier counts, 2251 count.  In that case
6     it was a camping trip.  It was alleged, the defense was that
7     it was a spur of the moment event.
8                 THE COURT:  It's got to be a dominant motive
9     but it can be one of several dominant motives so you want
10    that in this charge, don't you, Kelly?
11                MR. FISCHER:  Yes.  And the remaining portion
12    of that where it says not just incident to the travel.
13                THE COURT:  Okay.  Let's see.  Accordingly, we
14    hold that a jury may find a violation of 2251A so long as the
15    evidence shows that illegal sexual activity for the
16    production of visual depictions of that activity was one of
17    the dominant motives for the interstate transportation of the
18    minors and not merely an incident of transportation.
19                MR. FISCHER:  Yeah, that was the nature of the
20    Mann Act, that they traveled over interstate lines.  I think
21    that rule with respect to traveling across state lines, not
22    just being one of the purposes, but it having to be a
23    dominant purpose.  One of the dominant purposes.  I think
24    that language is what applies to the -- in principal to these
25    charges.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1          MISS PEEBLES:  I think there are other

2     circuits that address that and that is one of the things that

3     they say in the others that we looked at.  We didn't focus on

4     that particular count.

5          THE COURT:  It's not your client's problem.

6          MISS PEEBLES:  But I did see that.

7          MR. LOVRIC:  I've seen case law from the

8     circuit saying it has to be one of the purposes for

9     traveling.

10         MISS PEEBLES:  Dominant I think.

11         MR. LOVRIC:  I've never seen that language

12    dominant but I seen it saying one of the purposes for going.

13    It can't be just that you happen to be in Vegas on vacation

14    and with no evidence of anything except you're there, you

15    have sex with a minor, that would not violate the statute.

16         MR. EGAN:  Or like the August occasion,

17    assuming it happened.

18         MR. LOVRIC:  Yeah, the August, the first one

19    they may conclude that doesn't violate the statute but the

20    others one do.  Well, Sacco just came up to let them in or

21    whatever, check his rent or whatever.  Make sure the tenants

22    were coming in and then he rapes her.

23         MR. FISCHER:  That's consistent with your

24    argument really that he comes up more frequently afterward.

25         MR. LOVRIC:  After first, second, third.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1990

1    After that if he is coming up, I'm going to fix up the

2    apartment and, by the way, I know Shannon's up there, I'll

3    have a good time with her.  As long as that's one of the

4    purposes, it violates the statute.

5              THE COURT:  I'll put the word dominant in.

6    We'll take a look at it before we go to the jury, remind me,

7    and we'll decide whether that word comes in or stays out.

8              MR. FISCHER:  Also, again, the incidental

9    aspect of that holding that it cannot have just been an

10   incident to the interstate travel is important in this case

11   because I think that that conforms to what the proof is here.

12   That at least originally it was a coincidental coincidence of

13   two maelstroms.

14             MR. LOVRIC:  The only difficulty with that is

15   it dilutes the original part of the charge which it has one

16   purpose.  If you start saying it can't be incidental then

17   you're like starting to backtrack on what you said.  It has

18   to be one of the purposes.  It's one of the purposes.  It

19   means it has to be thought out process.  It can't be just the

20   person happens to be there.

21             MR. FISCHER:  I think they're entirely

22   incident that it must be a dominant purpose, not a

23   coincidence.  Those two reside side by side in piece.

24   There's no problem with those two being submitted in the same

25   breath.

1          MR. LOVRIC:  I don't know about that.

2          THE COURT:  We're still on the record so

3   let's -- I'll read once again the holding of Judge Calabresi

4   in the Second Circuit Court of Appeals, US versus Sarios, 87

5   Fed 3rd 34, at paragraph 21.  Accordingly, we hold that a

6   jury may find a violation of 2251A so long as the evidence

7   shows that illegal sexual activity for the production of

8   visual depictions of that activity was one of the dominant

9   motives for the interstate transportation of the minors and

10  not merely an incident of the transportation.  And I think

11  what counsel for Mr. Sacco wants me to do is not only use the

12  words, one of the dominant motives, but also incorporate into

13  the charge that it was not an incident of the transportation

14  and I think that language refers to the bringing of a person

15  across a state line for purposes of having sexual activity

16  and may not be applicable to the situation where a person

17  comes up here or one of the dominant purposes is to engage in

18  the activity for the purpose of making the depiction.  He

19  brings a camera with him but he doesn't bring the person with

20  him.  I'm not sure that's a distinction but it doesn't seem

21  like it would apply here.  I'll give you an exception for not

22  adding that in.

23          MR. FISCHER:  Thank you.

24          THE COURT:  Off the record.

25          (Discussion held off the record)

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1     (Court stands adjourned)

2          C E R T I F I C A T I O N

3

4

5          I, VICKY A. THELEMAN, RPR, CRR, United

6     States Court Reporter in and for the United States

7     District Court, Northern District of New York, do

8     hereby certify that I attended at the time and place

9     set forth in the heading hereof; that I did make a

10    stenographic record of the proceedings had in this

11    matter and cause the same to be transcribed; that

12    the foregoing is a true and correct copy of the same

13    and the whole thereof.

14

15

16                    _____

17                    VICKY A. THELEMAN, RPR, CRR

18                    United States Court Reporter

19                    US District Court - NDNY

20

21

22    Dated:  August 25, 2008.

23

24

25