1993

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------------------

4    UNITED STATES OF AMERICA,

5                    -versus-                    08-CR-77

6    LINDA O'CONNOR and DEAN SACCO.

7    ----------------------------------------------------------

8                    TRANSCRIPT OF JURY TRIAL

9    held in and for the United States District Court,

10   Northern District of New York, at the Federal Building and

11   Courthouse, 15 Henry Street, Binghamton, New York, on

12   FRIDAY, May 23, 2008, before the HON. THOMAS J. McAVOY,

13   Senior United States District Court Judge, PRESIDING.

14   APPEARANCES:

15   FOR THE GOVERNMENT:

16   UNITED STATES ATTORNEY'S OFFICE

17   BY:  MIROSLAV LOVRIC, AUSA

18        Binghamton, New York

19   FOR THE DEFENDANT O'CONNOR:

20   FEDERAL PUBLIC DEFENDER'S OFFICE

21   BY:  LISA PEEBLES, AFPD

22        Syracuse, New York

23   FOR THE DEFENDANT SACCO:

24   KELLY FISCHER, ESQ.

25   Binghamton, New York

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1        (At the bench)

2        THE COURT:  The government made an application

3    to exclude Mrs. Dinunzio, Mr. Sacco's witness, on the ground

4    that she was here in the courtroom for several days during

5    the trial, and that's true, she was, but nobody asked to have

6    her excluded, and even though there's a rule about having

7    witnesses who are in the courtroom excluded on request of

8    counsel, no such request was forthcoming.  And I've made of

9    an inquiry of Mr. Fischer.  He indicates the topics the

10   witness Mrs. Dinunzio will testify about are background

11   material about Mr. Sacco and also about his trips to Norwich

12   and working on the Fair Street house so that the Court

13   doesn't see there's any prejudice possibly that the

14   government could have because of this situation.  So I'm

15   going to deny the government's application and give him an

16   exception to take on the appeal.

17        MR. LOVRIC:  Can I just put on the record,

18   Judge, if I had known that she was going to be a witness for

19   the defense, I would have asked, but I did not have or

20   receive any witness list so I assumed Mr. Sacco did not

21   intend to put on any witnesses other than himself.  I would

22   certainly have brought that to everybody's attention if I was

23   aware of it.  But I had no indication she would be a witness

24   any more than a lot of other people who sat through this

25   trial as spectators and who are not witnesses.  So that's --

1    that's the basis of my objection, which I think it's a

2    violation of sequestration under the federal rules.

3                  THE COURT:  Okay.  Who else do you have, Mr.

4    Fischer?

5                  MR. FISCHER:  Some people who worked on the

6    house and hopefully a T-Mobile guy who said he was going to

7    be here at 9:30 this morning to talk about Dean Sacco to show

8    there was not coverage in the Norwich area.  If he was making

9    these calls, it couldn't have been from the Norwich area.

10                 THE COURT:  No cellphone coverage.

11                 MR. FISCHER:  No cellphone for T-Mobile.

12                 (In open court)

13                 (Jury present)

14                 THE COURT:  Morning, ladies and gentlemen.

15   Short day today?  The lawyers will make it seem long, don't

16   worry.

17                 All right.  Mr. Fischer, who do you got for

18   us?

19                 MR. FISCHER:  Thank you, your Honor.  I'll

20   first call Terry Kuhn.

21                 THE CLERK:  Sir, please come forward and state

22   your name for the record.

23                 THE WITNESS:  Terry Kuhn, K-U-H-N.

24

25

Terry Kuhn - Direct

```
 1   T E R R Y    K U H N, having been called as a witness,

 2   being duly sworn, testified as follows:

 3                   THE COURT:  Okay, Mr. Fischer.

 4                   MR. FISCHER:  Thank you, your Honor.  May it

 5   please the Court.

 6   DIRECT EXAMINATION

 7    BY MR. FISCHER:

 8       Q    Sir, would you state your full name for the record,

 9   please.

10       A    Terry Gunther Kuhn.

11       Q    Where do you live?

12       A    Norwich, New York.

13       Q    Are you employed?

14       A    Yes.

15       Q    What kind of work do you do?

16       A    I have two jobs.  I'm a career firefighter for the

17   City of Norwich Fire Department and I also own a tree

18   service.

19       Q    With respect to your work in the tree service

20   business, did you have occasion to enter into an agreement

21   with Mr. Dean Sacco?

22       A    Yes.

23       Q    Where was the work to be performed?

24       A    In Norwich.

25       Q    What work were you supposed to do for Mr. Sacco?
```

Terry Kuhn - Direct

1997

1    A    Remove two trees.

2    Q    Do you know where that work was to be done?

3    A    Forty-five Fair Street in the City of Norwich.

4    Q    Do you remember when you first had contact with Mr.

5  Sacco about having that work done?

6    A    Yeah, on the phone.

7    Q    Yes.

8    A    On the telephone.

9    Q    Okay.  Do you remember when that was when you first

10  spoke with Mr. Sacco about it?

11    A    He spoke to my wife.  July 5 of 2006 is the date

12  that he originally called to request an estimate.

13    Q    Did you give him an estimate?

14    A    Yes.

15    Q    Do you remember when that was done?

16    A    August 11 of 2006 is the invoice date.  Would have

17  been -- I don't have the date for sure of when we would have

18  done it on the phone.  I don't have that record.  It was

19  faxed back and forth, if I remember correctly.

20    Q    The estimate that you gave to Mr. Sacco, you

21  communicated that to him by telephone or by personal meeting?

22    A    No.  By telephone.

23    Q    And that was done prior to the date of the invoice?

24    A    Yes.

25    Q    The date of the invoice is August 11, 2006, am I

Terry Kuhn - Direct

1    correct?

2        A    Yes.

3        Q    When was the work done?

4        A    Would have been the 11th.

5        Q    August 11?

6        A    I would imagine it would have been the 11th, yes.

7        Q    Is there some uncertainty whether, in fact, it was

8    done on the 11th or are you pretty sure about that?

9        A    I don't have my daily book with me.  I can't answer

10   that, whether it was exactly the 11th or not, but that's the

11   date the invoice was generated.

12       Q    Does your tree service business have a regular

13   course of practice with respect to when you create and send

14   invoices in relation to when the work is done?

15       A    They're not done daily, no.

16       Q    So you can say that the work was done on or before

17   August 11 of 2006?

18       A    Yes.

19       Q    Do you remember doing the work at the house?

20       A    Yes.

21       Q    Who was present when you did the work, if you

22   recall?

23       A    Myself, my father and one employee.

24       Q    Was Mr. Sacco present when you did that work?

25       A    No.

Terry Kuhn - Direct

1    Q    Had you ever met Mr. Sacco in Norwich on or before

2    August 11 of 2006?

3    A    No.

4    Q    You had had telephone conversations with him prior

5    to August 11?

6    A    Yes.

7    Q    What telephone number did you use for your

8    business?

9    A    For him to contact me, my business number is

10   (607)334-9000.  I also have a cellphone I use as well.

11   Q    What was the cellphone number that you used back at

12   that time?

13   A    I believe it was (607)226-3844.

14   Q    So if Mr. Sacco and you had conversations during

15   that August 11 date and prior, it would have been one of

16   those two numbers that you just mentioned?

17   A    Yes.

18   Q    How much did you charge Mr. Sacco to do the work?

19   A    The grand total, including tax, was 1701, so it was

20   $1,575 plus tax.

21   Q    You sent the invoice to Mr. Sacco.

22   A    Yes.

23   Q    Has he paid you for that?

24   A    No.  Not fully.

25   Q    Did he make any partial payment?

Terry Kuhn - Direct                                    2000

1      A     Yes, $200.

2      Q     When did he make that partial payment?

3      A     February 10 of 2007.

4      Q     Going back to the date on or before August 11, 2006

5   when you did the work at 45 Fair Street, do you remember

6   whether anybody else -- do you remember whether anybody was

7   living in the building at 45 Fair Street?

8      A     I don't know.

9      Q     And I may have asked you, but I need to ask you to

10  make sure I get it.  Did you ever meet personally with Mr.

11  Sacco on or before August 11, 2006?

12     A     No.

13     Q     To your recollection, did you ever meet with Mr.

14  Sacco personally on any occasion other than February 10,

15  2007?

16     A     Not that I remember.

17     Q     Those are all the questions I have.  Thank you.

18                THE COURT:  Okay, Miss Peebles?

19                MISS PEEBLES:  No questions, your Honor.

20                THE COURT:  Mr. Lovric?

21                MR. LOVRIC:  Just a couple questions.

22  CROSS-EXAMINATION

23   BY MR. LOVRIC:

24     Q     How you doing, Mr. Kuhn.  We'll get you out of here

25  real soon.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Terry Kuhn - Cross

1     A     Okay.

2     Q     Are you self-employed or is it a family business?

3     A     It's a family business, an LLC.

4     Q     Okay.  And who works in the family business?

5     A     My father and myself, and my wife does the

6  secretary work.

7     Q     Okay.  It sounds like cheap labor.

8     A     Not really.

9     Q     And when you went over to do the work at 45 Fair

10  Street, I think you indicated to us you were there, your

11  father, and there was an employee with you.

12     A     Yes.

13     Q     The employee, is that a regular employee that you

14  utilize to help you out?

15     A     Yes.

16     Q     Okay.  And when you did the work there at 45 Fair

17  Street, were you there the whole time the work was done?

18     A     I believe so, yes.

19     Q     And Mr. Sacco still owes you how much money, about?

20     A     $1,704.56.

21     Q     Oh, he still owes that much?

22     A     Yes.  He still owes that much.  He's only paid

23  $200.  We did finance charges on top of that.

24     Q     Okay.  I see.

25          MR. LOVRIC:  Okay.  That's all the questions I

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Zaid Kurdieh - Direct                                    2002

```
 1  have.  Thank you, Mr. Kuhn.
 2                  THE COURT:  Mr. Fischer, anything further?
 3                  MR. FISCHER:  No, your Honor.  Thank you.
 4                  THE COURT:  Miss Peebles?
 5                  MISS PEEBLES:  No, your Honor.
 6                  THE COURT:  Thank you, Mr. Kuhn.  You may step
 7  down, sir.
 8                  (Witness excused)
 9                  THE COURT:  Okay.  Mr. Fischer, who is next?
10                  MR. FISCHER:  Thank you, your Honor.  I'll
11  call Zaid Kurdieh, and I'll get him.
12                  THE CLERK:  State your name for the record.
13                  THE WITNESS:  Zaid Kurdieh, Z-A-I-D,
14  K-U-R-D-I-E-H.
15
16
17
18
19
20
21
22
23
24
25
```

Zaid Kurdieh - Direct

1  Z A I D   K U R D I E H, having been called as a witness,

2  being duly sworn, testified as follows:

3  DIRECT EXAMINATION

4  BY MR. FISCHER:

5      Q    Sir, would you state your full name for the record,

6  please.

7      A    Zaid Kurdieh.

8      Q    Successfully mispronounced your first and last

9  names.

10          Sir, where do you live?

11      A    I live in Norwich, New York.

12      Q    What's the nature of your employment?

13      A    I operate an organic farm.

14      Q    How long have you done that?

15      A    Since 1998.

16      Q    Do you have other people who work with you in that

17  business?

18      A    Yes, I do.

19      Q    Can you tell the jury a little bit about how that

20  operation works, please.

21      A    We produce organic fruits, vegetables and chicken

22  and -- in Norwich, and we transport them primarily to New

23  York City and sell them at greenmarkets as well through a

24  system called CSAs.

25      Q    How is your produce, etcetera transported to those

Zaid Kurdieh - Direct

2004

1   markets?

2       A    We have trucks that transport the produce to the

3   markets.

4       Q    These are your vehicles that you own?

5       A    Yes, these are vehicles that are owned by the

6   business.

7       Q    Do you hire people to drive for you?

8       A    Yes, we do.

9       Q    Did there come a time when you met Mr. Sacco,

10  Mr. Dean Sacco?

11      A    Yes, I did.

12      Q    When was that?

13      A    That was approximately in September of 2006.  I put

14  an ad in the paper for a driver and he answered the ad.

15      Q    Do you remember when you first met with Mr. Sacco?

16      A    Yes, I do.

17      Q    When was that?

18      A    That was, again, approximately September of 2006.

19      Q    Do you remember that first meeting with him?

20      A    Yes, I do.

21      Q    Did you hire Mr. Sacco?

22      A    Yes, I did.

23      Q    What work did you hire Mr. Sacco to do?

24      A    Hired him to drive our trucks to New York City.

25      Q    When did he begin that work?

Zaid Kurdieh - Direct

1    A    In September of 2006.

2    Q    Do you remember whether it was early, mid or late

3  September when he began working?

4    A    Probably the first week of September.

5    Q    And how frequently did Mr. Sacco do work for you

6  after you first hired him?

7    A    Approximately once or twice a week he drove truck

8  to New York City.

9    Q    Was that once or twice every week?

10    A    It was every week until the CSAs were done for the

11  year.  So it was a seasonal job.

12    Q    When were the CSAs done for the year?

13    A    They were done in early November.

14    Q    So from September when Mr. Sacco was hired until

15  early November, he was driving for you one to two times per

16  week?

17    A    Yes.

18    Q    Were there particular days when Mr. Sacco would

19  drive for you?

20    A    Yes.  CSA day, which I can't remember exactly.  It

21  was either probably a Wednesday or a Thursday.

22    Q    What time frames did he do this work, like on a

23  daily -- if he was going to drive for you say on a Wednesday,

24  explain how that time -- how the day would work timewise,

25  please.

Zaid Kurdieh - Direct

1      A    He would come and pick up the truck in the morning

2  and set out to drive to New York City, and then he would come

3  back, so it would be roughly say from 6 to 6 or 6 to 7.

4  That's the normal time frame that it takes to deliver the

5  produce.

6      Q    6 AM to 6 PM?

7      A    On occasion he also kept the truck in New Jersey

8  because it would -- he had other things to do and we would

9  allow him to keep the truck down there and then bring it back

10 later on, so occasionally that happened.

11     Q    Was Mr. Sacco a good employee?

12     A    Yes, he was.

13     Q    Do you know whether Mr. Sacco had any other

14 business in the Norwich area?

15     A    No, I'm not aware of any other business.

16     Q    Do you know whether he owned property in the

17 Norwich area?

18     A    Yes, he always talked about his house.  We had

19 discussions about his house.

20     Q    While Mr. Sacco worked for you, how frequently

21 would you have personal contact with him?

22     A    We visited with him.  We had him over for dinner

23 with a friend of his from New Jersey.

24     Q    Do you remember who that person was?

25     A    Yes.  Her name was Mary.  She was Egyptian and she

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Zaid Kurdieh - Direct                                    2007

1   spoke the same language that I speak, so we invited her

2   because it was contemplation of perhaps getting married.

3        Q    What language is that?

4        A    Arabic.

5        Q    Were you able to converse with her in Arabic?

6        A    Yes.

7        Q    Do you remember approximately when that was Mary

8   and Mr. Sacco came to your home for dinner?

9        A    Exactly when, I don't remember, no.

10       Q    Do you have any best estimate of when that was?

11       A    Possibly October.

12                MR. FISCHER:  Those are all the questions I

13  have at this time.  Thank you.

14                THE COURT:  Miss Peebles?

15                MISS PEEBLES:  I have no questions, your

16  Honor.

17                THE COURT:  Mr. Lovric.

18                MR. LOVRIC:  I just have a couple, Judge.  If

19  I can have a minute.

20                Judge, if I can have a minute to review a

21  document of mine.

22                THE COURT:  Okay.

23  CROSS-EXAMINATION

24  BY MR. LOVRIC:

25       Q    Good morning, Mr. Kurdieh.

Zaid Kurdieh - Cross

2008

1      A      Kurdieh.

2      Q      Mr. Kurdieh, I just want to ask you a few questions

3  about Mr. Sacco.  During the time that you knew Mr. Sacco and

4  had conversations with him, do you recall a conversation

5  where Mr. Sacco told you about traveling out of the country

6  to meet a woman that he had met on the internet?

7      A      I vaguely remember a conversation about him

8  traveling to meet a woman, but I'm not a hundred percent

9  certain of that.

10      Q      Okay.  Did Mr. Sacco indicate to you how old this

11  woman was that he talked about?

12      A      If he did, I don't remember.

13      Q      Okay.  Did he ever mention anyone of the age of 15

14  or 17 or the country of the Dominican Republic to you?

15      A      No.

16      Q      Mr. Kurdieh, during the time that Mr. Sacco did

17  work for you, he also told you that he was working in New

18  Jersey at a furniture place, Glenwood Furniture?

19      A      Yes.

20      Q      And at the time that he was working for you, he

21  indicated to you that he was traveling back to New Jersey

22  also doing work at the Glenwood Furniture?

23      A      Yes.

24      Q      And that's how you came to kind of have this

25  understanding with him that if he was driving a truck for

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Zaid Kurdieh - Cross                                    2009

1    you, then he could go over to New Jersey, keep the truck

2    while he did what he had to do in New Jersey, and then come

3    back up to New York State?

4         A    Correct.

5         Q    Now, during the time that Mr. Sacco worked for your

6    business, were there times when he would call you from his

7    cellular telephone?

8         A    Yes.

9         Q    And did you also communicate with him sometimes

10   calling him on his cellphone?

11        A    Yes.

12        Q    Did you also from time to time call him at the

13   Glenwood Furniture place?

14        A    Yes.

15        Q    And you were able to reach him when you called him

16   there?

17        A    Yes.

18        Q    And when he drove the truck for you, from your

19   business down to New York City, did you ever call him on his

20   cellphone when he's en route driving down there?

21        A    I believe I could have.  I don't specifically

22   remember doing that, but we do that in the normal course of

23   business as drivers.

24        Q    And did Mr. Sacco at some point tell you about

25   buying a house up in the Norwich area?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Zaid Kurdieh - Cross

1    A    Yes, he did.

2    Q    Do you remember the address?

3    A    No, I don't remember the specific address.

4    Q    Okay.  But it was a house right in Norwich?

5    A    Yes.

6    Q    And did Mr. Sacco at some point actually tell you

7  that the tenants that were living upstairs were moving out

8  because of a heating situation, a heating problem?

9    A    Yes, he did.

10   Q    Do you recall that?

11   A    Yes, I do.

12   Q    Did he tell you the tenants upstairs were an

13 elderly couple?

14   A    Yes.

15   Q    The reason they were moving, they're elderly, they

16 really couldn't take the cold heat -- based on the heating

17 problem he had?

18   A    Yes.

19   Q    So Mr. Sacco then told you the upstairs apartment

20 was going to be vacant once this elderly couple moved out?

21   A    Yes.

22   Q    And did Mr. Sacco at some point also tell you and

23 confide in you that the tenants downstairs were not paying

24 their rent on time?

25     A    He did so, and he also sent a letter to that effect

Zaid Kurdieh - Cross

2011

1    while he was in jail in Norwich.

2        Q    Okay.  And in fact, in that letter that he sent

3    you, somewhere around September of 2006, he wrote in that

4    letter and said:  Neither tenant has paid rent for the past

5    five months.  I'm losing my house.  Is that what he wrote to

6    you?

7        A    Yes.

8        Q    And when he wrote this letter to you from jail, he

9    indicated that he had some problems with his downstairs

10   tenants and he writes, between December and February and in

11   March they had had me arrested.  Is that pretty much what he

12   said?

13       A    Yes.

14       Q    Mr. Kurdieh, I'd like to show you what I've marked

15   as Exhibit 125.  If you can take a look at that document.  Do

16   you recognize that?

17       A    Yes, I do.

18       Q    What is that?

19       A    That is the letter that we received from Dino, but

20   I don't believe it was September of 2006.  I can't remember

21   exactly when it was received.

22       Q    Okay.  That's the letter you got from Mr. Sacco?

23       A    Yes, it is.

24            MR. LOVRIC:  Judge, I would offer Government

25   Exhibit 125 into evidence.

Zaid Kurdieh - Cross                                      2012

1              MISS PEEBLES:  No objection.

2              MR. FISCHER:  May I voir dire, your Honor?

3              THE COURT:  Sure.

4    VOIR DIRE EXAMINATION

5     BY MR. FISCHER:

6         Q    Sir, this is dated 01 S-E-P-T, September.  This is

7    in September of 2006 or September 2007?

8         A    I believe we got the letter in September 2007.

9         Q    After Mr. Sacco had been incarcerated for about six

10   months at that point?

11        A    The time frames I'm not very familiar with because

12   I learned of these things rather late.

13             MR. FISCHER:  Those are all the questions I

14   have.  I have no objection.  Thank you.

15             THE COURT:  All right.  Receive Government's

16   125 in evidence.

17             MR. LOVRIC:  That's all the questions I have.

18   Thank you, Mr. Kurdieh.

19             THE COURT:  Mr. Fischer, any further questions

20   of this witness?

21             MR. FISCHER:  Yes, your Honor.

22   REDIRECT EXAMINATION

23    BY MR. FISCHER:

24        Q    Sir, the testimony that you gave concerning a

25   problem with the upstairs tenants and the heating system, do

Zaid Kurdieh - Redirect

1    you recall when that -- when that occurred?  Was it while he

2    was working with you?

3        A    It was definitely while he was working with me.  We

4    discussed that because he was concerned because the tenants

5    had been there for a while and he was trying to get a heating

6    system so that they could stay there because they were

7    elderly and he was concerned and he wanted to keep good

8    tenants, so we had discussions about that.

9        Q    And, in fact, was a heating system delivered to

10   your loading dock at the Norwich Meadows Farms?

11       A    Yes.

12       Q    Do you remember how that happened?

13       A    He asked if we would allow that, and we did, so a

14   heating system was delivered to our loading dock.

15       Q    Do you remember why he asked that it be delivered

16   to your place of business at Norwich Meadow Farms rather than

17   directly to the house at 45 Fair Street?

18       A    Exactly I don't, but I think it may be related that

19   he wasn't available at the time because he traveled to his

20   other job.

21       Q    Do you remember what kind of a heating system, hot

22   air, boiler, some other kind of heating system?

23       A    I think it was hot air, but I can't be certain.

24       Q    Do you remember seeing the system that was

25   delivered?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Zaid Kurdieh - Redirect

```
 1      A    I remember seeing it on the loading dock.

 2      Q    How big was it?

 3      A    Approximately possibly three by five and a half

 4   feet.

 5      Q    Did Mr. Sacco or anybody else eventually come and

 6   take that heating system from your loading dock?

 7      A    Yes.

 8      Q    Do you remember who did that?

 9      A    No, I don't.

10      Q    Were you present when that was done?

11      A    I don't remember if I was.  I don't think so.

12      Q    With respect to telephone contact with Mr. Sacco,

13   when you -- when Mr. Sacco was driving for you, you mentioned

14   that you would call him while he was driving?

15      A    I may have called him while he was driving as a

16   matter -- because it's a long day and there's issues

17   remaining to discuss in terms of delivery.  I don't remember

18   specifically talking to him on any particular time, but

19   that's what we do as a matter of course with our drivers; we

20   call them and talk to them, make sure everything is going

21   okay.

22      Q    What telephone numbers did you use for your

23   business to make those calls?

24      A    I may have used my cellphone and/or my office phone

25   but most likely my cellphone.
```

Zaid Kurdieh - Redirect                    2015

1       Q     Can you state for the record, please, what those
2   phone numbers were.
3       A     Sure.  (607)316-4474 is my cellphone number and
4   (607)336-7598 is the office number.
5       Q     Was Mr. Sacco able to use -- withdraw that.  Did
6   Mr. Sacco have a cellphone?
7       A     Yes.
8       Q     Was he able to use that cellphone when he was in
9   Norwich?
10      A     I don't remember if he was or wasn't.  I vaguely
11  remember that he possibly wasn't able to because he might not
12  have had a service that worked in Norwich.
13      Q     I'm sorry.  Were there ever occasions when he asked
14  to use your phones?
15      A     I can't remember.
16      Q     Did Mr. Sacco ever work for you on Saturdays?
17      A     He may have.  I think he worked for us while we
18  were showing him how to plan things on a Saturday, I believe.
19      Q     When you say how to plan things, how to plan
20  produce?
21      A     Produce.
22      Q     Were there ever occasions when Mr. Sacco would
23  arrange things on the vehicles on Saturday that were to be
24  delivered later on?
25      A     There may have been, yes.

Zaid Kurdieh - Redirect                                    2016

1        Q      Do you have any recollection of those events?

2        A      Not specifically.

3               MR. FISCHER:  Those are all the questions.

4   Thank you.

5               THE COURT:  Miss Peebles?

6               MISS PEEBLES:  I have no questions.

7               THE COURT:  Mr. Lovric?

8               MR. LOVRIC:  No further questions.

9               THE COURT:  Okay.  Thank you, sir.  You may

10  step down.

11               (Witness excused)

12               MR. FISCHER:  Your Honor, we have a

13  representative from T-Mobile present.  I don't have a name,

14  but I can go get the person.

15               THE COURT:  Why don't you go find out and you

16  can call him or her.

17               THE CLERK:  State your name for the record.

18               THE WITNESS:  Michael Keiser, K-E-I-S-E-R.

19

20

21

22

23

24

25

Michael Keiser - Direct

1   M I C H A E L    K E I S E R, having been called as a witness,

2   being duly sworn, testified as follows:

3                    THE COURT:  Okay, Mr. Fischer.

4                    MR. FISCHER:  Thank you, your Honor.  May it

5   please the Court.

6   DIRECT EXAMINATION

7    BY MR. FISCHER:

8        Q    Sir, would you tell the jury your full name,

9   please.

10       A    Michael Keiser; Michael Louis Keiser.

11       Q    Where do you live?

12       A    I live in Great Bend, PA.

13       Q    What's the nature of your employment?

14       A    I sell cellphones for different companies.  One of

15   them is T-Mobile.

16       Q    Are you an authorized T-Mobile representative?

17       A    Yes.

18       Q    Are you familiar with what areas of reception that

19   T-Mobile gets in say the Norwich, New York area?

20       A    Yes.

21       Q    How are you aware of that?

22       A    By different addresses, we're able to check what

23   the service looks like on the address.

24       Q    Is there a map that can be used to determine where

25   there is and is not service for T-Mobile?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Keiser - Direct                           2018

1       A    Yes.

2       Q    And did you bring that map with you today?

3       A    Yes.

4       Q    Is this the document, sir?

5       A    Yeah.

6       Q    Sir, I will show you Defendant's Exhibit S-28.

7  What is that?

8       A    This top sheet, I did a search of my address,

9  actually, and it shows different kinds of service that you

10  can -- you get.  The darker greens show the -- where you get

11  more bars.  The lighter green, you have less bars.  I pulled

12  up an address on Yahoo for YMCA, and that's right in the

13  middle of Norwich, and you can obviously see there's no

14  green, so they don't have any service in Norwich, at least

15  not in downtown.

16      Q    When did you do that?

17      A    I think it was Wednesday.

18      Q    Do you know whether service is better or worse now

19  than it was say a year ago?

20      A    That I don't.  I didn't work there long enough.

21      Q    But it's clear that there is no cellphone service

22  for a T-Mobile telephone in downtown Norwich, am I correct?

23      A    That's correct.

24           MR. FISCHER:  Those are all the questions.

25  Thank you.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Michael Keiser - Direct

1              THE COURT:  Miss Peebles?

2              MISS PEEBLES:  I have no questions.

3              THE COURT:  Mr. Lovric?

4    CROSS-EXAMINATION

5    BY MR. LOVRIC:

6         Q    Can I take a look at that map?

7         A    Yeah.

8         Q    Thank you.  Mr. Keiser, how you doing?

9         A    How are you?

10        Q    Good.  Just a few questions, Mr. Keiser.

11        A    Sure.

12        Q    As I look at this map, if I understand this

13   correctly, the second page of this map is the immediate

14   downtown area of Norwich, is that right?

15        A    Well, it's actually pinpointed exactly to the YMCA.

16        Q    Okay.  And it indicates as to this exact pinpoint,

17   there's no coloring, light green or anything like that?

18        A    Yeah.

19        Q    What happens with the T-Mobile coverage let's say a

20   mile outside of downtown Norwich?

21        A    That I wouldn't know.  I know that in that

22   surrounding area there's generally not good T-Mobile service.

23        Q    Okay.  I'm sorry.

24        A    I was going to say, as a representative, I wouldn't

25   recommend getting that type of service which -- unless

Michael Keiser - Cross

1    they've got hot spots, which I'm not going to go into.

2         Q    I don't want to talk about hot spots either.  Is it

3    fair to say, Mr. Keiser, in Upstate New York, Norwich, a lot

4    of different Upstate New York areas, coverage will be spotty?

5    You go over one hillside, you might have some coverage, you

6    go over another hillside and you have no coverage?

7         A    Yeah.  That's generally true.  Since I sell three

8    different types, I can tell you that T-Mobile is a big city,

9    populated cellphone company.  They put most of their towers

10   in like city areas.  They're not like too much into their

11   country areas yet.

12        Q    I take it like a lot of cell companies, T-Mobile

13   also has a lot of coverage on the highways?

14        A    Yes.

15        Q    Interstate?

16        A    Yes.

17        Q    If you've got a T-Mobile phone, you're going up

18   interstate 81 or 88, you're going to get decent coverage?

19        A    Up 81 probably; 88, probably not.

20        Q    Depends on where, if you're like close to

21   Binghamton or close to a larger city?

22        A    Yeah.  Yeah.  Depending on how large the cities

23   are.  I haven't tested T-Mobile myself out that far.  I have

24   AT&T myself.

25        Q    You work for T-Mobile and you work for AT&T?

Michael Keiser - Cross                    2021

1       A     Yeah.

2       Q     Do they know that?

3       A     Well -- they might now.

4       Q     How about Route 17, for example?

5       A     It should work in that area because Elmira is the

6   next biggest city.  It's a highly college-populated area.  So

7   they'll get service out that way.

8       Q     So if I understand your testimony, T-Mobile may not

9   be the service of choice that you're going to want to buy if

10  you live in the Upstate New York area, but from time to time

11  and from area to area, you may get spotty coverage; may not

12  be the four or five bars that you want, but you're going to

13  get some coverage?

14      A     Yeah.  But showing over Norwich, there's no

15  coverage there, and there wasn't any roaming like anywhere in

16  the vicinity.

17      Q     Okay.  But that's as to literally like a square --

18  12-square-block area that you're talking about?

19      A     That's true too.

20      Q     Correct.  So if you go a couple miles outside of

21  Norwich, that may be different, you may have some coverage?

22      A     Yeah.  But if you lived right in Norwich, you

23  wouldn't have good service.

24      Q     So like if you live right down in downtown Norwich,

25  T-Mobile is not the one you want to have for your house?

Michael Keiser - Cross

1     A     Correct.

2     Q     You're not going to make any calls.  Let's say if

3  you live in Jersey City, New Jersey, for example, T-Mobile

4  has great coverage there?

5     A     Probably.

6     Q     Big city?

7     A     Probably.

8     Q     Okay.  And if you drive through Upstate New York,

9  there will be places where you're going to have some

10  coverage?

11     A     M-m h-m-m.

12     Q     Okay.

13           MR. LOVRIC:  That's all I have, Judge.

14           MR. FISCHER:  Just a few to follow up.

15           THE COURT:  Okay.

16  REDIRECT EXAMINATION

17   BY MR. FISCHER:

18     Q     Sir, with respect to Route 17 coverage Mr. Lovric

19  asked you about, you talked about Route 17 having coverage

20  because of Elmira, Elmira College, heavy population.  That's

21  traveling from Binghamton traveling west on 17?

22     A     That's correct.

23     Q     If you travel on Route 17 east going down toward

24  New York, what's the coverage like there?

25     A     That I'm not too sure.  I think it's actually

Michael Keiser - Redirect

1  pretty decent.  Just because it's going down towards New York
2  City and they definitely have great coverage in New York
3  City.

4       Q    With respect to say Deposit or Fishs Eddy, do you
5  know what kind of coverage they have in those areas?

6       A    Probably going to be a little spotty because it
7  gets off the highway a little bit, and I think that's
8  generally a country area too.  I've been through Deposit
9  once.  I wouldn't expect T-Mobile to have great service
10 there.

11      Q    With respect to the coverage that did exist in the
12 area around Norwich, do you know how far out of downtown one
13 would need to travel in order to pick up T-Mobile coverage?

14      A    I wouldn't know exact miles, but I would -- can
15 make an assumption that you have to at least make it to the
16 next biggest -- like either major highway or biggest city.
17 Even my AT&T coverage is spotty out in that area, and I have
18 pretty good coverage anywhere.

19           MR. FISCHER:  Thank you very much.

20           THE COURT:  Anything further of this witness?

21 RECROSS-EXAMINATION

22 BY MR. LOVRIC:

23      Q    That's your assumption, right?

24      A    That's my assumption.

25           MR. LOVRIC:  Thank you.

Michael Keiser - Redirect                          2024

1              THE COURT:  Okay.  Thank you, Mr. Keiser.  You
2    may step down, sir.
3                   (Witness excused)
4              MR. FISCHER:  Your Honor, we'll call Elizabeth
5    Dinunzio, please.
6              THE CLERK:  Please state your name for the
7    record.
8              THE WITNESS:  My name is Elizabeth Maria
9    Dinunzio.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Michael Keiser - Redirect                    2025

```
 1   E L I Z A B E T H   M.   D I N U N Z I O, having been called

 2   as a witness, being duly sworn, testified as follows:

 3                    THE COURT:  Okay, Mr. Fischer.

 4                    MR. FISCHER:  Thank you, your Honor.

 5   DIRECT EXAMINATION

 6    BY MR. FISCHER:

 7        Q    Would you state your full name for the record,

 8   please.

 9        A    Yes.  My name is Elizabeth Maria Dinunzio, a/k/a

10   Betty.

11        Q    And where do you live?

12        A    I live in Waterbury, Connecticut.  Do you want the

13   address?

14        Q    No.  That's all right.  How long have you lived in

15   Waterbury, Connecticut?

16        A    I've been in Waterbury for five years.  I came up

17   from down south in Georgia and just came back home because

18   that's where my family is and I'm getting on and they're

19   getting on.

20        Q    Can you tell the jury, please, a little bit about

21   your background, your family, your educational background.

22        A    My educational background.  I have a degree in

23   liberal arts studies from Vermont College.  And I'm also a

24   registered certified nurse assistant trained in geriatrics.

25   I am also a second degree ranking practitioner, which is a
```

Elizabeth M. Dinunzio - Direct                    2026

1  healing complimentary modality.

2      Q    And what about your family background?  Are you

3  married, do you have children?

4      A    Yes, I have five children.  Do you want me to name

5  them?  I have five children.  I have a daughter and four

6  sons.  Yes.

7      Q    Dean Sacco's your son?

8      A    He is.  He's my second son.

9      Q    When was Dean born?

10      A    He was born on May 31, 1958.

11      Q    Would you tell the jury, please, a little bit about

12  Dean's background, how -- where he was raised.

13      A    Well, he was -- he was raised initially, as we

14  called in the Army, an Army brat, which is a child of

15  professional Army people.  We went on active duty when Dean

16  was about 3 years old.  His father is a retired infantry

17  officer.  And we did, like all Army families, a lot of

18  uprooting, a lot of moving, a lot of leaving schools, leaving

19  friends, leaving family to go where my husband and where dad

20  had to go.

21      Q    What places did you travel to where Dean lived for

22  any length of time?

23      A    Kansas, Nebraska, in the United States.  Germany,

24  two and a half years.  Florida while he was in -- while

25  Dean's dad was in Vietnam for two tours, and the children and

Elizabeth M. Dinunzio - Direct                    2027

1   I on the first tour were in Florida; on the second tour we

2   went back to Connecticut.

3       Q    Where -- when Dean kind of left the nest --

4       A    Yes.

5       Q    -- how long ago was that?

6       A    He was a teenager, I would say about 17.

7       Q    After that -- withdraw that.  Do you know whether

8   Dean has a college education?

9       A    He doesn't, unfortunately, but he's a very educated

10  guy.  He's an avid reader, a musician, a poet.  He's an

11  excellent writer.  So I would say he's self-educated.

12      Q    You say he's an excellent writer.  Have you seen

13  his writings?

14      A    Yes.

15      Q    How have you seen his writings?

16      A    He usually -- because I write also, he usually asks

17  my opinion, sends me a copy of a writing.  He's done some

18  wonderful short stories.  I wish I brought the copies today.

19  He's done well.  Wonderful short stories.  He's done some

20  freelance journalism for a Philippino newspaper in New

21  Jersey.  He's a much more gifted writer than his mother.  He

22  can just sit and write.  I sit and sweat.  Dean sits and

23  writes.  He's an excellent writer and a wonderful musician.

24  He has composed beautiful music.  And his main passion in

25  life was his guitar, his music.

Elizabeth M. Dinunzio - Direct                    2028

1      Q     Are you familiar with a book that Dean wrote

2   entitled American Desperado?

3      A     Yes.  Yes.

4      Q     Can you tell the jury about your knowledge about

5   the writing of that book.

6      A     Well, yes, I can, because he would send me a

7   paragraph to read and proofread and send back to him with

8   suggestions until he decided that mom was too difficult a

9   teacher.  I was too hard on him.  So I did read parts of the

10  manuscript as he was writing it.  And I questioned, did he

11  heavily fictionalize it.  His idea was, Mom, if you want to

12  sell a book, you've got to put what sells books.  So to him,

13  it was a marketing thing.  Now if, to me, I wrote a memoir, I

14  would approach it very differently.  I just want to say what

15  I have to say about my life.  He had an idea that writing

16  should sell.  In fact, he was always after me to get my

17  writing published, which I didn't want to do.  I wrote for

18  me.  He wrote for others.  So I did read parts of the

19  manuscripts.  I did give him suggestions and I did say, you

20  fictionalized a good deal, but, you know, there's a saying in

21  writing, any tale told twice is fiction.  We try to write our

22  memoirs.  Something else happens in the writing.

23     Q     Do you know when that book was published?

24     A     Oh, gosh, if you want years, no.  Let me see.  It's

25  2008.  It was in the late '90s.  It was in the late '90s.

Elizabeth M. Dinunzio - Direct                    2029

1       Q    Do you know how much time passed between the

2   writing of the book and the publication of the book?

3       A    I would say less than a year in terms of when he

4   finally got it polished and finished and felt like it was

5   ready, but he took a good -- I mean, the writing process was

6   a good three or four years.  These are difficult writings.

7   I've had to do it in school.  It's very difficult to write

8   about yourself and your life.

9       Q    Did Dean, after the book was published, make any

10  steps towards writing another book?

11      A    Well, he had in mind that he did want to write

12  another book, and I was encouraging him to keep writing all

13  the time, keep a journal, keep writing.  And he may have done

14  a short story or two in the interim.  I'm not quite sure of

15  when he wrote some of the short stories.

16      Q    Did Dean ever express to you his intention, what he

17  intended the second book to be?

18      A    Yes.  That was going to be the success book.  He

19  said, Mom, the next one's going to be the success book.

20      Q    With respect to Dean's emotional status --

21      A    Yes.

22      Q    -- you were familiar with his emotional status say

23  in 1990?

24      A    Oh, yes.  Yes.

25      Q    Did you have contact with Dean on a regular basis

1    say '95 to the year 2000?

2        A    I always had regular contact.  Always.

3        Q    How often did you have that contact?

4        A    Dean is -- he's an avid caller, and certainly a

5    visitor and certainly on holidays.  So, you know, it was

6    never a long stretch of time when I didn't see or hear.

7        Q    So you were familiar with his emotional status say

8    1997 to 2003, in that range?

9        A    Yes, yes.

10       Q    What was his emotional status during those times?

11       A    He had periods of depression.  He had -- I would

12   say it was kind of swinging, but he did have some periods

13   that really concerned me, yes, of deep depressions.

14       Q    Are there any particular events that you think of

15   that were evidence to you of that depression?

16       A    Yes.

17       Q    What were those?

18       A    I remember that he -- he called me one night and he

19   said he said he didn't want his life anymore and, you know, I

20   tried to keep him on the telephone, say, Honey, what's wrong?

21   What's happening?  And I told him to stay where he was and

22   that I would get help to him.  And I called a friend of mine

23   who's a social worker and we -- we got him some help.

24       Q    When was that?

25       A    We did.  I think that was -- oh, gosh.  Years now.

Elizabeth M. Dinunzio - Direct                    2031

1    If you want the year, I'm lost, but I remember that when he

2    was a teenager, yes.

3         Q    Many years ago?

4         A    Many years ago.  Many years ago.

5         Q    Was there a time, to your knowledge, when Dean

6    began living at the YMCA in -- I believe it's Elizabeth, New

7    Jersey?

8         A    Yes.

9         Q    When was that?

10        A    That was about what, 2001 or so.  Yeah.

11        Q    Were you familiar with Mr. Sacco's employment at

12   around that time, Mr. Sacco, Dean Sacco, your son?

13        A    Yes.  Yes, I was.  He was very happy to have --

14   someone introduced him, I think a relative of Mr. Sorvino,

15   who he went and interviewed with and -- and Bill hired him I

16   think right that day, as well as I can remember.  And he did

17   work -- he worked for him as a regular 9-to-5 employee like

18   the first four years that he was there.

19        Q    Do you know when approximately Dean began working

20   for Mr. Sorvino?

21        A    Do you mean the month?

22        Q    The year?

23        A    I think it was -- let me see.  It's 2008.  It had

24   to be about 2002, 3.  Because it's been about six years.  And

25   I'm a terrible mathematician, terrible.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Direct                    2032

1      Q     When Dean began working for Mr. Sorvino, that was

2  Glenwood Furniture?

3      A     That was Glenwood Furniture, yes.

4      Q     Did there come a time when Dean moved away from the

5  YMCA?

6      A     Yes.  Yes.  In a very short time he was able to

7  move from the YMCA and to get an apartment closer to working,

8  yes.

9      Q     Since Dean began working at Glenwood Furniture, for

10  example, has Dean had girlfriends?

11     A     Oh, yes.

12     Q     Have you met them?

13     A     Yes.

14     Q     Who have you met?

15     A     Yes.  I met Diana from New Jersey.  Dean brought

16  her to Connecticut to meet me.  He brought her to a family

17  wedding.  He brought her to a family anniversary party, a

18  50th wedding anniversary party.  He brought her to my

19  nephew's wedding.  And she was a lovely woman.  Very lovely.

20  Diana, yes.

21     Q     How old was she?

22     A     She was in her 30s.

23     Q     When was this that you met?

24     A     If I can remember the year my nephew got married.

25  That was about maybe four or five years ago again.  2003

Elizabeth M. Dinunzio - Direct                    2033

1    maybe.

2         Q    Has Dean had other girlfriends say since -- within

3    the last six years?

4         A    Yes.  Yes.  The thing about Dean and his

5    girlfriends is, he always brings them to meet mom.  And you

6    know, the girls invariably come to Connecticut and meet Mom.

7    I love people.  I'm gregarious like my son.  I love

8    international people.  Diana spoke Spanish so we could speak

9    a little Spanish, and Dean speaks Spanish very well.

10             The second lovely young woman was Marie Carmen

11   Delmar from the Dominican Republic.  I went to New York.  I'm

12   very close to New York.  I took the bus down and I met them

13   at Grand Central Station.  We had a lovely day together.  We

14   did New York.  We went to lunch.  I listened to Marie Carmen.

15   Wonderful story.  She was working on a master's degree in

16   economics and she had to -- I think her visa was running out

17   and she had to go back to the Dominican Republic but she -- I

18   have several pictures of her.  She's a lovely, lovely and

19   intelligent and educated young woman.  I totally enjoyed her.

20        Q    Did you create some -- did you bring some pictures

21   with you?

22        A    I don't have them with me.

23        Q    Did you give me some pictures?

24        A    I gave you some pictures, yes.

25        Q    I'd like to show you what's been marked for

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Direct                    2034

1    identification as Exhibit S-29.

2         A    Without my glasses this is --

3         Q    Do you need your glasses?

4         A    Yeah, Susan, my daughter, has my glasses.  Yes.

5    Okay.  Do you want me to just --

6         Q    Well, would you look at those?

7         A    I will, yes.  Did you want my comments, sir, do you

8    want my comments?

9         Q    No.  Are those -- are any of those pictures

10   pictures of Mary -- is it Mary Carmen?

11        A    Mary in English, Maddie (phonetic) Carmen in

12   Spanish.  Yes.  Lovely young woman.

13        Q    Do you know when that picture was taken?

14        A    Is there a date behind it?  Photoshop.  Oh, dear.

15   Again, this was about three years ago.  It's 2008.

16        Q    I've put an exhibit marker, S-29.

17        A    Okay.

18        Q    Which is wrong.

19             MR. FISCHER:  Excuse me.

20        Q    I've put an exhibit marker on this, S-30.  Do you

21   see that?

22        A    I do.

23        Q    And Exhibit S-30, is that the picture of Mary

24   Carmen?

25        A    It is indeed, in New York.  That's the day we spent

Elizabeth M. Dinunzio - Direct

1   together in New York.

2              MR. FISCHER:  Your Honor, I'll offer the

3   document in evidence.

4              MISS PEEBLES:  No objection.

5              MR. LOVRIC:  Rule 16 violation, Judge.

6              THE COURT:  Because you didn't get it in

7   advance?

8              MR. LOVRIC:  That's correct.

9              MR. FISCHER:  I understand.

10             THE COURT:  Let's go to side-bar for a minute.

11             (At the bench)

12             THE COURT:  So you're claiming surprise and

13   violation of Rule 16.  Let me ask you, what kind of

14   preparation would you make had you had that picture given to

15   you before trial, say a month or two?

16             MR. LOVRIC:  In all honesty, none, Judge.  I

17   have to be honest.  In all honesty, none.  But I'm simply

18   making a point, Judge.

19             THE COURT:  Overrule the objection.

20             MR. LOVRIC:  Okay.

21             (In open court)

22   BY MR. FISCHER:

23       Q    Miss Dinunzio --

24       A    Yes.

25       Q    -- you mentioned employment Dean had had with

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Direct                    2036

1    Glenwood Furniture?

2         A    Yes.

3         Q    Did that employment change sometime?

4         A    It did.  When Dean bought his house and he had to

5    have a good car to get up to his house and he was getting

6    financially stressed, he proposed to Bill that he work

7    independently -- to Mr. Sorvino that he work independently

8    for a while for -- so that he could take more money home in

9    his paycheck.  And Mr. Sorvino valued Dean, and he was very

10   willing to go along with that.  And so I would say for maybe

11   the last seven months or so of his employment there, that it

12   changed into the independent son, whatever, but up to that

13   point he had been a regular 9-to-5 employee for Glenwood in

14   which he did many, many things besides sales.  He was the

15   all-around guy in Glenwood.

16        Q    You mentioned a time when Dean bought the house in

17   Norwich?

18        A    Yes.

19        Q    When was that?

20        A    I think it was about May.  Here we go with years.

21   2005, 4.  Sorry.  I'm terrible with years.

22        Q    How sure are you not it was May of 2006?

23        A    I'm not sure because I don't -- everything is at

24   home on my calendars.  I should have brought them.  But I

25   just don't remember years.  I remember events, not years.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Direct                        2037

1      Q      It was more than a year ago that Dean bought the

2   house?

3      A      Yes.

4      Q      Would you say it was more than two years ago that

5   Dean bought the house?

6      A      Yes.

7      Q      Would you say it was more than three years ago that

8   Dean bought the house?

9      A      No.  It was about three years ago.

10      Q      What did Dean do with respect to the house after he

11   bought it?

12      A      Oh, dear.  He rolled up his sleeves immediately.  I

13   know we can't -- I guess we can't show the pictures, but

14   again, he had his picture taken in front of his house and

15   called me up and said, Mom, this is the proudest day of my

16   life.  I finally own my own home like my brothers.  And he --

17   immediately he was on the phone with, it needs a lot of work.

18   I've got to do work in the backyard.  The neighbors want me

19   to take trees down because they're shading their flowers.  He

20   was very concerned about getting things in tip-top shape.

21   Here's the Army brat again.  You've got to get things in

22   tip-top shape and you've got to do it fast.  You don't fool

23   around and waste time.  He was ready to roll up his sleeves

24   and go in there and work.

25      Q      After he bought the house, are you aware of how

Elizabeth M. Dinunzio - Direct                    2038

1    frequently he would come to Norwich from New Jersey to do

2    work on the house?

3         A    Very frequently.  You know, in my recollection, it

4    was almost every weekend for a while, except when he had --

5    he was moonlighting with the wine school.  He was -- I forget

6    what else he was moonlighting as, just trying to make a

7    dollar anywhere, but he did go up fairly frequently and

8    wanted me to go home many times.  And I said, well, Dean,

9    what am I going to do, honey, while you're sanding floors and

10   pulling up carpets and doing, you know.  I get bored in the

11   country.  I'm a city girl so -- so I didn't go up with him, I

12   think for the first couple of weeks, and then initially I

13   said, okay, if you want to come all the way to Waterbury, get

14   me, I will go up.  And I really did want to see the house.  I

15   just didn't want to hang around and I didn't want to be put

16   to work.  So, yeah, so I did go up, and can I recall that day

17   for you Mr. --

18        Q    Well, first of all, do you remember approximately

19   when that was?

20        A    I remember that it was spring because we looked at

21   the foliage.  We looked at the trees.  We looked at the

22   flower beds that needed to be cleaned out.  So maybe June.

23   Maybe June.

24        Q    Okay.

25        A    Because it was fairly spring up here.

Elizabeth M. Dinunzio - Direct

2039

1     Q    And you came to Norwich with Dean?

2     A    I did.

3     Q    And what did Dean do?

4     A    Well, the -- okay.  At that time on my first trip

5 up there with him, he still had tenants upstairs, so when we

6 pulled into the yard and he parked in front of the garages,

7 we got out of the car and he immediately wanted to show me

8 everything.  He started opening up, Mom, these garages, look

9 at this mess.  We've got to get all this cleaned out.  He

10 showed me where a tree in the back was causing shade or a

11 problem.  He said, I've got to trim that tree.  I've got to

12 get all this cleaned out.  And at that point his elderly

13 tenants came down the stairs to meet me.  They heard us out

14 in the back talking, and Dean was very surprised because they

15 were quite elderly and they weren't getting out very much.

16 He said, I can't believe they're coming down here.  So they

17 came down.  They were lovely.  I met them.  They shook my

18 hand.  They seemed to be so happy with the improvements that

19 Dean wanted to make around the place.  And then after we got

20 all outside, he showed me the trees that had to come down and

21 the tree the neighbor didn't like because it was ugly, that

22 he had to cut down.  They invited us upstairs.  We went and

23 had a lovely visit with this lovely old couple.  Dean invited

24 them to lunch.  They said no, they would take a rain check.

25 He said, I'd love you to come out to lunch with my mom.  They

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Direct

2040

1    couldn't do it that day and said, okay, I'll take a rain

2    check.  Then we went downstairs.  He showed me -- obviously,

3    they lived there, but they were very accommodating and they

4    walked me around and showed me the upstairs.  It looked

5    rather worn, like rental property.  The rugs were pretty

6    warn.  And they were quite elderly.  Didn't smell that good.

7    But they're a lovely couple.

8        Q    This is upstairs?

9        A    This is upstairs.  Downstairs was vacant.  No one

10   had moved in downstairs.  So we did go downstairs and we

11   looked at every nook and cranny in that house.  He showed

12   me -- it's a lovely old house and I love old houses.  The

13   stained glass windows are just beautiful.  And he immediately

14   pointed out to me what had to be bettered or fixed.  He

15   showed me like a particle board closet in the bedroom.  He

16   said, This has got to go, this is ugly.  And he said, Mom,

17   you've got to see this bathroom because you've never seen a

18   bathroom like this one.  Well, I hadn't.  The commode was

19   raised up and on a rug, kind of like a throne, really very

20   different.  And then he showed me the closet in the kitchen

21   that a family of mice had taken over during the vacancy

22   interval, and I said, You've got a job there, vacuum up all

23   that.  So we joked about the chandelier in the living room,

24   which was a gaudy old ugly thing.  And he was -- as Dean will

25   do, he was pointing out to me, that's got to go, that's got

Elizabeth M. Dinunzio - Direct

2041

1    to go, I have to get rid of this closet.  I did -- the
2    bathroom will have to stay that way for a while and, you
3    know, I want to sand these floors.  These are beautiful
4    floors.  I said, oh, my gosh, you've got your work cut out
5    for you here.  So his pride in that house was palpable.  Was
6    palpable pride.
7        Q    Did you come to Norwich a second time to look at
8    the house?
9        A    I did.
10       Q    When was that?
11       A    I did.  Now that was -- several months later.  It
12   was probably five or six months later, although it wasn't
13   wintertime because by that time the elderly couple had moved.
14   Dean was concerned that they might fall down the stairs.
15   They were really up in their 80s and it was not a good place
16   for them anymore.  In the meantime they had moved out, and he
17   wanted my opinion on that apartment, particularly in case he
18   wanted to move in the upstairs apartment.  So again, we went
19   through room by room, looked at the carpets.  We decided yes,
20   the carpets had to come up and be thrown out.  They were
21   smelly and dirty and old.  He look at the kitchen and he
22   said, you know, I don't know a thing about remodeling a
23   kitchen but I'm going to start tearing down cupboards because
24   this isn't going to work, which he did.  So, I didn't -- let
25   me see.  Was anybody downstairs then?  I think that the

Elizabeth M. Dinunzio - Direct                    2042

1   downstairs people had moved in then, yes, so we didn't -- we

2   didn't go there and knock on the door.  We just concerned

3   ourselves with upstairs.

4       Q    So you did not look downstairs, at the downstairs

5   apartment at that time?

6       A    No.  No.

7       Q    How long did you spend there the first time?

8       A    The first time we spent just -- I would say a

9   couple of hours.  The second time I met neighbors.  We went

10  outside to look at the tree business and what trees had to

11  come down, and the neighbors came out.  His neighbors -- if

12  you face the house, his neighbors to the left, a young kind

13  of middle-age couple came out, and they were very warm.  Very

14  inviting.  Shook Dean's hands, introduced themselves to me

15  and started talking about their concerns from his property,

16  very, very close, and their concern was --

17               MR. LOVRIC:  Objection.  Objection.

18      A    -- a tree --

19               MR. LOVRIC:  I think we're going off --

20               THE COURT:  Yeah, sustained.

21               MR. LOVRIC:  -- on tangents.

22               THE WITNESS:  Sorry.

23               THE COURT:  Yes.

24  BY MR. FISCHER:

25      Q    Did Dean speak with you about his financial

Elizabeth M. Dinunzio - Direct

1    situation with respect to the rents?

2        A    Yes.  Yes.  It was -- it was difficult.  He had

3    never been a landlord.  He -- he looked to Bill Sorvino for

4    advice because Mr. Sorvino owned rental property.  He was --

5    he was going dollar to dollar.  It was tough.  It was tough

6    to support, like everybody in the modern world, his car, you

7    know, his place to live, his living expenses.  And, you know,

8    he was concerned about this mortgage money coming in and the

9    mortgage being paid on time.  Yes.

10       Q    Since March of 2007, the last 14 months, do you

11   know what has happened with respect to that home?

12       A    I think the home has been taken back by the bank.

13   I think.

14       Q    With respect to the vehicle, what happened to that?

15       A    That was -- that was taken back by the car company.

16   He lost his home.  He lost his car.  He lost his job.

17       Q    And the summer of 2007, last summer?

18       A    Yes.

19       Q    Did you pay for a storage shed?

20       A    I did.  I did.  He --

21       Q    Let me ask you -- without asking you about that in

22   particular, let me ask you, before that time did you ever pay

23   for a storage shed for Dean before that time?

24       A    Oh, periodically.  Oh, before --

25       Q    Before.

Elizabeth M. Dinunzio - Direct                    2044

1     A    Did I pay for it?

2     Q    Yes.

3     A    No.  May I clarify?  I wrote the check, but it's

4  Dean's money, what he had left in savings.  I took from his

5  savings, put in my account and wrote a check.  He did not ask

6  me to pay his bill.  He asked me to please write out the

7  check with his money.

8     Q    When was that?

9     A    Okay.  Let me think about this.  March.  Was it

10  about May or June?

11     Q    Of what year?

12     A    Last year.  '07.  Yeah.

13     Q    Was Dean incarcerated at that time?

14     A    Yes.

15     Q    Before that time had you ever paid for, whether out

16  of your own pocket or reimbursed, any storage sheds for Dean?

17     A    No.

18             MR. FISCHER:  Those are the questions I have.

19  Thank you.

20             THE COURT:  Okay.  Miss Peebles.

21             MISS PEEBLES:  No questions.

22             THE COURT:  Mr. Lovric.

23  CROSS-EXAMINATION

24   BY MR. LOVRIC:

25     Q    Miss Dinunzio?

Elizabeth M. Dinunzio - Cross                    2045

1      A    Yes.

2      Q    Did I hear you correctly just tell Mr. Fischer,

3  when he asked you about storage sheds, you said, I

4  occasionally did, as far as paying for storage units?

5      A    No, sir.

6               MR. LOVRIC:  Judge, I'd like Vicky to read

7  back that question and answer, if I could.

8               (Record read back)

9               THE COURT:  I think if you want to go back a

10  question before it and maybe read the one after, because it's

11  got to be put in context.

12               (Record read back)

13  BY MR. LOVRIC:

14      Q    Did you occasionally pay for storage units for Dean

15  Sacco?

16      A    No, sir.  Not occasionally, until this storage unit

17  in Norwich.

18      Q    Were you aware that he had a storage unit or

19  storage units in Jersey, Jersey City?

20      A    No.  I wasn't.

21      Q    And it's your testimony you never paid any storage

22  units in Jersey City, for any storage units in Jersey City?

23               MR. FISCHER:  Without a time frame, I have an

24  objection to the question.

25      Q    Ever while Dean Sacco has been applied --

Elizabeth M. Dinunzio - Cross

2046

1      A    Yes.

2      Q    Have you ever paid for any storage units for him?

3      A    Sir, not that I remember.

4      Q    In Jersey City New Jersey?

5      A    No.  Not that I remember.

6      Q    What does that mean, not that you remember?  Would

7  you remember that?

8      A    I would think I would.  And I feel like the answer

9  is no.  I think I would remember that.  Yes.

10     Q    So you never paid any other storage units except

11 for this one in Norwich, New York?

12     A    No.

13     Q    Miss Dinunzio, you began to pay for the storage

14 unit in Norwich sometime in the summertime or little bit

15 thereafter of 2007 --

16     A    Okay.

17     Q    -- is that right?

18     A    Yes.

19     Q    And you wrote checks that you sent?

20     A    I did, yes.

21     Q    And the reason you were paying for the storage unit

22 is because all of Dean Sacco's belongings were in that

23 storage unit?

24     A    Yes.

25     Q    Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Cross                    2047

1     A    I don't know about all, but he had belongings in

2  it.

3     Q    Dean Sacco asked you to pay for the storage unit so

4  that those belongings would not be thrown away, is that

5  right?

6     A    Yes.

7     Q    And you didn't do it on your own, I take it, right?

8     A    No.

9     Q    Okay.  So it was his belongings that you were

10  paying for to be kept in storage?

11     A    Yes.

12     Q    And Miss Dinunzio, you indicated earlier when you

13  were talking with Mr. Fischer about having read Dean Sacco's

14  book, right?

15     A    I indicated having read parts of the manuscript.

16     Q    Okay.  I just want to make sure we're all talking

17  about the same manuscript, same book.

18     A    Yes.

19     Q    Did you ever see this photo?

20     A    Yes.

21     Q    Okay.  That's Dean Sacco?

22     A    It is.

23          MR. LOVRIC:  Just for the record, it's

24  Government Exhibit 68.

25     Q    And this is Dean Sacco's book?

Elizabeth M. Dinunzio - Cross                    2048

1      A     Yes.

2      Q     You've seen this before?

3      A     Yes, I have definitely.  I've seen the book.

4      Q     In fact, you've got a copy of the book; you

5  received a copy at some point of this book?

6      A     I did?

7      Q     Isn't it a fact that Mr. Sacco actually got copies

8  of this book for several members of the family?

9      A     He did for several members of the family.  We kind

10  of just passed it around.  It wasn't randomly given away.

11     Q     I don't mean to make this complicated.  You got a

12  copy of the book, you've seen --

13     A     I do not have a copy of that book, sir.

14     Q     Not now, but at some point you got a copy of this

15  book, right?

16     A     Oh.

17     Q     I'm sorry?

18           MR. FISCHER:  Your Honor, I have two

19  objections.  Even whether it's complicated or not, Mr.

20  Lovric's opinion, I move to strike, and I would ask that he

21  permit the witness to answer the questions.

22           THE COURT:  Yeah, it's complicated, that can

23  be stricken.  But I think he's trying to get the witness to

24  answer the question, and let's see how he does with his next

25  question.

Elizabeth M. Dinunzio - Cross                    2049

1    BY MR. LOVRIC:

2        Q    Miss Dinunzio, you did receive a copy of Dean

3    Sacco's book at some point in your lifetime, did you not?

4        A    Sir, I remember reading through another member's

5    copy.  That's what I remember.  I had already been introduced

6    to the book.

7        Q    Okay.

8        A    So my recollection is, is that when several members

9    got a copy that I read parts of it to see what was the same,

10   what had changed, what was going on.  That's what I remember,

11   sir.

12       Q    You read the book, is that a fair statement?

13       A    That's a fair statement.

14       Q    Thank you.  In fact, Mr. Sacco, in this book,

15   describes a very graphic event where he sexually molested

16   Susan, your daughter, is that correct?

17       A    That's correct.

18       Q    And Susan's sitting right here in the front row,

19   right?

20       A    Yes.

21       Q    And that's your daughter and his sister?

22       A    Yes.

23       Q    And you remember reading that where he talks about

24   how he crept into her room one night, sexually molested her,

25   she woke up at some point, and he spent the night trying to

Elizabeth M. Dinunzio - Cross

1    comfort her for what he had just done to her?  Do you

2    remember reading that?

3         A    I do.

4         Q    And he also writes in this book how when Susan had

5    friends of hers sleeping over, he crept into the room and

6    sexually molested Susan's friends, is that a fair statement?

7         A    That's a fair statement sir.  It's a fair

8    statement.

9         Q    And Dean Sacco writes in this book how when he was

10   a teenager, in his latter years in high school, how he

11   tackles this girl that he's following in the rain and

12   sexually molests her in the rain as she's trying to get away

13   from him.  Do you remember reading that?

14        A    No.

15        Q    No, you never read that?

16        A    No.  I don't remember reading that.

17        Q    And he also in this book describes how in his

18   younger years he would -- I believe the words he used would

19   slither through the neighbors at night, peeping in windows of

20   young girls and young women and sort of stalking them.  Do

21   you remember reading that?

22        A    Yes.

23        Q    And he also talks in this book how in the I believe

24   Augusta, Georgia area, he would go out at night and actually

25   break into people's homes through the screens and go in and

Elizabeth M. Dinunzio - Cross                    2051

1    just sit in the bedroom and observe women as they slept, do

2    you remember that?

3         A    Yes.

4         Q    And he describes very graphically his fascination

5    with young girls, some children, and committing acts against

6    those young girls?

7         A    Sir, you're talking about a book.  You're not

8    talking about a fact.  You're talking about a book.

9         Q    I'm talking about Dean Sacco's book.

10        A    Yeah.

11        Q    Is that right?

12        A    That's right.

13        Q    And all that stuff --

14        A    Sounds like fancy to me.

15        Q    It does.  Well, let me ask you this:  Do you

16   remember writing this letter dated May 19, 2000 to Dean

17   Sacco:  "Just a quick note to let you know I received your

18   book yesterday.  The book.  I don't go to my mailbox every

19   day so it may have been there a day or so."

20               THE COURT:  Is that in evidence?

21               MR. LOVRIC:  I'm sorry?

22               THE COURT:  Is that in evidence?

23               MR. LOVRIC:  I'm cross-examining her about a

24   letter that she wrote to this defendant.

25               THE COURT:  Is it in evidence?

Elizabeth M. Dinunzio - Cross                    2052

1          MR. LOVRIC:  The letter's not, but I'm reading

2    it to her.  I want to ask her some questions about it, Judge.

3          THE COURT:  Okay.

4          MR. FISCHER:  Your Honor, I suggest that if

5    it's going to be cross-examination, the witness be afforded

6    an opportunity to read it to herself.  That's the more

7    appropriate way.

8          MR. LOVRIC:  No, it's not.  That's what Mr.

9    Fischer would like.  I would like to do my cross the way I'd

10   like to do my cross.

11         THE COURT:  I can exercise my discretion as

12   the statute says, allow her to take a look at it before she's

13   crossed on it.

14         MR. LOVRIC:  Judge, can I ask her some

15   questions before I get into the letter then?

16         THE COURT:  No.  Questions that aren't from

17   the substance of the letter?

18         MR. LOVRIC:  No, it's from the letter.

19         THE COURT:  Show her the letter.

20   BY MR. LOVRIC:

21      Q    Have you read it?

22      A    I did.

23      Q    You wrote that letter?

24      A    I did write that letter.

25         MR. LOVRIC:  I would offer that into evidence,

Elizabeth M. Dinunzio - Cross                    2053

1   your Honor.

2              THE COURT:  What's the numerical designation

3   of that exhibit?

4              MR. LOVRIC:  Judge, it's Exhibit 68, the

5   government's exhibit, and this is at page 253.

6              THE COURT:  Okay.  Government 68.

7              MR. LOVRIC:  Yes, your Honor.

8              THE COURT:  Any objections?

9              MR. FISCHER:  May I see the particular page?

10             MISS PEEBLES:  None from me, your Honor.

11             MR. FISCHER:  Your Honor, no objection to that

12  particular page only being offered and received in evidence,

13  your Honor.  I don't have an objection to that page.

14             THE COURT:  We'll receive Government's Exhibit

15  68 in evidence.

16             MR. LOVRIC:  Just for the judge, the exhibit

17  is in evidence, other portions.  It's page 253 that I'm now

18  adding.  We read through eight I believe portions of this

19  exhibit already for the jury from the book.

20             THE COURT:  Are you saying the letter is part

21  of the book?  I am very confused about that.

22             MR. LOVRIC:  Yes, Judge.  The letter is in the

23  book.

24             THE COURT:  I didn't know that.  I thought it

25  was a separate letter you're talking about.

Elizabeth M. Dinunzio - Cross                    2054

1           MR. LOVRIC:  No, Judge.  The letter is in this
2    book.
3           THE COURT:  I haven't read the book.  I don't
4    know what's in the book.  All right.  So now you're saying
5    this letter is part of the book, book's already in evidence,
6    so why did we go through all this exercise?  Because I didn't
7    know about it.
8           MR. LOVRIC:  I don't know, Judge.
9           THE COURT:  Go ahead.  Whatever.
10   BY MR. LOVRIC:
11       Q    Miss Dinunzio --
12       A    Yes, sir.
13       Q    -- you wrote a letter to Dean Sacco?
14       A    I did.
15       Q    Well, let me read it for the jury.
16       A    Sure.
17       Q    It's reading from page 253, it says, "Friday
18   May 19, 2000.  Dean, just a quick note to let you know I
19   received your book yesterday.  I don't go to my mailbox every
20   day so it may have been in there a day or so.  I felt rather
21   astounded for some reason.  I skimmed through while riding
22   the bus home.  My first impression is that you did a very
23   good job.  It is an interesting read, a good opening.  And I
24   am truly impressed with some of the writing.  Reading about
25   myself feels a bit uncomfortable at the onset.  I briefly

Elizabeth M. Dinunzio - Cross

1   want to say that your interpretations are okay with me.

2   However you saw me is valid.  In fact, however you see me is

3   valid.  So far I'm not having any problems and don't see

4   anything to rewrite.  I'll read it thoroughly and give you

5   any suggestions that come up.  But quickly, I wanted to know

6   more.  You talk about Aida and the warrant.  Why not tell the

7   reader what you had done to merit that.  I for one, wanted to

8   know.  You skipped your behavior, the stalking, whatever

9   bizarre things you did.  I see that as important in a book

10  about dysfunctional behavior.  I'm proud of your work.  It is

11  really, really good.  Thanks for sending me a copy."  And you

12  signed it, "Congratulations.  Love, Mom," right?

13      A    Thank you for refreshing my memory.  I really had

14  forgotten that.  I had.

15      Q    Okay.  Well, you don't write anything in there

16  about this fictional work or that this is fictional?

17      A    Not in that letter.  Not in that letter.

18      Q    You don't write that because there is no fiction in

19  that book?

20      A    Sir, reading can be interpreted by anyone who reads

21  a book.

22      Q    I want to ask you, Mrs. Dinunzio, did Dean Sacco

23  sexually molest Susan?

24      A    Not to my knowledge.

25      Q    You read this part about Dean talking about

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Cross                    2056

1  molesting your daughter and you never asked Dean Sacco if he

2  sexually molested your daughter?

3       A    I have no memory of having that conversation.

4       Q    You have no memory of having a conversation with

5  Dean Sacco about molesting your daughter when she was under

6  the age of 10 years old; you have no memory of that, is that

7  your testimony?

8       A    That's my testimony.

9       Q    Do you have any memory of talking to Dean Sacco

10  about molesting --

11       A    I know his last name, sir.

12       Q    Do you have any memory of talking to him about

13  creeping into your daughter's room and molesting her friends

14  at sleepovers?  Did you ever talk to him about that?

15       A    I would refer that to his counselors.  That's what

16  counselors are for.  That's why we go to counselors.  We go

17  to professionals to talk about that sort of thing.

18       Q    That's why Dean Sacco went to professionals,

19  because he had a fascination with young children and raping

20  them and molesting them, is that why?

21            MR. FISCHER:  Your Honor, I think that's

22  argumentative.  It's overboard.

23            THE COURT:  Sustained.

24       Q    Did you ever talk to Dean Sacco about the

25  molestation that he describes in this book?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Cross

2057

1    A    No, but I did recommend that he get counseling.

2    Q    Miss Dinunzio, if you look on your screen there --

3    A    Yes.

4    Q    -- I'm putting in the photo that Mr. Fischer showed

5    you.

6    A    Yes.

7    Q    What's that girl's name?

8    A    Marie Carmen.

9    Q    Did Dean Sacco ever show you a videotape where he

10   is asking her about performing pornographic tapes with him?

11   A    No.

12   Q    Were you aware of that?

13   A    No.

14   Q    He never shared that with you?

15   A    No.

16              MR. LOVRIC:  Thanks, Miss Dinunzio.

17              THE COURT:  Mr. Fischer.

18              MR. FISCHER:  Thank you, your Honor.

19   REDIRECT EXAMINATION

20    BY MR. FISCHER:

21    Q    Miss Dinunzio --

22    A    Yes.

23    Q    -- do you remember the letter that you were shown

24   just a few moments ago out of Dean's book?

25    A    Well, I do after -- after he read it -- after I

Elizabeth M. Dinunzio - Redirect                    2058

1  read it, rather, but it's been a -- it isn't something

2  foremost in my mind.  I have a life beyond that book.

3       Q    I'm going to read you a line from the letter.

4  Quote, "I briefly want to say that your interpretations are

5  okay with me."

6       A    Yes.

7       Q    Do you remember seeing that?

8       A    Yes, I do.

9       Q    What do you mean when you say that, if you recall?

10      A    That -- that sentence is written totally from the

11  writer in me.  You are -- we're allowed when we write to

12  interpret our lives, our situation, and it's awfully -- if he

13  in memoir or autobiography, because you get family members

14  really riled about what you've written.  What I was saying to

15  him was, yes, your interpretation is okay.  I don't

16  necessarily agree with it, but if that's how you interpret as

17  a writer, then that's fine.  Then that's fine.

18      Q    Was it your understanding that Dean was writing

19  purely nonfiction?

20                MR. LOVRIC:  Objection.  Leading.

21                THE COURT:  Sustained.

22                MR. FISCHER:  I can rephrase the question.

23                THE COURT:  Sure.

24      Q    Was it your understanding that Dean's book was

25  written from a purely nonfictional or from a fictional

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Redirect                    2059

1   perspective?

2              MR. LOVRIC:  Objection.  Leading the witness.

3              THE COURT:  No.  He asked fiction or

4   nonfiction.  She has a choice.  Is there a third one?

5              MR. FISCHER:  No, just fiction and nonfiction.

6              THE COURT:  Okay.

7      A    To me, okay, you said fiction or nonfiction.  I

8   would say nonfiction -- I would say fiction to sell a book.

9      Q    What do you mean by that?

10     A    I mean that there's a market out there and anybody

11  knows who reads that there is -- there's a marketing ploy

12  with a book and that's putting sexual whatever in a book

13  because those books sell.  Nobody, you know, people aren't

14  going to go out and buy a boring memoir about, I went to

15  college, whatever.  So it's a marketing ploy.  It's a

16  marketing ploy.

17          May I say something else, Mr. Fischer?

18     Q    Yes.

19     A    When you put something out to the public, it

20  obviously is not something you're trying to hide.  It's there

21  in front of God and the whole world.

22     Q    Did you talk about -- with Dean about why he wrote

23  the book?

24     A    For one thing, it was keeping him occupied.

25  There's always been a writer in him.  He's -- so the need to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Redirect                    2060

1   write is very difficult to explain.  I have a trunk full of

2   writing because I need to write.  I don't want to publish it,

3   I don't want to do anything with it.  I just need to write.

4   So there's a need to write, if you have a propensity to

5   writing, and it's a wonderful endeavor.  It's something to

6   do.  Something constructive to do with time.  And we learn

7   about ourselves in the process.

8        Q    Did you have discussions with Dean about that?

9        A    Yes.

10        Q    What were those discussions?

11             MR. LOVRIC:  Objection.

12        A    Well, I couldn't discuss --

13             MR. LOVRIC:  Hearsay.

14             THE COURT:  Sustained.

15        Q    Do you know whether Dean ever expressed a desire to

16   change?

17        A    Oh, yes.  Oh, yes.

18        Q    When?

19        A    Oh, yes.  It was -- many times.  He just wanted --

20        Q    What?

21        A    -- for instance, to make his life better when he

22   got into the work in New Jersey and with Bill Sorvino and

23   making -- setting goals for himself and wanting his piece of

24   the American dream.  His home.  His something to be very

25   proud of.  And just, you know, getting into mainstream

Elizabeth M. Dinunzio - Redirect                    2061

1   America and being a homeowner, and that was -- that was a big

2   area of change and a big area of goals of focusing.

3        Q    Did you ever speak with Dean about some of the

4   sexual issues that he had had when he was younger?

5        A    I'm sure we did at times.  And again, I really

6   recommended counseling, which he did several times.

7        Q    You mentioned when I spoke with you last time

8   around that the manuscript that Dean was writing during --

9   after publication of American Desperado was going to be a

10  success story.  Did you speak to him about what was meant by

11  that?

12                  MR. LOVRIC:  Objection.

13                  MR. FISCHER:  It goes to state of mind more

14  than anything.

15                  MR. LOVRIC:  State of mind of whom?  I object.

16  To the defendant?  Because he is not the witness.

17                  THE COURT:  Let's go to side-bar for a minute.

18                  (At the bench)

19                  THE COURT:  Did you discuss this matter with

20  the witness on the stand?  This is kind of free base.

21                  MR. FISCHER:  I did not discuss this with her.

22  It was raised basically in response to the reading of the

23  book.  You know, we didn't go into this at all.  I talked to

24  her about whether -- on my direct, whether she was familiar

25  with the writing of the manuscript because that's also been

Elizabeth M. Dinunzio - Redirect                    2062

1   in evidence and when that was written.  She, as I understand

2   it, talked about it being like -- I don't remember her words,

3   a new beginning of sorts or a new leaf, as I heard something

4   along those lines.

5                MISS PEEBLES:  Can the jury take a break,

6   Judge?  They were asking.

7                (Jury excused)

8                (At the bench)

9                MR. FISCHER:  Mr. Lovric introduced with this

10  witness new evidence concerning her query of Dean, query of

11  anybody with respect to conduct that I presume Mr. Lovric

12  intends to allege was nonfiction.  That was true.  This area

13  that we're covering now, I don't know what she's going to

14  say, but I presume -- but I have not discussed this with her

15  before we stepped in.

16               MR. LOVRIC:  Can I put something on the

17  record, Judge?

18               THE COURT:  That's what you're here for.

19               MR. LOVRIC:  Okay.  First of all, the defense

20  on their direct of her brought out the fact that this witness

21  believed that the book was a fictional interpretation,

22  fictional writing, so when I went and cross-examined her

23  about it, it was the door that the defense had opened --

24               THE COURT:  That's right.

25               MR. LOVRIC:  -- as to whether the book is or

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Redirect                    2063

1    isn't fictional, and I don't see how anything that came out

2    is my problem.  And now the defense is bringing out other

3    things, which I don't know why and where it's going, but it's

4    clearly what the defendant is -- defense is bringing out.

5                    THE COURT:  What's the objection?  He doesn't

6    know what she's going to say.

7                    MR. LOVRIC:  I have an objection because she's

8    about to testify to conversations with the defendant.  It's

9    hearsay.

10                   MR. FISCHER:  Hearsay objection.

11                   THE COURT:  And the response I heard from Mr.

12   Fischer, he's not offering it for the truth, he's offering it

13   for state of mind.

14                   MR. LOVRIC:  Whose state of mind?

15                   THE COURT:  Mr. Sacco.

16                   MR. FISCHER:  In writing the manuscript.

17                   MR. LOVRIC:  No, the defendant needs to take

18   the stand if he wants to introduce his state of mind.  You

19   can't introduce statements that he made to other people

20   because they are being offered for truthfulness of the

21   statement, in this case that the book is not a fiction.

22   That's my view.

23                   THE COURT:  Well, I think you're right this

24   time.

25                   MR. FISCHER:  I think it's actually both.  It

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Redirect                2064

1    is both a hearsay and not a hearsay.

2                    THE COURT:  Well, it can't be both; one or the

3    other.

4                    MR. FISCHER:  In this instance I believe it,

5    Judge, can, frankly, because the substance of it has to do

6    with his state of mind, but it's also spoken in a context

7    that evidences state of mind independently.

8                    MR. LOVRIC:  Then the defendant would always

9    be able to get their entire --

10                   THE COURT:  It's not an admission so that's

11   out, because you're offering it in his defense.  You're

12   asking this witness what she believed that he meant when he

13   wrote the book.  I think that's -- you're asking for the

14   truth of that.  That's what you want to show, that he was not

15   trying to write an autobiography, he was fictionalizing this

16   because he wanted to sell the book.  She's already said that.

17                   MR. LOVRIC:  And the other part is, you're

18   asking this witness to say what's in the defendant's mind,

19   not in her own, and that's also not admissible.

20                   MR. FISCHER:  Based upon statements that he

21   made, not her interpretations of it.  That would be the

22   evidence that I should present in this regard.

23                   THE COURT:  I'm going to sustain the

24   objection.  Take a break.

25                   (In open court)

Elizabeth M. Dinunzio - Redirect                    2065

1              (At the bench)

2              MR. LOVRIC:  Judge, when we were at side-bar

3    here, Agent Lyons informed me that he was observing Miss

4    Dinunzio.  She was speaking to juror number 7, and Agent

5    Lyons said that he could hear that she was telling juror

6    number 7 that he is a good boy, and she said that twice.  So

7    I bring that to the Court's attention.

8              THE COURT:  What would you like me to do about

9    it?

10              MR. LOVRIC:  I'd like a legal instruction that

11    he's not a good boy.  I was just kidding, for the record.

12              MR. FISCHER:  You made a joke.

13              THE COURT:  He does from time to time.  Not

14    often; from time to time.

15              MR. LOVRIC:  I don't know, Judge.  Like I

16    said, I didn't see it or hear it.  The agent told me.

17              THE COURT:  I think unless you want me to give

18    a curative instruction...

19              MR. LOVRIC:  No, no.  I wasn't going to ask

20    for that.  I don't want to put anybody on the spot.

21              THE COURT:  That couples -- that's along with

22    another consideration, but Colleen just told me a couple

23    minutes ago that juror number 1 recognized the tree cutting

24    guy.  I'm saying, so what, but at least I've got to let you

25    people know about that.  She knew him through some kind of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Redirect                2066

1    EMT type affiliation.  That guy was a fireman, he testified.

2                   MISS PEEBLES:  Was she a nurse?

3                   THE COURT:  I don't remember.  I don't think

4    his testimony was -- we have to scrutinize it for truth or

5    not.  I think he got up there and said what he knew, what he

6    could remember without bringing any records or his book or

7    anything.  If you think about it, think of something to do.

8    I mean, maybe in the charge.  I've got to talk to you too,

9    Kelly, about that, because we've done a lot of research on

10   dominant purpose.

11                  MR. FISCHER:  Okay.

12                  THE COURT:  We can say something that the

13   evidence comes from the answers the witness gave to questions

14   in the courtroom and anything said that wasn't in response to

15   a question is not evidence and can't be considered by you.

16   Something like I say anyway.

17                  MISS PEEBLES:  Yeah, that's pretty typical.

18                  THE COURT:  Yeah, that's pretty typical.

19                  MR. LOVRIC:  I'm not asking for anything,

20   Judge.  I brought it to the Court's attention.  I just

21   wanted --

22                  MR. FISCHER:  I will make sure to address it

23   with Miss Dinunzio, no more conversations.  I didn't see them

24   so --

25                  THE COURT:  Why don't you tell her that.  And

Elizabeth M. Dinunzio - Redirect                    2067

1    we'll bring the jury in and we'll go from there.

2                    (In open court)

3                    (Jury present)

4                    THE COURT:  Okay, Mr. Fischer.

5                    MR. FISCHER:  Thank you, your Honor.  May it

6    please the Court.

7    BY MR. FISCHER:

8        Q    Miss Dinunzio, in speaking with Mr. Lovric, as I

9    heard what you said --

10       A    Yes.

11       Q    -- you said something about with respect to the

12   book, that it being about dysfunctional behavior.

13       A    Yes.

14       Q    What's that based upon, that testimony that you

15   gave about that subject?

16       A    Please repeat that.  I'm sorry.

17       Q    Sure.  Mr. Lovric asked you a question and you

18   responded that the book was about dysfunctional behavior.

19       A    Yes.

20       Q    What do you base that statement on?

21       A    The book.

22       Q    No, your statement that the book was based on

23   dysfunctional behavior, what do you mean by that?

24       A    I'm drawing a complete blank.

25       Q    Okay.

Elizabeth M. Dinunzio - Redirect                    2068

1       A     Sorry.

2       Q     You had opportunities to observe Dean prior to

3   2000, many opportunities, right?

4       A     Yes.

5       Q     You're his mom.

6       A     Right.

7       Q     Did you observe what you concluded was

8   dysfunctional behavior?

9       A     Yes.

10      Q     And you were aware of other behavior that you

11  didn't see?

12      A     Yes.

13      Q     Since that time, have you observed any difference

14  in Dean's behavior?

15      A     Oh, absolutely.  A marked difference.

16      Q     How so?

17      A     Marked difference.  Thinking through things more

18  clearly.  Goal setting.  Having substantial reasons to be

19  doing things, for instance, you know his job, his house,

20  his -- yes.  There was a marked difference.  Yes.  Okay.

21  Sorry.  I don't want to make a dissertation out of this.

22      Q     With respect to Mary Carmen --

23      A     Yes, that's fine.

24      Q     -- when did Dean start seeing Mary Carmen, to your

25  recollection?

Elizabeth M. Dinunzio - Redirect

1     A     Oh, my goodness.  I know it was a couple of years

2  ago.  It was about two years ago.  Now let me think.  When we

3  went to New York, it was very cold.  It was very cold, so it

4  was either fall -- maybe around November.  That was what,

5  two -- two, three years ago?  Here I go again with the years.

6     Q     And Dean had been seeing Mary before you met Mary?

7     A     Yes.  He told me about her.  Yes.

8     Q     I'll show you Exhibit S-30 in evidence.

9     A     Yes.

10    Q     Who is that in the picture again?

11    A     That's Mary Carmen and Dean.

12    Q     And when was that taken, to the best of your

13 recollection?

14    A     Well, I thought it was fall, but it doesn't look

15 fall-ish to me in the picture.  I know it was cold.  I know

16 it was -- some of the trees are -- it was quite a chilly day

17 in New York.  That's what I remember.  We're obviously in

18 jackets.

19    Q     Dean and Mary Carmen in that picture appear to

20 be -- both of them smiling?

21    A     Yes.

22    Q     Do you remember -- did you take that picture?

23    A     I did.

24    Q     Were they in fact smiling?

25    A     Yes.

Elizabeth M. Dinunzio - Redirect                    2070

1      Q     Did you spend some time with them that day?

2      A     I spent the entire day.  I took the train into

3   New York, met them at Grand Central Station, and we went

4   to -- this was the park, Central Park.  We went to Central

5   Park, we went to lunch, we walked around the city, and I

6   listened to them speak Italian to each other.  She spoke

7   Italian very well and Dean speaks it, and he was delighted to

8   have someone to be able to speak to, so they would practice

9   Italian.

10                MR. FISCHER:  Those are all the questions I

11   have, your Honor.  Thank you.

12                THE COURT:  Okay.  Miss Peebles.

13                MISS PEEBLES:  I have no questions.  Thank

14   you.

15                THE COURT:  Mr. Lovric?

16                MR. LOVRIC:  Judge, I have no more questions

17   for this witness.

18                THE COURT:  All right.  Thank you,

19   Mrs. Dinunzio.  You may step down, ma'am.

20                THE WITNESS:  All right.

21                (Witness excused)

22                MR. FISCHER:  Your Honor, may we have a brief

23   side-bar, please?

24                THE COURT:  Sure.

25                (At the bench)

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Elizabeth M. Dinunzio - Redirect                    2071

1          MR. FISCHER:  Your Honor, I'm ready to rest.

2    I had subpoenaed Gilbert Pedersen, Judge, from Norwich to say

3    he installed the boiler in November of 2006.  The message I

4    got from my secretary was, and I quote, he said he's not

5    going to be here, he has nothing to do with this situation,

6    send a patrol car to pick him up.

7          THE COURT:  Well, we can.

8          MR. FISCHER:  I'm ready to rest at this point

9    but for Mr. Pedersen's testimony.  What I would ask -- and it

10   appears we're going to be presenting testimony on Tuesday in

11   any event.  He's really not an imperative, fundamental,

12   important witness.  I don't know if Miss Peebles is prepared

13   to present evidence at this point.

14         MISS PEEBLES:  I am.

15         MR. FISCHER:  I can rest.  And I would ask the

16   Court's permission if I can persuade Mr. Pedersen to come in

17   and say what he has to say about this, to reopen my case at

18   that point for that sole purpose.

19         THE COURT:  The Court will hold the record

20   open for the witness.  You can put that in after you get him

21   here, after Miss Peebles or even after Mr. Lovric finishes,

22   subject to whatever Mr. Lovric wants to do.  In response we

23   have to have an off-the-record conversation, so we have to

24   send the jury out --

25         MR. FISCHER:  Exactly.

1              THE COURT:  -- concerning --

2              Yes.  Ladies and gentlemen, we're going to ask

3    you to stand aside for a few minutes.  We're going to bring

4    you right back in.  Don't get comfortable.

5              (Jury excused)

6              THE COURT:  All right.  We're on the record.

7    The jury has been excused for a few moments.  And Mr. Sacco,

8    I haven't permitted you to address me before, but I'm going

9    to address you and your counsel now.

10             As you know, you have a choice to make here.

11   You have a right to remain silent or you have a right to

12   testify in your own behalf.  And have you had an opportunity

13   to discuss that issue at length with Mr. Fischer?

14             DEFENDANT SACCO:  Yes, I have, sir.

15             THE COURT:  All right.  What do you want to do

16   in this case?

17             DEFENDANT SACCO:  In this particular case,

18   sir, I'm going to remain silent and not be subject to Mr.

19   Lovric, who considers me a criminal and a pedophile and a

20   predator and a sexual rapist and all this stuff.  I've always

21   been an honest and open person.  My life has changed, and I

22   will not subject myself to this man's, what I consider

23   criminal prosecutorial behavior.

24             THE COURT:  All right.  So you choose not to

25   testify, is that right?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

2073

1              DEFENDANT SACCO:  Yes.

2              THE COURT:  All right.  So, fine.  You ready

3    to go, Miss Peebles?

4              MISS PEEBLES:  Yes.

5              THE COURT:  Colleen, bring the jury back in,

6    please.

7              (In open court)

8              (Jury present)

9              THE COURT:  All right, ladies and gentlemen.

10   The defendant Sacco has rested.  The Court's going to reserve

11   all motions on his behalf.  And Miss Peebles is now going to

12   call witnesses to present to you.

13             Miss Peebles, are you ready?

14             MR. FISCHER:  I am, your Honor.

15             THE COURT:  Who would you like to call?

16             MISS PEEBLES:  On behalf of Mrs. O'Connor, the

17   defense would call Deanna Kirwin.

18             THE CLERK:  Please state your name for the

19   record.

20             THE WITNESS:  Deanna Kirwin.

21

22

23

24

25

Deanna Kirwin - Direct

1   D E A N N A   K I R W I N, having been called as a witness,

2   being duly sworn, testified as follows:

3                 THE COURT:  Okay, Miss Peebles.

4   DIRECT EXAMINATION

5    BY MISS PEEBLES:

6        Q     Good morning, Deanna.  Can you tell the jurors how

7   old you are.

8        A     I'm 13.

9        Q     What town do you live in?

10        A     Norwich.

11        Q     Okay.  What school do you attend?

12        A     Norwich Middle School.

13        Q     Do you know a girl by the name of Shannon O'Connor?

14        A     Yes, I do.

15        Q     Can you tell the jury how you know Shannon

16   O'Connor.

17        A     Through a friend through school.  She was my best

18   friend.

19        Q     Can you tell the jury when you first -- right

20   around when you first met Shannon O'Connor.

21        A     Like in the middle school.

22        Q     What year?

23        A     Last year.

24        Q     Would it be '06?

25        A     Yes.

Deanna Kirwin - Direct

2075

1    Q    Now, Deanna, did -- what type of contact did you

2    have with Shannon?  Would you describe that for the jury.

3    A    Can you clarify that more, please.

4    Q    How often did you see Shannon?

5    A    Like in school and then occasionally on the

6    weekends.

7    Q    Did you ever spend the night at Shannon O'Connor's

8    house?

9    A    Yes.

10    Q    Do you recall where she lived in Norwich?

11    A    That apartment.  I'm not really positive where it

12    is.

13    Q    On Fair Street?

14    A    M-m h-m-m.

15    Q    Could you say yes for the record?

16    A    Yes.

17    Q    Now, did you ever go to the YMCA in Norwich?

18    A    Yes.

19    Q    And how often did you go to the YMCA?

20    A    For Y dances.

21    Q    Say that again.  Sorry?

22    A    Like Fridays, usually.

23    Q    Did you say Y dances?

24    A    Yes.

25    Q    So there would be dances that were held for kids

Deanna Kirwin - Direct

2076

1   your age at the YMCA?

2       A    Yes.

3       Q    Did you ever attend a Y dance with Shannon

4   O'Connor?

5       A    Yes.

6       Q    Do you know around what time that was in '06?

7       A    Not really sure.

8       Q    Do you know if it was before Christmas?

9       A    Yes, it was before Christmas.

10      Q    Can you tell the jury what you did with Shannon

11  O'Connor after you went to the Y dance?

12      A    We'd usually go to -- we'd walk to her house and

13  then we'd say hi to her mother, and her mom would be watching

14  TV so we'd go in her room.  Then when her mom was done

15  watching TV, we'd go out and watch TV.

16      Q    Can you tell the jury about the distance between

17  the downtown YMCA in Norwich and Fair Street where Shannon

18  O'Connor was living with her mom.

19      A    It was a couple of streets.

20      Q    So a couple of blocks?

21      A    M-m h-m-m.

22      Q    And you would walk from the Y dance to Fair Street?

23      A    Yes.

24      Q    Now, you stated that you spent the night there

25  after that Y dance?

Deanna Kirwin - Direct                                              2077

1      A    Yes.

2      Q    Can you tell the jury what you did with Shannon the

3  next day after you guys got up.

4      A    We went into like the garage thing and she showed

5  me magazines.

6      Q    What kind of magazines was she showing you?

7      A    Pornographic.

8      Q    Could you explain to the jury what you saw when you

9  went into this garage area.

10     A    They're like bins, and in the bins there was videos

11 and magazines.

12     Q    You said they were pornographic magazines?

13     A    Yes.

14     Q    How long were you in the shed area looking at these

15 pornographic magazines with Shannon?

16     A    Like ten minutes, and then we'd go inside.

17     Q    Did Shannon mention -- or strike that.  Was Shannon

18 concerned about her mother finding out about you guys looking

19 at these pornographic magazine?

20     A    She said that if she found out, then she'd probably

21 like lock up the thing or something.

22     Q    And Shannon had been into that shed before?

23     A    Yes.

24     Q    Now, did Shannon ever talk to you -- and I'm not

25 asking what she said -- but did she ever talk to you about

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Deanna Kirwin - Direct

2078

1    her relationship with Dean Sacco?

2        A    Yes.

3                 MISS PEEBLES:  No further questions.

4                 THE COURT:  Okay.  Mr. Lovric.

5    CROSS-EXAMINATION

6     BY MR. LOVRIC:

7        Q    Hi, Deanna.

8        A    Hi.

9        Q    How you doing?

10       A    Good.

11       Q    Have you ever testified in court before?

12       A    No.

13       Q    This will be pretty cool to tell in school, won't

14   it?

15       A    Yeah.

16       Q    Maybe you can write a paper and get an extra grade

17   or extra credit.  I think the teacher would probably go for

18   that.  What do you think?

19       A    Maybe.

20       Q    Deanna, I just have a couple of questions.  Shannon

21   was a pretty good friend of yours.

22       A    Yes.

23       Q    You guys got along pretty well?

24       A    Yes.

25       Q    Joked around, had fun with her?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Deanna Kirwin - Cross                                    2079

```
 1      A    Yes.

 2      Q    Do you think she was a pretty good friend to you?

 3      A    I'm pretty sure.

 4      Q    Okay.  I take it you guys kind of did the same kind

 5  of stuff 13-year-old kids do, goofed around and stuff and

 6  talked about boys and talked about school, that kind of

 7  stuff?

 8      A    Yes.

 9      Q    Okay.

10      A    Not usually school though.

11      Q    What's that?  What was that?

12      A    I said not usually school though.

13      Q    Okay.  But you guys did the kind of things that

14  13-year-old teenagers do these days, talk about stuff going

15  on and things you like and don't like, that kind of stuff,

16  right, I take it?

17      A    Yeah.

18      Q    The shed that Miss Peebles talked to you about,

19  that's in the back of Shannon's house where that garage is

20  and the shed, right?

21      A    Yes.

22      Q    Okay.  Do you remember which part of the back you

23  guys went into on stuff you just told Miss Peebles about?

24      A    It was like the second to last one, I believe.

25      Q    Was it like in the back -- there's garages on the
```

Deanna Kirwin - Cross                              2080

1    left, there's garages on the right, and there's also a shed

2    in the middle?

3         A    It's on the left.

4         Q    Okay.  On the left somewhere?

5         A    M-m h-m-m.

6         Q    Okay.  Did you go to Shannon's house a lot or just

7    once or twice?  How would you describe it?

8         A    Like three times.

9         Q    Okay.  Okay.  And when Shannon -- when Shannon

10   mentioned Dean Sacco, did she mention him by name?

11        A    She said it was her landlord.

12        Q    Okay.  So she just talked about him as the

13   landlord.  Did you know the landlord's name?

14        A    She said -- yeah, Dean.  She referred to him as

15   Dean.

16        Q    Okay.  And I take it she at some point told you the

17   landlord, that's how you knew she was talking about the

18   person that owns that house?

19        A    Yes.

20        Q    Okay.  And did she seem -- did she seem concerned

21   to you when she talked about Dean?

22        A    She was like upset kind of.

23        Q    Okay.  Upset about something that had happened with

24   the landlord?

25        A    Yeah.

Deanna Kirwin - Cross

2081

1           MR. FISCHER:  Your Honor, I object as hearsay.

2           THE COURT:  I'm sorry?

3           MR. FISCHER:  I object.  It was hearsay as to

4    what she told this witness.

5           THE COURT:  Well, if he asked for a

6    conversation, then you're absolutely right.  But what he's

7    asking is for this witness to describe what Shannon was like

8    when she referred to your client, so I don't think that's a

9    hearsay question and answer.

10   BY MR. LOVRIC:

11       Q    Deanna, my question is:  When Shannon did mention

12   or talk about the landlord, did she seem to you that she was

13   upset and something was bothering her about something dealing

14   with the landlord?

15       A    Yes.

16           MR. LOVRIC:  That's all I have, Deanna.  And

17   good luck in school and getting that credit for writing my

18   story.

19           THE COURT:  Mr. Fischer?

20           MR. FISCHER:  Thank you, your Honor.

21   CROSS-EXAMINATION

22    BY MR. FISCHER:

23       Q    I can't tell whether it's morning or afternoon but

24   I'll call it morning.  Morning.  The YMCA you said is just a

25   couple of streets away from 45 Fair Street?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Deanna Kirwin - Cross                                   2082

1       A    Yes.

2       Q    How long a walk would you say it is?

3       A    Like five or ten minutes.

4       Q    Miss Kirwin, I'm going to put on the screen a

5   photograph that's already been in evidence as Exhibit 51.  Do

6   you see that?

7       A    Yes.

8       Q    Is that the garage area that you referred to?

9       A    Yes.

10      Q    Does that show the area where these magazines and

11  stuff were stored?

12      A    Yes.

13      Q    Can you -- and I'm not sure whether this is going

14  to work, but can you point on your screen as to which storage

15  area those were stored in?

16      A    (Witness complies.)

17      Q    There you go.  Thank you.  As you look at the

18  screen, did a blue arrow appear on your screen?

19      A    Yes.

20      Q    That shows the shed or garage where these items

21  were stored?

22      A    Yes.

23      Q    Do you see to the right of that on that picture

24  closed doors between what appear to be two sets of garages?

25      A    Yes.

Deanna Kirwin - Cross

2083

1    Q    Can you see there it seems to be a basketball hoop
2  up on the middle building?
3    A    Yep.
4    Q    Is that consistent with what you saw at that time?
5  Did it look like that back then?
6    A    Not really sure.  It was a long time ago.
7    Q    How long was it?
8    A    Like last year.
9    Q    This was when you were a student at the Norwich
10 Middle School?
11   A    No.  When I was a student at Perry Brown.
12   Q    Do you remember what time of year it was when you
13 were there?
14   A    Not really sure.
15   Q    Shannon was living at the apartment when you --
16 when you guys went back into the shed?
17   A    Yes.
18   Q    Was anybody to your recollection living upstairs in
19 that apartment house?
20   A    She said her landlord lived up there.
21   Q    Did the two of you ever go upstairs?
22   A    No.
23   Q    Were these garages where this stuff was stored,
24 were they locked?
25   A    A couple of them were but not all of them.

Deanna Kirwin - Cross

2084

1    Q    And the stuff where these pornographic magazines

2  that you looked at, that was unlocked?

3    A    Yes.

4    Q    And were you able to walk in, open the garage doors

5  and walk in?

6    A    Yes.

7    Q    And you said there was other stuff there too?

8    A    Yes.

9    Q    Do you remember whether there were any -- say any

10 dressers stored in there?

11   A    Not that I know of.

12   Q    What other stuff was stored in there?

13   A    Videos of pornographic stuff.

14   Q    Okay.  Like videos that -- like store-bought

15 videos?

16   A    Yes.

17   Q    What else was stored in there?

18   A    That's all I can remember.

19   Q    And was this stuff stored in something?

20   A    In like a bin kind of thing.

21   Q    What did the bin look like?

22   A    It was made of wood.

23   Q    Do you remember what color it was?

24   A    Like tannish.

25   Q    Do you remember how big it was?

Deanna Kirwin - Cross                                2085

1        A     Not really sure.

2        Q     How many magazines were there?

3        A     I'm not sure.

4        Q     Did you speak with anybody, any adults about that

5   issue at that time?

6        A     No.

7              MR. FISCHER:  Those are all the questions I

8   have for you.  Thank you.

9              THE COURT:  Okay.  Miss Peebles.

10             MISS PEEBLES:  No further questions.  Thank

11  you.

12             THE COURT:  Mr. Lovric?

13             MR. LOVRIC:  No questions.  Thanks, Deanna.

14             THE COURT:  Okay.  Thank you.  You may step

15  down, Deanna.

16             (Witness excused)

17             MISS PEEBLES:  Your Honor, the defense on

18  behalf of Linda O'Connor now calls James Mullen.

19             THE COURT:  Okay.

20             THE CLERK:  Sir, please come forward and state

21  your name for the record.

22             THE WITNESS:  James Mullen, M-U-L-L-E-N.

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Mullen - Direct

1   J A M E S    M U L L E N, having been called as a witness,

2   being duly sworn, testified as follows:

3                   THE COURT:  Okay, Miss Peebles.

4   DIRECT EXAMINATION

5    BY MISS PEEBLES:

6        Q    Mr. Mullen, can you tell the jury where you reside,

7   the town where you reside.

8        A    I live in the town of Norwich.

9        Q    Can you tell the jurors where you're employed.

10       A    I'm the executive director of the Norwich Family

11  YMCA.

12       Q    And how long have you worked in that capacity?

13       A    I've been employed at the YMCA in Norwich for 16

14  years.

15       Q    And as executive director of the YMCA in Norwich,

16  could you explain what your job duties and functions are.

17       A    As a community-based organization, I am in charge

18  of a community organization with over 4,000 members,

19  providing programs and services for members in our community,

20  ages six months through a hundred years of age.  Wide

21  variety.  Child care, camping, sports, athletics, swimming,

22  health and fitness, across the board.

23       Q    Now, as executive director of the YMCA, are you

24  familiar with some of the day-to-day members that go to the Y

25  in Norwich?

James Mullen - Direct

1      A      I consider that to be my job to -- as a member

2   service organization, to make our members feel wanted, know

3   them by name.  We're kind of a family, so -- it was probably

4   easier ten years ago when we had 2,000 members.  When we have

5   4,000 now, it's a challenge to know every single member.  I

6   feel I pride myself knowing most of our members.

7      Q      Do you know Linda O'Connor?

8      A      Yes.

9      Q      And can you explain to the jury how you know Linda

10  O'Connor.

11     A      Linda was a member of our organization in Norwich.

12  She moved to the community and was looking for a facility for

13  her and her daughter to utilize as a family.

14     Q      Do you know Shannon O'Connor?

15     A      Yes.

16     Q      And were you involved or aware of an incident that

17  occurred in August of 2006 concerning her claims of taking

18  the mother's medication?

19     A      Yes.

20     Q      What involvement did you have with that incident?

21     A      As the director of the facility, I have 112

22  employees that work for us at the YMCA.  During the summer of

23  2006, one of our large programs is the operations of our day

24  camp, which is at our off-site facility, our Camp Thompson

25  facility in Smyrna, New York.  And it was reported by my

James Mullen - Direct

1   direct report, our camp director, of an incident where

2   Shannon had referenced to her counselors earlier that morning

3   that she had taken her mother's medication and tried to

4   commit suicide.

5       Q    Did you have any direct involvement with that after

6   it was reported to you in any way, shape or form?

7       A    The only interaction that I had with that case and

8   situation was to make sure that all of our procedures were

9   followed by our employees.  And then due to the severity of

10  the situation, and obviously any concern that I would have

11  for any of our members, I usually try to go up to the

12  hospital, which is located just a couple blocks away from our

13  facility, and so I did go up to make sure that the staff that

14  went with her and Shannon were safe and secure at the

15  hospital.

16      Q    Now, would you say -- how many employees showed up

17  at the hospital?  Do you have any recollection of that?

18      A    I'm going to say at least three, maybe four were

19  there during her time that she was at Chenango Memorial

20  Hospital.

21      Q    So this generated a lot of attention on that day,

22  is that accurate?

23      A    Yes.

24      Q    Now, I want to turn to a time after March of 2007.

25  Did you have any contact with Linda O'Connor that you can

James Mullen - Direct                                    2089

1   recall after that time period?

2        A    Linda did come back to the YMCA.  Specific date, I

3   don't recall.  It was probably end of March and --

4        Q    Can you describe -- well, let me strike that.  Did

5   she seek you out?

6        A    Yes.  She came to the front desk of our

7   organization and asked to speak to the director, and I had

8   staff at the desk come and get me, and at that time the staff

9   stated that there was a woman at the front desk who seemed

10  very upset and was crying and wanted to see me.

11       Q    And did you thereafter meet with Mrs. O'Connor?

12       A    Yes.  I came out from my office, which is located

13  behind the front desk, and came to the desk and saw that she

14  was upset, so we went to a neighboring room, which is our

15  conference room, so we weren't at the front desk where the

16  day-to-day business operations take place.  And we sat in the

17  conference room and we talked.

18       Q    Now, did your discussions involve her daughter

19  Shannon O'Connor?

20       A    Yes.

21       Q    And did they involve discussions concerning --

22            MR. LOVRIC:  Objection.

23            THE COURT:  Basis?

24            MR. LOVRIC:  It's hearsay.

25            MISS PEEBLES:  I didn't ask specifically what

                VICKY ANN THELEMAN, RPR, CRR
                UNITED STATES DISTRICT COURT

James Mullen - Direct

1    was said.  I was simply asking the nature of the topic.

2                    THE COURT:  You can ask the topic but you

3    can't ask for a specific conversation.

4     BY MISS PEEBLES:

5        Q    What was the topic that you were discussing with

6    Mrs. O'Connor?

7        A    The topic with Mrs. O'Connor was the ability to

8    continue using the YMCA for her and her daughter, knowing

9    that they would be safe at the YMCA.

10       Q    And what was Mrs. O'Connor's safety concern,

11   without telling the jury --

12                   MR. LOVRIC:  Objection.

13                   THE COURT:  Sustained.

14       Q    When you were done having a conversation with Mrs.

15   O'Connor, what did you take away in your mind with regard to

16   her concerns?

17                   MR. LOVRIC:  Objection.

18                   THE COURT:  Sustained.  How about maybe

19   something that he did.

20       Q    Did you do anything after you had these discussions

21   with Mrs. O'Connor or did you make any -- strike that.  What

22   did you tell -- what was your role during that discussion

23   with Mrs. O'Connor?

24       A    My role with the conversation, I was a sounding

25   board.  I was there listening to one of our members and her

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Mullen - Direct

2091

```
 1    concerns.  And my -- and I had a response where I said the
 2    YMCA is a community-based organization, is a safe
 3    environment, and we will do anything that we can to make sure
 4    that every member is safe at the YMCA, to the best of our
 5    ability.
 6         Q    And was there a reference concerning another member
 7    that also went to the YMCA?
 8                   MR. LOVRIC:  Objection.
 9                   THE COURT:  Sustained.
10         Q    Did you -- after discussing Mrs. O'Connor's
11    concerns, did you go back and look at any kind of records at
12    the YMCA?
13         A    After our conversation, no.
14         Q    What was your state of mind after having that
15    discussion with Mrs. O'Connor?
16                   MR. FISCHER:  Objection.
17                   THE COURT:  Relevance?
18                   MR. FISCHER:  It's not necessarily based upon
19    the conversation itself, which is hearsay.
20                   THE COURT:  I'll sustain the objection.
21    BY MISS PEEBLES:
22         Q    But as far as you remember, there was an issue
23    concerning safety concerns with Mrs. O'Connor and her
24    daughter, is that fair?
25         A    That's what she was asking, whether or not she
```

James Mullen - Direct                                2092

1    would be safe with her daughter and they can utilize the YMCA

2    as they had been.

3              MISS PEEBLES:  No further questions.  Thank

4    you.

5              THE COURT:  Okay.  Mr. Lovric.

6    CROSS-EXAMINATION

7    BY MR. LOVRIC:

8        Q    Mr. Mullen?

9        A    Yes.

10       Q    How did Linda utilize the Y there?  Did she have an

11   account?

12       A    She was a member, and as a member of the

13   organization, you're entitled to utilize any of the

14   facilities or programs.

15       Q    Okay.  And the account that Shannon was on, was

16   that on Linda O'Connor's?

17       A    I believe she was under single parent membership

18   category.

19       Q    Who was?

20       A    Linda and Shannon.

21       Q    So they were both on the same family account?

22       A    Correct.

23       Q    Okay.  And I take it when Linda or Shannon wanted

24   to use the Y, there was some kind of magnetic card and you

25   swipe it?

James Mullen - Cross

2093

1      A     Correct.

2      Q     Okay.

3                  MR. LOVRIC:  All right.  That's all.

4                  THE COURT:  Okay.  Mr. Fischer.

5                  MR. FISCHER:  Thank you, your Honor.

6    CROSS-EXAMINATION

7     BY MR. FISCHER:

8      Q     Mr. Mullen, when they swipe that card, is there a

9    record kept and created indicating who is going to the YMCA

10   at what time?

11     A     That's correct.

12     Q     And you produced that record already, your

13   organization has, for the purposes of this case?

14     A     Yes.  Folks have asked that from us.

15     Q     Okay.

16                 MR. FISCHER:  No further questions.  Thank

17   you.

18                 THE COURT:  Miss Peebles?

19                 MISS PEEBLES:  No further questions.  Thank

20   you.

21                 THE COURT:  Mr. Lovric.

22                 MR. LOVRIC:  No other questions, Judge.

23                 THE COURT:  Okay.  Thank you, Mr. Mullen.  You

24   may step down, sir.

25                 (Witness excused)

Joyce Hagen - Direct                                    2094

1            MISS PEEBLES:  Yes, your Honor.  On behalf of

2   Linda O'Connor, the defense calls Joyce Hagen.

3            THE COURT:  Okay.

4            THE CLERK:  Ma'am, please come forward.

5            State your name for the record.

6            THE WITNESS:  My name is Joyce Hagen.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joyce Hagen - Direct

2095

1   J O Y C E    H A G E N, having been called as a witness,

2   being duly sworn, testified as follows:

3   DIRECT EXAMINATION

4    BY MISS PEEBLES:

5        Q    Miss Hagen, can you tell the jury what town you

6   reside in.

7        A    I live in Norwich, New York.

8        Q    Where are you currently employed?

9        A    I'm employed at the Norwich Family YMCA at Norwich,

10  New York.

11       Q    And what is your job description?

12       A    My title is finance director, which I'm also the

13  supervisor for the front desk staff.

14       Q    And do you maintain and keep YMCA membership

15  records?

16       A    Yes, I do.

17       Q    And did you generate some records for myself on

18  behalf of Linda O'Connor?

19       A    You're referring to the attendance records?

20       Q    Correct.

21       A    Yes.

22       Q    And you recall that you obtained the records for

23  Dean Sacco, Shannon O'Connor?

24       A    That is correct.

25       Q    And when an individual uses the YMCA and they use

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Joyce Hagen - Direct                                    2096

1    their scanner card, their name shows up if they're the one

2    who used the facility?

3         A    Yes.

4         Q    And it doesn't matter who's paying for the

5    membership, is that correct?

6         A    That's correct.

7         Q    Now, Miss Hagen, I want to draw your attention to a

8    time period after March of '07, around March of '07.  Do you

9    understand my question?

10        A    Yes.

11        Q    Do you know Linda O'Connor?

12        A    Yes.

13        Q    How do you know Linda O'Connor?

14        A    I had seen Linda in the YMCA previously in the

15   corridors, but on the time that you're referring to, Linda

16   came to the YMCA, to the front desk, and asked to speak to

17   the executive director, Jamie Mullen.  So, I went to Jamie's

18   office.  He was tied up, and I asked him if he'd like me to

19   take Linda to the conference room.

20        Q    Could you describe for the jury the demeanor of

21   Mrs. O'Connor when she went to the Y that day.

22        A    She seemed upset, and that's why I asked if I

23   should take her to the conference room, because it seemed she

24   wanted to speak to Jamie personally, privately.  So, I took

25   Linda to the conference room, and she started talking to me

1    about --

2                    MR. FISCHER:  Objection.

3                    THE COURT:  You can't tell us what she was

4    talking about.

5                    THE WITNESS:  Oh, I'm sorry.

6                    THE COURT:  That's okay.  You didn't know.

7    She'll ask you another question.

8    BY MISS PEEBLES:

9        Q    So when you went into the conference room, you were

10   present with the conversation that Mrs. O'Connor was having

11   with the executive director, Mr. Mullen?

12       A    She actually spoke with me before Jamie came in.

13   Yes, I stayed there with him after he came in, yes.

14       Q    And there were concerns that Mrs. O'Connor -- that

15   you were addressing with Mrs. O'Connor concerning her

16   membership there, is that correct?

17       A    As far as membership continuing with her being able

18   to come to the Y, yes.

19       Q    Yes.  And after that conversation with Mrs.

20   O'Connor, did you do anything to address her concerns?  Did

21   you yourself do anything to address any of her concerns?

22       A    I know that we spoke to her to reassure her that

23   everything would be fine, that the Y was a place where she

24   and Shannon could come and feel safe.  I think I can even

25   remember giving her a hug.  I just felt like she needed a hug

Joyce Hagen - Direct                                    2098

1    at that time.  And again, just reassured her that they were

2    fine.

3         Q    And did you specifically say anything to her during

4    that conversation?  Do you remember you saying anything to

5    her?

6         A    I'm not sure what you mean.  I mean, I know there

7    was conversation back and forth.  She was in there for

8    several minutes.  Just that --

9                   MR. FISCHER:  I object to the substance of it.

10                  THE COURT:  Sustained.

11                  MISS PEEBLES:  No further questions.  Thank

12   you, Mrs. Hagen.

13                  THE COURT:  Mr. Lovric?

14                  MR. LOVRIC:  I have no questions, Judge.

15                  THE COURT:  Mr. Fischer?

16                  MR. FISCHER:  I have a question.

17   CROSS-EXAMINATION

18    BY MR. FISCHER:

19        Q    Does Judge Ingraham still go to the Y?

20        A    Yes.

21        Q    Thank you.

22                  MR. FISCHER:  No further questions.

23                  THE COURT:  Anything further with this

24   witness?

25                  MISS PEEBLES:  No, your Honor.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Joyce Hagen - Cross                                      2099

1                    THE COURT:  Thank you, Miss Hagen.  You may

2    step down, ma'am.

3                         (Witness excused)

4                    MISS PEEBLES:  Your Honor, at this time the

5    defense would call Richard Haumann.

6                    THE CLERK:  Please state your name for the

7    record.

8                    THE WITNESS:  Richard L. Haumann.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Richard Haumann - Direct

2100

1   R I C H A R D   L.   H A U M A N N, having been called as a

2   witness, being duly sworn, testified as follows:

3   DIRECT EXAMINATION

4    BY MISS PEEBLES:

5       Q    Mr. Haumann, could you tell the jurors where you're

6   employed.

7       A    I work for the Office of the Federal Public

8   Defender in Syracuse.

9       Q    And how long have you worked in that capacity?

10      A    Approximately nine years.  A little under nine

11  years.

12      Q    What do you do at the Federal Defender's office?

13      A    I'm an investigator.

14      Q    And before your employment with the Office of the

15  Federal Defender, where did you work?

16      A    I worked for various police organizations.

17      Q    And specifically, where was your first employment

18  as --

19      A    Syracuse Police Department, Syracuse, New York.

20      Q    What was your title?

21      A    Well, I had several titles.  I started as a police

22  officer, sergeant, lieutenant, detective, deputy chief was my

23  final position.  I was their chief of detectives, chief of

24  operations.

25      Q    And when did you retire from that position?

Richard Haumann - Direct

2101

1    A    1986.

2    Q    And where did you work after you retired from the

3    Syracuse Police Department?

4    A    I worked short period of time for Broward County

5    Sheriff's Department in Florida, and then I worked for Amtrak

6    Police.  I was the superintendent and/or chief of operations

7    for the entire country, in the police department.

8    Q    Now, in your capacity as an investigator for my

9    office, did you work on --

10    A    Excuse me.  I'd rather refer to it as our office.

11        THE COURT:  Good one.

12    Q    Did you work on the case involving Linda O'Connor?

13    A    Yes, I did.

14    Q    Can you briefly describe to the jury what you did

15    to investigate matters concerning Linda O'Connor.

16    A    I reviewed a lot of reports, I issued a lot of

17    subpoenas.  I interviewed a lot of people.

18    Q    Did you review any phone records?

19    A    Yes.

20    Q    And did you prepare a chart pertaining to the phone

21    records that you reviewed?

22    A    Yes, I did.

23    Q    I'm going to hand you what's been marked as Defense

24    Exhibit 70 and ask if you can identify those documents.

25        THE COURT:  I take it that's O-70.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard Haumann - Direct

2102

1            MISS PEEBLES:  O-70.

2            THE COURT:  Okay.

3    A    Yes.

4    Q    And what are those documents?

5    A    They are Linda O'Connor's home phone.

6    Q    For what period?

7    A    For a period of November 17, '06 through 2/23/07.

8    Q    And you prepared these charts?

9    A    Yes, I did.

10            MISS PEEBLES:  Your Honor, at this time I'd

11   like to offer Defense Exhibit O-70.

12            MR. LOVRIC:  No objection.

13            MR. FISCHER:  No objection.

14            THE COURT:  Receive Defendant's O-70 in

15   evidence.

16    BY MISS PEEBLES:

17   Q    Now, I'm going to ask you to take a look at the

18   chart that we have pertaining to the home -- O'Connor home

19   phone.

20   A    May I put my glasses on?

21   Q    Yeah.

22   A    Thank you.

23   Q    All right.  Now I'm going to direct your attention

24   down to 11/30 of '06 where there's a call to the Best

25   Western.

Richard Haumann - Direct                    2103

1      A     11/30, is that what you're referring to?

2      Q     Yes.

3      A     Yes.

4      Q     And then there's also a phone call to the bus

5   company in Oneonta?

6      A     Correct.  Actually, those are two separate bus

7   companies.  Yep.

8      Q     So there were two calls to two separate bus

9   companies on November 30?

10     A     Right.

11     Q     Now, the next chart pertains to December, and going

12  through December, the end of December, January, and all of

13  January.  Did you ever find any calls to the Best Western

14  after that November 30 phone call?

15     A     No.

16     Q     Were there any phone calls made to the Best Western

17  in the month of February?

18     A     There were not.

19     Q     Were there any phone calls to any other bus

20  companies after 11/30 of 06?

21     A     There were not.

22     Q     Now you also prepared some records pertaining to

23  Mrs. O'Connor's cellular telephone or TracFone.  Do you

24  remember doing that?

25     A     Correct.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard Haumann - Direct                          2104

1      Q    I'm going to hand you what's been marked as Defense

2 Exhibit O-71 and ask if you can identify those documents.

3      A    Yes.  Those are the ones I prepared.

4           MISS PEEBLES:  Your Honor, at this time I'd

5 like to offer Defense Exhibit O-71.

6           MR. LOVRIC:  No objection.

7           MR. FISCHER:  No objection.  Thank you.

8           THE COURT:  Court receives Defendant's O-71 in

9 evidence.

10  BY MISS PEEBLES:

11     Q    Now, I'm going to ask you to look at the cellphone

12 chart that you prepared.  Were there any phone calls made to

13 the Best Western from Linda's TracFone any time through

14 January or February of '07?

15     A    No.

16     Q    Looking at January 2, it appears that there were

17 phone calls, attempts were made to contact Shannon's

18 cellphone, is that fair?

19     A    That's correct.

20     Q    And then it -- now did you have an opportunity to

21 review Shannon O'Connor's cellphone records?

22     A    Yes, I did.

23     Q    And can you tell the jury what Shannon's cellphone

24 was used for to call on January 1 of '07?

25     A    On January 1 her cellphone was used to call Dean

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard Haumann - Direct

2105

1   Sacco's cellphone.

2       Q    And on January 2, Linda O'Connor is attempting to

3   contact her daughter from her TracFone?

4       A    That's correct.

5       Q    Now, there's also a call down here on January 11

6   from Linda's TracFone to the Norwich Police Department.  Do

7   you see that?

8       A    Yes, I do.

9       Q    And why is January 11 significant during the course

10  of this investigation?

11      A    January 11.  I'm trying to recall.

12      Q    Did it coincide with the day she ran away from her

13  mom?

14      A    I believe that is the day, yes.  Absolutely.

15      Q    And above that it appears there was also a phone

16  call that was made to Shannon's TracFone right before the

17  call to the Norwich Police Department?

18      A    That's correct.

19      Q    Now you also had an opportunity to look at some

20  Best Western records that were obtained through the

21  investigation of this case?

22      A    Yes.

23      Q    And specifically referring to December 1 of '06,

24  were there any phone calls that were made from the hotel

25  room?

Richard Haumann - Direct

2106

1    A    No, there were not.

2    Q    I'm going to refer to December 27, from the

3  O'Connor home phone.  It appears on December 27 that a phone

4  call was made to Glenwood Furniture and it was a nine-minute

5  call in duration.  Do you see that?

6    A    Yes, I do.

7    Q    Why is that significant?

8    A    That's significant because Shannon O'Connor said

9  that she was raped on that day by Dean Sacco after she had

10 some cake and went up to his room.  That's 4:40 PM in the

11 afternoon, and that's the significance of it.

12   Q    In reviewing the phone records, were there any

13 other calls that generated any type of suspicion?

14   A    No.

15   Q    Now, you said you issued some subpoenas in this

16 case --

17   A    Yes.

18   Q    -- at my request?

19   A    Sometimes.

20   Q    And did you issue a subpoena to the Chenango

21 Memorial Hospital?

22   A    Yes.

23   Q    And in -- what was the subpoena?

24   A    Chenango Memorial was for the August 11 records of

25 her hospitalization there.

Richard Haumann - Direct                                    2107

1      Q     Did they send us records in response to our

2  subpoena?

3      A     Yes.

4      Q     I'm going to hand you what's been marked as Defense

5  Exhibit O-17 and ask if you can identify these documents.

6      A     Yes.  These are the documents that were returned on

7  the subpoena.

8              MR. LOVRIC:  No objection.

9              MR. FISCHER:  No objection.  Thank you.

10             THE COURT:  Okay.  We'll receive Defendant's

11 O-17 in evidence.

12  BY MISS PEEBLES:

13     Q     I'm going to show you what's been marked as Defense

14 Exhibit O-17.  And these were the blood lab results that we

15 received in connection with Shannon O'Connor?

16     A     Correct.

17     Q     And that was for August 11, correct?

18     A     Yes.

19     Q     And after the blood work, it appears that they

20 canceled any type of drug screen.  Do you see that on the

21 document?

22     A     That's what's written on the form, yes.

23     Q     And the glucose levels appear to be within the

24 normal range, is that what it appears?

25     A     Yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard Haumann - Direct                    2108

1      Q      And all of her blood level ranges were normal?

2      A      Yeah, I believe so.  Let me just look at it again

3   and make sure.  But I believe so, yeah.

4             Yes.

5      Q      There was also a progress note that was attached

6   along with the records that we received?

7      A      Yes.

8      Q      And in it, it also says that, "When talking to

9   Naomi, the patient Shannon O'Connor was very straight and

10  matter of fact regarding details.  She had denied previous

11  suicide attempts to social workers.  However, she told staff

12  at the Y camp when she first made the disclosure that she had

13  made two attempts within the past year.  Y camp director.  And

14  then after that, they were going to conduct a psych

15  evaluation when she was medically clear."  That's what this

16  document states?

17     A      Correct.

18     Q      Now we also subpoenaed records from the Greater

19  Binghamton Health Center?

20     A      That's correct.

21     Q      I'm going to hand you what's been marked as Defense

22  Exhibit O-32 and ask if you can identify these documents.

23     A      Yes.  These are the returned documents from the

24  Binghamton Health Center.

25             MR. LOVRIC:  I have no objection.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard Haumann - Direct

2109

1        MR. FISCHER:  No objection.

2        THE COURT:  Okay.  We'll receive Defendant's

3   O-32 in evidence.

4   BY MISS PEEBLES:

5        Q    And this document in the highlighted section refers

6   to the patient had been complaining of auditory and visual

7   hallucinations?

8        A    That's correct.

9        Q    And it said they'd since diminished and she hasn't

10  had any other complaints since taking Risperdal?

11       A    Correct.

12       MISS PEEBLES:  No further questions.

13       THE COURT:  Mr. Lovric.

14  CROSS-EXAMINATION

15   BY MR. LOVRIC:

16       Q    Hi, Mr. Haumann.

17       A    How are you, Mr. Lovric.

18       Q    We know each other, right?

19       A    Good to see you.

20       Q    Good to see you too.  It will be quicker for me,

21  I'm looking for the summary Miss Peebles just talked to you

22  about, the December 27 nine-minute call to Glenwood.  Which

23  one is that in?  It will save me a lot of time.

24       A    Right here.

25       Q    Okay.  What's the number of the exhibit?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard L. Haumann - Cross                    2110

1       A    Seventy.

2       Q    So that's D O-70?

3       A    Seventy.

4       Q    Its Defense O'Connor 70?

5       A    Correct.

6       Q    I'm going to put this on the screen, Mr. Haumann.

7   Can you see that?

8       A    Yes.

9       Q    Okay.  Now these -- this summary chart is for which

10  telephone?

11      A    It's for the home phone.

12      Q    Okay.  The Linda O'Connor home telephone?

13      A    Yes.

14      Q    Right?

15      A    Yes, yes.

16      Q    And I'm going to put a green arrow on this call.

17  See that?

18      A    I see a blue arrow but, yes.

19      Q    December 27.  That's what I see there is a blue

20  arrow.

21           THE COURT:  That's right.

22      Q    December 27, nine-minute call at 4:44 PM from Linda

23  O'Connor's home telephone to Glenwood, right?

24      A    Correct.

25      Q    Now, Mr. Haumann, were you present when the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard L. Haumann - Cross                    2111

1    T-Mobile guy testified today?

2         A    Yes.

3         Q    Do you recall the T-Mobile rep indicated that at

4    Miss O'Connor's home, T-Mobile had no service?  You couldn't

5    even get a signal, right?

6         A    Yes.

7         Q    So on December 27, 2006, Shannon O'Connor, are you

8    aware, has testified and in the reports you read indicated

9    that Dean Sacco came over and was there on her birthday and

10   that is one of the times he raped her?

11        A    Yes.  I'm aware of that.

12        Q    You're aware of that?

13        A    Yeah.

14        Q    Okay.  This call is to Glenwood Furniture for nine

15   minutes, right?

16        A    That's correct.

17        Q    That's where Dean Sacco works, right?

18        A    Correct.

19        Q    And so Mr. Haumann, I'd like you to explain to this

20   jury why it makes no sense that this nine-minute call is Dean

21   Sacco sitting in Miss O'Connor's living room calling his

22   office in a nine-minute telephone call on December 27.

23        A    I'm not sure I understand your question.  What was

24   that?

25        Q    I'll rephrase it.  I'd like you to explain to this

Richard L. Haumann - Cross                        2112

1    jury why this is not a call of Dean Sacco calling his

2    employer.

3         A    Oh, I don't know that.  I wouldn't know that

4    answer.

5         Q    Well, if I take it correctly, you were trying to

6    suggest that this is Shannon O'Connor calling Dean Sacco.  Am

7    I misunderstanding that?

8         A    I believe you are.  I'm suggesting that a call was

9    made from that home at 4:44 PM to the Glenwood Furniture

10   house.  I never said that I suggested that Shannon was making

11   that call.

12        Q    Well, Miss Peebles asked you why this is

13   significant, and you said, if I remember correctly, that the

14   reason why this is significant is that Shannon O'Connor

15   claims that Dean Sacco was at the house and raped her that

16   day.  Didn't you say that?

17        A    Did I say that?

18        Q    Yeah.

19        A    No.  That I understood that -- I'm sorry.  Could

20   you have that question reread to me?  I'm sorry.  I missed

21   the questioned.

22             MR. LOVRIC:  Judge, I would ask Vicky to go

23   find that question where Miss Peebles asked Mr. Haumann why

24   this call is --

25             THE COURT:  While she's doing that, we'll go

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Richard L. Haumann - Cross

2113

1    to side-bar for a minute.  We don't need Vicky at side-bar

2    while she's working over here.

3                    (Meeting at the bench off the record)

4                    (Record read back)

5        A    Yes.

6        Q    You said that?

7        A    Yes, I did.

8        Q    Okay.

9        A    I'm sorry.  Your questions were so long, it's hard

10   for me to decipher them.

11       Q    Okay.  I'll shorten them down, Mr. Haumann.

12       A    Would you please.  Thank you.

13       Q    My question to you is:  This December 27 phone call

14   on the summary that you created --

15       A    Correct.

16       Q    -- actually shows that Dean Sacco could have been

17   sitting in Mrs. O'Connor's living room making a call from her

18   phone to his workplace saying whatever, I'm up here in

19   Norwich and I'll be at work in a day or two, whatever, isn't

20   that correct?

21       A    That's possible, yes.

22       Q    Okay.  And my final question is:  The Chenango

23   Memorial Hospital records that we looked at, I believe it's

24   Defense Exhibit 32, do you remember those?

25                    THE COURT:  That's Binghamton Health Center.

Richard L. Haumann - Cross                    2114

1    17 was the Chenango Memorial.

2                   MR. LOVRIC:  I apologize.

3                   THE COURT:  17.

4         A    Correct.

5         Q    Do you know what tests they screened for -- what

6    drugs they screened for or what medications they screened

7    for?

8         A    No, I don't offhand, no.

9         Q    There's thousands of medications.  Do you know if

10   they screened for every single prescription medication in

11   those tests that they ran?

12        A    I don't know the answer to that.

13                  MR. LOVRIC:  Okay.  That's all I have.

14                  THE COURT:  Okay.

15                  MR. FISCHER:  Your Honor, I'm going to need

16   some records from Mr. Lovric, some of the phone records that

17   were introduced into evidence.

18                  THE COURT:  Okay.

19   CROSS-EXAMINATION

20    BY MR. FISCHER:

21        Q    Mr. Haumann, the exhibit that's on the screen right

22   now, is that Exhibit O-70?

23        A    Yes.  I don't have it with me, but I think it's 70,

24   yes.

25        Q    It is.  Answered my own question.

Richard L. Haumann - Cross                    2115

1        A     Yes.

2        Q     I put on that screen that portion of Exhibit O-70

3   relating to 11/23.  Is that 11/23/06?

4        A     That's correct.

5        Q     Do you know what day Thanksgiving was?

6        A     Yes, I do.

7        Q     What day was Thanksgiving?

8        A     The 23rd; Thursday, the 23rd.

9        Q     So Exhibit O-70 shows phone calls to Mr. Sacco's

10  cellphone on Thanksgiving 2006?

11       A     Correct.

12       Q     What phone calls does that show to Mr. Sacco's

13  phone call on Thanksgiving 2006?

14       A     What phone calls?  I'm sorry.  Maybe I'm

15  misinterpreting your question.

16       Q     The exhibit shows some calls.

17       A     You mean the different times are you talking?

18       Q     Yeah.

19       A     Okay.  It shows 11:06, 2:10, 2:30, 4:34 for the

20  23rd.

21       Q     What does that -- if you break it down to its bare

22  essentials, what does that mean about who called whom at

23  those times on those dates?

24       A     Well, from the record, it would reflect that

25  someone called from the O'Connor home phone to Mr. Sacco's

Richard L. Haumann - Cross                    2116

1    phone, his cellphone.

2         Q    Some of those calls lasted two, three, and four

3    minutes?

4         A    That's correct.

5         Q    And they start about 11:00 in the morning?

6         A    Correct.

7         Q    And the last call for Thanksgiving 2006 is 4:34 PM?

8         A    Correct.

9         Q    You were here for the testimony of the T-Mobile

10   representative?

11        A    Yes, I was.

12        Q    Am I correct in saying then that this Exhibit O-70

13   indicates that if Mr. Sacco received these calls, he was

14   outside the downtown Norwich area, am I correct?

15        A    Based on that gentleman's testimony, yes.  Yes,

16   that would be correct.

17        Q    Mr. Haumann, Exhibit 80 already in evidence is the

18   full record, as I understand it, of Mr. Sacco's cellphone

19   usage for a period of time.  I'm going to show you a portion

20   of that document.  Can you see that on your screen?

21        A    Yes.  I can see it on the screen.

22        Q    I'm trying to make that arrow point to a

23   December 27, 2006 telephone call.  Can you see that?

24        A    Yes, I can.

25        Q    Can you tell from that record where that call

Richard L. Haumann - Cross                    2117

1   originated?

2        A    Which call, on the 27th?  I'm sorry.

3        Q    I'm sorry.  The one where it says:  Destination,

4   Norwich, New York, 5:17 PM.

5        A    Yes.  Can I tell where it is originating from?

6        Q    Yes.

7        A    Well, it's originating from -- based on what you

8   just told me, it's originating from Mr. Sacco's phone, his

9   cellphone.  It looks like it's going to this area code here,

10  (607)336-8768.

11       Q    Do you know whose phone that is?

12       A    I don't offhand, no.

13       Q    But it's clear that on -- I'm sorry -- December 27,

14  2006 Mr. Sacco's phone made a call to the 607 area code, is

15  that correct?

16       A    That's correct.  And it looks like it's for two

17  minutes.

18       Q    In fact, if you go earlier on December 27, to the

19  top of those listings, it shows that there are incoming calls

20  to Mr. Sacco's phone on September 27, 2006 commencing at 8:13

21  AM, am I correct?

22       A    That's correct.

23       Q    And another one coming in to Mr. Sacco's phone 9:08

24  AM, am I correct?

25       A    Correct.

Richard L. Haumann - Cross                    2118

1      Q      And that's from 201.  201 is a Connecticut

2   exchange, if you know?

3      A      It's down in that area.  I don't know exactly where

4   that is.  I know it's in that area.

5      Q      That phone call, based on the records in evidence,

6   shows that Mr. Sacco received a call on his cellphone on

7   December 27, 2006 at 9:08 AM that lasted three minutes?

8      A      Correct.

9      Q      It also shows that on December 27, 2006 Mr. Sacco

10  received a call 11:28 AM from an 800 number lasting seven

11  minutes?

12     A      Correct.

13     Q      And also that at 3:34 PM there was an incoming call

14  to Mr. Sacco's phone, 3:24 PM an 860 number lasting one

15  minute?

16     A      That's correct.

17     Q      Then Mr. Sacco's cellphone calls that Norwich

18  (607)336-8768 for two minutes?

19     A      Correct.

20     Q      That's at 5:17 PM?

21     A      Correct.

22     Q      Thank you, Mr. Haumann.

23             MR. FISCHER:  Those are my questions.

24             THE COURT:  Miss Peebles?

25             MISS PEEBLES:  No further questions.  Thank

Richard L. Haumann - Recross                    2119

1    you.

2                    THE COURT:  Mr. Lovric?

3    RECROSS-EXAMINATION

4     BY MR. LOVRIC:

5        Q    Mr. Haumann, on that last series of calls made from

6    that T-Mobile cellphone, that simply means Mr. Sacco was

7    making those calls from a place that he had service from

8    these cell towers, right?

9        A    Yes.

10        Q    And based upon what the T-Mobile guy said, that

11   could be anywhere up to one or two miles outside of Norwich,

12   is that a fair statement?

13        A    I'm not sure that's what he said, but I mean, it's

14   a possibility, yes.

15                    MR. LOVRIC:  Okay.  That's all.

16                    THE COURT:  Anything further?

17                    MISS PEEBLES:  No, your Honor.

18                    MR. FISCHER:  No, your Honor.  Thank you.

19                    THE COURT:  Thank you, Mr. Haumann.  You may

20   step down.  Enjoy your weekend.

21                    THE WITNESS:  You too.

22                    (Witness excused)

23                    THE COURT:  All right, ladies and gentlemen.

24   It's about the appointed time.  I went to side-bar to speak

25   with counsel about the schedule for Tuesday, and it appears

Richard L. Haumann - Recross

1    that there may be two witnesses that we'll hear from on

2    Tuesday.  However, there has been a change as far as the

3    timing is concerned.  And that change is caused by a force

4    that is way beyond my control, and I'm married to that force.

5    And I'm told that the earliest I'm going to be here on

6    Tuesday is 11:00.  So we'll invite you back at that time to

7    hear the last of the testimony and perhaps begin with the

8    closing arguments if we can get through those witnesses and

9    the government doesn't have any rebuttal witnesses.  We don't

10   know about that.  We'll have to see.  Keep us in suspense.

11          So let me remind you not to discuss the case

12   among yourselves, with anybody else, or permit anyone to

13   discuss it with you.  And I hope you have a warm, dry

14   weekend.  Enjoy yourself.  And no media and research.  We'll

15   see you back Tuesday at 11:00 AM.

16          (Jury excused)

17          (Court stands adjourned)

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, VICKY A. THELEMAN, RPR, CRR, United
States Court Reporter in and for the United States
District Court, Northern District of New York, do
hereby certify that I attended at the time and place
set forth in the heading hereof; that I did make a
stenographic record of the proceedings had in this
matter and cause the same to be transcribed; that
the foregoing is a true and correct copy of the same
and the whole thereof.


_____

VICKY A. THELEMAN, RPR, CRR

United States Court Reporter

US District Court - NDNY


Dated:  August 25, 2008.