1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------------------

4    UNITED STATES OF AMERICA,

5                        -versus-                    08-CR-77

6    LINDA O'CONNOR and DEAN SACCO.

7    ----------------------------------------------------------

8                    TRANSCRIPT OF JURY TRIAL

9    held in and for the United States District Court,

10   Northern District of New York, at the Federal Building and

11   Courthouse, 15 Henry Street, Binghamton, New York, on

12   WEDNESDAY, May 28, 2008, before the HON. THOMAS J. McAVOY,

13   Senior United States District Court Judge, PRESIDING.

14   APPEARANCES:

15   FOR THE GOVERNMENT:

16   UNITED STATES ATTORNEY'S OFFICE

17   BY:  MIROSLAV LOVRIC, AUSA

18        Binghamton, New York

19   FOR THE DEFENDANT O'CONNOR:

20   FEDERAL PUBLIC DEFENDER'S OFFICE

21   BY:  LISA PEEBLES, AFPD

22        Syracuse, New York

23   FOR THE DEFENDANT SACCO:

24   KELLY FISCHER, ESQ.

25   Binghamton, New York

1          (In open court)

2               MR. FISCHER:  Judge, concerning the book and

3    the diaries, as I understand it, we're not going to give the

4    jury the book or the diaries.  They have already been read

5    the portions or the entire documents in evidence.

6               THE COURT:  Let's see.  What are the numbers

7    and I can tell you?

8               MR. FISCHER:  The diary is Exhibit 34, the

9    book is Exhibit 68.

10              THE COURT:  Thirty-four is in subject to

11   redaction.  Sixty-eight -- I think what we're going to do is

12   give them the excerpts that were read to the jury.  I don't

13   think it would be proper to give them the rest.

14              MR. FISCHER:  That was my understanding.  I'm

15   all set, Judge.

16              (Jury present)

17              THE COURT:  Morning, ladies and gentlemen.

18   Are you ready for some more?

19              Mr. Fischer, are you prepared to address the

20   jury?

21              MR. FISCHER:  Yes, your Honor.  Thank you.

22              THE COURT:  All right.

23              MR. FISCHER:  May it please the Court,

24   counsel.  Good morning to everybody.

25              It's the first time I've ever had to try to

Summation - Mr. Fischer

1  sleep in the middle of a closing.  Didn't work.  I'll try to

2  pick up.  And, you know, I spent a long time, I spent an hour

3  and five minutes yesterday and I'm going to spend a good deal

4  more time with you today because of the importance of it, and

5  it is really important.  I beg your indulgence while I go

6  through some of these things.

7           You know, we've talked about the stakes here.

8  Thirty years from now and 45 years from now this case may be

9  a memory, it may not for you.  You may look back and say,

10  Dean Sacco, that sounds familiar.  Linda O'Connor, I

11  remember.  Oh, that was that trial I sat on for a month.  But

12  for the people involved in this, for the people involved in

13  this, it's a life-affecting decision that will be reached

14  here.  So it's important that we take our time.  And I

15  suggest to you that when you go back to deliberate on your

16  own collectively as 12 jurors -- and, fortunately or

17  unfortunately, the alternates in this case probably will not

18  deliberate.  Everybody, thank goodness, has survived

19  month-long testimony, and 12 of you will go back and

20  deliberate in this case.  Take your time.  It's worth taking

21  the time to analyze the proof in this case.  And I ask you to

22  do that.  As I had plenty of time to think, I came up with

23  lots more stuff to talk about.  And in addition, some things

24  that I talked briefly about yesterday.

25           Something I want to go back -- first, I'm

Summation - Mr. Fischer

1    taking it out of my own order.  Mr. DiFiori, you know that

2    sticks because that's a direct statement that Mr. Sacco

3    inculpated himself.  And I pointed out that Mr. DiFiori was

4    nervous, and I think that's clear.  But why?  Why?  And I

5    suggest to you, when you're deciding this case, ask

6    yourselves why repeatedly.  Why did this happen?  Why did

7    this happen?  To come up with the answers you need.  One of

8    my favorites, *Twelve Angry Men*, it's an old movie with Henry

9    Fonda, where people were ready to convict except for one

10   fellow just said, why, why did this happen?  Let's just

11   talk -- let's examine this bit of evidence.  It's the way --

12   it's the right way to do it.  To analyze, to break it down

13   into its component parts, see if they understand and support

14   at the end of day the structure, that is, they support the

15   guilty verdict beyond a reasonable doubt.  If they don't,

16   there's only one result that you can have.

17              Mr. DiFiori, I don't know his background

18   beyond what he testified to here.  He's from Argentina.  I

19   don't know whether he's a green card resident at that time,

20   US citizenship, I don't know where he stands.  He came up

21   through Florida.  He came up to New York City.  He's admitted

22   marijuana user, goes out to Los Angeles and California.  He

23   got really nervous after he spoke to FBI.  What is the

24   rational, reasonable conclusion to reach from all of this?

25   That he's just an innocent bystander trying to do the right

Summation - Mr. Fischer

1    thing after he denied these things a number of times to the

2    FBI, to Mr. Haumann?  I don't think that stands up.  There's

3    something about that that is not square.  And it is a

4    concern, and it's something you should ask about when you

5    speak amongst yourselves about this.

6              We live in a cynical, cynical age.  As I

7    understood Mr. Lovric in his closing statement, everybody

8    lies.  And therefore it's okay that Shannon O'Connor lied in

9    this case.  That's what seems to be the rationale.  That

10   seems to be the way that Mr. Lovric justifies Shannon

11   O'Connor lying to you.  You know, I use confabulate.  There's

12   a spectrum, range of motivations for what she said incorrect,

13   for things she said that proved not to be so.  Some of them,

14   I can't remember a date, okay, fine.  That's understandable.

15   Take, for example, though, while I was at the Greater

16   Binghamton Health Center, we planned -- it's called a riot in

17   some of the records.  We planned an event, some of the other

18   kids, we planned an event where we were going to

19   intentionally deceive the members of the Greater Binghamton

20   Health Center all at once to create some ruckus.  Maybe

21   that's a childish prank.  Okay, fine.  Take it for that.  But

22   when we took that a step further, so are you saying that --

23   when I asked her, were you intentionally deceiving them and

24   you're telling this jury that you didn't deceive them?  She

25   said, oh, I wouldn't, no.  Basically, she said, no, I -- I'm

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Mr. Fischer                    2275

1   not lying about this, I'm not lying to anybody about

2   anything.  I didn't state it very well, but I think it was

3   very clear what she was saying to you, she did not try to

4   deceive anybody about what occurred there.  Now that is a lie

5   to cover up a misdeed, which is an intentional, deliberate

6   meditated lie.  It sits at that end of the spectrum.

7              Mr. Lovric talked about she couldn't remember

8   dates.  And that's true to a degree.  However, some of the

9   dates we don't need a calendar date.  They're markers.  There

10  are events by which we measure our lives.  We don't need a

11  specific time.  June 14, 1967, whatever date you want to

12  pick.  However, there are days like Thanksgiving.  There are

13  days like my birthday.  When I relate specific events

14  occurred on that day and I remember it for these reasons.  On

15  Thanksgiving my mother made a Thanksgiving turkey dinner.  We

16  sat down and Mr. Sacco sat there with me on Thanksgiving and

17  had Thanksgiving dinner with me.  I was very uncomfortable, I

18  didn't like it at all.  Is that correct?  This is something

19  not just Miss O'Connor talked about.  Mr. Lovric, in his

20  opening statement, I am going to prove to you on Thanksgiving

21  Day and her birthday, these horrific events occurred on those

22  days.  Was he successful?  Did he meet his burden of proving

23  that?  Absolutely not.

24              What does the proof show you?  We have some

25  phone records.  What these phone records show is that on

Summation - Mr. Fischer                              2276

1   November 23, 2006, Thanksgiving, the day one of these events

2   was supposed to have occurred, Mr. Sacco was using his

3   cellphone.  Why did I call the T-Mobile gentleman to show

4   that Mr. Sacco could not use his cellphone in Norwich?

5                Now, December 27, there are some calls.

6   There's a call to Glenwood at one point, but there are also a

7   number of incoming calls throughout the course of the day

8   that Mr. Sacco receives on his cellphone.  Now how did that

9   work?  Mr. Lovric suggested, as I understand it, that you

10  know he could get service a mile or two out of town so if he

11  wanted to make some calls, he could go do that.  However,

12  what about the incoming calls?  How exactly would that work?

13  I'm going to have an incoming call, I'm going to drive two

14  miles out of town, I'm going to take my incoming call, I'm

15  going to drive back in, three or four, five times during the

16  course of the day?  That is just nonsense.  Doesn't make any

17  sense.  It proves that Mr. Sacco was not in Norwich on

18  December 27, 2006.  The story about the birthday is false.

19  Cannot be true based on independent evidence, not a

20  government witness, not a witness that's been prepped to the

21  nines and will say what I want them to say, on independent

22  documentary evidence.

23                Manipulation.  We're manipulated every day by

24  advertisers on television, radio, billboards, magazines,

25  newspapers, all sorts of publications.  People talking in our

2277

1   ear, trying to convince us they are correct about something.

2   You know what, I am not exempt.  I stand here as an advocate

3   I advocate on behalf of Mr. Sacco's position in this case.  I

4   want you to agree with me.  That's honest.  Honest as can be.

5   It's our jobs.  I'm a manipulator by profession.  Mr. Lovric

6   wants you to believe what he says in this case.  Miss Peebles

7   wants you to believe what she says in this case.  It's what

8   we do.  Is it accurate? You decide that.  You sort among

9   what we said.  It's not evidence.  We just take certain bits

10  of evidence, I guess, and talk about that.  But there's an

11  emotional, an emotional aspect to manipulation that should

12  not escape your attention in this case.  The word, the words

13  "brutally raped" were used over a hundred times during the

14  course of opening and closing during this case.  Why were

15  those specific words chosen and used, selected?  Why?  Ask

16  yourselves, why?  Why were there stories about terrible

17  events, people drowning their children in bathtubs?  Why?

18  What's the purpose of that?  I submit to you, it is solely

19  for the purpose of emotional manipulation.  To manipulate you

20  to be upset with Mr. Sacco.

21          The truth in this case lies somewhere outside

22  of that.  What was the nature of the relationship between

23  Shannon O'Connor and Dean Sacco?  Those two know.  I don't

24  really think that anybody else knows.  However, again, I go

25  back to those phone calls.  You listen to the tenor of the

Summation - Mr. Fischer                           2278

1   conversations, and it gives you an indication about what that

2   relationship was like.  Listen to the substance of those

3   phone calls.  The details, the personal details.  That does

4   not come about by way of a relationship where there's great

5   fear and animosity, people.  Do they talk about personal

6   details of their lives if they're terrified of each other or

7   one's terrified of the other?  It is inconsistent.  It is

8   inconceivable.  It's not true.  It's not accurate and it

9   can't be.  There was some different relationship there.

10  There was a personal relationship that is not what Shannon

11  O'Connor said to you on the witness stand.  She wanted you to

12  believe that she was fearful.  She wanted you to believe that

13  Mr. Sacco made threats against her.  She wanted you to

14  believe that Mr. Sacco used physical threats against her.

15  But those things are not supported by the evidence that she

16  created back in March of 2007, a year and two months ago, at

17  the time of the first disclosure.  Historically they're

18  inaccurate.  Historically you can work from that point

19  forward to find out where she got to the point from where

20  she's saying now, it's consistent, it's logical.  Again, why?

21  Why?  Why would she do such a thing?

22          Let me address the why's at the end of it.

23  Let's talk about some other evidence at the moment.  Oh, the

24  doctor didn't testify.  I addressed this yesterday.  Why

25  didn't the doctor testify?  Because if the doctor testified,

Summation - Mr. Fischer                              2279

1   if he was an honest doctor, he would have to say not just

2   yes, there is evidence here of sexual assault, but if he knew

3   other facts upon which he based his opinion, he would

4   probably have to say, yes, it's also consistent with using a

5   vibrator.  It's also consistent with masturbation.  I don't

6   like talking about this stuff, I really don't.  It's not my

7   way.  But it is on the table and we need to talk about it.

8   Those are the facts.  I'm sure if this doctor had testified

9   on this witness stand, he would have said those things, but

10  he wasn't produced, so it's speculation about what that

11  doctor would have said.

12          Oh, the birthday and Thanksgiving dates.

13  There are other things that are problematic about that.  As I

14  understand it, Shannon O'Connor says that on her birthday she

15  goes upstairs and finds Mr. Sacco naked.  Is that supported

16  by the evidence in the case aside from Shannon's testimony?

17  How about the other evidence?  Does that support that claim?

18  No, it doesn't, I submit.  The Pipers moved out end of

19  October or early November.  Why?  Because it was cold.  There

20  was a problem with the heat in the place.  The boiler system

21  was out.  Mr. Pedersen, the plumber, didn't come in and

22  testify.  And I introduced this document in a short

23  appearance that we had before the proof was closed and

24  outside your presence, but I want to point it out to you.

25  It's Exhibit Number S-31, Pedersen Plumbing record.  Why is

Summation - Mr. Fischer

2280

 1    that relevant?  Who cares when the plumber was there?  Page
 2    2.  Install new boiler supplied by owner.  Is that
 3    consistent?  Absolutely.  A boiler was delivered to Norwich
 4    Meadows Farms.  Mr. Sacco and -- or I don't know whether Mr.
 5    Sacco or Clesson Lockwood moved it over to the house at some
 6    point.  It's consistent with the Pipers moving out because it
 7    was cold upstairs.  Fittings, material, labor, date
 8    performed.  1/4, 1/8/07.  After Christmas.  You put the
 9    little details out and you compare the big parts against the
10    little parts to see if things line up, and they don't in this
11    case.  They don't line up.  There was no heat upstairs that
12    Mr. Sacco was standing upstairs on December 27, when he
13    wasn't there anyway, naked, waiting.  Doesn't make sense
14    ultimately.  Doesn't fit.  It's certainly not proof beyond a
15    reasonable doubt.
16              As I understood the prosecution's argument in
17    this case, Shannon O'Connor went on porn sites because she
18    was abused.  Does everyone who goes on porn sites have a
19    history of being abused?  Absolutely not.  You've got a kid
20    here who is sexually aware, curious, on her own initiative
21    undertook, before August of 2006 and after 2006, on at least
22    three total occasions before and after, to go and find and
23    look at pornography.  Does it flow that it occurred for a
24    particular reason or does it flow that this occurred
25    naturally becoming aware, a 13-year-old girl raised the way

Summation - Mr. Fischer                    2281

1    that she was?  The one does not flow from the other.  Those

2    arguments are -- they assume too much.  But Renee Lang's

3    daughter's house December '06, and Shannon says, I was there

4    because I was curious about pregnancy, I really wanted to

5    find out pregnancy.  Mr. Lovric talked to you about Shannon

6    being on pregnancy sites at the Huizinga's house.  What did

7    Mr. Lovric not mention about that event?  That she was on gay

8    pornography sites.  And what that has to do with pregnancy,

9    if you can figure that out, then you're doing better than I

10   am.  That just doesn't make sense.  That rationale for

11   accessing porn just doesn't fly.  That excuse doesn't work.

12            Suggestibility.  I suggested to you yesterday

13   that Shannon O'Connor was a very suggestible kid, and it's

14   true.  A couple of examples.  You had a transcript from the

15   videotape, if it's played -- and if you want to have it

16   played again, I believe you may well have an opportunity to

17   use the transcripts as well.  I think that it's during those

18   interviews that the conversation between Detective Blenis

19   and -- actually, might be on the first tape where you don't

20   have a transcript, a conversation occurs between Detective

21   Blenis and Shannon O'Connor.  Was there a tripod?  No.

22   Something with three legs?  Um, something you set the camera

23   up on.  Oh, yeah.  Oh, yeah, there was one of those.  Where

24   did the tripod come from?  Not from Shannon O'Connor.  It

25   came from Detective Blenis.  Was there ever any other

Summation - Mr. Fischer

1   evidence in this case about a tripod being found, discovered,

2   used, ever?  That was pure, pure, unadulterated suggestion.

3   When Shannon would make a disclosure throughout the records,

4   what she got was -- and there's a reason for it, and again,

5   I'm not suggesting that anybody told her to lie.  But it's

6   inherent, unfortunately, in the way that this system operated

7   in this case, that this system steered her to the response

8   that the system wanted from her.  I cite as an example, you

9   know, the "Good job."  You know, Detective Blenis, if you

10  watch the tape, the taped interview with Shannon from

11  October 29, 2007, "Good job."  You're telling the truth.

12  Even he assumed and, you know, what Liz Chesebro said, it

13  makes sense from the systemic perspective that they should

14  not really question if somebody makes a claim.  That

15  rationale has a sensibility to it.  But there's another side

16  to that coin, because now you're in a situation where, if a

17  12- or 13-year-old girl makes a claim and they do not

18  investigate it -- and fortunately for Kim Hamilton, Shannon

19  was confronted with overwhelming proof and confessed that

20  what she wrote up was false.  But in this case, nobody really

21  questioned Shannon along the way.  Miss Panus did question

22  Shannon at one point, September of '06, about the pornography

23  at the Huizinga's, and once Shannon was finally confronted

24  with the overwhelming evidence, what was her reaction?  She

25  cried and admitted the truth.  When she was confronted with

Summation - Mr. Fischer                          2283

1   overwhelming evidence against the falsity against the

2   Hamiltons, what was her response?  She cried and she admitted

3   the truth.  Unfortunately, with respect to the allegations

4   that are on the table in this case, nobody confronted her

5   along the way about this until she was cross-examined.

6   Nobody said to her, what about this?  But nobody said to her

7   on the tapes that were made in October of 2007 or December of

8   2007, gee, wait a minute, aside from what you're saying about

9   your mother, about Mr. Sacco you said this back then, but

10  you're not saying it now.  Explain to us why.  They didn't do

11  that.  They said, oh, good job, you're telling the truth,

12  good job, keep up the good work.  She was rewarded.

13              By the time she got here, it was too late to

14  recant.  She knew what would happen if she recanted at this

15  point.  Exactly what happened to her sister.  And she had a

16  fear of being prosecuted that she talked about on

17  February 28, 2007 after her mother was arrested, and she was

18  with her mother, for walking out of the Pizza Hut.  She was

19  afraid she would be arrested.  A legitimate fear.  She has a

20  legitimate fear today, I submit, of being arrested if she

21  recants based upon what her sister Mandy, I believe it is,

22  did and what happened to her.  Shannon cannot recant.

23  She's -- she's boxed in irretrievably to this story and will

24  defend it forever in the face of whatever comes up against

25  it, and she's done that.  And that defense of the

Summation - Mr. Fischer

2284

1    indefensible is a reflection on her credibility, and

2    credibility in this case I've been talking about -- it seems

3    like I've talked to it to death, but it is really the

4    foundation in this case.  If you take Shannon O'Connor's

5    testimony, all of her statements and everything else away

6    from this case, what's left does not support this case.  It

7    does not support the convictions here.  Shannon O'Connor's

8    credibility is, in a word, terrible for cause, for whatever

9    cause it is.  It is what it is.  It is terrible.  She does

10   not know the truth if it walked up and introduced itself to

11   her.  She -- and I'm not saying that she's lying.  You don't

12   need to lie to have bad credibility.  She is confused.

13   There's no doubt about it.  No doubt.  She takes bits and

14   pieces from events and mixes them up and they come out in

15   some sort of story.

16            You know, I was thinking about this.  I was

17   walking with my son last weekend in our -- down in the woods

18   out behind my house.  And we have deer out there.  My son

19   said, Daddy, there was a deer out in the backyard.  I said,

20   yeah?  He said, yeah, it was out in the treehouse.  I said,

21   yeah, that makes sense.  Yeah, and he started to walk up the

22   stairs to the treehouse.  Oh, really?  He said, yeah, and he

23   got up a couple stairs and he fell.  Okay.  He fell, he fell

24   on the other deer, he sat on him for a while, then they got

25   up and walked away.  I said, okay.  That's the type of thing.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Mr. Fischer

2285

1  It's innocent.  He's not looking -- maybe he believes it.  I

2  don't understand how the mind of a child works or adolescent

3  works, I really don't.  It's been a long time since I've

4  been -- but what's consistent is that there can be

5  inconsistent confabulations here.  Mistakes.  Confusion.  And

6  if there's a person who is prone to confusion, this girl is

7  the one.

8           You know, the last note from Liz Chesebro,

9  that May 3, 2008 note, where Shannon is allegedly involved in

10 some devil worship thing, Liz Chesebro noted basically that

11 Shannon was confused.  Well, she was and she is.  She's more

12 confused than most people.  In fact, she's confused to the

13 point where she really is.  She has a diagnosed mental

14 illness.  I don't mean to make light of her condition, but it

15 affects her credibility.  Again, not for the purpose of

16 saying that she's lying about it but whether you can believe

17 that what she says is accurate and whether you can believe

18 that what she says leaves no room for a reasonable doubt,

19 because that is the standard that must be met in this case.

20           Oh.  You know, when she testified, she had

21 part of the entourage back here in the seats.  Now I had my

22 back to them, I was watching her, but as I understand it, I

23 don't know, maybe you all saw it, maybe you didn't, that

24 there were signals going on.  Think, think and slow down, and

25 a little coaching going on here.  That's again -- it's

Summation - Mr. Fischer

2286

1    consistent with how things have been done with Shannon from

2    at least August 11, 2006 until today.

3              Again, I ask the question, why?  Why the

4    disclosure on March 2, 2007?  What happened?  How do you

5    understand the why?  What led up to that disclosure?

6    Timeline.  Okay.  As of March 2, Liz Chesebro has been

7    working closely with Shannon for about four months.  About

8    seven or eight days before the disclosure, Linda is arrested

9    at Pizza Hut.  Shannon is scared she's going to be arrested

10   too.  Linda says she's very emotionally distraught.

11             2/28/07, Shannon dreams about mother and

12   Shannon stabbing each other.

13             2/28/06, Liz Chesebro discusses with someone

14   Ray's petition to have custody of Shannon.  Now whether that

15   was expressly conveyed to Shannon or not, I suggest to you

16   that it didn't need to be verbally said, Ray is seeking

17   custody of you, he may not be your father, and by the way,

18   he's incarcerated for killing his girlfriend.  That didn't

19   need to be conveyed verbally, but there are a lot of

20   intangibles that go on between people, not just words.

21             2/28/06, Shannon goes to the Hamiltons.

22             March 1, Shannon and Elizabeth Chesebro go to

23   the Family Court.  Now apparently Shannon didn't go in, but

24   she went over there, as I understand it.

25             March 1, Liz Chesebro says Shannon O'Connor

1    expresses a fear of her mother.

2            March 1, a supervised visitation with her

3    mother.  The week preceding the disclosure Shannon's studying

4    sex in school.  The week before the disclosure Shannon sees a

5    condom on the bus.  And this disclosure to Liz Chesebro

6    occurs on the way back, I guess it's from the supervised

7    visit or Family Court.  I don't remember which it was.

8    That's a lot going on for a kid.  For any kid, let alone a

9    kid that had gone through everything that she had been

10   through.

11           The reason that I point these things out is --

12   and again, it's my opinion.  Take it, reject it.  Take part

13   of it, reject most of it.  Whatever you decide.  But I submit

14   to you for your consideration the prospect that Shannon's

15   mental disability or emotional disability really did not come

16   about only in October, November, September of 2007.  She

17   suffered under this.  Her mother suffered under it for more

18   than three decades.  Shannon had this condition before.  All

19   of these stressors in her life created a response in her.  It

20   was not diagnosed in March of 2007.  I submit to you that

21   probably existed at that time and that there are elements of

22   confabulation that go into that March 2, 2007 disclosure,

23   that tenseness, that mixing stuff up and having it come up in

24   a certain type of story occurred at that time.  No meds at

25   that time.  I'm not sure, frankly, if the meds helped.  I

Summation - Mr. Fischer                2288

1   don't know what they do.  I know that Thorazine is an

2   antipsychotic medication, but I don't know what it does to

3   somebody.  I don't know if it really helped her.  Kim

4   Hamilton said the same thing:  I don't know if they really

5   help her by giving her all these meds.  But she was not

6   taking them on March 2, 2007, and I leave it to you to decide

7   whether there was some psychosis in Shannon O'Connor at that

8   time.

9            Suggestibility.  I'm going to bounce back to

10  it for a second.  April of 2007, Shannon says she has a

11  kidney stone and goes to the hospital and actually gets

12  Vicodin.  Who had a kidney stone?  Her mother had a kidney

13  stone in August of 2006 and went to the hospital and said, go

14  live with the Pipers.  Suggestibility?  Shannon seems to

15  incorporate events that come out in abnormal ways and her

16  response that a 13-year-old child has a kidney stone doesn't

17  make any sense at all.  Nobody ever did, as I understand it,

18  but that was her conclusion.  It affects her credibility.  It

19  affects how she processes events and how she speaks about

20  them when they come out.

21           I was going to go through all of the things

22  that led up to these disclosures in October and December of

23  2007, but I'm not going to do that.  The evidence is in front

24  of you.  You're all aware of all the things that happened to

25  Shannon from March 2007 to December 5 of 2007 when these

Summation - Mr. Fischer                    2289

1    statements were made.

2              Suffice it to say, there was a lot going on.

3    Substantial emotional events going on.  And that Shannon

4    clearly did suffer from severe mental illness at the time.

5    My understanding of how that works and how it worked in this

6    case is, it's not ever-present.  You're not always static.

7    You don't always remain in that same condition.  It's not

8    like a steady grade up and steady grade back down with a

9    flue.  It comes in waves.  I mean, when she was at the

10   Greater Binghamton Health Center, she was able to complete

11   her studies, and not just complete her studies but excel.

12   She got great grades.  She got 90s and 100s.  Mr. Lovric

13   suggests that I want my cake and I eat it too with that, that

14   she can't be smart and mentally ill at the same time.  But I

15   disagree with that conclusion.  In fact, I believe they are

16   probably consistent.  There has been a history replete with

17   very smart people having mental illness and people who have

18   accomplished tremendous things in the world having mental

19   illness.  She was smart.  There's no two ways around it.

20   I've cross-examined a lot of people in my day.  I've taken a

21   lot of depositions.  I've had an opportunity to ask a lot of

22   questions of a lot of people in my day.  Shannon O'Connor is

23   a very bright kid.  She's a very good witness.  She was as

24   good at defending her position -- she was better at it than

25   most adults I've ever talked to.  She was a bright kid.  But

Summation - Mr. Fischer

1    it's not inconsistent that she confabulated things and that

2    she was smart.  The two can live comfortably together.

3                Shannon said she did not have access to the

4    upstairs.  She testified under oath to that.  She testified

5    under oath that she did not go into the shed.  We proved --

6    we didn't prove, Miss Peebles proved unequivocally that

7    Shannon's testimony about going to the shed was false.  Just

8    not true.  Upstairs?  Upstairs?  Did Shannon have access to

9    the upstairs apartment when Mr. Sacco was not present?

10   Mr. Parmalee, government's witness, helps to answer that

11   question.  Mr. Parmalee comes in, he doesn't remember whether

12   it is Thursday or Friday, but it's a school day, end of week.

13   Shannon hasn't been in school.  Comes over about 4 PM and

14   says, is Shannon here?  And Mr. Parmalee says, mom says she's

15   upstairs, go ahead, knock on the door.  Mr. Parmalee goes,

16   knocks on the door.  Shannon comes down, he says, as I recall

17   it, 15, 30 seconds.  Took her that long.  But she comes down

18   alone.  Doesn't -- and he's not looking for but he doesn't

19   see any evidence that anybody else is upstairs.

20               Shannon, when she testifies, has a different

21   recollection of that event.  Shannon's recollection is, her

22   mother came up, knocked on the door, said, you've got to get

23   ready, go down, Parmalees are here.  Shannon got dressed,

24   came downstairs, Mr. Sacco came downstairs too, and Linda

25   came out on the porch.  And Buddy the dog was out there

1    barking at everybody.

2             Can you reconcile those?  No, you can't.

3    They're inconsistent.  Who's telling the truth?  Who has a

4    motivation to say that Mr. Sacco was or was not present?

5    Does Mr. Parmalee have any motivation in this case?  Why

6    would he do that?  He wouldn't.  There is no motivation for

7    anyone else not to tell the truth.  Is there motivation for

8    Shannon O'Connor?  Absolutely.  It exonerates, it absolves

9    her from any responsibility if Mr. Sacco was present.  It

10   shows no, she could not have had access to the upstairs

11   apartment.  I submit to you that that evidence leads to the

12   conclusion that Shannon did, in fact, have access to the

13   upstairs apartment when Mr. Sacco was not present, just like

14   she had access to Mr. Sacco's personal belongings in the

15   shed.  The girl said it was the one next to the shed.  Maybe

16   it was.  I don't know.  The testimony that we heard from

17   Mr. Lockwood was, everything got moved into the shed.

18            But Shannon was in the shed, and I submit to

19   you that she may well have been upstairs.  In either event,

20   Shannon had access to Mr. Sacco's personal belongings.  What

21   personal belongings did Shannon have access to?  Pornographic

22   magazines?  Yes.  Tapes that were eventually found in the

23   storage unit 129.  She also had access to Mr. Sacco's

24   writings.  I don't know whether the book came from the

25   storage unit or not.  I don't recall the testimony.  But

Summation - Mr. Fischer

2292

1    Shannon had an interest in Mr. Sacco based upon his ways.

2    She had access to these things.  She denied it, but she did.

3    That puts her in a position where she can say things that are

4    consistent with what Mr. Sacco wrote about.

5                Independent of -- independent of meeting with

6    FBI, independent reason why she would say things, she makes

7    the disclosure, August 11, concerning August 11, 2006, early

8    August 2006, but it's inconsistent historically.  I submit to

9    you, those events did not occur August 11, 2006.  She says in

10   her original March 2 disclosure, Detective Blenis' sworn

11   statement she signed with you that after August -- that

12   initial contact that there was no contact again until

13   November, Thanksgiving 2006.  We have proved that that could

14   not have occurred on Thanksgiving.

15               She says, the next paragraph in that

16   March 7 -- March 2, 2007 statements:  These events occurred

17   on my birthday, December 27, 2006.  We have learned those

18   events could not have occurred at that time.  She says in

19   that March 2, 2007 statement:  I did not see Mr. Sacco in the

20   month of January.  Now, January that she's talking about is

21   just two to three months before the disclosure.

22               February 10, 2007 is a date that I believe

23   Miss O'Connor talked about.  YMCA records show that Miss

24   O'Connor, Shannon O'Connor and Mr. Sacco were at the YMCA

25   together on that date, not necessarily together.  That's not

Summation - Mr. Fischer                    2293

1   necessarily what the records show.  They show they were at

2   the YMCA at approximately the same time, as I recall.  There

3   was testimony about that time they had gone ice skating.

4   There was testimony that about that time they rode horses

5   together.  That testimony again supports the position that

6   this was not a relationship based upon terror.  It was closer

7   than that.  That's consistent with those 14 and 15 telephone

8   calls.  The March 2, 2007 statement is less than a month,

9   about three weeks after the February 10, 2007 date.  If

10  there's any historical accuracy at all, you'll look to that

11  date, and that's difficult.  That's a difficult date.  But

12  the disclosure about that February 2007 date as it relates to

13  photographs, as it relates to pictures, as it relates to my

14  mother having sex with me on my birthday, don't come until

15  October and December of 2007.

16              The case really ultimately, as I see this

17  case, is a statutory rape case.  The girl cannot consent.

18  She's not allowed to.  The law does not permit that.  Rightly

19  so.  That's a state charge.  Mr. Sacco was charged in the

20  state courts.  He remains charged in the state courts.  No

21  matter happens here, he has to go face whatever he faces.  I

22  think Detective Blenis said two rape charges, a number of

23  other charges that are still pending in the state court in

24  Chenango County.  And if you don't think that he has to go

25  face those things, I remind you of who was present when

Summation - Mr. Fischer                    2294

1    Shannon O'Connor testified:  Joseph McBride, prosecutor in

2    Chenango County.  But that's where this case belongs.

3               Federal charges that you're sitting here to

4    decide have additional requirements.  It raises the bar a

5    little higher.  It has a requirement that there be interstate

6    commerce effect.  As I understand Mr. Lovric's testimony,

7    basically anything that we do, if we take a breath of the air

8    that has traveled from New Jersey, then that becomes a

9    federal case.  I submit to you, that is not a fair statement

10   of what is required, particularly with respect to Mr. Sacco.

11              Let me do this.  Let me back away from the

12   charges because I'll address the law just before I finish.  I

13   have a plan in place and I need to follow it.  I want to stay

14   with Shannon's testimony and credibility for a moment.

15              The portion of the tape that Mr. Lovric played

16   for you about George Lang, if I heard that right, Shannon

17   says she was hurt because George and Shannon's mother were

18   having a relationship.  Now, you go back, you listen to it.

19   Maybe my recollection is faulty, but that's the gist of what

20   I got from that; Shannon had a problem with that.  Rightly

21   so, but maybe for the wrong reason.

22              I can't remember the fellow's name from

23   Norwich Meadows Farm who came to testify.  Said Mr. Sacco

24   brought with him to dinner at his house his hopefully

25   bride-to-be Mary from Egypt.  I don't know if Shannon was

Summation - Mr. Fischer

1  jealous.  I really don't know.  I don't know the nature of

2  relationship.  I can't say if she was or not.  But it is not

3  beyond the realm of probability that she was.  How does she

4  react when she has negative emotional feelings?  One way that

5  she reacts is she becomes accusatory, apparently.  That would

6  not be the first time that that has ever occurred.  Did it

7  occur in this case?  I'm asking you to ask that question and

8  to discuss that question among yourselves and come up with a

9  conclusion.

10          Shannon was seeking control in her life.  Her

11  life was really out of control for a long time, apparently.

12  And it's -- we all strive for it.  We all strive to make

13  sense of -- an anarchic world.  Shannon did it in ways,

14  though, that were not within the norm.  She says she tried to

15  commit suicide.  Okay.  Those are very emotionally charged

16  events.  She says August 11, she took a shot of insulin

17  that -- from her mother's diabetic kit and took some Vicodin.

18  That, if true, is really tragic.  But it's not true.  The

19  record I believe Miss Peebles introduced from the hospital,

20  you can look at the record.  One of the injuries -- doing

21  injury work, I can look at those records and understand what

22  they mean.  Glucose is within normal limits; not high, not

23  low, within normal limits.  If she injected -- normal,

24  healthy kid injected herself with insulin, her glucose limits

25  would not be within the normal limits.  What she says

Summation - Mr. Fischer                                    2296

1    occurred did not occur.

2                September, she, at the Lang's house, tries

3    another suicide which, if true, would be as terrible as

4    anything can be.  She injects herself with a syringe full of

5    Clorox and perfume.  I'm not a toxicologist, but I do not

6    believe if one injected themselves with Clorox that they

7    would last very long, especially a hundred-pound 13- or

8    14-year-old.  It would have some consequences that nobody

9    would forget.  Did that happen?  No.  It did not.

10               I asked Elizabeth Chesebro about it because it

11   was in her notes.  And this was the language that came out of

12   Liz Chesebro:  She took a shot of Clorox and a shot of

13   perfume.  I understood that to mean a shot like a shot glass

14   shot.  And that just made her sick, right?  And that's what I

15   asked Miss Chesebro.  Maybe Miss Chesebro meant she injected

16   herself with Clorox.  I do not believe that's what she

17   intended to mean.  That's certainly what Shannon said to you.

18   A hospital record would have been made of that.  I'm

19   absolutely certain you would have been made aware if that

20   hospital record had occurred.  The conclusion clearly is,

21   what she says she did, she did not do.

22               September 19, 2007.  She has a suicide attempt

23   at the Greater Binghamton Health Center.  She takes a plastic

24   knife and seeks to -- she -- basically she admits to it.

25   What that created was -- and I think it's reflected in some

Summation - Mr. Fischer

2297

1    of the other records -- superficial scratches.  It's a way of

2    reaching out.  It's a way of asking for attention and trying

3    to gain control over one's life.  But is it a legitimate

4    suicide attempt?  No, it's not.  But it is a way for her to

5    get control of her life, and it was desperate and it was

6    aberrational, but it has meaning in this case.  It helps to

7    explain why.

8            November 2006, she takes a shoestring and

9    apparently puts it around her neck.  I don't know if she was

10   wearing a hoodie or not.  But she was able to rescue herself

11   when somebody knocks on the door.  She's all alone.  Nobody's

12   there to see what happened.  Is that a legitimate attempt at

13   suicide or not?  Because it's portrayed here as such.  It's

14   portrayed here as a real, honest-to-goodness attempt.  She

15   has this petechia condition where some marks, blood vessels

16   on her face were apparently broken.  I don't know.  I didn't

17   see the pictures.  I don't know who was observing.  That's

18   what Shannon said.  But again, she's calling out, she's

19   looking for help, and she needs the help.  She's in a bad

20   place at that point.  But are those legitimate?  Are they

21   real?  I submit, no.

22           What do kids do for attention?  This is --

23   this is not necessarily the oldest story ever told but it is

24   one of the older stories told.  There's a gentleman who wrote

25   a book about it, Arthur Miller.  In high school I had to read

Summation - Mr. Fischer

2298

1   The Crucible.  I hated reading it.  I thought, this is just

2   ridiculous, why do I have to read it.  There's a reason why,

3   so I understand later on, when I walk around the world,

4   what's what.  What's The Crucible tell us?  The Crucible is

5   some story about girls who made accusations in 1700, 300

6   years ago or so, against some other people in the community

7   that were blatantly false, that they were witches, but it's a

8   story that goes beyond just that fact that there can be false

9   accusations.  It's a story that talks about how society

10  reacts to them.  And it's important.  In that case society

11  reacted by believing, taking charge and getting ready to kill

12  people over those accusations.  In this case society has

13  basically reacted in the identical manner, except they're not

14  going to be killed.  There are stakes at issue, but they're

15  not going to be killed.  The story is the same today as it

16  was 300 years ago.  It has not changed a bit.  Society, the

17  more we change, the more we stay the same.  Our reaction to

18  those claims is exactly what it was then, and I'm glad that I

19  read that.  It's important.  And it's not just a story; it's

20  a principle.  It's an observation about us and how we react

21  to these things.

22            I'd like to talk about the charges against

23  these defendants, the legal basis for these claims, these

24  allegations.  Mr. Sacco is charged, as I understand it, in

25  counts two, three, four, six and seven.  Count two, buying a

Summation - Mr. Fischer                                    2299

1  child for the purpose of producing pornography.  Count three,

2  trafficking, child trafficking, rent for sex claim.

3              Let me talk about those two because they share

4  many of the same principles.  Purpose is different; one for

5  having sex and one for producing pornography, as I understand

6  it.  But they share the idea that there's a sale of a child

7  for one purpose.  In this case that proof is really weak.  It

8  came from where?  It came from Shannon O'Connor about the

9  Best Western.  You know, Mr. Lovric was up here for a few

10 hours yesterday talking to you in his closing, and he

11 probably spent about a minute talking about the Best Western

12 events because they aren't true.  They are the purest

13 confabulation there is in this case.  But where did that come

14 from?  Lisa Florance-Diaz and Liz Chesebro had conversations.

15 They're documented in Liz Chesebro's records.  Elizabeth

16 Chesebro said, I suspected this all along.  Even if Shannon

17 doesn't admit it, I suspected it all along.  Well, geez, if

18 there's a suggestion that I've ever heard, that's it.  She

19 denied it.  You know what, in that same note, Liz Chesebro

20 had to specifically say, I asked an open-ended question.  It

21 was such a rarity, she had to make a note of it.  And you

22 know what, the answer to it was no, it didn't happen, but it

23 comes out in the note that Shannon denied it, but we

24 suspected it all along that this occurred.  She said it

25 didn't occur; we know she really means that it did occur.

Summation - Mr. Fischer                    2300

1    That's really weak evidence.

2              The testimony from Shannon about the Best

3    Western comes in that December 5 video, at the height, I

4    submit, of the psychosis that she was operating under.

5    There's no substance to those claims at all.  Convicting that

6    lady on that evidence is a crime.  That's not acceptable.

7    That's not okay.  That evidence does not rise beyond a

8    reasonable doubt.  It doesn't rise to probable.  It doesn't

9    rise to likely.  It doesn't come off the ground.

10             The financial issues, I have here some of Mr.

11   Sacco's financial records.  Miss O'Connor's financial records

12   are in.  What I think you see is, Dean's getting paid for the

13   rent.  He gets 800 bucks up front, three months.  You find

14   additional payments of $600, $600.  When she gets Section 8,

15   Section 8 apparently pays a portion of the rents.  When she

16   comes up short, he is yelling and screaming to DSS, hey, man,

17   I'm not getting paid.  I need to get paid.

18             Why is he yelling and screaming about not

19   getting paid?  Because he has two mortgages, water bills,

20   insurance, NYSEG, his phone bills, rent at home.  He needs

21   that money.  He doesn't just need that money, Dean Sacco had

22   a dream of coming up here, having his own life in Norwich.

23   Wanted to change things around.  That was threatened.  The

24   claim is, as I understand it, he put all of that on the line

25   for two months' worth of partial rent payment.  Look, he

Summation - Mr. Fischer                                    2301

1    lived in New Jersey.  Elizabeth City.  He's right near

2    New York.  If somebody wanted sex for money, he could go in

3    the city and do that.  He doesn't have to come up to Norwich.

4    He doesn't have to come up here and put everything on the

5    line, everything on the line.  And you can see how hard he

6    worked to salvage this.  He hired a bankruptcy lawyer to see

7    if he could salvage his house.  He's writing letters from

8    jail trying to save the house.  It's the most important thing

9    to the guy.  Would he give that up for this rent for sex?

10   Would he give up any rent at all?  No, he wouldn't.  He

11   needed this money.

12             The charge is not supported by the evidence.

13   Even the financial evidence itself.  Yes, Linda had money

14   trouble.  Yes, she made bad judgment with money, she bought

15   dogs, etcetera.  She did pay the rent.  They went through

16   HUD, through DSS, and got the rent paid.

17             Count four, I believe it is production of

18   child pornography.  The disclosures about cameras, first of

19   all, I submit to you, take a look at this bag.  It's a black

20   bag.  Can't put towels in it.  It's not a YMCA bag.  When

21   Shannon is questioned by Detective Blenis, did he have a

22   camera, where did he put it?  He put it in a bag.  Like a

23   YMCA bag that he'd go in the YMCA, put towels in it.  What

24   color?  Brown.  Is it the same bag, I asked Shannon?  She

25   said, no, it's not.

Summation - Mr. Fischer                    2302

1              That claim, Mr. Lyons testified that there
2    were tapes found.  I recall him saying 30 hours of tapes.
3    Maybe he didn't say that.  There were sure a lot of tapes.
4    They were found in Mr. Sacco's stuff in the storage unit.
5    What did they come up with?  What's the best the government
6    can produce out of all this searching, looking, finding, is
7    30 hours essentially of innocuous tapes, with one exception.
8    The tape that was played for you of Mary Carmen.  If you have
9    any question about it, look at this picture, okay.  And look
10   at that tape again if you need to, to figure out that it's
11   the same person.  That's all they got.  There is no
12   illegal -- there's no picture of Shannon found.
13             The government says Mr. Sacco apparently
14   secreted all the evidence, but he did not secrete the condom.
15   He did not secrete this camera.  He did not secrete the 30
16   hours of videotape.  Maybe he came up, 30 hours of video,
17   drove back down to New Jersey, videotaped himself speaking
18   Italian, drove back up to Norwich and put those there.  I
19   don't think that happens.  Those tapes found there were the
20   tapes that were there.  He didn't come up to Norwich and hide
21   stuff.
22             What do those tapes show?  Him talking with
23   some guys, talking about buying a camera to make pornography.
24   All right.  And him taking a call looking for young models,
25   and I agree that's damning evidence.  It's evidence of

Summation - Mr. Fischer                    2303

1    intention.  It's evidence of thought.  But that's all it's

2    evidence of.  And thought alone does not convict you of a

3    federal charge.  We're not there yet.  We have not yet

4    reached 1984.  There must be some evidence of it.  The idea

5    that, yes, if I considered videotaping somebody, that I'm

6    guilty of this crime, is not accurate.  Did it happen is the

7    test.  Did it happen is the question.  And that question has

8    to be answered not just by a probability or it might have

9    been.  That must be proved beyond a reasonable doubt.

10              Does the proof in this case rise to a beyond a

11   reasonable doubt?  Absolutely not.  The proof comes from --

12   the primary source, not the exclusive source, but the primary

13   source -- Shannon's October 29, 2007 disclosure.  I submit to

14   you, you ought to look at that again.  You ought to watch

15   her.  Her affect is flat, which indicates that she's

16   medicated.  She was, as I recall the testimony, October 1,

17   late October, November 1, receiving these Thorazine stat meds

18   that she called them.  Auditory hallucinations, I don't know

19   whether they occurred before or after October 29, 2007, but

20   they occurred at around that time.  At that time, there's no

21   doubt about it, she is hallucinating.  I mean, that's the

22   word in those documents.  I didn't make that word up.  Can

23   you rely on that?  Is that proof that supports a conviction

24   on these federal charges beyond a reasonable doubt?  It can't

25   be.  If that's sufficient, then the system has no value

Summation - Mr. Fischer                                    2304

1    whatsoever.

2              Count six.  Did Mr. Sacco travel to Norwich

3    for the purpose of having sex with Shannon O'Connor?  First

4    of all, I go back to August '06.  Did it happen?  Linda Panus

5    seemed like a diligent, responsible, straightforward

6    caseworker for DSS.  She did investigate.  She's the one who

7    challenged Shannon about, did these things occur at

8    Huizinga's house where Shannon said, yes, it did.  She asks

9    Shannon, she goes through the good touch/bad touch, December

10   '06.  She understands it.  She specifically asks Shannon, did

11   this ever occur to you?  And what does Shannon say?  No.

12   That's historical evidence, not after the fact looking back,

13   "knowing what I know now, this is what I would have done"

14   evidence.  Historical evidence says it didn't occur in

15   August.

16             With respect to that count, and I think that's

17   the strongest count the government has here, the interstate

18   commerce aspect of it is lacking.  Yes, Mr. Sacco traveled

19   from New Jersey to New York.  Was that the primary motivating

20   factor?  Why did he travel up here?  Well, he had a job.  He

21   had the house.  And, if you believe the government's case,

22   Shannon was up here.  But was that what drove him up here?

23   Absolutely not.  Was that what motivated him to get in the

24   car and drive up here?  I submit to you again that if that's

25   what he was looking for, there were a thousand other places

Summation - Mr. Fischer

2305

1   within a hundred miles of him where he could have gone.

2   That's not why he came up here.  He came up here to do the

3   plumbing work.

4            I looked through this financial record, S-27.

5   It shows a lot in a short document.  New Jersey Department of

6   Personnel, looking for a job November 20, 2006.  Norwich

7   Water, December 28, 2006.  Norwich Water.  Chase Home

8   Finance, December 28, 2006.  Clerk application, December 7,

9   2006 to New Jersey.  Chase Home Finance, 116.07.  $25 in cash

10  on January 19.  Chase Home Finance again, January 26.  Jay

11  Selenger, 2006, bankruptcy lawyer, down payment.  Chase 678,

12  February mortgage.  Another payment to Jay Selenger.  NYSEG,

13  gas and electric.  Ron Donahue, March 4, 2007 for -- for --

14  that's when that flooring work got done, by the way.  Shannon

15  says these events occurred where the floors were sanded.

16  They did not occur back in October or November or December.

17  They occurred more recently than that.  This is a March 4,

18  2007 payment.  They occurred, if they occurred, in February

19  of 2007.  Again, March 11, Norwich Water.  March 11, Chase

20  Home Finance.  March 10, Selenger.  You have other records

21  here.  Rising Sun.

22            Bottom line is, in my opinion -- it's just my

23  opinion -- the purpose for Mr. Sacco coming up, the main

24  purpose, primary purpose, the motivating factor for him to

25  come up here was to work on this house.  Pretty clear.  If

1  there was a relationship between Shannon O'Connor and Dean

2  Sacco, my understanding of what Judge McAvoy will tell you

3  about the rules in this regard, it goes something along these

4  lines:  It may not just be incidental to the other purposes.

5  If the contact between Shannon O'Connor and Mr. Sacco is

6  incidental, that does not satisfy that interstate commerce

7  requirement.  Was that contact incidental or was that the

8  reason why Mr. Sacco came to Norwich?  That's the question

9  you'll need to wrestle with.

10              May 2005, Mr. Sacco puts his thousand-dollar

11  down payment on his house.  Has tenants up there.  Somebody

12  moves out downstairs, apparently.  Pipers had been up there.

13  He does work.  August 11, the tree guy did the work on or

14  before August 11, 2006.

15              Another reason, legitimate reason for

16  Elizabeth Dinunzio to testify was, she came up here -- she

17  came up here and said, this is what Dean intended to do and

18  this is what Dean did upstairs, the things that are not

19  reflected in this documentation.  Tore out a bathroom or a

20  kitchen.  I'm not sure which it was.  Tore out carpets.  I

21  think Clesson Lockwood talked about removing garbage, digging

22  out the basement, putting in a new heating system.  These are

23  all other purposes.

24              Did he come up here in November of 2 -- I'm

25  sorry, May of 2005 to meet Shannon O'Connor?  No.  Meeting

Summation - Mr. Fischer                                    2307

1    Shannon O'Connor was purely coincidence.  An incident to what

2    his primary job was up here, to take care of his house.  To

3    make money.  He wanted to make money.  He wanted five jobs.

4    It was a coincidence in the dictionary definition of what

5    that is.  The contact with Shannon O'Connor was an incident

6    to his primary purpose in coming up here, to work on the

7    house.

8              Oh, count seven, possession of child

9    pornography.  As I understand the government's position on

10   closing, it's that Exhibit 40, the photographs, terrible

11   photographs from the Philippines or wherever they are, which

12   apparently were mailed up here from a guy in Louisiana.  I

13   don't know much about that.  But that's what it shows.  The

14   government says you may look to those as a basis for a

15   finding of guilt in this case.  Says it on the closing.  But

16   I had the openings transcribed by the stenographer, and she

17   was kind enough to do that, and as I looked over this, I came

18   to the conclusion clearly that it was the government's

19   position at the time of the opening in this case that count

20   seven is the count that charged possession of child

21   pornography, that the child pornography in this case that you

22   will hear talked about is the child pornography that was the

23   photos and videotapes that were taken by Dean Sacco and Linda

24   O'Connor and George Lang.  And that's it.  Apparently there's

25   been a fundamental shift in what the government is proving in

Summation - Mr. Fischer                                    2308

1    this case.  They knew about that stuff back then.  But in the

2    opening they didn't say to you, look, we're going to prove to

3    you, we're going to produce photographs.  Why would the

4    government shift, change positions, rely now on different

5    evidence?  I assume they'll say this indictment, count seven

6    indictment goes back to January of 2004; we intended to mean

7    all those things that Mr. Sacco might have done from January

8    2004 to date.  You know what, that's not true either.  What

9    the indictment did is it charged Linda O'Connor for the

10   events involving Mr. Lang back then consistent with what the

11   government said in their opening.  What they said in the

12   opening is inconsistent with the position that they've taken

13   here on closing.  You know what, it's okay, because like it

14   or not, if you look at those pictures, all right, and you

15   compare them against the rules that Judge McAvoy's going to

16   give you in this case, they are terrible.  They are children,

17   but they are not prohibited in this sexual conduct.  That

18   definition is a technical definition that's very, very, very

19   important because if you don't follow that rule and there's a

20   conviction in this case, then it's fundamentally a flawed

21   result, and you can't do that in this case.  The stakes are

22   too high.

23            Listen closely to Judge McAvoy's definition.

24   The photographs show children.  They show a child, what

25   appears to be a child, and Investigator Shultz said that.

Summation - Mr. Fischer                    2309

1    But the one photograph taken from the internet dated 2002

2    shows a girl standing there naked.  It's not prohibited

3    pornography.  It does not focus on genitals.  It does not

4    show sexual conduct.  What's prohibited, that is,

5    genital-to-genital, genital-to-oral, there's a list of

6    definitions, that picture does not show that.  What it shows

7    is a girl standing there without her clothes on.  That is not

8    prohibited by the law.

9                The other things in the brochure are

10   distasteful at best.  But they don't focus on genitals.  They

11   do not show oral-to-genital contact.  They do not show

12   genital-to-genital contact.  They do not show any of the

13   prohibited things.  Okay.  Ugly, yes.  Illegal, no.

14               Your Honor, I'm going to be a bit longer.  I

15   don't know if you want me to continue at this point.

16               THE COURT:  I think we ought to probably take

17   a break.

18               (Jury excused)

19               THE COURT:  At this time I'm going to ask you

20   to quantify that as best you can.

21               MR. FISCHER:  Fifteen to twenty minutes.

22               THE COURT:  Okay.

23               (Short break taken)

24               (Jury present)

25               THE COURT:  Okay, Mr. Fischer.  You may

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Mr. Fischer                    2310

1    continue.

2              MR. FISCHER:  Thank you, your Honor.  May it

3    please the Court and counsel.

4              I'm almost done.  I wanted to point out about

5    Exhibit 40 that I was just talking, it's really made up of

6    three components, it is in.  Fact, I submit to you it is.

7    What did exist in February 10, 2008 when the criminal

8    complain was drafted by Mr. Lyons?  It was not something the

9    government had or was aware of when they created the

10   indictment in this case and it was not, according to Mr.

11   Lovric, part of their case when Mr. Lovric made his opening

12   statement to you.  But if you consider it in this case, it's

13   made up of three parts.  2002 pictures of girl standing

14   there.  Investigator Shultz pointed out that she looked to be

15   young.  I agree she does.  But she's standing there, that's

16   it.  That's what I was referring to when I say she looked

17   young.  There are two other components to that exhibit that

18   were apparently mailed up as part of some enterprise, and if

19   those are underaged children, that business enterprise

20   wouldn't last two days in this setting.  There's a

21   distinction that -- if you go to that exhibit, there's a

22   distinction that you can point to parts of it.  But in none

23   of those parts is there any prohibited conduct.

24             The condom in this case is direct physical

25   evidence.  It's important.  It shows Shannon's DNA.  It was

Summation - Mr. Fischer                    2311

1  in the shed of the garage at one time.  It was moved over to

2  the storage unit 129.  It was not removed by Mr. Sacco at any

3  time.  What does that show?  It shows Shannon O'Connor had

4  sex with somebody, some man.  Shannon would never admit to

5  ever having sex with anybody but Mr. Sacco.  That exonerates

6  her, exculpates her in some fashion from any other wrongdoing

7  she may have been engaged in.  She had boyfriends.  Did she

8  bring boys over there?  Did she hide a condom?  Those are

9  questions that have to be answered.  Those questions have to

10 be answered.

11         Mr. Lyons testified, as I recall it, that the

12 government chose not to have a DNA sample from Mr. Sacco.

13 Why?  There's no explanation for it.  It would have proved

14 either in or out, either yes or no.  Yes, a possibility, or

15 no, it could not have been.  It could have solved this case,

16 dead in its tracks, resolved, but the government chose not to

17 do it.  The government bears the burden of proving this case.

18 Why they chose not to make that one test...  I alluded to

19 fingerprints.  That was lame.  I admit it.  It was weak.

20 Taking fingerprints, maybe that wasn't the right thing to

21 address.  I addressed it because it came to my mind.  It was

22 a legitimate question I thought at the time.  But the failure

23 to take a DNA sample from Mr. Sacco when they had the

24 opportunity to do it is different.

25         Psychological motivation.  The players here,

Summation - Mr. Fischer                                2312

1    what is the psychological motivation?  I'm glad that Mr.

2    Lovric asked that question.  Liz Chesebro.  Unfulfilled need

3    to be a mother.  She needed to be Shannon O'Connor's mother,

4    needed to take the place of Linda O'Connor, clear as

5    anything.

6                Renee Lang loved testifying.  This was a

7    social outing for Renee Lang.  I'm not sure she was credible,

8    but that's why she got up here and testified.

9                Mr. -- then Detective, now Sergeant Blenis

10   wanted to protect and serve.  He was doing his best.

11               The DNA expert.  I'm convinced that she's

12   going to go out and become a consultant and make a fortune in

13   the business.  She's excellent.  She loved doing what she

14   does.

15               Kim Hamilton.  What's her motivation for

16   coming here?  Did she come here to lie to you about

17   something?  Did she really have an ax to grind?  Would she

18   get up and lie about these events because she was angry that

19   she got accused, falsely accused of sexual misconduct with

20   Shannon O'Connor?  You look at her and you evaluate her

21   credibility.  She seemed a pretty credible witness, and she

22   didn't seem to have any ulterior motives that I could see.

23   She got up and said, this is what happened, and she stated

24   her opinions, basically, I don't know about Mr. Sacco, but I

25   do know Linda O'Connor didn't do these things.  You know,

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Mr. Fischer                                2313

1   that's consistent with the evidence in this case, and I think

2   it's the observation made at the time that leaves a question

3   of reasonable doubt as to Mr. Sacco but eliminates any

4   question as to Linda O'Connor.

5              Elizabeth Dinunzio, my client's mother.  She

6   has an obvious motivation.  Did she lie?  No.  She stopped,

7   she thought about it, she gave the best answer she could.

8   She didn't lie to anybody.

9              Shannon O'Connor.  Her motivation is obvious

10  really.  She needed control over her life, and this is a way

11  to do it.  It's the classic old story Crucible retold.

12             Mr. Lovric and Mr. Lyons have motivation in

13  this case.  No two ways around it; that is what it is.  They

14  want to see a conviction here.

15             Clesson Lockwood.  Did the FBI know about

16  Clesson Lockwood prior to 2008?  I -- well, I note on

17  June 27, 2007.  Did the FBI have access to those records in

18  2007?  They did.  Is it credible to say that we didn't know

19  anything about Clesson Lockwood?  No.  It's not credible.  To

20  say, I didn't remember all the records that I saw, that's

21  credible.  To say, I didn't see all these records, lead FBI

22  agent on the case, that's not credible.

23             Adam Lori, AUSA came up from New Jersey,

24  assistant United States Attorney.  He was -- I'm glad that he

25  testified because what he did is he talked about a motivation

Summation - Mr. Fischer                                    2314

1    Mr. Lovric has in this case.  The news flash you get on the

2    internet, I won this case.  That's what Mr. Lovric wants.

3    His motivation is to maybe rescue a damsel in distress, but

4    he used this girl for his own purposes, to get a conviction

5    in this case.  He put this broken piece of crystal back

6    together in his own mold the way that he wanted it done.  He

7    is an example of what the system did here.  Everybody had

8    their own motivation.  They used this girl for their

9    purposes.  You know, I'm not exempt from that.  My

10   cross-examination of her, I crossed her about specific

11   incidents for a particular reason.  But the government, if

12   they get up and say they didn't do that, can't accept it.

13                I'm just about done.  I'm standing here and

14   I'm telling you, on this evidence, on this weak, unstable,

15   disjointed, inconsistent, false evidence you've been

16   presented, both on direct and cross-examination, the

17   foundation is not sufficient to support a conviction on these

18   federal charges.  Morally, if you believe what occurred here,

19   if you believe what Shannon O'Connor says morally, God will

20   judge, but legally, on these facts that you were presented,

21   on this testimony, on this incredible testimony based

22   primarily upon an incredible witness, cannot support a

23   conviction on these federal charges.  With the stakes such as

24   they are, beyond a reasonable doubt, just doesn't rise to

25   that level.

Summation - Mr. Fischer

1                I need to step away.  I give you the case.  I

2     ask your favor to take the time, analyze this critically,

3     analyze it intellectually, based upon your reason, your

4     common sense, but the facts as you believe them to be

5     credible against the law that the Judge gives to you on this

6     evidence, using your reasoned, intellectual skills mandates a

7     not guilty verdict.  And I ask that after you look at all of

8     this, look at it in that context and see if it fits with a

9     not guilty verdict.  I submit to you that it will.  And on

10    that basis, it's your duty, your oath, your obligation -- and

11    the oath is something I know that every one of you take very

12    seriously, more seriously than some of the witnesses who

13    testified.  It will be your sworn obligation to do your duty,

14    as unpleasant as it may seem to you, to return a not guilty

15    verdict in this case.

16                The press is here watching us.  They may have

17    their take on that.  That's not a consideration.  This

18    evidence did not rise to the level of beyond a reasonable

19    doubt in this case, it mandates a not guilty verdict.  Mr.

20    Sacco will face judgment on the state charges and in the eyes

21    of God, but on these charges in this court, on these facts,

22    this law, there cannot be anything other than a not guilty

23    verdict.

24                Thank you.  Thank you, your Honor.

25                THE COURT:  Thank you, Mr. Fischer.

1          All right.  Miss Peebles, you ready?

2          MISS PEEBLES:  Words.  That's why Mrs.

3  O'Connor is here, because of the words spoken by her daughter

4  Shannon O'Connor.  And as the distinguished United States

5  Supreme Court Justice Louis Brandeis once stated, the logic

6  of words must yield to the logic of realities, and the words

7  in this case don't even come close to matching the realities

8  as the case has been presented against Mrs. O'Connor.

9          We've heard a lot about these words and why

10  and the words by Shannon O'Connor in this case were used as

11  weapons against her mother and they were like daggers to her

12  heart as she sat in this courtroom.  There's been a lot of

13  talk about books and if Shannon O'Connor were to write her

14  autobiography it would be entitled American Dream Girl and it

15  would read something like this:  Hi, my name is Shannon

16  O'Connor and I'm now 14 years old.  I grew up in a small town

17  in New York called Deposit.  In Deposit everybody knew

18  everybody's business.  It's always been just me and my mom.

19  My mom's married to a man named Raymond O'Connor and he's in

20  state prison.  I have his last name but he's not my real

21  father and I never lived with him or had much contact.  I

22  really could have used a father figure in my life.  We never

23  had much money but I seemed to get everything I could

24  possibly want or ever need.  My mom would buy me toys and I

25  didn't even need them.  I know that may sound strange coming

Summation - Ms. Peebles

1    from a kid but it seems to be a very important part of my

2    upbringing.  When I was very young my mom had brain surgery

3    and had I to stay with family friends.  When my mom recovered

4    I went back to live with her and we lived in a house on Pine

5    Street.  It was kind of a pain because I had to walk up a

6    flight of stairs and carrying things up the stairs was a

7    drag.  Trust me, it was not just me, my mom hated it too, so

8    we moved.  We moved in to a house on River Street.  It was

9    right on the river with only the road in between and this

10   will become important in a minute.  My mom collected

11   disability and sometimes she got in arguments with the

12   landlord, Sharon Wright, if she did not pay on time.  I guess

13   the entire town must have known, after all, it was awful

14   small and everyone knew everyone.  Pastor Kathy Myrick was a

15   family friend.  I guess my mom went to her for some type of

16   counseling.  She was a great mom to her kids.  We went to her

17   church.  I was later introduced to George and Renee Lang when

18   I was ten years old.  George Lang helped my mom on the

19   computer because she had no clue what she was doing.  George

20   and Renee would come over to the house together and

21   eventually we began spending more time at the Langs.  We did

22   not have any family of our own so I started calling them

23   Grandma and Grandpa.  They lived in a single-wide trailer in

24   Nineveh and we would sometimes spend the weekends with them.

25   It was kind of nice getting out of Deposit.  I loved George

Summation - Ms. Peebles

1   and Renee but my mom and Renee would argue sometimes and one

2   time before George died they got into an argument and Renee

3   dumped yogurt on my mother.  I'm not sure how the argument

4   started or what it was about.  We eventually stopped seeing

5   them so much after that and it was hard because they were

6   like family to us.  The plans they made to adopt us fell

7   through and we never talked about it again.  After George

8   died we were not even invited to the funeral.

9           Growing up in Deposit there was not much to do

10  so sometimes my mom would plan mini getaways and several

11  times she took me to the Best Western in Johnson City.  It

12  was a lot of fun.  We would bowl, shop, go to dinner,

13  Chuckie Cheese, and get our hair done.  I loved those trips

14  with my mom.  In June of 2006 we lost our home and all of our

15  possessions.  It was really hard and we were devastated.  My

16  mom's friend Delores Tompkins was really nice and she agreed

17  to let us stay with her until we could find affordable

18  housing, but one delay Delores received a bill for ordering

19  pornography.  She was upset.  It was definitely not me.  I

20  always seemed to get blamed.

21          One day when we were with Delores my mom found

22  an ad for a home in Norwich.  Thank goodness because we were

23  wearing out our welcome.  She called the number and spoke to

24  someone over the phone.  We went and looked at the house.  It

25  was on Fair Street in Norwich.  We wanted the house really

Summation - Ms. Peebles

2319

1    bad.  I don't know about the money or where she got it or how

2    much she paid.  We really wanted the house so she called the

3    guy back.  I got on the phone and asked if I could get a

4    puppy and the landlord said it was okay.  My mom spent a lot

5    of money on the puppy for me and I named him Buddy.  I was so

6    excited but I never dreamed how much work a puppy would be.

7    My mom said it was my puppy.

8            On August 2 of 2006 we met the landlord and my

9    mom signed some papers.  I'm not sure what they were talking

10   about.  The landlord's name was Dean.  He was nice.  He

11   helped us move our stuff in.  I thought he was really great.

12   He told my mom about the YMCA camp and my mom signed me up.

13   The Pipers lived upstairs and they were really old.  They

14   seemed like nice people.  The Y camp was great.  I loved all

15   the camp counselors, Rhett Jenung, Lance Thorn and Jenny.  I

16   loved being around them.  After ten days living in our new

17   home I had about had it with the puppy.  It was constant and

18   me and my mom were fighting constantly so I went to camp and

19   I think this was on August 11.  I told my camp counselors

20   that I had taken my mother's medication in order to kill

21   myself.  I told them that I took my mother's insulin and

22   three pain pails.  I could not believe all the attention that

23   my saying this sparked.  Lance called for an ambulance.  I

24   begged him to ride with me.  I could not believe everyone

25   that showed up at the hospital.  All these people cared about

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles

2320

1   me.  It felt really good.  I met my Naomi from DSS for the

2   first time.  She was really nice.  I told her that I had

3   never tried to kill myself before, but I guess I already told

4   my camp counselors that I had tried twice before.  But who

5   can fault me, I couldn't keep it straight.  Anyway, they sent

6   me to a real hospital, not a psychiatric hospital.  I know

7   they took a blood test but no one ever asked me about the

8   results.  Glucose levels, what is that and who cares if they

9   were normal?  Who cares if they decided not to do a chemical

10  test?  I really did take my mother's insulin.  It didn't

11  matter anyway because I said it so it must have been true.

12  Besides, I was really mad at my mother.  I told everyone at

13  the hospital that my mother was physically and mentally

14  abusive to me.  I told them I didn't want to see my mother.

15  I didn't have bruises on me but what difference does that

16  make?  I said -- I said it and they believed me.  Why would

17  they question a 12 year old kid anyway.  After five days in

18  the regular hospital I went back to live with my mom.  We

19  patched things up over the dog and I told her it was not just

20  her fault.  Everything was fine until my mom got sick a few

21  days later.  She was violently ill and the old man upstairs

22  rushed her to the hospital.  I was mad, I was not going to

23  stay with the Pipers.  I went downstairs and stayed by

24  myself.  My mom probably planned this so the next day I

25  showed up at the Y camp and told everyone I had been left

Summation - Ms. Peebles

1   home alone with no food.  Naomi showed up and she was so

2   nice.  I guess the Pipers realized I was too much for them so

3   Naomi got ahold of Grandma Lang, she agreed to watch me,

4   though my mom and her were not on speaking terms, but it was

5   great to be back at Grandma Langs.  I was happy at Grandma's

6   house.  Nothing about being there bothered me.  I had really

7   missed her.  My mom got out of the hospital.  I got to speak

8   to her on the phone but Naomi made Grandma Lang listen to our

9   conversation.  It was little awkward but it worked out okay.

10  Mom really wanted me back.  She told me about all of the

11  things she brought to fix up my room.  I had no idea where

12  she got the money.  I loved gettings things.  I told Grandma

13  Lang the landlord creeped me out.  Things became a little

14  tense with Grandma Lang.  She had rules and I began hating

15  living at their house.  I really started appreciating my

16  mother.  Toward the end of September I got caught looking at

17  pornography at Grandma Lang's daughter house and I tried

18  denying it and blaming my mother, that seemed to work in the

19  past with Naomi, but she, my mom, wasn't even around, but I

20  tried anyway.  I was looking at Triple X videos and sites

21  referencing gay men and adult chat rooms.  There were also a

22  few teen pregnancy sites but I begged Naomi not to tell my

23  mother.  When she confronted with me the hard evidence I

24  could not deny it any longer and I didn't want to ruin the

25  visit I was going to have with my mother.  How could I have

Summation - Ms. Peebles                    2322

1  been so careless?  Oh, well, I think Naomi is likely to blame

2  my mother anyway.  I also thought I could tell others.  I was

3  hoping they would ask me what is wrong and maybe they would

4  just feel sorry for me.  After a while I could not wait to

5  get away from Renee.  She was driving me crazy, making me do

6  chores.  After a while I just walked away and slammed the

7  door.  I was not used to all of those rules.  She was also

8  making me play an instrument and I thought I'm done with

9  that, but Grandma refused to give me permission to quit.  I

10 thought too bad, I'll have Naomi sign the slip.  She does

11 whatever I want.

12             I finally returned home to live with my mother

13 toward the end of October of 2006 I was thrilled.  My mom had

14 redone my entire room.  Boy, she really out did herself.

15 When I returned home my Naomi was still my caseworker and she

16 was great.  We both started counseling and my mom was getting

17 assistance with her parenting skills.  The Judge issued an

18 order which I guess said that I could not be around Dean

19 Sacco unsupervised.  I guess it was because I told Grandma

20 Lang he creeped me out, but not always.  Sometimes I liked

21 being around him.  I tend to change my mind from time to

22 time.  It didn't make a difference to me.  It's not like my

23 mom would have control over me.  Dean and I talked a lot.  I

24 complained about my mother to him.  I even found his

25 pornography collection in the garage.  That was a find.  My

Summation - Ms. Peebles                    2323

1  friend Deanna Kirwin spent the night after a Y dance and the

2  next day I took her out back and showed her everything.  We

3  were looking at magazines and I showed her his video

4  collection.  I told her my mother couldn't find out,

5  otherwise she'd make him put a lock on it.  I never wanted

6  that to happen.  I couldn't imagine Deanna ever telling

7  anyone.  She would get in trouble too for looking at the

8  stuff.  If anyone ever asked, I'll just deny it.  I'll be

9  believed anyway.

10              I talked to Dean a lot.  One time I told him

11  that I had experience with sex with my Grandpa.  I couldn't

12  think of any other male in my life so I told him I did things

13  with my grandfather.  What difference would it make?  He's

14  dead.  I felt proud to tell him I had experience.  I think it

15  worked because he became more comfortable around me.  I went

16  to the YMCA several times with Dean.  I also wanted to visit

17  him when he was in town.  I would tell my mother I was going

18  to play games and she would always let me.  This doesn't mean

19  anything just because I went places him.  One time when I was

20  up stairs my friend Brook came over to the house.  Brook and

21  her dad just knocked on the back door and came down.  I told

22  the prosecutor that my mom came running up the stairs after

23  me and that I hurried and put my clothes on and came down.  I

24  also said Dean came down and my mom was outside and everyone

25  was talking.  What do you mean Mr. Parmalee said my mom

1   wasn't out there?  That she had directed them to where I was

2   and simply went back inside.  That doesn't make any sense

3   with my story; that she allowed me to have sex with Dean and

4   that she was part of it.  She would want to cover it up.  Why

5   believe Mr. Parmalee?  Everyone believes me, not him.

6   Besides, what stake in the outcome does he have?  My story is

7   much better anyway.

8                    My mom tried hard to bond with me after I was

9   returned to her.  She took me to the Best Western to go

10  shopping and hang out.  We left on Friday and took the bus

11  from Norwich.  I have no idea how she paid for it and I

12  didn't care.  I told her I really wanted a skateboard so she

13  took me to Wal-Mart and bought me one.  I appreciate her

14  efforts, I really do.  Naomi was no longer my caseworker at

15  this time.  Liz Chesebro took over and she was great.  She

16  came over to the house.  She talked to me about how I was

17  getting along with my mother.  She really seemed to care.

18  She didn't seem too impressed with my mother and she talked

19  to her about paying December's rent.  Apparently Dean was

20  being a pain.  He had called DSS a few times and he also

21  threatened to evict us.  I guess my mother blew all of our

22  money at the Best Western on December 1.  She should have

23  known better.  It doesn't matter anyway, she'd start

24  receiving HUD assistance.  As far as I know, Liz never asked

25  about Dean, whether I was around him.  I guess she didn't

even realize he was living upstairs. It wouldn't matter much anyways. It's not like I would tell her what I was doing.

Anyhow, about my birthday. For some reason Dean couldn't come to my birthday party. I was mad. I called him and he wished me happy birthday but he had to work. My birthday was on Wednesday. It doesn't matter. I was still really mad and it was a good thing my mom bought me a TracFone. I can call whoever I want whenever I wanted to.

I still couldn't get along with my mother. She just didn't understand me. On January 11 I got mad and I decided I was going to go run away. I took my TracFone and walked to Brook's house. My mom tried calling me but I wouldn't answer the call. Next thing I know, Norwich police are at Brook's house. Can you believe her? She called the police. They drove me home as far as I remember, told me that I had to obey my mother. I know it would seem weird she would call the police on me. I'm eventually going to try and claim she prostituted me to the landlord and two men at the Best Western. But who's going to remember this any way? They'll believe me over her anyway. Elizabeth Chesebro came and talked to me about running away. I was not too happy but I just told her my mom was yelling at me and she tried to get my mom to recognize it was partially her fault because she didn't think my mom should be yelling at me. This incident blew over and we started getting along better. I was still

Summation - Ms. Peebles                          2326

1    receiving counseling.  I had my own separate counselor, she

2    was really nice.

3              Somehow my mom got more money.  It was

4    approaching the end of January.  I begged her to buy me

5    another puppy and she did.  I count believe it.  She spent

6    almost $900 on a dog for me.  I guess she didn't learn her

7    lesson the last time.  Oh, well, I was happy.  I tried harder

8    to take care of the dog.  Because we spent so much money on

9    the puppy, my mom ran low on money in February.  It was the

10   end of the month and she knows how much I love pizza.  I

11   really wanted pizza so we walked to Pizza Hut.  This was

12   embarrassing.  We ordered, ate, and left Pizza Hut without

13   paying.  We were told to come back inside, so we did.  My mom

14   got in trouble for this and she should have known better.

15   The next day Liz showed up at school and she told me I was

16   going to be placed in foster care.  She said my mom could not

17   afford to support me.  At first I was upset but after

18   listening to Liz, I knew she was right.  I was taken to the

19   Hamiltons.  That was great, I loved it there.  There were a

20   lot of kids and a mother and a father.  Liz explained to me

21   that my mom was not equipped to raise me and that I was much

22   better off with the Hamiltons.  I sort of felt bad for my

23   mom, but not really.  Liz was driving me around, to and from

24   school, getting me settled.  I really enjoyed her company.

25   One day we were talking about school, talking about condoms,

Summation - Ms. Peebles

what they were used for.  I think it was the very next day my

teacher, Mrs. Duke, was lecturing us on puberty and sex.  I

really liked Mrs. Duke, so I approached her after class.  I

asked her if someone younger had sex with someone older, is

it their fault if they did not say no?  I then went on to

tell her I had sex with the landlord.  I referred to him as

the landlord because I didn't want her to think I was

particularly close to this person.  I couldn't believe what

happened after that.  Liz came to the Hamiltons, I sat down

with her and I told her about what happened with Dean.  I

told her my mother didn't know and he would tell me to be

quiet so my mother wouldn't hear.  Liz was furious that my

mother violated the Court order.  She kept asking me why my

mother would allow me around him if there was a court order.

Liz said it was my mom's fault.  If she had not violated the

order, this could have been prevented.  Liz took me to the

police station.  I met Detective Blenis.  He was cool.  I

told him the same things I told Liz and we talked about

getting an examination.  I could not believe all the

commotion this started.  The next day I went roller skating

with the Hamiltons and I had the time of my life.

Liz took me for an examination and I told the

doctors I had never been assaulted or otherwise abused.

After the exam I got to go to the police station again and

this was really cool.  I got to wear an earpiece and record

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles                                    2328

1   Dean talking to me.  I was given a script to follow and I
2   told him I was concerned that I might be pregnant.  The first
3   call didn't get taped and he didn't know how to call me back
4   because I was at the police station, so we called my home
5   phone and talked to my mom.  She told him I was in foster
6   care.  He was asking my mom that I sounded depressed.  He
7   apparently was fishing for information.  He is such a dope.
8   He started asking me about what I said about my Grandpa.  I
9   couldn't believe he brought that up.  I tried to deny it,
10  saying that I said eew, he's really old, he was sick,
11  undergoing chemo.  When people are sick like that they don't
12  do stuff like that.  He was baffled.  He asked if he had
13  imagined all of that.  The last thing I need is for Detective
14  Blenis and Liz to think I had some close relationship with
15  him.  I don't think that matters anyway because of my age but
16  I don't want it to look like I had in any way initiated any
17  of this.  Then he would not shut up about our relationship
18  and our talks.  His pleading for mercy was a little more than
19  I could handle.  I realized that he never mentioned my mother
20  getting in trouble but what difference does that make?  He
21  was pathetic.  I couldn't believe he said so consider if the
22  person was a bad person that got you pregnant or that he was
23  a loving person, if he had the best intentions in mind or if
24  you were raped or brutally attacked, you have to decide did
25  you want to have sex with the person?  Did you initiate a lot

Summation - Ms. Peebles

1    of things that happened?  If that is true, then you might

2    want to consider being more of an adult.  That's just

3    ridiculous.  He shouldn't have taken advantage of my

4    vulnerability.  I was too young anyway.

5              The second phone call we used -- we used my

6    cellphone so he would feel comfortable answering the phone.

7    The day before we had a restricted number, he might have

8    caught on.  I know I claimed I never called him before,

9    especially nine times on New Year's, but for some odd reason

10   I believed he would answer my cellphone without hesitation

11   once he saw the number come up.  I had not even thought about

12   the phone calls when I started claiming my mom and George

13   Lang sexually abused when me I said my mom allowed the

14   landlord to do those things to me.  Those phone calls were

15   seven months earlier, how was I supposed to remember what was

16   said.

17             Anyway, it was a lot of fun making the calls.

18   I felt like one of the gang.  My mom had no idea what was

19   going on.  I was ordered not to discuss it with her, which

20   was just fine.  She would have been upset and I didn't want

21   to have to deal with her anyway.

22             When I lived with the Hamiltons, I set up a

23   MySpace account.  I said I was 17 years old, and I named

24   myself party girl and someone who loved hot guys.  I picked

25   Liz, Naomi and Theresa Jones as my top friends.  I really

Summation - Ms. Peebles

2330

1  felt like one of their group.  They had all kind of stuff on

2  their MySpace pages and I learned a lot about each of them.

3  It was really cool.  I really felt like I was part of their

4  click.

5            I worried a lot about my mom, whether she was

6  going to jail for leaving Pizza Hut and violation of the

7  Court's order.  No one really told me what was going on and I

8  worried whether she was taking care of herself.  I wanted her

9  to go to my school functions and track meets but she never

10  would.  I finally learned that she was going to have to go to

11  jail and I was really upset.  I could not understand why she

12  would have to go to jail.  It didn't seem fair.  Liz said she

13  should go to jail, it's her fault and she needs to change her

14  behavior.  I didn't believe her at first but then when I

15  talked to my mom while she was in jail she seemed happy.  I

16  thought she would be upset.  It didn't seem like she was

17  learning anything.  Liz kept saying she has to want to

18  change.  Well, I have to at least give her a chance.  Toward

19  the end of summer I was really concerned that my mom would

20  not change.  Liz said she wouldn't and I thought she just

21  might take off and live with Ray.  She said Ray would be

22  getting out some time.  I figured she'd leave and I'd never

23  hear from her again.  I couldn't believe she'd do that but

24  the more I thought about it the angrier I became.  Liz asked

25  me about mom paying rent and whether she said anything to me

Summation - Ms. Peebles

1  about it.  I think she kept asking me that because she

2  thought the landlord had sex with me for the rent and it was

3  my mom's fault.  I did not really know how my mom paid the

4  rent but it was probably her fault.  She should have followed

5  the court order and I wouldn't be in this mess.  I don't even

6  think she cares and even if she says she does, she's never

7  there.  At least when she's in jail I know where she is and

8  she's being taken care of.  I felt like everything was out of

9  my control and my mom was due to be released from jail.  I

10  really wanted to see her but for some reason I was not

11  allowed.  I could not believe she, my mom, would be happy in

12  jail.  Toward the end of September I decided I was going to

13  tell my counselor I wanted to kill myself.  I thought maybe I

14  would windup in the hospital, but instead I ended up in a

15  psychiatric center and that was not really what I had in

16  mind.  They evaluated me and asked if I suffered from

17  auditory and visual hallucinations.  At the time I said I

18  didn't, but I was certainly going to keep that in the back of

19  my mind.  I went crazy when I first arrived.  I was

20  introduced to Dr. Michele Toth and Lisa Flores-Diaz, two very

21  nice people.  I began discussing things with Miss

22  Flores-Diaz.  She seemed to really care.  She asked me if my

23  mom was prostituting me for rent.  I was not sure what she

24  meant so I told her my mom was fine with it.  She said it's

25  fine, better than being homeless.  Liz would visit me at the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles                    2332

1  GBHC and so would the Hamiltons.  I had no idea what was

2  going on with my mother and she was not allowed to see me.

3  There were a lot of people interested in my case and they had

4  team meetings and they all sat around discussing me and I

5  felt really important.  Every time I said something I'd get a

6  lot of attention.  For a 13-year-old kid that was pretty

7  cool.  I knew my mom was being released from jail but I had

8  no idea what she was doing.  When I asked Liz she said not

9  much.  I was mad.  It didn't seem like she was even trying.

10                 It was the end of October and I was in the

11  Greater Binghamton Health Center and my mom didn't seem to

12  care.  Well, I was going to make her care, that's when I

13  decided to tell Liz that my mom knew what was going on with

14  Dean and that she took pictures.  This was great.  It brought

15  back memories of when I met with Liz and Detective Blenis

16  months ago.  I got to leave the facility and Liz took me to

17  the advocacy center and I was videotaped.  Detective Blenis

18  really felt bad for me.  It seemed like the more I said about

19  my mother, the more praise I received.  I first told them I

20  was listening to my music in my room and my mom walked in and

21  covered the window with a sheet.  Dean followed her in the

22  room, my mom sat against the door while Dean had sex with me.

23  My mom took pictures of it and I was mad.  I wanted to punch

24  her in the face.  I guess as they continued to ask questions

25  I forgot what I said earlier so when they asked me when did

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1   she put the sheet up I said a few weeks before because the

2   sun was waking me up in the morning.  After I said all this

3   Detective Blenis typed up a statement and I signed it.  I

4   couldn't wait for my mother's reaction.

5           Liz told me that day she was coming to my

6   Halloween party but she never showed up.  I was so upset I

7   started banging the walls and I had to be sedated.  I waited

8   and waited and heard nothing about my mother.  On November 6

9   I spoke to Liz on the phone and I asked her if they had

10  talked to my mother and she said they'll talk to her when

11  they feel it's appropriate.  Liz would not come and see me

12  the next day.  I was very upset and I tied a shoelace around

13  my neck and had abrasions on my skin.  I told my counselors I

14  was trying to kill myself and Liz was called that same night

15  and the next day Miss Lisa spent a lot of time with me.  I

16  get a lot of attention when I do these things.

17          I guess they finally talked to my mom and she

18  denied it.  Apparently she told Detective Blenis Dean had

19  taken pictures of the house and he could check Rite-Aid to

20  see if there was a record of photographs being developed.  He

21  had to explain to my mother that they would not develop naked

22  pictures of her daughter at the Rite-Aid.  She is pretty clue

23  less.  Unfortunately, this did not create the reaction I had

24  hoped so I started acting out again.  I was telling my

25  counselors that I had more to tell.  I thought this might

Summation - Ms. Peebles                        2334

1    also be a good time to pull out the auditory and visual

2    hallucinations that I had learned about.  I figured why not,

3    it will probably create more of a stir.  I talked to Liz and

4    I told her my mother had sexually abused me and so did George

5    Lang.  This was great, I got to leave the facility again and

6    be videotaped.  This time Detective Blenis was there.  He was

7    outside the room and the other woman named Denise sat in with

8    me and Liz.  They started asking me questions and I told them

9    that when I was 11 and a half, almost 12 my mom walked into

10   the bathroom and started sexually abusing me.  I realized I

11   never said I was 10 years old when my mom fondled me.  I was

12   certain I was almost 12 during this interview.  My mom, well,

13   she didn't say anything.  She just walked in, started

14   fondling me and made me fondle her.  Prior to that she just

15   let me do my own thing when I was 9 or 10.  It was at the

16   same time in December right before my 12th birthday that

17   Grandpa Lang started sexually abusing me.  My mom was having

18   sex with George and they dragged me in on it.  He made me

19   give him a blow job and my mom took pictures with a digital

20   camera.  There are pictures of me on a hard drive doing this.

21   It was the kind of camera you hook up to the computer and the

22   pictures show up from the camera to the computer.  I know

23   George is dead and Renee doesn't know anything about

24   computers.  He has a password so you probably won't be able

25   to get into this computer.  Trust me, there are pictures of

Summation - Ms. Peebles

1  me doing this on his hard drive.  What, what do you mean

2  there's a forensic analysis of the hard drive and you did not

3  find pictures?  Well, he must have erased them.  What do you

4  mean there was never a digital camera hooked up to his hard

5  drive?  You have to believe me, it happened.  Renee said he

6  didn't own a digital camera.  What does she know, I am

7  telling the truth.  I know Grandpa Lang was very sick with

8  cancer.  Why would Renee say he was impotent.  After talking

9  to the prosecutor, it must have happened the year before.

10  What do you mean Grandpa Lang was impotent a year before he

11  was diagnosed with cancer in 2004.  You have to believe me.

12  He had sex with my mom and I gave him a blow job.  I think

13  you will believe me when I say this, everyone else has.

14          I did not want to see that videotape of me

15  replayed again.  I can't believe the lady had the nerve to

16  play that again and again after I told her I didn't want to.

17  I'm so used to getting what I want and no one ever questions

18  what I said.  Now all of a sudden inconsistencies and

19  impossibilities are a big deal.  Well, as for me and the

20  landlord, well, also my mom had sex with him too and took

21  pictures.  I know it may seem hard to believe but trust me,

22  Dean just wasn't into young, skinny woman.  He also was

23  attracted to my mother.

24          As for the Best Western, my mom took me there

25  on three occasions since moving to Norwich.  Once we just

Summation - Ms. Peebles

2336

1   went shopping and twice after that, around my birthday during

2   a school week she took me.  She used her own name when she

3   checked in.  We would then bring the guys up to the room.

4   How was I supposed to know that they could get the

5   registration records?  Like the prosecutor said, maybe the

6   guy was already upstairs in the room when we arrived.  Who

7   cares if my mom's phone records don't show any other calls to

8   the Best Western or to any bus company.  We could have gotten

9   there any number of ways.  I'm just not sure how but there

10  are ways.  How am I supposed to know where these men came

11  from.  For all I know they fell from the sky.  Don't make me

12  describe them, I get confused.  I can't remember what I said

13  and for God sake, don't play that video again.  That was

14  months ago.  You have to believe me.  Why would I make this

15  up?  I must be telling the truth.

16             This last claim really got things going.  I

17  couldn't believe it when I was told that this was going to be

18  a federal prosecution.  Immediately I said I wanted to meet

19  the person who was going to be in charge of things.  They

20  arranged a pizza party at the federal building and I was

21  introduced to the prosecutor.  He must have known how much I

22  love pizza.  There was no holding back now.  I certainly hit

23  the big leagues.  I bet even my mom would be impressed with

24  me and she definitely would be thinking of me every day.  I

25  got a little flighty as the days got closer to my testimony

Summation - Ms. Peebles

2337

1   against my mother.  I joined a cult and I claimed I was a

2   devil worshiper.  I worked through it and I was not going to

3   let my followers down.  I'm certain my mom would be surprised

4   with my strength and poise as I walked into this courtroom.

5   I certainly had enough practice.  I had an entire entourage

6   with me, including a bodyguard, and I really felt like a

7   celebrity.  Everyone was hanging on my every word.  I was not

8   about to crack.  I was extremely annoyed at one point and I

9   needed a break.  After the break I magically realized I could

10  say I don't recall and I don't remember.  What more could

11  they ask.  That was a great find.  I made it through two days

12  in trial where the attention and focus was on me.  I had to

13  make sure I said about my mother, I love her with every ounce

14  of my body.  I couldn't look at her right then, I had to

15  focus on Michelle and my supporters.  I'm sure my mom

16  understands all of this is for her own good.  She's not a

17  capable mother, she's not a strong mother, and I can't

18  continue to worry about her well-being.  She's better off and

19  as for me, I'm preparing for my sequel.

20          Now I must acknowledge those who assisted me

21  in creating this wonderful masterpiece.  I would first like

22  to thank all of those from DSS that have helped me with my

23  writing and for a special thanks to Liz Chesebro, for without

24  her this could have never happened.  I am forever grateful

25  for her assistance, love and support.  I would also like to

Summation - Ms. Peebles                    2338

1   thank Detective Blenis for always believing in me and also

2   Agent Lyons who tried hard to make excuses for me when he

3   testified in front of the grand jury, especially when he

4   stated that I was in the care, custody and control of my

5   mother when I made my initial claim against Dean Sacco, which

6   is why I didn't implicate my mother at first.  Thanks for

7   your valiant effort, whether you misspoke or whatever, I

8   really appreciate you trying to make excuses.  As you know, I

9   was already in foster care and my mother's contact with me

10  was limited at that time as well.

11          Lastly, my heart goes out to Mr. Lovric and

12  his creative wisdom.  Having one of the men from the Best

13  Western waiting for me upstairs was brilliant.  I don't know

14  why I didn't think of that when I first was interviewed.

15  Also, having my mom bound up the stairs when the Parmalees

16  came over to make it sound like she was involved was a stroke

17  of genius.  What does it matter what Mr. Parmalee says.

18  Also, why couldn't Dean be making calls from my home phone to

19  his work on my birthday.  What difference does it make that

20  he was calling Norwich from his cell one half hour later.

21  It's still a great suggestion.  I'm not sure how you handled

22  the rent thing, but it sounds good to me.  You brought up how

23  she struggled.  I figured that must be good enough.  Besides

24  introducing a letter from Dean that said he was about to lose

25  the house in September '07 because the tenants failed to pay

Summation - Ms. Peebles                            2339

1    will surely confuse the jury and they may just buy it.  Never

2    mind my mother was in jail and I had already made claims of

3    sex abuse against Dean.  I guess it's not surprising she was

4    not paying him then.  Also, the camera.  I know Investigator

5    Shultz said I never identified the video camera but once you

6    showed it to me, I thought why certainly that's the video

7    camera that Dean used to tape me.  I'm not sure where you

8    came up with me telling my teacher my mom sexually abused me,

9    but that works for me.

10              Finally, the phantom storage shed is a great

11   cover.  Why else wouldn't they find any pictures.  Of course

12   there must have been some other storage shelter in a far off

13   land.  What difference does it make that Dean saved a trophy

14   amongst all his other worldly possessions in Norwich.  It's

15   still a great argument.  The Lang hard drive.  He must have

16   erased the pictures, otherwise, they'd still be there.  Good

17   one, I knew you'd think of something to try to negate the

18   fact that there was never a digital camera hooked up to the

19   USB port.  Coming up with a phantom flash drive is simply

20   brilliant.  I don't know what that is but good job.  I can

21   picture Grandpa Lang on his death bed erasing pictures of me.

22   Also, phew, thanks for pointing out the timing of everything

23   and trying to make sense of my claims.  I really wasn't

24   thinking of how sick he was when I was 12.  Good thing I was

25   steered in the right direction.  You have no doubt proven

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles                    2340

1  beyond a reasonable doubt that I was under the age of 16

2  years old and that I was in the care and custody of my mother

3  when I was with Dean.  As for my mother having knowledge or

4  partaking in any pictures, the jury has my word.  Thanks

5  again for everything and just believing me like everyone

6  else.  I'm confident once you speak to the jury that they

7  will just believe me too.  I hope you are around to assist me

8  with my next masterpiece.  Until then, take care.

9              As only a good mother would do after reading

10  her daughter's book, Linda O'Connor sends her daughter a

11  letter praising her for her writing.

12              Dear Shannon.  I have received and read your

13  book.  I must say it's a fine piece of writing.

14  I'm impressed with your knowledge and the persuasion in which

15  you write.  I should not be surprised, after all, you did

16  receive an award for being a creative writer.  However, I

17  must point out that much of what you say is pure fiction and

18  perhaps you should entitle the book, American Attention

19  Seeker- a Systematic Failure.  Market it as a fairytale

20  fictional read.  I know you have frequently ignored my

21  suggestions in the past and you tend to lack respect for

22  anything I have to say but just this once may you rethink

23  your choice of words and only then may we ever begin to

24  repair the damage that has been done.  While you certainly

25  have already sold hundreds of copies, I would hope that you

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles

1   would not forsake our wonderful close mother/daughter

2   relationship at all cost.  I will close by saying the loss of

3   your love pales in comparison to anything I've already gone

4   through.  May all of your dreams come true and remember

5   however angry I maybe, I will always love you.  Roses on your

6   pillow.  Mom.

7            The government has stood before you and has

8   told you that the crimes against Mrs. O'Connor are horrific.

9   They're not horrific.  They are absolutely, unconditionally

10   absurd.  As hard as they have tried to twist the facts and

11   rethink their theory and color the testimony of the witnesses

12   that have been presented before you, they have failed

13   miserably.

14            When I opened I told you they would be able to

15   prove that Linda O'Connor mismanaged her money.  That she

16   took from Pizza Hut without paying.  That she violated the

17   court's order and allowed her daughter around Dean Sacco.

18   And those things she admitted and she did without hesitation.

19   What she has gone through knowing what she knows now and

20   having violated the Court's order, she went to jail and never

21   once wanted her daughter to feel upset or guilty about her

22   being in jail for violating that court order.  And Shannon

23   took it as Linda being happy while she was in jail.  Linda

24   has missed the company of her daughter for well over a year

25   now.  This case is similar to a story told by a young boy to

Summation - Ms. Peebles                    2342

1    his father one late summer evening.  The kid had been coming

2    home late.  The father said one last time, that's it.  You're

3    not going to be going anywhere.  You're not going to have to

4    worry because there's not going to be a curfew.  He went

5    beyond the curfew one summer night.  He came to his father

6    and his father was furious and he was tattered, torn, his

7    clothes had been ripped and he had a stick in his hand and he

8    was filthy and his father looked at him and said, son, where

9    have you been, and he says you are not going to believe it.

10   I got into a huge altercation with a 700-pound grizzly bear

11   and I fought and I fought and I fought.  I used this stick

12   and I finally fended him off and I killed him.  And, Dad,

13   this is the stick that I used to kill the bear.  And his

14   father said, well, that's a nice stick but where's the bear?

15          What the government has presented in this case

16   is a stick.  There is no bear.  There is no proof whatsoever,

17   circumstantial or otherwise, to support the claims against

18   Mrs. O'Connor.  The range of emotions are indescribable of

19   what Mrs. O'Connor has had to go through.  Believing her

20   daughter had been sexually abused, knowing her daughter was

21   in a psychiatric hospital, blaming herself and now having to

22   sit in a federal court with her life on the line as the

23   result of things that her daughter is now claiming against

24   her.  I can't even imagine.

25          Kim Hamilton came into this courtroom because

Summation - Ms. Peebles

1    I subpoenaed her.  She had six, seven foster children running
2    around her house.  How inconvenient is that?  I drag her from
3    Norwich up here to testify.  What ax does she have to grind?
4    I didn't ask her what her opinion was about Mrs. O'Connor.  I
5    was asking her about events that she witnessed firsthand as
6    the foster mother.  I was not the one who asked her opinion.
7    That was Mr. Lovric.  And she gave her opinion based on a
8    mother and she said from her heart and her gut and her seeing
9    what was going on between her and Linda, the mother, the
10   mother, and Kim Hamilton said the idea was for Shannon to
11   be -- eventually be reunited with her mother.  She also had
12   no problem staying with her.  She was a visitor at the
13   psychiatric hospital.  Where would she have an ax to grind?
14   She's still actively working with DSS.  She has foster
15   children, and in the middle of adopting.  Why would she want
16   to go against the very agency that she has to work with
17   regularly.  I'm sure it's not the agency but the bottom line,
18   what ax would she possibly have to grind?  Zero.  She doesn't
19   know Linda from a bag of beans other than the things she
20   heard on the phone and she heard Shannon talk about.  She's
21   not friends with Linda.  Is she concerned about the
22   allegations against Linda based on the experience she had?
23   I'm sure she's semi-concerned because -- and by the grace of
24   God -- she was accused of sex abusing Shannon and other kids
25   and she was having her sign the form and, of course, she

Summation - Ms. Peebles

2344

1    would be concerned and, of course, she would want to come in

2    here and point those things out in order to give you a fair

3    assessment of the situation, a full picture of the situation.

4    If you look at the testimony of Mallory Monagan, my heart

5    went out to her.  That is not the same reaction I had when

6    Shannon O'Connor took that stand and was making allegations

7    that her mother was sexually fondling her in the bathtub and

8    she never said it was when she was 10.  If you look at the

9    interview she says six or seven times on the video it was

10   right before her 12th birthday.  Eleven and a half in

11   December of 2005.  Ten years old, the first time I heard 10

12   years old is when she took the stand.  There was nothing

13   ever, not a thread of proof ever that was ever introduced

14   that was -- that there was ever any allegations that anything

15   happened when she was 10 years old.  It's quite the contrary.

16   What Elizabeth Chesebro asks her during that interview when

17   you were 9 or 10 your mom let you do your own thing?  Oh,

18   yeah.  Right before my 12th birthday, that's the same time

19   it started happening with George Lang.  George Lang can't

20   defend himself, he's dead.  There's two phantom people she

21   made up that she can't describe because she doesn't want to

22   get confused.  That's why they're not at defense table.

23            Miro Lovric in his closing is talking about

24   some phantom phone call between Linda and Dean after the

25   phone call's disconnected from the Norwich Police Department.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles

2345

1    Linda doesn't have a clue what's going on.  She has no idea.

2    She's trying to act like there's some cover up going on

3    between Linda and Dean.  That's just incredible.  It

4    absolutely makes no sense.  Dean is a smooth talking

5    intelligent individual and you know where the proof is in

6    that?  He befriended an Assistant US Attorney who came into

7    this courtroom and testified he went to wine parties with

8    him, he went working out with him, that he sparred with him.

9    If he can't figure it out, how is somebody like Linda

10   O'Connor going to figure it out who we've heard the proof

11   suggest is intellectually limited.  No one said she was

12   insane.  She's intellectually limited.  She collects

13   disability.  She had brain surgery.  Nobody says that she's

14   mentally ill.  There was no testimony about that.  Now, if an

15   Assistant US Attorney can't read between the lines, how is

16   Linda O'Connor supposed to?  This is a guy that was reading

17   the paper supposedly while he's on the subway.  Oh, geez, the

18   guy I work out with is charged with sex offenses against a

19   minor.  I think I need to call someone up.  He had no idea up

20   to that point.  That's the impression that I got.

21           Mr. DiFiori, what he testified to was criminal

22   in this courtroom because that is absolutely one hundred

23   percent a crock.  He doesn't tell his wife who he supposedly

24   is very close to.  We all know who we tell people we're close

25   to, who we are intimate with, who we tell things that are

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles

1    important.  Even if you want to believe he wouldn't tell the

2    FBI agent something of that magnitude, he would tell his

3    wife.  We called him on the phone and my investigator

4    recorded him.  I wasn't even going to talk to the guy.  I

5    read the reports, he didn't know anything.  Luckily, thank

6    God, we did because you kind of got the sense -- I don't know

7    if he was afraid.  It seemed to me like he wanted to feel

8    important.  He's standing in the Federal Building, maybe they

9    weren't even going to call him as a witness, then he came up

10   with I read some articles in the paper.  I see what he's

11   charged with now.  He said he had sex with a minor who was a

12   prostitute.  That flies in the face of the letter that Mr.

13   Sacco sent to William Sorvino where he says he, you know,

14   took a chance and fell in love with a girl.  That doesn't

15   sound like somebody who said anything about a prostitute.

16   The letter to William Sorvino is critical because it talks

17   about the charges resulting from my tenants downstairs.  You

18   don't think Linda was upset when she heard about what Shannon

19   had said was happening.  She went right down to the YMCA.

20   You heard the individuals talk about how upset she was.  This

21   was not taken lightly by Linda.  Think about not being able

22   to comfort your daughter when you know something like that

23   happened.  She wasn't even allowed to talk about it.  She was

24   precluded from talking about it.  So she's intellectually

25   limited.  She's precluded from talking to her daughter.  What

Summation - Ms. Peebles

2347

1    impression do you think Shannon might have taken away from

2    that?  My mom doesn't care.

3                Langs, I guess what the government's trying to

4    insinuate, oh, the Langs let them stay in their single-wide

5    trailer.  She was living it up in Nineveh.  She was, you

6    know, letting George Lang have sex with her daughter.  That

7    is insane.  They're in a single-wide trailer up Nineveh.  If

8    Linda borrowed any money, the records show -- same records

9    government introduced -- Linda had to pay them back.  Linda

10   had to write a check for $100.  Linda had to write a check

11   for $40.  They weren't giving her money.  They weren't giving

12   her some pie in the sky life in Nineveh, New York.  They

13   didn't have family.  Linda and Shannon didn't have family.

14   They counted on the Langs.  They were like Grandma and

15   Grandpa.  That was her family, that's what the proof shows.

16               I don't even think we need to address the

17   rent.  The proof is in evidence.  The rent has always been

18   paid.  I don't even know how this could have started, other

19   than a rumor, maybe Kathy Myrick, somebody Linda thought was

20   her friend.  Imagine that.  The proof with regard to any rent

21   payments is in evidence.  Every month is covered.  It makes

22   absolutely no sense that if Linda didn't have the money on

23   December 1 because she blew it at the Best Western on her

24   daughter, if she didn't have the money on December 1 -- Dean

25   was calling on the 6th and claiming and then threatening to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Summation - Ms. Peebles                    2348

1    evict Linda and Shannon.  That makes no sense.  When you look

2    at the records with Delaware Opportunities, Norwich house,

3    Linda started in December making calls to get the HUD

4    assistance.  That was already in the works.  Her rent was

5    down to $113 a month.  If you look at the January money

6    order, it's absolutely critical.  Dean puts on there, you owe

7    me $300 for January back rent.  Why would he be putting that

8    on the money order if he had some working thing going with

9    Linda concerning sex with Shannon?  It absolutely makes no

10   sense.  It makes no sense.  I think if Linda thought he was

11   having sex with Shannon, that Linda would probably be owning

12   the house on 45 Fair Street, not paying Dean Sacco rent.

13              The phone call from March 15, no matter what

14   the government says, that cannot be changed.  It is what it

15   is.  Dean Sacco pleading for Shannon not to say anything.

16   Begging.  He is pulling out all the stops.  All the stops.

17   He knows how close Linda is with Shannon at that time.  How

18   close Shannon is with Linda.  Not once not once does he say

19   your mother's going to get in trouble.  Your mother knew.

20   Not once.  You better be careful, your mom's going to get in

21   trouble.  That's not said and that's critical.  He is

22   literally pulling out all the stops.  The only time Linda's

23   name gets mentioned, if your mom can help you or the social

24   worker, he puts her in the same sentence as a social worker.

25   The March 15 phone call is absolutely critical.  And the

Summation - Ms. Peebles

2349

1  videos, if you ever need to have the videos replayed, we have

2  transcripts for both the October and the December interviews.

3  It's what she said.  It's what she said the first time.

4        The government has words and they have words

5  that will never come close to matching the realities.  Like I

6  said, I don't think I ever could do justice in describing

7  what Mrs. O'Connor has to go through.  I have to say I am

8  honored and proud to be her spokesperson in this case.  I

9  stand humbly before each and every one of you and I ask you

10  to return a little bit of dignity, whatever she has left, and

11  find her not guilty.

12        Thank you.

13        THE COURT:  Thank you, Miss Peebles.

14        We're going to take a break for lunch, ladies

15  and gentlemen.  It's just about 12:30.  We'll see you back at

16  1:30.

17        (Jury excused)

18        (Lunch break taken)

19        (Jury present)

20        THE COURT:  Okay.  Mr. Lovric, are you ready

21  to address the jury with your rebuttal?

22        MR. LOVRIC:  Yes, Judge.

23        THE COURT:  You may do that at this time.

24        MR. LOVRIC:  Good afternoon.  Hope you had a

25  good lunch.  But I'm going to get right to the point.  I

Rebuttal Summation - Mr. Lovric

2350

1    think I told you early on, I get to the point, and I don't

2    think you have any difficulty understanding where I'm coming

3    from and what my thinking and what my point is.

4              I find it best to be very direct with people.

5    I like doing business that way.  I've been doing it for 23

6    years now, and it works just fine for me.

7              Let me start first by addressing something

8    that Mr. Fischer talked about at the very end.  What Mr.

9    Fischer said to you regarding assistant US Attorney Lurie and

10   myself and Agent Lyons, I submit to you he should be ashamed

11   of.  Now I'll say it directly to him:  He should be ashamed

12   of.  He basically said to you that AUSA Lurie came up here

13   and lied, and then Mr. Fischer argued just a few minutes ago

14   to you that Mr. Lori gave him, Mr. Fischer, the ammunition or

15   the tools by which to impugn my integrity and my motivations

16   and why I'm doing this case and what I'm looking to do.

17             Let me tell you a little bit about what I'm

18   doing here.  I've been a prosecutor for 23 years, 15 years of

19   those in Binghamton, 8 of those in New York City.  I'm not

20   going anywhere.  Forty-eight years old, I'm not making

21   millions of dollars like some attorneys out in private

22   practice.  I never will.  I think after 23 years of doing

23   this, I know where I'm going and where I'm not going, and one

24   of the things that I'm not about is where I am in my life in

25   terms of status.  I do this job because I love this job.  I

Rebuttal Summation - Mr. Lovric                    2351

1    do this because I believe it's the right thing to do.  I have

2    no problem standing in front of you and telling you that I am

3    very proud to represent the Shannon O'Connors of the world.

4    I have no problem justifying what cases I prosecute and what

5    cases I bring before you.  Are these cases that I go out or

6    Agent Lyons goes out and any other investigator and we pick

7    and choose and we pick and choose our evidence?  No.  I think

8    you've probably figured it out by now, these things do not

9    come in with a little bow on them, perfectly packaged and

10   everything fits nicely and everything that you have as far as

11   evidence lines up.  That's not the real world of criminal

12   justice.  The defense would like you to think that.  They'd

13   like you to think that everything has to be all lined up.

14   Everything has to match.  It has to be tied with a nice red

15   ribbon on the card and the box has to say "Guilty."  Well,

16   I've got news for you folks.  This is not CSI.  This is not

17   Law & Order.  This is the real world.  This is how cases

18   develop out there.  This is how crimes happen.  And this is

19   how criminals engage in activities.  And what happens at the

20   end of it all is an Agent Lyons or Investigator Blenis or an

21   AUSA Lovric out there in the world gets this thing, the way

22   it was left for them to get.

23            Mr. Fischer would like you to believe that I'm

24   a part of the conspiracy.  I'm one of those liars.  Agent

25   Lyons is one of those liars.  We're all doing that.  That's

1    essentially what he said to you.  That I coached Shannon.

2    Agent Lyons coached Shannon.  Agent Lyons coached DiFiori.

3    That's what he wants you to believe.  That's what he says is

4    happening in this case.  Well, I'm going to tell you a couple

5    of things and I want to bring some information to your

6    attention and then you ask yourselves, who's really playing

7    games with you and who are the game players and who are the

8    people trying to pull things over your eyes?

9                    Mr. Fischer talked about the DNA.  Agent Lyons

10   was on the stand, and it was Mr. Fischer that brought out

11   through Agent Lyons that the DNA was tested on the condom and

12   Shannon's DNA that was sent.  Mr. Fischer and Mr. Sacco were

13   asked to provide a sample.  Agent Lyons told you that.  We

14   asked them, you want to give us a sample buccal swab just

15   like Shannon, we'll send it up to the lab and Andrea Lester

16   will send you a copy of the report like she does us?  We

17   asked him that.  Do you remember what Agent Lyons said their

18   response to that was?  No way.  It is disingenuous of Mr.

19   Fischer to stand in front of you on his summation and say the

20   government chose not to do a DNA test on Sacco.  That is

21   disingenuous.  Now, I could care less whether he wants to or

22   didn't want to provide a DNA sample or what his reasoning

23   was.  That is disingenuous to try and hoodwink you folks into

24   thinking we didn't care about giving him the chance to have

25   his DNA tested.  You can go back and have that reread on

Rebuttal Summation - Mr. Lovric

1    cross-examination of Agent Lyons, and that's what Mr. Fischer

2    asked him and Agent Lyons told him that.  I don't know if he

3    thinks that you guys have a memory span of a week or a day,

4    but I remember that, and if you don't, have it read back to

5    you by Vicky.  So when he says that we didn't care, you ask

6    yourself, who's playing games in this courtroom?

7              Now on top of that, I told you in opening,

8    Andrea Lester told you as well, the only thing that she could

9    tell you if she had the DNA of the male contributor is they

10   could be either included in the pool of millions of people or

11   excluded.  That's the science of it.  Based on that mixture

12   and how the DNA mixed with Shannon's.  But I'm going -- I

13   don't know that.  He had the opportunity to provide it.  Why

14   do you think Mr. Sacco said no way?  I don't think I need to

15   tell you that.  And all this baloney --

16             MR. FISCHER:  Your Honor, at this point I do

17   have an objection with respect to invoking certain rights

18   that Mr. Sacco has.

19             THE COURT:  Well, Mr. Sacco has the right to

20   remain silent.  He doesn't have to furnish any evidence if he

21   chooses not to.

22             MR. FISCHER:  Exactly.

23             THE COURT:  That's what you want me to say?

24             MR. FISCHER:  Yes, your Honor, that's my

25   request.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Rebuttal Summation - Mr. Lovric                    2354

1          THE COURT:  Okay.

2          MR. LOVRIC:  And all this baloney about the

3  condom in unit 129, Mr. Fischer would like you to believe --

4  let me see if I get this right -- Shannon planted the condom.

5  I had to pinch myself because I thought I was still sleeping.

6  Shannon thought all the way in advance, if some day I need to

7  do something to Mr. Sacco, I need to use that mechanical

8  penis that George bought for my mother, and I need to break

9  and tear my hymen because I do know that a broken and torn

10  hymen shows sexual intercourse.  After I do that, I need to

11  take that condom off the mechanical vibrator that my mother

12  used and then I have to roll it back the same way because

13  Andrea Lester's going to know I rolled it back the wrong way,

14  it was taken off the wrong way.  And then Shannon thought

15  ahead of time, months, I need to put this somewhere where it

16  will implicate Mr. Sacco when, down the road, I go to do

17  something to him, like frame him or make some allegation.

18  And so I'm going to put it in his dresser in a box with

19  envelopes and let it sit there until the time is right.  That

20  is stupid.  I'm sorry.  I can't put it any other way.  That

21  is the stupidest argument I've heard in my 23 years of being

22  in a courtroom.  I'm sorry.  I'm sorry.  You have to be an

23  imbecile to come up with that argument.  I can't put it any

24  other way.  And I am being blunt.

25          I told you before, this defense has gone back

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Rebuttal Summation - Mr. Lovric

2355

1    and forth from Shannon is a blubbering mental incompetent to

2    she is Einstein.  Well, Mr. Fischer just tried to pull one

3    over on you and tell you she's Einstein.  She thought of this

4    all ahead of time.  She planted that condom.  Couple days

5    ago, Shannon was a mental incompetent, and I submit to you

6    what I said to you in my direct or my first summation to you,

7    they are playing it both ways.  They don't really care what

8    you buy.  They don't care if you believe one story or the

9    other, half one or another.  They could care less.  But

10   you're being fed inconsistent theories.  You're being fed

11   inconsistent arguments by the defense.  What does that tell

12   you?

13                Exhibit 40.  Mr. Fischer spent a lot of time

14   on Exhibit 40.  And he's dead wrong about the entire time he

15   spent on it.  Pull out Exhibit 40.  I'm not going to do it

16   here for you.  Dean Sacco, after he writes in his journal

17   that he has a conversation with the Thai, T-H-A-I, guy, Mr.

18   Sacco gets this brochure in 2004.  Now, yesterday -- excuse

19   me -- well, it was yesterday.  Mr. Fischer wanted you to

20   believe that the journal entries that Mr. Sacco made in 2002,

21   that they were the old Sacco.  He's done being a child

22   predator.  In 2002 he realized what he is and he's done with

23   it.  Well, that brochure comes to him in 2004, two years

24   later.  What's the answer to that, Mr. Fischer?  Oh, he

25   forgot to check the dates.  That brochure is evidence to you

Rebuttal Summation - Mr. Lovric

1   of Mr. Sacco's propensity of being a sexual offender, and you

2   can use it as such.  You can consider that as evidence that

3   he has a propensity to engage in sex with minors and to seek

4   out minors.  What better evidence than he's getting a

5   brochure to go to Thailand, Philippines and Cambodia to have

6   sex with young girls?  Take a look at that picture.  It's

7   like a 13-year-old girl in the picture and she's standing

8   there with this pose naked.  I mean, come on.  You gotta be

9   kidding me.  I can't even believe we're arguing over this

10  brochure.  Is it child porn?  Absolutely.  Mr. Fischer says

11  wrong.  Well, I've got news for you.  You're dead wrong.

12  He'd like it not to be child porn but it is.  You look at it.

13              Interstate commerce travel.  I said this to

14  you last time.  Dean Sacco barely sets foot in Norwich,

15  New York from the time he buys the house up until August 22

16  of 2006.  You can look at all the records that are in there.

17  You can look at his bank card records.  You can look at

18  whatever is in there.  He barely comes to Norwich, New York.

19  And when does he start?  And not only start but it's almost

20  every several days he's coming up to Norwich.

21              Take a look at his Y records, Exhibit 13.

22  When does he join the Y?  September of '06.  Not in '05 when

23  he bought the house.  When does he start coming to the Y?

24  September 13, September 16, September 20, September 23,

25  October 4, October 5, October 7, October 9, October 10,

Rebuttal Summation - Mr. Lovric

1    twice, October 11, October 12, October 14, October 18,

2    October 19, October 21, October 25 -- I'm not going to say

3    the word October -- 26, 28, November 4, 6, 11, 18, 25,

4    December 3, 9, 22, 23, 24, January, and on and on it goes.

5    He's in Norwich almost every other day, every third day.  Oh,

6    I see.  Mr. Fischer wants you to believe he's working on the

7    house.  Baloney.  He's found himself a child that he has

8    complete access to.  He can have her any time he wants when

9    he is up there.

10           What he's doing with Shannon and what he's

11   doing with Linda O'Connor.  Now, the Judge will tell you

12   about this interstate travel.  Listen to the Judge's

13   instruction.  With all due respect, with no respect to Mr.

14   Fischer, Mr. Fischer doesn't know what he's talking about

15   when federal law is concerned.  The travel does not have to

16   be solely for the purpose of engaging in sex or to try to

17   engage in sex with a minor.  It simply has to be one of the

18   reasons he came up.  Listen to the Judge's instruction.  And

19   I have a suggestion, if you have any question on the law, ask

20   that man, not that man (indicating).

21           And I have a couple other examples, and what I

22   want you to ask yourself is, is Mr. Fischer misstating

23   intentionally or unintentionally?  Well, maybe the number of

24   times that I point out to you will help you answer that

25   question.

Rebuttal Summation - Mr. Lovric                    2358

1           Videotapes are found in New Jersey.  Mr.

2   Fischer on his summation said that I said or I claimed that

3   Sacco drove up from Jersey, picked up the videotapes, left

4   the cameras, took the videotapes back, and that's where they

5   were found because he didn't want them to be found.  I think

6   Mr. Fischer's having hallucinations.  What I said to you and

7   what I'm saying to you is, the videotapes, part of what you

8   saw were found in New Jersey.  Mr. Sorvino gathered those

9   things up in his work area, Mr. Sacco's.  He then put them in

10  his garage, as he told you.  Agent Lyons recovers those

11  8-millimeter videotapes.  They are all in New Jersey.  My

12  point was -- and I was being sarcastic -- how is it that

13  every videotape is found in New Jersey?  Not in Norwich; in

14  New Jersey.  They're all down there.  And amongst all the

15  videotapes in New Jersey, there is none of Norwich, yet the

16  camera is in Norwich.  That's what I was trying to get across

17  to you.  I think you guys got it.  I don't think Mr. Fischer

18  did.  The camera's in Norwich.  Sacco, as I said before,

19  videotapes himself doing everything, and is it a coincidence

20  that no Norwich videotapes were found down in New Jersey?

21  And I submit to you, no.  He got rid of the Norwich, New

22  Jersey videotapes that he had in New Jersey.  He didn't leave

23  those things up here.  He took them home to enjoy them in the

24  privacy of wherever the heck he lived at the time.  But

25  that's why you don't find and we don't find those videos.

Rebuttal Summation - Mr. Lovric                    2359

1    Because between the 15th and the 18th, when he talks to

2    DiFiori, he gets rid of the Norwich videotapes.  He leaves

3    the cameras up there.  He doesn't think the cameras are going

4    to be any value to anybody even if they find them.

5                    Now, another point in cross-examination of

6    DiFiori, Mr. Fischer, not me, Mr. Fischer got Mr. DiFiori

7    talking about, and I think it was something about why he had

8    Mr. Sacco move from one building to another that he owned,

9    and Mr. DiFiori started to tell you about Mr. Sacco's

10   background.  Do you remember that?  If you don't, have it

11   read back to you, do me a favor, because I am a little tired

12   of this selective game of facts being played.  But DiFiori

13   starts to tell Mr. Fischer and in fact he starts to tell him

14   why he's scared of Sacco.  Now, Mr. Fischer brought out

15   through Agent Lyons that Sacco spent time in state prison.

16   But he cuts off DiFiori when DiFiori wants to tell you why

17   he's afraid of Sacco.  And ask yourself this question:  Do

18   you think Mr. DiFiori knows that Mr. Sacco spent time in

19   state prison?  Do you think that might be why he's also

20   scared of Mr. Sacco and not too thrilled about saying, this

21   guy told me what he did but I don't really want to get

22   involved?  You know what Mr. Fischer says to you?  This was

23   all late.  I don't frankly care if he threw me in.  This was

24   all Agent Lyons getting DiFiori to make this up before he

25   enters the courtroom.  That was a bunch of baloney.  It was

Rebuttal Summation - Mr. Lovric

1    Mr. DiFiori, when the time comes, sitting -- coming up from

2    New Jersey, knows he's going to testify, he finally -- he

3    knows he's under oath, he's going to have to tell everything

4    he knows.  It would have been great if he told the agent when

5    they visited him.  But does that mean he's making it up?

6    First of all, why say it five, ten minutes before you walk

7    into the courtroom?  You know why.  Because he knows he's

8    going to have to swear under oath and tell everything he

9    knows.  And he finally comes clean with that.  They would

10   like you to think we all made it up.  Yes.  Agent Lyons and I

11   sat down and I told Jim Lyons, go over there and tell

12   Mr. DiFiori that he needs to say the following things.

13   That's what they're saying happened.

14            The marijuana.  Mr. Fischer talks about

15   marijuana that is mentioned by Shannon and by DiFiori.  The

16   only people that ever asked anybody about marijuana is Mr.

17   Fischer.  He asked Amanda Rising and I believe Mr. DiFiori

18   about marijuana usage at one of their barbecues.  He admitted

19   it, yeah, people used marijuana there.  Then it was Mr.

20   Fischer that asked Shannon, isn't it a fact that on one of

21   those occasions after Dean had sex with you that he provided

22   marijuana to you?  And she said yes.  He brings it up and

23   then he doesn't like the answer and he says they're making it

24   up.  He's the one asking the questions.  I didn't ask Shannon

25   about marijuana, I didn't ask DiFiori or Amanda Rising about

Rebuttal Summation - Mr. Lovric                    2361

1  marijuana.  I'm not quite sure why he's doing this.  He wants

2  to make it sound like people are making something up that he

3  just asked of them.  He's the one asking them and eliciting

4  the information from them, I'm not.  How is that Agent Lyons

5  and me coaching witnesses what to say?  I'm sorry, but I

6  don't follow that logic.

7           Mr. Fischer twice on summation and at least

8  one time during the case got this fact dead wrong and

9  repeatedly kept doing it.  You can answer your question

10  whether he did it intentionally or unintentionally.  During

11  cross-examination of Shannon he at one point -- I'm going to

12  ask all of you to picture Shannon sitting there, and here's

13  my first point about that.  There were several occasions,

14  several occasions, numerous, in my view, occasions when Mr.

15  Fischer asked Shannon a question and gave her wrong dates,

16  wrong information in the question, and Shannon actually had

17  the wherewithal to correct him.  On one occasion he's giving

18  her a date of when sex occurred upstairs, in the upstairs

19  apartment, and he is telling her it was Christmas rather on

20  her birthday around Christmas.  She says, no, that was the

21  time before Christmas when the Parmalees stopped over.  On

22  another occasion he's feeding her the wrong date when she

23  provided information to Liz Chesebro and Detective Blenis on

24  October 29 and she corrects him again.  And it happens

25  several more times when he was cross-examining her.  Slip of

Rebuttal Summation - Mr. Lovric

1    the tongue?  Or is he playing games and trying to get Shannon

2    tripped up?  You be the judge of that.

3              On summation he said the first disclosure

4    about the mother, Linda O'Connor -- and this is what he told

5    you just a couple hours ago -- the first disclosure about the

6    mother being involved and the photographing he said to you

7    occurred on December 5 of 2007.  Wrong.  You can look at

8    Exhibit 106.  10/25/2007 interview of Shannon when Shannon

9    discloses that her mom -- Shannon reported her mom and

10   photographs were involved with the time Dean sexually abused

11   her which she had not disclosed before, and then she goes on

12   to describe how mom was taking pictures downstairs as Dean

13   raped her.  He has done that three times by my count, trying

14   to get you to believe that the first time she says anything

15   about Linda O'Connor being involved is the December 5

16   interview.  It's just dead wrong.  It's in the DSS records.

17   Liz Chesebro testified about it.  And you know what, please

18   watch those videos again.  Watch that October 25 video, and

19   you'll hear her tell them again that the first time her

20   mom -- that she says that was the first time being

21   involved -- in that October 25 interview.

22             I submit to you, you know, I was sitting there

23   listening to defendant Sacco's summation and, you know, he

24   can't -- they can't even come out and admit -- you know, on

25   the one hand Mr. Fischer says that videotape of Mary, the

Rebuttal Summation - Mr. Lovric

1    little video clip that you see, he says something like it's

2    damning and it shows intent, and then when he's talking about

3    Mr. Sacco's character and propensity, he says he had some

4    proclivity and problems, sexual problems.  We agree on that.

5    And then he said Mr. Sacco did not hide that propensity.  You

6    know, they can't even come out and say he had sex with

7    Shannon.  Instead, this is a statutory rape matter.  I mean,

8    it's just baloney.  It's like what they want you to believe,

9    they can't come out and say it, because they'd like to have

10   all their options.  They'd like to have their cake and eat it

11   too.  They can't come out and say yes, Dean Sacco had sex

12   with Shannon multiple times and Shannon went upstairs for

13   him.

14           Let me do Mr. Sacco's summation for you.  He

15   wants you to believe Dean had sex with Shannon, consensual

16   sex, Shannon snuck up there multiples times and they had sex,

17   she loved it, he loved it, they were happy as pigs in a

18   blanket, they were having the time of their life, and then

19   something happened where Shannon said:  He raped me.  That's

20   what his summation should have gone like.  They can't come

21   out and say that.  They don't want to give you anything.  No,

22   he didn't really have sex, it was really a condom that

23   Shannon planted, and yeah, she was probably friendlier with

24   Sacco, it may seem, but you know what, Clesson could have

25   planted that condom or one of his sons or it was a mechanical

Rebuttal Summation - Mr. Lovric

1    vibrator and Shannon to -- this is what they're doing to you.

2    This is what they're doing with you.  And then they're

3    claiming that I and investigators are involved in framing

4    them.  You ask yourself, who's playing games here?

5                 Dr. Waters.  I'll answer the question for you.

6    Mr. Fischer, we didn't call Dr. Waters.  In my opening I said

7    I would.  I did; I told you that.  If you remember, Mr.

8    Fischer put Defense Exhibit Number 13, Sacco, into evidence.

9    It's Dr. Waters' report.  He did this either with the first

10   or second witness.  I don't recall, to be honest with you.

11   But it came out of the blue, and I was like, I don't even

12   think the witness knew what they were talking about.  I was

13   going to call Dr. Waters to put this report in.  Mr. Fischer

14   put it in light years before I even had Dr. Waters scheduled.

15   After he put this in, I didn't need to call Dr. Waters.  This

16   is my whole point of calling him.  Do you think Dr. Waters

17   remembers one exam out of 50 billion that he does?  He would

18   have read this report to you and said, this is what I did,

19   this is what I found, these were my findings.  That was my

20   point of calling him.  Once Mr. Fischer put this in, if you

21   noticed, I didn't object.  I was just stunned he's putting

22   this report in.  So I don't need to call Dr. Waters.  I'm

23   going to take an ER doctor out for a whole day, have him sit

24   here to do what, read you a report?  I can do that.

25                 And while we're on the topic, let's do it.

Rebuttal Summation - Mr. Lovric

2365

1  Page 4.  "Patient states five encounters, first in August
2  assailant had vaginal intercourse on the couch.  Has had five
3  encounters and at least one oral.  No physical violence."
4  She didn't tell them that Sacco did anything violent to her.
5  She's never said he did anything violent to her.  He slapped
6  her across the face on one occasion, but it's not like he
7  forced her and held her down.  She's never claimed that.
8  She's never said that he beat her.  He threatened her.  But
9  assailant told patient -- Read this.  But assailant told --
10  assailant is Sacco, by the way.  "Assailant told patient her
11  mother would go to jail and she would go to foster care."
12            Next, page 5.  "Abnormal genital inspection.
13  Completely torn hymen.  Clinical impression:  Sexual
14  assault."  That's all I was going to call Dr. Waters for.
15  And if you remember in my opening, that's what I told you.
16  Mr. Fischer wants to make it sound sinister, like I didn't
17  call him because there was some -- something that he's going
18  to tell you that somehow negates everything.  Why didn't he
19  call him?  They called everybody he wanted to.  He has no
20  obligation to, but if there's something sinister out there
21  with Dr. Waters, why didn't he call him?  I didn't need to.
22  I got his report in.
23            The video camera Mr. Fischer spent some time
24  talking to you about in the course of telling you that I
25  suggested to Shannon or Agent Lyons to identify the video

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Rebuttal Summation - Mr. Lovric                    2366

1    camera.   Okay.   Shannon told you this camera was used on the

2    last occasion that Dean Sacco raped her.   Did you notice

3    nobody's really talking about this camera much?   Government

4    Exhibit 35, the Polaroid, which, by the way, so I can match

5    it up for you, this is the camera that Amanda Rising and

6    DiFiori talked about Dean at those barbecues, he would be out

7    there with his Polaroid, taking pictures of people.   Did you

8    notice Shannon didn't identify this to you?   They would like

9    you to believe that Shannon makes this stuff up as she goes

10   along.   When I show her the cameras, she identifies this one

11   but not this one.   Why not do both?   If you're making it up

12   as you go along, yeah, both cameras, Sacco had both of them,

13   sure.   Yeah, he used both of them on me.   She never said he

14   used this camera.   The defense would like you to think

15   Shannon just threw people under the bus whenever she felt

16   like it, that she just made stuff up.   She wants to make

17   stuff up about her mother?   Why not put her mother there on

18   every rape?   Why not put her mother there on every single

19   time taking pictures?   Why not put it, yeah, they were both

20   together all the time?   They took pictures of me, she was

21   with the camera, he was engaging in sex with me.   Why not

22   just throw it all in?   You're going to make stuff up.   It's

23   easy, according to them.   She's just making it up.

24              You know what you saw in this case

25   essentially, ladies and gentlemen?   And I said this before

Rebuttal Summation - Mr. Lovric                2367

1    when I went through the blame game.  Every time somebody had

2    evidence to offer against O'Connor or Sacco, they attacked

3    them.  They've now stooped to attacking me personally and

4    Agent Lyons.  I'm surprised they didn't go to look for my

5    MySpace account.  They'll find I didn't have one.  I'm

6    surprised they didn't call my wife, who will gladly tell them

7    all the crap I did in my life.  That's what it boils down to.

8    Look at the character assassination.

9             You saw Liz Chesebro trying to do her job.

10   Did she make a mistake by giving Shannon her MySpace?

11   Absolutely.  Which one of us doesn't think that was a

12   mistake?  No, it has to be more sinister than that.  Every

13   single witness, Naomi, Liz Chesebro, they personally went

14   after.

15            DiFiori, Mr. Fischer wants you to think he's

16   an illegal immigrant without a green card.  Oh, yes, I see,

17   the government's going to let him stay here.  You know what,

18   this is bunch of garbage.  It's unbelievable how low they

19   stooped.  Character assassination, one person after another.

20   Anyone that had anything to offer as far as evidence was

21   assassinated here.  They're a liar.  They're fabricating.  I

22   can't remember the word he used, I missed that one on the

23   SATs, but everybody's a liar and it's a fabrication.  If it

24   hurts them, it's all fabricated.

25            I called Jim Parmalee to testify.  Don't you

Rebuttal Summation - Mr. Lovric

1    think I knew what Jim Parmalee was going to tell you?  Jim

2    Parmalee and Shannon's accounts of what happened are

3    completely at odds.  I wanted you to hear Jim Parmalee tell

4    you what he remembered and being there and coming there, even

5    though it's not matched up to Shannon.  What does that tell

6    you?  They would like you to think on the one hand that the

7    government is out there making all this fit.  We're coaching

8    Shannon.  We're coaching witnesses.  We're giving them

9    information on how to make it all fit.  Parmalee, a perfect

10   example how it doesn't fit.  What it means is another thing.

11   Jim Parmalee, nice guy.  He remembers going over there.

12   Shannon was out that week, Brooke wanted to see her.  They

13   stopped by.  He knocks, Linda tells him to go over here.  He

14   knocks, knocks, knocks, waits, waits, waits, Shannon comes

15   down.  Shannon tells you her mother comes running up, telling

16   her Brooke's here with her father, to get downstairs.  I

17   don't know which memory is correct.  I really don't.  I asked

18   Shannon, I didn't tell her what Jim Parmalee said.  I simply

19   asked her, tell me about what you remember.  I asked Jim

20   Parmalee.  I didn't tell him what Shannon remembered.  That's

21   the way life is.  Is there any doubt that Parmalee went there

22   with his daughter to see Shannon?  No.  Whether Sacco came

23   down or not, whether O'Connor ran up the back stairwell, the

24   other entrance, that's why I did that stuff for you.

25   Upstairs, 1, 2, 3, 4, 5, you can take a look at it.  It's

Rebuttal Summation - Mr. Lovric

1   different ways that she could have gone upstairs without

2   being seen or not.  I don't know which memory is correct.

3   Are they lying?  I don't think so.  You think Jim Parmalee's

4   going to get up here and lie to you?  Why would Shannon lie

5   to you if she knows that Jim Parmalee doesn't remember the

6   same thing she does?  She would change her story.  But no,

7   they want you to believe there's sinister things going on.

8              Hamilton.  I'm going to say this once, I'm

9   going to say it clearly.  Kim Hamilton had an ax to grind.

10  What happened?  And this is me submitting to you what

11  occurred.  Mandy, 16 years old at the time, made a false

12  allegation against a 20-year-old guy, that he had raped her.

13  Within two days Investigator Blenis determines that is a

14  false allegation and Mandy admits its false.  And Mandy

15  confesses it's a false allegation.  What happens,

16  Investigator Blenis arrests her.  You know what, Kim Hamilton

17  to this day is PO'd about that.  Her daughter got arrested

18  and she is ticked because she doesn't think she should have

19  been arrested.  Maybe she should have gotten counseling,

20  maybe a talk over, but she is ticked what Investigator Blenis

21  did.  She is ticked at how DSS worked Shannon O'Connor's case

22  and how Greater Binghamton did.  You know what, I found it

23  interesting that she said -- I forget the words exactly.  I

24  asked her something to the effect, what gives you the

25  expertise, and she says, well, I'm an expert foster care mom

1    or an expert parent.  You know what, with all due respect to

2    her, she thinks she knows better than everybody.  And what I

3    submit to you happened here was, she came in and she skewed

4    that whole thing about Mandy and the other kids making this

5    false allegation against her.  It was Mandy's idea, Mandy put

6    Shannon up to it, and Shannon did it because Shannon will go

7    along with the kids when they're trying to do something and

8    so Mandy was the instigator, but Kim here switched that

9    around.  And that's what happened.  And that's why I went in

10   some length with her about her motivations, because I figured

11   out quickly, this person has an ax to grind.  There's

12   something that's ticking her off.  And she's now taking those

13   facts and turning them sideways because she can.  Mr. Fischer

14   said that he's a manipulator.  I'm not saying that, he said

15   that, so I don't get accused again.  I can't remember if he

16   invoked Miss Peebles or not.  I'm not going to invoke her

17   name.  But he did invoke my name.  With all due respect to

18   everybody seated over there, I don't put myself in the

19   manipulator category.

20            I'm here because I believe the facts and the

21   evidence.  Now, I don't make the decisions, but I'm not here

22   to manipulate anybody.  I'm here to show you and to try to

23   demonstrate to you what the facts are.  I collect them as I

24   find them.  I collect people as I find them.  Agent Lyons

25   gets people as he finds them.  You can't make people

Rebuttal Summation - Mr. Lovric

2371

1   something they're not and you can't put evidence where there

2   isn't and you can't change evidence.  But I'm not a

3   manipulator, and I'm not going to sit here and put myself in

4   that group.

5          The boiler, I submit to you this was another

6   little hoodwink.  Take a look at Sacco's bank records.  It's

7   here.  Exhibit 85 or 86.  It's the card he uses, bank card,

8   when he's in Norwich.  In January of '07 he pays a plumber

9   $500 for a boiler.  Mr. Fischer has that receipt, which I

10  have no objection to.  It's a water heater boiler.  It's $500

11  for a water boiler, the thing that heats your water when you

12  want hot water in the shower.  It's not the gas furnace.  And

13  in fact, the furnace is what Zaid Kurdieh I believe talked

14  about was delivered on a big truck, on a big pallet to his

15  place where Mr. Sacco was working.  And oh, by the way, he

16  was working there in the fall of '06, not in the spring of

17  '07, and it was that that was replaced because the Pipers

18  left, as it was too cold upstairs.  Now what's the point of

19  this?  This is a minor point but it's a major issue.  Mr.

20  Fischer would like you to believe that Sacco could not have

21  been naked upstairs having sex with Shannon in the fall of

22  '06 because it was too cold because the furnace wasn't

23  working, so he puts this bill in for $500 for a water boiler.

24  One problem, it's the water boiler, not the gas furnace.  And

25  second problem, Kurdieh testified that when Sacco's working

Rebuttal Summation - Mr. Lovric                    2372

1    there, the furnace was delivered, and he helped bring it over

2    to Sacco's place, and that all takes place in the fall of

3    2006, not in the spring of 2007.  Who's playing games here?

4                    Schoolteacher disclosure.  Mr. Fischer got it

5    wrong again.  Liz Chesebro testified, but on summation we

6    just heard Lisa Peebles and Mr. Fischer say Shannon never

7    disclosed anything to the schoolteacher first.  She did.

8                    MISS PEEBLES:  Objection.  Misstates what I

9    said.

10                   THE COURT:  I'm sorry.  I couldn't hear you.

11                   MISS PEEBLES:  Objection.  That misstated what

12   I said.

13                   THE COURT:  Well, it's going to be up to the

14   jury to remember that.  Whatever Miss Peebles said you can

15   remember, and now what Mr. Lovric is saying to you, if it's

16   different, you just have to make up your mind what happened.

17   Do the best you can.

18                   MR. LOVRIC:  Liz Chesebro testified on

19   March 2, she gets a call from the school.  Shannon had

20   disclosed to a schoolteacher, and it's in her notes, and I

21   believe one of the attorneys read it, that the school called

22   to Liz Chesebro, said Shannon had disclosed to a

23   schoolteacher, either science or health class teacher, and

24   she asked her what happens if an older person has sex with a

25   younger person and the younger person doesn't say no.  And

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    this is what caused the teacher to ask a question and realize

2    that she had sexual contact with an adult.  It was the

3    schoolteacher.  And the school then called Liz Chesebro and

4    Liz then went to Kim Hamilton's house, where she then

5    found -- Shannon came home, interviewed her, and that's when

6    she disclosed the rapes by O'Connor.  Now on summation

7    somebody said -- I'm not going to accuse anybody.  Somebody

8    said on summation -- it was one of the two attorneys, it

9    wasn't me -- that Shannon told Liz on the way home from

10   school for the first time that Sacco had sex with her.

11   That's false.  That's a misstatement of fact.

12                    The interstate commerce.  The Judge will tell

13   you what the law is, but the other day when I was doing my

14   summation, I have a list of ten things, ten ways that this

15   federal -- these federal laws were violated on interstate

16   commerce.  The first is, Sacco traveled from New Jersey into

17   New York.  It's interstate travel, and he did that where one

18   of his purposes was to engage in sex or try to engage in sex

19   with Shannon.  And again, you will see -- and if you have a

20   question, ask Judge McAvoy -- it's not even required he

21   actually engaged in sex, so long as he travels with that

22   intent and that's one of his purposes.

23                    Affecting interstate commerce.  Now Mr.

24   Fischer -- I forget the words he used.  It was, if you

25   breathe interstate, it's a violation.  Well, you know what,

Rebuttal Summation - Mr. Lovric                    2374

1    folks, he may not like it, but that's essentially the way it

2    works.  Federal statutes -- and if you have a question, ask

3    Judge McAvoy -- they require minimal interstate effect.

4    Minimal.  Here are the ways that there was interstate

5    commerce being affected.  Traveling across state lines, Mr.

6    Sacco.  Any hotels paid for by Miss O'Connor.  Making phone

7    calls across state lines.  Using a bus company to travel,

8    even if it's within the state.  Using a bank card across

9    state lines, to bring a bank card from New Jersey, use it in

10   New York State.  Sending a money order back and forth.  Miss

11   O'Connor sent at least one money order to Dean Sacco in March

12   of 2007.

13           While we're on that topic, Miss Peebles just

14   got done summing up to you and telling you that Miss O'Connor

15   sent Dean Sacco a money order in January of 2007.  She said

16   January of 2007.  Government Exhibit 77.  And it's also in

17   the bank records.  This money order is dated March 2, 2007.

18   This money order was sent to Dean Sacco in March of 2007, not

19   January of 2007.  What's the significance of that that Miss

20   Peebles I suggest wanted you to think?  Well, first of all,

21   she's trying to argue to you that Linda O'Connor was up to

22   date on paying her rent and rent payments.  Right on this

23   money order it says it's a money order for $113.  Note on the

24   bottom says:  Amount due $300 for January.  Linda O'Connor's

25   putting right here she still owes $300 for January.  She's

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Rebuttal Summation - Mr. Lovric

1    sending Mr. Sacco 113 in March. Who's playing games with

2    you?

3            Is there any question that Dean Sacco was not

4    getting paid his rent? Let me count all the ways that's been

5    shown. Dean Sacco himself complains that he's not getting

6    rent monies on time. Dean Sacco complains to Bill Sorvino

7    that his downstairs tenants are not paying him on time. Dean

8    Sacco explained to Mr. Kurdieh that testified who he works

9    for that he's not getting paid on time. Dean Sacco

10   complained to anybody and everybody that his downstairs

11   tenants were not paying.

12           Way number 7, interstate commerce: Using

13   internet to send e-mails or pictures. When Linda O'Connor or

14   George Lang are sending pictures and e-mails back and forth

15   to each other, that affects interstate commerce. Using

16   internet to make purchases online. Dean Sacco buying the

17   cameras, at least -- at least two of the cameras. Using the

18   internet to view or download child porn. Dean Sacco in his

19   journal was using the internet all the time.

20           The cameras that were transported across state

21   lines. Now this part, I mentioned it yesterday, but I wanted

22   to reemphasize again. These two cameras came from New

23   Jersey. How do you know? Well, Dean Sacco bought them on

24   eBay and had them shipped to New Jersey. They had to have

25   been brought from New Jersey to New York where they were

Rebuttal Summation - Mr. Lovric

1  found.  Dean Sacco also bought another camera on eBay, the

2  Fuji 1000 zoom lens camera.  And that was also delivered to

3  New Jersey.  And Dean Sacco in his journal writes about

4  searching and looking for a digital camera.  Two of the four

5  cameras have been found and recovered.  The other two

6  mentioned haven't.  You know at least one other camera was in

7  Norwich because Dean Sacco in unit number 129 had pictures,

8  and I showed them to you during my summation the other day.

9  They're dated June 24, 2006 and they're pictures with a

10  camera, and neither of these two cameras made those pictures.

11  One is a Polaroid, this is a video camera, and those are

12  still photographs.  So you know he had at least another

13  camera in Norwich that has never been recovered, either in

14  Norwich or anywhere else.

15          But the point of that is, you know that all

16  the cameras that he possessed have traveled in interstate

17  commerce.  And then finally, as I told you, you can look on

18  the camera.  They're both made out of -- not only out of the

19  state but out of the country.

20          I'm going to quickly move through and wrap up.

21  Miss Peebles' summation I found interesting.  And the note I

22  wrote myself is:  I guess -- this is what I wrote to myself:

23  I guess they think this is funny or entertaining.  Miss

24  Peebles' summation went back again, and I can't figure out

25  which defense is using what defense at what time because they

Rebuttal Summation - Mr. Lovric

2377

1    use it all the time back and forth.  Her defense, this

2    concocted story that she wrote, Miss Peebles, that is, that

3    Shannon is brilliant.  Shannon put all this together.

4    Shannon concocted it all.  Shannon did this all from scratch.

5    And the reason for that, Miss Peebles tells you, is for the

6    attention.  For the attention.  I cannot -- I cannot begin to

7    tell you how absurd that sounds.  Whatever you may think of

8    Shannon, and Shannon has issues and Shannon does like

9    attention and Shannon does want attention, but the fact of

10   the matter is, today, as she testified, Shannon is going to

11   continue to tell the jury and to tell law enforcement about

12   all these horrific things that have happened to her, for

13   what?  That's what I asked before.  For a better life, as Mr.

14   Fischer put it.  She has a better life now living in

15   residential home where it's locked up?  It just makes no

16   sense.

17            And I go back to what I said to you yesterday.

18   Think to yourself about children that are sexually abused.

19   The defense would like you to believe that there's no

20   evidence other than Shannon in this case.  Well, I submit to

21   you that if you think about it, this case, unlike most sexual

22   abuse or rape cases, has tons of evidence.  What do you

23   usually think of when you think about a child disclosing

24   they've been raped by a parent or somebody else close to

25   them?  What do you have?  You have the child and you have the

Rebuttal Summation - Mr. Lovric                    2378

1    accused.  And that's it.  That's usually all you have.  Here,

2    as far as Mr. Sacco was concerned, I don't even want to

3    dignify the defense anymore because the evidence as to him is

4    overwhelming, as to what he is and what he did.  But Linda

5    O'Connor, think about it.  Sex abuse of Shannon took place in

6    the bedroom.  Did you expect to get another witness to come

7    in and say, yeah, I was there, I watched?  What are you going

8    to have?  They would like you to think that you have to have

9    witnesses.  You have to have somebody else that can support

10   Shannon.  And I said this to you yesterday.  You really do.

11   Renee Lang.  She walked in on them.  There is no logical,

12   rational explanation for what she saw.  Now the defense is

13   saying she's lying.  Mr. Fischer says she's thrilled to be

14   here and testify.  Well, that's a copout.  Yeah, everybody's

15   lying.  Shannon's lying.  Renee's lying.  Everybody's lying

16   that has any evidence to offer.  If you look at this case,

17   there is plenty of corroboration for what Shannon has told

18   you, and the defense would simply like you to ignore it and

19   just focus on Shannon.

20              The Best Western records.  They claim that

21   I've walked away from them.  Absolutely not.  I don't believe

22   there's a whole lot there to argue over that.  Shannon told

23   you she was taken to the Best Western in December and she

24   doesn't know the date.  And here's the other thing.  Shannon

25   told that to the police.  You know what, Shannon's a kid.

1  They want you to think that Shannon knows all these pieces of
2  evidence that are going to be out there.  But she told you it
3  happened and they dropped the dog off at the animal hospital
4  and she told you they went to the Best Western that weekend
5  and they went shopping.  We found receipts that match that
6  weekend.  Oh, Shannon knew that in advance that her mother's
7  going to keep those receipts.  Just like Shannon, when she
8  talks about one of the rapes, tells you and told the
9  investigators that Sacco had on this cowboy hat.  Oh, yeah,
10 she knew we were going to find a hat many months later.  Oh,
11 yeah, she knew Sacco's wearing that hat in his book that
12 she's never heard of, but that's what they want you to
13 believe, that these are all things that she knew existed and
14 planted in her story.
15          The Best Western is not even an issue.  The
16 fact of the matter is, hotel records show that Linda O'Connor
17 registered on December 1st, the day before she dropped off
18 the dog.  Shannon told you what happened.  Miss Peebles went
19 on and on how she can't describe who the men were.  Do you
20 know what?  Look at that December 5 tape again.  Do me a
21 favor, look at it again and watch how descriptive she is.
22 They would like you to believe because on the stand now she's
23 not able to articulate everything that she's lying or --
24 excuse me -- look at those videotapes.  And you know what,
25 look at them, please, do me a favor, watch those videos again

Rebuttal Summation - Mr. Lovric                    2380

1  and watch her body language.  Watch her demeanor.  Does it

2  look like a manipulating person that's making things up?

3  Watch how she describes this stuff and ask yourself, is that

4  consistent with somebody who is really trying to say things

5  and is distraught over what happened?

6                 On the one hand Miss Peebles wants you to

7  think Shannon was brilliant and wrote this book in her mind,

8  that she has now made these accusations.  On the other hand,

9  I keep going back to the meds.  Mr. Fischer, on his

10 summation, she's medicated; therefore, that's why she's

11 making this stuff up.  And in the same breath, within a

12 minute, she says she wasn't on medication and she should have

13 been and that's why she's making it up.  When she's with the

14 Hamiltons, she's not medicated.  When she's at Greater

15 Binghamton, she's medicated.  Which one is it?  They don't

16 care which one it is.

17                 Miss Peebles said it again.  She said it

18 during examination of Shannon, she said it in summation.  The

19 first call by Shannon to Dean Sacco -- I wrote it down -- she

20 says it was disconnected.  False.  Have Investigator Blenis'

21 testimony read back to you.  Investigator Blenis said the

22 first call, they completed it, they were done with it, and

23 then he went to review it and then realized the machine

24 didn't record it, and that's when they made the second call,

25 and in the interim Dean Sacco called Linda O'Connor.  It

Rebuttal Summation - Mr. Lovric                    2381

1    wasn't disconnected.

2              What's the significance of that?  They want

3    you to think this call was disconnected and then they sat

4    around for 25, 30 minutes strategizing with Shannon what else

5    she should do or what she'd do.  And Investigator Blenis told

6    you just the opposite.  They were done, they were packing up.

7    Goes to listen to the call, realizes it didn't record, and

8    they make the second call.

9              One final point about the call.  March 15, I

10   believe it's March 15, during the conversation with Sacco he,

11   for a second time, when he's trying to convince Shannon not

12   to go to the police, tells her, your mom will help you, when

13   they're talking about the pregnancy test.  And I go back to

14   what I told you yesterday.  Dean and Linda O'Connor had

15   talked for six minutes on how Dean was going to handle

16   Shannon, and this is when he calls her immediately after

17   getting that first call on the 14th.  And Dean says, your mom

18   will help -- can help you about the pregnancy test.  And

19   earlier -- excuse me, the day before, he also told her, well,

20   your mom said she would help.  That's within that first five

21   minutes that I played for you yesterday.

22             I'm going to sit down in a minute, and what I

23   want to leave you with is the following:  Mrs. Peebles told

24   you about how she feels about representing her client.  I'm

25   here to tell you that I have absolutely nothing to apologize

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Rebuttal Summation - Mr. Lovric

2382

1   for and I am very proud to be here on behalf of Shannon
2   O'Connor.  Kids like Shannon O'Connor should not have to
3   endure what these two people did to her.  And Shannon
4   O'Connor has nobody in the world.  The mother is sitting over
5   there.  She's in a, if you want to call it, a system that is
6   left to deal with the remnants of children like her.  She has
7   absolutely nothing.  She has nobody.  And she told you from
8   her own mouth what she feels today.  She loves her mother but
9   hates what she did to her.  We are here representing the
10  Shannons of the world.  And when you go through and make
11  these decisions, think about how it is that children, like
12  Shannon, who are sexually abused, how is it they disclose
13  things and how is it they come around to finally telling
14  about their parent.  When you step back from that, I will
15  submit that you will find that what Shannon has done
16  throughout this whole process is very consistent to a child
17  that's been raped and sexually abused by a parent, who feels
18  guilt for having engaged in this conduct with the parent.
19  Imagine how Shannon feels for having put up with two years of
20  engaging in sex with Linda O'Connor and how difficult that
21  was for her to come out and say.  And it will explain to you
22  how these disclosures happened.
23          These two people did what they're charged
24  with.  And now they're doing everything they can to wiggle
25  out of it.  They've accused everybody that there is to

2383

1    accuse.  There's no one left to accuse in this case.  They've

2    concocted every argument.  They have twisted the facts.

3    They've manipulated the arguments.  They have nothing else

4    left.  They threw the kitchen sink at you, hoping you'll buy

5    something and hoping you'll let them off the hook.  And I'm

6    here to ask you, don't let Dean Sacco and Linda O'Connor off

7    the hook just because they would like to think that

8    everything that Shannon says has to perfectly match up.

9    They're guilty with what they're charged with, and I'm asking

10   you to do your duty and find them so.

11              THE COURT:  Okay.  Thank you, Mr. Lovric.

12              All right.  Ladies and gentlemen, we're going

13   to take a break, and after we come back I'll charge you on

14   the law.

15              (Jury excused)

16              (Short break taken)

17              (Jury present)

18              THE COURT:  All right, ladies and gentlemen.

19   I know you're probably sick of being talked at, but I'm about

20   to talk at you for a period of time.  I just want to say a

21   little bit about the construction of the charge before I give

22   it to you in the hopes it will make it easier for you to

23   follow.

24              It's divided up into parts.  The first part

25   reminds you of some of the things I said back when we started

USA vs O'Connor and Sacco

2384

1   the case about the role of the Court and the jury.  About the

2   kind of proof that you're allowed to consider.  About

3   inferences that you may draw if you wish.  I'm going to talk

4   to you about the burden of proof that the government has.

5   And then I'm going to give you a rather detailed charge

6   involving credibility or believability of witnesses.  Things

7   that I hope will be of help to you when you undertake that

8   important, critical task.  Then I have a few other things to

9   say about motive and intent and that really ends the first

10  part of the charge.

11          Moving on to the middle of the charge, the

12  second part, I detail for you the charges made by the

13  government.  I'll read you each charge in the indictment as

14  we go through it one at a time, and after each charge, after

15  I read that to you, I'll tell you the statute that it

16  violates and how that statute reads and the part that you

17  have to consider.

18          Once I do that, once you've heard the charge

19  and the statute, I will break down the charge into elements

20  and tell you what elements you have to find before you can

21  consider guilt.  And of course, each element must be found

22  beyond a reasonable doubt.  And do that for each of the

23  counts in the indictment.

24          Then I move on to theory of liability which

25  the government asserts you can find guilt on.  It's called

USA vs O'Connor and Sacco

2385

1   aiding and abetting, and you'll understand it when I talk

2   about it because it's not rocket science; it's just another

3   way the government believes it might be able to prove guilt.

4                    Then I go into the last part of the charge,

5   which is very short.  It tells you how you're to go back into

6   the jury room, organize yourselves, select a foreperson and

7   conduct your deliberations.

8                    So with that, I'll begin.  If you want me to

9   quit any time, just raise your hands, we'll do it, but I'll

10  have to start later.

11                   All right.  Now that you've heard the evidence

12  and the arguments of counsel, it's my duty to instruct you on

13  the law applicable to this case.  It's your duty as jurors to

14  follow these instructions and to apply the rules of law I

15  give you to the facts that you find based upon the evidence

16  in the case.  You're not to single out one instruction alone

17  as stating the law, but you must consider my instructions as

18  a whole.  Also, you're not to be concerned with the wisdom of

19  any rule of law.  Regardless of what you think the law ought

20  to be, it would be a violation of your sworn duty to base a

21  verdict on any other view of the law than that given in my

22  instructions.  Similarly, it would be a violation of your

23  sworn duty, as judges of the facts, to base a verdict on

24  anything but the evidence in the case.

25                   You have been chosen and sworn as jurors to

1    try the issues of fact presented by the allegations in the

2    indictment and the denial made by the not guilty pleas of

3    each defendant.  You are to perform this duty without bias or

4    prejudice as to any party.  You're not to consider any

5    party's race, religion, national origin, sex or age.  The law

6    does not permit jurors to be governed by sympathy, prejudice

7    or public opinion.  Both the accused and the public expect

8    that you'll carefully and impartially consider all the

9    evidence in the case, follow my instructions, and reach a

10   just verdict regardless of any consequences.  Nothing said in

11   these instructions or said or done by me during the trial

12   should convey or suggest in any manner any intimation as to

13   what verdict I think you should return.  Your verdict must be

14   based on your thoughts and deliberations concerning the

15   evidence before you and the facts you find from the evidence

16   and nothing else.

17            In this regard, during the course of the

18   trial, I occasionally asked a question of a witness in order

19   to bring out facts not then fully covered in the witness'

20   testimony.  Do not assume that I hold any opinion on the

21   matters to which my questions may have related.

22            The law presumes a defendant to be innocent.

23   Thus, each defendant begins the trial with a clean slate.

24   And the law permits nothing but legal evidence presented to

25   the jury to be considered in support of any charge against

USA vs O'Connor and Sacco

2387

1    the accused.  The accused must never be convicted on the

2    basis of conjecture or suspicion.  It follows then that the

3    presumption of innocence alone is sufficient to acquit a

4    defendant.  The government must prove a defendant's guilt and

5    it must prove that guilt beyond a reasonable doubt.  The

6    burden of proving guilt beyond a reasonable doubt is an

7    important concept for you to understand and needs to be

8    explained a little further.

9              The burden of proving guilt beyond a

10   reasonable doubt is always on the government.  The government

11   must prove beyond a reasonable doubt that a particular

12   defendant has committed every element of each offense

13   charged.  The burden never shifts to a defendant to prove his

14   or her innocence, and the law never imposes upon a defendant

15   in a criminal case the burden of calling any witnesses or

16   producing any evidence.  The government need not, however,

17   prove guilt beyond all possible doubt.  The test is one of

18   reasonable doubt.  A reasonable doubt is a doubt based on

19   reason and common sense; the kind of doubt that would make a

20   reasonable person hesitate to act.  Proof beyond a reasonable

21   doubt must, therefore, be proof of such a convincing

22   character that a reasonable person would not hesitate to rely

23   and act on it in the most important of his or her own

24   affairs.

25              Now, an indictment is but a formal method of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2388

1    accusing a person of a crime.  It's not evidence of any kind

2    against the accused.  The law, however, does recognize two

3    types of evidence that you may properly use in deciding

4    whether a defendant is guilty or not guilty.

5                   One type of evidence is called direct

6    evidence.  Direct evidence is testimony by a witness about

7    what is known to him or her by virtue of his or her own

8    senses, that is, what a witness sees, feels, hears, or

9    touches.

10                   The other type of evidence is called

11   circumstantial evidence.  This is evidence that tends to

12   prove a disputed fact by proof of other facts.  As applied to

13   this criminal proceeding, circumstantial evidence is proof of

14   a chain of facts based upon certain circumstances indicating

15   the guilt or innocence of the accused.  That's all there is

16   to circumstantial evidence.  You infer on the basis of

17   reason, experience and common sense the existence or

18   nonexistence of some other fact.

19                   Circumstantial evidence is of no lesser value

20   than direct evidence, and no greater degree of certainty is

21   required of circumstantial evidence than of direct evidence.

22   The law makes no distinction between the weight to be given

23   direct or circumstantial evidence.  All that's required is

24   that before convicting the accused, you, the jury, be

25   satisfied of the defendant's guilt beyond a reasonable doubt

USA vs O'Connor and Sacco

2389

1    from all the evidence in the case.

2                    During the charge you just heard me use, and

3    will hear me use again, the term inference.  And in your

4    deliberations, and as stated, you are permitted to make

5    inferences on the basis of your reason, experience and common

6    sense.  So I'll now explain the meaning of the term

7    inference.

8                    During your deliberations you're to consider

9    only the evidence presented in the case.  The evidence in the

10   case consisted of the sworn testimony of the witnesses,

11   physical items, documents, exhibits, and all the facts that

12   may have been admitted or stipulated to.  Anything you may

13   have heard or seen outside the courtroom is not evidence and

14   must be entirely disregarded.  However, in your consideration

15   of the evidence, you're not limited only to what you've seen

16   and heard during the trial.  You are permitted but not

17   required to draw from facts that you find to have been proven

18   such reasonable inferences as seem justified in the light of

19   your experience, reason and common sense.  Now, an inference

20   is not a suspicion or a guess.  It's a reasoned, logical

21   conclusion that a disputed fact exists or does not exist on

22   the basis of another fact that you find has been proven.

23   Inferences may be drawn from both the direct and

24   circumstantial evidence.

25                   Now, the statements and arguments of counsel

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2390

1    are not evidence in the case unless made as an admission or

2    stipulation of fact.  If the attorneys on both sides agree to

3    the existence of a fact, you must then, unless otherwise

4    instructed, accept that stipulation as evidence and regard

5    that fact as proven.

6                    It's the duty of attorneys on each side of

7    this case to object when the other side offers testimony or

8    other evidence that the attorney believes is not admissible.

9    You should not show any prejudice against the attorney or

10   against that party because of the objections that have been

11   voiced.

12                   Upon allowing testimony or other evidence to

13   be introduced over an attorney's objection, the Court does

14   not, unless expressly stated, indicate any opinion as to the

15   weight or effect of such evidence.  You are the sole judges

16   of the credibility of all witnesses, and it is solely for you

17   to determine the weight and effect of all the evidence.  When

18   the Court has sustained an objection, you must disregard that

19   question entirely.  You may not draw any inference from the

20   wording of the question, nor may you speculate as to what a

21   witness would have said had he or she been permitted to

22   answer.  In addition, if an attorney asks a witness a

23   question that contains an assertion of fact, you cannot

24   consider the assertion as evidence of that fact.  The

25   lawyers' questions and statements are not evidence.  The

USA vs O'Connor and Sacco

1   witnesses' answers are the evidence.

2            Now, in your capacity as judges of the

3   credibility of witnesses and of the weight and effect of all

4   the evidence, you should carefully scrutinize all the

5   testimony given, the circumstances under which each witness

6   has testified, and every matter in evidence that tends to

7   show whether a witness is worthy of belief.  Consider each

8   witness' intelligence, motive, state of mind, demeanor and

9   manner while on the stand.  Consider the witness' ability to

10  observe the matters as to which he or she has testified and

11  whether he or she impresses you as having an accurate

12  recollection of these matters.  Consider also any relation

13  each witness may bear to either side of the case, the manner

14  in which each witness might be affected by the verdict, and

15  the extent to which, if at all, each witness is either

16  supported or contradicted by other evidence in the case.

17           If you find that a witness made a prior

18  inconsistent statement, in other words, a statement made

19  before the trial that conflicts with his or her trial

20  testimony, you may consider that fact in deciding how much of

21  the trial testimony, if any, to believe.  In making this

22  determination, you may consider whether the witness purposely

23  made a false statement or whether it was an innocent mistake;

24  whether the inconsistency concerns an important fact, or

25  whether it had to do with a small detail; and whether the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2392

1    witness had an explanation for the inconsistency and whether

2    that explanation appeals to your common sense.

3                   Inconsistencies or discrepancies in the

4    testimony of a witness or between the testimony of different

5    witnesses may or may not cause you to discredit such

6    testimony.  Two or more persons witnessing an incident or a

7    transaction may see or hear it differently and innocent

8    misrecollection, like failure to recollect, is not an

9    uncommon experience.  In weighing the effect of discrepancy,

10   always consider whether it pertains to a matter of importance

11   or to an unimportant detail, and whether the discrepancy

12   results from innocent error or intentional falsehood.

13                   As I've said previously, it's your job to

14   judge the credibility of each witness.  In evaluating the

15   credibility of the witnesses, you should take into account

16   any evidence that a witness may benefit in some way from the

17   outcome of the case.  Such interest in the outcome creates a

18   motive to testify falsely and may sway a witness to testify

19   in a way that advances his or her own interest.  Therefore,

20   if you find that any witness whose testimony you are

21   considering may have an interest in the outcome of this

22   trial, then you should bear that factor in mind when

23   evaluating the credibility of the testimony and accept it

24   with great care.

25                   Keep in mind, though, that it does not

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2393

1   automatically follow that testimony given by an interested

2   witness is to be disbelieved.  There are many people who, no

3   matter what their interest in the outcome of the case may be,

4   would not testify falsely.  It is for you to decide to what

5   extent, if at all, the witness' interest has affected his or

6   her testimony.

7           You'll recall that some witnesses who

8   testified were law enforcement officers.  The testimony of a

9   law enforcement officer is entitled to no special treatment

10  or consideration; it does not have any greater or lesser

11  weight.  The testimony of a law enforcement officer who takes

12  the stand is subject to the same rules and tests applicable

13  to the testimony of any other witness regarding, for example,

14  credibility, bias and interest in the outcome.

15          You'll recall that Andrea Lester, a forensic

16  scientist, and James Thompson, a computer forensic scientist,

17  gave testimony concerning their fields of expertise.  The

18  rules of evidence provide that if scientific, technical or

19  other specialized knowledge might assist you in understanding

20  the evidence or in determining a fact in issue, a witness

21  qualified by knowledge, skill, experience, training or

22  education may testify and state an opinion concerning such

23  matters.

24          Merely because these witnesses were allowed to

25  testify and express opinions and conclusions does not mean,

USA vs O'Connor and Sacco

2394

1  however, that you must accept their testimony.  You should

2  judge their testimony like any other testimony.  You may

3  accept it or reject it and give it such weight as you think

4  it deserves, considering each witness' training and

5  experience, the soundness of the reasons given for their

6  opinion, and all other evidence in the case.  The testimony

7  is entitled to no special treatment or consideration; it does

8  not have any greater or lesser weight.  All witnesses who

9  take the stand are subject to the same rules and tests

10  regarding, for example, credibility, bias, and interest in

11  the outcome.  You may consider the soundness of the reasons

12  given for each witness' opinion and the methods by which each

13  witness reached his or her conclusions.  The testimony is

14  given to assist you in reaching a proper conclusion.  It is

15  entitled to such weight as you find the witnesses'

16  qualifications warrant, but is not controlling on your

17  judgment.

18          Now, the fact that the prosecution is brought

19  in the name of the United States government entitles it to no

20  greater consideration or attention than any other party to

21  this litigation.  All parties, government and defendants

22  alike, stand equal before the law.

23          As stated previously, the law never imposes on

24  a defendant in a criminal case the burden or duty to testify,

25  to call witnesses or to produce evidence.  No inference of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco                    2395

1   any kind may be drawn and no presumption of guilt rises from

2   a defendant's decision not to testify.

3                    Crossed out some page here just to make it

4   easier on you.  Skip right over that.

5                    Now in making your decision, you're not bound

6   to any decide any issue of fact in accordance with the

7   testimony of any number of witnesses that does not produce in

8   your minds belief in the likelihood of truth against the

9   testimony of a lesser number of witnesses or other evidence

10  that does produce such belief in your minds.  The test is not

11  which side brings the greater number of witnesses or presents

12  the greater quantity of evidence but rather which witness and

13  which evidence appeals to your mind as being the most

14  accurate and otherwise trustworthy.

15                   The law does not require the prosecution to

16  call as witnesses all persons who may have been present at

17  any time or place involved in the case or who may appear to

18  have some knowledge of the matters in issue at this trial.

19  The law does not require the prosecution to produce as

20  exhibits all papers and things mentioned in the evidence.

21  You must decide this case on the evidence or lack of evidence

22  presented.  You should not be concerned with why someone was

23  not called as a witness or why certain evidence was not

24  presented.

25                   During the trial you've heard testimony of

USA vs O'Connor and Sacco

2396

1    witnesses and arguments by counsel that the government did

2    not utilize specific investigative techniques.  For example,

3    at some points no fingerprints were taken or a chemical

4    analysis may not have been done on every item.  You may

5    consider these facts in deciding whether the government has

6    met its burden of proof.  As I told you, you should look at

7    all the evidence or lack of evidence in deciding whether the

8    defendant is guilty.  However, you're also instructed that

9    there is no legal requirement that the government use all

10   investigative techniques to prove its case.  For example,

11   there's no requirement that the government must attempt to

12   take fingerprints or to have every item analyzed.  Law

13   enforcement techniques are not your concern.

14            Your concern, as I said, is to determine

15   whether or not, on the evidence presented or lack of evidence

16   presented, a defendant's guilt has been proven beyond a

17   reasonable doubt.

18            Now, in this case you're being asked to decide

19   whether the accused are guilty or not guilty of the crime

20   charged -- crimes charged in the indictment.  You're not

21   being asked whether any person is or may be guilty or not

22   guilty.  Your verdict should be based solely on the evidence

23   or lack of evidence as to the particular defendant you're

24   considering in accordance with my instructions and without

25   regard to the guilt or innocence of other people.  It is not

USA vs O'Connor and Sacco

2397

1   your duty then to give -- I'm sorry.  It is your duty then to

2   give separate and personal consideration to each defendant

3   and to each count charged against him or her.  In this regard

4   you should consider what the evidence in the case shows with

5   respect to each defendant and to each offense that each

6   defendant is charged with.  In sum, each defendant should be

7   considered separately and each count should be considered

8   separately.

9          The indictment contains a total of 7 counts.

10  Each count charges a defendant with a different crime.  There

11  are two defendants on trial before you.  You must, as a

12  matter of law, consider each count of the indictment and each

13  defendant's involvement in that count separately, and you

14  must return a separate verdict on each defendant for each

15  count in which he or she -- excuse me -- in which he or she

16  is charged.  Also bear in mind that some counts do not apply

17  to a particular defendant.  In this regard, Defendant

18  O'Connor is charged in counts one, three, four, five, and

19  seven.  Defendant Sacco is charged in counts two, three,

20  four, six and seven.

21         In reaching your verdict, bear in mind that

22  guilt is personal and individual.  Your verdict of guilty or

23  not guilty must be based solely upon the evidence about the

24  defendant under consideration.  The case against each

25  defendant, on each count, stands or falls upon the proof or

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco                    2398

1    lack of proof against that defendant alone, and your verdict

2    as to any defendant on any count should not control your

3    decision as to any other defendant on any other count.

4                We saw some charts and summaries that were

5    introduced by both sides as exhibits to illustrate some

6    point.  Some of these charts and summaries that were before

7    you have actually been introduced into evidence and therefore

8    may be taken into the jury room.  Others were not introduced

9    and may not be taken into the jury room.  However, if you

10   have a question or you believe these will resolve an issue in

11   the case when you deliberate, just send a note and ask to

12   come back into the courtroom and look at the chart or summary

13   that was not introduced into evidence.

14               Remember, however, that these charts and

15   summaries are compilations and visual representations of data

16   that were set -- that were set forth in testimony or

17   documents that were received in evidence.  They're no better

18   than the evidence which they're based and do not, in and of

19   themselves, constitute independent evidence.  Rather, it's

20   for you to decide whether the charts, schedules and summaries

21   correctly present the data set forth in the evidence on which

22   they're based and what effect, if any, the data has on your

23   determination of the facts.

24               Now, you'll note that the indictment charges

25   that the offenses were committed on or about certain dates.

USA vs O'Connor and Sacco

2399

1   The proof need not establish with certainty the exact date of

2   an alleged offense.  It is sufficient if the evidence in the

3   case establishes -- establishes beyond a reasonable doubt

4   that an offense was committed on a date reasonably near the

5   date alleged.

6              You may not draw any inference, favorable or

7   unfavorable, towards the government or the defendants on

8   trial from the fact that certain persons were not named or

9   charged as defendants in the indictment.  The circumstances

10  that these persons were not indicted must play no part in

11  your deliberations.

12             Whether a person should be named or indicted

13  as a defendant is a matter within the sole discretion of

14  United States Attorney and the grand jury.  Therefore, you

15  may not consider it in any way in reaching your verdict as to

16  the defendants on trial.

17             Before I read you the indictment filed in the

18  case and before I instruct you on the substantive law you're

19  to apply to the facts as you find them, I have just a few

20  closing remarks to make.  The first concerns matters relating

21  to person's state of mind; for example, knowledge,

22  willfulness and intent.  A person's state of mind is a fact

23  you're being called upon to decide.  Medical science,

24  however, has not yet devised an instrument that can record

25  what was in a person's mind in the past.  Rarely is direct

USA vs O'Connor and Sacco

2400

1   proof available to establish a person's state of mind.

2   Rather, a person's state of mind may be inferred from what he

3   or she says or does at the time of the occurrence or

4   nonoccurrence of certain events.

5          The intent with which an act is done is often

6   more clearly and conclusively shown by the act itself, or by

7   a series of acts, than by words or explanations of the act

8   uttered long after its occurrence.  Accordingly, intent and

9   also willfulness and knowledge is usually established by

10  surrounding facts and circumstances existing at the time the

11  act or acts in question occurred and the reasonable

12  inferences to be drawn from them.

13         Intent and motive, however, should never be

14  confused.  Motive is what prompts a person to act or fail to

15  act.  Intent refers only to the state of mind with which the

16  act is done or not done.  Personal advancement and financial

17  gain are two well-recognized motives for much of human

18  conduct.  These laudable motives may prompt one person to

19  voluntary acts of good and another to voluntary acts of

20  crime.  Good motive alone is never a defense where the act

21  done or omitted is a crime.  Therefore, the motive of the

22  accused is immaterial except insofar as evidence of motive

23  may aid determination of the state of mind.

24         I will instruct you further on the meaning of

25  knowledge and willfulness when it becomes appropriate.

USA vs O'Connor and Sacco

2401

1          I will now give you a brief description of

2     this case after which I will instruct you on the substantive

3     law you're to apply to the facts as you find them.   Remember

4     the government bears the burden of proving each and every

5     element of each crime charged beyond a reasonable doubt.

6          The prosecution charges the defendants with

7     having committed certain crimes, which I shall now explain to

8     you.

9          Count one.   Count one of the indictment reads

10    as follows:

11         Between in or about August of 2006 through

12    March of 2007, in the Northern District of New York and

13    elsewhere, Linda O'Connor, the defendant herein, being a

14    parent, legal guardian, and person having custody and control

15    of a minor, did knowingly offer to and did in fact sell and

16    otherwise transfer custody and control of a minor to Dean

17    Sacco, who traveled in interstate commerce, with knowledge

18    that as a consequence of the sale and transfer, the minor

19    would be portrayed in a visual depiction engaging in, and

20    assisting Dean Sacco to engage in sexually explicit conduct,

21    and with intent to promote the engaging in of sexually

22    explicit conduct by said minor for the purpose of producing a

23    visual depiction of such conduct and the rendering of

24    assistance by the minor to Dean Sacco to engage in sexually

25    explicit conduct for the purpose of producing a visual

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2402

1    depiction of such conduct.

2                Now don't worry about these numbers, you don't

3    have to memorize them, but I've got to tell them to you.

4    This charge is made in violation of Title 18 United States

5    Code, Section 2251A(a) and Section 2.

6                Count one of the indictment charges Defendant

7    O'Connor with violating Title 18 United States Code, Section

8    2251A(a), which provides in part that it's a crime for:

9                Any parent, legal guardian, or other person

10   having custody or control of a minor who sells or otherwise

11   transfers custody or control of such minor, or offers to sell

12   or otherwise transfer custody of such minor either

13               (1) with knowledge that, as a consequence of

14   the sale or transfer, the minor will be portrayed in a visual

15   depiction engaging in, or assisting another person to engage

16   in, sexually explicit conduct; or

17               (2) with intent to promote either

18               (A) the engaging in of sexually explicit

19   conduct by such minor for the purpose of producing any visual

20   depiction of such conduct; or

21               (B) the rendering of assistance by the minor

22   to any other person to engage in sexually explicit conduct

23   for the purpose of producing any visual depiction of such

24   conduct.

25               To convict Defendant O'Connor on this count,

USA vs O'Connor and Sacco

2403

1    the government must prove each of the following elements

2    beyond a reasonable doubt:

3                First, that Defendant O'Connor was a parent,

4    legal guardian, or a person having control or custody over

5    Shannon O'Connor;

6                Second, that Defendant O'Connor sold or

7    otherwise transferred custody or control over Shannon

8    O'Connor to Defendant Dean Sacco;

9                Third, that Defendant O'Connor either (I) knew

10   that, as a consequence of the sale or transfer, Shannon

11   O'Connor would be portrayed in a visual depiction engaging

12   in, or assisting Dean Sacco to engage in, sexually explicit

13   conduct; or (II) intended to promote either the engaging in

14   of sexually explicit conduct by Shannon O'Connor for the

15   purpose of producing any visual depiction of such conduct or

16   the rendering of assistance by Shannon O'Connor to Dean Sacco

17   to engage in sexually explicit conduct for the purpose of

18   producing any visual depiction of such conduct;

19               Fourth, at the time, Shannon O'Connor was

20   under the age of 18 years; and

21               Fifth, that Dean Sacco crossed state lines in

22   connection with the charged conduct.

23               The first element I read to you refers to the

24   phrase "custody or control."  Control is the power to manage,

25   command, direct or restrain another person.  Control involves

USA vs O'Connor and Sacco

2404

1    something more than mere persuasion, inducement or coercion.

2    The phrase "custody or control" is not limited to the same

3    degree of control as that exercised by a parent or guardian.

4    Control may be found to exist regardless of parental consent

5    or knowledge.  The phrase "custody and control" includes

6    temporary supervision over or responsibility for a minor,

7    whether such temporary supervision or responsibility was

8    obtained legally or illegally.

9              The second element requires the government to

10   prove that the Defendant O'Connor sold or otherwise

11   transferred custody or control over Shannon O'Connor to

12   Defendant Dean Sacco.  The term transfer has its ordinary,

13   everyday meaning.  This includes causing custody or control

14   to pass from one to another, handing over custody or control,

15   or otherwise causing custody or control to be passed on or

16   handed over to another.

17             The third element that I read to you uses the

18   phrase "visual depiction of sexually explicit conduct."

19             A visual depiction includes any photograph,

20   film, video or picture, including undeveloped film and

21   videotape and data stored on a computer disc or by electronic

22   means which is capable of conversion into a visual image.

23             In deciding whether the government has proven

24   this element, you may consider all the evidence concerning

25   the defendant's conduct.  While the government must prove

USA vs O'Connor and Sacco                2405

1    that defendant acted with knowledge that the minor would be

2    portrayed in a visual depiction of a child engaged in

3    sexually explicit conduct, or with the intent to promote

4    either the engaging in of sexually explicit conduct by the

5    minor for purposes of producing any visual depiction of such

6    conduct or the rendering of assistance by the minor to Dean

7    Sacco to engage in sexually explicit conduct for the purpose

8    of producing a visual depiction of such conduct, it is not

9    required that the government prove that the visual depiction

10   of that conduct was actually produced.

11            The term produced means producing, directing

12   manufacturing, issuing, publishing or advertising.

13            The phrase "sexually explicit conduct" as used

14   in this element means actual or simulated sexual intercourse,

15   including genital-to-genital, oral-to-genital,

16   anal-to-genital or oral-anal, whether between the persons of

17   the same or opposite sex; masturbation; sadistic or

18   masochistic abuse; or lascivious exhibition of the genitals

19   or pubic area of any person.

20            The term "lascivious exhibition" means the

21   depiction which displays or brings to view to attract notice

22   to the genitals or pubic area of children in order to excite

23   lustfulness or sexual stimulation in the viewer.  Not every

24   exposure of the genitals or pubic area constitutes a

25   lascivious exhibition.  In deciding whether the government

USA vs O'Connor and Sacco

2406

1    has proved that a particular visual depiction constitutes

2    lascivious exhibition, you should consider the following

3    questions:

4                    - Whether the focal point of the visual

5    depiction is on the child's genitals or pubic area, and

6    whether there is -- or whether there is some other focal

7    area.

8                    - Whether the setting of the visual depiction

9    makes it appear to be sexually suggestive, for example, in a

10   place or pose generally associated with sexual activity.

11                   - Whether the child is displayed in an

12   unnatural pose, or in inappropriate attire, considering the

13   age of the child.

14                   - Whether the child is fully or partially

15   clothed, or nude, although nudity is not in and of itself

16   lascivious.

17                   - Whether the visual depiction suggests sexual

18   coyness or willingness to engage in sexual activity; and

19                   - Whether the visual depiction is intended or

20   designed to elicit a sexual response in the viewer.

21                   It is not required that a particular visual

22   depiction involve all of these factors to be a lascivious

23   exhibition.  The importance which you give to any one factor

24   is up to you to decide.

25                   The fourth element which the government must

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2407

1    prove beyond a reasonable doubt is that Shannon O'Connor was

2    less than 18 years old at the time of the acts alleged in the

3    indictment.  The government does not need to prove that the

4    defendant knew that Shannon O'Connor was less than 18 years

5    old.

6              The fifth factor requires the government to

7    prove that Dean Sacco crossed state lines in connection with

8    the charged conduct.  Excuse me.

9              Count two of the indictment reads as follows:

10             Between in and about August of 2006 through

11   March of 2007, in the Northern District of New York and

12   elsewhere, Dean Sacco, the defendant herein, who traveled in

13   interstate commerce, did knowingly offer to and did in fact

14   purchase and otherwise obtain custody and control of a minor

15   from Linda O'Connor, with knowledge that, as a consequence of

16   purchase and obtaining of custody, the minor would be

17   portrayed in a visual depiction engaging in, and assisting

18   Dean Sacco to engage in, sexually explicit conduct, and with

19   intent to promote the engaging in of sexually explicit

20   conduct by said minor for the purpose of producing a visual

21   depiction of such conduct and the rendering of assistance by

22   the minor to Dean Sacco to engage in sexually explicit

23   conduct for the purpose of producing a visual depiction of

24   such conduct.

25             In violation of title 18 United States Code,

USA vs O'Connor and Sacco

2408

1    Section 2251A(b) and Section 2.

2            Count two charges Dean Sacco with buying a

3    child for the purpose of producing child pornography in

4    violation of Section 2251A(b) of Title 18 United States Code.

5    Section 2251A(b) provides, in relevant part, that:

6            Whoever purchases or otherwise obtains custody

7    or control of a minor or offers to purchase or otherwise

8    obtain custody or control of a minor either

9            (1) with knowledge that, as a consequence of

10   the purchase or obtaining of custody, the minor will be

11   portrayed in a visual depiction engaging in, or assisting

12   another person to engage in, sexually explicit conduct; or

13           (2) with intent to promote either

14           (A) the engaging in of sexually explicit

15   conduct by such minor for the purpose of producing any visual

16   depiction of such conduct; or

17           (B) the rendering of assistance by the minor

18   or any other person to engage in sexually explicit conduct

19   for the purpose of producing any visual depiction of such

20   conduct shall be guilty of a crime.

21           To convict Defendant Sacco on this count, the

22   government must prove each of the following elements beyond a

23   reasonable doubt:

24           First, that Defendant Sacco purchased or

25   obtained custody or control over the minor or offered to

USA vs O'Connor and Sacco

2409

1    purchase or otherwise obtain custody or control of a minor;

2              Second, that Defendant Sacco either: (I) knew

3    that as a consequence of the purchase or obtaining of

4    custody, the minor would be portrayed in a visual depiction

5    engaging in, or assisting Sacco to engage in, sexually

6    explicit conduct; or (II) intending to promote either the

7    engaging in of sexually explicit conduct by the minor for the

8    purpose of producing any visual depiction of such conduct, or

9    the rendering of assistance by the minor to Defendant Sacco

10   to engage in sexually explicit conduct for the purpose of

11   producing any visual depiction of such conduct;

12             Third, at the time, the minor -- at the time,

13   the minor was under 18 years of age; and

14             Fourth, that Defendant Sacco crossed state

15   lines in connection with the charged conduct.

16             In addressing this count, you should use the

17   definitions I previously provided to you in connection with

18   count one.

19             Count three.  Count three of the indictment

20   reads as follows:

21             Between in or about January of 2004 and March

22   of 2007, in the Northern District of New York and elsewhere,

23   Dean Sacco and Linda O'Connor, the defendants herein, while

24   in and affecting interstate commerce, did knowingly recruit,

25   entice, harbor, transport, provide and obtain by any means a

USA vs O'Connor and Sacco

2410

1   person that had not attained the age of 18 years, and more

2   specifically that person did not attain the age of 14 years

3   at the time, knowing that the person would be caused to

4   engage in a commercial sex act.

5                In violation of Title 18 United States Code,

6   Section 1591(a) & (b) and Section 2.

7                Both Defendants Sacco and O'Connor are charged

8   in count three of the indictment.  Count three charges a

9   violation of Section 1591(a) & (b) of Title 18 of the United

10  States Code, which provides in relevant part that:

11               Whoever knowingly, in or affecting interstate

12  or foreign commerce... recruits, entices, harbors,

13  transports, provides or obtains by any means a person,

14  knowing that the person has not attained the age of 18 years

15  and will be caused to engage in a commercial sex act, shall

16  be guilty of a crime.

17               To convict the defendants on this count, the

18  government has to prove the following elements beyond a

19  reasonable doubt:

20               First, that the defendant recruited, enticed,

21  harbored, transported, provided or obtained the minor by any

22  means;

23               Second, that Shannon O'Connor had not attained

24  the age of 18 years;

25               Third, that the defendant knew that Shannon

USA vs O'Connor and Sacco

2411

1   O'Connor would be caused to engage in a commercial sex act;

2   and

3                   Fourth, that the defendant's conduct affected

4   interstate or foreign commerce.

5                   With respect to the third element, referring

6   to a commercial sex act, a commercial sex act means any sex

7   act on account of which anything of value is given to or

8   received by any person.

9                   When considering this count three, remember

10  that each defendant is charged in this count and that you

11  must evaluate this charge as to each defendant separately.

12                  Count four of the indictment charges -- excuse

13  me.  Count four of the indictment reads as follows:

14                  Between in or about August of 2006 through

15  March of 2007, in the Northern District of New York and

16  elsewhere, Dean Sacco and Linda O'Connor, the defendants

17  herein, did knowingly and willfully employ, use, persuade,

18  induce, entice and coerce a minor to engage in sexually

19  explicit conduct for the purpose of producing a visual

20  depiction of said conduct, and said depiction was produced

21  using materials that had been mailed, shipped, transported in

22  interstate and foreign commerce by any means, in that a

23  defendant, while using a camera which had been transported in

24  interstate commerce and was manufactured outside the state of

25  New York, photographed a minor in sexually explicit conduct.

USA vs O'Connor and Sacco

2412

1      In violation of Title 18 United States Code,

2  Section 2251(a) and Section 2.

3      Count four of the indictment charges both

4  defendants with violating Title 18 United States Code,

5  Section 2251(a) which provides in pertinent part that:

6      Any person who employs, uses, persuades,

7  induces, entices or coerces any minor to engage in... any

8  sexually explicit conduct for the purpose of producing any

9  visual depiction of such conduct, shall be guilty of a crime

10 if... that visual depiction was produced using materials that

11 had been mailed, shipped, or transported in interstate or

12 foreign commerce by any means...

13     To prove defendant guilty of using a minor to

14 produce child pornography, the government must prove each of

15 the following elements beyond a reasonable doubt:

16     First, that Shannon was under the age of 18;

17     Second, that defendant used, employed,

18 persuaded, induced, enticed or coerced Shannon to take part

19 in sexually explicit conduct for purpose of producing a

20 visual depiction of that conduct; and

21     Third, the visual depiction was produced using

22 materials that had been mailed, shipped or transported in

23 interstate or foreign commerce.

24     The second element that the government must

25 prove beyond a reasonable doubt is that defendant used,

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2413

1   employed, persuaded, induced, enticed or coerced Shannon

2   O'Connor to take part in sexually explicit conduct for the

3   purpose of producing a visual depiction of that conduct.

4                    Visual depiction, as I've stated before,

5   includes any photograph, film, video or pictures, including

6   undeveloped film and videotape and data stored on computer

7   disc or by electronic means which is capable of conversion

8   into a visual image.

9                    In deciding whether the government has proven

10  that the defendant acted for the purpose of producing a

11  visual depiction of the sexually explicit conduct, you may

12  consider all the evidence concerning the defendant's conduct.

13  While the government must prove that defendant acted with the

14  purpose of producing a visual depiction of the child engaging

15  in sexually explicit conduct, it is not required that the

16  government prove that the visual depiction of that conduct

17  was actually produced.

18                    The phrase "sexually explicit conduct" is

19  defined as I previously explained it to you.

20                    The third element which the government must

21  prove beyond a reasonable doubt is that the visual depiction

22  was produced using materials that had been mailed or

23  transported in interstate or foreign commerce.

24                    Simply stated, the phrase "transported in

25  interstate or foreign commerce" means that the materials used

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2414

1    to produce the visual depiction had previously been moved

2    from one state to another or between the United States and

3    another country.  Here, the government alleges that the

4    camera used to take the photographs in question was

5    manufactured in another state or country.  I instruct you

6    that if you find that the camera was manufactured outside

7    New York that it is sufficient to satisfy this element.  The

8    government does not have to prove that the defendant

9    personally transported the camera across the state line or

10   the defendant knew that the camera had previously crossed the

11   state line.

12                   Count five of the indictment reads as follows:

13                   Between in and about August of 2006 through

14   March of 2007, in the Northern District of New York and

15   elsewhere, Linda O'Connor, the defendant herein, being a

16   parent, legal guardian, and person having custody and control

17   of a minor, did knowingly permit said minor to engage in, and

18   for the minor to assist Dean Sacco to engage in, sexually

19   explicit conduct for the purpose of producing a visual

20   depiction of such conduct, and said depiction was produced

21   using materials that had been mailed, shipped and transported

22   in interstate and foreign commerce by any means, in that, a

23   defendant, while using a camera which had been transported in

24   interstate commerce and was manufactured outside the State of

25   New York, photographed a minor in sexually explicit conduct.

USA vs O'Connor and Sacco

2415

1          In violation of Title 18 United States Code,

2   Section 2251(b) and Section 2.

3          Count five of the indictment charges Defendant

4   O'Connor with violating Title 18 United States Code, Section

5   2251(b), which provides in part that:

6          Any parent, legal guardian, or person having

7   custody or control of a minor who knowingly permits such

8   minor to engage in, or to assist any other person to engage

9   in, sexually explicit conduct for the purpose of producing

10  any visual depiction of such conduct shall be guilty of a

11  crime if such parent, legal guardian, or person knows or has

12  reason to know that such visual depiction... was produced

13  using materials that had been mailed, shipped or transported

14  in interstate or foreign commerce by any means...

15         To prove a defendant guilty of this charge,

16  the government must prove each of the following elements

17  beyond a reasonable doubt:

18         First, that Shannon O'Connor was under the age

19  of 18;

20         Second, that the defendant was a parent, legal

21  guardian or person having custody or control over Shannon

22  O'Connor;

23         Third, that the defendant knowingly permitted

24  the minor to engage in, or assist any other person in,

25  sexually explicit conduct for the purpose of producing a

USA vs O'Connor and Sacco

2416

1   visual depiction of that conduct; and

2              Fourth, the visual depiction was produced by

3   using materials that had been mailed or transported in

4   interstate or foreign commerce.

5              Again, in analyzing this charge, you should

6   use the definitions I previously gave you.

7              Count six of the indictment reads as follows:

8              First, that between in and about August of

9   2006 through March of 2007, in the Northern District of New

10  York and elsewhere, Defendant Dean Sacco did travel in

11  interstate commerce for the purpose of engaging in illicit

12  sexual conduct with a minor under 18 years of age.

13             In violation of Title 18 United States Code,

14  Section 2423(b) and Section 2.

15             Count six charges Defendant Sacco with

16  violating Section 2423(b) of Title 18 of the United States

17  Code, which provides in relevant part that:

18             A person who travels in interstate commerce...

19  for the purpose of engaging in any illicit sexual conduct

20  with another person shall be guilty of a crime.

21             To convict Dean Sacco on this count, the

22  government must prove the following elements beyond a

23  reasonable doubt:

24             First, that the defendant traveled in

25  interstate commerce;

USA vs O'Connor and Sacco

2417

1          Second, that one of the purposes of

2    defendant's travels across state lines was to engage in

3    illicit sexual conduct with another person; and

4          Third, that Shannon O'Connor was under 18

5    years of age at the time of the charged conduct.

6          The second element requires the government to

7    prove that one of the motives or purposes for the travel was

8    to engage in illicit sexual conduct with another person.  The

9    government must show that one of the defendant's motivating

10   purposes for traveling across state lines was for engaging in

11   sexual activity with a minor.  While the government need not

12   show that the illegal sexual conduct was the sole, or only,

13   purpose for the trip, it is not enough if you find that the

14   illegal sexual conduct was merely incidental to the travel.

15         For purposes of this count, the term "illicit

16   sexual conduct" means a sexual act with a person under the

17   age of 18 or any commercial sex act.  The phrase "sexual act"

18   means contact between the penis and vulva or the penis and

19   the anus.  Contact involving the penis occurs upon

20   penetrating, however slight.  The phrase "sexual act" also

21   means contact between the mouth and the penis, the mouth and

22   the vulva, or the mouth and the anus; the penetration,

23   however slight, of the anal or genital opening of another by

24   a hand or finger or by any object, with an intent to abuse,

25   humiliate, harass, degrade, or arouse or gratify the sexual

USA vs O'Connor and Sacco

2418

1  desire of any person; or the intentional touching, not

2  through the clothing, of the genitalia of another person who

3  has not attained the age of 16 years with an intent to abuse,

4  humiliate, harass, degrade, or arouse or gratify the sexual

5  desire of any person.

6           The phrase "commercial sex act" means any sex

7  act, on account of which anything of value is given to or

8  received by any person.

9           Count seven of the indictment reads as

10 follows:

11          Between in or about January of 2004 through

12 March of 2007, in the Northern District of New York and

13 elsewhere, Dean Sacco and Linda O'Connor, the defendants

14 herein, did knowingly and willfully possess material which

15 contains images of child pornography which were produced

16 using materials which have been mailed, shipped and

17 transported in interstate and foreign commerce by any means,

18 in that, defendants knowingly possessed computers, computer

19 hard drives, cameras and other materials containing graphic

20 images of child pornography, knowing that the images

21 contained a visual depiction and material containing a visual

22 depiction, the production of which involved the use of a

23 minor engage in sexually explicit conduct as defined in Title

24 18 United States Code, Section 2256.

25          In violation of Title 18 United States Code,

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2419

1  Section 2252A(a)(5)(B) and Section 2.

2            Count seven charges both defendants with

3  violating Section 2252A(a)(5)(B) of the Title 18 of the

4  United States Code, which provides, in relevant part, that:

5            Any person who knowingly possesses any book,

6  magazine, periodical, film, videotape, computer disc or any

7  other material that contains an image of child pornography...

8  that was produced using materials that have been mailed or

9  shipped or transported in interstate or foreign commerce by

10  any means... shall be guilty of a crime.

11            To convict the defendants on this count, the

12  government must prove each of the following elements beyond a

13  reasonable doubt:

14            First, that the defendant knowingly possessed

15  a visual depiction, as I will explain that term to you;

16            Second, that the visual depiction was produced

17  using materials that had been transported in interstate or

18  foreign commerce;

19            Third, that the visual depiction was child

20  pornography, as I'll explain that term; and

21            Fourth, that the defendant knew of the

22  sexually explicit nature of the material and that the visual

23  depictions were of actual minors engaged in that sexually

24  explicit conduct.

25            The first element which the government must

USA vs O'Connor and Sacco

2420

1    prove beyond a reasonable doubt is that the defendant

2    knowingly possessed a visual depiction.  A visual depiction

3    includes any photograph, film, video or picture, including

4    undeveloped film and videotape, and data stored on computer

5    disc or by electronic means which is capable of conversion

6    into a visual image.

7              To possess something means to have it within a

8    person's control.  This does not necessarily mean that the

9    person must hold it physically, that is, have actual

10   possession of it.  As long as the visual depiction is within

11   the defendant's control, he or she possesses it.  If you find

12   that defendant had either actual possession of the depiction

13   or that he had the power and intention to exercise control

14   over it, even though it was not in his physical possession,

15   you may find that the government has proven possession.

16             The law also recognizes that possession may be

17   sole or joint.  If one person alone possesses it, that is

18   sole possession.  However, it is possible that more than one

19   person may have the power and intention to exercise control

20   over the visual depiction.  This is called joint possession.

21   If you find that the defendant had such power and intention,

22   then he or she possessed the depiction even if he or she

23   possessed it jointly with another person.

24             The government must prove that the defendant

25   possessed the depiction knowingly.  And act is done knowingly

1   when it is done voluntarily and intentionally and not because

2   of accident, mistake or some other innocent reason.

3                    The second element which the government must

4   prove beyond a reasonable doubt is that the child pornography

5   was produced using materials that had been transported in

6   interstate or foreign commerce.

7                    I previously explained this phrase to you and

8   you may apply that same definition here.  Essentially, it

9   must be shown that the materials used to produce the child

10   pornography had previously moved from one state to another or

11   between the United States and another country.

12                    The third element which the government must

13   prove beyond a reasonable doubt is that the visual depiction

14   was child pornography.

15                    Child pornography means any visual depiction,

16   the production of which involved the use of a minor engaging

17   in sexually explicit conduct and which portrays that minor

18   engaged in that conduct.

19                    The visual depiction must be of a real person

20   under the age of 18 engaging in sexually explicit conduct.

21   The government does not have to prove the identity of the

22   minor or the exact age of the minor.  You may consider all of

23   the evidence in determining whether the depiction portrayed

24   an actual person under the age of 18 engaging in sexually

25   explicit conduct.

USA vs O'Connor and Sacco

2422

1          I previously defined the term "sexually

2    explicit conduct" for you and you should apply that same

3    definition to this count.

4               The fourth element which the government must

5    prove beyond a reasonable doubt is that the defendant knew

6    that the material possessed was child pornography.

7               As I stated before, an act is done knowingly

8    when it's done voluntarily and intentionally and not because

9    of accident, mistake or some other innocent reason.

10              In this case, the term "knowingly" refers to

11   an awareness of the sexuality -- excuse me, of the sexually

12   explicit nature of the material, and to the knowledge that

13   the visual depictions were in fact of actual minors engaged

14   in that sexually explicit conduct.

15              The government must show that the defendant

16   had knowledge of the general nature of the contents of the

17   material.  The defendant need not have specific knowledge as

18   to the identity or actual age of the underage performer.  The

19   defendant must have knowledge or an awareness that the

20   material contained a visual depiction of a minor engaged in

21   sexually explicit conduct.  Such knowledge may be shown by

22   direct or circumstantial evidence, or both.  Eyewitness

23   testimony of the defendant's viewing of the material is not

24   necessary to prove his or her awareness of its contents; the

25   circumstances may warrant that the defendant was aware of

USA vs O'Connor and Sacco

2423

1   what the material depicts.  Furthermore, the defendant's

2   belief as to the legality or illegality of the material is

3   irrelevant.

4              Now I'm going to talk about the other theory

5   that I mentioned to you that the government has about proving

6   these counts.

7              In counts four, five and seven, four, five and

8   seven, the defendants also are charged with violating 18

9   United States Code Section 2, aiding and abetting.  Section 2

10  of Title 18 of the United States Code provides that:

11             Whoever commits an offense against the United

12  States or aids or abets or counsels, commands, or induces, or

13  procures its commission, is punishable as a principal.

14             Under the aiding and abetting statute, it is

15  not necessary for the government to show that a particular

16  individual him or herself physically committed the crime with

17  which he or she is charged in order for you to find that

18  individual guilty.  The guilt of an individual may be

19  established without proof that the accused personally did

20  every act constituting the offense charged.

21             A person who aids or abets another to commit

22  an offense is just as guilty of the offense as if he or she

23  committed that offense him or herself.

24             Accordingly, you may find an individual guilty

25  of the offense charged if you find beyond a reasonable doubt

USA vs O'Connor and Sacco

2424

1    that the government has proved that another person actually

2    committed the offense with which the individual is charged,

3    and that individual aided or abetted that person in the

4    commission of a crime.

5              As you can see, the first requirement is that

6    you find that another person has committed the crime charged.

7    Obviously, no one can be convicted of aiding or abetting the

8    criminal acts of another if no crime was committed by the

9    other person in the first place.  But if you do find that a

10   crime was committed, then you must consider whether the

11   particular individual under consideration aided or abetted

12   the commission of the crime.

13             In order to aid or abet another to commit a

14   crime, it is necessary that the individual willfully and

15   knowingly associate him or herself in some way with the

16   crime, and that he or she willfully and knowingly seeks by

17   some act to help make the crime succeed.

18             Participation in a crime is willful if action

19   is taken voluntarily and intentionally or, in the case of a

20   failure to act, with the specific intent to fail to do

21   something the law requires to be done; that is to say, with a

22   bad purpose either to disobey or disregard the law.

23             In other words, if an individual is fully

24   aware that what he or she is doing plays a significant role

25   and intentionally participates in facilitating a transaction

USA vs O'Connor and Sacco

1    prohibited by law, he or she is equally guilty as the person

2    who directly performs the illegal acts, even though the other

3    played a greater or much larger role in the perpetration of

4    the crime.

5            Whether one aided and abetted or caused

6    another to commit a crime must be determined based on the

7    alleged aider and abettor's overt conduct, acts and

8    statements.  You are entitled to consider circumstantial

9    evidence as proof that one or more of these individuals aided

10   and abetted the crime.  It is not necessary that the acts

11   alleged to have constituted aiding and abetting be criminal

12   in and of themselves.  Under the law, acts which might

13   otherwise be legal can constitute the basis for a finding of

14   aiding and abetting.

15           A mere presence of an individual where a crime

16   is being committed, even coupled with knowledge by the

17   individual that a crime is being committed, or the mere

18   acquiescence by the individual in the criminal conduct of

19   others, even with guilty knowledge, is not sufficient to

20   establish aiding and abetting.  An aider and abettor must

21   have some interest in the criminal venture.

22           To determine whether an individual aided and

23   abetted the commission of the crime with which he or she is

24   charged, ask yourself these questions:

25           Did she or he participate in the crime charged

1    as something he or she wished to bring about?

2                    Did the individual associate him or herself

3    with the criminal venture knowingly and willfully?

4                    Did the individual seek by his or her actions

5    to make the criminal venture succeed?

6                    If he or she did, then the individual is an

7    aider and abettor and therefore guilty of the offense.  If,

8    on the other hand, your answers to this series of questions

9    are no, then the individual is not an aider and abettor, and

10   he or she cannot be found to have committed the charged

11   crime.

12                   After you retire to the jury room, you should

13   first select a foreperson who will preside over your

14   deliberations and speak on your behalf here in court.  Keep

15   in mind, however, that the foreperson's vote is entitled to

16   no more weight than any other juror.  Your verdict on each

17   count in the indictment must be unanimous -- that means

18   you've all got to agree -- as to either guilt or innocence.

19   Your verdict must also represent the considered judgment of

20   each juror.  Each of you must decide the case for yourself,

21   but it is your duty as jurors to consult with one another and

22   to deliberate with a view toward reaching an agreement if you

23   can do so without violence to individual judgment.

24                   I must be getting tired.  I apologize.

25                   There's nothing peculiarly different in the

USA vs O'Connor and Sacco

2427

1   way a jury should consider the evidence in a criminal case
2   from that in which all reasonable persons treat any question
3   that depends on evaluation of evidence presented to them.
4   You're expected to use your good sense, to consider the
5   evidence in the case only for the purpose for which it's been
6   admitted, to give this evidence a reasonable and fair
7   construction in the light of your common knowledge of the
8   natural inclinations and tendencies of human beings.
9           Consider each charge against each defendant
10  carefully.  If, as to the count you are considering, you find
11  that the government has failed to prove to your satisfaction
12  each and every element of the crime charged beyond a
13  reasonable doubt, then you must acquit the defendant on that
14  count.  On the other hand, if, as to that count you're
15  considering, you find that the government has proven to your
16  satisfaction every element of the crime charged, then you
17  must convict the defendant on that count.
18          If you find that the law as I've explained it
19  to you has not been violated, you must not hesitate for any
20  reason to return a verdict of not guilty.  On the other hand,
21  if you find that the law has been violated, you must not
22  hesitate, because of sympathy or any other reason, to render
23  a verdict of guilty.
24          Remember also that the punishment provided by
25  law for these offenses charged in the indictment is a matter

USA vs O'Connor and Sacco

2428

1   exclusively within the province of the court and should never

2   be considered by you in any way in arriving at an impartial

3   verdict as to the guilt or innocence of the accused.

4            During your deliberations do not hesitate to

5   re-examine your views and change your mind.  Remember, you're

6   not partisans.  Your duty is to seek the truth from the

7   evidence presented to you.  If any reference by the Court or

8   by counsel on any matters of evidence does not coincide with

9   your own recollection, it is your recollection that controls

10  your deliberations.

11           If, during the course of your deliberations,

12  your recollection on any part of the testimony should fail,

13  or if you should find yourself in doubt concerning my

14  instructions, you are privileged to return to the courtroom

15  to have the testimony read back to you, or have the

16  instructions explained.

17           Should you desire to communicate with the

18  Court during your deliberations, please put your message or

19  question in writing.  The foreperson should sign the note and

20  pass it to the marshal who will bring it to my attention.

21  I'll then respond, either orally or in writing, by having you

22  return to the courtroom.  I caution you, however, in your

23  communications with the Court, you must never state your

24  numerical division over any issue, if there is one.

25           Verdict forms have been prepared for you.

USA vs O'Connor and Sacco                                    2429

1   After you select a foreperson, you should review them.  Once

2   you've reached a unanimous verdict, your foreperson should

3   fill in the verdict form, date it and sign it -- this is the

4   verdict form -- to date it and sign it and inform the marshal

5   a verdict has been reached.

6              Now, I'm going to ask you all to step outside

7   for just a moment with Colleen, and then I'm going to bring

8   you back in and give you some more information.

9              (Jury excused)

10             THE COURT:  Exceptions or matters not already

11  spread upon the record, government?

12             MR. LOVRIC:  None, your Honor.

13             THE COURT:  Defendants?

14             MISS PEEBLES:  Nothing more than we already

15  talked about in chambers.

16             MR. FISCHER:  No, your Honor.  Thank you.

17             THE COURT:  Okay.  Bring them back.

18             (Jury present)

19             THE COURT:  All right, ladies and gentlemen.

20  At this time it is the duty of the Court to excuse the

21  alternate jurors.  The Court would like to thank you on

22  behalf of everyone present.  This has been a long, drawn-out

23  trial, much longer than any of us expected or thought, and

24  it's nobody's fault.  It's just the way these things happen.

25  Takes time to put this evidence in and have the final

USA vs O'Connor and Sacco

2430

1    arguments and the charge and all of those things.  And we

2    appreciate all of the attention that you four gave as the

3    trial progressed.

4                    As Mr. Fischer mentioned in his remarks, I was

5    also watching all of you, main jurors, alternate jurors, and

6    you did play close attention to the evidence.  You watched

7    and listened to everything that was being presented.  That's

8    a hard job at times.  You did it, and we thank you for it.

9    And we also thank you for the time you took out of your own

10   lives to come down here and be with us.

11                   So, I don't know if Colleen is about to punish

12   you by making you make a phone call or not.  I take no part

13   in that.  I leave it up to her.

14                   THE CLERK:  I believe, your Honor, based on

15   their service, we can go ahead and permanently excuse them.

16                   THE COURT:  You think they did enough?

17                   THE CLERK:  I think so.

18                   THE COURT:  I'll take your word.  Please step

19   aside.  Hope you've set the date for the reunion before you

20   leave.

21                   (Alternates excused)

22                   THE CLERK:  Will the marshal come forward to

23   be sworn.

24                   (Marshal was duly sworn)

25                   THE COURT:  All right.  Ladies and gentlemen,

USA vs O'Connor and Sacco

2431

1    we'll get the verdict forms into you very, very shortly.

2              The next thing is, the lawyers will go over

3    the exhibits and make sure they're in proper order to bring

4    back to you.  If you need to hear something played or see a

5    video, just write a note, hand it to the marshal, who will

6    hand it to me, and it will take some time to get it together.

7    We'll have to go back and get it as you want.  Try to be

8    explicit as to what part or parts, whatever you want.  You

9    want the whole thing, you get it.  If you want parts of it,

10   kind of cut them out.

11             Now, I know the charge was long, boring,

12   arduous, legalistic, and perhaps incomprehensible, so I'm

13   going to give you copies of the charge to take back in the

14   jury room with you.  I know you were all taking notes.  I

15   appreciated that, but I didn't want to tell you ahead of time

16   because you probably wouldn't have listened to anything.  Now

17   I'll get that in shape for you and have it brought back for

18   you.

19             Okay.  Ladies and gentlemen, you may begin

20   your deliberations.  And also, we're going to ask you

21   questions about how long you want to stay.  The rule is, you

22   can stay as long as you want until Colleen kicks you out or

23   Paul says -- as long as you want this evening, or you can

24   stay a short time and come back tomorrow.  It's up to you.

25   You're not to be hurried in your deliberations.  You have to

1  give a lot of consideration of what's been put before you.

2  Take all the time that you think you need.  So that's

3  something that someone will probably ask you about ten of 5,

4  do you want to stay and deliberate longer or do you want to

5  come back tomorrow.  It's up to you guys.  Whatever you want

6  to do.  You're all set.

7                    (Jury excused for deliberations at 4:13 PM)

8                    THE COURT:  Okay.  You guys got to get

9  together with the exhibits now, right?

10                    Any problem with the verdict form you see?

11                    MR. FISCHER:  No, Judge.

12                    THE COURT:  Okay.  We'll get those ready for

13  the jury.

14                    (Continuation of Deliberations)

15                    (Jury present).

16                    THE COURT:  All right, ladies and gentlemen.

17  We understand that you would like to leave now and go home

18  and come back here tomorrow at 9:30, tomorrow morning.  Is

19  that right?

20                    (All Jurors say yes).

21                    THE COURT:  Just let me remind you not to

22  discuss the case among yourselves, with anybody else or

23  permit anyone to discuss it with you.  You can't talk about

24  the case until you're all assembled, all 12 of you back in

25  the jury room tomorrow and, of course, you'll begin.  You

USA vs O'Connor and Sacco                    2433

1    don't have to come in here at all.  Once you count 12 heads

2    you can go ahead and start deliberating.  Stay away from

3    media or research or anything tonight.  Have a nice evening

4    and we'll see seal you tomorrow morning.  Have a nice

5    evening.

6                   (Jury excused).

7                   (Court stands adjourned).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1              C E R T I F I C A T I O N

2          I, VICKY A. THELEMAN, RPR, CRR, United

3   States Court Reporter in and for the United States

4   District Court, Northern District of New York, do

5   hereby certify that I attended at the time and place

6   set forth in the heading hereof; that I did make a

7   stenographic record of the proceedings had in this

8   matter and cause the same to be transcribed; that

9   the foregoing is a true and correct copy of the same

10  and the whole thereof.

11

12

13                      _____

14                      VICKY A. THELEMAN, RPR, CRR

15                      United States Court Reporter

16                      US District Court - NDNY

17

18

19  Dated:  November 19, 2008.

20

21

22

23

24

25

2435

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------------------

4    UNITED STATES OF AMERICA,

5                     -versus-                    08-CR-77

6    LINDA O'CONNOR and DEAN SACCO.

7    ----------------------------------------------------------

8                    TRANSCRIPT OF JURY TRIAL

9    held in and for the United States District Court,

10   Northern District of New York, at the Federal Building and

11   Courthouse, 15 Henry Street, Binghamton, New York, on

12   THURSDAY, May 29, and FRIDAY, May 30, 2008, before the

13   HON. THOMAS J. McAVOY, Senior United States District Court

14   Judge, PRESIDING.

15   FOR THE GOVERNMENT:

16   UNITED STATES ATTORNEY'S OFFICE

17   BY:  MIROSLAV LOVRIC, AUSA

18        Bighamton, New York

19   FOR THE DEFENDANT O'CONNOR:

20   FEDERAL PUBLIC DEFENDER'S OFFICE

21   BY:  LISA PEEBLES, AFPD

22        Syracuse, New York

23   FOR THE DEFENDANT SACCO:

24   KELLY FISCHER, ESQ.

25   Binghamton, New York

USA vs O'Connor and Sacco                    2436

1              THE COURT:  All right.  We have a note from

2    the jury, Court Exhibit 1.  It's signed by the foreperson,

3    juror number five.  And the note reads as follows:  Witness

4    number 16 for government, James Thompson, computer analysis.

5    We would like the stenographer to re-read his testimony.  Any

6    objections?

7              MISS PEEBLES:  No, your Honor.

8              MR. LOVRIC:  No.

9              MR. FISCHER:  No.

10             (Jury present).

11             THE COURT:  All right.  We have a note -- two

12   notes from the jury.  We're going to deal with them seriatim,

13   one at a time.  We're going to start with the first note

14   signed the foreperson, which reads as follows.  Witness

15   number 16 for government, James Thompson, computer analysis,

16   we would like the stenographer to re-read his testimony and

17   Vicky tells me that she's ready to do that.  So everybody's

18   in agreement.  We're going to do that for you.

19             (Record read back).

20             THE COURT:  All right.  Ladies and gentlemen,

21   I take it, Juror No. 5, that's what you folks wanted on

22   question number one?

23             THE FOREPERSON:  Yes.

24             Question number 2 is on an entirely different

25   topic and it deals with a legal analysis so I'm going to have

USA vs O'Connor and Sacco

2437

1    to confer with the lawyers before I answer that for you.  But

2    I will attempt to answer that.  I instructed you that if you

3    had a question about interpretation of the charge, you could

4    bring that up to me.  So it might take me -- shouldn't take

5    long but if you'd return to the jury room, I'll go over this

6    with the attorneys and we'll bring you back in.

7                    (Jury excused).

8                    THE COURT:  Okay.  Folks, I have in my hand

9    Court Exhibit number 2 signed by the foreperson, Juror No. 5,

10   which reads as follows:  Clarify aiding and abetting versus

11   guilty.  All right.  I will attempt to do that and I'll ask

12   for anybody's input, suggestions, objections, emendations or

13   anything else you might care to say about my analysis?  The

14   charge itself doesn't analogize -- doesn't put those concepts

15   across from one another.  They're supplemental concepts and I

16   told the jury, not in the formal charge, but in the preamble

17   that I gave to the charge, that the government -- the charge,

18   first of all, contains material having to do with the duties

19   of the Court and the jury, the other things that came in the

20   first part of the charge, then an analysis of each count of

21   the indictment and the elements of each count and then came

22   aiding and abetting which I told the jury was another theory

23   that the government is advancing to hold a particular

24   defendant liable, if you'll recall that preamble statement.

25   I'm not sure I used those exact words but that's the gist of

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

2438

1  it.

2           So what I propose to charge to the jury at

3  this time is that you have been given a verdict form and the

4  charge which contains an analysis, at least in the charge, of

5  seven different counts of indictment charging each defendant

6  with certain counts and both defendants with certain counts.

7  Now, if you are considering a particular defendant as to a

8  particular count and you find that this defendant did not, in

9  fact, perform or -- well, perform each and every element of

10  that particular crime beyond a reasonable doubt, then you

11  cannot convict that defendant on that count unless you find

12  that that individual who you could not convict on that count

13  was an aider and abettor.  First you have to find, to reach

14  that conclusion, that a crime was committed by another person

15  in the first place.  If you don't find that, you cannot

16  consider aiding and abetting liability.  But if you do find

17  that some other person committed the count that you're

18  considering, that you just decided you couldn't convict the

19  defendant you were considering on, but you find that another

20  person did that, then you can see if an individual aided and

21  abetted that person in committing that crime.  I've

22  completely outlined what aiding and abetting means in the

23  charge.  You have to refer to that definition to answer that

24  question.

25           Government?

USA vs O'Connor and Sacco                    2439

1          MR. LOVRIC:  I think that's correct.

2          THE COURT:  Thank you.

3          MISS PEEBLES:  Judge, maybe you can -- that's

4   fine but maybe you could also re-read the aiding and

5   abetting, at least the three.

6          THE COURT:  I could, Lisa.  They've got that

7   whole thing back there with them.  If you want me to read it,

8   I'll do it.

9          MISS PEEBLES:  Oh, yeah, and the other thing

10  is, Judge, that the aiding and abetting that the government

11  was advancing was only on the three counts.

12         THE COURT:  I should point out to them as to

13  which the aiding and abetting apply.

14         MISS PEEBLES:  And that the government's

15  theory.  Yeah.  Clarify it on those three counts.

16         THE COURT:  Sure.  I'll do that.  Mr. Fischer?

17         MR. FISCHER:  With that understanding, I don't

18  have any objection, your Honor.

19         THE COURT:  All right.  We'll just hold off a

20  minute so I make sure I know what I'm doing here.  All right.

21  It's in the charge but I'll make sure I clarify it again.

22  Aiding and abetting applies to counts four, five, and seven,

23  right?

24         MISS PEEBLES:  Right.

25         MR. LOVRIC:  That's correct.

USA vs O'Connor and Sacco

2440

1          THE COURT:  Okay.  Bring them in.  To tell

2    them a person is found to be an aider and abettor, that

3    person is guilty of that crime under the theory of aiding and

4    abetting.  If a person is not found to be an aider and

5    abettor, the person cannot be found guilty of that particular

6    crime.

7          MR. LOVRIC:  Unless they committed every

8    element of the theory.

9          THE COURT:  That's the other theory of

10   liability.  That's direct liability.  Maybe I can use that.

11   I've never seen that used in cases so I better not.

12          (Jury present).

13          THE COURT:  All right, ladies and gentlemen.

14   I'm going to try to answer your question the best way I can.

15   I may misperceive your question and if I do, the answer I'm

16   about to give you may not be correct and you are allowed,

17   after hearing my answer, to reassemble in the jury room and

18   say hey, Judge, you missed the boat.  Here's what we really

19   mean.  I'll be glad to try to straighten it out if I can.

20          Now, in the charge you're asked to consider

21   whether these defendants are guilty of seven counts.  Some

22   defendants are named in a count, both defendants are named in

23   some counts and some counts are only applicable to one

24   defendant.  Now you've got all that back in the original

25   instruction and every time you're considering a count in the

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2441

1    indictment your task is to first decide which defendant or

2    both does this count apply to.  Once you figured that out,

3    then you go down and you analyze the elements of that count

4    and you see whether or not the defendant you're considering,

5    whether it's defendant one or defendant two or both of them,

6    has committed each and every element of that crime charged

7    beyond a reasonable doubt.  If you find that the answer to

8    that question is no, then you cannot find that defendant

9    guilty on that count.  However, on counts four, five, and

10   seven, clearly it's stated right here in the charge -- you'll

11   find it, it's on page 59, the government has asked the Court

12   to charge you and I did on another theory of guilt, other

13   than that the defendant you are considering committed each

14   and every element of the crimes in the counts that you just

15   considered.  The government says, wait a minute.  This is

16   another way that a defendant can be found guilty even if they

17   did not commit each and every element of the crime you're

18   considering, and that way is aiding and abetting and I've

19   outlined in the charge exactly what it means to be an aider

20   and abettor.  But before you can use that theory you must

21   find that the other defendant committed the crime charged.

22   If you find that the other defendant committed the crime

23   charged, then you can look back at the defendant that you

24   found didn't commit every element of the crime charged and

25   see if that defendant was an aider and abettor under that

USA vs O'Connor and Sacco

2442

1   theory.  If the answer to that is no, that's the end of it

2   for that defendant.  If the answer to that is yes, then you

3   may find that defendant guilty under that theory of guilt.

4              How does that sound?  Okay.  Fine.  If I

5   missed something, come back and I'll try to go over it with

6   you.  Thank you.

7              (Jury excused).

8              (Continuation of deliberations).

9              THE COURT:  All right.  We have yet another

10  note from the jury.  It's labeled Court Exhibit 3 signed by

11  the foreperson, and reads as follows:  Can we please have the

12  transcript of the first videotape interview of Shannon

13  O'Connor with Detective Blenis and Liz Chesebro?  Answer, I

14  don't think it's in evidence.  However, we can suggest to

15  them they come in and watch the tape itself with the

16  transcript as an aid.  If anybody doesn't object to that or

17  does object to that or --

18             MR. LOVRIC:  I think that's correct, Judge.

19  If they want to either see or view the transcript, they do

20  have to then watch the videotape because the transcript is an

21  aid to the video but the video is the evidence to whatever

22  degree they're looking for -- whatever they're looking for.

23             THE COURT:  I think they should also just be

24  reminded of that because, again, the transcript may or may

25  not be completely accurate but the tape is what it is.  If

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco                    2443

1    they haven't asked for the tape, I'm going to ask the

2    foreperson if that procedure is what he wants or does he want

3    something else.

4                    MR. LOVRIC:  If it is, I have the video, it's

5    qued and ready to go.

6                    THE COURT:  Where's the transcript?

7                    MISS PEEBLES:  Right there.

8                    THE COURT:  Okay.  Is there enough for

9    everybody?

10                   MISS PEEBLES:  I think so.

11                   THE COURT:  Want to bring them in.

12                   (Jury present).

13                   THE COURT:  Okay, ladies and gentlemen.  We

14   have your third note which is labeled Court Exhibit 3 signed

15   by the foreperson and reads as follows.  Can we please have

16   the transcript of the first videotape interview of Shannon

17   O'Connor with the Detective Blenis and Liz Chesebro?

18   Answer's no, unless, unless you want to watch it with the

19   videotape and the reason for that is that the videotape is

20   the evidence.  The transcript was used by you folks as an aid

21   to understanding parts that were hard to understand.  That's

22   the first part of the answer.

23                   Second part is, is there any particular part

24   of the tape or transcript that you're interested in?  If

25   there is, instead of playing it all, we can narrow it down

USA vs O'Connor and Sacco

2444

1    for you.  You don't have to do that.  Can you do that?

2                    THE FOREPERSON:  Yes.

3                    THE COURT:  Should we let you back there to do

4    that?

5                    THE FOREPERSON:  Yes.  We can get the

6    transcript while we're watching the videos, is that true?

7                    THE COURT:  Absolutely.  That's how you get

8    it.  You've got to suffer through the tape.  So if you want

9    to go back and narrow it down and give Vicky a couple of

10   minutes or the equipment operators a couple of minutes.

11                   (Jury excused).

12                   (Jury present).

13                   THE COURT:  All right.  Ladies and gentlemen,

14   the parties have gone through what it is we believe you want

15   to hear and we're now directing your attention to pages 7

16   through 14 included of the transcript.  And as you get to

17   those pages, we will play the tape for you.  And if it's not

18   what you want to hear, let us know after you've heard it.

19                   Okay, Mr. Lovric.

20                   MR. LOVRIC:  Okay.

21                   (Playing Exhibit 88).

22                   MR. FISCHER:  Judge I do believe that is --

23                   THE COURT:  I can't hear a thing.

24                   MR. FISCHER:  I believe that's the end of

25   anything relating to Mrs. O'Connor as I understand it.

USA vs O'Connor and Sacco                    2445

1              THE COURT:  You're saying the tape should be
2    ended where it was stopped?
3              MR. FISCHER:  Yes, sir.
4              THE COURT:  Any problems?  I thought we were
5    going to the end on 14?
6              MISS PEEBLES:  That's right.
7              MR. FISCHER:  I'm sorry, but I do believe
8    that -- all that relates to Miss O'Connor, Judge.
9              THE COURT:  Let's hear from her counsel.
10             MISS PEEBLES:  As far as I know we were going
11   to 14 because that's where we ended.
12             THE COURT:  We got pretty much to the end of
13   14.
14             MISS PEEBLES:  We're just about to the end of
15   it.
16             THE COURT:  Let me ask the jury foreman, is
17   that the information you folks wanted?
18             THE FOREPERSON:  I think we'd like to go to
19   the end of the whole tape because there's more discussion
20   about the camera.
21             MISS PEEBLES:  If it's the camera, it goes on
22   to 15.
23             MR. FISCHER:  There's more than that camera.
24             THE COURT:  Let's go through the end of 15 and
25   we'll inquire again and see if there's more we should play.

                VICKY ANN THELEMAN, RPR, CRR
                UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2446

1          (Playing Exhibit 88).

2          MR. LOVRIC:  Do you want me to continue,

3 Judge?

4          THE COURT:  I want to find out from the

5 foreperson if we need to have more of the tape played?

6          THE FOREPERSON:  I'm hearing they want to go

7 through 17 because there's -- through 17.

8          (Playing Exhibit 88).

9          MR. LOVRIC:  Should I keep going, Judge?

10          THE FOREPERSON:  Yes.  We'll go through to 18,

11 please.

12          (Playing Exhibit 88).

13          MR. LOVRIC:  That's the bottom of 18.

14          THE FOREPERSON:  That's fine.  Thank you.

15 That's fine.  Thank you.

16          THE COURT:  Okay.  All set now?

17          (Jury excused).

18          THE COURT:  We're going to inquire of the jury

19 if they'd like to stay this evening or go home and come back

20 tomorrow.  Colleen is making that inquiry now.  So if you

21 want to stick around, at least to get that answer.

22          They want to go home so we'll bring them in

23 and send them home.

24          (Jury present).

25          THE COURT:  Please be seated.  All right,

USA vs O'Connor and Sacco

2447

1  ladies and gentlemen.  I've been informed that it is your

2  choice to conclude deliberations today, as far as today is

3  concerned and go home and come back tomorrow, is that right?

4  Is that 9:30 a good time for you?  Yes.

5              All right.  Let me remind you not to discuss

6  the case among yourselves, with anybody else or permit anyone

7  to discuss it with you.  Nothing in the media and no research

8  on your own.  We'll see you tomorrow morning at 9:30.  Have a

9  nice evening.

10              (Court stands adjourned).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs O'Connor and Sacco

2448

1      (Continuation of deliberations on May 30, 2008).

2             THE COURT:  Okay.  All right.  We have a note

3  from the jury.  It's labeled Court Exhibit Number 5.  It's

4  signed by the foreperson and reads as follows:  We would like

5  a clarification on aiding and abetting on count five because

6  there was only one defendant.  On page 57 of the jury

7  instructions, under aiding and abetting, it states counts

8  four, five, and seven.  And we're questioning count five.  It

9  only has one defendant.  Well, the way I read the indictment

10 count five charges Linda O'Connor only with a certain

11 specific act.  And if the jury is considering aiding and

12 abetting and if they find Dean Sacco committed those acts,

13 the question is did Linda O'Connor aid and abet Dean Sacco?

14 My thought is no, because Dean Sacco isn't charged with

15 having done anything in count five and, therefore, can't be

16 found guilty of anything in count five, so Linda O'Connor

17 can't aid and abet Dean Sacco.

18             Government have an objection, different view?

19             MISS PEEBLES:  That's our interpretation.

20 That was what we talked about.

21             THE COURT:  Surprise.  Surprise.

22             MR. LOVRIC:  I think that's correct, Judge.

23 What I do think and this is why aiding and abetting I believe

24 was charged as to four, five, and seven, is that as to count

25 five, defendant O'Connor can be aided and abetted by another

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1  in the commission of one element of count five.  I mean,

2  there is no other person that could have committed count five

3  because it requires a legal parent or guardian and the

4  evidence only relates to defendant O'Connor but if defendant

5  O'Connor did not personally commit every element of count

6  five, she can still be found guilty of count five if another

7  person committed an element of count five in aiding and

8  abetting.

9         THE COURT:  The law doesn't say about that,

10  does it?  Please help me, that if somebody commits one

11  element of one crime, then another person who did not commit

12  that crime can aid and abet that person and be found guilty

13  because that person, meaning Dean Sacco, is only found guilty

14  of one element and the crime consists of a number of

15  elements.

16         MR. LOVRIC:  Here's the scenario where I

17  believe that that does hold true, which is the jury can look

18  at count five and say -- if they say to themselves O'Connor

19  committed every element of count five except she did not take

20  the pictures but we believe Sacco took the pictures, the

21  actual photographing, can she still be convicted of count

22  five and my way of looking at it is yes, because someone

23  other than she took the pictures or intended to take the

24  photographs.  If she committed the other elements of the

25  crime, that other person committing the other elements still

USA vs O'Connor and Sacco

2450

1  can hold her accountable for it.

2           THE COURT:  I don't see that that squares at

3  all with what I told this jury about aiding and abetting

4  because I made it clear to this jury that the only way you

5  can find somebody to be an aider and abettor and, therefore,

6  liable as a principal or guilty of a crime is that you must

7  find first that some other person committed that crime and it

8  doesn't say an element of that crime or two elements or four

9  out of five.

10          MR. LOVRIC:  I understand what you're saying,

11 Judge.

12          THE COURT:  I think that's what it is in this

13 case.  I appreciate you offering me your version and I have

14 no problem if you want to take an exception to that charge,

15 in fact, I'll give you one in advance.  Really that's the way

16 I see it.  Want to bring them in.

17          THE CLERK:  Yes, your Honor.

18          (Jury present).

19          THE COURT:  All right, ladies and gentlemen.

20 We have your next note which is now labeled Court Exhibit

21 number 5 signed by your foreperson and it reads as follows.

22 We'd like a clarification on aiding and abetting on count

23 five because there is only one defendant.  On page 57 of the

24 jury instructions, under aiding and abetting it states counts

25 four, five, and seven, and we're questioning count five.  It

USA vs O'Connor and Sacco

2451

1    only has one defendant.  All right.  Let's see if I can

2    answer the question I think you're posing.

3                    First of all, if you find that Linda O'Connor

4    committed each and every element of that crime then you may

5    find her guilty if you find so beyond a reasonable doubt.  If

6    you don't find that that happened, my understanding is that

7    Dean Sacco can't be convicted of count five because the last

8    I heard he wasn't a parent, guardian or person having custody

9    or control over Shannon.  Well, if he can't commit that

10   crime, then the defendant O'Connor can't aid and abet because

11   there's no crime committed.  So it's a one-shot deal against

12   Defendant O'Connor the way the Court sees it.  So I don't

13   know why five got in there.

14                  THE FOREPERSON:  That was our question.

15                  THE COURT:  Is that what you guys wanted to

16   know?

17                  THE FOREPERSON:  Yes.

18                  THE COURT:  Thank you very much.

19                  (Jury excused)

20                  (In Chambers).

21                  THE COURT:  I think something that I didn't

22   fully address, as I told the jury about the analysis of

23   aiding and abetting on count five is the question of Dean

24   Sacco's liability as an aider and an abettor.  It would seem

25   to me if the jury decides that Linda O'Connor, in fact, did

USA vs O'Connor and Sacco

2452

```
 1   commit each and every element of count five beyond a
 2   reasonable doubt, that then they can look at Dean Sacco to
 3   see if he did anything that would make him an aider and
 4   abettor under that theory.  The problem is I was told by my
 5   law clerk Seth that there is only one line on the jury
 6   verdict which indicates the innocence or guilt of Linda
 7   O'Connor and that there should be another line there that
 8   would allow the jury to decide the question of aiding and
 9   abetting on behalf of Sacco.  You say no?
10              MR. LOVRIC:  Yes.
11              THE COURT:  Tell me why.
12              MR. LOVRIC:  The grand jury did not indict
13   Mr. Sacco on count five.  Count five only charges --
14              THE COURT:  We know that, Miro.  Was he -- he
15   wasn't even under Section 2 as to that statute?
16              MR. LOVRIC:  He is not charged in count five.
17              THE COURT:  We know that.
18              MR. LOVRIC:  How could you have a jury ask to
19   render a verdict as to Sacco on a count that he's not charged
20   in?
21              THE COURT:  As an aider and abettor.
22              MR. LOVRIC:  He's not charged, Judge.
23              THE COURT:  You didn't charge him?
24              MR. LOVRIC:  On count five, no.
25              MR. EGAN:  Take off aiding and abetting as to
```

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2453

1 count five.

2          MISS PEEBLES:  I guess my understanding is you

3 think it applies because you think if Linda commits three of

4 the elements and Sacco can fill in the fourth, that's

5 what --

6          THE COURT:  I reject that argument.

7          MR. LOVRIC:  Well, I'm not going to mix

8 arguments.  I'm not going to reargue that argument either but

9 I know what you said, but Dean Sacco is not charged in count

10 five.

11          THE COURT:  We know that.

12          MR. LOVRIC:  So he can't --

13          THE COURT:  Has he been charged as an aider

14 and abettor to count five, notwithstanding he's not charged

15 in count five?

16          MR. LOVRIC:  Yes, I believe that he has but

17 that doesn't answer the question as to whether or not the

18 jury needs to find anything as to him because --

19          MR. EGAN:  It's just a fun exercise?

20          MR. LOVRIC:  No.  How is this different if

21 there's only one defendant in a case and we're claiming that

22 unindicted co-conspirator -- or an unindicted person aided

23 and abetted.  You don't put the unindicted person's name in

24 the indictment to say did this -- the person committed this

25 crime.  You simply put the defendant's name, give them the

USA vs O'Connor and Sacco

1  legal charge.  You find out -- you figure out whether or not

2  he aided and abetted.

3                    THE COURT:  Let's hold the record for a

4  minute.

5                    (Discussion held off the record).

6                    (Continuation of deliberations).

7                    THE COURT:  All right.  Ladies and gentlemen,

8  we have a note from the jury labeled Court Exhibit number 6

9  and it reads as follows:  We've reached a verdict.  So you

10 ready to bring them in?

11                   MISS PEEBLES:  Yes.

12                   MR. FISCHER:  Yes.

13                   (Jury present).

14                   THE COURT:  All right, ladies and gentlemen.

15                   THE CLERK:  Ladies and gentlemen of the jury,

16 have you agreed upon a verdict, and if so, how do you find

17 and who shall say for you.  Will the foreperson please rise.

18                   In the matter United States of America versus

19 Dean Sacco and Linda O'Connor, 2008-CR-77.

20                   As to the crime charged in count one of the

21 indictment as to Defendant O'Connor, how do you find?

22                   THE FOREPERSON:  Guilty.

23                   THE CLERK:  So say you all?

24                   (All jurors say yes).

25                   THE CLERK:  As to the crime charged in count

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2455

1  two of the indictment as to Defendant Sacco, how do you find?

2                 THE FOREPERSON:  Guilty.

3                 THE CLERK:  So say you all?

4                 (All jurors say yes).

5                 THE CLERK:  As to the crime charged in count

6  three of the indictment, how do you find as to Defendant

7  O'Connor?

8                 THE FOREPERSON:  Guilty.

9                 THE CLERK:  So say you all?

10                 (All jurors say yes).

11                 THE CLERK:  As to Defendant Sacco, how do you

12  find?

13                 THE FOREPERSON:  Guilty.

14                 THE CLERK:  So say you all?

15                 (All jurors say yes).

16                 THE CLERK:  As to the crime charged in count

17  four of the indictment, how do you find as to Defendant

18  O'Connor?

19                 THE FOREPERSON:  Not guilty.

20                 THE CLERK:  So say you all?

21                 (All jurors say yes).

22                 THE CLERK:  As to Defendant Sacco?

23                 THE FOREPERSON:  Guilty.

24                 THE CLERK:  So say you all?

25                 (All jurors say yes).

USA vs O'Connor and Sacco

2456

1          THE CLERK:  As to crime charged in count five
2   of the indictment as to Defendant O'Connor, how do you find?
3          THE FOREPERSON:  Guilty.
4          THE CLERK:  So say you all?
5          (All jurors say yes).
6          THE CLERK:  As to the crime charged in count
7   six of the indictment as to Defendant Sacco, how do you find?
8          THE FOREPERSON:  Guilty.
9          THE CLERK:  So say you all?
10          (All jurors say yes).
11          THE CLERK:  As to the crime charged in count
12   seven of the indictment, how do you find as to Defendant
13   O'Connor?
14          THE FOREPERSON:  Not guilty.
15          THE CLERK:  So say you all?
16          (All jurors say yes).
17          THE CLERK:  As to Defendant Sacco?
18          THE FOREPERSON:  Guilty.
19          THE CLERK:  So say you all?
20          (All jurors say yes).
21          THE COURT:  All right.  Would anybody from the
22   defense side like the jury polled?
23          MISS PEEBLES:  Yes, your Honor.
24          THE COURT:  Okay.  We'll do that.
25          THE CLERK:  Juror number one, was the

USA vs O'Connor and Sacco

2457

1    verdict as reported by the foreperson your verdict?

2                        JUROR NO. 1:  Yes.

3                        THE CLERK:  Is it now your verdict?

4                        JUROR NO. 1:  Yes.

5                        THE CLERK:  Was this verdict freely and

6    voluntarily entered into by you?

7                        JUROR NO. 1:  Yes.

8                        THE CLERK:  Thank you.  You may be seated.

9                        Juror number two, was the

10   verdict as reported by the foreperson your verdict?

11                       JUROR NO. 2:  Yes.

12                       THE CLERK:  Is it now your verdict?

13                       JUROR NO. 2:  Yes.

14                       THE CLERK:  Was this verdict freely and

15   voluntarily entered into by you?

16                       JUROR NO. 2:  Yes.

17                       THE CLERK:  Thank you.  You may be seated.

18                       Juror number three, was the

19   verdict as reported by the foreperson your verdict?

20                       JUROR NO. 3:  Yes.

21                       THE CLERK:  Is it now your verdict?

22                       JUROR NO. 3:  Yes.

23                       THE CLERK:  Was this verdict freely and

24   voluntarily entered into by you?

25                       JUROR NO. 3:  Yes.

USA vs O'Connor and Sacco

2458

1          THE CLERK:  Thank you.  You may be seated.

2          Juror number four, was the

3   verdict as reported by the foreperson your verdict?

4          JUROR NO. 4:  Yes.

5          THE CLERK:  Is it now your verdict?

6          JUROR NO. 4:  Yes.

7          THE CLERK:  Was this verdict freely and

8   voluntarily entered into by you?

9          JUROR NO. 4:  Yes.

10          THE CLERK:  Thank you.  You may be seated.

11          Juror number five, was the

12   verdict as reported by the foreperson your verdict?

13          JUROR NO. 5:  Yes.

14          THE CLERK:  Is it now your verdict?

15          JUROR NO. 5:  Yes.

16          THE CLERK:  Was this verdict freely and

17   voluntarily entered into by you?

18          JUROR NO. 5:  Yes.

19          THE CLERK:  Thank you.  You may be seated.

20          Juror number six, was the

21   verdict as reported by the foreperson your verdict?

22          JUROR NO. 6:  Yes.

23          THE CLERK:  Is it now your verdict?

24          JUROR NO. 6:  Yes.

25          THE CLERK:  Was this verdict freely and

USA vs O'Connor and Sacco

2459

1   voluntarily entered into by you?

2                    JUROR NO. 6:  Yes.

3                    THE CLERK:  Thank you.  You may be seated.

4                    Juror number seven, was the

5   verdict as reported by the foreperson your verdict?

6                    JUROR NO. 7:  Yes.

7                    THE CLERK:  Is it now your verdict?

8                    JUROR NO. 7:  Yes.

9                    THE CLERK:  Was this verdict freely and

10  voluntarily entered into by you?

11                   JUROR NO. 7:  Yes.

12                   THE CLERK:  Thank you.  You may be seated.

13                   Juror number eight, was the

14  verdict as reported by the foreperson your verdict?

15                   JUROR NO. 8:  Yes.

16                   THE CLERK:  Is it now your verdict?

17                   JUROR NO. 8:  Yes.

18                   THE CLERK:  Was this verdict freely and

19  voluntarily entered into by you?

20                   JUROR NO. 8:  Yes.

21                   THE CLERK:  Thank you.  You may be seated.

22                   Juror number nine, was the

23  verdict as reported by the foreperson your verdict?

24                   JUROR NO. 9:  Yes.

25                   THE CLERK:  Is it now your verdict?

USA vs O'Connor and Sacco

2460

1                      JUROR NO. 9:  Yes.

2                      THE CLERK:  Was this verdict freely and

3    voluntarily entered into by you?

4                      JUROR NO. 9:  Yes.

5                      THE CLERK:  Thank you.  You may be seated.

6                      Juror number ten, was the

7    verdict as reported by the foreperson your verdict?

8                      JUROR NO. 10:  Yes.

9                      THE CLERK:  Is it now your verdict?

10                     JUROR NO. 10:  Yes.

11                     THE CLERK:  Was this verdict freely and

12   voluntarily entered into by you?

13                     JUROR NO. 10:  Yes.

14                     THE CLERK:  Thank you.  You may be seated.

15                     Juror number eleven, was the

16   verdict as reported by the foreperson your verdict?

17                     JUROR NO. 11:  Yes.

18                     THE CLERK:  Is it now your verdict?

19                     JUROR NO. 11:  Yes.

20                     THE CLERK:  Was this verdict freely and

21   voluntarily entered into by you?

22                     JUROR NO. 11:  Yes.

23                     THE CLERK:  Thank you.  You may be seated.

24                     Juror number twelve, was the

25   verdict as reported by the foreperson your verdict?

USA vs O'Connor and Sacco                    2461

1                      JUROR NO. 12:  Yes.

2                      THE CLERK:  Is it now your verdict?

3                      JUROR NO. 12:  Yes.

4                      THE CLERK:  Was this verdict freely and

5       voluntarily entered into by you?

6                      JUROR NO. 12:  Yes.

7                      THE CLERK:  Thank you.  You may be seated

8                      THE COURT:  Ladies and gentlemen, it's been a

9       long, arduous matter and the Court is aware that you folks

10      worked very, very hard on it.  As I said earlier yesterday or

11      the day before, I guess it was now, when we let the alternate

12      jurors go, the Court noted that you paid strict attention to

13      everything put before you and I'm sure that you worked very

14      hard and there's a lot of emotional pulling and tugging and

15      various points of view and that's why a jury has to work so

16      very, very hard to reconcile all of those different points

17      that are put before you and come out with a verdict.  Let me

18      tell you I'm very relieved that you came out with a verdict

19      because if you didn't, we would have had to try this all over

20      again.  Can you imagine that?  But in any event, we really

21      want to thank you on behalf of the parties and the attorneys.

22      They all did a good job in this case.  Got a little

23      contentious as we were going along but by in large everybody

24      did their part, you people did the best part of all by

25      returning a verdict, and as I've said to other juries,

USA vs O'Connor and Sacco

2462

1  nothing short of serving in the military can be as important

2  to your country as what you've done here in this courtroom.

3          Now I'd ask you to retire -- wait a minute,

4  Colleen, do they have come back?

5          THE CLERK:  Your Honor, we're going to

6  permanently excuse them with the thanks of the Court.

7          THE COURT:  Does that mean forever?

8          THE CLERK:  It means for the next two years.

9          THE COURT:  Two years off.  We're going to ask

10  you to go back in the jury room and I'll come back and talk

11  to you for a few minutes on various matters and we'll get you

12  out of here in 10, 15 minutes.  Thank you very much.

13          (Jury excused).

14          THE COURT:  Okay.  Under Rule 29(c) of the

15  Federal Rules of Criminal Procedure, a motion for judgment of

16  acquittal after discharge of the jury must be made within

17  seven days after the jury is discharged or within such

18  further time as the Court may fix during the seven-day

19  period.  That means you actually have to make the motion.

20  Doesn't mean you've got to give me the briefs or do anything

21  like that but even a short note to tell the Court that you're

22  making the motion will do and stop that time from running.  A

23  lot of people say, well, just apply to the Judge for an

24  extension.  That's not enough.  Got to actually file the

25  motion.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco

2463

1          Under Rule 33, motion for a new trial based on

2     the ground of newly discovered evidence may be made only

3     before or within two years of the final judgment, but if an

4     appeal is pending the Court may grant the motion only on

5     remand of the case.

6          A motion for a new trial based on any other

7     grounds shall be made within seven days after verdict or

8     finding of guilty or within such further time as the Court

9     may fix during the seven-day period.  Any appeal that is

10    going to be taken in this case must be taken within ten days

11    after the entry of judgment.

12         The Court is going to set sentencing for

13    Defendant O'Connor for Tuesday, September 30 at 9:30 AM in

14    Binghamton, New York and for Defendant Sacco, Wednesday

15    October 1, at 9:30 AM in Binghamton, New York.

16         Is there anything further at this time from

17    the government or the defendants?

18              MR. LOVRIC:  No, your Honor.

19              MISS PEEBLES:  No.

20              MR. FISCHER:  No, your Honor.

21              MR. LOVRIC:  The only application I have,

22    Judge, is that the Court issue an order remanding both

23    defendants pursuant to the statute post conviction because

24    thus far they've been on pretrial detention.  I would ask the

25    appropriate statute be imposed for detainment.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs O'Connor and Sacco                                    2464

1              THE COURT:  That's granted.  So ordered.

2  They're remanded.

3              MR. FISCHER:  Your Honor, with respect to the

4  forfeiture count in the indictment, is it my understanding

5  that that was going to be dismissed but I may have

6  misunderstood.

7              THE COURT:  You want to talk about that in

8  chambers?

9              MR. FISCHER:  I don't know that we need to.

10             THE COURT:  What's the government's position?

11             MR. LOVRIC:  Judge, I think I indicated that

12  previously and that the forfeiture allegation will be

13  dismissed at the time of sentencing.  We no longer seek to

14  forfeit the property of Mr. Sacco because he doesn't own that

15  anymore.

16             THE COURT:  That ought to work for you.

17             MR. FISCHER:  Yes, sir.  Thank you.

18             THE COURT:  Court stands adjourned in this

19  matter.

20             (Court stands adjourned)

21

22

23

24

25

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

2465

1                C E R T I F I C A T I O N

2

3

4         I, VICKY A. THELEMAN, RPR, CRR, United

5   States Court Reporter in and for the United States

6   District Court, Northern District of New York, do

7   hereby certify that I attended at the time and place

8   set forth in the heading hereof; that I did make a

9   stenographic record of the proceedings had in this

10  matter and cause the same to be transcribed; that

11  the foregoing is a true and correct copy of the same

12  and the whole thereof.

13

14

15                         _____

16                         VICKY A. THELEMAN, RPR, CRR

17                         United States Court Reporter

18                         US District Court – NDNY

19

20

21  Dated:  November 18, 2008.

22

23

24

25